# EXHIBITS 1-2

## REDACTED IN THEIR ENTIRETY

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff and Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## **DEFENDANTS' NOTICE OF DEPOSITION OF MASAYOSHI SON**

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure and District of Delaware Local Rule 30.1, on a date and time to be mutually agreed upon by the parties, Defendants Qualcomm Incorporated, Qualcomm Technologies, Inc. (collectively "Qualcomm"), and Nuvia, Inc. ("Nuvia") (collectively "Defendants"), by and through their attorneys, will take the deposition by oral examination of Masayoshi Son.

The deposition will be conducted at a location to be mutually agreed upon by the parties within the United States. The deposition will take place before a court reporter or other person authorized to administer oaths and will be conducted in accordance with the Federal Rules of Civil Procedure. The deposition shall continue day to day until completed. The deposition will be taken for the purposes of discovery, for use at trial or any other hearing in this matter, and for any other purposes permitted under the Federal Rules of Civil Procedure.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Andrea L. D'Ambra
Susana Medeiros
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019
(212) 318-3000

Kira Latham
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
(214) 855-8000


August 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 30, 2023, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Michael A. Jacobs, Esquire                                 *VIA ELECTRONIC MAIL*
Joyce Liou, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                     *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                                *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Ruohan (Jack) Li, Esquire                          *VIA ELECTRONIC MAIL*
Daniel P. Muino, Esquire
Fahd Hussein Patel, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*


                                    */s/ Jennifer Ying*
                                    _____
                                    Jennifer Ying (#5550)

# EXHIBIT 4

**⊪ORRISON ⊪ FOERSTER**

4200 REPUBLIC PLAZA
370 SEVENTEENTH STREET
DENVER
COLORADO 80202-5638

TELEPHONE: 303.592.1500
FACSIMILE: 303.592.1510

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI,
NEW YORK, PALO ALTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

September 15, 2023

By email

Melissa Felder Zappala
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047

Writer's Direct Contact
+1 (303) 592-2204
SLlewellyn@mofo.com

Re:     *Arm Ltd. v. Qualcomm Inc. et al.*
        C.A. No. 22-1146-MN

Counsel:

We write regarding Qualcomm's Notice of Deposition of Masayoshi Son, dated August 30,
2023.  As set forth below, the noticed deposition of Mr. Son would impose an undue burden
on an "apex" witness located in Japan and subject to deposition limits under Japanese law,
who does not focus on Arm's day-to-day operations, instead having significant roles at
numerous other entities.

The "apex" doctrine "recognizes that depositions of high-level officers severely burden those
officers and the entities they represent, and that adversaries might use this severe burden to
their unfair advantage."  *See, e.g.*, *United States ex rel. Galmines v. Novartis
Pharmaceuticals Corporation*, 2015 WL 4973626, at * 1 (E.D. Pa. 2015).  Accordingly,
Courts have limited access to high-ranking executives even when (unlike here) they are
involved in the day-to-day operations of the relevant party.  *Reif v. CNA*, 248 F.R.D. 448,
452 (E.D. Pa. 2008) (courts "have the discretion to prevent oppressive, harassing,
inconvenient, and burdensome depositions of executive officials"); *see also In re Jevic
Holding Corp.,* 526 B.R. 547, 556 (D. Del. 2014) (quashing subpoena directed to co-CEOs),
*affd,* 656 F. App'x 617 (3d Cir. 2016).

As Arm has repeatedly made clear in prior correspondence, Mr. Son is not an employee of
Arm, nor is he involved in the day-to-day operations of Arm, unlike Arm's current CEO,
Mr. Haas.  Instead, while being Arm's chair, Mr. Son has significantly greater
responsibilities with other entities, such as Chairman and CEO of various Softbank entities.
Because Qualcomm has also noticed the depositions of Arm's previous and current CEOs
(Rene Haas and Simon Segars), who obviously had greater involvement in Arm's day-to-day
operations, Qualcomm has no basis to depose Mr. Son for (at most) duplicative discovery.
*See, e.g.*, *Piontek v. I.C. Sys.*, No. 1:08–1207, 2008 WL 7674787, at * 1 (M.D. Pa. Oct.22,
2008) (holding that defendant need not make its CEO available for deposition where two
other employees with superior knowledge of the case were already available for deposition).

# ||ORRISON ⏚ FOERSTER

Melissa Felder Zappala
September 15, 2023
Page Two

This burden on a third "apex" witness is particularly unwarranted where Arm has already



These documents confirm that Mr. Son does not have
unique information relevant to this case, beyond what Qualcomm could obtain from other
"apex" witnesses in this case, and Qualcomm has not shown otherwise.  The production of
███████████████, combined with the ability to depose the current and former CEOs of
Arm, renders any deposition of Mr. Son cumulative, duplicative, unreasonable, and
disproportional.

Qualcomm also ignores the limits Japanese law places on the deposition of a Japanese citizen
and resident like Mr. Son:

First, for unwilling deponents, Japanese law requires the issuance of letters rogatory.  *J.C.
Renfroe & Sons, Inc. v. Renfroe Japan Co., Ltd.*, 515 F. Supp. 2d 1258, 1272 (M.D. Fla.
2007).  Courts have discretion to deny requests for letters rogatory, and have done so where
the process is not likely to yield non-duplicative information in a timely fashion.  *See, e.g.*,
*Horvath v. Deutsche Lufthansa, AG*, No. 02 Civ. 3269, 2004 U.S. Dist. LEXIS 1733, 2004
WL 241671, at *13 (S.D.N.Y. Feb. 9, 2004) (denying motion for reconsideration where
"defendant has presented no evidence that even were this court to issue a commission for the
deposition upon written questions . . . those questions in fact would be answered, let alone
answered in a timely fashion").

Second, for willing deponents, Japanese law permits depositions only in a few locations, and
requires attending lawyers to obtain visas.  U.S. Embassy & Consulates in Japan,
https://jp.usembassy.gov/services/depositions-in-japan/ (last visited Sep. 7, 2023).
Accordingly, even if Qualcomm could establish a legitimate basis for the deposition of
Mr. Son, Qualcomm seems unlikely to be able to depose Mr. Son until well after the close of
fact discovery.

Qualcomm's deposition notice for Mr. Son also fails to expressly limit its scope to Mr. Son's
role as Arm's chair.  As Arm has repeatedly made clear, Arm does not represent Mr. Son
personally, or in his capacity with other entities at which Mr. Son holds various positions.
To the extent Qualcomm's notice is not limited to Mr. Son's role as Arm's chair, Arm cannot
accept service, because the notice effectively and improperly seeks third-party discovery
through Arm.

**ⅢORRISON ꓱOERSTER**

Melissa Felder Zappala
September 15, 2023
Page Three


Sincerely,

*/s/ Scott F. Llewellyn*

Scott F. Llewellyn
Partner

# EXHIBIT 5

| | |
|---|---|
| **From:** | Gressel, Anna R |
| **Sent:** | Thursday, September 21, 2023 6:33 PM |
| **To:** | Li, Jack; Vaughn, Madalyn; Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Morgan, Erin J; Zappala, Melissa Felder; Braly, Jacob; jblumenfeld@morrisnichols.com; jying@morrisnichols.com |
| **Cc:** | Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Fung, Nicholas Rylan; Patel, Fahd H.; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC |
| **Subject:** | RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN |

Counsel,

We are disappointed in your response to our email, and strongly dispute your characterization of our discussion. We also note, again, that Qualcomm has provided ARM with a strong basis for understanding our contention concerning the relevance and importance of Mr. Son's deposition, which is referenced in our prior correspondence.

We are also unclear about what proposed "workaround" ARM is now purporting to offer, as we understand based on the email below that any such offer would not involve making Mr. Son available for a deposition in this matter. Before we proceed with our conversations, we simply need a threshold understanding of your position, and therefore the areas of potential discussion. To that end, we reiterate our request for ARM to confirm, by no later than 8:00pm ET on Friday, September 22, the following items:

- Please confirm that ARM is refusing to offer Mr. Son as a deponent based on the apex doctrine. If this is not accurate, please provide the precise conditions under which ARM will make Mr. Son available as a deponent in this matter.
- Please confirm whether Mr. Son is a "willing" or "unwilling" deponent under Japanese law, as discussed in your September 15 letter.
- Please confirm whether Mr. Son has been made aware that his deposition has been noticed in this litigation. If Mr. Son has been made aware of his deposition notice, please confirm when this occurred.
- Pease provide the details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period.

Presuming we do not hear back from you with responses by then, we will understand that your position on refusing to make Mr. Son available for a deposition remains unchanged. We believe it would be most productive to confer once we have your written response on these questions, which will enable us to move discussions forward. We are available on Monday from 2:30-4:00pm ET.

Regards,
Anna


**Anna R. Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

**From:** Li, Jack <JackLi@mofo.com>
**Date:** Thursday, Sep 21, 2023 at 12:26 PM
**To:** Gressel, Anna R <agressel@paulweiss.com>, Vaughn, Madalyn <mvaughn@paulweiss.com>, Dunn, Karen L <kdunn@paulweiss.com>, Isaacson, William A <wisaacson@paulweiss.com>, Nyarady, Catherine <cnyarady@paulweiss.com>, Morgan, Erin J <ejmorgan@paulweiss.com>, Zappala, Melissa Felder <mzappala@paulweiss.com>, Braly, Jacob <jbraly@paulweiss.com>, jblumenfeld@morrisnichols.com <jblumenfeld@morrisnichols.com>, jying@morrisnichols.com <jying@morrisnichols.com>
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>, Jacobs, Michael A. <MJacobs@mofo.com>, Llewellyn, Scott F. <SLlewellyn@mofo.com>, Muino, Daniel P. <DMuino@mofo.com>, Mooney, Kyle W. <KMooney@mofo.com>, Liou, Joyce <JLiou@mofo.com>, Fung, Nicholas Rylan <NFung@mofo.com>, Patel, Fahd H. <FPatel@mofo.com>, Brickey, Sarah E. <SBrickey@mofo.com>, Davenport, Lydia <LDavenport@mofo.com>, rvrana@ycst.com <rvrana@ycst.com>, agaza@ycst.com <agaza@ycst.com>, YCST_Arm_Qualcomm@ycst.com <YCST_Arm_Qualcomm@ycst.com>, GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We write in response to your email regarding Defendants' notice of deposition of Masayoshi Son.

We disagree with your characterization of yesterday's meet-and-confer. You have mischaracterized our representations and misrepresented our positions – even after we repeatedly corrected you on the call. As Arm has repeatedly made clear, Arm is disappointed by Qualcomm's focus on concocting self-serving narratives and prematurely creating alleged "impasses." As just one example, your email accuses Arm of "unpreparedness to address these considerations during the meet and confer." But Qualcomm failed to disclose any of "these considerations" or provide any substantive response to Arm's letter before the meet-and-confer. We have repeatedly asked Qualcomm to disclose its position(s) before our meet-and-confers to facilitate productive discussions between the parties. Yet Qualcomm failed to do so before the call yesterday, and thus plainly bears sole responsibility for the parties to not have a more productive discussion. Nevertheless, we remain optimistic that the parties can resolve, or at least narrow, their disputes regarding this subject.

During the meet-and-confer, Arm reiterated its position that the Apex doctrine bars Mr. Son's deposition given, *inter alia*, Qualcomm's deposition notices for two Arm CEOs with day-to-day responsibilities at Arm; in contrast, Mr. Son's position as Chair of Arm's Board of Directors does not involve day-to-day responsibility at Arm. Your email repeats and references Qualcomm's prior communication regarding Qualcomm's request for Mr. Son to be a custodian. As you are aware, however, Arm did not agree to Qualcomm's previous request, and maintained that Mr. Son should not be a custodian under the Apex doctrine, which Qualcomm conceded by agreeing Mr. Son would not be a custodian. Your email also does not take account of the full scope of parties' prior communications on this issue, stopping your citation at Qualcomm's May 16 letter, thereby ignoring Arm's subsequent response explaining that Qualcomm "fails to articulate a sufficient basis for Mr. Son to serve as a custodian." (S. Llewellyn Correspondence dated May 26, 2023.)

Nevertheless, in the interest of resolving or at least narrowing these issues, Arm will revisit Qualcomm's prior correspondence cited in your email regarding the custodian issue, based on your email's suggestion that these prior communications encompass Qualcomm's position regarding Qualcomm's proposed deposition of Mr. Son. We will also consider whether there is a workaround permitting Qualcomm to explore facts for which it might contend Mr. Son has unique knowledge, without burdening Mr. Son or burdening the Court with an unnecessary dispute. Any proposed workaround will, of course, depend on the specific subject matter and scope of issues identified by Qualcomm.

Meanwhile, we ask Qualcomm to provide the following information for Arm's consideration: (1) any facts relevant to the claims or defenses in this case for which Mr. Son allegedly has superior or unique knowledge that is not already set forth in Qualcomm's prior correspondence regarding the custodian issue or Qualcomm's

response to Interrogatory No. 6;  and (2) an explanation as to why those facts could not be explored via other witnesses, including the Arm's current CEO (Rene Haas) or previous CEO (Simon Segars) – both of whom Qualcomm has noticed for deposition.

Qualcomm asks Arm to confirm "whether Arm is taking the position that Mr. Son is a 'willing' or 'unwilling' deponent under Japanese law," which would impact whether Qualcomm must proceed by letters rogatory.  First, Qualcomm's request is conceptually mistaken.  Whether Mr. Son is a willing or unwilling deponent under Japanese law is not a position for *Arm* to take, particularly given Qualcomm's refusal to limit the scope of the proposed deposition to Mr. Son's role as Arm's chair.  Please provide any authority supporting Qualcomm's apparent suggestion that Arm has the authority to decide whether Mr. Son is a willing deponent, let alone making such a decision for a deposition in Mr. Son's personal capacity or his capacity with many other entities.  Second, as we stated on the call, Qualcomm's request would become relevant only if Apex protections did not apply and if Qualcomm had already secured a location in Japan to depose Mr. Son.

Qualcomm made several requests for Mr. Son's schedule, calendar, and travel plans during the call, which your email below clarified as a request for "the details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period."  First, as stated on the call, Arm does not believe that this information is relevant, given Arm's objections under the Apex doctrine and Qualcomm's failure to limit its deposition request to Mr. Son's role as Arm's chair, especially in view of the breadth and irrelevant details encompassed by Qualcomm's request.  Further, we are not aware of any basis for Qualcomm to suggest that Mr. Son's travel plans might affect the protections afforded by Japanese law for depositions of Japanese citizens and residents like Mr. Son.  Nonetheless, to permit Arm to further consider Qualcomm's request, please provide any authority supporting Qualcomm's request for *Arm* to provide the details of Mr. Son's calendar "during each day of the remaining fact discovery period," given (1) such details would likely encompass irrelevant information concerning the many third-party businesses with whom Mr. Son holds significant roles, (2) such details would be irrelevant to Arm's other objections under the Apex doctrine and to the protections afforded by Japanese law.

We are considering the specific requests in your email and will provide a follow-up response promptly.  However, given the timing of your email at 11:20 PM ET, and the time differences involved, we will likely need more time to respond than the arbitrary deadline Qualcomm seeks to impose.  We note that Qualcomm continues to unreasonably demand responses within hours, even though it took Qualcomm five days to respond to Arm's letter regarding this issue, and has flatly ignored Arm's concerns in other contexts for weeks.  By way of example, when Arm provided Qualcomm three days to respond regarding Arm's requested additional search terms, Qualcomm failed to provide any response for more than two weeks, despite Arm's repeated follow-ups and Qualcomm's availability to correspond on its own issues in the meantime.  (*See* Qualcomm's Sep. 11, 2023 response to S. Llewellyn Correspondence dated Aug. 25, 2023.)   As another example, after Arm promptly responded within two days to Qualcomm's email regarding Mr. Son's documents, it took Qualcomm two weeks to follow up.  (*See* M. Vaughn Aug. 25, 2023 email in response J. Li Aug. 11, 2023 email.)  Curiously, Qualcomm now accuses Arm of "delay" regarding Mr. Son's documents, even though Qualcomm failed to promptly respond to Arm's correspondence.  Qualcomm's inconsistency on the importance of quick responses, let alone demands for responses from Arm within hours of learning Qualcomm's positions, further suggests Qualcomm is not approaching discovery issues in good faith, but is instead trying to manufacture a purported impasse despite the parties' ongoing discussions.  This is particularly clear where the parties have repeatedly reached acceptable resolutions on other issues via the meet-and-confer process.

Please provide Qualcomm's availability tomorrow and Monday to further meet and confer regarding Qualcomm's notice to depose Mr. Son, as the parties continue to discuss and resolve or narrow these issues.

Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Gressel, Anna R <agressel@paulweiss.com>
**Sent:** Wednesday, September 20, 2023 11:20 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

<mark>External Email</mark>

---

Counsel,

We write to follow up on today's meet and confer concerning Qualcomm's notice of deposition for Mr. Son.  We understand from today's meeting and from your September 15 letter that ARM has taken the position that, in reliance on the "apex doctrine," it will not allow Qualcomm to depose Mr. Son.  However, we were surprised and disappointed to learn that ARM was unprepared today to discuss the substance of each party's respective positions, which could have aided in resolving this dispute or determining whether there are conditions under which the deposition could take place.

We were particularly surprised, and frankly, confused to hear that ARM claimed to be unaware of Qualcomm's position with respect to Mr. Son's relevant and unique knowledge of certain issues, including ARM's false and disparaging statements, through Mr. Son and/or Softbank, to third parties, including Qualcomm's customers.  ARM was put on notice of Qualcomm's position on this topic in February of this year at the very latest.  In fact, Qualcomm put this topic at issue in its October 26, 2022 Answer and Amended Counterclaim, and ████████████████████████████████████████████████████████  And consistently throughout the first half of this year, Qualcomm has explained the reasons for requesting discovery from Mr. Son, and specifically, the topics about which Mr. Son has unique and relevant knowledge—e.g., ARM's false and disparaging statements, through Mr. Son, to Qualcomm's customers. *See, e.g.*, Letter from M. Zappala dated March 7, 2023; Letter from M. Zappala dated April 19, 2023; Letter from M. Zappala dated May 1, 2023; Letter from M. Zappala dated May 16, 2023.  While negotiations took place concerning Mr. Son's status as a custodian, and the issue was tabled pending Mr. Son's document production, at no point did Qualcomm ever change its position

with respect to Mr. Son's relevant and unique knowledge concerning the at-issue communications with third parties and Qualcomm's customers. Given this, ARM's purported unawareness concerning Qualcomm's position on this issue, or its unpreparedness to address these considerations during the meet and confer, is simply incomprehensible.

Furthermore, because ARM was unprepared to hold substantive discussions at today's meeting about each party's respective position on the apex doctrine and Mr. Son's deposition, and given the late stage of fact discovery the parties find themselves in and the fact that 21 days have passed since Mr. Son was noticed, please confirm whether ARM will refuse to offer Mr. Son as a deponent based on the apex doctrine by no later than 3:00 pm ET tomorrow (September 21). By this time, please also confirm whether ARM is taking the position that Mr. Son is a "willing" or "unwilling" deponent under Japanese law, as discussed in your September 15 letter.

We were also troubled by your unwillingness during the meet and confer to confirm or deny whether Mr. Son has even been made aware that his deposition has been noticed in this litigation. Accordingly, by 3:00pm ET on September 21 please also confirm whether and when Mr. Son was made aware that he has been noticed for a deposition.

Finally, please provide the details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period.

Regards,
Anna

**Anna R Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Monday, September 18, 2023 2:22 PM
**To:** Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Thanks, Jack. We will circulate an invite for 1:30 p.m. ET on Wednesday, September 20.

Best,
Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**

1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3974 (Direct Phone) | 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Monday, September 18, 2023 5:05 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We are available to meet and confer on Wednesday (Sep. 20) from 1:30 to 2 PM ET, 3:30 to 4 PM ET, or after 4:30 PM ET.  Please circulate an invite.

Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Monday, September 18, 2023 12:40 PM
**To:** Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN


**External Email**

Counsel:

We write in response to your September 15, 2023 letter concerning Qualcomm's deposition notice of Mr. Son.  We are available to meet and confer regarding ARM's letter tomorrow at 2 p.m. ET.  Please confirm that time works for ARM and we will circulate a dial-in.

Best,
Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3974 (Direct Phone) | 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Friday, September 15, 2023 9:11 PM
**To:** Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com
**Subject:** ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

Please see the attached correspondence.

Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn

about Morrison & Foerster LLP's [Privacy Policy](#).
.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

==============================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).
.

==============================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).
.

# EXHIBIT 6

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Friday, September 22, 2023 7:56 PM
**To:** Gressel, Anna R; Vaughn, Madalyn; Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Morgan, Erin J; Zappala, Melissa Felder; Braly, Jacob; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Fung, Nicholas Rylan; Patel, Fahd H.; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We are writing in response to your email last night regarding Defendants' notice of deposition of Masayoshi Son.

We are disappointed that you have again pointed only to "prior correspondence" and have not provided for Arm's consideration:  (1) any specific facts relevant to the claims or defenses in this case for which Mr. Son allegedly has superior or unique knowledge that is not already set forth in Qualcomm's prior correspondence; or (2) any explanation as to why those specific facts could not be explored via other witnesses, including the Arm's current CEO (Rene Haas) or previous CEO (Simon Segars) – both of whom Qualcomm has noticed for deposition.  This undermines our ability to consider our current position regarding Apex protections and to consider potential workarounds that will provide Defendants with discovery of the specific facts sought without requiring a deposition of Mr. Son.  Nevertheless, we are in the process of reviewing your prior correspondence and will revert as soon as possible as to how, if at all, that impacts our current position that the Apex doctrine and any potential discovery workarounds for this issue.  We expect to be able to get back to you next week.

We are also disappointed that you have ignored our request regarding the steps that Defendants have taken to secure a time at the consulate in Japan to proceed with Mr. Son's deposition, even if Apex protections did not apply.  We take it by your silence that Defendants have not done anything to secure a time to proceed at the consulate in compliance with Japanese law.  Defendants also, again, fail to cite any authority supporting their apparent position that Defendants do not have to adhere to Japanese law in connection with their proposed deposition of Mr. Son.  Critically, if Defendants have, indeed, done nothing to comply with Japanese law and secure a time at the consulate then the parties dispute regarding Mr. Son's deposition may be moot.

Defendants have again refused to agree to even limit the scope of any deposition of Mr. Son to personal information gleaned in his role as Chair of Arm's Board of Directors.  Defendants' refusal to agree to this raises concerns that Defendants are seeking this deposition for improper purposes of the very kind that the Apex doctrine is designed to protect against.

Finally, we have already set forth our positions regarding the final three bullets raised in your email and are committed to providing information to you as soon as possible.  But your arbitrary demand that we provide this information by 8 pm on Friday is unreasonable – particularly given that by our review of your email this morning, the workweek in Japan had already ended.

Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Gressel, Anna R <agressel@paulweiss.com>
**Sent:** Thursday, September 21, 2023 6:33 PM
**To:** Li, Jack <JackLi@mofo.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel,

We are disappointed in your response to our email, and strongly dispute your characterization of our discussion. We also note, again, that Qualcomm has provided ARM with a strong basis for understanding our contention concerning the relevance and importance of Mr. Son's deposition, which is referenced in our prior correspondence.

We are also unclear about what proposed "workaround" ARM is now purporting to offer, as we understand based on the email below that any such offer would not involve making Mr. Son available for a deposition in this matter. Before we proceed with our conversations, we simply need a threshold understanding of your position, and therefore the areas of potential discussion. To that end, we reiterate our request for ARM to confirm, by no later than 8:00pm ET on Friday, September 22, the following items:

- Please confirm that ARM is refusing to offer Mr. Son as a deponent based on the apex doctrine. If this is not accurate, please provide the precise conditions under which ARM will make Mr. Son available as a deponent in this matter.

- Please confirm whether Mr. Son is a "willing" or "unwilling" deponent under Japanese law, as discussed in your September 15 letter.
- Please confirm whether Mr. Son has been made aware that his deposition has been noticed in this litigation. If Mr. Son has been made aware of his deposition notice, please confirm when this occurred.
- Pease provide the details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period.

Presuming we do not hear back from you with responses by then, we will understand that your position on refusing to make Mr. Son available for a deposition remains unchanged. We believe it would be most productive to confer once we have your written response on these questions, which will enable us to move discussions forward. We are available on Monday from 2:30-4:00pm ET.

Regards,

Anna

**Anna R. Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

**From:** Li, Jack <JackLi@mofo.com>
**Date:** Thursday, Sep 21, 2023 at 12:26 PM
**To:** Gressel, Anna R <agressel@paulweiss.com>, Vaughn, Madalyn <mvaughn@paulweiss.com>, Dunn, Karen L <kdunn@paulweiss.com>, Isaacson, William A <wisaacson@paulweiss.com>, Nyarady, Catherine <cnyarady@paulweiss.com>, Morgan, Erin J <ejmorgan@paulweiss.com>, Zappala, Melissa Felder <mzappala@paulweiss.com>, Braly, Jacob <jbraly@paulweiss.com>, jblumenfeld@morrisnichols.com <jblumenfeld@morrisnichols.com>, jying@morrisnichols.com <jying@morrisnichols.com>
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>, Jacobs, Michael A. <MJacobs@mofo.com>, Llewellyn, Scott F. <SLlewellyn@mofo.com>, Muino, Daniel P. <DMuino@mofo.com>, Mooney, Kyle W. <KMooney@mofo.com>, Liou, Joyce <JLiou@mofo.com>, Fung, Nicholas Rylan <NFung@mofo.com>, Patel, Fahd H. <FPatel@mofo.com>, Brickey, Sarah E. <SBrickey@mofo.com>, Davenport, Lydia <LDavenport@mofo.com>, rvrana@ycst.com <rvrana@ycst.com>, agaza@ycst.com <agaza@ycst.com>, YCST_Arm_Qualcomm@ycst.com <YCST_Arm_Qualcomm@ycst.com>, GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We write in response to your email regarding Defendants' notice of deposition of Masayoshi Son.

We disagree with your characterization of yesterday's meet-and-confer.  You have mischaracterized our representations and misrepresented our positions – even after we repeatedly corrected you on the call.  As Arm has repeatedly made clear, Arm is disappointed by Qualcomm's focus on concocting self-serving narratives and prematurely creating alleged "impasses."  As just one example, your email accuses Arm of "unpreparedness to address these considerations during the meet and confer."  But Qualcomm failed to disclose any of "these considerations" or provide any substantive response to Arm's letter before the meet-and-confer.  We have repeatedly asked Qualcomm to disclose its position(s) before our meet-and-confers to facilitate productive discussions between the parties.  Yet Qualcomm failed to do so before the call yesterday, and thus plainly bears sole responsibility for the parties to not have a more productive discussion.  Nevertheless, we remain optimistic that the parties can resolve, or at least narrow, their disputes regarding this subject.

During the meet-and-confer, Arm reiterated its position that the Apex doctrine bars Mr. Son's deposition given, *inter alia*, Qualcomm's deposition notices for two Arm CEOs with day-to-day responsibilities at Arm; in contrast, Mr. Son's position as Chair of Arm's Board of Directors does not involve day-to-day responsibility at Arm.  Your email repeats and references Qualcomm's prior communication regarding Qualcomm's request for Mr. Son to be a custodian.  As you are aware, however, Arm did not agree to Qualcomm's previous request, and maintained that Mr. Son should not be a custodian under the Apex doctrine, which Qualcomm conceded by agreeing Mr. Son would not be a custodian.  Your email also does not take account of the full scope of parties' prior communications on this issue, stopping your citation at Qualcomm's May 16 letter, thereby ignoring Arm's subsequent response explaining that Qualcomm "fails to articulate a sufficient basis for Mr. Son to serve as a custodian."  (S. Llewellyn Correspondence dated May 26, 2023.)

Nevertheless, in the interest of resolving or at least narrowing these issues, Arm will revisit Qualcomm's prior correspondence cited in your email regarding the custodian issue, based on your email's suggestion that these prior communications encompass Qualcomm's position regarding Qualcomm's proposed deposition of Mr. Son.  We will also consider whether there is a workaround permitting Qualcomm to explore facts for which it might contend Mr. Son has unique knowledge, without burdening Mr. Son or burdening the Court with an unnecessary dispute.  Any proposed workaround will, of course, depend on the specific subject matter and scope of issues identified by Qualcomm.

Meanwhile, we ask Qualcomm to provide the following information for Arm's consideration: (1) any facts relevant to the claims or defenses in this case for which Mr. Son allegedly has superior or unique knowledge that is not already set forth in Qualcomm's prior correspondence regarding the custodian issue or Qualcomm's response to Interrogatory No. 6;  and (2) an explanation as to why those facts could not be explored via other witnesses, including the Arm's current CEO (Rene Haas) or previous CEO (Simon Segars) – both of whom Qualcomm has noticed for deposition.

Qualcomm asks Arm to confirm "whether Arm is taking the position that Mr. Son is a 'willing' or 'unwilling' deponent under Japanese law," which would impact whether Qualcomm must proceed by letters rogatory.  First, Qualcomm's request is conceptually mistaken.  Whether Mr. Son is a willing or unwilling deponent under Japanese law is not a position for *Arm* to take, particularly given Qualcomm's refusal to limit the scope of the proposed deposition to Mr. Son's role as Arm's chair.  Please provide any authority supporting Qualcomm's apparent suggestion that Arm has the authority to decide whether Mr. Son is a willing deponent, let alone

making such a decision for a deposition in Mr. Son's personal capacity or his capacity with many other entities.  Second, as we stated on the call, Qualcomm's request would become relevant only if Apex protections did not apply and if Qualcomm had already secured a location in Japan to depose Mr. Son.

Qualcomm made several requests for Mr. Son's schedule, calendar, and travel plans during the call, which your email below clarified as a request for "the details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period."  First, as stated on the call, Arm does not believe that this information is relevant, given Arm's objections under the Apex doctrine and Qualcomm's failure to limit its deposition request to Mr. Son's role as Arm's chair, especially in view of the breadth and irrelevant details encompassed by Qualcomm's request.  Further, we are not aware of any basis for Qualcomm to suggest that Mr. Son's travel plans might affect the protections afforded by Japanese law for depositions of Japanese citizens and residents like Mr. Son.  Nonetheless, to permit Arm to further consider Qualcomm's request, please provide any authority supporting Qualcomm's request for *Arm* to provide the details of Mr. Son's calendar "during each day of the remaining fact discovery period," given (1) such details would likely encompass irrelevant information concerning the many third-party businesses with whom Mr. Son holds significant roles, (2) such details would be irrelevant to Arm's other objections under the Apex doctrine and to the protections afforded by Japanese law.

We are considering the specific requests in your email and will provide a follow-up response promptly.  However, given the timing of your email at 11:20 PM ET, and the time differences involved, we will likely need more time to respond than the arbitrary deadline Qualcomm seeks to impose.  We note that Qualcomm continues to unreasonably demand responses within hours, even though it took Qualcomm five days to respond to Arm's letter regarding this issue, and has flatly ignored Arm's concerns in other contexts for weeks.  By way of example, when Arm provided Qualcomm three days to respond regarding Arm's requested additional search terms, Qualcomm failed to provide any response for more than two weeks, despite Arm's repeated follow-ups and Qualcomm's availability to correspond on its own issues in the meantime.  (*See* Qualcomm's Sep. 11, 2023 response to S. Llewellyn Correspondence dated Aug. 25, 2023.)   As another example, after Arm promptly responded within two days to Qualcomm's email regarding Mr. Son's documents, it took Qualcomm two weeks to follow up.  (*See* M. Vaughn Aug. 25, 2023 email in response J. Li Aug. 11, 2023 email.)  Curiously, Qualcomm now accuses Arm of "delay" regarding Mr. Son's documents, even though Qualcomm failed to promptly respond to Arm's correspondence.  Qualcomm's inconsistency on the importance of quick responses, let alone demands for responses from Arm within hours of learning Qualcomm's positions, further suggests Qualcomm is not approaching discovery issues in good faith, but is instead trying to manufacture a purported impasse despite the parties' ongoing discussions.  This is particularly clear where the parties have repeatedly reached acceptable resolutions on other issues via the meet-and-confer process.

Please provide Qualcomm's availability tomorrow and Monday to further meet and confer regarding Qualcomm's notice to depose Mr. Son, as the parties continue to discuss and resolve or narrow these issues.

Best Regards,

Jack

**Jack Li**

Associate | Morrison & Foerster LLP

2100 L Street, NW, Suite 900 | Washington, DC 20037

**P:** +1 (202) 887-1562

mofo.com | LinkedIn | Twitter

---

**From:** Gressel, Anna R <agressel@paulweiss.com>
**Sent:** Wednesday, September 20, 2023 11:20 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel,

We write to follow up on today's meet and confer concerning Qualcomm's notice of deposition for Mr. Son.  We understand from today's meeting and from your September 15 letter that ARM has taken the position that, in reliance on the "apex doctrine," it will not allow Qualcomm to depose Mr. Son.  However, we were surprised and disappointed to learn that ARM was unprepared today to discuss the substance of each party's respective positions, which could have aided in resolving this dispute or determining whether there are conditions under which the deposition could take place.

We were particularly surprised, and frankly, confused to hear that ARM claimed to be unaware of Qualcomm's position with respect to Mr. Son's relevant and unique knowledge of certain issues, including ARM's false and disparaging statements, through Mr. Son and/or Softbank, to third parties, including Qualcomm's customers.  ARM was put on notice of Qualcomm's position on this topic in February of this year at the very latest.  In fact, Qualcomm put this topic at issue in its October 26, 2022 Answer and Amended Counterclaim, and ███████████████████████████████████████████████████████████████████████████████████.  And consistently throughout the first half of this year, Qualcomm has explained the reasons for requesting discovery from Mr. Son, and specifically, the topics about which Mr. Son has unique and relevant knowledge—e.g., ARM's false and disparaging statements, through Mr. Son, to Qualcomm's customers.  *See, e.g.*, Letter from M. Zappala dated March 7, 2023; Letter from M. Zappala dated April 19, 2023; Letter from M. Zappala dated May 1, 2023; Letter from M. Zappala dated May 16, 2023.  While negotiations took place concerning Mr. Son's status as a custodian, and the issue was tabled pending Mr. Son's document production, at no point did Qualcomm ever change its position with respect to Mr. Son's relevant and unique knowledge concerning the at-issue communications with third parties and Qualcomm's customers.  Given this, ARM's purported unawareness concerning Qualcomm's position on this issue, or its unpreparedness to address these considerations during the meet and confer, is simply incomprehensible.

Furthermore, because ARM was unprepared to hold substantive discussions at today's meeting about each party's respective position on the apex doctrine and Mr. Son's deposition, and given the late stage of fact discovery the parties find themselves in and the fact that 21 days have passed since Mr. Son was noticed, please confirm whether ARM will refuse to offer Mr. Son as a deponent based on the apex doctrine by no later than 3:00 pm ET tomorrow (September 21).  By this time, please also confirm whether ARM is taking the position that Mr. Son is a "willing" or "unwilling" deponent under Japanese law, as discussed in your September 15 letter.

We were also troubled by your unwillingness during the meet and confer to confirm or deny whether Mr. Son has even been made aware that his deposition has been noticed in this litigation.  Accordingly, by 3:00pm ET on September 21 please also confirm whether and when Mr. Son was made aware that he has been noticed for a deposition.

Finally, please provide the details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period.

Regards,

Anna

**Anna R Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Monday, September 18, 2023 2:22 PM
**To:** Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Thanks, Jack.  We will circulate an invite for 1:30 p.m. ET on Wednesday, September 20.

Best,

Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3974 (Direct Phone) | 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Monday, September 18, 2023 5:05 PM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W.

<KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>

**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We are available to meet and confer on Wednesday (Sep. 20) from 1:30 to 2 PM ET, 3:30 to 4 PM ET, or after 4:30 PM ET.  Please circulate an invite.

Best Regards,

Jack

**Jack Li**

Associate | Morrison & Foerster LLP

2100 L Street, NW, Suite 900 | Washington, DC 20037

**P:** +1 (202) 887-1562

mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Monday, September 18, 2023 12:40 PM
**To:** Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

**External Email**

---

Counsel:

We write in response to your September 15, 2023 letter concerning Qualcomm's deposition notice of Mr. Son.  We are available to meet and confer regarding ARM's letter tomorrow at 2 p.m. ET.  Please confirm that time works for ARM and we will circulate a dial-in.

Best,

Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3974 (Direct Phone) | 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Friday, September 15, 2023 9:11 PM
**To:** Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com
**Subject:** ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

Please see the attached correspondence.


Best Regards,

Jack


**Jack Li**

Associate | Morrison & Foerster LLP

2100 L Street, NW, Suite 900 | Washington, DC 20037

**P:** +1 (202) 887-1562

mofo.com | LinkedIn | Twitter


========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.


========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.


========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn

about Morrison & Foerster LLP's <u>Privacy Policy</u>.
.

================================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's <u>Privacy Policy</u>.
.

# EXHIBIT 7

| | |
|---|---|
| **From:** | Li, Jack <JackLi@mofo.com> |
| **Sent:** | Thursday, September 28, 2023 4:37 PM |
| **To:** | Gressel, Anna R; Vaughn, Madalyn; Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Morgan, Erin J; Zappala, Melissa Felder; Braly, Jacob; jblumenfeld@morrisnichols.com; jying@morrisnichols.com |
| **Cc:** | Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Fung, Nicholas Rylan; Patel, Fahd H.; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC |
| **Subject:** | RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN |

Counsel,

As you acknowledge in your email, consistent with the parties' discussions, Arm expects to follow up with a further response this week.  We note, however, that Qualcomm still has not provided the additional information requested in Arm's September 22 email, in response to Qualcomm's email from September 21.

Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Gressel, Anna R <agressel@paulweiss.com>
**Sent:** Thursday, September 28, 2023 7:55 AM
**To:** Li, Jack <JackLi@mofo.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN


**External Email**

---

Counsel,

We write to follow up on your email dated Sept. 22 concerning Qualcomm's notice of deposition of Masayoshi Son.

Almost one week has passed since your last email, in which ARM committed to "reviewing [the Parties' prior] correspondence and [to] revert as soon as possible as to how, if at all, that impacts [ARM's] current position that the Apex doctrine and any potential discovery workarounds for this issue." You previously suggested that you would provide a response to us this week. Please let us know when that information – and specifically your position on whether ARM is refusing to make Mr. Son available for a deposition under the "apex doctrine" – will be forthcoming.

You also told us in your Sept. 22 email that you were "committed to providing information to you as soon as possible" concerning the following items raised in our email:

- Whether Mr. Son is a "willing" or "unwilling" deponent under Japanese law, as discussed in your September 15 letter.
- Whether Mr. Son has been made aware that his deposition has been noticed in this litigation. If Mr. Son has been made aware of his deposition notice, please confirm when this occurred.
- The details of Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period.

We have not yet heard back from you on any of these items, notwithstanding that nearly a full workweek has elapsed in Japan. Please provide a date certain by which you will supply this information; otherwise, we will have to assume that you do not intend to provide responses and we will proceed accordingly.

Regards,
Anna


**Anna R Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Wednesday, September 27, 2023 10:53 AM
**To:** Vaughn, Madalyn <mvaughn@paulweiss.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

We write in response to your email below and regarding Defendants' Responses and Objections to Arm's Third Set of RFPs.  As outlined in Arm's September 20 email, Defendants' response to each of Arm's Third Set of RFPs states either that Defendants "will produce only those documents that it agreed to produce in response to" a few earlier-served requests, or that "Defendants are willing to meet and confer with Plaintiff regarding the relevance and appropriate scope."  Each of Defendants' responses suffers the very same deficiency, *i.e.*, each response fails to state whether Defendants are withholding any responsive materials, as required by Fed. R. Civ. P. 34(b)(2)(C).  (*See, e.g.*, *Crozer-Chester Med. Ctr. v. Nat'l Lab. Rels. Bd.*, 976 F.3d 276 (3d Cir. 2020) ("Rule 34 provides that a responding party has the obligation to state whether any responsive materials are being withheld and state the reason or reasons why.").)  We have circulated an invite for 4 PM ET today.


Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Vaughn, Madalyn <mvaughn@paulweiss.com>
**Sent:** Monday, September 25, 2023 2:59 PM
**To:** Li, Jack <JackLi@mofo.com>; Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN


**External Email**

---

Counsel:


We write in response to your September 20, 2023 email concerning Qualcomm's R&Os to ARM's Third Set of RFPs, which we served more than five weeks ago on August 18, 2023.  As an initial matter, we were surprised to receive ARM's email that—for the very first time—takes issue with Qualcomm's August 18 R&Os and declares these issues as requiring "urgent" resolution.  (9/20/2023 Email from J. Li.)  We similarly were surprised by the various mischaracterizations in your email concerning discovery provided by Qualcomm to date, including ARM's baseless accusations that there has been any "lack of clarity surrounding Defendants'

prior responses and objections" to ARM's RFPs and that Qualcomm has engaged in "substantial delay in producing responsive documents." (*Id.*) The record speaks for itself on these baseless claims and in the interest of moving discovery forward, we do not attempt to refute each of them here.

While the scope of ARM's objections to Qualcomm's R&Os to ARM's Third Set of RFPs is not clear based on your September 20, 2023 email—which provides various RFPs as examples but does not raise issues on an RFP-by-RFP basis as ARM itself demanded of Qualcomm when negotiating Qualcomm's RFPs—we are willing to meet and confer to discuss this week. We are available on Wednesday, September 27 between 1-5 p.m. ET. Please circulate a dial-in at a time during that window that works for ARM.

Qualcomm reserves all rights.

Best,

Madalyn

**Madalyn Vaughn** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3974 (Direct Phone) | 212 492 0974 (Direct Fax)
mvaughn@paulweiss.com | www.paulweiss.com

---

**From:** Li, Jack <JackLi@mofo.com>
**Sent:** Wednesday, September 20, 2023 5:27 PM
**To:** Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com
**Cc:** Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Li, Jack <JackLi@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com
**Subject:** ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN

Counsel,

4

We write regarding Defendants' Responses and Objections to Plaintiff's Third Set of Requests for Production (Nos. 59-122), dated August 18, 2023.

Defendants do not dispute that Arm's Third Set of RFPs seek documents that are relevant to the claims and defenses in this action.  In fact, Defendants do not contend that any of the 63 different requests seek documents that are wholly irrelevant to the claims and defenses in this case.  But Defendants nevertheless refuse to agree to search for or produce any documents in response to any of those 63 requests.

Instead, in response to each of the 63 requests, Defendants laundry list a handful of boilerplate objections, identify a few earlier-served requests that allegedly relate to similar subject matter, and then state as follows for most requests:

> Subject to and without waiver of any of their objections, Defendants state that this Request is duplicative of prior [requests], and therefore refer Plaintiff Qualcomm will produce only those documents that it agreed to produce in response to those requests.  Accordingly, Defendants do not plan to search for or produce additional documents in response to this Request.  Nonetheless, Defendants are willing to meet and confer with Plaintiff to the extent that Plaintiff can identify categories of documents sought by this Request that are not duplicative of categories of documents sought by [those earlier requests].

Worse yet, for RFP Nos. 63, 67, 68, and 72, without objecting to the relevance of these requests, Qualcomm fails to even identify any earlier-served requests, and nevertheless refuses to produce any relevant information by stating:

> Subject to and without waiver of any of their objections, Defendants are willing to meet and confer with Plaintiff regarding the relevance and appropriate scope, if any, of this Request.

As a threshold matter, Defendants are wrong that the requests in the current Third Set of RFPs are entirely duplicative of the identified earlier requests.  More fundamentally, Defendants must respond to each request by clearly identifying the scope of non-privileged responsive documents that they will (or already have) produced.  Defendants cannot simply refuse to search for and produce documents unless and until Arm identifies for each request the precise subset of documents that may not otherwise be produced in response to other requests – particularly given the lack of clarity surrounding Defendants' prior responses and objections and its substantial delay in producing responsive documents.

Depositions are fast-approaching and the deadline for substantial completion of document production has long since passed.  It is therefore urgent that we resolve this issue and that Defendants complete their production of

non-privileged documents responsive to Arm's Third Set of RFPs as soon as possible.  Please provide a time on Thursday (Sep. 21) when Qualcomm is available to meet and confer.


Best Regards,

Jack


**Jack Li**

Associate | Morrison & Foerster LLP

2100 L Street, NW, Suite 900 | Washington, DC 20037

**P:** +1 (202) 887-1562

mofo.com | LinkedIn | Twitter


================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.


================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.


================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is

prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT 8

| | |
|---|---|
| **From:** | Gressel, Anna R |
| **Sent:** | Tuesday, October 3, 2023 8:19 PM |
| **To:** | Li, Jack; Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Fung, Nicholas Rylan; Patel, Fahd H.; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com |
| **Cc:** | Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Morgan, Erin J; Zappala, Melissa Felder; Vaughn, Madalyn; Braly, Jacob; jblumenfeld@morrisnichols.com; jying@morrisnichols.com; GRP-QC |
| **Subject:** | ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN |

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Counsel:

We write in response to your Thursday, September 28 email regarding Qualcomm's noticed deposition of Masayoshi Son. In that email, you indicated that you would provide a response to four questions posed by Qualcomm in a September 20 email by late last week. We have not heard from you. Given the limited time for scheduling and taking Mr. Son's deposition before the close of fact discovery on November 17, we are writing again in an effort to move this conversation forward.

In our prior correspondence, ARM took the position that Qualcomm must pursue Mr. Son's deposition through Japanese channels. While Qualcomm disagrees that it is obligated to do so—based on Mr. Son's relevance to this litigation and ability to sit for a deposition in the United States—it is nonetheless taking steps to make a deposition in Japan possible. Deposition rooms are available in Japan starting on November 8 in Osaka and November 20 in Tokyo. In order to schedule the deposition, there are several pieces of information Qualcomm needs from ARM, including:

- Who from ARM, apart from the witness, will physically be present in the deposition room: ▓▓▓▓▓▓▓
- Who from ARM will be participating online from the U.S.: ▓▓▓▓▓▓▓
- Who from ARM will be participating online from Japan: ▓▓▓▓▓▓▓
- Names of any foreign lawyers registered in Japan ("gaiben") who will be physically present on behalf of ARM in the deposition room: ▓▓▓▓▓▓▓

Please provide this information by the close of business on October 5, 2023 so we can proceed with scheduling the deposition. If you refuse to provide this information, we will view your failure to respond as a refusal to make Mr. Son available for a deposition.

Additionally, all of the questions we posed to you in our correspondence dated Sept. 20, 2023 remain unanswered. Your consistent refusal to provide any such responses for a full two weeks, while simultaneously promising that answers will be forthcoming, is deeply concerning. We would therefore appreciate your prompt responses on:

- Whether ARM's position is that ARM will not make Mr. Son available for a deposition based on the apex doctrine.
- Confirmation that Mr. Son is a "willing" deponent for purposes of taking depositions in Japan.
- When Mr. Son was made aware that his deposition has been noticed.
- The details of Mr. Son's whereabouts through the close of fact discovery.

Although ARM requested additional facts beyond those already provided concerning the relevance of Mr. Son's deposition, such requests have been fulfilled countless times in the parties' correspondence and Qualcomm's filings. This includes ARM's misinformation campaign, for which Mr. Son was an integral part, to damage Qualcomm,

disparage its products, and disrupt Qualcomm's relationships with its customers, and Mr. Son's public statements concerning ARM's IPO and his plan to "devote" himself to growing ARM.

For example, ████████████████████████████████████████████

████████  Further, in February 2022, Mr. Son announced his plan to take ARM public, claiming it would be "the largest IPO in semiconductor history," which he recently achieved.  And in November 2022, in ARM's 2022 Q2 earnings report, Mr. Son claimed that he has "been in love with ARM" and would "concentrate" on and "devote" himself to growing ARM.  Mr. Son clearly has unique knowledge concerning multiple topics that Qualcomm is entitled to explore.

Please provide this information, which is necessary to commence the process of scheduling the deposition in Japan, as soon as possible.  If you fail to do so, we must assume that the parties have reached an impasse on the matter of Mr. Son's deposition, and therefore, please provide your availability to meet and confer on these issues on Monday, October 9 between 2-4 pm ET.

Regards,
Anna

**Anna R Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

# EXHIBIT 9

| From: | Li, Jack <JackLi@mofo.com> |
|---|---|
| Sent: | Wednesday, October 4, 2023 5:16 PM |
| To: | Gressel, Anna R; Olson, Erik J. (Palo Alto); Jacobs, Michael A.; Llewellyn, Scott F.; Muino, Daniel P.; Mooney, Kyle W.; Liou, Joyce; Fung, Nicholas Rylan; Patel, Fahd H.; Brickey, Sarah E.; Davenport, Lydia; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com |
| Cc: | Dunn, Karen L; Isaacson, William A; Nyarady, Catherine; Morgan, Erin J; Zappala, Melissa Felder; Vaughn, Madalyn; Braly, Jacob; jblumenfeld@morrisnichols.com; jying@morrisnichols.com; GRP-QC |
| Subject: | RE: ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN |

Counsel,

We write in response to your October 3 email regarding Qualcomm's notice of deposition for Masayoshi Son. As discussed below, Arm believes Magistrate Judge Hatcher's decision regarding Mr. Son's custodial documents should effectively resolve the parties' dispute regarding a deposition of Mr. Son, in part because a deposition is obviously more burdensome than document collection for purposes of the relevant analysis under the Apex doctrine. Arm nonetheless addresses below various issues Qualcomm raised during the parties' meet-and-confer and in your most recent email.

## [1] Qualcomm's failure to meets its burden under the Apex doctrine

Arm has objected to Mr. Son's deposition based on the Apex doctrine, which "appl[ies] a rebuttable presumption that a high-level officials deposition represents a significant burden upon the deponent and that this burden is undue absent the two factors set forth in the apex doctrine, which go to the lack of a more convenient, less burdensome, and less expensive alternative." *United States ex rel. Galmines v. Novartis Pharm. Corp.*, Cov. No. 06-3213, 2015 WL 4973626, at *2 (D. Pa. Aug. 20, 2015). To that end, Arm asked Qualcomm to provide: (1) any specific facts relevant to the claims or defenses in this case for which Mr. Son allegedly has superior or unique knowledge; and (2) any explanation as to why those specific facts could not be explored via other witnesses already subject to deposition, including Arm's current CEO (Rene Haas) and previous CEO (Simon Segars). We reiterated our request for this information on the parties' September 20 meet-and-confer, and again in our subsequent emails. But on the call and in subsequent correspondence, Qualcomm referenced only prior discovery responses and correspondence regarding (1) an alleged a meeting between Mr. Son and one of Arm's partners and (2) cited Mr. Son's forward-looking public statements regarding his interest in Arm's business.

As you know, Qualcomm's argument in support of its request for all of Mr. Son's custodial files was based on the same grounds: that is, (1) an alleged meeting between Mr. Son and one of Arm's partners, and (2) public statements by Mr. Son. (D.I. 89 at 1-3, *id.* at Ex. 7, pp. 2-3.) Yet Magistrate Judge Hatcher denied Qualcomm's request to collect Mr. Son's custodial files on those grounds in light of Arm's arguments that Mr. Son (a) is not an Arm employee, (b) has significant responsibilities with other entities, and (c) lacks involvement in Arm's day-to-day operations.

Accordingly, Magistrate Judge Hatcher's decision regarding Qualcomm's request for Mr. Son's custodial files should effectively resolve Qualcomm's request for Mr. Son's deposition on the same grounds, at least because Arm's arguments opposing further collection of Mr. Son's custodial files are even more compelling as to Qualcomm's noticed deposition of Mr. Son. As cases confirm, Qualcomm's proposed deposition of Mr. Son imposes even greater burdens than Qualcomm's requested document collection, and thus is even more squarely inconsistent with the Apex doctrine. *See, e.g., L.A. All. v. City of L.A.*, No. 2:20-cv-2291-DOC, 2023 U.S. Dist.

LEXIS 151699, at *19-20 (C.D. Cal. Aug. 2, 2023) ("Unlike depositions of high-ranking officials, moreover, discovery requests like written interrogatories or requests for production tend to be less time-consuming and distracting."). This is particularly true where, as noted above, Qualcomm has already noticed the depositions of Arm's past and current CEOs, further undermining any rationale for Mr. Son's deposition under the Apex doctrine, given the similar burden Qualcomm seeks to impose on Arm's past and current CEOs.

Further, Qualcomm's assertion that Mr. Son has personal knowledge about a meeting with one of Arm's partners does not explain why such personal knowledge might be unique to Mr. Son, or superior to knowledge possessed by others whose depositions Qualcomm has noticed. Your reliance on Mr. Son's public statements also cannot overcome the Apex doctrine, at least because Mr. Son's *forward-looking* statements (1) were made *after* Arm brought this case against Qualcomm and (2) are not relevant to any claims or defenses in this case. Qualcomm thus still has not provided (1) any specific facts relevant to the claims or defenses in this case for which Mr. Son allegedly has superior or unique knowledge, or (2) any explanation as to why those specific facts could not be explored via other witnesses, including Arm's current and previous CEOs, or other methods.

Accordingly, Arm believes Qualcomm should withdraw its notice for Mr. Son's deposition, particularly given Qualcomm's inability to assert any basis to overcome the Apex doctrine beyond vague references to Qualcomm's previous arguments in requesting Mr. Son's custodial files—arguments that Magistrate Judge Hatcher rejected. If Qualcomm will not do so, Arm again requests that Qualcomm expressly explain the complete basis for its request to depose Mr. Son, rather than relying on vague references to prior correspondence or discovery responses, including an express enumeration of all grounds on which Qualcomm asserts Mr. Son has unique and superior knowledge that is not discoverable through other means, such as the currently-noticed depositions of Arm's past and current CEOs (or other Arm custodians).

As Qualcomm is aware, Arm has repeatedly expressed willingness to consider other, less burdensome means of discovery regarding the information that Qualcomm's purportedly seeks, which is obviously even more appropriate in view of Magistrate Judge Hatcher's decision denying Qualcomm's request for Mr. Son's custodial files on similar grounds, and is also obviously consistent with relevant case law applying the Apex doctrine to deny depositions. Accordingly, if Qualcomm will not withdraw its notice, Arm requests that Qualcomm explain why less burdensome means, including a Rule 30(b)(6) topic and/or an additional interrogatory directed to the relevant information would not suffice. *Czyzewski v. Sun Capital Partners, Inc. (In re Jevic Holding Corp.)*, 526 B.R. 547, 556 (D. Del. 2014) ("When determining whether the deposition of a high-ranking corporate officer is appropriate, courts in this circuit consider: (1) whether the executive or top-level employee has personal or unique knowledge on relevant subject matters; and (2) whether the information sought can be obtained from lower-level employees *or through less burdensome means, such as interrogatories*.") (emphasis added); *see also*, *Reif v. CNA*, 248 F.R.D. 448, 451, 453-55 (E.D. Pa. 2008) (denying motion for leave to compel deposition of an apex witness, because the moving party had not demonstrated "the insufficiency of interrogatories or the depositions of the lower level employees").

**[2] Qualcomm's baseless request for irrelevant, sensitive information regarding Mr. Son's "whereabouts"**

In response to Qualcomm's request, Arm confirms that Mr. Son is aware that his deposition has been noticed by Qualcomm.

But Arm believes it is premature to explore whether Mr. Son is a willing deponent under the relevant Japanese law, because (1) the parties are continuing to work through the apex doctrine issues discussed above, and (2) Qualcomm has not confirmed that the scope of Qualcomm' proposed deposition would be limited to Mr. Son's role as Arm's Chair.

Arm also requests that Qualcomm explain the relevance of "Mr. Son's whereabouts through the close of fact discovery, including the city and state/country that he will be in during each day of the remaining fact discovery period." Qualcomm has not identified any authority supporting its apparent assumption that the relevant Japanese law may not apply if a Japanese resident citizen travels to the U.S. for business purposes or otherwise. Further, Mr. Son has myriad business, philanthropic, and personal responsibilities unrelated to his role as Arm's Chair and unrelated to this case, which obviously are not properly the subject of inquiry by Qualcomm. Qualcomm has not identified any authority supporting its demand for obviously sensitive information regarding Mr. Son's "whereabouts through the close of fact discovery."

**[3] Qualcomm's failure to limit the scope of any deposition to Mr. Son's role as Arm's Chair**

To the extent Qualcomm will not withdraw its notice, Arm reiterates its request that Qualcomm confirm that the scope of the noticed deposition is limited to Mr. Son in his role as Arm's Chair. As Arm has explained previously, absent such a limitation, Qualcomm's proposed deposition of Mr. Son effectively seeks third-party discovery via Arm, and Arm does not represent Mr. Son personally or in his capacity with other entities.

We hope that Qualcomm recognizes the relevance of Magistrate Judge Hatcher's decision regarding Mr. Son's documents and withdraws its notice of deposition accordingly. Otherwise, we look forward to Qualcomm's response to Arm's specific requests above.

Best Regards,
Jack

**Jack Li**
Associate | Morrison & Foerster LLP
2100 L Street, NW, Suite 900 | Washington, DC 20037
**P:** +1 (202) 887-1562
mofo.com | LinkedIn | Twitter

---

**From:** Gressel, Anna R <agressel@paulweiss.com>
**Sent:** Tuesday, October 3, 2023 8:19 PM
**To:** Li, Jack <JackLi@mofo.com>; Olson, Erik J. (Palo Alto) <EJOlson@mofo.com>; Jacobs, Michael A. <MJacobs@mofo.com>; Llewellyn, Scott F. <SLlewellyn@mofo.com>; Muino, Daniel P. <DMuino@mofo.com>; Mooney, Kyle W. <KMooney@mofo.com>; Liou, Joyce <JLiou@mofo.com>; Fung, Nicholas Rylan <NFung@mofo.com>; Patel, Fahd H. <FPatel@mofo.com>; Brickey, Sarah E. <SBrickey@mofo.com>; Davenport, Lydia <LDavenport@mofo.com>; rvrana@ycst.com; agaza@ycst.com; YCST_Arm_Qualcomm@ycst.com
**Cc:** Dunn, Karen L <kdunn@paulweiss.com>; Isaacson, William A <wisaacson@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Morgan, Erin J <ejmorgan@paulweiss.com>; Zappala, Melissa Felder <mzappala@paulweiss.com>; Vaughn, Madalyn <mvaughn@paulweiss.com>; Braly, Jacob <jbraly@paulweiss.com>; jblumenfeld@morrisnichols.com; jying@morrisnichols.com; GRP-QC <GRP-QC@paulweiss.com>
**Subject:** ARM Ltd. v. Qualcomm Inc., et al., C.A. No. 22-1146-MN


**External Email**

---

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Counsel:

We write in response to your Thursday, September 28 email regarding Qualcomm's noticed deposition of Masayoshi Son.  In that email, you indicated that you would provide a response to four questions posed by Qualcomm in a September 20 email by late last week.  We have not heard from you.  Given the limited time for scheduling and taking Mr. Son's deposition before the close of fact discovery on November 17, we are writing again in an effort to move this conversation forward.

In our prior correspondence, ARM took the position that Qualcomm must pursue Mr. Son's deposition through Japanese channels.  While Qualcomm disagrees that it is obligated to do so—based on Mr. Son's relevance to this litigation and ability to sit for a deposition in the United States—it is nonetheless taking steps to make a deposition in Japan possible.  Deposition rooms are available in Japan starting on November 8 in Osaka and November 20 in Tokyo.  In order to schedule the deposition, there are several pieces of information Qualcomm needs from ARM, including:

1. Who from ARM, apart from the witness, will physically be present in the deposition room:
2. Who from ARM will be participating online from the U.S.:
3. Who from ARM will be participating online from Japan:
4. Names of any foreign lawyers registered in Japan ("gaiben") who will be physically present on behalf of ARM in the deposition room:

Please provide this information by the close of business on October 5, 2023 so we can proceed with scheduling the deposition.  If you refuse to provide this information, we will view your failure to respond as a refusal to make Mr. Son available for a deposition.

Additionally, all of the questions we posed to you in our correspondence dated Sept. 20, 2023 remain unanswered.  Your consistent refusal to provide any such responses for a full two weeks, while simultaneously promising that answers will be forthcoming, is deeply concerning.  We would therefore appreciate your prompt responses on:

1. Whether ARM's position is that ARM will not make Mr. Son available for a deposition based on the apex doctrine.
2. Confirmation that Mr. Son is a "willing" deponent for purposes of taking depositions in Japan.
3. When Mr. Son was made aware that his deposition has been noticed.
4. The details of Mr. Son's whereabouts through the close of fact discovery.

Although ARM requested additional facts beyond those already provided concerning the relevance of Mr. Son's deposition, such requests have been fulfilled countless times in the parties' correspondence and Qualcomm's filings.  This includes ARM's misinformation campaign, for which Mr. Son was an integral part, to damage

Qualcomm, disparage its products, and disrupt Qualcomm's relationships with its customers, and Mr. Son's public statements concerning ARM's IPO and his plan to "devote" himself to growing ARM.

For example, ███████████████████████████████████████████████████████████████████ ████████████████████  Further, in February 2022, Mr. Son announced his plan to take ARM public, claiming it would be "the largest IPO in semiconductor history," which he recently achieved.  And in November 2022, in ARM's 2022 Q2 earnings report, Mr. Son claimed that he has "been in love with ARM" and would "concentrate" on and "devote" himself to growing ARM.  Mr. Son clearly has unique knowledge concerning multiple topics that Qualcomm is entitled to explore.

Please provide this information, which is necessary to commence the process of scheduling the deposition in Japan, as soon as possible.  If you fail to do so, we must assume that the parties have reached an impasse on the matter of Mr. Son's deposition, and therefore, please provide your availability to meet and confer on these issues on Monday, October 9 between 2-4 pm ET.

Regards,

Anna

**Anna R Gressel** | Counsel
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3388 (Direct Phone) | 212 492 0388 (Direct Fax)
agressel@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# Exhibit 10

## PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3388

WRITER'S DIRECT FACSIMILE

(212) 492-0388

WRITER'S DIRECT E-MAIL ADDRESS

agressel@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
KAMESH BALASUBRAMANIAM*
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
PAUL D. BRACHMAN
GERALD BRANT
ROBERT A. BRITTON
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN P. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
TIHTINA DAGNEW
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
CAROLINE B. EPSTEIN
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRIAN FINNEGAN*
BRIAN P. FINNEGAN
PETER E. FISCH
HARRIS FISCHMAN
KATHERINE B. FORREST
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
ROBERT D. GOLDSTEIN
ROBERTO J. GONZALEZ*
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN M. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
LUKE JENNINGS
JEH C. JOHNSON
ROGER JOHNSON*
DEIRDRE JONES*
MATTHEW B. JORDAN
CHRISTODOULOS KAOUTZANIS
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
ROBERT A. KINDLER
JEFFREY L. KOCHIAN
ALEXIA D. KORBERG
DANIEL J. KRAMER

ANDREW D. KRAUSE
BRIAN KRAUSE
CAITH KUSHNER
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
MATTHEW N. LEIST*
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARRELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. MCCOLM
JEAN M. MCLOUGHLIN
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
SEAN A. MITCHELL
ERIN J. MORGAN
JUDIE NG-SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENHALL
CHARLES J. PESANT*
ANASTASIA V. PETERSON
ANDREAS PHILIPSON*
JESSICA K. PHILLIPS*
AUSTIN S. POLLET*
RAVI PUROHIT
VALERIE E. RADWANER
JEFFREY J. RECHER
LORIN L. REISNER
JEANNIE S. RHEE*
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
AARON J. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM
SCOTT A. SHER*
SUHAN SHIM
CULLEN L. SINCLAIR
MAURY SLEVIN
KYLE SMITH
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EYITAYO ST. MATTHEW-DANIEL
SARAH STASNY
BEN STEADMAN
AIDAN SYNNOTT
ROBERT D. TANANBAUM
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELAZQUEZ
MICHAEL VOGEL
ANDREA WAHLQUIST BROWN
JOHN WEBER
THEODORE V. WELLS, JR.
ERIC J. WEDEL
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
STACI YABLON
BOSCO YIU*
KAYE N. YOSHINO
TONG YU
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

October 5, 2023

**By Email**

Jack Li
Morrison & Foerster LLP
2100 L Street, NW, Suite 900
Washington, DC 20037

Re:    *Arm Ltd.* v. *Qualcomm Inc. et al.*
C.A. No. 22-1146-MN
**Highly Confidential – Attorneys' Eyes Only**

Counsel:

We write in response to your email dated October 4, 2023 concerning Defendants' notice of Masayoshi Son's deposition.

Qualcomm takes issue with many of ARM's statements and positions in its October 4, 2023 email, including, in particular, ARM's mischaracterization of the Court's order during the September 29, 2023 discovery teleconference. (*See* D.I. 111.) Qualcomm is also concerned by ARM's failure to engage on many of the issues set forth in Qualcomm's October 3, 2023 email, as well as ARM's repeated pattern of committing to respond to Qualcomm's questions, then offering nothing.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Jack Li                                                                                                      2

If ARM is refusing to make Mr. Son available for a deposition, whether under the "apex doctrine" or otherwise, it should say so plainly.  Otherwise, ARM's tactics appear to be little more than an attempt to run the clock on fact discovery, while preventing Qualcomm from obtaining relevant deposition testimony from an important and unique witness in this Action.

## I.    ARM Mischaracterizes the Court's Order

As an initial matter, ARM's October 4, 2023 email mischaracterizes the Court's order during the parties' September 29, 2023 discovery teleconference.  Specifically, ARM states that it "believes Magistrate Judge Hatcher's decision regarding Mr. Son's custodial documents should effectively resolve the parties' dispute regarding a deposition of Mr. Son," including due to the alleged burden of such a deposition and the Apex doctrine. (10/4/2023 Email from J. Li.)  That is incorrect.

Instead, the Court's order—which did not address either the burden of a deposition or the Apex doctrine (which was not briefed)—merely denied Qualcomm's request to depose Mr. Son as premature.  (D.I. 111.)  With respect to document discovery relating to Mr. Son, the Court ordered the parties to further confer concerning ████████████ ████████.  (Tr. at 84:1-9.)  The Court also urged ARM to take its responsibility to ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████:



> Arm, I urge you to take this responsibility seriously.  Although I know there's no per se rule against ████████████, it's certainly not prohibited, but it does seem as a practical matter to be fraught with peril.  The process itself that Arm uses should not be a black box that is guarded by Arm, nor do I think that Qualcomm gets to dictate the terms of the process, especially where this individual is not a custodian and the parties agreed to treat him different than a custodian.
>
> So please go meet-and-confer, agree on a process, and follow it.  And as I said, this should not be a hide-the-ball or gotcha process.  If after a couple weeks you can't resolve it, come back to me and I will, but it seems to me each of you is a much better situation position to resolve this particular dispute rather than having me draw an arbitrary line at the moment.
>
> Just to be clear, the motion to compel Mr. Sun's [sic] deposition is denied at this point as premature.

(*Id.* at 83:15–84:12.)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Jack Li                                                                                     3

Given that the parties' negotiations concerning Mr. Son's document review and production are still ongoing (*see* 10/3/2023 Letter from C. Nyarady at 2), ARM's invocation of the Court in its October 4, 2023 email to demand that Qualcomm "withdraw its notice for Mr. Son's deposition" is both confusing and inappropriate.  (10/4/2023 Email from J. Li.)

## II.    The Apex Doctrine Does Not Bar Mr. Son's Deposition

Contrary to ARM's assertion, the apex doctrine does not bar Mr. Son's deposition. Qualcomm has set out its position concerning the apex doctrine in extensive detail in its prior correspondence with ARM concerning Mr. Son, including in its letters and emails from March 2023 to the present.  (*See, e.g.*, 3/7/2023 Letter from M. Felder Zappala; 4/19/2023 Letter from M. Zappala; 5/1/2023 Letter from M. Felder Zappala; 5/16/2023 Letter from M. Felder Zappala; 9/20/2023 Email from A. Gressel; 9/28/2023 Email from A. Gressel; 10/3/2023 Email from A. Gressel.)  For ARM to maintain that it still does not understand Qualcomm's position is not credible.

Nevertheless, Qualcomm responds to two of ARM's points below:

First, ARM is not entitled to demand, as a predicate to the deposition, that "Qualcomm expressly explain the *complete basis* for its request to depose Mr. Son."  (*See* 10/4/2023 Email from J. Li (emphasis added).)  This is an interrogatory by another name, and it is improperly included in the parties' negotiations, especially considering that ARM has already used its allotted 25 interrogatories.  (*See* D.I. 26.)

Indeed, as of the date of this letter, ARM has still only produced ██████████ ████████████████ has not responded to the additional questions Qualcomm raised concerning Mr. Son's ██████████████████████████.  The Court also underscored at its September 29 conference that self-collection of documents is, "as a practical matter . . . fraught with peril."  (Tr. at 83:19.)  Given the Court's clear concern about ARM's "black box process" for ████████████████████—which the Court ordered ARM to revisit while meeting and conferring further with Qualcomm—ARM cannot now hide behind its deficient production to argue that Qualcomm does not have all the facts.  If that is the case, it is by ARM's design.  *See e.g.*, *Younes* v. *7-Eleven, Inc*., 312 F.R.D. 692, 706–07 (D.N.J. 2015) (citing *Bratka* v. *Anheuser-Busch Co*., 164 F.R.D. 448, 463 (S.D. Ohio 1995) ("Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant [discovery]; thus, "[i]f primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse").

Second, even without additional documents, Qualcomm has provided sufficient information to demonstrate Mr. Son's personal and unique involvement in matters involving Qualcomm, including disparaging statements made to Qualcomm's customers, which Qualcomm does not have reason to believe other witnesses could competently testify

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Jack Li                                                                                          4

about. *See In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2014 WL 3035791, at *3 (E.D. Pa. July 1, 2014) (in determining whether the apex doctrine applies, courts will consider "1) whether the executive has personal, superior, or unique knowledge on the relevant subject; and 2) whether the information can be obtained in a less burdensome way, such as through lower-level employees or other discovery methods").  In any event, to the extent ARM's position is that the depositions of ARM's past and current CEOs will provide insights into these and other oral conversations between Mr. Son and Qualcomm's customers concerning the issues alleged in Qualcomm's Amended Counterclaim, please confirm this in writing promptly.

Additionally, in February 2022, Mr. Son announced his plan to take ARM public, claiming it would be "the largest IPO in semiconductor history," which he recently achieved. And in November 2022, in ARM's 2022 Q2 earnings report, Mr. Son claimed that he has "been in love with ARM" and would "concentrate" on and "devote" himself to growing ARM. Whether these statements are forward-looking or post-date the filing of ARM's complaint is irrelevant. *See* Fed. R. Civ. P. 24(b)(1); *CoStar Grp., Inc.* v. *Xceligent, Inc.*, No. 4:16-CV-01288-FJG, 2017 WL 5957774, at *8 (W.D. Mo. Sept. 11, 2017) (agreeing that documents regarding "statements made by Plaintiffs after filing this lawsuit" are relevant and discoverable). In fact, ARM itself has produced documents that post-date the filing of the complaint.

Mr. Son clearly has unique knowledge concerning multiple topics, including ARM's recent IPO, that Qualcomm is entitled to explore. (*See also* Tr. at 93:14-25 (ordering ARM to "tell Qualcomm who worked on the IPO in a material way," and if "none of your custodians had involvement in the IPO and those folks aren't going to be in possession of the sorts of material that Qualcomm seeks, then you're going to have to go back to the drawing board and folks are going to have to work something out here.").) Accordingly, the parties should move ahead with scheduling Mr. Son's deposition with due haste.

### III.    ARM's Efforts to Stonewall and Delay Deposition Scheduling

As ARM knows, the close of fact discovery is currently scheduled for November 17, 2023, little more than one month away. Given that the parties are still conferring on the production of Mr. Son's documents, it is extremely important that we

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Jack Li                                                                                          5

move ahead with scheduling Mr. Son's deposition at the consulate in Japan on the earliest available date.

Although ARM criticized Qualcomm for allegedly having "done nothing to comply with Japanese law and secure a time at the consulate" (*see* 9/22/2023 Email from J. Li), Qualcomm has taken repeated steps to obtain information from ARM that is required by the Japanese consulate to schedule the deposition.  This includes whether Mr. Son is a "willing" deponent for the purpose of taking the deposition in Japan, and who from ARM will be present in the deposition room and participating remotely.  In the absence of this information Qualcomm is prevented from even reserving space at the Japanese consulate for the deposition, and every day that ARM refuses to respond, another day in the discovery period ticks by.

Qualcomm therefore requests responses to the following questions—to which ARM's responses are still outstanding—by no later than end of day on Monday, October 9:

1.    Whether ARM's position is that ARM will not make Mr. Son available for a deposition based on the apex doctrine;

2.    Confirmation that Mr. Son is a "willing" deponent for purposes of taking depositions in Japan;

3.    When Mr. Son was made aware that his deposition has been noticed;

4.    The details of Mr. Son's whereabouts through the close of fact discovery;

5.    Who from ARM, apart from the witness, will physically be present in the deposition room;

6.    Who from ARM will be participating online from the U.S.;

7.    Who from ARM will be participating online from Japan; and

8.    Names of any foreign lawyers registered in Japan ("gaiben") who will be physically present on behalf of ARM in the deposition room.

In the continued absence of a substantive response to these questions, we will view ARM's failure to reply as a refusal to make Mr. Son available for his noticed deposition.

## IV.    ARM Has Not Proposed Any Alternative Discovery Mechanism

Finally, although ARM states that it "has repeatedly expressed willingness to consider other, less burdensome means of discovery," ARM has not once proffered <u>any alternative whatsoever</u> in any correspondence or during any meet and confer.  Indeed, Qualcomm has <u>no</u> current understanding of what ARM envisions this "less burdensome means of discovery" would entail, including whether it would involve any information from or pertaining to Mr. Son.  Such a vague proposal is, simply put, no proposal at all.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Jack Li                                                                                          6

Qualcomm strongly believes that an oral deposition of Mr. Son is the appropriate manner of exploring the significant and disparaging oral statements by Mr. Son to Qualcomm's customers, among other relevant topics.  But if ARM has an alternative proposal, it should provide it.  Merely putting the burden on Qualcomm to engage in a one-sided meet and confer with itself—while ARM withholds all information—is unacceptable.  The Court ordered ARM to confer with Qualcomm.  ARM should comply.

We also note that ARM failed to respond to our prior email offering times to meet and confer on this issue.  Please provide your availability for early next week as soon as possible.

Defendants reserve all rights.


Best regards,

/s/ Anna R. Gressel

Anna R. Gressel

# Exhibit 11

**⫿⫿ORRISON ⫿OERSTER**

250 WEST 55TH STREET
NEW YORK
NEW YORK  10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
PALO ALTO, SAN DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

**HIGHLY CONFIDENTIAL –
ATTORNEYS EYES ONLY**

Writer's Direct Contact
+1 (212) 336-4092
KMooney@mofo.com

October 11, 2023

BY EMAIL

Anna Gressel
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Email: agressel@@@paulweiss.com

Re:     <u>Arm Ltd. v. Qualcomm Inc. *et al.*</u>,
         Case No. 22:1146-MN

Counsel:

We write in response to your letter dated October 5 regarding Qualcomm's proposed deposition of Mr. Son.  Qualcomm's repeated failure to confirm that its proposed deposition would be limited to Mr. Son's role as Arm's Chair raises concerns that Qualcomm is improperly seeking third-party discovery through Arm.  Moreover, the Court has encouraged Qualcomm to be reasonable because Mr. Son is not a custodian and is "a very senior individual that . . . would not be expected to be involved in [Arm's] day-to-day situations." (9/29 Hrg. Tr. at 83:9-14.)  Consistent with the Court's guidance, and the Apex doctrine, Qualcomm should consider less burdensome options to obtain the discovery it allegedly seeks from Mr. Son.  Arm has repeatedly proposed such options, including depositions of both Arm's former and current CEOs on the identified issues, as well as additional interrogatories and Rule 30(b)(6) topics addressing those issues.  We look forward to further exploring those options with you.

**I.     Qualcomm's Failure to Explain the Scope of the Proposed Deposition of Mr. Son**

Qualcomm has yet again failed to confirm that its proposed deposition of Mr. Son would be limited to his role as Arm's Chair.  Arm has repeatedly requested this confirmation from Qualcomm (9/15/23 letter from S. Llewellyn to M. Zappala; 9/21/23 email from J. Li to A. Gressel; 9/22/23 email from J. Li to A. Gressel; 10/4/23 email form J. Li to A. Gressel), but Qualcomm does not even address this request in its most recent letter.  As Arm has

**IIIORRISON FOERSTER**

A. Gressel
October 11, 2023
Page Two

explained, if Qualcomm's proposed deposition of Mr. Son is not limited to his role as Arm's Chair, then Qualcomm is improperly seeking third-party discovery through Arm.

## II.     Arm Has Proposed Less Burdensome Alternatives to Qualcomm's Proposed Deposition of Mr. Son

Qualcomm's assertion that Arm "has not once offered any alternative [for discovery on the identified issues] in any correspondence or during any meet and confer" (10/5/23 letter from A. Gressel to J. Li) is false. I specifically stated during the September 27 meet-and-confer that Arm would be open to considering additional interrogatories or Rule 30(b)(6) topics. I understand that you were on that call. We also offered these alternatives in past correspondence. (*See, e.g.*, 10/4/23 email form J. Li to A. Gressel.)

Arm reiterates its offer of alternative means of obtaining the discovery that Qualcomm allegedly seeks through a deposition of Mr. Son and understand from your letter that Qualcomm is open to such an alternative. To that end, Arm would be willing to offer Qualcomm two additional interrogatories directed to the requested information and that we would respond to on an expedited basis (*e.g.*, 14 days) provided that they seek information relevant to the claims and defenses in the case. Arm also would be willing to offer Qualcomm two additional 30(b)(6) topics directed to the requested information, provided that they are directed to subjects relevant to the claims and defenses in the case, and would designate witness(es) knowledgeable about those topics. Arm's offer should satisfy any basis Qualcomm has articulated for deposing Mr. Son, and any further request by Qualcomm to depose Mr. Son at this stage thus would be premature. *See, e.g.*, *Reif v. CNA*, 248 F.R.D. 448, 451, 453-55 (E.D. Pa. 2008) ("The Reifs must demonstrate the insufficiency of interrogatories or the depositions of the lower level employees before obtaining a deposition of CNA Financial Corp. CEO Lilenthal.").

## III.    Qualcomm Fails to Establish any Basis for Deposing Mr. Son Under the Apex Doctrine

Your letter asserts that Arm "is not entitled to demand, as a predicate to the deposition, that Qualcomm expressly explain the complete basis for its request to depose Mr. Son." Qualcomm is wrong. Under the Apex doctrine, Qualcomm bears the burden of rebutting the presumption that a deposition of Mr. Son would be unduly burdensome, and that the purportedly relevant information is not available from other, less burdensome sources such as those offered above and in our past discussions. *See, e.g.*, *Harapeti v. CBS TV Stations Inc.*, No. 21-15675 (JXN) (LDW), 2021 U.S. Dist. LEXIS 258600, at *5 (D.N.J. Dec. 1, 2021) ("[The Apex Doctrine] applies a rebuttable presumption that a high-level official's deposition represents a significant burden upon the deponent and that this burden is undue."). Qualcomm has not met its burden.

**IIIORRISON FOERSTER**

A. Gressel
October 11, 2023
Page Three

For example, Qualcomm's letter cites Mr. Son's comment that Arm's IPO would be one of the largest in semiconductor industry.  But Arm's IPO is not relevant to any claims or defenses in this case.  Mr. Son's general comment regarding Arm's IPO, without discussing any issues relating to the claims and defenses in this case, cannot support Qualcomm's request to depose Mr. Son.



Qualcomm's letter vaguely references additional communications with "other customers" of Qualcomm that "may" have occurred.  Qualcomm should first identify these "other customers," and similarly explain why Mr. Son would have unique or superior knowledge regarding these communications with "other customers."

Qualcomm also has not alleged any basis for a general deposition of Mr. Son about all issues relating to this case.  Instead, Qualcomm has identified only a single topic about which Mr. Son allegedly has potentially relevant knowledge, which might at most justify a very short deposition limited to specific topics in Mr. Son's role as Arm's Chair even assuming Qualcomm could rebut the presumption under the Apex doctrine.  But Qualcomm has failed to limit its deposition request to the appropriate scope or purportedly relevant topics.

## IV.    Qualcomm Ignores the Court's Discussion that Should Have Resolved Qualcomm's Proposed Deposition of Mr. Son

Your letter asserts that Arm mischaracterizes the Court's order, which clearly supports Arm's position as articulated above.

The Court denied Qualcomm's request for Mr. Son's custodial files based on Arm's argument that Mr. Son (1) is not an Arm employee, (2) has significant responsibilities with other entities, and (3) lacks involvement in Arm's day-to-day operations.  Indeed, Magistrate Judge Hatcher stated that she "urge[s] [Qualcomm] to be reasonable in light of the fact that [Mr. Son] is a nonemployee, a chairman of the board, and not the CEO.  He's not a custodian, and he's a very senior individual that I would not be expected to be involved in the day-to-day situations."  (9/29/23 Hrg. Tr. at 83:9-14.)

**IIIORRISON FOERSTER**

A. Gressel
October 11, 2023
Page Four


Magistrate Judge Hatcher's statement echoes Arm's objections to Qualcomm's proposed deposition of Mr. Son.  Because Mr. Son "is a nonemployee" and "would not be expected to be involved in the day-to-day situations," Mr. Son likely does not have superior or unique knowledge regarding any facts relevant to the claims or defenses in this case.  Because Mr. Son is a chairman of the board with many other significant responsibilities with third parties, Qualcomm's proposed deposition of Mr. Son—not limited to Mr. Son's role as Arm's Chair—would be improperly seeking third-party discovery.  And because Mr. Son is a very senior individual, Qualcomm's proposed deposition of Mr. Son is presumed unduly burdensome absent Qualcomm's showing of (1) specific facts relevant to the claims or defenses in this case for which Mr. Son allegedly has superior or unique knowledge and (2) an explanation as to why those specific facts could not be explored via other witnesses already subject to deposition or the alternative means of discovery proposed by Arm above.

*  *  *

Please let us know whether Qualcomm accepts Arm's proposed alternatives to Mr. Son's deposition, including Qualcomm's proposal for the additional 30(b)(6) topics and interrogatories.

Very truly yours,

Kyle Mooney

# Exhibit 12

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3388

WRITER'S DIRECT FACSIMILE

(212) 492-0388

WRITER'S DIRECT E-MAIL ADDRESS

agressel@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC  20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
KAMESH BALASUBRAMANIAM*
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
PAUL D. BRACHMAN
GERALD BRANT
ROBERT A. BRITTON
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN P. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
TIHITINA DAGNEW
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
CAROLINE B. EPSTEIN
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
KATHERINE B. FORREST
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN M. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
LUKE JENNINGS
JEH C. JOHNSON
ROGER JOHNSON*
DEIRDRE JONES*
MATTHEW B. JORDAN
CHRISTODOULOS KAOUTZANIS
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
ROBERT A. KINDLER
JEFFREY L. KOCHIAN
ALEXIA D. KORBERG
DANIEL J. KRAMER

ANDREW D. KRAUSE
BRIAN KRAUSE
CAITH KUSHNER
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
MATTHEW N. LEIST*
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. McCOLM
JEAN M. McLOUGHLIN
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
SEAN A. MITCHELL
ERIN J. MORGAN
JUDIE NG-SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
MARCO M. PARLEN
DANIELLE C. PENHALL
CHARLES J. PESANT*
ANASTASIA V. PETERSON
ANDREAS PHILLIPSY
JESSICA E. PHILLIPS*
AUSTIN S. POLLET*
RAVI PUROHIT
VALERIE E. RADWANER
JEFFREY J. RECHER
LORIN L. REISNER
JEANNIE S. RHEE
ANDREW M. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
AARON J. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM
SCOTT A. SHER*
SUHAN SHIM
CULLEN L. SINCLAIR
MAURY SLEVIN
KYLE SMITH
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EYITAYO ST. MATTHEW-DANIEL
SARAH STASNY
BEN STEADMAN
AIDAN SYNNOTT
ROBERT D. TANANBAUM
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELAZQUEZ
MICHAEL VOGEL
ANDREA WAHLQUIST BROWN
JOHN WEBER
THEODORE V. WELLS, JR.
ERIC J. WEDEL
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
STACI YABLON
BOSCO YU*
KAYE N. YOSHINO
TONG YU
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

October 24, 2023

**By Email**

Kyle Mooney
Morrison & Foerster LLP
250 West 55th Street
New York, NY, 10019

Re:    *Arm Ltd.* v. *Qualcomm Inc. et al.*
       C.A. No. 22-1146-MN

**Highly Confidential – Attorneys' Eyes Only**

Counsel:

We write in response to your letter dated October 11, 2023 concerning Defendants' notice of Masayoshi Son's deposition.

Qualcomm is concerned with several of the assertions in your letter.  (*See* 10/11/23 letter from K. Mooney to A. Gressel.)  *First*, ARM complains that "Qualcomm has yet again failed to confirm that its proposed deposition of Mr. Son would be limited to his role as Arm's Chair."  But ARM ignores that Qualcomm has repeatedly expressed its concern about ARM's purported narrowing of Mr. Son's document collection and deposition topics "to his role as Arm's Chair," including based on ARM's assertion that it does not represent

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Kyle Mooney                                                                          2

Mr. Son outside of this role and therefore cannot even purport to represent whether Mr. Son is a "willing" deponent under Japanese law.  (*See, e.g.*, 10/11/23 letter from K. Mooney to A. Gressel; 10/4/23 email from J. Li to A. Gressel; 10/3/23 letter from C. Nyarady to K. Mooney; 9/21/23 email from A. Gressel to J. Li; 9/21/23 email from J. Li to A. Gressel; 9/15/23 letter from S. Llewellyn to M. Felder Zappala; 5/1/23 letter from M. Felder Zappala to S. Llewellyn.)

When ARM imposed this same limitation with respect to Mr. Son's ▉▉▉▉▉ ▉▉▉▉▉, the manner in which those documents were reviewed and produced (*i.e.*,



) led to significant concerns from Qualcomm that ARM was taking an overly narrow approach in determining which actions or statements by Mr. Son were within Mr. Son's role as ARM's Chair.  (*Cf.* 9/29/23 Tr. 81:5-14) ("THE COURT: And did I hear you correctly that with respect to this Arm issue, where certainly you could see how the Arm limitation might not scoop up communication between Mr. Sun [sic] and third parties, that Arm was certainly willing to go back and discuss the issue ▉▉▉▉▉▉▉▉▉▉▉? MR. LI: Yes, Arm would be willing to ▉▉▉▉▉▉▉▉▉, Your Honor.")

*Second*, Qualcomm strongly disagrees with ARM's assertions that Mr. Son's deposition is not necessary because ARM's "IPO is not relevant to any claims or defenses in this case."  (*See* 10/11/23 letter from K. Mooney to A. Gressel.)  To the contrary, during the hearing, the Court specifically underscored the relevance of those documents and the importance of the custodians with material involvement in ARM's IPO, stating: "I didn't hear a real substantial argument from Arm that these [IPO] documents aren't relevant.  I think that they potentially are.  So, Arm, you're going to have to tell Qualcomm who worked on the IPO in a material way, and I think we know what that means, and whether any of the custodians that you've already collected from were ones that had material involvement on the IPO.  If none of your custodians had involvement in the IPO and those folks aren't going to be in possession of the sorts of material that Qualcomm seeks, then you're going to have to go back to the drawing board and folks are going to have to work something out here."  (9/29/23 Tr. 93:10-25.)  Mr. Son was involved in the ARM IPO and therefore Qualcomm is entitled to get discovery from him on these issues.

*Third*, Qualcomm vigorously disputes ARM's contention that "Qualcomm has never alleged that Mr. Son was the sole person involved in ▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉  (*See* 10/11/23 letter from K. Mooney to A. Gressel.)  As Qualcomm has previously explained to ARM, there is no way for Qualcomm to know whether any other ARM personnel were involved in Mr. Son's communications with ▉▉▉▉ because ARM has refused to reveal this information.  Indeed, in our last correspondence, we specifically asked ARM to confirm promptly in writing if other ARM executives, including its current and past CEOs, could provide insights into Mr. Son's oral conversations with Qualcomm's

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Kyle Mooney                                                                                                3

customers concerning the issues alleged in Qualcomm's Amended Counterclaims.  (*See* 10/5/23 letter from A. Gressel to J. Li.)  Qualcomm has not yet received any response.

Notwithstanding these concerns, Qualcomm is willing to engage in a good faith discussion about reasonable limitations on the subject matter of Mr. Son's deposition, including by limiting Mr. Son's deposition to his "role as Arm's Chair," as long as ARM confirms that by testifying in his "role as Arm's Chair" Mr. Son would be testifying about at least the following topics:

1.     Mr. Son's actions taken, statements made, or communications concerning his participation in ARM Board of Directors meetings, including the topics discussed therein;

2.     Mr. Son's actions taken, statements made, or communications concerning Mr. Son's discussions with any ARM customer or potential customer concerning ARM business matters;

3.     Mr. Son's actions taken, statements made, or communications concerning Qualcomm, Nuvia, or their license agreements with ARM;

4.     Mr. Son's actions taken, statements made, or communications concerning this action;

5.     Mr. Son's actions taken, statements made, or communications concerning the ARM IPO;

6.     Mr. Son's actions taken, statements made, or communications concerning his efforts to "concentrate" or "devote" himself to growing ARM;

7.     Mr. Son's actions taken, statements made, or communications concerning ARM's business model, including its licensing practices;

8.     Mr. Son's role in overseeing, supervising, or approving ARM's decision to design a semiconductor chip;

9.     Mr. Son's actions taken, statements made, or communications concerning the negotiation and licensing of ARM's ██████ ██████ ██████ ████████████, including to Qualcomm; and

10.    Mr. Son's actions taken, statements made, or communications concerning Qualcomm's acquisition of Nuvia, including communications with third parties;

11.    Mr. Son's actions taken, statements made, or communications concerning NVIDIA's failed attempt to acquire ARM.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Kyle Mooney                                                                                    4

Please let us know at your earliest convenience whether ARM will agree to Mr. Son's deposition pursuant to the agreement that Mr. Son will be deposed in his "role as Arm's Chair," subject to the topics and scope listed above.

Additionally, please confirm promptly whether Morrison & Foerster represents Mr. Son in connection with the above-captioned litigation, including any such deposition taken in connection with this action.

As to ARM's offer to provide Qualcomm with "two additional interrogatories directed to the requested information and that [ARM] would respond to on an expedited basis (*e.g.*, 14 days) provided that they seek information relevant to the claims and defenses in the case," as well as "two additional 30(b)(6) topics directed to the requested information, provided that they are directed to subjects relevant to the claims and defenses in the case, and would designate witness(es) knowledgeable about those topics," (*see* 10/11/23 letter from K. Mooney to A. Gressel), ARM has not yet provided any information in response to Qualcomm's requests to establish whether any other ARM employees have relevant information concerning certain of the topics above, including Mr. Son's discussions with Qualcomm's customers. Absent further information, these discovery devices do not appear to pose any reasonable alternative to Mr. Son's deposition in this matter.

Defendants reserve all rights.

Regards,

*/s/ Anna R. Gressel*

Anna R. Gressel

# Exhibit 13

**⫟⦚ORRISON ⫟ORRISON FOERSTER**

250 WEST 55TH STREET
NEW YORK
NEW YORK  10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
PALO ALTO, SAN DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

**HIGHLY CONFIDENTIAL –
ATTORNEYS EYES ONLY**

Writer's Direct Contact
+1 (212) 336-4092
KMooney@mofo.com

October 30, 2023

BY EMAIL

Anna Gressel
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Email: agressel@paulweiss.com

Re:    Arm Ltd. v. Qualcomm Inc. *et al.*,
        Case No. 22:1146-MN

Counsel,

We write in response to your letter dated October 24 regarding Defendants' proposed deposition of Mr. Son.  (10/24/23 letter from A. Gressel to K. Mooney.)

The parties appear in agreement that Defendants can obtain discovery concerning the subject matter identified by Defendants via alternative means that are far less burdensome than an Apex deposition of Mr. Son, such as disposition of "other ARM employees hav[ing] relevant information."  (10/24/23 letter from A. Gressel to K. Mooney at 4.)  Defendants, after repeated requests from Arm, have identified a single subject on which Mr. Son allegedly has relevant knowledge, *i.e.*, ███████████████████████████ ████████████████████████████████████████████████ █████████████████████████████  Accordingly, we understand from Defendants' October 24 letter that Defendants are amenable to proceeding as Arm suggested in lieu of deposing Mr. Son, *i.e.*, two additional interrogatory topics and Rule 30(b)(6) testimony regarding the meeting.  Defendants, in fact, already served a Rule 30(b)(6) topic directed specifically to this very subject (Topic 41), and Arm is amenable to designating a witness to offer corporate testimony on that subject.

Arm's offer of less burdensome means of obtaining the discovery that Defendants allegedly seek through a deposition of Mr. Son, and Arm's confirmation that other Arm employee(s) already subject to deposition by Defendants have relevant information, should satisfy any basis Defendants have articulated for deposing Mr. Son.  Therefore, a deposition

**IIIORRISON FOERSTER**

A. Gressel
October 30, 2023
Page Two

of Mr. Son at this stage would at very least be premature. *See, e.g.*, *Reif v. CNA*, 248 F.R.D. 448, 451, 453-55 (E.D. Pa. 2008) ("The Reifs must demonstrate the insufficiency of interrogatories or the depositions of the lower level employees before obtaining a deposition of CNA Financial Corp. CEO Lilenthal.").

Given that the parties now appear to agree that Defendants can obtain the requested discovery through other, less burdensome means, we respond only briefly to the other points raised in your letter.

First, we do not understand Defendants' position regarding the scope of the proposed (and now unnecessary) deposition of Mr. Son, but Defendants do not advance any argument supporting their position that Mr. Son should have been required to testify beyond the scope of his role as Arm's Chair.

Second, Arm did not argue that Mr. Son's deposition "[wa]s not necessary because Arm's 'IPO is not relevant to any claims or defenses in this case.'" (10/24/23 letter from A. Gressel to K. Mooney at 2.) Instead, Mr. Son's general comment about the IPO cited by Defendants is not relevant to any claims or defenses. Defendants argued during the September 29 hearing that Arm's IPO documents could potentially be relevant to the extent they contain information supporting Arm's requested remedy in this case, and Defendants do not explain how Mr. Son's general comment about the IPO would be relevant to Arm's requested remedy. In any event, Defendants do not contend that Mr. Son would have superior or unique knowledge regarding Arm's IPO in this respect.

Third, Defendants' demand that Mr. Son be prepared to testify about a laundry list of subjects is unsupported by authority. But that list firmly underscores that the sole basis for Defendants' requested deposition of Mr. Son is ██████████████████████████ ██████████████████.

Arm awaits Defendants' service of the alternative discovery discussed above, for which Arm would be willing to respond on an expedited basis, including before the close of fact discovery, to the extent Defendants do not delay service.

Very truly yours,

Kyle Mooney

# Exhibit 14

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3388

WRITER'S DIRECT FACSIMILE
(212) 492-0388

WRITER'S DIRECT E-MAIL ADDRESS
agressel@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC  20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JEFFREY E. ANDERSON
ALLAN J. ARFFA
STEFAN ARNOLD-SOULBY*
JONATHAN H. ASHTOR
ROBERT A. ATKINS
KANESH BALASUBRAMANIAM*
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
PAUL D. BRACHMAN
ROBERT A. BRITTON
BRAD BROWN
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN P. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
TAHYVNESS CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
TIHITINA DAGNEW
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
CAROLINE B. EPSTEIN
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERT FINZI
PETER E. FISCH
HARRIS FISCHMAN
KATHERINE B. FORREST
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN H. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
LUKE JENNINGS
JEH C. JOHNSON
ROGER JOHNSON*
DEIRDRE JONES*
MATTHEW B. JORDAN
CHRISTODOULOS KAOUTZANIS
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
BRADY A. KINDLER
ALEXIA D. KORBERG
DANIEL J. KRAMER
ANDREW D. KRAUSE

BRIAN KRAUSE
CAITH KUSHNER
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
MATTHEW N. LEIST*
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. McCOLM
JEAN M. McLOUGHLIN
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
MATTHEW MERKLE
WILLIAM B. MICHAEL
SEAN A. MITCHELL
ERIN J. MORGAN
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
CIAN O'CONNOR*
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENHALL
CHARLES J. PESANT*
ANASTASIA A. PETERSON
ANDREAS PHILIPSON*
JESSICA E. PHILLIPS*
AUSTIN S. POLLET*
RAVI PUROHIT
VALERIE E. RADWANER
JEFFREY J. RECHER
LORIN L. REISNER
JEANNIE S. RHEE
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
NEEL V. SACHDEV*
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM
SCOTT A. SHER*
SUHAN SHIM
CULLEN L. SINCLAIR
MAURY SLEVIN
KYLE SMITH
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EYITAYO ST. MATTHEW-DANIEL
SARAH STASNY
BEN STEADMAN
ARIAN SYNNUITI
ROBERT D. TANANBAUM
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELÁZQUEZ
MICHAEL VOGEL
ANDREA WAHLQUIST BROWN
JOHN WEBER
THEODORE V. WELLS, JR.
ERIC J. WEDEL
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
STACI YABLON
BOSCO YIU*
KAYE N. YOSHINO
TONG YU
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

November 17, 2023

**By Email**

Kyle Mooney
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019

Re:     *Arm Ltd.* v. *Qualcomm Inc. et al.*
C.A. No. 22-1146-MN
**Highly Confidential – Attorneys' Eyes Only**

Counsel:

         We write to follow-up on yesterday's meet and confer regarding Qualcomm's continued requests to depose Masayoshi Son.  During the meet and confer, we explained that we considered in good faith, but found severely insufficient, the offer in ARM's October 30 letter to substitute adequately prepared corporate deposition testimony and two additional interrogatory responses for a deposition of ARM Chair Masayoshi Son.  (October 30, 2023 Letter from K. Mooney.)  We explained that Qualcomm's recent deposition of Mr. Williamson, ARM's designated corporate witness under Federal Rule of Civil Procedure 30(b)(6) on the relevant subject matter, gave rise to significant concerns that ARM had not adequately prepared its corporate deponent to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

testify on topics of relevance to Mr. Son, and was therefore insufficient to substitute for Mr. Son's deposition.

During the meet and confer, Qualcomm thus asked ARM whether, after months of setting forth the relevance of Mr. Son's deposition and taking efforts to schedule it in Japan – and months of refusals from ARM to make Mr. Son available for the deposition or even answer basic questions to logistically make possible his deposition – ARM would be willing to reconsider its position on Mr. Son's deposition. In response, you told us no.

Additionally, ARM asked for the basis of our refusal of ARM's purported alternatives to Mr. Son's deposition in writing. That explanation follows, much of which we already explained on yesterday's call:

Contrary to ARM's representation that it was "amenable to designating a witness to offer corporate testimony" regarding the topics of relevance to Mr. Son (*id.*), it is clear from ARM's recent 30(b)(6) deposition that ARM's offer was not intended to shed true insight into the nature of Mr. Son's important – and damaging – statements to Qualcomm's customers, ███████████. Indeed, based on ARM's October 30 letter, Qualcomm expected that Mr. Williamson's corporate testimony would have, at a minimum, addressed 30(b)(6) Topic 41 (Statements made by Masayoshi Son regarding Qualcomm's licensing relationship with ARM), including ██████████████████ ████████████████████████████████ (*Id.*) For this corporate testimony to serve as a meaningful alternative to Mr. Son's deposition, Qualcomm anticipated that ARM's corporate witness would have been well prepared to address this subject matter during the deposition. However, Mr. Williamson expressly testified during his deposition on November 9, 2023 that he ██████████████████████████████████ ████████████████. This is unacceptable.

Specifically, Mr. Williamson was not able to ████████████████ ████████████████████████████. Instead, Mr. Williamson explained that ████████████████ ████████████. (*See* Williamson Dep. Tr. 261:3–13 ███████████████. *See also id.* at 259:10–14; 262:6–14; 266:21–267:2; 269:6–22.) As ARM's corporate deponent, Mr. Williamson testified that ████████████ (*id.* at 265:20–266:1), ██████████████████████████████████ (*id.* at 266:2–7). In fact, Mr. Williamson stated directly as ARM's corporate deponent that ████████████

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3



(*Id.* at 265:20–266:7.)  Topic 41 squarely included these subjects.[1,2]

In addition, yesterday Qualcomm also deposed ARM's former CEO, Simon Segars, which ARM also previously and repeatedly recommended as an alternative to a deposition of Mr. Son.  (*See* October 11, 2023 Letter from K. Mooney.)  Mr. Segars' testimony in fact only further confirmed why deposing Mr. Son is necessary.  Mr. Segars testified in key part that:

- .  (Segars Rough Dep. Tr. 14:7–15:4.)
- .  (*Id.* at 68:3–22.)
- (*See id.* at 60:9–61:5; 61:25–62:5; 63:20–68:2.)  In fact, (*See id.* at 62:14–65:19; QX102, ARM_01245006 at -5027.)  confirms that alternative deponents would be unable to adequately testify to his unique knowledge.
- In his role as ARM's chair, Mr. Son would have been (Segars Rough Dep. Tr. at 165:20–166:2.)  This, of course, seemingly contradicts Mr. Williamson's corporate testimony that (Williamson Dep. Tr. 237:17–24.)
- Even as ARM's CEO, Mr. Segars (Segars Rough Dep. Tr. 71:3–6.)  This testimony demonstrates the inadequacy of ARM's alternatives— only Mr. Son
- Even as ARM's CEO, Mr. Segars did not know whether (*Id.* at 69:23–25.)

---

[1] Moreover, Qualcomm put ARM on notice months ago that these were topics upon which Mr. Son has relevant knowledge, including specifically with respect to Mr. Son's                    .  (*See* Qualcomm's June 23, 2023 Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories at 18–20.)                    Qualcomm therefore reasonably expected that any substitute 30(b)(6) testimony would have addressed these topics.

[2] We note further that Mr. Williamson's failure to answer these questions also demonstrates that he was unprepared sufficiently to testify on 30(b)(6) Topics 33 and 34.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4



Notwithstanding the fact that Mr. Segars testified that ████████████ ████████ (*id.* at 12:8–10), and Mr. Segars ████████████████ ████████████████████████████, Mr. Segars purportedly ████████████. This significantly curtails Qualcomm's ability to obtain critical information about Mr. Son's contributions to key ARM decisions, statements, or actions relevant to this case, which are uniquely within Mr. Son's personal knowledge. For example, Mr. Segars ████████ ████████:

- ████████████████████████████████████ ████████ (*Id.* at 55:13–19; 54:15–20.)
- ████████████████████████████████ (*Id.* at 60:22–61:11.)
- ████████████████████████████████████ (*Id.* at 53:18–54:10.)

As we stated on yesterday's meet and confer, Mr. Williamson's deposition transcript spoke for itself in demonstrating both his inability to properly testify as ARM's corporate representative on his designated topics and the inability of ARM's corporate testimony to substitute for Mr. Son's own testimony. Given Mr. Williamson's lack of preparedness and relevant knowledge to address these topics, Qualcomm has significant concerns that Mr. Haas's testimony will prove similarly deficient. As you stated during the meet and confer, Mr. Williamson spoke to Mr. Haas in his preparation to give corporate testimony on Topic 41. If Mr. Williamson's resulting corporate testimony after preparing with Mr. Haas was wholly insufficient to address Topic 41 and other relevant subjects (and Mr. Segars's inability to recall his interactions with Mr. Son), Qualcomm has no reason to believe that Mr. Haas's *own testimony* will provide any further information.[3]

Nor will written discovery in the form of interrogatory responses resolve the issue. In particular, Mr. Williamson testified during his deposition that he ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████



[3] As we explained at the meet and confer, we also strongly disagree with ARM's misleading characterization that Mr. Son ████████████████████████████ and that is the only testimony for which ARM need propose alternatives to Mr. Son's testimony. Qualcomm has the right to seek discovery regarding whether Mr. Son made other such damaging statements to other customers. As ARM expressed regarding another topic during the meet and confer, the party with the relevant information "cannot put the burden on [the opposing] party to articulate every third party communication [the party with the information] may have ever had." (November 16, 2023 Meet and Confer.) There is no guarantee that Mr. Haas ████████████████████████████████████ and ARM has not provided that assurance. In fact, Mr. Haas's predecessor, Mr. Segars, testified specifically that he ████████ ████████████████████████████████████████████████████ (Segars Rough Dep. Tr. 71:3–6.) Moreover, as we have explained in prior correspondence, Qualcomm also seeks Mr. Son's testimony regarding ARM's IPO and certain other limited topics. (*See, e.g.*, October 24, 2023 Letter from A. Gressel.)

5

███████████████████████████ (Williamson Dep. Tr. 260:3–7.)
Qualcomm therefore has significant concerns that Mr. Son would play little or no role in verifying the accuracy or sufficiency of ARM interrogatory responses, which ARM would purport to substitute for Mr. Son's deposition testimony.  That concern is particularly disturbing here, given that ARM has repeatedly refused to provide information to Qualcomm about Mr. Son's involvement in the litigation.  (*See* October 4, 2023 Email from J. Li (refusing to answer even whether Mr. Son was a "willing" deponent under Japanese law or provide Mr. Son's whereabouts for a deposition outside of Japan).)[4]  Therefore, to the extent the interrogatories would only provide insight into ARM's corporate knowledge, that would shed no further light on Mr. Son's unique communications – the precise point at issue here.

As we stated on the meet and confer, our understanding is that ARM has maintained throughout the parties' discussions that it is not willing to make Mr. Son available for a deposition, even in his role as ARM's Board Chair.  Our robust and lengthy discussions on this point have seemingly not shifted ARM's position.

We therefore ask that ARM confirm as soon as possible that ARM's position remains unchanged that it is not willing to make Mr. Son available for a deposition, given our significant concerns that your proposed alternatives are demonstrably insufficient to substitute for that deposition.

Qualcomm reserves all rights.

Sincerely,

Anna R. Gressel

---

[4] We note also that it took repeated efforts over a period of months to obtain basic information regarding how Mr. Son's documents were collected.

# Exhibit 15

**ℿORRISON FOERSTER**

250 WEST 55TH STREET
NEW YORK
NEW YORK  10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
PALO ALTO, SAN DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

**HIGHLY CONFIDENTIAL –
ATTORNEYS EYES ONLY**

Writer's Direct Contact
+1 (212) 336-4092
KMooney@mofo.com

November 28, 2023

BY EMAIL

Anna Gressel
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Email: agressel@paulweiss.com

Re:    <u>Arm Ltd. v. Qualcomm Inc. *et al.*</u>,
       Case No. 22:1146-MN

Counsel,

      We write in response to your November 17 letter regarding Defendants' proposed deposition of Mr. Son, in contravention of the rules governing Apex depositions.  (11/17/23 letter from A. Gressel to K. Mooney.)  As Arm has already explained, Mr. Son resides in Japan, is an outside director of Arm (not an employee), and is not involved in Arm's day-to-day operations.  (*See, e.g.*, 9/15/23 letter from S. Llewellyn to M. Zappala.)  Arm has repeatedly offered alternative less burdensome means for Defendants to discover any alleged relevant information they seek, but Defendants have instead sought to depose Mr. Son after the close of fact discovery.

      We are surprised that Defendants — the day before the close of fact discovery — resurrected their request for a deposition of Mr. Son, having remained silent for three weeks after Arm believed the issue to have been resolved.  (*See* 11/16/23 email from M. Zappala to J. Li.)  On October 30, 2023, Arm sent a letter to Defendants noting that "[t]he parties appear in agreement that Defendants can obtain discovery concerning the subject matter identified by Defendants via alternative means that are far less burdensome than a deposition of Mr. Son."  (10/30/23 letter from K. Mooney to A. Gressel at 1.)  Arm further confirmed its proposal that Defendants serve two additional interrogatories and seek Rule 30(b)(6) testimony.  (*Id.*)  Defendants did not dispute that the parties were in agreement, did not object to Arm's proposal, and did not otherwise respond until raising a proposed deposition again *three weeks* later.  Accordingly, Arm understood the issue to have been resolved, and Defendants' belated request to depose Mr. Son is baseless.

**IIIORRISON FOERSTER**

A. Gressel
November 28, 2023
Page Two

*First*, Defendants did not even bother to serve interrogatories directed to Mr. Son's alleged communications with ██████████████ — despite Arm's repeated invitation that Defendants could serve extra interrogatories on this subject. Instead, Defendants sat silent for three weeks and then speculated during the parties' meet-and-confer, and in their recent letter, that Arm's responses to interrogatories would not have been sufficient. Defendants' contention is baseless and ignores case law requiring that Defendants demonstrate that alternative means of discovery are insufficient before seeking an Apex deposition. *See, e.g.*, *Reif v. CAN*, 248 F.R.D. 448, 451, 453-55 (E.D. Pa. 2008).

*Second*, Arm has already provided Rule 30(b)(6) testimony on this subject and Defendants did not complain about its sufficiency at the time.[1] On November 9, Mr. Williamson was questioned on this topic and responded to counsel's questions. (*See, e.g.*, 11/9/23 Williamson Tr. at 256:9-262:14.) Mr. Williamson explained that ████████████ ███████████████████████████████████████████████ (*Id.* at 257:9-258:2.) Mr. Williamson further testified that ███████████████████████████████████████████ (*Id.*) Mr. Williamson also testified ██████████████████████████████████████████████████ ████████████████████████:

- ████████████████████████████████████████ ████████████████. (*Id.* at 256:9-262:14.)

- ██████████████████████████. (*Id.* at 258:13-259:6.) ███████████████████████████████████████████ (*Id.* at 259:7-261:16.)

- ███████████████████████████████████ (*Id.* at 258:13-259:6.) ██████████████████████████████████████████ (*Id.* at 261:17-262:14.)

---

[1] Defendants completed a Rule 30(b)(6) deposition on this topic after Arm made clear that it was providing such testimony contingent on Defendants dropping their pursuit of Mr. Son's deposition. (*See, e.g.*, 10/25/2023 Arm Resp. and Obj. at 23.)

# ⅢORRISON ҒOERSTER

A. Gressel
November 28, 2023
Page Three

Defendants' counsel did not once contend that Mr. Williamson was unprepared on the topic or identify any related questions that Mr. Williamson could not answer — and which might have been addressed by reaching out to Mr. Haas at a break for any additional information. Defendants' counsel also did not leave the deposition open. (*Id.* at 310:2.)  Defendants' belated complaint that Mr. Williamson was prepared only to discuss statements concerning the litigation overlooks that the litigation itself concerns Qualcomm's rights to Arm technology.  But even if Defendants' counsel did have any questions to which Mr. Williamson did not fully respond, Mr. Haas attended the meetings and is being deposed in the coming weeks.  Arm is amenable to designating Mr. Haas's responses on this subject as Rule 30(b)(6) testimony on behalf of Arm.

Finally, Simon Segars' testimony falls far short of demonstrating that Mr. Son has superior or unique personal knowledge regarding any claim or defense in this case:



- ██████████████████████████████████ (11/16/23 Segars Tr. (Rough) at 15:2-3) does not establish that Mr. Son has personal or unique knowledge relevant to claims or defenses in this case.

- Mr. Segars' testimony that ████████████████████████████ does not justify a deposition of Mr. Son; Mr. Segars already testified about those meetings in response to counsel's questions.  (*See, e.g.*, *id.* at 69:9-68:1.)

- Mr. Segars' speculation that ████████████████████████ ███████████████████████████████ does not contradict Mr. Williamson's testimony or justify Mr. Son's deposition.  In fact, Mr. Seager specifically confirmed that ██████████████████████████ ████████████████████████ (*Id.* at 165:8-19.)

\*    \*    \*

In sum, Arm is disappointed that Defendants have suddenly (and belatedly) re-raised a request to depose Mr. Son at the close of discovery and reiterates that Defendants' demand is at the very least premature given the upcoming deposition of Mr. Haas.  We trust that this letter resolves the alleged dispute.

Very truly yours,

**IIIORRISON FOERSTER**

A. Gressel
November 28, 2023
Page Four

Kyle Mooney

# Exhibit 16

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3388

WRITER'S DIRECT FACSIMILE
(212) 492-0388

WRITER'S DIRECT E-MAIL ADDRESS
agressel@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JARRYD E. ANDERSON
ALLAN J. ARFFA
STEFAN ARNOLD-SOULBY*
JONATHAN H. ASHTOR
BRAD A. ATKINS
KANESH BALASUBRAMANIAM*
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
PAUL D. BRACHMAN
ROBERT A. BRITTON
BRAD BROWN
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN P. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
TA'HYNNESS CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THHTINA DAGNEW
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
CAROLINE B. EPSTEIN
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERT FINZI
PETER E. FISCH
HARRIS FISCHMAN
KATHERINE B. FORREST
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGGIORMELLA
NEIL GOLDMAN
ROBERTO D. GOLDSTEIN
ROBERTO J. GONZALEZ*
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN H. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
LUKE JENNINGS
JEH C. JOHNSON
ROGER JOHNSON*
DEIRDRE JONES*
MATTHEW B. JORDAN
CHRISTODOULOS KAOUTZANIS
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
ROBERT A. KINDLER
ALEXIA D. KORBERG
DANIEL J. KRAMER
ANDREW D. KRAUSE
BRIAN KRAUSE
CAITH KUSHNER
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
MATTHEW N. LEIST
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. MCCOLM
JEAN M. MCLOUGHLIN
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
MATTHEW MERKLE
WILLIAM B. MICHAEL
SEAN A. MITCHELL
ERIN J. MORGAN
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
CIAN O'CONNOR*
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENHALL
CHARLES J. (P&BAN)
ANASTASIA J. PETERSON
ANDREAS PHILIPSON*
JESSICA E. PHILLIPS*
AUSTIN S. POLLET*
RAVI PUROHIT
VALERIE E. RADWANER
JEFFREY J. RECHER
LORIN L. REISNER
JEANNIE S. RHEE
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
NEEL V. SACHDEV*
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
JACK A. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM
SCOTT A. SHER*
SUHAN SHIM
CULLEN L. SINCLAIR
MAURY SLEVIN
KYLE SMITH
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EYITAYO ST. MATTHEW-DANIEL
SARAH STASNY
BEN STEADMAN
AJAN SYNNUTT
ROBERT D. TANANBAUM
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELÁZQUEZ
MICHAEL VOGEL
ANDREA WAHLQUIST BROWN
JOHN WEBER
THEODORE V. WELLS, JR.
ERIC J. WEDEL
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
STACI YABLON
BOSCO YIU*
KAYE N. YOSHINO
TONG YU
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

December 7, 2023

**By Email**

Kyle Mooney
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019

Re:     *Arm Ltd.* v. *Qualcomm Inc. et al.*
        C.A. No. 22-1146-MN

**Highly Confidential – Attorneys' Eyes Only**

Counsel:

        We write in response to your November 28, 2023 letter, which again seeks to prevent a necessary deposition of Masayoshi Son.  (November 28, 2023 Letter from K. Mooney.)  We disagree with several premises of your letter and the substance of that letter.  Notably, we again reject your attempt to limit Qualcomm's interest in Mr. Son to only the meetings with ▮▮▮▮▮▮.  As we have repeatedly explained, it is in particular improper for ARM to attempt to unilaterally limit Qualcomm's ability to seek discovery regarding whether Mr. Son has made such damaging statements to other of Qualcomm's customers, and the substance and circumstances of those misstatements.  That is especially the case because discovery to date, including from ARM's own questioning,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

has already strongly suggested that other such statements were made. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, your letter only confirms that ARM's Rule 30(b)(6) testimony did not substantively address Mr. Son's statements "regarding Qualcomm's *licensing* relationship with ARM" as Rule 30(b)(6) Topic 41 and the parties' correspondence required.  (November 28, 2023 Letter from K. Mooney.)

Nor do we agree that our request to depose Mr. Son is belated.  As you know, Qualcomm served its deposition notice for Mr. Son over three months ago.  (*See* August 30, 2023 Qualcomm's Notice of Deposition to Masayoshi Son.)  ARM cannot continually obstruct the scheduling of that deposition and now claim surprise that Qualcomm continues to seek Mr. Son's deposition.

We will respond to the remainder of your letter in the course of our briefing to the Court.

Qualcomm reserves all rights.

Sincerely,

Anna R. Gressel

# Exhibit 17

**S&P Global**
Market Intelligence

# SoftBank Group Corp. TSE:9984

# FQ2 2023 Earnings Call Transcripts

## Friday, November 11, 2022 7:30 AM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ2 2023- | | | -FQ3 2023- | -FY 2023- | -FY 2024- |
|---|---|---|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** | **CONSENSUS** | **CONSENSUS** | **CONSENSUS** |
| **EPS (GAAP)** | 104.50 | 1855.90 | ▲1675.98 | 113.20 | 523.74 | 341.28 |
| **Revenue (mm)** | 1579000.00 | 1610447.00 | ▲1.99 | 1659400.00 | 6475243.85 | 6739081.21 |

Currency: JPY
Consensus as of Nov-08-2022 7:56 PM GMT



Stock Price [JPY] vs. Volume [mm] with earnings surprise annotations

| - EPS (GAAP) - | | | |
|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** |
| **FQ3 2022** | 92.85 | 12.07 | ▼(87.00 %) |
| **FQ4 2022** | 229.10 | (1233.10) | NM |
| **FQ1 2023** | 95.80 | (1949.55) | NM |
| **FQ2 2023** | 104.50 | 1855.90 | ▲1675.98 % |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ..................................................................... | 3 |
| Presentation | ..................................................................... | 4 |
| Question and Answer | ..................................................................... | 14 |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

**EXECUTIVES**

**Ian Thornton**

**Kazuko Kimiwada**
*Senior VP, Head of Accounting Unit & Corporate Officer*

**Masayoshi Son**
*Founder, Chairman of the Board, CEO & Corporate Officer*

**Navneet Govil**
*Managing Partner & CFO*

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

**ANALYSTS**

**Daisaku Masuno**
*Nomura Securities Co. Ltd., Research Division*

**Unknown Analyst**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

[Interpreted] Thank you very much for waiting everyone. Now we would like to start SoftBank Group Corp. earnings results briefing for 6-month period ended September 30, 2022. First of all, I would like to introduce today's participants. From left, we have Yoshimitsu Goto, Board Director and CFO; Kazuko Kimiwada, Senior Vice President and Head of Accounting Unit; Navneet Govil, Managing Partner and Chief Financial Officer, SoftBank Investment Advisors; Ian Thornton, Investor Relations, Vice President, Arm. Today's announcement is live broadcast over Internet.

Now I would like to invite Mr. Masayoshi Son, Chairman and CEO, SoftBank Group Corp to make opening remarks. Mr. Son, please.

**Masayoshi Son**
*Founder, Chairman of the Board, CEO & Corporate Officer*

[Interpreted] Good afternoon, everyone. This is Masayoshi Son, SoftBank Group Corp. Usually, I sit over here on the far left from your side and make a presentation, is the kind of a traditional way we've been doing for the announcement. But this time, we have a slight change. I'm not going to sit over here. And going on, this is the last time for me to be standing on this stage for the earnings results announcement to explain you and update you the quarterly result to you or give you any update on the business strategy.

So with today's -- this opportunity, I would like to make it for the -- make it last. In the meantime, Mr. Goto, next to me, he is going to make a presentation every time every quarter going forward. So I believe that he's been very excited for that moment. But he's been silent and sitting over here just during my presentation. So hope that he is going to make a presentation going forward and hope that you have a good time to listen to him going forward.

So maybe you're going to be wondered what happened? Are you unhealthy? Are you sick? Are you going to retire? You may wonder and you may -- and we did receive some questions from you, but that's not true at all. I am in good health, good shape. I have very much motivated and excited about the business. So I have good spirits and full of energy. And you may ask why, if you are in good shape, why not you're going to make a presentation for the quarterly results. Why this will be the last time? And let me explain to you why is that, and that will be the last message from me in the meantime at the quarterly results.

Of course, at the shareholders meeting, I will be attending. And if there is any news or any updates that I would like to make, of course, I'm prepared to do so. But unless otherwise, I believe that this will be the last in the meantime. So let me come to the center of the podium and give you a little bit of explanation in the presentation.

So as a business person, before I start at SoftBank, there was my origin, back when I was age of 19. I believe that was like an autumn season. I was driving a car, I get off the car. And when I was walking that was in United States. I was still a student, and I was reading the science magazine, and I was walking and reading, and I came across this photo. This looks like future cities or some kind of signs. This looks quite unique and strange and I wondered what is it. And I turn the next page, and I understand that this is the chip of microcomputer. That was the first time I understand that this is the microcomputer chip.

This is just the size of the fingertip, even less than 1 centimeter square thing. It was on the fingertip. And I was reading the article, I understood that this was computer. But then as a nat student, I was user of the terminal by IBM, large computer almost every day. And also -- I also used several types of computers. So I knew what computer is, and I knew what the computer program was, but I didn't know that it comes from this size, fingertip size, how small that is. That was not something that I imagined at that moment.

So this photo and the article that I read on the magazine, I couldn't stop crying, human being, actually encountered and also invented the thing that may exceed human beings' intelligence. That's something

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

that I felt when I read this article. So actually, I was not stopped crying. And I finally encountered something that exceed human being who is actually doing the best intelligence activities of all kinds.

And since then, 45 years have passed, right now, I'm 65 years old, so almost 50 years. So 46 years since then, it was like just a flight, a time flight and I flew and these days, information revolution is evolving every day and growing even more. Even after 46 years since I saw the microcomputer chip, first time, it's not yet matured, but actually, this big pan is growing even bigger. That's how I feel. So human beings born in this earth and tens of hundreds of thousands of years that's been passed depending on how you define humankind, but in the past 50 years or so, information revolution since it's done, it spreads everywhere.

And now that you cannot really live without smartphone anymore in everyday basis. That's the kind of a situation we are living right now. The center of computing has been shifted from PC era, the circuit board era, the personal computer, PC was kind of the device that spreads around the people, but now that trend has been shifted to smartphones since Steve Jobs created this device to us. At the same time, center of the CPU have shifted from Intel to ARM. That's how I understand.

Center of computing has shifted from PC to smartphone. And from smartphone to even farther variety of devices that CPU is going to be embedded. So it's exactly the word Internet of Things, IoT. And that information is coming back together to the cloud and stored one after another. So every kind of things will be gathered and stored in the cloud. So it's going to be asset or treasure box of the information is going to be the cloud. And the center of the computing for this cloud is actually shifted from Intel architecture to ARM architecture.

Why ARM? Why the center of computer has been moved from Intel to ARM? It's because the source of energy, which is the power, the gas was essential things for automobile to move the car, but now that's been shifted to electricity and now that we are entering into electric vehicle era. Center of computers because its energy source is electricity and only is electricity. That's the reason why that the center of the CPU architecture has been shifted from Intel to ARM.

In big picture, there was -- there were Intel and ARM. That was those 2 architectures in this era. And as the biggest source of energy, this computer, because it uses the electricity, so that is why efficiency use of electricity and the design for that is important and that made ARM even stronger. At the time of personal computer, ARM was believed that the capabilities or the performance of computing is weak. Computing power was not good enough. That was people's recognition, and that time has stayed a bit long, but actually, recently, that's proved that, that was not true.

Even in the cloud area, the major cloud is now using straight to ARM architecture. Even in PC world, already that sign has been seen starting from last year and so. So a variety of things is going to be digitized, computerized. And then the stage for ARM is going to be even bigger. Since the foundation of SoftBank, just a little bit before the foundation, but back in -- at the age of 19, I encountered the photo, which led me to the path to the information revolution. And I was so impressed, and I was so moved.

And now I became an owner of ARM, who is the center of the computer. I didn't imagine when I was 19 at that moment at all. Since the pandemic started with COVID, we didn't know how it is going to be dangerous for the humankind. We could be very at risk, falling down to the valley, that was something that I explained and presented at the earnings in a couple of quarters ago, and I explained that the unicorn is going to be falling down to the valley. But actually, unicorn was the one that recovered because of online phenomena. And actually, the valley of COVID was not that deep. Risk was not that large. That was something that I felt.

But because, we didn't know how deep it will be, and we were about to fall down to the valley, so that is why that we decided to survive and dispose or monetize our asset. So I wanted to grow the company and business. So that is why I've been raising money as much as possible, try to switch myself so that we were able to create bigger transactions with large transactions of acquisitions. And at the time of Internet bubble, even we have to sell and monetize assets so that we can survive back then. And even at the Lehman crisis, we have survived by monetizing our assets.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So that moment, we actually sold many things. And this was the third crisis for us, which was a COVID shock. We have also decided once again to monetize whatever we have. As a part of that, we were to let ARM go back then. Personally, that was the least assets that I wanted to sell, but to survive was even more important for us so that I was crying but decided to let go.

But after we monetizing other assets, and we came to conclusion that we don't have to sell everything. So that's why the 1/3 was sold in cash, 1/3 receiving NVIDIA share in exchange -- excuse me, 2/3 that we're receiving NVIDIA share in exchange. So it was like a selling, but at the same time buying type of expression that I used back then.

So we become the major shareholder. So by combining ARM and NVIDIA, we thought that it's going to be even more powerful in the era of AI and computing era. However, if ARM and NVIDIA combined together, it could be too powerful, which was said by the many people and been declined or denied by several authorities. That's why that we have to give up this idea of combining those 2 companies together. But at the same time, from the beginning, this was the least asset that we wanted to sell, if we were not a crisis.

So not receiving approval for this acquisition, and at the moment that we received that decline, we realized that the valley of the COVID was not that deep and vaccinations has been going on amongst the people, so that receiving such decline was something that we could swallow. And a few months later, although that we passed the COVID valley, we start seeing the Ukraine situation, Russian situation and start seeing the severe inflations around the world in many of the central banks been providing our financial support.

And also, many people who hesitate to make any consumption start consuming once that we see some settle down of COVID. In addition to that, we start seeing the price of the energy going hike because of the Ukraine situation. We saw those equity market around the world was in damaged. So we're saying that we wanted to become the vision capitalist. We are going to make a lot of investments through Vision Fund, so we are very motivated a few years ago, and that was our policy, and that was our announcement.

But looking at the current situation, regardless of public securities or private securities, almost all the investments that we have made is not showing a good performance. Our Vision Funds suffered. But not only us, investors around the world is also seeing the same situation because of the damage of the equity market. Under such circumstance, I think through, what is the direction that SoftBank should be taking? Vision Fund, should we continue investing one after another? Or should we reduce our debt and reduce the debt ratio, having higher cash position so that we can make a safety drive of the business?

And there are several intense discussions internally. I myself also think through. And the conclusion was that we will not be able to see the settle of the inflation in the meantime. Even public security is going to be having a difficult time. And there are time lags for the private securities, which we believe that is going to be suffered. In the meantime, then we believe then that we have to be in defensive mode which we announced, and we made a decision earlier than the others, which was a good thing for us. So continuously keeping this direction.

So for new investments, we would like to be more selective in the Vision Fund has restructured and also has had a cost reduction, and we had executed the program. And during that time, as entrepreneur, as a business person, I do need to work on something. However, unfortunate things for me and us was that ARM came back to us. I could concentrate and devote myself in ARM, which I've been thinking for the past few months, and I've been focusing on ARM. And especially recently, it made me realized once again how great ARM is in the base for the ARM's growth and the source of the energy and our growth opportunity is something tremendous. That's something that I reminded myself once again.

So since the acquisition of ARM, even before then, I've been in love with ARM. And recently that the version 9 was released, and the feature of this version 9 start being used in next phase, and how can we best use of ARM? And what kind of interesting service, interesting technology can be made? And thinking about all that made me feel great technology innovation, great innovations, and I'm so convinced with all those.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So that's why in the coming few years, I only like to focus on this thing. So the next explosive growth of ARM is something that I would like to concentrate on, and I devote myself into that. And other management, we're going to be keeping defensive mode. To be defensive, Goto-san, Mr. Goto is more suitable than me as a Chief Financial Officer than who can keep the good defensive mode, and he should be the person that who update you how we're keeping our defensive mode. So me, personally, I'm the aggressive person, I'm not a defensive person. So I like to be concentrate and focused on the ARM. And now that I'm being in very deep in technology and also deep in business models and business strategy for ARM from the morning to the night, and that's something that the source of my energy, source of my happiness, source of my excitement. And I believe that's also be the base for the best contribution for the SoftBank growth.

So that's why I would like to focus on ARM and some technology around them. And I will be the best for stakeholder of SoftBank, best for humankind, best for the company, that's how deeply convinced I am. That's why I decided to provide happiness for everyone with information revolution, which is coming back to my original philosophy. And purely, I would like to pursue myself for this happiness. As a result, any earnings results announcement or day-to-day operation, I can ask Mr. Goto and also other senior management and keep the company running.

At the earnings results announcement, this will be my last message for you in the meantime. And Mr. Goto is going to explain you the content of our performance and he will be and also other members is going to address any questions that you may have. And feel free to ask any questions. That's all from me. Thank you very much.

**Ian Thornton**

[Interpreted] That was Mr. Masayoshi Son, Chairman and CEO of SoftBank Group. Please give us a few moments before we start the presentation. Thank you for your patience.

Thank you very much for waiting. Now I would like to invite Mr. Goto, Board Director and CFO, to present to you the earnings results and business overview.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Thank you very much for your kind introduction. My name is Goto. I think Mr. Son's presentation covers everything. But our job is to make sure that we communicate the facts for the last 3 months to a year, as Mr. Son mentioned earlier. And by the way, Mr. Son call himself as a businessperson and entrepreneur, he is the Founder of SoftBank. And also from our perspective, he is an entrepreneur, I don't see any other person who has such an entrepreneurship not only in Japan, but also in the world. I have been working with Mr. Son for the last 23 years, and he is entrepreneur and under the circumstance, we will make sure that we fulfill our missions. And in the meantime, I think Mr. Son's executing his entrepreneurship will serve you the best. So your continued support for us, Mr. Son and the senior management will be highly appreciated.

Now the financial results for the last 3 months. Not only talking about the things in the last 3 months, but also taking this opportunity, I'd like to talk more about what's going on in SoftBank from a financial perspective. Again, we are in a defensive mode. And being in SoftBank for the last 23 years, and we have gone through those ups and downs and by focusing on defense, looking back, my history in SoftBank, current financial position is the most stable and best level in my SoftBank history, I'm confident.

Even though NAV has been going down, it's JPY 16.7 trillion, and the loan to value is 15%, which is too low under normal operation and cash position, JPY 4.3 trillion, which means 4 years' worth of bond redemption. So again, we have a very stable, safe balance sheet. And why are we doing this? Well, I'd like to touch upon market environment. Investment companies like us, like Sequoia, Tiger Global, are looking at the market environment just like us and inflation in the United States.

CPI announcement yesterday made us relieved, but I believe that they keep raising rates to contain inflation. Consequently, the market have been and will be corrected for some time, especially in tech sector. So there should be continuous uncertainties in the market. And when talking about geopolitical

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

risks, cost for piece could be expensive. That's how we realize under the current condition. Infrastructure costs went up and food cost went up and prices have increased dramatically in general. Under the circumstance, we kept focusing on defense. And how should we continue on this mode? You may ask. Of course, the tide will be shifted some time, and we have to anticipate when that will come. But we will make sure we take time before we shift our position.

Now let me talk about the consolidated results. For the first half of FY '22, we posted JPY 3.2 trillion of net sales, JPY 849.6 billion of loss on investment, JPY 292.6 billion of income before income tax, and JPY 129.1 billion of net loss.

Looking at loss on investment. As you can see on the slide, in the first half of this year, Vision Fund posted a loss of JPY 4.3 trillion. But for Alibaba shares, as we announced in August, through early retirement of Alibaba transactions and by reduced holding of Alibaba, we saw a huge gain. I'll come back to the point later in detail.

You can see the similar results in terms of income before income tax by the segment. Alibaba tracts are done at the holding company level. SVF Vision Fund business recorded JPY 3.4 trillion loss, while investment business of holding companies, including Alibaba, posted JPY 3.3 trillion income and consolidated result was JPY 292.6 billion positive.

For net income quarterly, for the first quarter, from April through June, we saw JPY 3.2 trillion of net loss. However, in the second quarter, we saw JPY 3 trillion of net income. The main source of the huge gain is Alibaba. We signed the prepaid forward contracts using Alibaba shares for our financing activities. For example, 1 year ahead, principally, we should settle in cash, but there is an option to roll over. So we have options, allowing us to make a decision how to settle the transaction.

Looking at uncertainties in China, assets in China should be looked at, and we have to monetize assets in China that can be safely monetized. And by settling earlier, we should show the markets that we don't have to worry about financing in the future. By reducing our holding of Alibaba, Alibaba became equity method associate from accounting perspective. As you can see on the slide, we posted a gain on settlement of prepaid forward contract, which was JPY 0.6 trillion and -- excuse me, JPY 0.8 trillion of derivative gain thanks to hedging effect of the contracts. Those gains came from closing the contracts early, and that resulted in JPY 4 trillion of gain from remeasurement or remaining holding of Alibaba shares from book value to fair value. And total impact on consolidated P&L was JPY 4.3 trillion. By utilizing group assets, we want to strike the right balance.

And now talking about foreign exchanges. What kind of impact foreign exchange changes have on our company? In terms of net asset value, which is very important, because our corporate value comes from net asset value, from that perspective, our assets are falling currently -- excuse me, most of our assets are foreign currency denominated. And also, most of our deposits are foreign currency denominated. That means weaker yen has positive impact on NAV.

For this term, it was JPY 2.9 trillion. But again, foreign exchanges change. And what we want to do is to focus on improving values without being influenced by changes of foreign exchanges. Even though we posted a loss of JPY 1.1 trillion, we saw increase of equity by JPY 2.6 trillion. We had debt, including asset-backed finance. We could offset. But according to the accounting rule, we should separate such debt. Even though, again, we posted a loss of JPY 1 trillion, we saw increase in equity from accounting perspective.

Now the trend of net asset value, which has been going down in the last 12 months, and that's natural from the market environment. But still, we have JPY 16.7 trillion of net asset value as of today. If you compare that of March end to September end, it was JPY 23 trillion as of March end and down to JPY 19 trillion as of September 30 and debt decreased also. So as a result, NAV was smaller than that of equity value of holdings. And net value per share and share price as of March end, it was about JPY 11,000 per share. And share price back then was JPY 5,559. The discount percent was 50%. As of September 30, net asset value per share was JPY 10,800 and share price was JPY 4,900. Then discount was 55%, which was huge.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Market often called it SoftBank discount. Why discount? We have been talking about it with investors all the time. In that few weeks, our share price has bounced back. As of November 9, well, today, about JPY 6,950 or something, but as of November 9, over JPY 7,000. In any case, compared to September 30, our share price bounced back. So I believe that the discount at the moment is around 40%. So we want to keep working on decreasing 40% discount level by analyzing from different aspects. We keep working on that.

Now talking about equity value of holdings. This slide shows equity value of holdings by assets. On the right-hand side of the chart, you see percentage. Alibaba accounts for 15%. It was bigger like 30%, 40% in the past. SoftBank KK accounts for 11%, SVF1/2 LatAm, all in all, around 43%. Historically speaking, Alibaba or Orange has been smaller and smaller. Why? First, thanks to monetization. And second, decrease of share price. And if you look at the pie chart, you can see the change clearly. In balance, our portfolio is important from a rating perspective and investment perspective, especially looking at the percentage of listed shares, which is very important for rating. Percentage of listing companies decreased from 52% to 45% -- 44%, while the old asset value went down, it is pretty good. We are working on preparing our IPO. And once ARM's value is unleashed, I believe that proportion of listed shares would go up.

Now that I would like to go into a little bit more detail in how we're going to be defensive. Now we are very much slowing down the new investment activities, effectively almost stopped. So from that sense, we would like to make a collection of the investments, which means that we are receiving cash. So cash in situation is continued. If we do nothing, we just improve our balance sheet. As a result, 2 stakeholders that we have, which is equity holders and the bondholders or credit investors, more specifically, banks or the bondholders, those credit investors. So those are the 2 major stakeholders, and they have a different interest, different objectives.

If we do nothing, we will improve our balance sheet so that we can see the better quality in loan and better in bonds. But at the same time, we do need to make a return to shareholders, for example, buybacks, continuous dividend payouts, those that we've been executing in a continuous basis. So first, I would like to show you some credit index loan-to-value. So the loan-to-value is actually very steady. And as I mentioned in the beginning of this presentation, 15% or so, and if we are in the investment mode, then that we are not working properly, so it's not levered enough.

SoftBank Group's most important job for finance team is to pursue the most appropriate level of leverage. That's the kind of an important agenda for me as well as for team. So pursuing the best and appropriate leverage, then that we'll be able to have a higher possibility of making a best return to shareholders. And also, that will be the best for the retirement or the service of the debt. So if the credit index is too high, then that means that the less profitability even that you buy the not levered companies bonds, that's not making much money. So appropriate level of leverage is also important for the credit investors as well.

So we're trying to find the sweet spot for that is going to be the -- and it has been and is going to be the important mission for the finance team. And here is the monetization and capital allocation, JPY 2.7 trillion cash position was there with us on the -- at the end of March 2022. Since then, we've been having several transactions including the Alibaba forward contract, which gave us JPY 3.4 trillion in monetization. And then that we've been using those monies for the buybacks or the debt service.

But still, that gives us undrawn commitment line from the banks, including that, that we have about JPY 4 trillion, the cash position. This JPY 4.3 trillion actually is a level that allows us to cover coming 4 years debt service. So bonds, we have to make sure that we have to secure the repayments of those. For the other products and installment anything like products, installments with banks or the others that can be negotiable in terms of terms and everything, Swiss banks, but bond is not something like that. A service of the debt or the repayments of the bond is something we have to make sure to secure the source for that because we are quite prominent and a big user of the bond.

So that's why that we believe that we have to make sure that we have good positions of the cash to cover the bond redemption. And when it comes to the net debt, that's the deposit -- cash less deposit. I believe that the net debt is most logical to speak of the company. However, frequently asked question is that are you repaying your loans or the debt? So here, I wanted to show you our gross debt in the past 6 months

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

that we've been doing the actual payments quite largely. As you can see, about JPY 2.4 trillion debt has been repaid. And the bonds not only to cover the redemption of the bonds, but also or like a buyback of shares, we've been doing the buyback of bonds as well. So we have about JPY 300 billion level of the buyback of bonds. And also the early retirements has been also done for the bonds.

And also asset-backed financing, we don't have much need for the financing. So this has been also repaid one after another. In the loan by banks because we don't have much purpose of use so that commitment credit lines, those that we've been used that we repay and we just keep the undrawn portion and for the loan refinancing because we have a good cash position. So based on the discussion with counterparties that we try to make early repayments. So those has been also improved dramatically.

And now the going to the equity holders or shareholders return. Last year, this time that we have announced JPY 1 trillion buyback of our shares, which has finished at November 8. Last year that I said I may not be able to finish all that amount, and we have started it. And actually, we were able to accomplish all the amount that we've been planned and announced.

And after that, as in addition to this JPY 1 trillion, we have also announced JPY 400 billion level of the buyback, and we've been executing this program and the buyback because we have quite a long time of the insider period. And once that we announced the earnings that we have a bit open for the insider information so that there that we use and discussed with Trust Bank, keep them the order. And once we set the order with Trust Bank, we cannot change the terms, we cannot change the order.

But there are transaction volume increase and decrease, then the buyback amount is going to change as well in the past few weeks. Actually, our transaction volume of our share was very volatile, actually increased to 3 to 4x or 5x, then purchase actually accelerated 3x, 4x and 5x, as a result. Somehow, it's the same day as the announcements yesterday, as of yesterday, we have finished all the JPY 400 billion in buyback. Speed-wise, it was too quick and it may make some speculations, and I was a bit worried. But actually, it was just a matter of technicality.

Share buyback. Actually, when you see the past trend in the past 5 years, we made about cumulative amount was JPY 5 trillion of the buyback, I believe. This is the -- I believe we are the biggest buyback company, amongst Japanese company. And when you compare with other global companies, this is the past 3 years since the 2019 and those public companies around the world, and we are in top 10 for buyback. And Toyota is the #45. So this is a kind of a position that we take for the buyback and we want you to see those comparable data.

Now turning into some group activities. First is Vision Fund. In this quarter, environment is still tough. In here, $9,959 million and compared to previous quarter or a year-on-year basis, we are making slight improvement. This is a long time -- a long investment. So we don't want to be moving around policies in short-term period, but rather like to see the longer period. This is a cumulative gain and loss in the past 1 year or so. Unfortunately, that it comes to kind of offsetting all the gains that we received. But quarterly basis, now that you see that this -- there is some signs of hitting the bottom. So as a long-term operation that we would like to make sure that we can have a firm performance for the investors.

Vision Fund. We have Vision Fund 1 and Vision Fund 2. So let me share some data for Vision Fund 1 first. This one has a third-party investors as well. And the $89 billion is the investment cost and the cumulative investment return is $102.9 billion, so that it shows certain gains here. There are still public companies currently held, so we would like to make sure that we have -- we can make a good results and performance share with the investors. The blue portion, you can see some declines there because there are some valuation downs in public market, but compared to the end of September, now that we are in the beginning of November, this blue portion is actually increasing by $2 billion or so, I assume.

And Vision Fund 2, here, just about 2 years since we launched, so last year to previous year those invested portfolios, they are still in a growth process so that many companies are showing the markdown. But at the same time, I believe that many of our portfolio company has a very firm fundamentals so that they have -- we would like to make sure that we have a good manage on those portfolio companies. And we have 472 companies invested and some of them increasing value, some of them decreasing in value. This is -- this shows that those that decrease in the shares are about 2/3 and about 1/4 of them

are increasing in value, and the remaining is no change. So compared to the end of March, those with reducing the value which used to be 1/3 in end of March, but that is increasing about 2/3. That tells you how severe and difficult the environment is right now.

But at the same time, that we do see some companies that are increasing in value so that we would like to make sure that we can survive this moment together with all portfolio companies. And here, a gain and loss on investments, breaking down, what are the drivers for those that are increasing in value? And what are the drivers for those that are decreasing in value? Numbers, though the bars are too small, so that would be difficult to tell. But those 2 on your left is a relatively large driver. Recent transaction and the performance of portfolio companies, those are the main drivers for those that are marking up.

On your right-hand side, those that are marking down, mainly coming from public portfolio companies, and also public comparable companies, that's another reason for the markdown. And next to that is the performance of those portfolio companies. So we analyze those in detail so that we can manage how we can improve the management. And the invested amount wise, does, I mean telling this that we've been focused on defense, so the new investment activities for the second quarter only $0.3 billion, almost we have nothing that we have invested this quarter. Last year, first quarter was $15.6 billion. Second quarter was $14.1 billion. So last year, in the first half, only about $30 billion has been invested, almost JPY 4 trillion level of the investment was being made last year. And this year, about $2.5 billion as the first half. So it's about JPY 300 billion or so.

So our strategy is clearly shown in these numbers. So under such circumstance, IPO was very few in the first half. There are 3 IPOs, and 3 of them actually are making good return. At the time of IPO that there are some increase in share price, but later on, many of them are declining in the value share price because of -- due to the environment. But at the same time, there are many companies that are aiming for the IPO in the future. And once the market recovers and along with the situation, we believe that we'll be able to see better numbers in here.

In the meantime, there are 3 policies for the fund. So because we have invested JPY 5 trillion last year, and now that we are not even making much of the investments. So there are dynamic change from last year to this year, so that human resource -- size of human resource has to be slimmed down along with our activities situation so that we can make organizational efficiency. Also, we would like to be selective in terms of investments. So otherwise, we are not investing unless we find any special opportunities or any great opportunities. And also, at the same time that you would like to make an effort on enhancing the value of current portfolio.

And here, there are some changes in the leadership team for the fund, you may see on newspapers and so. But Rajeev Misra has been leading on fund. But he's -- now that they're making a new path for himself. So Vision Fund 1 is continuously chaired or the CEO is Mr. Rajeev Misra. And fund 2, he continuously served as Vice Chairman, but he is not going to be involved in any new investment activities for Vision Fund 2 because of the conflict of interest point of view. So as a new leadership, as you can see, in the United States and Latin America, Alex Clavel. Asia, Europe is Greg Moon and for the functional teams, Navneet, there that he's sitting here with us. So those 3 members are actually leading the team of the Vision Fund.

Now SoftBank Vision Fund sectors in focus. Of course, in general, markets are bad and situations are bad, but are really everything bad? We have not given up. We are looking at potential of future of invested companies. So again, let us remind you sectors in focus. The first, digital commerce. We have invested in many companies in this sector. As you can see, the worldwide retail e-commerce sales, the percentage increased from 7% to 24%. And it's going to be continued on this trend. And consumers want to have seamless digital first experiences. And they want to directly access online on their own. So again, the market will be more convenient and convened and it will be powered by AI.

Next sector, global supply chain. Let's say, automated warehouse which is one of our focuses, for example, AutoStore as one of the companies doing business in that sector. On the left-hand side, you can see automation market opportunity. Only 2% of the market is automated. 98%, unautomated, which has a great opportunity. Not only AI, but robotics should play a key role in the sector and the market, which is very attractive to us.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights Reserved.

Next, Fintech or Financial Services. Financial Services will continue to grow with digital payment, neobanking and digital investments & assets, for example, that growth is clear by looking at the PayPay. And labor market, historically, hiring demand is so high. By leveraging AI, hiring processes, onboarding process can be transformed dramatically. And also employee engagements and employee retention should be helped by AI and big data. And also talent management is something that AI should help. And consequently, business can grow.

Last but not the least, data. How can we deliver data to those businesses? As you can see, data volume has been growing exponentially and AI's computing power, which is powered by ARM, is growing and capability to analyze a huge volume of data and protect and manage data are going to be very important in the society in the future, and that can present a business opportunity.

Those are the sectors in focus from Vision Fund perspective. Now let us pick up some portfolio companies from SBG's perspective, SBKK, Yahoo! Holding, those are public companies or they have their own financial results announcement. So I exclude them. So first, let me talk about ARM. Revenue-wise, it looks like 6% down year-on-year, but non-royalty revenues changed dramatically quarter-by-quarter. In the first quarter of last year, that number included revenue from 2 big transactions that happened before is excluding such onetime effect. The revenue of ARM for the first half of the year would have seen increase.

And as you can see, 3-year CAGR was 21%, and that's how Mr. Son is confident with ARM from a numbers perspective. Looking at adjusted EBITDA, 3-year compound annual growth rate was 107%. We have been talking with ARM to build strategy in the future, preparing for IPO in the future. So that kind of group-wide effort bears fruit. Market share, which I'm sure is familiar to you. ARM's chip business is what ARM is most good at. And ARM's chip is heavily used in mobile and IoT. And semiconductor will be used in every market. So that means ARM has a huge growth potential going forward.

In the second quarter, ARM announced Neoverse V2 and ARMv9 technology-based, now Neoverse V2 processor was really a positive news. And ARM's product are supported by major companies like NVIDIA and Intel. So those big companies have made announcements to adopt ARM's design, which is a very positive trend. ARM welcomed 3 Board members and also welcomed the new CFO, Jason Child, who has great experience and expertise and other new board members have a great ARM expertise and experience in their respective sectors, and they should provide ARM's management great advice.

Looking at Japan, let me talk about PayPay. Number of registered users, 51 million. PayPay has reaffirmed its strong position. GMV, JPY 1.8 trillion, continuous growth. They have been focusing on expanding GMV. And the next challenge for them is to increase profitability. Different data shows high visibility and presence. For example, they have a #1 position in QR code payment market in Japan, #1 position in most download app. And going forward, growth opportunity for PayPay can be seen in TAM or total addressable market, which is about JPY 250 trillion, TAM, JPY 250 trillion and PayPay's GMV is only JPY 4.9 trillion of JPY 250 trillion of TAM. PayPay's JPY 4.9 trillion and other payment companies have fewer GMV. So this TAM is the blue ocean.

And from a technology perspective and from a business model perspective, we are in a strong position to get the share of this huge market. When this is nothing new, something old, T-Mobile. So acquisition of Sprint was done in 2013. At the time of acquisition of Sprint, AT&T, Verizon, Comcast, those are the 3 big bells. And we, Sprint and T-Mobile, as you can see on your left-hand side, they are -- that was their level. And now actually changed the landscape and now T-Mobile is leading the situation. AT&T is already in #4 position.

Acquisition of Sprint, I had a difficult time for financing, but I didn't imagine we expected that AT&T come to this position. So I believe that this is a very competitive market. T-Mobile strategy is, I believe, is very appropriate at the time. And at the time of acquisition, JPY 2.1 trillion investment was made, but the equity portion was the JPY 0.4 trillion. Remainings were leveraged. So leverage has been already paid and equity value is now that increased to JPY 3 trillion. And also, IRR bites 25% because the time has passed since then. So it's not bad, not bad at all. So 1 time that the people said that the Sprint acquisition was failure, you made a mistake. And actually, we did experience and suffered at the time with Sprint. However, as a result, it led to the great return to us. So with many people's wisdom and power, we believe that we come to this way.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And last but not least, financial strategy. We always announce our financial strategy in the beginning of the period, and there is no change for that. We always like to keep our words once we commit to the market. And on top of that, that we ask Masa to freely manage the business. But at the same time environment changed, market changed, so that we try to do what we can do based on our financial strategy. And so that we have no change on our strategy, just to reconfirm with you that these are the 3 financial policy, loan-to-value maintaining that below 25% in normal times and also maintain at least 2 years' worth of bond redemption in cash and secure recurring distributions and dividend income from Vision Fund 1 and 2 and other subsidiaries, so we would like to make sure these policies and, of course, under such market and circumstance, we would like to keep the defensive mode. But at the same time, we believe that there are -- we would be able to see the dawn of the recovery sometime later so that we are looking forward to the time to come and we would like to make sure that we keep the day to day.

And that's all from me. And now that we would like to open the floor to the questions. So Masa actually answers all the questions by himself, but I am not that capable, so that we have Ms. Kimiwada. She has a long history in SoftBank than me, and we have Navneet. He's been with us at the Vision Fund supporting Rajeev from the inception of the fund. And Ian, he's been working with us since the acquisition of ARM. So after privatized ARM, that he's been actually supporting the company from the Investor Relations point of view. So we have a great member actually ready for you.

So if you have any questions, please let us know.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Interpreted] Now we'd like to take questions. First, we'd like to take questions from the floor. [Operator Instructions] We are starting from the floor now. [Operator Instructions].

**Unknown Analyst**

[Interpreted] Maschio from Nikkei business. Two questions. First, you mentioned the long winter or market environment. What's your outlook for market environment in the next 12 months or next year for mid and long term? When do you expect market will be recovered? Do you think this year is the bottom or next year, we will see another bottom? So first, what's your view on market environment in the new year?

The second, impact on your finance from Alibaba shares. You posted a remeasurement gain. But going forward, what kind of impact Alibaba share or contract or settlement will have on PL? When you sell Alibaba shares, of course, it has an impact on cash. But what kind of impact when you sell Alibaba shares on P&L? If you keep holding on Alibaba shares, what kind of impact should we expect on PL? And how could you clarify?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Thank you very much for your questions. Maybe I will ask Kimiwada-san to answer the second question. The first, our outlook for the market. And if we have a crystal ball, that would be great. But to be honest with you, we don't know when we hit the bottom. But in the last 1 month or so, we are beginning to see the positive change. For example, IPO market, it looks like getting improved. Companies like mobile aisle tried IPO recently. But basically, we are pessimistic about the market environment. Why? Because like I mentioned, in the presentation geopolitical risks are still there. Until we see the light at the end of the tunnel, we can't expect a positive outlook in the market. We don't have to be rushed and we want to wait for a good timing.

**Kazuko Kimiwada**
*Senior VP, Head of Accounting Unit & Corporate Officer*

[Interpreted] And about your second question, Alibaba shares, if you look at the second -- excuse me 12th page, Page 12, and minus JPY 1.1 trillion at the bottom, it says. It's FVTPL valuation loss. The measurement took place in the middle of second quarter. And at the end of second quarter, we valued the fair value because it's FVTPL investment every quarter, we mark fair value every quarter. When the market gets better, we see positive. When markets get bad, we see negative. If we were to sell Alibaba shares, the difference between the share price we sold and the price at the end of the latest quarter. That's how you see.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Any other questions? So a person in the center with gray jacket.

**Unknown Analyst**

[Interpreted] Yamauchi from Manage News. FDX, I believe that the digital fund is investing in FDX. And what is the impact for your results? And also, for the second question, any possibility of management buyout? There are some rumors by analysts. Is there any possibility for that?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] About FDX, I've been seeing such news for the past couple of days. And we have invested in FDX related to companies about $100 million or so from Vision Fund. That's compared with the total

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights Reserved.

amount of investment, very minor. If, any case of markdown, but still that it is very -- not material for us. And about your second -- and in addition to that, cryptocurrencies is something that we are very small in terms of investing in such cryptocurrency related. And for your reference, I was biggest against person for this current cryptocurrency investments in the company.

Investing in AI is the vision for the Vision Fund. So the investing in currency is actually a bit different from our vision. So that's something that we need to see seriously. But through the business of cryptocurrency, there may be something that comes to the technology evolution like blockchain. That can be a positive for AI. So there can be some interpretations to make an investment and including some indirect of those, but still just about 1.3% of the Vision Fund overall. So for cryptocurrency that I am still not for the idea. No change for that. That's for the first question.

And for your second question, MBO. I have no comments for that. No change for that answer.

Next question?

**Unknown Analyst**

[Interpreted] Nakagawa from News Peaks. Two questions. First, you talked about resizing of SVF like 150 people out of 500, for example. How are you restructuring SVF from a human resource perspective? And related question, when market bounces back, you may want to be able to restart investment through Vision Fund. But investment company or venture capital, you have to continue investing to get information for going and to keep network. As we have to and later, maybe you may want to invest in early stage companies going forward? So what's your view on future investment by SVF?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Navneet, could you talk about that?

**Navneet Govil**
*Managing Partner & CFO*

So to your first question about reduction in the staff for the Vision Funds, so as has been reported in some of the media outlets, the reduction was more than 30%. And in terms of early stage, at the right time at the attractive valuations, we will continue to look at investing in companies that leverage artificial intelligence. That's the focus. We look at the most disruptive technology companies that leverage artificial intelligence. Thank you.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Thank you. Any other questions? Third row from me, a gentleman.

**Unknown Analyst**

[Interpreted] Matsuda from Nikkei newspaper. ARM IPO. My question is about ARM IPO. So semiconductor market is in difficulties and the world shortage is also going forward. In the financial report, also that indicates that there may be some slowdown of growth depending on the market. But before that you mentioned that fiscal '22 is a kind of target for the IPO timing. Do you have any change of the schedule and also why?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] It's in preparation for IPO, so I would like to ask Ian to answer that to make sure.

**Ian Thornton**

Thank you for your question. Clearly, we want to IPO as soon as is possible. But as Masa and Goto-san indicated earlier, given the current global economic uncertainty, given the state of the financial markets,

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

that's probably now unlikely to happen in this fiscal year, so unlikely to happen before the end of March 2023. However, the preparations for the IPO are going very well. They're advanced. And we are fully committed to IPOing sometime in 2023, in calendar '23.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] As explained by Ian, SoftBank Group has no change in our explanation about that, too. Once the market is ready, of course, sooner is better, but this is a great company, great asset, so that we would like to make sure that we have a great preparation in the market. That is why we don't have to rush. We don't have to switch. So that we think that sometime in year of 2023. Thank you. Any other questions from the floor?

**Unknown Analyst**

[Interpreted] Dee from Bloomberg. First, you mentioned that practically, you hold investment for now. But what's your position to the Chinese market? About the headcount reduction, about 30%. Is that the end of the entire restructuring? Or is there more to come in the future?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Thank you. The first question, maybe Navneet may add to my answer. But again, yes, investment-wise, in general, we put on hold. But the assets in China, we are more careful than before. I refrain from commenting on politics in China, for example, back assets that we have in China have been damaged. That's the fact. So for some time, our Chinese assets may suffer from uncertainties. That's why whenever an opportunity for monetization, we will do. When it comes to new investments, again, we continue to be more careful than before. And the second question, Navneet, you may want to answer to the second question.

**Navneet Govil**
*Managing Partner & CFO*

With respect to the reductions, as has been reported, it has been greater than 30%. We believe we have now rightsized the organization to support our more than 470 portfolio companies. And given the defensive posture that we have, and at the right time, when we see attractive investment opportunities at the correct valuations, we will be able to pursue them with the team we have at least.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Thank you very much. For the interest of time, I just like to have a last question from the floor. So there is from front row, gentleman, please.

**Unknown Analyst**

[Interpreted] Nagoshi from NHK. I have 2 questions, please. In the presentation, efficiency of the organization has also been discussed. So in the previous earnings, that no secrets, but the cost reduction is going to be pursued. But is that going to be the same policy? Any specific policies or ideas for the reductions? And as for Masa, I have second question about Masa. So in his explanation that he's going to delegate some of authority to somebody else, but -- so that is he going to be involved? Is he not going to be involved in the management as a CEO? Is he not going to touch on any management of the business at all?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] So let me come from your second question regarding Masa. And for the first question about the efficiency of the organization, Navneet, would you please answer that?

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So for the second one, Masa, as the Chairman and CEO, he -- no change on that. He's going to be involved. But we also need to do more better because we've been asking Masa too much probably to do many things. But we, in each our expertise that we need to actually have the role. So he's going to be supervising as a Group CEO to see new supervisor role, but also as an entrepreneur that he develop and grow the business. So he's been doing 2 roles.

So especially for the functional portion, me, myself and Kimiwada-san's team is going to look after. And each group company, they have their own management team. And for those public companies and public, they already have their own independent guidance. For those private like Vision Fund, for example, those is something even not a public company, but try to be close -- work as an independent body and try to enhance the governance. So Navneet, please go for the first question.

**Navneet Govil**
*Managing Partner & CFO*

So with respect to the efficiency of the organization and the reductions, when we made the reductions, those were across all levels, senior levels, junior levels, middle management levels, and they were across all geographies. The other thing we did was SoftBank's operations outside of Japan, we brought them under a single platform, One SoftBank.

So we had SoftBank International, we have the Vision Funds. We have now combined them and they are operated as One SoftBank team. So for all the functional areas like finance, legal, human resources and others, they are single teams outside of Japan, supporting each of the investing teams like the investing teams for Vision Fund 1, Vision Fund 2, the LatAm funds. So there is significant efficiency as a result of these organizational changes that we made.

**Operator**

[Interpreted] Thank you very much. Now we would like to take questions from Zoom participants. [Operator Instructions] Nakajima-san from [ Kyoto Suchin ]?

**Unknown Analyst**

[Interpreted] My name is Nakajima from [ Kyoto Suchin ]. I have a question about Son-san's remarks. He mentioned that this time, it was the last, which surprised me. I thought that he would show himself next time and onwards, but it seems today was the last. Going forward, maybe shareholders' meeting is the only forum where we can see Masa's face. So maybe Masa's remarks won't be picked by media, for example, not so much compared to -- from before. So that could have a negative impact to you, but even though there are some disadvantage of Masa not showing up as frequently as before, still, he decided or you decided to have him focused on ARM.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] Thank you very much for your question. Of course, we took into consideration of some disadvantage. But if you listen to what Masa said carefully, yes, he will lead AGM and also he mentioned that he might show himself when he thought he would have to do. But for like results announcement, our job is to communicate with you the fact, which we will continue to do. I think eventually, by releasing him from the efforts on earnings results announcement, for example, he should be able to have more time and efforts into his real focus. But at some point, I'm sure he'll be happy to show his face to you, and we are looking forward to that opportunity. Thank you.

**Operator**

[Interpreted] Next question from the Zoom participants. Masuno-san from Nomura Securities.

**Daisaku Masuno**
*Nomura Securities Co. Ltd., Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

[Interpreted] Yes. This is Masuno. I have 2 questions. First is about Alibaba. At the end of September, Alibaba forward contract, so looking at the financial report end of September, less than 1 year or over 1 year, you have JPY 2.8 trillion of Alibaba forward. And I don't know how that's going to be addressed, but I believe that depending -- as long as we see some steadiness of the Alibaba share price, you may be able to settle in shares and repay, you don't need to repay in cash. How do you see that? That's my first question.

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] As you say, this transaction is basically trying to have a hedge. So when share price goes down, we have already -- we can settle with the agreed share price so that when we see the decline in share price, we believe that we have more positive benefit by settling in shares. By having the option, we'll be able to be flexible when the share price is volatile. So that's the kind of the benefit that we try to keep it with us.

**Daisaku Masuno**
*Nomura Securities Co. Ltd., Research Division*

[Interpreted] And my second question is the stand-alone cash runway. So excluding the credit lines, JPY 3.6 trillion at the end of March. So buybacks and shares and buyback of bonds, you have spent JPY 800 billion. So JPY 3.5 trillion less those that it's going to give you JPY 2.8 trillion. Bonds that you keep cash equivalents to 2-year bond redemptions, that gives you JPY 1.9 trillion. But if you try to keep more than that, then JPY 2.8 trillion is going to be necessary to reserve for the bond redemptions or any -- otherwise, that you cannot have any excess for the share buyback or the coverage for the debt. How long years that would you like to keep as a cash for the debt service? How do you see the balance in between the cash position and the financial policy?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] So our financial policy is maintaining our cash to cover at least 2-year bond redemption. And that because historically, at the time of Lehman bankruptcy, how long did the market closed, and those are the kind of data and I believe 2 years of the bond coverage is more than enough. So that's the base for our financial policy. And for the second half and the next fiscal year, there are several financing plan that are with us. So being defensive and seeing such circumstance, if the financing plan is something acceptable for the counterpart in the market, then that I believe that that's going to be executed. And that is, I believe, gives us more than enough of the cash position.

**Daisaku Masuno**
*Nomura Securities Co. Ltd., Research Division*

[Interpreted] So in that case, you may increase the debt, but you have a cash position so that net does not really worried?

**Yoshimitsu Goto**
*Senior VP, CFO, CISO, Head of Finance & Administration, Corporate Officer and Director*

[Interpreted] If we divest the asset then that's going to be even positive. So if you settle in shares for the Alibaba contract, then I believe that, that's also positive for you.

**Operator**

[Interpreted] In the interest of time, this was the last question. Thank you, Goto-san. This concludes the SoftBank Group Corporation earnings results briefing for the 6 months period ended September 30, 2022. The video footage of the session will be uploaded on our corporate website. Thank you once again very much for joining the SoftBank Group Corp. earnings results briefing for 6-month period ended September 30, 2022.
[Portions of this transcript that are marked [Interpreted] were spoken by an interpreter present on the live call.]

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# Exhibits 18-23

## REDACTED IN THEIR ENTIRETY

# Exhibit 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-1146 (MN) (LDH) |
| | ) | |
| v. | ) | **CONFIDENTIAL – FILED UNDER** |
| | ) | **SEAL** |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | **CONTAINS INFORMATION** |
| | ) | **DESIGNATED HIGHLY** |
| Defendants. | ) | **CONFIDENTIAL** |

**DEFENDANTS' LETTER TO THE HONORABLE LAURA D. HATCHER**
**REGARDING SEPTEMBER 29TH DISCOVERY DISPUTE TELECONFERENCE**

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

September 21, 2023

Dear Judge Hatcher:

Defendants (collectively, "Qualcomm") seek to obtain relevant, proportional discovery concerning: (i) ARM's Architecture License Agreements and annexes thereto (collectively, "ALAs") with third parties; (ii) documents from Masayoshi Son; (iii) documents concerning ARM's initial public offering ("IPO"); and (iv) documents from ARM custodian Antonio Viana.

**ARM's ALAs.**  ARM's case centers around its breach of contract claim concerning Nuvia's ALA.  To test ARM's breach claims, back in December 2022, Qualcomm requested all ALAs ARM has entered into with any party, as these contracts are relevant to how the Nuvia ALA should be interpreted.  (Ex. 1 at 12 (RFP No. 27).)  After months of negotiation, in July, ARM agreed that it would search for and produce all ALAs and confirmed that its search was "not limited in time."  (Ex. 2 at 4.)  Qualcomm therefore expected ARM would produce all ALAs by the August 18 substantial completion deadline (D.I. 26, ¶ 7(b)) given that any third-party objection period would have passed by that date.  (*See* D.I. 38, § 49.)  But ARM failed to begin producing any such ALAs until September, and much to Qualcomm's surprise, for the ones it has produced, they are heavily redacted.  (*See, e.g.*, Exs. 3, 4.)

Indeed, on September 12, ARM officially reversed course and revealed that it now intended to (i) unilaterally redact "non-responsive" information in third-party ALAs it produces; and (ii) only produce ALAs for "████████████."[1]  (*See* Ex. 5 at 9.)  ARM inexplicably claimed it never "agree[d] to produce all ALAs" or "unredacted versions of relevant ALAs."  (*See* Ex. 5 at 2.)  ARM is wrong.  (Ex. 2 at 4.)

ARM should not be permitted to redact any third-party ALAs, particularly where the ESI Order prohibits redacting responsive information (D.I. 39, § 2(j)) and where no third party has lodged any objection with the Court.  The specific information ARM claims it redacted—including ████████████████████████████████████████—is relevant and responsive.  For example, to the extent ARM seeks a reasonable royalty payment as a form of damages, ████████████████ may be a relevant consideration.  Moreover, ████████████████████████ may well inform the proper interpretation of the terms at issue here.  And, the "Highly Confidential – Attorneys' Eyes Only" designation provides sufficient protection, so no redactions are necessary.  (*See* D.I. 38, § 42.)  But, even if the information ARM is redacting is in fact non-responsive—which Qualcomm disputes—the ESI Order provides that non-responsive "Confidential information . . . may be redacted from a document *only if the document can be redacted without obscuring otherwise responsive information.*"  (D.I. 39, § 2(j) (emphasis added).)  Here, ARM's redactions are extensive and preclude Qualcomm's ability to adequately review and comprehend the terms of the agreements.  (*See, e.g.*, Exs. 3, 4.)  As to its non-active licensees, ARM explicitly agreed not to apply a date restriction on its production of ALAs.  (*See* Ex. 2 at 4.)  ARM should not be permitted to do so.

**Masayoshi Son's Documents.**  Mr. Son is the chairman of ARM's Board.  Since February 2023, Qualcomm has repeatedly explained to ARM that Mr. Son's documents are highly relevant and must be produced.  ████████████████████████████████████████████████████

---

[1] ARM has yet to produce the full set of ALAs for its "████████████████."  (*See* Ex. 5 at 2.)

ARM initially refused to make Mr. Son a custodian, but after months of negotiations, ARM agreed on the parties' June 27 meet and confer to ███████████████████████████████ ██████████████████████████████████████████ (*See* Ex. 5 at 27-28.)  Despite that agreement nearly three months ago, and after countless assurances by ARM in the interim—seemingly designed to forestall Court intervention—now, more than a month past the substantial completion deadline, ARM has produced only ███████[2] from Mr. Son's files.

Upon being confronted with what appeared to be clear deficiencies in Mr. Son's ███████ ████████, ARM initially refused to respond to repeated requests for basic facts about the ███████ ██████████████████████████.  (*See, e.g.*, Ex. 5 at 15.)  ARM only revealed on September 12 that the entire ███████████ consisted of approximately ███████████████████ (*see id.* at 9)—which confirmed Qualcomm's concern that the collection, ██████████████████████, was readily deficient.  ARM then agreed to "compromise" and review all of the approximately █████████████ █████████ (*see id.*), but appears to have since withdrawn its agreement to review even that small collection of documents in response to Qualcomm's insistence to raise these significant issues with with the Court (*see id.* at 1). ███████████████████ is deficient for at least two reasons:

*First*, as ARM's Chairman, there is no basis for ARM to allow █████████████████████████ ████████.  While ARM represented back in June that it would not ask ████████████████████████ ████████████████████████████████████████████ (*see* Ex. 5 at 28), ARM revealed on September 15 that ██████████████████████████████████████████████ (*see id.* at 2). ███████████████████████████ not only violated the parties' agreement, but the nature of the collection makes clear that responsive documents are being withheld.  For example, although Qualcomm served RFPs specifically requesting Mr. Son's relevant non-privileged communications with third parties (*see, e.g.*, Ex. 8 at 6 (RFP No. 43)), ██████████████████████████████████████████ ████████.  Counsel for ARM was apparently aware of this material limitation on the collection, but did not affirmatively disclose that fact to Qualcomm until pressed.

*Second*, ARM's own production confirms the deficiencies of its production of Mr. Son's documents, as ARM has produced documents that Mr. Son is on that are relevant to this litigation but were not produced from Mr. Son's custodial files. (*See, e.g.*, Ex. 9.)  ARM should be ordered to collect all of Mr. Son's custodial files as it would a typical custodian and promptly meet and

---

[2] ARM only recently produced these ████████████ on September 11.  Moreover, ████████ ████████████ are junk files or documents withheld as privileged.

confer with Qualcomm in good faith to agree on a set of proposed search terms that ARM will run to identify all responsive, non-privileged documents in Mr. Son's custodial files that ARM will produce. Moreover, ARM should also be ordered to make Mr. Son available for a deposition, an issue that the parties are continuing to discuss but that Qualcomm anticipates will be ripe for resolution by the September 29 conference.

**Documents Concerning ARM's IPO.** ARM's IPO is highly relevant, including to ARM's inability to establish irreparable harm in connection with the permanent injunction it seeks. (*See, e.g.*, D.I. 1, ¶ 67.) For example, to refute any claim by ARM that this litigation has allegedly caused ARM to lose goodwill with its customers, Qualcomm is entitled to discovery concerning ARM's communications with its customers (many of whom are now significant IPO investors) that discuss or refer to this litigation or any of the issues in this litigation. (*See* Ex. 10 (RFP No. 54).) Any irreparable harm arguments, including, for example, economic harm, reputational harm, and harm to customer relationships, are all topics that ARM likely discussed with its investors and banks in the preparation and filing of its IPO, which occurred just last week.

There are two disputes concerning production of ARM's IPO documents. *First*, ARM refuses to run two additional search terms or to continue to negotiate these terms, which are designed to specifically target relevant issues relating to ARM's IPO (*see* Ex. 11 at 3-4). *Second*, ARM refuses to conduct targeted collections for responsive documents from the files of any ARM employee or representative that communicated on ARM's behalf—including, for example, ARM's counsel, Morrison & Foerster—who are not custodians but nonetheless had meaningful involvement in ARM's IPO, including in communications with third parties (*see id.* at 6). Despite acknowledging that dozens of ARM employees and representatives who are not custodians were involved in ARM's IPO, ARM has refused to identify those individuals who may have specific knowledge concerning ARM's IPO as it relates to this litigation, instead categorically refusing to conduct or even discuss any targeted collection of documents from these individuals. ARM should be compelled to (i) search for and produce responsive documents identified by Qualcomm's two additional proposed search terms, and (ii) identify ARM employees or representatives that have relevant knowledge concerning ARM's IPO as it relates to this litigation, and conduct targeted searches of their documents.

**Antonio Viana's Documents.** Until this morning, ARM had produced *zero documents* for ARM custodian Antonio Viana—███████████████████— and had refused to provide a sufficient explanation for why. Instead, despite agreeing to add Mr. Viana (who left in 2015) as a custodian back in March, ARM waited until mere weeks prior to the substantial completion deadline to disclose that ████████████████████████ ████████████ (*See* Ex. 2 at 3.) ARM thereafter refused to provide additional information concerning this ███████ (*Id.* at 1.) Only after repeated requests with respect to Mr. Viana specifically did ARM disclose that it collected approximately 12,000 documents from Mr. Viana's files, but only 24 documents hit on search terms and none were responsive. (Ex. 5 at 10.) Qualcomm sought an explanation from ARM concerning why none of Mr. Viana's documents were responsive, but ARM failed to provide an adequate response. (*See, e.g.*, Ex. 5 at 6.) However, ARM has now produced documents from Mr. Viana that Qualcomm has not yet had the opportunity to review (Ex. 12). Qualcomm reserves its right to ask that ARM be ordered to produce further responsive documents from Mr. Viana's custodial files based on its review of ARM's production.

Respectfully,

*/s/ Jennifer Ying*

Jennifer Ying (#5550)

JY
Attachments

cc:    All Counsel of Record (via e-mail, with attachments)

# Exhibit 25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,
      Plaintiff,

    v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,
      Defendants.

C.A. No. 22-1146-MN

**CONTAINS HIGHLY
CONFIDENTIAL – ATTORNEYS'
EYES ONLY INFORMATION**

### ARM LTD.'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO QUALCOMM'S SECOND SET OF INTERROGATORIES (NOS. 12-19)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court ("Local Rules"), Arm Ltd. ("Arm") submits the following responses and objections to Qualcomm's Second Set of Interrogatories (Nos. 12-19), served September 1, 2023, ("Interrogatories").

### RESERVATION OF RIGHTS

1.    Arm's responses to the Interrogatories ("Responses") are made in accordance with the Federal Rules of Civil Procedure and based upon information currently available to Arm.  Arm responds to the Interrogatories without prejudice to Arm's right to supplement its Responses.  Arm provides these responses and objections to the best of its current knowledge, information, and belief, based on information readily and reasonably available to it after making a reasonable inquiry.  Arm expressly reserves the right to modify or supplement any Response and to assert additional objections to the Interrogatories as necessary or appropriate.

2.    Arm makes these responses subject to and without waiving Arm's right to introduce, use, or refer to information, which Arm presently has, but which Arm has not yet had

sufficient time to analyze and evaluate, as well as Arm's right to amend or supplement its responses in the event that any information previously available to Arm is unintentionally omitted from its responses.

3.      Arm objects to each instruction, definition, and/or Interrogatory to the extent that it seeks information, documents, and/or things protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, common interest privilege, joint defense privilege, or any other applicable privilege or protection, and will not disclose such material.

4.      To the extent a Response herein identifies one or more individuals with knowledge concerning a particular subject matter identified in an Interrogatory, such Response shall not be construed as an admission concerning the accuracy of Defendants' characterization of the subject matter.

## GENERAL OBJECTIONS

Arm makes the following General Objections, pursuant to the Local Rules, which are hereby incorporated by reference in each Response to each Interrogatory.  By responding to these Interrogatories, Arm does not intend, and shall not be deemed to have accepted or adopted any of Defendants' definitions or instructions.  Arm incorporates by reference its General and Specific Objections set forth in *Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1-11)*, served February 27, 2023.

1.      Arm objects to the definition of "Plaintiff," "ARM," "you," and "your" as overbroad to the extent it defines these terms beyond Arm Ltd.

2.      Arm objects to the definitions of "ALA" and "TLA" as overbroad to the extent they define Architecture License Agreement and Technology License Agreement to include "all amendments and annexes to any such agreement."

3.        Arm objects to each instruction, definition, and Interrogatory to the extent that it seeks information, documents, or things protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, common interest privilege, joint defense privilege, or any other applicable privilege or protection.  No privileged or protected information will be disclosed.  Any disclosure of protected or privileged information is inadvertent and is not intended to waive these privileges or protections.

4.        Arm objects to each instruction, definition, and Interrogatory to the extent that it seeks to impose obligations on Arm beyond those required by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws, rules, or orders.

5.        Arm objects to the Interrogatories to the extent that they seek confidential, proprietary, or trade secret information pertaining to Arm, its business, or third parties that is subject to the Protective Order entered in this case.

6.        Arm objects to the Interrogatories to the extent that they seek to obtain any information or documents that is not in its possession, custody, or control.

7.        Arm objects to the Interrogatories to the extent that they seek information already in Defendants' possession, information that is a matter of public record, or otherwise equally available to Defendants or equally obtainable from more convenient sources.

8.        Arm objects to the definitions contained in the Interrogatories to the extent they attempt to define terms that may require construction by the Court.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 12:**

**RESPONSE TO INTERROGATORY NO. 12:**

**INTERROGATORY NO. 13:**

**RESPONSE TO INTERROGATORY NO. 13:**

████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

**INTERROGATORY NO. 14:**

Describe, in detail, the complete factual and legal bases for your contention that ARM is entitled to specific performance as a remedy in this case. Your response should include, but is not limited to, an identification of what "specific performance" relief You seek and the complete legal and factual basis for such relief.

**RESPONSE TO INTERROGATORY NO. 14:**

Subject to its objections, Arm responds that Arm is entitled to specific performance because monetary damages are not readily ascertainable and would be inadequate to fully compensate Arm for Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA. Defendants have breached a valid contract, Arm has satisfied its own obligations under that contract, and Defendants could have destroyed all Arm confidential information and derivatives thereof to abide by the contract, but did not. A remedy which does not require the destruction of all Arm confidential information received under the Nuvia ALA would not fully compensate Arm for the harm that Defendants have caused, and continue to cause, to Arm.

████████████████████████████████████████████

████████████████████████████████████████████



████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

█████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

█████████████

Arm objects to this request as duplicative of Interrogatory No. 8.  Arm incorporates its response to Interrogatory No. 8, including all amendments and supplements thereto.  Arm further objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of expert testimony prior to the time set by the Court for final expert witness disclosures.  Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

Arm incorporates by reference its responses and objections to Defendants' Interrogatory No. 8, including all supplements thereto.

Subject to its objections, Arm responds that Arm is entitled to specific performance because monetary damages are not readily ascertainable and would be inadequate to fully compensate Arm for Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA. Defendants have breached a valid contractual obligation in the termination provisions of the Nuvia ALA. The Nuvia ALA was rightly terminated because of a material breach by Nuvia and Qualcomm, via a failure to abide by the permission requirements for re-assignment upon acquisition of Nuvia by Qualcomm. Arm has satisfied its own obligations under the now-terminated agreement, and Defendants did not discontinue use of or destroy all ARM Confidential Information, Arm Technology, and derivatives or embodiments thereof to abide by the agreement. A remedy which does not require the discontinuance and destruction of all ARM Confidential Information, Arm Technology, derivatives or embodiments of such Arm Confidential Information and Arm Technology, and any products embodying such technology or information, received under the Nuvia ALA would not fully provide relief for the harm to Arm that Defendants have caused, continue to cause, and which is reasonably calculated to occur.

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ (*See, e.g.*, ARM_01236577-579). ████████████████

████████████████████████████████████████████████

████████████████████████████████████████ (*See id.*) ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████ (*See, e.g.*, ARM_01236577-01236744).

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ ██████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ ████████████████████████████████████

████████████████████████████████████████████













Arm objects to this request as duplicative of Interrogatory No. 8. Arm incorporates its response to Interrogatory No. 8, including all amendments and supplements thereto. Arm further objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**INTERROGATORY NO. 15:**

Describe, in detail, the complete factual and legal basis for your contention that ARM is entitled to injunctive relief as a remedy in this case. Your response should include, but is not limited to, an identification of what injunctive relief You seek and the complete legal and factual basis for such relief.

**RESPONSE TO INTERROGATORY NO. 15:**

Subject to its objections, Arm responds that Arm is entitled to injunctive relief because Arm has suffered irreparable harm and monetary damages are not readily ascertainable and would be inadequate to fully compensate Arm for Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA.  Defendants have breached a valid contract, Arm has satisfied its own obligations under the terms of the agreement, and Defendants could have destroyed all Arm confidential information and derivatives thereof to abide by the agreement, but did not.  A remedy which does not require the destruction of all Arm confidential information received under the Nuvia ALA would not fully compensate Arm for the harm that Defendants have caused, and continue to cause, to Arm.



███████████████████████████████████████████████████████

██████████████████████

Arm objects to this request as duplicative of Interrogatories Nos. 8 and 14.  Arm incorporates its responses to Interrogatory Nos. 8 and 14, including all amendments and supplements thereto.  Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures.  Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

Arm incorporates by reference its responses and objections to Defendants' Interrogatory Nos. 8 and 14, including all amendments and supplements thereto.

Subject to its objections, Arm responds that Arm is entitled to injunctive relief for the termination provisions of the Nuvia ALA, because Arm has suffered irreparable harm and monetary damages are not readily ascertainable and would be inadequate to fully compensate Arm for Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA.  Injunctive relief as to Arm's Trademark-related claims under the Lanham Act are addressed below.

█████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████







Arm objects to this request as duplicative of Interrogatories Nos. 8 and 14. Arm incorporates its responses to Interrogatory Nos. 8 and 14, including all amendments and supplements thereto. Arm objects to this Interrogatory as it is premature in that it seeks

information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**INTERROGATORY NO. 16:**

Describe, in detail, the complete factual and legal basis for your contention that ARM has been irreparably harmed. Your response should include, but is not limited to, an identification of the specific alleged harm to ARM and the complete legal and factual basis for that alleged harm.

**RESPONSE TO INTERROGATORY NO. 16:**

Subject to its objections, Arm responds that Arm has been irreparably harmed by Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA. Defendants have breached a valid contract, Arm has satisfied its own obligations under the terms of the agreement, and Defendants could have destroyed all Arm confidential information and derivatives thereof to abide by the agreement, but did not. A remedy which does not require the destruction of all Arm confidential information received under the Nuvia ALA would not fully compensate Arm for the harm that Defendants have caused, and continue to cause, to Arm.





Arm objects to this request as duplicative of Interrogatories Nos. 8, 14, and 15.  Arm incorporates its responses to Interrogatory Nos. 8, 14, and 15, including all amendments and supplements thereto.  Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures.  Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

Arm incorporates by reference its responses and objections to Interrogatory Nos. 8, 14 and 15, including all amendments and supplements thereto.  Subject to its objections, Arm

responds that Arm has been irreparably harmed by Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA. Arm addresses irreparable harm as to its Trademark-related claims below in its responses and objections to Interrogatory Nos. 18 and 19. Defendants have breached a valid contract, Arm has satisfied its own obligations under the terms of the agreement, and Defendants could have discontinued use and distribution of any Arm Confidential Information, Arm Technology, derivatives or embodiments of such Arm Confidential Information and Arm Technology, and any products embodying such technology or information, and destroyed or returned all Arm Confidential Information, Arm Technology, and derivatives or embodiments of such Arm Confidential Information and Arm Technology to abide by the agreement, but did not. A remedy which does not require the discontinued use and distribution of any Arm Confidential Information, Arm Technology, derivatives or embodiments of such Arm Confidential Information and Arm Technology, and any products embodying such technology or information, and the destruction or return all Arm Confidential Information, Arm Technology, and derivatives or embodiments of such Arm Confidential Information and Arm Technology under the Nuvia ALA would not fully compensate Arm for the harm that Defendants have caused, and continue to cause, to Arm.





███████████████████████

████████████████████████████

██████████████████████████

███████████████████████████

██████

Arm objects to this request as duplicative of Interrogatories Nos. 8, 14, and 15. Arm incorporates its responses to Interrogatory Nos. 8, 14, and 15, including all amendments and supplements thereto. Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**INTERROGATORY NO. 17:**

Describe, in detail, the complete factual and legal bases for your allegations that "[u]nless Defendants' breaches of the Nuvia ALA's termination provisions are enjoined and specific performance is granted, Arm will continue to suffer irreparable harm," and that "Arm has the right to enforcement of Nuvia and Qualcomm's compliance with the ALA's termination provisions, including via injunctive relief, specific performance, or any other measures necessary to avoid irreparable harm to ARM or to mitigate damages that have been caused by, and will continue to be caused by, Defendants' breach." (D.I. 1 ¶ 67).

**RESPONSE TO INTERROGATORY NO. 17:**

Subject to its objections, Arm responds that specific performance is necessary because monetary damages are not readily ascertainable and would be inadequate to fully compensate Arm for Defendants' past and continuing failure to comply with the termination provisions of the

Nuvia ALA.  Defendants have breached a valid contract, Arm has satisfied its own obligations under the terms of the agreement, and Defendants could have destroyed all Arm confidential information and derivatives thereof to abide by the agreement, but did not.  A remedy which does not require the destruction of all Arm confidential information received under the Nuvia ALA would not fully compensate Arm for the harm that Defendants have caused, and continue to cause, to Arm.



███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

Arm objects to this request as duplicative of Interrogatories Nos. 8, 14, 15, and 16.  Arm incorporates its responses to Interrogatory Nos. 8, 14, 15, and 16, including all amendments and supplements thereto.  Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

Arm incorporates by reference its responses and objections to Defendants' Interrogatory Nos. 8, 14, 15, and 16, including all amendments and supplements thereto.

Subject to its objections, Arm responds that specific performance is necessary because monetary damages are not readily ascertainable and would be inadequate to fully compensate Arm for Defendants' past and continuing failure to comply with the termination provisions of the Nuvia ALA.  Arm addresses its Trademark-related claims under the Lanham Act below in its responses and objections to Interrogatory Nos. 18 and 19.  Defendants have breached a valid contract, Arm has satisfied its own obligations under the terms of the agreement, and Defendants could have discontinued use and distribution of any Arm Confidential Information, Arm

Technology, derivatives or embodiments of such Arm Confidential Information and Arm Technology, and any products embodying such technology or information, and destroyed or returned all Arm Confidential Information, Arm Technology, and derivatives or embodiments of such Arm Confidential Information and Arm Technology to abide by the agreement, but did not.  A remedy which does not require the discontinued use and distribution of any Arm Confidential Information, Arm Technology, derivatives or embodiments of such Arm Confidential Information and Arm Technology, and any products embodying such technology or information, and destruction or return of all Arm Confidential Information, Arm Technology, and derivatives or embodiments of such Arm Confidential Information and Arm Technology under the Nuvia ALA would not fully compensate Arm for the harm that Defendants have caused, and continue to cause, to Arm.



Arm objects to this request as duplicative of Interrogatories Nos. 8, 14, 15, and 16. Arm incorporates its responses to Interrogatory Nos. 8, 14, 15, and 16, including all amendments and supplements thereto. Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**INTERROGATORY NO. 18:**

Describe, in detail, the complete factual and legal bases for your allegations that "Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' trademark infringement," and that "Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing infringement, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants'

possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology." (D.I. 1 ¶ 82).

**RESPONSE TO INTERROGATORY NO. 18:**

Subject to its objections, Arm responds that it does not have complete knowledge regarding Defendants' activities with respect to the Nuvia-based Products, including Defendants' use of ARM Marks in connection with Nuvia-based products. As discovery is ongoing, Arm reserves the right to supplement, amend, or modify its response to this Interrogatory, and reserves the right to rely upon any evidence subsequently discovered or which may otherwise come to light during discovery.

Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower-case letters (collectively, the "ARM Marks"), true and correct copies of which were attached to Arm's Complaint as Exhibits A and B.

These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with particular microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register ARM Marks were filed on July 31, 2017, and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and

goodwill, which belong to Arm.  Arm has had valid and protectable rights in the ARM Marks

since substantially before Qualcomm's and Nuvia's first uses of those marks in connection with

integrated circuit and microprocessor technologies.  Qualcomm and Nuvia, as current or former

Arm licensees under agreements that permitted the use of the ARM Marks, have had actual

knowledge of Arm's ownership and use of the ARM Marks for years.  ████████████████

████████████████████████████████████████████████████████████████

████████████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

    Arm does not know the full scope of Defendants' plans regarding the use of ARM Marks

with Nuvia-based Products, beyond information in Defendants' public statements.  Based on

Defendants' public statements, and representations Defendants have made that are known to

Arm, Defendants have already or will soon use Arm's trademarks in connection with Nuvia-based Products. For example, Defendants asserted in their Answer and Amended Counterclaim that Qualcomm is "poised to release to the market" Nuvia-based Products, and that "Defendants are permitted to use ARM's Marks" under Qualcomm's license. (D.I. 18 ¶¶ 1, 148; *see also id.* ¶¶ 3, 42, 146-47.)

Further, Defendants' public statements confirm that Defendants have used or will soon use Arm's trademarks to suggest sponsorship, affiliation, and/or association with Arm. In January 2022, for example, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[1] At Qualcomm's Snapdragon Tech Summit, Qualcomm announced its next-generation Oryon CPU will be built on the Arm-V9 architecture.[2] Given Qualcomm's past practice of using ARM Marks in its listing of "Qualcomm Application Processors," including standalone product names such as "4x ARM Cortex-A53,"

---

[1] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[2] Sourabh Jain, *Qualcomm Snapdragon Tech Summit 2022- Snapdragon 8 Gen 2, Oryon CPU, AR2 Gen 1 platform, and other announcements*, BUSINESS INSIDER (Nov. 17, 2022), https://www.businessinsider.in/tech/news/qualcomm-snapdragon-tech-summit-2022-snapdragon-8-gen-2-oryon-cpu-ar2-gen-1-platform-and-other-announcements/articleshow/95581109.cms; *Qualcomm Oryon CPU: a custom CPU at the center of next-generation premium experiences on Snapdragon platforms*, Qualcomm, Inc., https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms.

"8x ARM Cortex-A53," and "4x ARM Cotex-A7 CPU," Arm reasonably anticipates that Qualcomm will do the same with Nuvia-based Products.[3]



Arm objects to this request as duplicative of Interrogatory No. 2. Arm incorporates its response to Interrogatory No. 2, including all amendments and supplements thereto. Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent that it calls for information not within the possession, custody, or control of Arm regarding Defendants' prior, current, or contemplated use of ARM Marks in connect with Nuvia-based products. Arm objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense

---

[3] *Qualcomm Application Processors Selector Guide,* Qualcomm, Inc., https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/application-processors-selector-guide_87-pn002-1-c.pdf.

privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure or the Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

Subject to its objections, Arm responds that it does not have complete knowledge regarding Defendants' activities with respect to the Nuvia-based Products, including Defendants' use of ARM Marks in connection with Nuvia-based products. Arm reserves the right to supplement, amend, or modify its response to this Interrogatory, and reserves the right to rely upon any evidence subsequently discovered or which may otherwise come to light.

Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower-case letters (collectively, the "ARM Marks"), true and correct copies of which were attached to Arm's Complaint as Exhibits A and B.

These marks are registered for "[e]lectronic data processing equipment," "integrated circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures, namely, software instructions designed to function with particular microprocessors," "data processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch, development and design," among numerous other goods and services. The applications to register ARM Marks were filed on July 31, 2017, and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and

goodwill, which belong to Arm.  Arm has had valid and protectable rights in the ARM Marks

since substantially before Qualcomm's and Nuvia's first uses of those marks in connection with

integrated circuit and microprocessor technologies.  Qualcomm and Nuvia, as current or former

Arm licensees under agreements that permitted the use of the ARM Marks, have had actual

knowledge of Arm's ownership and use of the ARM Marks for years.  ████████████

████████████████████████████████████████████████████

████████████████████

    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

    Arm does not know the full scope of Defendants' plans regarding the use of ARM Marks

with Nuvia-based Products, beyond information in Defendants' public statements.  Based on

Defendants' public statements, and representations Defendants have made that are known to

Arm, Defendants have already or will soon use Arm's trademarks in connection with Nuvia-based Products.  For example, Defendants asserted in their Answer and Amended Counterclaim that Qualcomm is "poised to release to the market" Nuvia-based Products, and that "Defendants are permitted to use ARM's Marks" under Qualcomm's license.  (D.I. 18 ¶¶ 1, 148; *see also id.* ¶¶ 3, 42, 146-47.)

Further, Defendants' public statements confirm that Defendants have used or will soon use Arm's trademarks to suggest sponsorship, affiliation, and/or association with Arm.  In January 2022, for example, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[4]  At Qualcomm's Snapdragon Tech Summit, Qualcomm announced its next-generation Oryon CPU will be built on the Arm-V9 architecture.[5]  Given Qualcomm's past practice of using ARM Marks in its listing of "Qualcomm Application Processors," including standalone product names such as "4x ARM Cortex-A53,"

---

[4] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[5] Sourabh Jain, *Qualcomm Snapdragon Tech Summit 2022- Snapdragon 8 Gen 2, Oryon CPU, AR2 Gen 1 platform, and other announcements*, BUSINESS INSIDER (Nov. 17, 2022), https://www.businessinsider.in/tech/news/qualcomm-snapdragon-tech-summit-2022-snapdragon-8-gen-2-oryon-cpu-ar2-gen-1-platform-and-other-announcements/articleshow/95581109.cms; *Qualcomm Oryon CPU: a custom CPU at the center of next-generation premium experiences on Snapdragon platforms*, Qualcomm, Inc., https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms.

"8x ARM Cortex-A53," and "4x ARM Cotex-A7 CPU," Arm reasonably anticipates that Qualcomm will do the same with Nuvia-based Products.[6]

In addition, Arm's Trademark Guidelines instruct that an Arm licensee with an Architecture License Agreement with Arm "shall apply the Arm corporate logo" in a few instances: (1) Die encapsulation: "to the die encapsulation (die package) of each unit of any Architecture Compliant Product," (2) Technical documentation: "in a prominent place, to any technical documentation for, or relating to, any Architecture Compliant Product distributed under license from Arm," and (3) Websites: "and/or the Arm word trademark and any appropriate Arm product/service/technology word trademark to the page(s) of your website relating to any Architecture Compliant Product distributed under license from Arm," per the Trademark Guidelines.[7]  An ALA partner is also permitted to apply the Arm corporate logo to product packaging, advertising and promotional materials, and hyperlinks. ██████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

---

[6] *Qualcomm Application Processors Selector Guide,* Qualcomm, Inc., https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/application-processors-selector-guide_87-pn002-1-c.pdf.

[7] Branding Guidelines – Arm® (https://www.arm.com/company/policies/trademarks/guidelines-brand)

Arm objects to this request as duplicative of Interrogatory No. 2. Arm incorporates its response to Interrogatory No. 2, including all amendments and supplements thereto. Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures. Arm further objects to this Interrogatory to the extent that it calls for information not within the possession, custody, or control of Arm regarding Defendants' prior, current, or contemplated use of ARM Marks in connect with Nuvia-based products. Arm objects to this Interrogatory to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the common interest privilege, the joint defense

privilege, or any other applicable privilege or claim of confidentiality, or that is otherwise not

discoverable under the Federal Rules of Civil Procedure or the Local Rules

**INTERROGATORY NO. 19:**

Describe, in detail, the factual and legal bases for your allegations that "Arm will suffer and is suffering irreparable harm to its name, reputation, and goodwill from Defendants' false designation of origin," and that "Arm has no adequate remedy at law and is entitled to a permanent injunction against Defendants' continuing false designation of origin, including requiring Defendants, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the falsely designated matter, all semiconductor chips, die encapsulation (die packages), end user product packaging, advertising and promotional materials, technical documentation, websites, and other matter in Defendants' possession, custody, or control that bears or displays the ARM Marks in any manner in connection with the relevant Nuvia technology." (D.I. 1 ¶ 94).

**RESPONSE TO INTERROGATORY NO. 19:**

Subject to its objections, Arm responds that it does not have complete knowledge

regarding Defendants' activities with respect to the Nuvia-based Products, including Defendants'

use of ARM Marks in connection with Nuvia-based products.  As discovery is ongoing, Arm

reserves the right to supplement, amend, or modify its response to this Interrogatory, and

reserves the right to rely upon any evidence subsequently discovered or which may otherwise

come to light during discovery.

Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in

standard characters and the stylized ARM mark featuring the word "arm" in all lower-case letters

(collectively, the "ARM Marks"), true and correct copies of which were attached to Arm's

Complaint as Exhibits A and B.

These marks are registered for "[e]lectronic data processing equipment," "integrated

circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures,

namely, software instructions designed to function with particular microprocessors," "data

processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch,

development and design," among numerous other goods and services.  The applications to register ARM Marks were filed on July 31, 2017, and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.  Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm's and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.  Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years. ████████

████████████████████████████████████████

████████████████

████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████

████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████.

Arm does not know the full scope of Defendants' plans regarding the use of ARM Marks with Nuvia-based Products, beyond information in Defendants' public statements. Based on Defendants' public statements, and representations Qualcomm has made that are known to Arm, Defendants have already or will soon use Arm's trademarks in connection with Nuvia-based Products. For example, Defendants asserted in their Answer and Amended Counterclaim that Qualcomm is "poised to release to the market" Nuvia-based Products, and that "Defendants are permitted to use ARM's Marks" under Qualcomm's license. (D.I. 18 ¶¶ 1, 148; *see also id.* ¶¶ 3, 42, 146-47.)

Further, Defendants' public statements confirm that Defendants have used or will soon use Arm's trademarks to suggest sponsorship, affiliation, and/or association with Arm. In January 2022, for example, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[8] At Qualcomm's Snapdragon Tech Summit, Qualcomm announced its next-generation Oryon CPU will be built on the Arm-V9

---

[8] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

architecture.[9]  Given Qualcomm's past practice of using ARM Marks in its listing of "Qualcomm Application Processors," including standalone product names such as "4x ARM Cortex-A53," "8x ARM Cortex-A53," and "4x ARM Cotex-A7 CPU," Arm reasonably anticipates that Qualcomm will do the same with Nuvia-based Products.[10]



 Arm objects to this request as duplicative of Interrogatory No. 2 and No. 18.  Arm incorporates its responses to Interrogatory Nos. 2 and 18, including all amendments and supplements thereto.  Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by

---

[9] Sourabh Jain, *Qualcomm Snapdragon Tech Summit 2022- Snapdragon 8 Gen 2, Oryon CPU, AR2 Gen 1 platform, and other announcements*, BUSINESS INSIDER (Nov. 17, 2022), https://www.businessinsider.in/tech/news/qualcomm-snapdragon-tech-summit-2022-snapdragon-8-gen-2-oryon-cpu-ar2-gen-1-platform-and-other-announcements/articleshow/95581109.cms; *Qualcomm Oryon CPU: a custom CPU at the center of next-generation premium experiences on Snapdragon platforms*, Qualcomm, Inc., https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms.

[10] *Qualcomm Application Processors Selector Guide,* Qualcomm, Inc., https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/application-processors-selector-guide_87-pn002-1-c.pdf.

the Court for final expert witness disclosures.  Arm further objects to this Interrogatory to the

extent that it calls for information not within the possession, custody, or control of Arm

regarding Defendants' prior, current, or contemplated use of ARM Marks in connect with Nuvia-

based products.  Arm objects to this Interrogatory to the extent it seeks information protected

from discovery by the attorney-client privilege, the attorney work-product doctrine, the common

interest privilege, the joint defense privilege, or any other applicable privilege or claim of

confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure

or the Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:**

Subject to its objections, Arm responds that it does not have complete knowledge

regarding Defendants' activities with respect to the Nuvia-based Products, including Defendants'

use of ARM Marks in connection with Nuvia-based products.  Arm reserves the right to

supplement, amend, or modify its response to this Interrogatory, and reserves the right to rely

upon any evidence subsequently discovered or which may otherwise come to light.

Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in

standard characters and the stylized ARM mark featuring the word "arm" in all lower-case letters

(collectively, the "ARM Marks"), true and correct copies of which were attached to Arm's

Complaint as Exhibits A and B.

These marks are registered for "[e]lectronic data processing equipment," "integrated

circuits," "semiconductors," "microprocessors," "RISC-based instruction set architectures,

namely, software instructions designed to function with particular microprocessors," "data

processors," "printed circuit boards," "electronic circuit boards," and related "[r]esearch,

development and design," among numerous other goods and services.  The applications to

register ARM Marks were filed on July 31, 2017, and were issued on March 5, 2019. The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.

The ARM Marks have come to signify the highest standards of quality and excellence associated with licensed Arm products and services and have incalculable reputation and goodwill, which belong to Arm.  Arm has had valid and protectable rights in the ARM Marks since substantially before Qualcomm's and Nuvia's first uses of those marks in connection with integrated circuit and microprocessor technologies.  Qualcomm and Nuvia, as current or former Arm licensees under agreements that permitted the use of the ARM Marks, have had actual knowledge of Arm's ownership and use of the ARM Marks for years. ███████████████

████████████████████████████████████████████████

██████████████████████

         ███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

Arm does not know the full scope of Defendants' plans regarding the use of ARM Marks with Nuvia-based Products, beyond information in Defendants' public statements. Based on Defendants' public statements, and representations Qualcomm has made that are known to Arm, Defendants have already or will soon use Arm's trademarks in connection with Nuvia-based Products. For example, Defendants asserted in their Answer and Amended Counterclaim that Qualcomm is "poised to release to the market" Nuvia-based Products, and that "Defendants are permitted to use ARM's Marks" under Qualcomm's license. (D.I. 18 ¶¶ 1, 148; *see also id.* ¶¶ 3, 42, 146-47.)

Further, Defendants' public statements confirm that Defendants have used or will soon use Arm's trademarks to suggest sponsorship, affiliation, and/or association with Arm. In January 2022, for example, Qualcomm issued a press release touting the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," with Qualcomm's CEO boasting that "the recent acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."[11] At Qualcomm's Snapdragon Tech Summit, Qualcomm announced its next-generation Oryon CPU will be built on the Arm-V9 architecture.[12] Given Qualcomm's past practice of using ARM Marks in its listing of

---

[11] *Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms*, Qualcomm Inc. (Jan. 3, 2022), https://www.qualcomm.com/news/releases/2022/01/04/qualcomm-and-leading-compute-partners-build-industry-momentum-windows-arm.

[12] Sourabh Jain, *Qualcomm Snapdragon Tech Summit 2022- Snapdragon 8 Gen 2, Oryon CPU, AR2 Gen 1 platform, and other announcements*, BUSINESS INSIDER (Nov. 17, 2022), https://www.businessinsider.in/tech/news/qualcomm-snapdragon-tech-summit-2022-snapdragon-

"Qualcomm Application Processors," including standalone product names such as "4x ARM Cortex-A53," "8x ARM Cortex-A53," and "4x ARM Cotex-A7 CPU," Arm reasonably anticipates that Qualcomm will do the same with Nuvia-based Products.[13]

In addition, Arm's Trademark Guidelines instruct that an Arm licensee with an Architecture License Agreement with Arm "shall apply the Arm corporate logo" in a few instances: (1) Die encapsulation: "to the die encapsulation (die package) of each unit of any Architecture Compliant Product," (2) Technical documentation: "in a prominent place, to any technical documentation for, or relating to, any Architecture Compliant Product distributed under license from Arm," and (3) Websites: "and/or the Arm word trademark and any appropriate Arm product/service/technology word trademark to the page(s) of your website relating to any Architecture Compliant Product distributed under license from Arm," per the Trademark Guidelines.[14]  An ALA partner is also permitted to apply the Arm corporate logo to product packaging, advertising and promotional materials, and hyperlinks. ██████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

---

8-gen-2-oryon-cpu-ar2-gen-1-platform-and-other-announcements/articleshow/95581109.cms; *Qualcomm Oryon CPU: a custom CPU at the center of next-generation premium experiences on Snapdragon platforms*, Qualcomm, Inc., https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms.

[13] *Qualcomm Application Processors Selector Guide,* Qualcomm, Inc., https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/application-processors-selector-guide_87-pn002-1-c.pdf.

[14] Branding Guidelines – Arm® (https://www.arm.com/company/policies/trademarks/guidelines-brand)

Arm objects to this request as duplicative of Interrogatory No. 2 and No. 18.  Arm incorporates its responses to Interrogatory Nos. 2 and 18, including all amendments and supplements thereto.  Arm objects to this Interrogatory as it is premature in that it seeks information that is likely to be the subject of additional expert testimony prior to the time set by the Court for final expert witness disclosures.  Arm further objects to this Interrogatory to the

extent that it calls for information not within the possession, custody, or control of Arm

regarding Defendants' prior, current, or contemplated use of ARM Marks in connect with Nuvia-

based products.  Arm objects to this Interrogatory to the extent it seeks information protected

from discovery by the attorney-client privilege, the attorney work-product doctrine, the common

interest privilege, the joint defense privilege, or any other applicable privilege or claim of

confidentiality, or that is otherwise not discoverable under the Federal Rules of Civil Procedure

or the Local Rules.


Dated: November 17, 2023

OF COUNSEL:

Michael A. Jacobs
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
(415) 268-7000
mjacobs@mofo.com
jliou@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202
(303) 592-2204
sllewellyn@mofo.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
  /s/ Robert M. Vrana
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com
*Attorneys for Plaintiff Arm Ltd.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 17, 2023, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
mvaughn@paulweiss.com
jbraly@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Brian Shiue
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
bshiue@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square

1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

# Exhibit 26

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(202) 223-7458

WRITER'S DIRECT FACSIMILE

(202) 379-4112

WRITER'S DIRECT E-MAIL ADDRESS

mzappala@paulweiss.com

1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019-6064
TELEPHONE (212) 373-3000

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 - 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

PARTNERS RESIDENT IN WASHINGTON

JARRYD E. ANDERSON
JOSEPH J. BIAL
PAUL D. BRACHMAN
JOHN P. CARLIN
REBECCA S. COCCARO
THITHINA DAGNEW
KAREN L. DUNN
JEANNETTE A. GALLO
ROBERTO J. GONZALEZ

WILLIAM A. ISAACSON
JANE B. O'BRIEN
JESSICA E. PHILLIPS
JEANNIE S. RHEE
KANNON K. SHANMUGAM
SCOTT A. SHER
KYLE SMITH
JOSHUA H. SOVEN

PARTNERS NOT RESIDENT IN WASHINGTON

MATTHEW W. ABBOTT*
EDWARD T. ACKERMAN*
JACOB A. ADLERSTEIN*
WILL AITKEN-DAVIES*
ALLAN J. ARFFA*
STEFAN ARNOLD-SOULBY*
JONATHAN H. ASHTOR*
ROBERT A. ATKINS*
KANESH BALASUBRAMANIAM*
SCOTT A. BARSHAY*
PAUL M. BASTA*
LYNN B. BAYARD*
BRUCE BIRENBOIM*
H. CHRISTOPHER BOEHNING*
BRIAN BOLIN*
ANGELO BONVINO*
ANDRE G. BOUCHARD*
ROBERT A. BRITTON*
BRAD BROWN*
WALTER F. BROWN*
SUSANNA M. BUERGEL*
JESSICA S. CAREY*
DAVID CARMONA*
GEOFFREY R. CHEPIGA*
ELLEN N. CHING*
WILLIAM A. CLAREMAN*
LEWIS R. CLAYTON*
YAHONNES CLEARY*
JAY COHEN*
KELLEY A. CORNISH*
CHRISTOPHER J. CUMMINGS*
THOMAS V. DE LA BASTIDE III*
MEREDITH R. DEARBORN*
ALICE BELISLE EATON*
ANDREW J. EHRLICH*
CAROLINE B. EPSTEIN*
GREGORY A. EZRING*
ROSS A. FIELDSTON*
ANDREW C. FINCH*
BRAD J. FINKELSTEIN*
BRIAN P. FINNEGAN*
ROBERTO FINZI*
PETER E. FISCH*
HARRIS FISCHMAN*
KATHERINE B. FORREST*
VICTORIA S. FORRESTER*
HARRIS B. FREIDUS*
MANUEL S. FREY*
MICHAEL E. GERTZMAN*
ADAM M. GIVERTZ*
SALVATORE GOGLIORMELLA*
NEIL GOLDMAN*
CHARLES H. GOGGE, JR.*
ANDREW G. GORDON*
BRIAN S. GRIEVE*
UDI GROFMAN*
MELINDA HAAS
ALAN S. HALPERIN*
CLAUDIA HAMMERMAN*
IAN M. HAZLETT*
BRIAN S. HERMANN*
JOSHUA HILL JR.*
MICHELE HIRSHMAN*
JARRETT R. HOFFMAN*
ROBERT HOLO*
CHRISTOPHER HOPKINS*
DAVID S. HUNTINGTON*
AMRAN HUSSEIN*
LORETTA A. IPPOLITO*
JAREN JANGHORBANI*
BRIAN M. JANSON*
LUKE JENNINGS*
JEH C. JOHNSON
ROGER JOHNSON*
DEIRDRE JONES*
MATTHEW B. JORDAN*
CHRISTODOULOS KAOUTZANIS*
BRAD S. KARP*
PATRICK N. KARSNITZ*
JOHN C. KENNEDY*
ROBERT A. KILLIP*
BRIAN KIM*
KYLE J. KIMPLER*
ROBERT A. KINDLER*
ALEXIA D. KORBERG*
DANIEL J. KRAMER*
ANDREW D. KRAUSE*
BRIAN KRAUSE*

CAITH KUSHNER*
DAVID K. LAKHDHIR
GREGORY F. LAUFER*
BRIAN C. LAVIN*
MATTHEW N. LIANT*
XIAOYU GREG LIU*
TIMOTHY LOWE*
RANDY LUSKEY*
LORETTA E. LYNCH*
JEFFREY D. MARELL*
MARCO V. MASOTTI*
DAVID W. MAYO*
ELIZABETH R. McCOLM*
JEAN M. McLOUGHLIN*
MARK F. MENDELSOHN*
CLAUDINE MEREDITH-GOUJON*
MATTHEW MERKLE*
WILLIAM B. MICHAEL*
SEAN A. MITCHELL*
ERIN J. MORGAN*
JUDIE NG SHORTELL*
CATHERINE NYARADY*
CIAN O'CONNOR*
BRAD R. OKUN*
SUNG PAK*
CRYSTAL L. PARKER*
LINDSAY B. PARKS*
ANDREW H. PARKEN
DANIELLE C. PENHALL*
CHARLES J. PESANT*
ANASTASIA V. PETERSON*
ANDREAS PHILIPSON*
AUSTIN S. POLLET*
RAVI PUROHIT*
VALERIE E. RADWANER*
JEFFREY J. RECHER*
LORIN L. REISNER*
ANDREW N. ROSENBERG*
JACQUELINE P. RUBIN*
RAPHAEL M. RUSSO*
NEEL V. SACHDEV*
ELIZABETH M. SACKSTEDER*
JEFFREY B. SAMUELS*
PAUL L. BANDLER*
AARON J. SCHLAPHOFF*
KENNETH M. SCHNEIDER*
ROBERT B. SCHUMER*
JOHN M. SCOTT*
BRIAN SCRIVANI*
KYLE T. SEIFRIED*
SUHAN SHIM*
CULLEN L. SINCLAIR*
MAURY SLEVIN*
AUDRA J. SOLOWAY*
SCOTT M. SONTAG*
MEGAN SPELMAN*
ROBERT Y. SPERLING*
EYITAYO ST. MATTHEW-DANIEL*
SARAH STASNY*
BEN STEADMAN*
AIDAN SYNNOTT*
ROBERT D. TANANBAUM*
BRETTE TANNENBAUM*
RICHARD C. TARLOWE*
DAVID TARR*
MONICA K. THURMOND*
DANIEL J. TOAL*
LAURA C. TURANO*
CONRAD VAN LOGGERENBERG*
KRISHNA VEERARAGHAVAN*
JEREMY M. VEIT*
LIZA M. VELAZQUEZ*
MICHAEL VOGEL*
ANDREA WAHLQUIST BROWN*
JOHN WEBER*
ERIC J. WEDEL*
THEODORE V. WELLS, JR.
SAMUEL J. WELT*
LINDSEY L. WIERSMA*
STEVEN J. WILLIAMS*
LAWRENCE I. WITDORCHIC*
MARK B. WLAZLO*
STACI YABLON*
BOSCO YIU*
KAYE N. YOSHINO*
TONG YU*
TRACEY A. ZACCONE*
KENNETH B. ZIMAN*
T. ROBERT ZOCHOWSKI, JR.*

*NOT ADMITTED TO THE DC BAR

December 7, 2023

**By Email**

**HIGHLY CONFIDENTIAL / ATTORNEYS- EYES ONLY**

Kyle Mooney
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601

Re:  *Arm Ltd.* v. *Qualcomm Inc. et al.*
      C.A. No. 22-1146-MN

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

Counsel:

I write concerning ARM's improper redactions of the Architecture License Agreements ("ALAs") that ARM has produced in this matter. As you know, on September 29, 2023, the Court ordered ARM and Qualcomm to meet and confer regarding the redacted ALAs on a license by license basis.

Pursuant to the Court's order, the parties met and conferred eight times—October 19, 2023, October 30, 2023, October 31, 2023, November 7, 2023, November 17, 2023, November 22, 2023, November 30, 2023, and December 1, 2023—with several of these meet and confers lasting two hours each.

On each meet and confer, Qualcomm asked ARM for very specific information regarding ARM's redactions, and despite agreeing to provide the requested information, ARM has, for the last month, failed to do so. ARM must stop delaying the resolution of these issues.

As we have repeatedly explained, ARM's redactions are overbroad and preclude Qualcomm from any meaningful analysis of the ALAs. Qualcomm's position remains that *all* redactions are improper, and that the ALAs should be produced in full. Any redaction precludes Qualcomm's ability to adequately review and comprehend the terms of the ALAs. *See Wyeth* v. *Orgenus Pharma Inc.*, C.A. No. 09–3235, 2010 WL 4117157, *4 (D.N.J. Oct. 19, 2010) (observing that "courts have routinely recognized that license agreements . . . are discoverable and that [a party's] third party confidentiality concerns do not outweigh legitimate grounds to compel production," and citing sixteen different cases to that effect).

In many of these instances, ARM purports to redact the ALAs based on its claim of non-responsiveness. However, as courts in Delaware have held, such redactions based on "relevance" or "non-responsiveness" are not appropriate. *See Nimitz Techs.* v. *CNET Media Inc.*, No. 1:22-cv-00413, 2023 WL 8187441, *14 n.14 (D. Del. Nov. 27, 2023) ("Relevance . . . is not a proper ground for redaction."); *Del. Display Grp. LLC* v. *Lenovo Grp. Ltd.*, No. cv-13-2108, 2016 WL 720977, *6 (D. Del. Feb. 23, 2016) (ordering unredaction of "sensitive" documents over irrelevance objections because "a party may not redact information that it unilaterally deems sensitive, embarrassing, or irrelevant"). Moreover, many of ARM's redactions cover not only the definitions of defined terms, but the terms *themselves*. Therefore, Qualcomm has no visibility into what terms are even being defined. For example,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

Moreover, ARM itself has indicated that its agreements with third parties are highly relevant to their own claims of irreparable harm. ARM has claimed, repeatedly, that Qualcomm's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.* ARM's Response to Interrogatory No. 14 (Nov. 17, 2023). Setting aside the point that relevance is not a proper grounds for redaction, ARM's insistence throughout the meet and confer process that key terms of its agreements are not relevant is therefore belied by its own statements; Arm itself has put the "structure and terms" of its licensing agreements at issue. The "structure and terms" of these ALAs necessarily include the key provisions that Arm has redacted, including the scope of and restrictions on licensed technology, royalty rates, pricing information, and confidentiality provisions, among others. All bear on whether Arm has in fact been forced to "change the nature and structure" of its business model.



Below, we address, on a license-by-license basis, the most pertinent provisions in the ALA that must be unredacted. These provisions largely fall into the following categories:

1.  **Pricing and Royalty Information:** As Qualcomm explained at the September 29 hearing and on subsequent meet and confers, the pricing and royalty information is critical information that must be unredacted. *First*, ARM is seeking specific performance in the form of destruction of Qualcomm's custom CPUs. To get specific performance, ARM must make a showing that there are no damages that can sufficiently compensate ARM. *See W. Willow-Bay Court, LLC* v. *Robino-Bay Court Plaza, LLC*, C.A. No. 2742, 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007) ("The party seeking specific performance must show that there is no adequate remedy at law."); *Prestancia Mgmt. Grp., Inc.* v. *Virginia Heritage Found. II LLC*, C.A. No. 1032-S, 2005 WL 1364616 at *4 (Del.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

Ch. May 27, 2005).  Qualcomm denies that there has been any breach and that even if there was any such breach, ARM is not entitled to specific performance because monetary damages are sufficient to compensate ARM.  As part of this analysis, information regarding royalties that ARM charges other licensees is directly relevant to determining what a reasonable royalty (or any other form of monetary compensation) may be in this case for ARM's technology.  Accordingly, Qualcomm is entitled to understand the royalty rates that ARM imposes on other licensees, as this will be a component of this damages analysis.  Courts regularly admit "comparable" licensing agreements to determine reasonable royalty rates. *E.g. Blue Gentian, LLC* v. *Tristar Prods., Inc*., No. 1:13–cv–1758, 2017 WL 5451745, *2-*4 (D.N.J. Nov. 14, 2017); *Sciele Pharma, Inc.* v. *Lupin, Ltd.*, C.A. No. 09-37, 2013 WL 12161442, *2 (D. Del. Jan. 31, 2013); *Commissariat a L'energie Atomique* v. *Samsung Elecs*., 2006 WL 8452836, *9-*14 (D. Del. Apr. 13, 2006).

2.    **Scope of Licensed Technology/Intellectual Property:**  To adequately analyze the royalty rates in the other ALAs, Qualcomm needs to understand the technology to which these royalty rates apply.  Yet, ARM has redacted numerous provisions in its ALAs that identify the ARM technology licensed by the various ALAs.  This information is necessary to understand (1) exactly what information ARM is claiming ownership over, and (2) similarities among the ALAs.  The Court made very clear in its prior hearing that it expected the parties to meet and confer about the scope of the license agreements, and stated that if "there's a specific license agreement that has similar or same technology, it's similarly situated such that the provisions are actually relevant here," and that the Court would consider Qualcomm's request to unredact (2023.09.29 Hrg. Tr. 50:19-24).

3.    **Representations and Warranties:**  ARM has redacted numerous representations and warranties in various ALAs.  Qualcomm cannot ascertain the exact scope of the redacted information, but it is possible that the redacted representations and warranties contain statements regarding the scope of ARM's purported ownership rights in the licensed technology and trademark rights.  Much of this case turns on the scope of ARM's ownership rights as it relates to the technology developed by Qualcomm and Nuvia.  As such, Qualcomm is entitled to understand representations and warranties ARM has made to other licensees regarding the scope of its ownership and trademark rights, as that is relevant to the claims at issue.

4.    **Confidentiality Provisions:**  ARM's primary argument in this litigation is that custom technology developed by Nuvia and Qualcomm somehow constitute ARM Confidential Information under the ALAs, such that ARM

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

has the right to require destruction of this technology—even though ARM had no involvement in developing this technology. ARM premises this argument on the fact that the technology developed exclusively by Nuvia and Qualcomm is compatible with ARM architectural manuals. But these manuals are publicly available for anyone to download. Therefore, ARM's confidentiality arguments are puzzling, and Qualcomm is entitled to test ARM's course of dealing and business practices regarding confidentiality as applied to other licensees. Therefore, all parts of the confidentiality provisions in the license agreements should be unredacted.

5. **Termination Provisions:** ARM's case centers on ARM's claims about what it is entitled to demand from licensees as part of terminating an ALA. As such, Qualcomm is entitled to information regarding ARM's course of practice in connection with termination provisions in other ALAs. Moreover, as ARM's counsel stated at the September 29, 2023 hearing: "As far as the redaction issue, the assignment provision and termination provisions should be unredacted." (2023.09.29 Hrg. Tr. 14:11-14). Consistent with ARM counsel's representation, the termination provisions in all ALAs should be unredacted in full.

6. **Support:** ARM has put into issue in this litigation the extent of the support it provides to licensees. ARM appears to be making the argument that the support it provided to Nuvia is somehow an indicator that designs that Nuvia generated contain ARM intellectual property or ownership rights. As such, it is highly relevant to understanding ARM's business practices regarding support it provides other licensees, and this provision must be unredacted. As the Court noted during the September 29 hearing: "I understand Qualcomm's argument to be essentially that on the support issue that issued during discovery, so it's a little bit unfair to now turn around and block any support provisions in the ALAs from being reviewed and analyzed from outside counsel for Qualcomm." (2023.09.29 Hrg. Tr. 16: 6-13).

7. **Term of Agreements:** As part of a comparative analysis of ALAs and ARM's business model, Qualcomm is entitled to understand the applicable length of the ALAs. For example, we understand from Mr. Grisenthwaite's deposition that ███████████████ (Grisenthwaite Tr. 49:9-20.) The existence of such ███████ as compared to time limited ALAs is highly relevant for understanding the relevant market and rights of various licensees. Therefore, this information should be unredacted.

We note that on December 4, 2023, we received versions of three ALAs—███

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

██████████████ —that contained further unredactions as compared to the previously provided versions of these agreements.  ARM appears to have unredacted provisions in these agreements related to the scope of the licensed technology, representations and warranties, confidentiality, and support.  As such it is unclear why ARM is maintaining parallel redactions in other ALAs, as ARM apparently recognizes its obligation to unredact these provisions, which are relevant to the claims and defenses in this case.

Because of the scale and scope of the redactions, the below represents Qualcomm's current best efforts to identify the most important provisions, but Qualcomm reserves the right to identify further provisions.  As Qualcomm has pointed out, ███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

Please promptly confirm that ARM will unredact the provisions set out below.

I.   ██████



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP



**II.** ████████

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

8



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

9



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

10



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

11



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

13





PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

15



**VI.**



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

16



**VII.**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

17



**VIII.**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

19



**IX.** ███

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20



X.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

21

**XI.**



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

22



XII.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

23



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

24





PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

25

**XIII.**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

26



XIV.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

27



PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

28



**XV.** ███████

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

29



* * *



30



Defendants reserve all rights.

Sincerely,

*/s/ Melissa Felder Zappala*

Melissa Felder Zappala

cc:    All counsel of record

# Exhibits 27-88

## REDACTED IN THEIR ENTIRETY