IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARM LTD.,                                      )
                                               )
                        Plaintiff,             )
                                               )   C.A. No. 22-1146 (MN)
            v.                                 )
                                               )   **REDACTED – PUBLIC VERSION**
QUALCOMM        INC.,      QUALCOMM)                **Original Filing Date: July 10, 2024**
TECHNOLOGIES, INC. and NUVIA, INC.,            )   **Redacted Filing Date: July 22, 2024**
                                               )
                        Defendants.            )


**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE ARM'S EXPERT OPINIONS**


OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
Samantha Mehring
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

July 10, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. NATURE AND STAGE OF THE PROCEEDING..................................................................1

II. SUMMARY OF ARGUMENT AND FACTS ......................................................................1

III. LEGAL STANDARD...........................................................................................................1

IV. ARGUMENT .......................................................................................................................2

  A. Todd Schoettelkotte's Testimony Should Be Excluded…………………….…..…2

  B. Guhan Subramanian's Testimony Should Be Excluded…………………………..5

  C. Ravi Dhar's Opinions Should Be Excluded…………………………………….…9

  D. Shuo-Wei (Mike) Chen's Testimony Should Be Excluded………………………14

  E. Robert Collwel's Testimony Should Be Excluded………………………………19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
 Civil Action 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022) ...................... *passim*

*Am. Cruise Lines, Inc.* v. *HMS Am. Queen Steamboat Co. LLC*,
 No. 13-cv-324, 2017 WL 3528606 (D. Del. Aug. 16, 2017)...........................................10, 12

*Am. Eagle Outfitters, Inc.* v. *Walmart, Inc.*,
 No. 2:20-cv-00412, 2023 WL 1775702 (W.D. Pa. Feb. 6, 2023)...............................5

*CareDx, Inc.* v. *Natera, Inc.*,
 No. 19-cv-662, 2021 WL 1840646 (D. Del. May 7, 2021) ....................................4

*Century 21 Real Est. Corp.* v. *LendingTree, Inc.*,
 425 F.3d 211 (3d Cir. 2005)........................................................................13

*Chemipal Ltd.* v. *Slim-Fast Nutritional Foods Intern., Inc.*,
 350 F. Supp. 2d 582 (D. Del. 2004)............................................................16

*Daubert* v. *Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993)..........................................................................1, 8, 15

*ECB USA, Inc.* v. *Savencia, S.A.*,
 No. CV 19-731-GBW-CJB, 2024 WL 1251184 (D. Del. Mar. 22, 2024)...............................8

*Elcock* v. *Kmart Corp.*,
 233 F.3d 734 (3d Cir. 2000)...........................................................................1

*Gen. Elec. Co.* v. *Joiner*,
 522 U.S. 136 (1997)..................................................................................2

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, No. CV 14-877-LPS-CJB, 2017
 WL 8948975 (D. Del. May 30, 2017)................................................................2

*Green River Bottling Co.* v. *Green River Corp.*,
 997 F.2d 359 (7th Cir. 1993) ......................................................................5

*Grimes* v. *Nw. Airlines, Inc.,* No. CIV. A. 98-CV-4794, 1999 WL 527831, at *1
 (E.D. Pa. July 22, 1999)..............................................................................4

*iGames Ent., Inc.* v. *Chex Servs., Inc.*,
 No. CIV.A. 04-180-KAJ, 2005 WL 3657156 (D. Del. June 9, 2005).......................................6

*Masimo Corp.* v. *Philips Elecs. N. Am. Corp.*,
   C. A. No. 09-80-LPS-MPT, 2013 WL 2178047 (D. Del. May 20, 2013) ..............................20

*Niederer* v. *Ferreira*,
   189 Cal. App. 3d 1485 (Ct. App. 1987)...............................................................................8

*O'Hara* v. *The Premcor Ref. Grp., Inc.*,
   No. CV 09-500-RGA, 2012 WL 12896236 (D. Del. Oct. 5, 2012)....................................3, 22

*Oakland-Alameda Cnty. Coliseum Auth.* v. *Golden State Warriors, LLC*,
   53 Cal. App. 5th 807 (Ct. App. 2020)...................................................................................9

*Orbital Eng'g, Inc.* v. *Buchko*,
   578 F. Supp. 3d 727 (W.D. Pa. 2022)..................................................................................21

*Sabinsa Corp.* v. *Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010)...............................................................................................10

*Torain* v. *City of Phila.*,
   No. CV 14-1643, 2023 WL 174952 (E.D. Pa. Jan. 12, 2023) ..................................................3

*UGI Sunbury LLC* v. *A Permanent Easement for 1.7575 Acres*,
   949 F.3d 825 (3d. Cir. 2020)..............................................................................................21

*Urb. Outfitters, Inc.* v. *BCBG Max Azria Grp., Inc.*,
   511 F. Supp. 2d 482 (E.D. Pa. 2007) ..................................................................................11

*Versata Software, Inc.* v. *SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013).............................................................................................5

*Withrow* v. *Spears*,
   967 F. Supp. 2d 982 (D. Del. 2013).....................................................................................19

*XY, LLC* v. *Trans Ova Genetics, LC*,
   2016 WL 97788 (D. Col. Jan. 8, 2016).................................................................................21

*In re: Zoloft Prods. Liab. Litig.*,
   No. 12-md-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), *aff'd* 858 F.3d
   787 (3d Cir. 2017)..............................................................................................................13

**Rules**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ................................................................................................22

Fed. R. Civ. P. 37(c)(1)..........................................................................................................19

Fed. R. Evid. 104(a)................................................................................................................2

Fed. R. Evid. 702 ....................................................................................................................1, 2

**Other Authorities**

Advisory Comm. On Rules of Evidence, *Agenda for Committee Meeting* 17 (Apr.
    30, 2021) ..........................................................................................................................2

Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc. (collectively, "Qualcomm") move to exclude testimony of Arm's experts Todd Schoettelkotte, Guhan Subramanian Ravi Dhar, Shuo-Wei (Mike) Chen, and Robert Colwell, as set forth below and in Appendix A, attached as Exhibit 1 (summary chart of all paragraphs of expert reports to be excluded).

## I.      NATURE AND STAGE OF THE PROCEEDING

Qualcomm refers the Court to Section II of Defendants' Opening Brief in Support of Their Motion for Summary Judgment, which Qualcomm incorporates by reference herein.

## II.     SUMMARY OF ARGUMENT AND FACTS

Opinions of each of the above-named experts should be excluded for the reasons set forth below. Qualcomm hereby incorporates by reference the Statement of Facts set forth in Section IV of Defendants' Opening Brief in Support of Their Motion for Summary Judgment, as well as Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment. Further facts relevant to each of the above-named experts are set forth in the argument sections of this Brief.

## III.    LEGAL STANDARD

The Court has "a gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).[1] Rule 702 imposes "three distinct substantive restrictions on the admission of expert testimony: [1] qualifications, [2] reliability, and [3] fit." *Elcock* v. *Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a

---

[1] For quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations are omitted for readability. All emphasis is added unless otherwise indicated.

district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997). "It is well-established 'an opinion based on speculation or an educated guess is inadmissible.'" *Allscripts Healthcare, LLC v. Andor Health, LLC*, Civil Action 21-704-MAK, 2022 WL 3021560 at *43 (D. Del. July 29, 2022).

The amended Federal Rule of Evidence 702, which took effect on December 1, 2023, provides that an expert witness's opinion testimony is admissible only if the proponent demonstrates to the court that it is more likely than not that the proposed testimony satisfies all elements of Rule 702, including that the testimony is based on sufficient facts or data and is the product of reliable principles and methods. This amendment arose because the Advisory Committee on Evidence detected a "pervasive problem" of courts delegating to the jury the judicial responsibility of critically screening expert testimony. Advisory Comm. On Rules of Evidence, *Agenda for Committee Meeting* 17 (Apr. 30, 2021)). As the Advisory Committee explained, "unfortunately many courts have held that the critical question of the sufficiency of an expert's basis [for his testimony], and the application of the expert's methodology, are generally questions of weight and not admissibility." Committee Note, 344 F.R.D. 850, 857 (Apr. 24, 2023). The amendment "reject[s]" that "incorrect application of Rules 702 and 104(a)," and "emphasize[s] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis." Committee Note, 344 F.R.D. at 858.

## IV.    ARGUMENT

### A.    TODD SCHOETTELKOTTE'S TESTIMONY SHOULD BE EXCLUDED

Todd Schoettelkotte, a CPA who testifies about damages, opines that monetary damages are inadequate and not readily ascertainable with respect to future harm. Ex. 2 (Schoettelkotte 12/20 Rep.) at ¶¶ 14–15. The issue of whether specific performance or monetary damages is the proper remedy is a legal issue for the Court and not a jury to resolve. *GlaxoSmithKline LLC v.*

*Glenmark Pharms. Inc.*, No. CV 14-877-LPS-CJB, 2017 WL 8948975, at *7 n.6 (D. Del. May 30, 2017), *report and recommendation adopted*, No. CV 14-877-LPS-CJB, 2017 WL 2536468 (D. Del. June 9, 2017) (rejecting argument that expert opinions should not be excluded because they are relevant to equitable defenses, as "those defenses are exclusively for the District Court to decide and therefore . . . would not be relevant for the jury trial").

Nor can Schoettlekotte testify to the alleged future harms to be remedied in this case because he offers no opinions on whether harm occurred or the probability of future harm; he simply regurgitates fact witnesses' views without providing an independent expert opinion. Even his opinion that money damages are inadequate and cannot be calculated with reasonable certainty, in addition to having no basis in any independent opinion about harm, is speculative.

1. ***No Independent Opinion Of Harm***: With respect to his opinions that monetary damages are inadequate, Schoettelkotte testified that (1) there was no evidence that Arm incurred any injury from Qualcomm's conduct, (Ex. 3 (Schoettelkotte 3/25 Rep.) at ¶¶ 14, 56 ("The harms discussed in my Initial Report have not yet transpired."); Ex. 4 (Schoettelkotte Tr.) at 83:8–87:4)[2], and (2) with respect to any future harms, he is not offering an independent expert opinion. *E.g. id.* at 39:6– 41:18 ("[T]o identify[] what those harms are, I relied upon my discussions with Nuvia [sic] personnel, the documents produced in this case, deposition testimony."). Experts cannot, under the guise of providing expert testimony, serve as a mouthpiece for witnesses on whose statements or opinions the expert relies. *O'Hara* v. *The Premcor Ref. Grp., Inc.*, No. CV 09-500-RGA, 2012 WL 12896236, at *1 (D. Del. Oct. 5, 2012) (holding proposed testimony that "simply consists of recitations of narrative reports and deposition testimony" "clearly inadmissible"); *Torain* v. *City*

---

[2] Arm's public statements and statements by its employees confirm that Arm has not been harmed. Ex. 5 (Arm Holdings plc Q2 FY 2024 Shareholder Letter) at 2; Mot. SJ. at § VI.A; Ex. 6 (Haas Tr.) at 165:24–166:5; Ex. 7 (Abbey Tr.) at 365:23–367:17; Ex. 8 (Williamson Tr.) at 244:6–14.

*of Phila.*, No. CV 14-1643, 2023 WL 174952, at *5 (E.D. Pa. Jan. 12, 2023) ("Experts may not simply 'parrot' the ideas of other experts and should not 'become the mouthpiece of the witness on whose statements the expert purports to base his opinion.'"). They cannot regurgitate facts provided by witnesses without conducting their own analysis. *CareDx, Inc.* v. *Natera, Inc.*, No. 19-cv-662, 2021 WL 1840646, at *3–4 (D. Del. May 7, 2021) (excluding expert who relied on witness testimony for cost estimates that he "did not engage in reasonable … efforts to verify"). For each category of harm proffered in Schoettelkotte's report, he relied on input of others without conducting his own analysis. Ex. 2 at ¶¶ 69–140.[3] Moreover, he opines that harm will result from a "denial of Arm's request for specific performance," as opposed to Qualcomm's conduct. Ex. 3 at ¶ 15, *see also* ¶¶ 28, 30–31, 39, 45.

   **2.  *No Opinion On Probability Of Harm*:** Schoettelkotte spends over 100 paragraphs describing alleged "harms" that he asserts "could" or "may" come to pass, but admits he is not offering an opinion on the probability or the likelihood that any of those harms may happen. Ex. 2 at ¶¶ 69–140; Ex. 4 at 39:6–41:18; 90:12–92:2, 135:3–10, 142:4–14, 144:19–146:12, 176:2–7. Speculation regarding harm is irrelevant, and experts may not opine on it. *Allscripts*, 2022 WL 3021560 at *43 (It is well-established 'an opinion based on speculation or an educated guess is inadmissible.'"); *Grimes* v. *Nw. Airlines, Inc.,* No. CIV. A. 98-CV-4794, 1999 WL 527831, at *1 (E.D. Pa. July 22, 1999) ("Parties may not present speculative damages testimony").

---

[3] *E.g.*, Schoettelkotte opines that Qualcomm's alleged breach "could have a cascade of significant effects" on the Arm licensing ecosystem and monetary damages are inadequate to compensate for these effects. Ex. 2 at ¶ 16. In support, he cites almost exclusively statements by Arm or Arm witnesses expressing concerns about that possibility. *Id.* at ¶¶ 69–99 nn.180–244; Ex. 4 (Schoettelkotte Tr.) at 89:12–90:8, 113:12–114:18, 134:7–134:17. He also claims that, without an injunction, there could be a "significant decrease in licensing revenue and Arm's investment in research and development." Ex. 2 at § VII(E). But he relies on hypothetical statements by Arm employees that customers *might* pay less to Arm by opting to develop their own technology, thereby reducing R&D funds. *Id.* at ¶ 127.

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law" it must be stricken. *Am. Eagle Outfitters, Inc.* v. *Walmart, Inc.*, No. 2:20-cv-00412, 2023 WL 1775702, at *3 (W.D. Pa. Feb. 6, 2023) (excluding Schoettelkotte's "subjective and speculative" testimony as not "supported by a reliable methodology and sufficient facts and data").

**3.** ***Opinions Are Speculative And Unreliable***: Schoettelkotte's opinion that money damages are inadequate and cannot be estimated with reasonable certainty are unsupported, speculative and unreliable. Ex. 2 at ¶¶ 69–140. Schoettelkotte provides no citations for his assertions, repeatedly stating without any support, that "In my opinion, the . . . harm . . . caused by Defendants' breach of the ALA cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty." Ex. 2 at ¶ 98, *see also* ¶¶ 69–70, 78, 85, 88, 93, 97, 107, 119, 129, 136–37. His view that monetary damages are inadequate depends on his views of how licensees and prospective licensees would react to this Court granting monetary relief instead of specific performance. Ex. 3 at ¶¶ 14–17, 28, 30–31, 34, 36, 39, 41, 45, 48, 50–51, 53, 56, 58–59. Yet he admits that he does not have an opinion about what these licensees would think or even whether they know what remedy Arm is seeking in this litigation. Ex. 4 at 106:17–108:15, 109:13–112:4, 140:13–142:3. As a legal matter, and as even Schoettelkotte acknowledges, lost royalties and lost sales are typically utilized to compensate for harm in a breach of license dispute. Ex. 4 at 52:20–56:2, 57:18–59:7; *Versata Software, Inc.* v. *SAP Am., Inc.*, 717 F.3d 1255, 1263–64 (Fed. Cir. 2013); *Green River Bottling Co.* v. *Green River Corp.*, 997 F.2d 359, 363 (7th Cir. 1993).

**B.    GUHAN SUBRAMANIAN'S TESTIMONY SHOULD BE EXCLUDED**

Subramanian's testimony should be excluded to the extent it constitutes (a) interpretation of the scope and meaning of a contract, (b) interpretation of the parties' intent or state of mind, including in entering into the contracts at issue, or (c) testimony about "negotiation theory." In

addition, Subramanian's opinion that "non-enforcement could have negative follow-on effects that are impossible to quantify" is speculative, unreliable, and improper for a jury.

      **1. *Testimony About The Meaning And Scope Of Contracts*:** As a general matter, experts "simply may not testify about their interpretation of a contract and the rights and obligations of the parties based on their interpretation," including about the "scope and meaning" of the contract or the "legal effect of the [contract]." *Allscripts*, 2022 WL 3021560, at *26. "[E]vidence that the terms were given a specialized meaning requiring expert aid to understand" is thus "a critical predicate for putting forth an expert to opine on the meaning of terms" in a contract. *iGames Ent., Inc.* v. *Chex Servs., Inc.*, No. CIV.A. 04-180-KAJ, 2005 WL 3657156, at *3 (D. Del. June 9, 2005).

      Subramanian offers the following opinion in his opening report:

> Consistent with the business objectives of CIC provisions and negotiation principles,



Ex. 9 (Subramanian 12/20 Rep.) at ¶ 19(3) (the "Contract Opinion"). The Contract Opinion—which purports to describe the obligations under the ▆▆▆▆▆▆ of the Nuvia ALA—illustrates the issue with much of Subramanian's work in this case: while framed as analysis of "business objectives" using "negotiation theory," his opinion is pure contract interpretation. Similarly, in paragraph 83, Subramanian asserts the following, purportedly in support of his opinion that "the ▆▆▆▆▆▆ in the Arm-Nuvia ALA are consistent with business considerations, negotiation theory and case studies":





Ex. 9 at ¶ 83. In support, Subramanian cites only the Qualcomm ALA. There are countless similar statements throughout his reports. *E.g., id.* at ¶¶ 27, 54, 56, 57, 59, 61, 63–66); Ex. 10 (Subramanian 3/25 Rep.) at ¶¶ 14, 16, 19. At no point has Subramanian suggested, let alone explained and supported, that terms in the contract have a "specialized meaning" requiring expert interpretation. Subramanian's entire Contract Opinion should be excluded, along with the portions of his Report that are pure contract interpretation.

      **2. *Testimony About Intent Or State Of Mind*:** "Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case [] and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury." *Allscripts*, 2022 WL 3021560, at *27 (excluding opinions about meaning of contract and intent of parties regarding terms in contract). Statements that provisions in a contract "reflect[] the parties' agreed understanding of" certain facts or "evidence the parties' understanding and agreement" about the definition of products covered by the contract have been excluded as improper testimony about intent. *Id.* at *44.

      Subramanian's reports are rife with such testimony. For example, at paragraph 72 of his opening report, in a section entitled "Qualcomm and Nuvia seemed to be aware of the ▆▆▆ ▆▆▆ in the ALAs," Subramanian opines: "my review of the record indicates that Nuvia was aware of the issues that could arise if the company was acquired." Ex. 9 at ¶ 72. He then describes record evidence from which he infers Qualcomm's "awareness" that it "anticipated needing both

Arm's consent as well as potential new agreements . . . in order to continuing developing Nuvia's innovations" and that it ███████████████████████████████████████ ███████████████████████████ Ex. 9 at ¶¶ 73, 75. His reports contain many similar arguments, all of which should be excluded. *E.g.*, *id.* at ¶¶ 55, 63, 77; Ex. 10 at ¶¶ 15, 20, 24; Ex. 11 (Subramanian Tr.) at 191:9-193:10.

**3. *Subramanian's Testimony About "Negotiation Theory" Does Not "Fit" The Case*:**
Expert testimony must "fit" the issues in the case—that is, it must "'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591; *ECB USA, Inc.* v. *Savencia, S.A.*, No. CV 19-731-GBW-CJB, 2024 WL 1251184, at *3–4 (D. Del. Mar. 22, 2024) (excluding expert testimony about "commonly understood conceptions of the role of CEO') ("It is not relevant (and thus, the jury will not benefit from hearing testimony about) what CEOs at *other* companies 'generally' do. Instead, what is relevant is what the CEO of *Schratter actually did do* before and after June 2014, and what Defendants communicated on this score.").

Subramanian's Report provides pages of background about "negotiation theory" and its "application to licensing agreements." Ex. 9 at ¶¶ 30–50. He refers to these principles to assert they are consistent either with his interpretation of the contract or the inferences he draws from record evidence about the parties' intent and state of mind. *See, e.g.*, *id.* at ¶¶ 66, 78, 84.

This generic testimony does not fit the issues in this case, to the extent it is used to explain the meaning of the contracts or the parties' intent or state of mind. The plain language reading of a contract controls, so to the extent that the language in the Nuvia and Qualcomm ALAs is clear, as Professor Subramanian asserts[4], extrinsic evidence is unnecessary. *Niederer* v. *Ferreira*, 189

---

[4] Ex. 9 at ¶ 54; *see also* Ex. 10 at ¶¶ 15 n.23, 16, 35, 37, 40–41.

Cal. App. 3d 1485, 1499–1500 (Ct. App. 1987). Moreover, where extrinsic evidence is determined to be necessary, the evidence that matters is that which illuminates "what the *parties* intended," *Oakland-Alameda Cnty. Coliseum Auth*. v. *Golden State Warriors, LLC*, 53 Cal. App. 5th 807, 818 (Ct. App. 2020), not evidence of whether what the parties intended was consistent with general negotiation theory and principles.

**4. *Testimony That "Non-Enforcement Could Have Negative Follow-On Effects That Are Impossible To Quantify" Is Speculative And Not Reliable*:** Subramanian claims that "non-enforcement could have negative follow-on effects that are impossible to quantify." Ex. 9 at ¶¶ 93–102. Subramanian provides no support or explanation for why he expects these harms "could" come to pass: he does not cite studies about the kinds of harms that typically arise if a termination provision in a licensing agreement is not specifically enforced or list instances in which such harms have occurred in similar instances. Instead, his opinion relies exclusively on testimony from Arm witnesses about potential future harms (none of which have come to pass) and other record evidence he interprets. *See, e.g.*, Ex. 9 at ¶¶ 91 n.126, 94 n.129, 99–100; *see also* Ex. 11 at 396:8-24, 397:16-25, 398:2-9, 402:9-19, 403:12-25, 404:2-405:22.

This opinion is unreliable speculation. It is, at best, an inadmissible regurgitation of fact witness testimony, it assumes future harm without predicting the probability of that harm, and because it is aimed at explaining why specific performance is necessary and damages are not calculable, it is not proper testimony for a jury. Testimony on this topic should be excluded, including all paragraphs identified at Exhibit 1. *See supra* p. 1.

### C.   RAVI DHAR'S OPINIONS SHOULD BE EXCLUDED

Ravi Dhar opines that Qualcomm's use of Arm marks creates a likelihood of confusion and likelihood of harm. *See* Ex. 12 (Dhar 12/20 Rep.) at ¶¶ 15–16. These opinions are not the product of any reliable methodology or analysis and they do not "fit" the facts in the case. Dhar's

opinion that the Arm brand is "strong" is similarly deficient. *See id.* at ¶ 13. And Dhar's opinion that Qualcomm's use of the ARM trademark is not fair use is an improper legal opinion. *See id.* (Dhar 12/20 Rep.) at ¶ 136.

1. ***Likelihood of Confusion Testimony Is Unreliable And Does Not Fit The Case***: The relevant inquiry in determining likelihood of confusion is whether "*consumers* viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Sabinsa Corp.* v. *Creative Compounds, LLC*, 609 F.3d 175, 182 (3d Cir. 2010) (quoting *Checkpoint Sys., Inc.* v. *Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001)). Courts have excluded testimony where experts eschew a survey and merely provide "a recitation of facts paired with bare assertions" in support of their conclusion that confusion is likely. *Am. Cruise Lines, Inc.* v. *HMS Am. Queen Steamboat Co. LLC*, No. 13-cv-324, 2017 WL 3528606, at *4 (D. Del. Aug. 16, 2017); *see also Sabinsa*, 609 F.3d at 190 (Ambro, J., concurring) (where confusion survey could have been, but was not, conducted, "we could reasonably infer that [the plaintiff] expected that any survey results would undermine its case").

Here, Dhar opines that customers are confused by Qualcomm's use of "Arm-based," and "Arm-compliant" because they "convey[] endorsement and sign-off by Arm." Ex. 12 at ¶ 117. Dhar admits customers for Qualcomm's products (and Arm's products) are a small set of sophisticated businesses well known to both Qualcomm and Arm. *See* Ex. 13 (Dhar Tr.) at 86:9–21, 224:9–20, 268:23–269:6, 386:2–20. Nonetheless, Dhar did nothing to ascertain whether the relevant customers had experienced confusion or were likely to be confused. He did no survey, despite using surveys in prior cases to assess likelihood of confusion. *See id.* at 68:10–70:11, 71:19–72:7. He did not ask to speak to customers. *See id.* at 9:3–6, 129:20–130:2. And he did not

interview customer-facing Arm employees about any actual confusion or conversations that could reflect likelihood of confusion. *See id.* at 232:10–234:2, 280:11–19. Instead, he reviewed qualitative evidence he claims suggests likelihood of confusion, including Qualcomm press announcements, third-party press, statements by Qualcomm employees on earnings calls and at other events, and reports by financial analysts that discuss Qualcomm's products as being "Arm-based" or "Arm-compliant," or that use the word "Arm" in connection with Qualcomm.  Ex. 12 at ¶¶ 112, 116, 119; Ex. 14 at ¶¶ 28, 31–35. But he never analyzed (a) whether customers read the articles he cited (Ex. 13 at 345:25–46:21), or (b) whether these highly sophisticated customers were likely to be confused by the use of these terms, which witnesses widely acknowledge indicate that Qualcomm's products are compatible[5] with the Arm instruction set architecture. Ex. 15 (Steckel 2/27 Rep.) at ¶¶ 77, 86, 87.  He also did not analyze whether Qualcomm's customers were at the events at which Qualcomm personnel used the word "Arm" in relation to Qualcomm, Ex. 13 at 340:18-341:12, and asserted without support that use of these terms by financial analysts is indicative of confusion among Qualcomm's customers.  *Id.* at 347:4-348:20.

Dhar claims it would be "challeng[ing]" to conduct a survey because the products at issue had not launched. Ex. 13 at 71:19–72:20. This is wrong—and another indication of Dhar's unreliability. Documents Dhar cites in his opening report make clear that at least one Qualcomm product at issue launched in October 2023. *See* Ex. ██████████████████████ Ex. 13 at 273:13–15, 328:2–19; Ex. 12 at ¶¶ 76, 112; Ex. 17 (10/24/2023 Anand Tech Article). In any event, surveys can be conducted for products before they launch. *See, e.g.*, *Urb. Outfitters, Inc.* v. *BCBG*

---

[5]  Dhar opines that "Arm's Trademarks [] signify compliance with the ████████████████ ████████████  and . . . verification[] and validation in accordance with the applicable provisions in the relevant license Annex." Ex. 12 at ¶ 13. But he has *no* relevant support for these contentions other than deposition testimony from Mr. Jonathan Armstrong—Arm's head of branding, who is not an Arm customer. Ex. 12 at ¶¶ 81, 122.

*Max Azria Grp., Inc.*, 511 F. Supp. 2d 482, 496, 498 (E.D. Pa. 2007) (discussing evidence of surveys based on marketing materials before the "new incarnation" of a brand had "appeared on the market").

Without a survey or reliable qualitative evidence, Dhar's likelihood of confusion opinion amounts to "[c]onclusory statements of basic facts [that] will not help the jury and fail to offer a reliable methodology." *Am. Cruise Lines*, 2017 WL 3528606, at *4. It should be excluded.

**2. *Dhar's Opinions On The Significance Of The Arm Brand Are Unreliable*:** Dhar opines that the Arm brand and marks are "strong and confer value in the marketplace," (Ex. 12 at ¶¶ 13, 99–101; Ex. 14 at ¶ 7)[6] and that "products linked to Arm" are "conferred positive associations" thanks to the strength of Arm's brand (Ex. 12 at ¶ 105). Dhar supports these opinions with citations to random awards, Arm's sales statistics, and Arm's own statements about its branding efforts. *See id*. at ¶¶ 99–100, 102–104. But Dhar failed to analyze whether customers are aware of, or have any understanding of, the Arm brand from these sources, and admits he did not analyze how the decision to purchase a Qualcomm product is made (in part because he mistakenly believed no Qualcomm products were "on the market"). *See id*. at 223:17–224:8, 226:04–230:22.

Moreover, he did nothing to ensure that the evidence he relied on was complete: instead of identifying all awards in the relevant industry and determining the percentage Arm had won, he drew a conclusion from a handful of awards (about which he knew nothing, as he admitted at his deposition (*see id*. at ¶¶ 99(a), (c); Ex. 13 at 257:6–264:10); instead of tracking references to Arm or Arm marks by customers, he relied on what Arm said about its own brand (*see* Ex. 12 at ¶¶ 98, 100, 102–106; Ex. 13 at 232:10–233:5); instead of examining a connection between use of Arm's

---

[6] Dhar improperly purports to add additional support for this proposition in Paragraph 7 of his Reply, that were not in his Opening Report. That paragraph should be stricken.

marks and growth in Arm's sales, he relied on sales numbers in a vacuum (*see* Ex. 12 at ¶ 99(b)). These cherry-picked citations are insufficient to comprise a reliable expert analysis. *See In re: Zoloft Prods. Liab. Litig.*, No. 12-md-2342, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015), *aff'd* 858 F.3d 787 (3d Cir. 2017).

**3. *Dhar's Opinion That There Is A Likelihood of Harm Is* Ipse Dixit:** Dhar opines that Qualcomm's use of the ARM marks "will cause harm to Arm" because "any dissatisfaction or problems" with Qualcomm's products will be "erroneously attributed" to Arm, and Arm may experience "spillover" effects. Ex. 12 at ¶ 127. He also claims that "Qualcomm's unauthorized use of Arm's Trademark . . . will likely divert sales from authorized users of Arm's Trademark." *Id.* at ¶ 132. The only source Dhar cites is deposition testimony from Arm's Chief Commercial Officer about generalized and hypothetical contract-based harm to Arm—testimony that is contradicted by other passages in that same deposition. *Compare* Ex. 12 at ¶¶ 129–30, *with* Ex. 7 (Abbey Tr.) at 363:4–13, 365:17–367:17. Dhar attempts to bolster his unsupported theories of harm in his reply by citing general academic literature. Ex. 14 at ¶ 54. But he does not explain how or why these academic concepts might apply. Dhar ignores that Arm itself has taken the position that it has not been harmed. *Supra* p. 3. As such, his opinion is *ipse dixit* and should be excluded.

**4. *Dhar's Opinion on Fair Use Constitutes an Improper Legal Opinion*:** Dhar opines that "Qualcomm's unauthorized use of the Arm Trademarks would not constitute fair use." Ex. 12 at ¶ 136. This is an improper legal opinion. *Allscripts*, 2022 WL 3021560, at *2. It is also incomplete. Fair use is a defense to trademark infringement if: (1) using the "plaintiff's mark is necessary to describe" defendant's product and (2) "defendant uses only so much of the plaintiff's mark as is necessary" (3) to "reflect the true and accurate relationship" between the parties. *Century 21 Real*

*Est. Corp.* v. *LendingTree, Inc.*, 425 F.3d 211, 222 (3d Cir. 2005). Dhar addresses only the third factor. *See* Ex. 12 at ¶ 136.

### D.     SHUO-WEI (MIKE) CHEN'S TESTIMONY SHOULD BE EXCLUDED

Chen offers what he calls quantitative and qualitative opinions. Both should be excluded because: (1) there is no "fit" between the opinions and the ultimate legal issues in this case so they will not assist in resolving issues in this case, and (2) they are unreliable because Chen applies no accepted methodology to conduct his analysis. Additionally, Chen's reply report goes beyond the scope of his Opening Report to opine on whether pre-acquisition Nuvia source code (Register Transfer Language—"RTL") and the Qualcomm custom CPUs are ███████████

███████████████. *See, e.g.* Ex. 18 (Chen 3/25 Rep.) at ¶¶ 7, 56.

**1. *Chen's "Quantitative" Opinions*.** Chen offers two "quantitative" opinions: that (1)

████████████████████████████████████████████

████████████████ and (2) "the February 28, 2022 ███████ code . . . [and] the April 1, 2022 ████████ code . . . are nearly identical." Ex. 19 (Chen 12/20 Rep.) at ¶ 18. The opinions purport to address whether Nuvia's pre-acquisition RTL for the ██████ Design in Process *is similar* to post-termination RTL for Qualcomm's custom CPUs.

*a. No "Fit":* Arm claims that Defendants' custom CPUs are derivatives of Arm Technology. D.I. 1 ¶¶ 2, 62, 68. Chen purports to "determine the similarity of source code across different versions of code produced by Qualcomm" (Ex. 19 at ¶ 20) to conclude that ████████

████████████████████████████████████████████

████████████████████ *Id.* at ¶ 18. To do so, Chen made use of the Beyond Compare source code comparison tool to generate comparisons of file name and line similarity between selected folders and files of the produced RTL—comparing the March 14, 2021 codebase to the later Qualcomm custom CPU codebases. *See id.* at ¶¶ 23–26. But the tool provides no

substantive analysis of the RTL that it compares. *See* Ex. 20 (Chen Tr.) at 98:14–99:6. Chen did

not conduct any further analysis of the contents of the folders or files that he compared beyond an

initial check to ensure that the RTL comparison tool was functioning properly. *See id.* at 119:7–

121:17. Accordingly, the simple ████████████████████████████████████████

██████████████████████████████  without any further analysis, is irrelevant because it

conveys nothing about the presence or absence of Arm Technology. *Daubert*, 509 U.S. at 591. For

example, there could be high similarity of code having nothing to do with Arm Technology or no

similarity of code that is related to Arm Technology. But Chen made no effort to review the

underlying RTL or to determine whether any of the purported similarities in the RTL involve ARM

Technology. Ex. 20 at 119:7–121:17. Chen admitted that the comparison captures things like non-

operative code comments, copyright headers, and code headings. *Id*. at 115:13–119:6. These non-

operative portions of the RTL contain no information related to the performance of the RTL or its

execution of necessary functions. They are also unrelated to the Arm Technology. A code comment

is "for engineers to remind themsel[ves] . . . [of] what [they're] trying to do as a reminder, as a

note," while copyright headers are merely indicators that certain code is proprietary (in certain

circumstances because it was developed by a third party), and code headings function as titles or

"guidance of what [certain RTL is] citing." *Id*. at 115:22–24, 117:24–118:1. As a result, Chen's

quantitative analysis did not consider whether the RTL in question "was functional, what it was

doing, [or] whether it involved the Arm architecture," which would bear on issues in this case. *Id*.

at 121:3–17.

    *b. Flawed Methodology*: In determining whether an expert's methodology is reliable,

courts look to a series of non-exhaustive factors, including "(1) whether a method consists of a

testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or

potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Paoli*, 35 F.3d at 742 n.8.

Chen's opinion should be excluded, as the methodology he used for his analysis was flawed in several respects: neither Chen nor the comparison tool reviewed any of the substance of the RTL itself; Chen lacked knowledge regarding the manner in which the tool compares RTL across codebases; and Chen chose an arbitrary skew tolerance (the maximum number of lines to review when looking for matching RTL).

*First*, as explained above, Chen's analysis of "line similarity," discussed above, is also unreliable. Ex. 19 at ¶¶ 31–32, 35. He does not explain why a similar naming convention means two codebases are similar. As Chen acknowledged, two files can have the same name but different content. *See* Ex. 20 at 125:4–8. Chen also admits his opinion that █████████████ ████████████████████████████ is a subjective determination not governed by industry standard or specific threshold. *Id.* at 93:12–95:8. Without further analysis provided beyond a simple line comparison devoid of any expertise, *see, e.g.*, Ex. 21 (QCARM_7517717), Chen has no reliable methods.

*Second*, Chen fails two of the "reliability" factors, as his methodology has no "known or potential rate of error," and he is ignorant as to "the existence and maintenance of standards controlling [Beyond Compare's] operation." *Paoli*, 35 F.3d at 742 n.8; *Chemipal Ltd.* v. *Slim-Fast Nutritional Foods Intern., Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004) (excluding expert testimony where expert "does not understand the methodology used" to gather information

16

supporting opinion). Chen had never used the tool before, lacks knowledge regarding the algorithm the tool used, and failed to review any default settings used by the tool other than the skew tolerance. Ex. 20 at 100:3–102:21, 110:1–6, 113:1–119:6. Given that "the [Beyond Compare] algorithm is proprietary" (Ex. 20 at 102:8) and there are a variety of algorithms that can be employed by source code comparison tools (Ex. 20 at 113:1–21), Chen's failure to understand the algorithm used in his comparisons results in him not understanding the manner in which RTL was being compared or how "matching" RTL is determined between codebases. This deficiency in his comparison is further compounded by his failure to "investigate [the default settings]" in the program to understand whether and how it was comparing portions of the code base beyond the operative RTL intended to be compatible with the Arm Architecture. Ex. 20 at 109:19–110:6.

*Finally*, Chen arbitrarily selected a skew tolerance of 2,000 lines, (*see* Ex. 19 at ¶ 27)—a setting in the comparison tool that compares each line from the pre-termination RTL to the 2,000 lines before and after the same location in the post-termination RTL to determine whether there is a match, regardless of location or the substantive nature of the line itself. Ex. 22 (Annavaram 2/27 Rep.) at ¶ 271. The chosen skew tolerance provides no analytical assistance and can be used to manipulate the results, as a larger skew tolerance means that a larger number of lines of code are being compared, which is more likely to result in a higher similarity percentage. *See id.* at 275–76. Chen provides no justification for the reliance on the 2000-line skew tolerance besides it being the default setting, which again has no "known or potential rate of error" and no "standards controlling [it's] operations," and he conducted only one test on one file using another skew tolerance near the end of his RTL review, which he did not include in his Report. Ex. 20 at 110:7–112:25.

    **2. *Chen's "Qualitative" Opinions.*** Chen claims to have found ███████████

████████████ in the March 14, 2021 ███████████ RTL codebase containing ████████████

███████████████████████████████████████████████████████████. *See* Ex. 19 at

¶¶ 37–47. ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████ Ex. 19 at ¶¶ 38–40, 41–47. He therefore concludes that ███████████████

████████████████████████ e. *Id.* at ¶¶ 19, 36. Chen's opinions should be stricken because he

relies exclusively on a version of the Arm ARM from July 2021—a version that ***did not exist*** at

the time Nuvia drafted its RTL prior to the March 15, 2021 acquisition of Nuvia by Qualcomm.

*See* Ex. 23 (ARM_01324149) at -4150; Ex. 20 at 131:22–133:13. It would have been impossible

for Nuvia to have relied on or incorporated this version of the Arm ARM in coding any RTL

included in the March 14, 2021 RTL codebase. ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ Ex. 20 at 133:14–135:5. Because these documents cannot be documents from

which Nuvia obtained Arm Technology to create its RTL, and because these are the only

documents on which Chen relies for this purpose, his opinions based on these documents are not

relevant or reliable.

Chen also offers no actual evidence that the Qualcomm custom CPUs implement

███████████████████████. While Chen points to ███████████████████████████ in

the pre- and post-acquisition RTL allegedly copied from Arm 2020 Architecture Extensions, (*see*

Ex. 19 at ¶¶ 48–51), ████████████████████████████. *See* Ex. 20 at 182:18–184:5. As

a result, ████████████████████████████████████████████████████████

████ is not relevant to any issue in the case.



████████████████████████████████████████████████████████████████████. *See*

Ex. 19 at ¶¶ 52–53. ████████████████████████████████████████

████████████████████████████████████████.

**3. *Chen's Reply Report Offers New Opinions Absent From His Opening Report*.** Chen's

Opening Report does not mention the words derivative or embody, and offers no opinions on these

issues. When Qualcomm's expert discusses "derivatives" and "embodiments" in his rebuttal

report, he is only responding to Colwell's report. Ex. 22 at ¶ 11–19, 81, 216–253, 255–257, 304.

In response, Chen's Reply Report uses the word "derivative" 40 times in a less than 40 pages,

████████████████████████████████████████████████████████████████████.

*See* Ex. 18 *passim*, *see, e.g.*, ¶¶ 7, 20, 54–55. Chen cannot use his Reply Report as a vehicle to

render opinions absent from his Opening Report. *See Withrow* v. *Spears*, 967 F. Supp. 2d 982,

1001 (D. Del. 2013) ("A rebuttal or reply expert report is proper if the intent of the report is 'solely

to contradict or rebut evidence on the same subject matter identified' by the opposing party's

expert report."); Fed. R. Civ. P. 37(c)(1). Chen's Reply Report should be excluded to the extent it

opines on whether the Qualcomm RTL is derivative of or embodies Arm Technology.

**E.      ROBERT COLWELL'S TESTIMONY SHOULD BE EXCLUDED**

**1. *Reliance On Chen's Unreliable Opinions*:** Colwell relies entirely on Chen's

quantitative analysis for certain opinions. *See* Ex. 25 (Colwell 12/20 Rep.) at ¶¶ 162–167, 175 (that

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ ); *see also* Ex. 26 (Colwell Tr.) at 232:7–12. Relying solely on Chen, Colwell opines

that (1) ████████████████████████████████████████████████████████,

and (2) ██████████████████████████████████████████████████████

█████████████████████████████████████. Ex. 25 at ¶¶ 163, 166–

167. Throughout his Report, Colwell also cites to the same July 2021 version of the Arm ARM

that Chen relied upon in his Report, which post-dates the creation of the relevant Nuvia RTL. Ex.

23 (ARM_01324149) at -4150; Ex. 25 at ¶¶ 26, 60, 61; *supra* p. 20. Colwell testified that this

irrelevant version of the Arm ARM is the only version of the manual he considered in forming his

opinions. Ex. 26 at 164:13–167:7. And, as with Chen, Colwell is also unfamiliar with the settings

of the Beyond Compare tool beyond skew tolerance. *Id.* at 116:13–21. As discussed *supra*, Chen's

analysis is flawed and should be excluded. Therefore, Colwell's opinions that rely on Chen's

qualitative opinion should also be excluded. *Masimo Corp.* v. *Philips Elecs. N. Am. Corp.*, C. A.

No. 09-80-LPS-MPT, 2013 WL 2178047 at *13–14, 18 (D. Del. May 20, 2013) (excluding

expert's opinions that relied on excluded opinions of other experts).

    2. ***Failure To Apply Terms As Defined In The Contract***: Colwell uses terms defined in

the Nuvia ALA but disregards their definitions. Colwell admitted he used his own definition of

█████████████████████████████████████████████████████████ even

admitting that he chose ***not*** to apply that term as defined in the contract. Ex. 26 at 172:10–173:25,

177:3–178:16, 195:15–196:21, 196:23–201:10, 214:3–219:2; Ex. 27 (Nuvia ALA) at §1.8; Ex. 28

(Nuvia ALA, 2020 Annex 1) at §§ A.5, A.10. Opinions relying on Colwell's own, made-up

definitions should be excluded. Ex. 25 at ¶¶ 75–89, 95, 110, 111, 113, 115, 129–33, 135–38, 145,

148, 153–55, 162, 166–68, 178–80, 182.

Colwell's definitions of these defined terms ███████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████ *Orbital Eng'g, Inc.* v.

*Buchko*, 578 F. Supp. 3d 727, 733 (W.D. Pa. 2022); *see also Allscripts,* 2022 WL 3021560 at *44

(excluding expert testimony "regarding the meaning of contractual terms"); *XY, LLC* v. *Trans Ova*

*Genetics, LC*, 2016 WL 97788 at *4 (D. Col. Jan. 8, 2016) (excluding testimony where expert

"used his own understanding of how to read [contractual] definitions").

For example, Colwell states that he interpreted the defined term ███████████████

████ to mean ████████████████████████████ including to assert that

Nuvia had █████████████████████████ prior to the acquisition—but the Nuvia

ALA Annex contains a definition for ███████████████████████████

███████████████████████████████████████████████████████████

████. Colwell also testified that he knows what confidential information is and used what he

deemed to be "the normal meaning of confidential information," which Colwell understood to be

information that is "secret and important and you got to keep it to yourself,"; he ignores that

███████████████████████████████████████████████████████████

██████████████████████████████████ ███████████████████████

██ ████████████████. Colwell similarly defined ████████████ based on his own

understanding of the ███████████████████████████████████████

███████████████████████████████████████████████████████████

█████████ ███████████████████████████ Colwell's testimony, untethered to any

contractually defined terms, "is not scientific knowledge *for purposes of the case,*" and "will [not]

help the trier of fact to understand the evidence or to determine a fact in issue." *UGI Sunbury LLC*

v. *A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d. Cir. 2020).

**3. *Colwell's Counterclaim Rebuttal Report*:** A rebuttal report is limited to "the same subject matter identified" by the opposing party's expert. Fed. R. Civ. P. 26(a)(2)(D)(ii). Annavaram's Report focuses solely on ███████████████████████████████ ████████████████████████ without analyzing the origin of the features, the process of their implementation, their value relative to the overall product, their significance relative to performance of the product, or their use beyond the Nuvia-use case. Ex. 29 (Annavaram 5/20 Rep.) at ¶¶ 19–53. Colwell never disputes the presence of the identified features, but instead opines on the history, purpose, significance, value, and size of the features Annavaram identified— issues unrelated to Annavaram's limited scope and outside of Colwell's expertise. Colwell testified that he is "by no means" a finance or marketing expert, and his expertise does not extend to the development of the CMN product at Arm. Ex. 26 at 10:7–8. All of Colwell's opinions related to the development of the features in the CMN product are improper "mouthpiece" testimony for Arm's engineer in charge of the development of the CMN. Ex. 30 at ¶¶ 35, 50, 56, 59, 66, 70, 77– 80, 82, 83, 86, 101, 111. These opinions improperly "recit[e] … narrative reports and deposition testimony." *O'Hara*, 2012 WL 12896236, at *1 (D. Del. Oct. 5, 2012).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
Samantha Mehring
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

July 10, 2024

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 10, 2024, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                              *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Joyce Liou, Esquire                                  *VIA ELECTRONIC MAIL*
Lydia Davenport, Esquire
Daralyn J. Durie, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                               *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                          *VIA ELECTRONIC MAIL*
Sarah E. Brickey, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Daniel P. Muino, Esquire                                      *VIA ELECTRONIC MAIL*
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                                     *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                                 *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL  33131
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)