# EXHIBIT 1

**APPENDIX A**

**GROUNDS FOR EXCLUSION OF ARM'S EXPERT OPINIONS AND CORRESPONDING PARAGRAPHS**

**Todd Schoettelkotte**

| Grounds for Exclusion of Expert Opinions | Corresponding Paragraphs |
|---|---|
| Schoettelkotte provides no independent opinion of harm. | Schoettelkotte 12/20/2023 Rep. ¶¶ 10–17, 69–140.<br><br>Schoettelkotte 3/25/2024 Rep. ¶¶ 11, 13–28, 30–31, 34, 36, 39, 41–42, 45–48, 50–51, 53, 56–59, 61–63, 65. |
| Schoettelkotte provides no opinion on the probability of harm. | Schoettelkotte 12/20/2023 Rep. ¶¶ 10–17, 69–140.<br><br>Schoettelkotte 3/25/2024 Rep. ¶¶ 11, 13–28, 30–31, 34, 36, 39, 41–42, 45–48, 50–51, 53, 56–59, 61–63, 65. |
| Schoettelkotte's opinions are speculative and unreliable. | Schoettelkotte 12/20/2023 Rep. ¶¶ 10–17, 69–140.<br><br>Schoettelkotte 3/25/2024 Rep. ¶¶ 11, 13–28, 30–31, 34, 36, 39, 41–42, 45–48, 50–53, 56–59, 61–63, 65–66. |

**Guhan Subramanian**

| Grounds for Exclusion of Expert Opinions | Corresponding Paragraphs |
|---|---|
| Subramanian's opinions about the meaning and scope of contracts are improper. | Subramanian 12/20/2023 Rep. ¶¶ 19, 53–66, 68–69, 71, 76, 78–86, 96, 98.<br><br>Subramanian 3/25/2024 Rep. ¶¶ 5, 7, 10–22, 27-35, 37, 39–41. |
| Subramanian's opinions about the parties' intent or state of mind are improper. | Subramanian 12/20/2023 Rep. ¶¶ 19, 51–53, 55–78, 84–86, 88, 90, 94–100.<br><br>Subramanian 3/25/2024 Rep. ¶¶ 5, 7, 10, 15, 18–22, 24–26, 39, 45. |
| Subramanian's opinions about negotiation theory do not "fit" the case. | Subramanian 12/20/2023 Rep. ¶¶ 19, 30–50, 52–53, 55, 63–66, 78, 84–89, 91–94.<br><br>Subramanian 3/25/2024 Rep. ¶¶ 5, 10, 15, 25–27, 39, 44–45, 48–49. |
| Subramanian's opinion that "non-enforcement could have negative follow-on effects that are impossible to quantify" is speculative and not reliable. | Subramanian 12/20/2023 Rep. ¶¶ 19, 93–101.<br><br>Subramanian 3/25/2024 Rep. ¶¶ 5, 42–49. |

**Ravi Dhar**

| Grounds for Exclusion of Expert Opinions | Corresponding Paragraphs |
|---|---|
| Dhar's opinion on the likelihood of confusion is unreliable and does not "fit" the case. | Dhar 12/20/2023 Rep. ¶¶ 15, 112–15, 117–21. <br><br> Dhar 3/25/2024 Rep. ¶¶ 3, 14–37, 42–52. |
| Dhar's opinions on the significance of the Arm brand are unreliable. | Dhar 12/20/2023 Rep. ¶¶ 13, 78–106. <br><br> Dhar 3/25/2024 Rep. ¶¶ 3, 4–13. |
| Dhar's opinion that there is likelihood of harm is *ipse dixit*. | Dhar 12/20/2023 Rep. ¶¶ 16, 122–33. <br><br> Dhar 3/25/2024 Rep. ¶¶ 3, 42, 53–57. |
| Dhar's opinion on fair use constitutes an improper legal opinion. | Dhar 12/20/2023 Rep. ¶¶ 134–37. <br><br> Dhar 3/25/2024 Rep. ¶¶ 38–42. |

**Shuo-Wei (Mike) Chen**

| Grounds for Exclusion of Expert Opinions | Corresponding Paragraphs |
|---|---|
| Chen's quantitative opinions do not "fit" the issues in this case. | Chen 12/20/2023 Rep. ¶¶ 18, 20–35.<br><br>Chen 3/25/2024 Rep. ¶¶ 7–41. |
| Chen's quantitative opinions are methodologically flawed. | Chen 12/20/2023 Rep. ¶¶ 18, 20–35.<br><br>Chen 3/25/2024 Rep. ¶¶ 7–41. |
| Chen's qualitative opinions are irrelevant and unreliable. | Chen 12/20/2023 Rep. ¶¶ 19, 36–53.<br><br>Chen 3/25/2024 Rep. ¶¶ 7, 42–59. |
| Chen's reply offers new opinions absent from his opening report. | Chen 3/25/2023 Rep. ¶¶ 7, 10, 13, 14, 15, 17, 18, 20–22, 24, 35, 42–59. |

**Robert Colwell**

| Grounds for Exclusion of Expert Opinions | Corresponding Paragraphs |
|---|---|
| Colwell's opinions rely on Chen's unreliable opinions. | Colwell 12/20/2023 Rep. ¶¶ 26, 109, 160–67, 171, 175–76.<br><br>Colwell 2/27/2024 Rep. ¶¶ 31–34.<br><br>Colwell 3/25/2024 Rep. ¶¶ 4 (to the extent Colwell references Chen), 14, 28, 111–12. |
| Colwell's opinions are not relevant because he failed to use terms as defined in the contract. | Colwell 12/20/2023 Rep. ¶¶ 3, 74–89, 95, 110–11, 113, 115, 117–23, 129–33, 135–39, 141–48, 153–55, 162, 166–69, 178–80, 182.<br><br>Colwell 2/27/2024 Rep. ¶¶ 5, 6, 11, 14, 19–26, 29, 37, 41<br><br>Colwell 3/25/2024 Rep. ¶¶ 8–13, 16–108. |
| Colwell's counterclaim opinions exceed the scope of Murali Annavaram's opening report. | Colwell 6/10/2024 Rep. ¶¶ 4, 34–59, 62, 63, 65, 66, 68, 69, 70, 72, 73, 75, 77–86, 93, 94, 97, 98–102, 109, 111–14, 120. |

# EXHIBIT 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., a U.K. corporation, | § § § | |
| Plaintiff, | § § | |
| v. | § § | C.A. No. 22-1146 (MN)) |
| QUALCOMM, INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation | § § § § § § § | |
| Defendants. | § | |

EXPERT REPORT OF W. TODD SCHOETTELKOTTE
RELATING TO REMEDIES FOR DEFENDANTS' BREACH OF CONTRACT

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT.

_____          12-20-23
W. TODD SCHOETTELKOTTE                    _____
                                          EXECUTED ON

## Table of Contents

I.     Introduction ........................................................................................ 1

II.    Credentials and Compensation ...................................................... 2

III.   Information Reviewed and Considered ........................................ 3

IV.   Legal Framework for Damages .................................................... 5

V.    Summary of Opinions .................................................................... 6

VI.   Background ...................................................................................... 8

     A.    Industry Overview ............................................................... 8

     i.     CPU Background ................................................................... 8

     ii.    CPU Use in Various Segments ....................................... 10

     B.    Arm ....................................................................................... 13

     C.    Qualcomm .......................................................................... 21

     D.    Nuvia and the Nuvia ALA ................................................ 22

     E.    Qualcomm's Acquisition of Nuvia and Continued Development of Nuvia-based Cores ................................................................................ 25

VII.  Damages Inadequate to Compensate for Harm ......................... 32

     A.    Summary.............................................................................. 32

     B.    Significant Disruption to Arm's Licensing Ecosystem....................... 33

     i.     Existing and Prospective Arm Licensees Could Demand More Favorable Terms and Lower Royalties to Account for Increased Risk ................................. 35

     ii.    Existing and Prospective Arm Licensees Could Exploit Development and Financial Terms of Other Licenses in Unexpected Ways to Compete Against Arm's Partners ............................................................................. 36

iii. **Arm Will Not Be Able to Rely on Partners Respecting Provisions in Its Existing and Prospective Licenses to Protect Its Intellectual Property** ............................... 39

iv. **Third Parties and End Users May Shift to Nuvia-based Cores** ........................... 40

v. **Existing and Prospective Licensees May Shift Away from Arm Chips** ............. 43

vi. **Licensing Ecosystem Summary** ....................................................................... 44

C. **Significant Negative Impact on Arm's First Mover Advantage** .......................... 45

D. **Arm's Expansion into New Segments and Markets Will Be Undermined** ........ 50

E. **Significant Decrease in Licensing Revenue and Arm's Investment in Research and Development** .......................................................................................... 57

F. **Significant Decrease in Arm's Reputation and Goodwill** ................................... 61

G. **Inadequacy of Damages Exacerbated by Several Additional Factors** ................ 64

VIII. Trademark Infringement .......................................................................... 67

IX. Other Issues ................................................................................................ 67

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.   INTRODUCTION

1.      Plaintiff Arm Ltd. ("Arm" or "Plaintiff") has accused Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively, "Qualcomm") and Nuvia, Inc. ("Nuvia") (both collectively, "Defendants") of breaching the Nuvia Architecture License Agreement (the "Nuvia ALA").[1]  More specifically, I understand Arm alleges that Nuvia was acquired by Qualcomm without Arm's consent to assignment of the Nuvia ALA, and that Nuvia therefore breached ███████████ of the Nuvia ALA.[2]  I understand that Arm further alleges that subsequent to Arm's termination of the Nuvia ALA, ████████████████████████████ ███ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████  As a remedy for Defendants' breach of the Nuvia ALA, I understand that ████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████

2.      I have been retained as an expert on behalf of Arm to assess and provide testimony regarding whether damages are adequate to compensate Arm for the harm caused by Defendants' breach of the Nuvia ALA.  For purposes of this report, and to address this issue, I

---

[1] Complaint, August 31, 2022, pp. 16 – 18.
[2] Complaint, August 31, 2022, pp. 10 – 11; ARM_00111064 – 080 at 078.
[3] ████████████████████████████████████████████████████████████ ██████████████████████
[4] Complaint, August 31, 2022, pp. 13 – 16; ARM_00111064 – 080 at 077.
[5] Complaint, August 31, 2022, pp. 16 – 18; ARM_00111064 – 080 at 077.  I am informed and understand that Arm is not requesting that any silicon (physical computer chips) made before Qualcomm's acquisition be destroyed, to the extent there are any.

was asked to assume that Defendants are found liable for breach of the Nuvia ALA.  I offer no opinion regarding liability.

3.      I have also been asked to assess and provide testimony regarding the damages associated with Arm's claim for trademark infringement.  I offer no opinion regarding liability.

4.      My analysis, as set forth in this report, is based on information available to me as of the date of this report.

## II.    CREDENTIALS AND COMPENSATION

5.      I am a Senior Managing Director of J.S. Held LLC ("J.S. Held"), a global consulting firm providing specialized technical, scientific, financial, and advisory services.[6]  I currently serve as the firm's Intellectual Property Practice Lead.  For more than 25 years, I have provided economic and financial consulting services in a variety of litigation matters and disputes, including intellectual property, breach of contract, business interruption, valuation, and general damage assessments.  These services have included analyses of irreparable harm, lost sales, lost wages, lost profits, incremental profits, price erosion, reasonable royalties, product line profitability, fixed and variable costs, cash flows, and other related financial information.  I have consulted with numerous publicly traded and closely held companies in a variety of industries, including software, medical products, biotechnology, electronics, semiconductors, Internet, telecommunications, consumer products, food services, oil and gas, and others.  Within the semiconductor and integrated circuit industry, my experience includes testimony and consultation on matters involving licensing disputes, patent infringement, and trade secret misappropriation related to silicon chip fabrication, integrated circuits for power conversion, as

---

[6] J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any public accounting services.  J.S. Held is not a law firm and does not provide legal advice.

well as components and functionality within mobile devices, automobiles, and Field Programable Gate Arrays ("FPGAs").

6.     I am a Certified Public Accountant ("CPA"), licensed in Texas, and a Certified Valuation Analyst ("CVA").  I am a member of the American Institute of CPAs ("AICPA"), the Texas CPA Society, and the National Association of Certified Valuators and Analysts ("NACVA").  I am also a member of the Licensing Executives Society ("LES"), an organization of more than 2,500 members, including corporate executives and professionals involved in the licensing and valuation of patents, trademarks, and other intellectual property.  Additionally, I have served as a Guest Lecturer at the Chicago-Kent College of Law, the Georgetown University Law Center, the John Marshall Law School, and the University of Oregon Law School on topics including accounting, valuation of intellectual property, and intellectual property management. I have been named by *Intellectual Asset Management* as one of the leading patent damages experts in the United States.  Attached as Schedule 1 to this report is a summary of my professional background and testifying experience, including all publications over the last ten years and all expert testimonies over the last four years.

7.     J.S. Held is compensated for my team's involvement in this matter based upon J.S. Held's hourly billing rates.  My time is currently billed at a rate of $695 per hour.  J.S. Held's fee is not contingent upon the outcome of this litigation or the opinions that I express.

## III.   INFORMATION REVIEWED AND CONSIDERED

8.     In connection with the preparation of this report, I have reviewed and considered information from a variety of sources, including documents and data produced by the parties; legal documents (and related exhibits); deposition testimony (and related exhibits); and publicly available information, articles, press releases, and Internet websites.  The documents and other information that I have reviewed and considered as of the date of this report include those cited

throughout this report (including the footnotes) as well as those listed on Schedule 2 attached to this report. I have also held discussions with Arm personnel, including Will Abbey (Executive Vice President & Chief Commercial Officer at Arm), Christine Tran (Senior Director of Legal at Arm), and Paul Williamson (Senior Vice President and General Manager of IoT Line of Business at Arm), as well as Arm's technical expert, Robert Colwell, Ph.D. In addition, I have reviewed and considered the following deposition transcripts (and related exhibits):[7]

**Arm Personnel**

- Will Abbey, Executive Vice President & Chief Commercial Officer
- Jonathan Armstrong, Head of Brand and Creative Services
- Lynn Couillard, Vice President of Sales
- Richard Grisenthwaite, Executive Vice President & Chief Architect
- Rene Haas, Chief Executive Officer
- Tim Herbert, Vice President of North American Sales (retired)
- Simon Segars, Former Chief Executive Officer
- Karthik Shivashankar, Senior Director of Wearables and Commercial Licensing
- Christine Tran, Senior Director of Legal (rough transcript)
- Ian Thornton, Vice President of Investor Relations (rough transcript)
- Paul Williamson, Senior Vice President and General Manager of IoT Line of Business
- Mark Werkheiser, Distinguished Engineer

**Nuvia Personnel**

- Lynn Bos, former Technical Program Manager
- Manu Gulati, former Founder & Senior Vice President of Engineering
- Pradeep Kanapathipillai, former CPU Microarchitecture and RTL Lead
- Nitin Sharma, former CPU Verification Engineer
- Jignesh Trivedi, former CPU Verification Engineer
- Gerard Williams, III, former Founder & Chief Executive Officer

**Qualcomm Personnel**

- Cristiano Amon, President and Chief Executive Officer
- Ziad Asghar, Senior Vice President of Product Management
- Geeta Balakrishnan, Principal Engineer in the CAD Team

---

[7] I understand that certain final deposition transcripts were not yet available to me at the time I submitted my Report. Accordingly, I may supplement my Report to incorporate the content of those final deposition transcripts.

- Ramakrishna Chunduru, former Chief Procurement Officer
- Michael Roberts, Vice President of Global Marketing
- Laura Sand, Senior Vice President, Legal Counsel
- Rohit Singh, Director of Program Management
- James Thompson, Chief Technology Officer

9.    In forming my opinions in this case, I have relied upon the information and documents identified in this report, and I have also relied upon my more than 25 years of experience and expertise in analyzing remedies for misuse of intellectual property, analyzing the adequacy of damages to compensate for harms relating to the misuse of intellectual property, and assessing and calculating damages adequate to compensate for such harms.  My analysis in this case is ongoing.  Should additional information, such as documents or data provided by the parties, testimony, whether through expert report or deposition, or rulings issued by the Court, come to my attention after the date of this report, I may find it necessary to update or revise my analysis, opinions, and conclusions.  I reserve my right to do so.

## IV.    LEGAL FRAMEWORK FOR DAMAGES

10.    I am not an attorney and do not intend to provide any legal opinion.  In forming my opinions, I have assumed a breach of the Nuvia ALA ███████████████████

11.    I am informed and understand that if Defendants breached the ALA, then ████████
████████████████████████████████████████████████████████████████████████████
██████████████████████ including the █████████████████████████████████ .

12.    I am informed and understand that specific performance is appropriate only if monetary damages are not adequate to compensate Arm for the harm (including future harm) caused by Defendants' breach of the Nuvia ALA.

13.    I am informed and understand that monetary damages are not adequate to compensate Arm for harm (including future harm) if those damages cannot be determined with reasonable certainty.  I am informed and understand that "reasonable certainty" requires that

damages be established to a reasonable degree of certainty (or fair degree of probability), but does

not require absolute certainty, absolute assurance, or mathematical exactitude as to the precise

amount of damages.   I am informed and understand that damages are not "reasonably certain"

where they are merely speculative or conjectural.

V.    <u>SUMMARY OF OPINIONS</u>

14.   In my opinion, if Defendants are found liable for breach of the Nuvia ALA but are

not ordered to discontinue the use and distribution of 

, then monetary

damages are not adequate to compensate Arm for the harm (including future harm) caused by

Defendants' breach of the Nuvia ALA.

15.   In my opinion, the monetary damages associated with the harm to Arm (including

future harm) caused by Defendants' breach of the Nuvia ALA (if Defendants are not ordered to

discontinue the use and distribution of ███████████████████████████████

███████████████████████) cannot be determined with reasonable

certainty.  In my opinion, the monetary damages associated with the following harms that may

result from Defendants' breach of the Nuvia ALA, individually and collectively, cannot be

determined with reasonable certainty:

- disruption to Arm's ability to control the use and distribution of Arm's intellectual property (including ███████████ and ███████████ ██████████) and to maintain Arm's licensing ecosystem;

- significant negative impact on Arm's first mover advantage;

- harm to Arm's expansion into new segments and markets;

- a decrease in licensing revenue and investment in research and development; and

- a decrease in Arm's reputation and goodwill.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                                6

16.    As it relates to the disruption to Arm's ability to control the use and distribution of Arm's intellectual property (including ██████████████████████████████████) and to maintain Arm's licensing ecosystem, Defendants' breach of the ALA could have a cascade of significant effects including:



17.    Several factors relating to Arm's intellectual property (including ████████████ ██████████████████████) and the industry and market segments in which Arm's intellectual property is implemented exacerbate the difficulty of determining the monetary damages associated with the above harms, individually and collectively, with reasonable certainty.  Those factors include the following:

- Qualcomm is a long-term Arm licensee and one of Arm's largest licensees by revenue which may magnify the signal sent to existing and prospective Arm licensees about Arm's ability to control its intellectual property;

- The relative speed with which the CPU industry develops which means that the short-term as well as longer-term harms resulting from Defendants' breach are difficult to predict and could lead to large and unforeseeable impacts (*e.g.*, in a "butterfly effect" type manner);

- The acute uncertainty of the harms given the actions of current and prospective licensees, and unknown emerging market segments, among other uncertainties.  Such factors include (but are not limited to) the inability to quantify the number prospective licensees and related revenue,

as well as the difficulty in measuring the financial impact of actions that current and prospective licensees may take based on the decisions of other licensees.

**VI.**   BACKGROUND

**A.  Industry Overview**

**i.   CPU Background**

18.     Modern computing devices (including mobile phones, personal computers, cloud computing devices, servers and autonomous vehicles) operate by the use of a central processing unit ("CPU"), sometimes simply referred to as a "processor."[8]   CPUs are the component of a computing device which "performs arithmetic, logic, and other operations to transform data input into more usable information output," and are comprised of "a complex set of electronic circuitry that runs the machine's operating system and apps."[9]   A "CPU core" or "processor core" is the "processing unit within the CPU that can execute instructions.  The more cores a CPU has, the more tasks it can handle simultaneously."[10]   The number of cores within a CPU can vary "depending on their intended use case.  For example, a mobile-focused CPU might have fewer cores in order to conserve battery life, while a desktop-focused CPU might have more cores for improved performance."[11]   One or more CPUs (each including one or more cores) can be integrated onto a System-on-a-Chip ("SoC").[12]   An SoC is a single package that contains one or more CPUs (each including one or more cores) along with other components such as "memory, input and output ports, peripheral interfaces and secondary storage devices."[13]

---

[8] https://semiengineering.com/knowledge_centers/integrated-circuit/ic-types/processors/central-processing-unit-cpu/; Discussions with Robert Colwell.
[9] https://www.arm.com/glossary/cpu; Discussions with Robert Colwell.
[10] https://www.lenovo.com/us/en/glossary/cpu-core/.
[11] https://www.lenovo.com/us/en/glossary/cpu-core/; Discussions with Robert Colwell.
[12] https://www.arm.com/glossary/soc-development; https://www.arm.com/glossary/cpu.
[13] https://www.arm.com/glossary/soc-development; https://www.arm.com/glossary/cpu; Discussions with Robert Colwell.

19.     A CPU is defined by architecture that allows the CPU to interface between the hardware of a computing device and its software.[14]   These interfaces are referred to as "instruction set architectures" or "ISAs."[15]   There are two different architectures, or "schools of thought," "about how a processor's [ISA] is designed:" Complex Instruction Set Computers ("CISC") and Reduced Instruction Set Computer ("RISC").[16]   CISC architecture "supports complex instructions that can be carried out across multiple clock cycles, while RISC must use simple instructions that can be executed within a single cycle."[17]   The most commonly used architecture for ISAs is RISC.[18]   RISC is "is an alternative to the Complex Instruction Set Computing (CISC) architecture and is often considered the most efficient CPU architecture technology available today."[19]   When compared to CISC, RISC has a "significantly higher architecturally-determined performance."[20]   ARM, or "Advanced RISC Machine" is a specific family of instruction set architecture that is based on RISC and was developed by Arm.[21]   Arm architecture, including its RISC-based ISAs, are "are common in smartphones, tablets, laptops, gaming consoles and desktops, as well as a growing number of other intelligent devices."[22]

20.     The global market for microprocessor chips is estimated to increase from $106 billion in 2022 to $185.39 billion by 2032, at a compound annual growth rate ("CAGR") of 5.8%.[23]   With this comes the continued efforts to innovate the microprocessor market.   A "common

---

[14] https://www.arm.com/glossary/isa; Discussions with Robert Colwell.
[15] https://www.arm.com/glossary/isa; Discussions with Robert Colwell.
[16] https://www.gigabyte.com/Glossary/cisc; Discussions with Robert Colwell.
[17] https://www.gigabyte.com/Glossary/cisc.
[18] https://www.precedenceresearch.com/microprocessor-market.
[19] https://www.arm.com/glossary/risc.
[20] Bhandarkar, Dileep, and Douglas W. Clark. "Performance from architecture: comparing a RISC and a CISC with similar hardware organization." *Proceedings of the fourth international conference on Architectural support for programming languages and operating systems*. 1991, p. 318.
[21] https://www.arm.com/glossary/risc.
[22] https://www.arm.com/glossary/risc.
[23] https://www.precedenceresearch.com/microprocessor-market.

advancement[] in CPU technology is making []transistors smaller and smaller."[24]   A smaller process node (which is comprised of transistors that are used to "perform all the of number crunching and data storage done inside the chip") translates "to a higher number of calculations per second – and less energy released as heat."[25]   The dramatic improvement in CPU speeds over the decades is often referred to as "Moore's Law," [26] which "is the observation that the number of transistors on an integrated circuit will double every two years with minimal rise in cost "[27]

### ii.    CPU Use in Various Segments

21.    CPUs are used in numerous applications or segments.  For example, in the mobile segment, "[t]he mobile applications processor is the primary chip in a smartphone, and runs the operating system and applications in addition to controlling many of the device functions, including gaming, music, video, and any other applications.  While high compute performance is required for today's applications, processors also must be highly energy efficient so that the smartphone's battery will last all day without needing to be recharged."[28]   Mobile applications processors are expected to handle even more processing capabilities with the increase in "high-performance processing capabilities, including the shift to 5G, growth in mobile gaming, and emergence of AI and ML workloads."[29]

22.    CPUs are also widely used in consumer electronics, which include "products found in the home, such as digital TVs, tablets, laptops, [and] extended reality ('XR') headsets and wearables."[30]

---

[24] https://www.digitaltrends.com/computing/what-is-a-cpu/.
[25] https://www.techspot.com/article/1856-aiming-for-atoms-chip-manufacturing/.
[26] https://www.digitaltrends.com/computing/what-is-a-cpu/.
[27] https://www.intel.com/content/www/us/en/newsroom/resources/moores-law.html.
[28] ARM_01259705 – 0105 at 9718.
[29] ARM_01259705 – 0105 at 9718.
[30] ARM_01259705 – 0105 at 9718.

23.     CPUs are also used in the embedded segment or "Internet of Things" ("IoT") where they are included in a "wide range of goods, including washing machines, thermostats, digital cameras, drones, sensors, surveillance cameras, manufacturing equipment, robotics, electronic motor controllers and city infrastructure and building management equipment."[31]

24.     The automotive market also uses CPUs for tasks such as "IVI [in-vehicle-infotainment], ADAS [Advanced Driver Assistance Systems], engine management, and body and chassis control."[32]  CPUs in vehicles are "expected to increase as ADAS, electrification, IVI, and eventually autonomous driving, accelerate requirements for higher compute performance in newly manufactured vehicles."[33]

25.     Within the networking equipment segment, CPUs are "deployed into wireless networking such as base-station equipment, enterprise Wi-Fi, and wired networking equipment such as routers and switches.  The market is growing as more wired and wireless infrastructure is deployed, as much of the data consumed in the cloud is created at the edge and needs to be transmitted over networks to the data center for processing."[34]

26.     CPUs in the cloud compute, data center, and server segment are used in "the main server chips, data processing units (DPUs), and smart network interface cards (SmartNICs) used by [cloud service providers] to run their operations.  The increase in cloud computing has been driven by the rapid increase in data traffic generated by consumers and enterprises globally and by the migration of enterprise workloads to the cloud."[35]  Server CPUs "serve[] as a crucial component responsible for processing instructions and commands within a server.  Its role

---

[31] ARM_01259705 – 0105 at 9718.
[32] ARM_01259705 – 0105 at 9719.
[33] ARM_01259705 – 0105 at 9719.
[34] ARM_01259705 – 0105 at 9719.
[35] ARM_01259705 – 0105 at 9719.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                11

encompasses tasks such as retrieving and executing instructions, processing data, and undertaking various computational functions like serving web pages and executing database queries.  As the linchpin of server functionality, the CPU plays a pivotal role in determining the computing capabilities of servers. The responsiveness and overall performance of a server are heavily influenced by the efficiency of its CPU."[36]  It is my understanding that a server CPU works in four basic steps:[37]

- Fetch: "The CPU retrieves instructions from memory, interprets them, and determines the next operation to be performed."

- Decode:  "All instructions or commands undergo translation into assembly instructions. During this stage, the server CPU decodes the assembly code, converting it into understandable binary instructions."

- Execute: "The CPU carries out instructions using calculations and technical algorithms, producing processed data as output."

- Store: "Following the execution of instructions, the CPU stores the output data back into the memory. This sequence of operations forms the core functioning of a server CPU, enabling it to process and manage data effectively."

27.    The performance of server CPUs can be measured based on the number of cores, number of threads, and clock speed.[38]  I understand that server processors differ from personal computer processors.[39]  Server processors are built to withstand ample amounts of data and serve multiple users, requiring highly reliable components with enterprise-grade cache requirements.[40]

---

[36] https://community.fs.com/article/what-is-a-server-cpu.html.
[37] https://community.fs.com/article/what-is-a-server-cpu.html.
[38] https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance.
[39] https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance.
[40] https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance.

**B. Arm**

28.     Arm is described as "the industry leader of CPUs" that is relied on by "the world's leading semiconductor companies and OEMs."[41]   Arm is also known as "[t]he global leader in the development of licensable compute technology.[42]   Arm was established in 1990, was first publicly listed on the NASDAQ in 1998, and is headquartered in the United Kingdom.[43]   Since its founding, Arm has spent decades developing "the most pervasive CPU architecture in the world," which includes not only CPU products but also a "portfolio of products that are deployed alongside [its] CPUs," such as graphics processing units ("GPUs"), system IP, compute platform products, as well as development tools and software.[44]   Arm has invested significantly in developing its architectures and accompanying verification suites over more than 30 years as it has developed an ecosystem benefiting all Arm-compatible chips.[45]   Arm continues to develop newer and more improved offerings backed by its intellectual property portfolio, and is currently on version 9 ("Arm v9") as the next generation of Arm architecture offerings.[46]   █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ █ ████████

████████████████████████████████████ █

---

[41] ARM_01259705 – 0105 at 9712.

[42] ARM_01427450 – 492 at 451.

[43] ARM_01259705 – 0105 at 9713 – 9714.

[44] ARM_01259705 – 0105 at 9716.

[45] Deposition of Simon Segars, November 16, 2023, p. 47.

[46] https://www.arm.com/architecture/cpu.

[47] Deposition of Will Abbey, October 27, 2023, p. 168 ████████████████████████████
████████████████████████████ *see also* Deposition of Paul Williamson, November 9, 2023, pp. 300 – 301 and 304 – 305.

[48] ARM_01259705 – 0105 at 9718.

[49] ARM_01259705 – 0105 at 9713.

29.    Arm partners with companies of varying size.[50]  With "thousands of partners, [Arm's] customers can go to market faster with [] products that customers demand."[51,52] Companies such as Indie Semiconductor, Phoenix Technologies, MediaTek, Maven Silicon, and many others participate in Arm's partnership program.[53]  Arm's licensees and partners comprise thousands of companies throughout the supply chain for semiconductor products, including the following: [54,55]

- **Design Companies (or "fabless")** — These are companies that design CPUs and SoCs but do not operate manufacturing facilities and instead outsource the manufacturing of CPUs and SoCs.  Examples of Arm licensees include Qualcomm, Nordic Semi, and MediaTek.

- **Fabrication Companies (or "fabs" or "foundries")** — These are companies that manufacture CPUs and SoCs, and may manufacture chips for other companies based on their designs that are provided to them.  Examples of Arm licensees include STMicroelectronics and Samsung.

- **End-User Device Manufacturers** — These are companies that manufacture and sell end-user devices (*e.g.*, mobile phones, personal computers) that incorporate CPUs and SoCs.  Examples of Arm licensees include Apple and Lenovo.

30.    In addition, Arm boasts the industry's largest software ecosystem with over 15 million developers and 10 million apps supported by operating systems such as Android, iOS, Linux, and Windows, among others.[56]

31.    Arm's technology has been widely adopted.  As of December of 2022, Arm's share across applicable industries was approximately 48.9% (equaling $98.9 billion in chip value based

---

[50] https://www.arm.com/partners.

[51] https://www.arm.com/partners.

[52] According to Ms. Tran, Arm's use of "partnerships" (or "partners") is synonymous with "licensing relationships." (*see* Deposition of Christine Tran, December 19, 2023, p. 6 (rough transcript))

[53] https://www.arm.com/partners; ARM_01259705 – 0105 at 9720.

[54] https://www.arm.com/partners; ARM_01259705 – 0105 at 9720; Deposition of Paul Williamson, November 9, 2023, p. 279; Discussions with Paul Williamson.

[55] Certain of the example licensees identified have capabilities of more than one category (*i.e.*, Samsung).

[56] ARM_01427450 – 492 at 458.

on Arm chips ).[57] Noted in its 2nd Amended 2023 F-1, Arm concludes, ██████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ [58]

32.     As of 2022, more than 230 billion chips have been shipped that were based on Arm's technology.[59]  In addition, more than 70% of the world's population uses Arm processor technology.[60]

33.     Arm's has a strong presence in mobile applications processors.[61]  Since 2016, Arm has sought to "further develop and market [its] products to build on [its] success in powering the world's smartphones and other consumer electronic devices."[62]  Specifically, Arm has "focused in recent years on making Arm the ubiquitous provider of compute technology in all market segments by expanding into new markets, including cloud computing, networking, automotive, and IoT, most of which have strong secular tailwinds."[63]   However, ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ they also offer incredibly fast response time and excel at tackling complex workloads through multithreading."[65]  Indeed, a May 2021 IBS semiconductor industry report indicated Intel's share in the data center CPU market is significant with AMD seeking to increase its share.[66]  In addition,

---

[57] ARM_01259705 – 0105 at 9713.
[58] ARM_01259705 – 0105 at 9718.
[59] ARM_01427450 – 492 at 451.
[60] ARM_01427450 – 492 at 452.
[61] ARM_01259705 – 0105 at 9718.
[62] ARM_01259705 – 0105 at 9714.
[63] ARM_01259705 – 0105 at 9714.
[64] Discussions with Will Abbey.
[65] https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance.
[66] ARM_00088045 – 303 at 070, 074, 127, and 129; *see also* Deposition of Tim Herbert, October 25, 2023, p. 29.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                                15

Arm has noted that:



34.     Arm states that "[r]esearch and development is at the heart of [its] business and critical to [its] future success.  Accordingly, ███████████████████████████ ████████████████████████████ [Arm's] vision to invest and develop new products is driven by [its] desire to maintain or increase [its] market share and create value for [its] customers."[68]  As part of its R&D efforts, Arm had approximately 6,000 individuals employed globally as of March 31, 2023, with approximately 80% of their workforce focused on research and development efforts in the previously stated markets.[69]  Because of its R&D investments, as of March 31, 2023, Arm had over 6,800 U.S. and foreign patents, and 2,700 patent applications pending worldwide.[70]

35.     Arm's business model is built on its licensing ecosystem.[71]  Arm offers two main types of licenses: Technology License Agreements ("TLAs") and Architecture License Agreements ("ALAs").[72]  In general, Arm provides access to its intellectual property, ██████ ████████████████████████████████████████████ ███████████████████████ that can be used to create files used to actually make CPUs and other components.[73]  In return, ████████████████████████, which can differ

---

[67] ARM_00088656 – 684 at 667; *See also* QCARM_3314892 – 915 at 899.
[68] ARM_01259705 – 0105 at 9804.
[69] ARM_01259705 – 0105 at 9713.
[70] ARM_01259705 – 0105 at 9721.
[71] Discussions with Will Abbey and Christine Tran.
[72] Discussions with Will Abbey and Christine Tran.
[73] *See, e.g.*, QCARM_2426822 – 836; Discussions with Will Abbey and Christine Tran.

based on the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under the licensees' agreement(s).[74]

36.     The vast majority of Arm's licenses are TLAs, and historically most Arm customers have a TLA.[75]  A TLA provides a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[76]  In a TLA, the "Arm Technology" is a selection of Arm "products" including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.[77]  The licensee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮.[78]  In exchange, the TLA licensee ▮▮▮▮▮▮▮▮▮▮▮▮ to Arm.[79]  The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[80]  In addition to ▮▮▮▮▮▮ Arm also receives ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.[81]

37.     An ALA from Arm, in contrast to a TLA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.[82]  In contrast to a TLA, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under the ALA; rather, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to



---

[74] *See, e.g.*, QCARM_2426822 – 836 at 828; *see also* Deposition of Will Abbey, October 27, 2023, p. 168.
[75] ARM_01259705 – 0105 at 9794; Deposition of Simon Segars, November 16, 2023, pp. 29 – 30.
[76] *See, e.g.*, QCARM_2426822 – 836 at 822 – 826; Discussions with Will Abbey and Christine Tran.
[77] Discussions with Christine Tran.
[78] Discussions with Christine Tran.
[79] ARM_01259705 – 0105 at 9833.
[80] ARM_01259705 – 0105 at 9833.
[81] ARM_01259705 – 0105 at 9793.
[82] *See, e.g.*, ARM_00111064 – 080 at 064 – 070; Discussions with Christine Tran; Deposition of Christine Tran, December 19, 2023, p. 66 (rough transcript)

██████████████████████████████████████████████████—each of

which is based on ████████████████████████████████████████■

Arm has granted fewer ALAs than TLAs.[84]  Arm also provides ███████████

██████████████████████████████[85]  For an ALA, the ████████████

████████████████████████████████████████████████████■

Arm ALA licensees also may have an Arm TLA.[87]  Because CPU optimization is costly and time

consuming, ALA licensees ████████████████████████ and then ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

38.     Arm has built and continues to build a strong relationship with its partners

through investment in Arm's licensing ecosystem, including TLAs and ALAs and, in turn, has

developed a long-term recurring revenue stream that is reinvested in research and development

to continue to improve and optimize Arm's technology.[89]

39.     As a company focused on licensing its intellectual property, Arm considers it to be

critical to safeguard ARM Technology and Arm Confidential Information.[90]  As Mr. Abbey

(Arm's Executive Vice President & Chief Commercial Officer) testified during his deposition: "At

the end of the day, Arm's an IP company.  Our confidential information, our intellectual property

is so germane to what we do. ████████████████████████████████████████

---

[83] Discussions with Christine Tran.
[84] Deposition of Tim Herbert, October 25, 2023, p. 55; Discussions with Will Abbey and Christine Tran.
[85] *See, e.g.*, ARM_00111064 – 080 at 064 and 073 – 074; Discussions with Will Abbey and Christine Tran.
[86] ARM_01259705 - 0105 at 9834.
[87] Deposition of Will Abbey, October 27, 2023, p. 91.
[88] ARM_01259705 - 0105 at 9793.
[89] Discussions with Will Abbey and Paul Williamson.
[90] Deposition of Will Abbey October 27, 2023, p. 352; *see also* Deposition of Paul Williamson, November 9, 2023, pp. 238 and 243 – 244.

 Mr. Abbey also testified that ███████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████[92] Mr. Williamson testified that "██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████"[93] Similarly, Mr. Williamson testified that ████████████ ██████████████████████████████████████████████ ████████████████████"[94]

40.     Arm implements license provisions in order to protect its intellectual property (including Arm Technology and Arm Confidential Information) and licensing ecosystem, and relies on those provisions to ensure that it can continue to invest in research and development and to support its partners.[95]  For example, Arm requires that a party have a license when it does any development work using Arm's intellectual property and that the scope and terms of the license are defined in advance.[96]  Arm's TLAs and ALAs ████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████[97]

41.     For example, Arm's TLAs and ALAs ███████████████████████ ██████████████████████████████████████████████

[91] Deposition of Will Abbey, October 27, 2023, p. 324.
[92] Deposition of Will Abbey, October 27, 2023, p. 361.
[93] Deposition of Paul Williamson, November 9, 2023, p. 246.
[94] Deposition of Paul Williamson, November 9, 2023, p. 246.
[95] Discussions with Paul Williamson and Christine Tran.
[96] Discussions with Paul Williamson and Christine Tran.
[97] Discussions with Paul Williamson and Christine Tran.



████████████████████████████████████ [98] For example, ██████████

██████████████████████████████████

███████████████████████

42.     Arm's TLAs and ALAs also include █████████████████████ ████████████████████ ██ Those ████████████████ require that Arm licensees █████████████████████████████████████████████ ████████████████████████████████████████ ███████ .[101] For example, ████████████████████████████████ ███████

43.     These protections are critical to Arm's business.[103]  If Arm could not enforce the protections included in its TLAs and ALAs, then licensees could misuse Arm's intellectual

---

[98] Discussions with Paul Williamson and Christine Tran.
[99] ARM_00111064 – 080 at 078.
[100] Discussions with Paul Williamson and Christine Tran.
[101] Discussions with Paul Williamson and Christine Tran.
[102] ARM_00111064 – 080 at 077.
[103] Discussions with Paul Williamson and Christine Tran.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    20

property and the damage to Arm's intellectual property and licensing ecosystem would be significant.[104]

### C. Qualcomm

44.    Qualcomm is one of the world's largest semiconductor companies, developing products directed to wireless communications, networking, personal computers, cell phones, automobiles, and other high-tech electronic devices.[105]   Qualcomm's primary focus is on the mobile market, where it markets and develops its ████████ CPU products on a worldwide scale.[106]  Qualcomm is one of Arm's largest partners, accounting for approximately 11% of Arm's annual revenue.[107]  Qualcomm has an ALA and TLA with Arm.[108]  Arm and Qualcomm executed the first TLA in September 1997 and first ALA in September 2003.[109]  I understand that prior to acquiring Nuvia (discussed below), ████████████████████████████████████████

██████████████████████████████████████████████.[110]

45.    Qualcomm, via QCT ("Qualcomm CDMA Technologies"), "utilizes a fabless production model, which means that [it] do[es] not own or operate foundries for the production of silicon wafers from which [its] integrated circuits are made."[111]  Qualcomm's reliance on third-party licensing and manufacturing contracts negates the need for procurement of raw materials.[112]  This segment holds significant importance to Qualcomm as "[d]ie cut from silicon

---

[104] Discussions with Will Abbey and Paul Williamson.
[105] https://www.investopedia.com/articles/markets/012216/worlds-top-10-semiconductor-companies-tsmintc.asp; https://www.qualcomm.com/products.
[106] https://www.qualcomm.com/snapdragon/overview; Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 31; Deposition of Ramakrishna Chunduru, October 30, 2023, p. 40.
[107] ARM_01259705 – 0105 at 9754.
[108] ARM_00060458 – 512; ARM_00044650 – 692.
[109] ARM_00095370 – 449 at 370.
[110] Deposition of James Thompson, November 11, 2023, pp. 53 – 56.
[111] https://investor.qualcomm.com/segments/qct; Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 11.
[112] Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, pp. 4 and 11 - 12.

wafers are the essential components of all of [its] integrated circuits and a significant portion of the total integrated circuit cost."[113]  The primary foundry suppliers for QCT include Samsung Electronics, Semiconductor Manufacturing International Corporation, and TSMC and generally take place in the Asia-Pacific region.[114]

46.     In addition to licensing intellectual property (*e.g.*, from Arm), Qualcomm also has a licensing entity referred to as QTL ("Qualcomm Technology Licensing").[115]  QTL grants licenses or otherwise provides rights to use portions of Qualcomm's intellectual property portfolio, which includes certain patent rights essential to and/or useful in the manufacture and sale of certain wireless products.[116]  A significant portion of QTL's licensing revenues are derived from agreements and grants under Qualcomm's cellular standard-essential patents.[117]

### D.  Nuvia and the Nuvia ALA

47.     Nuvia was a semiconductor company founded in early 2019 by three former Apple engineers: Gerard Williams III, Manu Gulati, and John Bruno.[118]  Nuvia was formed with the aim of developing energy-efficient server CPUs based on Arm architecture for use in data centers.[119]

48.     In September 2019, Nuvia executed an ALA with Arm as well as a TLA ("Nuvia TLA").[120]  The Nuvia ALA included ████████████████████████████████████████ ████████████████████████████████████:[121]

---

[113] Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 12.
[114] Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 12.
[115] Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 7.
[116] Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 7.
[117] Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023, p. 12.
[118] NuVia, Inc., Private Company Profile, *S&P Capital IQ*.
[119] QCARM_3314892 – 915 at 893;
https://web.archive.org/web/20210115193713/https://nuviainc.com/; *see also* Deposition of Tim Herbert, October 25, 2023, pp. 28 and 31; Deposition of Richard Grisenthwaite, November 15, 2023, p. 62; Deposition of Nitin Sharma, October 27, 2023, p. 38.
[120] ARM_00111064 – 090 at 064; QCARM_2426822 – 836.
[121] Discussions with Christine Tran.



50.

---

[122] ARM_00111064 – 080 at 064.
[123] ARM_00111064 – 080 at 064.
[124] ARM_00111064 – 080 at 064.
[125] *See, e.g.*, ARM_00111064 – 080 at 078; Discussions with Will Abbey and Christine Tran.
[126] ARM_00111064 – 060 at 078.

51.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



52.   I understand that Nuvia worked from 2019 through early 2021 to develop a custom processor core for the server market based on Arm architecture.[131]   Arm provided significant support to Nuvia during its development of an Arm-based core for the server market.[132]   In August 2020, Nuvia (in collaboration with Arm) had appeared to succeed, and announced its ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.'"[133] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬

[127] *See, e.g.*, ARM_00111064 – 080 at 077; Discussions with Christine Tran
[128] *See, e.g.*, ARM_00111064 – 080 at 077; Discussions with Christine Tran.
[129] ARM_00111064 – 080 at 077.
[130] ARM_00111064 – 080 at 077.
▬ ▬▬▬▬▬▬▬▬▬
https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.
[132] Deposition of Richard Grisenthwaite, November 15, 2023, pp. 77 – 78.
[133] https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5.
▬▬▬▬▬▬

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

53.     Nuvia had its initial round of Series A funding in November of 2019 that raised $53 million.[135]  Dell Technologies Capital, among other investment groups, were involved in the round of funding.[136]  Nuvia based cores, developed with support from Arm, had begun to gain significant traction throughout the industry.[137]  In September 2020, Nuvia raised $240 million in Series B funding with plans to "deliver industry leading CPU performance to the data center."[138]

### E.   Qualcomm's Acquisition of Nuvia and Continued Development of Nuvia-based Cores

54.     On January 27, 2021, Qualcomm notified Arm that Qualcomm had "entered into a definitive agreement to acquire NUVIA Inc."[139]  Qualcomm acknowledged that



[140]

[141]  Qualcomm asked for a response in one week, on February 3, 2021, "given the pace of the acquisition," and "apologize[d] for the short fuse on th[e] request."[142]

---

[135] https://web.archive.org/web/20210422062904/https://nuviainc.com/nuvia-raises-53-million-to-reimagine-silicon-design-for-the-data-center/.

[136] https://web.archive.org/web/20210422062904/https://nuviainc.com/nuvia-raises-53-million-to-reimagine-silicon-design-for-the-data-center/.

[137] Deposition of Richard Grisenthwaite, November 15, 2023, pp. 77 – 78; QCARM_0584334 – 345 at 336.

[138] https://web.archive.org/web/20210316180114/https://nuviainc.com/.

[139] ARM_00032601 – 602 at 602.

[140] ARM_00032601 – 602 at 602.

[141] ARM_00032601 – 602 at 602.

[142] ARM_00032601 – 602 at 602.

55.     Arm responded to Qualcomm's January 27, 2021 letter on February 2, 2021,

congratulating Qualcomm on the news of the acquisition and indicating that it would ████



56.     Qualcomm responded on February 3, 2021.[146] ████

[143] ARM_00048483 – 484 at 484.
[144] ARM_00048483 – 484 at 484.
[145] ARM_00048483 – 484 at 484.
[146] ARM_00032623 – 625.
[147] ARM_00032623 – 625 at 624.
[148] ARM_00032623 – 625 at 624.
[149] ARM_00032623 – 625 at 624.

57.   ████████████████████████████████████████████████████

████████████████████████████████

58.   On March 15, 2021, Qualcomm completed the acquisition of Nuvia, and stated it would be transitioned into the QCT branch of the company.[151]   Nuvia was purchased for approximately $1.3 billion.[152]   Qualcomm reported, "Qualcomm Technologies expects to integrate next generation CPUs across a wide portfolio of products, including powering flagship smartphones, laptops, and digital cockpits, as well as Advanced Driver Assistance Systems, extended reality, and infrastructure networking solutions.[153]   The purchase price allocation included tangible assets, intangible assets, and liabilities.[154]

59.   For over a year, Arm and Qualcomm engaged in negotiations to try to resolve their dispute and reach an agreement regarding Qualcomm's ability to continue to develop Nuvia-based Cores.[155]   I understand that those discussions did not ultimately result in an agreement.[156]

60.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████      ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[150] ARM_00032605 – 606 at 606.

[151] https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

[152] Qualcomm Inc. Form 10-K for the fiscal year ended September 26, 2021, p. F-30.

[153] https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia.

[154] Qualcomm Inc. Form 10-K for the fiscal year ended September 26, 2021, p. F-30.

[155] See, *e.g.*, ARM_01215343 – 544; ARM_01309668 – 669; ARM_00032604; ARM_01305515; ARM_00000003; ARM_00000019 – 021; ARM_00087288 – 289; ARM_01215409.

[156] Deposition of Simon Segars, November 16, 2023, p. 72; Deposition of Rene Haas, December 12, 2023, pp. 163 – 164.

[157] QCARM_0338883; QCARM_2429057.



[158] QCARM_0338883.

[159] QCARM_0338883.

[160] QCARM_2426822 - 836 at 833.

[161] QCARM_3337797; QCARM_0557206; QCARM_3059661.

[162] QCARM_3434164.

[163] In addition, in April 2022, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (e.g., QCARM_3965325 – 326).

[164] ARM_01305479 – 480 at 480.

**Figure 8:** ████████████████████ [165]



63. ████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████ ▪

64. ████████████████████████████

███████████████████ ▪ ██████████

████████████████████████████████

████████████████████████████████

███████████████████████ ▪ ██████

[165] ARM_01305479 – 480 at 480.
[166] QCARM_2429057.
[167] QCARM_2429057.
[168] QCARM_3059661.
[169] ARM_01238999 – 9003; *see also* ARM_01215997 – 6001 at 997 █████████████████████

QCARM_2417783 ████████████████████████████

████

[REDACTED] In this report, I use "Nuvia-based Cores"

to refer [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] I am informed and understand that [REDACTED]

[REDACTED] has been described as [REDACTED] and therefore would be a Nuvia-based Core.[172]  I

understand that Defendants are developing other products that fit the definition of Nuvia-based

Cores. [REDACTED].[173]

     65.   [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]



[170] *See, e.g.*, Arm Ltd.'s Second Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1 and 6), November 17, 2023, pp. 4, 11 – 12, and 43 – 46; Arm Ltd.'s Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories (No. 20), November 17, 2023, pp. 5 and 11 – 12.

[171] Correspondence dated 10/26/2023, email from J. Braly to J. Li; Deposition of Mike Roberts, November 28, 2023, pp. 35 – 37.

[172] https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04; *see also* https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-chip-tests.

[173] *See, e.g.*, Deposition of Jignesh Trivedi, October 25, 2023, pp. 83 – 90 [REDACTED]
Deposition of Manu Gulati, October 12, 2023, pp. 63 – 64 [REDACTED] and 208 [REDACTED];
Deposition of Gerard Williams, November 11, 2023, pp. 243 – 245 [REDACTED], and 246 – 247

[174] ARM_01241187.
[175] ARM_01241187.



66. ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ ██ ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ ██

67.    Notwithstanding Arm's correspondence with Qualcomm, Arm alleges ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ ██ For example, in June 2022, Qualcomm

said that its Nuvia chips will soon join the industry-wide "ecosystem transition to Arm" and that

by "late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon

---

[176] ARM_01241187.
[177] ARM_00045393.
[178] ARM_00045393.
[179] Arm Ltd.'s Second Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories (Nos. 1 – 11), November 17, 2023, pp. 27 – 28 *see* Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim, October 26, 2022, pp. 10 and 80.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

with a Nuvia-designed CPU."[180]  Moreover, in November 2022, Qualcomm made clear that "the creation of our custom CPU was started by Nuvia engineers while employed at Nuvia."[181]

68.    Based on Qualcomm's continued use of the Nuvia-based Cores (including the ████████████████████████), Arm filed this litigation.[182] Arm asserts that despite Nuvia's and Qualcomm's certifications, Defendants continued to use and develop Arm-based Technology developed under the Nuvia license agreements, including Nuvia-based Cores.[183]

## VII.   DAMAGES INADEQUATE TO COMPENSATE FOR HARM

### A.   Summary

69.    In my opinion, if Defendants are found liable for breach of the Nuvia ALA but are not ordered to discontinue the use and distribution of Arm Technology, Arm Confidential Information, and any products embodying such technology or information (including Nuvia-based Cores), then monetary damages are not adequate to compensate Arm for the harm (including future harm) caused by Defendants' breach of the Nuvia ALA.  In my opinion, the monetary damages associated with the harm to Arm (including future harm) caused by Defendants' breach of the Nuvia ALA cannot be determined with reasonable certainty.

70.    I have considered the harms that Defendants' breach of the Nuvia ALA may cause to Arm, based on my discussions with Arm employees and review of the record, and described those harms below.  As further described below, those harms to Arm include: (A) a significant disruption to Arm's licensing ecosystem, (B) a significant negative impact on Arm's first mover

---

[180] Complaint, August 31, 2022, p. 14 (citing *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375).
[181] Mark Hachman, *Qualcomm dubs Nuvia CPU 'Oryon,' on track for 2023*, PCWorld (Nov. 17, 2022), https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html.
[182] Complaint, August 31, 2022.
[183] Complaint, August 31, 2022, pp. 13 – 15.

advantage, (C) harm to Arm's expansion into new segments and markets, (D) a significant decrease in licensing revenue and investment in research and development, and (E) a significant decrease in Arm's reputation and goodwill.  Moreover, these harms are exacerbated by several additional factors.  As set forth below, monetary damages cannot adequately compensate for any of these harms (individually or collectively).  Further, the damages associated with these harms (individually and collectively) cannot be determined with reasonable certainty.  I address these harms in turn below.

**B.  Significant Disruption to Arm's Licensing Ecosystem**

71.   The harm to Arm's licensing ecosystem resulting from Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.  The disruption to Arm's licensing ecosystem includes many different, but overlapping, harms which cannot be quantified.  The uncertainty of those harms is further exacerbated by the unprecedented situation in which a licensee is being permitted to continue to use and distribute Arm Technology, Arm Confidential Information, and products embodying such technology or information despite it doing so in breach of its license agreement (assuming that Defendants are found to have breached the Nuvia ALA and not ordered to stop using and distributing Arm Technology, Arm Confidential Information, and products embodying such technology or information).

72.   For example, Mr. Williamson testified concerning 

"[184]  Mr. Williamson further testified that Arm's damages are "inestimable,"[185] and that:

---

[184] Deposition of Paul Williamson, November 9, 2023, pp. 243 – 244.
[185] Deposition of Paul Williamson, November 9, 2023, p. 244.



73.    Mr. Abbey also stated that Qualcomm ███████████████████████

████████████████████████████████████████████████████████████████

██████████████ [187] Further, Mr. Abbey testified that ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ [188] Mr. Williamson testified that

"ARM has a reputation of trust with its partners who build technology based on ARM's

technology and services associated with it.  Their success is a shared success business with ARM,

and trust is an important element of that continuing business practice." [189]   Similarly,

Mr. Williamson testified that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Mr. Haas testified that Arm is ████

████████████████████████ and that if it "allow[s] ███████████████████

██████████████████████████

74.    The harms to Arm's ecosystem may include the following: (i) existing and

prospective Arm licensees could demand more favorable terms and lower royalties to account

[186] Deposition of Paul Williamson, November 9, 2023, pp. 244 – 245.
[187] Deposition of Will Abbey, October 27, 2023, p. 361.
[188] Deposition of Will Abbey, October 27, 2023, p. 361.
[189] Deposition of Paul Williamson, November 9, 2023, p. 246.
[190] Deposition of Paul Williamson, November 9, 2023, p. 246.
[191] Deposition of Rene Haas, December 12, 2023, pp. 164 – 165.

for increased risk, (ii) existing and prospective licensees could exploit development and financial terms of other licensees in unexpected ways to compete against Arm's partners, (iii) Arm will not be able to rely on provisions in its existing and prospective licenses to protect its intellectual property, (iv) third parties and end users may shift to Nuvia-based Cores, and (v) existing and prospective licensees may shift away from Arm chips. This harm represents a significant threat to Arm's ability perpetuate its business model given its dependence on developing, licensing, and protecting its intellectual property.

### i. Existing and Prospective Arm Licensees Could Demand More Favorable Terms and Lower Royalties to Account for Increased Risk

75.    The harm of existing and prospective Arm licensees demanding more favorable license terms and lower royalties to account for increased risk associated with other licensees' misuse of Arm's intellectual property resulting from Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[192]

76.    For example, current and prospective Arm licensees could consider the impact of Qualcomm or other licensees or prospective licensees breaching their license agreements, and misusing Arm Technology, Arm Confidential Information, and products embodying such technology or information.[193] This could have several impacts. For example, existing licensees may be less inclined to respect their license terms or selectively misinterpret terms which would require Arm to devote significant resources to negotiating and, potentially, enforcing those licenses.[194] The transaction costs associated with probable re-negotiations and other related

---

[192] Discussions with Will Abbey and Paul Williamson.
[193] Discussions with Will Abbey and Paul Williamson.
[194] Discussions with Will Abbey and Paul Williamson.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                35

effects could result in significant harm to Arm's licensing ecosystem.[195]

77.  In addition, existing and prospective licensees may seek reduced royalty rates or other concessions.[196] Given that ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ██ In addition, given the large number of Arm existing and prospective licensees, even a minimal change in royalty rates into the future can result in additional significant harm to Arm's licensing ecosystem.[198]

78.  In my opinion, the scope of the harm of existing and prospective Arm licensees demanding more favorable terms and lower royalties to account for increased risk cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

    ii.  **Existing and Prospective Arm Licensees Could Exploit Development and Financial Terms of Other Licenses in Unexpected Ways to Compete Against Arm's Partners**

79.  The harm of existing and prospective Arm licensees exploiting the technology developed under, and financial terms of, other Arm licensees in unexpected ways – including competing against Arm's partners --  as a result of Defendants' breach of the Nuvia ALA  cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[199] In particular, if Qualcomm is permitted to continue to use Arm Technology, Arm Confidential

---

[195] Discussions with Will Abbey and Paul Williamson; Deposition of Will Abbey, October 27, 2023, p. 365 (Mr. Abbey testified regarding the amount of time related to negotiations.); Deposition of Simon Segars, November 16, 2023, p. 83 (" ███████████████████████████████████████████ ████████████████████████████████████████); Deposition of Tim Herbert, October 25, 2023, p. 121 (Mr. Herbert testified ████████████████ the Nuvia ALA)..

[196] Discussions with Will Abbey and Paul Williamson.
[197] Discussions with Will Abbey and Paul Williamson.
[198] Discussions with Will Abbey and Paul Williamson.
[199] Discussions with Will Abbey and Paul Williamson.

Information, and products embodying such technology or information (provided or developed under the Nuvia ALA), then other companies may follow this precedent and try to "free ride" on Arm's licensing regime, causing a loss of control of Arm's licensing ecosystem.[200]  In essence, Arm licenses become "tradeable commodities" between companies.[201]  Such an occurrence may result in Arm being deprived of the opportunity to partner with new companies in industries and markets that have not yet emerged.[202]

80.    Arm negotiates TLAs and ALAs with specific companies and includes many terms specific to those agreements.[203]  Arm considers many different factors when negotiating the terms of a specific TLA or ALA and ensures that any final agreements include protections for Arm's intellectual property.[204]  In particular, Arm negotiates license agreements ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[205]  Arm also negotiates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.[206]  Arm does not intend or expect, and Arm licensees do not pay for, the right to acquire and use products developed by other licensees under other license agreements with other technical and financial terms (and that may have been negotiated with different downstream products in mind).[207]  In such a situation, the acquiring company taking a lower, unnegotiated for rate, would allow it to gain an unfair advantage over other Arm partners.[208]

81.    Accordingly, if a licensee were permitted to "go around" these protections and acquire other licensees (i.e., "free ride" on Arm's ecosystem and partners' development) knowing

---

[200] Discussions with Will Abbey and Paul Williamson.
[201] Discussions with Paul Williamson.
[202] Discussions with Will Abbey and Paul Williamson.
[203] Discussions with Paul Williamson and Christine Tran.
[204] Discussions with Paul Williamson and Christine Tran.
[205] Discussions with Paul Williamson and Christine Tran.
[206] Discussions with Paul Williamson.
[207] Discussions with Paul Williamson and Christine Tran.
[208] Discussions with Will Abbey and Paul Williamson.

that it could use that other licensees' work and pay their own differently negotiated royalty rates, then the harm to Arm's ecosystem would be significant.[209]  Any Arm licensee could consider this an option and, accordingly, all of Arm's existing and prospective licenses would be at risk.[210]

82.    This risk is acute even considering only Arm's largest licensees.  For example, ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ ██

But if Qualcomm were permitted to do so, then Arm's other major licensees (and potentially all licensees) would effectively consider themselves to have the same right – or at least the ability to do so based on Qualcomm's example and that Arm could not rely on the protections in its license agreements to prevent these actions.[212]  Arm's licensees would effectively be able to commandeer the development of all other Arm licensees, complete development, and then commercialize the other licensees' work under their own agreement – an agreement that does not give them such a right -- and with potentially lower royalty rates.[213]

83.    Mr. Abbey identified these risks in his deposition testimony stating that ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[214]  Mr. Abbey further testified that ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[209] Discussions with Will Abbey and Paul Williamson.
[210] Discussions with Will Abbey and Paul Williamson.
[211] Discussions with Will Abbey and Paul Williamson.
[212] Discussions with Will Abbey and Paul Williamson.
[213] Discussions with Will Abbey and Paul Williamson.
[214] Deposition of Will Abbey, October 27, 2023, p. 361.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                              38

████████████████████.”[215]

84.     If Qualcomm could acquire Nuvia, repurpose Nuvia's development work under the ALA for a different purpose, and then commercialize that work under Qualcomm's own lower royalty rates, then Arm would effectively lose control of its intellectual property and licensing ecosystem.[216]  Particularly given Qualcomm's size and prominence as one of Arm's largest partners by royalty revenue, there would be little to stop others from engaging in the same actions as Qualcomm knowing that Arm could not enforce the contractual provisions that protect Arm's intellectual property.[217]

85.     In my opinion, the scope of the harm of existing and prospective Arm licensees exploiting development and financial terms of other licenses in unexpected ways to compete against Arm's partners cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### iii.  Arm Will Not Be Able to Rely on Partners Respecting Provisions in Its Existing and Prospective Licenses to Protect Its Intellectual Property

86.     The harm to Arm's ability to freely negotiate licensing terms with the expectation that those freely-negotiated licensing terms will be enforced resulting from Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[218]  This "chilling effect" of increased uncertainty may impact the number and types of licenses that Arm can enter into with existing or prospective partners.[219]  Further, Arm will lose its control over its Arm Technology and Confidential Information, including the

---

[215] Deposition of Will Abbey, October 27, 2023, p. 362.
[216] Discussions with Will Abbey and Paul Williamson.
[217] Discussions with Will Abbey and Paul Williamson.
[218] Discussions with Will Abbey and Paul Williamson.
[219] Discussions with Will Abbey and Paul Williamson.

ability to determine which entities have access to such information.[220]

87.   Mr. Abbey's testimony highlighted the importance of Arm's ability to maintain control of its intellectual property and confidential information.  For example, Mr. Abbey stated that, ███████████████████████████████████████████████████████████████ ███████████████████████████████ And as I said earlier, as an intellectual property, a company that focuses on intellectual property, it's really important that we safeguard and protect Arm's intellectual property."[221]  Similarly, Mr. Abbey stated, "I think the fact that ████████████████████████████████████████████████████████████████████ ██████████████████████████."[222]  Mr. Abbey also emphasized the importance of having the ability to "stand behind" Arm's contractual agreements.  Specifically, Mr. Abbey stated that "as a person that spends a long time negotiating contracts that covers things like this,… we spend time meticulously reviewing these agreements and making sure these agreements are things that we can stand behind.[223]

88.   In my opinion, the scope of the harm of Arm not being able to rely on partners and prospective partners respecting provisions in its existing and prospective licenses to protect Arm Technology and Confidential Information cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### iv.   Third Parties and End Users May Shift to Nuvia-based Cores

89.   The harm of third parties and end users shifting to Nuvia-based Cores and products incorporating Nuvia-based Cores as a result of Defendants' breach of the Nuvia ALA cannot be

---

[220] Discussions with Will Abbey and Paul Williamson.
[221] Deposition of Will Abbey, October 27, 2023, p. 352.
[222] Deposition of Will Abbey, October 27, 2023, p. 360.
[223] Deposition of Will Abbey, October 27, 2023, p. 365.

readily quantified and the associated monetary damages cannot be reasonably ascertained.[224] The impetus for such a shift to these other chips would be that Qualcomm contends that Nuvia-based Cores would be sold and subject to the Qualcomm ALA rates which are lower than the Nuvia ALA rates.[225]   Accordingly, Qualcomm may be able to sell Nuvia-based Cores and products incorporating Nuvia-based Cores at a lower price point than it would cost an existing or prospective ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ TLA or ALA.[226]

90.   Qualcomm has publicly touted the performance of the Nuvia-based Cores. Specifically, Qualcomm recently "invited reporters [] to a special benchmarking session for the" Snapdragon X Elite, which is "based on the Oryon processor."[227]   At the benchmarking session, the "X Elite dunked on Apple, according to an account from a *WindowsCentral* reporter."[228] Qualcomm has stated that "nine Windows PC makers have signed on to build new machines based on the X Elite platform," namely "Acer, ASUS, Dell [], Hewlett Packard, HONOR, Lenovo, Microsoft Surface, Samsung, and Xiaomi."[229]  In addition, a May 2021 IBS semiconductor industry report noted that "[t]he acquisition of NUVIA…is expected to strengthen the competitive position of Qualcomm in the notebook computer market."[230]

91.   However, in tandem with the performance increases related to Nuvia-based Cores, Qualcomm intends to benefit from lower royalty rates to Arm (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[224] Discussions with Will Abbey and Paul Williamson.
[225] Discussions with Will Abbey and Paul Williamson.
[226] Discussions with Will Abbey and Paul Williamson.
[227] https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04; *see also* https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-chip-tests.
[228] https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04.
[229] https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04.
[230] ARM_00088045 – 303 at 219.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

██████████████████████████████████████). As previously discussed in this report, Qualcomm contends that its acquisition of Nuvia allows Qualcomm to avoid paying Arm royalty rates under its TLA or a renewed TLA for Arm's v9 CPUs. Indeed, this "cost savings" benefit has been analyzed by Qualcomm. ███████████████████████████████

████████████████████████████████████████████████ ███████

██████████████████████████████████████████████████████████

██████████████████████████ █ ████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ As such, the cost savings arise from the benefit Qualcomm received by commandeering Nuvia's development under a different agreement – the Nuvia ALA.

92.    The cost savings sought by Qualcomm due to lower royalty payments to Arm also could have a significant impact on Arm's financial performance. Arm's 2nd Amended F-1 highlighted the risk of this type of action (*i.e.*, major customer electing to develop via an ALA) stating, ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████ "[235]

93.    In my opinion, the scope of the harm of third parties and end users shifting to Nuvia-based Cores and products incorporating Nuvia-based Cores cannot be readily determined

---

[231] Deposition of Paul Williamson, November 9, 2023, pp. 43 and 95.
[232] QCARM_3524599 – 500 at 599.
[233] QCARM_3524599 – 500 at 599.
[234] ████████████████████████████████████
[235] ARM_01259705 – 0105 at 9737.

or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### v.    Existing and Prospective Licensees May Shift Away from Arm Chips

94.    The harm associated with existing and prospective Arm licensees shifting away from Arm chips altogether as a result of Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[236]   As discussed later in this report, if Arm's investments in research and development were to be impacted due to a decline in revenue, existing and prospective licensees may perceive Arm as not being an industry leader in performance and support.[237]   As a result, existing and prospective Arm licensees may seek alternatives to Arm-based and Arm-compatible products and move away from Arm chips.[238]

95.    One potential alternative that existing and prospective licensees might consider is RISC-V.  RISC-V is described as a different "instruction set architecture," that is open-source.[239]  Arm has stated that "[m]any of [its] customers are [] major supporters of the RISC-V architecture and related technologies.  If RISC-V-related technology continues to be developed and market support for RISC-V increases, [Arm's] customers may choose to utilize this free, open-source architecture instead of [its] products."[240]   While RISC-V has been recognized as a competitive threat, "[t]he general consensus is that, right now, RISC-V doesn't pose a major threat to Arm.  That's because the technology is currently far inferior to Arm's offering."[241]   The threat of RISC-V is considered to be low because RISC-V is immature compared to Arm and "doesn't have the

---

[236] Discussions with Will Abbey and Paul Williamson.
[237] Discussions with Will Abbey and Paul Williamson.
[238] Discussions with Will Abbey and Paul Williamson.
[239] https://www.cnbc.com/2022/09/01/why-arms-lawsuit-against-qualcomm-is-a-big-deal.html.
[240] ARM_01259705 – 0105 at 9733.
[241] https://www.cnbc.com/2023/09/14/arm-ipo-what-is-risc-v-and-why-does-arm-call-the-rival-product-a-risk.html.

same level of support."[242]   RISC-V does not have the type of ecosystem that has been developed by Arm.[243]  However, the risk of competition from RISC-V may increase as a result of Qualcomm's and Nuvia's alleged actions.[244]

96.    The uncertainty introduced by Qualcomm's and Nuvia's alleged actions could result in promotion or increased adoption of RISC-V or x86 despite the perceived current lack of support for the alternative.  Such a development could have long-term, unforeseen consequences on Arm's licensing ecosystem.

97.    In my opinion, the scope of the harm of existing and prospective Arm licensees shifting away from Arm chips cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### vi.    Licensing Ecosystem Summary

98.    In my opinion, the scope of the harm to Arm's licensing ecosystem caused by Defendants' breach of the ALA cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

99.    The harms to Arm's licensing ecosystem are substantial and pose a significant threat to Arm's business.  The reason for this is that Arm's business revolves around its licensing of Arm Technology and Arm Confidential Information and if Defendants can breach the Nuvia ALA and continue to use Arm Technology and Arm Confidential Information provided under

---

[242] https://www.cnbc.com/2023/09/14/arm-ipo-what-is-risc-v-and-why-does-arm-call-the-rival-product-a-risk.html.
[243] https://www.cnbc.com/2023/09/14/arm-ipo-what-is-risc-v-and-why-does-arm-call-the-rival-product-a-risk.html.
[244] Discussions with Will Abbey and Paul Williamson.

the Nuvia ALA, and products embodying such technology and information (including the Nuvia-based Cores), then Arm's entire business may be substantially undermined.

### C.  Significant Negative Impact on Arm's First Mover Advantage

100.    The harm to Arm's first mover advantage resulting from Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[245]    Arm's loss of first mover advantage could cause significant detrimental effects, including a loss of ecosystem benefits and the ability of Arm to establish a foothold in emerging markets as potential licensees seek alternatives to Arm-based technology.[246]

101. Due to its early innovation, Arm has established a meaningful presence in the market.  As described in its 2nd Amended F-1, Arm states that it has "enjoyed success for more than 30 years by providing market-leading technology, adapting [its] solution to changing market needs and building a software developer ecosystem unlike any other in history."[247]  In describing its formation, Arm states that:

> The original joint venture set out to develop a processor that was high performance, power efficient, easy to program, and readily scalable— a goal that continues to define Arm today.  Our CPUs initially gained significant traction in mobile phones in the mid-1990s because our energy-efficient processors provided an appropriate level of performance while consuming little power, which was critical for these smaller form factor devices.  Over time, mobile phones, and the chips they used, became more advanced and ultimately evolved into the smartphones that are prevalent today.  The Arm CPU proved to be critical in enabling the smartphone revolution.[248]

102. Arm's innovation in the mobile phone revolution has been significant.  Namely, "[w]ith the help of Arm technology, many more devices such as televisions, watches, washing

---

[245] Discussions with Will Abbey and Paul Williamson.
[246] Discussions with Will Abbey and Paul Williamson.
[247] ARM_01259705 – 0105 at 9720.
[248] ARM_01259705 – 0105 at 9714.

machines, cameras, factory equipment, and others are undergoing the same revolution."[249]

Indeed, Arm's CPU architecture "has resulted in the proliferation and evolution of computers as

people know them today.  [By enabling] the mobile phone and smartphone revolution, and

through [its] focus on energy efficiency and [its] history of continuous innovation, [Arm has]

enabled new categories of 'smart' consumer electronics."[250]  In fact, "in the fiscal year ended

March 31, 2023, more than 260 companies reported that they had shipped Arm-based chips, and

[] approximately 70% of the world's population uses Arm-based products."[251]  In addition, "[t]he

scale of [Arm's] reach continues to expand, with more than 30 billion Arm-based chips reported

as shipped in the fiscal year ended March 31, 2023 alone, representing an approximately 70%

increase since the fiscal year ended March 31, 2016."[252]  As evidence of Arm's long standing

impact on the CPU industry, Arm reports that "based on royalty revenue information provided

to us by customers in quarterly royalty reports, approximately 46% of our royalty revenue for the

fiscal year ended March 31, 2023 came from products released between 1990 to 2012."[253]

103.  Based on its existing ecosystem in markets such as mobile phones and smartphones,

Arm has indicated that it intends to expand its presence in new markets.  For example, statements

in its 2nd Amended F-1 express Arm's intentions to grow its presence, as highlighted below.

- "We have long-standing, significant market share in high-value markets, such as mobile applications processors, which enables us to invest in other growth opportunities.  Our long-term growth strategy includes expanding our market share in growth markets, including cloud compute, networking equipment, automotive, and consumer electronics.  We believe that the increasing need for high-powered and energy-efficient computing, as well as our continued investments, will enable us to grow our share in these segments."[254]

---

[249] ARM_01259705 – 0105 at 9714.
[250] ARM_01259705 – 0105 at 9792.
[251] ARM_01259705 – 0105 at 9792.
[252] ARM_01259705 – 0105 at 9792.
[253] ARM_01259705 – 0105 at 9794.
[254] ARM_01259705 – 0105 at 9792 – 793.

- "Arm CPUs are the world's most widely licensed and deployed processors. Our products are used in almost all smartphones, the majority of tablets and digital TVs, and a significant proportion of all chips with embedded processors, including for both consumer and enterprise applications. For the fiscal year ended December 31, 2022, we had a greater than 99% share of the smartphones market and a very high share in a range of other electronic devices, from digital TVs to drones. As new high-growth markets for electronics emerge and incorporate more AI and ML workloads, they require our more advanced processor designs in areas such as cloud computing the automotive industry, and it IoT economy. Our operating and financial performance is dependent, in large part, upon maintaining our market share in the smartphone and consumer electronics markets and maintaining or growing market share in our other target markets."[255]

- "For established markets where there is an incumbent architecture with a supporting ecosystem, it can be difficult for a new architecture to displace existing architectures and, therefore, to gain market share. For example, we have made significant progress and have established a large market share in markets such as smartphones, consumer electronics, and IoT. We face competition primarily from other architectures like x86 and RISC-V in many of these markets. Furthermore, certain semiconductor companies, including some of our existing customers, have designed or are in the process of designing their own architectures in markets such as smartphone application processors, other mobile chips, consumer electronics, IoT and embedded computing, networking equipment, automotive, and cloud compute."[256]

104. As previously discussed in this report, Arm partners with companies of varying size.[257] With "thousands of partners, [Arm's] customers can go to market faster with [] products that customers demand."[258] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [259] Mr. Segars testified that "through Arm's history, we built an extensive partnership of third-parties who provide things that Arm

---

[255] ARM_01259705 – 0105 at 9795.
[256] ARM_01259705 – 0105 at 9838.
[257] https://www.arm.com/partners.
[258] https://www.arm.com/partners.
[259] Deposition of Paul Williamson, November 9, 2023, pp. 279 – 281.

doesn't, which makes it easier to support a—to use an ARM microprocessor.  There is a large amount of software in the world that is written to run on Arm, and an ARM-compatible processor can run all of that code.  So it enables people to get a product to market much more quickly than building their own or using an alternative and at lower cost."[260]  Mr. Herbert similarly testified of the software ecosystem as follows: "It is the collection of software that has been developed by different companies that would allow someone that was building an Arm server the ability to develop it and drop it in and it would work."[261]

105.  By acquiring Nuvia, Qualcomm gained an advantage by way of an accelerated path to developing its own CPUs, which will come at the expense of Arm's other licensees.  As part of the rationale for acquiring Nuvia, Qualcomm stated ████████████████████

████████████████████████████████████████████████

███████████████████████████████  ██  ████████████████

████████████████████████████████████████████████

████  ██  ██████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████  ██

---

[260] Deposition of Simon Segars, November 16, 2023, p. 32.
[261] Deposition of Tim Herbert, October 25, 2023, pp. 90 – 91.
[262] QCARM_7467691 – 692 at 692.

██████████████████████████
██  ████████████████████████



Ultimately, via its acquisition of Nuvia, Qualcomm has shortened the time it would have needed to build its own CPU development team as well as the development time itself.

106.  As described above, Arm has developed a significant presence—particularly in the mobile segment, which has led to the development of an extensive partner ecosystem.  Arm's vast ecosystem also serves to buttress Arm's established presence given the benefits afforded to Arm's



partners and end users.  Through its actions, Qualcomm appears intent on leveraging Arm's presence in the market and ecosystem to replace CPUs developed under Arm TLAs with Nuvia-based Cores.  As discussed previously in this report, a harm that may result to Arm is third parties and end users shifting to Nuvia-based Cores.  By foregoing its own development efforts (and related costs), Qualcomm appears poised to use the Nuvia-based Cores at the direct expense of Arm and its established first mover advantage.  This advantage may not have been realized under Qualcomm's own ALA, given that Qualcomm had failed to create its own products under that agreement.[268]  In addition to losing the benefit of its first mover advantage in the mobile segment, Qualcomm's actions also jeopardize Arm's ability to use this advantage to enter and grow its presence in emerging markets.  ███████████████████████████

████████████████████████████████████████████

███████████████  Here again, as with the mobile segment, Qualcomm intends to benefit from foregoing its own development efforts (and related costs) to use Nuvia-based Cores to the detriment of Arm's own decades-long efforts.  With fewer licensees, Arm's ability to broaden into emerging markets will be impacted.

107.    In my opinion, the scope of the harm of the significant negative impact on Arm's first mover advantage cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### D. Arm's Expansion into New Segments and Markets Will Be Undermined

108. The harm to Arm's expansion into new segments and markets resulting from

---

[268] Deposition of Richard Grisenthwaite, November 15, 2023, p. 218.
[269] QCARM_3524599 – 500 at 599.

Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[270]  For example, Arm has sought, and is still seeking, to develop a presence in the server market.[271]  Nuvia was expected to provide Arm with a foothold in this segment where x86 dominates.[272]  However, Qualcomm's actions resulted in the diversion of Nuvia's efforts away from developing a CPU for servers, which have undermined Arm's planned expansion into the segment.

109.  As discussed previously in this report,



---

[270] Discussions with Will Abbey and Paul Williamson.
[271] Discussions with Will Abbey and Paul Williamson.
[272] Discussions with Will Abbey and Paul Williamson.
[273] QCARM_3314892 – 915 at 893.
[274] ARM_00002198 – 202 at 198.
[275] ARM_00000045.

████████████████████████ █ █████████████████████████

█████████████████████████████████████████████████████

████████████████ █   Upon announcing the acquisition of Nuvia, Qualcomm's January 2021 press release stated that "[t]he addition of NUVIA CPUs to Qualcomm Technologies' already leading mobile graphics processing unit (GPU), AI engine, DSP and dedicated multimedia accelerators will further extend the leadership of Qualcomm Snapdragon platforms, and positions Snapdragon as the preferred platform for the future of connected computing."[278]  In its Form 10-K filing, Qualcomm reported that "[u]pon completion of development, NUVIA's technologies are expected to be integrated into certain QCT products."[279]

110.  With the loss of Nuvia's focus on developing a data center CPU, ███████████████ ██████████████████████████████████████████████[280]  As described in a December 2020 Gartner industry report:



111.  However, Gartner stated that, "[t]o date, none of these vendors have achieved significant success, and many have had to reevaluate their developments or fallen by the

---

[276] QCARM_0584330 – 332 at 332.

[277] QCARM_0584330 – 332 at 331.

[278] https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia.

[279] Qualcomm Inc Form 10-K for the fiscal year ended September 26, 2021, p. F-30.

[280] *e.g.*, Deposition of Tim Herbert, October 25, 2023, p. 257 ("My personal opinion, [Nuvia was] on a path to displace Intel in the server space, and that got completely interrupted by the acquisition [by Qualcomm].").

[281] ARM_00045266 – 276 at 267.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

wayside."[282]   Gartner further explained that "[m]ost of these vendors have failed to achieve success with their Arm-based designs due to:

- The lack of per-thread performance for early Arm cores when compared to available x86 processors.

- Immaturity of the vendor ecosystem and software compatibility.

- The operational cost to add additional processor architecture into IT management systems, which was too high for many potential customers.

- The inertia of the IT industry and the data center market, which results in it taking many years for new vendors to displace incumbent vendors."[283]

112.   The Gartner report also noted that:

> Despite these new and interesting products [by NVIDIA, Amazon Web Services, and a number of Chinese companies], challenges still remain as vendors have to compete with the incumbent x86 architecture, which has significant investments in both CPU development and software ecosystems.[284]

Gartner further estimated that:

> At the same time, there is growing interest in the use of Arm-based processors within the data center.  While previously, Arm has had little impact on the data center (ripples on the x86 mill pond), a growing wave of Arm-based solutions is anticipated.[285]

113.   Arm's challenges in the data center segment were also explained in a December 2021 Arm document related to its now-abandoned corporate transaction with NVIDIA.  Specifically, the document indicated that:



---

[282] ARM_00045266 – 276 at 267.
[283] ARM_00045266 – 276 at 268.
[284] ARM_00045266 – 276 at 268.
[285] ARM_00045266 – 276 at 269.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    53



114.  The dominance of Intel's x86 CPUs in the server market is due in part "because they profit from the complete hardware and software ecosystem that is the result of Intel and AMD's long years of developing the market; they also offer incredibly fast response time and excel at tackling complex workloads through multithreading."[287] A

115.  The previously mentioned Arm document also included the following discussion points related to Arm's efforts to significantly penetrate the data center market.

- "The x86 ISA is ubiquitous in datacenters, and has been for decades, leading to the development of an enormous software and developer ecosystem.  The x86 ecosystem has 'one trillion lines of code' optimized for its architecture, creating a compelling reason for customers to choose x86 over Arm.  These lines of code support critical software offerings that are directly available on x86 but unavailable on Arm, including Microsoft's enterprise apps, Salesforce, Adobe, SAP, Oracle ERP, Workday, ServiceNow, and Intuit. [] The lack of competitive Arm ecosystem is also corroborated by Broadcom, Qualcomm and Marvell's

---

[286] ARM_00088656 – 684 at 667.
[287] https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance.
[288] QCARM_3314892 – 915 at 899.
[289] QCARM_3314892 – 915 at 905.
[290]

exit from the general-purpose Arm-based CPU IP datacenter market segment."[291]

- "Datacenter and PC, two markets that SoftBank targeted with its investments in Arm, are far more difficult to crack. Unlike Arm, the x86 incumbents in datacenter and PC (Intel and AMD) benefit from an established ecosystem of developers, software, systems, and peripherals. They are also vertically integrated, enjoying profits generated from multiple levels of the technology stack, allowing them to make massive R&D investments. As a result, any competitor following an IP-only licensing model, like Arm, is at a major ecosystem and economic disadvantage."[292]

- "In addition, Arm does not have the systems building expertise, the software engineering scale, or the R&D resources of x86 vendors like Intel and AMD. Even under the most optimistic projections, standalone Arm could not generate the revenue necessary to invest and compete toe-to-toe with the entrenched x86 incumbents."[293]

- "To date, Arm has only managed to achieve limited inroads in datacenter, mainly licensing to Amazon, which makes custom chips for its own use, and start-up Ampere Computing, the only entity that offers merchant Arm central processing units ('CPUs') for datacenter."[294]

- "These observations are not criticisms of Arm's technology or engineering team. Arm has great engineering talent in the areas where it focuses. But as a standalone IP licensing business, and without access to further capital, Arm has inherent scale, scope, and economic limitations that would impact Arm's future as a standalone licensing firm."[295]

- "Arm's limitations as a standalone, IP-licensing only entity, have become apparent over many years. Arm licensees, including Broadcom, Qualcomm, and more recently Marvell, have tried and failed to penetrate datacenter and PC. As mere licensees, they were neither able to direct Arm to make the necessary investment in datacenter and PC CPU, nor able to infuse Arm with ecosystem-building expertise it needs."[296]

- "[Intel Foundry Services] is a strong challenge to Arm's efforts in the datacenter and PC markets. Customization was Arm's greatest selling

---

[291] ARM_00088656 – 684 at 667 – 668.
[292] ARM_00088656 – 684 at 658.
[293] ARM_00088656 – 684 at 658.
[294] ARM_00088656 – 684 at 658.
[295] ARM_00088656 – 684 at 658.
[296] ARM_00088656 – 684 at 659.

point in the datacenter, as Arm does not have the mature ecosystem or massive R&D resources that Intel can bring to bear.  Now Arm's handful of datacenter customers can create custom x86 CPUs that will benefit from the massive x86 code base."[297]

- "For Arm, investing in datacenter and PC has become a high-risk investment."[298]

116.  Despite these headwinds, Arm reiterated its commitment to developing the server market in its 2nd Amended F-1 Registration Statement, stating that the "market[] represent[s] a significant portion of [its] revenue growth opportunity."[299]

117.  Arm indicated that not developing the data center market would adversely affect its business, stating that ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████[300]  With Qualcomm's acquisition of Nuvia and the abandonment of Nuvia's data center CPU, Arm's statements indicate that its attempt to broaden its toehold in the data center segment is uncertain and/or significantly delayed.  This is especially the case as the significant amount of investment to develop custom CPUs, which can "cost hundreds of millions of dollars."[301]

118.  In sum, while Arm's ALAs and TLAs (including the Nuvia agreements) ██████ ███████████████████████████████████████████  Arm's execution of them and the specific terms agreed to can be influenced at least in part by Arm's expectation that the licensee will help it gain a foothold in a new industry or market segment, as was the case with Nuvia.[302]

---

[297] ARM_00088656 – 684 at 661.
[298] ARM_00088656 – 684 at 661.
[299] ARM_01259705 – 0105 at 9738.
[300] ARM_01259705 – 0105 at 9738.
[301] Deposition of Simon Segars, November 16, 2023, pp. 79 – 80.
[302] Discussions with Will Abbey and Paul Williamson.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

119.   In my opinion, the scope of the harm of undermining Arm's expansion into new segments and markets cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### E.  Significant Decrease in Licensing Revenue and Arm's Investment in Research and Development

120.   The significant decrease in Arm's revenue and investment in research and development ("R&D") and innovation resulting in the loss of control of Arm's intellectual property stemming from Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[303]

121.   Arm's loss of control of its intellectual property and licensing ecosystem, as described above, is likely to result in decreased licensing revenue which, in turn, would result in decreased investment in R&D, which will harm Arm's ability to improve its technology going forward in detrimental ways that cannot be readily quantified with reasonable certainty.[304]

122.  Arm's innovations are reliant on its R&D investments.  Arm states that "[r]esearch and development is at the heart of [its] business and critical to [its] future success.  Accordingly, [it has] always invested, and will continue to invest, significant resources in [its] R&D program.  [Arm's] vision to invest and develop new products is driven by [its] desire to maintain or increase [its] market share and create value for [its] customers."[305]  Mr. Williamson's testimony highlights Arm's drive to develop and innovate, stating that "[w]e are an ambitious technology company and we always want our product to be the best it can be.  It improves our market opportunity both in market share and in value terms if it is the best performing CPU in the markets we

---

[303] Discussions with Paul Williamson.
[304] Discussions with Paul Williamson.
[305] ARM_01259705 – 0105 at 9804.

operate."[306]

123.  Arm describes its R&D expenses as follows:



[307]

124.  Arm describes itself as "an engineering-first company, with 4,753 of [its] employees, or approximately 80% of [its] global employees, as of March 31, 2023, focused on research, design, and technical innovation."[308]  As shown in the figure below, since 2019, Arm has incurred R&D expenses totaling approximately $3.3 billion, which comprises over 40% of Arm's revenue.

[309]



125.  The importance of Arm's R&D investment to its future success is underscored in its 2nd Amended F-1 filing, as shown below.

- "We will have to make significant expenditures to continue developing our semiconductor products and other products.  The long development time of generally five or more years from the initial design of our semiconductor products until its incorporation into new end-user applications can place significant strain on our financial resources and personnel."[310]

---

[306] Deposition of Paul Williamson, November 9, 2023, p. 227.
[307] ARM_01259705 – 0105 at 9804 – 805.
[308] ARM_01259705 – 0105 at 9721.
[309] ARM_00000510 – 632 at 535; ARM_00000382 – 509 at 416; ARM_00000244 – 381 at 281; https://www.currency.me.uk/convert/gbp/usd.
[310] ARM_01259705 – 0105 at 9739.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- "To remain competitive, we must continue to develop new products, applications; and enhancements to our existing products and services, particularly as next generation technology is adopted by market participants. Allocating and maintaining adequate research and development resources, such as the appropriate personnel and development technology, to meet the evolving demands of the market is essential to our continued success…."[311]

- "We have substantially increased our R&D investment to focus on long-term returns and to replicate the strong position that we maintain in smartphones and in other markets, such as automotive, networking equipment, cloud compute and industrial IoT. Each generation of processor is typically more advanced and more complex than the previous generation, which requires increased development efforts that may be partially offset by improvements in productivity. Consequently, each year we increase our R&D investment in line with the increased development needs of the next generation of products."[312]

126. However, Arm's R&D investments are at risk based on Qualcomm's and Nuvia's failure to adhere to the Nuvia ALA.

127. Arm's R&D investments are tied to its revenue stream. As such, any significant changes to Arm's expected revenues can impact Arm's future R&D activities, which in turn can lead to a further decline in revenue. Mr. Segars testified that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████[313] This relationship between revenue and R&D is illustrated in Arm's documents, as shown below.

- "Our customers may decide to license our ISA and develop their own processors based on our ISA, rather than utilize our predeveloped products through an implementation license, resulting in less fees paid to us. Customers may choose to develop their own processors if they believe they can do so more effectively than us or if supply and capacity constraints within the semiconductor industry further incentivize vertical

---

[311] ARM_01259705 – 0105 at 9745.
[312] ARM_01259705 – 0105 at 9804.
[313] Deposition of Simon Segars, November 16, 2023, p. 192.

integration in an effort to secure additional control over their supply chains."[314]

- "If our customers, and particularly one or more key customers from whom we generate a significant portion of our total revenues, elect to develop their own processors based on our ISA, the market for our developed processor portfolio would decline, which could have a material adverse effect on our business, results of operations, financial condition and prospects."[315]

- "Additionally, certain of our customers have in the past sought, and customers may in the future seek, to renegotiate pre-existing contractual commitments.   []  [S]ignificant reductions in existing contractual commitments could have a material adverse effect on our financial condition and results of operations."[316]

- "Our ability to fund research and development expenditures depends on generating sufficient revenue and cash flows from operations and the availability of external financing, if necessary.  Our research and development expenditures, together with other ongoing operating expenses, is a substantial drain on cash flow and may decrease cash balances, which may limit our ability to pursue other potentially attractive initiatives."[317]

- "As a result, the architectural licensees pose a threat to Arm's implementation IP business.  When architectural licensees create implementations that are more advanced or powerful than Arm's own, innovation and competition suffer.  Arm ultimately will find it increasingly difficult to fund its own engineering teams to create implementation IP for its implementation licensees who need that IP to compete against the architectural licensees.  Instead, Arm could be pressured to further cut back on investment to drive profitability, while Apple and Qualcomm create their proprietary designs and chips for the downstream markets, which cannot be sublicensed to other companies."[318]

- "This is not a theoretical risk.  Arm's architectural licensees are among the most profitable technology companies in the world, larger and far better funded than Arm.  The architectural licensees also have the means and incentive to challenge Arm for engineering talent, risking a downward spiral—*i.e.*, Arm must pay more to retain its engineers, which increases Arm's costs, which makes Arm less profitable, which discourages Arm from making further investments in its own implementation IP, which

---

[314] ARM_01259705 – 0105 at 9737.
[315] ARM_01259705 – 0105 at 9737.
[316] ARM_01259705 – 0105 at 9744.
[317] ARM_01259705 – 0105 at 9744.
[318] ARM_00088656 – 684 at 663.

makes Arm less competitive with the architectural licensees (and less competitive with x86), and so on."[319]

128.  As discussed above, Arm's R&D investments are the heart of its business and critical to its future success.  Arm's significant levels of R&D are based on its licensing revenue. However, as previously discussed in this report, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████   The cost savings to Qualcomm are revenue losses to Arm.  Additionally, as discussed previously in this report, other existing and prospective licensees may seek alternatives to Arm, resulting in decreased revenues to Arm.  As such, the potential loss of revenue from (1) Qualcomm's and Nuvia's alleged breach and (2) the resulting decrease in revenue from other partners over time will have a compounding effect on Arm in the future if it is unable to continue its R&D activities at a level necessary to remain competitive.  In other words, as Mr. Segars testified there is a ████████████ or as the above noted Arm document stated, a ██████████████████████████████ This loss is not quantifiable.

129.    In my opinion, the scope of the harm associated with the significant decrease in licensing revenue and Arm's investment in research and development cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

## F.  Significant Decrease in Arm's Reputation and Goodwill

130. The harm to Arm's reputation and decrease in Arm's goodwill resulting from

---

[319] ARM_00088656 – 684 at 663.
██ ██████████████████████████████████████████

Defendants' breach of the Nuvia ALA cannot be readily quantified and the associated monetary damages cannot be reasonably ascertained.[321]

131.  Arm's brand and reputation are critical aspects of its success.  As discussed above, Arm's history of innovation has resulted in significant success and presence in the market, particularly in the mobile segment.  Arm's 2nd Amended F-1 filing states that its "brand and reputation are critical factors in [its] relationships with customers, employees, governments, suppliers, and other stakeholders.  [Its] failure to address, or the appearance of [its] failure to address, issues that give rise to reputational risk…could significantly harm [Arm's] brand and reputation."[322]  Qualcomm's and Nuvia's actions, and their ability to avoid the requested specific performance may have a detrimental impact on Arm's goodwill through harm to its brand and reputation.

132. Mr. Williamson discussed the harm to Arm's goodwill stating that "there are multiple harms, including potentially loss of revenue, [] but also *reputational damage* and a fundamental long-term business challenge created by a potential situation where ARM licensees do not feel bound to the terms of our contracts.  So it is harmful to our business in broader terms than purely lost revenues, but that is not exhaustive."[323]  Mr. Williamson also testified that "ARM has a reputation of trust with its partners who build technology based on ARM's technology and services associated with it.  Their success is a shared success business with ARM, and trust is an important element of that continuing business practice."[324]  Similarly, Mr. Williamson testified that "[s]hould we not protect our technology, it could impact the trust that companies more

---

[321] Discussions with Paul Williamson.
[322] ARM_01259705 – 0105 at 9758.
[323] Deposition of Paul Williamson, November 9, 2023, p. 243 (emphasis added).
[324] Deposition of Paul Williamson, November 9, 2023, p. 246.

broadly feel in the ARM business model and the security based on ARM's technology."[325]  Finally,

Mr. Williamson stated that "[i]t is impossible for me to know the scale of the harm caused already

or the number of companies who have reduced their trust in ARM and therefore not approached

us to build their business within our ecosystem."[326]

133.  Mr. Abbey also testified regarding harm to Arm's brand (and thus goodwill), stating

that "the end result is a contract.  At the end of the day, Arm's an IP company.  Our confidential

information, our intellectual property is so germane to what we do.  And a partner that continues

to use Arm confidential information without a contract is—damages our brand and damages our

reputation."[327]  Mr. Abbey also stated that "Qualcomm does not have rights to continue to exploit

the NUVIA design.  Arm intellectual property is in that design, and therefore, it causes brand

damage to Arm."[328]  Further, Mr. Abbey testified that "[i]f all partners had the belief that I acquire

a company, I can do anything I want with Arm technology, that weakens our brand and therefore

is important for us to protect that in the marketplace. [A lot of] damage is being done to the idea

that this thing is in public knowledge that this is taking place."[329]

134.  Harm to Arm's brand and reputation can be wide ranging.  Arm has stated that:

> Damage to [its] brand and reputation could reduce demand for [its]
> products and adversely affect [its] business, operating environment and
> the trading price of [its] securities.  Damage to [its] reputation may also
> make us less attractive to current and prospective employees relative to
> [its] competitors, particularly given the intensely competitive market for
> highly skilled employees.  Moreover, repairing [Arm's] brand and
> reputation may be difficult, time-consuming, and expensive.  The
> heightened competitive pressures could result in a loss of customers or a
> reduction in revenues or revenue growth rates, all of which could

---

[325] Deposition of Paul Williamson, November 9, 2023, p. 246.
[326] Deposition of Paul Williamson, November 9, 2023, p. 248.
[327] Deposition of Will Abbey, October 27, 2023, p. 324.
[328] Deposition of Will Abbey, October 27, 2023, p. 361.
[329] Deposition of Will Abbey, October 27, 2023, p. 361.

adversely affect [its] business, results of operations, financial condition and prospects.[330]

135.   As illustrated above and through this report, Arm's goodwill and reputation are critical to its success and market standing.  Arm's brand as an innovator has been built over many decades.   This includes harm to Arm's reputation due to a lessened perception in the enforceability of contractual terms, and potential increased need by Arm to enforce those terms through litigation.  Harm to Arm's goodwill and reputation cannot be measured as a result of Qualcomm's and Nuvia's alleged actions.

136.   In my opinion, the scope of the harm associated with the significant damage to Arm's reputation and goodwill cannot be readily determined or quantified and the damages associated with that harm cannot be determined with reasonable certainty.  Therefore, monetary damages cannot adequately compensate Arm for this harm.

### G.  Inadequacy of Damages Exacerbated by Several Additional Factors

137.  Several additional factors in this case exacerbate the potential harms to Arm, and the uncertainty of monetary damages adequate to compensate for those harms, if Defendants are found liable for breaching the Nuvia ALA but are not required to discontinue use and distribution of Arm Technology, Arm Confidential Information, and any products embodying such technology or information (including Nuvia-based Cores).

138.  For example, not only is Qualcomm a long-term Arm licensee, it is also one of Arm's largest licensees by revenue.[331]  Qualcomm made up 11% of Arm's total revenue for the fiscal year ended March 30, 2023.[332]  Given the magnitude of Qualcomm's contribution to Arm's financial performance (as well as Qualcomm's overall status in the industry), Qualcomm's

---

[330] ARM_01259705 – 0105 at 9758.
[331] Deposition of Rene Haas, December 12, 2023, p. 107.
[332] ARM_01259705 – 0105 at 9754; *See also* Deposition of Simon Segars, November 16, 2023, pp. 10 – 13.

alleged actions would have an outsized impact on Arm.  To the extent Qualcomm is permitted to use the Nuvia-based Cores developed under the Nuvia ALA, other industry participants (and Arm licensees) may be emboldened given Qualcomm's size as an Arm licensee and recognition as an industry leader.

139.  Another exacerbating factor is the relative speed with which the CPU industry develops.  Emerging technologies develop rapidly and may not be foreseen.[333]  Arm asserts that it is "continuously evaluating emerging markets and technologies that may enable [it] to create more advanced products that bring more value to [it]s customers and ecosystem."[334]   For example, Arm states that it is "leading the way in integrating AI and ML capabilities across all devices through [its] highly scalable architecture.  All modern smartphones are AI and ML capable by virtue of their Arm processors, and we are increasingly working with companies in other markets, such as consumer electronics and automotive, to deploy AI-based solutions."[335] However, Arm has stated that "[i]f it fail[s] to develop new products in response to, or in anticipation of, rapid technological changes in [its] industry or the industries [it] serve[s], [its] business may be materially and adversely affected."[336]   Further, Arm has indicated that both known and unknown rapid technological changes make "the future market for [its] products [] difficult to predict."[337]  Given the rapidly evolving landscape of electronics (which cannot be fully anticipated), the total harm to Arm is unpredictable.  For example, as previously discussed, Arm gained a first mover advantage in the mobile CPU segment, but Arm's ability to leverage this advantage to emerging markets could be in jeopardy due to Qualcomm's and Nuvia's alleged

---

[333] Discussions with Will Abbey and Paul Williamson.
[334] ARM_01259705 – 0105 at 9722
[335] ARM_01259705 – 0105 at 9722.
[336] ARM_01259705 – 0105 at 9724.
[337] ARM_01259705 – 0105 at 9739.

actions.  This sort of impact is amplified by the so-called "Butterfly Effect."[338]  In other words, future triggering events could magnify the potential impacts of Qualcomm's and Nuvia's alleged actions (discussed previously in this report) and may set into motion events that may be different (potentially significant) in the "but for" scenario in which Qualcomm and Nuvia act within the bounds of its agreements as sought by Arm.  For example, an event in the server market that significantly increases demand of server CPUs would have an even larger impact on Arm given Arm's small market presence in that space and its delayed development of the segment due to Nuvia's shift away from developing what was a promising alternative to x86-based processors.  Or in another example, a decrease in Arm's R&D activities (as previously discussed) could result in its inability to capitalize on currently unforeseen CPU applications.

140.  The uncertainty of the harms discussed in this report are particularly acute given that they involve the actions of parties (*i.e.*, current and prospective licensees), unknown emerging market segments, among other uncertainties.  Such factors include but are not limited to the following.

- The ability to quantify the number prospective licensees and related revenue is not ascertainable.

- The difficulty in measuring the financial impact of actions that current and prospective licensees may take based on the decisions of other licensees.

- The ability to measure the goodwill and reputational harm due to Qualcomm's and Nuvia's alleged actions would be difficult.

- The uniqueness of Qualcomm as a market leader (and one of Arm's largest customers) which would have an outsize impact on its alleged breach.

- The value of Arm's first mover advantage in emerging markets and the magnitude of the loss is difficult to measure.

---

[338] https://www.forbes.com/sites/startswithabang/2018/02/13/chaos-theory-the-butterfly-effect-and-the-computer-glitch-that-started-it-all/?sh=4b460bee69f6; https://hbr.org/2022/08/in-uncertain-times-the-best-strategy-is-adaptability.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                           66

- The loss of revenue from the factors discussed in this report would have an unpredictable impact on Arm's total financial condition and market presence.

## VIII.   TRADEMARK INFRINGEMENT

141. I am informed and understand that Arm seeks a declaratory judgment that Defendants unlicensed use of Arm's trademarks will constitute trademark infringement.[339]  I am informed and understand that Arm is not aware of any trademark infringements by Defendants to date.[340]  I may be asked to opine on potential damages associated with trademark infringement if any such infringement is alleged to have occurred before trial of this matter.  I reserve my right to do so.

## IX.   OTHER ISSUES

142. This report represents my analysis, opinions, and conclusions at this time and is based on information available to me as of the date above.  The citations listed in this report are illustrative, and as part of my analysis, I also considered the additional documents and other information listed on Schedule 2.  If additional information or testimony becomes available to me, I may revise or supplement my analysis, opinions, and conclusions, and I may modify or supplement my report as necessary.  I may testify at trial regarding any related matter raised by the parties after the date of this report if asked to do so by the Court or the parties' attorneys.  I may be asked to develop additional schedules or exhibits for trial purposes related to my analysis, opinions, and conclusions.  I may also be asked to develop and rely on demonstratives at trial or any pre-trial proceeding.  I may also be asked to develop additional schedules or exhibits if asked to do so by the Court or the parties' attorneys, post-trial.  This report is intended solely for use in

---

[339] Complaint, August 31, 2022, pp. 18 – 22.
[340] Arm Ltd.'s Second Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories Nos. 1 – 11, November 17, 2023, pp. 17 – 26.

the above-referenced litigation and is not to be used for any other purpose.



**Schedule 1**

# W. Todd Schoettelkotte, CPA, CVA
### *Senior Managing Director*

333 Clay Street, Suite 3960
Houston, Texas 77002
713-335-5455 | tschoettelkotte@jsheld.com

**Certifications**
Certified Public Accountant, Texas
Certified Valuation Analyst

**Professional Affiliations**
State Bar of Texas' Grievance
Committee, Committee Member,
2004 – 2009

Federal Bar Association,
South Texas Chapter, Treasurer,
2007 – 2015

Institution for Law and Technology
Advisory Board Member

**Associations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

Licensing Executives Society

National Association of Certified
Valuators and Analysts

**Education**
Master of Accounting
Rice University, Houston, TX

BS Management
Rice University, Houston, TX

W. Todd Schoettelkotte is a Senior Managing Director of Ocean Tomo, a part of J.S. Held LLC, a global consulting firm providing specialized technical, scientific, financial, and advisory services. Mr. Schoettelkotte has more than 25 years of experience in the evaluation and quantification of economic damages arising from patent, copyright and trademark infringement, and trade secret misappropriation disputes. His clients have included numerous Fortune 500 companies in a wide variety of industries including semiconductor, telecommunication, energy, consumer products, life sciences and computers (hardware, software and the internet). Mr. Schoettelkotte has been recognized by Intellectual Asset Management Magazine as one of the leading patent damages experts in the United States. Mr. Schoettelkotte's background is in accounting, finance and economics, and he has a specific, focused understanding of those issues integral to the valuation and management of intellectual property.

**Intellectual Property Valuation**

Mr. Schoettelkotte has directed numerous valuation projects related to patents, trademarks and trade secrets. A significant portion of his practice is focused on the determination of royalty rates and terms for licensing agreements. Additionally, Mr. Schoettelkotte has conducted numerous studies involving lost profits and unjust enrichment.

In the process of assisting clients in the valuation of intellectual property assets, Mr. Schoettelkotte has participated in the identification and review of business plans, market studies, financial documents and other related information.

**Patent, Copyright and Trademark Infringement**

Mr. Schoettelkotte has performed market analyses/studies wherein the patented, trademarked or copyrighted product is sold, assessed lost profits stemming from alleged infringements, evaluated the contribution of the patented process/method to the end product and established the economic value of the underlying intellectual property.

Mr. Schoettelkotte is skilled in the application of the Georgia-Pacific factors to the determination of reasonable royalty rates. He has determined reasonable royalty rates within infringement suits on many occasions in numerous industries. Over the course of his career, Mr. Schoettelkotte has reviewed hundreds of license agreements, providing a broad frame of reference for reasonable royalty damages analyses. Mr. Schoettelkotte has testified in federal and state court and arbitration proceedings on matters involving intellectual property valuation, lost profits, reasonable royalty and economic damages issues.

**Articles and Presentations**

"Intellectual Property Damages," Chicago-Kent College of Law, October 15, 2019

"Damages in Other Areas of Intellectual Property," The University of Arizona IP Conference, March 5, 2018

# W. Todd Schoettelkotte

"Impact of Recent Court Cases on 'Real World' Royalty Rates," LES (USA & Canada) Houston Chapter, July 20, 2017

"What is Discoverable and Admissible for Damages, Willfulness and Other Purposes," Intellectual Property Owners Association, March 21, 2011

"Strategies in Intellectual Property," Chicago Kent, College of Law, Spring 2004 – 2010

Damages, Part II: "Litigation Strategies" – 15th Annual Advanced Patent Law Institute - University of Texas School of Law, October 28-29, 2010

"IP Damages and Valuation," Global Intellectual Property Management, Georgetown University Law Center, July 2, 2008

"Keys for Effectively Working with Your Damages Expert Throughout the Litigation Life Cycle," Houston Bar Association, March 22, 2007

"Advanced Evidence and Discovery – Working With Experts From Start To Finish" – Texas Bar Association, April-May 2006

"Trademarks – Financial Disclosure and Corporate Governance" – International Trademark Association, Emerging Issues in Trademark Law Forum, February 2-3, 2006

"Valuation of IP – A Licensing Perspective" – Lighthouse Seminar Group, IP Licensing Nuts & Bolts, March 3, 2005

"Measuring the Value of Damages in Trademark Infringement Claims" – DuPont's 18th Annual CLE Intellectual Property Law Seminar, October 12, 2004

"Measuring the Value of Damages in Patent and Trademark Claims" – Houston CPA Society, September 2004

"Measuring Damages in Trademark Infringement and Related Claims in Light of Recent Court Decisions" – The 19th Annual Intellectual Property Law Conference – American Bar Association, April 1, 2004

"Intellectual Property Damages: Patents & Trademarks" – Houston CPA Society "Litigation and Valuation Services Committee," January 28, 2004

Co-Author: "Accounting for Attorneys" – University of Oregon School of Law, November 12, 2003

"What are the Financial Stakes in Litigation? What are the Costs and the Return on Investment (ROI) That Can Be Expected? The Question of Intangible Returns?" – 2003 Fourth International Conference on Intellectual Property by CNCPI, October 7, 2003, Paris, France

"Current Issues in the Analysis of Reasonable Royalties in Patent Infringement Actions" – 2003 Licensing Executives Society Annual Meeting, September 24, 2003

Co-Author FTI Consulting Training Course: "Calculating Damages in Patent Infringement – A Lost Profits and Reasonable Royalty Case Study," July 17, 2003



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of December 2023**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*In the Matter of Certain Semiconductor Devices, and Methods of Manufacturing Same and Products Containing the Same (Respondents-Innoscience);* U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition

*Demaray LLC v. Samsung Electronics Co. Ltd., et al.:* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition, Supplemental Report, Deposition

*Persawvere, Inc. v. Milwaukee Electric Tool, Corporation;* U.S. District Court, District of Delaware (Wilmington), Rebuttal Expert Report, Deposition, Trial

*Beacon Navigation GmbH v. Bayerische Motoren Werke AG; BMW of North America, LLC and BMW Manufacturing Co., LLC;* U.S. District Court, Southern District of Michigan, Expert Report, Deposition

*Ningde Amperex Technology Limited v. Zhuhai CosMX Battery Co., Ltd., et al.;* U.S. District Court, Eastern District of Texas (Marshall), Initial Report, Rebuttal Expert Report, Deposition

*Plastipak Packaging, Inc. v. Nestlé Waters North America, Inc.;* U.S. District Court, Eastern District of Virginia (Alexandria), Opening Expert Report, Rebuttal Expert Report, Supplemental Expert Report, Supplemental Rebuttal Expert Report, Deposition

*Ollnova Technologies Limited v. ecobee Technologies, ULC d/b/a Ecobee;* U.S. District Court, Eastern District of Texas (Marshall), Rebuttal Expert Report, Deposition, Trial

*EIS, Inc. v. IntiHealth GER GmbH, et al.;* U.S. District Court, District of Delaware, Expert Report, Rebuttal Expert Report, Commercial Success Report, Reply Report, Trial

*HID Global Corporation v. Vector Flow., et al.;* U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition

*BlueRadios, Inc. v. Kopin Corporation, Inc.;* U.S. District Court, District of Colorado (Denver), Rebuttal Expert Report, Deposition, Supplemental Rebuttal Expert Report, Deposition

*Bay Materials, LLC v. 3M Company*; U.S. District Court, District of Delaware (Wilmington), Declaration, Deposition, Commercial Success Report, Deposition

*Continuous Composites, Inc. v. Markforged, Inc.*; U.S. District Court, District of Delaware, Expert Report, Reply Report, Deposition

*Fate Therapeutics, Inc., et al. v. Shoreline Biosciences, Inc., et al.;* U.S. District Court, Southern District of California (San Diego), Rebuttal Expert Report, Deposition

*Delta Air Lines, Inc. v. Marriott International, Inc.;* U.S. District Court, Northern District of Georgia (Atlanta), Rebuttal Expert Report, Supplemental Rebuttal Report, Deposition



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of December 2023**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*Textron Innovations Inc. v. SZ DJI Technology Co., Ltd., et al.;* U.S. District Court, Western District of Texas (Waco), Expert Report, Deposition, Supplemental Expert Report, Trial

*VoIP-Pal.com, Inc. v. Verizon Communications Inc., et al.*; U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition

*Ragnarok Game, LLC and ESDFOS, LLC v. ZeniMax Media Inc, et al.;* Superior Court of the State of California, County of Los Angeles, Central District, Opening Expert Report, Rebuttal Expert Report, Deposition

*DivX, LLC v. Harman International Industries, Inc.;* New York Supreme Court, New York County, Expert Report, Rebuttal Expert Report, Deposition

*Shimon Maimon v. Lockheed Martin Corporation;* Judicial Arbitration and Mediation Services, Rebuttal Expert Report, Deposition, Arbitration

*WSOU Investments, LLC d/b/a Brazos Licensing and Development v. ZTE Corporation;* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition

*Wonderland Switzerland AG v. Evenflo Company, Inc.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Supplemental Expert Report, Trial

*NNCrystal US Corporation and The Board of Trustees of The University of Arkansas v. Nanosys, Inc.*; U.S. District Court, District of Delaware, Expert Report, Reply Report, Deposition

*Pavemetrics Systems, Inc. v. Tetra Tech, Inc. and Tetra Tech Tas Inc.;* U.S. District Court, Central District of California (Los Angeles), Expert Report, Deposition, Trial

*Global Tubing, LLC v. Tenaris Coiled Tubes, LLC and Tenaris, S.A.;* U.S. District Court, Southern District of Texas (Houston), Expert Report, Deposition

*The Cookie Department, Inc. v. The Hershey Company, One Brands, LLC;* U.S. District Court, Northern District of California (Oakland), Rebuttal Expert Report, Deposition

*Unirac, Inc. v. EcoFasten Solar, LLC and Esdec, Inc.;* U.S. District Court, District of Delaware, Expert Reports, Deposition

*In the Matter of Certain Integrated Circuits, Chipsets, and Electronic Devices, and Products Containing the Same (Respondents)*; U.S. International Trade Commission, Washington, D.C., Rebuttal Expert Report, Deposition



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of December 2023**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*In the Matter of Certain High-Density Fiber Optic Equipment and Components Thereof (Complainant)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing; Enforcement Proceeding - Expert Report, Supplement to the Expert Report, Deposition, 2nd Supplement to the Expert Report, 3rd Supplement to the Expert Report, Witness Statement, 4th Supplement to the Expert Report, Supplement to Witness Statement, Hearing

*Blue Mountain Holdings, Ltd., et al. v. Bliss Nutraceticals LLC, et al.*; U.S. District Court, Northern District of Georgia (Atlanta), Expert Report, Deposition

*Gibson Brands, Inc. v. Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC*; U.S. District Court, Eastern District of Texas (Sherman), Rebuttal Expert Report, Deposition, Supplemental Rebuttal Expert Report, Trial

*Conformis, Inc. v. Medacta USA, Inc. and Medacta International SA;* U.S. District Court, District of Delaware, Rebuttal Expert Report, Supplemental Rebuttal Expert Report, Deposition

*In the Matter of Certain Silicon Photovoltaic Cells and Modules with Nanostructures, and Products Containing Same (Respondents);* U.S. International Trade Commission (Washington, D.C.), Expert Report, Deposition, Witness Statement, Hearing

*EcoFactor, Inc. v. Google LLC;* U.S. District Court, Western District of Texas (Waco), Expert Report, Deposition, Supplemental Report, Trial, Declaration

*G.W. Lisk Company, Inc. v. GITS Manufacturing Company*; U.S. District Court, Southern District of Iowa (Central); Expert Report, Reply Report, Deposition

*American Eagle Outfitters, Inc. and Retail Royalty Company v. Walmart, Inc.*; U.S. District Court, Western District of Pennsylvania (Pittsburgh), Expert Report, Rebuttal Report, Deposition

*Simply Wireless, Inc. v. T-Mobile US, Inc., et al.*; U.S. District Court, Eastern District of Virginia (Alexandria), Expert Report, Reply Report, Deposition, Sur-Sur Reply Report

*Gentex Corporation v. Galvion LTD and Galvion Inc.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition

*Kirsch Research and Development, LLC v. DuPont de Nemours, Inc., FT Synthetics, Inc. and Atlas Roofing Corporation*; U.S. District Court, Eastern District of Texas (Texarkana), Expert Report, Deposition

*Malvern PanAnalytical Inc. v. TA Instruments-Waters LLC and Waters Technologies Corporation;* U.S. District Court, District of Delaware (Wilmington), Expert Report, Rebuttal Report, Reply Report, Deposition

*Finalrod IP, LLC v. Endurance Lift Solutions, Inc.;* U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Deposition

*Pierce Manufacturing, Inc. and Oshkosh Corporation v. E-One, Inc. and REV Group, Inc.*; U.S. District Court, Middle District of Florida (Tampa), Declaration, Expert Report, Deposition, Trial



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of December 2023**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*Polar Electro Oy* v. *Suunto Oy, et al.*; U.S. District Court, District of Utah (Central), Expert Report, Deposition

*Wonderland Switzerland AG* v. *Evenflo Company, Inc., et al.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Trial

*Lufkin Industries, Inc.* v. *International Business Machines Corporation, et al.*; 159th Judicial District Court of Angelina County, Texas, Expert Report #1, Supplemental Report #1, Expert Report #2, Supplemental Report #2, Deposition

*The Hillman Group, Inc.* v. *KeyMe, LLC*; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Deposition #1, Consolidated Report, Deposition #2

*Team Worldwide Corporation* v. *Academy, LTD d/b/a Academy Sports + Outdoors, et al.*; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Rebuttal Report, Deposition #1, Deposition #2, Supplemental Report

*Nevro Corp.* v. *Boston Scientific Corporation, et al.*; U.S. District Court, Northern District of California (San Francisco), Expert Report, Supplemental Report, Deposition, Declaration

*Carnegie Institution of Washington, et al.* v. *Pure Grown Diamonds, Inc., et al.*; U.S. District Court, Southern District of New York (Foley Square), Expert Report, Supplemental Report, Deposition

*In the Matter of Certain High-Density Fiber Optic Equipment and Components Thereof (Complainant)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing

*Nissei ASB Co. and Nissei ASB Machine, Co., LTD.* v. *R&D Tool & Engineering Co.*; U.S. District Court, Western District of Missouri (Western), Expert Report, Reply Report, Deposition

*Jager Pro Incorporated* v. *Bull Creek Welding and Fabrication, Inc.*; U.S. District Court, Eastern District of Arkansas (Central), Expert Report, Deposition

*CFA Institute* v. *American Society of Pension Professionals & Actuaries, et al.*; U.S. District Court, Western District of Virginia (Charlottesville), Expert Report, Deposition

*Legacy Separators, LLC, et al.* v. *Halliburton Energy Services, Inc., et al.*; U.S. District Court, Southern District of Texas (Houston), Expert Report, Rebuttal Report, Deposition, Supplemental Report, Second Supplemental Report, Deposition #2, Trial

*Saracen LLC, Saracen Energy Power Advisors LP, Saracen Energy Advisors LP, collectively d/b/a The Saracen Group of Companies* v. *Sylvain Ross and Marginal Unit, Inc.*; U.S. District Court, Southern District of Texas (Houston), Expert Report, Supplemental Report, Second Supplemental Report, Third Supplemental Report, Revised Third Supplemental Report, Trial

*Innovation Sciences, LLC* v. *HTC Corporation*; U.S. District Court, Eastern District of Texas (Sherman), Expert Report, Deposition

*In the Matter of Certain Digital Video Receivers, Broadband Gateways, and Related Hardware and Software Components (Respondents)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Hearing



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of December 2023**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*Under Armour, Inc. v. Battle Fashions, Inc. and Kelsey Battle*; U.S. District Court, Eastern District of North Carolina (Western), Expert Report, Deposition, Supplemental Report

*Finalrod IP, LLC and R2R and D, LLC d/b/a Superod v. John Crane, Inc., et al.*; U.S. District Court, Western District of Texas (Midland), Expert Report, Rebuttal Report, Supplemental Report, Deposition

*In the Matter of Certain Wireless Mesh Networking Products and Related Components Thereof (Complainant)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing

*Liqwd, Inc. and Olaplex LLC v. L'Oréal USA, Inc., et al.*; U.S. District Court, District of Delaware (Wilmington), Declaration, Deposition #1, Supplemental Declaration, Deposition #2, Expert Report, Deposition #3, Trial

*Nevro Corp. v. Stimwave Technologies, Inc.*; U.S. District Court, District of Delaware (Wilmington), Declaration, Deposition, Reply Declaration

*XY, LLC v. Trans Ova Genetics, LC*; U.S. District Court, District of Colorado (Denver), Expert Report, Deposition, Trial, Declaration

*Maui Jim, Inc. v. SmartBuy Guru Enterprises, et al.*; U.S. District Court, Northern District of Illinois (Eastern), Expert Report, Deposition

*MPEG LA, L.L.C. v. Toshiba America Information Systems, Inc.*; Supreme Court of the State of New York, County of New York, Expert Report, Deposition

*Team Worldwide Corp. v. Intex Recreation Corp, et al.*; Federal Arbitration, Inc., Hearing

*Justice Laub and Daniel Kanes v. Nicholas Horbaczewski, Drone Racing League, Inc., et al.*; U.S. District Court, Central District of California (Western), Expert Report, Deposition

*ASM Holding B.V. v. Hitachi Kokusai Electric, Inc.*; International Centre for Dispute Resolution, Hearing

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc., et al.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Deposition, Supplemental Report, Trial, Declaration

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**     Schedule 2
**Documents and Other Information Considered**

| ARM_ | | ARM_ | | ARM_ | | ARM_ | | ARM_ | | ARM_ | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Begin | End | Begin | End | Begin | End | Begin | End | Begin | End | Begin | End |
| 00000003 | 00000003 | 00060458 | 00060512 | 01228027 | 01228027 | 01235148 | 01235148 | 01239454 | 01239457 | 01240470 | 01240507 |
| 00000019 | 00000021 | 00063692 | 00063693 | 01228028 | 01228028 | 01235149 | 01235149 | 01239458 | 01239458 | 01240508 | 01240526 |
| 00000022 | 00000023 | 00067288 | 00067289 | 01228029 | 01228029 | 01236577 | 01236579 | 01239459 | 01239459 | 01241187 | 01241187 |
| 00000045 | 00000045 | 00081962 | 00081963 | 01228030 | 01228030 | 01236580 | 01236580 | 01239460 | 01239460 | 01241589 | 01241589 |
| 00000244 | 00000381 | 00082925 | 00082937 | 01228031 | 01228031 | 01236581 | 01236587 | 01239461 | 01239461 | 01241597 | 01241598 |
| 00000382 | 00000509 | 00085677 | 00085677 | 01228032 | 01228032 | 01236588 | 01236593 | 01239462 | 01239462 | 01243410 | 01243629 |
| 00000510 | 00000632 | 00085679 | 00085679 | 01228033 | 01228033 | 01236594 | 01236595 | 01239463 | 01239463 | 01243875 | 01243995 |
| 00002198 | 00002202 | 00085680 | 00085680 | 01228034 | 01228034 | 01236596 | 01236596 | 01239464 | 01239464 | 01245599 | 01245617 |
| 00002226 | 00002230 | 00085682 | 00085682 | 01228035 | 01228035 | 01236605 | 01236609 | 01239465 | 01239465 | 01245618 | 01245618 |
| 00024810 | 00024810 | 00085687 | 00085687 | 01228036 | 01228036 | 01236610 | 01236612 | 01239466 | 01239466 | 01245619 | 01245640 |
| 00024815 | 00024815 | 00086088 | 00086088 | 01228037 | 01228037 | 01236613 | 01236615 | 01239467 | 01239469 | 01245641 | 01245672 |
| 00024817 | 00024817 | 00087449 | 00087449 | 01228038 | 01228038 | 01236616 | 01236617 | 01239470 | 01239470 | 01245673 | 01245703 |
| 00024819 | 00024819 | 00087451 | 00087451 | 01228039 | 01228039 | 01236618 | 01236644 | 01239471 | 01239471 | 01245704 | 01245705 |
| 00024820 | 00024820 | 00087699 | 00087702 | 01228040 | 01228040 | 01236645 | 01236653 | 01239472 | 01239472 | 01245706 | 01245719 |
| 00024825 | 00024825 | 00087854 | 00087856 | 01228041 | 01228041 | 01236654 | 01236666 | 01239473 | 01239473 | 01245720 | 01245726 |
| 00024826 | 00024826 | 00088045 | 00088303 | 01228042 | 01228042 | 01236667 | 01236670 | 01239474 | 01239474 | 01245727 | 01245755 |
| 00024837 | 00024837 | 00088371 | 00088386 | 01228043 | 01228043 | 01236671 | 01236677 | 01239475 | 01239475 | 01245756 | 01245793 |
| 00024838 | 00024838 | 00088390 | 00088408 | 01228044 | 01228044 | 01236678 | 01236682 | 01239476 | 01239476 | 01245794 | 01245813 |
| 00024841 | 00024841 | 00088655 | 00088655 | 01228045 | 01228045 | 01236683 | 01236683 | 01239477 | 01239477 | 01245814 | 01245837 |
| 00024844 | 00024844 | 00088892 | 00088903 | 01228046 | 01228046 | 01236684 | 01236690 | 01239478 | 01239478 | 01245838 | 01245848 |
| 00024851 | 00024851 | 00088906 | 00088918 | 01228047 | 01228047 | 01236691 | 01236697 | 01239479 | 01239479 | 01245849 | 01245890 |
| 00032604 | 00032604 | 00092674 | 00092679 | 01228048 | 01228048 | 01236698 | 01236699 | 01239483 | 01239483 | 01245891 | 01245914 |
| 00032650 | 00032650 | 00092784 | 00092787 | 01228049 | 01228049 | 01236700 | 01236702 | 01239485 | 01239485 | 01245915 | 01245938 |
| 00037713 | 00037713 | 00094543 | 00094545 | 01228050 | 01228050 | 01236703 | 01236707 | 01239486 | 01239486 | 01245939 | 01245940 |
| 00037718 | 00037718 | 00095578 | 00095578 | 01228051 | 01228051 | 01236708 | 01236710 | 01239488 | 01239488 | 01245941 | 01245978 |
| 00037729 | 00037729 | 00095579 | 00095579 | 01228052 | 01228052 | 01236711 | 01236730 | 01239490 | 01239490 | 01245979 | 01246020 |
| 00040078 | 00040080 | 00095580 | 00095580 | 01228053 | 01228053 | 01236731 | 01236733 | 01239493 | 01239493 | 01246021 | 01246042 |
| 00040237 | 00040241 | 00097527 | 00097528 | 01228054 | 01228054 | 01236734 | 01236739 | 01239495 | 01239495 | 01246043 | 01246066 |
| 00040283 | 00040285 | 00098968 | 00099018 | 01228055 | 01228055 | 01236740 | 01236742 | 01239504 | 01239504 | 01246067 | 01246085 |
| 00040289 | 00040306 | 00109518 | 00109560 | 01228056 | 01228056 | 01236743 | 01236744 | 01240202 | 01240203 | 01246086 | 01246111 |
| 00044650 | 00044692 | 00109734 | 00109750 | 01228057 | 01228057 | 01238999 | 01239003 | 01240204 | 01240225 | 01246112 | 01246134 |
| 00045253 | 00045253 | 00109778 | 00109778 | 01228058 | 01228058 | 01239440 | 01239440 | 01240226 | 01240236 | 01246135 | 01246157 |
| 00045262 | 00045264 | 00109791 | 00109803 | 01228059 | 01228059 | 01239441 | 01239441 | 01240237 | 01240280 | 01246158 | 01246194 |
| 00045266 | 00045276 | 00109806 | 00109819 | 01228060 | 01228060 | 01239442 | 01239442 | 01240281 | 01240282 | 01246195 | 01246197 |
| 00045334 | 00045335 | 00109822 | 00109852 | 01228061 | 01228061 | 01239443 | 01239443 | 01240283 | 01240304 | 01246198 | 01246224 |
| 00045393 | 00045393 | 00109855 | 00109865 | 01228062 | 01228062 | 01239444 | 01239444 | 01240305 | 01240307 | 01246225 | 01246227 |
| 00051071 | 00051073 | 00109982 | 00109985 | 01228063 | 01228063 | 01239445 | 01239445 | 01240308 | 01240325 | 01250306 | 01250306 |
| 00051088 | 00051088 | 00109991 | 00109991 | 01228064 | 01228064 | 01239446 | 01239446 | 01240326 | 01240353 | 01250307 | 01250307 |
| 00052794 | 00052816 | 01215343 | 01215344 | 01228065 | 01228065 | 01239447 | 01239447 | 01240354 | 01240381 | 01259704 | 01259704 |
| 00056424 | 00056433 | 01215409 | 01215409 | 01228066 | 01228066 | 01239448 | 01239448 | 01240382 | 01240391 | 01259705 | 01260105 |
| 00056441 | 00056441 | 01215423 | 01215423 | 01228073 | 01228073 | 01239449 | 01239449 | 01240392 | 01240412 | 01260121 | 01260391 |
| 00056519 | 00056529 | 01215632 | 01215633 | 01228074 | 01228074 | 01239450 | 01239450 | 01240413 | 01240437 | 01260418 | 01260686 |
| 00056538 | 00056552 | 01215634 | 01215653 | 01228075 | 01228075 | 01239451 | 01239451 | 01240438 | 01240447 | 01262030 | 01262366 |
| 00056882 | 00056894 | 01215997 | 01216001 | 01233718 | 01233718 | 01239452 | 01239452 | 01240448 | 01240448 | 01266931 | 01266990 |
| 00056900 | 00056909 | 01228026 | 01228026 | 01235144 | 01235144 | 01239453 | 01239453 | 01240449 | 01240469 | 01266995 | 01267070 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.   **Schedule 2**
**Documents and Other Information Considered**

| ARM_ | |
|---|---|
| Begin | End |
| 01271909 | 01271926 |
| 01271927 | 01271928 |
| 01271929 | 01271953 |
| 01305479 | 01305479 |
| 01305515 | 01305515 |
| 01309668 | 01309669 |
| 01427450 | 01427492 |
| 01427493 | 01427522 |
| 01427523 | 01427537 |

| MASA_ | |
|---|---|
| Begin | End |
| 00001719 | 00001724 |

| QCARM_ | |
|---|---|
| Begin | End |
| 0002821 | 0002823 |
| 0002825 | 0002827 |
| 0363482 | 0363482 |
| 0550518 | 0550529 |
| 0557206 | 0557207 |
| 0569461 | 0569494 |
| 0584330 | 0584332 |
| 0591730 | 0591732 |
| 0591733 | 0591736 |
| 0591737 | 0591740 |
| 0591741 | 0591745 |
| 0592425 | 0592431 |
| 2414807 | 2414813 |
| 2417783 | 2417783 |
| 2423231 | 2423233 |
| 2424464 | 2424466 |
| 2424496 | 2424498 |
| 2424621 | 2424623 |
| 2425046 | 2425048 |
| 2425297 | 2425299 |
| 2426801 | 2426803 |
| 2426804 | 2426806 |
| 2426807 | 2426814 |
| 2426815 | 2426821 |
| 2426822 | 2426836 |
| 2426837 | 2426852 |
| 2426853 | 2426855 |

| QCARM_ | |
|---|---|
| Begin | End |
| 2426856 | 2426881 |
| 2426882 | 2426882 |
| 2426883 | 2426884 |
| 2426885 | 2426887 |
| 2426888 | 2426888 |
| 2426889 | 2426891 |
| 2426892 | 2426894 |
| 2426895 | 2426897 |
| 2554114 | 2554116 |
| 3241389 | 3241393 |
| 3337797 | 3337799 |
| 3400486 | 3400548 |
| 3404294 | 3404353 |
| 3426632 | 3426638 |
| 3437962 | 3438003 |
| 3438004 | 3438037 |
| 3438038 | 3438074 |
| 3438075 | 3438113 |
| 3438114 | 3438152 |
| 3438153 | 3438193 |
| 3438194 | 3438234 |
| 3438235 | 3438275 |
| 3452409 | 3452442 |
| 3452662 | 3452664 |
| 3452665 | 3452667 |
| 3452668 | 3452672 |
| 3452720 | 3452723 |
| 3452805 | 3452807 |
| 3453808 | 3453810 |
| 3453866 | 3453868 |
| 3453870 | 3453872 |
| 3453873 | 3453874 |
| 3453875 | 3453877 |
| 3453879 | 3453881 |
| 3454302 | 3454304 |
| 3457104 | 3457104 |
| 3460229 | 3460233 |
| 3460451 | 3460453 |
| 3519910 | 3519912 |
| 3520810 | 3520812 |
| 3520813 | 3520815 |
| 3520816 | 3520818 |
| 3520819 | 3520821 |

| QCARM_ | |
|---|---|
| Begin | End |
| 3520822 | 3520825 |
| 3520826 | 3520829 |
| 3520830 | 3520834 |
| 3522610 | 3522611 |
| 3526546 | 3526553 |
| 3536886 | 3536888 |
| 3536889 | 3536891 |
| 3536892 | 3536894 |
| 3536895 | 3536897 |
| 3536898 | 3536901 |
| 3536902 | 3536905 |
| 3536921 | 3536933 |
| 3537376 | 3537378 |
| 3537773 | 3537776 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
**Documents and Other Information Considered**

Schedule 2

| Legal Documents and Related Exhibits |
| --- |
| 2022-08-31 - Complaint |
| 2022-10-26 - Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim |
| 2023-02-27 - Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Interrogatories, Nos. 1-11 |
| 2023-02-27 - Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Requests for Production, Nos. 1-36 |
| 2023-02-27 - Defendants' Responses and Objections to Plaintiff's First Set of Interrogatories, Nos. 1-13 |
| 2023-02-27 - Defendants' Responses and Objections to Plaintiff's First Set of Requests for Production, Nos. 1-51 |
| 2023-04-04 - Arm Ltd.'s First Amended Objections and Responses to Qualcomm's First Set of Requests for Production, Nos. 1-36 |
| 2023-04-26 - Corrected Second Amended Complaint for Willful Patent Infringement |
| 2023-05-04 - Defendants' Responses and Objections to Plaintiff's Second Set of Requests for Production, Nos. 52-58 |
| 2023-05-05 - Arm Ltd.'s First Objection and Responses to Qualcomm's Second Set of Requests for Production, Nos 37-50 |
| 2023-06-23 - Defendants' First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, Nos. 1-4 and 6 |
| 2023-07-14 - Arm Ltd.'s First Objection and Responses to Qualcomm's Third Set of Requests for Production, Nos. 51-54 |
| 2023-08-23 - Defendants' Responses and Objections to Plaintiff's Third Set of Requests for Production, Nos. 59-122 |
| 2023-10-02 - Arm Ltd.'s Objections and Responses to Qualcomm's Second Set of Interrogatories, Nos. 12-19 |
| 2023-10-02 - Plaintiff Arm Ltd.'s Objections and Responses to Defendant Qualcomm's Fourth Set of Requests for Production, Nos. 55-70 |
| 2023-10-20 - Defendants' Responses and Objections to Plaintiff's First Set of Requests for Admission, Nos. 1-30 |
| 2023-10-26 - Defendants' Supplemental and Amended Response and Objections to Plaintiff's First Set of Interrogatories, No. 5 |
| 2023-10-26 - Correspondence Email from J. Braly to J. Li |
| 2023-10-27 - Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories |
| 2023-11-09 - Arm Ltd.'s Objections and Responses to Qualcomm's Third Set of Interrogatories, No. 20 |
| 2023-11-17 - Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories, Nos. 12-19 |
| 2023-11-17 - Arm Ltd.'s Objections and Responses to Qualcomm's Fourth Set of Interrogatories, Nos. 21-25 |
| 2023-11-17 - Arm Ltd.'s Second Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories, Nos. 1-11 |
| 2023-11-17 - Arm Ltd.'s Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories, No. 20 |
| 2023-11-17 - Defendants' First Supplemental Reponses and Objections to Plaintiff's Second Set of Interrogatories, Nos. 15-16 |
| 2023-11-17 - Defendants' Responses and Objections to Plaintiff's Fourth Set of Requests for Production, No. 123 |
| 2023-11-17 - Plaintiff Arm Ltd.'s Objection and Requests for Production Qualcomm's Fifth Set of Requests for Production, Nos. 71-124 |
| 2023-11-17 - Plaintiff Arm Ltd.'s Responses and Objections to Qualcomm's First Requests for Admissions to Plaintiff, Nos. 1-30 |

| Deposition Transcripts and Related Exhibits | | | |
| --- | --- | --- | --- |
| 2023-09-22 - Rohit Singh | 2023-11-02 - Lynn Couillard | 2023-11-28 - Jim Thompson | 2023-12-08 - Jonathan Armstrong |
| 2023-10-12 - Manu Gulati | 2023-11-03 - Gerard Williams | 2023-11-28 - Michael Roberts | 2023-12-12 - Rene Haas |
| 2023-10-20 - Ramakrishna Chundur | 2023-11-08 - Ziad Asghar | 2023-11-29 - Lynn Bos | 2023-12-14 - Vivek Agrawal |
| 2023-10-25 - Jignesh Trivedi | 2023-11-09 - Paul Williamson | 2023-11-30 - Karthik Shivashankar | 2023-12-14 - Laura Sand |
| 2023-10-25 - Tim Herbert | 2023-11-15 - Christiano Amon | 2023-12-01 - Pradeep Kanapathipillai | 2023-12-19 - Christine Tran (rough transcript) |
| 2023-10-27 - Nitin Sharma | 2023-11-15 - Richard Grisenthwaite | 2023-12-07 - Mark Werkheiser | 2023-12-20 - Ian Thornton (rough transcript) |
| 2023-10-27 - Will Abbey | 2023-11-16 - Simon Segars | 2023-12-08 - Geeta Balakrishnan | |

| Publicly Available Information/Other |
| --- |
| Bhandarkar, Dileep, and Douglas W. Clark. "Performance from architecture: comparing a RISC and a CISC with similar hardware organization." Proceedings of the fourth international conference on Architectural support for programming languages and operating systems. 1991 |
| NuVia, Inc., Private Company Profile, S&P Capital IQ |
| Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023 |
| Qualcomm Inc. Form 10-K for the fiscal year ended September 26, 2021 |
| https://community.fs.com/article/what-is-a-server-cpu.html |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
**Documents and Other Information Considered**

Schedule 2

| Publicly Available Information/Other (cont.) |
| --- |
| https://hbr.org/2022/08/in-uncertain-times-the-best-strategy-is-adaptability |
| https://investor.qualcomm.com/segments/qct |
| https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5 |
| https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375) |
| https://semiengineering.com/knowledge_centers/integrated-circuit/ic-types/processors/central-processing-unit-cpu/ |
| https://web.archive.org/web/20210115193713/https://nuviainc.com/ |
| https://web.archive.org/web/20210316180114/https://nuviainc.com/ |
| https://web.archive.org/web/20210422062904/https://nuviainc.com/nuvia-raises-53-million-to-reimagine-silicon-design-for-the-data-center/ |
| https://www.arm.com/architecture/cpu |
| https://www.arm.com/glossary/cpu |
| https://www.arm.com/glossary/isa |
| https://www.arm.com/glossary/risc |
| https://www.arm.com/glossary/soc-development |
| https://www.arm.com/partners |
| https://www.cnbc.com/2022/09/01/why-arms-lawsuit-against-qualcomm-is-a-big-deal.html |
| https://www.cnbc.com/2023/09/14/arm-ipo-what-is-risc-v-and-why-does-arm-call-the-rival-product-a-risk.html |
| https://www.currency.me.uk/convert/gbp/usd |
| https://www.digitaltrends.com/computing/what-is-a-cpu/ |
| https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04 |
| https://www.forbes.com/sites/startswithabang/2018/02/13/chaos-theory-the-butterfly-effect-and-the-computer-glitch-that-started-it-all/?sh=4b460bee69f6 |
| https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance |
| https://www.gigabyte.com/Glossary/cisc |
| https://www.intel.com/content/www/us/en/newsroom/resources/moores-law.html |
| https://www.investopedia.com/articles/markets/012216/worlds-top-10-semiconductor-companies-tsmintc.asp |
| https://www.lenovo.com/us/en/glossary/cpu-core/ |
| https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-chip-tests |
| https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html |
| https://www.precedenceresearch.com/microprocessor-market |
| https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia |
| https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia |
| https://www.qualcomm.com/products |
| https://www.qualcomm.com/snapdragon/overview |
| https://www.techspot.com/article/1856-aiming-for-atoms-chip-manufacturing/ |

This list incorporates reference to all documents identified in the footnotes of my report.

# EXHIBIT 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., a U.K. corporation, | § § § | |
| Plaintiff, | § § | |
| v. | § § | C.A. No. 22-1146 (MN)) |
| QUALCOMM, INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation | § § § § § § § | |
| Defendants. | § | |

REPLY EXPERT REPORT OF W. TODD SCHOETTELKOTTE

RELATING TO REMEDIES FOR DEFENDANTS' BREACH OF CONTRACT

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT.

_____
W. TODD SCHOETTELKOTTE

3-25-24
_____
EXECUTED ON

**Table of Contents**

I.      INTRODUCTION ........................................................................................................ 1

II.     CREDENTIALS AND COMPENSATION ...................................................................... 2

III.    INFORMATION REVIEWED AND CONSIDERED ......................................................... 2

IV.     LEGAL FRAMEWORK FOR DAMAGES ....................................................................... 4

V.      SUMMARY OF OPINIONS ......................................................................................... 4

VI.     ASSESSMENT OF THE KENNEDY REPORT ................................................................. 5

        A.      Summary ..................................................................................................... 5

        B.      Arm Public Statements Identified By Dr. Kennedy Do Not Address Prospective

                Harms ......................................................................................................... 6

        C.      Testimony Identified By Dr. Kennedy Does Not Address Prospective Harms 12

        D.      Dr. Kennedy's Claim of Purported Benefit of Oryon Launch Is Misguided .... 14

        E.      Dr. Kennedy's Asserted Examples of Quantified Damages Are Not Applicable

                ................................................................................................................... 16

        i.      Arm's 2019 Nuvia Total Contract Value ("TCV") Amounts Are Not Applicable

                ................................................................................................................... 16

        ii.     Arm's 2021 Nuvia TCV Amounts Are Not Applicable ................................. 17

        iii.    Arm's Negotiations With Qualcomm Are Not Applicable .................................. 18

        F.      The "Available Methodologies to Quantify Damages" Identified By Dr.

                Kennedy Are Not Supported Or Applicable ............................................... 21

        i.      Dr. Kennedy's "Head Start" Methodology Is Unsupported And Does Not

                Address Harms At Issue .......................................................................... 21

        ii.     Dr. Kennedy's "Design Transfer Fee" Methodology Is Unsupported And Does

                Not Address Harms At Issue ...................................................................... 23

G.      Dr. Kennedy's Various Critiques Of My Initial Report Are Unpersuasive, Unsupported, And Incorrect .......................................................................................... 26

i.      Arm's "Systemic and Idiosyncratic Risks" Do Not Discount Harms From Defendants ......................................................................................................... 26

ii.      Dr. Kennedy Incorrectly Interprets RISC-V Threat ................................. 28

iii.      Dr. Kennedy Misunderstands Arm's "First Mover Advantage" ........................ 29

iv.      Dr. Kennedy's Assessment Of Arm's Research and Development Is Unsupported .................................................................................................. 30

v.      Dr. Kennedy's Assessment Of Harm To Goodwill Is Incorrect .......................... 31

VII.      OTHER ISSUES ........................................................................................................... 33

## I.    INTRODUCTION

1.      Plaintiff Arm Ltd. ("Arm" or "Plaintiff") has accused Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively, "Qualcomm") and Nuvia, Inc. ("Nuvia") (both collectively, "Defendants") of breaching the Nuvia Architecture License Agreement (the "Nuvia ALA").[1]  More specifically, I understand Arm alleges that Nuvia was acquired by Qualcomm without Arm's consent to assignment of the Nuvia ALA, and that Nuvia therefore breached ████████████████████████.[2]  I understand that Arm further alleges ██████████ ███████████████████████████████████████████████████ █ ███ ████████████████████████████████████████████████████████ █████████████████████████████████████████  As a remedy for Defendants' breach of the Nuvia ALA, I understand that Arm seeks specific performance of ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████

2.      I have been retained as an expert on behalf of Arm to assess and provide testimony regarding whether damages are adequate to compensate Arm for the harm caused by Defendants' breach of the Nuvia ALA.  On December 20, 2023, I submitted an expert report

---

[1] Complaint, August 31, 2022, pp. 16 – 18.
[2] Complaint, August 31, 2022, pp. 10 – 11; ARM_00111064 – 080 at 078.
[3] ██████████████████████████████████████████████████ ██████████████████████████
[4] Complaint, August 31, 2022, pp. 13 – 16; ARM_00111064 – 080 at 077.
[5] Complaint, August 31, 2022, pp. 16 – 18; ARM_00111064 – 080 at 077.  I am informed and understand that Arm is not requesting that any silicon (physical computer chips) made before Qualcomm's acquisition be destroyed, to the extent there are any.

containing my opinions ("Initial Report").  On February 27, 2024, Patrick F. Kennedy, Ph.D. issued his expert report ("Kennedy Report") which includes his rebuttal opinions to my Initial Report.  I have been asked to review the Kennedy Report and provide an assessment of Dr. Kennedy's opinions and critiques.  As stated in my Initial Report, I was asked to assume that Defendants are found liable for breach of the Nuvia ALA.  I offer no opinion regarding liability.

3.      My analysis, as set forth in this report, is based on information available to me as of the date of this report.

## II.   CREDENTIALS AND COMPENSATION

4.      I am a Senior Managing Director of J.S. Held LLC ("J.S. Held"), a global consulting firm providing specialized technical, scientific, financial, and advisory services.[6]  I currently serve as the firm's Intellectual Property Practice Lead.  My credentials were detailed in my Initial Report.  Attached as Schedule 1 to this report is a summary of my professional background and testifying experience, including all publications over the last ten years and all expert testimonies over the last four years.

5.      J.S. Held is compensated for my team's involvement in this matter based upon J.S. Held's hourly billing rates.  My time is currently billed at a rate of $695 per hour.  J.S. Held's fee is not contingent upon the outcome of this litigation or the opinions that I express.

## III.   INFORMATION REVIEWED AND CONSIDERED

6.      In connection with the preparation of this report, I have reviewed and considered information from a variety of sources, including documents and data produced by the parties; legal documents (and related exhibits); deposition testimony (and related exhibits); and publicly

---

[6] J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services.  J.S. Held is not a law firm and does not provide legal advice.

available information, articles, press releases, and Internet websites.  The documents and other information that I have reviewed and considered as of the date of this report include those cited throughout this report (including the footnotes) as well as those listed on Schedule 2 attached to this report.  I have also held discussions with Arm personnel, including Will Abbey (Executive Vice President & Chief Commercial Officer at Arm), Christine Tran (Senior Director of Legal at Arm), and Paul Williamson (Senior Vice President and General Manager of IoT Line of Business at Arm), as well as Arm's technical expert, Robert Colwell, Ph.D.  In addition, I have reviewed and considered the following deposition transcripts (and related exhibits):[7]

**Arm Personnel**

- Will Abbey, Executive Vice President & Chief Commercial Officer
- Jonathan Armstrong, Head of Brand and Creative Services
- Lynn Couillard, Vice President of Sales
- Richard Grisenthwaite, Executive Vice President & Chief Architect
- Rene Haas, Chief Executive Officer
- Tim Herbert, Vice President of North American Sales (retired)
- Simon Segars, Former Chief Executive Officer
- Karthik Shivashankar, Senior Director of Wearables and Commercial Licensing
- Christine Tran, Senior Director of Legal
- Ian Thornton, Vice President of Investor Relations
- Paul Williamson, Senior Vice President and General Manager of IoT Line of Business
- Mark Werkheiser, Distinguished Engineer

**Nuvia Personnel**

- Lynn Bos, former Technical Program Manager
- Manu Gulati, former Founder & Senior Vice President of Engineering
- Pradeep Kanapathipillai, former CPU Microarchitecture and RTL Lead
- Nitin Sharma, former CPU Verification Engineer
- Jignesh Trivedi, former CPU Verification Engineer
- Gerard Williams, III, former Founder & Chief Executive Officer

---

[7] Since the issuance of my Initial Report, I have received and reviewed the final deposition transcripts of those previously identified as rough transcripts in my Initial Report.

**Qualcomm Personnel**

- Cristiano Amon, President and Chief Executive Officer
- Ziad Asghar, Senior Vice President of Product Management
- Geeta Balakrishnan, Principal Engineer in the CAD Team
- Ramakrishna Chunduru, former Chief Procurement Officer
- Michael Roberts, Vice President of Global Marketing
- Laura Sand, Senior Vice President, Legal Counsel
- Rohit Singh, Director of Program Management
- James Thompson, Chief Technology Officer

7. In addition to the above, I have also reviewed and considered Dr. Kennedy's report, including the opinions, documents, and other information cited therein. In forming my opinions in this case, I have relied upon the information and documents identified in my Initial Report and this report, and I have also relied upon my more than 25 years of experience and expertise in analyzing remedies for misuse of intellectual property, analyzing the adequacy of damages to compensate for harms relating to the misuse of intellectual property, and assessing and calculating damages adequate to compensate for such harms. My analysis in this case is ongoing. Should additional information, such as documents or data provided by the parties, testimony, whether through expert report or deposition, or rulings issued by the Court, come to my attention after the date of this report, I may find it necessary to update or revise my analysis, opinions, and conclusions. I reserve my right to do so.

## IV. LEGAL FRAMEWORK FOR DAMAGES

8. The legal framework for specific performance and damages and my understanding of same are set forth in my Initial Report and are unchanged.

## V. SUMMARY OF OPINIONS

9. I have reviewed and considered the Kennedy Report as well as documents and information referenced by Dr. Kennedy. The Kennedy Report, including the documents and

information referenced by Dr. Kennedy, do not change the opinions expressed in my Initial Report.

## VI. ASSESSMENT OF THE KENNEDY REPORT

### A. Summary

10. The Kennedy Report sets forth numerous assertions in response to my Initial Report. Dr. Kennedy misunderstands or misrepresents the positions and support provided in my Initial Report and fails adequately to support his own opinions.

11. For example, Dr. Kennedy claims that "contrary to Mr. Schoettelkotte's opinions, assuming a liability finding in favor of Arm, Arm's damages are readily quantifiable with reasonable certainty, and such damages are adequate to compensate for Arm's alleged harm if Arm is successful in proving its claims."[8] But Dr. Kennedy misrepresents my opinions and fails to support his own opinion, as summarized below.

- Dr. Kennedy fails to recognize that the harms discussed in my Initial Report are prospective and are not harms that have already occurred. As such, his reliance on an alleged lack of past harm and Arm's current position is irrelevant. Arm's public statements regarding past events and Arm's current position, Arm personnel testimony regarding past events, Arm's past valuations of its Nuvia relationship, and Arm's past negotiations with Qualcomm do not establish that the prospective harms that I have identified in my Initial Report are unlikely to occur, or that any damages associated with any of those harms can be calculated with reasonable certainty and would be adequate to compensate Arm.

- Dr. Kennedy repeatedly approaches his analysis from the wrong frame of reference. His opinions are focused on the alleged value of Nuvia using Arm's technology (not the proper analysis), rather than the harms caused by Qualcomm misusing Arm's technology in an unlicensed manner that undermines the Arm licensing ecosystem.

- Dr. Kennedy does not provide any evidence showing that Arm's licensing ecosystem would not be substantially harmed if Defendants are found liable for the breach of the Nuvia ALA but are not ordered to discontinue the use and distribution of Arm Technology, Arm Confidential

---

[8] Kennedy Report, p. 17.

Information, and any products embodying such technology or information.

- Dr. Kennedy fails to demonstrate that the "available methodologies to quantify damages" that he identifies or any others (alone or in combination) are adequate to calculate damages for any of the harms identified in my Initial Report with reasonable certainty.

- Dr. Kennedy does not identify any specific formula, calculation, or quantitative or qualitative means that (alone or in combination) can be used to calculate the alleged damages associated with any of the harms identified in my Initial Report with reasonable certainty.

- Dr. Kennedy does not calculate, with reasonable certainty or otherwise, alleged damages that (alone or in combination with any other damages) are adequate to compensate Arm for any one or more of the harms identified in my Initial Report, or even identify a specific process and inputs for doing so.

- Dr. Kennedy's position that damages adequate to compensate Arm can be calculated with reasonable certainty is undermined by the fact that he fails to calculate *any* damage amounts for any one or more of the alleged harms (or any portion(s) of those harms) identified in my Initial Report.

- Dr. Kennedy's critiques of my Initial Report are unpersuasive, unsupported, and incorrect.  Dr. Kennedy mischaracterizes the opinions in my Initial Report and makes numerous incorrect or unsupported statements as a result.

12.   Throughout the remainder of this report, I provide my assessment of the discussion and conclusions set forth in the Kennedy Report.  Any lack of specific criticism is not meant to imply and is not agreement with Dr. Kennedy's opinions and conclusions.

**B. Arm Public Statements Identified By Dr. Kennedy Do Not Address Prospective Harms**

13.   Dr. Kennedy's first rebuttal section reveals Dr. Kennedy's fundamental misunderstanding of my Initial Report.  Specifically, Dr. Kennedy states that "Arm alleges the Defendants' actions have caused it harm, but Arm's public statements do not identify the

purported harms that are the subject of Mr. Schoettelkotte's report."[9]  Further, Dr. Kennedy states that "Mr. Schoettelkotte fails to acknowledge these public statements and nowhere addresses the fact that these statements contradict Mr. Schoettelkotte['s] allegations of harm."[10]  However, as my Initial Report plainly stated:

> [i]n my opinion, if Defendants are found liable for breach of the Nuvia ALA but are not ordered to discontinue the use and distribution of Arm Technology, Arm Confidential Information, and any products embodying such technology or information (including Nuvia-based Cores), then monetary damages are not adequate to compensate Arm for the harm (including future harm) caused by Defendants' breach of the Nuvia ALA. In my opinion, the monetary damages associated with the harm to Arm (including future harm) caused by Defendants' breach of the Nuvia ALA cannot be determined with reasonable certainty.
>
> I have considered the harms that Defendants' breach of the Nuvia ALA may cause to Arm, based on my discussions with Arm employees and review of the record, and described those harms [in my Initial Report].[11]

14.     Given that Arm's request for specific performance has not been addressed by the Court and denied, the harms discussed in my Initial Report have not yet transpired.  As such, the examples cited by Dr. Kennedy focusing on the existence of past harms are inapplicable and do not refute the prospective harms identified in my Initial Report.

15.     Dr. Kennedy claims that:

> Arm's public statements since the Defendants' alleged breach portray increasing royalty revenue, market share, and strength in Arm's ecosystem.  These public statements of financial health and affirming the strength of Arm's licensing ecosystem—which postdate Defendants' alleged breach of the Arm / Nuvia ALA—contradict the notion that Arm has been damaged to date, and Arm has not made any public disclosure of the type and extent of the harm suggest by Mr. Schoettelkotte.[12]

The Kennedy Report then references various public statements by Arm—none of which relate to

---

[9] Kennedy Report, p. 19.
[10] Kennedy Report, p. 19.
[11] Initial Report, p. 32.
[12] Kennedy Report, p. 19.

the harm that would result from a denial of Arm's request for specific performance.[13]

16.   Dr. Kennedy concludes that:

> [w]hile Mr. Schoettelkotte opines that Arm has and will suffer irreparable harm, Arm's statements to the public and public-facing documents contradict the type and scope of past or prospective future harm claimed by Mr. Schoettelkotte.  In its public statements and filings, Arm repeatedly highlights its strong financial performance, robust licensing position, and its plans for future growth and does not mention any significant weaknesses.[14]

Dr. Kennedy's conclusion simply highlights his misunderstanding of the harms identified in my Initial Report.  Notably, Dr. Kennedy ignores and does not consider Arm's public statements that identified material prospective harms that could result from this dispute.  Specifically, Dr. Kennedy did not include in his list public statements in Arm's Form F-1 filing that "[w]e have experienced, and may in the future experience, significant fluctuations in our period-to-period results of operations.  Our results may fluctuate and be unpredictable because of a variety of factors, including, among others:" "new litigation or developments in current litigation, including, but not limited to, a lawsuit with Qualcomm and Nuvia…."[15]  Further, Arm described the litigation with Qualcomm and indicated that "[o]ur complaint seeks, among other things, specific performance of the Nuvia ALA termination provisions to require Qualcomm and Nuvia to stop using and destroy the relevant Nuvia technology…."[16]  Arm also stated that "[w]e can provide no assurances regarding the outcome of the litigation, or how the litigation will affect our relationship with Qualcomm, which is currently a major customer of ours and accounted for 11% of our total revenue for the fiscal year ended March 31, 2023."[17]  Arm also indicated that

---

[13] Kennedy Report, pp. 20 – 24.
[14] Kennedy Report, p. 24.
[15] ARM_01259705 – 0105 at 735 – 736.
[16] ARM_01259705 – 0105 at 754.
[17] ARM_01259705 – 0105 at 754.

"because litigation and the outcome of regulatory proceedings are inherently unpredictable, our business, results of operations, financial condition and prospects could be materially adversely affected by an unfavorable resolution of one or more of these proceedings, claims, demands or investigations."[18] As such, Dr. Kennedy's claim that "Arm's statements to the public and public-facing documents contradict the type and scope of past or prospective future harm claimed by Mr. Schoettelkotte" is incorrect.[19] A full consideration of Arm's public statements only emphasizes the gravity of the potential harm to Arm considering its recent statements regarding the "strong financial performance, robust licensing position, and its plans for future growth" as described by Dr. Kennedy.

17.     The public statements identified by Dr. Kennedy relate to past events and do not address the prospective harms raised in my Initial Report. As such, Dr. Kennedy fails to indicate the relevance of the public statements for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm. As such, the public statements cited by Dr. Kennedy do not support his assertion that damages (as an alternative to specific performance) can be calculated with reasonable certainty or would be adequate to compensate Arm.

18.     While questioning the veracity of the harms identified in my Initial Report based on Arm's statements in its public filings, Dr. Kennedy also ignores that Qualcomm has also recognized in its public filings many of the same types of prospective threats to its own licensing ecosystem.

19.     For example, Qualcomm has also identified the risk of potential re-negotiations of

---

[18] ARM_01259705 – 0105 at 754.
[19] Kennedy Report, p. 24.

its license agreements as a result of legal proceedings.[20]  Specifically, Qualcomm has stated that it could be "required to reduce the royalty rates in [its] patent license agreements" as well as changes requiring the modification or renegotiation of its "existing license agreements or pursuing other commercial arrangements."[21]  Along with the risk of renegotiation, Qualcomm also identified the potential for transaction costs, stating:

> [t]o the extent we are required to implement any of these licensing and/or business practices, including by modifying or renegotiating our existing license agreements or pursuing other commercial arrangements, *we would incur additional transaction costs, which may be significant,* we could incur delays in recognizing revenues until license negotiations were completed, and our business, revenues, results of operations, cash flows and financial condition could be harmed.[22]

20.    Qualcomm also identifies in its own public filings the importance of its R&D as well as the link to its future success.  For example, Qualcomm states that "[w]hile we continue to invest significant resources toward advancements primarily in support of 5G-based technologies, we also invest in new and expanded product areas, and industries and applications beyond mobile handsets, but utilizing our existing technical and business expertise and through acquisitions or other strategic transactions."[23]  Qualcomm further stated that "[i]n particular, *our future growth* depends in part on new and expanded product areas, and industries and applications beyond mobile handsets…..  Accordingly, *we intend to continue to make substantial investments* in these new and expanded product areas, industries and applications, and in developing related products and technologies."[24]  Qualcomm also highlighted the impact on its future success if its efforts "on new and expanded product areas" are not successful, stating:

---

[20] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, pp. 28 – 29.
[21] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 29.
[22] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 29 (emphasis added).
[23] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 21.
[24] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 21 (emphasis added).

[i]f we are *not successful* in extending our technologies and products into new and expanded areas, and industries and applications beyond mobile handsets, if our new technologies and products are not successful, or if we are not successful in the time frames we anticipate, we may incur significant costs and asset impairments, *our business and revenues may not grow or grow as anticipated, our revenues and margins may be negatively impacted*, our stock price may decline and *our reputation may be harmed*.[25]

21.   In addition, Qualcomm indicated that a reduction in revenue would hinder its resources for research and development:

[t]he loss of any one of our significant customers, a reduction in the purchase of our products by any of these customers or the cancellation of significant purchases by any of these customers,…would reduce our revenues and could harm our ability to achieve or sustain expected results of operations.   A delay of significant purchases, even if only temporary, would reduce our revenues in the period of the delay.   *Any such reduction in revenues would also impact our cash resources available for other purposes, such as research and development.*[26]

22.   In addition, Qualcomm recognized that the misuse of its intellectual property could cause it reputational harm as well.   Specifically, Qualcomm stated:

[t]he misappropriation, theft, misuse, disclosure, loss or destruction of the technology, intellectual property, or the proprietary, confidential or personal information, of us or our employees, customers, licensees, suppliers or third parties, could harm our competitive position, reduce the value of our investment in research and development and other strategic initiatives, cause us to lose business, *damage our reputation*, subject us to legal or regulatory proceedings, cause us to incur other loss or liability and otherwise adversely affect our business.[27]

23.   Qualcomm's identification of many of the types of prospective threats and harms to its licensing ecosystem that were discussed in my Initial Report further supports the opinions set forth in my Initial Report.   This is because Qualcomm has itself acknowledged through public

---

[25] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 21 (emphasis added).
[26] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 19 (emphasis added).
[27] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 26 (emphasis added).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                      11

statements that the types of harms which Arm identified are of a similar risk to its own business.

24.     Additional public statements and statements from regulators support the importance of Arm's licensing ecosystem and corroborate the harms identified in my Initial Report.  For example, a complaint filed by the FTC in 2021 states that:

> Arm Processor Technology is at the foundation of many innovative products of our modern digital age, including nearly every smartphone on the market, advanced driver assistance features in recent and upcoming cars, web servers that can provide significantly better cost performance over the most comparable non-Arm servers, and many other examples. In these products, Arm Processor Technology is a critical input. The wide deployment of Arm's Processor Technology has fostered a vibrant ecosystem of software and hardware developers, software, and devices.[28]

### C.   Testimony Identified By Dr. Kennedy Does Not Address Prospective Harms

25.     Continuing his apparent misunderstanding of my Initial Report, Dr. Kennedy states that "[n]ot only do Arm's public statements indicate that Arm has not been harmed, Arm's witnesses, including those Mr. Schoettelkotte relies on heavily in his report, testified that no actual harm has been experienced by Arm.  These statements by Arm's own personnel contradict allegations that Arm has been harmed."[29]  Dr. Kennedy goes on to cite and discuss testimony from Arm personnel related to the existence of *past* harm, at the time of their depositions, with Arm's lawsuit pending and the Court yet to rule on specific performance.[30]  Dr. Kennedy ignores the testimony discussed in my Initial Report that relates to the *future* harms that may flow from a denial of Arm's request for specific performance.  Dr. Kennedy's focus on the existence of *past* harm is irrelevant.  As discussed in my Initial Report, the harm to Arm is *prospective*, and evidence of that prospective harm is not contradicted or undermined by Arm witness testimony regarding

---

[28] Complaint, In the Matter of Nvidia Corporation, Softbank Group Corporation, and Arm, Ltd., Docket No. 9404, Federal Trade Commission, December 2, 2021, p. 2 (https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf).
[29] Kennedy Report, p. 24.
[30] Kennedy Report, pp. 24 – 26.

past harm.  Dr. Kennedy also ignores testimony by Arm witnesses, cited below and in my Initial Report, showing the likelihood of the prospective harms to Arm's licensing ecosystem if specific performance is not ordered in this case.

26.    For example, as cited in my Initial Report, Mr. Williamson testified concerning "████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████"[31]  Mr. Williamson further testified that Arm's damages are "inestimable,"[32] and that:



27.    Mr. Abbey also stated that Qualcomm "████████████████████████████████

████████████.  Arm intellectual property is in that design, and therefore, it causes brand damage to Arm."[34]  Further, Mr. Abbey testified that ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████."[35]  Mr. Williamson testified that "ARM has a reputation of trust with its partners who build technology based on ARM's technology and services associated with it.  Their success is a shared success business with ARM, and trust is an important element of that continuing business practice."[36]    Similarly,

---

[31] Deposition of Paul Williamson, November 9, 2023, pp. 243 – 244.
[32] Deposition of Paul Williamson, November 9, 2023, p. 244.
[33] Deposition of Paul Williamson, November 9, 2023, pp. 244 – 245.
[34] Deposition of Will Abbey, October 27, 2023, p. 361.
[35] Deposition of Will Abbey, October 27, 2023, p. 361.
[36] Deposition of Paul Williamson, November 9, 2023, p. 246.

Mr. Williamson testified that ." [37]   Mr. Haas testified that Arm is "

" and that if it "

." [38]

28.    In sum, the testimony identified by Dr. Kennedy largely relates to past events and does not address the prospective harms raised in my Initial Report.  Dr. Kennedy fails to indicate the relevance of the testimony for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the testimony cited by Dr. Kennedy does not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

**D.  Dr. Kennedy's Claim of Purported Benefit of ▮▮▮ Launch Is Misguided**

29.    Dr. Kennedy claims that "[w]hile Arm alleges that the Defendants' alleged breach has caused harm, Qualcomm's development efforts and business plans related to the development of custom Arm-compliant CPUs in certain markets will actually benefit Arm.  Specifically, Qualcomm's development efforts of its Arm-compatible ▮▮▮ CPU cores (▮ ▮▮▮ will likely lead to increased royalties for Arm.  Mr. Schoettelkotte ignores this in his report." [39]  Dr. Kennedy subsequently identifies discussion of Qualcomm's intention to enter the PC market with the ▮▮▮.  Dr. Kennedy concludes that "any market share that

---

[37] Deposition of Paul Williamson, November 9, 2023, p. 246.
[38] Deposition of Rene Haas, December 12, 2023, pp. 164 – 165.
[39] Kennedy Report, p. 26.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Qualcomm gains in the PC market is market share gained for Arm versus x86 alternatives. Further, Qualcomm's sales of ████████ will generate royalties for Arm under the Arm / Qualcomm ALA.   Therefore, Qualcomm's development of the ████████ will generate additional royalties for Arm from an increased volume of shipments for the PC market."[40]

30.   As discussed in my Initial Report, I understand that ████████████████

████████████[41]  Further, I understand that the ████████████████



██████████████████████████ Dr. Kennedy fails to recognize the significance that ████████████

████████.   As such, the impending launch of the ████████, should the court not order specific performance, is an event signaling to Arm's licensing ecosystem and the market more broadly that licensees "can do anything [they] want with Arm technology,"[43] leading to the harms that are addressed in my Initial Report.

31.   In sum, the alleged benefit of ██████ sales identified by Dr. Kennedy does not address the prospective harms raised in my Initial Report.   Dr. Kennedy fails to indicate the relevance of this alleged benefit for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm for harms beyond

---

[40] Kennedy Report, p. 30.

[41] Correspondence dated 10/26/2023, email from J. Braly to J. Li; Deposition of Mike Roberts, November 28, 2023, pp. 35 – 37.

[42] ARM_01238999 – 9003; *see also* ARM_01215997 – 6001 at 997 ████████████████████████ ██████ QCARM_2417783 ██████

[43] Deposition of Will Abbey, October 27, 2023, p. 361.

any ███ royalties. That is, even if Arm may receive royalties for ████, those royalties must be offset by the many-faceted and interconnected types of harm to Arm identified in my Initial Report, which Dr. Kennedy has not calculated, let alone shown would be net positive when considering ████ royalties (as his opinions implicitly assume).  As such, the alleged benefit raised by Dr. Kennedy does not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### E.  Dr. Kennedy's Asserted Examples of Quantified Damages Are Not Applicable

32.   Dr. Kennedy states that "Mr. Schoettelkotte contends that damages cannot be quantified, while ignoring the extensive evidence that Arm has expended time and effort quantifying what it sought as adequate compensation."[44]  Dr. Kenndy identifies two instances in which he alleges that Arm has quantified "damages":

- "At the time of the Arm / Nuvia ALA, Arm calculated the expected total contract value ("TCV") of the Arm / Nuvia license agreements[;]"[45] and

- "Arm inflated its valuation of the Nuvia ALA during its commercial negotiations with Qualcomm[.]"[46]

### i.  Arm's 2019 Nuvia Total Contract Value ("TCV") Amounts Are Not Applicable

33.   Dr. Kennedy states that he "understand[s] that at the time of the Arm / Nuvia license agreements were being negotiated in 2019, ████████████████████████████ ████████████████████████████████████."[47]  Dr. Kennedy goes on to identify several Arm documents regarding the Arm / Nuvia negotiations and Arm's

---

[44] Kennedy Report, p. 31.
[45] Kennedy Report, p. 31.
[46] Kennedy Report, p. 33.
[47] Kennedy Report, p. 31.

analysis of the Nuvia relationship in 2019.[48]

34.   The 2019 TCV amounts identified by Dr. Kennedy are irrelevant as they do not address the prospective harms raised in my Initial Report from Qualcomm proceeding with unlicensed technology.   Dr. Kennedy fails to indicate the relevance of these amounts for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.   Indeed, the 2019 TCV amounts were calculated before Nuvia and Qualcomm breached the Nuvia ALA.   As such, the 2019 TCV amounts do not support that damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### ii.   Arm's 2021 Nuvia TCV Amounts Are Not Applicable

35.   Dr. Kennedy states that he "understand[s] that Arm re-evaluated the TCV and expected royalties associated with the Nuvia contract during the period of commercial negotiations with Qualcomm regarding the Nuvia acquisition."[49]  Dr. Kennedy then discusses ████████████████████████████████████████████████████████████ Dr. Kennedy concludes that "███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████"[51]

36.   The 2021 TCV amounts identified by Dr. Kennedy are irrelevant as they do not address the prospective harms raised in my Initial Report from the failure to reach a deal and the

---

[48] Kennedy Report, pp. 31 – 33.
[49] Kennedy Report, p. 33.
[50] Kennedy Report, pp. 33 – 35.
[51] Kennedy Report, p. 35.

impact on Arm from Qualcomm proceeding with unlicensed technology. Dr. Kennedy fails to indicate the relevance of these amounts for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm. Further, while describing the 2021 TCV amounts as "inflated," Dr. Kennedy provides no explanation as to why the amounts are allegedly "inflated." As such, the 2021 TCV amounts do not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### iii. Arm's Negotiations With Qualcomm Are Not Applicable

37. Dr. Kennedy states that "Arm sought ████████████████████████████ ████████████████████████████████████████████████████████ and adjustments to ████████████████ in various market segments. Arm and Qualcomm engaged in extensive back and forth negotiations regarding Arm's request for compensation in connection with the acquisition."[52] Dr. Kennedy then discusses documents regarding negotiations between Arm and Qualcomm that included ████████████████████████████████ ████████████████████████████—all of which would have been related to Qualcomm's continued use of Arm's technology in an authorized/licensed manner.[53]



38. Dr. Kennedy states that "[t]hese commercial negotiations address issues at play in this litigation, and, therefore, demonstrate that Arm has been able to attach a monetary value to the issues in this litigation."[54] Dr. Kennedy further states that:

---

[52] Kennedy Report, p. 35.
[53] Kennedy Report, pp. 35 – 41; ARM_00086285 – 293; QCARM_3537713 – 715; QCARM_3535535 – 536; QCARM_7434227 – 229; ARM_01305785 – 789; ARM_00000017 – 018.
[54] Kennedy Report, p. 41.

> [t]he relevant issue here is not whether Arm's inflated value of the TCV is correct, but instead that Arm was able to calculate a value that it used in negotiations to seek compensation for Qualcomm's alleged use of the Nuvia-based designs, thus illustrating that the value of the Nuvia agreement could be monetized and calculated.  Yet, Mr. Schoettelkotte ignores this evidence of valuation.[55]

39.    Dr. Kennedy's discussion and conclusion of the amounts from the negotiations demonstrate his misunderstanding of my Initial Report and Arm's claims in this matter. Specifically, each of the offers discussed by Dr. Kennedy pre-date this lawsuit and a denial of Arm's requested specific performance, and thus necessarily exclude "issues in this litigation," including the harm to Arm's licensing program if Qualcomm were permitted to proceed with unlicensed technology.  When Arm made offers during negotiations, those amounts reflected an agreement to allow Qualcomm's continued use of Arm Technology pursuant to agreed terms and conditions.  Further, had Arm and Qualcomm agreed to resolve their dispute at that time, this would signal to Arm's licensees, prospective licensees, and the market that Arm controlled its technology, could enforce the terms of its license agreements, and that Arm's customers had to respect and compensate Arm for the use of its technology.  That is the opposite of the signal that would be publicly sent to Arm's licensees, prospective licensees, and the market if Qualcomm were known to have used Arm's technology in an unauthorized manner but the Court *denied* Arm's request for specific performance.  In fact, in an email exchange cited by Dr. Kennedy, ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ █  ████████████████████

███████████████████████████████████████████████████████████████

---

[55] Kennedy Report, p. 42.
[56] QCARM_3537713 – 715 at 713.

███████████████████████████████   The error of Dr. Kennedy's conclusion is apparent in his claims that the offers address "issues at play in this litigation, and, therefore, demonstrate that Arm has been able to attach a monetary value to the issues in this litigation," or that the "relevant issue" is "that Arm was able to calculate a value that it used in negotiations to seek compensation for Qualcomm's alleged use of the Nuvia-based designs." Because Dr. Kennedy is not analyzing the type of harms set forth in my Initial Report, his statements and conclusions are incorrect.  As such, the negotiation amounts would not adequately compensate Arm for those harms.  Dr. Kennedy also does not explain how the amounts from the negotiations can be used to calculate damages for the harms identified in my Initial Report with reasonable certainty or would be adequate to compensate Arm.

40.    As a final matter, I understand there may be a dispute regarding the admissibility of the documents related to these negotiations.  As such, I have included the response above solely to address Dr. Kennedy's discussion of these documents to the extent the Court were to allow any of this information to be considered or addressed by experts in this case.

41.    As discussed above, the negotiation amounts identified by Dr. Kennedy are irrelevant as they do not address the prospective harms raised in my Initial Report.  Dr. Kennedy fails to indicate the relevance of these amounts for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the amounts identified by Dr. Kennedy do not support that damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**F.    The "Available Methodologies to Quantify Damages" Identified By Dr. Kennedy Are Not Supported Or Applicable**

42.    Dr. Kennedy states that "Mr. Schoettelkotte ignores that, even if Arm had not attached a value to the issues in this litigation [], there are well established methodologies that could be used to calculate damages[]: (1) quantification of the alleged head start damages, and (2) utilization of previous design transfer fees as a proxy for adequate compensation."[57]    As discussed below, Dr. Kennedy fails to demonstrate that either of these "available methodologies" address the harms identified in my Initial Report, that they can be used to determine damages for such harms with reasonable certainty, or that they would be adequate to compensate Arm.

**i.    Dr. Kennedy's "Head Start" Methodology Is Unsupported And Does Not Address Harms At Issue**

43.    Dr. Kennedy states that "Arm alleges that Qualcomm received a head start by using certain Arm intellectual property.  That is, Qualcomm was allegedly able to save development time and will be able to commercialize its custom CPUs for certain market segments earlier than it otherwise would have.  For head start damages in this litigation, this benefit, (i.e., Qualcomm's head start) would be tied to its alleged improper use of certain technology as opposed to other independent development efforts."[58]  Dr. Kennedy also states that "[i]n this matter, the financial consequence of Qualcomm's alleged head start to Arm would be that Qualcomm will shift from higher TLA royalty rates to lower ALA royalty rates earlier than it otherwise would have for certain market segments."[59]

44.    Dr. Kennedy asserts that "[o]nce the head start period is determined, the specific calculation of damages would flow directly from the application of royalty rates to units sold over the appropriate head start period.  Further, because Qualcomm intends to release its custom

---

[57] Kennedy Report, p. 45.
[58] Kennedy Report, p. 45.
[59] Kennedy Report, pp. 47 – 48.

CPU products in various market segments at different times, and because of the dynamics that are unique to each market segment, Qualcomm's alleged head start and Arm's resulting damages, if any, would need to be quantified on a market-by-market basis…."[60] Dr. Kennedy further claims that "these [head start] damages would provide adequate compensation to Arm as it ties the alleged harm (i.e., lost royalties) back to the specific alleged wrongful conduct (i.e., Defendants' breach and alleged improper use of Arm's intellectual property)."[61]

45.    Dr. Kennedy is incorrect.  Dr. Kennedy approaches damages in this matter as if Arm's claim was one for misappropriation of trade secrets.[62]  However, as indicated at the beginning of my Initial Report and this report, I understand this matter relates to the Defendant's alleged breach of the Nuvia ALA and the impact of the court denying Arm's request for specific performance.  As such, Dr. Kennedy is not addressing the relevant harms as identified in my Initial Report.

46.    Critically, Dr. Kennedy has not demonstrated that the "head start" methodology described in his report can be used to calculate damages associated with all the harms to Arm addressed in my Initial Report (let alone with reasonable certainty) or would be adequate to compensate Arm for those harms that are distinct from the benefit to Qualcomm from any head start.

47.    In conjunction with the fact that Dr. Kennedy's "head start" methodology does not properly address the prospective harms identified in my Initial Report, he fails to include a calculation demonstrating the viability of the methodology he purports to be appropriate. Indeed, Dr. Kennedy claims his "head start" methodology "can be calculated with reasonable

---

[60] Kennedy Report, p. 53.
[61] Kennedy Report, pp. 56 – 57.
[62] Indeed, Dr. Kennedy cites to a treatise entitled "*Commentary on Monetary Remedies in Trade Secret Litigation*."

certainty."[63]  Yet, Dr. Kennedy has not proven that to be the case by employing the methodology he asserts is appropriate.  Indeed, public statements made by Mr. Amon indicate that the benefit to Qualcomm and resultant harm to Arm from a head start due to Nuvia is not easily quantifiable. In April 2021, Mr. Amon stated "The NUVIA asset give[s] us a lot of flexibility.  You should think about it as having a scalable leading CPU asset to together with the other Qualcomm assets."[64] Mr. Amon further stated that "the transition across the board to ARM architecture really create[s] a big expansion opportunity for Qualcomm, and we're very focused to make that happen with a leading position leveraging the NUVIA CPU.  Having said that, I think this asset gives us a lot of flexibility to continue to be expanding to all the different business vectors we're building in the company."[65]

48.  As discussed above, Dr. Kennedy's "head start" methodology is irrelevant as it does not address the prospective harms raised in my Initial Report.  Dr. Kennedy fails to indicate the relevance of this methodology for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the "head start" methodology identified by Dr. Kennedy does not support that damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

ii.  **Dr. Kennedy's "Design Transfer Fee" Methodology Is Unsupported And Does Not Address Harms At Issue**

49.  Dr. Kennedy states that "[w]hile [he] understand[s] that Qualcomm asserts that a

---

[63] Kennedy Report, p. 56.
[64] https://seekingalpha.com/article/4422252-qualcomm-incorporateds-qcom-ceo-steve-mollenkopf-on-q2-2021-results-earnings-call-transcript.
[65] https://seekingalpha.com/article/4422252-qualcomm-incorporateds-qcom-ceo-steve-mollenkopf-on-q2-2021-results-earnings-call-transcript.

novation, or an assignment of contracts between parties, is not necessary, previous consents and novations, along with associated fees, demonstrate that Arm was willing to ███████████████ ████████████████████████████████████████████████.”[66]  Dr. Kennedy further claims that "Arm's acceptance of a fee in these situations illustrates that Arm was willing to accept monetary compensation in other acquisitions involving Arm licensees."[67]  In addition, Dr. Kennedy concludes that "Arm consents, novates, and in certain instances, receives a fee for such novation. These types of transactions occur in the normal course of Arm's business and do not result in the purported harm that Arm has alleged and that Mr. Schoettelkotte opines on in his report."[68]

50.   As with his "head start" assessment, Dr. Kennedy has not demonstrated that the "design transfer fee" methodology can adequately compensate Arm for the types of harms enumerated in my Initial Report.  Further, Dr. Kennedy does not demonstrate that the "design transfer free" methodology can compensate for the harms discussed in my Initial Report with reasonable certainty.  Specifically, Dr. Kennedy has not shown how his "design transfer fee" methodology addresses the facts of this case.  As discussed previously in this report and in my Initial Report, a denial of specific performance would signal to Arm's licensing ecosystem and the market more broadly that licensees "can do anything [they] want with Arm technology,"[69] leading to the harms that are addressed in my Initial Report.  Nothing in the Kennedy Report indicates that Dr. Kennedy's "design transfer fee" methodology would address these harms, in particular because he fails to identify a specific amount or perform an analysis of how said design transfer fee would compensate for the harms identified in my Initial Report.

---

[66] Kennedy Report, p. 57.
[67] Kennedy Report, p. 57.
[68] Kennedy Report, p. 59.
[69] Deposition of Will Abbey, October 27, 2023, p. 361.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    24

51. Dr. Kennedy also fails to grasp that the circumstances surrounding the examples he discusses ████████████████████████) are not present in the dispute between Arm and the Defendants. Specifically, Dr. Kennedy does not state whether the ████████████ ████████████████████████ (or other examples) involved any risk of a signal to the market of the enforceability of Arm's license agreements. Rather, the novation amounts reflected an agreement to allow the parties continued use of Arm technology subject to their respective agreements, thereby affirming Arm's control of its licensing program and terms, rather than undermining the program and terms, as Qualcomm's continued use would absent specific performance. Further, the circumstances surrounding the novations did nothing to give the perception that Arm's license agreements are not enforceable. However, in this matter, after Nuvia and Qualcomm's breach, a denial of specific performance would signal to the market that Arm lacks the ability to enforce its license agreements, which would be *opposite* as when the novation payments occurred. As such, those "normal course" events are not applicable to the now public dispute between Arm and the Defendants. Because Dr. Kennedy is not analyzing the type of harms set forth in my Initial Report, his statements and conclusions are incorrect.

52. Finally, I note that Dr. Kennedy does not cite any treatises establishing that the use of "previous design transfer fees" is a "well established methodolog[y] that [can] be used to calculate damages"[70] in a matter involving a breach of contract.

53. As discussed above, Dr. Kennedy's "design transfer fee" methodology is irrelevant as it does not address the prospective harms raised in my Initial Report. Dr. Kennedy fails to indicate the relevance of this methodology for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those

---

[70] Kennedy Report, p. 45.

harms can be determined with reasonable certainty and would adequately compensate Arm. As such, Dr. Kennedy's "design transfer fee" methodology does not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### G. Dr. Kennedy's Various Critiques Of My Initial Report Are Unpersuasive, Unsupported, And Incorrect

54.    The remaining portion of the Kennedy Report includes various critiques of sections of my Initial Report. As an initial matter, I note that throughout his report, Dr. Kennedy mischaracterizes the opinions set forth in my Initial Report (and reiterated above in this report).[71] Below I address certain of Mr. Kennedy's assessments. As previously stated in this report, any lack of specific criticism is not meant to imply and is not agreement with Dr. Kennedy's opinions and conclusions.

### i.    Arm's "Systemic and Idiosyncratic Risks" Do Not Discount Harms From Defendants

55.    Dr. Kennedy claims that "Mr. Schoettelkotte conflates Arm's systemic and idiosyncratic risks with risk purportedly associated only with Qualcomm's alleged actions. However, many of Arm's purported harms exist simply due to the nature of Arm's business, and Mr. Schoettelkotte has not differentiated the harms purportedly due to Defendants' alleged wrongful conduct from harms that are due to the nature of Arm's inherent business risks."[72] Dr. Kennedy makes similar claims throughout his report, such as the examples below.

- "Mr. Schoettelkotte fails to distinguish existing and prospective licensees' possible demand for lower royalties that could occur in the normal course of business, versus the demand for 'more favorable terms' that he identifies as purported harm to Arm."[73]

- "Based on Arm's own submissions to the SEC, CMA, and FTC, it is evident

---

[71] *See, e.g.,* Kennedy Report, pp. 62, 70, 73 – 75, 81 – 82, and 92 – 95.
[72] Kennedy Report, p. 61.
[73] Kennedy Report, p. 64.

that Arm encounters attempts by licensees to renegotiate the terms of the existing license agreements in the normal course of business, and such activity occurs separately from Defendants' alleged actions."[74]

- "Mr. Schoettelkotte's opinions fail to differentiate between activity and business risks that occur in the normal course of Arm's business and what he claims is wrongful conduct by Defendants."[75]

- "This competitive environment is not a purported harm, but rather a general business risk that exists within Arm's business model, including granting rights under ALAs to Qualcomm and to other manufacturers."[76]

- "Thus, 

56.   Dr. Kennedy fails to recognize that while the prospective harms addressed in my Initial Report are not unlike some of the risks identified by Arm in its public statements, the harms discussed in my Initial Report would be tied to a denial of specific performance and are over and above any "systemic and idiosyncratic" risks Arm has otherwise identified in its public statements (if Qualcomm proceeds with unlicensed technology, it will exacerbate those types of harm, along with imposing others).  Further, Dr. Kennedy fails to recognize the impact of the prospective harms identified in my Initial Report because they are related to the actions of one of Arm's largest licensees flouting Arm's license agreement (in the event specific performance is denied).  Notably, Dr. Kennedy's above cited examples do not reflect that Arm has addressed the impacts that may result from this matter in its public filings, as discussed previously in this report and my Initial Report.

---

[74] Kennedy Report, pp. 65 – 66.
[75] Kennedy Report, p. 73.
[76] Kennedy Report, pp. 75 – 76.
[77] Kennedy Report, p. 93.

### ii.     Dr. Kennedy Incorrectly Interprets RISC-V Threat

57.    Regarding RISC-V, Dr. Kennedy states that "[c]ustomers adopted RISC-V for reasons unrelated to Qualcomm's alleged actions."[78]  Dr. Kennedy appears to be making a claim that is not stated in my Initial Report.  Nowhere in my Initial Report do I state that customers adopted RISC-V due to Defendants' alleged actions.  Further, Dr. Kennedy asserts that there is a contradiction in my Initial Report.[79]    However, this is yet another misunderstanding (or mischaracterization) on Dr. Kennedy's part.  Dr. Kennedy's discussion of RISC-V does not negate that RISC-V is a present—yet not a fully-fledged—threat to Arm as discussed in my Initial Report and below.

58.    Dr. Kennedy indicates that "Mr. Schoettelkotte does not explain how Qualcomm's alleged actions influence other licensees and market participants to shift away from Arm-based CPUs to RISC-V-based CPUs.  Prior to Qualcomm's alleged actions, RISC-V already had a presence in the marketplace and some of Arm's customers and licensees adopted this technology."[80]  In support of his statement, Dr. Kennedy identifies an ███████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ █ Based on these documents, Dr. Kennedy concludes that "█████████████████████████████████████████████████████████████████ ██████████████████████████████  ███████████████████████████████████████ █████████████████████████████ █ On this conclusion, Dr. Kennedy and I agree.  Yet, the harm discussed in my Initial Report is related to *prospective* harm that would arise if Arm's request for specific performance is denied.

---

[78] Kennedy Report, p. 79.
[79] Kennedy Report, pp. 79 – 80.
[80] Kennedy Report, p. 80.
[81] Kennedy Report, pp. 80 – 81; ARM_01282466 – 575; ARM_00120530 - 536.
[82] Kennedy Report, pp. 80 -81.

59.     As noted in my Initial Report, "the threat of RISC-V is considered to be low because RISC-V is immature compared to Arm and 'doesn't have the same level of support.'  RISC-V does not have the ecosystem that has been developed by Arm."[83]  Further, as the documents cited by Dr. Kennedy illustrate, ███████████████████████████████████████████ However, the harms to Arm's ecosystem discussed in my Initial Report could provide an opportunity for alternatives such as RISC-V to compete with Arm, if Arm were weakened financially or reputationally.  For example, the March 2023 Arm document cited by Dr. Kennedy supports this assessment of RISC-V.  The document indicated that the ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████ Further, the document indicated that a ███████████████████ █████████████████.[85]  Specifically, the document noted that ████████████ ████████████████████████████████████████████" and "███████████ ████████████████████████████████████ ████████████████████ Notably the document indicated that one of Arm's differentiators from RISC-V included Arm's brand reputation, stating that "Arm is the trusted supplier of IP to the largest tech firms in the world."[87]  This highlights the relevance of the harms discussed in my Initial Report, and how those harms discussed could increase the potential risk of competition, including from RISC-V, if specific performance is not ordered.

###     iii.     Dr. Kennedy Misunderstands Arm's "First Mover Advantage"

60.     Dr. Kennedy claims:

---

[83] Initial Report, pp. 43 – 44.
[84] ARM_00120530 – 536 at 532.
[85] ARM_00120530 – 536 at 531.
[86] ARM_00120530 – 536 at 531.
[87] ARM_00120530 – 536 at 535.

> [i]t is unclear what Mr. Schoettelkotte means by a 'first mover advantage,' what the benefits of Arm's mover advantage are, which markets he purports to apply it to, and the basis for Mr. Schoettelkotte's opinion that Qualcomm has denied Arm any of these purported benefits through Qualcomm's alleged wrongful conduct. Nor has Mr. Schoettelkotte provided any support showing that Arm in fact has a first mover advantage, however defined.[88]

Further, Dr. Kennedy states that "[a]s a threshold matter, Mr. Schoettelkotte does not define what he considers Arm's 'first mover advantage' to be or how Arm purportedly derives benefit from its purported 'first mover advantage.'"[89]

61.    Dr. Kennedy's misunderstanding is perplexing.  My Initial Report identifies the mobile phone segment numerous times in describing Arm's first mover advantage and how that advantage might translate to other segments, depending on business plans Arm might choose to pursue (but that might be foreclosed if Qualcomm were permitted to continue using unlicensed technology).[90]  Dr. Kennedy even identifies Arm's prevalence of "Arm-compatible CPUs, as components of SoCs," that "are in close to 100% of smartphones."[91]  However, Dr. Kennedy then goes on to discuss his view regarding Arm's loss of its first mover advantage being "inconsistent with history."[92]  But given Dr. Kennedy's misunderstanding of the first mover advantage discussed in my Initial Report, his conclusions do not apply.

### iv.    Dr. Kennedy's Assessment Of Arm's Research and Development Is Unsupported

62.    Dr. Kennedy claims that "Arm's R&D expenses are not as directly tied to revenues as Mr. Schoettelkotte claims them to be."[93]  Dr. Kennedy's assertion is particularly surprising given that Arm states in its public filings that it "architect[s], develop[s], and license[s] high-

---

[88] Kennedy Report, p. 81.
[89] Kennedy Report, p. 83.
[90] Initial Report, pp. 45 – 47.
[91] Kennedy Report, p. 83.
[92] Kennedy Report, p. 83.
[93] Kennedy Report, p. 92.

performance, low-cost, and energy-efficient CPU products and related technology" (*i.e.*, does not manufacture a product) and that R&D "is at the heart of [its] business and critical to [its] future success."[94]  Indeed, Arm's R&D expenses have outpaced its spending for Selling, General, and Administrative expenses since fiscal year 2019, and has been Arm's largest expense category since fiscal year 2019 at 44% of revenue.[95]  Further, Arm's R&D expenses as a percentage of revenue far exceed those of Qualcomm and the companies included within SIC 3674 (Semiconductors and Related Devices).  As shown in Schedule 3, for the period 2019 through 2023, Arm's R&D as a percentage of revenue was 40% while Qualcomm's was 22%.  Further, as shown in Schedule 5, the average R&D expense as a percentage of revenue for SIC 3674 was 10%.

63.    As such, Dr. Kennedy's claim that Arm's R&D activities are not tied to its revenues is unsupported given the magnitude of Arm's R&D expenses as percentage of revenue and how it compares to other companies in the industry.

### v.    Dr. Kennedy's Assessment Of Harm To Goodwill Is Incorrect

64.    Dr. Kennedy claims that "from a damages perspective, harm to goodwill is a quantitative conclusion based upon the financial impact that an event has on a business's ability to generate future profit."[96,97] Dr. Kennedy further states that "Arm's public disclosures state that it has identified 'no indication of impairment' to its goodwill over its last three fiscal years."[98] Finally, Dr. Kennedy states that "Mr. Schoettelkotte presents no analytical or quantitative foundation for the claim that Arm's brand and reputation has been damaged or will be imminently damaged as a result of the Defendant's alleged breach, and his claims are

---

[94] ARM_01259705 – 0105 at 712 and 804.
[95] See Schedules 3 and 4.
[96] Kennedy Report, p. 94.
[97] I note that the cited pages to the *Litigation Services Handbook* do not support Dr. Kennedy's statement.
[98] Kennedy Report, p. 94.

contradicted by Arm's public disclosures in its SEC filings."[99]

65.    Due to Dr. Kennedy's misunderstanding of my Initial Report, he has focused on *past* events rather than the *prospective* harm related to Arm's goodwill if Qualcomm were permitted to proceed with unlicensed technology.   As such, Dr. Kennedy's stating that Arm has not identified any "indication of impairment" to its goodwill over the last three years is irrelevant. Rather, contrary to Dr. Kennedy's assertion, Arm's public disclosures *have* identified the potential harm due to the dispute at issue.   Notably, in its Form F-1 filing, Arm stated "[w]e have experienced, and may in the future experience, significant fluctuations in our period-to-period results of operations.   Our results may fluctuate and be unpredictable because of a variety of factors, including, among others:" "new litigation or developments in current litigation, including, but not limited to, a lawsuit with Qualcomm and Nuvia…."[100]  Further, Arm described the litigation with Qualcomm and indicated that "[w]e can provide no assurances regarding the outcome of the litigation, or *how the litigation will affect our relationship with Qualcomm*, which is currently a major customer of ours and accounted for 11% of our total revenue for the fiscal year ended March 31, 2023."[101]  In addition, Arm stated that "our involvement in such litigation *could cause us to incur significant reputational damage in the industry, in our relationship with Qualcomm or in our relationship with other third-party partners*."[102]

66.    Further, despite claiming "harm to goodwill is a quantitative conclusion," Dr. Kennedy identifies no methodology that would measure prospective harm to goodwill.   Neither does Dr. Kennedy explain how the "available methodologies" he asserts earlier in his report would include the prospective harm to Arm's goodwill.

---

[99] Kennedy Report, p. 95.
[100] ARM_01259705 – 0105 at 735 – 736.
[101] ARM_01259705 – 0105 at 754 (emphasis added).
[102] ARM_01259705 – 0105 at 754 (emphasis added).

## VII.   <u>OTHER ISSUES</u>

67.   This report represents my analysis, opinions, and conclusions at this time and is based on information available to me as of the date above.  The citations listed in this report are illustrative, and as part of my analysis, I also considered the additional documents and other information listed on Schedule 2.  If additional information or testimony becomes available to me, I may revise or supplement my analysis, opinions, and conclusions, and I may modify or supplement my report as necessary.  I may testify at trial regarding any related matter raised by the parties after the date of this report if asked to do so by the Court or the parties' attorneys.  I may be asked to develop additional schedules or exhibits for trial purposes related to my analysis, opinions, and conclusions.  I may also be asked to develop and rely on demonstratives at trial or any pre-trial proceeding.  I may also be asked to develop additional schedules or exhibits if asked to do so by the Court or the parties' attorneys, post-trial.  This report is intended solely for use in the above-referenced litigation and is not to be used for any other purpose.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**OCEAN TOMO**®

**Schedule 1**

A PART OF  JS|HELD

# W. Todd Schoettelkotte, CPA, CVA
*Senior Managing Director*

333 Clay Street, Suite 3960
Houston, Texas 77002
713-335-5455 | tschoettelkotte@jsheld.com

**Certifications**
Certified Public Accountant, Texas
Certified Valuation Analyst

**Professional Affiliations**
State Bar of Texas' Grievance
Committee, Committee Member,
2004 – 2009

Federal Bar Association,
South Texas Chapter, Treasurer,
2007 – 2015

Institution for Law and Technology
Advisory Board Member

**Associations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

Licensing Executives Society

National Association of Certified
Valuators and Analysts

**Education**
Master of Accounting
Rice University, Houston, TX

BS Management
Rice University, Houston, TX

W. Todd Schoettelkotte is a Senior Managing Director of Ocean Tomo, a part of J.S. Held LLC, a global consulting firm providing specialized technical, scientific, financial, and advisory services. Mr. Schoettelkotte has more than 25 years of experience in the evaluation and quantification of economic damages arising from patent, copyright and trademark infringement, and trade secret misappropriation disputes. His clients have included numerous Fortune 500 companies in a wide variety of industries including semiconductor, telecommunication, energy, consumer products, life sciences and computers (hardware, software and the internet). Mr. Schoettelkotte has been recognized by Intellectual Asset Management Magazine as one of the leading patent damages experts in the United States. Mr. Schoettelkotte's background is in accounting, finance and economics, and he has a specific, focused understanding of those issues integral to the valuation and management of intellectual property.

**Intellectual Property Valuation**

Mr. Schoettelkotte has directed numerous valuation projects related to patents, trademarks and trade secrets. A significant portion of his practice is focused on the determination of royalty rates and terms for licensing agreements. Additionally, Mr. Schoettelkotte has conducted numerous studies involving lost profits and unjust enrichment.

In the process of assisting clients in the valuation of intellectual property assets, Mr. Schoettelkotte has participated in the identification and review of business plans, market studies, financial documents and other related information.

**Patent, Copyright and Trademark Infringement**

Mr. Schoettelkotte has performed market analyses/studies wherein the patented, trademarked or copyrighted product is sold, assessed lost profits stemming from alleged infringements, evaluated the contribution of the patented process/method to the end product and established the economic value of the underlying intellectual property.

Mr. Schoettelkotte is skilled in the application of the Georgia-Pacific factors to the determination of reasonable royalty rates. He has determined reasonable royalty rates within infringement suits on many occasions in numerous industries. Over the course of his career, Mr. Schoettelkotte has reviewed hundreds of license agreements, providing a broad frame of reference for reasonable royalty damages analyses. Mr. Schoettelkotte has testified in federal and state court and arbitration proceedings on matters involving intellectual property valuation, lost profits, reasonable royalty and economic damages issues.

**Articles and Presentations**

"Intellectual Property Damages," Chicago-Kent College of Law, October 15, 2019

"Damages in Other Areas of Intellectual Property," The University of Arizona IP Conference, March 5, 2018

# W. Todd Schoettelkotte

"Impact of Recent Court Cases on 'Real World' Royalty Rates," LES (USA & Canada) Houston Chapter, July 20, 2017

"What is Discoverable and Admissible for Damages, Willfulness and Other Purposes," Intellectual Property Owners Association, March 21, 2011

"Strategies in Intellectual Property," Chicago Kent, College of Law, Spring 2004 – 2010

Damages, Part II: "Litigation Strategies" – 15th Annual Advanced Patent Law Institute - University of Texas School of Law, October 28-29, 2010

"IP Damages and Valuation," Global Intellectual Property Management, Georgetown University Law Center, July 2, 2008

"Keys for Effectively Working with Your Damages Expert Throughout the Litigation Life Cycle," Houston Bar Association, March 22, 2007

"Advanced Evidence and Discovery – Working With Experts From Start To Finish" – Texas Bar Association, April-May 2006

"Trademarks – Financial Disclosure and Corporate Governance" – International Trademark Association, Emerging Issues in Trademark Law Forum, February 2-3, 2006

"Valuation of IP – A Licensing Perspective" – Lighthouse Seminar Group, IP Licensing Nuts & Bolts, March 3, 2005

"Measuring the Value of Damages in Trademark Infringement Claims" – DuPont's 18th Annual CLE Intellectual Property Law Seminar, October 12, 2004

"Measuring the Value of Damages in Patent and Trademark Claims" – Houston CPA Society, September 2004

"Measuring Damages in Trademark Infringement and Related Claims in Light of Recent Court Decisions" – The 19th Annual Intellectual Property Law Conference – American Bar Association, April 1, 2004

"Intellectual Property Damages: Patents & Trademarks" – Houston CPA Society "Litigation and Valuation Services Committee," January 28, 2004

Co-Author: "Accounting for Attorneys" – University of Oregon School of Law, November 12, 2003

"What are the Financial Stakes in Litigation? What are the Costs and the Return on Investment (ROI) That Can Be Expected? The Question of Intangible Returns?" – 2003 Fourth International Conference on Intellectual Property by CNCPI, October 7, 2003, Paris, France

"Current Issues in the Analysis of Reasonable Royalties in Patent Infringement Actions" – 2003 Licensing Executives Society Annual Meeting, September 24, 2003

Co-Author FTI Consulting Training Course: "Calculating Damages in Patent Infringement – A Lost Profits and Reasonable Royalty Case Study," July 17, 2003

2



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*In the Matter of Certain Semiconductor Devices, and Methods of Manufacturing Same and Products Containing the Same (Respondents);* U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Hearing

*Demaray LLC v. Samsung Electronics Co. Ltd., et al.:* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition, Supplemental Report, Deposition, Second Supplemental Report, Deposition, Trial

*Ningde Amperex Technology Limited v. Zhuhai CosMX Battery Co., Ltd., et al.;* U.S. District Court, Eastern District of Texas (Marshall), Initial Report, Rebuttal Expert Report, Deposition, Trial

*HID Global Corporation v. Vector Flow., et al.;* U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Trial

*Persawvere, Inc. v. Milwaukee Electric Tool, Corporation;* U.S. District Court, District of Delaware (Wilmington), Rebuttal Expert Report, Deposition, Trial

*Beacon Navigation GmbH v. Bayerische Motoren Werke AG; BMW of North America, LLC and BMW Manufacturing Co., LLC;* U.S. District Court, Southern District of Michigan, Expert Report, Deposition

*Plastipak Packaging, Inc. v. Nestlé Waters North America, Inc.;* U.S. District Court, Eastern District of Virginia (Alexandria), Opening Expert Report, Rebuttal Expert Report, Supplemental Expert Report, Supplemental Rebuttal Expert Report, Deposition

*Ollnova Technologies Limited v. ecobee Technologies, ULC d/b/a Ecobee;* U.S. District Court, Eastern District of Texas (Marshall), Rebuttal Expert Report, Deposition, Trial

*EIS, Inc. v. IntiHealth GER GmbH, et al.;* U.S. District Court, District of Delaware, Expert Report, Rebuttal Expert Report, Commercial Success Report, Reply Report, Trial

*BlueRadios, Inc. v. Kopin Corporation, Inc.;* U.S. District Court, District of Colorado (Denver), Rebuttal Expert Report, Deposition, Supplemental Rebuttal Expert Report, Deposition

*Bay Materials, LLC v. 3M Company;* U.S. District Court, District of Delaware (Wilmington), Declaration, Deposition, Commercial Success Report, Deposition

*Continuous Composites, Inc. v. Markforged, Inc.;* U.S. District Court, District of Delaware, Expert Report, Reply Report, Deposition

*Fate Therapeutics, Inc., et al. v. Shoreline Biosciences, Inc., et al.;* U.S. District Court, Southern District of California (San Diego), Rebuttal Expert Report, Deposition

*Delta Air Lines, Inc. v. Marriott International, Inc.;* U.S. District Court, Northern District of Georgia (Atlanta), Rebuttal Expert Report, Supplemental Rebuttal Report, Deposition



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
|---|

*Textron Innovations Inc. v. SZ DJI Technology Co., Ltd., et al.;* U.S. District Court, Western District of Texas (Waco), Expert Report, Deposition, Supplemental Expert Report, Trial

*VoIP-Pal.com, Inc. v. Verizon Communications Inc., et al.*; U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition

*Ragnarok Game, LLC and ESDFOS, LLC v. ZeniMax Media Inc, et al.;* Superior Court of the State of California, County of Los Angeles, Central District, Opening Expert Report, Rebuttal Expert Report, Deposition

*DivX, LLC v. Harman International Industries, Inc.;* New York Supreme Court, New York County, Expert Report, Rebuttal Expert Report, Deposition

*Shimon Maimon v. Lockheed Martin Corporation;* Judicial Arbitration and Mediation Services, Rebuttal Expert Report, Deposition, Arbitration

*WSOU Investments, LLC d/b/a Brazos Licensing and Development v. ZTE Corporation;* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition

*Wonderland Switzerland AG v. Evenflo Company, Inc.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Supplemental Expert Report, Trial

*NNCrystal US Corporation and The Board of Trustees of The University of Arkansas v. Nanosys, Inc.*; U.S. District Court, District of Delaware, Expert Report, Reply Report, Deposition

*Pavemetrics Systems, Inc. v. Tetra Tech, Inc. and Tetra Tech Tas Inc.;* U.S. District Court, Central District of California (Los Angeles), Expert Report, Deposition, Trial

*Global Tubing, LLC v. Tenaris Coiled Tubes, LLC and Tenaris, S.A.;* U.S. District Court, Southern District of Texas (Houston), Expert Report, Deposition

*The Cookie Department, Inc. v. The Hershey Company, One Brands, LLC;* U.S. District Court, Northern District of California (Oakland), Rebuttal Expert Report, Deposition

*Unirac, Inc. v. EcoFasten Solar, LLC and Esdec, Inc.;* U.S. District Court, District of Delaware, Expert Reports, Deposition

*In the Matter of Certain Integrated Circuits, Chipsets, and Electronic Devices, and Products Containing the Same (Respondents)*; U.S. International Trade Commission, Washington, D.C., Rebuttal Expert Report, Deposition



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

---

**CASE DESCRIPTION / TYPE OF TESTIMONY**

---

*In the Matter of Certain High-Density Fiber Optic Equipment and Components Thereof (Complainant)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing; Enforcement Proceeding - Expert Report, Supplement to the Expert Report, Deposition, 2nd Supplement to the Expert Report, 3rd Supplement to the Expert Report, Witness Statement, 4th Supplement to the Expert Report, Supplement to Witness Statement, Hearing

---

*Blue Mountain Holdings, Ltd., et al. v. Bliss Nutraceticals LLC, et al.*; U.S. District Court, Northern District of Georgia (Atlanta), Expert Report, Deposition

---

*Gibson Brands, Inc. v. Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC*; U.S. District Court, Eastern District of Texas (Sherman), Rebuttal Expert Report, Deposition, Supplemental Rebuttal Expert Report, Trial

---

*Conformis, Inc. v. Medacta USA, Inc. and Medacta International SA*; U.S. District Court, District of Delaware, Rebuttal Expert Report, Supplemental Rebuttal Expert Report, Deposition

---

*In the Matter of Certain Silicon Photovoltaic Cells and Modules with Nanostructures, and Products Containing Same (Respondents)*; U.S. International Trade Commission (Washington, D.C.), Expert Report, Deposition, Witness Statement, Hearing

---

*EcoFactor, Inc. v. Google LLC*; U.S. District Court, Western District of Texas (Waco), Expert Report, Deposition, Supplemental Report, Trial, Declaration

---

*G.W. Lisk Company, Inc. v. GITS Manufacturing Company*; U.S. District Court, Southern District of Iowa (Central); Expert Report, Reply Report, Deposition

---

*American Eagle Outfitters, Inc. and Retail Royalty Company v. Walmart, Inc.*; U.S. District Court, Western District of Pennsylvania (Pittsburgh), Expert Report, Rebuttal Report, Deposition

---

*Simply Wireless, Inc. v. T-Mobile US, Inc., et al.*; U.S. District Court, Eastern District of Virginia (Alexandria), Expert Report, Reply Report, Deposition, Sur-Sur Reply Report

---

*Gentex Corporation v. Galvion LTD and Galvion Inc.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition

---

*Kirsch Research and Development, LLC v. DuPont de Nemours, Inc., FT Synthetics, Inc. and Atlas Roofing Corporation*; U.S. District Court, Eastern District of Texas (Texarkana), Expert Report, Deposition

---

*Malvern PanAnalytical Inc. v. TA Instruments-Waters LLC and Waters Technologies Corporation*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Rebuttal Report, Reply Report, Deposition

---

*Finalrod IP, LLC v. Endurance Lift Solutions, Inc.*; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Deposition

---

*Pierce Manufacturing, Inc. and Oshkosh Corporation v. E-One, Inc. and REV Group, Inc.*; U.S. District Court, Middle District of Florida (Tampa), Declaration, Expert Report, Deposition, Trial

---



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
|---|

*Polar Electro Oy* v. *Suunto Oy, et al.*; U.S. District Court, District of Utah (Central), Expert Report, Deposition

*Wonderland Switzerland AG* v. *Evenflo Company, Inc., et al.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Trial

*Lufkin Industries, Inc.* v. *International Business Machines Corporation, et al.*; 159th Judicial District Court of Angelina County, Texas, Expert Report #1, Supplemental Report #1, Expert Report #2, Supplemental Report #2, Deposition

*The Hillman Group, Inc.* v. *KeyMe, LLC*; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Deposition #1, Consolidated Report, Deposition #2

*Team Worldwide Corporation* v. *Academy, LTD d/b/a Academy Sports + Outdoors, et al.*; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Rebuttal Report, Deposition #1, Deposition #2, Supplemental Report

*Nevro Corp.* v. *Boston Scientific Corporation, et al.*; U.S. District Court, Northern District of California (San Francisco), Expert Report, Supplemental Report, Deposition, Declaration

*Carnegie Institution of Washington, et al.* v. *Pure Grown Diamonds, Inc., et al.;* U.S. District Court, Southern District of New York (Foley Square), Expert Report, Supplemental Report, Deposition

*In the Matter of Certain High-Density Fiber Optic Equipment and Components Thereof (Complainant)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing

*Nissei ASB Co. and Nissei ASB Machine, Co., LTD.* v. *R&D Tool & Engineering Co.*; U.S. District Court, Western District of Missouri (Western), Expert Report, Reply Report, Deposition

*Jager Pro Incorporated* v. *Bull Creek Welding and Fabrication, Inc.*; U.S. District Court, Eastern District of Arkansas (Central), Expert Report, Deposition

*CFA Institute* v. *American Society of Pension Professionals & Actuaries, et al.*; U.S. District Court, Western District of Virginia (Charlottesville), Expert Report, Deposition

*Legacy Separators, LLC, et al.* v. *Halliburton Energy Services, Inc., et al.*; U.S. District Court, Southern District of Texas (Houston), Expert Report, Rebuttal Report, Deposition, Supplemental Report, Second Supplemental Report, Deposition #2, Trial

*Saracen LLC, Saracen Energy Power Advisors LP, Saracen Energy Advisors LP, collectively d/b/a The Saracen Group of Companies* v. *Sylvain Ross and Marginal Unit, Inc.*; U.S. District Court, Southern District of Texas (Houston), Expert Report, Supplemental Report, Second Supplemental Report, Third Supplemental Report, Revised Third Supplemental Report, Trial

*Innovation Sciences, LLC* v. *HTC Corporation*; U.S. District Court, Eastern District of Texas (Sherman), Expert Report, Deposition

*In the Matter of Certain Digital Video Receivers, Broadband Gateways, and Related Hardware and Software Components (Respondents)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Hearing

Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.  **Schedule 2**
**Documents and Other Information Considered**

| ARM_ | | ARM_ | | ARM_ | | ARM_ | | ARM_ | | ARM_ | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Begin | End | Begin | End | Begin | End | Begin | End | Begin | End | Begin | End |
| 00000003 | 00000003 | 00056882 | 00056894 | 00095579 | 00095579 | 01228039 | 01228039 | 01236610 | 01236612 | 01239464 | 01239464 |
| 00000017 | 00000018 | 00056900 | 00056909 | 00095580 | 00095580 | 01228040 | 01228040 | 01236613 | 01236615 | 01239465 | 01239465 |
| 00000019 | 00000021 | 00057479 | 00057481 | 00095789 | 00095790 | 01228041 | 01228041 | 01236616 | 01236617 | 01239466 | 01239466 |
| 00000022 | 00000023 | 00058159 | 00058163 | 00095791 | 00095791 | 01228042 | 01228042 | 01236618 | 01236644 | 01239467 | 01239469 |
| 00000045 | 00000045 | 00060458 | 00060512 | 00096011 | 00096011 | 01228043 | 01228043 | 01236645 | 01236653 | 01239470 | 01239470 |
| 00000244 | 00000381 | 00063607 | 00063610 | 00096692 | 00096715 | 01228044 | 01228044 | 01236654 | 01236666 | 01239471 | 01239471 |
| 00000382 | 00000509 | 00063692 | 00063693 | 00097388 | 00097420 | 01228045 | 01228045 | 01236667 | 01236670 | 01239472 | 01239472 |
| 00000510 | 00000632 | 00067288 | 00067289 | 00097527 | 00097528 | 01228046 | 01228046 | 01236671 | 01236677 | 01239473 | 01239473 |
| 00002198 | 00002202 | 00079507 | 00079514 | 00098968 | 00099018 | 01228047 | 01228047 | 01236678 | 01236682 | 01239474 | 01239474 |
| 00002226 | 00002230 | 00081942 | 00081944 | 00104678 | 00104678 | 01228048 | 01228048 | 01236683 | 01236683 | 01239475 | 01239475 |
| 00024810 | 00024810 | 00081945 | 00081947 | 00109518 | 00109560 | 01228049 | 01228049 | 01236684 | 01236690 | 01239476 | 01239476 |
| 00024815 | 00024815 | 00081962 | 00081963 | 00109734 | 00109750 | 01228050 | 01228050 | 01236691 | 01236697 | 01239477 | 01239477 |
| 00024817 | 00024817 | 00082714 | 00082716 | 00109778 | 00109778 | 01228051 | 01228051 | 01236698 | 01236699 | 01239478 | 01239478 |
| 00024819 | 00024819 | 00082717 | 00082717 | 00109791 | 00109803 | 01228052 | 01228052 | 01236700 | 01236702 | 01239479 | 01239479 |
| 00024826 | 00024820 | 00082925 | 00082937 | 00109806 | 00109819 | 01228053 | 01228053 | 01236703 | 01236707 | 01239483 | 01239483 |
| 00024825 | 00024825 | 00083356 | 00083356 | 00109822 | 00109852 | 01228054 | 01228054 | 01236708 | 01236710 | 01239485 | 01239485 |
| 00024826 | 00024826 | 00085677 | 00085677 | 00109865 | 00109865 | 01228055 | 01228055 | 01236711 | 01236730 | 01239486 | 01239486 |
| 00024837 | 00024837 | 00085679 | 00085679 | 00109982 | 00109985 | 01228056 | 01228056 | 01236731 | 01236733 | 01239488 | 01239488 |
| 00024838 | 00024838 | 00085680 | 00085680 | 00109991 | 00109991 | 01228057 | 01228057 | 01236734 | 01236739 | 01239490 | 01239490 |
| 00024841 | 00024841 | 00085682 | 00085682 | 00110165 | 00110168 | 01228058 | 01228058 | 01236740 | 01236742 | 01239493 | 01239493 |
| 00024844 | 00024844 | 00085687 | 00085687 | 00112064 | 00112067 | 01228059 | 01228059 | 01236743 | 01236744 | 01239495 | 01239495 |
| 00024851 | 00024851 | 00086088 | 00086088 | 00118835 | 00118938 | 01228060 | 01228060 | 01237617 | 01237617 | 01239504 | 01239504 |
| 00032604 | 00032604 | 00086164 | 00086245 | 00120302 | 00120303 | 01228061 | 01228061 | 01238999 | 01239003 | 01239789 | 01240096 |
| 00032650 | 00032654 | 00086247 | 00086251 | 00120530 | 00120536 | 01228062 | 01228062 | 01239440 | 01239440 | 01240202 | 01240203 |
| 00037713 | 00037713 | 00086285 | 00086293 | 01215343 | 01215344 | 01228063 | 01228063 | 01239441 | 01239441 | 01240204 | 01240225 |
| 00037718 | 00037718 | 00086829 | 00086837 | 01215409 | 01215409 | 01228064 | 01228064 | 01239442 | 01239442 | 01240226 | 01240236 |
| 00037729 | 00037729 | 00087367 | 00087371 | 01215423 | 01215423 | 01228065 | 01228065 | 01239443 | 01239443 | 01240237 | 01240280 |
| 00040078 | 00040080 | 00087449 | 00087449 | 01215632 | 01215633 | 01228066 | 01228066 | 01239444 | 01239444 | 01240281 | 01240282 |
| 00040237 | 00040241 | 00087451 | 00087451 | 01215634 | 01215653 | 01228073 | 01228073 | 01239445 | 01239445 | 01240283 | 01240304 |
| 00040283 | 00040285 | 00087699 | 00087702 | 01215997 | 01216001 | 01228074 | 01228074 | 01239446 | 01239446 | 01240305 | 01240307 |
| 00040289 | 00040306 | 00087854 | 00087856 | 01226630 | 01226706 | 01228075 | 01228075 | 01239447 | 01239447 | 01240308 | 01240325 |
| 00044650 | 00044692 | 00087936 | 00087937 | 01228026 | 01228026 | 01232495 | 01232512 | 01239448 | 01239448 | 01240326 | 01240353 |
| 00045250 | 00045253 | 00088045 | 00088303 | 01228027 | 01228027 | 01233718 | 01233718 | 01239449 | 01239449 | 01240354 | 01240381 |
| 00045262 | 00045264 | 00088371 | 00088386 | 01228028 | 01228028 | 01235135 | 01235137 | 01239450 | 01239450 | 01240382 | 01240391 |
| 00045266 | 00045276 | 00088390 | 00088408 | 01228029 | 01228029 | 01235144 | 01235144 | 01239451 | 01239451 | 01240392 | 01240412 |
| 00045334 | 00045335 | 00088655 | 00088655 | 01228030 | 01228030 | 01235148 | 01235148 | 01239452 | 01239452 | 01240413 | 01240437 |
| 00045393 | 00045393 | 00088656 | 00088684 | 01228031 | 01228031 | 01235149 | 01235149 | 01239453 | 01239453 | 01240438 | 01240447 |
| 00051071 | 00051073 | 00088892 | 00088903 | 01228032 | 01228032 | 01236577 | 01236579 | 01239454 | 01239457 | 01240448 | 01240448 |
| 00051088 | 00051088 | 00088906 | 00088918 | 01228033 | 01228033 | 01236580 | 01236580 | 01239458 | 01239458 | 01240449 | 01240469 |
| 00052794 | 00052816 | 00092674 | 00092679 | 01228034 | 01228034 | 01236581 | 01236587 | 01239459 | 01239459 | 01240470 | 01240507 |
| 00056424 | 00056433 | 00092787 | 00092787 | 01228035 | 01228035 | 01236588 | 01236593 | 01239460 | 01239460 | 01240508 | 01240526 |
| 00056439 | 00056441 | 00094543 | 00094545 | 01228036 | 01228036 | 01236594 | 01236595 | 01239461 | 01239461 | 01241187 | 01241187 |
| 00056519 | 00056529 | 00095370 | 00095449 | 01228037 | 01228037 | 01236596 | 01236604 | 01239462 | 01239462 | 01241589 | 01241589 |
| 00056538 | 00056552 | 00095578 | 00095578 | 01228038 | 01228038 | 01236605 | 01236609 | 01239463 | 01239463 | 01241597 | 01241598 |

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
**Documents and Other Information Considered**

Schedule 2

| ARM_ Begin | ARM_ End |
|---|---|
| 01241616 | 01241620 |
| 01243410 | 01243629 |
| 01243875 | 01243995 |
| 01245599 | 01245617 |
| 01245618 | 01245618 |
| 01245619 | 01245640 |
| 01245641 | 01245672 |
| 01245673 | 01245703 |
| 01245704 | 01245705 |
| 01245706 | 01245719 |
| 01245720 | 01245726 |
| 01245727 | 01245755 |
| 01245756 | 01245793 |
| 01245794 | 01245813 |
| 01245814 | 01245837 |
| 01245838 | 01245848 |
| 01245849 | 01245890 |
| 01245891 | 01245914 |
| 01245915 | 01245938 |
| 01245939 | 01245940 |
| 01245941 | 01245978 |
| 01245979 | 01246020 |
| 01246021 | 01246042 |
| 01246043 | 01246066 |
| 01246067 | 01246085 |
| 01246086 | 01246111 |
| 01246112 | 01246134 |
| 01246135 | 01246157 |
| 01246158 | 01246194 |
| 01246195 | 01246197 |
| 01246198 | 01246224 |
| 01246225 | 01246227 |
| 01250306 | 01250306 |
| 01250307 | 01250307 |
| 01259704 | 01259704 |
| 01259705 | 01260105 |
| 01260121 | 01260391 |
| 01260418 | 01260686 |
| 01262030 | 01262366 |
| 01266931 | 01266990 |
| 01266995 | 01267070 |
| 01271909 | 01271926 |

| ARM_ Begin | ARM_ End |
|---|---|
| 01271927 | 01271928 |
| 01271929 | 01271953 |
| 01281879 | 01281879 |
| 01282466 | 01282575 |
| 01286878 | 01286998 |
| 01291202 | 01291202 |
| 01292638 | 01292644 |
| 01292866 | 01292866 |
| 01292867 | 01292914 |
| 01294035 | 01294036 |
| 01294037 | 01294038 |
| 01296809 | 01296825 |
| 01305479 | 01305479 |
| 01305515 | 01305515 |
| 01305785 | 01305789 |
| 01309668 | 01309669 |
| 01311070 | 01311084 |
| 01425186 | 01425186 |
| 01426109 | 01426156 |
| 01427450 | 01427492 |
| 01427493 | 01427522 |
| 01427523 | 01427537 |

| MASA_ Begin | MASA_ End |
|---|---|
| 00001719 | 00001724 |

| QCARM_ Begin | QCARM_ End |
|---|---|
| 0002821 | 0002823 |
| 0002825 | 0002827 |
| 0275507 | 0275543 |
| 0275743 | 0275763 |
| 0337839 | 0337855 |
| 0337857 | 0337899 |
| 0338297 | 0338311 |
| 0338573 | 0338576 |
| 0343120 | 0343142 |
| 0343143 | 0343222 |
| 0343533 | 0343587 |
| 0343954 | 0343976 |
| 0363482 | 0363482 |

| QCARM_ Begin | QCARM_ End |
|---|---|
| 0550518 | 0550529 |
| 0557206 | 0557207 |
| 0569461 | 0569494 |
| 0584330 | 0584332 |
| 0591730 | 0591732 |
| 0591733 | 0591736 |
| 0591737 | 0591740 |
| 0591741 | 0591745 |
| 0592425 | 0592431 |
| 2414807 | 2414813 |
| 2417783 | 2417783 |
| 2423231 | 2423233 |
| 2424464 | 2424466 |
| 2424496 | 2424498 |
| 2424621 | 2424623 |
| 2425046 | 2425048 |
| 2425297 | 2425299 |
| 2426801 | 2426803 |
| 2426804 | 2426806 |
| 2426807 | 2426814 |
| 2426815 | 2426821 |
| 2426822 | 2426836 |
| 2426837 | 2426852 |
| 2426853 | 2426855 |
| 2426856 | 2426881 |
| 2426882 | 2426882 |
| 2426883 | 2426884 |
| 2426885 | 2426887 |
| 2426888 | 2426888 |
| 2426889 | 2426891 |
| 2426892 | 2426894 |
| 2426895 | 2426897 |
| 2554114 | 2554116 |
| 3241389 | 3241393 |
| 3337797 | 3337799 |
| 3400486 | 3400548 |
| 3404294 | 3404353 |
| 3426632 | 3426638 |
| 3429791 | 3429872 |
| 3434164 | 3434165 |
| 3437962 | 3438003 |
| 3438004 | 3438037 |

| QCARM_ Begin | QCARM_ End |
|---|---|
| 3438038 | 3438074 |
| 3438075 | 3438113 |
| 3438114 | 3438152 |
| 3438153 | 3438193 |
| 3438194 | 3438234 |
| 3438235 | 3438275 |
| 3452409 | 3452442 |
| 3452662 | 3452664 |
| 3452665 | 3452667 |
| 3452668 | 3452672 |
| 3452720 | 3452723 |
| 3452805 | 3452807 |
| 3453808 | 3453810 |
| 3453866 | 3453868 |
| 3453870 | 3453872 |
| 3453873 | 3453874 |
| 3453875 | 3453877 |
| 3453879 | 3453881 |
| 3454302 | 3454304 |
| 3457104 | 3457104 |
| 3460229 | 3460233 |
| 3460451 | 3460453 |
| 3474751 | 3474828 |
| 3519910 | 3519912 |
| 3520810 | 3520812 |
| 3520813 | 3520815 |
| 3520816 | 3520818 |
| 3520819 | 3520821 |
| 3520822 | 3520825 |
| 3520826 | 3520829 |
| 3520830 | 3520834 |
| 3522610 | 3522611 |
| 3522895 | 3522902 |
| 3526546 | 3526553 |
| 3535535 | 3535535 |
| 3535536 | 3535536 |
| 3536628 | 3536629 |
| 3536886 | 3536888 |
| 3536889 | 3536891 |
| 3536892 | 3536894 |
| 3536895 | 3536897 |
| 3536898 | 3536901 |

| QCARM_ Begin | QCARM_ End |
|---|---|
| 3536902 | 3536905 |
| 3536921 | 3536933 |
| 3537376 | 3537378 |
| 3537713 | 3537715 |
| 3537773 | 3537776 |
| 3839896 | 3839911 |
| 3920067 | 3920067 |
| 7434227 | 7434227 |
| 7434228 | 7434229 |
| 7505464 | 7505464 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.
### Documents and Other Information Considered

Schedule 2

| Legal Documents and Related Exhibits |
|---|
| 2022-08-31 - Complaint |
| 2022-09-30 - Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Counterclaim |
| 2022-10-26 - Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim |
| 2023-02-27 - Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Interrogatories, Nos. 1-11 |
| 2023-02-27 - Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Requests for Production, Nos. 1-36 |
| 2023-02-27 - Defendants' Responses and Objections to Plaintiff's First Set of Interrogatories, Nos. 1-13 |
| 2023-02-27 - Defendants' Responses and Objections to Plaintiff's First Set of Requests for Production, Nos. 1-51 |
| 2023-04-04 - Arm Ltd.'s First Amended Objections and Responses to Qualcomm's First Set of Requests for Production, Nos. 1-36 |
| 2023-04-26 - Corrected Second Amended Complaint for Willful Patent Infringement |
| 2023-05-04 - Defendants' Responses and Objections to Plaintiff's Second Set of Requests for Production, Nos. 52-58 |
| 2023-05-05 - Arm Ltd.'s First Objection and Responses to Qualcomm's Second Set of Requests for Production, Nos 37-50 |
| 2023-06-23 - Defendants' First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, Nos. 1-4 and 6 |
| 2023-07-14 - Arm Ltd.'s First Objection and Responses to Qualcomm's Third Set of Requests for Production, Nos. 51-54 |
| 2023-08-23 - Defendants' Responses and Objections to Plaintiff's Third Set of Requests for Production, Nos. 59-122 |
| 2023-10-02 - Arm Ltd.'s Objections and Responses to Qualcomm's Second Set of Interrogatories, Nos. 12-19 |
| 2023-10-02 - Plaintiff Arm Ltd.'s Objections and Responses to Defendant Qualcomm's Fourth Set of Requests for Production, Nos. 55-70 |
| 2023-10-20 - Defendants' Responses and Objections to Plaintiff's First Set of Requests for Admission, Nos. 1-30 |
| 2023-10-26 - Defendants' Supplemental and Amended Response and Objections to Plaintiff's First Set of Interrogatories, No. 5 |
| 2023-10-26 - Correspondence Email from J. Braly to J. Li |
| 2023-10-27 - Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories |
| 2023-11-09 - Arm Ltd.'s Objections and Responses to Qualcomm's Third Set of Interrogatories, No. 20 |
| 2023-11-17 - Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories, Nos. 12-19 |
| 2023-11-17 - Arm Ltd.'s Objections and Responses to Qualcomm's Fourth Set of Interrogatories, Nos. 21-25 |
| 2023-11-17 - Arm Ltd.'s Second Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories, Nos. 1-11 |
| 2023-11-17 - Arm Ltd.'s Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories, No. 20 |
| 2023-11-17 - Defendants' First Supplemental Reponses and Objections to Plaintiff's Second Set of Interrogatories, Nos. 15-16 |
| 2023-11-17 - Defendants' Responses and Objections to Plaintiff's Fourth Set of Requests for Production, No. 123 |
| 2023-11-17 - Plaintiff Arm Ltd.'s Objection and Responses to Defendant Qualcomm's Fifth Set of Requests for Production, Nos. 71-124 |
| 2023-11-17 - Plaintiff Arm Ltd.'s Responses and Objections to Qualcomm's First Requests for Admissions to Plaintiff, Nos. 1-30 |

| Deposition Transcripts and Related Exhibits | | | |
|---|---|---|---|
| 2023-09-22 - Rohit Singh | 2023-11-02 - Lynn Couillard | 2023-11-28 - Jim Thompson | 2023-12-08 - Jonathan Armstrong |
| 2023-10-12 - Manu Gulati | 2023-11-03 - Gerard Williams | 2023-11-28 - Michael Roberts | 2023-12-12 - Rene Haas |
| 2023-10-20 - Ramakrishna Chunduru | 2023-11-08 - Ziad Asghar | 2023-11-29 - Lynn Bos | 2023-12-14 - Vivek Agrawal |
| 2023-10-25 - Jignesh Trivedi | 2023-11-09 - Paul Williamson | 2023-11-30 - Karthik Shivashankar | 2023-12-14 - Laura Sand |
| 2023-10-25 - Tim Herbert | 2023-11-15 - Christiano Amon | 2023-12-01 - Pradeep Kanapathipillai | 2023-12-19 - Christine Tran |
| 2023-10-27 - Nitin Sharma | 2023-11-15 - Richard Grisenthwaite | 2023-12-07 - Mark Werkheiser | 2023-12-20 - Ian Thornton |
| 2023-10-27 - Will Abbey | 2023-11-16 - Simon Segars | 2023-12-08 - Geeta Balakrishnan | |

| Expert Reports |
|---|
| 2024-02-27 - Expert Report of Patrick F. Kennedy, PhD. |

| Publicly Available Information/Other |
|---|
| Ampere's Second Mot. for Protective Order |
| Arm Holdings plc Amendment No. 2 to Form F-1, September 5, 2023 |
| Arm Holdings plc Form 424(b)(4), September 14, 2023 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**

**Schedule 2**

**Documents and Other Information Considered**

| Publicly Available Information/Other (cont.) |
| --- |
| Arm Holdings plc FQ2 2024 Earnings Call Transcripts, November 8, 2023 |
| Arm Holdings plc FQ3 2024 Earnings Call Transcripts, February 7, 2024 |
| Arm Holdings plc FQ3 2024 Results Presentation, February 7, 2024 |
| Arm Holdings plc Q2 FY 2024 Key Financial Data |
| Arm Holdings plc Q2 FY 2024 Shareholder Letter |
| Arm Holdings plc Q3 FY 2024 Key Financial Data |
| Arm Holdings plc Q3 FY 2024 Shareholder Letter |
| Bhandarkar, Dileep, and Douglas W. Clark. "Performance from architecture: comparing a RISC and a CISC with similar hardware organization." Proceedings of the fourth international conference on Architectural support for programming languages and operating systems. 1991 |
| Hearing Transcript, September 29, 2023 |
| https://9to5mac.com/2019/11/15/three-former-apple-execs-create-new-chip-company-will-compete-with-intel-and-amd/ |
| https://aws.amazon.com/what-is/cpu/ |
| https://community.fs.com/article/what-is-a-server-cpu.html |
| https://download.intel.com/newsroom/kits/40thanniversary/pdfs/What_is_a_Microprocessor.pdf |
| https://futurumgroup.com/about-us/who-we-are/ |
| https://futurumgroup.com/insights/qualcomm-snapdragon-x-elite-and-oryon-cpu-aim-to-disrupt-the-pc-market/ |
| https://hbr.org/2022/08/in-uncertain-times-the-best-strategy-is-adaptability |
| https://investor.qualcomm.com/segments/qct |
| https://investors.arm.com/static-files/187d293b-42eb-48b0-b82f-e78bce4da9e4 |
| https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5 |
| https://mixed-news.com/en/samsung-xr-devices-will-use-google-and-qualcomm-tech/ |
| https://newsroom.arm.com/news/arm-announces-closing-of-initial-public-offering |
| https://nvidianews.nvidia.com/news/nvidia-introduces-grace-cpu-superchip |
| https://pc-tablet.com/qualcomm-throws-down-the-gauntlet-snapdragon-xr2-gen-2-challenges-apples-vision-pro-in-mixed-reality-race/ |
| https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375) |
| https://seekingalpha.com/article/4422252-qualcomm-incorporateds-qcom-ceo-steve-mollenkopf-on-q2-2021-results-earnings-call-transcript |
| https://semiengineering.com/knowledge_centers/integrated-circuit/ic-types/processors/central-processing-unit-cpu/ |
| https://support.microsoft.com/en-us/windows/common-pc-and-device-terms-4542f069-4cf7-431a-bb6b-c6cbdbe3e6e9 |
| https://techcrunch.com/2020/09/24/nuvia-series-b |
| https://viewpoint.pwc.com/dt/us/en/pwc/pwc_sec_volume/pwc_sec_volume_US/8000_registration_an_US/sec_8110_form_f1_US.html#pwc-topic.dita_fb3ce65d-0b9d-4db7-92ff-4e1fd99ba885 |
| https://web.archive.org/web/20210115193713/https://nuviainc.com/ |
| https://web.archive.org/web/20210316180114/https://nuviainc.com/ |
| https://web.archive.org/web/20210422062904/https://nuviainc.com/nuvia-raises-53-million-to-reimagine-silicon-design-for-the-data-center/ |
| https://www.americanbar.org/groups/tort_trial_insurance_practice/committees/automobile-litigation/safety_regulatory_considerations/ |
| https://www.androidauthority.com/mobile-processors-2022-2741344/ |
| https://www.arm.com/architecture/cpu |
| https://www.arm.com/glossary/adas |
| https://www.arm.com/glossary/connected-devices |
| https://www.arm.com/glossary/cpu |
| https://www.arm.com/glossary/iot-devices |
| https://www.arm.com/glossary/isa |
| https://www.arm.com/glossary/risc |
| https://www.arm.com/glossary/smart-devices |
| https://www.arm.com/glossary/soc-development |
| https://www.arm.com/partners |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**   **Schedule 2**
**Documents and Other Information Considered**

| Publicly Available Information/Other (cont.) |
| --- |

https://www.cnbc.com/2022/09/01/why-arms-lawsuit-against-qualcomm-is-a-big-deal.html
https://www.cnbc.com/2023/09/14/arm-ipo-what-is-risc-v-and-why-does-arm-call-the-rival-product-a-risk.html
https://www.cnbc.com/2023/11/09/how-arm-gained-chip-dominance-with-apple-nvidia-amazon-and-qualcomm.html
https://www.cnet.com/tech/computing/qualcomms-pc-chip-could-mean-windows-pcs-as-good-as-apple-macbooks/
https://www.currency.me.uk/convert/gbp/usd
https://www.digitaltrends.com/computing/what-is-a-cpu/
https://www.eweek.com/servers/cavium-introduces-thunderx2-arm-server-chip-for-data-center-systems/
https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04
https://www.forbes.com/sites/startswithabang/2018/02/13/chaos-theory-the-butterfly-effect-and-the-computer-glitch-that-started-it-all/?sh=4b460bee69f6
https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf
https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance
https://www.gigabyte.com/Glossary/cisc
https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.html
https://www.intel.com/content/www/us/en/newsroom/resources/moores-law.html
https://www.intel.com/content/www/us/en/products/docs/processors/xeon/server-processor-overview.html
https://www.intel.com/content/www/us/en/support/articles/000056236/intel-nuc.html
https://www.investopedia.com/articles/markets/012216/worlds-top-10-semiconductor-companies-tsmintc.asp
https://www.lenovo.com/us/en/glossary/cpu-core/
https://www.lenovo.com/us/en/glossary/instruction-set-architecture/
https://www.lenovo.com/us/en/glossary/x86/
https://www.linkedin.com/in/ivan-knez/
https://www.linkedin.com/in/peter-greenhalgh-8900789b/
https://www.linkedin.com/in/shultzwang/
https://www.linkedin.com/in/todd-lepinski-ababaa9/
https://www.mckinsey.com/featured-insights/mckinsey-explainers/what-is-the-internet-of-things
https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-chip-tests
https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html
https://www.precedenceresearch.com/microprocessor-market
https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/M29QualcommPDFa.pdf
https://www.qualcomm.com/news/onq/2013/06/mobile-processors-101-why-smartphones-are-smarter-all-one-processor
https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms
https://www.qualcomm.com/news/releases/2005/11/qualcomm-introduces-worlds-most-advanced-mobile-microprocessor
https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia
https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia
https://www.qualcomm.com/news/releases/2023/10/qualcomm-unleashes-snapdragon-x-elite--the-ai-super-charged-plat
https://www.qualcomm.com/products
https://www.qualcomm.com/products/technology/processors
https://www.qualcomm.com/research/extended-reality
https://www.qualcomm.com/snapdragon/overview
https://www.sec.gov/files/reada10k.pdf
https://www.techspot.com/article/1856-aiming-for-atoms-chip-manufacturing/
https://www.telink-semi.com/system-on-chip/
https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027
https://www.tomshardware.com/pc-components/cpus/arm-pc-market-share-shrinks-mercury-research
https://www.tomshardware.com/reviews/glossary/soc-system-on-chip-definition,5890.html
https://www.wired.com/story/apples-new-macbook-pro-chips-flex-power-custom-silicon/

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
**Documents and Other Information Considered**

| Publicly Available Information/Other (cont.) |
| --- |

NuVia, Inc., Private Company Profile, S&P Capital IQ
Nvidia-Arm, A report to the Secretary of State for Digital, Culture, Media & Sport on the anticipated acquisition by NVIDIA Corporation of Arm Limited, July 20, 2021
Performance from Architecture: Comparing a RISC and a CICS with Similar Hardware Organization, Bhandarkar & Clark
Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023
Qualcomm Inc. Form 10-K for the fiscal year ended September 26, 2021
Qualcomm Incorporated FQ1 2024 Earnings Call Transcripts, January 31, 2024
Qualcomm Incorporated, Form 10-K for fiscal year ended September 24, 2023
Reference Manual on Scientific Evidence, Federal Judicial Center and National Research Council of the National Academies
S&P Capital IQ, Infineon Technologies AG Transaction Details, Merger/Acquisition: Cypress Semiconductor Corporation
S&P Capital IQ, Nuvia, Inc. Transaction Details, Merger/Acquisition: Qualcomm Technologies, Inc.
S&P Capital IQ, Nuvia, Inc. Transaction Details, Private Placement: Mayfield Fund, LLC
The Sedona Conference, Commentary on Monetary Remedies in Trade Secret Litigation, 24 SEDONA CONF. J. 349 (2023)
Weil, Roman L., et al. Litigation Services Handbook: The Role of the Financial Expert, 6th Edition, Wiley, 2017

**Arm, Ltd. v. Qualcomm, Inc.**

**Arm and Qualcomm R&D as Percent of Revenue**

*FY2019 - Q3 FY2024*

Schedule 3



| ($000,000, USD) | Arm, Ltd. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Total |

| ($000,000, USD) | Qualcomm, Inc.[1] | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | Q1 2024 | Total |
| R&D Expenses | $ 5,398 | $ 5,975 | $ 7,176 | $ 8,194 | $ 8,818 | $ 2,096 | $ 37,657 |
| Revenue | 24,273 | 23,531 | 33,566 | 44,200 | 35,820 | 9,935 | 171,325 |
| *R&D as a % of revenue* | *22%* | *25%* | *21%* | *19%* | *25%* | *21%* | *22%* |

**Note:**

[1] Qualcomm, Inc. fiscal year ends the last Sunday in September.  See, Qualcomm, Inc. 10-Q, December 24, 2023, p. 11.

**Sources:**

Schedule 4.

Qualcomm, Inc. 10-K, 2023, pp. 41, 42; Qualcomm, Inc. 10-K, 2021, p. 42; Qualcomm, Inc. 10-K, 2019, p. 43;

Qualcomm, Inc. 10-Q, December 24, 2023, p. 19.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Arm, Ltd. v. Qualcomm, Inc.

Schedule 4

**Arm, Ltd. Consolidated Income Statement[1]**

*FY2019 – Q3 FY2024*



**Note:**

[1] Arm, Ltd. fiscal year is from April 1 to March 31. See, ARM_01259705-105 at 709.

**Sources:**

ARM_00000510-632 at 535; https://www.currency.me.uk/convert/gbp/usd.

ARM_00000382-509 at 416.

ARM_01259705-105 at 927.

https://investors.arm.com/financials/quarterly-annual-results.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm, Ltd. v. Qualcomm, Inc.**

Schedule 5

**Total R&D Expenses and Revenue for SIC 3674[1]**
*FY2019 - FY2023*



**Note:**

[1] S&P Capital IQ data obtained using the following criteria: SIC Code 3674, Revenues >0, R&D Expense >0, including latest FY-4.

The amounts above include 1,011 companies, and exclude Arm, Ltd. and Qualcomm, Inc.

**Source:**

S&P Capital IQ.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT 4

ATTORNEYS EYES ONLY

Page 1

1

2      IN THE UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF DELAWARE

3      C.A. No. 22-1146 (MN)

       ----------------------------------------x

4      ARM LTD.,

5                              Plaintiff,

6             - against -

7

       QUALCOMM INC., QUALCOMM TECHNOLOGIES,

8      INC., AND NUVIA, INC.,

9

                               Defendants.

10     ----------------------------------------x

11                    July 2, 2024

                      9:07 a.m.

12

13              *CONFIDENTIAL*

14            *ATTORNEYS' EYES ONLY*

15

16        VIDEOTAPED DEPOSITION of WILLIAM TODD

17     SCHOETTELKOTTE, held at the offices of

18     MORRISON & FOERSTER LLP, located at 250 West

19     55th Street, New York, New York 10019, before

20     Anthony Giarro, a Registered Professional

21     Reporter, a Certified Realtime Reporter and a

22     Notary Public of the State of New York.

23

24

25

ATTORNEYS EYES ONLY

Page 2

1
2  A P P E A R A N C E S :
3
4
   MORRISON FOERSTER LLP
5    Attorneys for Plaintiff
     250 West 55th Street
6  New York, New York 10019
7  BY:  KYLE W.K. MOONEY, ESQ.
        kmooney@mofo.com
8       KYLE D. FRIEDLAND, ESQ.
        kfriedland@mofo.com
9
10
   MORRISON FOERSTER LLP
11   Attorneys for Plaintiff
     600 Brickell Avenue, Suite 1560
12  Miami, Florida 33131
13  BY:  MICHAEL DeSTEFANO, ESQ.
        mdestefano@mofo.com
14     (via Zoom)
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S (Cont.):
3
4
   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
5    Attorneys for Defendants
     1285 Avenue of the Americas
6  New York, New York 10019
7  BY:  SAMANTHA MEHRING, ESQ.
        smehring@paulweiss.com
8
9
10  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    Attorneys for Defendants
11   2001 K Street, N.W.
     Washington, D.C. 20006
12
    BY:  WILLIAM A. ISAACSON, ESQ.
13     wisaacson@paulweiss.com
14
15
16
17
18
19
20
21  ALSO PRESENT:
22     PHIL GLAUBERSON, Videographer
       JACOB SCHULZ, Paul Weiss,
23     Summer Associate
       CHRISTINA PORTUALLO, Morrison &
24     Foerster, Summer Associate
25

Page 4

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2       THE VIDEOGRAPHER:  Good
3   morning.  We are going on the record
4   at 9:07 a.m. on July 2nd, 2024.
5   Please note that the microphones are
6   sensitive and may pick up whispering
7   and private conversations.  Please
8   mute your phones at this time and
9   place them away from the microphones
10  as they can interfere with the audio.
11  Audio and video recording will
12  continue to take place unless all
13  parties agree to go off the record.
14      This is Media Unit 1 of the
15  video-recorded deposition of William
16  Todd Schoettelkotte in the matter of
17  ARM Ltd., plaintiff, versus Qualcomm
18  Inc., Qualcomm Technologies, Inc. and
19  Nuvia, Inc., defendants, C.A. No.
20  22-1146 (MN), filed in The United
21  States District Court for the
22  District of Delaware.
23      The location of this
24  deposition is Morrison & Foerster
25  LLP, 250 West 55th Street, York, New

Page 5

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   York.
3       My name is Phil Glauberson
4   representing Veritext.  And I am the
5   videographer.  The court reporter is
6   Anthony Giarro from Veritext.
7       I am not authorized to
8   administer an oath, I am not related
9   to any party in this action, nor am I
10  financially interested in the
11  outcome.
12      All appearances will be
13  noted on the stenographic record.
14      Will the court reporter
15  please swear in the witness.
16  W I L L I A M   T O D D
17  S C H O E T T E L K O T T E, after having
18  first been duly sworn by a Notary Public of
19  the State of New York, was examined and
20  testified as follows:
21  EXAMINATION BY
22  MR. ISAACSON:
23      Q    Mr. Schoettelkotte, I'm Bill
24  Isaacson.  I'll be asking you questions.
25      Today for convenience, we've

2 (Pages 2 - 5)

ATTORNEYS EYES ONLY

Page 22

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   behalf of ARM to assess and provide
3   testimony regarding whether damages are
4   adequate to compensate ARM for the harm
5   caused by defendants' breach of the Nuvia
6   ALA."
7        When you used the term harm,
8   does that have any specialized meaning
9   for you?
10       A    I don't understand the
11  question.
12       Q    So you have a background as
13  a damages expert; correct?
14       A    That's correct.
15       Q    If I hit myself, I might
16  harm myself.  It's got a generalized
17  meaning.
18       Does it have any specialized
19  meaning to you as a damages expert when
20  you use the term harm?
21       A    If I'm being honest, I still
22  don't really understand your question, if
23  you could rephrase it.
24       Q    Are you giving opinions in
25  this case as an expert on whether ARM was

Page 23

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   harmed by the alleged breach of contract
3   in this case?
4        A    In large part, my
5   understanding of the likely harms to ARM
6   are based upon my discussions with ARM
7   personnel and my review of the documents
8   and information produced in this case and
9   a general understanding of the construct
10  of calculating damages for particular
11  economic harms over the course of many
12  years of evaluating economic damages.
13       Q    ████████████████████
     █████████████████████████████████
     ███████████████████████████
     ██  ██  ████████.
17       Q    And you're offering no
18  opinions on liability in this case;
19  correct?
20       A    I'm not.
21       Q    So you're assuming that
22  Nuvia committed a breach of the Nuvia ALA
23  ████████████████████
     ██  ██  ████
25       Q    And are you assuming that

Page 24

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   Qualcomm committed a breach of the Nuvia
3   ALA████████████████████
4        A    Well, I'm assuming that
5   Qualcomm and Nuvia are largely one
6   enterprise at this point.  Again, from a
7   legal perspective, a little bit outside
8   my purview.  But I'm assuming that they
9   are one in the same right now, given that
10  Qualcomm purchased Nuvia.
11       And my understanding is, is
12  that there is an argument in the case
13  that when that acquisition occurred,
14  there████████████████████████
     █████████████████████████████████
     █████████████████████████████████
     █████████████████  And I
18  understand that it's ARM's position that
19  those steps were not taken, either at all
20  or in the proper fashion.
21       And as a result of that,
22  there is a series of harms that are
23  likely to occur, again based upon, Number
24  One, my discussions with ARM personnel
25  but, Two, my review of the record

Page 25

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   evidence in this case.
3        Q    You're not here to give
4   opinions about the contract or the law;
5   correct?
6        A    That's correct.
7        Q    And so I'm just talking
8   about your assumptions coming into this
9   and not your opinions.
10       You do have the
11  understanding that Qualcomm was not a
12  party to the Nuvia ALA; correct?
13       A    That's correct.
14       Q    But your understanding is
15  that Qualcomm and Nuvia for purposes of
16  that contract are one in the same?
17       MR. MOONEY:  Objection,
18  form.
19       A    I thought I was pretty
20  clear.  Maybe I wasn't.  Number One, I'm
21  not offering a legal opinion as to
22  whether they are one in the same.  What I
23  was endeavoring to communicate was I
24  understand that when Qualcomm buys Nuvia,
25  Nuvia becomes, essentially, part of

7 (Pages 22 - 25)

ATTORNEYS EYES ONLY

Page 26

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  Qualcomm.  Again, I'm not holding that
3  out as a legal perspective.  I'm not
4  offering a legal opinion on that.
5      But I understand now that
6  Qualcomm, which now owns and controls
7  Nuvia, has -- has some decisions to make
8  on whether it will or it will not adhere
9  to the Nuvia contract.  And I believe
10  there's a dispute as to whether Qualcomm
11  now with Nuvia as part of the enterprise
12  properly adhered to the contract.
13  Whether or not this is a Nuvia compliant
14  issue or a Qualcomm compliant issue or a
15  combined entity issue, again, that's well
16  beyond my purview as a non-legal person.
17      Q      And in your report, you used
18  the term, Nuvia ALA ███████████
19  ███████████
20      Do you have an understanding
21  of what ███████ of the Nuvia ALA
22  you're referring to when you refer to the
23  ███████████?
24      A      Well, I'm happy to look at
25  the contract.  I haven't committed it to

Page 27

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  memory.
3      Q      Sure.
4      MR. ISAACSON:  Why don't we
5  mark this ███████
6      (The above-referred-to
7  document was marked as ███████████
8  for identification, as of this date.)
9      A      And I'm sorry.  You
10  mentioned Nuvia ███████████
11      Q      Yes.  You used the term
12  Nuvia ALA ███████████ in
13  paragraph 10 of your report.
14      Thank you.
15      MR. MOONEY:  Do you have the
16  rest of this agreement or no?
17      MR. ISAACSON:  Not
18  currently.
19      MR. MOONEY:  Just for the
20  record, so ███████████████
21  It doesn't have the annex to the
22  amendments.  That's fine.
23      Q      And I give this to you, just
24  in case this helps you, if you tell me
25  what your understanding of the Nuvia ALA

Page 28

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  termination provisions are.
3      A      So in paragraph 42 of my
4  report, I say, "ARM's TLAs and ALAs also
5  include ███████████████████
6  ███████████████
7  ███████████████
8  ███████████████
9  ███████████████
10  ███████████████
11  ███████████████████
12  ███████████████████
13  ███████████████
14      I cite to Footnote ███ which
15  is a discussion with Paul Williamson and
16  Christine Tran.  For example,
17  ███████████ of the Nuvia ALA includes
18  the following ███████████  And
19  I cite to ███ by citing to Footnote 102,
20  which is document ending in 080,
21  beginning in 064.  And I cite a section
22  of the agreement, which is ███████████,
23  which I understand to be a discussion of
24  the ███████████ of this ALA by
25  ARM in accordance with ███████████.

Page 29

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2      Q      So when you refer in
3  paragraph 10 to the Nuvia ALA ███████████
4  ███████████ you're referring to your
5  discussion in paragraph 42 of your
6  report; is that correct?
7      A      Well, you said paragraph 10.
8  I might just be not following you.
9      Q      In paragraph 10, you used
10  the term Nuvia ALA ███████████
11  ███████████
12      A      And you said paragraph 10 of
13  my report?
14      Q      Yes.
15      You see, "I have assumed a
16  breach of the Nuvia ALA ███████████
17  ███████████ It's at the end of that
18  very short paragraph 10.
19      A      I see that.
20      Q      So I'm just trying to get an
21  understanding of when you say you've
22  assumed a breach of the Nuvia ALA
23  ███████████████████
24  ███████████████████

(Pages 26 - 29)

ATTORNEYS EYES ONLY

Page 30

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    that you just referenced?
3        A    That's correct.
4        Q    And are you assuming a
5    single breach of those ███████████
6    multiple breaches of those ███████████
7        MR. MOONEY:  Objection to
8    form.
9        A    I think I'm assuming there's
10   a breach as to the legal argument.
11   Regarding whether there is more than one
12   breach, I would say that sounds like a
13   legal interpretation which I'm maybe not
14   necessarily comfortable giving.
15       My understanding is that
16   there is a breach of ███████████, which
17   is the section that we've been referring
18   to, as to whether there's multiple
19   breaches. I don't know if I have an
20   opinion on that.
21       Q    You've given the opinion
22   that if defendants are found liable for
23   breach of the Nuvia ALA, but are not
24   ordered to discontinue the use and
25   distribution of ARM technology, ARM

Page 31

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    confidential information, any products
3    embodying such technology and
4    information, then monetary damages are
5    not adequate to compensate ARM for the
6    harm, including future harm, caused by
7    defendants' breach of the Nuvia ALA.
8        When you're giving that
9    opinion, are you referring to any
10   specific conduct that caused that breach?
11       A    Can you point me to where
12   you're reading from?
13       Q    Sure. Paragraph 14 of your
14   report.
15       A    I'm sorry. If I could just
16   take a look at the paragraph real quick.
17       Q    Sure.
18       A    Thank you. Okay. Thank
19   you.
20       Q    So when you say if
21   defendants are found liable for breach,
22   and you go on to talk about the rest of
23   your opinion, are you referring to any
24   specific alleged breached or conduct or
25   it's just any breach of the Nuvia ALA?

Page 32

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        A    Well, my understanding is,
3    is that -- and again, this is as a
4    layman, not as an attorney -- but my
5    understanding is, is that ███████████
6    ███████████████████████████████████
7    ███████████████████████████████████
8    ██████████████████████████████
9    ██████████████████████████████████████
10   ████████████████████████████
11
12       And that consent would be a
13   consent that would either allow them to
14   use the technology in some appropriate
15   manner defined by the contract. Or to
16   the extent that it's not defined or
17   authorized by the contract, my
18   understanding is, is that there are
19   ██████████████████. And once the
20   contract is terminated, ████████████████
21   ████████████████████████████████████
22
23       Q    So when you're using the
24   term, if defendants are found liable for
25   breach of the Nuvia ALA, would that

Page 33

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    include any use of Nuvia confidential
3    information by Qualcomm where Qualcomm
4    did not have the right to use that?
5        MR. MOONEY:  Objection,
6    form.
7        A    Again, it sounds like a
8    legal question.
9        Q    And I'm not asking you a
10   legal question. So let me make this
11   clear.
12       You've given an opinion that
13   if defendants are found liable for breach
14   of the Nuvia ALA, then you have a certain
15   opinion that follows from that about how
16   monetary damages in certain circumstances
17   would not be adequate to compensate ARM.
18   I'm trying to understand what you mean by
19   a breach of the Nuvia ALA that
20   triggers -- that's the premise for your
21   opinion.
22       Is it any breach of the
23   Nuvia ALA where Qualcomm does not have
24   the right to use Nuvia confidential
25   information?

9 (Pages 30 - 33)

ATTORNEYS EYES ONLY

Page 34

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2      MR. MOONEY:  Objection,
3  form.
4     A    That seems like a different
5  question, sir, completely different
6  question than the first one you asked.
7  And I appreciate you being clear.  But
8  perhaps I didn't understand where you're
9  going.
10     Q    I'm trying to help you to
11  explain where I'm going.
12      MR. MOONEY:  Counsel, if he
13  could finish his answer.  Thanks.
14     A    Maybe we don't talk over one
15  another.
16      So I have guided you to
17  where in my report, I was referring to.
18  And then you mentioned paragraph 10.  Now
19  you've moved to paragraph 14.  And I'm
20  not sure I understand the question that
21  you're asking.
22      So if you could -- you're
23  welcome to repeat the question.  But that
24  may not provide the clarity I'm looking
25  for.  But if you could maybe ask the

Page 35

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2  question again, I would appreciate it.
3     Q    Let me try to put it this
4  way.
5      When you say if defendants
6  are liable for the breach of the Nuvia
7  ALA, is that any breach of the Nuvia ALA
8  or is there some type of breach of the
9  Nuvia ALA that you were referring to?
10     A    Well, I am understanding as
11  a non-legal person that the breach of the
12  ALA here would be a breach of continuing
13  to use ARM confidential information as
14  part of an agreement that was subject to
15  termination based upon the actions of
16  Qualcomm and Nuvia once Qualcomm acquired
17  Nuvia.
18      And I believe there is or
19  are references in the record to some
20  correspondence between ARM and Qualcomm
21  after Qualcomm notified ARM that they had
22  acquired Nuvia, letting Qualcomm know of
23  what was required of them in ARM's mind
24  moving forward.
25      And it's my understanding

Page 36

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2  that ARM's position is Qualcomm failed to
3  adhere to what Qualcomm was -- excuse
4  me -- Qualcomm failed to adhere to what
5  ARM was requesting of Qualcomm under the
6  contract.  And as a result, ARM
7  terminated the contract, which then, as I
8  understand from a non-legal perspective,
9  brought in the concept of the next steps,
10  whether they'd be negotiations or
11  specific performance or what have you,
12  which finds us here.
13     Q    So when you referred to a
14  breach of the Nuvia ALA stemming from
15  █████████████████████████
      ███████████████████████████
      ███████████████████
19  ██████████ do you have any
19  understanding of what that confidential
20  information is or why it's confidential?
21      MR. MOONEY:  Objection to
22  form.
23     A    Well, again, this sounds
24  like a legal question again or certainly
25  defining a legal nature of information or

Page 37

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2  confidential information.
3      But in general, my
4  understanding is, as part of the
5  contract, ARM contract with Nuvia, ARM
6  and Nuvia are working together, sharing
7  confidential information in order to
8  bring a product to market.
9      Ultimately when Qualcomm
10  acquires Nuvia, that then would trigger
11  at least some discussion or some activity
12  amongst the parties, whereby Qualcomm and
13  Nuvia would need to reach some form of
14  agreement in order for the parties to
15  move forward.
16      I understand that that
17  agreement was not reached.  And it was
18  not reached because in ARM's mind, the
19  confidential information that it had
20  shared underneath the ALA and the TLA
21  with Nuvia was now being shared with
22  Qualcomm in a manner which is
23  inconsistent with the agreement between
24  Nuvia and ARM.
25     Q    And then in that

10 (Pages 34 - 37)

ATTORNEYS EYES ONLY

Page 38

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2 paragraph 14, in the second-to-last line,
3 you referred to harm, including future
4 harm. You see that?
5   A   Yes.
6   Q   And you also referred to
7 harm, including future harm, in
8 paragraph 15 in the first line,
9 continuing on to the second line. You
10 see that?
11   A   I do.
12   Q   So when you referred to harm
13 being caused by defendants' alleged
14 breach of the Nuvia ALA, are you assuming
15 there was such a harm?
16   A   It's my understanding, based
17 upon my discussions with ARM personnel
18 and review of documents in this case,
19 certainly, my review of documents in this
20 case and skills and experience allow me
21 the ability to identify likely harms that
22 would occur due to the breach.
23       And so I think it's a
24 combination of review of deposition
25 testimony, review of documents,

Page 39

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2 discussion with ARM personnel, as well as
3 my experience in assessing harms and
4 assessing damages over the course of my
5 career.
6   Q   Just so I understand it, do
7 you consider yourself to be giving an
8 expert opinion in this case that ARM was
9 harmed by Qualcomm's alleged defendants'
10 breach of the Nuvia ALA?
11   A   So, again, I would refer you
12 back to my last answer. The harms that I
13 am referring to are the harms that I
14 understand based upon my discussions with
15 ARM personnel, my review of their
16 deposition testimony, my review of
17 documents in this case, certainly, my
18 review of various damages methodologies,
19 as it relates to those harms, which were
20 identified, but also my skills and
21 experience in assessing damages
22 throughout the course of my career.
23   Q   So I can't tell from that
24 answer whether you're saying you are
25 giving an expert opinion, yes, based on

Page 40

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2 that foundation, that there was harm in
3 this case or whether you're simply
4 referring to those, would be the sources
5 for finding any harm in this case.
6   A   Those would be the sources
7 that I'm aware of that would be
8 associated with identifying the harm,
9 including future harm, associated with
10 defendants' breach of the Nuvia ALA.
11   Q   Right.
12       So you listed the sources by
13 which harm, including future harm, would
14 be found in this case to your
15 understanding.
16       But you're not giving your
17 own independent expert opinion about
18 whether ARM was harmed in this case; is
19 that correct?
20   A   I am -- I would say it a
21 little bit differently. And, again, I
22 tried to say this now twice. So
23 apparently, I'm not doing a good enough
24 job.
25       I've identified that there

Page 41

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2 is likely harm in this case, based upon
3 my discussions with ARM personnel, my
4 review of the documents produced in this
5 case, the deposition testimony.
6       In addition, I've also
7 looked at those harms and assessed them
8 from a damages standpoint to determine
9 whether, if any, damages would either be
10 adequate to compensate or possible to
11 calculate and are these the types of
12 harms that I would anticipate or expect
13 in a case like this.
14       But as to identifying what
15 those harms are, I relied upon my
16 discussions with Nuvia personnel, the
17 documents produced in this case,
18 deposition testimony as I said.
19   Q   In paragraph 3, you
20 say, "I've also been asked to assess and
21 provide testimony regarding the damages
22 associated with ARM's claim for trademark
23 infringement."
24       What trademarks are you
25 referring to there?

11 (Pages 38 - 41)

ATTORNEYS EYES ONLY

Page 42

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2      A    I believe it's the ARM
3  trademark.
4      Q    And then at paragraph 141,
5  you say in the second sentence, "I am
6  informed and understand that ARM is not
7  aware of any trademark infringements by
8  defendants to date."
9          And you say, "I may be asked
10  to opine on potential damages associated
11  with trademark infringement, if any such
12  infringement is alleged to have occurred
13  before trial of this matter."
14          So am I correct that as of
15  this date, you do not have any opinions
16  that ARM has incurred any damages for
17  violation of trademarks?
18      A    I believe that is correct.
19      Q    And when you say you were
20  informed and understand that ARM's not
21  aware of any trademark infringement by
22  defendants to date, who informed you of
23  that?
24      A    I reviewed the second
25  supplemental objections and responses to

Page 43

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  Qualcomm's first set of interrogatories.
3      Q    And you're not aware of any
4  use of Qualcomm's use of ARM marks today;
5  is that right?
6      A    Well --
7      MR. MOONEY:  Objection,
8  form.
9      A    Again, I want to be careful
10  that I don't run into any legal issue
11  here.  I am not aware of that use as --
12  as a general statement.  Whether or not
13  there is anything going on in the
14  background, I might not be aware of or
15  whether something constitutes trademark
16  infringement or alleged trademark
17  infringement.  I don't have an opinion on
18  that.  But as a -- as a non-legal person,
19  I'm not aware of anything.
20      Q    And I understand from your
21  CV that you have an undergraduate degree,
22  a bachelor's in management; is that
23  right?
24      A    Business management, yes.
25      Q    And then you got a master's

Page 44

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  in accounting; is that right?
3      A    That's correct.
4      Q    Did you ever practice as a
5  CPA?
6      A    I did, yes.
7      Q    What period of time did you
8  do that?
9      A    Roughly 1995 to '97.
10      Q    Your CV also states that
11  your clients have included numerous
12  Fortune 500 companies and a wide variety
13  of industries including semiconductors.
14          Have you ever provided a
15  damages calculation for a semiconductor
16  before?
17      A    I have, yes.
18      Q    If you want to consult the
19  schedule of your report with your prior
20  testimony, feel free to do that.
21          But would you tell me the
22  instances where you provided a damages
23  calculation for a semiconductor company
24  before?
25      A    Samsung Electronics, Demaray

Page 45

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  v. Samsung.
3      Q    Which page are you on now?
4      A    Page 1 of 5.
5      Q    Demaray versus Samsung?
6      A    That's correct.
7      Q    You could keep going through
8  the list.
9      A    Power Integrations versus
10  Fairchild Semiconductor.
11      Q    Which page are you on?
12      A    Page 5.
13      Q    Do you recall any others?
14  This was for your last four years.  Do
15  you recall any others?
16      A    Yeah.  I'm forgetting the
17  name of one that was, I guess, more
18  recent.  I'll have to see if I can recall
19  it throughout the course of the
20  deposition.  Those are the ones that I
21  recall.
22      Q    And the Power Integrations
23  company, you estimated damages there.
24          What was the general nature
25  of the claim for which you were

12 (Pages 42 - 45)

ATTORNEYS EYES ONLY

Page 46

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    estimating damages?
3        A    I believe it was a patent
4    infringement matter.
5        Q    And with respect to the
6    Demaray versus Samsung, what was the
7    general nature of that case for which you
8    were estimating damages?
9        A    It was a patent infringement
10   matter.
11       Q    And in both of those cases,
12   were you estimating damages for the
13   plaintiff?
14       A    I don't believe so, no.
15       Q    So let me break it down
16   then.
17           So for the Demaray versus
18   Samsung case, were you estimating damages
19   for the plaintiff?
20           MR. MOONEY:  Objection,
21   form.
22       A    No.
23       Q    And for Power Integrations,
24   were you estimating damages for the
25   plaintiff?

Page 47

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        A    No.
3            MR. MOONEY:  So the record
4    is clear, who was he retained by or
5    whose damages was he allegedly
6    assessing?
7            MR. ISAACSON:  I was asking
8    if he was estimating damages for the
9    plaintiff.  I see what you're saying.
10   Fair point.
11           MR. MOONEY:  It may be clear
12   to everybody else.
13           MR. ISAACSON:  No.  I think
14   you are correct.
15       Q    So for Power Integrations,
16   were you estimating damages on behalf of
17   the plaintiff, working for the plaintiff?
18       A    No.
19       Q    And the same question then
20   in Demaray.
21           Were you estimating damages
22   working for the plaintiff?
23       A    No.
24       Q    How often in your career
25   have you estimated damages for alleged

Page 48

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    breach of a license agreement on behalf
3    of the party who was claiming damages?
4        A    I would say several, many.
5    I don't recall.  It's a very common form
6    of -- common form of legal action.
7        Q    So by virtue of the fact
8    that you've been deposed over 100 times,
9    I assume you've been retained as an
10   expert over 100 times.  Is it hundreds of
11   times?
12       A    I would say it's over 100
13   times.  Whether it's 200 or 300 times, I
14   don't know.  I've been doing this for
15   almost 30 years.
16       Q    So when you say you've
17   estimated damages for alleged breach of a
18   license agreement on behalf of a
19   plaintiff many times, I'm trying to
20   understand what range that would be,
21   given how often you've been retained as
22   an expert.
23       A    Well, I guess I would -- as
24   I'm listening to your question now, you
25   used the word license agreement.  I would

Page 49

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    say when I think of breach of contract, I
3    think a breach of contract for all types
4    of agreements.
5        Q    I'll say breach of a
6    contract.
7        A    So I've been involved in
8    breach of contract agreements as part of
9    numerous lawsuits.  I can't tell you how
10   many as I sit here.
11       Q    Would it be dozens?
12       A    I would say certainly, it
13   could be dozens.  I don't know.  It's not
14   something I've committed to memory.  But
15   it's a relatively -- well, it's not an
16   uncommon claim for there to be a breach
17   of contract.  In that breach of contract,
18   we are looking to assess what harm to
19   the plaintiff is based upon that breach.
20       Q    And within those cases, have
21   you sometimes estimated damages for
22   alleged breach of a license agreement on
23   behalf of the party claiming damages?
24       A    I believe that to be true as
25   well, yes.

13 (Pages 46 - 49)

ATTORNEYS EYES ONLY

Page 50

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  Q    And can you point me to any
3  standard manuals or publications that set
4  forth methods you've relied on in the
5  past for estimating damages for the
6  alleged breach of a contract?
7  A    Well, I would say that there
8  are various treatises, damages handbooks,
9  damages text.  I haven't committed them
10 all to memory.  We referred to them from
11 time to time.  I generally am aware of if
12 there is a breach of contract, there can
13 be a number of different forms of damages
14 that may be considered.
15     And factually, each case is
16 different, the circumstances are
17 different, the parties are different, the
18 agreements are different.  And we are
19 looking to identify the measure of
20 damages and the construct of damages,
21 which is most similarly situated to not
22 only the harm, but the facts of that
23 case.
24 Q    Are there any treatises,
25 damages handbooks or damages text that

Page 51

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  you could point me to that do set forth
3  methods that you've relied on in the past
4  for estimating damages for breach the
5  contract?
6  A    Yes.  Again, there's an
7  AICPA damages handbook that we've used in
8  the past.  I think there's several kind
9  of general damages type handbooks.
10 Again, I haven't committed the titles to
11 memory.  But, yes, there's numerous of
12 them.
13 Q    There's the AICPA damages
14 handbook.
15     Without regards to the
16 specific titles, without remembering
17 specific titles, is there any other way
18 to refer me to materials that you've
19 relied on, organizations that published
20 it, anything else?
21 A    Not as I sit here.  Like I
22 said, there's various manuals or
23 treatises that set forth those measures
24 of damages that one can look at.  So,
25 yes, they're out there.  I haven't

Page 52

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  committed them to memory in a way that I
3  could provide clarity here.
4  Q    And the only one you can
5  remember now right now is the AICPA
6  publication?
7  A    Maybe stated a little bit
8  differently, I can't remember the
9  specific titles.  If you want me to check
10 at a break, I can certainly do that.
11 But, again, it's not something that I've
12 committed to memory.
13 Q    I think that would be great
14 if you checked it at a break.
15     Without having to name the
16 specific titles, if there's ways of
17 pointing me to the publication, that
18 would be useful.
19 A    Sure.
20 Q    And are there common methods
21 you have used in the past to estimate
22 damages for alleged breach of a license
23 agreement?
24 A    So ultimately, if you are
25 looking at issues of breaching a license

Page 53

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  agreement, you could look at things such
3  as potential lost profits.  You could
4  look at a potential for a royalty.  When
5  you talk about breaches more generally,
6  you're looking at things such as benefit
7  of the bargain, or sometimes people go
8  the other way.  And they want to talk
9  about rescission.  Sometimes people want
10 to talk about restitution damages, things
11 like that, are whenever there's a breach
12 of contract, we look at certain of those
13 potential paths forward.
14     But if you're talking about
15 license agreements for technology or
16 patents, oftentimes, you're looking at,
17 you know, what are the potential harms of
18 that breach now from a monetary
19 standpoint.  To the extent there are lost
20 profits or royalty, as I said, you might
21 look there.  If there's a breach, such
22 that there would be some price erosion
23 measure of damages, that might be
24 something else you would look at; you
25 know, depending on whether there's now

14 (Pages 50 - 53)

ATTORNEYS EYES ONLY

Page 54

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2     some confusion in the marketplace, you
3     might -- you might see some harm to
4     reputation if the party who's offering
5     the product to the market doesn't adhere
6     to certain standards or obligations under
7     the license agreement. So, again, it's
8     all fact-specific.
9     Q      And everything you just
10    listed are methods that you have used in
11    the past to estimate damages for either
12    breach of a license agreement or breach
13    of contract; is that correct?
14    A      Well, I either used them or
15    considered them. I don't think that was
16    your original question. Your original
17    question was what types. So those are
18    the things that I'm aware of. Again,
19    every fact pattern is distinct.
20         So I would say that those
21    are some of the considerations that I
22    would have. But those considerations
23    would vary based upon the fact patterns
24    in the case.
25    Q      So my original question was

Page 55

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2     about methods that you used. I'm not
3     sure if you've used all of these methods.
4         So have you --
5     A      I've used all of those
6     methods.
7     Q      For estimating damages in a
8     breach of contract or breach of license
9     agreement?
10    A      I have used them all in some
11    form. I'm not sure whether it's in a
12    breach of a license agreement or not.
13    But those are all forms of damages that I
14    have used. Again, the facts of each case
15    are different. I can't tell you as I sit
16    here. I've used all those in the
17    specific reference that you've set forth.
18    Q      So you've used -- if I could
19    just break these down briefly -- in the
20    past in estimating damages, the method of
21    estimating a reasonable royalty; is that
22    right?
23    A      I have.
24    Q      You have used in the past in
25    estimating damages, lost profits?

Page 56

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2     A      That's correct.
3     Q      You have used in estimating
4     damages in the past, estimating the
5     benefit of the bargain?
6     A      That is correct.
7     Q      In estimating damages in the
8     past, you have measured damages called
9     restitution?
10    A      That's correct.
11    Q      And by restitution, do you
12    understand that is estimating the
13    wrongful profits of the breaching party?
14    A      In general, yes, under kind
15    of a fraud type claim, breach of
16    contract, again, I'm not a legal person.
17    But there's almost -- I don't believe
18    that a breach of contract, just in
19    general, allows for benefit of the
20    bargain, unless there's some specific
21    fraudulent act or something else. Again,
22    that's mirror of a legal interpretation.
23    But that's my understanding.
24    Q      But regardless of the law,
25    you've used that method to estimate

Page 57

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2     damages?
3     A      Well, I think it's
4     important, the context, so that we don't
5     get crosswinds. But, yes, I've used that
6     method, not only in those type cases, but
7     also trademark cases or trade secret
8     cases.
9     Q      And you've also in the past
10    estimated damages using price erosion?
11    A      That's correct.
12    Q      And you've also estimated
13    damages for harm to reputation when there
14    was confusion in the marketplace?
15    A      That is correct. You see
16    that in trademark cases, things of that
17    nature.
18    Q      And in the past, have you
19    estimated damages for future damages for
20    breach of a contract or license
21    agreement?
22         MR. MOONEY: Objection,
23    form.
24    A      I can't say that I haven't.
25    To the extent that there was some kind of

15 (Pages 54 - 57)

ATTORNEYS EYES ONLY

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2    specific performance type argument
3    where -- or not specific performance, I
4    beg your pardon, benefit of the bargain
5    type argument where you're playing out
6    the term of a contract and what the
7    parties had negotiated or bargained for.
8    Again, it would have had to have been
9    included in the contract and, again, very
10   fact-specific.
11       Q      So you believe you've
12   estimated future damages where a contract
13   had a term that was moving forward into
14   the future?
15       A      To the extent that you were
16   looking at a contract and the information
17   in the contract allowed you to do so.  So
18   the example might be I agree to purchase
19   X amount of widgets over the period of
20   the term of the contract.  And
21   ultimately, the company doesn't purchase
22   those.  And so the supplying company buys
23   the equipment or material in order to get
24   that widget to the potential purchaser.
25   But the potential purchaser walks away,

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2    leaving the supplying company with a
3    boatload of inventory and no one to sell
4    it to.  So there's carrying costs and
5    things like that, that you would take
6    into play, you know, kind of going
7    forward.
8        Q      When you have used the
9    reasonable royalty method for calculating
10   damages, in calculating that royalty, do
11   you take into account both past and
12   future harm?
13       A      Well, we usually are
14   calculating the royalty for -- based upon
15   the number of units, if you will, that
16   are subject to a breach.
17             But, of course, you don't
18   know what the situation going forward
19   past either the trial date or the current
20   date of the report is to know how many
21   unit sales would be or how the market
22   develops going forward.  So in large
23   part, no.
24       Q      So when you're looking at
25   reasonable royalty, do you look at the

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2    future value of the license right?
3        A      In what way?
4        Q      So when you're using a
5    reasonable royalty to estimate damages,
6    do you take into account the future value
7    of the license right that is the subject
8    of the royalty?
9        A      That's the same question.
10   It's unclear to me.  So you have to do
11   better.
12       Q      I'm not clear on why you
13   don't understand it.
14             So when you're using a
15   reasonable royalty to estimate damages,
16   do you take into account, future value of
17   the license right in any respect?
18       A      Again, I'm trying to
19   understand when you say future value of
20   the license right, if you're asking me
21   whether you're looking at what parties to
22   a hypothetical negotiation would do.
23   You're sometimes taking into account
24   something called the Book of Wisdom,
25   which might result in some awareness

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2    that, you know, you didn't know that the
3    hypothetical that is only available to
4    you now, post the hypothetical
5    negotiation date.  I do believe that
6    courts accept and have allowed the
7    concept of Book of Wisdom under certain
8    circumstances.  So it's certainly
9    something I would consider, again
10   factually based upon a certain fact
11   pattern.
12       Q      When you've estimated
13   damages for alleged breach of a license
14   or a contract, have you done that in
15   cases where the party who claims to be
16   injured said that it had lost goodwill?
17       A      So I know that goodwill
18   is -- has been incorporated into certain
19   cases.  I don't know if I've specifically
20   worked on a project that is consistent
21   with what you're referring to.
22             Again, as I stated earlier,
23   in a situation where you're looking at,
24   say, a trademark case and one says, hey,
25   you're infringing my trademark, you're

16 (Pages 58 - 61)

ATTORNEYS EYES ONLY

Page 62

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    going to harm my reputation and my
3    goodwill based upon your infringing use
4    of my mark. So that's certainly
5    something that has been a part of a case
6    that I have worked on. Those goodwill
7    and reputational harms are oftentimes
8    very difficult to calculate, depending on
9    the types of information that you have
10   available to you. So it's certainly been
11   present in cases that I've been
12   involved in.
13        Q    Based on your background as
14   a damages expert, do you agree that
15   damages experts would commonly calculate
16   damages for a breach of a license
17   agreement by calculating a reasonable
18   royalty rate?
19        A    I think that a reasonable
20   royalty rate is one measure of damage
21   that can be used. To say it's common or
22   not common, I don't know. I haven't done
23   that study. It's certainly one measure
24   of damage.
25        If you were looking at a

Page 63

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    contract, whereby a party just stops
3    paying royalties and they've now breached
4    the licensing agreement and the licensor
5    goes to the licensee and says, hey,
6    you've breached the agreement, you need
7    to pay us a royalty per the term of the
8    contract.
9        I've been involved in cases
10   which I've been asked to perform somewhat
11   of a royalty audit. And to the extent
12   there are additional sales that a royalty
13   has not been paid upon, I've been asked
14   to kind of summarize those from an
15   accounting standpoint.
16        So I would say, yes, in
17   those kind of breach of a license
18   agreement where we're asked to do royalty
19   audit type functions, I've seen that.
20        Q    Would you consider
21   reasonable royalty to be a standard
22   method of calculating damages in your
23   field for breach of a license agreement
24   where the alleged breach has to do with
25   using information on an unlicensed basis?

Page 64

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        A    Well, again, a reasonable
3    royalty in a situation where there's a
4    breach is -- oftentimes, it's part of the
5    agreement. So when you say determination
6    of a reasonable royalty, oftentimes, the
7    royalty is already determined. It's
8    really just a matter of how many units
9    are identified and how that -- how that
10   function is going forward. Again, this
11   is setting aside any other types of
12   damages and the factual nature of the
13   dispute.
14        Q    Do you have any reason to
15   say that reasonable royalty would not be
16   an accepted method for estimating damages
17   in this case?
18        A    In the one that we're here
19   on today?
20        Q    Yes.
21        A    Well, I think that in this
22   particular case, based upon the harms
23   that ARM has identified and the documents
24   that I've reviewed, I don't think it
25   would be adequate to compensate ARM. And

Page 65

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    it certainly wouldn't be calculating
3    damages to the harms that ARM would
4    likely incur to a reasonable degree of
5    certainty.
6        Q    If you go back to your --
7        MR. MOONEY: We're at 115,
8    counsel.
9        MR. ISAACSON: The next
10   question will take a few minutes, if
11   you want to take a break.
12        MR. MOONEY: That would be
13   great.
14        THE VIDEOGRAPHER: This will
15   end Media Unit 1, going off the
16   record at 10:21.
17        (A short recess was taken.)
18        THE VIDEOGRAPHER: We're
19   back on the record at 10:36. This
20   will begin Media Unit 2.
21        Q    If we could go back to your
22   list of testimony, which is part of
23   Schedule 1 of your report, could you
24   identify on this list anytime you
25   estimated damages on behalf of a party

17 (Pages 62 - 65)

ATTORNEYS EYES ONLY

Page 78

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  poor behavior by attorneys who settled a
3  case that Mirowski did not believe based
4  upon current legal counsel that the
5  counsel should have settled the case.
6          And so this was a follow-on
7  case, so a case within a case, which
8  brought in a variety of arguments from
9  the initial case and what parties had
10  concluded or what parties thought at the
11  time of that first case of the case
12  within a case where there was some type
13  of attorney misbehavior.
14          And in the second case, I
15  was asked to come in and provide some
16  opinions.  I don't necessarily recall the
17  extent of the opinions as I sit here.
18  But it was a somewhat complex
19  multi-facetted litigation, including
20  prior cases, prior license agreements,
21  poor behavior by attorneys, all of which
22  somewhat were incorporated into this case
23  within a case, best I can recall.
24  Q     And did you calculate a
25  reasonable royalty?

Page 79

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  A     I don't recall.
3  Q     Let's go back to your expert
4  report and your list of cases.
5  A     Okay.
6  Q     How many of these cases or
7  can you identify which cases which you
8  were asked to provide an opinion about
9  whether damages were adequate to
10  compensate a party as opposed to
11  providing an actual calculation of
12  damages or discussing an actual
13  calculation of damages?
14          MR. MOONEY:  Objection,
15  form.
16  A     I believe Bay Materials is
17  one under A.
18  Q     I see it on page 1.
19  A     I believe Nevro.
20  Q     Where's Nevro?
21  A     Page 4.  L'Oreal.  I believe
22  that's it.
23  Q     I'm sorry.
24          L'Oreal, did you say?
25  A     It's Liqwd v. L'Oreal on the

Page 80

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  fifth page.
3  Q     Thank you.
4          The Bay Materials case, did
5  you give an opinion that monetary damages
6  would not --
7  A     Sorry.  Can you please state
8  that again?
9  Q     Sure.
10          In the Bay Materials case,
11  did you give an opinion that monetary
12  damages would not be adequate to
13  compensate a party?
14  A     That's correct.
15  Q     In Nevro, did you give an
16  opinion that monetary damages would not
17  be adequate to compensate a party?
18  A     That's correct.
19  Q     And in Liqwd versus L'Oreal,
20  did you give an opinion that monetary
21  damages would not be adequate to
22  compensate a party?
23  A     I give an opinion that
24  monetary damages would be adequate to
25  compensate.

Page 81

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  Q     Other than these three cases
3  in your career, do you remember any other
4  cases where you gave opinions that
5  monetary damages would or would not be
6  adequate to compensate a party?
7  A     I believe I have in the
8  past.  I don't recall as I sit here what
9  additional cases or what other cases that
10  I can think of at this point.  I seem to
11  recall there was a case involving Under
12  Armour sometime ago.
13  Q     Any other cases you recall?
14  A     I believe there was a matter
15  involving the automotive manufacturer who
16  manufactures the Crosstrek automobile.
17  Q     Any other cases you
18  remember?
19  A     Not that I sit here.
20  Doesn't mean there weren't any.  But
21  those are the ones that I recall.
22  Q     In the Under Armor case, did
23  you give the opinion that monetary
24  damages would or would not be adequate to
25  compensate a party?

21 (Pages 78 - 81)

ATTORNEYS EYES ONLY

Page 82

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    A    I believe I gave the opinion
3  that monetary damages could be determined
4  in that case.
5    Q    And the same question for
6  the Crosstrek automobile case.
7    A    And to be clear, that was a
8  trademark case. And the Crosstrek case
9  was also a trademark case. And I believe
10  I argued that monetary damages would
11  compensate for the harm.
12    Q    That's a good point.
13      What was the general nature
14  of the case in Liqwd and L'Oreal?
15    A    That was a patent case over
16  a product called Olaplex, a hair care
17  product.
18    Q    What was the general nature
19  of the case of Nevro versus Boston
20  Scientific Corporation?
21    A    Case involving spinal cord
22  stimulation, a patent case.
23    Q    And the general nature of
24  the case of Bay Materials?
25    A    Patent case involving the

Page 83

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  correction for malocclusions.
3    Q    If you look at your reply
4  report, relating to remedies for the
5  defendants' breach of contract, which is
6  Exhibit 256, is the March 25th report.
7    A    Okay.
8    Q    In paragraph 14, you
9  say, "Given ARM's request for specific
10  performance has not been addressed by the
11  court and denied, the harms discussed in
12  my initial report have not yet
13  transpired."
14      Does it remain the case that
15  today, that none of the harms that you
16  discussed in your reports, in your
17  opening report and reply report have
18  occurred yet?
19    A    Well, it's a bit unclear.
20  So if you look at the deposition
21  testimony of ARM witnesses, I believe
22  Mr. Williamson, Mr. Abbey, I think I
23  recall their opinion is it's really
24  impossible to determine what impact
25  Qualcomm's actions have had at this

Page 84

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  point, whether certain potential
3  licensees have decided not to take a
4  license with ARM or certain potential
5  licensees are requesting relief, relief
6  meaning lower royalty rates.
7      I understand that in my
8  discussions with Mr. Williamson and
9  Mr. Abbey that there has been a
10  consistent level of discussion amongst
11  licensees who are speaking with ARM
12  personnel about the Qualcomm situation.
13      So while I think the market,
14  as I understand it -- and by market, has
15  an awareness, just by virtue of what's
16  available in ARM's 10-K, which describes
17  the nature of the lawsuit and the
18  potential harms that could arise from
19  such a lawsuit. If things were to move
20  forward, it's impossible to tell what has
21  happened yet.
22      However, I understand that
23  these are perspective harms to the extent
24  that specific performance is not
25  ultimately granted by the court in this

Page 85

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  case.
3    Q    Now, you had the chance to
4  review the Williamson and Abbey
5  depositions before your reply report;
6  correct?
7    A    That's correct.
8    Q    And even before your opening
9  report?
10    A    I believe that's correct,
11  yes.
12    Q    So when you say in
13  paragraph 14 of your reply report, as we
14  just read, you say, "The harms discussed
15  in my initial report have not yet
16  transpired."
17      So does that statement
18  remain true today?
19    A    I would say that in large
20  part, the harms that are set forth in my
21  report are perspective harms. I only
22  attached to that what I am aware of in
23  the depositions, which is as it relates
24  to what Mr. Abbey and Mr. Williamson
25  know, it's my understanding that they█████

22 (Pages 82 - 85)

ATTORNEYS EYES ONLY

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    ████████████████████████████
     ████████████████████████████
     ████████████         And they
5    shared in their depositions that it's
6    impossible to know at this point.
7        Q      You're sharing with me --
8        A      I'm sorry.  I would just
9    like to finish my answer.
10       Q      Sure.
11       A      So while I understand that
12   these are perspective harms, I also am
13   providing a fulsome understanding of the
14   record as I understand it.
15       MR. MOONEY:  I just want to
16   designate the transcript as highly
17   confidential, attorneys' eyes only.
18       Q      In your reply report, you
19   say, "The harms discussed in my initial
20   report have not yet transpired."
21           Was that a correct
22   statement?
23       A      Certainly.
24       Q      And is that a correct
25   statement as of today?

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        A      35?
3        Q      Yes.  Page 35.  We're in
4    Section B of your report.  And this is
5    little 1 of your report.  And this is
6    actually I think 7B, little 1.
7           The title of this section is
8    "Existing and Prospective ARM Licensees
9    Could Demand More Favorable Terms and
10   Lower Royalties to Account for Increased
11   Risk."
12          There are Footnotes 192 to
13   198 for this section.  Those footnotes
14   identify discussions with Will Abbey and
15   Paul Williamson, along with in Footnote
16   195, two deposition excerpts.
17          So are those discussions
18   with Will Abbey and Paul Williamson and
19   those two deposition excerpts the basis
20   for the statements you are making in this
21   section of your report?
22       MR. MOONEY:  Objection,
23   form, mischaracterizes the footnote.
24       MR. ISAACSON:  What am I
25   getting wrong here?

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        A      It is a correct statement as
3    of today.  I'm simply supplementing my
4    awareness of the factual record.
5        Q      Am I correct that the harms
6    that you have identified in your report
7    will not take place, unless the court
8    refuses to grant ARM's request for
9    specific performance?
10       A      Again, it's my understanding
11   that the ARM ecosystem is at risk for the
12   reasons enumerated in my report.  And to
13   the extent that the court does not grant
14   specific performance, I understand that
15   the market will then -- in all the ways
16   that I have enumerated in my report --
17   understand that ARM's ecosystem is
18   compromised as a result of the actions or
19   activities in this case.
20       Q      If you could look at page 35
21   of your report.
22       A      Which report are you
23   referring to?
24       Q      Opening report.  So this is
25   Exhibit 255.

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        MR. MOONEY:  There's two
3    deposition excerpts.
4        MR. ISAACSON:  Is there a
5    third one?
6        MR. MOONEY:  There's three
7    of them.
8        MR. ISAACSON:  Oh,
9    deposition.  Okay.  Thank you.
10       Q      I'll just say the same
11   question with three deposition excerpts.
12          Are these discussions with
13   Will Abbey and Paul Williamson and those
14   three deposition excerpts the basis for
15   the statements you are making in this
16   section of the report?
17       A      That is correct.  Well, I
18   beg your pardon, with the exception of
19   paragraph 78, which is my opinion as an
20   expert in calculating economic damages as
21   part of -- as part of this case, again
22   based upon skills and experience and
23   training.
24       Q      But for any facts, for the
25   conclusion that existing prospective ARM

ATTORNEYS EYES ONLY

Page 90

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   licensees could demand more favorable
3   terms and lower royalties to account for
4   increased risk, you are relying on your
5   discussions with Will Abbey and Paul
6   Williamson and the three deposition
7   excerpts?
8       A     That's correct.
9       Q     And when you say could, you
10  say could demand in the title?
11      A     Yes.
12      Q     Are you assessing any
13  probability that that could happen when
14  you say could?
15      A     Well, I'm not offering an
16  opinion on probability. I'm essentially
17  identifying where the harms in the
18  market, harms in ecosystem could
19  undermine ARM's business based upon the,
20  as I said earlier, facts of this case,
21  documents in this case, deposition
22  testimony.
23      Q     When you're saying in
24  paragraph 78, "In my opinion, the scope
25  of the harm of existing and prospective

Page 91

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   ARM licensees demanding more favorable
3   terms and lower royalty rates to account
4   for increased risk cannot be readily
5   determined or quantified, and the damages
6   associated with that harm cannot be
7   determined with reasonable certainty,"
8   when you make that statement, is there
9   any level of probability that you are
10  assuming with respect to whether the
11  probability of ARM licensees demanding
12  more favorable terms and lower royalties?
13      A     No. I'm not offering a
14  probability here. I'm basing my opinions
15  of those events, again based upon we talk
16  about documents that I've reviewed in
17  this case. I think I mentioned the
18  public filings that Abbey -- excuse me --
19  that ARM has set forth, identifying the
20  lawsuit with Qualcomm, Nuvia and the
21  potential impacts there.
22           Certainly, my discussion,
23  deposition testimony based upon these
24  experiences that these gentlemen have on
25  a daily basis, discussing with potential

Page 92

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   customers or licensees.
3       Q     The point that existing and
4   prospective ARM licensees could demand
5   more favorable terms and lower royalties
6   to account for increased risk, is that
7   sufficient for you to reach the opinion
8   that monetary damages in this case cannot
9   be readily determined or quantified and
10  cannot be determined with reasonable
11  certainty?
12      A     Certainly.
13      Q     You say in
14  paragraph 76, "For example, current and
15  prospective ARM licensees could consider
16  the impact of Qualcomm or other licensees
17  where prospective licensees breaching
18  their license agreements and misusing
19  ARM's technology, ARM confidential
20  information and products embodying such
21  technology or information."
22           So that risk, that ARM
23  licensees could demand more favorable
24  terms and lower royalties, does that
25  happen anytime you have an ARM licensee

Page 93

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   breach their license agreements?
3       A     I think that to the extent
4   that ARM licensees breach their license
5   agreements and misuse ARM technology --
6   and I talk about several impacts of
7   that -- existing licensees may be less
8   inclined to respect their license terms
9   or selectively misinterpret terms.
10           I talk about several other
11  issues as well in the same paragraph,
12  along those same lines. I would say that
13  the fact that this is Qualcomm, and
14  Qualcomm is one of, I think, the three or
15  four largest licensees within the ARM
16  licensing ecosystem. So obviously, very
17  public.
18           And, again, I think
19  Mr. Abbey or Mr. Williamson says, ████
20  ████████████████████████████████████
21  ████████████████████████████████
22  ████████████████████████████████████
23  ████████████ That's what we have. It's
24  what people trust. If people lose -- if
25  companies lose confidence in that and

24 (Pages 90 - 93)

ATTORNEYS EYES ONLY

Page 94

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   identify that there is additional risk to
3   working under those conditions, well,
4   then, again, there's a compromise to the
5   ecosystem as I understand it.
6       Q      So is there a compromise to
7   the ecosystem if an ARM licensee, other
8   than Qualcomm, breaches their license
9   agreement and misuses ARM technology or
10  information?
11      A      Well, there certainly could
12  be. I'd need to understand what the fact
13  pattern is.
14      Q      And would you have the
15  opinion that monetary damages cannot
16  adequately compensate ARM anytime that an
17  ARM licensee, other than Qualcomm,
18  breached their license agreement and used
19  ARM technology or ARM confidential
20  information?
21      MR. MOONEY: Objection to
22  form.
23      A      Again, it would depend on
24  the fact pattern and what was at issue in
25  the case and how the case or situation

Page 95

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   played out. It certainly could be the
3   outcome.
4       Q      So, for example, on
5   paragraph 73 on the previous page, at the
6   end of paragraph 73, you quote Mr. Haas,
7   saying, ████████████████████████████
8   ████████████████████████████████████
9   ████████████████████████"
10      Do you have the opinion that
11  anytime an ARM licensee uses ARM IP
12  without a license that ARM can't be
13  adequately compensated with monetary
14  damages?
15      A      I would say that to the
16  extent that the ecosystem is damaged by
17  that situation, that very well may be
18  true. Here, again, given the nature of
19  the actions of Nuvia and Qualcomm here,
20  certainly, the belief is, is that the
21  ecosystem will be harmed. And that's
22  borne out in the testimony. It's borne
23  out in documents. It's borne out in
24  information shared with the public
25  through disclosures. So that certainly

Page 96

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   could be the case. It depends on the
3   fact pattern.
4       Q      So is it your understanding
5   that there can be harms to the ARM
6   ecosystem, as you describe it, by the use
7   of ARM's IP in an unlicensed way for
8   which money damages could be adequate?
9       MR. MOONEY: Objection to
10  form.
11      A      Can you ask that again,
12  please?
13      Q      Sure.
14      Is it your understanding
15  that there can be harm to the ARM
16  ecosystem by the use of ARM's IP in an
17  unlicensed way for which money damages
18  could be adequate?
19      MR. MOONEY: Same objection.
20      A      I don't necessarily
21  understand the question. Maybe I'm
22  getting the tenses wrong. But it almost
23  sounds as if you're saying if someone
24  could provide ARM with a bucket of money
25  that would be adequate to compensate,

Page 97

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   does that mean there would be no harm to
3   the ecosystem?
4       A      No. The other way around.
5       If there is a harm to the
6   ARM ecosystem by the use of ARM's IP in
7   an unlicensed way, are there situations
8   where money damages could be adequate to
9   remedy that?
10      MR. MOONEY: Objection to
11  form.
12      A      So you're asking me if there
13  is harm to the ecosystem, could someone
14  provide some amount of money to ARM that
15  would remedy the harm to the ecosystem?
16      Q      Yes.
17      A      Well, I don't necessarily --
18  I don't necessarily have an opinion on
19  what that sum of money would be. Do I --
20  is there some negotiation that ARM would
21  have with a potential licensee or with a
22  licensee who has harmed the ecosystem,
23  whereby the parties were negotiating an
24  amount, I can't necessarily value that as
25  I sit here without further information.

25 (Pages 94 - 97)

ATTORNEYS EYES ONLY

Page 98

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    I wouldn't say that there's not a number
3    that they could arrive at.  I'd need to
4    think through what that might look like.
5        Q    Have you estimated damages
6    in a case before where the injured party
7    was claiming that their licensees could
8    demand more favorable terms and lower
9    royalties due to the breach of a license
10   agreement?
11       A    I believe so, yes.
12       Q    In which case was that?
13       A    I believe it was a topic in
14   the DivX-Harmon lawsuit.
15       Q    In the DivX-Harmon case, did
16   the plaintiff DivX contend that the
17   breach of the license agreement there
18   could cause their licensees to demand
19   more favorable terms and lower royalties?
20       A    To the best of my
21   understanding, that is correct.  I think
22   it also was an issue in the Kokusai case.
23       Q    In the DivX case, you
24   estimated a reasonable royalty as damages
25   based on a royalty audit; is that right?

Page 99

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        A    In that particular case, I
3    didn't estimate damages.  I was simply
4    asked to look at the licensing agreement
5    and identify what the unpaid royalty base
6    was based upon financial accounting
7    information and apply that royalty rate
8    that was in the agreement.  So I wasn't
9    necessarily asked to determine a royalty
10   rate.
11       Q    And was your report there
12   used to estimate damages on behalf of the
13   plaintiff?
14       A    It was used to assess what
15   the unpaid royalty amounts were.  The
16   harm to the ecosystem of licensees not
17   paying royalties for DivX's technology
18   was an element of the case, which was
19   associated with an inability to calculate
20   damages on what that harm might be,
21   meaning the importance of the ecosystem
22   and the importance of protecting the use
23   of the DivX technology in the
24   marketplace.
25       Q    I apologize.  I don't

Page 100

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    understand the last part of your answer.
3    I understand you said it was used to
4    assess what the unpaid royalty amounts
5    were.
6        But was there a separate
7    amount of damages that were being
8    calculated due to this inability due to
9    this risk of licensees demanding more
10   favorable terms and lower rates?
11       A    There was not a separate
12   amount for damages associated with that.
13       Q    And then you mentioned
14   another case which I'm --
15       A    I think it was prior to the
16   four years.  It was a case involving a
17   company called Kokusai.
18       Q    Can you spell Kokusai?  Take
19   your best shot.
20       A    K-O-K-O-S-A-I, perhaps.
21       What was the subject matter
22   of that case?
23       A    Royalty audit associated
24   with the unpaid royalties on certain
25   devices used to prepare or create

Page 101

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    manufactured semiconductors.
3        Q    And the plaintiff there
4    claimed that its licensees could demand
5    more favorable terms and lower royalties;
6    is that right?
7        A    I believe it related to
8    ecosystem type concepts.  I don't recall
9    specifically what they were claiming.
10       Q    When you say ecosystem
11   concepts, you mean that a breach of a
12   license agreement can hurt the ecosystem
13   of the relationship with licensees?
14       A    Right.  Again, all cases are
15   different; right?  You can't fold one
16   case over on top of the other and say
17   that they're exactly the same.  This case
18   obviously has a unique fact pattern based
19   upon the ecosystem that ARM has built.
20       And the importance of that
21   ecosystem and the position that Qualcomm
22   holds in it is the very public nature of
23   the disagreement between the parties, the
24   transition from essentially a server
25   market to a market in which ARM had not

26 (Pages 98 - 101)

ATTORNEYS EYES ONLY

Page 102

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    necessarily allotted or provided Qualcomm
3    to use the technology that it purchased
4    in breach of -- purchased and implemented
5    in breach of the license agreement.
6        Q    Returning to paragraph 76
7    where you said current and prospective
8    ARM licensees could consider the impact
9    of Qualcomm or other licensees or
10   prospective licensees breaching their
11   license agreement, do you know whether
12   ARM has alleged that any other licensees
13   have breached their license agreements
14   with ARM, other than Qualcomm, in the
15   past years?
16       A    Are you saying -- are you
17   saying prior to any information related
18   to this case?  I'm not sure I understand.
19       Q    I'm saying --
20       A    We've got to do a better job
21   of you not interrupting me.
22       Q    I was trying to be helpful
23   there because you asked me about my
24   question.
25       A    No.  That wasn't what I was

Page 103

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    asking.  What I'm really getting at is,
3    if we're talking about ARM and we're
4    talking about events that happened prior
5    to this litigation, are we -- are you
6    asking me about a potential licensee
7    breach from many, many years ago?  Or are
8    you asking me about any potential
9    breaches after the factual pattern that
10   we're aware of in this case?
11       Q    Prior to today, are you
12   aware of ARM alleging any breach of its
13   license agreements by its licensees,
14   other than the allegations against
15   Qualcomm?
16       A    I don't have an awareness of
17   that.
18       Q    Has anyone from ARM told you
19   that they have not alleged breaches of
20   their agreements by any other licensees,
21   other than Qualcomm or Nuvia?
22            MR. MOONEY:  Objection to
23   form.
24       A    I don't have an awareness of
25   that.

Page 104

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2        Q    Did you consider
3    investigating whether Qualcomm and Nuvia
4    are the only alleged breaches of license
5    agreements of ARM?
6        A    And do you mean forever and
7    always?
8        Q    Sure or at any time.
9        A    It wasn't necessary as part
10   of this case.
11       Q    When you say it wasn't
12   necessary in order to understand whether
13   there was actual harm to the ARM
14   ecosystem, you didn't want to know
15   whether Qualcomm or Nuvia were the only
16   alleged breachers of license agreements;
17   is that right?
18            MR. MOONEY:  Objection to
19   form.
20       A    So, again, this is where
21   your question is a bit confusing.  If
22   you're talking about before the factual
23   pattern of this case or after the factual
24   pattern of this case, I'm not aware of --
25   that there's been any additional breaches

Page 105

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2    that were shared with me as part of my
3    work in this case.
4            My understanding is, as I've
5    written here, given the impact on the
6    licensing ecosystem and the impact of
7    other licensees and their reactions to
8    the factual pattern here, to what extent
9    that those licensees may demand more
10   favorable terms or breach a license
11   agreement, those become, to my
12   understanding, a more factual likelihood.
13       Q    And did you take into
14   consideration whether existing or
15   prospective ARM licensees would take into
16   account a large award of money damages
17   for a breach before they decided to
18   consider breaching their own license
19   agreements?
20       A    Well, I certainly understood
21   that there was or were negotiations
22   between Qualcomm and ARM prior to the
23   filing of this lawsuit.  However, I
24   understand that the parties were not able
25   to reach an agreement.

27 (Pages 102 - 105)

ATTORNEYS EYES ONLY

Page 106

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   Q    So my question's about other
3   licensees.
4        Did you take into
5   consideration whether existing or
6   prospective ARM licensees before they
7   decided to consider breaching their own
8   license agreement would take into
9   account a large monetary award against
10  Qualcomm?
11       MR. MOONEY:  Objection,
12  form.
13  A    I was answering that
14  question when you interrupted me.
15  Q    Well, then I'm not saying it
16  clearly.
17       If in lieu of specific
18  performance, the court awarded a large
19  amount of monetary damages in this case.
20       Do you think that
21  prospective and current licensees of ARM
22  would take that into account in making
23  their decisions about their own licensing
24  agreements?
25  A    Well, I can't necessarily

Page 107

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   tell you what other prospective licensees
3   would think.  They may or they may not.
4   Again, I think that the position of ARM
5   is to protect the ecosystem because the
6   ecosystem has been -- the licensing
7   ecosystem system has been largely built
8   over a significant period of time,
9   significant amounts of R&D, investments.
10  I think it's upwards of 40 percent of
11  their overall revenue being plowed back
12  into R&D in order to create technology
13  that licensees want.
14       And licensees need to trust
15  that when they license into that
16  ecosystem that they will, in fact, get
17  the benefits of the ecosystem while at
18  the same time be able to trust that the
19  ecosystem is intact.
20       And now if you're asking me
21  to the extent that there was a large sum
22  of money that was paid that showed the
23  ecosystem or represented to the ecosystem
24  that the ARM licensing ecosystem was
25  intact, I can't tell you what those

Page 108

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   parties would think.  But my sense is
3   that the goal here is to protect the ARM
4   ecosystem.  And given the factual pattern
5   of this case, if this were to move
6   forward without there being a specific
7   performance, that would have a harm to
8   the ecosystem.  If there was some amount
9   of money that was communicated to the
10  market, I don't know what that would be.
11       Again, I don't think it's --
12  can be determined with a reasonable
13  degree of certainty as I sit here based
14  upon the unknown impacts of the breach at
15  this time on the ecosystem.
16       MR. MOONEY:  We've just been
17  going over an hour, if this is a good
18  time for a break.
19       MR. ISAACSON:  Sure.
20       THE VIDEOGRAPHER:  This will
21  end Media Unit 2, going off the
22  record at 11:41.
23       (A short recess was taken.)
24       THE VIDEOGRAPHER:  We're
25  back on the record at 11:54.  This

Page 109

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   will begin Media Unit 3.
3   Q    Am I correct that if ARM
4   licensees were deciding they still
5   trusted the ARM ecosystem after a large
6   award of damages, you don't have an
7   opinion about what they would think or
8   not think about that?
9        MR. MOONEY:  Objection to
10  form.
11  A    Can you repeat that?
12  Q    Sure.
13       Am I correct that if ARM
14  licensees were deciding whether they
15  still trusted the ARM ecosystem after a
16  large award of damages against Qualcomm,
17  you don't have an opinion about what they
18  would be thinking?
19       MR. MOONEY:  Objection,
20  form.
21  A    You said if they were
22  considering the ecosystem after a large
23  award of damages, you're asking me if I
24  have an opinion as to what they would be
25  thinking?

28 (Pages 106 - 109)

ATTORNEYS EYES ONLY

Page 110

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   Q   Yes.
3   A   Well, I mean I can't tell
4   you specifically what each member of the
5   ecosystem would be thinking. But I guess
6   I could -- I would say that it would
7   depend on whether there was a
8   communication to the marketplace that the
9   ecosystem was, in fact, intact and that
10   their participation in that ecosystem
11   remained without risk and would provide
12   them the benefits that they had sought
13   from their first introduction and
14   entrance into the ecosystem.
15   Q   Am I correct that you would
16   not have an opinion if there were a large
17   award of damages against Qualcomm in this
18   case whether licensees would conclude
19   that the ecosystem was still intact and
20   without risk?
21   MR. MOONEY: Objection to
22   form.
23   A   And you're saying that is in
24   lieu of specific performance?
25   Q   Yes.

Page 111

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   A   Well, again, it would depend
3   on how the marketplace viewed that award.
4   I can't tell you that that award would be
5   adequate to compensate for harms that
6   otherwise would have occurred. I can't
7   tell you that number could have been
8   calculated to a degree of reasonable
9   certainty.
10   But if you're asking me to
11   put myself in the mind's eye of the
12   ecosystem, I believe the ecosystem
13   would -- to the extent that they're aware
14   it -- be of the opinion that whatever
15   ARM's urging the court to do would be the
16   outcome. Anything less than that I think
17   would be seen as ARM's inability to
18   control and protect its ecosystem.
19   Again, whether I can provide
20   you with an understanding of what each
21   individual or specific licensee in the
22   ecosystem would be thinking, no, I can't
23   provide you that. I think that the only
24   way to maintain that ecosystem would be
25   to show the market that the ecosystem is

Page 112

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   intact. And that would be when licensees
3   are adhering to the terms of the license
4   agreements.
5   Q   Is it your view that
6   licensees will not consider the ARM
7   ecosystem to be intact without risk,
8   unless a court grants what ARM's urging
9   the court to do as the proper outcome for
10   this case?
11   MR. MOONEY: Objection,
12   form.
13   A   It's my opinion that the
14   marketplace would have to view ARM's
15   ability to control and maintain its
16   ecosystem based upon the contractual
17   obligations of those who are part of it.
18   Now, to the extent that
19   there is a monetary judgment or award in
20   this case, again, I can't tell you how
21   participants would view that
22   independently. But my understanding is,
23   is that the importance of the ecosystem
24   and ARM's ability to enforce its rights
25   and maintain that ecosystem is, as I

Page 113

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   understand it, critical to ARM's ability
3   to continue to invest in the ecosystem
4   and grow the ecosystem and enter into new
5   and emerging markets and things of that
6   nature.
7   Q   If you look at page 36 of
8   your report.
9   A   Sorry. Can you repeat that?
10   Q   Page 36 of your report.
11   A   Thank you.
12   Q   The section there, little 2,
13   is titled "Existing and Prospective ARM
14   Licensees Could Exploit Development and
15   Financial Terms of Other Licenses in
16   Unexpected Ways to Compete Against ARM's
17   Partners."
18   The footnotes that relate to
19   this section are Footnotes 199 through
20   217. And you'll see that those refer
21   often to the discussions and then also to
22   some depositions.
23   For the statement that
24   existing and prospective ARM licensees
25   could exploit development and financial

29 (Pages 110 - 113)

ATTORNEYS EYES ONLY

Page 114

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  terms of other licenses in unexpected
3  ways to compete against ARM's partners,
4  are you depending upon your discussions
5  with Will Abbey and Paul Williamson, as
6  well as the depositions, the deposition
7  of Will Abbey?
8      A    I'm certainly citing to that
9  information for purposes of my discussion
10  in this report.  That's correct.
11     Q    Are you relying on anything
12  else for the conclusion that existing and
13  prospective ARM licensees could exploit
14  development and financial terms of other
15  licenses in unexpected ways to compete
16  against ARM's partners?
17     A    Not beyond my skills and
18  experience.
19     Q    Well, when you say your
20  skills and experience, do you have
21  background in this industry or some
22  skills and experience that you would rely
23  on to support the conclusion that
24  existing and prospective ARM licensees
25  could exploit development and financial

Page 115

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  terms of other licenses in unexpected
3  ways to compete against ARM's partners?
4      A    Well, again, I'm really --
5  I'm identifying two things here, the
6  benefit of my analysis in reviewing the
7  record evidence here in this case; in
8  addition to that, assessing whether the
9  harms associated with the activities that
10  I've talked about could be readily
11  determined or quantified within a
12  reasonable degree of certainty.
13         So as a damages expert who
14  has assessed damages in a multitude of
15  matters, I am looking at the factual
16  background of this case.  And I'm
17  providing my opinion that to -- an
18  attempt to provide the harm associated
19  with these prospective ARM licensees
20  doing the -- or taking the positions that
21  are identified in the prior paragraphs
22  that those measures of harm could not be
23  determined with a reasonable degree of
24  certainty as they couldn't be readily
25  quantified.

Page 116

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2      Q    I apologize.  I don't
3  understand how that answers my question.
4  So let me ask you again.
5         Do you have some expertise
6  or background that you would rely on to
7  support the conclusion that's stated in
8  little 2, existing and prospective ARM
9  licensees could exploit development and
10  financial terms of other licenses in
11  unexpected ways to compete against ARM's
12  partners?
13     A    So little 2 is a summary
14  statement, which reflects the information
15  contained in my analysis of paragraphs
16  79, 80, 81, 82, 83, 84.  And, finally, I
17  provide my opinion as to whether there is
18  an ability to calculate with a reasonable
19  degree of certainty, the harms that would
20  result.
21         So I think we've been pretty
22  clear I rely upon my review of the
23  evidence produced in this case to
24  identify what those harms would be.  And
25  then I assess, well, what measure of

Page 117

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  damages would one in my position with an
3  experience in assessing damages in
4  matters like this, how one would go about
5  doing that to a reasonable degree of
6  certainty.
7         And it's my opinion that the
8  harms of existing and prospective ARM
9  licensees who are exploiting the
10  development and financial terms of other
11  licenses in unexpected ways cannot be
12  readily determined or quantified within a
13  reasonable degree of certainty.
14     Q    So am I right that for
15  paragraphs 80 through 84, you are
16  reviewing evidence in this case and not
17  expressing expert opinions?
18     A    I'm reviewing the record
19  evidence in this case as to the likely
20  harms that would take place.  And I'm
21  identifying my opinions as to those harms
22  and whether there could be monetary
23  damages assessed to those with a
24  reasonable degree of certainty.
25     Q    Now I'm being specific to 80

30 (Pages 114 - 117)

ATTORNEYS EYES ONLY

Page 118

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  through 84. I see in 85, you have in my
3  opinion.
4      So in those paragraphs where
5  you're going through facts and evidence,
6  are you expressing any opinions based on
7  your expert background?
8      MR. MOONEY: Objection.
9      Q   Or there, are you just
10  relying on the discussions with Will
11  Abbey and Paul Williamson and the
12  deposition excerpts?
13      MR. MOONEY: Objection,
14  form, and to the extent that it
15  mischaracterizes those paragraphs.
16      A   Look, if you want to
17  testify, you could have somebody take
18  your deposition. But what I'm telling
19  you is, what I have answered is exactly
20  what I did. I performed an analysis
21  based upon the material available to me
22  in this case.
23      And as part of that
24  analysis, I set it forth in these
25  paragraphs. And then I determine whether

Page 119

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  there would be an ability for me to
3  calculate damages. So maybe we just
4  stick with what my opinion is.
5      Q   Well, are you expressing any
6  opinions in paragraphs 80 through 84?
7      A   My opinions are based upon
8  the factual record that I have seen which
9  suggests to me that these are the likely
10  harms. If you're asking me if I have
11  independently tested whether those harms
12  have occurred, my understanding is that
13  they are prospective harms that would
14  likely occur, to the extent that the
15  court in this case did not award a result
16  of specific performance.
17      Q   Looking specifically at
18  paragraphs 80 through 84, are you
19  expressing any opinions in those
20  paragraphs?
21      A   I'm setting forth my
22  understanding of the record. The whole
23  report is my opinions.
24      Q   I'm just asking about these
25  paragraphs.

Page 120

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2      A   This report, whatever
3  paragraph that you're choosing to show
4  me, is the summary of information that I
5  am aware of in this case.
6      Q   When you're saying a summary
7  of information in this case, are you
8  saying that those are not opinions that
9  you're rendering?
10      MR. MOONEY: Objection,
11  form.
12      A   Well, the report contains my
13  opinions and conclusions. This is a
14  summary of the material, the evidence
15  that I have reviewed. And based upon
16  that evidence, I'm offering the opinion
17  from a financial standpoint that there
18  would not be an amount that could be
19  quantified in the manner in which I set
20  forth in paragraph 85.
21      Q   In paragraph 80, about
22  halfway down, there's a sentence that
23  says, "ARM does not intend or expect."
24      Do you see that?
25      A   No, I do not.

Page 121

1  WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2      Q   So go to paragraph 80.
3  Eight lines, there's a sentence that
4  begins" ARM does not intend or expect."
5      Do you see that?
6      A   I do.
7      Q   So that sentence says, "ARM
8  does not intend or expect, and ARM
9  licensees do not pay for the right to
10  acquire and use products developed by
11  other licensees under other license
12  agreements with other technical and
13  financial terms. And that may have been
14  negotiated with different downstream
15  products in mind."
16      And your basis for talking
17  about what ARM does not intend or expect,
18  that's based on your discussions with
19  Paul Williamson and Christine Tran;
20  right?
21      A   Yes. It's based upon my
22  understanding of the factual record in
23  this case, the evidence that I have
24  gathered as part of my analysis.
25      Q   Well, with respect to this

31 (Pages 118 - 121)

ATTORNEYS EYES ONLY

Page 130

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2    Q    Are you from your
3    investigation or your conversations with
4    those individuals aware of any ARM
5    license agreement that prohibits a
6    licensee from being acquired by another
7    ARM licensee?
8    A    That sounds like a legal
9    question.  No, I'm not aware of that.
10   Q    Are you aware of any ARM
11   license agreement that prohibits a
12   licensee from acquiring another licensee?
13   A    How is that different than
14   the last question?
15   Q    The first one was being
16   acquired, and now it's the acquirer.
17   A    No.  I'm not aware of
18   anything like that.
19   Q    Are you aware of any license
20   agreement that states in the event of an
21   acquisition of the licensee, the
22   licensee's agreement will be terminated?
23   A    I'm not necessarily -- no,
24   I'm not necessarily aware of that.
25   Again, I think it would depend on whether

Page 131

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2    there was a breach, and then there's a
3    termination which comes from that breach
4    would be my understanding.
5    Q    You do consider the ARM
6    licensing agreements to be meticulously
7    drafted based on your investigation in
8    this case; correct?
9        MR. MOONEY:  Objection,
10   form.
11   A    I don't know what you mean
12   by meticulously drafted.  Can you share
13   with me what you mean by that?
14   Q    Sure.  I will do that
15   probably after lunch.
16   A    I mean I would say that it's
17   my understanding that ARM is very aware
18   of the agreements that it drafts and
19   drafts them with the ecosystem in mind,
20   would be my thinking.
21   Q    On paragraph 73 --
22   A    Okay.
23   Q    -- you're quoting Mr. Abbey.
24   You see that?
25   A    First sentence?

Page 132

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2    Q    And the second sentence.
3        In the second sentence, it
4    says, "Mr. Abbey testified that if all
5    partners have the belief if I acquire a
6    company, I do anything I want with ARM
7    technology.  That weakens our brand.  And
8    therefore, it is important for us to
9    protect that in the marketplace."
10       Do you think if that was a
11   concern, could ARM protect itself and its
12   ecosystem by having provisions in its
13   licenses that prohibited acquisitions or
14   that terminated a license in the event of
15   an acquisition?
16   A    Are you asking me if --
17       MR. MOONEY:  Objection,
18   form.
19   A    It feels like a legal
20   question.  But just to make sure, are you
21   asking me if I think that ARM should have
22   other provisions in its license
23   agreements that would prevent certain
24   things?
25   Q    Not should.

Page 133

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2    I'm asking you, with respect
3    to that concern that's discussed in your
4    report, could ARM protect itself in its
5    ecosystem by having provisions in its
6    licenses that prohibit acquisitions or
7    that terminate a license in the event of
8    an acquisition?
9    A    You're asking me if they
10   could?
11   Q    Yes.
12   A    I don't really have an
13   opinion on that.  Maybe that's -- maybe
14   that's fair or not fair.  I'm not sure
15   how that would implement any other legal
16   provision that may arise.
17   Q    If we can look at page 39 of
18   your report --
19   A    Sure.
20   Q    -- this section, little 3 of
21   your report is titled "ARM Will Not Be
22   Able to Rely on Partners Respecting
23   Provisions in its Existing and
24   Prospective Licenses to Protect its
25   Intellectual Property."

34 (Pages 130 - 133)

ATTORNEYS EYES ONLY

Page 134

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2     The footnotes in this
3   section are 218 through 223 which again
4   relate to either discussions that you had
5   or deposition excerpts in this case of
6   Will Abbey.
7     For the evidence in this
8   section that you reviewed, are you
9   relying on those discussions and the
10  deposition of Mr. Abbey?
11    MR. MOONEY:  Objection, to
12    the extent that it mischaracterizes.
13    A    Yes.  I am relying upon the
14  information, the evidence in this case,
15  which includes the deposition of
16  Mr. Abbey and Mr. Williamson, as well as
17  the discussions of the same.
18    Q    In paragraph 86, in the
19  second sentence, you refer to a chilling
20  effect.  Do you see that?
21    A    I do.
22    Q    It says, "This chilling
23  effect of increased uncertainty may
24  impact the number and type of licenses
25  that ARM could enter into with existing

Page 135

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   or prospective partners."
3     When you used the term may,
4   are you doing any assessment of
5   probability there?
6     A    I'm not.  I'm not providing
7   an assessment of probability.  Again, my
8   understanding is that these types of
9   harms would be likely to the extent that
10  the ecosystem is -- is not held intact.
11    Q    In paragraph 87, you're
12  quoting Mr. Abbey again.
13    And in the third sentence
14  that begins, "Similarly, Mr. Abbey
15  stated," do you see that?
16    A    Yes.
17    Q    It says, "Similarly,
18  Mr. Abbey stated I think the fact that
19  Qualcomm -- they're using intellectual
20  property that's unlicensed to them -- has
21  huge implications for ARM's intellectual
22  property company."
23    Do you think that risk
24  that's being described there would apply
25  anytime a company is using ARM's

Page 136

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   intellectual property without a license?
3     MR. MOONEY:  Objection,
4     form.
5     A    Well, again, to the extent
6   that there is a breach of contract within
7   the ecosystem, I would think that, yes,
8   that would have an impact on the
9   ecosystem as discussed here.
10    Q    And in the last sentence, it
11  says, "Specifically, Mr. Abbey stated
12  that as a person that spends a long time
13  negotiating contracts that covers things
14  like this, we spent time in meticulously
15  reviewing these agreements and making
16  sure these agreements are things we can
17  stand behind."
18    It was your understanding
19  based on the record that before they
20  signed these contracts that ARM was
21  meticulously reviewing the agreements;
22  correct?
23    A    Again, that would generally
24  be my understanding.  The one thing that
25  I think that's in play here to some

Page 137

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2   extent -- and I think I talk about this
3   in my report as it relates to Qualcomm --
4   is just -- the size of Qualcomm is one of
5   the more significant licensees and the
6   impact that that has on the ecosystem
7   when we talk about other licensees,
8   compared to a company the size of
9   Qualcomm.
10    Q    So do you think the Qualcomm
11  contract was more meticulously reviewed
12  than other contracts?
13    A    I don't have an awareness of
14  that.  I'm more referring to the idea
15  that to the extent that there is a breach
16  of contract, which causes ARM to lose
17  control of its intellectual property,
18  especially with one of the licensees the
19  size of Qualcomm and the impacts that
20  they have on the marketplace would be
21  very significant, maybe more so than
22  others.
23    Q    Do you have an opinion about
24  whether the impact would be more so than
25  others?

35 (Pages 134 - 137)

ATTORNEYS EYES ONLY

Page 138

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2     A     Well, I think that
3  throughout my report, I talk about the
4  size of Qualcomm and the impact that
5  Qualcomm has based upon, you know, even
6  whether Qualcomm and Nuvia -- with Nuvia
7  were to come out with Nuvia Cores, that
8  the marketplace would begin to shift to
9  and perhaps a shifting away from the ARM
10 technology that is currently in the
11 market.  So I think there's just various
12 parts of my report, which I refer to the
13 size of Qualcomm, and the impact of
14 Qualcomm on the licensing ecosystem.
15    Q     The Qualcomm ALA -- I'm not
16 referring to the Nuvia ALA, I'm referring
17 to the Qualcomm ALA -- was in your
18 materials considered which would mean you
19 laid eyes on it.  Is that something that
20 you reviewed in any detail?
21    A     Again, I reviewed it.  It
22 wasn't something that I reviewed from a
23 legal standpoint to determine the metes
24 and bounds of the contract.
25    Q     And did you assume for

Page 139

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  purposes of this case that ███████████
   ██████████  ALA license agreement?
5        MR. MOONEY:  Objection to
6  form.
7     A     Well, I assumed that there
8  is a breach.  So if you're asking me
9  whether their conduct was or was not a
10 breach, I assume that.
11       MR. ISAACSON:  We're coming
12 up on 12:30 here.  I don't know when
13 people want to eat.  I'm flexible.
14       THE WITNESS:  I'm flexible
15 when you get to a stopping point.
16       MR. ISAACSON:  I'm about to
17 move to the next section.
18       THE WITNESS:  That's fine.
19 We could stop.
20       THE VIDEOGRAPHER:  This will
21 end Media Unit 3, going off the
22 record at 12:30.
23       (A lunch recess was taken.)
24       THE VIDEOGRAPHER:  We're
25 back on the record at 1:21.  This

Page 140

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  will begin Media Unit 4.
3     Q     So as part of your review of
4  evidence of the record in this case, have
5  you seen anything that would indicate
6  ARM's licensees or prospective licensees
7  expect that if ARM were to prevail in
8  this case that the court would award
9  specific performance, rather than
10 monetary damages?
11    A     Can you repeat that, please?
12    Q     Sure.
13          As part of evidence of the
14 record in this case, have you seen
15 anything that would indicate that ARM's
16 licensees or prospective licensees expect
17 that if ARM were to prevail in this case
18 that the court would award specific
19 performance, rather than monetary
20 damages?
21    A     Well, while I cannot -- I
22 don't have an awareness of what ARM
23 licensees have or have not seen.  I know
24 that there's certainly publicly available
25 information that's disseminated on this

Page 141

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  litigation at this point.
3     Q     Are you aware of any
4  publicly disseminated information that
5  suggests that ARM is seeking specific
6  performance and not monetary damages?
7     A     I may or may not have seen
8  information like that.  I don't recall.
9     Q     And you haven't seen
10 anything that would suggest that ARM
11 licensees or prospective licensees have
12 any knowledge of what relief ARM is
13 seeking in this case, whether it be
14 specific performance or monetary damages;
15 correct?
16       MR. MOONEY:  Objection,
17 form.
18    A     While I can't tell you what
19 specific ARM licensees have seen or have
20 not seen, I have certainly seen
21 information in ARM public documents.
22 There's also certainly press releases out
23 there.
24          To what degree that signals
25 to the market specific performance or

36 (Pages 138 - 141)

ATTORNEYS EYES ONLY



Page 142

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   lack thereof, I don't have an awareness
3   of that.
4      Q   So going back to your
5   opening report, page 40, the next
6   subsection, little 4, which is titled
7   "Third-Parties and End Users May Shift to
8   Nuvia-Based Cores," when you say may
9   shift, is this another instance where
10   you're not doing a probability assessment
11   when you're saying may shift?
12      A   I'm not doing a probability
13   analysis.  I'm basing my understanding
14   here on the record evidence.
15      Q   And that record evidence is
16   set forth here in Footnotes 224 through
17   235 and includes your interviews, some
18   public available articles on Forbes,
19   publicly available articles on Forbes and
20   some Qualcomm and ARM documents.
21      A   Well, it's deposition
22   testimony.
23      Q   And deposition testimony;
24   correct?
25      A   That's correct.

Page 143

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2      Q   In paragraph 91, which runs
3   over on to page 42, there's a discussion
4   of an internal Qualcomm May 22nd e-mail.
5   Do you see that?
6      MR. MOONEY:  Objection to
7   form.
8      A   Are you talking about the
9   first sentence of 91?
10      Q   No.
11      If you move over to
12   page 42 --
13      A   Okay.
14      Q   -- there's a reference four
15   lines down to an internal Qualcomm May 22
16   e-mail.
17      A   Okay.  I'm just reading it
18   now.  Okay.
19      Q   There, it says in your
20   report,
21
22
23
24      What's your understanding of
25   how those savings are achieved?

Page 144

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

19      When you say could have a
20   significant impact on ARM's financial
21   performance, is that another situation
22   when you say could have that you're not
23   making any assessment of the probability
24   of that happening?
25      A   Well, I think I'm looking at

Page 145

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   these statements in relationship to other
3   statements in the report and discussions
4   that I've had with ARM personnel.  I'm
5   not offering a probability assessment
6   here, as much as I am offering my
7   understanding of the record evidence.
8      Q   And on page 43, Subsection
9   5, "Existing and Prospective Licensees
10   May Shift Away from ARM Chips," when you
11   say may there, is that also a situation
12   where you are not making a probability
13   assessment when you say may?
14      A   I'm not providing a
15   probability assessment here.  I'm basing
16   my understanding here on the record
17   evidence, which is discussions with
18   Mr. Williamson, publicly available
19   information, as well as discussions with
20   ARM personnel more generally.
21      Q   Subsection C of your report,
22   which is on page 45, is titled
23   "Significant Negative Impact on ARM's
24   First Mover Advantage."
25      And then it says in

37 (Pages 142 - 145)

ATTORNEYS EYES ONLY

Page 146

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  paragraph 100, "ARM's loss of first mover
3  advantage could cause significant
4  detrimental effects," and then you list
5  some detrimental effects.
6        When you say could, is this
7  also a situation where you are not making
8  any assessment of the probability of this
9  happening?
10    A    I'm not assessing
11  probabilities. I'm looking at the record
12  evidence as I understand it.
13    Q    Are you referring to past
14  first mover advantages or future first
15  mover advantages or both when you say
16  first mover advantage?
17        MR. MOONEY: Objection,
18    form.
19    A    Well, when I'm referring to
20  first mover advantage, I think there's
21  both past and future. So my
22  understanding is, is that there are other
23  markets that ARM has a desire to get
24  into. And there could be others that
25  develop in the future as well.

Page 147

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2    Q    And what markets or market
3  segments do you consider ARM to have a
4  first mover advantage as of the date of
5  your report?
6    A    Well, by way of example, I
7  understand that ARM was seeking to get
8  into the server market and also the
9  automotive market. And I understand that
10  given the actions of the defendant in
11  this case, I understand that those have
12  been at least chilled or stalled at this
13  point as ARM has lost control of its
14  intellectual property and its ability to
15  use that intellectual property in the
16  markets that it had sought to enter into
17  based upon Nuvia being acquired by
18  Qualcomm and Qualcomm repurposing Nuvia's
19  technology in PCs.
20    Q    So did you understand that
21  as of the date of this report, that ARM
22  had achieved a first mover advantage in
23  the server market?
24    A    My understanding of the date
25  of my report, that ARM was seeking to

Page 148

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2  enter into the server market based upon
3  its workings with Nuvia in order to enter
4  that market.
5    Q    Let me go back to my
6  original question. I'll get to the ones
7  where they're seeking to achieve a first
8  mover advantage.
9        What market or market
10  segments did you consider ARM to have
11  already achieved a first mover advantage
12  as of the date of your report?
13    A    So in paragraph 101, I
14  describe a statement from an ARM document
15  which says our CPUs initially gained
16  significant traction in mobile phones in
17  the mid-1990s because our energy
18  efficient processors provided an
19  appropriate level of performance while
20  consuming little power.
21        It goes on from there. So
22  certainly, mobile phones would be one
23  that I would identify ARM as having a
24  first mover advantage, as well as a
25  significant entrenchment.

Page 149

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
1
2    Q    Did you understand that the
3  alleged breach of the Nuvia ALA would
4  cause harm to ARM's first mover advantage
5  with respect to mobile phones?
6    A    Well, to the extent that
7  Qualcomm were to repurpose the Nuvia
8  technology for use in mobile phones or
9  the market was to begin to adopt the
10  Nuvia platform in mobile phones, I
11  understood that it was a possibility.
12    Q    Were there any other markets
13  in which you considered ARM to have
14  achieved a first mover advantage by the
15  time of your report, other than mobile
16  phones?
17    A    Well, ARM talks about its
18  development in televisions, watches,
19  washing machines, cameras, factory
20  equipments and others undergoing the same
21  revolution, as well as PCs.
22    Q    Did you consider ARM to have
23  achieved a first mover advantage in
24  television, watches, washing machines,
25  cameras, factory equipment?

38 (Pages 146 - 149)

ATTORNEYS EYES ONLY

Page 150

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2    A    I understood them to be, as
3  stated in my report, that their
4  innovation in the mobile phone revolution
5  was significant.  Mainly with the help of
6  ARM technology, many additional devices
7  underwent the same revolution.
8    Q    Did you understand ARM to
9  have a first mover advantage in any of
10  those markets or market segments listed
11  there: Television, watches, washing
12  machines, cameras, factory equipment?
13    A    I understood them to have a
14  significant presence based upon the
15  technology that they have.  And
16  ultimately, some of that being their
17  first mover advantage in bringing that
18  high technology to market.
19    Q    Did you understand ARM to
20  have a first mover advantage with respect
21  to computers?
22    A    I think that as it relates
23  to PCs more generally, I think their
24  focus in this case was to get into
25  servers.  I don't know whether -- I don't

Page 151

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  know whether I have evidence or I've
3  heard anything as it relates to first
4  mover advantage in PCs, although I think
5  as I mentioned a few moments ago, ARM's
6  CPU architecture has resulted in the
7  proliferation and evolution of computers
8  as people know them today.
9    Q    You previously said that you
10  understood ARM would be seeking a first
11  mover advantage in server markets and
12  automotive markets.
13    Are there any other markets
14  that you believed ARM was going to seek a
15  first mover advantage in?
16    A    Those are the two that stick
17  out to me that I believe I reference in
18  my report.
19    Q    In paragraph 105, it
20  says, "By acquiring Nuvia -- I'm sorry.
21  Are you at paragraph 105?
22    A    Yes.
23    Q    "By acquiring Nuvia,
24  Qualcomm gained an advantage by way of an
25  accelerating path to developing its own

Page 152

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  CPUs which will come at the expense of
3  ARM's other licensees."
4    When you say it will come at
5  the expense of ARM's other licensees,
6  then you've estimated that success as
7  representing 2 to $4 billion in value --
8  is that right? -- based on the record
9  that you've seen?
10    MR. MOONEY:  Objection to
11  form.
12    A    So as part of the rationale
13  for acquiring Nuvia, Qualcomm stated that
14  it did not possess the necessary skills
15  internally to meet the PC community means
16  acquisition as the fastest and best
17  alternative to address this space.
18  ████████████████████████████
19  ██████████
20    I think what that is
21  suggesting is -- that is suggesting the
22  amount that Qualcomm saved by not having
23  to develop its team over the course of
24  time, by identifying individuals and
25  getting them working on a solution to be

Page 153

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2  more competitive.  If I recall,
3  Qualcomm's position was that their
4  team, while they had an aptitude to some
5  degree, they were not the level of talent
6  necessary in order to be able to turn
7  around something that would be useful
8  or relevant in the market.  So acquiring
9  Nuvia allowed them to do that more
10  quickly.
11    Then the problem arises with
12  by acquiring Nuvia, they were, in
13  essence, identifying the technology that
14  Nuvia and ARM had identified together and
15  repurposing it for situations that were
16  not called for in the agreement.
17    So I don't know how -- I
18  don't know how that necessarily
19  represents a value that I've came up
20  with. ███████████████████████████
21  ████████████████████████████████
22  ████████████████████████████████
23  ████████████████████
24    Q    And, in fact, at page 49
25  after a long quote, you say that

39 (Pages 150 - 153)

ATTORNEYS EYES ONLY

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   Nuvia's data center CPU that caused the
3   delay of ARM's entry into the market.
4       MR. MOONEY:  When you were
5   saying ARM, were you referring to
6   Qualcomm as far as the acquiring
7   entity?
8       MR. ISAACSON:  No.  I did
9   say that.  Let me start again.
10      Q       Would you agree with
11  ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ██████████████
    ██  ██ ██████████████
    ████████████
    ████████████████████████████
    ██████████████████████████████
    ██████████████████████████
    ████████████████████
    ██████████████████████████
    ██████████████████████ Qualcomm can certainly come

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   in and purchase Nuvia.  There's no
3   restriction on that.
4       My understanding is as a
5   layman, what the parties are arguing
6   about here is Qualcomm cannot come in and
7   take the technology that ARM licensed to
8   Nuvia and use it in ways that it was not
9   anticipated for under Qualcomm's
10  leadership without further negotiating
11  and coming to a resolution with ARM which
12  I understand never happened.
13      And as a result, there was a
14  termination of the contract, which my
15  understanding is Qualcomm disregarded and
16  began to move forward in any event.
17      Q   Do you agree that Qualcomm's
18  acquisition of Nuvia, the abandonment of
19  Nuvia's data center made ARM's entry into
20  the data center market uncertain or
21  significantly delayed it?
22      MR. MOONEY:  Objection,
23  form.
24      A   I guess I don't have an
25  opinion on that because I don't believe

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2   that Nuvia and ARM were at that point yet
3   of launching a product when Qualcomm came
4   in.  So I would be speculating as to
5   whether or not that was, you know, kind
6   of where we are.  What we know is that
7   there was a breach of the agreement.
8       And Qualcomm continues to
9   use the ARM technology, even after the
10  contract was terminated, sending a
11  message which would be impactful to the
12  ecosystem.  When we talk again about
13  servers, this was a first mover advantage
14  opportunity for ARM to get into servers.
15  That was something I understood from my
16  discussions with ARM personnel which was
17  certainly meaningful to ARM as part of
18  their ecosystem.
19      Q   If you look at paragraph 117
20  of your report, you see the second
21  sentence?
22      A   I just want to make sure I
23  reorient myself as to where we are.
24      Q   It's page 56, paragraph 117.
25      A   117, you said?

1   WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2       Q   Yes.
3       A   Thank you.
4       Q   In the second sentence, it
5   says, "With Qualcomm's acquisition of
6   Nuvia and the abandonment of Nuvia's data
7   center CPU, ARM's statements indicate
8   that its attempt to broaden its toehold
9   in the data center segment is uncertain
10  and significantly delayed."
11      Is that a statement you
12  still agree with?
13      A   I do.
14      Q   Page 57, this is Section E,
15  "Significant decrease in licensing
16  revenue and ARM's investment in research
17  and development."
18      Are you with me?
19      A   I am.
20      Q   In paragraph 120, you say,
21  "The significant decrease in ARM's
22  revenue and investment in research and
23  development and innovation."
24      And you go on to say that
25  that cannot be readily quantified.

44 (Pages 170 - 173)

ATTORNEYS EYES ONLY

Page 174

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2　　　　The significant decrease in
3　ARM's revenue and investment in research
4　and development that you referred to
5　there, has any of that happened to this
6　date?
7　　A　　I'm aware that I have
8　information on that, beyond my
9　understanding from discussions with
10　Mr. Williamson and ARM documents which
11　cite the importance of research and
12　development and the importance on
13　continued revenue generation because of
14　how quickly the market changes and reacts
15　to new technology introductions.  So,
16　again, this is a prospective harm based
17　on the actions of Qualcomm and Nuvia in
18　this case.
19　　Q　　And in paragraph 121, you
20　say, "ARM's loss of control of its
21　intellectual property and licensing
22　ecosystem."
23　　　　When you say loss of
24　control, is that referring to a breach of
25　a license agreement?

Page 175

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2　　A　　This is referring to I think
3　the discussion throughout the report,
4　also, the breach in this particular case,
5　in which the impact that that would have
6　on the ecosystem in general of chilling
7　particular investments in ARM technology,
8　attempts to renegotiate for lower rates
9　because of additional risks.
10　　　　Qualcomm's awareness that by
11　acquiring Nuvia and repurposing the
12　technology will allow it to save -- save
13　royalty dollars as part of that
14　acquisition are all just what I would say
15　exemplary of the types of impacts on
16　Nuvia's revenue and the ability to
17　redeploy revenue into research and
18　development dollars.
19　　Q　　You say in paragraph 121,
20　"ARM's loss of control in intellectual
21　property and licensing ecosystem as
22　described above is likely to result in
23　decreased licensing revenue which would,
24　in turn, result in decreased investment
25　in R&D."

Page 176

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2　　　　Are you making any
3　probability assessment there about
4　whether ARM will actually reduce and in
5　future, its decreased investment in R&D?
6　　A　　I'm not providing any
7　probability assessment here.
8　　Q　　In paragraph 127, you
9　say, "ARM's R&D investments are tied to
10　its revenue stream.  As such, any
11　significant changes to ARM's expected
12　revenues can impact ARM's future R&D
13　activities which, in turn, could lead to
14　further decline in revenue."
15　　　　Looking at Figure 10 where
16　it says ARM, R&D as a percentage of
17　revenue, when you referred to significant
18　changes in ARM's expected revenue, can
19　you tell me the general magnitude of what
20　you mean by a significant change in
21　revenue?
22　　A　　I don't know if I have a
23　sense of that.  I think what I'm really
24　trying to show here is the very
25　significant percentage of ARM's revenue

Page 177

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

2　that is redeployed into research and
3　development.
4　　　　Again, from my discussions
5　with Mr. Williamson and Mr. Abbey, it's
6　clear to me that because they are a
7　company who depends on their intellectual
8　property, to the extent that they have an
9　impact on revenue and an impact on their
10　ecosystem, it does a number of things.
11　It might impact their ability to identify
12　and bring in very talented employees,
13　similar to what Qualcomm experienced.  It
14　might lessen their ability to deploy
15　revenue back into the marketplace or miss
16　opportunities because the market moves
17　along so quickly in this space.
18　　　　I think again, this is
19　really emblematic of the significant
20　amount of R&D that it takes in order to
21　maintain a leadership position in this
22　market.
23　　Q　　Have you done any assessment
24　of what decrease in revenue would result
25　in what reduction in R&D investment by

45 (Pages 174 - 177)

ATTORNEYS EYES ONLY

Page 178

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  ARM?
3      A    I have not. I have not
4  assessed that, outside of, again, the
5  discussions that I've had with ARM
6  personnel and review of documents which
7  identify that revenue and R&D are linked.
8  And any prospective negative impact on
9  the ecosystem could harm that.
10     Q    And on paragraph 127 at the
11 bottom of page 59 and 60, there's a
12 number of single-spaced bullet points.
13 Do you see that?
14     A    I do.
15     Q    And those are quotes from
16 ARM's public filings with the SEC; right?
17     A    Well, I think I don't want
18 to -- I won't disagree with you, other
19 than to say the purpose of those is
20 there's deposition testimony of a man
21 named Mr. Segars, who testified that
22 unless ARM has the engineering firepower
23 to keep its products competitive, then
24 its role in the broader semiconductor
25 ecosystem is at risk of fading.

Page 179

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2      Q    All I've asked is whether
3  those are quotes of ARM's public filings.
4      A    I know you did. And I'm
5  providing some background.
6      Q    I'm not looking for
7  background on that. I just want to do it
8  and move on.
9      MR. MOONEY: Counsel, just
10 let him finish the response.
11     A    That's fine. If you want an
12 incomplete answer, that's fine. That's
13 part of my analysis in this case as
14 reflected in paragraph 127 and onward.
15     Q    And all of those risk
16 factors, those are risk factors
17 identified in the SEC document; correct?
18     A    Well, again, I think it's
19 more than that. And so I'd like to
20 answer the question.
21     Q    If you think it's more than
22 that, tell me that.
23     A    I will. That was the point
24 of my first discussion before you cut me
25 off and told me to stop because this is a

Page 180

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  deposition. And you're asking me
3  questions.
4      MR. MOONEY: Counsel, can
5  you let the witness finish?
6      MR. ISAACSON: I'm trying
7  not to use the whole day. And when
8  I'm asking if something came from an
9  SEC document, and I get a long
10 answer, that's not helping any of us.
11     MR. MOONEY: Let me finish
12 what I'm saying --
13     MR. ISAACSON: And I don't
14 mean to interrupt you. Sorry.
15     MR. MOONEY: I appreciate
16 it. It'll make it easier for the
17 court reporter if you could let the
18 witness finish what he's saying
19 before asking the next question.
20 We're doing pretty well.
21     A    So, again, what I was
22 getting at here is there's something that
23 was identified as a knock-on effect in a
24 deposition of Mr. Segars. Mr. Segars
25 identified the relationship between R&D

Page 181

1    WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL
2  and revenue. And what these particular
3  points are set forth to do is to identify
4  that even within public filings where ARM
5  is going to market and communicating with
6  the marketplace more broadly, they are
7  illustrating the relationship between
8  maintaining revenue and the impact of
9  dipping revenue in a knock-on effect of
10 continued R&D redeployment.
11     Q    Page 61, Section F,
12 "Significant Decrease in ARM's Reputation
13 and Goodwill."
14     A    Okay.
15     Q    The significant decrease in
16 ARM's reputation and goodwill, is that
17 harm that has taken place already or is
18 this a future harm?
19     A    This would be a prospective
20 harm based upon the impact on the
21 ecosystem, to the extent that it is
22 determined or seen within the marketplace
23 that ARM licensees can use ARM's
24 technology in unexpected ways or
25 unlicensed ways that are inconsistent

46 (Pages 178 - 181)

ATTORNEYS EYES ONLY

Page 222

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1 Nuvia ALA.
2
3      Do you see that in
4 paragraph 46?
5      MR. MOONEY:  Objection.
6  A    Okay.  I've read 46.
7  Q    Did you analyze, other than
8 the Nuvia TLA, any agreements in looking
9 in this section to value the new features
10 in the CMN 700?
11  A    Which agreements are you
12 referring to?
13  Q    Any other license
14 agreements.
15  A    I'm not aware what license
16 agreements you're referring to.
17  Q    In paragraph 54, you
18 say, "In any event, Dr. Kennedy ignored
19 testimony from Mr. Larri, related to the
20 time it took ARM to develop features
21 requested by Nuvia."
22      What's your understanding of
23 what Mr. Larri's previous experience was
24 in working on Coherent Mesh Network
25 products?

Page 223

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2  A    Are you asking what my
3 understanding of his experience is with
4 CMN?
5  Q    Yes.
6  A    I may have seen it in his
7 deposition.  I don't recall as I sit here
8 what the extent of his experience was.
9      (The above-referred-to
10 document was marked as QX Exhibit 268
11 for identification, as of this date.)
12  Q    Exhibit 268 is the expert
13 reply report of Patrick Kennedy,
14 June 24th, 2024.
15      Did you have a chance to
16 review this report?
17  A    Not in great detail, no.
18  Q    Have you done work to form
19 any new opinions based on this report?
20  A    I have not.
21  Q    You have not done any work
22 to, for example, form any opinions that
23 would be critical of this report?
24  A    Well, not at this time.
25 Again, I have not had a chance to fully

Page 224

WILLIAM TODD SCHOETTELKOTTE -- CONFIDENTIAL

1
2 vet this.
3      MR. ISAACSON:  Let's take a
4 break.  And I'm probably done.
5      THE VIDEOGRAPHER:  This will
6 end Media Unit 5, going off the
7 record at 3:38.
8      (A short recess was taken.)
9      THE VIDEOGRAPHER:  We're
10 back on the record at 3:51.  This
11 will begin Media Unit 6.
12 (Continued on the following page.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 225

1
2      MR. ISAACSON:  I have no
3 further questions.  Thank you for
4 your time today.
5      THE WITNESS:  Thank you.
6      MR. MOONEY:  No questions at
7 this time.  Thank you.
8      THE VIDEOGRAPHER:  This will
9 end Media Unit 6 and conclude the
10 deposition of William Todd
11 Schoettelkotte.  We're going off the
12 record at 3:51, July 2nd, 2024.
13      (Time noted:  3:51 p.m.)
14
15 _____
16      WILLIAM TODD SCHOETTELKOTTE
17
18 Subscribed and sworn to
19 before me on this _____day
20 of _____, 2024.
21
22 _____
23      NOTARY PUBLIC
24
25

57 (Pages 222 - 225)

ATTORNEYS EYES ONLY

Page 226

```
 1
 2              I N D E X
 3       E X A M I N A T I O N
 4   EXAMINATION
 5   Mr. Isaacson       5
 6         E X H I B I T S
 7
 8   QX          Description      Page
 9   QX Exhibit 255    Expert report    6
10   QX Exhibit 256    Reply expert     6
            report
11
     QX Exhibit 257    Reply expert     6
12         report
13   QX Exhibit 258    License agreement  27
14   QX Exhibit 259    Expert report    76
15   QX Exhibit 260    Proposal       186
16   QX Exhibit 261    Table        191
17   QX Exhibit 262    Table        193
18   QX Exhibit 263    Slides       196
19   QX Exhibit 264    Slides       200
20   QX Exhibit 265    Royalty Forecast  200
21   QX Exhibit 266    Slides       202
22   QX Exhibit 267    Chart        202
23   QX Exhibit 268    Expert report    223
24
25
```

Page 228

```
 1              ERRATA SHEET
          VERITEXT/NEW YORK REPORTING, LLC
 2
     CASE NAME: Arm Ltd. v. Qualcomm Inc., Et Al.
 3   DATE OF DEPOSITION: 7/2/2024
     WITNESSES' NAME: William Todd Schoettelkotte
 4
 5   PAGE  LINE (S)    CHANGE      REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21          William Todd Schoettelkotte
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS ____ DAY OF _____, 20__.
23
24
25   (NOTARY PUBLIC)       MY COMMISSION EXPIRES:
```

Page 227

```
 1
 2       C E R T I F I C A T I O N
 3
 4
 5       I, ANTHONY GIARRO, a Shorthand Reporter
 6   and a Notary Public, do hereby certify that
 7   the foregoing witness, WILLIAM TODD
 8   SCHOETTELKOTTE, was duly sworn on the date
 9   indicated, and that the foregoing, to the
10   best of my ability, is a true and accurate
11   transcription of my stenographic notes.
12       I further certify that I am not
13   employed by nor related to any party to this
14   action.
15
16
17
         _____
18       ANTHONY GIARRO
19
20
21
22
23
24
25
```

# EXHIBIT 5

Exhibit 99.2



FYE24-Q2 SHAREHOLDER LETTER

arm

# Building the future of computing, on **Arm**. Together. For everyone.

Results for quarter ending September 30, 2023

Arm will be hosting a conference call via an audio webcast to discuss earnings at 14:00 Pacific Time (17:00 Eastern Time, 22:00 GMT) on Wednesday, November 8, 2023. A replay of and a transcript of the call will be available the following day.

The webcast and replay can be access at: https://edge.media-server.com/mmc/p/k879zaca

### Dear Shareholder,

It is such a thrill to write our first quarterly shareholder letter as a public company once again. These letters will update investors on Arm's progress and provide details about the quarter in advance of our earnings calls, maximizing time available for Q&A.

Certainly, the highlight of the quarter was the Arm IPO on September 14, when we listed on the Nasdaq Global Select Market. This was a historic event for the company and its employees, one that we celebrated across all our offices around the globe. Arm has been developing leading technology for more than 30 years, and we are delighted that you, our shareholders, will be joining us on the journey ahead. I am so proud of what we accomplished to get us to this point, however this is just the beginning. The best is yet to come.

### Quarterly Highlights

- Revenue increased 28% year-over-year, topping $800 million for the first time, reinforcing that our diversified business strategy is showing real results.
- The better than expected revenue was driven by multiple high-value long-term license agreements signed with industry leading technology companies, and royalty revenue benefiting from market share gains and higher royalty rates.
- The immediate need for companies to increase investment in Artificial Intelligence (AI) across all end markets helped drive license revenue up 106% year-over-year.
- The ongoing requirement for power efficient solutions in infrastructure and automotive continued to drive double digit royalty growth in those markets.
- Non-GAAP operating profit increased 92% year-over-year to $381 million resulting in a 47.3% non-GAAP operating margin.
- Addressing the demand for reduced development time and decreased time to market, Arm announced the Arm® Neoverse™ Compute Subsystems, for companies developing differentiated chips for cloud compute.
- 7.1 billion Arm-based chips were reported as shipped, taking the cumulative total to 272.5 billion.
- New Arm-based energy-efficient AI capable products were announced by Google, Meta, Nvidia, Renesas, Xiaomi, and many more, as Arm takes AI everywhere.

"Following our successful IPO, Arm is off to an outstanding start as a public company with record revenue fueled by the success of our diversified business," said Rene Haas, CEO. "Licensing revenue was up over 100% year-over-year as the demand for AI has kicked off increased investment across all end markets. Our royalty revenue benefited from market share gains in automotive and cloud compute as our latest technologies, such as Armv9, increased penetration across all markets where AI is driving the need for our unique combination of performance and power efficiency."



## Results for Q2 fiscal year ending 2024

Today, we are pleased to share results for the second quarter of fiscal year ending 2024 (Q2 FYE24), which ended September 30, 2023.

### Financial Metrics

| $million, unless stated | GAAP | | | Non-GAAP (1) | | |
|---|---|---|---|---|---|---|
| | Q2 FYE24 | Q2 FYE23 | Y/Y % | Q2 FYE24 | Q2 FYE23 | Y/Y % |
| **Total revenue** | **806** | **630** | **28%** | **806** | **630** | **28%** |
| License and other revenue | 388 | 188 | 106% | 388 | 188 | 106% |
| Royalty revenue | 418 | 442 | (5)% | 418 | 442 | (5)% |
| Cost of goods sold | (46) | (25) | 84% | (26) | (24) | 8% |
| **Gross profit** | **760** | **605** | **26%** | **780** | **606** | **29%** |
| *Gross margin (%)* | *94.3%* | *96.0%* | | *96.8%* | *96.2%* | |
| Operating expenses | (916) | (422) | 117% | (399) | (408) | (2)% |
| **Operating profit (loss)** | **(156)** | **183** | **(185)%** | **381** | **198** | **92%** |
| *Operating margin (%)* | *(19.4)%* | *29.0%* | | *47.3%* | *31.4%* | |
| **Net income (loss)** | **(110)** | **114** | **(196)%** | **380** | **178** | **113%** |
| **Diluted earnings per share ($)** | (0.11) | 0.11 | (200)% | 0.36 | 0.17 | 112% |
| **Free cash flow** | | | | **169** | **33** | **412%** |

(1) For more information, definitions, and reconciliations of Non-GAAP measures see the "Key Financial and Operating Metrics" section below.

### Non-Financial Metrics (1)

| | Q2 FYE24 | Q2 FYE23 | Y/Y % |
|---|---|---|---|
| Annualized contract value ("ACV") | $1,108 million | $1,080 million | 3% |
| Remaining performance obligations ("RPO") | $2,414 million | $1,751 million | 38% |
| Arm Total Access licenses | 22 | 13 | 69% |
| Arm Flexible Access licenses | 212 | 194 | 9% |
| Chips reported as shipped | 7.1 billion | 7.5 billion | (6)% |
| Total number of employees | 6,629 | 5,679 | 17% |
| Engineers as a percentage of total employees | 80% | 79% | |

(1) For more information and definitions of Non-Financial Metrics see the "Key Financial and Operating Metrics" section below.

We didn't just have the IPO to celebrate in Q2 FYE24, it was also a great quarter financially, operationally and strategically, demonstrating the strength of our diversified business and AI driving demand for new Arm technology.

Financially, Arm is announcing our highest ever quarterly revenue, over $800 million for the first time in our history, up 28% year-over-year, exceeding the growth seen by many of our peers in the semiconductor industry. Revenue exceeded expectations at the beginning of the quarter, and is primarily due to multiple high-value, long-term license agreements signed with industry leading technology companies who are developing chips across all of our target markets. This drove very strong growth in our licensing and other revenue, up 106% year-over-year. Much of this license revenue growth was enabled by the Arm Total Access business model, which provides customers with access to a wide range of Arm central processing units (CPUs) and related technologies. We have seen strong demand for higher-performance CPUs as companies look to capture the increasing demand for AI, from cloud servers to smartphones to automotive applications. Royalty revenue was down 5% year-over-year, with lower sales of chips for smartphones being offset by growth in other target markets such as cloud compute and automotive applications. Additionally, our overall royalty revenue is benefiting from higher royalty rates as Armv9 penetration increases.

Operationally, Arm continued to increase investments in R&D to meet the demand for more compute capability from across the industry and to execute on our broadening product roadmap. Overall headcount increased by 17% year-over-year, with more than 85% of the net new hires going into engineering roles. The cost associated with this increase in headcount was offset by several one-off items, resulting in non-GAAP operating expenses declining by 2% year-over-year. With revenue growing strongly and costs declining, non-GAAP operating profits have increased by 92%, delivering a 47.3% non-GAAP operating margin.

Strategically, Arm continues to lead on innovation and during the quarter we announced the Arm Neoverse Compute Subsystems (CSS), a faster, more efficient path to delivering custom-built chips for AI, cloud servers, 5G base station equipment, and other infrastructure applications. And then shortly after the end of the quarter, we announced Arm Total Design for Neoverse CSS which engages critical ecosystem partners to help accelerate the development of Arm Neoverse-based chips.

## Guidance

Looking forward, we have good visibility into our licensing pipeline for the second half of the fiscal year, although there is uncertainty regarding the exact timing of some deals and the revenue recognition profiles for future agreements are subject to change. Industry analysts forecast that the semiconductor industry is starting to recover, which can benefit our royalty revenue, however the trajectory of the recovery is not clear, and the industry remains vulnerable to changes in the external macroeconomic environment.

|  | Q3 FYE24 | FYE24 |
|---|---|---|
| Revenue | $720m - $800m | $2,960m - $3,080m |
| Non-GAAP operating expense (1) | ~$460m | ~$1,765m (2) |
| Non-GAAP fully diluted earnings per share (1) | $0.21-$0.28 | $1.00 - $1.10 |

(1) For more information and definitions of the Non-GAAP measures see the "Key Financial and Operating Metrics" section below. A reconciliation of each of the projected non-GAAP operating expense and non-GAAP fully diluted earnings per share, which are forward-looking non-GAAP financial measures, to the most directly comparable GAAP financial measure, is not provided because Arm is unable to provide such reconciliation without unreasonable effort. The inability to provide each reconciliation is due to the unpredictability of the amounts and timing of events affecting the items we exclude from the non-GAAP measure.
(2) Our FYE24 non-GAAP operating expense guidance includes a one-time increase in social security taxes of approximately $45m in the fourth quarter, related to the vesting of certain equity awards following our IPO.



### Our strategy to take artificial intelligence everywhere

Arm is central to the acceleration of AI and Machine-Learning (ML) workloads to computers everywhere. Whether its large language models being trained in the cloud or inference models being deployed at the edge, the need for efficient computing resources has never been more important. All AI algorithms need CPUs to run their models and our strategy is to develop the CPUs and related technologies needed to run these algorithms in the most energy efficient manner. Arm is making rapid progress in the adoption of its technology with AI acceleration in its CPUs and GPUs, and AI-specific products such as the Arm Ethos™ neural processing unit (NPU).

Arm is continuing to see demand from companies needing access to higher-performance CPUs, GPUs and other technologies, and to develop AI capable chips for a wide range of end markets. During the quarter, Arm signed multiple licenses for its latest products with companies that are designing chips requiring advanced AI capability for applications such as autonomous driving, cloud servers, consumer electronics, Internet of Things (IoT) and smartphones. This included a leading autonomous automotive OEM licensing additional Arm CPU and GPU IP as they develop the next generation of their Arm-based autonomous vehicle platform.

During Q2 and early Q3 our partners made the following announcements regarding AI capable devices:
- **Nvidia** GH200 Grace Hopper Superchip, which combines our Arm-based Grace CPU with the Hopper GPU, a case study for the need for energy-efficient compute for AI training and inference.
- **Renesas** announced its New Ultra-High Performance MCUs that include Arm Helium Technology to boost AI performance on edge and end-point devices.
- **Meta** and Arm announced a collaboration demonstrating PyTorch models running natively on Arm CPUs and NPUs, paving the way for easy deployment of PyTorch models at the edge.
- **Google**'s new Tensor G3 chip has been upgraded to support on-device generative AI, and includes the latest and most powerful mobile CPU, the Arm Cortex™-X4.
- The new **Xiaomi** 14 and 14 Pro will use Qualcomm's Snapdragon 8 Gen 3, which is also based on Arm Cortex-X4 CPU, and will run generative AI directly on the handset.
- **Google** and **Qualcomm** partnering to bring generative AI experiences to all Android phones, running the algorithm on a combination of the Arm CPU and accelerator.



### Arm growing share in our target markets

Arm is making significant progress across its target end markets, with new product and ecosystem announcements, market leaders licensing Arm technology for their next chips, design wins at major OEMs, and with the latest Arm technology being deployed into high-volume applications.

**Cloud Compute**

Arm continues to gain market share within the cloud compute market as our customers increasingly adopt and deploy Arm CPUs into their cloud server chips driven by the need for power efficient computing. We are licensing our Neoverse CPU and Compute Subsystem technologies to both Cloud Service Providers (CSPs) and semiconductor companies developing chips for CSPs, and are continuing to invest in the software and developer ecosystem to make it easiest to develop chips and software for Arm-based cloud infrastructure.

During the quarter and in early Q3, we made several announcements to drive our strategy forward, including:

- Arm Neoverse CSS, a faster, lower-risk path to custom-built SoCs for infrastructure, but still allowing partners to retain flexibility to focus on innovation and differentiation.
- Arm Total Design, an ecosystem committed to frictionless delivery of custom SoCs based on Neoverse CSS that includes leading ASIC design houses, IP vendors, EDA tools providers, foundries and firmware developers - partners include Broadcom, Cadence, Intel Foundry Services, Socionext, Synopsys and TSMC.

**Automotive**

The automotive semiconductor market is one of Arm's fastest growing opportunities and where we have been rapidly gaining market share. Arm's strategy is to have our Automotive Enhanced (AE) CPUs and GPUs adopted as a platform for the software defined vehicle, and to have Arm technology designed into the next generation in-vehicle infotainment (IVI) systems, advanced driving assistance system (ADAS) products, and electronic control units (ECUs) at leading automotive OEMs and suppliers.

During the quarter, a leading automotive technology developer as well as a semiconductor customer who has recently entered the automotive ADAS chip market, both licensed a wide range of Arm's automotive enhanced CPUs and GPUs to gain access to the existing Arm automotive developer ecosystem.

After the end of the quarter,

- Renesas unveiled the fifth generation of its R-Car family of chips, including two new Arm-based MCU product lines providing solutions that meet the high computing performance and real-time processing requirements of the future automotive market. Renesas has committed to supporting market demands and making Arm-based products available to its customers.
- NXP announced the S32M2 motor controller series of automotive solutions, based on the Arm Cortex-M family of processors, and targeting energy-efficient functions within an electric vehicle.

Together, Renesas and NXP are the two largest automotive MCU providers, and by choosing to use Arm CPUs, system developers will be able to take advantage of the vast Arm software ecosystem within the automotive market.



**IoT/Embedded**

Arm is already the leading CPU architecture for IoT devices and embedded computers. One of the Arm Total Access agreements signed this quarter was with a major semiconductor company developing high-performance embedded computing chips. In addition, Arm signed a license for high-performance processors to a company developing satellite and ground unit communications.

Shortly after the end of the quarter, Renesas announced the world's most powerful family of microcontrollers, the RA8 series, based on the Arm Cortex-M85 processor. The Cortex-M85 integrates Arm Helium technology which provides a 4x performance acceleration for machine learning algorithms and is essential as AI becomes increasingly important in edge and end-point devices.

**Smartphone**

Interest in high performance, pervasive Arm compute in smartphone and consumer electronics only continues to grow. Arm's strategy is to develop and license more advanced technology such as CPUs based on its Armv9 architecture, and platforms that deliver additional functionality, higher performance, and higher energy efficiency in mobile and consumer computing devices. Arm's customers and end device consumers continue to demand these latest and greatest advances.

During the quarter, Arm signed multiple high-value, long-term licenses with leading OEMs and semiconductor companies developing chips for consumer electronics products, including the two new Arm Total Access agreements.

For Q2 FYE24, analyst reports indicate that shipments of smartphone handset were down approximately 5% year-over-year, and this was reflected in lower royalty revenue recognised. However, industry analysts are beginning to see signs of recovery in smartphone sales, with fiscal Q2 shipments up approximately 7% sequentially from Q1.

During the quarter and in early Q3,

- Mediatek announced the Dimensity 9300, its latest mobile chip with a one-of-a-kind All Big Core design targeting flagship smartphones. The Dimensity 9300 is powered by four Arm Cortex-X4 cores, four Arm Cortex-A720 cores and Arm Immortalis™-G720. It is designed for significantly improved performance for on-device generative AI processing, including running large language models on a smartphone.
- Microsoft introduced new services for app developers to accelerate the porting and optimization of apps and programs to run on natively on Arm-based Windows devices.

## Financial Overview
(US GAAP unless otherwise stated)

### Industry context

Semiconductors are indispensable to everyday life. In today's technology-driven world, semiconductors are the enablers of the devices and infrastructure that facilitate virtually everything people do. As consumers and enterprises continue to demand more from their devices, and as new technologies, such as AI, create new markets and use cases, the pervasiveness of high-performance and energy-efficient semiconductors will continue to expand for decades to come.

The semiconductor industry has declined for the past several quarters driven by an inventory correction; OEMs stock-piled large numbers of chips following shortages during the pandemic, and as end-market demand weakened OEMs reduced their purchases of new chips in order to deplete their existing inventories. This inventory correction has primarily impacted consumer electronic products such as PCs, laptops and smartphones, as well as industrial equipment and IoT devices. While recent reports from industry analysts suggest that the industry has started to show signs of recovery, the trajectory of the recovery remains uncertain.

### Total revenue

Total revenue in Q2 FYE24 was $806 million, an increase of 28% from the same period in the prior year, with strong license and other revenue more than offsetting a small decline in royalty revenue. This is better than we had expected at the beginning of the quarter, and is primarily due to multiple high-value, long-term license agreements signed with leading technology companies who are developing chips across all of our target markets from premium smartphones to servers to IoT devices.

### License and other revenue

License and other revenue for Q2 FYE24 was $388 million, up 106% year-over-year. While this strong growth was the result of continuing demand for the latest Arm technology, it's important to remember that the application of accounting standards can result in significant portions of multi-year licensing contracts to be recognized as revenue immediately, often as much as half of a deal's total value. As this dynamic can cause revenue volatility period-to-period, we believe it is helpful to evaluate our licensing and other revenue growth in conjunction with our other reported metrics of annualized contract value ("ACV") and remaining performance obligations ("RPO"). ACV evenly spreads the committed licensing fees over the duration of the contract, while RPO reflects the value of contracts that have been signed and which remain to be recognized as license and other revenue in future periods.



## Annualized contract value

We define annualized contract value as the total annualized committed fees, excluding any potential future royalty revenue, for all signed agreements deemed to be active through the last day of each applicable reporting period. ACV at the end of Q2 FYE24 was $1,108 million, up 3% year-over-year and up 6% sequentially. The sequential growth was our strongest over the last eight quarters and was primarily driven by the high-value license deals, especially Arm Total Access agreements, signed with major technology companies.

## Remaining performance obligations

Remaining performance obligations represent the transaction price allocated to performance obligations that are unsatisfied, or partially unsatisfied, which includes unearned revenue and amounts that will be invoiced and recognized as license and other revenue in future periods. As of the end of Q2 FYE24, RPO was $2,414 million, up 38% year-over year and up 44% sequentially, driven by the high-value license deals and the renewal of a long-term customer agreement. We expect to recognize approximately 28% of RPO as revenue over the next 12 months, 21% over the subsequent 13-to 24-month period, and the remainder thereafter.



Remaining performance obligations

## Licenses signed

During the quarter, Arm signed two additional Arm Total Access agreements, taking the total number of extant licenses to 22, which includes more than half of our top 20 customers. The two new Arm Total Access agreements were signed with a leading OEM developing their own chips and a leading semiconductor company, both targeting smartphones and consumer electronics devices, as well as other markets. In addition, Arm signed two extensions for existing Arm Total Access agreements. Arm Total Access agreements are typically multi-year commitments to Arm CPUs and related technologies, and many of Arm's long-term customers now have Arm Total Access agreements; 17 of the 22 have been Arm customers for more than a decade, demonstrating the enduring nature of the Arm architecture.

The Arm Flexible Access program enables startups to take advantage of the benefits of the broad Arm ecosystem as they enter into new markets. These agreements need to be renewed annually, and in Q2 the company had over 40 renewals and 18 new agreements signed, leading to one net addition, bringing the total number of extant licensees to 212[1]. The companies that renewed existing agreements or signed new agreements during the quarter are developing products for a wide range of applications including multiple AI accelerators, augmented reality headset, automotive application, sensors, wearables, and wireless communication equipment.

---

[1] For the quarter ending June 30, 2023 (Q1 FYE24), the number of Flexible Access agreements has been corrected to 211 from 214 (as previously reported in Arm's final prospectus (IPO Prospectus) filed on September 14, 2023 with the U.S. Securities and Exchange Commission pursuant to Rule 424(b)(4) under the Securities Act of 1933, as amended, relating to our Registration Statement on Form F-1) to account for certain customer license terminations and a consolidation of customer licenses due to an acquisition.



## Royalty revenue

Royalty revenue was $418 million, down 5% year-over-year, reflecting the ongoing weakness in the smartphone market, offset by relative strength in other growth markets such as cloud compute and automotive applications.

Looking into the details and based on our analysis:
- **Smartphone:** Royalty revenue was negatively impacted by the high levels of smartphone chip inventory that had been built up in prior quarters, partially offset by higher royalty rates from smartphones using chipsets based on our latest Armv9 architecture.
- **Cloud Compute:** Royalty revenue grew double-digits, benefiting from ramping cloud compute chips and higher royalty rates from Armv9-based chips; infrastructure continues to be the fastest growing area for Arm.
- **Automotive:** Automotive continues to deliver very strong quarters with royalty revenue from ADAS more than doubling on the same period a year ago.
- **IoT/Embedded:** Royalty revenue from the IoT market was approximately flat as the market goes through inventory corrections due to soft end-market demand.

During the quarter, Arm's customers reported that they had shipped 7.1 billion Arm-based chips in the prior period. This is a reduction of 6% year-over-year, reflecting the weakness in high volume markets such as IoT and embedded applications, offset by growth in higher-value, but lower-volume markets such as cloud servers and automotive chips. This takes the cumulative number of Arm-based chips shipped to more than 272.5 billion.

## Gross profit and margin
Cost of sales in Q2 FYE24 were $46 million, resulting in a Gross Profit of $760 million and a 94.3% Gross Margin. Non-GAAP cost of sales were $26 million, resulting in a non-GAAP Gross Profit of $780 million and a 96.8% Gross Margin.

## Operating expense and margin
Total operating expense in Q2 FYE24 was $916 million, including $490 million of share-based compensation cost (equity-settled) and $27 million for costs associated with the recent Arm IPO. Total non-GAAP operating expense of $399 million was down 2% year-over-year, due to a combination of a $40 million favorable reversal of a litigation provision, and a change in mix of share-based compensation from primarily cash-settled (or liability-classified) in Q2 FYE23, to primarily equity-settled in Q2 FYE24, which benefited the year-over-year non-GAAP comparison. For more detail on share-based compensation cost see table in GAAP to Non-GAAP Reconciliation.

Research and development (R&D) expense was $626 million, representing 77.7% of revenue. Non-GAAP R&D expense was $283 million, representing 35.1% of revenue, and up 13% year-over-year. Growth was driven by an 18% increase in engineering headcount, offset by the change in mix of share-based compensation cost from cash-settled to equity-settled.

Selling, general and administrative (SG&A) expense was $290 million, representing 36.0% of revenue. Non-GAAP SG&A expense was $116 million, representing 14.4% of revenue, down 27% year-over-year primarily due to the reversal of the litigation provision.

GAAP operating profit showed a loss of $156 million compared with a profit of $183 million for the same period a year ago. The increase in revenue was more than offset by the investment in engineering, higher share-based compensation costs and IPO-related costs. These items were partially offset by the reversal of the litigation provision.

Non-GAAP operating profit of $381 million was up 92% year-over-year and represents a 47.3% non-GAAP operating margin, compared with 31.4% for the same period last year.

Total share-based compensation cost (equity-settled) was $509 million with $19 million in cost of sales, $343 million in R&D and $147 million in SG&A. Share-based compensation costs were higher in Q2 than is expected in future quarters as the IPO triggered a one-time expense for previously granted shares. The future run-rate of share based compensation cost will depend on a number of factors, including the share price, but is currently expected to be between $150 million to $200 million per quarter.

For Q2 FYE23, adding back cash-settled share-based compensation cost of $47 million would have resulted in non-GAAP operating profit for the period of $245 million. For Q2 FYE24, excluding the favorable reversal of the litigation provision of $40 million and adding back cash-settled share-based compensation cost of $9 million would have resulted in non-GAAP operating profit for the period of $350 million, a 43% year-over-year increase in underlying non-GAAP operating profit and representing a 43.4% non-GAAP operating margin.

### Income before income tax, taxation, share count and earnings per share

Income before income tax in Q2 FYE24 showed a loss of $119 million compared with a profit $152 million in Q2 FYE23. Non-GAAP Income before income taxes was $423 million, up 86% year-over-year.

The Company's effective tax rate for the quarter was 7.6% (non-GAAP 10.2%), which benefited from the one-time higher share-based compensation cost and its impact on profitability in the quarter. We expect the non-GAAP effective tax rate to be in the mid-teens on a go-forward basis.

Net income in Q2 FYE24 showed a loss of $110 million compared with a profit of $114 million in Q2 FYE23. Non-GAAP net income was $380 million, up 113% year-over-year.

Q2 FYE24 fully diluted earnings per share showed a loss of $0.11 per share (non-GAAP showed an income of $0.36 per share) compared with Q2 FYE23, which showed an income of $0.11 (non-GAAP showed an income of $0.17 per share).

On a GAAP basis, due to our loss position in the quarter, both basic and diluted shares were the same at 1,025,312,845 because including equity-classified awards would have been anti-dilutive. On a non-GAAP basis our fully diluted share count was 1,042,978,494.

### Free cash flow

Non-GAAP free cash flow was $169 million for the quarter, with non-GAAP free cash flow for the trailing four quarters totaling $860 million, up 291% year-over-year. At the end of Q2 FYE24, Arm's cash and cash equivalents, and short term investments, totaled $2,206 million, up 8% from $2,049 million in the prior quarter and 60% year-over-year.

**In closing**

We are delighted with Arm's first quarter as a listed company, which has demonstrated the strength of our business model and the robustness of our diversified products and end markets. Thank you for taking the time to review our letter, and we look forward to speaking to you on our call later today.

Sincerely,

Rene Haas,
Chief Executive Officer

Jason Child,
Chief Financial Officer





**Investor Contact**
Ian Thornton
Investor.relations@arm.com

**Media Contact**
Phil Hughes
Global-PRteam@arm.com

**Arm Holdings plc**
**Consolidated Income Statements**
**(in millions, except share and per share data)**
**(Unaudited)**

| | Three Months Ended September 30, | | Six Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Revenue:** | | | | |
| Revenue from external customers | $ 644 | $ 469 | $ 1,179 | $ 993 |
| Revenue from related parties | 162 | 161 | 302 | 329 |
| Total revenue | 806 | 630 | 1,481 | 1,322 |
| Cost of sales | (46) | (25) | (77) | (50) |
| **Gross profit** | 760 | 605 | 1,404 | 1,272 |
| **Operating expenses:** | | | | |
| Research and development | (626) | (248) | (963) | (466) |
| Selling, general and administrative | (290) | (172) | (486) | (325) |
| Disposal, restructuring and other operating expenses, net | — | (2) | — | (4) |
| **Total operating expense** | (916) | (422) | (1,449) | (795) |
| **Operating income (loss)** | (156) | 183 | (45) | 477 |
| Income (loss) from equity investments, net | (5) | (60) | (12) | (74) |
| Interest income, net | 28 | 6 | 52 | 8 |
| Other non-operating income (loss), net | 14 | 23 | 13 | 27 |
| **Income (loss) before income taxes** | (119) | 152 | 8 | 438 |
| Income tax benefit (expense) | 9 | (38) | (13) | (99) |
| **Net income (loss)** | (110) | 114 | (5) | 339 |
| | | | | |
| **Net income (loss) per share attributable to ordinary shareholders** | | | | |
| Basic | $ (0.11) | $ 0.11 | $ 0.00 | $ 0.33 |
| Diluted | $ (0.11) | $ 0.11 | $ 0.00 | $ 0.33 |
| | | | | |
| **Weighted average ordinary shares outstanding** | | | | |
| Basic | 1,025,312,845 | 1,025,234,000 | 1,025,273,638 | 1,025,234,000 |
| Diluted | 1,025,312,845 | 1,027,048,150 | 1,025,273,638 | 1,026,475,177 |

**Arm Holdings plc**
**Consolidated Balance Sheets**
**(in millions, except par value and per share amounts)**
**(Unaudited)**

| | As of | |
|---|---|---|
| | September 30, 2023 | March 31, 2023 |
| **Assets:** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 1,406 | $ 1,554 |
| Short-term investments | 800 | 661 |
| Accounts receivable, net (including receivables from related parties of $270 and $402 as of September 30, 2023 and March 31, 2023, respectively) | 864 | 999 |
| Contract assets | 235 | 154 |
| Prepaid expenses and other current assets | 137 | 169 |
| **Total current assets** | 3,442 | 3,537 |
| **Non-current assets:** | | |
| Property and equipment, net | 205 | 185 |
| Operating lease right of use assets | 205 | 206 |
| Equity investments (including investments held at fair value of $578 and $592 as of September 30, 2023 and March 31, 2023, respectively) | 725 | 723 |
| Goodwill | 1,615 | 1,620 |
| Intangible assets, net | 147 | 138 |
| Deferred tax assets | 139 | 139 |
| Non-current portion of contract assets | 121 | 116 |
| Other non-current assets | 211 | 202 |
| **Total non-current assets** | 3,368 | 3,329 |
| **Total assets** | $ 6,810 | $ 6,866 |
| **Liabilities:** | | |
| **Current liabilities:** | | |
| Accrued compensation and benefits and share-based compensation | $ 159 | $ 589 |
| Tax liabilities | 107 | 162 |
| Contract liabilities (including contract liabilities from related parties of $119 and $135 as of September 30, 2023 and March 31, 2023, respectively) | 288 | 293 |
| Operating lease liabilities | 24 | 26 |
| Other current liabilities (including payables to related parties of $17 as of September 30, 2023 and March 31, 2023) | 217 | 293 |
| **Total current liabilities** | 795 | 1,363 |
| **Non-current liabilities:** | | |
| Non-current portion of accrued compensation and share-based compensation | 19 | 152 |
| Deferred tax liabilities | 241 | 262 |
| Non-current portion of contract liabilities | 740 | 807 |
| Non-current portion of operating lease liabilities | 190 | 193 |
| Other non-current liabilities | 52 | 38 |
| **Total non-current liabilities** | 1,242 | 1,452 |
| **Total liabilities** | 2,037 | 2,815 |
| Commitments and contingencies (Note 11) | | |

**Arm Holdings plc**
**Consolidated Balance Sheets**
**(in millions, except par value and per share amounts)**
**(Unaudited)**

|  | As of | |
|---|---|---|
|  | September 30, 2023 | March 31, 2023 |
| **Shareholders' equity:** |  |  |
| Ordinary shares, $0.001 par value, 1,088,334,144 and 1,025,234,000 shares authorized, 1,025,234,000 issued and outstanding as of September 30, 2023 and March 31, 2023, respectively. | 2 | 2 |
| Additional paid-in capital | 1,979 | 1,216 |
| Accumulated other comprehensive income | 352 | 376 |
| Retained earnings | 2,440 | 2,457 |
| **Total shareholders' equity** | 4,773 | 4,051 |
| **Total liabilities and shareholders' equity** | $ 6,810 | $ 6,866 |

**Arm Holdings plc**
**Consolidated Statements of Cash Flows**
**(in millions)**
**(Unaudited)**

| | Three Months Ended September 30, | | Six Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Cash flows provided by (used for) operating activities:** | | | | |
| Net income (loss) | $ (110) | $ 114 | $ (5) | $ 339 |
| Adjustments to reconcile net income (loss) to net cash provided by (used for) operating activities: | | | | |
| Depreciation and amortization | 41 | 45 | 82 | 87 |
| Deferred income taxes | (4) | (1) | (17) | (9) |
| Income (loss) from equity investments, net | 5 | 60 | 12 | 74 |
| Share-based compensation cost | 513 | 34 | 653 | 47 |
| Operating lease expense | 9 | 8 | 17 | 17 |
| Other non-cash operating activities, net | (3) | (13) | (3) | (2) |
| Changes in assets and liabilities: | | | | |
| Accounts receivable, net (including receivables from related parties) | 33 | (144) | 135 | (209) |
| Contract assets | (55) | 23 | (87) | 39 |
| Prepaid expenses and other assets | 12 | 8 | 13 | 13 |
| Accrued compensation and benefits and share-based compensation | 5 | 32 | (442) | (509) |
| Contract liabilities (including contract liabilities from related parties) | (96) | (2) | (72) | 12 |
| Tax liabilities | (76) | (11) | (64) | 39 |
| Operating lease liabilities | (13) | (23) | (17) | (59) |
| Other current liabilities (including payables to related parties) | (34) | (54) | (92) | (34) |
| **Net cash provided by (used for) operating activities** | $ 227 | $ 76 | $ 113 | $ (155) |
| | | | | |
| **Cash flows provided by (used for) investing activities** | | | | |
| Purchase of short-term investments | (125) | (440) | (385) | (665) |
| Proceeds from maturity of short-term investments | 126 | 320 | 246 | 610 |
| Purchases of equity investments | — | — | (11) | (3) |
| Purchases of intangible assets | (13) | (8) | (13) | (22) |
| Purchases of property and equipment | (34) | (26) | (60) | (38) |
| **Net cash provided by (used for) investing activities** | $ (46) | $ (154) | $ (223) | $ (118) |
| | | | | |
| **Cash flows provided by (used for) financing activities** | | | | |
| Payment of intangible asset obligations | (11) | (9) | (21) | (20) |
| Other financing activities, net | (1) | — | (6) | — |
| Payment of withholding tax on vested shares | (12) | — | (12) | — |
| **Net cash provided by (used for) financing activities** | $ (24) | $ (9) | $ (39) | $ (20) |
| | | | | |
| Effect of foreign exchange rate changes on cash and cash equivalents | 1 | (11) | 1 | (21) |
| Net decrease in cash and cash equivalents | 158 | (98) | (148) | (314) |
| Cash and cash equivalents at the beginning of the period | 1,248 | 788 | 1,554 | 1,004 |
| Cash and cash equivalents at the end of the period | $ 1,406 | $ 690 | $ 1,406 | $ 690 |
| | | | | |
| **Non-cash operating, investing and financing activities:** | | | | |
| Non-cash additions in property and equipment | 5 | 2 | 5 | 9 |
| Non-cash additions in intangible assets | — | — | 38 | — |
| Non-cash additions to equity investments from conversion of certain receivables | 4 | — | 4 | — |
| Non-cash additions in operating lease right of use assets | 6 | 2 | 13 | 2 |
| Non-cash additions of operating lease liabilities | 6 | 2 | 13 | 2 |
| Non-cash distributions to shareholders | 12 | — | 12 | — |
| Non-cash withholding tax on vested shares | 11 | — | 11 | — |
| Non-cash reclassification of share-based compensation costs | 343 | — | 343 | — |

**Key Financial and Operating Metrics**

We use the following key performance indicators and non-GAAP financial measures to analyze our business performance and financial forecasts and to develop strategic plans, which we believe provide useful information to the market to aid in understanding and evaluating our results of operations in the same manner as our management team. Certain judgments and estimates are inherent in our processes to calculate these metrics. These key performance indicators and non-GAAP financial measures are presented for supplemental informational purposes only, should not be considered a substitute for financial information presented in accordance with GAAP, and may differ from similarly titled metrics or measures presented by other companies.

The following table sets forth a summary of the key financial and operating metrics:

| (in millions, except for Number of Arm-based Chips, Number of extant Arm Total Access and Arm Flexible Access licenses, and Total number of employees and engineers) | Three Months Ended September 30, | | Six Months Ended September 30, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Total revenue | 806 | 630 | 1,481 | 1,322 |
| License and other revenue | 388 | 188 | 663 | 446 |
| Royalty revenue | 418 | 442 | 818 | 876 |
| Operating income | (156) | 183 | (45) | 477 |
| Non-GAAP operating income (1) | 381 | 198 | 653 | 495 |
| Net income from continuing operations | (110) | 114 | (5) | 339 |
| Non-GAAP net income (1) | 380 | 178 | 626 | 414 |
| Net cash provided by operating activities | 227 | 76 | 113 | (155) |
| Non-GAAP free cash flow (1) | 169 | 33 | 19 | (235) |
| | | | | |
| Operating metrics: | | | | |
| Number of Arm-based chips reported as shipped (billions) | 7.1 | 7.5 | 13.9 | 14.8 |

| | As of | |
|---|---|---|
| Operating metrics: | **September 30, 2023** | **September 30, 2022** |
| Cumulative number of Arm-based chips reported as shipped (billions) | 272.5 | 242.0 |
| Number of extant Arm Total Access licenses (2) | 22 | 13 |
| Number of extant Arm Flexible Access licenses (2)(3) | 212 | 194 |
| Annualized contract value | $ 1,108 | $ 1,080 |
| Remaining performance obligation | $ 2,414 | $ 1,751 |
| Total number of employees (at end of period) | 6,629 | 5,679 |
| Total number of engineers | 5,318 | 4,500 |
| Total number of non-engineers | 1,311 | 1,179 |

(1) Non-GAAP operating income, Non-GAAP net income from continuing operations and Non-GAAP free cash flow are non-GAAP financial measures. For more information regarding our use of these measures and a reconciliation of these measures to the most directly comparable GAAP financial measures, see "—GAAP to Non-GAAP Reconciliation" below.

(2) As of the last day of the applicable period.

(3) For the quarter ended June 30, 2023 (Q1 FYE24), the number of Flexible Access agreements has been corrected to 211 from 214 (as previously reported in our IPO Prospectus) to account for certain customer license terminations and a consolidation of customer licenses due to an acquisition.

**Number of Arm-based chips reported as shipped - for the period and cumulative**

Each quarter, most of our customers, and those contracted through Arm China, furnish us (directly or via Arm China) with royalty reports setting forth the actual number of Arm-powered chips they shipped in the immediately preceding quarter. Royalty reports received in the 12-month period from April 1 to March 31 of each year relate to chip shipments made in the period from January 1 to December 31 of each year. We also perform various procedures to assess customer data related to royalties for reasonableness, and our license agreements generally include rights for us to audit the books and records of our customers to verify certain types of customer data.

We consider the number of chips reported as shipped by our customers as a key performance indicator because it represents the acceptance of our products by companies who use chips in their products (e.g., our customers' customers). The number

of chips shipped also provides insight into chip pricing and volumes in different end markets, which helps inform our pricing models and competitive positioning.

The cumulative number of Arm-based chips reported as shipped are from inception to date. We consider the cumulative number of Arm-based chips reported as shipped by our customers as a key performance indicator because it represents the scale of expansion of Arm-based products.

### Number of extant Arm Total Access and Arm Flexible Access licenses

Each quarter, we track the number of extant Arm Total Access and Arm Flexible Access licenses with our customers, and those contracted through Arm China. We believe that, over time, many of our customers will transition to either an Arm Total Access or Arm Flexible Access license to access our products. This transition enables us and our customers to focus less on contract negotiations and more on how our products can be deployed in our customers' future chips.

We consider the number of extant Arm Total Access and Arm Flexible Access licenses as key performance indicators as they represents the increasing collaboration between us and our customers, which could be a leading indicator to more chips being designed with our products and, accordingly, more recurring royalty revenue in the future, improving our long-term market share.

### Annualized contract value

Each quarter, we track the annualized contract value ("ACV") relating to licensing agreements signed with our customers and those contracted through Arm China per the aggregate license fee as shared under the IPLA. We define ACV as the total annualized committed fees, excluding any potential future royalty revenue, for all signed agreements deemed to be active through the last day of each applicable reporting period. Arm Total Access agreements and ALAs are deemed to be active for, and annualized over, the number of years in the contract. Any other license agreements, including single use and limited use licenses issued under an Arm Flexible Access agreement or TLA, are deemed to be active for, and annualized over, three years based on the historical licensing patterns of our customers. The aggregate license fee shared by Arm China is also deemed to be active for, and annualized over, three years.

ACV is an operational metric based on committed fees, excluding royalties, not recognized revenue, and therefore is not reconcilable to, nor a substitute for, revenue reported under GAAP. However, we consider ACV to be a key operational metric that we use to track existing licensing commitments with our customers. Bookings of new licenses and recognized revenue may fluctuate materially from quarter to quarter due to customer buying patterns, timing of subscription renewals and as a function of contract duration. As a result, we believe ACV provides an additional understanding of our business performance and long-term trends.

### Remaining performance obligations

Remaining performance obligations ("RPO") represent the transaction price allocated to performance obligations that are unsatisfied, or partially unsatisfied, which includes unearned revenue and amounts that will be invoiced and recognized as revenue in future periods.

Arm has elected to exclude potential future royalty receipts from the disclosure of remaining performance obligations. Revenue recognition occurs upon delivery or beginning of license term, whichever is later.

### Non-GAAP financial measures

In addition to our results determined in accordance with GAAP, we utilize and present financial measures that are not calculated and presented in accordance with GAAP. Our non-GAAP financial measures include non-GAAP cost of sales, non-GAAP gross profit, non-GAAP gross profit margin, non-GAAP research and development, non-GAAP selling, general and administrative, non-GAAP operating expense, non-GAAP operating income, non-GAAP operating profit margin, non-GAAP income (loss) from equity investments, net, non-GAAP interest income, net, non-GAAP other non-operating income (loss), net, non-GAAP income before income taxes, net, non-GAAP net income, non-GAAP basic and diluted net income per share attributable to ordinary shareholders, and free cash flow. We believe these non-GAAP financial measures provide useful information to investors and others in understanding and evaluating our results of operations, as well as provide a useful measure for period-to-period comparisons of our business performance. Moreover, we have included these non-GAAP financial measures because they are key measurements used by our management internally to make operating decisions, including those related to analyzing operating expenses, evaluating performance, and performing strategic

planning and annual budgeting. We believe that the presentation of our non-GAAP financial measures, when viewed holistically, is helpful to investors in assessing the consistency and comparability of our performance in relation to prior periods and facilitates comparisons of our financial performance relative to our competitors, particularly with respect to competitors that present similar non-GAAP financial measures in addition to their GAAP results.

Non-GAAP financial measures are presented for supplemental information purposes only, should not be considered a substitute for financial information presented in accordance with GAAP, and may not align with similar financial measures presented by our competitors, which may limit the ability of investors to assess our performance relative to certain peer companies.

Non-GAAP financial measures presented herein exclude acquisition-related intangible asset amortization, share-based compensation cost associated with equity awards where our intent is to issue equity upon vesting (in lieu of cash settlement), costs associated with disposal activities, impairment of long-lived assets, restructuring and related costs, public company readiness costs, other operating income (expenses), net, (income) loss from equity method investments, and income tax effect on non-GAAP adjustments. We exclude these items from our non-GAAP financial measures because they are non-cash in nature, or because the amount and timing of these items is unpredictable and not driven by core results of operations, which renders comparisons with prior periods and competitors less meaningful.

Investors should consider non-GAAP financial measures alongside other financial performance measures, including operating income, net income and our other GAAP results. For more information regarding our use of these measures and a reconciliation to the most directly comparable GAAP financial measure, see "—GAAP to Non-GAAP Reconciliation."

**Arm Holdings**
**GAAP to Non-GAAP Reconciliation**
**(Unaudited)**

The following is a reconciliation of GAAP to Non-GAAP results:

| (in millions, except share and per share amounts) | GAAP Results | Acquisition-related intangible asset amortization | Share-based compensation costs (equity settled) (1)(2)(3) | Public company readiness costs | Costs associated with disposal activities | Restructuring and related costs | Income (loss) from equity investments, net | Income tax effects on non-GAAP adjustments | Non-GAAP Results |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended September 30, 2023 | | | | | |
| Total revenue | $    806 | $    — | $    — | $    — | $    — | $    — | $    — | $    — | $    806 |
| Cost of sales | (46) | 1 | 19 | — | — | — | — | — | (26) |
| **Gross profit** | 760 | 1 | 19 | — | — | — | — | — | 780 |
| **Gross profit margin** | 94.3 % | | | | | | | | 96.8 % |
| **Operating expenses:** | | | | | | | | | |
| Research and development | (626) | — | 343 | — | — | — | — | — | (283) |
| Selling, general and administrative | (290) | — | 147 | 27 | — | — | — | — | (116) |
| **Total operating expense** | (916) | — | 490 | 27 | — | — | — | — | (399) |
| **Operating income (loss)** | (156) | 1 | 509 | 27 | — | — | — | — | 381 |
| **Operating profit margin** | (19.4)% | | | | | | | | 47.3 % |
| Income (loss) from equity investments, net | (5) | — | — | — | — | — | 5 | — | — |
| Interest income, net | 28 | — | — | — | — | — | — | — | 28 |
| Other non-operating income (loss), net | 14 | — | — | — | — | — | — | — | 14 |
| **Income (loss) before income taxes** | (119) | 1 | 509 | 27 | — | — | 5 | — | 423 |
| Income tax benefit (expense) | 9 | — | — | — | — | — | — | (52) | (43) |
| **Net income (loss)** | $    (110) | $    1 | $    509 | $    27 | $    — | $    — | $    5 | $    (52) | $    380 |
| **Net income (loss) per share attributable to ordinary shareholders** | | | | | | | | | |
| Basic | $    (0.11) | | | | | | | | $    0.37 |
| Diluted | $    (0.11) | | | | | | | | $    0.36 |
| **Weighted average ordinary shares outstanding** | | | | | | | | | |
| Basic | 1,025,312,845 | | | | | | | | 1,025,312,845 |
| Diluted | 1,025,312,845 | | | | | | | | 1,042,978,494 |

(1) Total share-based compensation cost, including both cash and equity settled awards, was $518 million for the three months ended September 30, 2023. For non-GAAP purposes, we adjust for those awards that are currently liability-classified but will be equity settled after the initial public offering. Liability-classified awards are remeasured at the end of each reporting period through the date of settlement to ensure that the expense recognized for each award is equivalent to the amount to be paid in cash or equity settled after the initial public offering.

**GAAP to Non-GAAP Reconciliation (continued)**
**(Unaudited)**

| (in millions, except share and per share amounts) | GAAP Results | Acquisition-related intangible asset amortization | Share-based compensation costs (equity settled) (1)(2)(3) | Public company readiness costs | Costs associated with disposal activities | Restructuring and related costs | Income (loss) from equity investments, net | Income tax effects on non-GAAP adjustments | Non-GAAP Results |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended September 30, 2022 | | | | | |
| Total revenue | $ 630 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ 630 |
| Cost of sales | (25) | 1 | — | — | — | — | — | — | (24) |
| **Gross profit** | 605 | 1 | — | — | — | — | — | — | 606 |
| **Gross profit margin** | 96.0 % | | | | | | | | 96.2 % |
| **Operating expenses:** | | | | | | | | | |
| Research and development | (248) | — | (2) | — | — | — | — | — | (250) |
| Selling, general and administrative | (172) | — | 1 | 13 | — | — | — | — | (158) |
| Impairment of long-lived assets | — | — | — | — | — | — | — | — | — |
| Disposal, restructuring and other operating expenses, net | (2) | — | — | — | 2 | — | — | — | — |
| **Total operating expense** | (422) | — | (1) | 13 | 2 | — | — | — | (408) |
| **Operating income (loss)** | 183 | 1 | (1) | 13 | 2 | — | — | — | 198 |
| **Operating profit margin** | 29.0 % | | | | | | | | 31.4 % |
| Income (loss) from equity investments, net | (60) | — | — | — | — | — | 60 | — | — |
| Interest income, net | 6 | — | — | — | — | — | — | — | 6 |
| Other non-operating income (loss), net | 23 | — | — | — | — | — | — | — | 23 |
| **Income (loss) before income taxes** | 152 | 1 | (1) | 13 | 2 | — | 60 | — | 227 |
| Income tax (expense) benefit | (38) | — | — | — | — | — | — | (11) | (49) |
| **Net income (loss)** | $ 114 | $ 1 | $ (1) | $ 13 | $ 2 | $ — | $ 60 | $ (11) | $ 178 |
| **Net income (loss) per share attributable to ordinary shareholders** | | | | | | | | | |
| Basic | $ 0.11 | | | | | | | | $ 0.17 |
| Diluted | $ 0.11 | | | | | | | | $ 0.17 |
| **Weighted average ordinary shares outstanding** | | | | | | | | | |
| Basic | 1,025,234,000 | | | | | | | | 1,025,234,000 |
| Diluted | 1,027,048,150 | | | | | | | | 1,027,048,150 |

(1) Total share-based compensation cost, including both cash and equity settled awards, was $46 million for the three months ended September 30, 2022. In the three months ended September 30, 2022, the share-based compensation income of $1 million pertains to a decrease in fair value of certain liability-classified awards that will be settled in equity at the time of vesting. For non-GAAP purposes, we adjust for those awards that are currently liability-classified but will be equity settled after the initial public offering. Liability-classified awards are remeasured at the end of each reporting period through the date of settlement to ensure that the expense recognized for each award is equivalent to the amount to be paid in cash or equity settled after the initial public offering.

**GAAP to Non-GAAP Reconciliation (continued)**
**(Unaudited)**

| (in millions, except share and per share amounts) | GAAP Results | Acquisition-related intangible asset amortization | Share-based compensation costs (equity settled) (1)(2)(3) | Public company readiness costs | Costs associated with disposal activities | Restructuring and related costs | Income (loss) from equity investments, net | Income tax effects on non-GAAP adjustments | Non-GAAP Results |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Six Months Ended September 30, 2023** | | | | | |
| Total revenue | $ 1,481 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ 1,481 |
| Cost of sales | (77) | 2 | 25 | — | — | — | — | — | (50) |
| **Gross profit** | 1,404 | 2 | 25 | — | — | — | — | — | 1,431 |
| **Gross profit margin** | 94.8 % | | | | | | | | 96.6 % |
| **Operating expenses:** | | | | | | | | | |
| Research and development | (963) | — | 439 | — | — | — | — | — | (524) |
| Selling, general and administrative | (486) | — | 191 | 41 | — | — | — | — | (254) |
| Impairment of long-lived assets | — | — | — | — | — | — | — | — | — |
| Disposal, restructuring and other operating expenses, net | — | — | — | — | — | — | — | — | — |
| **Total operating expense** | (1,449) | — | 630 | 41 | — | — | — | — | (778) |
| **Operating income (loss)** | (45) | 2 | 655 | 41 | — | — | — | — | 653 |
| **Operating profit margin** | (3.0)% | | | | | | | | 44.1 % |
| Income (loss) from equity investments, net | (12) | — | — | — | — | — | 12 | — | — |
| Interest income, net | 52 | — | — | — | — | — | — | — | 52 |
| Other non-operating income (loss), net | 13 | — | — | — | — | — | — | — | 13 |
| **Income (loss) before income taxes** | 8 | 2 | 655 | 41 | — | — | 12 | — | 718 |
| Income tax benefit (expense) | (13) | — | — | — | — | — | — | (79) | (92) |
| **Net income (loss)** | $ (5) | $ 2 | $ 655 | $ 41 | $ — | $ — | $ 12 | $ (79) | $ 626 |
| **Net income (loss) per share attributable to ordinary shareholders** | | | | | | | | | |
| Basic | $ — | | | | | | | | $ 0.61 |
| Diluted | $ — | | | | | | | | $ 0.60 |
| **Weighted average ordinary shares outstanding** | | | | | | | | | |
| Basic | 1,025,273,638 | | | | | | | | 1,025,273,638 |
| Diluted | 1,025,273,638 | | | | | | | | 1,035,798,696 |

(1) Total share-based compensation cost, including both cash and equity settled awards, was $676 million for the six months ended September 30, 2023. For non-GAAP purposes, we adjust for those awards that are currently liability-classified but will be equity settled after the initial public offering. Liability-classified awards are remeasured at the end of each reporting period through the date of settlement to ensure that the expense recognized for each award is equivalent to the amount to be paid in cash or equity settled after the initial public offering.

**GAAP to Non-GAAP Reconciliation (continued)**
**(Unaudited)**

| (in millions, except share and per share amounts) | GAAP Results | Acquisition-related intangible asset amortization | Share-based compensation costs (equity settled) (1)(2)(3) | Public company readiness costs | Costs associated with disposal activities | Restructuring and related costs | Income (loss) from equity investments, net | Income tax effects on non-GAAP adjustments | Non-GAAP Results |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Six Months Ended September 30, 2022 | | | | | |
| Total revenue | $ 1,322 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ 1,322 |
| Cost of sales | (50) | 3 | — | — | — | — | — | — | (47) |
| **Gross profit** | 1,272 | 3 | — | — | — | — | — | — | 1,275 |
| **Gross profit margin** | 96.2 % | | | | | | | | 96.4 % |
| **Operating expenses:** | | | | | | | | | |
| Research and development | (466) | — | (1) | — | — | — | — | — | (467) |
| Selling, general and administrative | (325) | — | (7) | 21 | — | — | — | — | (311) |
| Impairment of long-lived assets | — | — | — | — | — | — | — | — | — |
| Disposal, restructuring and other operating expenses, net | (4) | — | — | — | 1 | 1 | — | — | (2) |
| **Total operating expense** | (795) | — | (8) | 21 | 1 | 1 | — | — | (780) |
| **Operating income (loss)** | 477 | 3 | (8) | 21 | 1 | 1 | — | — | 495 |
| **Operating profit margin** | 36.1 % | | | | | | | | 37.4 % |
| Income (loss) from equity investments, net | (74) | — | — | — | — | — | 74 | — | — |
| Interest income, net | 8 | — | — | — | — | — | — | — | 8 |
| Other non-operating income (loss), net | 27 | — | — | — | — | — | — | — | 27 |
| **Income (loss) before income taxes** | 438 | 3 | (8) | 21 | 1 | 1 | 74 | — | 530 |
| Income tax (expense) benefit | (99) | — | — | — | — | — | — | (17) | (116) |
| **Net income (loss)** | $ 339 | $ 3 | $ (8) | $ 21 | $ 1 | $ 1 | $ 74 | $ (17) | $ 414 |
| **Net income (loss) per share attributable to ordinary shareholders** | | | | | | | | | |
| Basic | $ 0.33 | | | | | | | | $ 0.40 |
| Diluted | $ 0.33 | | | | | | | | $ 0.40 |
| **Weighted average ordinary shares outstanding** | | | | | | | | | |
| Basic | 1,025,234,000 | | | | | | | | 1,025,234,000 |
| Diluted | 1,026,475,177 | | | | | | | | 1,026,475,177 |

(1) Total share-based compensation cost, including both cash and equity settled awards, was $59 million for the six months ended September 30, 2022. In the six months ended September 30, 2022, the share-based compensation income of $8 million pertains to a decrease in fair value of certain liability-classified awards that will be settled in equity at the time of vesting. For non-GAAP purposes, we adjust for those awards that are currently liability-classified but will be equity settled after the initial public offering. Liability-classified awards are remeasured at the end of each reporting period through the date of settlement to ensure that the expense recognized for each award is equivalent to the amount to be paid in cash or equity settled after the initial public offering.

**GAAP to Non-GAAP Reconciliation (continued)**
**(Unaudited)**

(2) A summary of share-based compensation cost recognized on the Condensed Consolidated Income Statements is as follows:

| (in millions) | Three Months Ended September 30, | | | | Six Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Cost of sales | $ | 20 | $ | 2 | $ | 26 | $ | 3 |
| Selling, general and administrative | | 149 | | 12 | | 198 | | 18 |
| Research and development | | 349 | | 32 | | 452 | | 38 |
| Total | $ | 518 | $ | 46 | $ | 676 | $ | 59 |

(3) A summary of share-based compensation liability-classified cost recognized on the Condensed Consolidated Income Statements is as follows:

| (in millions) | Three Months Ended September 30, | | | | Six Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Cost of sales | $ | 1 | $ | 2 | $ | 1 | $ | 3 |
| Selling, general and administrative | | 2 | | 11 | | 7 | | 25 |
| Research and development | | 6 | | 34 | | 13 | | 39 |
| Total | $ | 9 | $ | 47 | $ | 21 | $ | 67 |

The following is a reconciliation of Non-GAAP free cash flow to Net cash provided by operating activities, the most directly comparable GAAP cash flow measure:

| (in millions) | Three Months Ended September 30, | | | | Six Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Net cash provided by operating activities | $ | 227 | $ | 76 | $ | 113 | $ | (155) |
| *Adjusted for:* | | | | | | | | |
| Purchases of property and equipment | | (34) | | (26) | | (60) | | (38) |
| Purchases of intangible assets | | (13) | | (8) | | (13) | | (22) |
| Payment of intangible asset obligations | | (11) | | (9) | | (21) | | (20) |
| Non-GAAP free cash flow | $ | 169 | $ | 33 | $ | 19 | $ | (235) |

**Forward-Looking Statements**

This shareholder letter contains forward-looking statements that reflect our plans, beliefs, expectations and current views with respect to, among other things, future events and financial performance. Our actual results could differ materially from the forward-looking statements included herein. Statements regarding our future and projections relating to revenue, cost of sales expenses, costs, income (loss), and potential growth opportunities are typical of such statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in "*Risk Factors*" in our IPO Prospectus.

The following contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, relating to our operations, results of operations and other matters that are based on our current expectations, estimates, assumptions and projections. Forward-looking statements are based on our management's beliefs and assumptions and on information currently available to our management. In some cases, you can identify forward-looking statements by the words "may," "might," "will," "could," "would," "should," "expect," "is/are likely to," "intend," "plan," "objective," "anticipate," "believe," "estimate," "predict," "potential," "target," "continue" and "ongoing," or the negative of these terms or other comparable terminology intended to identify statements about the future. The forward-looking statements and opinions are based upon current expectations and, while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements. We caution that you should not place undue reliance on any of our forward-looking statements. We undertake no obligation to update forward-looking statements to reflect developments or information obtained after the date hereof and disclaim any obligation to do so except as required by applicable laws.

# EXHIBIT 6

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3                           ---oOo---

4

5      ARM LTD., a UK Corporation, )
                                    )
6                    Plaintiff,     )
                                    )
7      vs.                          )  C.A. No. 22-1146 (MN)
                                    )
8      QUALCOMM INC., a Delaware    )
       corporation; QUALCOMM       )
9      TECHNOLOGIES, INC., a        )
       Delaware Corporation, and   )
10     NUVIA, INC., a Delaware      )
       Corporation,                 )
11                                  )
                     Defendants.    )
12     _____)

13

14

15            HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

16            VIDEOTAPED DEPOSITION OF RENE HAAS

17               TUESDAY, DECEMBER 12, 2023

18

19

20

21     STENOGRAPHICALLY REPORTED BY:

22     ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23     CSR LICENSE NO. 9830

24     JOB NO. 6326906

25

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 2

```
1            UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3                    ---oOo---
4
5    ARM LTD., a UK Corporation, )
                                  )
6        Plaintiff,   )
                       )
7    vs.              ) C.A. No. 22-1146 (MN)
                       )
8    QUALCOMM INC., a Delaware   )
     corporation; QUALCOMM       )
9    TECHNOLOGIES, INC., a       )
     Delaware Corporation, and   )
10   NUVIA, INC., a Delaware     )
     Corporation,                )
11                               )
         Defendants.   )
12   _____  )
13
14
15
16      Videotaped deposition of RENE HAAS, taken on
17   behalf of the Defendant, pursuant to Notice, on
18   Tuesday, December 12, 2023, at Morrison & Foerster,
19   LLP, 755 Page Mill Road, Palo Alto, California
20   beginning at 9:25 a.m., and ending at 6:02 p.m.,
21   before me, ANDREA M. IGNACIO, CSR, RPR, CCRR,
22   CRR, CLR ~ License No. 9830.
23
24
25
```

Page 3

```
1    A P P E A R A N C E S:
2
3        FOR THE PLAINTIFF:
4        MORRISON & FOERSTER LLP
5        By:  MICHAEL JACOBS, Esq.
6             ERIK J. OLSON, Esq.
7        755 Page Mill Road
8        Palo Alto, California 94304
9        650.813.5825
10       mjacobs@mofo.com
11
12       FOR THE DEFENDANT:
13       PAUL WEISS
14       By:  KAREN L. DUNN, Esq.
15            MADALYN VAUGHN, Esq. New York
16            ERIN MORGAN, Esq. New York
17       2001 K Street, NW
18       Washington, D.C.  20006-1047
19       kdunn@paulweiss.com
20
21
22       ALSO PRESENT:
23          Doug Stock, Videographer
24          Robert Calico, Arm Ltd.
25                ---oOo---
```

Page 4

```
1                I N D E X
2
3    WITNESS:  Rene Haas
4
5    EXAMINATION                  PAGE
6    BY MS. DUNN                  9, 351
7    BY MS. YING                  319
8    BY MR. JACOBS                348, 354
9
10             E X H I B I T S
11   EXHIBIT                      PAGE
12   Exhibit 142  RH Masa 2.4 20.22.ptx Bates     14
13        ARM_01230402 - '81
14   Exhibit 143  2022-04-28 Rene briefing Bates  47
15        ARM_00098756
16   Exhibit 144  Chat Filters, Bates         59
17        ARM_01241616 - 20
18   Exhibit 145  Chat Filters, Bates         73
19        ARM_00082083 - '89
20   Exhibit 146  Chat Filters, Bates         108
21        ARM_00082120 - '27
22   Exhibit 147  Chat Filters, Bates         124
23        ARM_01239056 - '68
24   Exhibit 148  2-1-22 Letter, Bates ARM_00037427  136
25   //
```

Page 5

```
1                EXHIBITS
2    EXHIBIT                      PAGE
3    Exhibit 149  Chat Filters, Bates         153
4        ARM_00087926 - '29
5    Exhibit 150  Chat Filters, Bates         175
6        ARM_00087844 - '50
7    Exhibit 151  8-31-22 E-mail Bates        184
8        ARM_00094320 - '63
9    Exhibit 152  8-31-22 E-mail Bates        200
10       ARM_00110511 - '12
11   Exhibit 153  Chat Filters, Bates         225
12       ARM_00087844 - '50
13   Exhibit 154  3-5-23 E-mail Bates         231
14       ARM_01215878 - '79
15   Exhibit 155  Anticipated Acquisition by Nvidia  273
16       Corporation of Arm Limited Initial
17       Submission 12-20-21 Bates
18       ARM_00088656 - '84
19   Exhibit 156  Chat Filters, Bates ARM_01239046  288
20       - '49
21   Exhibit 157  Samsung - Arm Executive Meeting   310
22       10-4-22, Bates ARM_01427450 - '92
23   Exhibit 158  How a Lopsided Apple Deal Got     326
24       Under Arm's Skin
25   //
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 6

1       PREVIOUSLY MARKED EXHIBITS
2  EXHIBIT                  PAGE
3  Exhibit 108   2-16-21 Letter, Bates     91
4       ARM_01284106
5
6           ---oOo---
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1      DEPOSITION PROCEEDINGS
2  DECEMBER 12, 2023        9:25 A.M.
3        ---oOo---
4
5    THE VIDEOGRAPHER:  Good morning.  We are on
6  the record at 9:25 a.m. on December 12, 2023.    0
7    Please note that the microphones are
8  sensitive and may pick up whispering and private
9  conversations.  Please mute your phones at this time.
10  Audio and video recording will continue to take place
11  unless all parties agree to go off the record.
12    This is Media Unit 1 of the video-recorded
13  deposition of Rene Haas.  Taken by counsel for the
14  Defendant, in the matter of Arm Limited versus
15  Qualcomm Inc., et al.  This case is filed in the
16  United States District Court for the District of
17  Delaware.  Case No. 22-1146(MN).
18    The location of today's deposition is
19  755 Page Mill Road, Palo Alto, California.
20    My name is Douglas Stock, representing
21  Veritext.  I am the videographer.
22    And the court reporter today is Andrea
23  Ignacio, also from Veritext.
24    I am not authorized to administer an oath.  I
25  am not related to any party in this action, nor am I

Page 8

1  financially interested in the outcome.
2    If there are any objections to proceeding,
3  please state them at the time of your appearance.
4    Counsel and all present -- and all present
5  will now state their appearance and affiliation for
6  the record, beginning with the noticing attorney.
7    MS. DUNN:  Karen Dunn from Paul Weiss, on
8  behalf of Qualcomm.
9    MS. MORGAN:  Erin Morgan from Paul Weiss, on
10  behalf of Qualcomm.
11    MS. VAUGHN:  Madalyn Vaughn from Paul Weiss,
12  on behalf of Qualcomm.
13    MS. YING:  Jennifer Ying from Morris Nichols
14  Arsht & Tunnell, on behalf of Qualcomm.
15    MR. JACOBS:  Michael Jacobs, Morrison &
16  Foerster, for Arm.
17    MR. OLSON:  Erik Olson, Morrison & Foerster,
18  for Arm.
19    MR. CALICO:  I'm Rob Calico, in-house counsel
20  for Arm.
21    THE VIDEOGRAPHER:  Thank you.
22    And Madam Court Reporter, if you would please
23  swear in the witness.
24    And then, counsel, you may proceed.
25

Page 9

1       RENE HAAS,
2    having been sworn as a witness
3    by the Certified Shorthand Reporter,
4      testified as follows:
5
6    MS. DUNN:  Thank you.
7
8       EXAMINATION
9  BY MS. DUNN:
10  Q   Mr. Haas, when did you start working at Arm?
11  A   October of 2013.
12  Q   Great.
13    And what was your role when you started at
14  Arm?
15  A   I was vice president for strategic alliances.
16  Q   Okay.  Are you trained as an engineer?
17  A   My degree is in engineering.
18  Q   Okay.  Do you consider yourself an engineer
19  today?
20  A   I don't do engineering work today.
21  Q   Okay.  When was the last time you did any?
22  A   I was a field application engineer at NEC
23  Electronics in the early 1990s.  That was probably the
24  last time.
25  Q   Okay.  And then at some point, you were named

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



Page 158

1   already.
2       Mr. Williamson says:
3       "I prefer to test the pitch with Xiaomi, who
4   have a real need and intention."
5       Do you see that?
6   A   Uh-huh.
7   Q   Okay.  What is Mr. Williamson talking about
8   pitching?
9   A   Yeah, I'm not sure as I'm reading through
10  this.
11  Q   And does it refresh your recollection that
12  you respond to Mr. Williamson and say:
13      "They" -- meaning Xiaomi -- "and Samsung
14  should be first, but we need the soul of the product
15  to be told."
16      Do you see that?
17  A   Uh-huh, yeah.
18  Q   Okay.  So you and Mr. Williamson are speaking
19  about pitching a product to Samsung and to Xiaomi and
20  to others.  What product is that?
21  A   Just looking up to the top of the thread, I
22  think it's the TC24, which is the Total Compute
23  Platform.
24  Q   Okay.  And what is the Total Compute
25  Platform?

Page 159

1   A   It is a combination of CPUs and GPUs and
2   interconnect to build a mobile phone SoC.
3   Q   Okay.  And that's what you're discussing
4   pitching to these various companies?
5   A   Yes.
6   Q   And you say:
7       "MediaTek is practically last."
8       Do you see that?
9   A   Yes.
10  Q   Okay.  And why do you say that MediaTek
11  should be last -- practically last?
12  A   Because they don't build phones.
13  Q   Okay.  And are you -- were you aware at this
14  time whether Qualcomm was trying to sell to MediaTek?
15  A   Qualcomm does not sell to MediaTek.
16  Q   Okay.  All right.
17  A   To the best of my -- to the best of my
18  knowledge.
19  Q   And then Mr. Williamson responds and agrees
20  and says:
21  [REDACTED]
22  [REDACTED]
23      Do you say that -- see that?
24  A   Yes.
25  Q   Okay.  And why was MediaTek Arm's path to

Page 160

1   squash Nuvia?
2   A   You know, it's Paul's -- it's Paul's line, so
3   yeah, it's his -- his view.  I'm not exactly sure
4   where he was coming from on that.
5   Q   Okay.  So even though you don't say [REDACTED]
6   [REDACTED]
7   [REDACTED]
8   [REDACTED]
9   [REDACTED] your testimony today is that you
10  don't -- you don't know what he's talking about?
11  A   That's right.
12  Q   And then you say:
13      "MediaTek won't take this unless forced.  OEM
14  is key, not MediaTek."
15      Do you see that?
16  A   Yes.
17  Q   And you also say:
18      "AGREED.  Longer discussion, but we can't
19  give people a back door.  Our partners are smart."
20  [REDACTED]
21  [REDACTED]
22  [REDACTED]
23  [REDACTED]
24  [REDACTED]
25  [REDACTED]

Page 161

1   A   Yeah, they're separate issues.
2   [REDACTED]
3   [REDACTED]
4   [REDACTED]
5   [REDACTED]
6   Q   Okay.
7   A   So it's kind of a -- it's kind of orthogonal
8   to -- to Nuvia at this point.
9   Q   And Mr. Williamson saying to you that
10  [REDACTED]
11  [REDACTED]
12  [REDACTED]
13  A   No.
14  Q   No.
15      Did he say things like this all the time?
16  A   [REDACTED]
17  Q   Yeah.
18  A   [REDACTED]
19  [REDACTED]
20  [REDACTED]
21  Q   Yeah, so this is just you guys being candid?
22  A   Uh-huh.
23  Q   Okay.  All right.
24      So we've seen this -- this phrase before,
25  [REDACTED] in connection

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



Page 162

1   with what was called Aurora.
2      Do you recall that?
3   A  Yes.
4   Q  Okay.  And when did Arm start pitching Aurora
5   to customers?
6   A  I don't know if we ever did.
7   Q  Okay.
8   A  I don't think we did.
9   Q  Okay.  Okay.
10     And then if you could just look at the end
11   where Mr. Williamson is saying:
12
19     Do you see that?
20   A  Yes.
21   Q  Do you know what you're -- what you are
22   talking about when you say

Page 163

3   Q  Okay.  And who would your competitors be in
4   doing that?
5   A  Nobody.
6   Q  You would have no competition?
7   A  Correct.
8   Q  Okay.  Okay.
9     So Arm sued Qualcomm on August 31 of 2022.
10   And at that time -- you recall that?
11     You can put that to the side.
12     You recall that Arm sued Qualcomm on
13   August 31, 2022; correct?
14   A  Uh-huh.
15   Q  Okay.  At that time, what evidence was there
16   that Arm had been harmed by Qualcomm's conduct?
17   MR. JACOBS:  Objection; form.
18   THE WITNESS:  At the time that we filed the
19   lawsuit, what evidence was present that we had been
20   harmed?
21   MS. DUNN:  Yeah.
22   THE WITNESS:

Page 164

1
4
9
14   MS. DUNN:  Okay.
15   Q  Apart from being in uncharted waters and not
16   being able to find a settlement, what other harm can
17   you articulate --
18   A  We were -- we were --
19   Q  -- as of the time when you decided to bring a
20   lawsuit?
21   A  -- we were literally, as I said, at a point
22   where it was about potential harm.  It wasn't -- it
23   wasn't really about harm at the time.  It was about if
24   we -- if we turn the other way and we allow our IP to
25   be used in an unlicensed way, you kind of don't really

Page 165

1   have a business.
2   Q  Okay.  And so at that time, other than the
3   potential harm you just talked about, was there any
4   harm that you could articulate?
5   A  Potential harm -- no.  At that time, we had
6   never had a customer ignore our contracts blatantly.
7     So let's just say Qualcomm lets other
8   companies know that, You know what?
16   Q  Okay.  And you said earlier that you were not
17   an expert in the Nuvia contract, I believe?
18   A  That's right.
19   Q  Were you an expert in Qualcomm's ALA?
20   A  No.
21   Q  And are you an expert, as you sit here today,
22   in Qualcomm's ALA?
23   A  I am not.
24   Q  Okay.  And sitting here today, what -- what
25   concrete harm has Arm suffered?

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 166

1    A  What concrete harm --
2    Q  Yes.
3    A  -- that we have suffered?
4    Q  Yes.
5    A  Nothing yet.
6    Q  Okay.  How has Arm benefitted from filing a
7  lawsuit against Qualcomm?
8    A  I don't think we benefitted at all.
9    Q  Okay.  Has Arm had any greater success in
10  licensing technology to customers as a result of the
11  lawsuit?
12    A  Have we had any greater success?
13      I don't think it's changed.
14    Q  Okay.  Have you had any greater success in
15  selling your technology as a result of the lawsuit?
16    A  I don't know how to quantify greater success
17  or less success.
18    Q  Okay.  Do you think that the lawsuit has
19  harmed Qualcomm's reputation with customers?
20    A  I don't know.
21    Q  Okay.  Have you ever talked to any of
22  Qualcomm's customers about the lawsuit?
23    A  They've asked about it.
24    Q  Okay.  Have you -- let's start with the
25  question that I asked.  Have -- actually, strike that,

Page 167

1  because there was -- ambiguous.
2      Have you ever initiated any conversations
3  with any of Qualcomm's customers about the lawsuit?
4    A  No.
5    Q  Okay.  [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
   [redacted]
21    Q  And how do you describe to these customers
22  Qualcomm's licenses?
23    A  How do we describe their licenses?
24    Q  Yeah.
25    A  We don't.

Page 168

1    Q  So you -- any time that you're describing to
2  [redacted]
   [redacted]
5    A  We explain to them the chronology of the fact
6  that they bought the company, the fact that they came
7  to us to negotiate an assignment fee and settlement to
8  transfer the licenses.  We explain to the cust- --
9  customers that that was never consummated.  It --
10  Qualcomm continues to use the designs.
11      Every single customer we speak to are shocked
12  and ask us to explain what was inside Qualcomm's head.
13      And we said, We -- we -- we can't tell you
14  what's inside their heads.
15      It's not a discussion about their li- --
16  the -- the Qualcomm licenses are independent of the
17  discussion.
18    MS. DUNN:  Move to strike.  And also, a good
19  amount of your answer was hearsay.
20    Q  So my question is:  [redacted]
   [redacted]
   [redacted]
   [redacted] ; correct?
24    A  We are explaining to them, as I said before,
25  exactly what the chronology was in terms of why we

Page 169

1  brought the claim.
2    Q  My question is:  In the conversations you
3  have with Qualcomm's customers about this lawsuit,
4  which is a licensing dispute, are you describing to
5  them the terms of the licenses?
6    A  Whose licenses?
7    Q  Qualcomm's.
8    A  No.  I said we do not.
9    Q  Okay.  Do you describe to the customers --
10  strike that.
11      In the conversations you have with Qualcomm's
12  customers about this lawsuit, which is a licensing
13  dispute, are you describing to them the terms of the
14  Nuvia license?
15    A  No.
16    Q  Okay.  I think you mentioned earlier that the
17  Arm Board of Directors approved the lawsuit?
18    A  Excuse me for a second.
19      I believe so.
20    Q  Okay.  And Masa approved the lawsuit,
21  presumably?
22    A  Well, he's on the board.
23    Q  Right.
24      So as part of the board, did he approve the
25  lawsuit?

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



Page 170

1   A   The board approved it, so by definition.
2   Q   Okay.  And the lawsuit got press coverage
3   when it was filed; right?
4   A   Yes.
5   Q   Okay.  And people in the industry were aware
6   of it; right?
7   A   I assume.
8   Q   Right.
9       Well, I mean, you mentioned that customers
10  have come to you to ask questions, so --
11  A   Well, you're talking about the press re- -- I
12  don't know who read the press release when it came
13  out.  You're talking about when the press was
14  released.  I can't speak to what happened that day.
15  Q   Were people in the industry aware of the
16  lawsuit?
17  A   Were -- were they aware when?
18  Q   After it was filed --
19  A   Uh-huh.
20  Q   -- to -- to your knowledge, did people in the
21  industry become aware of the lawsuit?
22  A   Sure.
23  Q   Right.
24      It wasn't a secret.  People knew about it;
25  right?

Page 171

1       MR. JACOBS:  Objection; form; asked and
2   answered.
3       THE WITNESS:  When -- but when you say
4   "people knew about it," over what time period?
5       I'm not sure.  That's kind of a vague
6   question.
7       MS. DUNN:  Q.  Is it your understanding that
8   the fact of your lawsuit was well-known in the
9   industry.
10  A   I don't know how to define "well-known."
11  Q   Okay.  Is it your understanding that other
12  industry actors knew about your lawsuit?
13  A   Some knew.
14  Q   Okay.  Okay.
15      Give me one second.
16      Right.  Okay.  All right.
17      Now, this --
18      MS. MORGAN:  Oh, actually...
19      (Sotto voce discussion between counsel.)
20      MS. DUNN:  Okay.  All right.
21  Q   You testified earlier that -- actually,
22  strike that.
23      The same day Arm filed the lawsuit, August 31
24  of 2022, you personally sent a letter to various
25  industry participants.

Page 172

1       Do you recall that?
2   A   Yes.
3   Q   All right.
4       And what was the purpose of your sending the
5   letter?
6   A   ██████████████████████████
   ████████████████████████████████
   ████████████████████████████████
   █████████████████████
10  Q   ███████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████
    ███████████
15  ████████████████████████████
16  ████████
17  Q   Okay.
18      A   That was the question you asked me.
19  Q   Okay.  But you agree that you sent out a
20  number of letters to alert industry participants to
21  the lawsuit; correct?
22  A   I wouldn't say "industry participants."  I
23  would call them customers of ours.
24  Q   Okay.  So we can agree that on the day that
25  Arm filed suit, you personally sent a letter to

Page 173

1   various customers of yours to alert them to the
2   lawsuit; correct?
3   A   Correct.
4   Q   ████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████
    ████████████████████████████████
10  ████████████████████████████████████
    ████████████████████████████████
    █████████████████████████
    ████████████████████████████████████
15  ████████████████████████████████
16      MS. DUNN:  Okay.  Okay.
17  Q   ████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████
    ████████████████████████████████
    ███████████████
    ████████████████████████████████████

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 354

1    FURTHER EXAMINATION
2   BY MR. JACOBS:
3    Q   Let me just be clear:  When you spoke to
4   Mr. Son, was the thrust of the conversation at a --
5   when you say "at a high level," was the thrust of the
6   conversation, "Were you and I there together
7   throughout, or did you have a separate discussion?"
8        Was that the thrust of the -- the
9   conversation with him?
10   A   Correct.
11   Q   ███████████████████████████████████
██████████████████████████████████████
██████████████████
15   MR. JACOBS:  No further questions.
16   MS. DUNN:  Okay.  No further questions from
17  us, either.  Thank you, Mr. Haas.
18   THE VIDEOGRAPHER:  Keep your mics on for just
19  a moment.
20   Madam Court Reporter, do you need anything on
21  the record?
22   STENOGRAPHIC REPORTER:  Same order for
23  everyone?
24   MS. DUNN:  Yes, yes.
25   THE VIDEOGRAPHER:  We've reached the end of

Page 355

1   today's deposition, which consists of nine media
2   files.
3        This is the end of File No. 9.  We are going
4   off the record at 6:02 p.m.
5        (WHEREUPON, the deposition ended at
6        6:02 p.m.)
7        ---oOo---

Page 356

CERTIFICATE OF REPORTER

2
3        I, ANDREA M. IGNACIO, hereby certify that the
4   witness in the foregoing deposition was by me first
5   duly sworn to tell the truth, the whole truth, and
6   nothing but the truth in the within-entitled cause;
7        That said deposition was taken in shorthand
8   by me, a disinterested person, at the time and place
9   therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12       That before completion of the deposition,
13  review of the transcript [x] was [ ] was not
14  requested.  If requested, any changes made by the
15  deponent (and provided to the reporter) during the
16  period allowed are appended hereto.
17       I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
    Dated: December 15, 2023
22
23
24  ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
25

Page 357

1   MICHAEL JACOBS, Esq.
2   mjacobs@mofo.com
3        December 15, 2023
4   RE:  Arm Ltd. v. Qualcomm Inc., Et Al.
5   12/12/2023, Rene Haas (#6326906)
6   The above-referenced transcript is available for
7   review.
8        Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  CS-NY@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

90 (Pages 354 - 357)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 358

1  Arm Ltd. v. Qualcomm Inc., Et Al.
2  Rene Haas (#6326906)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Rene Haas              Date
25

Page 359

1  Arm Ltd. v. Qualcomm Inc., Et Al.
2  Rene Haas (#6326906)
3         ACKNOWLEDGEMENT OF DEPONENT
4     I, Rene Haas, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Rene Haas              Date
13 *If notary is required
14         SUBSCRIBED AND SWORN TO BEFORE ME THIS
15         _____ DAY OF _____, 20____.
16
17
18         _____
19         NOTARY PUBLIC
20
21
22
23
24
25

91 (Pages 358 - 359)

# EXHIBIT 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4     ARM LTD.,                         )
                                        )
5           Plaintiff and              )
            Counterclaim Defendant,    )
6                                       )
            v.                          ) C.A. No. 22-1146
7                                       ) (MN)
      QUALCOMM INC., QUALCOMM          )
8     TECHNOLOGIES, INC. and NUVIA,    )
      INC.,                            )
9                                       )
            Defendants and            )
10          Counterclaim Plaintiffs.  )
      _____ )

11

12

13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14         VIDEO-RECORDED DEPOSITION OF WILL ABBEY

15

16              Friday, October 27, 2023

17               Palo Alto, California

18

19

20

21

22

23    Stenographically Reported By:

24    Hanna Kim, CLR, CSR No. 13083

25    Job No. 6165933

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1       IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3
4   ARM LTD.,                )
                             )
5       Plaintiff and        )
        Counterclaim Defendant,  )
6                            )
        v.               ) C.A. No. 22-1146
7                        ) (MN)
    QUALCOMM INC., QUALCOMM        )
8   TECHNOLOGIES, INC. and NUVIA,    )
    INC.,                )
9                            )
        Defendants and       )
10      Counterclaim Plaintiffs.  )
    _____    )
11
12
13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES
14  ONLY, video-recorded deposition OF WILL ABBEY taken
15  on behalf of the Defendants, at 755 Page Mill Road,
16  Palo Alto, California 94304, on Friday, October 27,
17  2023, beginning at 9:06 a.m., PDT, and concluding at
18  5:42 p.m., before Hanna Kim, CLR, Certified
19  Shorthand Reporter, No. 13083.
20
21
22
23
24
25

Page 3

1       APPEARANCES OF COUNSEL:
2
3   FOR PLAINTIFF ARM LTD.:
4       MORRISON & FOERSTER LLP
5       BY:  SCOTT F. LLEWELLYN, ESQ.
6       4200 Republic Plaza
7       370 Seventeenth Street
8       Denver, Colorado 80202-5638
9       303.592.2204
10      sllewellyn@mofo.com
11
12
13  FOR DEFENDANTS QUALCOMM INC., QUALCOMM
14  TECHNOLOGIES, INC. AND NUVIA, INC.:
15      PAUL, WEISS, RIFKIND, WHARTON & GARRISON
16      LLP
17      BY:  ERIN J. MORGAN, ESQ.
18      BY:  MADALYN VAUGHN, ESQ.
19      2001 K Street, N.W.
20      Washington, D.C. 20006-1047
21      202.223.7300
22      emorgan@paulweiss.com
23      mvaughn@paulweiss.com
24
25

Page 4

1       APPEARANCES OF COUNSEL:  (CONTINUED)
2
3   ALSO PRESENT:
4       PHILLIP PRICE, Counsel for Arm Ltd.
5       SHAWNA HYNES, Video Operator
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1           INDEX OF EXAMINATION
2
3   WITNESS:  WILL ABBEY
4   EXAMINATION                    PAGE
5       BY MS. MORGAN:               11
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

INDEX OF EXHIBITS

ABBEY DEPOSITION EXHIBITS                          PAGE

Exhibit QX19  E-mail from Tim Herbert,       79
       18/01/2022, and attachment;
       Bates nos. ARM_00088655
       through ARM_00088684

Exhibit QX20  E-mail set, with top e-mail    136
       from Rene Haas, 28/01/2021;
       Bates nos. ARM_00081998

Exhibit QX21  E-mail set, with top e-mail    146
       from Tim Herbert, 28/06/2021;
       Bates nos. ARM_00064035
       through ARM_00064036

Exhibit QX22  E-mail from Will Abbey,        184
       02/06/2021, and attachment;
       Bates nos. ARM_00000019
       through ARM_00000021

Exhibit QX23  E-mail set from top e-mail     218
       from Will Abbey, 01/06/2021;
       Bates nos. ARM_00110012
       through ARM_00110016

Page 8

INDEX OF EXHIBITS (CONTINUED)

ABBEY DEPOSITION EXHIBITS                          PAGE

Exhibit QX29  E-mail set, with top e-mail    337
       from Lynn Couillard,
       02/09/2022; Bates nos.
       ARM_00094941 through ARM
       00094943

Exhibit QX30  E-mail Will Abbey,             349
       02/05/2023, "Qualcomm Dispute
       - Protecting our Ecosystem";
       Bates nos. ARM_01215886

              --o0o--

Page 7

INDEX OF EXHIBITS (CONTINUED)

ABBEY DEPOSITION EXHIBITS                          PAGE

Exhibit QX24  E-mail set, redacted, with top  251
       e-mail from RK Chunduru,
       8/24/2021; Bates nos.
       QCARM_3972038 through
       QCARM_3972039

Exhibit QX25  E-mail from Will Abbey,        264
       31/08/2021, and attachment;
       Bates nos. ARM_00000016
       through ARM_00000018

Exhibit QX26  E-mail from Will Abbey,        280
       30/09/2021, and attachment;
       Bates nos. ARM_00081785
       through ARM_00081787

Exhibit QX27  E-mail set, with top e-mail    291
       from Will Abbey, 14/07/2021;
       Bates nos. ARM_00036331
       through ARM_00036334

Exhibit QX28  E-mail from Will Abbey,        315
       31/08/2022, "Arm News"; Bates
       nos. ARM_01215564

Page 9

1        Palo Alto, California
2      Friday, October 27, 2023; 9:06 a.m., PDT
3              --o0o--
4        THE VIDEOGRAPHER:  Good morning.  We are
5   going on the record at 9:06 a.m., on October 27,
6   2023.
7        Please note that the microphones are
8   sensitive and may pick up whispering and private
9   conversations.
10        Please mute your phones at this time.
11        Audio and video recording will continue to
12   take place unless all parties agree to go off the
13   record.
14        This is Media Unit 1 of the video-recorded
15   deposition of Will Abbey, taken by counsel for
16   Defendant, in the matter of Arm, Ltd., versus
17   Qualcomm Inc., et al., filed in the United States
18   District Court, for the District of Delaware, Case
19   Number 22-1146 MN.
20        The location of the deposition is 755 Page
21   Mill Road, Palo Alto, California 94304.
22        My name is Shawna Hynes, representing
23   Veritext Legal Solutions, and I am the videographer.
24        The court reporter is Hanna Kim, from the
25   firm Veritext Legal Solutions.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1      I am not related to any party in this
2  action, nor am I financially interested in the
3  outcome.
4      If there are any objections to proceeding,
5  please state them at the time of your appearance.
6      Counsel and all present will now state
7  their appearances and affiliations for the record,
8  beginning with the noticing attorney.
9      MS. MORGAN:  Good morning.  I'm Erin
10  Morgan from Paul Weiss.  I'm here with my colleague
11  Madalyn Vaughn.  And we represent the Defendants in
12  this case.
13      MR. LLEWELLYN:  Scott Llewellyn, Morrison
14  & Foerster, for Arm.
15      With me is Phillip Price, in-house counsel
16  for Arm.
17      THE VIDEOGRAPHER:  Thank you.
18      Will the court reporter please swear in
19  the witness.
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

Page 11

1      WILL ABBEY,
2      having been duly administered an oath over
3  videoconference as stipulated by all counsel, was
4      examined and testified as follows:
5
6      EXAMINATION
7  BY MS. MORGAN:
8  Q.  Good morning.
9  A.  Good morning.
10  Q.  Can you state your name for the record?
11  A.  Will Abbey.
12  Q.  Okay.  Mr. Abbey, have you ever been
13  deposed before?
14  A.  No.  This is the first time.
15  Q.  Okay.  So I'm sure your counsel has gone
16  over some of this with you, but I'm just going to
17  explain a couple of ground rules to you and -- and
18  make sure that you understand what we're doing
19  today.
20      Okay?
21  A.  Yes, that's okay.
22  Q.  Okay.  So you understand that you're under
23  oath at this deposition and that you're expected to
24  tell the truth in response to my questions; right?
25  A.  I do.

Page 12

1  Q.  Is there any reason you can't do that
2  today?
3  A.  No reason at all.
4  Q.  Okay.  A funny thing about a deposition is
5  that everything that you say is being written down
6  by the court reporter.
7      What that means is that even though you're
8  on video and even though in a normal conversation if
9  I ask you a question you could nod or say "mm-hmm"
10  or something like that and it would indicate a
11  response, for the court reporter, you have to give
12  an actual verbal response.
13      So you should try to remember to do that.
14  I have the same issue.  I nod when I'm responding.
15  I'll try to remind you.  She'll remind both of us.
16      But can you try to give a verbal response
17  when I ask you a question?
18  A.  I will.
19  Q.  Okay.
20      Also for the court reporter, we have to
21  try not to talk over each other.  It's weird.  It's
22  not like a normal conversation where you can finish
23  someone's sentence, but we have to make an effort
24  for me to ask the question and then for you to
25  answer.  I will try not to cut you off.

Page 13

1      Can you try to do the same?
2  A.  Absolutely.
3  Q.  Again, as your colleagues know or as your
4  counsel knows, I will fail at this.  So, you know,
5  it's not -- it's not the end of the world, but we
6  should just make an effort, and Hanna will keep us
7  in line.
8      If you don't understand a question, you
9  should ask me to clarify.
10      Does that make sense?
11  A.  It does.
12  Q.  Okay.  And from time to time your attorney
13  may object.  It's fine for you to go ahead and
14  answer.  The objection is for the record, unless he
15  tells you specifically not to answer a question,
16  which typically would come up in the context of
17  privileged information, which I'm not going to be
18  seeking today.
19      Do you understand?
20  A.  I do.
21  Q.  Okay.  Do you have any questions before we
22  get started?
23  A.  No questions at all.
24  Q.  Okay.  Oh, I should also say, I'm going to
25  try to take a break about every hour because

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 358

1  what each word meant and what the outcomes were that
2  we were trying to achieve by sending this e-mail at
3  the time it was sent.  But, again, this is some time
4  ago.
5      Q.  Can you think of any way that the
6  litigation would impact any Arm partners' access to
7  Arm technology?
8      MR. LLEWELLYN:  Objection.  Calls for
9  speculation.
10     THE WITNESS:  I don't know for sure how it
11  would impact partners.
12  BY MS. MORGAN:
13     Q.  ████████████████████████
   ██████████████
15     A.  ██████████████████████████
   ██████████████████████████
17     Q.  ███████████████████████████
   █████████████████████
20     MR. LLEWELLYN:  Objection.  Form.
21     THE WITNESS:  Without your reminder,
   ██████████████████████████████
   █████████████████████████████████
   █████████████████████████████

Page 359

1  BY MS. MORGAN:
2      Q.  Why did you send this?
3      MR. LLEWELLYN:  Objection.  Form.
4      THE WITNESS:  I don't know why I sent it.
5  I may have known at the time, but as I sit here
6  today, I don't know why I sent it.
7  BY MS. MORGAN:
8      Q.  ██████████████████████████
   ██████████████
   █████████████████████████
   ████████████████████
12     Q.  Do you know if any other customers were
13  contacted by other people at Arm at the same time --
14     MR. LLEWELLYN:  Objection.  Form.
15  BY MS. MORGAN:
16     Q.  -- about the litigation?
17     A.  ████████████████████████████
   ██████████████████████████████
20     Q.  Okay.  Let's see.
21  ████████████████████████████████████
   ████████████████████████████████████████
23     MR. LLEWELLYN:  Objection.  Form.
24     THE WITNESS:  Can you elaborate?  I don't
25  understand.

Page 360

1  BY MS. MORGAN:
2      Q.  ██████████████████████████
   █████████████████████████████████
   ███████
5      A.  Vaguely, yes.
6      Q.  ████████████████████████████████
   ██████████████████████████████████████
9      A.  Not to my knowledge.
10     MR. LLEWELLYN:  Objection.  Form.
11  BY MS. MORGAN:
12     Q.  ███████████████████████████████
   █████████████████████████
15     MR. LLEWELLYN:  Objection.  Form.
16     THE WITNESS:  As I sit here today, no.
17  BY MS. MORGAN:
18     Q.  █████████████████████████████████
   █████████████████████
   ██████████████████████████████████
   ██████████████████████
   ██████████████████████████████████████
3      MR. LLEWELLYN:  Objection.  Form.
4  BY MS. MORGAN:
5      Q.  If there is any?
6      A.  ███████████████████████████████
   ███████████████████████████████████████
   ██████████████████████████████████
   ██████████████████████
   █████████████████████████████████
   ███████████████████████████████████
   ███████████████████████████████████
   █████████████████████████████████.
20     Q.  ██████████████████████████████
   ████████████████████████████████████████
24     A.  I don't need outside evidence to confirm
25  to me that damage is being done because we're an IP

91 (Pages 358 - 361)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 362

1  company.  We talked about that each contracts
2  [verbatim] that we have is unique and specific and
3  confidential.
4
5
6      Q.  But sitting here today, you don't -- you
7  can't cite any outside evidence that supports that;
8  right?
9          MR. LLEWELLYN:  Objection.  Form.
10         THE WITNESS:  I can't cite outside
11  evidence.  It's a fact.  This is being done.  So
12  damage is being done.
13  BY MS. MORGAN:
14     Q.
15
16
17         MR. LLEWELLYN:  Objection.  Form.
18         THE WITNESS:  You get into the substance
19  of what we do as a company.
20
21
22
23
24                , which is to protect our intellectual

Page 363

1  property.  So it's causing -- it's causing damage.
2  That damage has already been done.
3  BY MS. MORGAN:
4      Q.
5
6
7      A.  Not to my knowledge.  But, again, it
8  doesn't mean it hasn't been done.  Not to my
9  knowledge.
10     Q.
11
12     A.  I'm not aware of any -- any, sitting here
13  today.
14     Q.
15
16
17         MR. LLEWELLYN:  Objection.  Form.
18         THE WITNESS:  I think everybody is looking
19  to see what happens.  Right?  The matter's not
20  concluded, and I think it's important that we
21  protect Arm intellectual property.
22  BY MS. MORGAN:
23     Q.
24

Page 364

1      A.  I think the --
2          MR. LLEWELLYN:  Objection.  Form.
3          THE WITNESS:  The understanding is the
4  matter is not concluded, so I think it depends what
5  happens.
6  BY MS. MORGAN:
7      Q.
8
9          MR. LLEWELLYN:  Objection.  Form.
10  Mischaracterizes testimony.
11  BY MS. MORGAN:
12     Q.  I'm trying to understand what you mean
13  when you say "it depends on what happens"?
14     A.
15
16
17     A.  Okay.
18     Q.
19
20         MR. LLEWELLYN:  Objection.  Calls for
21  speculation.
22         THE WITNESS:
23
24  BY MS. MORGAN:
25     Q.

1
2
3      A.  I think so.
4      Q.  What's the evidence that you're aware of?
5      A.
6
7
8
9
10
11
12
13
14
15
16
17
18
19                                                    ?
20         MR. LLEWELLYN:  Objection.  Form.
21         THE WITNESS:  Can you repeat the question?
22  BY MS. MORGAN:
23     Q.
24

92 (Pages 362 - 365)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 366

1    ████████████
2        MR. LLEWELLYN: Objection. Form.
3        THE WITNESS: Not to my knowledge.
4    BY MS. MORGAN:
5        Q.  ████████████████████
████████████████████████
████████████████████████████
9    A.  I'm not aware of ████████
██████████ how -- how did you phrase it? That is --
11  how did you phrase it?
12    Q.  That are ████████████████
████████████████████████
15    A.  I'm not aware ████████████
16  of doing that.
17    Q.  ████████████████████
████████████████████████████
███████████
20    A.  Not to my knowledge.
21    Q.  ██████████████████
23        MR. LLEWELLYN: Objection. Form.
24        THE WITNESS: I -- I wouldn't know. Not
25  to my knowledge.

Page 367

1  BY MS. MORGAN:
2    Q.  ████████████████████
██████████████████████
5        MR. LLEWELLYN: Objection. Form.
6        THE WITNESS: It's hard to quantify that.
7  So I don't know for sure.
8  BY MS. MORGAN:
9    Q.  ████████████████████
████████████████████████
████████████
13    A.  No.
14        MR. LLEWELLYN: Objection. Form.
15        THE WITNESS: ████████████
████████████████████████.
18        MS. MORGAN: Mr. Abbey, I have no further
19  questions for you.
20        THE WITNESS: You've made me happy. Thank
21  you very much.
22        MR. LLEWELLYN: No questions. We're done.
23        MS. MORGAN: So then we can congratulate
24  you on finishing your deposition and thank you for
25  your time. And we can go off the record.

Page 368

1        THE WITNESS: Thank you so much.
2        THE VIDEOGRAPHER: Do you want to get your
3  orders on the record?
4        MR. LLEWELLYN: No, I --
5        THE VIDEOGRAPHER: This marks the -- one
6  moment.
7        We are off the record at 5:42 p.m., and
8  this concludes today's testimony given by Will
9  Abbey. The total number of media used was seven and
10  will be retained by Veritext Legal Solutions.
11        (Proceedings concluded, 5:42 p.m., PDT, on
12        October 27, 2023.)

Page 369

1        CERTIFICATE OF REPORTER
2      I, Hanna Kim, a Certified Shorthand
3  Reporter, do hereby certify:
4      That prior to being examined, the witness
5  in the foregoing proceedings was by me duly sworn to
6  testify to the truth, the whole truth, and nothing
7  but the truth;
8      That said proceedings were taken before me
9  at the time and place therein set forth and were
10  taken down by me in shorthand and thereafter
11  transcribed into typewriting under my direction and
12  supervision;
13      I further certify that I am neither
14  counsel for, nor related to, any party to said
15  proceedings, not in anywise interested in the
16  outcome thereof.
17      Further, that if the foregoing pertains to
18  the original transcri███████████████eral
19  case, before compl███████████████eview
20  of the transcript [x]██████████████.
21      In witness wh███████████
22  subscribed my nam██████████
23    Dated: 1st day of ████
24        _____
25      Hanna Kim
      CLR, CSR No. 13083

93 (Pages 366 - 369)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 370

1  SCOTT F. LLEWELLYN, ESQ.

2  sllewellyn@mofo.com

3          November 1, 2023

4  RE:   ARM Ltd. v. Qualcomm Inc., Et Al.

5    10/27/2023, Will Abbey (#6165933)

6    The above-referenced transcript is available for

7  review.

8    Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12   The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-ny@veritext.com.

16

17  Return completed errata within 30 days from

18  receipt of testimony.

19   If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22          Yours,

23          Veritext Legal Solutions

24

25

Page 372

1          JURAT

2

3      I, WILL ABBEY, do hereby certify under

4  penalty of perjury that I have read the foregoing

5  transcript of my deposition taken on Friday,

6  October 27, 2023; that I have made such corrections

7  as appear noted herein in ink, initialed by me; that

8  my testimony as contained herein, as corrected, is

9  true and correct.

10

11      Dated this _____ day of _____, 2023,

12  at _____.

13

14

15

16

17

18      _____

     WILL ABBEY

19

20

21

22

23

24

25

Page 371

1      ERRATA SHEET FOR THE TRANSCRIPT OF:

2  Case Name: ARM, LTD. vs. QUALCOMM, ET AL.

3  Dep. Date: OCTOBER 27, 2023

4  Deponent: WILL ABBEY

5          CORRECTIONS:

6  Pg. Ln.   Now Reads   Should Read   Reason

7  ___ ___   _____   _____   _____

8  ___ ___   _____   _____   _____

9  ___ ___   _____   _____   _____

10  ___ ___   _____   _____   _____

11  ___ ___   _____   _____   _____

12  ___ ___   _____   _____   _____

13  ___ ___   _____   _____   _____

14  ___ ___   _____   _____   _____

15  ___ ___   _____   _____   _____

16  ___ ___   _____   _____   _____

17  ___ ___   _____   _____   _____

18  ___ ___   _____   _____   _____

19

20          Signature of Deponent

21  SUBSCRIBED AND SWORN BEFORE ME

22  THIS____DAY OF_____, 2023.

23  _____

24  (Notary Public) MY COMMISSION

25  EXPIRES:_____

94 (Pages 370 - 372)

# EXHIBIT 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          H I G H L Y   C O N F I D E N T I A L

2                  ATTORNEYS' EYES ONLY

3             IN THE UNITED STATES DISTRICT COURT

4                FOR THE DISTRICT OF DELAWARE

5                          C.A. NO: 22-1146 (MN)

6      -----------------------------------

7      ARM LTD., a UK Corporation,

8

9             Plaintiff,

10     v.

11     QUALCOMM INC., a Delaware corporation,

12     QUALCOMM TECHNOLOGIES, INC., a

13     Delaware Corporation, and NUVIA, INC., a

14     Delaware Corporation,

15            Defendants.

16     -----------------------------------

17       Deposition of PAUL WILLIAMSON, taken by AILSA

18      WILLIAMS, Certified Court Reporter, held at the

19     offices of Norton Rose Fulbright, London, United

20        Kingdom, on 9 November, 2023 at 9:00 a.m

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

1     A P P E A R A N C E S:
2  Attorneys for the Plaintiff:
3     MORRISON & FOERSTER LLP
4     BY: KYLE W.K. MOONEY
5     Kmooney@mofo.com
6
7  For the Defendants:
8     PAUL, WEISS, RIFKIND, WHARTON & GARRISON
9  LLP
10    BY: MELISSA FELDER ZAPPALA and BRIAN SHIUE
11    Mzappala@paulweiss.com
12    Bshiue@paulweiss.com
13
14  ALSO PRESENT:
15  PHILIP PRICE: (ARM)
16  COURT REPORTER:  AILSA WILLIAMS
17  VIDEOGRAPHER: PHILIP HILL
18
19
20
21
22
23
24
25

Page 3

1
2              I N D E X
3  PAUL WILLIAMSON (Sworn)
4  Examination by MS. ZAPPALA: Pg. 6
5  Examination by MR. MOONEY: Pg. 310
6  Further Examination by MS. ZAPPALA: Pg. 314
7
8          INDEX OF EXHIBITS
9  Previously Marked Exhibits Referenced:
10     Exhibit QX 19, Exhibit QX29
11  QX45 Notice of Deposition . ... ... ... ... ...8
12  QX46 Email exchange ARM_01238940-44 ... ... ... 13
13  QX47 Teams Chat ARM_00087671-73 ... ... ... ... 14
14  QX48 Teams Chat ARM_01241616-20 ... ... ... ... 31
15  QX49 Technology License Agreement . ... ... ... 47
16  QX50 Annex 1, ARM_00111082-97 . ... ... ... ... 48
17  QX51 Teams Chat, ARM_00087851 . ... ... ... ... 56
18  QX52 Teams Chat, ARM_01242365-66 ... ... ... ... 66
19  QX53 Email exchange, ARM_00063607-10 ... ... ... 71
20  QX54 "ARM - Qualcomm & Nuvia Architecture . ... 78
21  License"
22  QX55 Annex 1, ARM_00002654-67 . ... ... ... ... 88
23  QX56 Teams Chat, ARM_01239039-45 ... ... ... ... 94
24  QX57 Teams Chat, ARM_00082090-93 ... ... ... ...119
25  QX58 Email and attachments, ARM_00032601-02 ...144

Page 4

1  QX59 Email and attachments, ARM_00048483-84 ...147
2  QX60 Email and attachments, ARM_00032623-25 ...158
3  QX61 Email and attachments, ARM_00032605-06 ...168
4  QX62 Email and attachments, ARM_00032598-99 ...184
5  QX63 Email exchange, ARM_00095801-02 .. ... ...190
6  QX64 Teams Chat, ARM_00098825-27 ... ... ... ...193
7  QX65 Email and attachments, ARM_01294035-36 ...198
8  QX66 Teams Chat, ARM_00115764 . ... ... ... ...203
9  QX67 Teams Chat and Slide Deck, ... ... ... ...221
10  ARM_00082120-31
11  QX68 Team Chat, ARM_00081197 .. ... ... ... ...229
12  QX69  Complaint ... ... ... ... ... ... ... ...240
13  QX70 Email exchange, ARM_01238950-54 .. ... ...253
14  QX71 ARM-Samsung Slide Deck, .. ... ... ... ...262
15  ARM_01240527-94
16  QX72 Teams Chat, ARM_00087733-35 .. ... ... ...272
17  QX73 Email exchange, ARM_01231257-59 .. ... ...295
18  QX74 "Growth Opportunities: Progress .. ... ...305
19  Report", ARM_01291819-62
20
21
22
23
24
25

Page 5

1        THE VIDEOGRAPHER:  Good morning.  We are        09:26
2  going on the record.  The time is 09:24 a.m. local        09:26
3  time in London, UK, on November 9, 2023.        09:26
4        This is the beginning of media number        09:27
5  one, volume one, in the video recorded deposition        09:27
6  of Paul Williamson, taken by counsel for plaintiff        09:27
7  in the matter of ARM Limited versus Qualcomm Inc        09:27
8  et al, filed in the United States District Court        09:27
9  for the District of Delaware, case number/docket        09:27
10  number C.A No: 22-1146 (MN).        09:27
11        This deposition is being held at Norton        09:27
12  Rose Fulbright at the London office.        09:27
13        My name is Philip Hill from Veritext        09:27
14  Legal Solutions and I am the videographer.  The        09:27
15  court reporter is Ailsa Williams, also from        09:27
16  Veritext Legal Solutions.        09:27
17        Please would counsel introduce        09:27
18  themselves for the record.        09:27
19        MS. ZAPPALA:  Melissa Zappala, on behalf        09:28
20  of defendant, of Paul Weiss.  With me is my        09:28
21  colleague, Brian Shiue.  One correction to the        09:28
22  record, this deposition is being taken by        09:28
23  defendants and counter claimants.        09:28
24        MR. MOONEY:  Kyle Mooney, Morrison and        09:28
25  Foerster, counsel for ARM and with me is Philip        09:28

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1 Price Senior Director and Head of Litigation at                     09:28
2 ARM.                                                                09:28
3           THE VIDEOGRAPHER:  Would the court              09:28
4 reporter swear in the witness.                                      09:28
5           PAUL WILLIAMSON                                 09:28
6           Having been sworn,                                       09:28
7           Testified as follows:                                   09:28
8      EXAMINATION BY MS. ZAPPALA:                          09:28
9      MS. ZAPPALA:  Good morning.                          09:28
10     A   Good morning.                                     09:28
11     Q   Could you state your name for the          09:28
12 record.                                                             09:28
13     A   My name is Paul Williamson.                     09:28
14     Q   I am Melissa Zappala.  I will be            09:28
15 taking your deposition today.  I just wanted to go      09:28
16 over a couple of ground rules for the deposition.       09:29
17        One thing I wanted to note, I have a        09:29
18 hearing loss.  It affects my speech.  You are           09:29
19 British, you have an accent, so we may have a           09:29
20 sense of dueling accents here.  If you can't            09:29
21 understand anything I say, please ask me to repeat      09:29
22 myself.  Likewise, if I have difficulty I hope you      09:29
23 will indulge me by repeating the answer.                 09:29
24     A   Absolutely, and I appreciate you            09:29
25 sharing that with me.                                     09:29

Page 7

1      Q   So we have a clean record I will be         09:29
2 asking questions, I would appreciate if you would       09:29
3 wait for me to finish my question and likewise          09:29
4 I will wait for you to finish your answer, so that      09:29
5 the court reporter can take down what we are both       09:29
6 saying.  Is that okay?                                    09:29
7      A   I understand, yes.                            09:29
8      Q   And if at any time you a need a            09:29
9 break, please ask and we can accommodate that.          09:29
10        Also, in terms of the natural pattern of    09:29
11 human speech, people tend to say "uh-huh", nod         09:29
12 their head.  It is important for the deposition        09:30
13 transcript to give audible answers.  I would           09:30
14 appreciate if you keep that in mind.                    09:30
15     A   Understood.                                    09:30
16     Q   Is there any reason you cannot give         09:30
17 truthful testimony today?                                09:30
18     A   None.                                          09:30
19     Q   We are here today taking your               09:30
20 deposition in your personal capacity as an             09:30
21 individual witness, but you understand that you        09:30
22 have been designated as a corporate representative     09:30
23 on behalf of ARM on a few topics.  Do you have         09:30
24 that understanding?                                      09:30
25     A   I do.                                          09:30

Page 8

1      Q   Let me share with you the deposition        09:30
2 notice.  So this would be marked as Exhibit QX45.       09:30
3        (Exhibit QX45 marked for identification)    09:31
4        I have put in front of you as QX45 our       09:31
5 notice 30(b)(6) deposition notice.  I wanted to        09:31
6 make sure we are on the same page in terms of the      09:31
7 topics that you will be testifying about in your       09:31
8 corporate representative capacity.  I understand       09:31
9 they are topics -- the topics start on page 4.         09:31
10 I understand you to be testifying on topics 1, 20,    09:31
11 21, 23, 25, 27, 28, 30, 31, 33, 34, 35, 36, 37,       09:31
12 40, 41, and 59.  Is that consistent with your         09:32
13 understanding?                                          09:32
14        MR. MOONEY:  Counsel, let me jump in so     09:32
15 the witness doesn't become uncomfortable because      09:32
16 he doesn't remember all the numbers.  Let me          09:32
17 represent that yes, Mr. Williamson is designated      09:32
18 to testify as to topics 1, 20, 21, 23, 25, 27, 28,    09:32
19 30, 31, 33, 34, 35, 36, 37, 40, 41 and 59,            09:32
20 consistent with ARM's objections and the              09:32
21 agreements reached between the parties, as well as    09:32
22 any objections that are made today, but subject to    09:33
23 that the list of numbers I think does match what      09:33
24 you read out.                                           09:33
25        MS. ZAPPALA:  Thank you.  If I had just     09:33

Page 9

1 asked your counsel that would have been easiest.       09:33
2        Okay.  So we are agreed between counsel      09:33
3 we are going to combine your individual testimony     09:33
4 with the corporate representative testimony.  For     09:33
5 the sake of efficiency on the record, if we get to    09:33
6 a set of questions on which you have been             09:33
7 designated that you don't have personal knowledge     09:33
8 of, please let me know so then we can make a          09:33
9 record that you don't have personal knowledge of     09:33
10 the issue but are testifying as a corporate           09:33
11 representative.  Does that make sense?                 09:33
12        MR. MOONEY:  Objection.                       09:33
13     A   Yes.                                          09:33
14        MR. MOONEY:  I'm not even following          09:33
15 this.                                                   09:33
16        MS. ZAPPALA:  We are going to ask            09:33
17 questions because a lot of the topics on which he    09:33
18 has been designated will lead into his personal      09:33
19 knowledge, so we are not going topic by topic, we    09:33
20 are combining the record.                              09:34
21        MR. MOONEY:  That is fine but you are        09:34
22 asking him to tell you if he doesn't have personal   09:34
23 knowledge or if he does for each question?  I am     09:34
24 not following this.                                    09:34
25        MS. ZAPPALA:  No, I am saying if we get     09:34

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 238

```
 1  with this lawsuit?                          17:25
 2       A  ARM brought this lawsuit in order to  17:25
 3  protect its intellectual property rights, ensure  17:25
 4  that our contracts are enforceable and enforced   17:25
 5  and that our reputation is protected as an IP     17:26
 6  licensing business, among other things.           17:26
 7       Q  ███████████████████████████████          17:26
    ████████████████████████████████████████
    ████████████████████████████████████?    17:26
10       MR. MOONEY:  Objection, form.  Vague.   17:26
11       A  ██████████████████████████               17:26
    ████████████████████████████████████████
    ████████████████████████████████████████
                                            17:26
15       Q  And when you say that the           17:26
16  obligations and provisions in the licensing deals  17:26
17  are respected, then one outcome of that would be   17:26
18  that Qualcomm would not manufacture custom CPUs    17:27
19  using Nuvia technology.  Right?                    17:27
20       MR. MOONEY:  Objection, form.  Vague.    17:27
21       A  So my understanding is that if our    17:27
22  contractual provisions are met, that -- sorry.    17:27
23       MR. MOONEY:  Apologies.  For the record,   17:27
24  I was startled that my microphone was on the       17:27
25  table.  Do you want to ask the question again so   17:27
```

Page 239

```
 1  you can get that cleanly.                     17:27
 2       MS. ZAPPALA:  When you say that the       17:27
 3  ████████████████████████████████████          17:27
    ████████████████████████████████████████
    █████████████████████████████████████
                                          17:27
 7       MR. MOONEY:  Objection, form.  Vague.     17:27
 8       A  I don't think that that necessarily   17:27
 9  follows.  ██████████████████████████           17:27
    ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    █████████████████████████████
                                        17:28
16       Q  I want to understand.  One intended    17:28
17  outcome of this litigation is that ████████    17:28
    ████████████████████████████████  Is that   17:28
19  correct?                                        17:28
20       MR. MOONEY:  Objection, form.  Vague.     17:28
21       A  So again not words that I would use    17:28
22  to describe the intended outcome.  The intended   17:28
23  outcome is the contractual obligations are        17:28
24  respected.  One of those that I believe that you   17:28
25  are referring to ████████████████████           17:29
```

Page 240

```
 1  █████████████████████████████               17:29
 2  it is one of many remedies that could be sought in  17:29
 3  conjunction with seeing our contractual terms       17:29
 4  obliged with.                                       17:29
 5       Q  I am going to add as QX69 a copy of     17:29
 6  the complaint by ARM in this litigation.           17:29
 7       (Exhibit QX69 marked for identification.)    17:29
 8       I direct you to paragraph 68 on page 18.     17:29
 9  Paragraph 68 says:                                 17:30
10       "ARM is entitled to specific performance    17:30
11  requiring defendants ████████████████████        17:30
    ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
                                          17:30
18       Do you see that?                         17:30
19       A  I see that clause, yes.              17:30
20       Q  And that is an outcome that ARM is    17:30
21  seeking in connection with the litigation, right?   17:30
22       A  That is how it is presented in the     17:30
23  document, correct.                              17:30
24       Q  And is it correct that ARM is        17:31
25  seeking specific performance in this litigation?   17:31
```

Page 241

```
 1       MR. MOONEY:  Objection, form, vague.     17:31
 2  Seeks a legal conclusion and characterization.    17:31
 3       MS. ZAPPALA:  Well, topic 35 of our       17:31
 4  30(b)(6) notice seeks testimony about ARM's        17:31
 5  request for specific performance in this action,   17:31
 6  so with that is it correct that ARM is seeking     17:31
 7  specific performance in this action?               17:31
 8       MR. MOONEY:  Same objection, same         17:31
 9  grounds.  The witness is designated on topic 35 to  17:31
10  testify to facts concerning ARM's request for     17:31
11  specific performance in this action.  My objection  17:31
12  is merely that the witness may not be well versed   17:31
13  in the legalese "specific performance" but any     17:32
14  facts relating to the request you can ask.         17:32
15       A  I am not familiar with the legal      17:32
16  ramifications of the terminology of "specific      17:32
17  performance", as I am not a legal expert, but I    17:32
18  would agree with you that we are in this clause     17:32
19  here clearly stating that we are entitled to       17:32
20  specific performance and whatever legal            17:32
21  connotations that has in requiring that the Nuvia  17:32
22  termination provisions are met.                    17:32
23       Q  Paragraph 68 is ████████████████     17:32
    ████████████████████████████████████████
    ████████████████████████████ right?        17:32
```

61 (Pages 238 - 241)

1       MR. MOONEY: Objection, mischaracterizes     17:33
2   the paragraph.                                   17:33
3       A  I don't see -- I see this as a            17:33
4   statement that ARM is entitled to require the    17:33
5   defendant to conform with that.  I don't see     17:33
6   wording that says we request the court to enforce  17:33
7   that that happens, but that might be -- I am not  17:33
8   sure if that is what you were referring to.      17:33
9       Q  Let me start again.  So you say in        17:33
10  paragraph 68:                                    17:33
11      ████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████     17:33
16      Right?                                       17:33
17      A  That is the wording in front of me,       17:33
18  and yes, that is what we are stating.
19      Q  Is ARM seeking any damages from           17:33
20  Qualcomm in connection with this litigation?     17:34
21      MR. MOONEY: Objection, beyond the scope      17:34
22  of the 30(b)(6) notice.                          17:34
23      A  ARM believes that the actions             17:34
24  related to this have caused multiple harms and   17:34
25  damages may be one of multiple outcomes that ARM  17:34

1   may be entitled to in relation to failure to     17:34
2   comply with contractual terms.                   17:34
3       Q  You say that ARM has suffered             17:34
4   multiple harms.  Can you identify those harms for  17:34
5   me?                                              17:34
6       A  So there are multiple harms,              17:34
7   including potentially loss of revenue, which we   17:34
8   have discussed, but also reputational damage and a  17:34
9   fundamental long-term business challenge created  17:35
10  by a potential situation where ARM licensees do   17:35
11  not feel bound to the terms of our contracts.  So  17:35
12  it is harmful to our business in broader terms    17:35
13  than purely lost revenues, but that is not        17:35
14  exhaustive.                                       17:35
15      Q  When you say Qualcomm conducted harm       17:35
16  to ARM's business in broader terms including lost  17:35
17  revenue, I want to make sure I understand how this  17:35
18  harm fell.  You mentioned reputational damage.    17:35
19  You also mentioned that ARM licensees might not   17:35
20  feel bound to the terms of their licenses.  Is    17:35
21  there any other harm other than loss off revenue  17:35
22  that you can identify?                            17:36
23      MR. MOONEY: Objection, form.                  17:36
24  Mischaracterizes testimony.                       17:36
25      A  I think it is hard to understate the      17:36

1   significance of damage that people not complying  17:36
2   with IP license agreements could have to a        17:36
3   business which is dependent on IP licensing and I  17:36
4   think that has harm within and beyond our         17:36
5   industry.                                         17:36
6       Q  ████████████████████████████████    ████████
    ████████████████████████████████████████████  ████████
    ████████████████████████                        17:36
10      MR. MOONEY: Objection, vague,                17:36
11  speculation.                                      17:36
12      A  ████████████████████████████████████████████  ████████
    ████████████████████████████████████████████  ████████
    17:37
15      Q  When you say "future damages of this      17:37
16  are inestimable", what do you mean by that?       17:37
17      A  I mean that ARM's business is             17:37
18  fundamentally defined by our ability to protect   17:37
19  and license our technology.  It supports not only  17:37
20  our revenues but the revenues of many of our      17:37
21  partners in our broader ecosystem, and they are   17:37
22  dependent on ARM continuing to manage the         17:37
23  technology and manage the licensing and rights    17:37
24  associated with it.  So I think it brings risk and  17:37
25  damages to ARM, ARM's future business and         17:37

1   significant businesses that are built on the      17:37
2   structure of access to technology that we have    17:38
3   built, but as I said that is not the only damages  17:38
4   it provides, but it is certainly a very           17:38
5   significant concern for ARM.                      17:38
6       Q  You said ARM needs to continue to         17:38
7   manage the technology and manage the licensing and  17:38
8   rights associated with it.  Has ARM had any       17:38
9   difficulty doing so?                              17:38
10      A  ARM continues our business as usual        17:38
11  at this stage, but the impact of companies        17:38
12  conducting action similar to this, where they     17:38
13  breach or move outside of our existing agreements,  17:39
14  would be significantly harmful, and we believe    17:39
15  that that is a real and meaningful consequence to  17:39
16  ARM and our ecosystem.                            17:39
17      Q  Are you aware of any companies             17:39
18  conducting actions similar to this?               17:39
19      A  I am not aware of immediate action.        17:39
20      Q  Are you aware of any company that         17:39
21  are intending to take actions similar to this?    17:39
22      A  It would be speculation as to what        17:39
23  others might do in response to the outcome of this  17:39
24  litigation, but I am not aware or party to         17:39
25  discussions or what people might be doing in       17:39

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 246

1  response to it.                                     17:39
2       Q  You also mentioned reputational        17:39
3  damage.  Can you explain that to me a bit more?    17:39
4       A  ARM has a reputation of trust with     17:40
5  its partners who build technology based on ARM's   17:40
6  technology and services associated with it.  Their 17:40
7  success is a shared success business with ARM, and 17:40
8  trust is an important element of that continuing   17:40
9  business practice.                                 17:40
10      Q  And how have Qualcomm and Nuvia's      17:40
11 activities impacted ARM's reputation of trust?     17:40
12      A  Should we not protect our              17:40
13 technology, it could impact the trust that         17:40
14 companies more broadly feel in the ARM business    17:40
15 model and the security with which they can build   17:40
16 their business based on ARM's technology.          17:41
17      Q  ███████████████████████████████        ████
                                                     17:41
22      A  I am not aware of direct examples or   17:41
23 actions yet, but the process is ongoing.           17:41
24      Q  When you say "process is ongoing",     17:41
25 what do you mean?                                  17:41

Page 247

1       A  Sorry, the litigation process.        17:41
2       Q  ██████████████████████████            ████
                                                     17:41
5       A  I am not aware of a current case.      17:42
6  ████████████████████████████████████████████████████
                                                     17:42
14      Q  And you don't know how many           17:42
15 companies ████████████████████████              17:42
                                                     17:42
17      A  It is impossible to know what is not   17:42
18 communicated to us by our partners, ████████████   17:42
                                                     17:42
25      Q  And are you aware of ███████████       17:43

Page 248

1  ████████████████████████████████████████████████████
                                                     17:43
4       A  As I said, a ███████████████████████████
   ████████████████████████████████████████████████████
                                                     17:43
8       Q  I am going to reask the previous      17:43
9  question a different way.  ██████████████████████
                                                     17:43
12      A  It is impossible for me to know the    17:43
13 ████████████████████████████████████████████████████
   ████████████████████████████████                  17:43
17      Q  And are you aware of ███████████████████
   ██████████████████████████████████████            17:44
20      A  I missed the end of the question.      17:44
21      Q  Are you aware of ████████████████       17:44
   █████████████████████████████?                   17:44
24      A  So as I said, it is ██████████████████
                                                     17:44

Page 249

1  ████████████████████████████████████████████████████
   ██████████████, but I don't have specific         17:44
4  evidence to present to that and I would be         17:44
5  unlikely to see it.                                17:45
6       Q  How has ARM been harmed as a result    17:45
7  of ████████████████████████████████████████       17:45
                                                     17:45
9       MR. MOONEY:  Form, vague.                 17:45
10      A  Qualcomm ███████████████████████████   17:45
12 ████████████████████ that I am aware of or        17:45
13 released them for many years, so as yet, pursuant  17:45
14 ████████████████████, harm has not been caused yet, 17:45
15 but that does not speak to the Nuvia agreement.    17:45
16      Q  What do you mean when you reference    17:45
17 the Nuvia agreement?                               17:45
18      A  My understanding, and maybe we need    17:45
19 to restate the question was you asked me, cores    17:45
20 ████████████████████████ I am not aware of        17:46
21 any cores that have been recently developed by     17:46
22 ████████████████████████, so I can't speak to     17:46
23 harms that relate to that.                         17:46
24      Q  Do you understand that Qualcomm's      17:46
25 position is that it ██████████████████████████     17:46

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

Page 314

1 they sent those messages?                    19:46
2       A  No.                                  19:46
3       Q  ██████████████████      ███████
   ████████████████████████████  ██████
   █████████████████████                 19:46
7       A  No.                                  19:46
8       MR. MOONEY:  No further questions.      19:46
9       Further Examination by MS. ZAPPALA:     19:46
10      MS. ZAPPALA:  One redirect.  So counsel 19:47
11 asked you a number of questions about whether you 19:47
12 █████████████████████████████████████
   ███████████████                        19:47
14      A  Yes.                                 19:47
15      Q  At the time that you sent those      19:47
16 messages, were the real comments in those messages 19:47
17 your best understanding of the situation at the 19:47
18 time that you sent them?                     19:47
19      MR. MOONEY:  Objection, form, compound. 19:47
20      A  As we discussed earlier, these were  19:47
21 my speculations as to potential impact which would 19:47
22 reflect my limited understanding at the time. 19:47
23      Q  Right, so at the time that you sent  19:47
24 those Teams messages they reflected your ██████
   █████████████████████████████          19:47

Page 315

1       MR. MOONEY:  Objection, form, vague.    19:48
2       A  I would say more than limited.  I    19:48
3 don't believe I had ██████████████████████
   ██████ the point at which I sent these messages. 19:48
5       Q  But you sent messages reflecting     19:48
6 what you understood █████████████████████████
   ██████ right, even though right now you say it 19:48
8 is speculation?                              19:48
9       MR. MOONEY:  Objection, form, vague,    19:48
10 compound.                                    19:48
11      A  I speculated as to the potential     19:48
12 impact, should certain outcomes occur without 19:48
13 understanding or having viewed the Nuvia ALA. 19:48
14      MS. ZAPPALA:  No further questions.      19:48
15      MR. MOONEY:  Nothing further.           19:48
16      THE VIDEOGRAPHER:  Going off the record. 19:48
17 The time is 19:46.  End of media card number  19:48
18 seven.  End of the video deposition of Paul  19:48
19 Williamson.                                   19:49
20      Please can all parties state their      19:49
21 transcripts or video orders for clarity, thank 19:49
22 you.                                          19:49
23      MR. MOONEY:  I would like to order a     19:49
24 transcript.                                   19:49
25      MS. ZAPPALA:  I would like to order a    19:49

Page 316

1 transcript and video.                         19:49
2       MR. MOONEY:  Counsel are both agreed     19:49
3 they would like transcripts and videos of this 19:49
4 deposition.                                   19:49
5       MR. SHIUE:  Quickly if possible.         19:49
6       MS. ZAPPALA:  Okay, thank you.           19:50
7       THE VIDEOGRAPHER:  Thank you.            19:50
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 317

1             CERTIFICATE OF WITNESS
2
3   I, Paul Williamson, am the witness in the
4   foregoing deposition.  I have read the foregoing
5   statement and, having made such changes and
6   corrections as I desired, I certify that the
7   transcript is a true and accurate record of my
8   responses to the questions put to me on Thursday,
9   9 November, 2023.
10
11
12
13
14   _____
15   Paul Williamson
16
17
18
19
20
21
22
23
24
25

80 (Pages 314 - 317)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 318

CERTIFICATE OF COURT REPORTER

1
2
3 I, AILSA WILLIAMS, an Accredited LiveNote
4 Reporter, hereby certify that Paul Williamson was
5 duly sworn, that I took the Stenograph notes of
6 the foregoing deposition and that the transcript
7 thereof is a true and accurate record transcribed
8 to the best of my skill and ability.  I further
9 certify that I am neither counsel for, related to,
10 nor employed by any of the parties to the action
11 in which the deposition was taken, and that I am
12 not a relative or employee of any attorney or
13 counsel employed by the parties hereto, nor
14 financially or otherwise interested in the outcome
15 of the action.
16 Before completion of the deposition, review of the
17 transcript was requested.  Any changes made by the
18 deponent (and provided to the reporter) during the
19 period allowed are appended hereto.
20
21
22
_____
23 AILSA WILLIAMS
24 Dated:   11/14/23
25

Page 319

1       ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
2
   CASE NAME: ARM Ltd. v. Qualcomm Inc., Et Al.
3  DATE OF DEPOSITION: 11/9/2023
   WITNESSES' NAME: Paul Williamson
4
5  PAGE  LINE (S)   CHANGE        REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21       Paul Williamson
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
_____
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:

81 (Pages 318 - 319)

# EXHIBIT 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                            :
ARM LTD., a U.K. corporation,               :
                                            :
            Plaintiff,                      :
                                            :          Civil Action No.
            v.                              :          1:22-cv-01146
                                            :
QUALCOMM INC., a Delaware                   :
corporation, QUALCOMM                       :
TECHNOLOGIES INC., a Delaware               :
corporation, and NUVIA, INC., a             :
Delaware corporation,                       :
                                            :
            Defendants.                     :
                                            :
-----------------------------------------------------x
```

## EXPERT REPORT OF PROFESSOR GUHAN SUBRAMANIAN

## DECEMBER 20, 2023

CONTENTS

**I.    Background**................................................................................................**2**

   A.  Qualifications .........................................................................................2

   B.  Statement of Assignment ......................................................................8

   C.  Summary of Opinions ..........................................................................10

**II.   Summary of Relevant Facts** ...............................................................**11**

**III.  Negotiation Theory and Application to Licensing Agreements** ...............**18**

   A.  Core Negotiation Terminology: BATNA, ZOPA, and Reservation Value....18

   B.  Single-Issue vs. Multi-Issue Negotiations ......................................21

   C.  The Value Creation Role of CIC Provisions ...................................25

   D.  The Business Role of CIC Provisions in IP Licensing Agreements..............28

**IV.   Application to Arm-Nuvia ALA** ...........................................................**31**

   A.  Arm Entered into a Limited Number of ALA Contracts and Each Was
       Separately Negotiated. ...................................................................31

   B.  Arm Negotiated Different Provisions with Nuvia and Qualcomm. ..............35

**V.    Application to Qualcomm's Acquisition of Nuvia** ......................................**42**

   A.  Due Diligence Typically Involves an Examination of License Agreements. 42

   B.  Qualcomm and Nuvia Seemed to be Aware of the ███████████ in the
       ALAs. ..............................................................................................47

   C.  Qualcomm Did Not Negotiate for Nuvia to Obtain Arm's Consent. ............49

**VI.   Application To the ███████████ in the Arm-Nuvia ALA** .....................**50**

   A.  The ███████████ in the Arm-Nuvia ALA Are Consistent with
       Business Considerations, Negotiation Theory and Case Studies. ................50

   B.  Terms That Were Considered and/or Offered Previously for a Re-negotiated
       License Cannot Simply Be Adopted Later. ....................................57

   C.  Predicting the Outcome of a Renegotiated ALA Would Be Extremely
       Difficult. ........................................................................................58

   D.  Non-Enforcement Could Have Negative Follow-On Effects That Are
       Impossible to Quantify.....................................................................60

CONFIDENTIAL

## I.   BACKGROUND

### A. Qualifications

1.   I serve as the H. Douglas Weaver Professor of Business Law at the Harvard Business School ("HBS") and the Joseph Flom Professor of Law and Business at the Harvard Law School ("HLS"). I am the first person in the history of Harvard University to hold tenured appointments at both HBS and HLS. I have taught at HBS and/or HLS continuously since 1999. At Harvard I serve as the faculty chair for the JD/MBA program and the Advisory Committee on Shareholder Responsibility. I hold degrees in Economics, Law, and Business from Harvard University.

2.   My research and publications focus on issues of corporate negotiations, corporate law, and corporate governance. I am a co-author (with former Delaware Chancellor William T. Allen and HLS professor Reiner Kraakman) of *Commentaries and Cases on the Law of Business Organization* (4th ed. 2012), a leading textbook on corporate law. I am also the author of *Dealmaking: The New Strategy of Negotiauctions* (2nd ed. 2020) ("Dealmaking"), a practitioner-oriented book that provides guidance for managing complex business transactions.

3.   I am the co-author of *Deals: The Economic Structure of Business Transactions* (forthcoming Harvard University Press 2024). This book provides an economic

CONFIDENTIAL

analysis of deal terms in corporate transactions. It examines challenges such as moral hazard, information asymmetries, and asset specificity, and then describes how deal terms can be used to overcome these barriers to contracting. Economics Nobel Prize Winner Oliver Hart states: "Klausner and Subramanian's book will be an invaluable resource for anyone who wants to understand real-world contracts and deals. The authors present many interesting cases and skillfully use basic economic ideas to understand them. There are many insights for practitioners, but academics will also learn a great deal and will be stimulated to refine their theories."

4.   Twelve of my academic articles have been selected by scholars in the field as being among the "top ten" articles published in corporate and securities law in their respective years, among the 400+ articles that are published each year. The two-volume treatise *Law and Economics of Mergers and Acquisitions*, which includes thirty-three "seminal" articles published over the past fifty years, contains four of my articles, more than from any other scholar.[1] My article Corporate Governance 2.0, was selected as a McKinsey Award finalist for best article published in the *Harvard Business Review* in 2015.

---

[1]   *Law and Economics of Mergers and Acquisitions*. Eds. Steven Davidoff Solomon and Claire A. Hill. United Kingdom: Edward Elgar Publishing (2013).

CONFIDENTIAL

5.   In 2013, I delivered the annual Pileggi Lecture to the Delaware judiciary, members of the Delaware bar, and law students in Wilmington, Delaware. According to the *Delaware Journal of Corporate Law*, the lecturer is always "a leading voice in corporate law."[2] In his introduction of my lecture, former Delaware Supreme Court Chief Justice Leo Strine stated: "[T]oday we have a speaker who epitomizes excellence in corporate law."[3]

6.   I have been similarly recognized by the members of the Delaware Chancery Court. In October 2018, for example, Vice Chancellor Sam Glasscock noted that "Professor Guhan Subramanian is a recognized expert in corporate affairs … and has been recognized by this Court as helpful on many occasions."[4] Delaware Chancellor Kathaleen McCormick recently observed that my "published work concerning policy questions of corporate law fill the footnotes of many decisions of Delaware courts."[5]

7.   At HLS, I teach the basic course on Corporate Law. I also teach a joint course between HLS and HBS entitled *Deals*, which focuses on complex business

---

[2]   Lectures & Symposia. *Delaware Journal of Corporate Law*. <https://djcl.org/symposium-lectures> (accessed Feb. 27, 2023); "Past Pileggi Lecture Keynote Speakers." *Delaware Journal of Corporate Law*. <https://djcl.org/home-2-2-2> (accessed Feb. 27, 2023).

[3]   Video on file with author.

[4]   *In re Starz Appraisal*, No. 12968-VCG, 2018 WL 4922095, at *1 (Del. Ch. Oct. 10, 2018).

[5]   *In re Williams Cos. Stockholder Litigation*, No. 2020-0707-KSJM, 2021 WL 754593, at 24 n. 141 (Feb. 26, 2021). At the time of the opinion, Kathaleen McCormick was Vice Chancellor.

CONFIDENTIAL

transactions.[6] At HBS, I teach in several executive education programs, such as *Strategic Negotiations*, *Changing the Game*, *Making Corporate Boards More Effective*, and *Preparing to be a Corporate Director*. I am the faculty chair for the week-long HBS executive education course *Mergers & Acquisitions*, and within that course I teach the module on "Deal Execution." I also present on developments in corporate governance and transactional practice to the American College of Corporate Directors, a national association of public-company directors.

8.   Since 2018, I have served as the faculty chair for the HLS Program on Negotiation ("PON").[7] Founded in 1983, PON includes faculty, graduate students, and staff from Harvard University, the Massachusetts Institute of Technology and Tufts University, among other schools. The mission of PON is to "develop[] the theory and practice of negotiation, to nurtur[e] the next generation of negotiation teachers and scholars, and to help[] students become

---

[6]   More information on this course can be found at Harvard Law Today. *See* Deakin, Michelle. "Designing the Deal." *Harvard Law Bulletin* (Sept. 1, 2005). <https://hls.harvard.edu/today/designing-the-deal> (accessed Feb. 27, 2023); McArdle, Elaine. "Bridging Theory and Practice in Corporate Law." *Harvard Law Bulletin* (Jan. 24, 2012). <https://hls.harvard.edu/today/bridging-theory-and-practice-in-corporate-law> (accessed Feb. 27, 2023).

[7]   *See* Perkins, Christine. "Subramanian Will Succeed Mnookin as Program on Negotiation Chair." *Harvard Law Today* (Mar. 15, 2018). <https://hls.harvard.edu/today/subramanian-will-succeed-mnookin-program-negotiation-chair> (accessed Mar. 6, 2023).

                    CONFIDENTIAL

more effective negotiators."[8] Over the past thirty-five years, PON faculty, including myself, have taught tens of thousands of businesspeople around the world how to become more effective negotiators. In particular, I have taught in the *Negotiation & Leadership* program and the PON *Master Class*. PON Global, a program that I spearheaded in 2016, has been taught to more than a thousand executives in ten countries around the world.[9]

9.  Since 2013, I have served as a director of LKQ Corporation (NASDAQ: LKQ), a Fortune 500 company in the automotive sector ("LKQ"). LKQ is incorporated in Delaware and has operations throughout the U.S., Canada, and Europe. In 2022, LKQ had approximately $13 billion in annual revenues, 50,000 employees, and $15 billion in market capitalization; it is currently #319 on the Fortune 500 list.[10] I am formerly the Chair of the Nominating/Governance Committee and the Lead Independent Director. I currently serve as Chairman of the Board.

---

[8]   "Welcome to the Program on Negotiation (PON)." *Harvard Program on Negotiation*. <https://www.pon.harvard.edu/about> (accessed Mar. 6, 2023).

[9]   *See* "PON Global." *Harvard Program on Negotiation* (May 20, 2022). <https://web.archive.org/web/20220520141129/https://www.pon.harvard.edu/category/pon-global> (accessed Mar. 13, 2023).

[10]   "Fortune 500." *Fortune* (2023). <https://fortune.com/ranking/fortune500/2023/search/?Name=lkq> (accessed June 8, 2023).

CONFIDENTIAL

10. During my ten years on the LKQ board, the company has made more than a hundred acquisitions. I have been involved in the negotiation and execution of several of the most significant acquisitions, including Sator Beheer for approximately $268 million (May 2013),[11] Rhiag-Inter Auto Parts Italia S.p.A. for €1.0 billion (March 2016),[12] Stahlgruber GmbH for €1.5 billion (May 2018),[13] and Uni-Select. Inc. for $2.1 billion (February 2023).[14]

11. I am regularly retained as an advisor or expert witness in complex corporate transactions. I also advise individuals, boards of directors, and management

---

[11] Knight, Meribah. "LKQ Acquires Netherlands Auto Parts Distributor for $268 Million." *Crain's Chicago Business* (Apr. 25, 2013). <https://www.chicagobusiness.com/article/20130425/NEWS05/130429834/lkq-acquires-netherlands-auto-parts-distributor> (accessed Feb. 27, 2023); "LKQ Corporation Finalizes Acquisition of Sator Beheer." *GlobeNewswire* (May 1, 2013). <https://www.globenewswire.com/news-release/2013/05/01/543410/10030936/en/%20LKQ-Corporation-Finalizes-Acquisition-of-Sator-Beheer.html> (accessed Feb. 27, 2023).

[12] "LKQ Corporation Announces Agreement to Acquire Rhiag-Inter Auto Parts Italia S.p.A." *GlobeNewswire* (Dec. 22, 2015). <https://www.globenewswire.com/news-release/2015/12/22/797609/0/en/LKQ-Corporation-Announces-Agreement-to-Acquire-Rhiag-Inter-Auto-Parts-Italia-S-p-A.html> (accessed Feb. 27. 2023); "LKQ Corporation Finalizes Acquisition of Rhiag-Inter Auto Parts Italia S.p.A." *GlobeNewswire* (Mar. 21, 2016). <https://www.globenewswire.com/news-release/2016/03/21/821696/0/en/LKQ-Corporation-Finalizes-Acquisition-of-Rhiag-Inter-Auto-Parts-Italia-S-p-A.html> (accessed Feb. 27, 2023).

[13] "LKQ Corporation Announces Agreement to Acquire Stahlgruber GmbH." *GlobeNewswire* (Dec. 11, 2017). <https://www.globenewswire.com/news-release/2017/12/11/1250656/0/en/LKQ-Corporation-Announces-Agreement-to-Acquire-Stahlgruber-GmbH.html> (accessed Feb. 27, 2023); "LKQ Corporation Finalizes Acquisition of Stahlgruber GmbH." *GlobeNewswire* (May 31, 2018). <https://www.globenewswire.com/news-release/2018/05/31/1514504/0/en/LKQ-Corporation-Finalizes-Acquisition-of-STAHLGRUBER-GmbH.html> (accessed Feb. 27, 2023).

[14] "LKQ Corporation Enters into Definitive Agreement to Acquire Uni-Select Inc." *Uni-Select* (Feb. 27, 2023). <https://uniselect.com/content/files/LKQ-Corp-Acquisition-of-Uni-Select-Press-Release-Final.pdf> (accessed Feb. 27, 2023).

CONFIDENTIAL

teams on issues of deal-making and corporate governance, and I have participated in several significant transactions as a member of the LKQ board of directors. Over the past fifteen years, I have been involved as an advisor, expert witness, or corporate director in deals or situations worth over $150 billion in aggregate value.

12. I have testified as an expert witness approximately twenty times at trial or arbitration hearing, and numerous times by deposition, for both plaintiffs and defendants, in disputes concerning corporate transactions, deal process design, corporate governance, and M&A, and have never been disqualified as an expert in these fields. My Curriculum Vitae, which includes a complete listing of my academic publications and expert witness testimony over the past five years, is attached as **Appendix A**: *Curriculum Vitae*.

### B. Statement of Assignment

13. On August 31, 2022, Arm Ltd. ("Arm"), a provider of microprocessor intellectual property ("IP") for use in semiconductor chips and other electronic devices, filed a complaint against Qualcomm Inc., Qualcomm Technologies, Inc. (collectively, "Qualcomm"), and NuVia, Inc. ("Nuvia") asking for specific

CONFIDENTIAL

performance of termination provisions contained in licenses entered into by Nuvia and Arm.[15]

14.  The complaint rests upon licenses that Arm negotiated with Nuvia in 2019 permitting Nuvia to license Arm's architecture to build custom processor cores.[16] Qualcomm acquired Nuvia in 2021.[17]

15.  I have been retained by Arm, through its counsel Morrison & Foerster LLP, to answer the following questions:

1)  What principles of negotiation theory and transactional practice are relevant in assessing the initial negotiation of the licensing agreements negotiated between Arm and Nuvia?

2)  What principles of negotiation theory and transactional practice are relevant in assessing Qualcomm's acquisition of Nuvia?

3)  What principles of negotiation theory and transactional practice are relevant for assessing the ███████████ in the Arm-Nuvia ALA?

4)  Is it possible to predict the outcome of a hypothetical successful negotiation between Qualcomm and Arm over a transfer of Nuvia's ALAs to Qualcomm?

---

[15]  Complaint. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Aug. 31, 2022) ("Complaint") ¶¶ 1-3.

[16]  *Id.* ¶¶ 20-22.

[17]  "Qualcomm to Acquire NUVIA." *Qualcomm* (Jan. 12, 2021). <https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia> (accessed Sept. 12, 2023).

CONFIDENTIAL

16. A complete list of the documents and data that I rely upon in reaching my conclusions in this matter is provided in **Appendix B**: *Materials Considered*.

17. The current hourly rate for my work is $1,950. My compensation is not affected by my findings or the outcome of this litigation. I supervised and directed a team at Vega Economics to assist me in this assignment, and I receive further compensation based on their billings. Their compensation is not affected by my findings or the outcome of this litigation.

18. I hold the opinions stated in this report with a reasonable degree of professional certainty. I reserve the right to amend or supplement my opinions and report, if appropriate, based on any additional discovery, or in response to opinions or reports of other experts in this matter.

### C. Summary of Opinions

19. Based on my review of the record, my experience, and my professional judgment, I conclude that:

    1) Arm entered into a limited number of ALA contracts, and each was negotiated separately. Consistent with negotiation principles, Arm negotiated different provisions with Nuvia and Qualcomm.

    2) Due diligence in an M&A transaction typically involves an examination of license agreements. Consistent with norms in transactional practice, Qualcomm and Nuvia seemed to be aware of the ████████ in the ALAs.

CONFIDENTIAL

3) Consistent with the business objectives of CIC provisions and negotiation principles, 

4) As a matter of negotiation theory, it is not feasible to predict with great precision the outcome of a hypothetical successful negotiation between Qualcomm and Arm over a transfer of Nuvia's ALAs to Qualcomm. This means that contractual terms that were considered during the parties' previous negotiations cannot simply be adopted later in order to make the parties whole. This is especially true now that Qualcomm's conduct and the resulting publicity of this lawsuit means that there must be a consideration of harm to Arm, not just the benefit to Qualcomm from the Nuvia ALA transfer.

20.  My full conclusions are contained in the body of this report.

## II.   SUMMARY OF RELEVANT FACTS

21.  I assume the following facts to be true for purposes of my analysis. To my knowledge, these facts are uncontested between the parties.

22.  Arm is a developer of IP related to microprocessor architectures and designs.[18] A microprocessor architecture "defines behavior that is common to many processor designs," while the processor itself "is an implementation of an architecture, and can be integrated into several different designs."[19] Arm

---

[18]      "The       ARM       Processor       Business       Model."       *Arm*. <https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model> (accessed Sept. 12, 2023).

[19]    *Id.*

CONFIDENTIAL

processor designs and architectures are integrated into silicon semiconductor chips, system-on-chip devices, or other specialized computing platforms.[20] Instead of manufacturing chips itself, Arm licenses its processor technology to companies making chips or other electronic devices.[21]

23.    Arm was founded in 1990 and has spent decades developing its leading processor technology.[22] Approximately 80 percent of Arm's employees are focused on research and design of Arm's technology.[23] Arm's processor designs and architectures are used by leading companies across the globe, including AMD, Intel, MediaTek, Nvidia, Samsung, and others.[24]

24.    Arm makes money from licensing its IP to partner companies, both by collecting an upfront license fee and a royalty based on the selling price of the chip.[25] In pursuit of this goal of monetizing its IP, Arm provides support to

---

[20]    *Id.*; "Licensing Arm Technology: Access for Everyone." *Arm*. <https://www.arm.com/products/licensing> (accessed Sept. 12, 2023).

[21]    "The ARM Processor Business Model." *Arm*. <https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model> (accessed Sept. 12, 2023).

[22]    Arm Holdings plc. *Amendment No. 2 to Form F-1 Registration Statement* (Sept. 5, 2023). <https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm> (accessed Dec. 14, 2023) ("Arm Registration Statement") at 3.

[23]    *Id.* at 2.

[24]    *Id.* at 1.

[25]    Abbey, Will. Deposition (Oct. 27, 2023) ("Abbey Dep.") 72:13-73:12, 100:2-102:19; Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works> (accessed Sept. 12, 2023).

                                                    CONFIDENTIAL

companies developing technology based on Arm-designed components or architectures.[26] Arm also negotiates license agreements with each customer that seeks to implement its technology.[27]

25. Arm may enter into different types of license agreements with its customers based on how the licensee intends to use Arm technology.[28] One common contractual licensing agreement Arm uses is the Technology License Agreement ("TLA"), █████████████████████████████████████ ███████████████████████.[29] Architecture License Agreements ("ALAs"), on the other hand, █████████████████████████████████████████

---

[26] Abbey Dep. 33:15-34:24; "Licensing Arm Technology: Access for Everyone." *Arm*. <https://www.arm.com/products/licensing> (accessed Sept. 12, 2023) ████████ ██████ ████████); Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works/2> (accessed Sept. 12, 2023) (████████████ ███████████████████████████████████████).

[27] Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works> (accessed Sept. 12, 2023) ("████████████████████████████████████████████████████ ██████████████████████████████████████."). *See also* Abbey Dep. 69:8-19.

[28] Arm Registration Statement at 87; Abbey Dep. 75:12-77:18; Grisenthwaite, Richard. Deposition (Nov. 15, 2023) 24:1-25:4; Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works> (accessed Sept. 12, 2023) ███████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████.").

[29] Segars, Simon. Deposition (Nov. 16, 2023) ("Segars Dep.") 29:23-30:21; Abbey Dep 75:12-24.

CONFIDENTIAL


.[30] The vast majority of Arm's agreements are TLAs, with Arm granting very few ALAs to date.[31] Companies that have negotiated ALAs with Arm ███████████ ██████████████████████████████████████████████████████████████ ████████████████████.[32]

26.   Because Arm's business model relies on monetizing its research and the resulting IP, the specific licenses governing allowed usage and agreed compensation for Arm's technology are extremely important to the company.[33]

---

[30]   Segars Dep. 30:12-32:12; Abbey Dep. 76:11-77:20.

[31]   Arm Registration Statement at 88 ("Historically, most customers licensed our products under the terms of a TLA."), 133 ("A very small number of companies want to design customized Arm CPUs for their next-generation chips. For these companies, we can provide an architecture license which allows the licensee to develop their own CPU design that is compliant with the Arm ISA."); Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works> (accessed Sept. 12, 2023) ("In terms of numbers, ARM has around 1000 licenses in the market spread across 320 licensees/partners. Of those 320 licensees, only 15 of them have architecture licenses."). *See also* Segars Dep. 31:2-4.

[32]   Segars Dep. 31:15-24, 42:24-44:19; Williamson, Paul. Deposition (Nov. 9, 2023) ("Williamson Dep.") 21:10-23:18.

[33]   Williamson Dep. 244:17-19 ("ARM's business is fundamentally defined by our ability to protect and license our technology."); Arm Registration Statement at 87 ("We generate the majority of our revenue from customers who enter into license agreements, pursuant to which we receive royalty fees based on average selling price of the customer's Arm-based chip or a fixed fee per chip. Royalty revenues are impacted primarily by the adoption of our products by the licensee as well as other factors, such as product lifecycles, customer's business performance, market trends and global supply constraints. In the fiscal year ended March 31, 2023, royalty revenue represented 63% of our total revenue.").

                    CONFIDENTIAL

Arm's licenses, and its ALAs in particular, carefully and specifically designate the technology that can be used by the customer to develop its processor cores.[34]

27. Nuvia, a chip maker founded by ex-Apple and Google engineers, obtained both an Arm ALA and an Arm TLA in 2019 and began developing the Phoenix core, a custom central processing unit ("CPU") core based on the Arm architecture.[35] These license agreements that Arm negotiated with Nuvia ███████████ ██████████████████████████████████████████████████████████ ████████████████.[36] ████████████████████████████████ ██████████████████████████████████████████████████████████

28. The negotiations between Nuvia and Arm over Nuvia's licensing agreements proceeded as follows:

---

[34] Complaint ¶ 19; Arm Registration Statement at 87 ("Under an ALA, ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████.").

[35] Tyson, Mark. "Nuvia 'Clean-Sheet CPU Design' Performance Previewed." *Hexus* (Aug. 11, 2020). <https://hexus.net/tech/news/cpu/144733-nuvia-clean-sheet-cpu-design-performance-previewed> (accessed Sept. 12, 2023); Gulati, Manu. 30(b)(1) Deposition (Oct. 12, 2023) ("Gulati Dep.") 40:19-46:18.

[36] Segars Dep. 113:24-115:17 (discussing how the royalty rates under Nuvia's and Qualcomm's ALAs differed and stating that ████████████████████████████████

[37] ██████████████████████████████████████████████████████████ ██████████████████████████ *See also* Segars Dep. 82:12-21, 105:1-106:21.

CONFIDENTIAL





CONFIDENTIAL





CONFIDENTIAL

29. In January of 2021, Qualcomm acquired Nuvia and indicated that it planned to integrate Nuvia's CPU designs into Qualcomm products.[52] However, neither Nuvia nor Qualcomm provided notice of the acquisition to Arm, and neither obtained Arm's consent to transfer or assign Nuvia's licenses to Qualcomm, in alleged breach ███████████████████████████.[53]

III.   **NEGOTIATION THEORY AND APPLICATION TO LICENSING AGREEMENTS**

   **A. Core Negotiation Terminology: BATNA, ZOPA, and Reservation Value**

30. The best alternative to a negotiated agreement ("BATNA") for both sides determines the bargaining range for any negotiation.[54] In a price negotiation,

---

[53]  Complaint ¶ 28.
[54]  Subramanian, Guhan. *Dealmaking: The New Strategy of Negotiauctions, 2nd edition*. New York: W. W. Norton & Company (2020) ("Dealmaking") at 6-7.

                    CONFIDENTIAL

the BATNAs can often be quantified to yield a "reservation value," that is, the minimum-willingness-to-take for a seller, or a maximum-willingness-to-pay for a buyer.[55] Given the BATNAs and reservation values, effective negotiators will then usually have at least a first-pass assessment, before they engage in negotiations, as to whether a zone of possible agreement ("ZOPA") exists.[56]

31. In my forthcoming book *Deals: The Economic Structure of Business Transactions*, my co-author and I offer a simple example of these concepts involving the sale of a used car, in which the BATNA for the seller (Sarah) is to sell the car to a dealership for $6,900, plus the option value for a better deal before the sale to the dealership (translating into a reservation price of $8,000 for the sale of her car); and the BATNA for the buyer (Jim) is to buy a newer car with lower mileage for $11,500 (translating into a reservation price of $9,000 for his purchase of Sarah's car). The analysis continues as follows:

> Sarah is willing to accept as little as $8,000, and Jim is willing to pay as much as $9,000. So … using the vocabulary of negotiations theory, there is a *zone of possible agreement*, or ZOPA between $8,000 and $9,000. In economics this is called the contract zone. If Sarah and Jim arrive at a price in that zone, they will be collectively better off by $1,000, compared to the

---

[55] *Id.* at 8.

[56] *Id.* at 9-10.

                    CONFIDENTIAL

status quo of no deal, as of the time they are negotiating. The deal would create $1,000 in *joint value*.[57]

32. Our book continues with the point that simply because there is a ZOPA (and even if the parties are both aware that there is a ZOPA), there is no guarantee that the parties will reach a deal. The reason is that each side will use tactics (such as anchoring, bluffing, and posturing) in an effort to extract more of the ZOPA; but by doing so they risk no deal at all. We illustrate this point by returning to the used car negotiation:

> Because Sarah wants the highest price she can get, and Jim wants the lowest price, their attempts at strategic bargaining may result in no deal. Even if they reach a point at which they are negotiating in the range between $8,000 and $9,000, there is no guarantee that they will settle on a price. Sarah may reject $8,200, even though it is above her reservation price, because she thinks she can get $8,500. Or Jim might reject $8,500, even though it is lower than his reservation price, because he thinks he can get the car for $8,200. The two may give up and take their alternative deals without realizing they have a potential deal.[58]

33. This simple example illustrates a few core points from basic negotiation theory. First, the joint value created in any negotiation is a function of the parties' BATNAs. Therefore, the joint value created in a negotiation between Sarah and Jim is different from a negotiation between Sarah and (say) Bob, because Bob's

---

[57]  Klausner, Michael and Guhan Subramanian. *Deals: The Economic Structure of Business Transactions.* Page Proofs. Harvard University Press, forthcoming ("Deals") at 7-8.

[58]  *Id.* at 9.

CONFIDENTIAL

BATNA would be different from Jim's. Second, because the joint value is different, the outcome is likely to be different based on the counterparty. Specifically, Sarah will make offers and counteroffers based on her assessment of Jim or Bob's willingness-to-pay, which will be based on her assessment of their (different) BATNAs. Third, because of these dynamics, negotiation theory cannot predict with any great confidence where in the ZOPA the deal will end up. And fourth, the ZOPA can change if BATNAs change. Specifically, a ZOPA that may have existed at some point in time previously may not necessarily exist today, particularly where the conditions and factors impacting the ZOPA have changed considerably.

### B. Single-Issue vs. Multi-Issue Negotiations

34.   The field of negotiation initially focused on developing the theory and practice of pure price negotiations.[59] These negotiations were "fixed pie" because more for one side necessarily meant an equal amount less for the other side. The Nash bargaining model, which I have applied in my own research on M&A,[60] predicts that the parties each get half (~50 percent) of the ZOPA in these pure

---

[59]   *See, e.g.*, Karrass, Chester L. *Give and Take: The Complete Guide to Negotiating Strategies and Tactics*. United States: Crowell (1974).

[60]   Subramanian, Guhan. "Bargaining in the Shadow of Takeover Defenses." *Yale Law Journal* 113.3 (2003): 621-686.

                    CONFIDENTIAL

price negotiations.[61] Assuming common knowledge and a $100 ZOPA, I explain this model as follows:

> In a Nash bargaining game, two players each request a certain amount of the surplus (here, $100). If their requests are compatible (i.e., summing to <= $100), each player receives the amount requested; if their requests are not compatible (i.e., summing to > $100), each player receives nothing. Assuming Pareto optimality, independen[ce] of irrelevant alternatives, symmetry, and invariance to positive linear transformations, the Nash bargaining game solution is that each player demands half of the surplus.[62]

35.  Therefore, with no other information about the negotiation other than the magnitude of the ZOPA, a useful first approximation is that each side obtains half of the ZOPA in a fixed-pie negotiation.[63]

36.  However, many real-world negotiations involve multiple issues, not just price. The field of negotiations has accordingly developed to study these more complicated negotiations as well.[64] The presence of multiple issues in the negotiation allows negotiators to make trades across issues – specifically,

---

[61]  *See* Nash, John. "Two-Person Cooperative Games." *Econometrica* 21.1 (1953): 128-140.

[62]  Subramanian, Guhan. "Bargaining in the Shadow of Takeover Defenses." *Yale Law Journal* 113.3 (2003): 621-686 at 643 n. 105.

[63]  Professor Barry Nalebuff (Yale School of Management) has advocated for the same split-the-ZOPA-evenly approach as a normative matter. Nalebuff, Barry. *Split the Pie: A Radical New Way to Negotiate*. Harper Business (2022).

[64]  *See, e.g.*, Raiffa, Howard. *The Art and Science of Negotiation*. Cambridge, Massachusetts: The Belknap Press of Harvard University Press (1982) at 131-132; Lax, David A. and James K. Sebenius. *The Manager as Negotiator*. New York: The Free Press (1986) at 30-33; Malhotra, Deepak and Max H. Bazerman. *Negotiation Genius*. New York: Bantam Dell (2008) at 50-52; Dealmaking at 22-26.

CONFIDENTIAL

giving what is cheap to give, in exchange for receiving what is valuable to receive. For this reason, multi-issue negotiations create the possibility for value creation, or so-called "win win" negotiations. This stands in contrast to pure price negotiations, which are fixed-pie negotiations or sometimes called "win lose."

37. This distinction between fixed-pie and value-creating negotiations is well-established in the negotiation literature. While specific prescriptions among negotiation experts vary somewhat, there is general consensus around the idea that effective negotiators try to maximize the overall value of the deal and also capture an appropriate share for their side.

38. Visually, a pure price negotiation can be depicted by a straight line, with the reservation prices for each side demarcating the ZOPA as shown in **Figure 1**: *Pure Price Negotiation*.

**Figure 1**: Pure Price Negotiation



Seller Reservation Value                    Buyer Reservation Value

39. In contrast, because of the possibility that both sides can be better off from trades, a multi-issue negotiation can only be depicted in a two-dimensional

CONFIDENTIAL

way. In my teaching, for example, I often use the following diagram to depict the possible outcomes in a multi-issue negotiation. *See* **Figure 2**: *Multi-issue Negotiation*.

**Figure 2**: Multi-issue Negotiation



40.    As shown in this diagram, the ZOPA in a multi-issue negotiation is no longer points along a line, but rather the entire shaded area. This means that the ability to predict the outcome is even more difficult in a multi-issue negotiation than in a single-issue (price) negotiation. While classical economic models of bargaining provide some traction in a price negotiation, these models do not readily translate to the multi-issue context. I provide implications of this point

     CONFIDENTIAL

for a hypothetical re-negotiation of the ALA between Arm and Qualcomm in Part VI below.

### C. The Value Creation Role of █████████

41.     ███████████████ commonly used in many different contexts; licensing agreements, supply agreements, credit agreements, and employment agreements are just a few examples. ███████████████████████████ ████████████████████████████. In general, the business purpose is to provide a licensor with control over the manner and terms in which it does business with a counterparty.[65] For example, a licensing agreement will typically give the licensor the right to exit the agreement if the licensee ███████████████.[66] The basic idea is that a licensor should not be forced to provide a license to a future third party, for example, to a competitor, or expand the scope of an existing license to an existing counterparty, against its will or on terms that it does not agree with for that particular party. ██████████████



---

[65]   "Dear Negotiation Coach: Coping with a Change-of-Control Provision." *Harvard Program on Negotiation* (July 31, 2023). <https://www.pon.harvard.edu/daily/business-negotiations/dear-negotiation-coach-coping-with-a-change-of-control-provision-nb> (accessed Sept. 19, 2023) ("████████████████████████████████, as they allow a party to avoid being forced to work with someone other than its agreed-upon counterpart.").

[66]   *See, e.g.*, Centocor/Schering-Plough Distribution Agreement (Apr. 3, 1998) § 8.2 (c), attached to Schering Plough Corp. *Form 10-K* (Feb. 26, 2004) ("Change in Control. If either party is acquired by a third party or otherwise comes under Control (as defined in Section 1.4 above) of a third party, it will promptly notify the other party not subject to such change of control. The party not subject to such change of control will have the right, however not later than thirty (30) days from such notification, to notify in writing the party subject to the change of Control of the termination of the Agreement taking effect immediately.").

                      CONFIDENTIAL

does not necessarily mean that the license will not continue; but it gives the licensor the right to re-negotiate the terms on which the license will be given.

42. ███████████ are a common way to protect against situations where an acquisition of a licensee would (1) dramatically change the scope of rights or obligations between the licensor and licensee, or (2) potentially be used by the acquiring company to bypass the licensor's licensing framework and gain access to licensed technology by acquiring the licensee.

43. By limiting the risk for contracting parties in ways that are relatively cheap to give and valuable to receive, ███████████ can benefit both sides – a classic "win win" as described in the prior Part. For example, most credit agreements specify that the debt becomes due if there is a change in control of the borrower. This is because the creditor is granting credit to this specific borrower – and if the borrower subsequently becomes controlled by some other entity, the creditor's risk of default may increase. Research shows that the cost of capital is lower when there is a ███████████ in a credit agreement.[67] The intuition for

---

[67] *See, e.g.*, Crabbe, Leland. "Event Risk: An Analysis of Losses to Bondholders and 'Super Poison Put' Bond Covenants." *The Journal of Finance* 46.2 (1991): 689-706 at 689, 690 (finding that issuers received a 24 to 32 basis point discount when including a CIC control provision); Griffith, Sean J. and Natalia Reisel. "Dead Hand Proxy Puts and Shareholder Value." *University of Chicago Law Review* 84.3 (2017): 1027-89 at 1056 ("We find that inclusion of a Dead Hand Proxy Put reduces firms' borrowing costs in a manner that is both statistically and economically significant.").

CONFIDENTIAL

this finding is that the creditor perceives less risk, and therefore can offer a lower cost of debt, because the ██████████ eliminates the possibility of having to extend credit to a future, higher risk, successor in interest to the borrower. In this way a ██████████ is a "win-win" between the parties.

44. When a ██████████ is a defined term, the parties will typically enumerate the events that trigger a ██████ Five types of events are often included in the definition of what constitutes a ██████



45. These triggers make conceptual sense because they capture the business purpose of a ██████████, namely, to protect the parties against doing business with a counterparty against their will or on terms that they have not agreed to. Triggering the ██████████ may not necessarily mean that the

CONFIDENTIAL

parties will terminate their agreement; but it forces a re-negotiation of the terms on which the parties will continue.

46.   In some cases, the ████████ contemplates this re-negotiation, and requires that the grantor cannot "unreasonably withhold" consent for the contract or license rights to be transferred. When this language exists, it weakens the grantor's ability to extract concessions in exchange for transferring the rights to the new owner. Other ████████ do not constrain the grantor's consent obligation in this way. When the "unreasonably withheld" language is absent, the grantor has a stronger hand in the re-negotiation with the new owner.

**D. The Business Role of ████████ in IP Licensing Agreements**

47.   ████████ are particularly common, if not ubiquitous, in IP licensing agreements. Licensors need to protect their IP as it represents their source of revenue, and uncontrolled usage is likely to dilute or reduce additional revenue sources. ████████ and anti-assignment provisions allow licensors to control if and how their IP is used by companies with whom the licensor did not originally negotiate. Without such provisions, an agreement originally negotiated with one company may end up allowing an entity to use the licensor's IP without negotiating its own contract terms. In an acquisition scenario, the acquiring company may also be much larger than the original licensee and seek to use the IP on a larger scale and in a different manner than

CONFIDENTIAL

was originally bargained for. These mismatches between the original negotiating context and the ultimate use create inefficiency; in general, a deal that does not accurately reflect the desires of both parties who are bound to it will not maximize the total surplus that could be claimed between the parties.

48. To effectuate the ███████████, licensors may include an option for contract termination, and/or a contract may have a general termination provision conditioned upon certain triggers such as a breach of terms by the other party.[68]

████████████████████████████████████████████████████████

██████████████████████████.[69] Writing in an option for contract termination allows the licensor in a licensing agreement to have a "no deal" alternative should negotiation with a new acquiring entity fail. Without this BATNA, the licensor will have no credible walk away option and the prospective licensee, knowing this fact, may extract all of the value from any renegotiation, or refuse to negotiate entirely.[70]

---

[68] *See, e.g.*, "Termination Clauses." *LexisNexis*. <https://www.lexisnexis.com/supp/largelaw/no-index/coronavirus/commercial-transactions/commercial-transactions-termination-clauses.pdf> (accessed Sept. 11, 2023) (giving examples of differently conditioned termination clauses, including upon change of control).

[69] Deals at 113 ("From the narrow perspective of one party, there is often value in having an unconditional right to terminate when a deal is no longer beneficial. In a long-term supply contract, for example, a buyer may want freedom to stop making purchases if it no longer needs what is being supplied, or if it finds a better deal elsewhere.").

[70] Dealmaking at 165-67 (explaining how, to execute a "shut-down move" in a negotiation, such as threatening to terminate a contract if an offer or term is not accepted, the threat must be

CONFIDENTIAL

49. It also may make sense, from a business perspective,  ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████. Without such a clause, the licensor

risks the licensee continuing to use the derivative work to further future R&D

efforts (on an unlicensed basis), despite that work being (definitionally) the

originally licensed IP. The licensee would essentially be permitted free use of

the licensor's technology: the licensee would get the core technology under the

original license, build a derivative, and then pay no royalties on the derivative.

An entity that subsequently acquires the licensee and its derivative technology

would then be able to extract the value that the licensor would have gained

through the derivative. IP negotiations thus need to address the use of derivative

work based on the licensor's IP to avoid such a scenario where entities could

constantly change royalty rates through acquisitions of licensees conducted

with the licensor's consent. Such a provision covering derivative work, while

undeniably favorable to the licensor, nonetheless reflects an intentional

outcome of the negotiation process based on important business objectives.

---

"credible"), 24 ("If we are fully forthcoming about our interests, the other side can use this information to extract all of the value that is created. … The core of the problem is this: in order to identify value-creation opportunities in a negotiation we need to disclose information; but disclosing information can expose us to value-claiming tactics by the other side.").

CONFIDENTIAL

50.  A . If the licensor allowed a licensee to breach its license agreement without imposing consequences for such a breach, other licensees may engage in similar behavior or attempt to use the licensee's breach (and lack of consequences) to negotiate for more favorable terms.

## IV.  APPLICATION TO ARM-NUVIA ALA

### A. Arm Entered into a Limited Number of ALA Contracts and Each Was Separately Negotiated.

51.  Most of Arm's licensing agreements are TLAs, not ALAs.[71] [73]

The significant support required from Arm for ALA licensees' development efforts and the fact that most companies do not have the capabilities to design custom CPUs and instead buy off-the-shelf CPUs (available from Arm and

---

[71]  Segars Dep. 31:2-4.

[72]  Manners, David. "ARM Adds an Architectural Licensee." *Electronics Weekly* (Apr. 21, 2015). <https://www.electronicsweekly.com/news/business/finance/arm-adds-architectural-licensee-2015-04> (accessed Sept. 11, 2023).

[73]  Complaint ¶ 14.

CONFIDENTIAL

other chip design companies) contribute to the relative infrequency of these types of agreements.[74]

52. Because of the significant investment that each of these handful of ALA deals requires from Arm and its licensees, the ALA terms are subject to careful review and negotiation. As a matter of custom in transactional practice, internal specialists in the underlying technology, assisted by inside and outside counsel, would carefully review the ALAs. Indeed, even if the licensee chose not to deviate from initial terms proposed by Arm at the onset of the negotiations, it is standard business practice for all contracts, especially such high profile and customized ones, to be carefully reviewed to ensure that they reflect the full and accurate business intentions of the parties.[75] There are additionally legitimate business reasons to expect that Arm's ALAs were subject to individualized negotiations, including the relative infrequency with which they were entered into and the highly customized nature of the work that each would

---

[74] Segars Dep. 43:10-44:19, 51:16-52:24, 191:2-193:18. *See also* Complaint ¶ 18.

[75] An Arm representative also testified to this effect. Herbert, Tim. Deposition (Oct. 25, 2023) ("Herbert Dep.") 54:25-57:8 (describing how Arm had ███████████████ and testifying, "███████████████████████████. So they've come up with ██████████████████████████. Q. In your experience, do ████████████████████████████████? [sic] … THE WITNESS: ██████████████████████).

                    CONFIDENTIAL

encompass, in contrast to a TLA that might provide for simple incorporation of an "off-the-shelf" Arm design.[76]

53. Given this expectation, under reasonable business custom and practice, ██████ ████████████████████████████████████████████████████████ ████████████████, would have represented the negotiated intentions of both of both licensor and licensee. Given the timeline of negotiating Nuvia's ALA discussed in Part II above, I conclude that, under reasonable business custom and practice, ██████████████████████████████████████ ████████████████████████.

54. ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████



_____

[76]   Abbey Dep. 75:22-76:4; Complaint ¶ 17.

[77]   ████████████████████████████████████████

CONFIDENTIAL

55. According to business custom and practice, the inclusion of such a specific and clear provision would not have been accidental, particularly in light of the extensive editing and redlining and multiple meetings involved in the negotiation process.[78] █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

56. Further, my analysis of the Qualcomm ALA alongside Nuvia's ALA, which will be discussed in the next section, shows that █████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████.

57. Importantly, ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[78] Herbert Dep. 119:18-212:12 (testifying that Nuvia proposed about fifteen rounds of edits to the ALA, that he met with Nuvia in person about ten times to discuss the ALA and may have had additional phone conversations, and that the negotiation process took six months); ████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████

CONFIDENTIAL



**B. Arm Negotiated Different Provisions with Nuvia and Qualcomm.**

58.   I analyzed the terms of both the Qualcomm and the Nuvia ALAs and their

appendices and found that, in terms of economics and negotiations, they reflect

the different business objectives of Qualcomm and Nuvia.

59.   While much of the language appears similar, ████████████████████████

████████████████████████████████████████

████████████████████████████████ █████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ █ ██████████████

---
79 ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████



60. ████████████████████████████████████████████████████

61. ████████████████████████████████████████████████████

CONFIDENTIAL



62.

CONFIDENTIAL



63.   The uniqueness of these contracts, as well as their individualized provisions, indicates that each was the product of negotiations between the parties and Arm, and as such, each reflects the deliberate intentions and expectations of Qualcomm or Nuvia, respectively. Testimony taken from parties involved in negotiations also confirms this. ████████████████████████████████

████████████████████████████████████████████████████████



CONFIDENTIAL





89 Herbert Dep. 185:9-13 ("Q. Did the fact that NUVIA was a start-up play a role in deciding how the payment [to ARM] would be structured in this case? A. Yes, because they were very cash constrained.").

64. 

65.

---

91  Herbert Dep. 318:7-18 (reading from a document discussing "Nuvia/Qualcomm Plans" that "[██████████████████████████] because they had a limited scope, if Qualcomm wants to expand the usage to other markets, we expect to be renumerated."); Williamson Dep. 38:23-39:24 (testifying that Qualcomm's acquisition of Nuvia "could result in the core being deployed in any number of markets" including those beyond the originally anticipated market of cloud server designs), 62:24-63:24 (testifying that the Qualcomm ALA was agreed to in 2013 and that by 2021 [when Nuvia was acquired], it was "a very different time in the relationship and market").

CONFIDENTIAL



66.     These differences are entirely consistent with the negotiation theory described in Part III. Negotiators will adjust their negotiation tactics and strategy based on the perceived BATNA of the counterparty. For example, a licensee that

CONFIDENTIAL

intends to use Arm's technology for a more lucrative market may justify more favorable terms compared to a licensee who is pursuing a more commoditized, lower margin market. In this case, it is highly likely, in my opinion, that Arm perceived a different BATNA for each of Nuvia and Qualcomm, which in turn would yield a different ZOPA in the two different negotiations, which then (as summarized in Table 1) yields different ALAs.

## V.   APPLICATION TO QUALCOMM'S ACQUISITION OF NUVIA

### A. Due Diligence Typically Involves an Examination of License Agreements.

67. As a matter of standard transactional practice, Qualcomm reasonably should have been aware of the ███████████████████ when it agreed to acquire Nuvia. As I described in Part III.C above, ████████████ ███████████████ are common in corporate contracts. As a large and sophisticated enterprise with extensive experience with IP licensing and contract negotiation, including with Arm,[92] Qualcomm should have reasonably known of the possibility of such provisions existing in Nuvia's contracts, and of their resulting implications.

---

[92]   Complaint ¶ 26.

   CONFIDENTIAL

68. Consistent with this conclusion, I analyzed a collection of Arm ALAs provided

   to me in this matter and found that: (i) each contract reflected a unique

   agreement, but (ii) CIC or anti-assignment provisions were a standard inclusion

   across the contracts. For example, Arm's ███████████████████████████

   states:

   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   █████████████████████████████████

69. Similarly, the ALA between ███████████████████████ Inc. includes

   █████████████████████████████████ that require Arm's ███████████

   ███████████████████████████████████████████

   ███████████████████████████████████████████

   ███████████████████████████████████████████

   ███████████████████████████████████████████

   ████████████████████████████████████[94] The results of my

---

[93]  Architecture License Agreement Between ████████████████████████
      ██████ (Oct. 16, 2012) (ARM_01246043 at ARM_01246059).
[94]  Technology License Agreement Between ████████████████████████████
      (AMD) (Oct. 31, 2013) (ARM_01245673 at ARM_01245693-94).

review of these and other contracts reflect the reality that such provisions are commonplace protective measures that may be negotiated for in IP licensing agreements.[95]

70.   █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████   As a matter of standard corporate practice, an important component of the due diligence process is to analyze the target company's contracts and agreements, especially those pertaining to IP, for any relevant provisions that could impact their transferability in a merger or acquisition.[97] Similarly, once

---

[95] For additional examples of Arm ALA and TLA provisions dealing with license assignment or changes in control, *see* ████████████████████████████████
████████████████████████████████████████████████████
████ ██████ ████ ████ ████ ████ ████████ ████ ████ █ ████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████ June 30, 2021) (ARM_01245727 at ARM_01245751).

[96] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

[97] Robins, Martin B. "Intellectual Property and Information Technology Due Diligence in Mergers and Acquisitions: A More Substantive Approach Needed." *Journal of Law, Technology and Policy* (2008): 321-356 at 328-29 ("Since M&A transactions and macroeconomic turmoil can have a major impact on the viability of licensors and licensees, it is also prudent to address the termination provisions of any major license agreements to which

aware, 

71. Similarly, my review of Arm's ALAs found that ████████████ were commonplace, and generally involved the requirement that the licensee

---

the target is a party to determine what circumstances allow for termination. For example, if there is a "change of control" of the licensor, or if the licensor's circumstances drastically deteriorate, or merely for the licensor's own convenience."); Börzsönyi, Blanka. "Intellectual Property Considerations in M&A Due Diligence." *Annales Universitatis Scientiarum Budapestinensis de Rolando Eötvös Nominatae* 58 (2019): 89-99 at 96 ("Counsel must also understand how the Target IP has been developed or acquired[.] … In the case of acquired IP, the assignment provisions of the relevant agreements must be double-checked to ensure that the transfer of ownership has been completed, without any additional conditions or obligations. A core area of review is the IP [licenses] concluded by the Company[.] … IP counsel should normally try to identify… any post-termination restrictions; … e.g., in the case of stock purchases and forward or reverse mergers change-of-control or anti-assignment provisions may be triggered[.]").

98 

CONFIDENTIAL

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ██ or substantially similar language. [100] It is reasonable for Arm to have negotiated for such a protection to prevent unauthorized and unsupervised use of its IP, and Qualcomm's due diligence and acquisition bidding should have incorporated the possibility that Arm

---

[99] ██████████████████████████████████

[100] ██████████ Technology License Agreement Between Arm Limited and ██████████████████ Inc. (AMD) (Oct. 31, 2013) (ARM_01245673 at ARM_01245690) ("████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████"); Architecture License Agreement Between Arm Limited and ██████████████████████ (Oct. 16, 2012) (ARM_01246043 at ARM_01246058) ███████ ██████ █████ ██ ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Architecture License Agreement Between Arm Limited and ██████████████ (Nov. 5, 2009) (ARM_01246021 at ARM_01246033) (██████████████████████); Technology License Agreement Between Arm Limited and ██████████████ (Mar. 30, 2005) (ARM_01240449 at ARM_01240461); Technology License Agreement Between Arm Limited and ██████ ██████ (Oct. 17, 2014) (ARM_01246135 at ARM_01246147-48); Second Amended and Restated Technology License Agreement Between Arm Limited and ████████████████ ██████ (Oct. 17, 2016) (ARM_01245979 at ARM_01245993-94); Amended and Restated Architecture License Agreement Between Arm Limited and ████████████(Mar. 23, 2017) (ARM_01245794 at ARM_01245805); Architecture License Agreement Between Arm Limited and ██████████████ (Feb. 3, 2018) (ARM_01246067 at ARM_01246080); Architecture License Agreement Between Arm Limited and ██████████ (June 30, 2021) (ARM_01245727 at ARM_01245750).

CONFIDENTIAL

would trigger the provision if a renegotiated deal over the Nuvia licenses could not be completed.

### B. Qualcomm and Nuvia Seemed to be Aware of the ███████████ ███████

72. Consistent with customary transactional practices and my conclusions in the prior Part, my review of the record indicates ████████████████████





CONFIDENTIAL

73. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ ████ ████ ████████ ████████████ ██████ ████████ █

████████████████████████████████████████████████████

██████████████████████████████████████████████

74. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

████ ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████
████ ███████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████
████ ███████████████████████████████████████████████
█████████████████████████████
████ ███████████████████████████████████████████████
████████████████

CONFIDENTIAL

75.  Taken together, Qualcomm's initial communications show that it anticipated needing both Arm's consent as well as potential new agreements, including potentially new annexes, in order to continue developing Nuvia's innovations based on Arm's IP, and that it did not expect Qualcomm's ALA and TLA to ███████████████████████████████████████████████████████████ ████████████████████████████

76.  In my opinion, Qualcomm's stated position is consistent with the transfer of rights and assets during acquisitions. It is inconsistent with Qualcomm's assertions elsewhere that the "████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████[108]

**C. Qualcomm Did Not Negotiate for Nuvia to Obtain Arm's Consent.**

77.  Qualcomm could have negotiated for contractual commitments that would have reduced its exposure to the ███████████████████████ with Arm. However, Qualcomm's acquisition of Nuvia closed without Nuvia obtaining Arm's consent for transfer of Nuvia's ALA. I infer from this that Qualcomm assumed the risk that Arm would not consent for the transfer of the ALA.

---

[108] Counterclaim ¶ 201.

                                        CONFIDENTIAL

## VI.   APPLICATION TO THE ███████████ IN THE ARM-NUVIA ALA

### A. The ███████████████ in the Arm-Nuvia ALA Are Consistent with Business Considerations, Negotiation Theory and Case Studies.

78. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ ████████████████

███████████████████████████████████████████████████

███████████████████████ ██████████████████████████

███████████████████████████████████ █ █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

79. Real-world cases support this conclusion. Consider Disney which, on the cusp of launching its streaming service Disney+, elected not to renew its licensing

---

[109] Deals at 88 ("In some situations, for an exchange to take place between two parties, one or both must make an *asset-specific investment* (or, equivalently, a *relationship-specific investment*). This is an investment whose value is dependent on the cooperation of another party; it would have a substantially lower value, and perhaps no value, outside the relationship with that party.") (italics in original) (citations omitted).

CONFIDENTIAL

agreement with Netflix. As a result, Disney content was removed from Netflix and Netflix lost its rights to stream future Disney movies.[110]

80. *SQL Solutions v. Oracle Corp.* also illustrates this principle.[111] In this case, D&N Systems Inc. held a perpetual, non-exclusive license from Oracle Corp. to use certain Oracle software. Under the agreement, the rights to D&N were exclusively for its use and were not to be assigned or transferred to a third party without written permission from Oracle. In January 1990, Sybase, an Oracle competitor, bought D&N Systems using a reverse merger structure (i.e., leaving the D&N corporate shell intact). Oracle then withdrew from the licensing agreement with D&N, claiming that a "transfer of rights" occurred when Sybase acquired D&N. Sybase/D&N brought suit seeking injunctive relief, claiming no such transfer of rights took place because the D&N corporate shell remained unchanged. The District Court ruled for Oracle, finding that a "transfer of rights" did take place notwithstanding the reverse merger

---

[110] Robehmed, Natalie. "Disney to End Distribution Agreement with Netflix, Launch Streaming Service." *Forbes* (Aug. 8, 2017). <https://www.forbes.com/sites/natalierobehmed/2017/08/08/disney-to-end-distribution-agreement-with-netflix-as-it-prepares-own-streaming-service/?sh=7486af462a98> (accessed Dec. 14, 2023); Castillo, Michelle. "Disney Will Pull Its Movies from Netflix and Start Its Own Streaming Services." *CNBC* (Aug. 8, 2017). <https://www.cnbc.com/2017/08/08/disney-will-pull-its-movies-from-netflix-and-start-its-own-streaming-services.html> (accessed Dec. 14, 2023).

[111] *SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D. Cal. 1991).

CONFIDENTIAL

structure.[112] I explain to my students that this case illustrates the general point, that "[u]nder basic equitable principles, a company should not be forced, in effect, to license its intellectual property to a competitor."[113]

81.   Further, it is reasonable and standard that terminations occur *even if* one party will lose the benefit of its investments or improvements. For example, when Starbucks terminated a licensing agreement with Kraft Foods, Kraft could no longer distribute Starbucks coffee despite Kraft having made significant investment in developing Starbucks' retail presence for over a decade.[114] Indeed, in anticipation of the large loss that Kraft would suffer if Starbucks terminated the license arrangement—and consistent with negotiation principles—Kraft negotiated with Starbucks for a specified buyback process that involved a 35 percent sale premium.[115]

82.   In another case Hewlett-Packard ("HP") had a licensing partnership with Beats Electronics wherein HP invested to integrate Beats Audio technology into its

---

[112]   Subramanian, Guhan and Rhea Ghosh. "Remicade/Simponi: Legal Memorandum." *HBS Case Study N9-911-046* (July 13, 2012) at 3-4.

[113]   *Id.* at 4.

[114]   Reily, Stephen. "Starbucks, Kraft and the $2.7 Billion Divorce." *IMC Licensing* (Dec. 23, 2013). <https://imclicensing.com/starbucks-kraft-and-the-2-7-billion-divorce> (accessed Dec. 15, 2023).

[115]   *Id.*

CONFIDENTIAL

products, particularly its high-end PCs.[116] When Apple, an HP competitor, acquired Beats Electronics, HP was required to phase out its Beats integration plans, despite the previously existing partnership.[117] Such consequences are a natural and logical conclusion of ███████████████████████ that are needed to make asset-specific investments.[118]

---

[116] Reardon, Marguerite and Shara Tibken. "The Beats Go On at HP (at Least Until 2015)." *CNET* (May 28, 2014). <https://www.cnet.com/tech/computing/the-beats-go-on-at-hp-at-least-until-2015> (accessed Dec. 15, 2023).

[117] *Id.*; Keizer, Gregg. "HP Must Give Up Beats Audio After Apple Deal." *Computerworld* (May 29, 2014). <https://www.computerworld.com/article/2489984/hp-must-give-up-beats-audio-after-apple-deal.html> (accessed Dec. 15, 2023).

[118] Numerous other cases support the conclusion that it is reasonable and standard for ███████ ████████████████████ to require discontinuance of use even if it results in lost benefit of investments or improvements. For instance, Target had long term licensing agreements with the brands Cherokee, Circo, Mossimo, and Merona, but when those agreements were not renewed, Target not only lost the rights to sell those branded products but gave up all the investments it had made in brand value, promotion, and customer loyalty associated with brands. *See* Ziobro, Paul. "Target Won't Renew U.S. License for Cherokee Brand." *The Wall Street Journal* (Sept. 10, 2015). <https://www.wsj.com/articles/target-wont-renew-u-s-license-for-cherokee-brand-1441919400> (accessed Dec. 15, 2023); Kumar, Kavita. "Target Is Shedding Merona and Mossimo and Adding New Brands Instead." *Los Angeles Times* (Aug. 21, 2017). <https://www.latimes.com/business/la-fi-target-merona-mossimo-20170821-story.html> (accessed Dec. 15, 2023). As another example, Tesco, a supermarket chain, discontinued a streaming service it offered, Blinkbox. Upon that discontinuation, Tesco lost use of the content licenses it had acquired from Disney, despite having made significant investments in developing digital streaming and promoting usage of those licenses. *See* "Tesco's Blinkbox Starts Carrying Disney Movies." *Washington Times* (Apr. 4, 2012). <https://www.washingtontimes.com/news/2012/apr/4/tescos-blinkbox-starts-carrying-disney-movies> (accessed Dec. 15, 2023); Thomson, Amy. "Tesco Abandons Video-Streaming Ambitions in Blinkbox Sale." *Bloomberg* (Jan. 8, 2015). <https://www.bloomberg.com/news/articles/2015-01-08/tesco-abandons-video-streaming-ambitions-in-blinkbox-sale?embedded-checkout=true> (accessed Dec. 15, 2023); Brian, Matt. "Tesco Has Given Up on Blinkbox." *AOL* (July 19, 2019). <https://www.aol.com/news/2015-01-26-tesco-gives-up-on-blinkbox.html> (accessed Dec. 15, 2023).

83. 

84. Arm's treatment of its licensees as separate from each other is consistent with negotiation theory and important business considerations. As described in Part III.A, negotiation theory predicts that Arm would negotiate differently with its various ALA counterparties, based on Arm's perception of the counterpart's BATNA (and therefore the ZOPA for the negotiation). Indeed, the evidence provided in Part IV confirms that Arm did in fact negotiate different ALAs with different counterparties. If there could be leakage from one ALA to another,

---



CONFIDENTIAL

due to an un-enforced or under-enforced ▮▮▮▮▮▮▮, Arm would need to negotiate based on a lowest-common-denominator perceived BATNA among all its existing and possible counterparties. This one-size-fits-all negotiation approach would shrink the ZOPA, possibly creating a no-ZOPA situation even though a ZOPA would exist in each of the tailored negotiations with individual counterparties. The result would be a significant social welfare loss compared to the situation where Arm could negotiate tailored agreements with counterparties that are protected by ▮▮▮▮▮▮▮ that effectively silo the ALAs.

85.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

86.  To summarize, negotiation theory and important business considerations dictate that a licensor should be able to keep its licensees separate from each other using separate license agreements. ▮▮▮ ▮▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

                                    CONFIDENTIAL

Arm keeps each of its ALA licenses separate from each other and maintains control of its licensing model through its ███████████████████ that require ██████████████████████████████████. If Arm's licensees were allowed to assume the benefit of another entity's license (especially if the latter's license provided for lower royalty rates), Arm's entire business model would be severely threatened.

87. Keeping licensees and customers separate is a common business practice. For example, Microsoft has different retail licensing terms (e.g., governing capacity, cost, etc.) based on whether a customer is a government organization, educational entity, or a non-profit, as well as based on institution size.[121] Similarly, Adobe offers different licensing for businesses (large enterprise companies vs. small to midsize), government, and educational institutions that differ in terms of management, billing, and other factors.[122] In general, for

---

[121] "Licensing Options for Industries—Government." *Microsoft*. <https://www.microsoft.com/en-us/licensing/licensing-programs/licensing-for-industries?activetab=licensing-for-industries-pivot:primaryr2> (accessed Dec. 15, 2023); "Licensing Options for Industries—Education." *Microsoft*. <https://www.microsoft.com/en-us/licensing/licensing-programs/licensing-for-industries?activetab=licensing-for-industries-pivot:primaryr3> (accessed Dec. 15, 2023); "Licensing Options for Industries—Nonprofit." *Microsoft*. <https://www.microsoft.com/en-us/licensing/licensing-programs/licensing-for-industries?activetab=licensing-for-industries-pivot:primaryr4> (accessed Dec. 15, 2023).

[122] Foxen, David. "Adobe Licensing Quick Guide." *ITA Asset Management*. <https://www.itassetmanagement.net/wp-content/uploads/2014/07/Adobe-Licensing-Quick-Guide.pdf> (accessed Dec. 15, 2023); Pourhadi, Soroush. "Adobe Licensing Guide." *vScope* (Aug. 12, 2019). <https://www.vscope.net/blog/adobe-licensing-guide> (accessed Dec. 15, 2023).

   CONFIDENTIAL

companies where licensing technology is critical, siloed licenses permit customer segmentation, which is a marketing tool that is taught at virtually every business school in the world.

### B. Terms That Were Considered and/or Offered Previously for a Renegotiated License Cannot Simply Be Adopted Later.

88.  In the but-for world in which Qualcomm did not allegedly breach its contractual obligations to Arm, the two parties would possibly have arrived at new licensing agreements through a renegotiation process.[123] However, the potential terms and amounts considered and/or offered by Arm previously during such a process are not necessarily appropriate later in time, particularly where the conditions and factors impacting such terms and amounts have changed considerably. This is especially true here where the original ALA between Qualcomm and Arm was entered into on September 29, 2003, and the Amended and Restated ALA was entered into on May 30, 2013, many years before Arm and Nuvia entered into their ALA.[124] Given the passage of time, there is no reason to think that Arm would have been willing to grant the same terms it provided Qualcomm to Nuvia. Given the business environment and ecosystem

---

[123] The record reflects that renegotiations were commenced, although a deal was not reached. Williamson Dep. 16:21-18:14, 162:5-163:10, 169:24-175:5 (discussing negotiations with Qualcomm over ███████████████████████████████).

[124] ███████████████████████████████████████████████████████
███████████████████████████████████

CONFIDENTIAL

in which Arm and its competitors operate, the terms and amounts that the parties may have considered at some point in time in the past may no longer be appropriate with the passage of time and cannot simply be adopted at some point in the future.

89.   In terms of negotiation theory, it is well understood that BATNAs can shift over time, which then shifts the ZOPA, which in turn affects negotiation tactics and strategy, which in turn affects negotiation outcomes. The terms that the parties would have possibly achieved at one point in time do not have predictive power for a subsequent point in time, if BATNAs or perceived BATNAs have changed.

### C. Predicting the Outcome of a Renegotiated ALA Would Be Extremely Difficult.

90.   Given that Qualcomm should have known about the ██████████████ Nuvia's licenses to Qualcomm upon its acquisition of Nuvia, Qualcomm could have renegotiated Nuvia's licenses with Arm. Consistent with the prediction, Arm attempted to "negotiate[] with Qualcomm" for "more than a year" in order to "reach an agreement regarding Qualcomm's unauthorized acquisition of

CONFIDENTIAL

Nuvia's 'in-process technologies' and license," but was unable to reach an agreement.[125]

91.   Given the complexities of this deal, predicting exactly how the deal would turn out within the ZOPA even prior to this lawsuit, and without the attendant publicly from the lawsuit, would be extremely difficult. This is particularly true here because a hypothetical re-negotiation would involve dozens of important issues (and many more less critical issues). Part III.B describes why predicting the result of a multi-issue negotiation is even more difficult than predicting the outcome of a single-issue price negotiation. For these reasons, quantitative analysis of this hypothetical would need to factor in many considerations and be subject to a large amount of uncertainty, making it difficult to assess the value of the outcome in dollar terms from Arm's perspective. In addition, any such quantitative analysis would not cover what is perhaps the most significant harm at issue here: the harm to Arm's reputation and its licensing ecosystem.[126]

---

[125]   Complaint ¶ 37. *See also* Williamson Dep. 16:21-18:14, 162:5-163:10, 169:24-175:5 (█████████████████████████████████████████████████████████████████████ █████████████████████████).

[126]   Abbey Dep. 324:2-8 ("At the end of the day, Arm's an IP company. Our confidential information, our intellectual property is so germane to what we do. █████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████ 361:12-19 ("█████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████").

CONFIDENTIAL

92. The ZOPA that may have existed previously, moreover, may no longer exist currently due to substantial changes since the parties attempted to negotiate a resolution of Qualcomm's acquisition of Nuvia and its failure to obtain consent to the assignment of Nuvia's ALA. For example, while the parties previously were negotiating only as to the benefit that would accrue to Qualcomm (i.e., the assignment of the Nuvia ALA and Qualcomm's use of Nuvia's technology developed using Arm's technology and IP under the Nuvia ALA), any such negotiation now would need to consider the harm to Arm given the public defection and breach of Arm's largest partner (Qualcomm), the impact of Qualcomm's breach on other ALA licensees and potential licensees, the potential for other ALA licensees to seek more favorable terms for themselves in view of Qualcomm's breach, and the potential for other ALA licensees to take more extreme negotiating positions given Qualcomm's breach. These factors did not exist at the time of the prior negotiation.

## D. Non-Enforcement Could Have Negative Follow-On Effects That Are Impossible to Quantify.

93. Any commercial negotiation must be considered in the broader business context. In this case, Arm is part of the wider processor and chip industries and maintains business and licensing relationships with hundreds of companies, including other large players such as Apple, Microsoft, Marvell, and

CONFIDENTIAL

Samsung.[127] Arm has also invested significantly in creating an entire ecosystem for its products, comprised of upstream IP and downstream partners and manufacturing processes.

94. Allowing noncompliance with Arm's licenses would erode authority over Arm's IP.[128] If, in the hypothetical world with a renegotiated deal between Arm and Qualcomm, Qualcomm were allowed to continue developing technology created under the Nuvia-Arm ALA, this would send a signal to the market and to Arm's other partners that Arm would not (or could not) enforce its contractually negotiated termination, change in control provisions, or other IP protections.[129] Arm's other licensees would take note and ████████████████████████

---

[127] Complaint ¶ 14; Manners, David. "ARM Adds an Architectural Licensee." *Electronics Weekly* (Apr. 21, 2015). <https://www.electronicsweekly.com/news/business/finance/arm-adds-architectural-licensee-2015-04> (accessed Sept. 11, 2023).

[128] Underscoring this general principle, Qualcomm's own representative testified that "it is important to Qualcomm that its licensees respect the terms of the license agreements that it has entered into[.]" Thompson, James. 30(b)(6) Deposition (Nov. 28, 2023) 12:6-16.

[129] Williamson Dep. 242:19-246:16 (testifying to harms to Arm from this case including "reputational damages and a fundamental long-term business challenge created ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████; stating "the impact of companies conducting action similar to this, where they breach or move outside of our existing agreements, would be significantly harmful"; and stating "[s]hould we not protect our technology, it could impact the trust that companies more broadly feel in the ARM business model and the security with which they can build their business based on ARM's technology.").

CONFIDENTIAL

 of their own agreements have no teeth.[130] These licensees may also follow Qualcomm's behavior and bypass Arm's licensing model by acquiring other ALA licensees ████████████████████ ██████████████████████████. In negotiation analytic terms, the perceived BATNA of *all* of Arm's customers and potential customers would change, to Arm's disadvantage.

95.  This effect would be magnified by the fact that Qualcomm is a large partner, comprising as much as 34 percent of the Arm-based mobile computing chip market.[131] Several other companies comprise large shares as well, including Apple.[132]

---

[130] *Id.* 237:25-238:614 ("ARM brought this lawsuit in order to protect its intellectual property rights, ensure that our contracts are enforceable and enforced and that our reputation is protected as an IP licensing business, among other things. … It is our intent that the obligations and provisions in our IP licensing deals are respected and adhered to, and that is our reason for bringing it."); Abbey Dep. 361:12-19 ("The fact of the matter is, ███████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████.").

[131] "Strategy Analytics: Headline: Qualcomm, Apple and MediaTek Dominate the Arm-based Mobile Computing Chip Market." *Business Wire* (June 16, 2022). <https://www.businesswire.com/news/home/20220616005125/en/Strategy-Analytics-Headline%C2%A0Qualcomm-Apple-and-MediaTek-Dominate-the-Arm-based-Mobile-Computing-Chip-Market> (accessed Sept. 11, 2023). *See also* Segars Dep. 12:16-13:1.

[132] "Strategy Analytics: Headline: Qualcomm, Apple and MediaTek Dominate the Arm-based Mobile Computing Chip Market." *Business Wire* (June 16, 2022). <https://www.businesswire.com/news/home/20220616005125/en/Strategy-Analytics-Headline%C2%A0Qualcomm-Apple-and-MediaTek-Dominate-the-Arm-based-Mobile-Computing-Chip-Market> (accessed Sept. 11, 2023).

CONFIDENTIAL

96. If Arm was not able to enforce its ███████████████ and require Qualcomm to ██████████████████████████████████████ ████████████████, it is therefore possible that Arm would suffer reputational consequences and other follow-on effects related to the perception of Arm's inability to enforce the very terms of its licenses. Any analysis of the impact of potential future renegotiations must include an analysis of the impact of this market signal.

97. It is also possible that continued noncompliance or a renegotiated deal could impact Arm's ventures into upstream or downstream markets. For example, a future merger with a downstream computing company could be frustrated by the reputational impact of companies assuming that Arm's upstream IP cannot be protected, which reduces Arm's financial value. The interconnected nature of Arm's partners and product ecosystem means that non-enforcement of its licensing agreement terms could have far-reaching implications.

98. Allowing Qualcomm to ignore its contractual obligation to ████████████ ██████████ ███ ███ ███████████ ████ ██ could also competitively disadvantages Arm's partners. For example, Google noted Qualcomm's acquisition as a "direct threat" because Qualcomm competes with Google in

CONFIDENTIAL

mobile.[133] Samsung further stated that it was "worrying if Arm[] will lose motivation" in the partnership partially because "[Qualcomm] will go for its own development with Nuvia acquisition."[134]

99.   The threat to Arm's business model and the harm Arm would suffer is further supported by the testimony of Arm's current CEO, Rene Haas. Mr. Haas testified that after renegotiations failed with Qualcomm, Arm was in

"███████████████████████████████████████████████████

███████████████████"[135] Mr. Haas further testified to the risks to Arm's business model of ████████████████████████████████████

████████████████████████████████████████████."[136] He also emphasized the ████████████████████████████████████████

██████

---

[133]   Email from Pieter Arnout to Chris Bergey, et al., *Google Architecture License* (Jan. 15, 2021) (ARM_01241597 at ARM_01241598).

[134]   Email from Hanseu Park to Will Abbey, *[Dear Will] Pre-meeting brief for Top meeting with S.LSI IY Kang* (Aug. 3, 2021) (ARM_01215632).

[135]   Haas, Rene. Deposition (Dec. 12, 2023) 163:15-164:13 ("We were -- we were very much in uncharted waters at this point in time. ████████████████████████████████████████ ████████████████████████████ We attempted over a number of months to find a settlement to assign a license. We did not find that settlement. We – I'll say it differently. We did not get to a ████████████████████████████████████████ ████████████████████████ So as far as evidence of being harmed, I don't even know how to quantify that, ████████████████████████████████████ ███████████████████████████████████████████████.").

[136]   *Id.* 164:15-165:1.



So let's just say Qualcomm lets other companies know that, You know what? ██ ████ ███ █ ████ ██ ██
████████████████████████████
████████████████████████████
███████████████████. [137]

100. Other testimony from current and former Arm personnel highlights the importance of Arm's business model and the effect of Qualcomm and Nuvia's actions on the Arm ecosystem. Will Abbey, Arm's Chief Commercial Officer, testified that Qualcomm using intellectual property that is unlicensed "██████ ███████████████████████" [138] Former CEO Simon Segars also testified that it "is not a five-minute exercise to assign contracts" and that licensees cannot "give their designs to somebody else." [139]

---

[137] *Id.* 165:2-15.

[138] Abbey Dep. 360:21-24 ("I think the fact that Qualcomm, they're using intellectual property that's unlicensed to them has ████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████."), 362:1-5 ("We talked about that each contracts [verbatim] that we have is unique and specific and confidential. And so, ██████████████████████.").

[139] Segars Dep. 83:14-19 ("Having worked with other licensees in similar situations, we knew that, you know, they can -- that there are going to be differences between the contracts of the acquirer and the acquiree, and that it's, you know, not a five-minute exercise to assign contracts."), 100:5-8 ("████████████████████████
██████████████.

CONFIDENTIAL

101. All of these effects represent real economic damages to Arm. However, in my opinion, these effects would be virtually impossible to quantify.

102. I understand that Qualcomm may submit expert testimony regarding the impact to Qualcomm if the termination provisions of the Nuvia ALA were enforced. I reserve the right to fully address any such expert testimony in a rebuttal or reply report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 20th day of December 2023 in Noord, Aruba.

_____

Guhan Subramanian

CONFIDENTIAL

# Appendix A

Curriculum Vitae

## Guhan Subramanian

Hauser 314                                              Baker Library 473
Harvard Law School                                     Harvard Business School
Cambridge, MA  02138                                   Boston, MA 02163

### Academic Positions Held

H. Douglas Weaver Professor of Business Law, Harvard Business School, 2007-Present

Joseph Flom Professor of Law and Business, Harvard Law School, 2004-Present

Faculty Chair, JD/MBA Program, Harvard University, 2004-Present

Faculty Chair, Program on Negotiation, Harvard Law School, 2018-Present

H. Douglas Weaver Visiting Professor of Business Law, Harvard Business School, 2006-07

Joseph Flom Assistant Professor of Law and Business, Harvard Law School, 2002-2004

Assistant Professor of Business Administration, Harvard Business School, 2001-2002

Lecturer in Business Administration, Harvard Business School, 1999-2001

### Education

J.D., *magna cum laude*, Harvard Law School, 1998.  Moot court competition winner.  Editor, Harvard Law Review.

M.B.A., Harvard Business School, 1998.

A.B., *magna cum laude* (Economics), Harvard University, 1992.  Phi Beta Kappa.  Elected undergraduate student government president.

### Books

Deals: The Economic Structure of Business Transactions (forthcoming Harvard University Press 2024) (with Michael Klausner)

Dealmaking: The New Strategy of Negotiauctions (2nd ed. 2020)

                    CONFIDENTIAL

Corporate Law (2017) (with Holger Spamann)

Commentaries and Cases on the Law of Business Organization (4th ed. 2012) (with William T. Allen & Reinier Kraakman)

Dealmaking: The New Strategy of Negotiauctions (2011)

Commentaries and Cases on the Law of Business Organization (3rd ed. 2009) (with William T. Allen & Reinier Kraakman)

Commentaries and Cases on the Law of Business Organization (2nd ed. 2007) (with William T. Allen & Reinier Kraakman)


## **Academic Articles**

Pills in a World of ESG and Activism, 1 *University of Chicago Business Law Review* 417 (2022) (with Caley Petrucci)

Freezeouts in Delaware and Around the World, 24 *University of Pennsylvania Journal of Business Law* 803 (2022)

Deals in the Time of Pandemic, 121 *Columbia Law Review* 1405 (2021) (with Caley Petrucci).

Sources of Power in Public Negotiations: A Framework Applied to Public-Public and Public-Private Negotiations, *Negotiation Journal*, (2020) (with Brian Mandell and Stephen Petraeus).

Go-Shops Revisited, 133 *Harvard Law Review* 1215 (2020) (with Annie Zhao).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2020, out of 323 articles published in that year.

Appraisal After Dell, in *The Corporate Contract in Changing Times: Is the Law Keeping Up?* (University of Chicago Press 2019).

The Effect of Prohibiting Deal Protection on M&A Activity: Evidence from the United Kingdom, 60 *Journal of Law & Economics* 1 (2017) (with Fernan Restrepo).

The New Look of Deal Protection, 69 *Stanford Law Review* 1013 (2017) (with Fernan Restrepo).

Deal Process Design in Management Buyouts, 130 *Harvard Law Review* 590 (2016).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2017, out of more than 565 articles published in that year.

Freezeouts: Doctrine & Perspectives, M&A HANDBOOK (Claire Hill & Steven Davidoff Solomon, eds.) (2016) (with Fernan Restrepo).

                    CONFIDENTIAL

The Effect of Delaware Doctrine on Freezeout Structure and Outcomes: Evidence on the Unified Approach, 5 *Harvard Business Law Review* 205 (2015) (with Fernan Restrepo).

Corporate Governance 2.0, *Harvard Business Review* (March 2015).

Delaware's Choice, *Delaware Journal of Corporate Law* 39, no.1 (Nov. 2014).  Delivered as the 29th Annual Francis G. Pileggi Distinguished Lecture in Law in Wilmington, Delaware in November 2013.  Selected by academics as one of the "top ten" articles in corporate/securities law for 2014, out of more than 525 articles published in that year

Delaware's Choice: A Brief Reply to Symposium Commentators, *Delaware Journal of Corporate Law* 39, no.1 (Nov. 2014).

Does Shareholder Proxy Access Improve Firm Value?  Evidence from the Business Roundtable Challenge, *Journal of Law & Economics* 56 no.1 (Feb. 2013) (with Bo Becker and Dan Bergstresser).

Improving Director Elections, *Harvard Business Law Review* (Fall 2012) (with Bo Becker).

A New Era for Raiders, *Harvard Business Review* (Nov. 2010).

Is Delaware's Antitakeover Statute Unconstitutional?  Evidence from 1988-2008, *The Business Lawyer* 65, no. 1 (May 2010).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2010, out of 447 articles published in that year.

Is Delaware's Antitakeover Statute Unconstitutional?  Further Evidence and a Reply to Symposium Commentators, *Business Lawyer* 65, no. 1 (May 2010).

Auction? Negotiate? A Dealmaker's Guide, *Harvard Business Review* (Dec. 2009)

Go-Shops vs. No-Shops in Private Equity Deals: Evidence and Implications, *The Business Lawyer* 63, no. 1 (2008).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2008, out of 480 articles published in that year.

The Emerging Problem of Embedded Defenses: Lessons from Air Line Pilots Ass'n Intl. v. UAL Corp., *Harvard Law Review* 120, no. 5 (March 2007).

Post-Siliconix Freeze-Outs: Theory & Evidence, *Journal of Legal Studies* 36 (Jan. 2007). Selected by academics as one of the "top ten" articles in corporate/securities law for 2007, out of 484 articles published in that year.

Oracle vs. PeopleSoft: A Case Study, *Harvard Negotiation Law Review* 12 (Winter 2007) (with D. Millstone).

Bargaining in the Shadow of PeopleSoft's (Defective) Poison Pill, *Harvard Negotiation Law Review* 12 (Winter 2007).

CONFIDENTIAL

Fixing Freezeouts, *Yale Law Journal* 115, no.1 (Oct. 2005).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2005, out of 410 articles published in that year.

Takeover Defenses and Bargaining Power, *Journal of Applied Corporate Finance* 17, no.4 (Fall 2005).

The Disappearing Delaware Effect, *Journal of Law, Economics & Organization* 20, no.1 (April 2004).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2004, out of 439 articles published in that year.

Bargaining in the Shadow of Takeover Defenses, *Yale Law Journal* 113, no.3 (Dec. 2003). Selected by academics as one of the "top ten" articles in corporate/securities law for 2004, out of 439 articles published in that year.

The Drivers of Market Efficiency in Revlon Transactions, *Journal of Corporation Law* 28, no.4 (Summer 2003).

The Trouble With Staggered Boards: A Reply to Georgeson's John Wilcox, *Corporate Governance Advisor* 10, no.6 (Nov./Dec. 2002) (with L. Bebchuk & J. Coates).

The Influence of Antitakeover Statutes on Incorporation Choice: Evidence on the "Race" Debate and Antitakeover Overreaching, *University of Pennsylvania Law Review* 150, no.6 (June 2002).

The Powerful Antitakeover Force of Staggered Boards: Further Findings and a Reply to Symposium Commentators, *Stanford Law Review* 55, no.3 (Dec. 2002) (with L. Bebchuk & J. Coates).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2003, out of 450 articles published in that year.

The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence & Policy, *Stanford Law Review* 54, no.9 (June 2002) (with L. Bebchuk & J. Coates).  Selected by academics as one of the "top ten" articles in corporate/securities law for 2002, out of 350 articles published in that year.

A Buy-Side Model of M&A Lockups: Theory and Evidence, *Stanford Law Review* 53, no.2 (Nov. 2000) (with J. Coates).   Selected by academics as one of the "top ten" articles in corporate/securities law for 2001, out of 300 articles published in that year.

A New Takeover Defense Mechanism: Using an Equal Treatment Agreement as an Alternative to the Poison Pill, *Delaware Journal of Corporate Law* 23, no.2 (1998).

Note, Using Capital Cash Flows to Value Dissenters' Shares in Appraisal Proceedings, *Harvard Law Review* 111, no.7 (May 1998).

CONFIDENTIAL

## Other Activities

Chairman of the Board, LKQ Corp. (NASDAQ: LKQ)

Faculty Chair, Advisory Committee on Shareholder Responsibility, Harvard University

Member, New York State Bar Association

## Expert Testimony (Past 5 Years)

*Vintage Rodeo Parent, LLC et al. v. Rent-A-Center, Inc.*, C.A. No. 2018-0927-SG (Del. Ch. 2019) (report & deposition)

*Wilmington Trust Co. v. Hellas Tellecommunications et al.*, Index No. 653357/2011 (NY 2019) (report & deposition)

*Glencore Canada Corp. v. H.M.Q.*, Court File No. 2014-887(IT) G (Tax Court of Canada 2019) (report & trial testimony)

*Parallax Energy LLC v. Cherniere Energy, Inc.*, NO. 14-17-00982-CV 08-13-2019 (Tx. 2019) (deposition)

*In re Versum Materials Inc. Stockholder Litig.*, C.A. No. 2019-0206-JTL (Del. Ch. 2020) (reports).

*Dillon Trust Co. LLC, et al. v. U.S.*, Nos. 17-1898T, 17-2022T, 17-2023T (reports, deposition & trial testimony) (U.S. Court of Federal Claims 2020)

*Align Technology, Inc. v. SDC Financial, LLC et al.* (Case No. 01-19-0002-0945) (Arbitration 2020) (deposition)

*The Williams Companies Stockholder Litig.*, C.A. No.2020-0707-KSJM (Del. Ch. 2020) (reports, deposition & trial testimony)

*Roofers' Pension Fund v. Joseph C. Papa, et al.*, Case No. 2:16-cv-02805-MCA-LDW (2021) (reports & deposition)

*In re WeWork Litigation*, C.A. No. 2020-0258-AGB (2021) (report & deposition)

*Matthew Sciabacucchi et al. v. Charter Communications et al.*, C.A. No. 11418-VCG (Del. Ch. 2021) (reports & deposition)

*Bergeron Environmental & Recycling, LLC vs. LGL Recycling, LLC et al.*, Case No. 16-000158 (07) (Fla. 2021) (report, deposition & trial testimony)

                CONFIDENTIAL

*In re Straight Path Communications Inc. Consol. Stockholder Litig.*, C.A. No. 2017-0486-SG (Del. Ch. 2021) (report, deposition & trial testimony)

*City of Missoula v. Carlyle Infrastructure Partners, L.P., et al*, Case No. 01-19-0000-1366 (Arbitration 2021) (report & trial testimony)

*William J. Brown v. Matterport, Inc.*, C.A. No. 2021-0595-LWW (Del. Ch. 2021) (reports, deposition & trial testimony)

*Deutsche Bank National Trust Co. v. Morgan Stanley ABS Capital, Inc.*, Case No. 651959/2013 (N.Y. 2022) (report & deposition)

*In re Cloudera Inc. Securities Litig.*, Lead Case No. 19CV348674 (Cal. 2022) (report & deposition)

*In re Tesla, Inc. Securities Litig.*, Case No. 18-cv-04865-EMC (N.D. Cal. 2022) (reports, deposition & trial testimony)

*In Re Willowbrook Ethylene Oxide Litigation*, No. 2018-L-010475 (Ill. 2022) (report, deposition & trial testimony)

*In re Columbia Pipeline Group, Inc.*, C.A. No. 2018-0484-JTL (Del. Ch. 2022) (report, deposition & trial testimony)

*DCP NGL Services, LLC, v. Anadarko Petroleum Corp. et al.*, CPR File No. G-21-54-S (Arbitration 2022) (report & deposition)

*Politan Capital Management LP v. Masimo Corp et. Al*., C.A. No. 2022-0948-NAC (Del. Ch. 2023) (reports & deposition)

*Texas Pacific Land Corp. v. Horizon Kinetics LLC*, C.A. No. 2022-1066-JTL (Del. Ch. 2023) (report, deposition & trial testimony)

*Mewawalla v. Stanley C. Middleman et al.*, C. A. No. 21-cv-09700-EMC (N. D. Cal. 2023) (report & deposition)

*Fishel et al. v. Liberty Media Corp., Sirius XM Holdings, Inc. et al.*, C.A. No. 2021-0820-KSJM (Del. Ch. 2023) (report & deposition)

*Terraform Power Parent, LLC et al. v. Orrick, Herrington & Sutcliffe LLP*, Reference No. 1425037813 (Arbitration 2023) (reports & deposition)

*Davis v. Cerberus Capital Management, LP, et al.*, Index No. 654027/2013 (NY 2023) (report & deposition)

CONFIDENTIAL

*Current thru December 19, 2023*

CONFIDENTIAL

## Appendix B

Materials Considered

# Materials Considered[1]

## Legal

Complaint. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Aug. 31, 2022).

Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Counterclaim. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 22-01146) (Sept. 30, 2022).

*In re Starz Appraisal*, No. 12968-VCG, 2018 WL 4922095 (Del. Ch. Oct. 10, 2018).

*In re Williams Cos. Stockholder Litigation*, No. 2020-0707-KSJM, 2021 WL 754593 (Feb. 26, 2021).

*SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D. Cal. 1991).

## Depositions

Abbey, Will. Deposition (Oct. 27, 2023).

Grisenthwaite, Richard. Deposition (Nov. 15, 2023).

Gulati, Manu. 30(b)(1) Deposition (Oct. 12, 2023).

Haas, Rene. Deposition (Dec. 12, 2023).

Herbert, Tim. Deposition (Oct. 25, 2023).

Segars, Simon. Deposition (Nov. 16, 2023).

Thompson, James. 30(b)(6) Deposition (Nov. 28, 2023).

Williams, Gerard III. Deposition (Nov. 3, 2023).

Williamson, Paul. Deposition (Nov. 9, 2023).

---

[1] In preparing my report, I considered the documents listed here along with any items cited or referenced in the body and footnotes of my report.

CONFIDENTIAL

## Relevant Produced Documents

### Agreements

Amended and Restated Architecture License Agreement Between Arm Limited and Microsoft Corporation (Mar. 23, 2017) (ARM_01245794).

Annex 1 to the Architecture License Agreement Between Arm Limited and NuVia, Inc (Mar. 27, 2020) (ARM_00057230).

Annex 1 to the Architecture License Agreement Between Arm Limited and Qualcomm Global Trading Pte, Ltd. (May 29, 2013) (ARM_00063298).

Architecture License Agreement ("ALA") Between Arm Limited and Qualcomm Global Trading Pte, Ltd. (May 30, 2013) (ARM_00044650).

Architecture License Agreement Between Arm Limited and Ampere Computing (Feb. 3, 2018) (ARM_01246067).

Architecture License Agreement Between Arm Limited and Google LLC (June 30, 2021) (ARM_01245727).

Architecture License Agreement Between Arm Limited and Infineon Technologies AG (Nov. 5, 2009) (ARM_01246021).

Architecture License Agreement Between Arm Limited and Samsung Electronics Company Limited (Oct. 16, 2012) (ARM_01246043).

Draft of Annex 1 to the Architecture License Agreement Between Arm Limited and NuVia, Inc (Apr. 18, 2019) (ARM_00002374).

Draft of Technology License Agreement ("ALA") Between Arm Limited and NuVia, Inc. (Apr. 16, 2019) (ARM_00002358).

Master Royalty Schedule Between Qualcomm Global Trading Pte, Ltd. and Arm Limited (May 30, 2013) (LES-LTM-20780) (ARM_01298891).

Non-Disclosure Agreement Between Arm Limited and NuVia, Inc. (Mar. 19, 2019) (ARM_00058413).

Second Amended and Restated Technology License Agreement Between Arm Limited and Avago Technologies General IP (Singapore) Pte. Ltd. (Oct. 17, 2016) (ARM_01245979).

Technology License Agreement ("ALA") Between Arm Limited and NuVia, Inc. (Sept. 27, 2019) (ARM_00059183).

Technology License Agreement Between Arm Limited and Advanced Micro Devices, Inc. (AMD) (Oct. 31, 2013) (ARM_01245673).

CONFIDENTIAL

Technology License Agreement Between Arm Limited and Fujitsu Limited (Oct. 17, 2014) (ARM_01246135).

Technology License Agreement Between Arm Limited and NVIDIA Corporation (Mar. 30, 2005) (ARM_01240449).

**Emails**

Email from Gerard Williams III to Christine Cong Tran and Tim Herbert, *ALA discussion* (Aug. 9, 2019) (ARM_00026308).

Email from Gerard Williams III to Lip-Bu Tan, *ARM latest* (June 19, 2019) (QCARM_0020011).

Email from Gerard Williams III to Lip-Bu Tan, *ARM status* (Sept. 11, 2019) (QCARM_0213867).

Email from Gerard Williams III to Simon Segars, *Re: talk* (Mar. 25, 2019) (QCARM_2422447).

Email from Gerard Williams III to Tim Herbert, *Re: License payment model* (June 21, 2019) (ARM_00025914).

Email from Gerard Williams III to Tim Herbert, *Re: License payment model* (June 21, 2019) (QCARM_0020012).

Email from Gerard Williams III to Tim Herbert, *Re: License payment model* (June 21, 2019) (QCARM_3835058).

Email from Gerard Williams III to Will Abbey, *Re: Pricing…* (Sept. 14, 2019) (ARM_00037458).

Email from Hanseu Park to Will Abbey, *[Dear Will] Pre-meeting brief for Top meeting with S.LSI IY Kang* (Aug. 3, 2021) (ARM_01215632).

Email from Manu Gulati to Lip-Bu Tan, *Austin trip and ARM updates* (June 17, 2019) (QCARM_0276442).

Email from Matthew Gretton-Dann to Gerard Williams III, et al., *Re: NDA between NuVia Inc and Arm* (Mar. 19, 2019) (ARM_00058411).

Email from Pieter Arnout to Chris Bergey, et al., *Google Architecture License* (Jan. 15, 2021) (ARM_01241597).

Email from Tim Herbert to Gerard Williams III, *ALA & v8-A Feedback* (June 14, 2019) (QCARM_2420399).

Email from Tim Herbert to Gerard Williams III, *Architecture license agreement and v8A annex* (Apr. 18, 2019) (QCARM_3315932).

CONFIDENTIAL

Emails between Tim Herbert and Gerard Williams III, *Re: License payment model* (June 21, 2019-July 7, 2019) (ARM_00025914).

Email from Will Abbey to Gerard Williams III, *Re: A big Thank You* (Sept. 30, 2019) (ARM_00003124).

**Miscellaneous**

Letter from Ziad Asghar to Paul Williamson (Jan. 27, 2021) (ARM_00063625).

Letter from Ziad Asghar to Paul Williamson (Feb. 25, 2021) (ARM_01281876).

"Licensing Discussion." *Nuvia* (Aug. 26, 2019) (QCARM_3314368).

"NuVia, Inc. a New Way of thinking." *Nuvia* (Apr. 11, 2019) (QCARM_0002581).

## Publications

Arm Holdings plc. *Amendment No. 2 to Form F-1 Registration Statement* (Sept. 5, 2023). <https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm> (accessed Dec. 14, 2023).

Börzsönyi, Blanka. "Intellectual Property Considerations in M&A Due Diligence." *Annales Universitatis Scientiarum Budapestinensis de Rolando Eötvös Nominatae* 58 (2019): 89-99.

Brian, Matt. "Tesco Has Given Up on Blinkbox." *AOL* (July 19, 2019). <https://www.aol.com/news/2015-01-26-tesco-gives-up-on-blinkbox.html> (accessed Dec. 15, 2023).

Castillo, Michelle. "Disney Will Pull Its Movies from Netflix and Start Its Own Streaming Services." *CNBC* (Aug. 8, 2017). <https://www.cnbc.com/2017/08/08/disney-will-pull-its-movies-from-netflix-and-start-its-own-streaming-services.html> (accessed Dec. 14, 2023).

Centocor/Schering-Plough Distribution Agreement (Apr. 3, 1998), attached to Schering Plough Corp. *Form 10-K* (Feb. 26, 2004).

Crabbe, Leland. "Event Risk: An Analysis of Losses to Bondholders and 'Super Poison Put' Bond Covenants." *The Journal of Finance* 46.2 (1991): 689-706.

Deakin, Michelle. "Designing the Deal." *Harvard Law Bulletin* (Sept. 1, 2005). <https://hls.harvard.edu/today/designing-the-deal> (accessed Feb. 27, 2023).

"Dear Negotiation Coach: Coping with a Change-of-Control Provision." *Harvard Program on Negotiation* (July 31, 2023). <https://www.pon.harvard.edu/daily/business-negotiations/dear-negotiation-coach-coping-with-a-change-of-control-provision-nb> (accessed Sept. 19, 2023).

CONFIDENTIAL

"Fortune 500." *Fortune* (2023). <https://fortune.com/ranking/fortune500/2023/search/?Name=lkq> (accessed June 8, 2023).

Foxen, David. "Adobe Licensing Quick Guide." *ITA Asset Management*. <https://www.itassetmanagement.net/wp-content/uploads/2014/07/Adobe-Licensing-Quick-Guide.pdf> (accessed Dec. 15, 2023).

Griffith, Sean J. and Natalia Reisel. "Dead Hand Proxy Puts and Shareholder Value." *University of Chicago Law Review* 84.3 (2017): 1027-89.

Karrass, Chester L. *Give and Take: The Complete Guide to Negotiating Strategies and Tactics*. United States: Crowell (1974).

Keizer, Gregg. "HP Must Give Up Beats Audio After Apple Deal." *Computerworld* (May 29, 2014). <https://www.computerworld.com/article/2489984/hp-must-give-up-beats-audio-after-apple-deal.html> (accessed Dec. 15, 2023).

Klausner, Michael and Guhan Subramanian. *Deals: The Economic Structure of Business Transactions.* Page Proofs. Harvard University Press, forthcoming.

Knight, Meribah. "LKQ Acquires Netherlands Auto Parts Distributor for $268 Million." *Crain's Chicago Business* (Apr. 25, 2013). <https://www.chicagobusiness.com/article/20130425/NEWS05/130429834/lkq-acquires-netherlands-auto-parts-distributor> (accessed Feb. 27, 2023).

Kumar, Kavita. "Target Is Shedding Merona and Mossimo and Adding New Brands Instead." *Los Angeles Times* (Aug. 21, 2017). <https://www.latimes.com/business/la-fi-target-merona-mossimo-20170821-story.html> (accessed Dec. 15, 2023).

*Law and Economics of Mergers and Acquisitions*. Eds. Steven Davidoff Solomon and Claire A. Hill. United Kingdom: Edward Elgar Publishing (2013).

Lax, David A. and James K. Sebenius. *The Manager as Negotiator*. New York: The Free Press (1986).

Lectures & Symposia. *Delaware Journal of Corporate Law*. <https://djcl.org/symposium-lectures> (accessed Feb. 27, 2023).

"Licensing Arm Technology: Access for Everyone." *Arm*. <https://www.arm.com/products/licensing> (accessed Sept. 12, 2023).

"Licensing Options for Industries—Education." *Microsoft*. <https://www.microsoft.com/en-us/licensing/licensing-programs/licensing-for-industries?activetab=licensing-for-industries-pivot:primaryr3> (accessed Dec. 15, 2023).

CONFIDENTIAL

"Licensing Options for Industries—Government." *Microsoft*. <https://www.microsoft.com/en-us/licensing/licensing-programs/licensing-for-industries?activetab=licensing-for-industries-pivot:primaryr2> (accessed Dec. 15, 2023).

"Licensing Options for Industries—Nonprofit." *Microsoft*. <https://www.microsoft.com/en-us/licensing/licensing-programs/licensing-for-industries?activetab=licensing-for-industries-pivot:primaryr4> (accessed Dec. 15, 2023).

"LKQ Corporation Announces Agreement to Acquire Rhiag-Inter Auto Parts Italia S.p.A." *GlobeNewswire* (Dec. 22, 2015). <https://www.globenewswire.com/news-release/2015/12/22/797609/0/en/LKQ-Corporation-Announces-Agreement-to-Acquire-Rhiag-Inter-Auto-Parts-Italia-S-p-A.html> (accessed Feb. 27. 2023).

"LKQ Corporation Announces Agreement to Acquire Stahlgruber GmbH." *GlobeNewswire* (Dec. 11, 2017). <https://www.globenewswire.com/news-release/2017/12/11/1250656/0/en/LKQ-Corporation-Announces-Agreement-to-Acquire-Stahlgruber-GmbH.html> (accessed Feb. 27, 2023).

"LKQ Corporation Enters into Definitive Agreement to Acquire Uni-Select Inc." *Uni-Select* (Feb. 27, 2023). <https://uniselect.com/content/files/LKQ-Corp-Acquisition-of-Uni-Select-Press-Release-Final.pdf> (accessed Feb. 27, 2023).

"LKQ Corporation Finalizes Acquisition of Rhiag-Inter Auto Parts Italia S.p.A." *GlobeNewswire* (Mar. 21, 2016). <https://www.globenewswire.com/news-release/2016/03/21/821696/0/en/LKQ-Corporation-Finalizes-Acquisition-of-Rhiag-Inter-Auto-Parts-Italia-S-p-A.html> (accessed Feb. 27, 2023).

"LKQ Corporation Finalizes Acquisition of Sator Beheer." *GlobeNewswire* (May 1, 2013). <https://www.globenewswire.com/news-release/2013/05/01/543410/10030936/en/%20LKQ-Corporation-Finalizes-Acquisition-of-Sator-Beheer.html> (accessed Feb. 27, 2023).

"LKQ Corporation Finalizes Acquisition of Stahlgruber GmbH." *GlobeNewswire* (May 31, 2018). <https://www.globenewswire.com/news-release/2018/05/31/1514504/0/en/LKQ-Corporation-Finalizes-Acquisition-of-STAHLGRUBER-GmbH.html> (accessed Feb. 27, 2023).

Malhotra, Deepak and Max H. Bazerman. *Negotiation Genius*. New York: Bantam Dell (2008).

Manners, David. "ARM Adds an Architectural Licensee." *Electronics Weekly* (Apr. 21, 2015). <https://www.electronicsweekly.com/news/business/finance/arm-adds-architectural-licensee-2015-04> (accessed Sept. 11, 2023).

McArdle, Elaine. "Bridging Theory and Practice in Corporate Law." *Harvard Law Bulletin* (Jan. 24, 2012). <https://hls.harvard.edu/today/bridging-theory-and-practice-in-corporate-law> (accessed Feb. 27, 2023).

Nalebuff, Barry. *Split the Pie: A Radical New Way to Negotiate.* Harper Business (2022).

CONFIDENTIAL

Nash, John. "Two-Person Cooperative Games." *Econometrica* 21.1 (1953): 128-140.

"Past Pileggi Lecture Keynote Speakers." *Delaware Journal of Corporate Law*. <https://djcl.org/home-2-2-2-2> (accessed Feb. 27, 2023).

Perkins, Christine. "Subramanian Will Succeed Mnookin as Program on Negotiation Chair." *Harvard Law Today* (Mar. 15, 2018). <https://hls.harvard.edu/today/subramanian-will-succeed-mnookin-program-negotiation-chair> (accessed Mar. 6, 2023).

"PON Global." *Harvard Program on Negotiation* (May 20, 2022). <https://web.archive.org/web/20220520141129/https://www.pon.harvard.edu/category/pon-global> (accessed Mar. 13, 2023).

Pourhadi, Soroush. "Adobe Licensing Guide." *vScope* (Aug. 12, 2019). <https://www.vscope.net/blog/adobe-licensing-guide> (accessed Dec. 15, 2023).

"Qualcomm to Acquire NUVIA." *Qualcomm* (Jan. 12, 2021). <https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia> (accessed Sept. 12, 2023).

Raiffa, Howard. *The Art and Science of Negotiation*. Cambridge, Massachusetts: The Belknap Press of Harvard University Press (1982).

Reardon, Marguerite and Shara Tibken. "The Beats Go On at HP (at Least Until 2015)." *CNET* (May 28, 2014). <https://www.cnet.com/tech/computing/the-beats-go-on-at-hp-at-least-until-2015> (accessed Dec. 15, 2023).

Reily, Stephen. "Starbucks, Kraft and the $2.7 Billion Divorce." *IMC Licensing* (Dec. 23, 2013). <https://imclicensing.com/starbucks-kraft-and-the-2-7-billion-divorce> (accessed Dec. 15, 2023).

Robehmed, Natalie. "Disney to End Distribution Agreement with Netflix, Launch Streaming Service." *Forbes* (Aug. 8, 2017). <https://www.forbes.com/sites/natalierobehmed/2017/08/08/disney-to-end-distribution-agreement-with-netflix-as-it-prepares-own-streaming-service/?sh=7486af462a98> (accessed Dec. 14, 2023).

Robins, Martin B. "Intellectual Property and Information Technology Due Diligence in Mergers and Acquisitions: A More Substantive Approach Needed." *Journal of Law, Technology and Policy* (2008): 321-356.

Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works> (accessed Sept. 12, 2023).

   CONFIDENTIAL

"Strategy Analytics: Headline: Qualcomm, Apple and MediaTek Dominate the Arm-based Mobile Computing Chip Market." *Business Wire* (June 16, 2022). <https://www.businesswire.com/news/home/20220616005125/en/Strategy-Analytics-Headline%C2%A0Qualcomm-Apple-and-MediaTek-Dominate-the-Arm-based-Mobile-Computing-Chip-Market> (accessed Sept. 11, 2023).

Subramanian, Guhan and Rhea Ghosh. "Remicade/Simponi: Legal Memorandum." *HBS Case Study N9-911-046* (July 13, 2012).

Subramanian, Guhan. "Bargaining in the Shadow of Takeover Defenses." *Yale Law Journal* 113.3 (2003): 621-686.

Subramanian, Guhan. *Dealmaking: The New Strategy of Negotiauctions, 2nd edition*. New York: W. W. Norton & Company (2020).

"Termination Clauses." *LexisNexis*. <https://www.lexisnexis.com/supp/largelaw/no-index/coronavirus/commercial-transactions/commercial-transactions-termination-clauses.pdf> (accessed Sept. 11, 2023).

"Tesco's Blinkbox Starts Carrying Disney Movies." *Washington Times* (Apr. 4, 2012). <https://www.washingtontimes.com/news/2012/apr/4/tescos-blinkbox-starts-carrying-disney-movies> (accessed Dec. 15, 2023).

"The ARM Processor Business Model." *Arm*. <https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model> (accessed Sept. 12, 2023).

Thomson, Amy. "Tesco Abandons Video-Streaming Ambitions in Blinkbox Sale." *Bloomberg* (Jan. 8, 2015). <https://www.bloomberg.com/news/articles/2015-01-08/tesco-abandons-video-streaming-ambitions-in-blinkbox-sale?embedded-checkout=true> (accessed Dec. 15, 2023).

Tyson, Mark. "Nuvia 'Clean-Sheet CPU Design' Performance Previewed." *Hexus* (Aug. 11, 2020). <https://hexus.net/tech/news/cpu/144733-nuvia-clean-sheet-cpu-design-performance-previewed> (accessed Sept. 12, 2023).

"Welcome to the Program on Negotiation (PON)." *Harvard Program on Negotiation*. <https://www.pon.harvard.edu/about> (accessed Mar. 6, 2023).

Ziobro, Paul. "Target Won't Renew U.S. License for Cherokee Brand." *The Wall Street Journal* (Sept. 10, 2015). <https://www.wsj.com/articles/target-wont-renew-u-s-license-for-cherokee-brand-1441919400> (accessed Dec. 15, 2023).

CONFIDENTIAL

# EXHIBIT 10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                          :
ARM LTD., a U.K. corporation,             :
                                          :
                 Plaintiff,               :
                                          :          Civil Action No.
           v.                             :          1:22-cv-01146
                                          :
QUALCOMM INC., a Delaware                 :
corporation, QUALCOMM                     :
TECHNOLOGIES INC., a Delaware             :
corporation, and NUVIA, INC., a           :
Delaware corporation,                     :
                                          :
                 Defendants.              :
                                          :
-----------------------------------------------------x
```

**EXPERT REPLY REPORT OF PROFESSOR GUHAN SUBRAMANIAN**

**MARCH 25, 2024**

## CONTENTS

I.   Background ..................................................................................................2

  A. Qualifications ...........................................................................................2

  B. Summary of Opinions ..............................................................................3

II.  Professor Coates' Claim That "Arm's ALAs Could Very Well Cover
     Identical Technology" Is Irrelevant. ..................................................4

III. Because the Negotiated Agreements Provided Distinct, Different Rights,
     Professor Coates Is Incorrect That Qualcomm Did Not Need to Negotiate
     with Arm Following the Nuvia Acquisition. ................................................13

IV.  Professor Coates' Distinction Between ███████████████████████
     ████████████████████ Is Wrong, Illusory, and Incoherent. ................19

V.   Professor Coates Does Not Dispute That the ███████████████████
     ████████████████████████████████████████████
     ████████████████████████████████████████████████
     ███████████████████████████████████████████
     ████████████████████████████████████...................25

VI.  Professor Coates' Own Examples and Dr. Kennedy's Failure to Quantify
     Damages Demonstrate Why Damages Here Could Not Be Calculated
     with Reasonable Certainty. ..............................................................30

## I.   BACKGROUND

### A. Qualifications

1.   I serve as the H. Douglas Weaver Professor of Business Law at the Harvard Business School ("HBS") and the Joseph Flom Professor of Law and Business at the Harvard Law School ("HLS"). I hold degrees in Economics, Law, and Business from Harvard University. On December 20, 2023, I submitted an expert report in the above-captioned matter (the "Original Report").[1] My background, qualifications, and compensation are set forth in my Original Report, and my Curriculum Vitae, which includes a complete listing of my academic publications and expert witness testimony over the past five years, is attached as **Appendix A** of the Original Report.[2]

2.   Since filing the Original Report, I have reviewed the reports submitted by Professor John Coates and Dr. Patrick Kennedy on behalf of Qualcomm and Nuvia.[3] I have been asked by counsel for Arm, Morrison & Foerster LLP, to

---

[1]   Capitalized terms used herein, but not otherwise defined, have the meanings assigned to them in my Original Report.

[2]   Since filing the Original Report I was deposed in *Sjunde Ap-Fonden v. The Goldman Sachs Group, Inc. et al.* (S.D.N.Y. No. 18-cv-12084) (2024). I also have two new forthcoming papers: ESG Amnesia in M&A Deals, *Journal of Corporation Law* (forthcoming 2025) (with Caley Petrucci); and Redemption Mechanisms in Poison Pills: Evidence on Pill Design and Law Firm Effects, *The Business Lawyer* (forthcoming 2025) (with Olivier Baum).

[3]   Expert Rebuttal Report of Prof. John Coates. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Feb. 27, 2024) ("Coates Report"); Expert Report of Patrick F. Kennedy, Ph.D. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Feb. 27, 2024) ("Kennedy Report").

assess the arguments and claims of Professor Coates and Dr. Kennedy as they relate to the opinions I put forth and the topics discussed in my Original Report. Nothing contained in those reports causes me to reconsider or change any of the conclusions that I reached in the Original Report, and I affirm those conclusions in this reply report (the "Reply Report").

3.     A complete list of the documents and data that I rely upon in reaching my conclusions in this matter is provided in **Appendix A**: *Materials Considered*.

4.     I hold the opinions stated in this report with a reasonable degree of professional certainty. I reserve the right to amend or supplement my opinions and report, if appropriate, based on any additional discovery, or in response to opinions or reports of other experts in this matter.

## B. Summary of Opinions

5.     Based on my review of the Coates Report and the Kennedy Report, I conclude that:

- Professor Coates' claim that ███████████████████████ ███████████" is irrelevant.

- Because the negotiated agreements provided distinct, different rights, Professor Coates is incorrect that Qualcomm did not need to negotiate with Arm following the Nuvia acquisition.

- Professor Coates' distinction between ███████████████████ ████████████████ is wrong, illusory, and incoherent.

- Professor Coates does not dispute that the plain language of the Nuvia ALA ███████████████████████████████████████████████████ ████████████████████████████. Contrary to Professor Coates' assertion, this would include ███████████████████████████████████ ████████████████████████████████████████.

- Professor Coates' own examples and Dr. Kennedy's failure to quantify damages demonstrate why damages here could not be calculated with reasonable certainty.

6.    I explain these conclusions in the remainder of this report.[4]


## II.   PROFESSOR COATES' CLAIM THAT "ARM'S ALAS COULD VERY WELL COVER IDENTICAL TECHNOLOGY" IS IRRELEVANT.

7.    In the Original Report, I observed that Arm negotiated different ALAs with

Qualcomm and Nuvia. I provided examples of the differences between the

Qualcomm and Nuvia ALAs, including ███████████████████████████████

███████████.[5] I concluded that "[t]he uniqueness of these contracts, as well as their

individualized provisions, indicates that each was the product of negotiations

between the parties and Arm, and as such, each reflects the deliberate intentions

and expectations of Qualcomm or Nuvia, respectively."[6]

---

[4]    The opinions described herein are not exhaustive of all the errors and incorrect assertions Professor Coates makes in his report.

[5]    Original Report at Table 1.

[6]    *Id*. ¶ 63.

8.    Professor Coates does not challenge this straightforward conclusion. Instead, he engages in an effort to distract:

> Professor Subramanian … reviewed nine of ARM's at least 17 ALAs with parties other than Qualcomm and NUVIA that are listed on ARM's ALA redaction log. It is not clear why Professor Subramanian chose not to review *all* ARM's ALAs or how he selected the ALAs he reviewed.[7]

9.    According to Professor Coates, this alleged "review of incomplete and redacted contracts … precludes Professor Subramanian from offering any reliable assessment as to the degree of individualization in ARM ALAs at large."[8]

10.    Professor Coates apparently misunderstands the purpose of my review. These nine additional ALAs are documents that I "[c]onsidered" in my analysis.[9] I found that these ALAs were instructive examples of how



[10] I did not make any claims in my Original Report about how these nine additional ALAs may have been negotiated or whether they covered identical or different technology, and they

---

[7]    Coates Report ¶ 82 (emphasis in original).

[8]    *Id.* ¶ 83.

[9]    *See* Original Report at Appendix B ("Materials Considered").

[10]    *See Id.* ¶¶ 67-69, 71.

are not relevant for my conclusion that the Qualcomm and Nuvia ALAs each were "the product of negotiations … and as such, each reflects the deliberate intentions and expectations of Qualcomm or Nuvia, respectively."[11] This conclusion is consistent with the evidentiary record regarding the negotiation of the Qualcomm ALA in 2013 and the later negotiation of the Nuvia ALA in 2019.[12] Professor Coates' attempt to attack my methodology is nothing more than an effort to distract from this straightforward conclusion.[13]

11. Notably, Professor Coates does not identify a single ALA that challenges or contradicts my analysis, i.e., that demonstrates a lack of individualization in Arm's ALAs. Presumably, if Professor Coates had reviewed Arm's ALAs and found some to be indistinguishable, he would have put this forward in his arguments. His inability to cite *any* contract that lacks "highly individualized terms"[14] is a glaring omission in his analysis.

---

[11]   *Id*. ¶ 63.

[12]   I discuss documents and testimony relating to the unique negotiation considerations of the Nuvia and Qualcomm ALAs in my Original Report. *See id*. ¶¶ 27-29, 63-65.

[13]   Professor Coates also notes that the Annex 1 is redacted in these nine other agreements, suggesting—without basis—that the information in those redactions might have affected my analysis. He states: "My understanding from counsel is that ARM has not produced unredacted versions of these contracts. Because I have not been able to review these provisions, I am unable to evaluate how the redacted provisions would affect Professor Subramanian's analysis of ARM's ALAs or other issues in his report." Coates Report ¶ 82. I can answer Professor Coates' question: the redacted provisions of the other ALAs have nothing to do with my conclusion that the Qualcomm and Nuvia ALAs were the product of negotiations and business objectives of Qualcomm or Nuvia, respectively.

[14]   *See* Coates Report ¶ 80.

12. Professor Coates ignores the discussion in my Original Report that Arm's ALAs limit the license to the Arm Technology delivered by Arm to the licensee under that *particular* license.[15] An ALA licensee is licensed only to what is delivered by Arm under that contract to that licensee, but Professor Coates assumes that an ALA provides some level of a generic license to Arm Technology, which is inconsistent with the relevant deposition testimony from Arm personnel.[16]

13. The fact that the Qualcomm and Nuvia ALAs are different confirms that they cover different implementations of Arm technology, as set forth in my Original Report.[17] This conclusion is further supported by the fact that they have

---

[15] Original Report ¶ 83.

[16] *See, e.g.*, Abbey, Will. Deposition (Oct. 27, 2023) ("Abbey Dep.") 144:6-145:2 ("█████████ ████████████████████ I don't know what I would have thought back in 2021, but what I know for a fact is that that's not something that we would support."); Segars, Simon. Deposition ("Segars Dep.") (Nov. 16, 2023) 100:5-8 ("And, you know, █████████ ███████████████████████████████████████████"); Williamson, Paul. Deposition ("Williamson Dep.") (Nov. 9, 2023) 73:4-11 ("So it was my understanding and it is reiterated here that the ████████████████████████████."); Haas, Rene. Deposition (Dec. 12, 2023) ("Haas Dep.") 99:23-100:15 ("I think from a broad standpoint, the -- the way to think about it is that the ███████████████████████████████. And for those rights to go just gratis over into another acquiring company could potentially be interpreted as a ██████████████████████████. So it's fairly common practice in the industry for this to happen.").

[17] Original Report ¶¶ 58-66.

██████████████████████████████████████████ Nevertheless, Professor Coates speculates that "████████████████████████████████████████ ██████████." [19] In light of the significant differences of the rights granted between the Nuvia and Qualcomm ALAs, his speculation that the ALAs ████████ ████████████████████████" has the same logical structure as the possibility that I "could very well" write songs like Taylor Swift. [20]

14. Even if one were to accept Professor Coates' speculation that the Nuvia and Qualcomm ALAs ████████████████████," that does not mean that the ████████████████████████████████████████████████ ████████████████████ On the contrary, ████████████████████████

---

[18]   ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

[19]   Coates Report ¶ 87. *See also id.* ¶ 89 ("While they are not identical agreements, Professor Subramanian fails to acknowledge that parts of the agreements, including ████████ ████████████, are the same, and therefore that ARM's intentions and expectations, which presumably ████████████████████████████████████, are, at least in part, the same in both agreements."). This is an inconsequential observation that can be reduced to the tautological fact that both ALAs are, by definition, agreements for the licensee to use Arm architecture technologies; this does not imply that these ALAs or any ALAs are interchangeable.

[20]   A similar flaw undermines Professor Coates' claim that the case studies cited in my Original Report are inapplicable to my conclusion that the ████████████████████████████████████. *Id.* ¶¶ 135-38. Professor Coates relies on mischaracterizations such as his misguided argument that the Qualcomm and Nuvia ALAs might cover identical technology in his attempt to distinguish these case studies. As I discussed in my Original Report, the case studies discussed in my original report remain applicable.



This simple fact renders Professor Coates' claim that the ALAs ▮▮▮▮▮▮▮▮▮▮ irrelevant, because the royalty rates for this allegedly ▮▮▮▮▮▮▮ were ▮▮▮▮ as were the relevant rights.

15. Differences in core contract terms like royalties reflect different negotiated deals between each of the parties, which would not be interchangeable in terms of business objectives. Negotiation theory posits that such differences would have resulted from the different scope of each collaboration, the different starting negotiating postures (including the BATNA) and bargaining power of Nuvia and Qualcomm, respectively, and/or trades across other issues that Nuvia or Qualcomm made with Arm to arrive at the final unique mix of contract terms.[23]

---

[21] Original Report ¶ 62.

[22] *Id.*

[23] *See, e.g.*, Klausner, Michael and Guhan Subramanian. *Deals: The Economic Structure of Business Transactions.* Page Proofs. Harvard University Press, forthcoming ("Deals") at 9-10, 15 (ARM_01431858 at ARM_01431876-77, ARM_01431882). Professor Coates alleges that this analysis is meant to "supply the meaning of contracts after they have been agreed to by parties" Coates Report ¶ 76, and that I "tr[y] to use principles of negotiation theory and

16. Moreover, even if the Nuvia and Qualcomm ALAs "cover[ed] identical technology" at some level of abstraction, notwithstanding ██████████ ████████████████████,[24] the plain words in the contracts ████ ████████████████████████████████████████████████████ █████████████████████ Most relevant for present purposes, █████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

transactional practice to interpret a contract in a way that would usurp the role of the court to interpret the contract" and opine on "the intentions of the parties[.]" Coates Report ¶ 19. These claims are wrong. My usage of the principles of negotiation theory and transactional practice is not meant to interpret the Nuvia or Qualcomm ALAs in any legal sense, but rather to analyze the business objectives and negotiations that led to the plain language of the contract provisions and, from that perspective, analyze the reasons why certain IP protections would have been in place for the parties.

[24] ████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████
██ ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████ Original Report ¶ 83.

██████ This means that even if the ALAs "████████████████████████

████████," as Professor Coates claims, the plain language of the contract

states that ██████████████████████████████████████

████████  ████████  ██████  ████████  █  ████████  ████

████████████████████████████████████████████. These

conclusions are consistent with the relevant deposition testimony.[27] Professor

Coates fails to acknowledge that, as set forth in my Original Report, Arm's

ALAs limit the license to ████████████████████████████

████████████████████████████████████████████

████████████████████.[28] For this reason, Professor Coates' suggestion

that the ALAs ████████████████████ is irrelevant.

17.  Professor Coates blurs the important distinction between the intellectual

property ("IP") covered under the contracts and Arm's instruction set

---

[26] ████████████████████████████████████████████
████████████████████████████████████████████
████████

[27] *See, e.g.*, Segars Dep. 100:5-8 ("And, you know, at a high level, ████████████
████████████████████████████); Abbey Dep. 144:6-145:2 ("[W]hat I do know is that
you ████████████████████████████████████████
████████."); Williamson Dep. 73:4-11 ("So it was my understanding and it is reiterated
here that the Nuvia ALA ████████████████████████"); Haas Dep. 99:23-100:15 ("I
think from a broad standpoint, the -- the way to think about it is that the license rights ████
████████████████████. And for those rights to go just gratis over into another
acquiring company could potentially be ████████████████████████████
████████████ So it's fairly common practice in the industry for this to happen.").

[28] Original Report ¶ 83.

-11-

architecture ("ISA"), one component of that IP.[29] While Professor Coates observes that both the Nuvia and Qualcomm ALAs ████████████████ ████████████████████,[30] this observation is not informative as to the parties' rights under their respective licenses. To see the point, I highly doubt that, prior to Qualcomm's acquisition of Nuvia, Professor Coates would have claimed that Qualcomm had a right to use Nuvia's Arm-compliant designs, simply because ████████████████████. Knowing that the two ALAs did not have such overlap prior to the acquisition, Professor Coates has no basis to assume that the Nuvia ALA contained nothing of value to assign to Qualcomm, let alone did not require assignment.[31]

18.   Finally, Professor Coates' claim that the ALAs ████████████████ ███████" is flatly contradicted by the actions of the parties. Professor Coates provides a detailed account of the negotiations between Qualcomm and Arm over the Nuvia ALA following Qualcomm's acquisition of Nuvia.[32] None of

---

[29]   *See, e.g.*, Coates Report ¶¶ 88-89.

[30]   *Id*. ¶ 37.

[31]   *See id*. ¶¶ 88-89, 94, 117 ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████

[32]   *Id*. ¶¶ 52-67.

these negotiations would be necessary if the ALAs 

I now examine this negotiation between Qualcomm and Arm in more detail.

### III. BECAUSE THE NEGOTIATED AGREEMENTS PROVIDED DISTINCT, DIFFERENT RIGHTS, PROFESSOR COATES IS INCORRECT THAT QUALCOMM DID NOT NEED TO NEGOTIATE WITH ARM FOLLOWING THE NUVIA ACQUISITION.

19. 

As a result of these factors, Qualcomm and Arm negotiated at length over possible terms that would have permitted Qualcomm to continue using the Arm technology in Nuvia applications.[35]

20. Professor Coates provides an extensive account of these negotiations in his report. [36] He tries to obfuscate the situation by describing the fact that

---

[33] Original Report ¶¶ 58-66.

[34] *Id*.

[35] *Id*. ¶¶ 70-76.

[36] Coates Report ¶¶ 52-67.

"Qualcomm and ARM continued to communicate," there was "communication" between the parties, that Qualcomm had "communications with ARM around the time of the NUVIA acquisition," and that "conversations between the parties did not advance," but he eventually concedes that these "communications" and "conversations" were in fact "[n]egotiations."[37] The fact that Qualcomm perceived the need to negotiate with Arm directly contradicts Professor Coates' suggestion that the ALAs ███████████ ██████████.

21. Professor Coates also asserts that "Qualcomm's existing ALA with ARM meant that ███████████████████████████████████████████ ██████████ NUVIA."[38] If Professor Coates is simply claiming that Qualcomm did not need to acquire Nuvia, then I agree; nothing required Qualcomm to acquire Nuvia. However, if Professor Coates is claiming that, because (in his opinion) "ARM's ALAs ███████████████████████████████,"[39] that Qualcomm could use the Arm technology in Nuvia products without Arm's approval, that is a stunning and unsupported claim. It contains no analysis of the contracts or the businesses; it requires technical expertise that Professor

---

[37] *See id.* ¶¶ 54, 56, 63, 67, 94.

[38] *Id.* ¶ 117.

[39] *Id.* ¶ 87.

Coates does not claim to have; and it is directly contradicted by the contractual terms that Professor Coates cites in his report and the deposition testimony from the relevant Arm personnel.[40]

22.   The idea that Qualcomm did not need to negotiate with Arm is also directly contradicted by the contemporaneous statements of the parties. I summarized some of these statements in my Original Report.[41] For example,



Professor Coates ignores this overwhelming evidence of the need to negotiate—from Nuvia itself—that directly contradicts

---

[40]   *See, e.g.*, Segars Dep. 100:5-8; Abbey Dep. 144:6-145:2; Williamson Dep. 73:4-11; Haas Dep. 99:23-100:15.

[41]   Original Report ¶¶ 72-76.

[42]   

[43]

[44]

his suggestion that Qualcomm did not need to negotiate for the right to use Arm technology in Nuvia products.

23.  In order to avoid these facts, Professor Coates claims that parties can have lots of reasons to negotiate even if they do not have to:

> [P]arties may seek consent for a number of other reasons, including, for example, to manage the potential risk of tensions with a counterparty that has or might assert rights under contracts that do not include provisions addressing all possible contingencies, to convey efforts to cooperate, to update and reset overall terms governing an ongoing commercial relationship, or to expand, contract, or right-size terms and conditions for both parties.[45]

24.  All of these possible reasons to negotiate are speculation, with no basis in the record. And the actual record is clear that Qualcomm negotiated with Arm because it had to.[46]

25.  Professor Coates' speculation about alternative reasons to negotiate is also irrelevant. All of these possible reasons would seek to achieve a better outcome than one's BATNA. However, these reasons do not change the BATNA itself. The BATNA in this case, based on the record demonstrating the business

---

[45]  Coates Report ¶¶ 94-95. Presumably arguing in the alternative, Professor Coates argues that "negotiation theory and transactional practice are not relevant in a contract dispute[.]" *Id*. ¶ 75. This facially absurd claim would render *any* analysis related to contract negotiation—including Professor Coates' own—inapplicable in this matter, or indeed any contractual dispute matter. Contrary to Professor Coates' claim, the negotiation theory that underpins the Qualcomm and Nuvia ALAs can shed light on the business justifications and processes that resulted in each ALA.

[46]  *See supra* ¶ 22, n. 41-44.

context of the Nuvia ALA contract, is that Qualcomm could not use the Arm technology in Nuvia products without getting Arm's consent. This is reflected, among other things, by the fact ███████████████████████████████

████████████████████████████████████████████████████

███████████ Professor Coates' claim is yet again an effort to distract from this basic point.

26. Despite his claims suggesting it was unnecessary and meaningless for Qualcomm to negotiate, Professor Coates attempts to draw unsupported conclusions from Arm's negotiating posture, noting that Arm did not immediately terminate Nuvia's ALA upon its acquisition and claiming that Arm would "seek to protect its rights more promptly" if it were "concerned about improper usage of its technology[.]"[48] For Professor Coates to penalize Arm for attempting to cooperate and re-negotiate a license agreement with Qualcomm rather than immediately resort to costly litigation, while simultaneously claiming that Qualcomm's willingness to negotiate means nothing, is a double standard of the highest order. The far simpler explanation, supported by the principles of negotiation theory, is that both sides were willing

---

[47] ████████████ ███ ███████ ████ ██ ████ █ ██ ██████ ████ ████ █ ██████ ███ ██
████████████████████████████████████████████████████
[48] Coates Report ¶ 118.

to negotiate because there was a ZOPA representing value to be claimed between them. Specifically, Qualcomm could structure a deal allowing it to license the valuable Arm-based Nuvia technology, and Arm could avoid the cost and relationship damage of having to protect its IP in court.

27. Additionally, I also disagree with Professor Coates' assertion that my application of negotiation theory is irrelevant to the Nuvia ALA with respect to the consent to the assignment provision because certain employees may have believed they could not "unreasonably withhold" consent. [49] Yet again, Professor Coates mischaracterizes the evidence. He claims that "ARM's own employees believed such a requirement existed," but in fact he cites to only one Arm employee (who was not an attorney), and this employee was merely responding to an assertion by Qualcomm that background California law added a reasonableness requirement. [50] In any event, as I discussed in my Original Report, the absence of the "may not be unreasonably withheld" clause is a licensor-friendly feature and would have provided more bargaining leverage to Arm in the case of a subsequent acquiror of Nuvia (such as Qualcomm). I also reviewed other ALAs Arm entered into with ███████████████████

---

[49] *Id*. ¶ 147.

[50] *Id.* n. 246.

███████ which were separately negotiated and included the "may not be unreasonably withheld" clause.[51]

## IV.   PROFESSOR COATES' DISTINCTION BETWEEN ███████ █ ███████ ███████ █ ███████████████████ IS WRONG, ILLUSORY, AND INCOHERENT.

28.   Professor Coates draws an artificial and incorrect distinction between ███ ███████████████████ Specifically, he asserts that ███ ███████████ "only have consequences for the contract in which the provision appears" and "are intended to protect against transfers of (or transfers of rights under) those contracts themselves,"[52] while ███████ "give one party a right to veto, approve, or derive specific payouts (such as in a buy-sell arrangement, or a buyout option) upon the event of a change in control for the other contractual party."[53] Even if this distinction were correct (it is not), it is a straw man. No one is arguing that Arm had the right to ███████████ ███████ of Nuvia.[54] Yet again, his analysis is an effort to complicate and obfuscate the basic facts.

---

51   Original Report ¶¶ 57, 68-69.
52   Coates Report ¶ 101.
53   *Id*. ¶ 100.
54   *Id*. ¶ 103.

29.    Contrary to Professor Coates' suggestion, he and I agree 

Professor Coates nevertheless attempts the following sleight-of-hand:

> No experienced M&A professional would treat an
> 
> . As such,
> an anti-assignment provision would not customarily be expected to
> imply, much less explicitly grant, the right to secure an injunction to
> block a transaction. … Professor Subramanian's failure to
> distinguish between change-in-control and anti-assignment
> provisions appears to imply that
> [56]

30.    This is a straw-man argument: no one is arguing that Arm had the right to "secure an injunction to block" Qualcomm's acquisition of Nuvia or that "ARM was entitled to prohibit Qualcomm's acquisition of NUVIA." [57] Professor Coates' insinuation that I say this is simply wrong.

31.    The straw man arises from Professor Coates' misunderstanding of CIC provisions. He claims that [redacted] "give one party a right to veto" a

---

[55]   *See, e.g.*, Original Report ¶¶ 54, 60.

[56]   Coates Report ¶¶ 103, 120.

[57]   *Id.*

transaction,[58] "customarily give a contract party a true property right capable of effectively blocking an acquisition,"[59] and "can provide rights to effectively block or veto a change in control[.]"[60] This is wrong. Professor Coates provides no support for what he claims all "experienced M&A professional[s]" allegedly know about ███████████ [61] because there is none. ████████████ do not necessarily or even customarily give veto rights; they simply, as here, trigger certain rights and obligations of the contracting parties. Morgan Lewis, for example, states: "██████████████████████████

████████████████████████████████████████

██████████████████████████████." [62] The Practical Law Institute similarly defines a ████████████████████████████

██████████████████████████████████████

██████████████████████████████

---

58  *Id*. ¶ 100.

59  *Id*.

60  *Id*. ¶ 105. If Professor Coates is merely arguing that the consequence of some ███████████ can be so onerous as to block a change of control, as a practical matter, then he and I have no disagreement. But that is not the case with the ████████████ because Qualcomm acquired Nuvia.

61  *See id*. ¶ 103.

62  Perry, Jessica and Jared Wilkerson. "Real-World Litigation Impacts of Contract Clauses in Energy Contracts: Defining Change of Control Provisions Favorably." *Morgan Lewis* (Mar. 29, 2023). <https://www.morganlewis.com/blogs/powerandpipes/2023/03/real-world-litigation-impacts-of-contract-clauses-in-energy-contracts-defining-change-of-control-provisions-favorably> (accessed Mar. 4, 2024).

████████████ ■ Under these definitions, ██████████████████████

█████████████████████████████n, as it is customarily understood

in transactional practice and in the negotiations literature. And, in any event,

the label used for the ██████████████████████████████████

████████████ does not change the functional analysis of that provision.

32. Professor Coates contrasts his "veto right" and "right to secure an injunction to

block a transaction" that allegedly arises from a ███████████████████

████████████████████████████ "Broad veto rights over change of

control are not customarily understood from anti-assignment clauses, even if

they contain a transactional trigger."[64] This is correct. But no one is claiming

that the ███████████████████████████████████████████

███████████████████████████████████████████.[65] Instead, what

the █████████████████████ *does* do is prevent third parties such as

Qualcomm from using the Arm technology contained in Nuvia products

---

[63]   "Change of Control Clause." *Practical Law*. <https://uk.practicallaw.thomsonreuters.com/0-382-3325?transitionType=Default&contextData=(sc.Default)&firstPage=true>   (accessed Mar. 4, 2024).

[64]   Coates Report ¶¶ 101, 103.

[65]   Similarly, Professor Coates quotes research from Ayotte and Hansmann stating: "If the counterparty to a contract with a corporation *wishes to limit the persons to whom ownership or control of the corporation can be sold*, it must do this through specific language to that effect in the contract[.]" *Id.* ¶ 105 (emphasis added). I do not disagree with this straightforward assertion, and it does not change my analysis of the ████████████████████████ ████████████████████████

without getting Arm's approval first, in part because Arm could terminate the

Nuvia agreements (as it did) in the absence of consent to assignment.[66]

33.  Even the "leading practitioners"[67] who Professor Coates cites make the same

point. Professor Coates quotes an article by two partners from Skadden Arps

for the proposition that a "common misconception in drafting and interpreting

contracts" is that "████████████████████████████████████

████████"[68] But here is what the quoted language says in full:

████████████████████████████████████████

████████████████████████████

██████████████████. However, prohibitions on changes of
control are likely not implied from a simple ████████████████
… Restrictions on changes of control must therefore be separately
addressed. A change-of-control provision gives a party[] certain
rights in connection with the other party's transaction. Although
some ██████████████████ purport to void the transaction,
the more direct approach is to provide that a change of control is
equivalent to a material breach of the agreement or grounds for
termination, or both.[69]

---

[66]  As I described in my Original Report, ██████████████████ are common ways for
businesses to protect against situations where an acquisition of a licensee would be used by the
acquiring company to bypass the licensor's licensing framework and gain access to licensed
technology by acquiring the licensee. Original Report ¶ 42. That is, ██████████████
████████████████████████████████████████████
██████████████████████████████

[67]  Coates Report ¶ 106.

[68]  *Id.*

[69]  Ziff, Elaine D. and John G. Deming. "IP Licenses: Restrictions on Assignment and Change of
Control." *Practical Law Company* (2012). <https://www.skadden.com/-
/media/Files/Publications/2012/02/Publications2679_0.pdf?sc_lang=en> (accessed Mar. 4,
2024) at 10, cited in Coates Report ¶ 106.

34. In other words: if you want to give one party a veto right over a change of control, you must do so explicitly. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ do not do this on their own; instead, they simply ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, where further change-in-control language may be added to restrict assignment upon a change of control (▮▮▮▮▮▮▮▮▮▮▮). I agree with this commonsense point. Professor Coates' insinuation that I succumb to a "common misconception" that an anti-assignment clause prohibits a change of control is simply wrong. Nowhere do I say this in the Original Report, and Professor Coates provides no such citation to support his insinuation.

35. When boiled down to its essence, Professor Coates' argument seems to be as follows: (1) ▮▮▮▮▮▮▮▮ permit one or both parties to veto a change of control at the other; (2) I am confusing a ▮▮▮▮▮▮▮ with an ▮▮▮▮▮▮▮▮▮▮ (3) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮; and (4) because of this difference, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ None of these points are correct; and, even if they were, this distillation reveals the incoherence of the argument. The artificial and incorrect difference that Professor Coates claims between ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ is yet again nothing more than an effort to distract from the plain language of the contracts.

**V.    PROFESSOR COATES DOES NOT DISPUTE THAT THE** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



36.    In yet another straw-man attack, Professor Coates repeatedly claims that I argue that Arm's ALA with Nuvia prevents Qualcomm from using Arm technology in its own products, pursuant to its own ALA with Arm.[70]

37.    This is an egregious mischaracterization of my report. No one is claiming that Qualcomm cannot use Arm's technology delivered under Qualcomm's ALA in Qualcomm's products. Instead, Professor Coates and I agree that ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ As described in the Original Report, there are sound business

---

70    *See, e.g.*, Coates Report ¶¶ 92, 120.

71    *Id*. ¶¶ 29, 125 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

reasons for requiring the ██████████████████████████████████ ████████████[72]

38. One such reason that I described is to protect against situations "where an acquisition of a licensee would … dramatically change the scope of rights or obligations between the licensor and licensee[.]"[73] Professor Coates insists that this motivation cannot apply in this context because, according to him, there is nothing to "support the notion that there has been any change, let alone a dramatic change, in the scope of rights and obligations as between ARM and Qualcomm" with the Nuvia acquisition.[74]

39. Professor Coates is incorrect. In the Original Report, I described how the anticipated business context was vastly different for Nuvia and Qualcomm's agreements, with the negotiated terms reflecting Nuvia's more limited market scope. [75] Professor Coates admits as much when he states that his

---

[72]  Original Report Section VI.A.

[73]  *Id*. ¶ 42.

[74]  Coates Report ¶ 112.

[75]  Original Report ¶¶ 27, 65; Segars Dep. 113:24-115:17 (discussing how the royalty rates under Nuvia's and Qualcomm's ALAs differed and stating that "the agreement between Arm and NuVia [] anticipated fees and royalties based on what NuVia were intending to do."); Herbert, Tim. Deposition (Oct. 25, 2023) ("Herbert Dep.") 318:7-18 (reading from a document discussing "Nuvia/Qualcomm Plans" that "[Arm] discounted the ALA license fee to Nuvia because they had a limited scope, if Qualcomm wants to expand the usage to other markets, we expect to be renumerated."); Williamson Dep. 38:23-39:24 (testifying that Qualcomm's acquisition of Nuvia "could result in the core being deployed in any number of markets" including those beyond the originally anticipated market of cloud server designs), 62:24-63:24

"understanding is that the 'expected work scope' of the NUVIA ALA was limited to NUVIA's design of a CPU for use in a system on a chip for the server market" while "the 'expected work scope' of the Qualcomm ALA did not appear to be limited to a specific market, such as the server market" and indeed included "custom CPUs for the mobile market" in "contrast" to Nuvia's work.[76] Professor Coates appears to have misunderstood my argument, given that he agrees with it. The expected work scope for Nuvia's collaboration with Arm was different than the expected work scope for Qualcomm's collaboration with Arm at the time that each company's ALAs were negotiated and drafted, prior to the Nuvia acquisition. These differences would be reflected in the different

---

(testifying that the Qualcomm ALA was agreed to in 2013 and that by 2021 [when Nuvia was acquired], it was "a very different time in the relationship and market").

[76] Coates Report ¶¶ 113-14.

negotiations that occurred,[77] which produced different and non-interchangeable

licensing agreements.[78]

40. On the ███████████████████████████████, Professor Coates

yet again mischaracterizes my report, claiming that I assert that Arm and Nuvia

---

[77] I reiterate that Nuvia negotiators understood this fact at the time of negotiations with Arm and testified that the Nuvia ALA reflected Nuvia's unique start-up position. ██████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████

[78] Professor Coates also waves away negotiation differences relating to Nuvia's status as a start-up by insisting that Arm could have included a ████████████████████████
██████████████████████████ Coates Report ¶¶ 115-16. This logical fallacy—that Arm could not structure a contract to protect its IP in the event of a change of control of Nuvia without bargaining for an absurdly broad right to veto any proposed acquisition of Nuvia—ignores the fact that more tailored solutions were available to Arm, such as the anti-assignment clause and transactional trigger it eventually included, and ignores the real negotiating differences that resulted from Nuvia's unique business context, such as its status as a start-up. *See* Original Report ¶¶ 63-64.

"agree[d] to a ████████████████████████████████████

██████████ ██ ██ ████████ ████████████ ███████████ ██ ██████ █

███████████████████████████████[79] Yet again, this is an absurd claim. No one is claiming that, upon a change in control, Nuvia must stop using its own technology that does not fall within the ████████████████

███████████████████████████. Instead, the plain language of the Nuvia ALA requires ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████ ██████████████████████████████████████████

█████████ ██ ████████ ██ ████████ ██ █████████ ████████ █

████████████

---

[79]  Coates Report ¶ 146 (emphasis added).

[80]  *Id.* ¶¶ 29, 125 ████████████████████████████

[81]  Original Report Section VI.A.

41.  Professor Coates further asserts that the technology developed by Nuvia ███████ ████████████████████ would not be subject to ██████████████████ ████████████ ████████████ ████████ ██████████████████████ ████████ But this claim ignores the plain language of ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Put simply, ownership does not provide a blanket exception to contractual commitments or other legal obligations (e.g., many companies are enjoined from using or selling products, notwithstanding their ownership of those products, based on an injunction against patent infringement).

## VI.  PROFESSOR COATES' OWN EXAMPLES AND DR. KENNEDY'S FAILURE TO QUANTIFY DAMAGES DEMONSTRATE WHY DAMAGES HERE COULD NOT BE CALCULATED WITH REASONABLE CERTAINTY.

42.  Professor Coates argues in his report that the outcome of a hypothetical renegotiation between Qualcomm and Arm over the licensing issues at hand is

---

[82]  Coates Report ¶ 123.

not necessarily "'extremely difficult' to predict."[83] He provides examples of other contexts in which estimation is performed that lacks "great precision" or is "inherently imprecise," such as valuing a business or determining damages for a hypothetical unspecified litigation.[84]

43. While I agree that valuation is an imperfect science, Professor Coates' examples relate to arenas wherein the prediction or estimation of an exact value is possible based on established methodologies, whether from specific techniques such as a "'discounted cash flow' valuation technique"[85] or because the harm in a hypothetical litigation is readily quantifiable.[86] Notably, he does not offer *any* examples of predicting the outcome of a multi-issue negotiation between sophisticated parties.

---

[83]  *Id.* ¶¶ 142-44.

[84]  *Id.* ¶¶ 140-41 ("[B]usinesses are nonetheless routinely capable of being valued quantitatively without requiring that one identify a specific value 'with great precision.' Consider the standard and well-accepted 'discounted cash flow' valuation technique of projecting future cash flows and discounting those cash flows to present value using an estimated cost of capital."; "[I]nitial estimates of any loss or form of damage (at the time of a contract signing, and often at the time of breach) are inherently imprecise because they are estimates of counterfactuals[.] … [T]here are ways to arrive at an understanding of how to value a provision or to say that this is a reasonable range of outcomes. Courts do this all the time.").

[85]  *Id.* ¶ 140.

[86]  *Id.* ¶ 141.

44. Under certain assumptions, negotiation theory provides an average prediction for single-issue negotiations, namely the midpoint of the ZOPA.[87] However, negotiation theory does not provide a prediction for multi-issue negotiations,[88] such as the hypothetical Arm-Qualcomm renegotiation.

45. The difficulty of predicting the outcome of this renegotiation is particularly high because over two years have passed since the breakdown of negotiations in this matter, making it even more inappropriate to use any proposals from the parties' previous talks to inform a current prediction, and that negotiation turned primarily on the benefit to Qualcomm, rather than the harm to Arm if Qualcomm proceeded without a license, thereby undermining Arm's licensing program. In particular, unlike the initial negotiation, a hypothetical renegotiation would have to account for the possibility that Arm's business model is threatened by a perceived weakening in its IP protection.[89, 90] Professor

---

[87] Subramanian, Guhan. *Dealmaking: The New Strategy of Negotiauctions, 2nd edition*. New York: W. W. Norton & Company (2020) at 18.

[88] Graphically, the outcome of a multi-issue negotiation can fall anywhere in the green shaded area of Figure 2 in my Original Report ¶ 39.

[89] *See* Original Report ¶¶ 92-101.

[90] Professor Coates also contends that "[g]iven that almost one year passed from the NUVIA acquisition and ARM's termination of the NUVIA ALA, ███████████████ ████████████████████████████████████████████ ████████" Coates Report ¶ 91. Professor Coates' argument completely ignores that such a consequence is inherently tied to the outcome of this publicized litigation, which is of course still pending.

Coates contends that "ARM would have taken into account [these considerations] at the time of the parties' prior negotiation" and incorporated them into the BATNA.[91] This is a non sequitur; even if Arm had been thinking ahead to these possibilities if negotiations failed (a contention for which Professor Coates offers no support) it does not mean that these possibilities were baked into the numbers at the time, let alone could be quantified today. For example, while Arm might have contemplated "the possibility that Arm would trigger the [termination] provision if a renegotiated deal over the Nuvia licenses could not be completed,"[92] Arm could not have known that Qualcomm would challenge Arm's rights in exercising the ██████████████████ ██████████, and thus would not have priced that impact into its position at the time.

46. Another of Qualcomm's experts, Dr. Patrick F. Kennedy, also denies that the harm to Arm from a threat to its product ecosystem is difficult to quantify,[93]

---

[91]   *Id*. ¶ 144.

[92]   Original Report ¶ 71, quoted in Coates Report ¶ 144.

[93]   Kennedy Report ¶¶ 213-214.

instead asserting that "Arm's damages in this matter can be calculated with reasonable certainty."[94, 95]

47. Despite this claim that damages *can* be calculated, Dr. Kennedy does not attempt to *actually* calculate damages in this matter. In fact, Dr. Kennedy does not even provide a description of a methodology he would use to calculate damages. These are glaring omissions, because Dr. Kennedy's "professional experience includes assessing economic damages within and outside of the litigation environment."[96] If damages were readily calculable in this case, as Professor Coates and Dr. Kennedy claim, one would think that Dr. Kennedy would have done so, in view of his background and professional experience, or, at the very least, provided a roadmap to doing so.

48. Dr. Kennedy's claims ignore the high degree of uncertainty associated with the outcome of a hypothetical renegotiated deal. In fact, nowhere in Dr. Kennedy's report does he consider negotiation theory at all. As such, even putting aside the documented impossibility of pinpointing the outcome of a multi-issue negotiation, Dr. Kennedy's arguments are incapable of informing a reader

---

[94] *Id.* ¶ 214.

[95] Dr. Kennedy disagrees with my conclusions "[f]or the reasons discussed in detail in the preceding sections of this report," but does not explicitly address any of the points I made in my Original Report, instead responding to another expert entirely. *Id.* As such, I respond to his central conclusions to the extent they relate to my analysis of a hypothetical renegotiated deal.

[96] *Id.* ¶ 4.

where within the wide ZOPA between Qualcomm and Arm a renegotiated deal might end up.

49. Dr. Kennedy asserts without any basis in negotiation theory that "[t]hese commercial negotiations [between Qualcomm and Arm, following the Nuvia acquisition] address issues at play in this litigation, and, therefore, demonstrate that Arm has been able to attach a monetary value to the issues in this litigation."[97] In doing so, Dr. Kennedy inappropriately conflates a non-final proposal from one party during an on-going negotiation under different circumstances prior to termination with the final outcome of a negotiation. Dr. Kennedy also fails to consider the difficult-to-quantify factors of reputational harm, threats to Arm's product ecosystem, and similar issues would not have been in play at the time of such offers two years ago, before the parties reached an impasse and Arm terminated the relevant agreements, but would have to be incorporated into the BATNA of a currently re-negotiated deal now that this case has gone to litigation based on Qualcomm's flouting of its termination obligations and threats to Arm's licensing programs.[98] Because Dr. Kennedy fails to apply the principles of negotiation theory relevant to understanding a

---

[97] *Id.* ¶ 83.

[98] In the Original Report, I documented how Arm's reputation and licensing ecosystem would be damaged if it fails to protect its IP in this matter, based on testimony from Arm employees and relevant industry contextual factors. *See* Original Report ¶¶ 91, 93-100.

hypothetical renegotiation between Arm and Qualcomm, his conclusions are unsupported.

Dated March 25, 2024

_____

Guhan Subramanian

## Appendix A

Materials Considered

# Materials Considered[1]

## Expert Reports

Expert Rebuttal Report of Prof. John Coates. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Feb. 27, 2024).

Expert Report of Patrick F. Kennedy, Ph.D. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Feb. 27, 2024).

Expert Report of Professor Guhan Subramanian. *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Dec. 20, 2023).

## Depositions

Abbey, Will. Deposition (Oct. 27, 2023).

Gulati, Manu. 30(b)(1) Deposition (Oct. 12, 2023).

Haas, Rene. Deposition (Dec. 12, 2023).

Herbert, Tim. Deposition (Oct. 25, 2023).

Segars, Simon. Deposition (Nov. 16, 2023).

Williams, Gerard III. Deposition (Nov. 3, 2023).

Williamson, Paul. Deposition (Nov. 9, 2023).

## Relevant Produced Documents

### Agreements

Annex 1 to the Architecture License Agreement Between Arm Limited and NuVia, Inc (Mar. 27, 2020) (ARM_00057230).

Annex 1 to the Architecture License Agreement Between Arm Limited and Qualcomm Global Trading Pte, Ltd. (May 29, 2013) (ARM_00063298).

Master Royalty Schedule Between Qualcomm Global Trading Pte, Ltd. and Arm Limited (May 30, 2013) (LES-LTM-20780) (ARM_01298891).

Technology License Agreement ("ALA") Between Arm Limited and NuVia, Inc. (Sept. 27, 2019) (ARM_00059183).

---

[1] In preparing my report, I considered the documents listed here along with any items cited or referenced in the body and footnotes of my report.

   HIGHLY CONFIDENTIAL

**Emails**

Email from Gerard Williams III to Lip-Bu Tan, *ARM latest* (June 19, 2019)
(QCARM_0020011).

Email from Gerard Williams III to Tim Herbert, *Re: License payment model* (June 21, 2019)
(QCARM_0020012).

**Miscellaneous**

Klausner, Michael and Guhan Subramanian. *Deals: The Economic Structure of Business Transactions.* Page Proofs. Harvard University Press, forthcoming (ARM_01431858).

## Publications

"Change of Control Clause." *Practical Law*. <https://uk.practicallaw.thomsonreuters.com/0-382-3325?transitionType=Default&contextData=(sc.Default)&firstPage=true> (accessed Mar. 4, 2024).

Perry, Jessica and Jared Wilkerson. "Real-World Litigation Impacts of Contract Clauses in Energy Contracts: Defining Change of Control Provisions Favorably." *Morgan Lewis* (Mar. 29, 2023). <https://www.morganlewis.com/blogs/powerandpipes/2023/03/real-world-litigation-impacts-of-contract-clauses-in-energy-contracts-defining-change-of-control-provisions-favorably> (accessed Mar. 4, 2024).

Subramanian, Guhan. *Dealmaking: The New Strategy of Negotiauctions, 2nd edition*. New York: W. W. Norton & Company (2020).

Ziff, Elaine D. and John G. Deming. "IP Licenses: Restrictions on Assignment and Change of Control." *Practical Law Company* (2012). <https://www.skadden.com/-/media/Files/Publications/2012/02/Publications2679_0.pdf?sc_lang=en> (accessed Mar. 4, 2024).

HIGHLY CONFIDENTIAL

# EXHIBIT 11

ATTORNEYS EYES ONLY

Page 1

1

2             UNITED STATES DISTRICT COURT

3               FOR THE DISTRICT OF DELAWARE

4                      ---oOo---

5    ARM LTD., a UK Corporation,    )

6                      Plaintiff,  )

7             vs.                   )  C.A. No.

8    QUALCOMM INC., a Delaware      )  22-1146 (MN)

9    corporation; QUALCOMM          )

10   TECHNOLOGIES, INC., a Delaware )

11   Corporation, and NUVIA, INC.,  )

12   a Delaware Corporation,        )

13                     Defendants. )

14   ------------------------------)

15

16        A T T O R N E Y'S   E Y E S   O N L Y

17

18          Videotaped deposition of GUHAN

19      SUBRAMANIAN, taken on behalf of the

20      Defendant, pursuant to Notice, on

21      Thursday, April 18, 2024, at Morrison

22      & Foerster LLP, 250 West 55th Street,

23      New York, New York beginning at 9:08

24      a.m., and    ending at 5:24 p.m.,

25      before ERICA RUGGIERI, CSR, RPR, CLR.

ATTORNEYS EYES ONLY

Page 2

1
2  A P P E A R A N C E S :
3
4  FOR THE PLAINTIFF:
5  MORRISON & FOERSTER LLP
6    BY:  SCOTT LLEWELLYN, Esq.
7  4200 Republic Plaza
8  300 17th Street
9  Denver, Colorado 80202
10  303.592.2204
11  sllewellyn@mofo.com
12
13  FOR THE DEFENDANT:
14  PAUL WEISS LLP
15    BY:  ERIN J. MORGAN, ESQ.
16      SAMANTHA MEHRING, ESQ.
17  1285 Avenue of the Americas
18  New York, New York 10019
19  emorgan@paulweiss.com
20  smehring@paulweiss.com
21
22  ALSO PRESENT:
23  NATHANIEL ARMSTRONG, Videographer
24
25

Page 4

1
2      The location of today's
3  deposition is Morrison & Foerster
4  LLP located at 250 West 55th
5  Street, New York, New York.
6      I am not authorized to
7  administer an oath.  I am not
8  related to any party in this
9  action, nor am I financially
10  interested in the outcome.
11      If there are any objections to
12  proceeding, please state them at
13  the time of your appearance.
14      Counsel and all present,
15  including remotely, will now state
16  their appearance and affiliation
17  for the record beginning with the
18  noticing attorney.
19      MS. MORGAN:  Hi, I'm Erin
20  Morgan from Paul Weiss representing
21  the defendants and I'm here with my
22  colleague Samantha Mehring, also
23  from Paul Weiss.
24      MR. LLEWELLYN:  Scott
25  Llewellyn, Morrison Foerster for

Page 3

1
2      THE VIDEOGRAPHER:  We are now
3  on the record.  Good morning.  The
4  time is 9:08 a.m. on April 18,
5  2024.
6      Please note that the
7  microphones are sensitive and may
8  pick up whispering and private
9  conversations.  Please mute your
10  cell phones at this time.  Video
11  recording will continue to take
12  place unless all parties agree to
13  go off on the record.
14      This is media unit one of the
15  video recorded deposition of Guhan
16  Subramanian taken in the matter of
17  Arm LTD versus Qualcomm, Inc., et
18  al., filed in the United States
19  District Court, District of
20  Delaware Case No. 1:22-CV-011460.
21      My name is Nathaniel Armstrong
22  representing Veritext and I am the
23  videographer.  The court reporter
24  is Erica Ruggieri from the firm
25  Veritext.

Page 5

1  SUBRAMANIAN - ATTORNEY'S EYES ONLY
2  Arm.
3      THE VIDEOGRAPHER:  Thank you.
4  Will the court reporter please
5  swear or affirm the witness.
6  G U H A N   S U B R A M A N I A N,
7  called as a witness, having been
8  duly sworn by a Notary Public, was
9  examined and testified as follows:
10  EXAMINATION BY
11  MS. MORGAN:
12    Q.  Good morning,
13  Mr. Subramanian.
14    A.  Good morning.
15    Q.  Am I pronouncing your name
16  correctly?
17    A.  Yes.
18    Q.  Okay.  You've been deposed
19  a few times before, right?
20    A.  Yes.
21    Q.  Approximately how many
22  times?
23    A.  In my 25 years on the
24  faculty probably 90 to a hundred
25  times.

2 (Pages 2 - 5)

ATTORNEYS EYES ONLY

Page 186

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2  things.  It's a hypothetical.  For
3  example, I might not have understood
4  some of the context or negotiation
5  principles just might not be
6  relevant in this particular
7  situation or the parties in the room
8  were not acting consistent with
9  those negotiation principles.
10      The principles I'm offering
11  are considered to be customary
12  practice or best practice.  So if a
13  party in the room was acting not
14  consistent with those principles,
15  that might explain it as well.
16      Q.  Your second opinion is:
17  "Due diligence in an M&A transaction
18  typically involves an examination of
19  license agreements.  Consistent with
20  norms in transactional practice
21  Qualcomm and NuVia seems to be aware
22  of the CIC provisions in the ALAs."
23      Did I read that correctly?
24      A.  Yes.
25      Q.  When you are referring to

Page 187

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2  the ALAs, you are just talking about
3  the NuVia ALA, right?
4      A.  In this particular sentence
5  that's, I think, what I'm referring
6  to, yes, the NuVia ALA.
7      Q.  Okay.  Let's look at
8  ▬▬▬▬▬ again.  You have the
9  contract there and the exhibit I
10  believe is QX 209.
11      A.  Yes.
12      Q.  Are you on ▬▬▬▬ ?
13      A.  Yes.
14      Q.  Is it your position that
15  the language of this position is
16  clear?
17      MR. LLEWELLYN:  Objection,
18  form.
19      A.  That sounds like a contract
20  interpretation question and I'm not
21  expressing opinions about contract
22  interpretation.
23      Q.  If you look at paragraph 54
24  of your report.  Do you see that?
25      A.  Yes.

Page 188

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2      Q.  The second sentence of this
3  paragraph says:  "▬▬
   ▬▬▬▬▬▬▬▬▬▬▬▬▬
   ▬▬▬▬▬▬▬▬
   ▬▬▬▬▬▬
7      Do you see that?
8      A.  Yes.
9      Q.  Okay.  So do you agree then
10  that the language in this provision
11  is clear?
12      A.  Well, I think it's clear in
13  the sense of the words say what they
14  say.  I'm not expressing an opinion
15  about the interpretation of these
16  words, but the words seem to be
17  clear.
18      Q.  And you wrote in your
19  report that the agreement is clear
20  and specific?
21      A.  Yes.  But that's not meant
22  to be a contract interpretation
23  point.
24      Q.  There's deposition
25  testimony in this case about the due

Page 189

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2  diligence process that occurred in
3  connection with the NuVia
4  acquisition, right?
5      A.  That seems possible, yes.
6      Q.  You don't know?
7      A.  I don't recall as I sit
8  here, no.
9      Q.  There are witnesses in the
10  case that participated in due
11  diligence, right?
12      MR. LLEWELLYN:  Objection.
13      A.  I don't recall.
14      Q.  Do you have any reason to
15  doubt that there are witnesses in
16  this case who participated in due
17  diligence related to the NuVia
18  acquisition?
19      A.  No.
20      Q.  Why is it necessary to give
21  an expert opinion that due diligence
22  in an M&A transaction typically
23  involves an examination of license
24  agreements when there are witnesses
25  in this case that can just tell you

48 (Pages 186 - 189)

ATTORNEYS EYES ONLY

Page 190

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1   what the due diligence of the NuVia
2   acquisition entailed?
3   acquisition entailed?
4       MR. LLEWELLYN:  Objection,
5   form.
6       A.  Your question is why is it
7   relevant, is that your question?
8       Q.  No.  Why is it necessary to
9   give an expert opinion that due
10  diligence -- what typically happens
11  in due diligence when it's knowable
12  what actually happened in the due
13  diligence here?
14      MR. LLEWELLYN:  Objection to
15  form.
16      A.  I think it might be
17  relevant for the finder of fact to
18  be aware of what's custom and
19  practice in terms of due diligence.
20  So for example, if the Qualcomm
21  individual said we had no idea that
22  this ALA ████████████
    ██   █████████, a judge or jury could say
24  well, is that common, does that
25  happen.  And I think my answer would

Page 191

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2   be no, that's not very common, it
3   doesn't happen that often,
4   especially between sophisticated
5   parties like NuVia and Qualcomm.  So
6   that might be relevant in assessing
7   testimony by either Qualcomm or
8   NuVia individuals.
9       Q.  Okay.  You also state here
10  Qualcomm and NuVia seems to be aware
11  of ███████████.
12      A.  Can you direct me where I
13  say that?
14      Q.  Yeah.  It's in the -- it's
15  in your opinion that I just read.
16  "Consistent with norms and
17  transactional practice, Qualcomm and
18  NuVia seems to be aware of the
    ██  ████████████."
20      A.  Yes.
21      Q.  How did you determine that
22  Qualcomm and NuVia seems to be
23  aware?
24      A.  Well, in my analysis as
25  described in paragraph 72 and

Page 192

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2   following in my original report.  Do
3   you want me to summarize that?
4       Q.  Sure.
5       A.  On the NuVia side you've
6   got Mr. Williams saying pretty
7   clearly: ████████████████
    ████████████████████████████
    ████████████████████████
    ████████████."
11      So that seems pretty clear
12  that NuVia knew through its CEO.
13      And then on the Qualcomm
14  side my analysis is described in
15  paragraph 73-74.  I can again
16  summarize that if you want.
17      Q.  Sure.
18      A.  So paragraph 74, I'll start
19  with that.  Qualcomm said we want
20  to: "...work with the Arm team to
21  complete any necessary annexes."
22      And then in paragraph 73 it
23  describes how Qualcomm asked that
24  Arm consent to the transfer.
25      So it would seem logical

Page 193

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2   that Qualcomm knew because they
3   acted consistent with the fact that
4   Qualcomm knew.
5       Q.  So the portion of your
6   opinion that it says Qualcomm and
7   NuVia seemed to be aware of the ████
    ██  ██████████ is based on your review
9   of record evidence?
10      A.  Correct.
11      Q.  Let's look at Opinion 3
12  which says:  "Consistent with the
13  business objectives of ████████
    ██  ████████████ and negotiation
15  principles, the ██████
    ██  ████████s in the Arm NuVia ALA
17  required ███████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████
    ████████████████████
22  Without the ██████████████████████
23  the ████  provisions would be
24  ineffectual."
25      Are the ██████████████

49 (Pages 190 - 193)

ATTORNEYS EYES ONLY

Page 194

1  SUBRAMANIAN - ATTORNEY'S EYES ONLY
2  ████████ you are referring to
3  ████████ of the NuVia ALA?
4      A.  I think that's certainly an
5  important part, yes.  It's the way
6  to enforce essentially ███ of the
7  ALA.
8      Q.  So just, I'm just trying to
9  understand what you are referring to
10  with the language termination
11  provisions.  Are you specifically
12  referring to ███ or are you
13  referring to ███ and ███ together?
14      A.  I'm referring to ███ as an
15  enforcement mechanism for ███.
16      Q.  Got it.  Will you take a
17  look at ████████ in the NuVia
18  ALA, which is QX 209.
19      A.  Okay.
20      Q.  Have you reviewed this
21  provision before?
22      A.  Yes.
23      Q.  Is it your position that
24  the language of this provision is
25  clear?

Page 195

1  SUBRAMANIAN - ATTORNEY'S EYES ONLY
2      MR. LLEWELLYN:  Objection,
3  form.
4      A.  That does sound like a
5  contract interpretation question and
6  I'm not expressing opinions about
7  contract interpretation.
8      Q.  If you look at paragraph 40
9  of your reply report.
10      A.  Okay.
11      Q.  And you go over to page 29.
12      A.  Okay.
13      Q.  You say:  "No one is
14  claiming that upon a change in
15  control NuVia must stop using its
16  own technology that does not fall
17  within the scope of the termination
18  provisions, discontinuance and
19  destruction requirements.  Instead
20  the plain language of the NuVia ALA
21  requires that it," and then you
22  describe the language.
23      In this paragraph are you
24  stating that you think this
25  provision is clear?

Page 196

1  SUBRAMANIAN - ATTORNEY'S EYES ONLY
2      MR. LLEWELLYN:  Objection to
3  form.
4      A.  Again, I think that's a
5  contract interpretation question.
6  In this paragraph I'm responding to
7  a specific claim of what Professor
8  Coates says that I am saying in my
9  original report.  And basically he's
10  saying that under my theory NuVia
11  has got to destroy everything that
12  it owns in terms of technology,
13  regardless of whether it comes from
14  Arm or not.  And I do think it's an
15  absurd claim.  I never say that in
16  my report.  Professor Coates does
17  not cite any place where I say that.
18  And it wouldn't make any sense.  So
19  I'm simply responding to Professor
20  Coates in this particular paragraph.
21      Q.  Okay.  But when you use the
22  words "plain language," are you
23  saying that you think that the
24  provision is clear?
25      A.  I'm not.  I'm responding to

Page 197

1  SUBRAMANIAN - ATTORNEY'S EYES ONLY
2  Professor Coates.  I can read the
3  words, but the question of contract
4  interpretation is for the court to
5  determine.  All I'm saying in this
6  sentence is Professor Coates says
7  that I say that you got to destroy
8  everything.  And it's clear that no,
9  ████████████████████
10  ██ ████████████  That's
11  what this provision says.  So I'm
12  responding to Professor Coates's
13  absurd claim by just quoting the
14  language back to him.
15      Q.  Looking at ████████, is
16  there anything in this provision
17  that's unclear to you?
18      MR. LLEWELLYN:  Objection to
19  form.
20      A.  I'm not expressing a formal
21  opinion about the language of the
22  contract.  If you want, I can try to
23  answer your question but
24  understanding that it's not part of
25  my assignment.

50 (Pages 194 - 197)

ATTORNEYS EYES ONLY

Page 390

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2      Q.  91.
3      A.  Okay, what's the question?
4      Q.  I'll just read it to you.
5  Part 3B describes "...why predicting
6  the result of a multi issue
7  negotiation is even more difficult
8  than predicting the outcome of a
9  single issue price negotiation.  For
10  these reasons quantitative analysis
11  of this hypothetical would need to
12  factor in many considerations and be
13  subject to a large amount of
14  uncertainty making it difficult to
15  assess the value of the outcome in
16  dollar terms from Arm's
17  perspective."
18      Do you see that?
19      A.  Yes.
20      Q.  What do you mean by from
21  Arm's perspective?
22      A.  I think that phrase could
23  be stricken.  It's true generally.
24  It's also true from Arm's
25  perspective.

Page 391

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2      Q.  Does every sophisticated
3  large business to business contract
4  involve a multi-issue negotiation?
5      MR. LLEWELLYN:  Objection to
6  form.
7      A.  Yes.  I think that's fair.
8  Although the price term can be more
9  important in certain kinds of deals
10  than in other kinds of deals, but
11  it's almost never just a price
12  negotiation.
13      Q.  You say essentially in your
14  report that it's incredibly
15  difficult or impossible to predict
16  the outcome of a multi-issue
17  negotiation with certainty, right?
18      A.  Correct.
19      Q.  Does that mean that you can
20  never estimate damages in a breach
21  of contract case involving a
22  multi-issue negotiation?
23      A.  No.
24      MR. LLEWELLYN:  Objection to
25  form.

Page 392

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2      Q.  Why does it not mean that?
3      A.  Well, I said it earlier.
4  In many cases price is the most
5  important issue and so you can get a
6  pretty good estimate with some error
7  term on what the price would have
8  been but-for the breach.  So for
9  example.  In a freeze-out
10  transaction the controlling
11  shareholder pays X dollars per
12  share.  There's other issues in a
13  typical freeze-out, but price is the
14  most important issue.  And if there
15  was a deficiency in that process, a
16  court with reasonable confidence
17  could measure the magnitude of the
18  damages to the, in this case,
19  minority shareholders.
20      Q.  And in this case you don't
21  think price is the most important
22  issue in the ALAs?
23      A.  Well, when you say price,
24  there's different elements of price.
25  So I mentioned the freeze-out.  In a

Page 393

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2  freeze-out there is a single price
3  per share.  That's a number.
4      Q.  Right.
5      A.  Here as it says in Table 1
6  there's an ██████████████,
7  that's a price but it's payable over
8  a certain amount of time.  There's a
9  royalty rate which is a variable
10  number.  So unlike a freeze-out even
11  the ████████████████████████
12  ██ ██████████████.
13      Q.  Do you think that those
14  ████████████ are the most important
15  issue in the ALA?
16      MR. LLEWELLYN:  Objection to
17  form.
18      A.  I don't know.  Price is
19  certainly an important issue in most
20  negotiations, but it would require
21  technical expertise for me to know
22  whether the price was the most
23  important issue here.  It seems the
24  technology, especially from the
25  NuVia perspective is just as

99 (Pages 390 - 393)

ATTORNEYS EYES ONLY

Page 394

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1 SUBRAMANIAN - ATTORNEY'S EYES ONLY
2 important as the ███████ but
3 that's not with any basis in the
4 underlying technology.
5    Q.  You didn't look at any of
6 the financial proposals that were
7 made in the negotiations between
8 Qualcomm and Arm, right?
9    MR. LLEWELLYN:  Objection,
10 form.
11    A.  Between Qualcomm and Arm in
12 2021?
13    Q.  Yes.
14    A.  It's possible I did.  I
15 don't recall.
16    Q.  None of them are listed in
17 your materials considered, right?
18    A.  Okay.
19    Q.  Are you aware that the only
20 elements of those proposals were
21 licensing fees and royalty fees?
22    A.  Okay, are you asserting
23 that?
24    Q.  I'm asking if you are aware
25 of that.

Page 395

1 SUBRAMANIAN - ATTORNEY'S EYES ONLY
2    A.  It's possible that I
3 reviewed those documents, but I
4 don't recall as I sit here now.
5    Q.  In paragraph 92 you state:
6 "There have been substantial changes
7 since the parties attempted to
8 negotiate a resolution of Qualcomm's
9 acquisition of NuVia and ███████
███ ██████████████████████████
12 "
13    Do you see that?
13    A.  Is that the first sentence
14 in '92?
15    Q.  Yeah.
16    A.  Okay.  I can read that
17 first sentence, yes.
18    Q.  And then the substantial
19 changes that you are referring to I
20 think are list of harms to Arm that
21 are in rest of this paragraph.  Is
22 that what you are talking about when
23 you refer to substantial changes?
24    A.  I think that's part of it.
25 The harm to Arm, the public breach

Page 396

1 SUBRAMANIAN - ATTORNEY'S EYES ONLY
2 by Qualcomm, the potential impact on
3 other Arm customers, the general
4 ecosystem in which Arm operates, all
5 those are potential issues that
6 would have to be considered now that
7 were not the case in 2021.
8    Q.  Okay.  Do you understand
9 that Arm has actually suffered harm
10 as a result of Qualcomm's conduct
11 with the issue in this case?
12    MR. LLEWELLYN:  Objection to
13 form.
14    A.  Well, Arm is suing Qualcomm
15 so I would infer that they think
16 they have been harmed.
17    Q.  Okay.  But are you aware of
18 whether any actual harm has actually
19 occurred?
20    MR. LLEWELLYN:  Objection,
21 form.
22    A.  I have not done any kind of
23 independent assessment of that
24 question.
25    Q.  The harms that are listed

Page 397

1 SUBRAMANIAN - ATTORNEY'S EYES ONLY
2 here in your paragraph 92 are ███████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
14    Do you see that?
15    A.  Yes.
16    Q.  Do you know today if there
17 has been any impact of Qualcomm's
18 breach on other ALA licensees and
19 potential licensees?
20    A.  I have not done any
21 analysis along those lines for the
22 reason that it's outside the scope
23 of my report and also outside the
24 scope of my expertise.  I'm not a
25 technology expert.

100 (Pages 394 - 397)

ATTORNEYS EYES ONLY

Page 398

SUBRAMANIAN - ATTORNEY'S EYES ONLY
1
2     Q.  Do you know if any ALA
3   licensees have taken more extreme
4   negotiation positions given
5   Qualcomm's breach?
6     A.  I don't.  But this point is
7   about the potential for such
8   renegotiations, which in itself is
9   an injury.
10    Q.  In the sentence above this
11  list of harms which starts with the
12  words "For example," you say:  "For
13  example, while the parties
14  previously were negotiating only as
15  to the benefit that would accrue to
16  Qualcomm, i.e.
17  ███████████████████████████
18  ███████████████████████████
19
20  █   ███████████
21         And then you go on to
22  describe, you know, that now any
23  negotiation would have to consider
24  all these different harms.
25         What is the basis for your

Page 400

1   SUBRAMANIAN - ATTORNEY'S EYES ONLY
2     Q.  If all of these other
3   things that you are saying have to
4   be considered have not happened,
5   then is Arm in a different position
6   than it was in before?
7     MR. LLEWELLYN:  Objection to
8   form.
9     A.  Well, there's a next
10  paragraph, 93, and so those are also
11  cause to harm the overall ecosystem.
12  Those would have to be considered as
13  well.  So are you saying none of
14  those happened either?
15    Q.  Yeah, I'm saying if none of
16  those happened, then Arm is still in
17  the same position it was in, right?
18    A.  This is what I said before.
19  I think there's a potential for
20  these things to happen and that in
21  itself is an injury.  So for
22  example, an Arm licensee says I
23  don't need you to renegotiate these
24  terms but I want this other stuff
25  and I know that I could go sell

Page 399

1   SUBRAMANIAN - ATTORNEY'S EYES ONLY
2   statement that the parties were only
3   negotiating about the benefit to
4   Qualcomm?
5     A.  It's not meant to be a
6   formal opinion, but clearly Qualcomm
7   was trying to get the benefit of the
8   Arm technology in the NuVia
9   applications.  That is a benefit to
10  Qualcomm.
11    Q.  And was there no benefit to
12  Arm that was being negotiated as
13  part of the discussions?
14    A.  No.  I think that's a fair
15  point.  There's also a benefit to
16  Arm if that negotiation were
17  successful.  I think the point of
18  this only is to say in contrast to
19  that benefit to the parties jointly
20  there's now a whole bunch of other
21  stuff that has to be considered.  So
22  the reference is to the joint
23  benefit but then there's a whole
24  bunch of stuff now that would have
25  to be considered.

Page 401

1   SUBRAMANIAN - ATTORNEY'S EYES ONLY
2   myself to Qualcomm and they are just
3   going to breach the ██████████████
4   █████████████  So here's what I want
5   from you Arm.  And that threat could
6   extract concessions from Arm which
7   we would never see in a public way
8   or even in a private way for that
9   matter.
10    Q.  In paragraph 94 you say:
11  "Allowing noncompliance with Arm's
12  licenses would erode authority over
13  Arm's IP."
14  ██████████████████████████
15  ████████████████████████████
16  ██████████████████████████████
17
18    A.  Other than the current
19  matter?
20    Q.  Are you saying the fact
21  that Arm sued Qualcomm ████████████
22  ████████████████████████
23    A.  At least as regarded by
24  Arm, yes.
25    Q.  Anything else?

101 (Pages 398 - 401)

ATTORNEYS EYES ONLY

Page 402

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2    A.  I think this next part is
3    critical. ████████████
     ████████████████████
     ████████████████████
     ████████████████       So that in
8    itself would be a cost.
9        Q.  You are not aware today of
10   any Arm licensees that have taken
11   note and concluded that the
12   termination provisions of their
13   agreements have no teeth, right?
14       A.  I'm not aware of any such
15   evidence in part because it's
16   outside the scope, it's outside my
17   areas of expertise and I do think it
18   would be nondetectable in most
19   instances.
20       Q.  You are also not aware
21   today of any licensees that have
22   followed, quoting from your
23   paragraph 94: "Followed Qualcomm's
24   behavior and bypassed Arm's
25   licensing model by acquiring other

Page 403

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2    ALA licensees," you are not aware of
3    anyone who has done that, right?
4        A.  Well, this is a forward
5    looking thing so the point is if
6    Qualcomm can get away with it, to
7    use the colloquial term, then others
8    would have these inferences out in
9    the marketplace.  So this is not
10   something that could happen now but
11   could happen in the future.
12       Q.  No, I understand.  All of
13   the things that are listed in these
14   paragraphs in this last section are
15   about things that could happen,
16   right?  I'm just asking if you are
17   aware if any of them have happened
18   since you wrote your report.
19       A.  I'm not aware of these
20   things having happened because at
21   least in part this will be future
22   things in the event that Qualcomm
23   can, in fact, use Arm technology
24   without consent from Arm in NuVia
25   applications.

Page 404

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2        Q.  Okay.  In paragraph 96 you
3    wrote:  "It is, therefore, possible
4    that Arm would suffer reputational
5    consequences and other follow-on
6    effect related to the perception of
7    Arm's inability to enforce the very
8    terms of its licenses."
9            Same question.  I
10   understand that you were saying that
11   this could happen but are you,
12   sitting here today, aware of any
13   evidence that this has happened?
14       A.  I don't think your question
15   -- the answer is I have not done the
16   analysis because I'm not an expert
17   on the technology.  It is forward
18   looking.  It is by definition only
19   if Arm can't enforce its termination
20   provisions.  And I do think the
21   reputational consequences are
22   oftentimes are unobservable.
23       Q.  In paragraph 97 you say:
24   "It is also possible that continued
25   noncompliance or renegotiated deal

Page 405

SUBRAMANIAN - ATTORNEY'S EYES ONLY

1
2    could impact Arm's ventures into
3    upstream or downstream markets."
4            Do you see that?
5        A.  Yes.
6        Q.  Are you, sitting here
7    today, aware of whether that has
8    happened?
9        A.  Same answer.
10       Q.  And by same answer you mean
11   you said that this could happen, you
12   haven't done the analysis to
13   determine if it has happened?
14       A.  It's three reasons.  One is
15   it is outside the scope of my
16   opinions.  Second reason is it
17   requires technical expertise that I
18   do not have.  Third is it's forward
19   looking so by definition cannot have
20   happened to date.  And fourth reason
21   is it's probably nonobservable.
22       Q.  And just to clarify.  Those
23   four reasons are the reasons that
24   you have not done the analysis?
25       A.  Correct.

102 (Pages 402 - 405)

ATTORNEYS EYES ONLY

1    SUBRAMANIAN - ATTORNEY'S EYES ONLY
2        MR. LLEWELLYN:  Objection to
3    form.
4        Q.  In paragraph 98 you say:
5    "Allowing Qualcomm to ignore its
6    ███████████████████████████
7    ████████████████████ could also
9    competitively disadvantage Arm's
10   partners."
11       Do you see that?
12       A.  Yes.
13       Q.  Are you aware that there
14   has been actual competitive
15   disadvantage to any of Arm's
16   partners?
17       A.  Well, here I do cite Google
18   and Samsung worrying about that
19   issue.
20       Q.  Right.  But those are
21   citations from January and August of
22   2021.  I'm asking if there's been
23   any harm since you wrote this
24   report?
25       A.  Since I wrote the report?

1    SUBRAMANIAN - ATTORNEY'S EYES ONLY
2    ████████████████████████████████
3    ███████████
4        Q.  The evidence that you cite
5    in paragraphs 99 and 100 is all
6    evidence from Arm personnel, right?
7        A.  Correct.
8        Q.  Okay.  In paragraph 101 you
9    say: "All of these effects
10   represent real economic damages to
11   Arm.  However, in my opinion these
12   effects would be virtually
13   impossible to quantify."
14       What do you mean by real
15   economic damages?
16       A.  I don't know how to define
17   it any better than that.
18       Q.  Are you saying you think
19   Arm has suffered money damages?
20       A.  No.  The whole point of
21   this discussion is these are
22   possible things and the point of
23   this paragraph is there's an inquiry
24   did these things materialize, which
25   is difficult, for reasons I have

1    SUBRAMANIAN - ATTORNEY'S EYES ONLY
2        Q.  Right.  I know that there's
3    no harm at the time you wrote the
4    report because it's all forward
5    looking.
6        A.  No, but these are
7    competitors to Qualcomm, ████████
8    ██████████████████████████████████
9    █████████████ think that's
11   responsive to your question.
12       Q.  Okay.  So when you used the
13   word "could" in 98, it could also
14   competitively disadvantage Arm's
15   partners, what you meant was it has
16   also competitively disadvantaged
17   Arm's partners?
18       MR. LLEWELLYN:  Objection to
19   form.
20       A.  No.  That's not what I'm
21   saying.  I'm saying the word
22   "could."  I'm observing that Google
23   and Samsung have said as much, but
24   I'm not a technical expert and so I
25   can't assess whether it actually

1    SUBRAMANIAN - ATTORNEY'S EYES ONLY
2    already described, to figure out
3    with any confidence.  And then
4    second question even harder, okay,
5    if they materialized, what's the
6    magnitude.  As I say, it's virtually
7    impossible to answer either one of
8    those questions.
9        Q.  That's because all of the
10   harm is in the future?
11       MR. LLEWELLYN:  Objection to
12   form.
13       A.  No, it's for the four
14   reasons I said earlier.
15       Q.  The four reasons you said
16   earlier were about why you didn't do
17   the analysis to determine whether
18   particular harms had occurred.  So
19   my question I think is simple, which
20   is you are saying it's virtually
21   impossible to quantify.  Is it
22   virtually impossible to quantify
23   because these harms have not yet
24   come to fruition?
25       A.  Well, certainly that's true

103 (Pages 406 - 409)

ATTORNEYS EYES ONLY

Page 450

1
2  STATE OF NEW YORK        )
3                          ) :ss
4  COUNTY OF NEW YORK       )
5
6       I, GUHAN SUBRAMANIAN, the witness
7  herein, having read the foregoing
8  testimony of the pages of this
9  deposition, do hereby certify it to be a
10 true and correct transcript, subject to
11 the corrections, if any, shown on the
12 attached page.
13
14      _____
15          GUHAN SUBRAMANIAN
16
17
18
19 Sworn and subscribed to before me,
20 this _____ day of _____, 2024.
21 _____
22 Notary Public
23
24
25

Page 451

1
2  STATE OF NEW YORK        )
3             ss.:
4  COUNTY OF NEW YORK       )
5
6       I, ERICA L. RUGGIERI, RPR and a
7  Notary Public within and for the State
8  of New York, do hereby certify:
9       That I reported the proceedings
10 in the within-entitled matter, and
11 that the within transcript is a true
12 record of such proceedings.
13      I further certify that I am not
14 related by blood or marriage, to any
15 of the parties in this matter and
16 that I am in no way interested in the
17 outcome of this matter.
18      IN WITNESS WHEREOF, I have
19 hereunto set my hand this 9th day of
20 May, 2024.
21
22      *Erica Ruggieri*
23      ERICA L. RUGGIERI, RPR, CSR, CLR
24
25

Page 452

1
2  ------------- I N D E X -----------------
3  WITNESS                      PAGE
4  GUHAN SUBRAMANIAN
5       By: Ms. Morgan          5
6  -------------- EXHIBITS ----------------
7  QX                  FOR I.D.
8  Exhibit 207, Opening Report of   18
9  Guhan Subramanian
10 Exhibit 208, Reply Report of     18
11 Guhan Subramanian
12 Exhibit 209, NuVia ALA          140
13 Exhibit 210, Dear Negotiation    220
14 Coach blog post
15 Exhibit 211, Declaration        306
16 Exhibit 212, E-mail from Gerard  339
17 Williams to Lip-Bu Tan
18 Exhibit 213, Letter             345
19 Exhibit 214, Letter             346
20 Exhibit 215, Rebuttal report of  365
21 Professor John Coates
22
23      *** EXHIBITS ATTACHED ***
24
25

Page 453

1
2       INSTRUCTIONS TO WITNESS
3
4       Please read your deposition over
5  carefully and make any necessary
6  corrections.  You should state the reason
7  in the appropriate space on the errata
8  sheet for any corrections that are made.
9       After doing so, please sign the
10 errata sheet and date it.
11      You are signing same subject to
12 the changes you have noted on the errata
13 sheet, which will be attached to your
14 deposition.
15      It is imperative that you return
16 the original errata sheet to the deposing
17 attorney within thirty (30) days of
18 receipt of the deposition transcript by
19 you.  If you fail to do so, the deposition
20 transcript may be deemed to be accurate
21 and may be used in court.
22
23
24
25

114 (Pages 450 - 453)

ATTORNEYS EYES ONLY

Page 454

```
1
2          E R R A T A
3
4  I wish to make the following changes, for
5  the following reasons:
6  PAGE LINE

7  CHANGE:_____
   REASON:_____
8  _____
   CHANGE:_____
9  REASON:_____

10 CHANGE:_____
   REASON:_____
11 _____
   CHANGE:_____
12 REASON:_____

13 CHANGE:_____
   REASON:_____
14 _____
   CHANGE:_____
15 REASON:_____

16 CHANGE:_____
   REASON:_____
17 _____
   CHANGE:_____
18 REASON:_____

19 CHANGE:_____
   REASON:_____
20 _____
   CHANGE:_____
21 REASON:_____

22 CHANGE:_____
   REASON:_____
23 _____
   CHANGE:_____
24 REASON:_____

   _____    _____
25 WITNESS' SIGNATURE      DATE
```

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

# EXHIBIT 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

       Plaintiff,

    v.

QUALCOMM INC., a Delaware corporation,
QUALCOMM TECHNOLOGIES, INC., a
Delaware corporation, and NUVIA, INC., a
Delaware corporation,

       Defendants.

C.A. No. 22-1146-MN

**EXPERT REPORT OF RAVI DHAR
REGARDING TRADEMARK
INFRINGEMENT**

**CONTAINS HIGHLY
CONFIDENTIAL – ATTORNEYS'
EYES ONLY INFORMATION**

1

## Table of Contents

Page

I. QUALIFICATIONS ........................................................................................ 4

II. ASSIGNMENT ............................................................................................... 6

III. RELEVANT LEGAL STANDARDS ............................................................. 7

IV. MATERIALS CONSIDERED ........................................................................ 8

V. SUMMARY OF OPINIONS .......................................................................... 8

VI. BACKGROUND .......................................................................................... 10

    A. ARM COMPANY BACKGROUND ................................................... 10

    B. ARM TRADEMARK BACKGROUND .............................................. 12

    C. ARM ARCHITECTURE LICENSING SCHEME .............................. 13

        1. Arm's Licensing Ecosystem .................................................... 13

        2. Licensing Rights to Arm Trademarks ...................................... 17

    D. QUALCOMM ...................................................................................... 20

        1. Company Background ............................................................... 20

        2. Qualcomm's Architecture License Agreement ........................ 20

    E. NUVIA ................................................................................................ 21

        1. Company Background ............................................................... 21

        2. Nuvia's Architecture License Agreement ................................ 22

    F. QUALCOMM'S PLANS FOR NUVIA TECHNOLOGY ................... 23

VII. ARM BRANDING ........................................................................................ 25

    A. THE CONCEPT AND BENEFITS OF A BRAND .............................. 25

    B. THE COMPONENTS OF A STRONG AND DISTINCTIVE BRAND IDENTITY ........................................................................................... 27

VIII. ARM HAS BUILT A STRONG BUSINESS-TO-BUSINESS ("B2B") BRAND ........... 29

    A. B2B COMPANIES .............................................................................. 29

    B. ARM HAS A STRONG AND DISTINCTIVE B2B BRAND ............... 31

C.   TRADEMARK INFRINGEMENT ................................................................................... 35

    1.   Qualcomm's Historical Use of Arm Trademarks ................................................. 35

    2.   Qualcomm's Current and Future Use of Arm Trademarks on Nuvia
        Products ................................................................................................................ 37

    3.   Third-Party Mention of Arm Trademarks Regarding Qualcomm's Nuvia
        Products ................................................................................................................ 39

D.   HARM FROM QUALCOMM'S UNAUTHORIZED USE OF THE ARM
    MARK   ............................................................................................................................ 42

E.   QUALCOMM'S UNAUTHORIZED USE OF THE ARM MARK SHOULD
    NOT CONSTITUTE FAIR USE ............................................................................... 45

I.      QUALIFICATIONS

1.      My name is Ravi Dhar.  I am the George Rogers Clark Professor of Management and Marketing at the Yale School of Management.  I am also the Director of the Yale Center for Customer Insights at the School of Management at Yale University.  I also have an affiliated appointment as a Professor of Psychology at the Department of Psychology, Yale University.  In addition, I serve or have served on the editorial board of peer-reviewed consumer research journals such as the Journal of Consumer Psychology, Journal of Consumer Research, and Journal of Marketing and Marketing Letters.  Previously, I was the Associate Editor of Journal of Marketing Research, the past Area Editor of Marketing Science, and the Associate Editor of Journal of Consumer Research.  My academic work focuses on branding, consumer behavior, consumer psychology, marketing management, marketing strategy, survey design, methodology, and evaluation.

2.      My teaching responsibilities at Yale University's School of Management include two doctoral courses that examine advanced research topics in marketing.  I also teach or have taught several different courses for graduate students who are enrolled in the MBA program or the Executive MBA program at Yale:  Consumer Behavior, E-Business and Marketing, Marketing Strategy, Marketing Management, Marketing of Financial Services, and Strategic Marketing Leadership:  The Role of A CMO.  I have also taught and given seminars to mid-level and senior-level executives in more than a dozen countries in North and South America, Asia, and Europe.

3.      I hold a Ph.D. and Master of Science in Business Administration from the University of California at Berkeley.  I have published more than 85 papers in journals, proceedings, and as book chapters, including leading marketing, psychology, and management journals, such as the Harvard Business Review, Journal of Behavioral Decision Making, Journal

4

of Business, Journal of Consumer Psychology, Journal of Consumer Research, Journal of

Marketing Research, Journal of Personality and Social Psychology, Management Science,

Marketing Science, Nature Climate Change, Organizational Behavior and Human Decision

Processes, Sloan Management Review, and other peer-reviewed and industry journals.

     4.     Several of my publications were also considered for research awards such as the

Paul E. Green Award ("The Effect of Forced Choice on Choice," Finalist in 2004) and the

William O'Dell Award ("Consumer Choice Between Hedonic and Utilitarian Goods," Winner in

2005; "Making Complementary Choices in Consumption Episodes: Highlighting Versus

Balancing," Finalist in 2004; "The Effect of Forced Choice on Choice," Finalist in 2008 and

"Preference Fluency in Choice," Finalist in 2012).  The William O'Dell Award is presented to

the Journal of Marketing Research article that has made the most significant, long-term

contribution to marketing theory, methodology, and/or practice.  The Paul E. Green Award is

presented to the Journal of Marketing Research article that shows or demonstrates the most

potential to contribute significantly to the practice of marketing research.  I have been awarded

the 2012 Distinguished Scientific Accomplishment Award from the Society of Consumer

Psychologists, which is given annually to honor a scholar who has made significant and lasting

contributions in the field of consumer psychology.  A study of 475 marketing faculty members at

top 30 schools (as of spring 2017), ranked me as one of the four most productive marketing

faculty members (among those with at least one publication per year in one of the four top

marketing journals over the 10-year period between 2007 and 2016), tying for rank 2 through 4

with two other faculty.[1]  A detailed listing of my educational background and publications is set

forth in my curriculum vitae, which is attached to the end of this report as **Exhibit A**.

---

[1] Van Osselaer, Stijn M. J., and Sarah Lim, "Research Productivity of Faculty at 30 Leading Marketing
Departments," Marketing Letters, (2019): 1-48, at pp. 1-3, 8 (Table 3).

5.      My fields of expertise are branding, consumer and customer psychology, marketing management, marketing strategy and survey design, methodology, and evaluation. My current research focuses on various aspects of marketing and branding, including consumers' decision-making, the manner in which consumers acquire and process information when forming product perception and preferences, the effect of product attributes (including trademarks) and information presentation on consumer purchase and consumption decisions and the effect of different "marketing mix" activities (such as promotions and advertising) on consumer purchase decisions.

6.      I have served as an expert witness for both claimants and defendants on marketing research issues in a variety of litigation matters.  A list of recent cases in which I have testified as an expert witness at trial or by deposition in at least the past four years is attached as **Exhibit B**.

## II.      ASSIGNMENT

7.      I have been engaged by Morrison and Foerster LLP, on behalf of Plaintiff Arm Ltd. ("Arm") to opine on certain issues related to U.S. Registration Nos. 5,692,669 ("'669 Trademark") and 5,692,670 ("'670 Trademark") (collectively, "Arm Trademarks" or "Arm Marks") and Arm's claims against Defendants Qualcomm Inc., Qualcomm Technologies, inc. (collectively "Qualcomm") and NuVia, Inc. ("Nuvia").

8.      It is my understanding that Arm has filed this lawsuit against Defendants for breach of contract, trademark infringement, and false designation of origin.[2]

9.      In this case, I was asked to opine, from a marketing and consumer behavior perspective, on the following issues:

        a.   The benefit of a strong mark or brand in the marketplace;

---

[2] Complaint.  *Arm Ltd. v. Qualcomm Inc., Qualcomm Technologies, Inc., and NuVia, Inc.* (D. Del. No. 1:22-cv-01146) (Aug. 31, 2022) ("Complaint") ¶¶ 1-3.

b. Whether Arm's Trademarks and brand are distinctive and strong in the United States marketplace context;

c. Whether Qualcomm's unlicensed use of the Arm Trademarks in connection with "Nuvia Products," i.e., technology that encompasses Nuvia technology developed under now terminated Nuvia-Arm ALA[3]— ███████████████████ ████████████████████████████████████ ███████[4]—would likely result in confusion (i.e., whether Qualcomm's use of the ARM Marks is likely to cause purchasers of these products to falsely believe that there is some common ownership, affiliation with, connection to, or association with the Arm Trademarks, as to the origin, sponsorship, or approval of the Plaintiff, including whether such products have been validated by Arm);

d. Whether Qualcomm's use of the Arm Trademarks is likely to cause harm by impacting the brand or result in loss of sales by Arm and Arm's licensees that serve the same market.

## III.       RELEVANT LEGAL STANDARDS

10.     I have been informed of general legal principles relevant to my opinions in this matter.  I have used these legal principles in forming my opinions.

11.     I have been informed that, to prove infringement of a trademark, it must be shown that (1) Arm owns a valid, protectable trademark, and (2) Defendants' use of the mark is likely to cause confusion.

---

[3] For purposes of this report, I will refer to these products as "Nuvia Products." I understand that Nuvia developed the Phoenix core, a custom central processing unit ("CPU") core based on the Arm architecture, under its ALA. Tyson, Mark.  "Nuvia 'Clean-Sheet CPU Design' Performance Previewed."  *Hexus* (Aug 11, 2020). <https://hexus.net/tech/news/cpu/144733-nuvia-clean-sheet-cpu-design-performance-previewed>; ████████████████████████████████████████████████████████████

[4] ████████████████████████████████████████████ *see* ¶ 62.

IV.        **MATERIALS CONSIDERED**

12.      In forming my opinions, I drew on my knowledge, education, and experience in marketing and branding developed over the past several decades.  I reviewed case-specific materials provided to me by counsel, as well as other documents discussed in this report.  The materials that I relied upon include those cited in this report and the materials disclosed in **Exhibit C** to this report.

V.        **SUMMARY OF OPINIONS**

13.      Based on my knowledge and experience, well-established principles of branding, my analysis of documents and testimony provided to me by counsel and cited herein, and my own independent research, my conclusions are as follows:

- Arm's brand and Trademarks are strong and confer value in the marketplace.

- Strong customer acceptance of Arm's technology and Arm licensed products signifies a high standard of quality and innovation associated with Arm's Trademark that Arm has built over decades.

- Arm's Trademarks also signify compliance with the Arm Instruction Set Architecture ("ISA") and, in the case of technology developed under an ALA license, verification, and validation in accordance with the applicable provisions in the relevant license Annex.

14.      Qualcomm's prior history and usage of Arm's Trademarks, along with requirements in the relevant agreements and materials that it will provide to customers, demonstrate a high likelihood that Qualcomm will continue to use Arm's Trademarks in connection with its future products, particularly Nuvia Products.

15.      I also understand from the materials I reviewed that Qualcomm has used Arm's Trademarks in connection with its future Nuvia Products at least as recently as the Qualcomm

Snapdragon Summit, press releases, its earning calls, and other public statements, all within the past year.  Qualcomm's use of Arm's Trademarks is likely to cause customer confusion.  Thus, Qualcomm's unauthorized use of the Arm Mark for Nuvia Products is likely to mislead customers and other relevant industry participants into believing that there is some connection as to source, affiliation, sponsorship, or approval between Arm and Qualcomm.  By using the Arm Mark in connection with the Nuvia Products, Qualcomm would benefit from the positive and favorable associations with the Arm Mark.

16.    This unauthorized use is also likely to cause harm to Arm.  First, Qualcomm's use of Arm's Trademarks may result in loss of control to Arm of its brand and goodwill, by falsely associating the Nuvia Products with Arm's brand.  Second, Qualcomm's sale of the Nuvia Products may divert customers away from Arm, who may select a Nuvia Product rather than an Arm product or an Arm licensed product, understanding mistakenly that they are interchangeable.

17.    The opinions I express in this report are based on my background and experience, along with my review of materials provided to me by counsel, and of research that I carried out in relation to this engagement.  If called to testify, I expect to offer the opinions expressed in this report and the basis for those opinions.

18.    My analyses and opinions in this report are based on information available to me as of the date of this report.  I reserve the right to modify or supplement my testimony and this report in response to any further information provided by the parties and/or in light of additional documents or testimony brought forth through the ongoing discovery in this case, at trial, or otherwise, which may be brought to my attention after the date of my signature below.  I reserve the right to modify or supplement my opinions in view of arguments made by any person

retained by Qualcomm, including Qualcomm's counsel and anyone it engages to provide opinions.

19.     I am being compensated at the rate of $950 per hour for my services.  The compensation is in no way tied to the outcome of this matter or my opinion.

## VI.     BACKGROUND

### A.     ARM COMPANY BACKGROUND

20.     Arm is a world leader in its industry, developing processor architectures, including instruction set architectures, and processor core designs implementing those architectures.  "Arm's CPU technology has been an industry leader for many years and continues to be the most widely deployed architecture globally."  Arm's CPU architecture "has resulted in the proliferation and evolution of computers as people know them today.  [By enabling] the mobile phone and smartphone revolution, and through [its] focus on energy efficiency and [its] history of continuous innovation, [Arm has] enabled new categories of 'smart' consumer electronics."[5]

21.     "Software developers write software for Arm-based devices because it offers the biggest market for their products, and chip designers choose Arm processors because they have the broadest support of software applications."[6]

22.     "In the fiscal year ended March 31, 2023, more than 260 companies reported that they had shipped Arm-based chips, and…approximately 70% of the world's population uses Arm-based products."[7]

---

[5] ARM_01259705 – 0105 at -9720, -9792.
[6] Arm SEC Form 424B4 (September 13, 2023)
<https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm> at 2.
[7] ARM_01259705 – 0105 at -9792.

23.     I understand from the materials I considered that processor cores are the parts of a computer's Central Processing Unit, or "CPU," that read and execute program instructions to perform specific actions.  Modern CPUs frequently integrate multiple processor cores on a single semiconductor chip or integrated circuit ("IC"), and they are often referred to as "system on chip" or "SoC" devices.[8]

24.     CPUs are used in a variety of industries or market segments, including personal computing, mobile, cloud computing, automotive, artificial intelligence, Internet of Things ("IoT"), servers, data centers, and in effectively every other industry that utilizes computing devices.[9]

25.     Technology companies around the world use Arm processor technologies in products ranging from smartphones to servers.[10]

26.     Since Arm was founded in 1990, it has made significant investments to develop and market its products.[11]  In the mid-1990s Arm CPUs gained significant traction in the mobile market because of the processors' power efficiency and performance.[12]  Arm's more recent investments have focused on making it a "ubiquitous provider of compute technology in all market segments."[13]  Arm is also focused on expanding into new markets via developing

---

[8] "Licensing Arm Technology: Access for Everyone." *Arm*. <https://www.arm.com/products/licensing>; "The ARM Processor Business Model." *Arm*. <https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model>.
[9] *See, e.g.*, "Partner Ecosystem Catalog." *Arm* <https://www.arm.com/partners/catalog/results#sort=date%20descending&numberOfResults=12>; "CPU Architecture." *Arm*. <https://www.arm.com/architecture/cpu>.
[10] "Partner Ecosystem Catalog." *Arm* <https://www.arm.com/partners>; Deposition of Paul Williamson, November 9, 2023, p. 279; ARM_01259705 – 105 at -9713.
[11] ARM_01259705 – 0105 at 9714.
[12] *Id.*
[13] *Id.*

multiple product families optimized for specific markets such as smartphones, cloud computing, networking, automotive, and IoT.[14]

27.    I understand from the materials I considered that Arm's processors and business models offer unique customer benefits.  "Arm's flexible and modular design IP enables customers to build chips optimized for the PPA requirements for a specific use case or end market… By developing a wide range of CPU and related technologies, Arm can provide a CPU optimized for various use cases to reduce both energy consumption and area (with area being a key driver of the ultimate cost of a chip)."[15]

28.    Arm's position in the industry allows it to provide unique value to its customers: "To further reduce our customers' costs and to help de-risk their product development efforts, we combine our CPU products and SoC knowledge with our deep understanding of our ecosystem partners' design tools and manufacturing processes to provide processor products that not only optimize for power and performance, but also accelerate time to market for our customers."[16]

**B.    ARM TRADEMARK BACKGROUND**

29.    Arm owns intellectual property relating to its processor architectures and designs, including, among other things, trademarks.[17]

30.    Arm owns U.S. Registration Nos. 5,692,669 and 5,692,670 for the ARM word mark in standard characters and the stylized ARM mark featuring the word "arm" in all lower-case letters (collectively, the "Arm Trademarks" or "ARM Marks"), as pictured below:

---

[14] *Id.*
[15] Arm SEC Form 424B4 (September 13, 2023) <https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm> at 6.
[16] Arm SEC Form 424B4 (September 13, 2023) <https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm> at 6.
[17] "Terms and Policies – Trademarks." *Arm.* <https://www.arm.com/company/policies/trademarks>; Deposition of Will Abbey, October 27, 2023, p. 324.



[18], and [19]

31.     These marks are registered for "'[e]lectronic data processing equipment,' 'integrated circuits,' 'semiconductors,' 'microprocessors,' 'RISC-based instruction set architectures, namely, software instructions designed to function with particular microprocessors,' 'data processors,' 'printed circuit boards,' 'electronic circuit boards,' and related '[r]esearch, development and design,'" among numerous other goods and services.  The applications to register ARM Marks were filed on July 31, 2017 and were issued on March 5, 2019.  The application for Registration No. 5,692,669 has a claimed first use and first use-in-commerce date of November 30, 1990, while the application for Registration No. 5,692,670 has a claimed first use and first use-in-commerce date of August 1, 2017.[20]

## C.     ARM ARCHITECTURE LICENSING SCHEME

### 1.     Arm's Licensing Ecosystem

32.     Arm does not manufacture chips itself but instead licenses its processor technology to companies making chips and other electronic devices.[21]  Arm licenses its processor technologies under Arm licenses such as architecture license agreements ("ALAs") and technology license agreements ("TLAs").[22]

---

[18] U.S. Registration No. 5,692,669.
[19] U.S. Registration No. 5,692,670.
[20] Complaint, ¶ 71.
[21] "The ARM Processor Business Model." *Arm*. <https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model>.
[22] Complaint ¶ 17.  *See also* ARM_01259705 – 105 at -9794; Deposition of Simon Segars, November 16, 2023, pp. 29 – 30; Nuvia TLA, ARM_00059183 – 199.

33.     Arm's TLAs allow for licensees to use specific "off-the-shelf" Arm processor core designs with only minor modifications.[23]

34.     Arm provides support for licensees in developing Arm-compliant products under their TLA license.[24]  In return, licensees provide royalty payments for Arm, and the royalty fees depend on the technology developed under the TLA.[25]

35.     Arm's ALA licenses provide a licensee with greater rights and more flexibility. ALAs allow the licensee to design custom processor cores based on Arm's architectures, using Arm Technology and Arm Confidential Information.[26]

36.     

37.

38.

[26] Deposition of Simon Segars, November 16, 2023, 30:12-32:12; Deposition of Will Abbey, October 27, 2023, 76:11-77:20.



39.   █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

[28]

40.     The support and maintenance that Arm provides to its customers offers value that affords customers the ability to develop and innovate with Arm's support: "Our solution allows customers to build optimized chips, while reducing their design execution risk and their internal development costs…We invest significant time, resources and effort in the design and verification of each processor and work closely with our partners to ensure a standard of excellence in the processor products we deliver to our customers."[29]

41.     Each TLA or ALA license agreement is negotiated separately with individual customers based on the licensee's intended use of Arm's Technology and Confidential Information.[30]

42.     Thus, Arm's business operates on an extensive licensing ecosystem.  Arm engineers design processor core architecture, which Arm licenses to downstream customers who

---

█
████████████████████

[29] Arm SEC Form 424B4 (September 13, 2023)
<https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm> at 6.
[30] *See* Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works>.

use that technology for semiconductors.  Arm's licensing ecosystem is well-established, widespread, and is based on the use of underlying Arm Technology, Arm Confidential Information, and derivatives or embodiments thereof.[31]

43.     Arm has a significant licensing ecosystem, "with more than 30 billion Arm-based chips reported as shipped in the fiscal year ending March 31, 2023 alone, representing an approximately 70% increase since the fiscal year ended March 31, 2016."[32]

44.     Arm reports that "based on royalty revenue information provided to us by customers in quarterly royalty reports, approximately 46% of [Arm's] royalty revenue for the fiscal year ended March 31, 2023 came from products released between 1990 to 2012."[33]

45.     "For the calendar year ended December 31, 2022," Arm estimates that its total addressable market "was approximately $202.5 billion" and predicted "[it] will grow at a 6.8% compound annual growth rate ('CAGR') to approximately $246.6 billion by the end of the calendar year ending December 31, 2025."[34]

46.     The continued existence and success of this licensing system depends on Arm's trust in and relationships with its partners.  As Paul Williamson (Senior Vice President and General Manager of Client Line of Business at Arm) testified:

". . . ARM's business is fundamentally defined by our ability to protect and license our technology. ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████. So I think it brings

---

[31] ARM_01236577 – 579.
[32] ARM_01259705 – 0105 at -9792.
[33] ARM_01259705 – 0105 at -9794.
[34] Arm SEC Form 424B4 (September 13, 2023)
<https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm> at 7.



██████████ to ARM, ████████████████████████████████, but as I said that is not the ████████ it provides, but it is ████████████████████████████."[35]

47.     In addition, the continued existence and success of Arm's licensing system depends on the substantial investment Arm makes in its research and development, technological innovation, and support it provides to its customers under its license agreements.  As Arm explained in its second amended F-1 filing:

"We will have to make significant expenditures to continue developing our semiconductor products and other products.  The long development time of generally five or more years from the initial design of our semiconductor products until its incorporation into new end-user applications can place significant strain on our financial resources and personnel…To remain competitive, we must continue to develop new products, applications, and enhancements to our existing products and services, particularly as next generation technology is adopted by market participants.  Allocating and maintaining adequate research and development resources, such as the appropriate personnel and development technology, to meet the evolving demands of the market is essential to our continued success."[36]

### 2.     Licensing Rights to Arm Trademarks

48.     An Arm TLA or ALA provides a license to use Arm's Trademarks in connection with a licensee's Arm-compliant products that a licensee developed under a specific TLA or

---

[35] Deposition of Paul Williamson, November 9, 2023, pp. 244 – 245
[36] ARM_01259705 – 0105 at -9739, -9745

ALA.  A licensee's right to use Arm's Trademarks is specifically limited to products developed under their license.[37]

49.



50.

51.     I understand from the materials I considered that Arm provides guidelines governing how a licensee may use the Arm Trademarks in connection with licensed products. Arm publishes Arm Branding Guidelines that all its licensees must follow.  I also understand that the Branding Guidelines set forth instances under the ALAs and TLAs where a licensee is required to display an Arm Trademark, and other instances where the licensee is permitted, but not required, to display an Arm Trademark.[40]

52.     Arm's Trademark Guidelines instruct that an Arm licensee with an ALA with Arm ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in a few instances: ▮▮▮▮▮▮▮▮▮▮



and

---

[37] Deposition of Jonathan Armstrong, December 8, 2023, 62:5-10.
[38] ARM_00059183 – 199 at -9187.
[39] ARM_00044650 – 692 at -4656.
[40] *See* "Arm Branding Guidelines. *Arm*. < https://www.arm.com/company/policies/trademarks/guidelines-brand>.



██████████████████████████████████████████████████████████

████████████████████████████ An ALA partner is also permitted ███████████████

███████████████████████████████████████████████████████████.[41]

53.     The term ████████████████ is defined in the licensee's ALA.  For example, in Qualcomm's ALA, Section ███, it defines ████████████████████ as ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████

54.     Arm outlines the terms and policies associated with using the Arm Trademark.  A licensee may only use ████████████████████████████████████████████ like ████████████████ or █████████████[43]

55.     Companies will negotiate the use of these terms with Arm.  For example, as Jonathan Armstrong, Head of Brand and Creative Services at Arm, testified, for ██████ like ████████████████████████████████████████████████████████████ Mr. Armstrong further testified that if an unlicensed third party uses a phrase like ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████[45]

56.     Mr. Armstrong answered affirmatively that ████████████ under ████████████████ ████████████████████████████████████████████████████████████

---

[41] "Arm Branding Guidelines. *Arm*. < https://www.arm.com/company/policies/trademarks/guidelines-brand>.
[42] Qualcomm ALA (ARM_00044650) § 1.2.
[43] "Arm Branding Guidelines. *Arm*. < https://www.arm.com/company/policies/trademarks/guidelines-brand>.
[44] Deposition of Jonathan Armstrong, December 8, 2023, 75:14-18; *see also*, *id.*, 80:11-15.
[45] Deposition of Jonathan Armstrong, December 8, 2023, 78:10-18.

███████████████████████████████ to Arm's products, services, or related

technologies."[46]

57.     

**D.     QUALCOMM**

  **1.     Company Background**

58.     Qualcomm is a wireless technology company that develops various products,

including semiconductors, designed to "deliver intelligent computing and advanced connectivity

in mobile devices and other products."[49]

59.     

  **2.     Qualcomm's Architecture License Agreement**

60.     ████████████████████████████

████████████████████████████████████

██████████████

---

[46] Deposition of Jonathan Armstrong, December 8, 2023, 126:11-20.

█████████████████████████████████████████

█████████████████████████

[49] Qualcomm Form 10-K for FYE 2023, at 6.
[50] *See* ARM_00044650.
[51] *See* ARM_00060458.
[52] ARM_00044650.

61. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

62.     I understand that Arm's position is that the ████████ and related SoCs are not

licensed under Qualcomm's ALA because such technology was not developed under that ALA,

and, because the Nuvia ALA was terminated, these products are no longer licensed under the

Nuvia ALA.[54]  For purposes of this report, I assume that Arm is correct and that ████████

████ and related cores and SoCs are not licensed.

**E.     <u>NUVIA</u>**

**1.     Company Background**

63.     Nuvia was founded as a start-up in 2019 by engineers who left Apple and Google

and planned to design energy-efficient CPUs for data center servers based on a custom processor

implementing the Arm architecture.[55]

64.     In August 2020, Nuvia announced that their first-generation CPU code-named

"Phoenix" would be "a custom core based on the ARM architecture."[56]  Nuvia also announced

that benchmark tests showed Phoenix could outperform rival products from Apple, Intel, AMD,

and Qualcomm.[57]

---

[53] ARM_00044650 at -656.
[54] Answer and Affirmative Defenses to Defendant's Amended Counterclaim, dated November 15, 2022.
[55] Complaint ¶ 20.
[56] Complaint ¶ 24; John Bruno & Sriram Dixit, "Performance Delivered a New Way, Silicon Reimagined" *Medium.* (Aug. 11, 2020) <https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5>
[57] *Id.*

### 2.   Nuvia's Architecture License Agreement



65.

66.

67.

68.

---

███████████████████████████████████████████████

██████████████████████

69.     From September 2019 through early 2021, Nuvia worked to develop a customer

processor core based on Arm architecture.[64]  Arm provided documents, support, etc. to Nuvia to

assist Nuvia's efforts to deliver an Arm-based core for the server market.[65]

## F.     QUALCOMM'S PLANS FOR NUVIA TECHNOLOGY

70.     Although Qualcomm has its own ALA license with Arm, I understand that prior

to acquiring Nuvia, Qualcomm had not recently developed any commercial product based on its

own custom core.[66]

71.     In early 2021, Qualcomm acquired Nuvia for $1.4 billion.[67]  Qualcomm

announced that it intended to integrate Nuvia's ██████ CPU "across a wide portfolio of

products" including Qualcomm Snapdragon platforms, which Qualcomm expected to "sample in

the second half of 2022."[68]



72.     ██████████████████████████████

███████████████████████████████████

█████████████████████

73.     Qualcomm then continued to develop the ██████████ as well as several SoC

products incorporating the ██████████ including products ████████████████████,

---

[64] Complaint ¶ 23.
[65] *Id.*
[66] Complaint ¶ 26.
[67] "Qualcomm Completes Acquisition of NUVIA." *Qualcomm.* (March 15, 2021)
<https://qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia#:~:text=Qualcomm%20Incorporated%20(NASDAQ%3A%20QCOM),working%20capital%20and%20other%20adjustments> (ARM_00024809).
[68] *Id.*
[69] ARM_00032602 (1/27/2021 letter from Z. Asghar to P. Williamson).

███████████████████████ ██   ███████████████████████████████████

██████████████████ ██

74.     Since the acquisition, Qualcomm has made numerous statements, both internally and publicly, regarding its plans to release Nuvia Products incorporating the Nuvia-based technology soon, as detailed below.

75.     As early as November 2022, Qualcomm announced that its "Oryon" CPU would "be integrated across a wide portfolio of Snapdragon powered products starting with PCs and including smartphones, digital cockpits, Advanced Driver Assistance Systems, extended reality, and infrastructure networking solutions."[72]

76.     At Qualcomm's recent 2023 Snapdragon Summit Qualcomm previewed its Snapdragon X Elite SoC, that is reported by AnandTech to be "[b]ased on brand-new Arm CPU core design from their Nuvia subsidiary dubbed 'Oryon.'"[73] While the Snapdragon X Elite SoC will initially be used in laptop computers, Qualcomm has already announced plans to incorporate the SoC into smartphones and other devices.[74]

77.     In his deposition, ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██

---

[70] Complaint ¶¶ 43-53; Deposition of Gerard Williams, November 3, 2023, 179:1-6 (testifying that after the acquisition, the former Nuvia team continued work on Nuvia's Phoenix core; *see also* ARM_01238999 (5/18/2022 email from R. Grisenthwaite); QCARM_02417783 (1/19/2022 message from Z. Asghar to M. Gulati ███████████ ██████████████).

[71] *See* 11/17/2023 Arm's First Supplemental Responses to Qualcomm's Interrogatory Nos. 6, 20.

[72] "Qualcomm Oryon CPU: a custom CPU at the center of next-generation premium experiences on Snapdragon platforms." *Qualcomm*. (November 16, 2022) <https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms>.

[73] Smith, Ryan. "Qualcomm Previews Snapdragon X Elite SoC: Oryon CPU Starts in Laptops." *AnandTech*. (October 24, 2023) <https://www.anandtech.com/show/21105/qualcomm-previews-snapdragon-x-elite-soc-oryon-cpu-starts-in-laptops->.

[74] *Id.*

[75] ██████████████████████████████████████

## VII.        ARM BRANDING

78.     I use the term Arm brand to refer to the ARM Marks as seen in the marketplace. It is my opinion that the Arm brand is and has long been distinctive and strong.  In the following sections, I first discuss the concepts and benefits of a strong brand.  I then discuss the components of brand identity and what makes a strong brand.  Finally, I apply these principles to the Business to Business ("B2B") market in which Arm competes and discuss the strength and distinctiveness of the Arm brand in the B2B marketplace context.

### A.        THE CONCEPT AND BENEFITS OF A BRAND

79.     A brand is more than a trademark (e.g., a name or a symbol or a design).[76]  It includes several tangible brand elements (e.g., words, logos, colors, designs, imagery) and intangible brand elements (emotional, attitudinal, sensory) that, collectively, stand for a unique source and a promise of certain benefits to prospective customers.  However, a trademark is an important element of a company's brand.

80.     Strong brands are valued because they can impact consumer purchase behavior. Consumers in the marketplace rely on brands to make effective and efficient purchasing decisions.  First, the brand name or other brand identity elements allows consumers to quickly identify the source of a product or service, or its sponsor.  This confers systematic advantages to a strong brand in the marketplace.

81.     Second, a brand name and other brand identity elements take on meaning to customers based on repeated experience with the brand as well as from its advertising/promotional efforts and profile in the media.  For example, the Arm brand is not only

---

[76] *See generally, e.g.*, Kevin Lane Keller, <u>Strategic Brand Management: Building, Measuring and Managing Brand Equity</u>, (4th Ed., Pearson 2012); David A. Aaker, <u>Managing Brand Equity: Capitalizing on the Value of a Brand Name</u>, (Free Press 1991).

strong and recognized in the microprocessor industry, it has also likely taken on a specific meaning around intangible attributes, such as high performance, and also signals compliance with the Arm Instruction Set Architecture.[77]  It is this positive meaning of the brand among Arm's target customer base that leads to increased customer preference and loyalty.

82.    Third, brands also serve to reduce the risk associated with product purchase decisions.  Customers may perceive different types of risks in buying a product, such as functional risk (e.g., the product does not perform to expectations), financial risk (e.g., the price) or social risk (e.g., the product is not appreciated by others).  Thus, a well-known brand can help reduce the risk associated with the purchase or trial of a new variety that is linked to a familiar and trusted mark.

83.    Co-branding or composite branding strategy involves combining two or more existing brand names to create a brand name for a new product.  Ingredient branding refers to a type of co-branding or a process in which a company markets an established branded ingredient or component used in its own products.  Companies will often enter partnerships so that they can leverage the power of the ingredient brand to their mutual benefit.[78]  The overall marketing strategy seeks to signal the benefits built on the strong and favorable brand identity of the ingredient (e.g., Arm in this case).

84.    In the next section, I describe the key elements of a strong brand measured by brand knowledge, including brand performance and brand imagery.

---

[77] Deposition of Jonathan Armstrong, December 8, 2023, 82:20 – 83:8; 112:4-9.
[78] Composite Branding Alliances: An Investigation of Extension and Feedback Effects, C. W. Park, Sung Youl Jun, and Allan Shocker, Journal of Marketing Research, 1996.

## B.      THE COMPONENTS OF A STRONG AND DISTINCTIVE BRAND IDENTITY

85.      As stated above, the commercial strength of a brand lies in what customers in the marketplace have learned, felt, seen, and heard about the brand because of their direct or indirect experiences over time.  Thus, a strong and distinctive brand is built so that the desired thoughts, feelings, images, and perceptions become linked to the brand.

86.      Because brand knowledge is the key to creating a strong brand from the consumer viewpoint, it is important to understand how brand knowledge is stored in memory.  There are many different models of memory, and a well-established model is the associative network model of memory.  According to this model, memory consists of a network of nodes and connecting links, in which nodes represent stored information or concepts, and links represent the strength of association between such information or concepts.[79]  The information can be verbal, visual, abstract, or contextual in nature.[80]

87.      Consistent with the associative network memory model, brand knowledge is conceptualized as consisting of a brand node in memory with a variety of associations linked to it.  In particular, brand knowledge or the strength of a brand can be characterized in terms of two components: brand awareness and brand image.

- **Brand awareness** is related to the strength of the brand node in memory, as reflected by consumers' ability to identify the brand under different conditions.

- **Brand image** is perceptions about a brand as reflected by the brand associations held in consumer memory.

---

[79] *See* Kevin Lane Keller, Strategic Brand Management: Building, Measuring and Managing Brand Equity, (4th Ed., Pearson 2012).
[80] *See, e.g.*, Kevin Lane Keller, Conceptualizing, Measuring and Managing Customer-Based Brand Equity, J. Marketing 57(1):1-22 (1993).

- A strong brand tends to have both (a) strong awareness of identification of the mark with particular goods or services, and (b) strong brand image in memory in terms of the strength, favorability, and uniqueness of the brand associations.[81] Length of use, advertising/promotional efforts, exposure to the brand including its mentions as an ingredient of the product by the licensee and media are important factors in establishing brand awareness and a brand image and, thus, brand knowledge.

- Brand associations refer to the other informational nodes linked to the brand node in memory and contain the meaning of the brand for consumers.  As discussed, next, these associations can be in all forms and refer to the characteristics of the product or aspects independent of the product.

88.    The brand associations can be related to the **performance** of the brand.  For example, performance-related associations can be about the quality or reliability provided by the Arm brand.  The Arm Marks signal to consumers and to the public that the product is licensed and has been verified and validated by Arm as compliant with Arm's architecture.

89.    The brand associations can also be about the **imagery** of the brand, or the way in which the brand is linked to its customers' psychological or emotional needs.

90.    Like brand performance associations, imagery associations can be formed directly from a customer's own experience and contact with the brand or indirectly as communicated in brand advertising/promotional materials, directly as well as by ingredient branding.

91.    Based on the brand imagery (how people think about the brand), brands also take on personality traits (how people feel about the brand).  An important objective of building a

---

[81] *See* Kevin Lane Keller, <u>Strategic Brand Management: Building, Measuring and Managing Brand Equity</u>, (4th Ed., Pearson 2013).

strong brand is to create a personality for the brand that is attractive to the target and product market.

92.     The key to building a strong brand identity comes from the specific associations related to either performance or to imagery that become linked to the brand identity.  A brand's associations and meaning that are strong, favorable, and unique provide the underpinning of building strong brand equity that provides benefit to the brand owner.

## VIII.     ARM HAS BUILT A STRONG BUSINESS-TO-BUSINESS ("B2B") BRAND

### A.     B2B COMPANIES

93.     Whether a company sells products or services to consumers, Business to Consumers ("B2C") or to other businesses, B2B, a strong brand is among its most important and sustainable assets.[82]  Brands can facilitate the identification of products and business, differentiate them from their competition, communicate the value and benefits of a product or service, and reduce the risk and complexity involved in the buying decision.[83]  These functions are common to both B2C and B2B brands, although the relative importance of each function varies between the two, with risk reduction cited as the most important function of B2B brands and signaling value as the most important for B2C.[84]

94.     Numerous studies have established the importance of branding in B2B markets.[85] The benefits of a brand are built on the associations the brand has in the perceptions of the

---

[82] Balmer, J. M. T., et al., (2020), "The role of corporate brand image for B2B relationships of logistics service providers in China," Journal of Business Research, 117C, 850–861; Keller, K. L. (2013), Strategic Brand Management, Fourth/Global Edition, Essex: Pearson ("Keller (2013)"), p. 34; Iyer, P., et al. (2019), "Market orientation, positioning strategy and brand performance," Industrial Marketing Management, 81, 16–29; Leek, S. and G. Christodoulides (2012), "A Framework of Brand Value in B2B Markets: The Contributing Role of Functional and Emotional Components," Industrial Marketing Management, 41, 106–114.

[83] Kotler, P., and W. Pfoertsch (2006), B2B Brand Management, Evanston, IL: Springer ("Kotler and Pfoertsch (2006)"), p. 3.

[84] Kotler and Pfoertsch (2006), pp. 17–18, 46.

[85] Balmer, J. M. T., et al. (2020), "The role of corporate brand image for B2B relationships of logistics service providers in China," Journal of Business Research, 117, 850–861; Iyer, P., et al. (2019), "Market orientation, positioning strategy and brand performance," Industrial Marketing Management, 81, 16–29.

customers.[86]  For both B2C and B2B brands, these associations can be both functional (e.g., quality, technology, capacity, infrastructure, after sales service, capabilities, reliability, and innovation) and emotional (e.g., risk reduction, reassurance, and trust).[87]  Marketing research has found that both kinds of associations are important for B2B firms,[88] with functional associations generally contributing more to B2B brand strength.[89]

95.     Although the foundational principles of creating a strong brand are similar for B2B and B2C brands, the targets and marketing strategies are different.  For example, the buying process can differ significantly between business and consumer markets.  B2B firms tend to have fewer customers, but often each customer is larger and the relationship with the customer is more long-term.[90]  The products sold by B2B firms are often more complex, and buying transactions often involve significant technical expertise on both sides.[91]  B2B products are generally purchased by a group within an organization rather than a single individual, and as such can be subject to complex within-firm restrictions and negotiations.[92]  Finally, B2B firms face a "derived demand" in that the demand for B2B products as inputs depends on the final demand for its products.[93]

96.     These differences mean that the marketing strategies through which a strong B2B brand is achieved can differ from those used by B2C brands.  First, B2B brand focus tends to be

---

[86] Keller (2013), p. 31.
[87] Leek, S. and G. Christodoulides (2012), "A Framework of Brand Value in B2B Markets: The Contributing Role of Functional and Emotional Components," Industrial Marketing Management, 41, 106–114.
[88] Casidy, R., et al. (2018), "The relative influence of functional versus imagery beliefs on brand sensitivity in B2B professional services," Industrial Marketing Management, 72, 26–36; Leek, S. and G. Christodoulides (2012), "A Framework of Brand Value in B2B Markets: The Contributing Role of Functional and Emotional Components," Industrial Marketing Management, 41, 106–114.
[89] Kotler and Pfoertsch (2006), pp. 45–46; Casidy, R., et al. (2018), "The relative influence of functional versus imagery beliefs on brand sensitivity in B2B professional services," Industrial Marketing Management, 72, 26–36.
[90] Kotler and Pfoertsch (2006), p. 21.
[91] Kotler and Pfoertsch (2006), p. 21.
[92] Kotler and Pfoertsch (2006), p. 24.
[93] Kotler and Pfoertsch (2006), p. 22.

more targeted, since the relevant purchasers are a relatively small group of key buyers within customer firms, rather than the larger set of end users.[94]  Second, although emotional appeals can also play a role in B2B branding, the degree of expertise among buyers and the often complex buying process at many firms means that many B2B brands emphasize the performance benefits and tangible points of differentiation of the product, and the reduction of risk associated with choosing the brand, relative to many B2C brands that emphasize the image of brand and its emotional connection with consumers.[95]

The next sections apply these principles of brand equity to the Arm brand.

## B.    ARM HAS A STRONG AND DISTINCTIVE B2B BRAND

97.    Arm is a B2B brand because Arm's customers are other businesses.  As I discuss in Section VI.A. above, Arm's primary offerings are CPU products that address diverse performance, power, and cost requirements.[96]  Arm also offers complementary products such as graphic processing units ("GPUs"), development software and tools, and system IP.[97]  Arm's offerings in turn enable its licensees to develop, manufacture, and sell a wide range of technology products—including smartphones, tablets and personal computers, data centers and networking equipment, vehicles, smartwatches, thermostats, and drones and industrial robotics— to their own customers.[98][99]  Thus, Arm competes in a business market rather than a consumer

---

[94] Kotler and Pfoertsch (2006), p. 106.  See also Casidy, R., et al. (2018), "The relative influence of functional versus imagery beliefs on brand sensitivity in B2B professional services," Industrial Marketing Management, 72, 26–36 at p. 111, in which the authors note that relationships with buyers are often a critical component of brand equity.

[95] Kotler and Pfoertsch (2006), pp. 45–46.

[96] See ARM_01259705.

[97] Id.

[98] Id.

[99] See, e.g., "Amlogic Answers the UHD Challenge with Landmark Implementation of ARM Mali-450 MP6 GPU." BusinessWire. (November 20, 2013) <https://www.businesswire.com/news/home/20131119006559/en/Amlogic-Answers-the-UHD-Challenge-with-Landmark-Implementation-of-ARM-Mali-450-MP6-GPU> ("ARM designs the technology that is at the heart of advanced digital products, from wireless, networking and consumer entertainment solutions to imaging, automotive, security and storage devices. . . . Combined with comprehensive design services,

market.  Although the positive experience of its customer's customers is an important part of Arm's offering, Arm's direct customers are chip developers and manufacturers, such as Amazon, Google, Intel, NVIDIA, and Samsung, rather than end customers.[100]

98.     The value that the Arm Trademarks communicate to its customers is based on the pervasiveness and differentiating features of its CPU and ISA offerings.  Arm's CPU architecture, which combines compute performance with industry-leading power efficiency, has become the world's most widely used CPU architecture.[101]  The Arm ISA, which ███████, has also become the world's most popular ISA.[102]  Software developers are incentivized to write software for Arm-based devices because it offers the biggest market for their products and chip designers are incentivized to choose Arm CPUs because they have the broadest support of software applications.[103]  The Arm architecture and Arm ISA are crucial for Arm's customers to access this flourishing ecosystem.[104]

99.     The Arm Trademarks have been strong and distinctive marks for decades as demonstrated by the following:

    a.     The Arm Trademarks have consistently been recognized by the World Intellectual Property Organization for its global goodwill, reputation, fame, and distinctiveness.[105]

---

training, support and maintenance, and the company's broad Partner community, they provide a total system solution that offers a fast, reliable path to market for leading electronics companies.")
[100] *See* ARM_01259705.
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *See* ARM_01315253; ARM_01315276; ARM_01315241; ARM_01315259; ARM_01315333; ARM_01315304; ARM_01315237; ARM_01315323; ARM_01315315; ARM_01315297; ARM_01315338; ARM_01315283; ARM_01315287; ARM_01315310; ARM_01315328; ARM_01315264.

b.  More than 260 companies have reported shipping Arm-based chips this year. And Arm CPUs were used in more than 250 billion chips last year.[106]

c.  Arm has received many awards and accolades such as Overall Winner of the International Trade Awards in 2010; the Queen's Award for Enterprise in 2011;[107] the Linley Group's Best processor IP in 2014, 2018, and 2019;[108] and TSMC OIP Partner of the Year for Processor IP for 2009-2014, 2019, 2020, and 2021.[109]

100.  Beyond building its brand through its performance and partnership with reference customers, Arm has worked to develop its brand among the relevant pool of potential buyers in other ways.  Arm executives and employees regularly participate in industry events, on demand webinars, and Arm Tech Talks.[110]  Each year, Arm also invites its licensees to an event where Arm presents its technology roadmap.[111]

101.  A consistent finding in the marketing literature is that strong branding is most effective when the underlying product or service is of high quality, particularly in B2B markets

---

[106] *See* ARM_01259705.

[107] Shaw, Chris. "Queen's Awards 2011: Chip designs bring win for ARM." *NewElectronics.* (April 21, 2011) <https://www.newelectronics.co.uk/content/news/queen-s-awards-2011-chip-designs-bring-win-for-arm/>.

[108] "The Linley Group Announces Winners of Annual Analysts' Choice Awards." *The Linley Group.* (January 16, 2015) <https://www.globenewswire.com/en/news-release/2015/01/16/1020683/0/en/The-Linley-Group-Announces-Winners-of-Annual-Analysts-Choice-Awards.html>; "The Linley Group Announces Winners of Annual Analysts' Choice Awards." *The Linley Group.* (January 12, 2018) <https://www.globenewswire.com/en/news-release/2018/01/12/1288835/0/en/The-Linley-Group-Announces-Winners-of-Annual-Analysts-Choice-Awards.html>; "Arm Mali-G77 GPU Named Best Processor IP in The Linley Group's Analysts' Choice Awards." *Arm.* (January 20, 2020). < https://newsroom.arm.com/news/arm-mali-g77-gpu-named-best-processor-ip-in-the-linley-groups-analysts-choice-awards>.

[109] "TSMC Honors ARM with Partner Award for Fifth Consecutive Year." *Arm.* (November 3, 2014). <https://www.arm.com/company/news/2014/11/29442>; "TSMC Announces 2020 OIP Partner of the Year Awards for Excellence in Accelerating Silicon Innovation." *TSMC.* (October 20, 2020) <https://pr.tsmc.com/english/news/2734>; "Arm Awarded TSMC Partner of the Year Award for Processor IP." *Arm.* (October 3, 2018). <https://newsroom.arm.com/news/arm-awarded-tsmc-partner-of-the-year-award-for-processor-ip>; "TSMC Recognizes Partners of the Year at 2021 OIP Ecosystem Forum." *TSMC.* (October 27, 2021) <https://pr.tsmc.com/english/news/2875>.

[110] *See* "Company Events." *Arm.* <https://www.arm.com/company/events>.

[111] Deposition of James Thompson, November 28,2023, 39:10-16.

where buyers often have a high degree of technical expertise in evaluating the products and services that they purchase.  For Arm's CPU customers, the virtuous cycle of adoption created by the Arm ecosystem provides a rich software ecosystem and access to broad product markets.

102.    Arm's second amended F-1 filing states that its "brand and reputation are critical factors in [its] relationship with customers, employees, governments, suppliers, and other stakeholders.  [Its] failure to address, or the appearance of [its] failure to address, issues that give rise to reputational risk…could significantly harm [Arm's] brand and reputation."[112]

103.    Arm offers benefits to downstream customers.  "Arm CPUs run the vast majority of the world's software, including the operating systems and applications for smartphones, tablets and personal computers, data centers and networking equipment, and vehicles, as well as the embedded operating systems in devices such as smartwatches, thermostats, drones, and industrial robotics. [Arm] estimate[s] that approximately 70% of the world's population uses Arm-based products, and the scale of Arm's reach continues to expand, with more than 30 billion Arm-based chips reported as shipped in the fiscal year ended March 31, 2023, alone."[113]

104.    Further, Arm's innovation is responsive to consumer demands.  "As consumers and enterprises continue to demand more from their devices, the pervasiveness of high-performance and energy-efficient semiconductors will continue to expand."[114]  In addition, as Arm's EVP and Chief Commercial Officer Will Abbey commented, "The growth of AI, I believe, is the growth of Arm….  We believe that whether it's training, which is taking place

---

[112] ARM_01259705 – 0105 at 9758.
[113] *See* ARM_01259705 – 0105 at -9712.
[114]*See* ARM_01259705 – 0105 at -9715.

34

today, which will lead to inferencing downstream, the ARM architecture is ideal to enable AI at scale."[115]

105.    In summary, a brand is more than a unique identifier of source, it also communicates a promise of certain benefits to customers based on Arm technology.  A strong brand like Arm arises from the thoughts, feelings, and associations that are linked to the Arm brand.  The strength of the Arm brand means that products that are linked to Arm (e.g., as an ingredient of the product) are conferred positive associations that have been developed by the Arm brand over the years of successful innovation.

106.    The ecosystem created by Arm over decades, enables Arm's customers to access broad markets by creating compatible CPUs and software architecture.  The Arm brand and Arm Marks also signify versatility, balancing power-efficiency, and performance.  Use of the Arm communicates these benefits.  Accordingly, the Arm brand serves as a strong performance indicator when customers make purchasing decisions.[116]

## C.    TRADEMARK INFRINGEMENT

### 1.    Qualcomm's Historical Use of Arm Trademarks

107.    Qualcomm has consistently used Arm's Trademarks in customer communication for its products that incorporate, are derived from, use, or rely on Arm Technology.  For example, Qualcomm's Application Processors Selector Guide for IoT application processors include descriptions of several different tiers of Systems-on-Chip ("SoC"), noting that the CPU is made up of certain Arm cores or Arm "compliant" cores.[117]

---

[115] Lardinois, Frederic. "Arm after the IPO." *TechCrunch*. (September 14, 2023) <https://techcrunch.com/2023/09/14/arm-after-the-ipo/>.
[116] ARM_01259705 – 0105 at 9758.
[117] "Qualcomm Application Processors Selector Guide." *Qualcomm*. <https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/application-processors-selection-guide.pdf>.

108.   As another example, the Device Specification for Qualcomm's Snapdragon[TM] 410E (APQ 8016E) processor, published in September 2016, includes several uses of Arm's Trademark.[118]  The Specification described the features of the APQ 8016E chipset as including "Quad Arm Cortex" and included a functional block diagram showing the placement of the Arm processor cortex.[119]  The APQ 8016E was marketed as suitable for use in "music players[,] cameras," gaming devices, and GPS and Wi-Fi technology.[120]  The Product Brief for the APQ 8016E touts the use of Arm's Cortex and notes that the chipset features the Arm v8-A ISA, which is "an efficient instruction set."[121]

109.   A Qualcomm's 2022 Tech Summit, it announced that its Kryo CPU will be "built on the latest ARM-V9 architecture."[122]

110.   Qualcomm's Snapdragon 8 gen 3 Mobile Platform Product Brief, published October 23, 2023, described the CPU component as incorporating "Arm Cortex-X4 technology."[123]

111.   Qualcomm has also used Arm's Trademarks in connection with press releases marketing its Snapdragon line of products.  For example, a February 27, 2022, press release published in relation to the 2022 Mobile World Congress event, stated: "Qualcomm Technologies works with a broad range of OEMs, independent software vendors (ISVs), network

---

[118] "Qualcomm® Snapdragon 410E (APQ 8016E) processor Device Specification." *Qualcomm.* (Sept. 2016) <https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/snapdragon_410e_apq_8016e_data_sheet.pdf>.
[119] *Id.* at 9-12.
[120] *Id.* at 9.
[121] "Qualcomm® APQ8016E Application Processor." *Qualcomm.*
<https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/apq8016e-product-brief.pdf>.
[122] Sourabh Jain, "Qualcomm Snapdragon Tech Summit 2022- Snapdragon 8 Gen 2, Oryon CPU, AR2 Gen 1 platform, and other announcements," *Business Insider.* (Nov. 17, 2022) <https://www.businessinsider.in/tech/news/qualcomm-snapdragon-tech-summit-2022-snapdragon-8-gen-2-oryon-cpu-ar2-gen-1-platform-and-other-announcements/articleshow/95581109.cms>
[123] "Snapdragon® 8 Gen 3 Mobile Platform." *Qualcomm.* <https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_B_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf>.

operators, and channel partners to expand the Arm®-based Snapdragon computing ecosystem for enterprise use cases."[124]

### 2. Qualcomm's Current and Future Use of Arm Trademarks with Nuvia Products

112.     Qualcomm has continued to describe the Nuvia-based Products using "Arm."  For example, Qualcomm's public statements regarding the technology at issue use Arm's brand to communicate there is some connection as to source, affiliation, sponsorship, or approval between Arm and Qualcomm regarding the Nuvia Products.

a.  A press release published on January 3, 2022 touts the "broad support from ecosystem partners for the PC industry's transition to Arm®-based computing," and at the same time states that Qualcomm's "acquisition of NUVIA uniquely positions Qualcomm Technologies to drive this industry wide transition."  The press release quoted Qualcomm CEO Cristiano Amon saying: "The future of the PC industry is modern Arm-based architectures and Snapdragon compute platforms will continue to lead and define the future of productivity, education, and connected entertainment[.]"[125]

b.  At Qualcomm's 2023 Snapdragon Summit, Director of Product Management Manju Varma announced that the Oryon CPU would be the first "CPU on Arm-based architecture to hit over 4GHz."[126]

---

[124] "Qualcomm Expands Snapdragon Compute Ecosystem for the Next-Generation of Enterprise-Grade PCs." *Qualcomm.* (February 27, 2022) <https://www.qualcomm.com/news/releases/2022/02/qualcomm-expands-snapdragon-compute-ecosystem-next-generation-enterprise>.
[125] "Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms, Qualcomm Inc." *Qualcomm.* (Jan. 3, 2022) <https://www.qualcomm.com/news/releases/2022/01/>
[126] ARM_01422901 at 37:32.

c. On Qualcomm's November 1, 2023, Earnings Call, Qualcomm CEO Cristiano Amon explained the Snapdragon X Elite "Arm-based PC processor . . . is going to be part of the expansion of TAM [Total Addressable Market] for Qualcomm."[127]

113. 

114.

115.  At present, Qualcomm has continued to suggest sponsorship, affiliation, or certification of the Nuvia Products by Arm by publicly representing that it continues to use and develop derivatives or embodiments of Arm Technology, including ████████████.

116.  For example, in June 2022, Qualcomm said that its Nuvia chips will soon join the industry-wide "ecosystem transition to Arm" and that by "late next year, beginning 2024, you're going to see Windows PCs powered by Snapdragon with a Nuvia-designed CPU."[130]  In November 2022, Qualcomm said: "the creation of our custom CPU was started by Nuvia engineers while employed at Nuvia."[131]

---

[127] "Qualcomm (QCOM) Q4 2023 Earnings Call Transcript." *The Motley Fool*. (September 30, 2023) <https://www.fool.com/earnings/call-transcripts/2023/11/01/qualcomm-qcom-q4-2023-earnings-call-transcript/>.

[130] Complaint ¶¶ 48-49 (citing *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375).

[131] "Qualcomm dubs Nuvia CPU 'Oryon,' on track for 2023." *PCWorld.* (November 17, 2022) <https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html>.

117. Terms such as ████████ and █████████ have a particular meaning within the relevant market, ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████.[132]

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

118. Qualcomm's use of Arm's Trademark in connection with the Nuvia Products— including with phrases such as ██████████ and ███████████ falsely convey that such products ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

### 3. Third-Party Mention of Arm Trademarks Regarding Qualcomm's Nuvia Products

119. Even if Qualcomm no longer plans to use Arm's Trademarks in its communication, which is not the case at present, industry press covering the technology at issue has used Arm's brand to suggest endorsement, affiliation, or certification of the technology at issue by Arm.

---

█ ██████████████████████████████████████████████

█ █ ████████████████████████████████████

[134] *See* ¶ 62.

a. HONOR, a Chinese smartphone company announced at the 2023 Snapdragon Summit "the exciting news that HONOR is developing an ARM PC using the newly announced Snapdragon X Elite platform."[135]

b. An article published by Extremetech explains "[t]he Qualcomm and former Nuvia teams have morphed Nuvia's ARM designs into the Oryon custom CPU core," and that the Snapdragon Z Elite chips, based on this CPU, "will replace the 8cx chips in the company's portfolio."[136]

c. An international business and financial news outlet article describes Qualcomm's "major announcement" regarding "the launch of its new Oryon CPU." The article notes "The Oryon CPU is Qualcomm's first custom Arm CPU design" and goes on to tout the performance and power metrics of the Oryon CPU, stating the "Oryon CPU is a major development for the tech industry."[137]

d. In a video sponsored by Qualcomm, blogger Austin Evans notes that Qualcomm's Snapdragon X Elite chip is "Arm-Powered" and was "developed on Arm."[138]

e. An article published on October 29, 2023, by the Motley Fool, a private financial and investing advice company, stated "the new X Elite chips, powered by Oryon

---

[135] Stradling, Colton. "HONOR announces its first ARM PC built on Snapdragon X Elite will release next year." *Windows Central.* (October 25, 2023) <https://www.windowscentral.com/hardware/honor-announces-its-first-arm-pc-built-on-snapdragon-x-elite-will-release-next-year>.
[136] Whitwam, Ryan. "Qualcomm Announces Snapdragon X Elite Processor for Laptops." *ExtremeTech.* (October 25, 2023) <https://www.extremetech.com/computing/qualcomm-announces-snapdragon-x-elite-processor-for-laptops>.
[137] Priya Pathak. "Qualcomm takes swing at Intel with Oryon, unlocks 240 fps gaming on flagship phones with 8 Gen 3: Top announcements from Snapdragon Summit." *Financial Express* (Oct. 25, 2023).
[138] Evans, Austin. "The Biggest Upgrade for Windows PCs in YEARS." (October 28, 2023) <https://www.youtube.com/watch?v=Vt1EmsvEyd4>.

CPUs [Qualcomm] got when it acquired Arm-based designer Nuvia in 2021, claim some impressive performance."[139]

    f.   Counterpoint Technology Market Research published an article dated November 2, 2023 stating: "The Snapdragon X Elite is an ARM-based processor[.]"[140]  The article notes several times that the Oryon CPU is "Arm-based."[141]

120.    That third parties, including industry news outlets and Qualcomm's own licensees, are using Arm's Trademark in connection with the Nuvia Products demonstrates that participants throughout the relevant industry are associating the Nuvia Products with Arm sponsorship and falsely assuming a licensing relationship exists between Arm and Qualcomm regarding the Nuvia Products.[142]  Such third-party mentions also amplify the confusion created by Qualcomm's own use by suggesting Arm sponsorship and endorsement of the Nuvia Products to an even broader audience.

121.    Qualcomm's unauthorized use of the Arm Mark for Nuvia Products will mislead its customers and other relevant industry participants into believing that there is some connection as to source, affiliation, sponsorship, or approval between Arm and Qualcomm.  By using the Arm Mark in connection with the Nuvia Products, Qualcomm would benefit from the positive and favorable associations with the Arm Mark.

---

[139] Rossolillo, Nicholas. "Qualcomm Is Gunning for a Piece of Intel's Lunch -- Time to Buy Qualcomm Stock?" *The Motley Fool.* (October 29, 2023) <https://www.fool.com/investing/2023/10/29/qualcomm-is-gunning-for-a-piece-of-intels-lunch-ti/>.

[140] "Qualcomm Snapdragon X Elite Unveiled: ARM-based SoC for Windows-powered AI PCs." *Counterpoint Research.* (November 2, 2023) <https://www.counterpointresearch.com/insights/qualcomm-snapdragon-x-elite-arm-based-soc-windows-ai-pc/>.

[141] *Id.*

[142] *See* ¶ 62.

D.    **QUALCOMM'S UNAUTHORIZED USE OF THE ARM MARK IS LIKELY TO HARM ARM**

122.    As discussed above, Qualcomm has used Arm's Trademarks in its communications about Nuvia Products that incorporate, are derived from, or rely on Arm Technology.  It has done so by marking the Nuvia Products with the ARM Mark, and by publicly describing the Nuvia Products as ██████████ and ████████████  As discussed, use of these terms and of the Arm Trademarks ███████████████████████████ ████████████████████████████████████████████ ██████████████████████████████  In other words, it signals that the Nuvia Products have gone through a ███████ and ████████ process with ████████████████████, such that ██████████████████████████████ ██████████████ Arm and comply █████████████████████.[143]

123.    ████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████

124.    Further, Qualcomm's public statements regarding the technology at issue have already relied on Arm's brand to suggest endorsement, affiliation, or certification by Arm and confirm that Qualcomm intends to use Arm Trademarks in connection with products incorporating the ██████████ .  By describing the Nuvia Products with references to Arm, ██████████, or █████████████ and by using the ARM Mark in connection with promotion of the Nuvia Products, like at the Snapdragon Summit, Qualcomm has publicly made a clear connection between the technology at issue and Arm's brand.

---

[143] Deposition of Jonathan Armstrong, December 8, 2023, 82:20-83:8.
[144] ████████████████████████████████████████

125.    The absence of a license for Qualcomm's use of Arm's Trademarks in those products necessarily means that such use is infringing.[145]

126.    By using the ARM Mark without Arm's permission in its press announcements, at its launch events, and on its website, Qualcomm has used an asset developed by Arm (its brand) to increase consumer acceptance of new products.  The use of the familiar and trusted Arm brand will enable Qualcomm to communicate that the Nuvia Products are licensed and have been verified and validated by Arm, thereby facilitating acceptance and adoption of such products, and enabling Qualcomm to access the broad marketplace associated with the Arm ecosystem. Thus, by using the Arm Trademarks without Arm's permission, Qualcomm will draw on the equity of the Arm Mark to increase the likelihood of consumer acceptance of its products.

127.    Qualcomm's unlicensed use of Arm's Trademarks will cause harm to Arm by resulting in a loss of control to Arm of its brand and goodwill.  In general, the loss of brand image and goodwill occurs because any dissatisfaction or problems associated with the infringing user, or its products are likely to be erroneously attributed also to the trademark owner and/or its products.  Negative attributions and inferences concerning the infringing user, or its products can also spillover to Arm if it is seen as being associated with such products.

128.    As discussed above, the use of the Arm Trademarks and the terms ███████████ and ███████████ signal that the Nuvia Products have been developed under a valid Arm license.  Qualcomm's unauthorized use of Arm's Trademarks means that how customers view the Arm Mark is now connected to the quality and outcomes associated with the Nuvia Products. For example, any Nuvia Products that have the unauthorized use of Arm's Trademarks and have some negative customer response or experience place Arm's valuable brand asset at risk.

---

[145] *See* ¶¶ 61, 62, 66.

Customers may also mistakenly attribute any issues with the performance of Qualcomm's Nuvia Products also to presumed flaws in the Arm ISA or failures of Arm's own engineering team.

129.    As Will Abbey (Arm's Executive Vice President & Chief Commercial Officer) testified during his deposition: "At the end of the day, Arm's an IP company.  Our confidential information, our intellectual property is so germane to what we do. ██████████████

████████████████████████████████████████████████

██████ ."[146]

130.    Mr. Abbey also testified that "[i]f ████████████████████████

███████ I ██████████████████████████████████████

████████████████████████ ."[147]

131.    Therefore, Qualcomm's and third parties' continued use of the Arm Trademarks and its continued drawing of a false connection between its Nuvia Products and Arm's brand in the eyes of the customer deprives Arm of control over its brand and the management of its goodwill in the industry and to consumers.

132.    As discussed in Section VI.C., Arm licenses its technology to many different customers who compete in the same marketplace as Qualcomm.  Qualcomm's unauthorized use of Arm's Trademark in connection with the Nuvia Products ████████████████

████████████████████████████████████████████████

█████████████    Customers who might have sought out an Arm product may instead turn to Qualcomm's products because they mistakenly understand, because of Qualcomm's infringing use of Arm Trademarks, that Qualcomm's Nuvia Products are equivalent to Arm technology, or somehow supported by Arm.

---

[146] Deposition of Will Abbey, October 27, 2023, p. 324.
[147] Deposition of Will Abbey, October 27, 2023, p. 361.

133.    Customers of Nuvia Products themselves would be harmed by the deceptive nature of the sale and the loss of benefits they sought from using Arm's products.  Customers seeking to use an Arm product who instead receive a Qualcomm product are harmed and deceived by getting a product that is not in fact sponsored by or affiliated with Arm, and does not come with the unique benefits, like the support and maintenance from Arm engineers, that a true partnership with Arm would bring.

**E.    QUALCOMM'S UNAUTHORIZED USE OF THE ARM MARK SHOULD NOT CONSTITUTE FAIR USE**

134.    I understand that Qualcomm contends that its unauthorized use of the Arm Trademarks "constitutes fair use."[148]

135.    I have been informed that, to demonstrate fair use, Qualcomm must show (1) that its unauthorized use of the Arm Trademarks is necessary to describe both Arm's product or service and Qualcomm's product or service; (2) that Qualcomm uses only so much of the Arm Trademarks as is necessary to describe Arm's product; and (3) that Qualcomm's conduct or language reflect the true and accurate relationship between Arm's and Qualcomm's products or services.

136.    It is my opinion that Qualcomm's unauthorized use of the Arm Trademarks would not constitute fair use.  For example, as I discussed above in Section VII.C., Qualcomm's unauthorized use of the Arm Trademarks, in particular phrases such as ████████ and ███ ████████ falsely signifies that the ████████████████████████████████, ████████████████████████████ and have been ██████ and ██████ by Arm and that the ████████████████████████████████████████.[149]

---

[148] Defendants Responses and Objections to Plaintiff's First Set of Requests for Admission, Request No. 24.
[149] *See* ¶ 62.

45

Qualcomm's unauthorized use of the Arm Trademarks would **not** reflect the true and accurate relationship between Arm and Qualcomm's Nuvia-based Products, at least because there is no licensing relationship between Arm and Qualcomm with respect to the Nuvia Products and because the Nuvia-based Products have not gone through a verification and validation process with Arm's support and maintenance in order to comply with Arm's ISA requirements.  (*See*, *supra*, Sec. VII.C.)

137.    I have been informed that Qualcomm bears the burden to demonstrate fair use, including the factors discussed above in ¶ 135.  Accordingly, I have not conducted a full analysis on why Qualcomm's unauthorized use of the Arm Trademarks would not constitute fair use, but I reserve the right to do so in response to any expert opinion offered by Qualcomm regarding fair use.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed on December 20, 2023.

_____

**RAVI DHAR**

# EXHIBIT A

EXHIBIT A

June  2023

**RAVI  DHAR**
Yale School of Management
165 Whitney Avenue
Yale University
New Haven, CT 06520
(203) 432-5947

---

**Employment**

| | |
|---|---|
| **George Rogers Clark Professor of Management** | **2005 - Present** |
| **Professor of Psychology (*joint appointment*)** | **2003 – Present** |
| **Director, Yale Center for Customer Insights** | **2004 – Present** |
| **Professor of Marketing,** | **2000 – Present** |
| Associate Professor of Marketing, | 1997 - 2000 |
| Assistant Professor of Marketing | 1992 - 1997 |
| Yale School of Management | |

**Other Appointments**

| | |
|---|---|
| Visiting Faculty, HEC Paris | Summer 1996 |
| Visiting Associate Professor, Stanford University | Spring 1998 |
| Visiting Professor, Erasmus University | Summer 2000, 2001 |
| Visiting Professor, New York University | Spring 2005, Spring 2010 |

**Education**

| | |
|---|---|
| **Haas School of Business, UC Berkeley** | 1988-1992 |
| Ph. D. (Business Administration) | 1992 |
| M.S. (Business Administration) | 1990 |
| **Indian Institute of Management** | 1987 |
| M.B.A. | |
| **Indian Institute of Technology** | 1985 |
| B.Technology | |

**Academic Honors and Fellowships**

Distinguished Alumnus Award, Indian Institute of Management, 2013
Distinguished Scientific Contribution Award, SCP, 2012
Yale SOM Alumni Association Teaching Award, 2012
Finalist O'Dell Award 2012
Finalist, O'Dell Award, 2008
Winner, O'Dell Award 2005
Finalist, O'Dell Award, 2004
Finalist, Paul Green Award, 2004
AMA Consortium Faculty Fellow, 2003- 2009, 2010, 2012, 2013
INFORMS Doctoral Consortium Faculty – Multiple Years
ACR Doctoral Consortium Faculty – Multiple Years
John A. Howard Doctoral Dissertation Award (Honorable Mention), 1993

EXHIBIT A

AMA Doctoral Consortium Fellow, 1991

**Research Interests**

| | |
|---|---|
| Consumer Behavior | Marketing Strategy |
| Judgment and Decision Making | Branding |
| E-Commerce | Behavioral Finance |

**Teaching Interests**

| | |
|---|---|
| Marketing Management | Consumer Behavior |
| Marketing Strategy | Behavioral Decision Theory |
| Financial Services | E-Commerce Marketing |

**Professional Affiliation (Member)**

American Marketing Association
Association for Consumer Research
Society of Judgment and Decision Making

**Professional Activities**

Editorial Board,     *Journal of Consumer Research, 1997 – Present, Past Associate Editor*
*Journal of Consumer Psychology, 1997 – 2002, 2005 - Present*
*Journal of Marketing Research, 2001 – Present, Associate Editor*
*Journal of Marketing, 2005 - Present*
*Marketing Letters, 2000 - Present*
*Marketing Science, 2002- 2011, Past Area Editor*

Occasional Reviewer, *Marketing, Management, Psychology Journals, NSF, etc.*

**Publications in Journals**

**Approximate Number of Citations in Google Scholar: 22,000+**

1. "Targeted Electronic Health Record Alerts to Improve Management of Patients Hospitalized with Heart Failure and Reduced Ejection Fraction: The PROMPT-AHF Clinical Trial," (w Lama Ghazi…Tariq Ahmad), *European Heart Journal*, 2023.

2. "Planning Prompts as a Tool for Increasing Habitual Sustainability Behaviors," (w. Eleanor Putnam-Farr, Jane Upritchard, Michiel Bakker, Maragret Gorlin), *Journal of the Association for Consumer Research*, 2023.

3. "Driving Sustainable Food Choices: How to Craft an Effective Sustainability Labeling System (w. Paul Stillman, Chavanne Handon, Jonathan Kaplan,

EXHIBIT A

Treeny Ahmed, Michiel Bakker), *Journal of the Association for Consumer Research*, 2023.

4. Electronic alerts to improve heart failure therapy in outpatient practice: a cluster randomized trial (w Lama Ghazi…Tariq Ahmad), Journal of the *American College of Cardiology*, 2022.

5. Alerting Clinicians to 1-Year Mortality Risk in Patients Hospitalized With Heart Failure: The REVEAL-HF Randomized Clinical Trial (w Tariq Ahmad et al.) JAMA Cardiology, 2022.

6. "The impact of touchscreen devices on consumers' choice confidence and purchase likelihood," (with Johannes Hattula and Walter Herzog), *Marketing Letters*, 2022.

7. "In the Face of Self-threat: Why Ambivalence Heightens People's Willingness to Act," (with Taly Reich and Alex Fulmer), *Organizational Behavior and Human Decision Processes*, 2022.

8. "Attractive and Confident: How Boosting Self-perceived Attractiveness Reduces the Context Effects of All-average, Default, and Compromise options," (with Zixi Jiang, Jing Xu, and Margaret Gorlin), *Journal of Marketing Research*, 2021.

9. The Curse of the Original: How and When Heritage Branding Reduces Consumer Evaluations of Enhanced Products (with Minju Han, George Newman, Rosanna Smith), *Journal of Consumer Research*, 2021.

10. When does Altruism Trump Self-Interest? The Moderating Role of Affect in Extrinsic Incentives (with Uzma Khan and Kelly Goldsmith), *Journal of the Association for Consumer Research*, 2020.

11. "The Uncertain Self: How Self-Concept Structure Affects Subscription Choice," (with Jennifer Savary), *Journal of Consumer Research*, 2020.

12. By-Brand or By-Category? The Effect of Display Format on Brand Extension Evaluation" (with Xiaoying Zheng and Ernest Baskin), *Journal of Retailing*, 2019.

13. "You Don't Blow Your Diet on Twinkies: Choice Processes When Choice Options Conflict with Incidental Goals," (with K. Goldsmith and EMS Friedman), *Journal of the Association for Consumer Research,* 2019.

14. "Apples, Oranges and Erasers: The Effect of Considering Similar versus Dissimilar Alternatives on Purchase Decisions," (with Liz Friedman and Jennifer Savary), *Journal of Consumer Research*, 2018.

15. "Seeing Stars: How the Binary Bias Distorts the Interpretation of Customer Ratings," (w Matt Fisher and George Newman), *Journal of Consumer Research*, 2018.

EXHIBIT A

16. "Effect of Intelligence on Consumers' Responsiveness to a Pro-Environmental Tax: Evidence from Large-Scale Data on Car Acquisitions of Male Consumers," (w Jaakko Aspara and Xueming Luo), *Journal of Consumer Psychology*, 2017.

17. "Proximity of Snacks to Beverages Increases Food Consumption in the Workplace: A Field Study," (w E. Baskin, M. Gorlin, Z. Chance, N. Novemsky, K Huskey, M. Hatzis), *Appetite*, 2016.

18. "Mental Representation Changes the Evaluation of Green Product Benefits," (with Kelly Goldsmith and George Newman), *Nature Climate Change*, 2016.

19. "Closer to the Creator: Temporal Contagion Explains The Preference for Earlier Serial Numbers (with R. Smith and G. Newman), *Journal of Consumer Research*, 2016.

20. "Sophisticated by Design: the Nonconscious Influences of Primed Concepts and Atmospheric Variables on Consumer Preferences," (with T. Andrew Poehlman and John A. Bargh), *Customer Needs and Solutions*, 2015.

21. "Positive Consequences Of Conflict On Decision Making," (with J. Savary, T. Kleiman, and R. Hassin), *Journal of Experimental Psychology: General*, 2015.

22. "The Technological Conundrum: How Rapidly Advancing Technology Can Lead To Commoditization," (with T. Chan and W. Putsis), *Customer Needs and Solutions*, 2015.

23. "When Going Green Backfires: How firm Intentions Shape the Evaluation of Socially Beneficial Product Enhancements," (with G. Newman and M. Gorlin), *Journal of Consumer Research*, 2014.

24. Why Choosing Healthy Foods Is Hard, and How to Help: Presenting 4P's Framework for Behavior Change," (with Z. Chance and M. Gorlin), *Customer Needs and Solutions*, 2014.

25. "Giving Against the Odds: When Tempting Alternatives Increase Willingness to Donate," (with J. Savary and K. Goldsmith), *Journal of Marketing Research*, 2014.

26. Authenticity is Contagious: Brand Essence and the Original Source of Production," (with George Newman), *Journal of Marketing Research*, 2014.

27. "A Dual System Framework to Understand Preference Construction Processes in Choice," (with M. Gorlin), *Journal of Consumer Psychology*, 2013.

28. "Refining the dual-process theory of preference construction: A reply to Gawronski, Martin and Sloman, Stanovich, and Wegener and Chien," (with M. Gorlin), *Journal of Consumer Psychology*, 2013.

EXHIBIT A

29. Negativity Bias and Task Motivation: Testing the Effectiveness of Positively Versus Negatively Framed Incentives, (with K. Goldsmith), Journal of Experimental Psychology: Applied, 2013.

30. Representation and Perceived Similarity: How Abstract Mindset Aids Choice from Large Assortments," (with J. Xu and Z. Jiang), *Journal of Marketing Research*, 2013.

31. "Comparing Apples to Apples or Apples to Oranges: The Role of Mental Representation in Choice Difficulty," (with U. Khan and E. Kim), *Journal of Marketing Research*, 2013.

32. "Adding small differences can increase similarity and choice," (with J. Kim and N. Novemsky), *Psychological Science*, 2013.

33. When Guilt Begets Pleasure: The Positive Effect of a Negative Emotion," (with K. Goldsmith and E. Kim), *Journal of Marketing Research*, 2012.

34. Bridging the Gap Between Joint and Individual Decisions: Deconstructing Preferences in Relationships," (with M. Gorlin), *Journal of Consumer Psychology*, 2012.

35. The Importance of the Context in Brand Extension: How Pictures and Comparisons Shift Consumers' Focus from Fit to Quality," (with T. Meyvis and K. Goldsmith), *Journal of Marketing Research*, 2012.

36. "Self-Signaling and the Costs and Benefits of Temptation in Consumer Choice," (with K. Wertenbroch), *Journal of Marketing Research*, 2012.

37. "Price Framing Effects on Purchase of Hedonic and Utilitarian Bundles," (with U. Khan), *Journal of Marketing Research*, 2010.

38. "Making Products Feel Special: When Metacognitive Difficulty Enhances Evaluation," (with A. Pocheptsova and A. Labroo), *Journal of Marketing Research*, 2010.

39. "Modeling the Under Reporting Bias in Panel Survey Data," (with Sha Yang and Yi Zhao) *Marketing Science*, 2010.

40. " The Effect of Decision Order on Purchase Quantity Decisions," (with I. Simonson and S. M. Nowlis), *Journal of Marketing Research*, 2010.

41. Tradeoffs and Depletion in Choice," (with N. Novemsky, J. Wang, R. Baumeister), *Journal of Marketing Research*, 2010.

42. Opportunity Cost Neglect" (with S. Frederick, N. Novemsky, J. Wang, and S. Nowlis), *Journal of Consumer Research*, 2009.

EXHIBIT A

43. "Anticipating Adaptation to Products" (with J. Wang and N. Novemsky), *Journal of Consumer Research*, 2009.

44. Deciding Without Resources: Psychological Depletion and Choice in Context," (with O. Amir, A. Pochepstova, and R. Baumeister), *Journal of Marketing Research,* 2009.

45. Customization Procedures and Customer Preferences," (with A. Valenzuela and F. Zettelmeyer), *Journal of Marketing Research,* 2009.

46. "Beyond Rationality: The Content of Preferences," (with N. Novemsky), *Journal of Consumer Psychology*, 2008.

*47.* "Of Frog Wines and Frowning Watches: Semantic Priming of Perceptual Features and Brand Evaluation," (with A. Labroo and N. Schwarz), *Journal of Consumer Research*, 2008.

*48.* "When Thinking Beats Doing: The Role of Optimistic Expectations in Goal-Based Choice," (with A. Fishbach and Y. Zhang), 2007, *Journal of Consumer Research*.

*49.* "Seeing The Forest Or The Trees: Implications of Construal Level Theory for Consumer Choice*," (with E. Kim), Journal of Consumer Psychology, 2007*

50. "Where There Is a Way, Is There a Will? The Effect of Future Choices on Self-Control" (with U. Khan), *Journal of Experimental Psychology: General*, 2007

51. Preference Fluency in Choice," (with N. Novemsky, N. Schwarz, and I. Simonson), 2007, *Journal of Marketing Research*.

52. "The Shopping Momentum Effect," (with J. Huber and U. Khan), 2007, *Journal of Marketing Research*.

53. "Institutional Perspectives in Real Estate Investing," (with W. Goetzmann), 2006, *Journal of Portfolio Management*.

54. "Are Rheumatologists' Treatment Decisions Influenced by Patients Age?," (with L. Fraenkel and N. Rabidou)," 2006, *Rheumatology*.

55. "Sub-goals as Substitutes or Complements: The Role of Goal Accessibility," (with A. Fishbach and Y. Zhang), 2006, *Journal of Personality & Social Psychology*.

56. "Up Close and Personal: A Cross Sectional Study of the Disposition Effect" (with N. Zhu), *Management Science*, 2006.

57. "Licensing Effect in Consumer Choice," (with U. Khan), *Journal of Marketing Research*, 2006.

EXHIBIT A

58. "Goals as excuses or guides: The liberating effect of perceived goal progress on choice," (with A. Fishbach), *Journal of Consumer Research*, 2005.

59. "Goal Fulfillment and Goal Targets in Sequential Choice," (with N. Novemsky), *Journal of Consumer Research*, 2005.

60. "Towards extending the Compromise Effect to Complex Buying Contexts," (with Anil Menon and Bryan Maach), *Journal of Marketing Research*, 2004.

61. " To Buy or Not to Buy: Response Mode Effects on Consumer Choice," (with S. Nowlis), *Journal of Marketing Research, 2004*.

*62.* "Hedging Customers," (with R. Glazer), *Harvard Business Review*, 2003.

63. "The Effect of Forced Choice on Choice," (with I. Simonson), *Journal of Marketing Research,* 2003.

64. "Coping with Ambivalence: The Effect of removing a "fence sitting" option on Consumer Attitude and Preference Judgments (with B. Kahn and S. Nowlis), *Journal of Consumer Research*, 2002.

65. "Consumer Psychology: In Search of Identity," (with Z. Carmon, A. Drolet, S. Nowlis, and I. Simonson), *Annual Review of Psychology*, 2001.

66. "An Empirical Analysis of the Determinants of Category Expenditure," (with W. Putsis),  *Journal of Business Research*, 2001.

67. "Trying Hard or Hardly Trying: An Analysis of Context Effects in Choice" (with S. Nowlis and S. Sherman), *Journal of Consumer Psychology*, September 2000.

68. "Consumer Choice between Hedonic and Utilitarian Goods," (with K. Wertenbroch), *Journal of Marketing Research*, February 2000.

69. "Assessing the Competitve Interaction Between Private Labels and National Brands," (with R. Cotterill and W. Putsis), *Journal of Business,* January 2000.

70. "Comparison Effects on Preference Construction," (with S. Nowlis and S. Sherman), *Journal of Consumer Research,* December 1999.

71. "The Effect of Time Pressure on Consumer Choice Deferral," (with S. Nowlis), *Journal of Consumer Research*, March, 1999.

72.  "Making complementary choices in consumption episodes: Highlighting Versus Balancing," (with I. Simonson), *Journal of Marketing Research*, February, 1999.

73. "The Many Faces of Competition," (with W. Putsis), *Marketing Letters*, July, 1998.

EXHIBIT A

74. "Consumer Preference for a No-Choice Option," *Journal of Consumer Research*, September, 1997.

75. "Context and Task Effects on Choice Deferral," *Marketing Letters,* January*, 1997.*

76.  "The Effect of Decision Strategy on the Decision to Defer Choice," *Journal of Behavioral Decision Making*, December, 1996.

77. "The Effect of Common and Unique features in Consumer Choice," (with S. J. Sherman), *Journal of Consumer Research*, December, 1996.

78. "Similarity in Context: Cognitive Representation and the Violation of Preference Invariance in Consumer Choice," (with R. Glazer)*, Organizational Behavior and Human Decision Processes*, September, 1996.

79. "The Effect of the focus of comparison on consumer preferences," (with I. Simonson), *Journal of Marketing Research*, November, 1992.

## Publications in Book Chapters / Managerial Summary

1. Introduction to the Special Issue: Goals and Motivation (with U. Khan and A. Fishbach), Journal of the Association for Consumer Research, 2019.

2. Nudging Healthy Choices with the 4 Ps Framework for Behavioral Change (w Zoe Chance, M. Hatzis, M. Bakker, and L. Ash), *Handbook of Marketing Analytics: Methods and Applications in Marketing Management, Public Policy, and Litigation Support".*

3.  "How Google Optimized Office Snacks," (with Zoe Chance, Michelle Hatzis, and Michiel Bakker," Harvard Business Review, 2016.

4.  "Nudging Individuals Toward Healthier Food Choices with the 4Ps Framework for Behavior Change", (with Chance, Zoë, Ravi Dhar, Michelle Hatzis, and Kim Huskey. in *Behavioral Economics and Public Health*, ed. C. Roberto and I. Kawachi. 2015.

5. "The Power of Customer's Mindset," (with Kelly Goldsmith and Jing Xu), *Sloan Management Review*, 2010.

6. "Giving Consumers License to Enjoy Luxury," (with U. Khan and S. Schmidt), *Sloan Management Review*, 2010.

7. "Brand Permission: A Conceptual and Managerial Framework," (with Tom Meyvis), In Handbook on Brand and Experience Management, Bernd H.Schmitt and David L. Rogers (Eds.), Elgar Publishing, Northampton, MA, 2008.

8. "Dynamics of goal-based choice," (with A. Fishbach), In Handbook of Consumer Psychology, (eds. C. P. Haugtvedt, P.M. Herr & F. R. Kardes), Erlbaum Press, 2007.

EXHIBIT A

9. "A Behavioral Decision Theoretic Perspective on Hedonic and Utilitarian Choice,"(with U. Khan and K. Wertenbroch) in Inside Consumption: frontiers of Research on Consumer Motives, Goals, and Desires, (eds. S. Ratneshwar and David Glen Mick), London: Routledge, 2005.

10. "Customer Relations Online," in Wiley Next Generation of Business Thinkers, (ed. Subir Chowdhury), 2004.

11. "Defining Customers' Needs and Values for Marketing Success," in Inside the Minds: Textbook Marketing, Aspatore Press, 2003.

12. "The Online Store," (with D. R. Wittink), in Managing Customer Relationships (eds. Martha Rogers and Don Peppers), Wiley, 2003.

13. "Choice Deferral," in The Elgar Companion to Consumer Research and Economic Psychology (eds. P. Earl and S. Kemp), 1999.


## Select Working Papers / Papers Under Review

1. "Ironic Effects of Goal Activation on Choice," (with K. Goldsmith), under first review.

2. "The Effect of Goal Breadth on Consumer Preferences," (with E. Kim), under first review.

3. "Can Investors Multiply and Divide: Investors' response to Stock Splits," (with N. Zhu and Dan Ariely).

4. "Category Expenditure and Promotion: Can Private Labels Expand the Pie," (with W. Putsis), Working Paper.

5. "Mindset over Matter: The Interplay between Goals and Preferences," (with A. Pochepstova), Working Paper.


## Conference Proceedings Publications

1. Constructing preferences: The role of comparisons in consumer judgment and choice," (with S. Zhang) Proceedings of the Association for Consumer Research, University of Chicago Press (1999).

2. "Sequential Choices and Uncertain Preferences," Proceedings of the Association for Consumer Research, University of Chicago Press (1997).

EXHIBIT A

3. "Causes and Effects of Reference Effects in Choice," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1997).

4. "New Directions in Mental Accounting," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1995).

5. "Decision Difficulty and Uncertain Preferences: Implications for Consumer Choice," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1994).

6. "Behavioral Decision Research: Theory and Applications," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1993).

7. "To Choose Or Not To Choose: This is the Question," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1992).

**Invited and Conference Presentations**

**Invited Academic Presentations (\* denotes multiple presentations)**
> *Boston College*
> *Carnegie-Mellon University*
> *Chinese University, Hong Kong*
> *Columbia University\**
> *Cornell University\**
> *Duke University\**
> *Harvard University*
> *Hong Kong University of Science and Technology*
> *IIPM\**
> *INSEAD\**
> *Indiana University*
> *Korea University*
> *London Business School\**
> *MIT\**
> *National University of Singapore*
> *New York University\**
> *Northwestern University\**
> *Ohio State University*
> *Pennsylvania State University*
> *Stanford University\**
> *Texas A&M University*
> *Tilburg University*
> *Tulane University*
> *University of Alberta*
> *University of Arizona*
> *University of British Columbia (planned)*

EXHIBIT A

*University of California, Berkeley\**
*University of California, Los Angeles\**
*University of California, San Diego*
*University of Chicago\**
*University of Delaware*
*University of Colorado*
*University of Florida*
*University of Houston*
*University of Illinois, Urbana-Champaign\**
*University of Miami*
*University of Maryland*
*University of Massachusetts, Amherst*
*University of Michigan\**
*University of North Carolina\**
*University of Peking\**
*University of Pennsylvania\**
*University of Rotterdam\**
*University of Texas, Austin*
*University of Utah*
*University of Toronto\**
*University of Vienna*
*Washington University, St. Louis\**

**Conference Presentations (Over 300 presentations at conferences, consortiums, keynotes, symposiums, workshops, etc.) Recent presentations include:**

Keynote Addresses to Practitioners, Various Events
Choice Symposium
CEO Roundtables, New York and New Haven
CMO Roundtables, Various Organizations
ACR
Informs
Judgment and Decision Making
Behavioral Decision Research in Management
Society of Consumer Psychology

# EXHIBIT B

**Exhibit B**
Ravi Dhar's Prior Testimony (past 4 years or more)

1. Delta Air Lines, LLC v. Marriott International, Inc. And Marriott Worldwide Corp (Deposition)

2. Matthew Macormic and Eric Howard v. Vi-Jon LLC (Deposition)

3. Joseph Mier, et al. v. CVS Health and Vi-Jon LLC (Deposition)

4. Orgain v. Iovate, et al. (Deposition and Trial)

5. Jackson et al. v. Anheuser-Busch Companies, LLC and Miami Beer Venture, LLC (Deposition)

6. Girl Scouts of the United States of America v. Boy Scouts of America (Deposition)

7. Ferrari v. Vitamin Shoppe Inc. (Deposition)

8. AT&T Mobility LLC v. Mark Thomann and Dormitus Brands LLC (Deposition)

9. Alfwear, Inc. v. Mast-Jagermesiter US, Inc. et al. (Deposition)

10. State of Washington v. Comcast, et al. (Deposition and Trial)

11. Re: Animal Legal Defense Fund v. Hormel Food Corporation Matter (Deposition)

12. Bay Parc Plaza Apartments, L.P., et. al. v. Airbnb, Inc., et al. (Deposition)

13. Oddo, et al. v. Arcoaire Air Conditioning and Heating, et al. (Deposition)

14. Saxon Glass Technologies, Inc. v. Apple Inc. (Deposition)

15. In Re: Emerson Electric Co. Wet/Dry Vac Marketing and Sales Practices Litigation (Deposition)

16. In the Matter of Satellite Radio and "Preexisting" Subscription Services (SDARS III), Copyright Royalty Board (Deposition and Hearing)

17. Biscotti Inc. v. Microsoft Corp. (Deposition and Trial)

18. FTC v. DirecTV, Inc. (Deposition)

19. Zakaria v. Gerber Products Co. (Deposition)

20. Moab Industries, LLC v. Chrysler Group, LLC (Deposition and Trial)

21. In Re: Tropicana Orange Juice Marketing and Sales Practices Litigation (Deposition)

22. FTC v. Amazon.com, Inc. (Deposition)

**23.**  Ericsson, et al. v. <u>TCL Communication Technology Holdings, Ltd., et al.</u> (Deposition)

**24.**  Parallel Network Licensing v. <u>International Business Machines Corporation</u> (Deposition)

# EXHIBIT C

**Exhibit C**

## LIST OF MATERIALS CONSIDERED

**PLEADINGS, MOTIONS, AND TRADEMARK REGISTRATIONS**
Arm's Complaint and Exhibits, dated August 31, 2022
Qualcomm's Answer and Counterclaims, dated September 30, 2022
Qualcomm's Answer and Amended Counterclaims, dated October 26, 2022
Arm's Answer to Amended Counterclaims, dated November 15, 2022
USPTO Trademark Registration No. 5,692,669 and filed documents
USPTO Trademark Registration No. 5,692,670 and filed documents

**DISCOVERY**
Arm's Responses and Objections to Qualcomm's First Set of Interrogatories (Nos. 1-11), dated February 27, 2023
Arm's Supplemental Responses and Objections to Qualcomm's First Set of Interrogatories (Nos. 1-11), dated November 17, 2023
Arm's Supplemental Responses and Objections to Qualcomm's Third Set of Interrogatories (No. 20), dated November 17, 2023
Qualcomm's Responses and Objections to Qualcomm's First Set of Requests for Admission (Nos. 1-30), dated October 20, 2023

**DEPOSITION TRANSCRIPTS**
October 12, 2023 Deposition of Manu Gulati and Exhibits 1-33 thereto
October 27, 2023 Deposition of Will Abbey and Exhibits 19-30 thereto
October 27, 2023 Deposition of Nitin Sharma and Exhibits 1-29 thereto
November 3, 2023 Deposition of Gerald Williams and Exhibits 1-46 thereto
November 9, 2023 Deposition of Paul Williamson and Exhibits 19, 29, 45-74 thereto
November 16, 2023 Deposition of Simon Segars and Exhibits 27, 49, 100-114 thereto
November 28, 2023 Deposition of Mike Roberts and Exhibits 1-6 thereto
November 28, 2023 Deposition of Jim Thompson and Exhibits 1-19 thereto
December 8, 2023 Deposition of Jonathan Armstrong and Exhibits 45, 135-141 thereto

**PRODUCED MATERIALS**
ARM_00002955
ARM_00002988
ARM_00024811
ARM_00024820
ARM_00024829
ARM_00044650
ARM_00051126
ARM_00057230
ARM_00059183
ARM_00060458
ARM_00111064
ARM_01236577
ARM_01236580
ARM_01236581

**Exhibit C**

ARM_01236588
ARM_01236594
ARM_01236596
ARM_01236605
ARM_01236610
ARM_01236613
ARM_01236616
ARM_01236618
ARM_01236645
ARM_01236654
ARM_01236667
ARM_01236671
ARM_01236678
ARM_01236683
ARM_01236684
ARM_01236691
ARM_01236698
ARM_01236700
ARM_01236703
ARM_01236708
ARM_01236711
ARM_01236731
ARM_01236734
ARM_01236740
ARM_01236743
ARM_01262030
ARM_00032602
ARM_01215997
ARM_01238999
ARM_01259705
ARM_01315237
ARM_01315241
ARM_01315253
ARM_01315259
ARM_01315264
ARM_01315276
ARM_01315283
ARM_01315287
ARM_01315297
ARM_01315304
ARM_01315310
ARM_01315315
ARM_01315323
ARM_01315328
ARM_01315333
ARM_01315338

Exhibit C

QCARM_2417783

## ADDITIONAL PUBLIC LITERATURE AND WEBPAGES

- Van Osselaer, Stijn M. J., and Sarah Lim, "Research Productivity of Faculty at 30 Leading Marketing Departments," Marketing Letters, (2019)
- Tyson, Mark.  "Nuvia 'Clean-Sheet CPU Design' Performance Previewed."  Hexus (Aug 11, 2020).  <https://hexus.net/tech/news/cpu/144733-nuvia-clean-sheet-cpu-design-performance-previewed>
- Arm SEC Form 424B4 (September 13, 2023) <https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm>
- "Licensing Arm Technology: Access for Everyone." *Arm*. https://www.arm.com/products/licensing>
- "The ARM Processor Business Model." *Arm*. <https://developer.arm.com/documentation/dht0001/a/architectures--processors--and-devices/the-arm-processor-business-model>
- "Partner Ecosystem Catalog." Arm <https://www.arm.com/partners/catalog/results#sort=date%20descending&numberOfResults=12>
- "CPU Architecture." Arm. https://www.arm.com/architecture/cpu
- "Terms and Policies – Trademarks." Arm. <https://www.arm.com/company/policies/trademarks>
- Shimpi, Anand Lal. "The ARM Diaries, Part 1: How ARM's Business Model Works." *AnandTech* (June 28, 2013). <https://www.anandtech.com/show/7112/the-arm-diaries-part-1-how-arms-business-model-works>
- Arm Branding Guidelines – Arm, <https://www.arm.com/company/policies/trademarks/guidelines-brand>
- Qualcomm Form 10-K for FYE 2023
- John Bruno & Sriram Dixit, "Performance Delivered a New Way, Silicon Reimagined" *Medium* (Aug. 11, 2020) <https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5>
- "Qualcomm Completes Acquisition of NUVIA" *Qualcomm* (Mar. 15, 2021) <https://qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia#:~:text=Qualcomm%20Incorporated%20(NASDAQ%3A%20QCOM),working%20capital%20and%20other%20adjustments>
- "Qualcomm Oryon CPU: a custom CPU at the center of next-generation premium experiences on Snapdragon platforms." Qualcomm. (November 16, 2022) <https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms>
- Smith, Ryan. "Qualcomm Previews Snapdragon X Elite SoC: Oryon CPU Starts in Laptops" (Oct.." AnandTech. (October 24, 2023) https://www.anandtech.com/show/21105/qualcomm-previews-snapdragon-x-elite-soc-oryon-cpu-starts-in-laptops->
- Kevin Lane Keller, Strategic Brand Management: Building, Measuring and Managing Brand Equity, (4th Ed., Pearson 2012)

3

**Exhibit C**

- David A. Aaker, <u>Managing Brand Equity: Capitalizing on the Value of a Brand Name</u>, (Free Press 1991).
- Composite Branding Alliances: An Investigation of Extension and Feedback Effects, C. W. Park, Sung Youl Jun, and Allan Shocker, Journal of Marketing Research, 1996.
- Kevin Lane Keller, <u>Conceptualizing, Measuring and Managing Customer-Based Brand Equity</u>, J. Marketing 57(1):1-22 (1993).
- Balmer, J. M. T., et al., (2020), "The role of corporate brand image for B2B relationships of logistics service providers in China," Journal of Business Research, 117C, 850–861;
- Iyer, P., et al. (2019), "Market orientation, positioning strategy and brand performance," Industrial Marketing Management, 81, 16–29
- Leek, S. and G. Christodoulides (2012), "A Framework of Brand Value in B2B Markets: The Contributing Role of Functional and Emotional Components," Industrial Marketing Management, 41, 106–114.
- Kotler, P., and W. Pfoertsch (2006), B2B Brand Management, Evanston, IL: Springer
- Casidy, R., et al. (2018), "The relative influence of functional versus imagery beliefs on brand sensitivity in B2B professional services," Industrial Marketing Management, 72, 26–36
- "Amlogic Answers the UHD Challenge with Landmark Implementation of ARM Mali-450 MP6 GPU." BusinessWire. (November 20, 2013) <https://www.businesswire.com/news/home/20131119006559/en/Amlogic-Answers-the-UHD-Challenge-with-Landmark-Implementation-of-ARM-Mali-450-MP6-GPU>
- Shaw, Chris. "Queen's Awards 2011: Chip designs bring win for ARM." NewElectronics. (April 21, 2011) <https://www.newelectronics.co.uk/content/news/queen-s-awards-2011-chip-designs-bring-win-for-arm/>
- The Linley Group Announces Winners of Annual Analysts' Choice Awards." The Linley Group. (January 16, 2015) <https://www.globenewswire.com/en/news-release/2015/01/16/1020683/0/en/The-Linley-Group-Announces-Winners-of-Annual-Analysts-Choice-Awards.html>
- "The Linley Group Announces Winners of Annual Analysts' Choice Awards." The Linley Group. (January 12, 2018) <https://www.globenewswire.com/en/news-release/2018/01/12/1288835/0/en/The-Linley-Group-Announces-Winners-of-Annual-Analysts-Choice-Awards.html>
- "Arm Mali-G77 GPU Named Best Processor IP in The Linley Group's Analysts' Choice Awards." Arm. (January 20, 2020). < https://newsroom.arm.com/news/arm-mali-g77-gpu-named-best-processor-ip-in-the-linley-groups-analysts-choice-awards>
- "TSMC Honors ARM with Partner Award for Fifth Consecutive Year." Arm. (November 3, 2014). <https://www.arm.com/company/news/2014/11/29442>
- "TSMC Announces 2020 OIP Partner of the Year Awards for Excellence in Accelerating Silicon Innovation." TSMC. (October 20, 2020) <https://pr.tsmc.com/english/news/2734>
- "Arm Awarded TSMC Partner of the Year Award for Processor IP." Arm. (October 3, 2018) <https://newsroom.arm.com/news/arm-awarded-tsmc-partner-of-the-year-award-for-processor-ip>
- "TSMC Recognizes Partners of the Year at 2021 OIP Ecosystem Forum." TSMC. (October 27, 2021) <https://pr.tsmc.com/english/news/2875>
- "Company Events." Arm. <https://www.arm.com/company/events>

Exhibit C

- Lardinois, Frederic. "Arm after the IPO." TechCrunch. (September 14, 2023) <https://techcrunch.com/2023/09/14/arm-after-the-ipo/>
- "Qualcomm Application Processors Selector Guide," *Qualcomm* <https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/application-processors-selection-guide.pdf>
- "Qualcomm® Snapdragon 410E (APQ 8016E) processor Device Specification," *Qualcomm* (Sept. 2016) < https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/snapdragon_410e_apq_8016e_data_sheet.pdf>
- "Qualcomm® APQ8016E Application Processor," *Qualcomm* <https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/apq8016e-product-brief.pdf>
- "Snapdragon® 8 Gen 3 Mobile Platform." *Qualcomm.* <https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_B_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf>
- "Qualcomm and Leading Compute Partners Build Industry Momentum for Windows on Arm PCs Powered by Snapdragon Compute Platforms, Qualcomm Inc." (Jan. 3, 2022) <https://www.qualcomm.com/news/releases/2022/01/>
- Sourabh Jain, "Qualcomm Snapdragon Tech Summit 2022- Snapdragon 8 Gen 2, Oryon CPU, AR2 Gen 1 platform, and other announcements," BUSINESS INSIDERBusiness Insider. (Nov. 17, 2022) <https://www.businessinsider.in/tech/news/qualcomm-snapdragon-tech-summit-2022-snapdragon-8-gen-2-oryon-cpu-ar2-gen-1-platform-and-other-announcements/articleshow/95581109.cms>
- "Qualcomm Expands Snapdragon Compute Ecosystem for the Next-Generation of Enterprise-Grade PCs." Qualcomm. (February 27, 2022) <https://www.qualcomm.com/news/releases/2022/02/qualcomm-expands-snapdragon-compute-ecosystem-next-generation-enterprise>
- "Qualcomm (QCOM) Q4 2023 Earnings Call Transcript." The Motley Fool. (September 30, 2023) <https://www.fool.com/earnings/call-transcripts/2023/11/01/qualcomm-qcom-q4-2023-earnings-call-transcript/>
- *Qualcomm CEO on What He Really Thinks of Apple*, The Daily Charge (June 9, 2022), https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375).
- "Qualcomm dubs Nuvia CPU 'Oryon,'" on track for 2023,." PCWorld (Nov. (November 17, 2022),  <https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html>
- Stradling, Colton. "HONOR announces its first ARM PC built on Snapdragon X Elite will release next year." Windows Central. (October 25, 2023) <https://www.windowscentral.com/hardware/honor-announces-its-first-arm-pc-built-on-snapdragon-x-elite-will-release-next-year>
- Whitwam, Ryan. "Qualcomm Announces Snapdragon X Elite Processor for Laptops." ExtremeTech. (October 25, 2023) <https://www.extremetech.com/computing/qualcomm-announces-snapdragon-x-elite-processor-for-laptops>
- Rossolillo, Nicholas. "Qualcomm Is Gunning for a Piece of Intel's Lunch -- Time to Buy Qualcomm Stock?" The Motley Fool. (October 29, 2023) <https://www.fool.com/investing/2023/10/29/qualcomm-is-gunning-for-a-piece-of-intels-lunch-ti/>

**Exhibit C**

- "Qualcomm Snapdragon X Elite Unveiled: ARM-based SoC for Windows-powered AI PCs." Counterpoint Research. (November 2, 2023) <https://www.counterpointresearch.com/insights/qualcomm-snapdragon-x-elite-arm-based-soc-windows-ai-pc/>
- Evans, Austin. "The Biggest Upgrade for Windows PCs in YEARS." (October 28, 2023) <https://www.youtube.com/watch?v=Vt1EmsvEyd4>
- Priya Pathak, "Qualcomm takes swing at Intel with Oryon, unlocks 240 fps gaming on flagship phones with 8 Gen 3: Top announcements from Snapdragon Summit" Financial Express (Oct. 25, 2023)

All documents cited within my report

# EXHIBIT 13

Page 1

1

2      IN THE UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF DELAWARE

3      C.A. No. 22-1146 (MN)

       ----------------------------------------x

4      ARM LTD.,

5                            Plaintiff,

6               - against -

7

       QUALCOMM INC., QUALCOMM TECHNOLOGIES,

8      INC., AND NUVIA, INC.,

9

                            Defendants.

10     ----------------------------------------x

11                    May 3, 2024

                      9:11 a.m.

12

13

14          VIDEOTAPED DEPOSITION of DR. RAVI DHAR,

15     held at the offices of MORRISON & FOERSTER

16     LLP, located at 250 West 55th Street, New

17     York, New York 10019, before Anthony Giarro, a

18     Registered Professional Reporter, a Certified

19     Realtime Reporter and a Notary Public of the

20     State of New York.

21

22

23

24

25

Page 2

```
1
2   A P P E A R A N C E S :
3
4   MORRISON FOERSTER LLP
      Attorneys for Plaintiff
5   707 Wilshire Boulevard
      Los Angeles, California 90017
6
      BY:  NICHOLAS RYAN FUNG, ESQ.
7       nfung@mofo.com
8
      MORRISON FOERSTER LLP
9       Attorneys for Plaintiff
        425 Market Street
10   San Francisco, California 94105
11   BY: LYDIA DAVENPORT ESQ.
        ldavenport@mofo.com
12      (via Zoom)
13
      MORRISON FOERSTER LLP
14      Attorneys for Plaintiff
        4200 Republic Plaza
15      370 Seventeenth Street
        Denver, Colorado 80202
16
      BY: SARAH E. BRICKEY, ESQ.
17      sbrickey@paulweiss.com
        (via Zoom)
18
19   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Defendants
20      1285 Avenue of the Americas
        New York, New York 10019
21
      BY: ERIN J. MORGAN, ESQ.
22      ejmorgan@paulweiss.com
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S (Cont.):
3
4   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Defendants
5      2001 K Street, N.W.
        Washington, D.C. 20006
6
      BY: ANNA P. LIPIN, ESQ.
7       alipin@paulweiss.com
8
9
10
11
12
13
14
15
16
17
18
19
20
21   ALSO PRESENT:
22      ADAM VENTURINI, Videographer
23
24
25
```

Page 4

```
1
2       THE VIDEOGRAPHER:  Good
3   morning.  We are going on the record
4   at 9:11 a.m. on 5/3/24.  Please
5   note that the microphones are
6   sensitive and may pick up whispering
7   and private conversations.  Please
8   mute your phones at this time.  Audio
9   and video recording will continue to
10   take place unless all parties agree
11   to go off the record.
12       This is Media Unit 1 of the
13   video deposition of Ravi Dhar, taken
14   by counsel for defendants, in the
15   matter of ARM Ltd. vs.  Qualcomm
16   Inc., Qualcomm Technologies, Inc.,
17   and Nuvia, Inc., filed in The United
18   States District Court for the
19   District of Delaware, C.A. No.
20   22-1146 (MN).  The location of the
21   deposition is the offices of Morrison
22   & Foerster LLP at 250 West 55th
23   Street, New York, New York.
24       My name is Adam Venturini,
25   representing Veritext, and I am the
```

Page 5

```
1       DR. RAVI DHAR
2   videographer.  The court reporter is
3   Anthony Giarro from the firm
4   Veritext.
5       I am not authorized to
6   administer an oath, I am not related
7   to any party in this action, nor am I
8   financially interested in the
9   outcome.
10       If there are any objections
11   to proceeding, please state them at
12   the time of your appearance.
13       Counsel and all present
14   remote will be noted on the
15   stenographic record.
16       Court reporter, please swear
17   in the witness, and then counsel may
18   proceed.
19   D R.  R A V I  D H A R , after having first
20   been duly sworn by a Notary Public of the
21   State of New York, was examined and testified
22   as follows:
23   EXAMINATION BY
24   MS. MORGAN:
25       Q     Good morning, Dr. Dhar.
```

2 (Pages 2 - 5)

DR. RAVI DHAR

1
2      A      Good morning.
3      Q      Do you prefer Dr. Dhar or
4  Professor Dhar?
5      A      People usually say Doctor.
6  It's shorter, yeah.
7      Q      Okay.  Great.
8             This is not the first time
9  you've been deposed; right?
10     A      Correct.
11     Q      You've been deposed -- I
12  think it's in your report -- like 23
13  times since 2019; is that right?
14     A      Approximately.
15     Q      So I'm not going to go
16  through a long song and dance about the
17  way this is going to work.  But if you
18  don't understand any questions, feel free
19  to ask me to clarify.  I'm going to try
20  to take a break about every hour.  But if
21  you need a break, just let me know; okay?
22     A      Great.
23     Q      What did you do to prepare
24  for your deposition today?
25     A      So I went back and obviously

DR. RAVI DHAR

1
2  looked at my reports and Professor
3  Steckel's report and the complaint and,
4  you know, some of the documents.
5      Q      What documents did you look
6  at?
7      A      I think just some of the
8  documents that I might have cited in
9  my -- you know, like certain places, I
10  cited the depositions.  I looked at that.
11  I didn't obviously look at all the
12  depositions again.  And so that's the
13  nature of the documents.
14     Q      Do you remember looking at
15  any specific documents?
16     A      Other than the depositions,
17  no.
18     Q      Which depositions did you
19  look at?
20     A      Some of the ones I cited,
21  like Mr. Armstrong or Mr. Sharma,
22  Mr. Amon, Mr. Abbey.
23     Q      Did you meet with counsel to
24  prepare for your depo?
25     A      I did meet, yes, with

DR. RAVI DHAR

1
2  counsel.
3      Q      For how long?
4      A      I think like, maybe
5  including lunch, maybe five hours or so,
6  yeah.
7      Q      Who did you meet with?
8      A      With Mr. Fung here.
9      Q      Anyone else?
10     A      I don't think we met with
11  anyone else, certainly not in person, but
12  maybe Mr. Fung might have made a call to
13  other attorneys.  But they were not --
14  that might be for like 10, 15 minutes.
15     Q      Do you remember speaking to
16  any other attorneys on the phone when
17  Mr. Fung called them?
18     A      Yes.  I mean mostly saying
19  hello.  That's it, yeah.
20     Q      Do you remember who any of
21  those attorneys were?
22     A      Yes.  It was Ms. Davenport.
23     Q      Did you talk to any ARM
24  employees in preparation for your
25  deposition?

DR. RAVI DHAR

1
2      A      I did not.
3      Q      Did you talk to any ARM
4  customers in preparation for your
5  deposition?
6      A      I did not.
7      Q      You said you re-reviewed
8  your reports; right?  Did you see
9  anything that you want to correct?
10     A      No.
11     Q      You were retained in this
12  case by Morrison & Foerster, ARM's
13  counsel, to testify on ARM's behalf;
14  right?
15     A      Correct.
16     Q      When were you first
17  contacted about this case?
18     A      Sometime in 2023, I think,
19  around August.
20     Q      And do you know when you
21  were formally retained?
22     A      Around that same time, yes.
23     Q      You charge an hourly rate of
24  $950 an hour; right?
25     A      Correct.

DR. RAVI DHAR

2    Q    Do you know approximately
3 how many total hours you spent on this
4 case to date?
5    A    I do not recall.
6    Q    Can you ballpark it at all?
7    A    I don't have a good
8 estimate.
9    Q    Is it more than 20?
10    A    Oh, definitely more than 20.
11    Q    More than 50?
12    A    Yes.
13    Q    More than 70?
14    A    Yes.
15    Q    More than 100?
16    A    Yes.  More than 100, yeah.
17    Q    More than 150?
18    A    Most likely, including the
19 second report here.
20    Q    Do you think it's more than
21 200?
22    A    I don't precisely know that.
23 But, you know, could be around that,
24 yeah.
25    Q    It could be around 200.

DR. RAVI DHAR

2 Okay.
3         Did you work with the
4 Brattle Group on both your reports?
5    A    No.  I worked with Brattle
6 Group on the reply report.
7    Q    Is there a reason that you
8 asked the Brattle Group to work with you
9 on the reply report?
10    A    Yes.  Mostly on the
11 timeline, you know, I had limited time to
12 submit a response.  And my day job, I was
13 teaching at that time.  And I worked with
14 Brattle before.  And I normally have some
15 kind of support.  So I reached out to
16 Brattle.
17    Q    Did you work with any kind
18 of support on the opening report?
19    A    I did not.
20    Q    You did all the work
21 yourself?
22    A    Correct.
23    Q    Do you receive further
24 compensation based on the fees from the
25 Brattle Group?

DR. RAVI DHAR

2    A    Yes.  They have a standard
3 arrangement that I don't quite frankly
4 know.  But it's some percentage of the
5 billing that they make.  And then they
6 subtract some people.  I have not
7 bothered to find out the exact model.
8 And it's not contingent on any outcomes
9 and forth.
10    Q    How many people are on the
11 team at Brattle that you worked with on
12 the reply?
13    A    I don't recall the total
14 number.  There might be a couple at the
15 bank.  But there were at least three or
16 four that I recall.
17    Q    Are those three or four
18 people, people you've worked with on
19 other reports?
20    A    At least a couple of them,
21 yes.
22    Q    Who are the people that
23 you've worked with before on the teams?
24    A    So there's a person called
25 Mr. Herscovici.  I worked with him

DR. RAVI DHAR

2 before.  And there's another name whose
3 name I forget now, something.  It'll come
4 back to me.  But there were two of them
5 I've worked with before.
6    Q    Approximately how many times
7 have you worked with these two people
8 from the Brattle Group?
9    A    Maybe, you know, three or
10 four times at most, yeah.
11    Q    And that's three or four
12 times over how long?
13    A    Oh.  Maybe the last four,
14 five years.
15    Q    Do you know what their
16 hourly rate is?
17    A    I do not.
18    Q    Prior to your involvement in
19 this case, had you ever been retained by
20 ARM before?
21    A    Not to my knowledge.
22    Q    Had you been retained by
23 ARM's counsel at Morrison & Foerster
24 before?
25    A    I have done some matters for

4 (Pages 10 - 13)

DR. RAVI DHAR

2 A    Again, I don't keep track of
3 that.  But I would say approximately a
4 third, you know, in that range, yeah.
5     Q    And in how many of the cases
6 in which you served as an expert have you
7 opined on fair use?
8     A    Fair use, might have opined,
9 you know, few times as one of the issues,
10 basically.
11     Q    Do you consider yourself an
12 expert in fair use?
13     A    So when I say I'm an expert,
14 I mean, you know, I don't know all the
15 legal theory behind fair use.  So I had a
16 very clear instruction from counsel on
17 what to take into account.
18          And so my focus is really on
19 whether this is likely to be misleading
20 or false.  And that's the part that I
21 opine on.  But on the oral theory of fair
22 use, I would not call myself a legal
23 expert, you know, for anything.
24     Q    Do you recall that you've
25 testified in the past that you are not an

DR. RAVI DHAR

2 expert in fair use?
3     A    It's possible.  As I just
4 said, I'm certainly not a legal expert on
5 fair use based on the instructions given
6 to me.  What's part of fair use, I opined
7 on that.
8     Q    Did any of these cases in
9 which you served as an expert over the
10 last several years involve the
11 semiconductor industry?
12     A    I have to look.  There was
13 an IBM case that I recalled.  Sorry.
14 This is appendix --
15     Q    This is Exhibit B.  It's
16 appendix in the reply only.
17     A    Semiconductor industry,
18 okay, not in this list.
19     Q    What about the
20 microprocessor?
21     A    Oh, sorry.  I turned the
22 page.  So the parallel, you know, IBM, 24
23 on my list had some aspects of
24 technology.  I don't know if it was
25 semiconductors directly or not at this

DR. RAVI DHAR

2 point.
3     Q    Is that a patent
4 infringement case?
5     A    Correct, yeah.
6     Q    What was the work you did in
7 that case?
8     A    I think this was some kind
9 of rebuttal report, if I remember right,
10 yeah.
11     Q    Do you remember what your
12 opinion was?
13     A    No.  I don't remember that.
14     Q    Was it about trademark?
15     A    No.  It was about -- I think
16 it was about some aspects of technology.
17     Q    But you don't remember what
18 aspects of technology?
19     A    Correct.
20     Q    Do any of these cases
21 involve the microprocessor industry?
22     A    I think they probably do,
23 like the 23, it's a smartphone case.  So
24 I'm sure there's microprocessors.  My
25 role was not on that.  But clearly, they

DR. RAVI DHAR

2 had microprocessors in it.
3     Q    What was your role in that
4 case?
5     A    That case was a patent
6 infringement case.  So basically,
7 something around the value of infringing
8 features kind of things.
9     Q    So you were giving an
10 opinion on the value to a brand of
11 features that were patented?
12     A    Or there was dispute whether
13 these features -- I guess the patent
14 infringement has the first piece, whether
15 it does infringe the patent or not.  And
16 then if it does, what might be the value
17 of the features.  So I was mostly on the
18 second part, yeah.
19     Q    Understood.
20          I'm going to summarize by
21 saying you've had a lot of opinions about
22 brand strength; is that right?
23     A    Yes.
24     Q    What do you typically do to
25 assess brand strength?

16 (Pages 58 - 61)

DR. RAVI DHAR

2   A   So very similar to what I
3 did here, which is basically, you know,
4 you think about strength as being
5 strength in the marketplace, which is a
6 commercial strength, which is looking at,
7 you know, typical factors.  Things I look
8 at would be how long it's been using it,
9 is anybody else using a similar mark,
10 then going to the share, the sales, the
11 size, the awards that I mentioned,
12 recognition, and then how -- and looked
13 at sort of here, how the medias are
14 described.  So multiple ways in the
15 aggregate that I look at.
16   Q   Have you ever considered
17 consumer-based evidence in determining
18 the strength of a brand?
19      MR. FUNG:  Objection, form.
20   A   I might have.  I have to
21 think through it, but typically not,
22 because first, it's not required.  And
23 secondly, a lot of the additional factors
24 that I just mentioned, they all go to the
25 commercial strength.  And the surveys are

DR. RAVI DHAR

2 more useful when you're trying to
3 classify a certain magnitude.
4      So, for example, if there's
5 an issue around, is the brand famous,
6 which is basically an extension of the
7 strength, to certain level of threshold
8 and among the broader population.  I
9 think that's when a survey, you might
10 require -- sometimes you don't even
11 require there because everybody would
12 agree that Apple is famous.
13      So I think I might have said
14 that in an Apple brand that Apple is
15 famous.  And you don't need to do it,
16 survey for that, similar to the factors
17 that I mentioned, look at the sales of
18 Apple, look at a number of years, and
19 nobody else uses that, and share, all the
20 factors that we just discussed.
21   Q   I asked you a question about
22 consumer-based evidence, and you
23 responded by describing surveys.
24      Are there other types of
25 consumer-based evidence besides surveys?

DR. RAVI DHAR

2   A   So there can be many
3 types -- I think the commercial strength
4 is a consumer-based evidence of the
5 aggregate because what you have is, okay,
6 if this is the market share of the
7 addressable market or this is what
8 they're selling, that's aggregating.
9      Again, for this purpose, I
10 use the word consumer, customer, sort of
11 some interchangeably.  If you're
12 referring to customer, I don't opine that
13 the end consumer knows Qualcomm or ARM.
14 And so consumer -- customer-based
15 evidence could be in the aggregate, which
16 is like how much have they sold, how much
17 recognition have they received, how long
18 they have been operating, are there
19 similar things that might potentially
20 lead people to be confused.
21   Q   In connection with your
22 brand strength opinions, have you opined
23 on what affiliations consumers or
24 customers might have with a particular
25 brand?

DR. RAVI DHAR

2   A   When you say affiliation,
3 meaning?
4   Q   I mean what a consumer
5 associates with a particular brand.
6   A   I see.  So I'll use the word
7 meaning, what means it has.  Yes, I have
8 opined on, you know, like Apple would
9 mean to a lot of people or Nike would
10 mean, based on, you know, again, the
11 overall positioning.  And the association
12 of the product would be the successful
13 strategy allows you to do that.
14   Q   And you've never assessed
15 any evidence, beyond just looking at the
16 strategy of the company to determine what
17 the meaning would be of a brand?
18   A   No.  You would.  You can,
19 you can.  I mean it depends how important
20 that is.  And as I said, we've had the
21 discussion earlier.  I said the brand
22 strength, really, what matters here is
23 really on the identification side.  And
24 then ARM is so well-known around, you
25 know, performance and power.  And you see

17 (Pages 62 - 65)

Page 66

DR. RAVI DHAR

1
2 it in everything, all the documents, all
3 the awards and all the associations they
4 do.
5          So there's enough
6 aggregation evidence that that's what ARM
7 stands for, you know, including --
8 including what their offices may say.
9 So similarly with Apple, that Apple is
10 cool.  I don't think you need to do a
11 survey because they'll be many other
12 points of evidence that would say awarded
13 the coolest brand of the year and so
14 forth.
15     Q     My question is, have you
16 never assessed any evidence to determine
17 the meaning of a brand, beyond looking at
18 the brand strategy?
19     A     No, no.  Depends on what's
20 available.  Like as I said, the survey
21 was not required here.  And obviously, a
22 product has not been launched.  So
23 setting that aside -- but there are many
24 documents.
25          So, for example, in many

Page 67

DR. RAVI DHAR

1
2 cases, there would be documents in the
3 ordinary course of business that would
4 have some information on what the ARM
5 brand stands for.  And so you would look
6 at that.  You wouldn't necessarily --
7 that would be another point of consumer
8 data that you could have.
9     Q     What kind of documents are
10 you referring to?
11     A     So the documents I'm trying
12 to refer to is, which would often be
13 called a brand survey, done by companies,
14 called land tracking surveys.
15     Q     Have you relied on brand
16 surveys in the past to perform an opinion
17 about the meaning of a brand?
18     A     It would be one of the
19 inputs, yes.  These are all data points
20 that I look at.  And that would be
21 another data point.
22     Q     Have you conducted surveys
23 in the past to determine the meaning of a
24 brand?
25     A     I have to think through

Page 68

DR. RAVI DHAR

1
2 where it would be necessary because as I
3 said, many of the cases are more around
4 the identification and the strengths of
5 the market.  In my academic and the
6 consulting work I have done, I've done
7 that.  But I'm trying to think in the
8 legal setting.  I might have.  But
9 nothing readily comes to mind.
10     Q     You can't remember any
11 instance in which you've conducted a
12 survey in connection with your expert
13 work?
14     A     As far as the meaning of the
15 brand; right?
16     Q     Yes.
17     A     Nothing that comes to mind.
18 The surveys are really around -- around
19 specific issues of, you know, confusion.
20 So those are very standard sort of
21 questions.  So they won't have a meaning
22 question.  Brand dilution doesn't have a
23 meaning question.  So nothing readily
24 comes to mind.
25     Q     I understand.  So you

Page 69

DR. RAVI DHAR

1
2 mentioned that surveys are really around
3 specific issues of confusion.
4          Have you conducted surveys
5 in connection with issuing an opinion on
6 the likelihood of confusion --
7          MR. FUNG:  Objection, form.
8     Q     -- in your expert work?
9     A     As I said, a survey is not
10 required.  And here, the product was not
11 launched.  But sometimes, when it's not
12 clearcut based on everything else, you
13 might want to see what the survey tells
14 us.
15          Based on the data and the
16 documents I saw here, it was clear to me
17 that there's a likelihood of confusion.
18 So setting aside the products not
19 launched, I didn't think you'd require a
20 survey.
21     Q     I'm not asking about your
22 work in this case, though.
23          I'm just asking, generally,
24 have you conducted a survey to assess the
25 likelihood of confusion?

18 (Pages 66 - 69)

DR. RAVI DHAR

1
2     A     Yes; in some matters; some
3 matters, not; sometimes, I have; many
4 matters, I have not.  So it depends.
5     Q     How many times do you think
6 you've conducted a survey?
7     A     Hard to know.  But I would
8 say one-third, I told you was roughly on
9 trademark, I would say, maybe less than
10 that, maybe a quarter of that.  But I'm
11 just speaking from memory.
12     Q     And why is a survey not
13 necessary in some cases?
14     A     A survey is not necessary in
15 cases based on what other data points do
16 you have and what's available and what
17 kind of infringement it is.
18         So in this case, I think
19 it's very clear that this is infringing
20 on the ARM brand.  And it has no other,
21 you know, understanding that I've seen,
22 including Dr. Steckel hasn't pointed to
23 anything I've seen, other than parroting
24 some points from a deposition.  So I
25 didn't feel the need in this case to do

DR. RAVI DHAR

1
2 that.
3     Q     When you say it's clear that
4 it's infringing, how are you using the
5 word infringing?
6     A     I'm using it to mean that
7 there's a likelihood to see that it's
8 connected to ARM in terms of, you know,
9 connection with ARM as to, you know,
10 affiliation connection, some connection
11 with ARM brand on the licensing.
12     Q     You understand that
13 infringing is a legal term; right?
14     A     Yes.  I'm using it legally.
15     Q     You're not issuing a legal
16 opinion that Qualcomm has infringed ARM's
17 trademarks?
18     A     Correct.  I'm not, yeah.
19     Q     You said that a survey is
20 not required here because the product was
21 not launched.
22     A     No.  Survey's not required
23 for making a judgment on confusion.
24 Second, a product is not launched here at
25 the moment.  So there's current use of a

DR. RAVI DHAR

1
2 trademark that Qualcomm has done.  And it
3 might continue to use it in many
4 different ways when the product is
5 launched.  And so that's a challenge also
6 to do.  But the first point is
7 independent of the second one.
8     Q     What's the relevance of
9 whether the product has launched to
10 whether you conducted a survey?
11     A     Well, in my mind, it's
12 really related to if you're looking for
13 confusion at the time of purchase, it
14 needs to be very close when all the
15 collaterals and marketing is done by
16 Qualcomm when they officially introduced
17 the chip.  There might be other
18 collaterals.  And that will also tell you
19 what that is and how it might be -- add
20 to the confusion or not.
21     Q     So you would expect that
22 when Qualcomm actually introduces a chip
23 is when you would be able to assess
24 whether there's actual confusion?
25         MR. FUNG:  Objection, form.

DR. RAVI DHAR

1
2     A     You'd be able to -- closer
3 to the likelihood of purchasing
4 confusion.  So right now, I'm testifying
5 that -- or I'm opining in my report that
6 based on the use of mark at present,
7 there's likely to be confusion.  But I
8 don't know all the other things they
9 might do, between now and maybe summer of
10 2024, is my understanding, when it might
11 be officially introduced.  And that will
12 have some impact on that as well.
13     Q     What else could you do to
14 assess likelihood of confusion besides
15 conduct a survey?
16     A     So we discussed this, you
17 know, what's done in the ordinary course
18 of business.  You could look at how the
19 mark is, you know -- what I did, which is
20 look at how the mark is being used by
21 Qualcomm in terms of its press
22 statements, you know, earnings call,
23 press release, like the Snapdragon.  So
24 those are all data points because these
25 are people talking about the product.

19 (Pages 70 - 73)

Page 74

DR. RAVI DHAR

2   Q   Have you assessed the
3 likelihood of confusion in a B2B brand in
4 the tech industry?
5   A   Good question. I think I
6 might have. But it's hard to remember
7 sitting here. I don't recall.
8       THE WITNESS: Can we take a
9 break?
10      MS. MORGAN: Yes. We could
11 take a break right now.
12      THE VIDEOGRAPHER: Off the
13 record, 10:18 a.m.
14      (A short recess was taken.)
15      THE VIDEOGRAPHER: Back on
16 the record, 10:31 a.m.
17  Q   Welcome back, Dr. Dhar.
18  A   Thank you.
19  Q   Let's look at paragraph 5 of
20 your report, your opening report.
21  A   Yes.
22  Q   You state here that your
23 expertise is in branding, consumer and
24 customer psychology, marketing
25 management, marketing strategy and survey

Page 75

DR. RAVI DHAR

2 design, methodology and evaluation. Do
3 you see that?
4   A   Yes.
5   Q   Is your opinion in this case
6 in one of those fields?
7   A   Yes. Customer decision
8 making, which is sort of covered under
9 customer psychology, you know, marketing,
10 strategy and so forth, branding, of
11 course.
12  Q   How did you develop an
13 expertise in survey design?
14  A   By doing so is for my
15 research and teaching as well.
16  Q   What kind of surveys do you
17 conduct in your research?
18  A   So all kinds. A lot of them
19 would be experiments which is also
20 randomized control design. But it could
21 be a field survey, in the field, and, you
22 know, surveying employees. I do some
23 work with Google where we survey
24 employees, for example. So all kinds of
25 surveys.

Page 76

DR. RAVI DHAR

2   Q   What's a field survey?
3   A   Field survey means it's a
4 survey often done in the field, which
5 means really, you know, often real people
6 in like some experiments would be the
7 general idea.
8   Q   Do you ever do customer
9 surveys?
10  A   Yes. I've done customer
11 survey, mostly, you know, for the B2B,
12 you know. When I do consulting, for
13 example, at IBM, those are customer
14 surveys. And so that would be an example
15 of that.
16  Q   How do you conduct a B2B
17 customer survey?
18  A   So it's very similar to the
19 surveys we do for consumers, except you
20 have to recruit decision makers of that
21 product, which is a combination of people
22 who might be, let's call that, working in
23 IT, working in line of business,
24 C-suites. You need to have a mix of
25 people to make sure that you're getting

Page 77

DR. RAVI DHAR

2 different types of opinions.
3   Q   When you say you need to
4 recruit decision makers, what do you mean
5 by decision makers?
6   A   So typically, that means
7 whatever the category might be that
8 you'll have what's called a screening
9 question or a qualifying question to say
10 where do you work, the size of the
11 company, and you might have a question
12 around what's your role, are you involved
13 in purchasing XYZ. And then if you're
14 most interested in Z, you would have some
15 questions, what's your role in that
16 purchase, were you one of the decision
17 makers, primary one, secondary or I had
18 no role in that. You just signed the
19 check, for example, for some C-suite
20 executive who may not be involved in that
21 decision making. But they're ultimately
22 paying for that.
23  Q   And why is it important to
24 get decision makers for the survey?
25  A   Because those are the

20 (Pages 74 - 77)

DR. RAVI DHAR

1
2 relevant -- if you're doing a survey,
3 those are the relevant population for
4 whose opinions matter.
5     Q     Opinions on what?
6     A     On whatever the survey is
7 trying to do.
8     Q     Could that kind of survey be
9 used to assess the meaning of a brand?
10     A     If that's what you want to
11 do.  As I said earlier, it's not really
12 required.  But, yes, it could try to say
13 what is IBM branding to different people.
14 If that's your objective, you could do
15 that.
16     Q     Could that kind of survey
17 that you've described also be used to
18 assess likelihood of confusion related to
19 a brand?
20     A     It could.  Again, depending
21 if you feel it's required as I said, I
22 don't think a survey is required in this
23 matter or in many matters for that
24 matter.  But if you did do a survey, you
25 would want to do it with the kind of

DR. RAVI DHAR

1
2 people we discussed.
3     Q     With decision makers?
4     A     Correct, yeah.
5     Q     And that's because decision
6 makers are the people whose opinions are
7 relevant to likelihood of confusion?
8     A     Correct, yeah.
9     Q     Are there any areas of
10 expertise that you have that are not
11 listed here?
12     A     It's different words.  We
13 have economics, we have science.  And
14 this is at a high level.  But if you go,
15 sort of slice that, you might list, you
16 know, other areas; for example,
17 authenticity, I do a lot of work on
18 authenticity.  It's not listed here.  But
19 to me, ladder up to somewhere on customer
20 or consumer psychology.
21     Q     What does authenticity mean
22 in your field?
23     A     That could be a whole
24 dissertation.  There are many theories
25 around authenticity.  But one of the

DR. RAVI DHAR

1
2 theories is around sort of some
3 verification with some set of knowledge
4 people might have.  So we are judging
5 something, is it an authentic leader or
6 authentic in certain other aspects.  So
7 you have certain value criteria around
8 which you judge whether or not somebody
9 is authentic.
10     And, of course, this
11 criteria can change over time.  But the
12 general idea being that -- so the example
13 in one of my projects right now that I'm
14 doing, somebody who goes to restaurants,
15 Italian restaurants and doesn't really
16 know what are the ingredients, how it's
17 made, whether it's grade authentic
18 Italian.  But when they visited Italy and
19 they came back, that suddenly changed
20 their opinion and evaluations because now
21 their definition of authentic was, oh,
22 so they don't really do this or they
23 don't make a bread or they don't put
24 mozzarella in a way that pizza might be
25 used in this case.  So authenticity is

DR. RAVI DHAR

1
2 dynamic because it could change based on
3 the criteria that I use.  That might
4 change itself, yeah.
5     Q     That's very interesting.
6 Thank you for indulging me.
7     Are you an expert in the
8 area of legal damages?
9     A     Certainly not legal damages.
10 What I do might have implications for
11 that.  But I'm not a damages expert.
12     Q     When you say what you do
13 might have implications for that, what do
14 you mean?
15     A     So typically, some work in
16 the patent cases I might do on how
17 features are important to consumers.  The
18 damages expert might take that into
19 account in whatever they do.
20     Q     You're not a technical
21 expert; right?
22     A     Correct.
23     Q     And you didn't read any
24 source code in this case?
25     A     That's correct.

21 (Pages 78 - 81)

Page 82

DR. RAVI DHAR

1
2    Q    You wouldn't want to read
3  any source code.
4    A    Lots of zeroes and ones or
5  more than that, I don't know, yeah, not
6  read.
7    Q    Let's go to paragraph 9
8  which is on the same page.
9    A    Okay.
10   Q    This is your assignment in
11  this matter; right?
12   A    I kind of came up with this
13  assignment based on the question, which
14  is the way that I normally approach
15  matters like this, starting with the
16  strength of the mark, is it enough and
17  distinctive, is it likely to, you know,
18  lead to confusion and then if that
19  confusion is likely to lead to harm.
20   Q    At the beginning of
21  paragraph 9, you say you were asked to
22  opine from a marketing and consumer
23  behavior perspective on the following
24  issues.
25        What does it mean to opine

Page 83

DR. RAVI DHAR

1
2  from a marketing and consumer behavior
3  perspective?
4    A    So that's again sort of set
5  language that I use, meaning it's not a
6  legal opinion.  And I'm providing this
7  based on how a marketing expert would
8  look at it.
9    Q    The first question that's
10  listed here, the first issue that's
11  listed here is the benefit of a strong
12  mark or brand in the marketplace.
13        What do you mean by benefit
14  in this context?
15   A    So I just mean that like why
16  do companies try to, you know -- whether
17  companies want a strong brand.  So
18  obviously, brand building has investments
19  and resources, both financial money and
20  time.  So there must be some benefit to
21  companies to do that, one of the benefits
22  of the company.
23   Q    And you used the word brand
24  here, a strong mark or brand in the
25  marketplace.  We talked about this a

Page 84

DR. RAVI DHAR

1
2  little bit earlier.
3        But what's the distinction
4  between a strong mark and a strong brand?
5    A    So to me, as I said, the
6  brand has a broader meaning around
7  identification and then, you know,
8  associations, if you like, for marketing.
9  And the mark is also like a trademark,
10  you know, which is a specific
11  registration and might have some legal
12  meaning also.
13        So to me, you know, I've
14  used -- I focused really on the ARM
15  brand.  It's the word mark ARM if you'd
16  like.  So I see the two are related.  But
17  ultimately, marketing, look at the
18  identification and what it stands for.
19   Q    You said brand has a broader
20  meaning around identification and
21  associations for marketing.
22        Does a trademark have
23  meaning around identification and
24  associations for marketing?
25   A    So trademark, again, if it's

Page 85

DR. RAVI DHAR

1
2  used as brand, but I meant when trademark
3  is used as legal, I often see them
4  focused on the source identifier aspect
5  of it.  And maybe if they talk about some
6  harm, they might talk about some loss of
7  control and negative associations.
8        But more generally, I see a
9  lot of focus on identification, does
10  source affiliation or connection
11  permission related to the brand.  Not so
12  much in the meaning -- and you asked me
13  this question earlier.  And I said
14  typically, litigation.  I haven't seen
15  much discussion around the meaning of the
16  brand as a central, you know, it comes up
17  in certain areas like dilution, but not
18  typically in confusion that I've been
19  involved with.
20   Q    You mentioned a marketplace
21  in this issue.
22   A    Right.
23   Q    What's the marketplace
24  you're referring to?
25   A    So basically, marketplace

22 (Pages 82 - 85)

Page 86

DR. RAVI DHAR

1
2 context to me means like, you know,
3 because this is -- products, they operate
4 in a product market, in a certain
5 context. So in this case, it's a B2B
6 marketplace context. And so the contexts
7 of the marketplace varies across
8 products. So that's what I mean.
9    Q    What's the B2B marketplace
10 that's relevant in this case?
11    A    So I think in this case,
12 largely speaking, it's the customers of
13 Qualcomm. So customers, semiconductor
14 industry, semiconductor industry and
15 customers of ARM. So I think those are
16 two different relevant marketplaces here.
17    Q    Are customers of ARM in the
18 semiconductor industry in your definition
19 of that industry?
20    A    Yes. Customers of ARM would
21 be in the semiconductor industry.
22    Q    Do you understand ARM to be
23 a semiconductor designer?
24        MR. FUNG: Objection to
25    form.

Page 87

DR. RAVI DHAR

1
2    A    Manufacturing, semiconductor
3 manufacturing, yeah. And I assume it
4 also designs as a result of that, yeah.
5    Q    Do you also understand
6 Qualcomm to be a semiconductor designer?
7    A    I thought I was answering to
8 Qualcomm. I might have answered for ARM.
9    Q    Yes.
10    A    I said, do you understand
11 ARM to be a semiconductor designer?
12    A    So it's a designer of the
13 process, of course, which is part of what
14 goes into the CPUs of the semiconductors.
15 But they don't manufacture. So I said
16 manufacturing. I was thinking of
17 Qualcomm.
18    Q    So just to recap, what do
19 you understand Qualcomm to do?
20    A    So I understand Qualcomm to
21 be, you know, in the semiconductor
22 industry where it manufactures chips,
23 systems on chips. And, of course, there
24 are many, many other semiconductors that
25 might be in the ultimate devices,

Page 88

DR. RAVI DHAR

1
2 including what Qualcomm manufactures.
3    Q    So you don't understand ARM
4 and Qualcomm to do the same thing?
5    A    That's right.
6        MR. FUNG: Objection to
7    form.
8    A    ARM does not manufacture.
9    Q    Are there any other
10 distinctions that you could think of
11 between ARM's business and Qualcomm's
12 business?
13        MR. FUNG: Objection, form.
14    A    I don't know the full scope
15 of, you know, either of the company's
16 businesses. But I understand, you know,
17 the business models are different
18 potentially. ARM is a licensed server.
19 Primarily, most of their revenues comes
20 from licensing, whether it's royalties or
21 fees. And Qualcomm might have different
22 revenue models for its customers.
23    Q    The second issue on
24 paragraph Subsection B --
25    A    Sorry. Subsection B?

Page 89

DR. RAVI DHAR

1
2    Q    Yes, B, is whether ARM's
3 trademarks and brands are distinctive and
4 strong in the United States marketplace
5 context. Do you see that?
6    A    Yes.
7    Q    Are the trademarks that
8 you're referring to the two marks that
9 you've described in paragraph 7?
10    A    Yes. And the word mark, the
11 brand is, of course, ARM. But trademark
12 would be in a specific font style and so
13 forth.
14    Q    What do you mean when you
15 refer to the United States marketplace
16 context?
17    A    Oh, I just meant that
18 because it's global companies, both of
19 them. I'm just focused on the U.S.
20 markets here.
21    Q    So the brand strength,
22 outside of the United States, is not
23 relevant to your opinion?
24    A    Because that was my
25 understanding of a case, a U.S. case. So

23 (Pages 86 - 89)



Page 90

DR. RAVI DHAR

1    DR. RAVI DHAR
2 I think a lot of it applies everywhere.
3 But I focused on the U.S. market.
4    Q    What's the distinction
5 you're drawing between distinctive and
6 strong?
7    A    So basically, strong, as I
8 said, can refer to often, the commercial
9 strength that we went through, sales
10 share, you know, number of years in the
11 market, awards, recognition. And
12 distinctiveness is often, are there other
13 similar marks in that industry that can
14 affect like, well, there's another one
15 that uses ARM with a slightly, you know,
16 different thing. So it's often part of
17 commercial versus conceptual, if you'd
18 like, the distinctiveness, like unique is
19 the mark, if you'd like, compared to any
20 other players in the semiconductor
21 industry.
22    Q    So strength refers to
23 commercial strength, and distinctiveness
24 is more conceptual?
25    A    I think strength has two

Page 91

DR. RAVI DHAR

1    DR. RAVI DHAR
2 components so it. One is commercial, and
3 one is conceptual. And oftentimes,
4 strength has both components to it. And
5 commercial is one component. And
6 conceptual is another word. And that
7 conceptual is often thought of as
8 distinctiveness.
9    Q    The next issue that you have
10 as part of your assignment in Subsection
11 C --
12    A    Yes.
13    Q    -- says whether Qualcomm's
14 unlicensed use of the ARM trademarks in
15 connection with Nuvia products, i.e.,
16 technology that encompasses Nuvia
17 technology developed
18
19
20
21
22                And then you have
23 an additional parenthetical there. Do
24 you see where I am?
25    A    Yes.

Page 92

DR. RAVI DHAR

1    DR. RAVI DHAR
2    Q    How did you come to the view
3 that Qualcomm's use of ARM's trademarks
4 is unlicensed?
5    A    So, you know, I say in
6 Footnote 3 below that I understand that
7 the license was terminated. And Qualcomm
8 has its own license or ALA with ARM. But
9 ARM's position is that this was based on
10 the IP work that was done on the Nuvia
11 products and then transferred when
12 Qualcomm acquired. But I don't offer an
13 opinion on that. That's an assumption.
14 And that's through counsel which is what
15 Footnote 3 refers to here.
16    Q    So you were asked to assume
17 that ARM's position on whether Qualcomm's
18 use of ARM's trademark is licensed is
19 valid?
20        That was not a good
21 question. Let me ask that in a different
22 way.
23        You were asked to assume
24 that Qualcomm's use of ARM's trademark is
25 unlicensed?

Page 93

DR. RAVI DHAR

1    DR. RAVI DHAR
2        MR. FUNG: Objection, form.
3    A    I was asked to assume that
4 Qualcomm's use was -- yes. It was not
5 based on -- based on the license that was
6 provided to Nuvia. And these products
7 were based on the Nuvia technology.
8    Q    But
9
10                                    ; right?
11    A    Well, I'm offering an
12 opinion
13
14
15
16
17
18
19                                    So I'm
20 saying that the use
21        But I assume that use
22
23
24
25    Q    Right.

Page 122

DR. RAVI DHAR

1
2    Q    What other case studies can
3 you remember that relate to the
4 semiconductor industry or B2B brands in
5 the semiconductor industry?
6    A    So I've done some cases on,
7 you know, memory chips, like LSI.  I
8 don't know if LSI still exists, advanced
9 materials, semiconductor equipment
10 manufacturers.  So when I used to teach
11 marketing strategy, I would do cases on
12 those semiconductor chips and chip
13 industry.  So that's one more example.
14    Q    Do you think that you
15 applied knowledge from the Intel or LSI
16 case studies in issuing your opinions?
17    A    No, not at the specific
18 level of those.
19    Q    What specific experience in
20 marketing and branding did you rely on in
21 issuing your opinions?
22    A    Well, I mean I cite the
23 process which is well-established
24 framework and principles.  But I also
25 have knowledge in terms of working with

Page 124

DR. RAVI DHAR

1
2 business for Cisco.  I did some work with
3 HP.  HP has a business to business part.
4 But they are sort of what could be called
5 core customers.  I don't think HP makes
6 chips, makes the boxes, I think, and
7 other things.  But I don't think they
8 make the chips.
9    Q    So you have experience in
10 evaluating customer behavior of
11 purchasers of semiconductors, but not of
12 semiconductor manufacturers?
13        MR. FUNG:  Objection, form.
14    A    So not the R&D people, you
15 know.  But people who are buying or
16 selling to both sides, I would have
17 probably looked at that, like who's
18 buying from them and who's selling.  That
19 would be relevant here.  So I looked at
20 the buyer side, like what do the buyers
21 consider, and then what are the sellers,
22 also, so way of sellers, if you like.
23    Q    Who are the buyers that
24 you're referring to?
25    A    So it would vary by the

Page 123

DR. RAVI DHAR

1
2 very large companies on branding.  So
3 that influences how I think about it, but
4 not anything specific from that case and
5 said, hey, let's apply that here.
6    Q    Do you have any experience
7 with evaluating the behavior of customers
8 for CPUs?
9    A    Value the behavior, not
10 specifically at that level.
11    Q    What experience do you have
12 with evaluating customer behavior in the
13 semiconductor industry, generally?
14        MR. FUNG:  Objection, form.
15    A    So more in the tech
16 industry.  As I said earlier, I have, you
17 know, looked at Cisco, IBM.  And IBM had
18 a semiconductor business.  I don't know
19 if they still have it or not.
20        And so part of that
21 industry, I would look at different, you
22 know, verticals.  I mentioned generative
23 AI as one example, business analytics.
24 They have lots of different businesses.
25 So I would have looked at business to

Page 125

DR. RAVI DHAR

1
2 product market.  So depending on the
3 consulting assignment.  I recently looked
4 at wireless networks, for example, who's
5 buying the wireless network kind of thing
6 and who are the buyers and what do they
7 care about.
8    Q    That's not specifically
9 about the semiconductor industry?
10    A    No.  That's about the land
11 equipment, which would be where the
12 semiconductors might go in, not
13 specifically on semiconductors.
14    Q    Are there any specific
15 experiences that you've had that you view
16 as similar to the facts in this case?
17        MR. FUNG:  Objection, form.
18    A    Each case is different.  So
19 it's hard to -- I mean my role is
20 similar, which is that's why when we had
21 the discussion on the assignment, I said,
22 you know, that was the assignment I
23 proposed to counsel based on what I do is
24 a strength of the mark and the benefits
25 of the brand.  So my role is similar.

32 (Pages 122 - 125)

DR. RAVI DHAR

1
2 But the case is much bigger than my role.
3 So I don't have an opinion on that.
4     Q    In paragraph 13, you
5 say, "Based on my knowledge and
6 experience, well-established principles
7 of branding, my analysis of documents and
8 testimony provided to me by counsel and
9 cited herein and my own independent
10 research, my conclusions are as follows."
11           We've talked now about your
12 knowledge and your experience.
13     A    Yes.
14     Q    And we talked about the
15 documents and the testimony that you
16 reviewed.
17           What are the
18 well-established principles of branding
19 you relied on?
20     A    So I have a whole section of
21 what a brand is, what the strength is and
22 how do you measure the brand strength.
23 Those are well-established principles.
24 When I told you earlier, the sales, the
25 share, the recognition, and we had a

DR. RAVI DHAR

1
2 discussion on when I looked at, is Apple
3 a strong brand.  I did a very similar set
4 of things.  So those are well-established
5 principles, to measure the commercial
6 strength of a brand here.
7     Q    Are the well-established
8 principles of branding set forth in
9 paragraphs 79 to 92 of the report?
10     A    Yeah.  I mean they're all
11 over.  They keep going on, the length of
12 relationships and when I provide the data
13 and awards.  I wouldn't say they are
14 limited to that, but they're all sort of,
15 you know, listed in different places.
16 When I say -- when I looked at, you know,
17 how many units were shipped, for example,
18 30 billion, the size of the market.  And
19 those paragraphs are somewhat later.  So
20 I would say it's sprinkled everywhere.
21     Q    Did you do research on the
22 principles of branding which you relied
23 on in your report, for this report?
24     A    Sorry.  Did I do?
25     Q    Did you conduct research for

DR. RAVI DHAR

1
2 this report on the principles of branding
3 that you cite?
4     A    I mean I know most of this,
5 you know.  So I went back to the thing.
6 So when you say research, you mean
7 looking at the papers or did you mean
8 speak to somebody?
9     Q    I guess I mean anything.
10     A    Okay.  So, yes, so the
11 answer would be yes because I would go
12 back to the papers and the ones I'm
13 citing and I'm doing research and looking
14 up how it's being used.  We had this
15 discussion earlier on, multiple ways in
16 which, you know, Qualcomm was using it.
17 I did research on that and gave some
18 illustrative examples that I expanded on
19 in my reply report.
20           But that's another example
21 of research.  The research was both
22 looking at the academic side, but also
23 looking at how it's looking at the
24 awards, the list of awards, what were the
25 awards for, what they were doing.  That

DR. RAVI DHAR

1
2 was part of the research.
3     Q    Did you do any research that
4 you didn't write about in your report?
5           MR. FUNG:  Objection to
6     form.
7     A    No.  But as I mentioned, I
8 did mention all the articles that I
9 found.  So that would be an example where
10 I didn't write about it because it was
11 more of the same as opposed to different
12 research.
13     Q    Did you conduct a survey in
14 this case and not disclose it in your
15 report?
16     A    No, because as I said, you
17 know, A, the product is not being
18 launched.  So, no, I did not conduct a
19 survey.
20     Q    Did you talk to any ARM
21 customers in connection with your
22 research on this report?
23     A    No.  Only I reviewed, you
24 know, where they might have been deposed,
25 if there was anyone like that, but not --



Page 130

DR. RAVI DHAR

1
2 I did not personally have a conversation.
3    Q    Do you think any ARM
4 customers were deposed in this case?
5    A    Well, your client.
6    Q    Besides Qualcomm.
7    A    That's a good question.  I
8 mean I know people moved around.
9 Mr. Sharma was at different places,
10 including ARM I think at one time, and
11 Qualcomm.  But whether other companies
12 have been deposed, I don't think I saw
13 that.
14         MS. MORGAN:  I can go for
15 like ten more minutes, or we could
16 take a break.  What do you want to
17 do?
18         THE WITNESS:  Let's take a
19 break.
20         THE VIDEOGRAPHER:  Off the
21 record, 11:28 a.m.
22         (A short recess was taken.)
23         THE VIDEOGRAPHER:  Back on
24 the record, 11:44 a.m.
25    Q    Welcome back, Dr. Dhar.

Page 131

DR. RAVI DHAR

1
2    A    Thank you.
3    Q    I'm looking now at your
4 background section which starts on page
5 10 of your opening report.
6    A    Yes.
7    Q    And it goes all the way to
8 page 24.
9         This section contains
10 background information about the case
11 based on your read of documents and
12 deposition testimony; right?
13    A    I think that's correct.  Let
14 me quickly look at them.
15    Q    Sure.
16    A    Right.  It has some
17 information also on the size and sales at
18 ARM.  But it's the background information
19 also, yes.
20    Q    None of that information is
21 based on your personal knowledge; right?
22 It's based on your review of documents
23 and testimony?
24    A    Based on reviewing the
25 documents.  When you say personal

Page 132

DR. RAVI DHAR

1
2 knowledge, I would have personally
3 reviewed these documents?
4    Q    Right.
5         But you didn't have prior
6 knowledge of reviewing the documents in
7 the information background section?
8    A    I think that's correct.
9    Q    Are the background facts
10 part of your opinions in this case?
11    A    No.  I think the background
12 facts, I would call them, baseline
13 foundation knowledge kind of a thing.
14    Q    Do you understand any of the
15 facts in the background section to be in
16 dispute?
17    A    I mean one of the things we
18 already discussed, I don't know if the
19 background gets into it in more details,
20 which is that the license is -- we
21 discussed earlier on termination and
22 ███████████████████████████████████
███████████████████████████████████  So to me, if that's
25 also here, which it might be, I haven't

Page 133

DR. RAVI DHAR

1
2 gone through it, we discussed earlier,
3 Qualcomm disputes that.
4    Q    Let's look at paragraph 21.
5         You write here, "Software
6 developers write software for ARM-based
7 devices," the beginning of that sentence.
8 Do you see that?
9    A    Yes.
10    Q    This is a quote from ARM's
11 SEC Form 424B4; right?
12    A    Yes.
13    Q    What does ███████ mean?
14    A    So this is one of the
15 opinions I opined that, to me, what I've
16 said based on the use of the word ███████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████.
23    Q    How did you establish that
24 ███████ means ███████████████████████
25         MR. FUNG:  Objection, form.

34 (Pages 130 - 133)

Page 134

DR. RAVI DHAR

2     A     So ███████████████
████████████████████████████
████████████████████████████
███████████████████████████████
8           And in the reply report, I
9  give other examples of this.  And
10  clearly, I also mention that other
11  products historically that Qualcomm had
12  launched, using ███████████████
█████████████████████
14          And so based on the
15  documents I reviewed, the deposition
16  testimony and based on just the way it's
17  called, it means -- ███████████████
████████     It didn't require some special
19  linguistic knowledge in this case to do
20  that.
21     Q     Let's look at paragraph 33.
22     A     Okay.
23     Q     In this paragraph, you
24  state, "ARM's TLA ███████████████
██████████████████████████

Page 135

DR. RAVI DHAR

2 ████████████████████████
4           Do you see that?
5     A     Yes.
6     Q     What do you mean by
7  ████████████████
8     A     So this is the distinction
9  we made between ███████████████
████████████████████████████
████████████████████████████
13  Here, most of the things are basically
14  ███████████     And then you're
15  making smaller changes to it.
16     Q     What did you cite as support
17  for this?
18     A     23, there's some -- I guess
19  I cited -- I mean there's discussion of
20  this in the complaint, the distinction
21  being off-the-shelf.  I've seen it in
22  many places.  But here, I cite, you know,
23  the ████████████████████
25     Q     Do you think the phrase

Page 136

DR. RAVI DHAR

2 ████████████████     in the TLA?
3     A     No.  That might be in the
4  complaint and other documents.  I think
5  to me, ████████████████████
████████████████████████████
████████████████████████████████
████████████████████████████
11     Q     Do you know if this is a
12  direct quote from the complaint?
13     A     Sitting here, I do not.  I
14  see the distinction in many depositions
15  also come up between custom and the
16  standard or off-the-shelf.
17     Q     You didn't cite the
18  complaint as a source for this sentence,
19  did you?
20     A     No.  Not looking here, I did
21  not.
22     Q     Let's look at paragraph 39.
23           Here, you state that an ALA
24  ████████████████████████████

Page 137

DR. RAVI DHAR

2 ████████████████████████
████████████████████████████
████████
5           What do you mean by
6  ████████████
7     A     So I mean -- so as I
8  mentioned earlier, that the ALA ████
████████████████████████
10  ALA has the ████████
████████████████████████████
████████████████████████████
14  So ████████████     just meant, you
15  know, ████████████
16     Q     And you understand the
17  support and maintenance that ARM provides
18  to be connected to the verification
19  process?
20     A     Verification validation is
21  part of it.  But it might be also
22  connected to the ecosystem-related issues
23  that we discussed; in other words, it
24  provides an opportunity for the licensee
25  to -- they might have questions as

35 (Pages 134 - 137)

Page 218

DR. RAVI DHAR

1
2 can repeat the answer.
3    Q    You're giving answers that
4 are not responsive to the questions.
5    A    I'm happy to repeat the
6 answers.
7         MR. FUNG:  Counsel, just
8    state the question.
9    A    Yeah.  Just state your
10 question.
11    Q    The question is -- I want to
12 be clear that I will seek more than seven
13 hours with you if you can't answer these
14 questions.  I will petition the court.
15    A    You can do what you like.
16         MR. FUNG:  Just ask the
17    question.  Don't lecture the witness.
18    Q    The question is, you would
19 have to examine a specific B2B
20 transaction in order to understand what
21 information a decision maker relied on in
22 that transaction?
23    A    I don't know what
24 transaction you're talking about.
25         MR. FUNG:  Objection to

Page 219

DR. RAVI DHAR

1
2    form; objection, asked and answered.
3    A    In this case, I did not need
4 to rely on the answer that I already
5 gave, that ARM-based, non-compliant and
6 ARM have a false and misleading
7 information if there's no license, that
8 it uses the ARM brand.
9    Q    When you said it depends
10 even in B2B, whether you're buying paper
11 cups or not, what did you mean?
12    A    It means what is the overall
13 set of information they would consider.
14 I don't need to know all the overall set
15 of information that they're considering.
16         And here, they'll be other
17 information they'll also consider.  It's
18 not just about whether it's misleading
19 and false about ARM license.  There are
20 other information in the chip and that
21 they would consider.  I don't need to
22 know that to know that this particular
23 information is false and misleading.
24         MS. MORGAN:  Move to strike.
25    Q    You also state in this

Page 220

DR. RAVI DHAR

1
2 paragraph, "B2B products are generally
3 purchased by a group within an
4 organization, rather than a single
5 individual, and as such, can be subject
6 to complex within firm restrictions and
7 negotiations."
8         Do you see that?
9    A    Yes.
10    Q    How does that impact the
11 buying process for a B2B brand?
12    A    So, again, in a specific
13 case like this, it does not affect any of
14 the things I said, which is ARM-based and
15 ARM compliant is misleading and false.
16 What this is referring to is that the
17 process might play out over a certain
18 time frame.  They might have some
19 back-and-forth.
20    Q    Are you relying on
21 principles about B2B brands generally in
22 your report?
23    A    I'm relying on the fact that
24 B2B is more sophisticated.  And it would
25 make no difference, yes.

Page 221

DR. RAVI DHAR

1
2    Q    It makes no difference
3 whether it's a B2B transaction or a B2C
4 transaction?
5    A    It makes no difference in
6 terms of the false and misleading
7 information that the customer is
8 sophisticated would not change that
9 ███████████████████████████████████████
██████████████.
11    Q    You don't actually have the
12 technical expertise to evaluate whether
13 anything Qualcomm has said about any of
14 its products is false and misleading, do
15 you?
16         MR. FUNG:  Objection, form.
17    A    As I said, we made certain
18 assumption.  I don't -- I know that ARM
19 doesn't have the proper license.  I was
20 asked to assume that.  So under that
21 assumption, it's simply false and
22 misleading.  If that assumption is
23 incorrect, the lawyers on two sides will
24 fight it out.  But if it does not have a
25 license, then the use of ███████████████

56 (Pages 218 - 221)

Page 222

DR. RAVI DHAR

1
2 ████████████████████████
  ████████████
4    Q    You would agree that
5 Qualcomm and ARM both sell complex
6 products; right?
7         MR. FUNG:  Objection, form.
8    A    I mean they sell products.
9 We already discussed what they are,
10 labeling as complex.  I don't know what
11 that adds.
12    Q    You don't know if they're
13 complex?
14         MR. FUNG:  Objection.
15    A    I mean products, they're
16 complex, certainly compared to buying an
17 ice cream and a candy, yes.  So it just
18 depends.  I don't have -- compared to
19 buying a pair of sneakers, yes, they're
20 complex.
21    Q    And both Qualcomm and ARM
22 sell their products to businesses as part
23 of complex transactions; right?
24         MR. FUNG:  Objection, form.
25    A    They have some negotiations,

Page 223

DR. RAVI DHAR

1
2 correct.
3    Q    And the decision makers in
4 situations where Qualcomm sells its
5 products and where ARM sells its products
6 have technical knowledge about the
7 products?
8         MR. FUNG:  Objection, form.
9    A    Yes.
10    Q    And the decision to buy a
11 Qualcomm product or an ARM product is
12 typically made by groups of decision
13 makers, not one person; right?
14         MR. FUNG:  Objection, form.
15    A    They might have a buying
16 center, yes.
17    Q    What did you do in this case
18 to learn about the purchase process for
19 Qualcomm's products?
20    A    You mean the products that
21 Qualcomm makes?
22    Q    Yes.
23    A    Yes.  So as I said, it's not
24 in the market yet.  So I haven't looked
25 at that.  But based on the way my

Page 224

DR. RAVI DHAR

1
2 opinions are, the way that Qualcomm
3 describes it right now in the different
4 places, including the events, Snapdragon
5 and Summit, the press, to the financial
6 investors, that ARM -- that the terms
7 that are being used about ARM-based, ARM
8 is false and misleading.
9    Q    Have you researched as part
10 of your work in this case who Qualcomm's
11 customers are?
12    A    Qualcomm's customers, we
13 discussed earlier, would be businesses
14 that are making certain devices and so
15 forth, yeah.
16    Q    What research did you do to
17 establish that?
18    A    I looked at some of these
19 materials and depositions.  But I don't
20 know all the lists of the customers.
21    Q    Have you reviewed Qualcomm's
22 marketing materials that were provided to
23 customers in connection with any of its
24 products that you referred to as the
25 Nuvia products?

Page 225

DR. RAVI DHAR

1
2    A    Yes.  I looked at the
3 spreadsheets and other things.  But as I
4 said, the product has not been launched
5 yet.  And I also looked at the events,
6 the Snapdragon Summit, what are the press
7 releases and information that they
8 provided broadly to the market and to the
9 community.  I looked at that.
10    Q    Is it your understanding
11 that information that's provided broadly
12 to the market and to the community is the
13 same information that's provided to
14 customers as part of a sales pitch?
15         MR. FUNG:  Objection, form.
16    A    No.  It's part of it.  And
17 then I mentioned the specification sheets
18 and other things also provided.
19    Q    And do you have the
20 technical expertise to read those?
21         MR. FUNG:  Objection, form.
22    A    I was not evaluating all the
23 things.  My focus is somewhat
24 straightforward, which is the use of
25 ████████████████████████

57 (Pages 222 - 225)

DR. RAVI DHAR

4    Q     You said in response to my
5  question about whether you had looked at
6  Qualcomm's marketing materials, that the
7  product has not been launched yet.
8           What do you expect to change
9  when the product is launched?
10    A     It's a good question.  I
11  don't know the answer because in the
12  responses, Qualcomm I think -- ARM asked
13  if you would continue to, you know, some
14  questions around how would you use the
15  ARM mark.  And I think Qualcomm's
16  response was that they didn't answer the
17  question, is my memory.  So, in other
18  words, I don't know the answer in all the
19  ways that they would use it.
20    Q     Have you examined how long
21  Qualcomm's sales process takes?
22    A     No, I have not.
23    Q     Have you researched who the
24  decision makers are at Qualcomm's
25  customers?

DR. RAVI DHAR

2    A     Not specifically.  But it
3  would be a buying center again, a team.
4    Q     What do you mean by a buying
5  center?
6    A     Which just means a
7  collection of people who can be from
8  slightly different functional areas.
9    Q     What functional areas are
10  Qualcomm's decision makers made up of?
11    A     So it'll depend on the
12  products.  I've done extensive work in
13  this area I've told you before with IBM.
14  So it depends for business analytics
15  product or Gen AI.  But it's a
16  combination of somebody from corporate
17  IT, somebody from a business person,
18  somebody from a CIO's office.  It could
19  be a combination of people like that.
20    Q     Do you know what market the
21  Snapdragon Elite chip is in?
22    A     So Snapdragon is, I think,
23  in a lot of the products like PC
24  computer, you know, laptop, those kind of
25  products as well.  But they have a whole

DR. RAVI DHAR

2  series of this.  And I don't know if
3  they're all in the same categories or
4  different ones.
5    Q     You don't know what all the
6  markets are that Qualcomm's chips are in?
7           MR. FUNG:  Objection.
8    A     Sitting here, I don't recall
9  all of them.
10    Q     What did you do to learn
11  about the purchase process for ARM's
12  products?
13           MR. FUNG:  Objection, form.
14    A     So, again, my focus was
15  really not on -- you mean ARM's
16  customers?  Yeah.  That was not my main
17  focus, to look at how ARM's products are
18  purchased.
19    Q     So you didn't take any steps
20  to understand how ARM's products are
21  purchased?
22           MR. FUNG:  Objection, form.
23    A     Well, I looked at some of
24  the stuff that talks about Mr. Amon
25  saying when he uses ARM products versus

DR. RAVI DHAR

2  not.  So obviously, when the custom core
3  or processor core or when Intel wins or
4  what Apple is doing.  So I have some
5  sense of it, but it is not the main
6  focus.
7    Q     Did you research who the
8  decision makers are for making purchases
9  from ARM?
10    A     I don't recall.  I mean I
11  might have seen it in the Nuvia
12  depositions.  But it wasn't central to my
13  opinion.
14    Q     Do you know how long it
15  takes for ARM to enter into a sale with a
16  customer typically?
17           MR. FUNG:  Objection, form.
18    A     Same cycle.  I don't
19  remember seeing that.
20    Q     Do you know how long after
21  Qualcomm sells a chip to an equipment
22  manufacturer that the equipment
23  manufacturer may have a product on the
24  market that incorporates that chip?
25    A     The introduction cycle, I

58 (Pages 226 - 229)

Page 230

DR. RAVI DHAR

1
2 don't specifically look. But I've seen
3 the computer industry can take multiple
4 months, maybe even more, yeah.
5     Q     When you say multiple
6 months, do you mean like more than six
7 months?
8     A     It varies. I mean I
9 remember when I was more involved in
10 this, when Intel would launch a new chip,
11 it would depend on the customer. Dell
12 would launch it within a month. HP would
13 take six to nine months. So there was
14 not a fixed cycle in that business.
15     Q     And you didn't study the
16 cycle in this business of how long it
17 typically takes Qualcomm's customers to
18 go from buying a chip to introducing a
19 product that includes that Qualcomm chip;
20 right?
21     A     It wasn't relevant to my
22 task.
23     Q     Let's go to page 27 of your
24 report which is a little bit back.
25         Here, you talk about the

Page 231

DR. RAVI DHAR

1
2 components of a strong and distinctive
3 brand identity which we've talked about
4 extensively today; right?
5     A     Yes.
6     Q     At the beginning of this
7 section in paragraph 85, you state, "The
8 commercial strength of a brand lies in
9 what customers in the marketplace have
10 learned, felt, seen and heard about the
11 brand because of their direct or indirect
12 experiences over time."
13     A     Right.
14     Q     What do you mean by direct
15 experiences?
16     A     So this is just the idea
17 that how much you've been exposed to the
18 brand, your purchase of your 50 percent
19 share of the addressable market. A lot
20 of people have experience with the brand
21 in the marketplace. If nobody's bought
22 it, then most of it is indirect. And so
23 there's a combination that indirect can
24 also be communications, events, all other
25 stuff people do.

Page 232

DR. RAVI DHAR

1
2     Q     Is marketing material an
3 indirect experience with a brand?
4     A     Yeah. I would call it
5 indirect in that sense because it's
6 collateral. Direct, I mean by, you know,
7 sort of you have used it or are aware of
8 it kind of thing, not aware of it, used
9 it, some experience with it.
10     Q     Did you do anything in this
11 case to research what direct experiences
12 ARM's customers have had with ARM?
13     A     Not at an individual level.
14 As I said, it's a very successful brand.
15 And I didn't need to do that. And this
16 shocked that. Dr. Steckel seems to not
17 understand something basic as that.
18     Q     So your conclusions about
19 what customers in the marketplace have
20 learned, felt, seen and heard are based
21 on indirect experiences in the market?
22         MR. FUNG: Objection, form.
23     A     Not indirect. Aggregate,
24 its customers, that I look at the
25 aggregate, like sales and share and

Page 233

DR. RAVI DHAR

1
2 recognition. But I did not -- and we
3 talked about this in the morning. I
4 didn't do a survey of consumers to do
5 that.
6     Q     So there's no direct
7 evidence of what consumers' experiences
8 have been?
9     A     There is not direct evidence
10 on the survey that I did. Proof of the
11 pudding is in the eating. If Apple sells
12 $100 billion, that's direct evidence of a
13 strong brand. I don't need to do a
14 survey to do that.
15     Q     So your position is that you
16 can establish the direct experiences that
17 customers have had in the marketplace
18 with ARM by looking at ARM's sales?
19     A     You're using too many words.
20         MR. FUNG: Objection, form.
21     A     Let me simplify. I have
22 established that it's a commercially
23 strong brand, looking at a number of
24 different factors, including sales,
25 shares, awards, events, those kinds of

59 (Pages 230 - 233)

Page 234

DR. RAVI DHAR

1
2 things.
3     Q     Let's go to paragraph 87.
4     A     Okay.
5     Q     You state in the bullet
6 that's at the top of page 28, but is part
7 of the same paragraph, at the end of that
8 paragraph, you say, "Length of use,
9 advertising/promotional efforts, exposure
10 to the brand, including its mentions as
11 an ingredient of the product by the
12 licensee and media, are important factors
13 in establishing brand awareness and a
14 brand image and, thus, brand knowledge."
15     Do you see that?
16     A     Yes.  And I would add all
17 the things we talked about:  Sales, share
18 and all those things, yeah.
19     Q     This sentence is not
20 supported by a footnote; right?
21     A     It doesn't have a footnote.
22     Q     What is the basis of this
23 opinion?
24     A     What's the basis of this?
25     Q     Yes.

Page 235

DR. RAVI DHAR

1
2     A     This is 101.  This is the
3 commercial strength of a brand depends on
4 how much it's used, the length of it.
5 Then exposure happens to the ingredient.
6 So if you say ARM-based on all your
7 communication, your customers, which is
8 what Qualcomm has said, it's ARM-based,
9 ARM-based everywhere around core, this is
10 all multiplying the exposure.
11     And that goes to the
12 recognition and the strength of the brand
13 because brand strength has two
14 components:  The recognition, which is
15 the awareness, and the associations,
16 which is the meaning we spoke about
17 earlier.
18     Q     Is that written down
19 anywhere?
20     A     It's written in many places.
21 It's written here, it's in my second
22 report, you know, all the different
23 things.
24     Q     I meant, is it written down
25 in an authority that you could cite?

Page 236

DR. RAVI DHAR

1
2     A     Oh, yes.  Of course, it's
3 written down in ways of commercial
4 strength of the brand, would be based on,
5 you know, sales, share, advertising, all
6 these -- length of views.  These are all
7 elements of establishing -- they're all
8 factors, in other words.  They're around
9 for 100 years, and they have sales of
10 $5 billion, and they advertise a certain
11 amount, they attend a lot of events and
12 went to a lot of -- received a lot of
13 awards.  That all goes into the brand
14 awareness, brand strength.
15     Q     But you didn't cite any
16 place that it's written down here; right?
17     A     Not here.  I've said in many
18 things, in many places, I have that 81,
19 which is sort of a book around that.
20 That would be a place also that would
21 talk about the brand strength in detail.
22     Q     That's a 591-page textbook.
23 And you did not give any citation.
24     Do you know what you were
25 referring to in Footnote 81 or were you

Page 237

DR. RAVI DHAR

1
2 referring to that entire 591-page book?
3     A     No.  There would be a
4 chapter on brand strength, broken down
5 into brand strength.  The whole book is
6 how to build brand equity.  So there will
7 be a chapter on brand strength.  And
8 they'll be a chapter on building strong
9 brands.  I think over the years, he might
10 have even added a chapter on B2B branding
11 or something.
12     Q     So if I wanted to
13 cross-examine you on your reference to
14 this book, I'd have to read the whole
15 book and figure out where all the
16 references are that you haven't cited;
17 right?
18     MR. FUNG:  Objection.
19     A     I'm happy to send it if you
20 need it.  This is not -- this is
21 well-established principles.  These are
22 not controversial principles, in other
23 words.
24     Q     You say at the end of this
25 sentence that these are factors in

60 (Pages 234 - 237)

DR. RAVI DHAR

1
2 example.  I would identify like different
3 awards, for example, when I did for
4 Apple.  I would say different awards they
5 might have won, different brand
6 recognitions.  So depending on the
7 different instances, I might look at
8 different organizations.
9    Q    How did you identify the
10 recognition documents that you cited in
11 Footnote 105?
12    A    So this is when, you know --
13 so this is one of the ways in which, as I
14 said, it's a standard process of
15 establishing commercial strength, sales
16 share and recognition and awards.
17        So I would ask counsel.  I
18 would look -- I think the Web site also
19 talks about some awards and stuff they
20 have.  So these are not meant to be
21 comprehensive.  And I would ask counsel
22 like what are the others that are there.
23 And then I would look at them and decide.
24    Q    Do you think counsel
25 provided you with references to the World

DR. RAVI DHAR

1
2 Intellectual Property Organization?
3    A    Again, I don't remember
4 because I had done some research.  But
5 clearly, after I mentioned this list,
6 there was a list of things that I would
7 look at and decide whether it's relevant
8 or not.
9        MS. MORGAN:  I'm going to
10 mark this as QX219.
11        (The above-referred-to
12    document was marked as QX Exhibit 219
13    for identification, as of this date.)
14    Q    Do you recognize this
15 document?
16    A    They all look the same.
17 They were a whole bunch of them here.
18    Q    This has a Bates number at
19 the bottom; right?
20    A    Yes.
21    Q    And it says 1315310.  You
22 see that?
23    A    Yes.
24    Q    Do you see that that Bates
25 number is listed in Footnote 105?  It's

DR. RAVI DHAR

1
2 in the last line.
3    A    Yes.
4    Q    This is not an award; right?
5 This is an arbitration decision?
6    A    That's right.  Looks like
7 it, yeah.
8    Q    All of the documents, in
9 fact, that are cited in Section 105 were
10 arbitration decisions that were issued by
11 the World Intellectual Property
12 Organization arbitration and mediation
13 center; right?
14    A    I think my memory is that
15 they referred to ARM.  They sort of
16 provide a decision on ARM being a strong
17 or a famous mark or something to that
18 effect is some conclusions in many of the
19 documents that I recall reading; in other
20 words, they provide an opinion on the ARM
21 mark here.
22    Q    They rule on trademark
23 claims related to the ARM mark; right?
24    A    Right.  But they provide
25 this notion that ARM is a strong mark or

DR. RAVI DHAR

1
2 a famous mark or something well-known.
3 That's my memory from many of these that
4 I saw.
5    Q    Where do you see that in
6 here?
7    A    I have to look carefully.
8 So in the last page, it talks a little
9 bit about the panel assessing trademark
10 as distinctive and widely known in the
11 relevant customer circles, particularly
12 in the United States.  That's an example
13 of, you know, the kind of stuff I found
14 in these documents.
15    Q    And this is a decision
16 that's ruling that the ARM trademark is
17 sufficiently distinctive for certain
18 products to be enforced; right?
19    A    Right.
20    Q    You told me earlier that a
21 trademark and a brand are different;
22 right?
23        MR. FUNG:  Objection, form.
24    A    I said the trademark is
25 like, you know, a specific thing that has

DR. RAVI DHAR

1
2 been recognized. And the brand would be
3 the name like that. So specific
4 registration of Apple and the Apple
5 brand, obviously one is connected to the
6 other but what people see in the world as
7 a brand. And the trademark registration
8 would have a little bit more details
9 around that, yeah. So the word mark, ARM
10 and the brand are kind of closer, if you
11 like.
12     Q     Is it your understanding
13 that any trademark that is found to be
14 distinctive enough to be enforced
15 demonstrates global good will,
16 reputation, fame and distinctiveness?
17         MR. FUNG: Objection, form.
18     A     Again, I'm not relying on
19 any one piece of information. I've said
20 in my report your side hasn't pointed on
21 anything that ARM is not distinctive. I
22 said this to Dr. Steckel. And I haven't
23 found it. And I'm saying this is one of
24 the many documents that I see that
25 consistently also said it's distinctive.

DR. RAVI DHAR

1
2         So I'm not relying --
3 there's no silver bullet here that
4 there's only one piece here. Dozens of
5 these things in these decisions, then
6 subsequently on the awards and other
7 things and the lack of any close similar
8 mark in the marketplace would also go to
9 distinctive.
10     Q     The next subsection
11 says, "More than 260 companies have
12 reported shipping ARM-based chips this
13 year, and ARM CPUs were used in more than
14 250 billion chips last year."
15         Is this an example of the
16 commercial evidence that you're providing
17 to support that ARM is a strong brand?
18     A     Correct. I think the
19 250 billion should be cumulative. I
20 think the last year was 30 billion I
21 noted somewhere. 250 is cumulative is
22 what I recall.
23     Q     Cumulative over what period
24 of time?
25     A     I forget. Some larger

DR. RAVI DHAR

1
2 period, yeah.
3     Q     So you're saying that when
4 this says ARM's CPUs were used in more
5 than 250 billion chips since last year,
6 that's not correct?
7     A     That's not correct. That's
8 cumulative. I think I said somewhere in
9 this report, it's 30 billion last year.
10     Q     Is it possible to have a
11 commercially successful brand that's not
12 a strong brand?
13     A     Sorry. Could you repeat
14 that?
15     Q     Is it possible for a brand
16 to be commercially successful, but not
17 strong?
18         MR. FUNG: Objection, form.
19     A     I mean it would be strong in
20 that segment. I'm trying to think if
21 it's a strong brand. It goes into the --
22 we discussed -- legal issues around
23 copyright protected, those kind of
24 things, the word is descriptive, generic.
25 So there might be some legal issues.

DR. RAVI DHAR

1
2     Q     And then in Subsection C --
3     A     So where are you?
4     Q     C. Same section, but now
5 Subsection C.
6         You give your next group of
7 evidence that ARM has a distinctive or
8 strong mark, and you list out various
9 awards and accolades here. You see that?
10     A     Yes. And they're not
11 complete. There's just a bunch here,
12 yeah.
13     Q     How did you identify these
14 awards for your report?
15     A     So some, I looked online
16 myself. Some, I said they're on the Web
17 site. And I also asked counsel this is
18 what I'm looking for, like you can find
19 additional. And I decide whether to
20 include them or not. The idea was to be
21 illustrative rather than comprehensive.
22     Q     The first one you list is
23 the International Trade Awards?
24     A     Yes.
25     Q     What is that award body?

65 (Pages 254 - 257)

Page 258

DR. RAVI DHAR

1
2     A     I don't recall sitting here.
3  There were different awards.  I looked at
4  so many.
5     Q     How did you select which
6  ones you would include?
7     A     It was just like, you know,
8  look at the organization.  Sometimes I
9  looked at who else was listed in that,
10  like they all looked like companies
11  well-known, like Samsung would be getting
12  something.  So I looked at, you know,
13  many different places for this, what came
14  up.  And I looked for awards for ARM.  So
15  many different sources.
16     Q     Do you know what the
17  criteria are for being the overall winner
18  of the International Trade Awards?
19     A     Not sitting right now.
20     Q     Do you know if decision
21  makers in ARM's B2B market are aware of
22  this award?
23     A     Again, across all of this is
24  an indication of commercial strength and
25  success in the marketplace.  But I did

Page 259

DR. RAVI DHAR

1
2  not look at every single award as
3  something that a customer would be aware
4  of, yeah.
5     Q     Did you look at if a
6  customer would be aware of this award?
7     A     Sorry.  Which award?
8     Q     The International Trade
9  Awards.
10     A     Not specifically, no.
11     Q     The next award that you
12  listed is the Queens Award for Enterprise
13  in 2011.
14     A     Right.
15     Q     What's that award?
16     A     Again, I don't remember the
17  details.  But I think it must be the UK.
18  It's a UK-based company.  It's awards
19  given by the UK.
20     Q     You stated earlier in your
21  report that you were analyzing ARM's
22  marks in the U.S. market.
23     A     Right.
24     Q     Is an award in the UK
25  relevant to that analysis?

Page 260

DR. RAVI DHAR

1
2     A     Yeah.  If it's for its
3  performance globally, it's relevant,
4  yeah.  It's a very global company of that
5  industry.  So I think a lot of the award
6  is for success of British companies,
7  potentially in the world.
8     Q     Do you know what the
9  criteria are for winning the Queens Award
10  for Enterprise?
11     A     I might have seen it at some
12  point.  Sitting here, I don't memorize
13  all the criteria for all the awards that
14  I looked at.
15     Q     Do you know if that award
16  has to do with the brand?
17     A     Again, I don't recall.  The
18  award was given for overall recognition.
19  It can be given for technology.  But
20  ultimately, that all goes to the brand.
21  We talked about Google's secret sauce
22  might be the search engine.  But the
23  benefit goes to the brand.  Apple might
24  have some technology that's user
25  friendly.  But the benefit goes to the

Page 261

DR. RAVI DHAR

1
2  brand.  So they're linked.
3     Q     Do you know if decision
4  makers in ARM's B2B market are aware of
5  the Queens Award for Enterprise?
6     A     Again, these, I don't know
7  about a specific award.  This is
8  collectively showing that ARM is a very
9  successful company.  I'm surprised that
10  it's even under dispute, frankly, or even
11  a point worthy of dispute.  And these are
12  just examples, illustrative of that it's
13  a very strong brand.
14     Q     So you don't know if
15  decision makers in ARM's B2B market are
16  aware specifically of the Queens Award
17  for Enterprise?
18     MR. FUNG:  Objection, form.
19     A     Of a specific customer.  But
20  the aggregate, when you get all these
21  recognitions, many people would be aware
22  of it.
23     Q     They would be aware of this
24  specific award?
25     A     Of these awards.  I don't

66 (Pages 258 - 261)

Page 262

DR. RAVI DHAR

1
2 know about the specific award.  But the
3 fact that you're so successful, and this
4 is only a subset as I mentioned of the
5 awards.
6     Q     What is the Linley Group's
7 Best Processor IP Award?
8     A     Again, sitting here, I don't
9 recall.  But it's another award given by
10 organization.
11    Q     You don't know what it's
12 rewarding?
13        MR. FUNG:  Objection, form.
14    A     Well, it says processor IP.
15 But I don't remember the exact details at
16 ARM.  It talks about some of the details
17 in the footnote.  But I don't remember
18 all the details of the processor criteria
19 that they have.
20    Q     And putting aside that you
21 believe that the awards in the aggregate
22 have permeated the market and that
23 customers understand that ARM has won
24 many awards, do you know if decision
25 makers in ARM's B2B are specifically

Page 263

DR. RAVI DHAR

1
2 aware of this award that you cited, the
3 Linley Group's Best Processor IP Award?
4        MR. FUNG:  Objection.
5     A     No.  I haven't looked at
6 this specific award.  It was not
7 relevant, frankly, for the thing.  As I
8 said, this is one of many factors that
9 I've established that lead to ARM's
10 strength.
11    Q     The last award that you list
12 here is the TSMC OIP Partner of the Year
13 for Processor IP Award.  Do you see that?
14    A     Yes.
15    Q     What is that award?
16    A     Again, in the footnote, it
17 says it's a partner award.  I think it
18 might be for Taiwan.  I think it's Taiwan
19 Semiconductors.  But I don't remember
20 sitting here.  And it gives sort of
21 awards for best partners for the
22 organization which is a very large
23 semiconductor organization.
24    Q     You don't know what the
25 criteria are for that award; right?

Page 264

DR. RAVI DHAR

1
2     A     I might have known.  Sitting
3 here, I don't know.
4     Q     Again, you don't know if
5 decision makers in ARM's B2B market are
6 specifically aware of this award, the
7 TSMC OIP Partner of the Year Award;
8 right?
9     A     I would expect many to know.
10 But I have not done a specific analysis.
11    Q     Do you know if ARM's
12 customers make purchasing decisions based
13 on these awards?
14    A     This awards really goes back
15 to the commercial strength and
16 recognition.  And obviously, they don't
17 make decisions based on the award.  But
18 it's reflective.  It's not a causal.  But
19 it drives -- so, for example, if a law
20 school is rated in the top ten, it means
21 people think the law school is doing
22 something right.  So there are underlying
23 dimensions that gets you recognized for
24 being the best processor which the
25 companies will take into account here.

Page 265

DR. RAVI DHAR

1
2     Q     You have not done a specific
3 analysis of whether ARM's customers make
4 purchasing decisions based on these
5 awards; right?
6     A     That was very far from my
7 objective in this thing, yeah.
8     Q     It is your professional
9 opinion, though, that renown, as
10 indicated by reputation, fame, awards and
11 accolades is a good measure of a
12 trademark strength; right?
13    A     It's one measure.  But I
14 have multiple measures.  It is a good
15 input, yeah, of course.  If you want
16 popular choice award, it's a good measure
17 of popular choice.
18    Q     What principles of marketing
19 are you applying when you come to that
20 conclusion?
21    A     So the award -- this goes
22 back to the awards are based on
23 performance of the product or in the
24 marketplace.  So this goes to the
25 commercial strength, what goes into

67 (Pages 262 - 265)

Page 266

DR. RAVI DHAR

1
2 commercial strength.  We talked about
3 sales, share, length of use, events,
4 communication events and awards is one
5 such factor.
6      Q      In the next few paragraphs,
7 you talk about ARM's efforts to develop
8 its brand?
9      A      Yes.
10     Q      Do you see that?
11     A      Yes.
12          THE WITNESS:  Are you taking
13 a break at some point?
14          MS. MORGAN:  Yes.  I'm
15 almost done with this, and then we
16 could take a break.
17          THE WITNESS:  No.  That's
18 fine.
19     Q      You assert in paragraph 101
20 that strong branding is most effective
21 when the underlying product or service is
22 of high quality, particularly in B2B
23 markets, where buyers often have a high
24 degree of technical expertise in
25 evaluating the products and services that

Page 267

DR. RAVI DHAR

1
2 they purchase.
3      A      Right.
4      Q      Do you see that?
5      A      Yes.
6      Q      Do you agree that the
7 quality of ARM's products is relevant to
8 its customers' analysis of their purchase
9 decisions?
10     A      Yes.  That would be an input
11 into, you know, a decision which is
12 performance, yes.
13     Q      Why are ARM's efforts to
14 develop its brands relevant to the
15 question of whether its brand is strong?
16     A      It's just another element
17 into, you know, how would people
18 become -- you know, sales and share, we
19 discussed are one thing, but also how
20 often are you discussing your brand.  And
21 with the key -- because when you have
22 these events, these events are not random
23 people attending.  These are people who
24 are going to be potentially people from
25 the industry, broadly defined, for the

Page 268

DR. RAVI DHAR

1
2 events.
3          So the more people know what
4 you're doing, very similar to the
5 Snapdragon and Summit.  You're trying to
6 prelaunch, like what are the new stuff.
7 So having your presence felt is just
8 another factor in overall exposure, if
9 you like.
10     Q      You don't have the technical
11 expertise to evaluate if ARM's underlying
12 product is high quality; right?
13          MR. FUNG:  Objection, form.
14     A      That's correct.  I don't
15 know whether it's technically superior,
16 just like I don't know if Google's search
17 engine is technically superior, Bing or
18 something else.
19     Q      In paragraph 103, you
20 discuss the benefits of ARM's technology
21 for downstream customers.  You see that?
22     A      Yes.
23     Q      Who are ARM's downstream
24 customers?
25     A      So this would be the

Page 269

DR. RAVI DHAR

1
2 discussion we had earlier which would be
3 sort of, you know -- it's not the end
4 consumer I'm talking about.  It will be
5 the Qualcomm customers as an example
6 here.
7      Q      What benefits does ARM offer
8 to downstream customers?
9      A      So my understanding is that,
10 you know, if you are a downstream
11 customer and what ARM brand stands for
12 and the benefits of the ecosystem.  So
13 while clearly it benefits Qualcomm or the
14 licensee, but it also potentially has
15 benefits for the device makers and so on.
16     Q      How do benefits to
17 downstream customers impact B2B
18 transactions in the microprocessor
19 industry?
20     A      I mean, again, this is the
21 discussion we had around if you think
22 it's branded with ARM.  So you know ARM,
23 which is a strength of the mark, one
24 factor.  But you also think it gives me
25 some potential benefit, which if you're

68 (Pages 266 - 269)

DR. RAVI DHAR

1
2  not ARM, you don't get.  Maybe you don't
3  get access to the ecosystem.
4       So in that sense, to the
5  extent there is this benefit of
6  everything that ARM does to the customers
7  of Qualcomm, that benefit would be, you
8  know, inferred and lost if it's not
9  licensed.
10      Q     Do you know if ARM's
11  customers care about benefits to
12  downstream customers?
13           MR. FUNG:  Objection, form.
14      A     Sorry.  Who?
15      Q     Do you know if ARM's
16  customers care about benefits to
17  downstream customers?
18      A     You mean benefits ARM's
19  customer -- well, ARM's customers clearly
20  care about benefits to downstream
21  customers; in other words, if I
22  understand your question correctly,
23  Qualcomm cares about, you know, what
24  their customer wants which would be my
25  definition of the downstream customers.

DR. RAVI DHAR

1
2  So, yes, they would care about what's
3  important to, you know, the laptop HPs or
4  Lenovos of the world.
5       Q     Is that true even if
6  downstream customers don't know that
7  they're purchasing an ARM product?
8       A     It's true about the
9  technology, but not true of the brand.
10  So there's a distinction; right?  So they
11  still have the performance criteria that
12  they would want.
13           MS. MORGAN:  Let's take a
14  break.
15           THE VIDEOGRAPHER:  Off the
16  record, 2:46 p.m.
17           (A short recess was taken.)
18           THE VIDEOGRAPHER:  Back on
19  the record, 3:01 p.m.
20      Q     Welcome back, Dr. Dhar.
21      A     Thank you.
22      Q     We talked about the
23  different types of evidence that you
24  examined in determining that ARM has a
25  strong brand; right?

DR. RAVI DHAR

1
2       A     Yes.
3       Q     And we've discussed that you
4  did not conduct a survey to establish
5  that ARM has a strong brand; right?
6       A     Correct.
7       Q     Could you have conducted a
8  survey in this case?
9       A     That would be, you know,
10  whether the ARM is a strong market.  And
11  I don't think it's required.  And I
12  didn't feel the need to it and could one
13  do a survey, as I said.  Surveys are
14  typically done to get more of a magnitude
15  when the market is famous, fame surveys.
16  I was not opining that it's famous.  It
17  might be.  But I was not opining that.
18  So typically, surveys would be done for
19  that.
20      Q     Would it have been possible
21  for you to do a survey if you wanted to
22  establish that the market is famous?
23      A     Again, you would have to
24  know, you know, decide on all of ARM's
25  customers -- sorry.  The fame is outside

DR. RAVI DHAR

1
2  the customers.  It's more broadly in the
3  marketplace.  It was not necessary for my
4  purposes.
5       Q     But is it possible that you
6  could have done it, even if you view it
7  as unnecessary?
8       A     You mean if a fame survey
9  could be done in theory?  Yes, it could
10  be done in theory.
11      Q     How long would it take to do
12  a survey like that?
13      A     Again, I have a job.  I'm
14  doing research.  I would say four to six
15  weeks or something, yeah.
16      Q     Did you ask ARM's marketing
17  department whether it had surveys from
18  any other prior brand research?
19      A     I did ask through counsel
20  that, you know, we talked about tracking
21  surveys, yes.  I asked if they had any
22  such things.  And my understanding is
23  they did not, yeah.
24      Q     Did you ask for that
25  information because it would have been

69 (Pages 270 - 273)

Page 274

DR. RAVI DHAR

1
2 helpful to you in reaching your
3 conclusion that ARM is a strong brand?
4      A      Again, it would be just
5 another data point.  So these were all
6 data points.  So it would be another data
7 point.
8      Q      Did you ask ARM's marketing
9 department for any other brand research
10 that it had?
11           MR. FUNG:  Objection, form.
12      A      I mean I remember -- by the
13 way, you asked if I spoke to ARM, anyone.
14 And I said no.  But I think I recall I
15 spoke to Mr. Armstrong very early on.  I
16 don't recall much of that conversation.
17 That's why I forgot.  But I did have a
18 conversation with -- I don't know if
19 somebody else was there in addition to
20 Mr. Armstrong and some counsel.
21           But to your question, I mean
22 I generally asked broadly around that.
23 And my sense was, you know, I think he's
24 a new person.  I forget how long he's
25 there now.  The CMOs might have changed.

Page 275

DR. RAVI DHAR

1
2 And my sense is there wasn't anything
3 that I asked around the research that
4 they had on their brand, is my memory of
5 it.
6      Q      Did you ask specifically for
7 any type of customer-based evidence?
8           MR. FUNG:  Objection, form.
9      A      Yeah.  Not in those words.
10 I asked about what kind of like research
11 you might have done on -- empirical
12 research you might have done on your
13 customers.
14           And my sense was that it
15 certainly is not in discovery because I
16 asked counsel that too.  I haven't seen
17 that.  But I think -- my recollection is
18 that there wasn't anything that they said
19 they had.
20      Q      What else did you discuss
21 with Mr. Armstrong?
22           MR. FUNG:  I'd caution the
23 witness not to reveal privileged
24 communications with counsel.  But go
25 ahead.

Page 276

DR. RAVI DHAR

1
2      A      Okay.  I'm not supposed
3 to --
4           MS. MORGAN:  I'm sorry.  Are
5 you cloaking the conversation with
6 Mr. Armstrong in privilege?
7           MR. FUNG:  No.  I'm
8 reminding the witness not to disclose
9 communication with counsel to the
10 extent it came up during those
11 communications.
12      Q      Your counsel can tell me if
13 he thinks I'm wrong.  But you can testify
14 about your conversation with
15 Mr. Armstrong.  You just can't testify
16 about conversations you had with counsel.
17      A      Right.  Counsel was present
18 at that time, is what I mentioned.  But
19 the bottom line is I don't remember.  I
20 don't remember I had this conversation.
21 This was very early in the matter.  I
22 think I happened to be in London.  And
23 this was a Zoom at that time.  I was
24 traveling for some work, like maybe in
25 half an hour.  But most of it I think is

Page 277

DR. RAVI DHAR

1
2 what we covered.  I ████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████████████  But that's my memory.
10      Q      Was there anything else that
11 was part of that discussion that you
12 considered in drafting your report?
13      A      I would have mentioned the
14 thing.  My sense is this was very early
15 in the matter, like around October or
16 something when I was in London, I think.
17 And I might have just asked a very
18 foundation type questions at best at that
19 time because I was just getting into
20 details.
21      Q      Did that conversation form
22 part of the basis of your knowledge
23 that's in the report?
24      A      No, no memory of it.  So I
25 don't think it did.

70 (Pages 274 - 277)

DR. RAVI DHAR

2   Q   Did you have any other
3 conversations with anyone from ARM that
4 you did not disclose?
5   A   No.  That was the only one.
6 I don't know if anybody else from ARM was
7 in that call.  But I think it was
8 Mr. Armstrong.  There might have been
9 some other ARM executive.  But I don't
10 have memory of that.
11   Q   And beyond the factors that
12 we've discussed, which is considering the
13 length of time ARM used the mark, the
14 awards ARM won, ARM's arbitration awards,
15 the sale of ARM-based chips and ARM's
16 efforts in branding its company and its
17 products, did you take any other steps to
18 assess customer impressions of ARM's
19 brand?
20   A   I think that captures most
21 of the commercial variables, share, what
22 shares related to sales.  So you could
23 think of it similarly.  So those were the
24 main ones I think, yeah.
25   Q   Did you review any of ARM's

DR. RAVI DHAR

2 customer social media feeds to assess
3 whether they mention ARM?
4   A   ARMs, customer social media
5 feed?
6   Q   Yes.
7   A   I did not.
8   Q   Did you examine whether any
9 of ARM's customers published or engaged
10 with blog posts discussing ARM?
11   A   You know, I might have come
12 across some when I was doing my own
13 search, but nothing that informed my
14 opinion.
15   Q   Did you collect and review
16 SEC filings of ARM's customers to see
17 whether the filings mentioned ARM?
18   A   I did not.  I just looked at
19 the ARM IPO and SEC filings.
20   Q   Did you review transcripts
21 of earnings calls or analyst calls of
22 ARM's customers to see whether its
23 customers mentioned ARM and in what
24 light?
25   A   So I'm trying to remember

DR. RAVI DHAR

2 the citations that I have of -- so you
3 said ARM's customers; right?
4   Q   ARM's customers.
5   A   Yeah.  So I think I remember
6 there was some earnings call with the CFO
7 of Qualcomm that I had seen.  Palkhiwala
8 I think was his name.  I don't know if
9 there's an H or not.  Probably is.  But
10 I'm not 100 percent.
11   Q   Did you ask ARM for any
12 communications it had with its customers
13 that would show ARM's customers'
14 impressions of ARM?
15   A   Not specifically.  I did
16 not.
17   Q   And you weren't provided
18 with any such documents?
19   A   Yes.  I don't think so.
20   Q   Let's go to paragraph 107,
21 which is in a new section, Section C,
22 trademark infringement.
23   A   Yes.
24   Q   Are you opining in this case
25 that Qualcomm has infringed ARM's

DR. RAVI DHAR

2 trademarks?
3   A   So you mentioned infringed
4 was sort of legal, likely to confuse,
5 yes.
6   Q   Likelihood of confusion is
7 part of the legal standard for
8 infringement; right?
9   A   It probably is, yes.
10   Q   How did you come to the
11 conclusion that Qualcomm's use of ARM's
12 marks is likely to create confusion?
13   A   So this was based on the
14 analysis of like, you know, how the
15 connection was being made between the
16 Nuvia products and ARM because in my
17 assumption, there was not a license.
18   So the use of, you know, ARM
19 or ARM-based or ARM compliant is likely
20 to communicate to the customers that
21 there's a relationship based on ARM
22 brand.  And that's what's going to be the
23 likelihood of confusion.
24   Q   If you look at the header,
25 just under the heading C, it says

71 (Pages 278 - 281)

Page 282

DR. RAVI DHAR

1
2 "Qualcomm's Historical Use of ARM's
3 Trademarks."
4        Do you see that?
5    A    Yes.
6    Q    And then two pages later, it
7 says, "Qualcomm's Current and Future Use
8 of ARM's Trademarks with Nuvia Products."
9        Do you see that?
10    A    Yes.
11    Q    What is the distinction that
12 you drew between historical use and
13 current and future use?
14    A    Good question.  So I think
15 the historical use was, as we discussed
16 earlier, ARM -- ███████████████████
█████████████████████████████████
█████████████████████████████████
█████████████████████████████████
█████████████████████████████████
24        And then I'm saying that,
25 you know, the current use is basically

Page 283

DR. RAVI DHAR

1
2 related to the Nuvia products, if you
3 like.  And I said that future use is
4 where we discussed earlier, which is
5 future -- I don't know how they will use
6 it.  But if it continues to use like that
7 and whatever it does in the future will
8 lead to confusion.  But that's the
9 distinction between historical and
10 current.
11        And the future, I mentioned
12 in the response that when -- if you would
13 not use the mark, Qualcomm basically did
14 not say yes or no kind of a thing is my
15 memory.  So they denied answering the
16 question or something like that.
17    Q    So the historical use
18 section --
19    A    Yes.
20    Q    -- ██████████████████
████████████████ core that's licensed under ARM's
23 TLA?
24    A    Yes.
25    Q    Do you have an understanding

Page 284

DR. RAVI DHAR

1
2 of whether there's a difference in the
3 references that ██████████████████
██████████████████████████████████
██████████████████████
6    A    I think I mentioned I don't
7 see the distinction between -- so they
8 use the word ██████████████████████
████████  So I think both ██████████
████████████████████████████████  I
12 think you asked me if it is unique to
13 ██████████████████████████████
████████████  But I didn't look at
16 that.  But in terms of ████████████
████████████████████████████████
19    Q    So if you look at paragraph
20 110 --
21    A    Okay.
22    Q    -- there's a reference to
23 the ████████████ technology.  Do you see
24 that?
25    A    Yes.

Page 285

DR. RAVI DHAR

1
2    Q    You think that that's the
3 same as the way that Qualcomm uses the
4 word ██████████████████████████████
███████
6    A    No.  So this would be a
7 version where it literally says ARM,
8 which is my third thing.  If you say ARM
9 processor, then that would be also
10 obviously misleading if it's not ARM.
11        In this case, it is.  And I
12 was making the distinction that there's
13 ██████████████████████████████████
████████  But when
15 they use the word ARM, they might be
16 using it -- again, depends who's
17 speaking.  ████████████████████████
██████████████ which I don't think
19 they should, like when they're speaking
20 to the analyst or some other places.  And
21 so here, I think the ARM itself, I don't
22 remember if they ████████████████████
████████████████████
25    Q    And you don't think that

72 (Pages 282 - 285)

Page 322

DR. RAVI DHAR

1              DR. RAVI DHAR
2    a market where you're trying to buy a
3    washing machine versus chewing gum.
4    People would pay more attention and
5    exercise more care.  And as a result,
6    some alleged similarity may or may not
7    lead to confusion.
8       Q      How did you take into
9    account degree of care in analyzing
10   likelihood of confusion in this case?
11      A      So it's very simple as I
12   said.  But I don't think sophistication
13   changes anything because it stays
14   ████████████████████.  So
15   that's what it means.  So if it said
16   like, let's say ARM, ARM me, someone with
17   a degree of care would say, well, that's
18   not ARM, that's ARM me-based.
19          So to me, when you use ████
     ████████████████████████████████
     ████████████  The players have testified.
23   And so to me, this is a matter where --
24   that because it uses the same brand name
25   with the modifier base or compliant, it's

Page 323

DR. RAVI DHAR

1              DR. RAVI DHAR
2    not exercising -- and Qualcomm has
3    previously used ARM-based for a license
4    from ARM, and Qualcomm licenses are from
5    ARM.  So I think my point was that
6    sophistication is unlikely to change
7    that.
8       Q      Did you do any research to
9    evaluate whether B2B customers are aware
10   of this lawsuit?
11      MR. FUNG:  Objection, form.
12      A      I did not do -- I did not do
13   anything, any analysis on that.
14      MS. MORGAN:  Let's take a
15   break.
16          THE VIDEOGRAPHER:  Off the
17   record, 3:52 p.m.
18          (A short recess was taken.)
19          THE VIDEOGRAPHER:  Back on
20   the record, 4:03 p.m.
21      Q      Dr. Dhar, we've talked about
22   this.
23          But you did not conduct a
24   survey to establish likelihood of
25   confusion in this case; right?

Page 324

DR. RAVI DHAR

1              DR. RAVI DHAR
2       A      That's right, yeah.
3       Q      Could you have done one,
4    regardless of whether you thought it was
5    called for?
6       A      It's not obvious.  As I
7    said, the product was barely launched and
8    how many customers are there.  You can't
9    do a survey with 20 people.  You won't
10   get many for the results.  You would need
11   to have hundreds of customers that you
12   can approach.  You would need to know to
13   get the sample right.  So I didn't look
14   into that at all.  But I wouldn't say
15   that this is an obvious one for doing a
16   survey.
17      Q      Have you ever done a survey
18   for a product that's not yet launched?
19      A      I mean, you know, different
20   types of surveys, when you're doing
21   consulting, you're trying to often learn
22   about demand for a product.  So you might
23   do surveys in that case, like who's going
24   to buy this.  But that's a very different
25   purpose.  So you would try to identify,

Page 325

DR. RAVI DHAR

1              DR. RAVI DHAR
2    you know, easier to do for a consumer
3    product.
4       Q      Have you ever conducted a
5    survey, a likelihood of confusion survey
6    for a product that's not yet launched?
7       A      I don't recall.  I don't
8    recall if I did.  Nothing comes to mind.
9       Q      Is it possible to do that?
10      A      I mean under some
11   limitations, like, in other words, as I
12   said entire -- if it's not in the market,
13   you don't know all the ways in which they
14   would communicate about the mark.
15          So they'll be some
16   constraints, which is why I wrote about
17   how the future use -- I don't know all of
18   it -- how the market would be used by
19   Qualcomm in the future.  And so you would
20   have some constraints.  And you would
21   have to find out who the likely buyers
22   are.  So it might be easier, much easier
23   in a consumer product than something like
24   this for sure.
25      Q      Do you know how many

82 (Pages 322 - 325)

Page 326

DR. RAVI DHAR

1
2 customers Qualcomm marketed its products
3 to before they were launched?
4        MR. FUNG:  Objection, form.
5     A     Because these are large
6 companies, so I assume similar to ARM,
7 we're not talking huge numbers which
8 makes a survey much more difficult here.
9     Q     Did you ask if ARM had done
10 any of its own likelihood of confusion
11 analysis related to what you referred to
12 as the Nuvia products?
13     A     I did not see anything.  I
14 don't know if I specifically asked that.
15 I wouldn't expect them to have done.  But
16 I asked more broadly about work on brand,
17 but not on a particular survey.
18     Q     You told me earlier that a
19 survey related to strength or awareness
20 of the ARM brand would have taken four to
21 six weeks.  Do you remember that?
22     A     If you were to do a survey,
23 again, the limitations on how many ARMs
24 customers are there.  But these are just
25 customers.  If they're several hundred of

Page 327

DR. RAVI DHAR

1
2 them, and you want to ask them some
3 questions around, you know, by
4 definition, they would be aware of ARMs.
5        So the question is if
6 there's a customer.  So if you look at a
7 broader pool, people who are interested
8 in, you know, core processes of other
9 systems.  So you would have to
10 identify -- again, it's a non-trivial
11 exercise here to do a survey, to identify
12 the number of sample size and how you
13 read who the right people are.
14        Keep in mind this is a
15 buying center.  So you need to reach
16 different people who are decision makers.
17 So when I've done surveys on medical
18 products, like oncologists, very similar
19 restraints.  The U.S. doesn't have that
20 many neuro-oncologists.  So if you're
21 trying to do a survey of
22 neuro-oncologists, somewhat busy people,
23 it's not easy to get what you would need
24 in terms of survey even if you wanted to
25 do some.

Page 328

DR. RAVI DHAR

1
2     Q     Would you expect that a
3 likelihood of confusion survey in this
4 case would have also taken about four to
5 six weeks?
6        MR. FUNG:  Objection, form.
7     A     If you could do one.  I
8 think the challenge is not running a
9 survey.  The challenge is the survey, you
10 know, does a sample size.  So many times,
11 I have not done a survey because we look
12 into the sample and find there's no way
13 we can get, you know, 200 people here.
14 So that takes a little while.
15        So I was just referring to
16 the logistics of four to six weeks.  But
17 the question before that, even if it's
18 feasible.  And to me, it's not obvious
19 it's feasible.
20     Q     Could you also have just
21 contacted customers and anecdotally
22 collected evidence about confusion?
23        MR. FUNG:  Objection, form.
24     A     I mean I don't like to do
25 that.  I think that's anecdotal as you

Page 329

DR. RAVI DHAR

1
2 said.  And I think a survey needs to be
3 done in a very systematic unbiased way.
4 So I would not -- that's not my practice
5 to do that.
6     Q     But you could have done it
7 here; right?
8     A     Well, I would not do it
9 because I don't think it's good practice.
10 But somebody might do it, yeah.
11     Q     In your view, it was better
12 not to have any information about if
13 customers were confused about what you
14 referred to as the Nuvia products that
15 are collected anecdotally?
16        MR. FUNG:  Objection, form.
17     A     That's right because I felt
18 I had enough information to make an
19 unbiased decision.  If I start talking or
20 somebody I assign, I think it gets to
21 biased data.
22     Q     And you've never done a
23 survey with fewer than hundreds of
24 participants that you found meaningful?
25     A     Certainly lately, I would

83 (Pages 326 - 329)

Page 330

DR. RAVI DHAR

1
2 say even more.  But nowadays, data
3 collection, sample sizes always good to
4 be larger.  I mean again, maybe when I
5 mentioned some specialized products ten
6 years ago, I might have a smaller sample.
7 But certainly in the last three, four,
8 five years, I certainly tried to have
9 much larger sample sizes.
10    Q    Let's go to paragraph 28 of
11 your report.
12    A    The first report?
13    Q    No.  Sorry.  The reply
14 report.
15    A    Yes.
16    Q    You state in 28, "The
17 following excerpts illustrate that these
18 remarks often described the Nuvia
19 products in Snapdragon Elite as ARM,
20 ARM-based and/or ARM compliant."
21    Do you see that?
22    A    Yes.
23    Q    These are all references
24 from before December 2023; right?
25    A    Yes.  I think that's what it

Page 331

DR. RAVI DHAR

1
2 says.  That's what it is here.
3    Q    Is there a reason you didn't
4 collect all of these references and put
5 them in your opening report?
6    A    As I said, I was
7 illustrative.  It was not comprehensive.
8 And then when Dr. Steckel seemed to imply
9 I was cherrypicking, I wanted to make
10 clear there were lots of these
11 illustrations.  And I was just submitting
12 a few in the opening report.
13    Q    In Subsection A, you have a
14 quote from Cristiano Amon from
15 April 2021.  Do you see that?
16    A    Yes.
17    Q    And in the bolded sentence,
18 it says, "And some of the transition
19 across the board to ███████████████
███████████████████.  And we're
22 focused to make that happen with a
23 leading position leveraging the Nuvia
24 CPU."
25    Do you see that?

Page 332

DR. RAVI DHAR

1
2    A    Yes.
3    Q    Is this an example of use of
4 the word ARM that you contend is
5 confusing?
6    MR. FUNG:  Objection, form.
7    A    This is the part -- let's
8 see.  Yes.  So I think there was -- I'm
9 trying to think, although he made a
10 comment around an ARM itself also in
11 that, in addition to the architecture.
12 ███████████████████████
███████████████████████████
███████████████████████
16    Q    This is not a reference to
17 Qualcomm transitioning to an ARM
18 architecture; right?
19    MR. FUNG:  Objection, form.
20    A    Well, you mean because it
21 says some of the transition across the
22 board?  Well, it's the Nuvia -- I think
23 he's talking the Nuvia asset; you know, I
24 took it to mean the Nuvia asset, which is
25 a Nuvia technology that was acquired,

Page 333

DR. RAVI DHAR

1
2 that allows them to do this.
3    Q    This is a comment that
4 Mr. Amon made out loud in response to a
5 question on an earnings call; right?
6    MR. FUNG:  Objection, form.
7    A    Yes.  That's what it says.
8 It was a response to potentially
9 question.
10    Q    Do you know if the ████████
███████████████████████████████
███████████████████████
███████████████████████
████████████████████████████
███████████████████████████
21    Q    Is there any way that
22 Qualcomm can refer to the ARM
23 architecture that is not confusing in
24 your view?
25    A    So I didn't study that.  But

84 (Pages 330 - 333)

DR. RAVI DHAR

1
2 I mean certainly, you can list.  We have
3 no license with ARM.  But it uses XYZ, if
4 that's allowed.  I don't know if that's
5 allowed or not.  But let's say you wanted
6 to make a statement.  So companies would
7 often say this has no relationship with
8 Y.  But this is -- you know, this is why
9 you asked me about compatibility.  In
10 some contexts, compatibility, which
11 clearly makes sense, we have no
12 relations, we have no connections to
13 this.  But it allows you to have -- uses,
14 you know, my understanding is something
15 around the ISA.  You could make a
16 statement like that.
17        Again, I'm not opining that
18 would be allowed because I don't know
19 what ARM's position might be.  Even
20 that's not allowed to do that; in other
21 words, to say that you're aligned with
22 the ARM architect, you have to have some
23 kind of a relationship.
24        Setting that aside, I'm
25 answering your hypothetical which is you

DR. RAVI DHAR

1
2 could make it very clear that ARM has no
3 connection here.  But we are not excess
4 with ARM.
5    Q    So it's your understanding
6 that in order for Qualcomm to use the
7 word ARM, it has to first say that it
8 does not have an ARM license for the
9 products you referred to as the Nuvia
10 products?
11        MR. FUNG:  Objection, form.
12    A    No.  I'm saying there could
13 be just one way to do that.  I have not
14 thought about it, where it clearly made
15 clear there's no affiliation or
16 connection to ARM.  So it could literally
17 state that and then say something that it
18 wants to would be one way to do it.
19    Q    How did you conduct these
20 additional references that you added in
21 your reply report?
22    A    As I said, I have seen some
23 of this before also.  And basically, the
24 idea was to ask Brattle to see -- you
25 know, find additional -- if they're

DR. RAVI DHAR

1
2 additional things.
3    Q    Did you talk about ARM as a
4 stand-alone term in your opening report?
5    A    I forget now.  I mean this
6 again is blurry.  But I talked ARM.  And
7 we went through this many times.  It's
8 ARM, ARM-based, ARM compliant.  So ARM
9 would be the example of stand-alone.
10        So somebody saying it's an
11 ARM, especially in the context of
12 third-media and third-party mentions, I
13 would say often, the stand-alone was
14 used.
15    Q    You keep referring to ARM,
16 ARM-based and ARM compliant?
17    A    Right.
18    Q    Is ARM compatible okay for
19 Qualcomm to use?
20    A    No.  It's not okay.  I did
21 not analyze it, as I said in the morning,
22 which is not to say it is not okay or if
23 it's okay.  I just haven't analyzed it
24 because the most dominant use I came
25 across was ARM-based and ARM compliant.

DR. RAVI DHAR

1
2    Q    But you have no opinion
3 about ARM compatible?
4    A    That is correct.
5    Q    Why did you not look at that
6 term?
7    A    Because it was not used.  I
8 mean I was looking at the terms that were
9 used in this marketplace.
10    Q    If you look at Subsection G,
11 Mr. Palkhiwala says we wanted to develop
12 our own custom ARMs CPU.
13        Is it your understanding
14 that a participant in the B2B industry
15 would understand that to be an ARM-based
16 CPU and not a Qualcomm developed custom
17 CPU?
18        MR. FUNG:  Objection, form.
19    A    No.  They would also
20 understand that it has an association
21 with ARM, so that it uses the ARM brand,
22 which is the ARM CPU, which means it has
23 some process of core that's ARM.
24    Q    Have you considered whether
25 it's true that Qualcomm's custom CPU is

85 (Pages 334 - 337)

Page 338

DR. RAVI DHAR

1    built on the ARM architecture and
2    executes the ARM instruction set
3    architecture?
4        MR. FUNG:  Objection, form.
5    A    So ARM is a brand.  So to
6    have an ARM CPU, my understanding is that
7    you need a license from ARM because
8    you're making a connection to ARM.
9    Whether the technology is similar, which
10   is, technology is one layer under the
11   brand, and I don't have an opinion on
12   that, whether it can execute.
13       But my opinion is when you
14   call something an ARM CPU, it means that
15   ARM brand has a connection to the Nuvia
16   product.
17   Q    But you have no opinion
18   about whether it's true at the technology
19   level, that Qualcomm's custom CPU
20   operates using the ARM instruction set
21   architecture; right?
22   A    I mean I understand it uses
23   it because my understanding in the
24   claims, it's ███████████████

Page 339

DR. RAVI DHAR

1    ████████████.  And so the dispute is
2    really about where was this technology
3    developed.  But my focus was really on
4    the brand that people think there's a
5    connection to ARM.
6    Q    Let's look at paragraph 31.
7    Actually, let me ask you one more
8    question about those statements that you
9    added.
10       These were all oral
11   statements; right?
12   A    If these were all on the
13   presentation, some could be PowerPoints.
14   I don't know if they were all oral.  But
15   they could be written decks.  And then
16   there's a transcript of this, in
17   addition, that's available.
18   Q    Right.
19       But you don't know that
20   they're written decks; you haven't cited
21   anything from a written deck here; right?
22       MR. FUNG:  Objection, form.
23   A    No.  I talk about the
24   transcript was published and so on in the

Page 340

DR. RAVI DHAR

1    footnotes here.
2    Q    Right.
3    A    A transcript is different
4    from a written deck; right?
5        MR. FUNG:  Objection, form.
6    A    Oh, you mean a written deck.
7    Let's see.  If I have not cited, then at
8    least sitting here, I don't recall, yeah.
9    Q    Do you know who the audience
10   was for any of these oral presentations?
11   A    So earnings call, audience
12   is wide, obviously investors,
13   competitors; customers can also attend.
14   And I think they do attend in the tech
15   world.  So the audience can be quite
16   broad.
17   Q    How do you determine that
18   there were customers on Qualcomm's
19   earnings call?
20       MR. FUNG:  Objection, form.
21   A    I don't specifically -- the
22   point I'm making here is ARM is --
23   Qualcomm is kind of referring to this as
24   ARM or ARM-based or whatever we were

Page 341

DR. RAVI DHAR

1    talking earlier.  And this is progress.
2    It's on analysts, it's on earnings call,
3    it's on public statements, it's on the
4    event.  So, again, I'm looking at
5    multiple sources to make that point.
6    Q    Did you do an assessment of
7    these sources to determine whether any of
8    Qualcomm's customers were at any of these
9    events?
10   A    I wouldn't know how to do
11   that.  But, no, I didn't do that.
12   Q    Let's go to 31.
13   A    Yes.
14   Q    31 is where you begin the --
15   I think you called it a systematic
16   analysis?
17   A    Comprehensive, yes.
18   Q    Factiva database.
19       The Factiva database was
20   available at the time that you did your
21   opening report; right?
22   A    I mean the database is
23   available.  But I don't know if I had
24   access to it.  You have to be a member or

86 (Pages 338 - 341)

Page 342

DR. RAVI DHAR

1
2 some subscription for it.
3      Q      You told me earlier that you
4 thought you had read some of the sources
5 in the Factiva database for your opening
6 report; is that right?
7      A      I don't recall.  I don't
8 recall.  I said I saw some of the
9 statements in the Factiva database that I
10 had seen additionally.  But I had not
11 looked sort of comprehensively at it in
12 the database itself.
13      Q      You didn't try to run this
14 Factiva analysis for your opening report;
15 right?
16      A      Sorry.  What?
17      Q      You did not do this
18 analysis?
19      A      No.  I obviously generated
20 some of the things that I had seen.  But
21 I had not done the comprehensive search.
22      Q      In paragraph 32, Subsection
23 B, you state, "Out of 95 articles in the
24 Factiva database that include the term
25 Snapdragon Elite in the article headline,

Page 343

DR. RAVI DHAR

1
2 58 percent also include the term ARM in
3 the article body, and 37 percent also
4 include the term ARM-based in the article
5 body."
6      A      Yes.
7      Q      Do you know if the
8 Snapdragon Summit only involved
9 introduction of the Snapdragon Elite
10 chip?
11      MR. FUNG:  Objection, form.
12      A      I don't recall, sitting
13 here.  I mean I've seen the thing.  I'm
14 sure they're talking about a lot of
15 things in this one or two-day event in a
16 fancy resort.  But I don't recall.
17      Q      Did you evaluate whether use
18 of the term ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
21 ██████████████
22      A      Well, I mean there was a
23 purpose.  So that's why there's a lot of
24 examples in the next two pages, you know,
25 that try to highlight that.  But maybe --

Page 344

DR. RAVI DHAR

1
2 if they missed a couple of incorrectly,
3 it's possible.  But the large majority of
4 them, this is why -- we wrote down, I
5 wrote down like multiple pages here where
6 I have reviewed this.  And they clearly
7 refer to the Snapdragon or ARM-based.
8      Q      Do you know how many of
9 these articles refer to this lawsuit?
10      A      To this article, I did not
11 do a search on that term.  One could do
12 that, yeah.
13      Q      Would you think that
14 discussions about Snapdragon Elite that
15 also include the term ARM may include the
16 term ARM because they're discussing the
17 fact that ████████████████████████████████
████████████████████████████████████████
19      MR. FUNG:  Objection, form.
20      A      Sorry.  Could you repeat
21 that?
22      Q      Yes.
23      Would you think that
24 discussions about Snapdragon Elite that
25 also include the term ARM may include the

Page 345

DR. RAVI DHAR

1
2 term ARM because they're discussing the
3 fact that ████████████████████████████████
████████████████████████████████████████
5      MR. FUNG:  Objection to
6 form, calls for a legal conclusion.
7      A      As I said, I have lots of
8 examples where a couple of them do.  But
9 majority of them that I again illustrate
10 in the next few pages show to me the
11 context in which they were doing that.
12      Q      But you don't know how many
13 of these mention the lawsuit?
14      A      I did not do a search on
15 that.
16      Q      Do you know what the
17 audience is for any of these
18 publications?
19      A      So it's a wide audience
20 because they were wide kind of things.
21 Some are obviously broad business press,
22 technology press and people who are
23 interested in following.  So there's not
24 a single audience.
25      Q      Which of these publications

87 (Pages 342 - 345)

Page 346

DR. RAVI DHAR

1
2  do you think Qualcomm's customers review?
3      MR. FUNG:  Objection, calls
4  for speculation.
5      A    Well, I don't know sitting
6  here.  But many of them, like, you know,
7  Wall Street is read by a lot of people in
8  business, tech magazines, lots of things.
9  So I mean the point I'm trying to make is
10 it's pervasive.  And I'm not trying to
11 say this X Customer read it twice.  This
12 shows very progressive use of the term.
13 And frankly, I don't know if Qualcomm
14 doesn't say that it doesn't use it.
15     So the issue is, I have said
16 that the terms are false or misleading.
17 I haven't seen anywhere, Qualcomm say
18 that we haven't used this term.  So
19 doesn't seem that controversial to me
20 that I found so many examples of use of
21 ARM-based.
22     Q    In the next section that
23 starts on page 30, you collect financial
24 analyst reports that use the term ████
   ██████████ and ████████. Do you see

Page 347

DR. RAVI DHAR

1
2  that?
3      A    Yes.
4      Q    Is there a distinction in
5  your mind in how Qualcomm's customers may
6  view financial analyst reports versus the
7  other press you cited?
8      A    Sure.  So I think this is a
9  little bit more to say that there is, in
10 my opinion, confusion in the marketplace
11 with the use of these terms.  So the
12 focus here is not so much to say that
13 customers would have seen all these
14 reports.  But it's evidence that they are
15 using the words that maybe Qualcomm used;
16 in other words, where is this coming
17 from.  It has to come from somewhere.
18     And so this is just a way to
19 say that, hey, there is already confusion
20 if these terms are being used, regardless
21 of how many customers see it and what
22 that does.  So the use by press to me is
23 kind of another evidence the analysts
24 were using it, that they are potentially
25 confused.

Page 348

DR. RAVI DHAR

1
2      Q    If there's confusion in the
3  marketplace, but Qualcomm's customers are
4  not confused, does it matter?
5      MR. FUNG:  Objection, form.
6      A    Yes.  I mean it matters.
7  But as I said, all the reasons why there
8  is likely confusion in the marketplace
9  based on how it's used.  And this is
10 just -- this section is just evidence
11 that we see that in the financial analyst
12 community.
13     Q    Are financial analysts
14 Qualcomm's customers?
15     A    No.  But it shows that they
16 are talking to the industry people,
17 including, you know, potentially
18 Qualcomm.  They're analyzing the thing.
19 So analyzing the roadmap.  And they seem
20 to be confused here.
21     Q    Let's go to paragraph 48.
22     At the end of this
23 paragraph, you say, "Based on my
24 extensive research and analysis and
25 drawing from my expertise, I've reached

Page 349

DR. RAVI DHAR

1
2  the conclusion that Qualcomm's use of the
3  ARM trademarks is likely to result in
4  customer confusion, and as discussed in
5  Section 6, harm to ARM, including its
6  brand."
7      Do you see that?
8      A    Yes.
9      Q    Is the extensive research
10 you referred to here just the research
11 you've done for this case or are you
12 referring to other research?
13     A    No.  Just for this case.
14     Q    And when you say you're
15 drawing on your expertise, is there any
16 specific expertise you're drawing on?
17     A    This is broadly.  So you
18 asked me questions around, you know, my
19 understanding of why ARM-based would be
20 based on the brand.
21     And so those would be sort
22 of based on my expertise, I think.  And,
23 of course, I mentioned testimony as well.
24 But also, my expertise would come in
25 there.

88 (Pages 346 - 349)

Page 350

DR. RAVI DHAR

```
 1              DR. RAVI DHAR
 2    Q     Are you relying on any
 3  specific academic literature in your
 4  opinion about likelihood of confusion?
 5          MR. FUNG:  Objection, form.
 6    A     Yes.  I mean to the extent
 7  part of the strength of the market, part
 8  of that opinion, that's based on the
 9  academic, you know, list we talked about
10  earlier, commercial strength.
11          Then in terms of likelihood
12  of confusion, we talked about academic
13  literature on, you know, the B2B context,
14  and I described what the B2B context is
15  and why sophistication would not in this
16  case change any likelihood of confusion,
17  those kinds of literature that I cite
18  here.
19    Q     And the literature that you
20  cited is all in the footnotes?
21    A     Some are in the two
22  documents, between the first and second
23  one, but yes.
24    Q     And there's no other
25  academic literature that you're relying
```

Page 351

DR. RAVI DHAR

```
 1  on besides what's in the footnotes?
 2    A     That's correct.
 3    Q     In paragraph 50, you
 4  say, "Professor Steckel's contention that
 5  the unique context of B2B transactions
 6  undermines your assessment of the
 7  likelihood of confusion caused by
 8  Qualcomm's use of the term ARM-based or
 9  ARM compliant is baseless, likewise
10  baseless."
11    A     Right.  Sorry.  The first
12  sentence?
13    Q     Yes.
14    A     Okay, yes.
15    Q     What's the basis of your
16  assertion there?
17    A     So this is a discussion we
18  are having on degree of care and
19  exercising.  And as I said, you know, a
20  statement that is seen as false, in other
21  words, it's not likely to use a slightly
22  different word like ARM Me or ARM Plus
23  something that would -- careful, would
24  say, oh, this is not ARM.  You're using
```

Page 352

DR. RAVI DHAR

```
 1  the ARM brand.  And Qualcomm is a trusted
 2  company itself.
 3          So basically, people will
 4  believe. ███████████████████████
 5  ███████████████████████████
 6  ███████████████  And so there would be
 7  no reason to question it, that this is
 8  somehow, you know, incorrect because the
 9  likelihood of confusion, the idea is that
10  when you put a little bit more care and
11  thought, then it might become clear that
12  is -- well, this is not really, you know,
13  X or Y, whatever the brand is, oh, this
14  is really not Coca-Cola, the C was
15  backwards or something like that.
16          And so what I'm saying is
17  here, there would be nothing -- there's
18  nothing here that sophistication per se
19  would take care of based on the
20  statements that I've made in here.
21    Q     So if the products you
22  describe is the ██████████████
23  ██████████████████████ is it
24  your opinion that then there's no
```

Page 353

DR. RAVI DHAR

```
 1  likelihood of confusion?
 2          MR. FUNG:  Objection, form.
 3    A     So, in other words, which I
 4  said is the assumption I made, in other
 5  words. ████████████████████████
 6  ████████████████████████████
 7  ████████████████████████████
 8  █████████████████, and the
 9  technology did not come from Nuvia, and
10  so let's say -- so, yes, I think the
11  question is that it's properly, you know,
12  part of -- it's ██████████ at that time
13  because it's under a proper license and
14  whatever that royalty stream and
15  verification.  It still technically
16  didn't have the verification because I
17  guess ARM refused it or something.  So it
18  would need that piece potentially.
19          But when it's a proper
20  license, then the question is, if that's
21  what the ruling is, then what's the basis
22  for not verifying.  Again, I'm not a
23  lawyer.  So I'm not opining on that.
24  But, to me, it would need that step.
```

89 (Pages 350 - 353)



Page 382

DR. RAVI DHAR

1
2    A     Yeah.  I think he had a
3  statement -- oh.  It's in the statement
4  before this.  Arguably strong.  So I'm
5  just saying that he's kind of made it
6  flippantly without doing any analysis.
7          And I don't disagree, by the
8  way, that Qualcomm is -- we had this
9  discussion in the morning, based on the
10  strength, sales and all that.  But I'm
11  just saying that he made a statement that
12  I didn't see him do any analysis on the
13  Qualcomm strength.
14    Q     You don't disagree with
15  Professor Steckel, that Qualcomm is an
16  arguably strong brand?
17    A     Again, I haven't done the
18  analysis on Qualcomm.  But sitting here,
19  if I had to, on the dimensions that I
20  looked at within the industry, Qualcomm
21  would also be a potentially strong brand.
22  All I'm saying is he criticized me for
23  not doing this, what he wanted me to do,
24  which was to do a survey.  But he didn't
25  do any of the sort and made the similar

Page 383

DR. RAVI DHAR

1
2  opinion.
3    Q     Do you think he said in his
4  report that you had to do a survey?
5    A     Just customer, some language
6  around survey of customers, yeah.  On
7  paragraph 9, from a survey of customers,
8  you know, even though he's written a
9  paper on this that says you don't have to
10  do a survey.  But something to that
11  effect was one of his, you know,
12  complaints.
13          THE VIDEOGRAPHER:  Counsel,
14  I hate to interrupt.  But I have
15  about ten minutes before I need to
16  change the tape.
17          MS. MORGAN:  We can take a
18  break, and you could change it.
19          THE VIDEOGRAPHER:  Off the
20  record, 5:03 p.m.
21          (A short recess was taken.)
22          THE VIDEOGRAPHER:  Back on
23  the record, 5:13 p.m.
24    Q     Dr. Dhar, let's go to
25  paragraph 18 of your reply which is on

Page 384

DR. RAVI DHAR

1
2  page 14.
3    A     Paragraph 18?
4    Q     Yes.
5    A     Yes.
6    Q     The last sentence of this
7  sentence says, "Further, given the
8  sophisticated customers with a likely
9  knowledge of ARM, customers can be and
10  wanted to perceive the meaning of
11  compliant with ARM as a product that has
12  been verified and validated by ARM."
13          Do you see that?
14    A     Yes.
15    Q     What is the basis for your
16  expectation?
17    A     So this is this idea that
18
                                So people in the
24  industry would be more likely to know
25  that than the end consumer.

Page 385

DR. RAVI DHAR

1
2    Q     But how did you form your
3  expectation that people in the industry
4  would know that?  Did you do any research
5  on what people in the industry understand
6  about the term,
7    A     So
                        . But customers
15  would know that it's a
                        that
              would mean that there's a
20  process around that of
                        people who know the
22  different types of             and
23          as I said, I don't know if
            but

97 (Pages 382 - 385)

DR. RAVI DHAR

1
2    Q    Are you talking customers of
3  Qualcomm or customers of ARM?
4    A    Customers of Qualcomm.
5    Q    So your expectation is just
6  based on the fact that they are customers
7  of Qualcomm and, therefore, are
8  sophisticated business entities that buys
9  products from Qualcomm?
10   A    Who buy ARM-based, you know,
11 chips that are licensed from -- buy chips
12 for many different manufacturers,
13 including Qualcomm.  And they would know
14 that -- they know that ARM is a player in
15 this market.  And ████████████ has, you
16 know, certain meaning with that, in
17 addition to the connection to the brand.
18 ████████████████████████████████████████
19 ████████████████████████████████████████
20 ████████████████████.
21   Q    So based on the fact that
22 they're Qualcomm customers, you just
23 expect that they would understand what
24 ████████████ means?
25        MR. FUNG:  Objection, form.

DR. RAVI DHAR

1
2    A    Based on the customers of --
3  I would call it broader than Qualcomm
4  customers, like the category customers.
5  So people who are buying these chips, if
6  you'd like.
7    Q    Like business-to-business
8  customers in the semiconductor industry?
9    A    Correct.
10   Q    So it's your assessment that
11 by virtue of being business-to-business
12 customers in the semiconductor industry,
13 those customers would understand the
14 meaning of ARM compliant to imply that
15 the product was verified or validated by
16 ARM?
17        MR. FUNG:  Objection, form.
18   A    Correct.
19   Q    Let's go to paragraph 38.
20        You have an opinion here
21 that Professor Steckel provides no
22 support for his claim that Qualcomm's use
23 of ARM-based and other phrases
24 constitutes permissible preferential use.
25 Do you see that?

DR. RAVI DHAR

1
2    A    Sorry.  I haven't reached
3  that.  38, you said?
4    Q    Yes.
5        Do you see that the heading
6  now that says, "Professor Steckel
7  Provides No Support For His Claim That
8  Qualcomm's Use Of ARM-Based And Other
9  Phrases Constitutes Permissible
10 Referential Use"?
11   A    Yes.  I mean he cites
12 something that I then go on to say why it
13 doesn't say what he claims it says.
14   Q    That's what I want to ask
15 you about.
16        You said Professor Steckel
17 mischaracterizes that ARM's own publicly
18 available trademark use guidelines
19 explicitly instructs third-parties to
20 describe their products as ARM-based in
21 order to accurately describe the
22 relationship between the third-party
23 technology and ARM technologies.
24        And your quibble with it is
25 that the trademark guidelines do not

DR. RAVI DHAR

1
2  instruct third-parties to describe their
3  products as ARM-based.  Do you see that?
4        MR. FUNG:  Objection, form.
5    A    I mean my quibble -- it's
6  not a quibble.  It's a big one.  He
7  doesn't understand it.  I scratch my
8  head.  What he says makes no sense.
9        So what that third-party
10 guideline says is that if a third-party
11 wants to refer to -- third-party, which
12 may have nothing to do with ARM's
13 product, let's say.
14        Let's say I am now
15 Qualcomm's customer, they'd want to say
16 our laptops have Snapdragon and have
17 ARM-based processes, let's say.  To me,
18 that's a third-party.  It could be a
19 press too.  But that's a third-party.
20        And all it says is that,
21 hey, if you're a third-party, you should
22 accurately describe the connection.  And
23 I'm saying that by calling it ARM-based,
24 you're now describing ARM-based means a
25 connection to the thing.  The way he

98 (Pages 386 - 389)

Page 390

DR. RAVI DHAR

1
2 wrote it made no sense, as if the
3 third-party guidelines are saying, hey,
4 you're allowed to say ARM-based. That's
5 what it read like to me. And it says
6 nothing of the sort, is what I'm trying
7 to say.
8        (The above-referred-to
9    document was marked as QX Exhibit 222
10    for identification, as of this date.)
11   Q     Let me mark this as QX 222.
12       Is that the trademark use
13 guidelines that we were just talking
14 about?
15   A     Yes.
16   Q     It says on the front of
17 these guidelines that they're guidelines
18 for third-parties when referring to ARM's
19 trademarks. Third-parties are not
20 licensees; right?
21   A     Correct.
22   Q     And if you go to page 3 at
23 the bottom, you'll see a section that
24 says, "Referential Use Of ARM's
25 Trademarks"?

Page 392

DR. RAVI DHAR

1
2   A     And I have not seen any
3 evidence in this case, and you asked me
4 this earlier, other than third-party
5 licensees or third-parties who are saying
6 ARM-based and who don't have an ALA or a
7 TLA. And my understanding is I haven't
8 seen that, yeah.
9   Q     So it's your view that this
10 section that defines referential use of
11 ARM's trademarks is not useable by any
12 third-party; right?
13       MR. FUNG: Objection, form.
14   A     If they don't have a
15 license, correct. You can't say you're
16 ARM-based if it's not accurate.
17   Q     And by virtue of it
18 describing a third-party product, that
19 would be not a licensee product; right?
20   A     That would be?
21   Q     It would not be a licensee
22 product; it's a third-party product?
23       MR. FUNG: Objection, form.
24   A     Yeah. I don't know what
25 they mean by relevant third-party

Page 391

DR. RAVI DHAR

1
2   A     Right.
3   Q     It states here, "You may
4 refer to ARM-based products by using the
5 word based between the relevant ARM
6 trademark and the relevant third-party
7 product."
8       Do you see that?
9   A     Right.
10   Q     When it says third-party
11 product, you understand that to be
12 referring to the product of a
13 non-licensee?
14   A     That's what it could be.
15 But it says it has to be accurate, fair
16 and not misleading. And to me, as I've
17 said, it's misleading if there's no
18 license from ARM.
19   Q     So it's your opinion that a
20 third-party could not use the word
21 ARM-based between the relevant ARM
22 trademark and the third-party product
23 without being inaccurate, unfair and
24 misleading?
25       MR. FUNG: Objection, form.

Page 393

DR. RAVI DHAR

1
2 product. It could have the licensing
3 product in that. As I said, Qualcomm,
4 ███████████████████████████████
5 ████████████████████████████ And it
6 says we have ARM-based microprocessors.
7       And I'm saying you couldn't
8 say that. That would be false. And you
9 couldn't use the word ARM-based because
10 you're a third-party, if you're Lenovo,
11 but you're not describing the accurate
12 relationship because the Snapdragon chips
13 are not ARM-based here.
14   Q     So read together, where it
15 says you may refer to ARM-based products
16 by using the word based between the
17 relevant ARM trademark and the relevant
18 third-party product and in this
19 situation, you may use any appropriate
20 noun after the word based if it is
21 accurate, fair and not misleading, and it
22 complies with these guidelines, you would
23 say it's impossible that a third-party
24 could use the word based and also have it
25 be accurate, fair and not misleading?

99 (Pages 390 - 393)



Page 394

DR. RAVI DHAR

1
2        MR. FUNG:  Objection, form.
3    A      In this case because if your
4    chip -- as ███████████████████████
5    ███████████████████
6    yes, it would not be -- it would be
7    false.
8    Q      Can you think of any
9    situation in which a third-party could
10   refer to ███████████████████████████
11   ██████████████████████████████
12   ███████████████████████████
13   ██████████████████████
14   A      █████████████████████████
15   ██████████████████████████████████
16   ████████████████████████████
17   ██████████████████████████
18   ███████████████████████████████
19   ████████████████████████████████
20   ████████████████████████████████
21   ██████████████
23   Q      And you do not dispute that
24   these guidelines are about third-parties
25   who are not licensed; right?

Page 395

DR. RAVI DHAR

1
2    A      Right.  But as I said, his
3    interpretation is nonsensical.
4    Q      Your interpretation is that
5    there can be no referential use; right?
6    A      No.  There can be.  But this
7    is not referential use.  The use that
8    your client has done is false and
9    misleading.  And I said referential use,
10   like we accept MasterCard, is an example
11   of that.
12          So you can refer to the
13   technical attributes, assuming that ARM
14   allows, would not implicate the brand.
15   But using ARM-based, you're implicating
16   the brand, and that is not referential
17   use.  That implies a connection with ARM
18   brand.
19   Q      But putting Qualcomm aside,
20   you would say that under this section,
21   that it's impossible for any third-party
22   that's not licensed to use the word
23   based --
24   A      No.  I didn't say that.  I
25   said if you have a false license of

Page 396

DR. RAVI DHAR

1
2    Qualcomm, Nuvia product, a third-party,
3    like Lenovo or anybody else, could not
4    say that our product are ARM-based
5    because it's not ARM-based.  It's not
6    accurate.  So Lenovo doesn't have to have
7    the license, but neither did Qualcomm.
8    So you couldn't say that.
9    Q      So a third-party could be
10   unlicensed and could still use the word
11   ARM-based?
12   A      If it is accurate.  So if
13   you say we use ████████████████████████
14   ████████  and if is ███████████; in other
15   words, it has a license, then it would be
16   fine.
17   Q      But by virtue of it being a
18   third-party, doesn't have a license;
19   right?
20   A      No, no.  But my point is the
21   component of your product does.  So you
22   want to say here, next generation of
23   laptops has an ████████████████████.  If
24   that was true, which it's not, in my
25   opinion, then you could say that.

Page 397

DR. RAVI DHAR

1
2          So Lenovo doesn't have to
3    have the license.  Lenovo is a
4    third-party.  But Lenovo could say that
5    my product has a CPU or a system on chip
6    that combines the best of Qualcomm and
7    ARM-based technology or ARM-based would
8    be fine, if it is -- if Qualcomm had the
9    proper license.  But if Qualcomm doesn't
10   have the proper license, then it's not
11   true for it to say that.
12   Q      Is that limitation provided
13   for in the guidelines?
14          MR. FUNG:  Objection, form.
15   A      You mean in the reference
16   use here?
17   Q      Yes.
18   A      As I said, his
19   interpretation is nonsensical.  It made
20   no sense to me.  So it's very clear, to
21   me, what I said.
22   Q      Did you ask anyone at ARM
23   what the guidelines mean?
24   A      For me, no.  I didn't ask
25   specifically.  I kind of -- what it says

100 (Pages 394 - 397)

Page 398

DR. RAVI DHAR

1
2 here was clear to me.
3     Q      And you didn't ask how
4 third-parties used the guidelines; right?
5     A      I did not ask.  Again, when
6 you say ask, I only had one conversation
7 with them.  So I did not ask them
8 anything specifically that I recall.
9     Q      But you didn't ask for
10 documents that would convey how
11 third-parties use these trademark
12 guidelines through counsel; right?
13     A      Beyond this, no, I did not
14 ask that.
15     Q      And you've done no
16 evaluation of how third-parties use the
17 term ARM-based; right?
18     MR. FUNG:  Objection, form.
19     A      I have not done a systematic
20 analysis of that.
21     MS. MORGAN:  I have no
22     further questions.
23 EXAMINATION BY
24 MR. FUNG:
25     Q      Dr. Dhar, I just have a few

Page 399

DR. RAVI DHAR

1
2 questions.
3     In your opening and reply
4 reports, you have formed opinions
5 relating to the likelihood of confusion;
6 is that right?
7     A      Yes.
8     Q      You were able to form your
9 opinions about the likelihood of
10 confusion based on the current evidence
11 in the case; is that right?
12     A      Correct.
13     Q      And you were able to form
14 these opinions without conducting a
15 survey?
16     A      Correct.
17     Q      You were also able to form
18 your opinions without speaking with
19 decision makers in the B2B market?
20     A      In the semiconductor market,
21 correct.
22     Q      In your opening and reply
23 reports, you have formed opinions
24 relating to the strength and meaning of
25 ARM's branded trademarks; is that right?

Page 400

1
2     A      Correct.
3     Q      You were able to form these
4 opinions without using a survey?
5     A      Correct.
6     Q      You were able to form your
7 opinions without speaking with decision
8 makers in the B2B semiconductor market?
9     A      Correct.
10     MR. FUNG:  No further
11     questions.
12     MS. MORGAN:  Got nothing.
13     THE VIDEOGRAPHER:  We are
14 off the record concluded for the day,
15 5:27 p.m. Eastern Standard Time.
16     (Time noted:  5:27 p.m.)
17
18 _____
        DR. RAVI DHAR
19
20
21 Subscribed and sworn to
22 before me on this _____ day
23 of _____, 2024.
24
_____
25     NOTARY PUBLIC

Page 401

1
2         I N D E X
3
4       E X A M I N A T I O N
5 EXAMINATION
6 Ms. Morgan        5
  Mr. Fung        398
7
8         E X H I B I T S
9
10 QX              Description      Page
11 QX Exhibit 216    Opening report    19
12 QX Exhibit 217    Reply report    21
13 QX Exhibit 218    Transcript    180
14 QX Exhibit 219    Arbitration    251
                      decision
15
    QX Exhibit 220    Deposition      310
16                      transcript
17 QX Exhibit 221    Deposition      312
                      transcript
18
    QX Exhibit 222    Trademark use    390
19                      guidelines
20
21
22
23
24
25

101 (Pages 398 - 401)

Page 402

```
1
2          C E R T I F I C A T I O N
3
4
5      I, ANTHONY GIARRO, a Shorthand Reporter
6  and a Notary Public, do hereby certify that
7  the foregoing witness, DR. RAVI DHAR, was duly
8  sworn on the date indicated, and that the
9  foregoing, to the best of my ability, is a
10 true and accurate transcription of my
11 stenographic notes.
12     I further certify that I am not employed
13 by nor rel                          tion.
14
15
16
17          A N T H O N Y  G I A R R O
18
19
20
21
22
23
24
25
```

Page 403

```
1
2          ERRATA SHEET
           VERITEXT/NEW YORK REPORTING, LLC
3              1-800-727-6396
4  330 Old Country Road    7 Times Square
   Mineola, New York 11501  New York, New York
5  10036
6  NAME OF CASE:  ARM versus Qualcomm, et al.
   DATE OF DEPOSITION: May 3, 2024
7  NAME OF DEPONENT:  Dr. Ravi Dhar
8
   PAGE LINE (S) CHANGE      REASON
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21 _____
           DR. RAVI DHAR
22
23 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS ____ DAY OF _____, 20__.
24
25 _____  _____
   (NOTARY PUBLIC)  MY COMMISSION EXPIRES:
```

102 (Pages 402 - 403)

# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ARM LTD., A U.K. Corporation, | C.A. No. 22-1146-MN |
| Plaintiff | **EXPERT REPLY REPORT OF RAVI DHAR REGARDING TRADEMARK INFRINGEMENT** |
| v. |  |
| QUALCOMM INC., a Delaware Corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware Corporation, and NUVIA, INC., a Delaware Corporation, | **CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION** |
| Defendants. |  |

# TABLE OF CONTENTS

I. Qualifications ........................................................................................................... 1

II. Assignment ............................................................................................................. 1

III. Summary of Opinions ............................................................................................ 1

IV. The Arm Trademarks and Brand Are Distinctive and Strong, and Professor Steckel
Has Provided No Evidence to the Contrary ............................................................. 3

    IV.A. I Used Well-Established Principles to Evaluate the Strength of the Arm Trademarks
    and Brand ................................................................................................................... 3

    IV.B. Professor Steckel Presents No Evidence that Contradicts My Conclusions on the
    Strength of the Arm Trademarks and Brand ............................................................. 8

        IV.B.1. Professor Steckel Does Not Dispute Relevant Facts About the Ownership and
        Protection of the Arm Trademarks and Fails to Recognize that Survey Evidence Is
        Not Required to Assess the Strength of a Trademark .................................................. 8

        IV.B.2. Professor Steckel Misstates My Opinion on Ingredient Branding and His
        Comments on the Value of Arm Branding to End Customers Are Irrelevant to My
        Analysis ..................................................................................................................... 9

        IV.B.3. Professor Steckel's Opinion on the Strength of the Qualcomm Brand Is
        Irrelevant to My Analysis .......................................................................................... 11

V. Professor Steckel Fails to Recognize that Qualcomm's Unlicensed Use of the Terms
"Arm," "Arm-based," and "Arm-compliant" Is Likely to Confuse Customers ............. 11

    V.A. The Terms "Arm-based," "Arm based," and "Arm-Compliant" Communicate a False
    Connection to Arm's Brand ........................................................................................ 12

        V.A.1. The Terms "Arm-based" and "Arm based" Are Likely to Communicate a False
        Connection to Arm's Brand ...................................................................................... 12

        V.A.2. The Term "Arm-Compliant" Is Likely to Indicate Compliance of Nuvia products
        with Arm Brand Standards and Specifications to Qualcomm's Customers and
        Industry Participants ................................................................................................. 14

    V.B. Contrary to the Assertions of Professor Steckel, Qualcomm's Communication About
    and Description of the Snapdragon X Elite Processor as "Arm," "Arm-Based," and/or
    "Arm-Compliant" Is Likely to Confuse Customers ..................................................... 17

    V.C. Media Coverage of Qualcomm's Unlicensed Use of the Arm Brand and Trademarks
    Linked to Its Nuvia Products Both Demonstrates and Amplifies the Likelihood of
    Confusion ................................................................................................................... 21

        V.C.1. The Third-Party Press Provides Numerous Examples Presenting the Snapdragon
        X Elite Processor as "Arm," "Arm-Based," and/or "Arm-Compliant." ................... 22

        V.C.2. Financial Analyst Reports Also Describe the Snapdragon X Elite Processor as
        "Arm," "Arm-Based," and/or "Arm-Compliant." .................................................... 30

V.D. Professor Steckel's Assertions Do Not Refute My Findings Regarding Likelihood of Confusion ....................................................................................................................32

    V.D.1. Professor Steckel Fails to Address Qualcomm's Stand-Alone Use of the Term "Arm" and Baselessly Asserts that the Terms "Arm-Based" and "Arm-Compliant" Refer Only to the Technical Attributes of a Chip ....................................................32

    V.D.2. Professor Steckel Provides No Support for His Claim that Qualcomm's Use of "Arm-based" and Other Phrases Constitutes Permissible "Referential Use." .........33

    V.D.3. Professor Steckel Misinterprets My Prior Use Examples and Wrongly Asserts that My Likelihood of Confusion Analysis Is Based on Historical Information .....36

    V.D.4. Contrary to the Assertions of Professor Steckel, Qualcomm's Communication and Description of the Snapdragon X Elite Processor as "Arm," "Arm-Based," and/or "Arm-Compliant" Is Likely to Confuse Customers Regardless of Their Sophistication or Efforts to Exercise a Higher Degree of Care .............................37

    V.D.5. Contrary to the Assertions of Professor Steckel, It Is Not Necessary to Demonstrate Actual Confusion ...............................................................................38

**VI. Qualcomm's Unlicensed Use of the Arm Trademarks Is Likely to Result in Harm, and Professor Steckel Fails to Provide any Evidence to the Contrary....................................41**

    VI.A. I Used Well-Established Principles to Determine that Qualcomm's Unlicensed Use of the Arm Trademarks is Likely to Result in Harm ..........................................................41

    VI.B. Professor Steckel Provides No Evidence that Contradicts My Finding of Harm.........42

*HIGHLY CONFIDENTIAL*

### I. Qualifications

1. I previously submitted a report in this matter on behalf of the Plaintiff, Arm Ltd. ("Arm"), on December 20, 2023.[1] An overview of my qualifications is provided in Section I of my Opening Report. A list of the materials I have relied upon in preparation of this report is included in Appendix A.

### II. Assignment

2. Here, I have been asked by Morrison Foerster LLP to evaluate and respond to the opinions of Professor Joel Steckel in his expert report submitted on February 27, 2024.[2] In carrying out my assignment, I have been supported by an economic consulting firm, The Brattle Group, whose staff worked under my direction to conduct research and assist me in this matter. In addition to my standard billing rate of $950 per hour, I also receive compensation from The Brattle Group based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from The Brattle Group is in any way contingent or based upon the conclusions I reach or on the outcome of this matter.

### III. Summary of Opinions

3. Based on my review of the Steckel Rebuttal Report, I have determined that it suffers from serious conceptual and methodological flaws that render its conclusions unreliable. Accordingly, the assertions and conclusions contained in the Steckel Rebuttal Report do not change the opinions set forth in my Opening Report. Below, I summarize my responses to the Steckel Rebuttal Report and explain why the assertions therein do not alter my opinions.

   a. *First,* I relied on well-established principles and academic research on the theory and practice of branding in making my determination that the Arm Trademarks and brand are distinctive

---

[1]   Expert Report of Ravi Dhar, *Arm Ltd. v. Qualcomm Inc, Qualcomm Technologies, Inc., and NUVIA Inc.* (C.A. No. 22-1146-MN), December 20, 2023 ("Dhar Opening Report" or "my Opening Report").

[2]   Expert Rebuttal Report of Joel Steckel, *Arm Ltd. v. Qualcomm Inc, Qualcomm Technologies, Inc., and NUVIA Inc.* (C.A. No. 22-1146-MN), February 27, 2024 ("Steckel Rebuttal Report").

and strong in the U.S. marketplace context. Professor Steckel has provided no evidence that contradicts my conclusion.

b. ***Second,*** as explained in my Opening Report, the available evidence shows that Qualcomm's unlicensed use of Arm's Trademarks—including the terms "Arm," "Arm-based," and "Arm-compliant"—creates a likelihood of confusion among customers that is amplified by similar usage of these terms in the third-party press.[3] Claims to the contrary made by Professor Steckel are unsupported. Professor Steckel fails to address Qualcomm's unlicensed use of the stand-alone term "Arm" in describing the Nuvia Products. Moreover, he asserts—incorrectly and without any evidentiary support—that Qualcomm's unlicensed use of the terms "Arm-based" and "Arm-Compliant" will not lead to customer confusion about the Nuvia Products' connection with Arm and instead serve only as indicators of the technical attributes of a chip.[4] Because Professor Steckel fails to appropriately address either of these two issues, the notion that sophisticated customers, familiar with Arm's verification process and requirements, will not be confused by Qualcomm's misstatements—which have been amplified by third parties such as the media—is speculative and unreliable.

c. ***Third,*** I used well-established principles and academic research on the theory and practice of branding to demonstrate that Qualcomm's unlicensed use of the terms "Arm," "Arm-based," and "Arm-compliant" is likely to result in harm to the Arm brand, and Professor Steckel has provided no evidence to the contrary.

---

[3]   As discussed in the Dhar Opening Report (¶¶ 107-121) and Section V.C below, the media—like Qualcomm itself—also uses these terms to refer to the Nuvia Products (and the newly launched Snapdragon X Elite).

[4]   Professor Steckel states that these terms communicate that the Nuvia Products are compatible with the Arm Instruction Set Architecture ("ISA"). Steckel Rebuttal Report, ¶¶ 64-66. As explained in my opening report, the Arm ISA defines the software instructions that can be executed by the CPU. Dhar Opening Report, ¶ 98.

*HIGHLY CONFIDENTIAL*

**IV. The Arm Trademarks and Brand Are Distinctive and Strong, and Professor Steckel Has Provided No Evidence to the Contrary**

**IV.A. I Used Well-Established Principles to Evaluate the Strength of the Arm Trademarks and Brand**

4. My conclusion that the Arm Trademarks and brand are distinctive and strong in the U.S. marketplace is based on well-established principles of branding and academic research on the theory and practice of branding, which I cite heavily in Sections VII and VIII of my Opening Report. Section VII of my Opening Report discusses the concept and benefits of a strong brand in the marketplace context, as well as the components of a distinctive and strong brand identity. Section VIII then applies these concepts and demonstrates that Arm has built a distinctive and strong brand in the business-to-business ("B2B") market in which it competes.

5. As I explain in my Opening Report, the Arm Trademarks (i.e., U.S. Registration Nos. 5,692,669 and 5,692,670) are distinctive. I understand that U.S. Registration No. 5,692,669—pertaining to the Arm word mark in standard characters—has a claimed first use and first use-in-commerce date of November 30, 1990.[5] I also understand that U.S. Registration No. 5,692,670—pertaining to the stylized ARM mark featuring the word "arm" in all lowercase letters—has a claimed first use and first use-in-commerce date of August 1, 2017.[6] In order to protect against potential misuse of the Arm Trademarks, Arm provides clear guidelines on the use of the Arm Trademarks in the marketplace, including the Arm Trademark Use Guidelines and Arm Branding Guidelines.[7] Moreover, I am unaware of any other company in the semiconductor industry using anything similar to the Arm Trademarks.

6. It is also important to recognize that my analysis of the strength of the Arm Trademarks in the U.S. marketplace context relies on well-established principles. In particular, my detailed analysis of the strength of a brand based on academic principles is directly linked to the value it creates

---

[5]   Dhar Opening Report, ¶¶ 30-31.

[6]   Dhar Opening Report, ¶¶ 30-31.

[7]   *See, e.g.*, "Arm Trademark Use Guidelines," Arm, https://www.arm.com/company/policies/trademarks/guidelines-trademarks; "Arm Branding Guidelines," Arm, https://www.arm.com/company/policies/trademarks/guidelines-brand.

for Arm by attracting customers to its brand, which symbolizes the value offered to consumers.[8] Furthermore, it is my understanding that the commercial strength of a trademark is based on what it achieves through use and renown.[9] Accordingly, my Opening Report evaluated the commercial strength of the Arm Trademarks through an analysis of Arm's sales success and renown (e.g., reputation, fame, awards, and accolades). Beyond Arm's sales success and renown, the fact that Qualcomm uses the Arm Trademarks (even when it is not licensed to do so) indicates that the Arm brand is valuable. Moreover, Professor Steckel is incorrect in asserting that a survey of customers is required to establish a trademark's commercial strength.

7.   As explained in Section VIII.B of my Opening Report, Arm's sales success[10] and renown (e.g., reputation, fame, awards, and accolades)[11] demonstrate that the Arm Trademarks and brand are commercially strong. Moreover, I provide additional information regarding Arm's sales success (including Arm's market share and revenues) and renown (including media mentions about Arm's reputation and fame) below. Arm provides value through its mark by signaling to others

---

[8]   Academic literature establishes that brand strength leads to strong financial outcomes. *See, e.g.*, Vanitha Swaminathan, Sayan Gupta, Kevin Lane Keller, and Donald Lehmann, "Brand actions and financial consequences: a review of key findings and directions for future research," *Journal of the Academy of Marketing Science* 50 (2022): pp. 639-664; Kevin Lane Keller and Donald R. Lehmann, "Brands and Branding: Research Findings and Future Priorities," *Marketing Science* 25(6) (2006): pp. 740-759; and Kevin Lane Keller and Donald R. Lehmann, "How Do Brands Create Value," *Marketing Management* (May/June 2003): pp. 26-31.

[9]   J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed., (Danvers: Thomson Reuters, June 2017), Chapter 15, 15-8, footnote 14 ("If [a designation] is an inherently distinctive designation, then it does not need to acquire distinctiveness though [sic] acquiring a 'secondary meaning': what it achieves through use and renown is added 'strength.'").

[10]   *See, e.g.,* Dhar Opening Report, ¶ 99(b) ("More than 260 companies have reported shipping Arm-based chips this year. And Arm CPUs were used in more than 250 billion chips last year."), ¶ 103 (citing Arm Holdings Limited, Form F-1 Registration Statement, April 28, 2023, Amended July 31, 2023, ARM_01259705: "Arm CPUs run the vast majority of the world's software, including the operating systems and applications for smartphones, tablets and personal computers, data centers and networking equipment, and vehicles, as well as the embedded operating systems in devices such as smartwatches, thermostats, drones, and industrial robotics. [Arm] estimate[s] that approximately 70% of the world's population uses Arm-based products, and the scale of Arm's reach continues to expand, with more than 30 billion Arm-based chips reported as shipped in the fiscal year ended March 31, 2023, alone.").

[11]   *See, e.g.,* Dhar Opening Report, ¶ 99(a) ("The Arm Trademarks have consistently been recognized by the World Intellectual Property Organization for its global goodwill, reputation, fame, and distinctiveness."), ¶ 99(c) ("Arm has received many awards and accolades such as Overall Winner of the International Trade Awards in 2010; the Queen's Award for Enterprise in 2011; the Linley Group's Best processor IP in 2014, 2018, and 2019; and TSMC OIP Partner of the Year for Processor IP for 2009-2014, 2019, 2020, and 2021.").

*HIGHLY CONFIDENTIAL*

that a product has interoperability with the Arm ecosystem,[12] rather than a different ecosystem;[13] that is, the Arm Mark is not just Arm's source identifier, but it is further confirmation that a product has been through a specific Arm verification process and will work correctly with other Arm products and software. That signal conveys value because the validation process involves extensive time and input from Arm engineers.[14]

a. Arm's Sales Success

   i. Arm defines its total addressable market "to include all chips that can contain a processor . . . [including] the main controller chips in smartphones, PCs, digital TVs, servers, vehicles and networking equipment."[15] As of December 2022, Arm was estimated to have an approximately 49% market share across all chips in its addressable market, representing an aggregate value of $98.9 billion in chips containing Arm technology.[16] Additionally, as far back as a decade ago in 2014, Arm was estimated to have an approximately 39% market share across all chips in its addressable market.[17]

---

[12] "ARM verifies its IP for interoperability before it is released to partners to make sure it is suitable for a wide range of applications. . . . Frank Schirrmeister of Cadence Design Systems cites: 'As an ARM ecosystem partner, Cadence relies on pre verified ARM cores and subsystems that can be easily integrated into the designs that we use to validate our tool interoperability. ARM's software-driven verification approach reflects the industry's shift toward the portable stimulus specification and allows us to validate the integration and interoperability of ARM cores and subsystems on all Cadence System Development Suite engines, including simulation, emulation, and FPGA-based prototyping engines." Eoin McCann, *System Validation at Arm* (April 2016), https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/system-validation-at-arm-enabling-our-partners-to-build-better-systems.

[13] For example, the "About this Mac" feature in an Apple computer will tell the user whether the "Processor" is based on an Intel x86 or Arm processor. *How can I tell whether I have an "Intel" or an "Apple Silicon" based Mac,* https://focusritepro.zendesk.com/hc/en-gb/articles/360017409720-How-can-I-tell-whether-I-have-an-Intel-or-an-Apple-Silicon-based-Mac.

[14] "For example, on top of the >10,000 hours of validation run time done on each core model, the latest version of the ARM Juno test chip was subjected to an additional 6,130 hours of system validation run time." M.S. Hrishikesh, Madhusudhan Rajagopalan, Sujatha Sriram, and Rashmin Mantri, "System Validation at Arm; Enabling our Partners to Build Better Systems (April 2016), p. 11, https://developer.arm.com/-/media/Arm%20Developer%20Community/PDF/System%20IP/System_Validation_at_ARM_Enabling_our_partners_to_build_better_systems.pdf?revision=a82b4e93-4118-4a3a-ba5f-70e38f6b4616&hash=88D9B7CF58BE13B124E43EE538D21F4D#:~:text=For%20exa.

[15] Arm Holdings Limited, Form F-1 Registration Statement, April 28, 2023, Amended July 31, 2023, ARM_01259705, at -717.

[16] Arm Holdings Limited, Form F-1 Registration Statement, April 28, 2023, Amended July 31, 2023, ARM_01259705, at -718.

[17] Arm Holdings Limited, Form F-1 Registration Statement, April 28, 2023, Amended July 31, 2023, ARM_01259705, at -720.

*HIGHLY CONFIDENTIAL*

    ii.  Moreover, Arm has maintained a market share greater than 99% for the primary chip in smartphones (i.e., mobile applications processor) "for many years, by virtue of all key mobile operating systems depending on Arm processors."[18]

    iii.  For the fiscal year ending March 31, 2023, Arm's total revenue was approximately $2.7 billion.[19] Moreover, as far back as a decade ago in 2014, Arm's total revenue was approximately $1.3 billion.[20]

    iv.  In addition to information about Arm's sales success presented in my Opening Report, the above information regarding Arm's market share and revenues demonstrates the company's long-standing sales success, along with its continued growth over the last decade.

  b.  <u>Arm's Renown</u>

    i.  A June 2022 article from *The Economist* titled "Why everyone wants Arm" describes "the ubiquity of [Arm's] products" and states that "Arm has grown to the point where nearly all big tech firms use its designs."[21] The article also refers to Arm as "a keystone in the $500bn chip industry."[22] Lastly, the article provides detail about Arm's value to third parties over the years, including SoftBank's purchase of Arm for $32 billion in 2016 and Nvidia's offer to purchase Arm for $40 billion in 2020.[23]

    ii.  In advance of Arm's initial public offering ("IPO") in September 2023, an article from *Fast Company* describes Arm as a "[h]igh-profile chip designer" with a "long-awaited" IPO.[24] Moreover, an article from *The Guardian* refers to Arm as a "dominant supplier" to

---

[18]  Arm Holdings Limited, Form F-1 Registration Statement, April 28, 2023, Amended July 31, 2023, ARM_01259705, at -718.

[19]  Arm Holdings Limited, Form F-1 Registration Statement, April 28, 2023, Amended July 31, 2023, ARM_01259705, at -713.

[20]  Arm's 2014 total revenue of $1.3 billion is unadjusted for inflation. *See* "ARM Holdings Plc Reports Results For The Fourth Quarter And Full Year 2015," Arm, February 10, 2016, https://newsroom.arm.com/news/arm-holdings-plc-reports-results-for-the-fourth-quarter-and-full-year-2015.

[21]  "Why everyone wants Arm," The Economist, June 22, 2022, https://www.economist.com/business/2022/06/22/why-everyone-wants-arm.

[22]  "Why everyone wants Arm," The Economist, June 22, 2022, https://www.economist.com/business/2022/06/22/why-everyone-wants-arm.

[23]  "Why everyone wants Arm," The Economist, June 22, 2022, https://www.economist.com/business/2022/06/22/why-everyone-wants-arm.

[24]  Sam Becker, "Arm IPO update: Filing reveals SoftBank's target valuation as listing day approaches," Fast Company, September 5, 2023, https://www.fastcompany.com/90948568/arm-ipo-date-softbank-valuation-listing.

chipmakers and indicates that Arm's IPO valued the company at \$54 billion.[25] Since Arm's \$54 billion IPO in September 2023, its stock price has more than doubled and reflects a \$133 billion valuation[26] as of March 18, 2024.[27]

iii.   An August 2023 article from CNBC describes Arm as "one of the most important companies in technology" and "a bellwether for the chip industry."[28]

iv.   A May 2022 article from *The Financial Times* highlights the "crucial role" that Arm plays in the global technology sector.[29] The article quotes Qualcomm's CEO—Cristiano Amon—describing Arm as "a very important asset and . . . an asset which is going to be essential to the development of our industry."[30] Mr. Amon also states that "[w]hen we look today, I think the trend is that everything is moving to Arm."[31]

v.   In a December 2021 complaint filed by the U.S. Federal Trade Commission ("FTC") in response to Nvidia's proposed acquisition of Arm, the FTC states that "Arm Processor Technology is at the foundation of many innovative products of our modern digital age, including nearly every smartphone on the market, advanced driver assistance features in recent and upcoming cars, web servers that can provide significantly better cost performance over the most comparable non-Arm servers, and many other examples. In these products, Arm Processor Technology is a critical input. The wide deployment of Arm's Processor Technology has fostered a vibrant ecosystem of software and hardware developers, software, and devices."[32] Moreover, the FTC notes that "Arm achieved its

---

[25]   Arm set an IPO price of \$51 per share, which valued the company at \$54 billion at the start of the trading day. However, over the course of the day, investor activity pushed the stock price up nearly 25%, and Arm ended the day with a valuation of over \$65 billion. *See* Dominic Rushe, "UK chip designer Arm soars on Nasdaq debut to notch \$65bn valuation," The Guardian, September 14, 2023, https://www.theguardian.com/business/2023/sep/14/arm-ipo-share-sale-nasdaq-stock-market.

[26]   Based on Arm's market capitalization (i.e., stock price multiplied by the number of outstanding shares).

[27]   "Arm Holdings plc (ARM)," Yahoo Finance, accessed March 18, 2024, https://finance.yahoo.com/quote/ARM/.

[28]   Ryan Browne, "What Arm's expected debut means for the IPO market and SoftBank," CNBC, August 21, 2023, https://www.cnbc.com/2023/08/21/arm-ipo-what-it-means-for-ipo-market-softbank.html.

[29]   Anna Gross and Tim Bradshaw, "Qualcomm wants to buy a stake in Arm alongside its rivals," *The Financial Times*, May 30, 2022, https://www.ft.com/content/eab1d19d-ab4c-45b7-88b4-f1f5e115d16e.

[30]   Anna Gross and Tim Bradshaw, "Qualcomm wants to buy a stake in Arm alongside its rivals," *The Financial Times*, May 30, 2022, https://www.ft.com/content/eab1d19d-ab4c-45b7-88b4-f1f5e115d16e.

[31]   Anna Gross and Tim Bradshaw, "Qualcomm wants to buy a stake in Arm alongside its rivals," *The Financial Times*, May 30, 2022, https://www.ft.com/content/eab1d19d-ab4c-45b7-88b4-f1f5e115d16e.

[32]   Complaint, *In the Matter of Nvidia Corporation, SoftBank Group Corporation, and Arm, Ltd.*, Docket No. 9404, Federal Trade Commission, December 2, 2021, https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf.

status as a foundational technology for so many innovative products because of its neutral licensing business model that fosters trust, collaboration, and engagement between Arm and its licensees."[33]

vi. In addition to information about Arm's renown presented in my Opening Report, Arm's strong renown is evident from multiple media mentions, which refer to Arm as a "high-profile," "dominant," "keystone," and "bellwether" company in the semiconductor chip industry. Moreover, media mentions highlight the overall value of Arm over the years as indicated by SoftBank's purchase of Arm for $32 billion in 2016, Nvidia's offer to purchase Arm for $40 billion in 2020, Arm's $54 billion IPO in September 2023, and Arm's recent stock price surge and current valuation of around $130 billion (based on market capitalization).[34]

### IV.B. Professor Steckel Presents No Evidence that Contradicts My Conclusions on the Strength of the Arm Trademarks and Brand

#### IV.B.1. Professor Steckel Does Not Dispute Relevant Facts About the Ownership and Protection of the Arm Trademarks and Fails to Recognize that Survey Evidence Is Not Required to Assess the Strength of a Trademark

8.  Professor Steckel does not dispute that (i) Arm owns the Arm Trademarks and the iterations that it encompasses; (ii) Arm has Trademark Use Guidelines and Branding Guidelines that set parameters for use; and (iii) Arm ALAs contain provisions that set parameters for use by licensees (including Qualcomm).[35] Professor Steckel also does not provide any evidence of a third party using a similar mark in the semiconductor industry. Finally, Professor Steckel does not provide any evidence that contradicts my findings with regard to Arm's history of owning

---

[33] Complaint, *In the Matter of Nvidia Corporation, SoftBank Group Corporation, and Arm, Ltd.,* Docket No. 9404, Federal Trade Commission, December 2, 2021, https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf.

[34] Relatedly, Nvidia recently disclosed that it holds a $147 million investment stake in Arm. *See* Nick Turner, "Nvidia tried and failed to buy Arm for $40 billion in 2020, but it just reported a stake worth $147.3 million," *Fortune*, February 14, 2024, https://fortune.com/2024/02/14/nvidia-reports-stake-in-arm-ai-semiconductor-chips/.

[35] As set forth in my Opening Report, ███████████████████████████████████████████

███████████ Dhar Opening Report, ¶ 32. Arm's TLAs ███████████████████████████

███████████ Dhar Opening Report, ¶¶ 33-34. In contrast, Arm's ALAs ████████████████

                                                                    Dhar Report, ¶35.

the Arm Trademarks, sales success, and renown (e.g., reputation, fame, awards, and accolades), which I have further expanded upon in Section IV.A above. Indeed, Professor Steckel never states that Arm is not a strong brand.

9.  Instead, Professor Steckel's main dispute with my findings is that I have provided no evidence from a survey of customers in support of my conclusions regarding the strength of the Arm Trademarks.[36] However, as explained above, Professor Steckel fails to recognize that the determination of whether the Arm Trademarks or brand is strong does not require the expert to survey individual customers. Instead, my credentials and experience as a marketing expert allow me to reliably draw these conclusions based on established principles in the field of marketing science and consideration of marketplace factors. As I explain above in Section IV.A, Arm's sales success and renown (e.g., reputation, fame, awards, and accolades) demonstrate that the Arm Trademarks and brand are commercially strong.

10. It is also important to recognize that—in addition to wrongly asserting that survey evidence is required to demonstrate the strength of a distinctive mark like Arm's—Professor Steckel disregards this asserted requirement when making claims about the strength of Qualcomm's brand. In particular, Professor Steckel states that "Qualcomm presumably has its own (arguably strong) brand reputation in the relevant marketplace," but cites to no survey evidence to support this claim.[37] Therefore, while Professor Steckel criticizes my analysis of Arm's brand strength for a "lack of customer-based evidence,"[38] this criticism is inconsistent with Professor Steckel's own approach to opining about Qualcomm's brand.

### IV.B.2. Professor Steckel Misstates My Opinion on Ingredient Branding and His Comments on the Value of Arm Branding to End Customers Are Irrelevant to My Analysis

11. Professor Steckel misstates my opinion regarding ingredient branding. As an initial matter, I clearly explain in my Opening Report that Arm is a strong business-to-business ("B2B") brand. Nevertheless, Professor Steckel claims that I imply that "Arm's brand is an ingredient in the

---

[36]  Steckel Rebuttal Report, Section IV.A.
[37]  Steckel Rebuttal Report, ¶ 60.
[38]  Steckel Rebuttal Report, ¶ 42.

overall success of end products among downstream consumers." Beyond the fact that I do not make an assessment of Arm brand strength for end consumers, the awareness of Arm's brand among end consumers when making a purchase is not relevant to my analysis. Moreover, since I do not opine on whether end consumers see the Arm brand (or even the Qualcomm brand for that matter) as a strong brand, the "Intel Inside" example—a specific type of ingredient brand strategy marketing an ingredient brand (i.e., microprocessors in computers) to end consumers— provided by Professor Steckel is not relevant to my analysis.

12. Qualcomm's description of the Nuvia Products as "Arm-based" and/or "Arm-compliant" products takes advantage of Arm's strong B2B brand in the industry since Qualcomm sells its products to other businesses. My opinion is supported by the academic literature that establishes that, through co-branding or composite branding, a company may be able to leverage the strong brand associated with a partner company's ingredient product. Since I established that Arm is a strong B2B brand (i.e., in and of itself and not through any relationship with Qualcomm) in my Opening Report, Qualcomm's exploitation of the Arm Trademarks to describe the Nuvia Products means that the strength of the Arm brand is being exploited. Further, given the sophisticated industry understanding of Arm requirements for testing and verification prior to the release of Arm-approved processors,[39] Qualcomm's unauthorized use is likely to incorrectly communicate to others that Qualcomm's Nuvia Products are connected to the Arm brand and/or have been verified and validated by Arm (which I understand is inaccurate). Therefore, Qualcomm benefits from the unauthorized use of the Arm Trademarks when selling unlicensed Nuvia Products to its business customers.

---

[39] Eoin McCann, *System Validation at Arm* (April 2016), https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/system-validation-at-arm-enabling-our-partners-to-build-better-systems (describing validation process). "The partner's design is then certified by Arm as abiding by its guidelines, as upholding the Arm engineers' security principles and original design intent, and perhaps most importantly, as being capable of running software produced for that processor's design generation." Scott Fulton III, *Arm processors: Everything you need to know now* (March 30, 2021), https://www.zdnet.com/article/arm-processors-everything-you-need-to-know-now/.

### IV.B.3. Professor Steckel's Opinion on the Strength of the Qualcomm Brand Is Irrelevant to My Analysis

13. Professor Steckel's opinion on the strength of the Qualcomm brand is also irrelevant to my analysis. In particular, Professor Steckel states that "the Dhar Report fails to consider the extent to which Qualcomm's brand plays a role in marketing Qualcomm's Arm-based products to consumers."[40] However, in my Opening Report, I concluded that (i) Arm is a strong brand and (ii) Qualcomm's unlicensed use of the Arm Trademarks to describe the Nuvia Products is likely to cause customer confusion.[41] Thus, the role and strength of Qualcomm's brand and its brand associations are irrelevant to my analysis.

### V. Professor Steckel Fails to Recognize that Qualcomm's Unlicensed Use of the Terms "Arm," "Arm-based," and "Arm-compliant" Is Likely to Confuse Customers.

14. As I explained in my Opening Report, Qualcomm's use of Arm's Trademark in connection with the Nuvia Products—including such phrases as "Arm," "Arm-based," and "Arm-compliant"—is likely to falsely convey that such products have some connection as to source, affiliation, sponsorship, or approval between Arm and Qualcomm.[42] Arm's Trademark Guidelines say as much directly: "Do not use Arm's trademarks in any manner that expresses or implies that Arm has any affiliation, sponsorship, endorsement, certification, or approval of your product, service or company."[43]

15. The Steckel Rebuttal Report not only ignores entirely Qualcomm's use of the term "Arm," but also makes the unsupported (and incorrect) assertion that the use is permissible because modifier terms "Arm-based" and "Arm-Compliant" purportedly refer only to the technical attributes of a chip.[44]

---

[40]   Steckel Rebuttal Report, Section IV.C.

[41]   Dhar Opening Report, Section VIII.B ("Arm Has a Strong and Distinctive B2B Brand") and Section VIII.D ("Qualcomm's Unauthorized Use of the Arm Mark is Likely to Harm Arm").

[42]   Dhar Opening Report, ¶¶122-133.

[43] Arm Trademark Use Guidelines, https://www.arm.com/company/policies/trademarks/guidelines-trademarks.

[44]   *See, e.g.,* Steckel Rebuttal Report, ¶¶ 27, 66, 77.

### V.A. The Terms "Arm-based," "Arm based," and "Arm-Compliant" Communicate a False Connection to Arm's Brand

#### V.A.1. The Terms "Arm-based" and "Arm based" Are Likely to Communicate a False Connection to Arm's Brand

16. Mr. Jonathan Armstrong, Arm's head of brand and creative services confirmed that "to be based on Arm" means "built on an Arm architecture or to have used an Arm core, such as a CPU or a GPU" in his deposition testimony.[45] As pointed out by Mr. Armstrong, Arm indeed uses the terms "Arm-based" and "Arm based" to describe its licensed products. For example,

   a. An Arm press release from 2020 titled "Record Shipments of Arm-based Chips in Previous Quarter," notes that "Arm partners have shipped more than 160 billion Arm-based chips."[46]

   b. An Arm press release from 2021 titled "The Arm Ecosystem Ships a Record 6.7 Billion Arm-based Chips in a Single Quarter," notes that the "growth in Arm-based intelligent embedded solutions has been staggering," and that the company expects "to see increased adoption of Arm IP as we signed a record 175 licenses in 2020, many of those signed by first-time Arm partners."[47]

   c. Similarly, a company press release from 2021 titled "Arm Partners are Shipping More Than 900 Arm-based Chips Per Second Based on Latest Results," highlights that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[48]

---

[45] 30(b)(6) Deposition of Jonathan Armstrong (Arm Ltd.), December 8, 2023, 82:20-83:1 ("[Q.] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[46] "Record Shipments of Arm-based Chips in Previous Quarter," Arm Newsroom, February 25, 2020, https://newsroom.arm.com/news/record-shipments-of-arm-based-chips-in-previous-quarter.

[47] "The Arm Ecosystem Ships a Record 6.7 Billion Arm-based Chips in a Single Quarter," Arm Newsroom, February 11, 2021, https://newsroom.arm.com/news/the-arm-ecosystem-ships-a-record-6-7-billion-arm-based-chips-in-a-single-quarter.

[48] "Arm Partners are Shipping More Than 900 Arm-based Chips Per Second Based on Latest Results," Arm Newsroom, May 20, 2021, https://newsroom.arm.com/news/arm-partners-are-shipping-more-than-900-arm-based-chips-per-second-based-on-latest-results.

d. An Arm news release from 2023 titled "Premium Arm-based Chromebooks Delivering World-class Performance" describes ██████████████████████ "based on Arm technology" as "███████████████████████████████████████████ ███████████████████████████████████████████."[49]

e. Arm describes its CPU architecture as "the most pervasive processor architecture in the world, with more than 280 billion Arm-based chips shipped by our partners over the past three decades in products ranging from sensors, wearables and smartphones to supercomputers."[50]

f. Arm describes numerous licensed commercial products as "based" on Arm technology:[51]



i. ████████████████████

ii. ████████████████████████████████████

iii. ████████████████████████████

iv. ██████████████████████

v. ████████████████████████████████

vi. ████████████████████

vii. ██████████████████████████

viii. ██████████████████████

g. An Arm case study discusses ████████████████, ██████████████████████████ across their ████████████████████," such as the ████ ███████████████████ ████████████

17. Furthermore, PCMag Encyclopedia's definitions of similar phrases that also include the term "based" provide further evidence that the term "ARM-based" suggest a false connection to Arm's brand:

---

[49]   "Premium Arm-based Chromebooks Delivering World-class Performance," Arm Newsroom, January 17, 2023, https://newsroom.arm.com/premium-arm-based-chromebooks.

[50]   "CPU Architecture," Arm, https://www.arm.com/architecture/cpu.

[51]   "Arm Designs," Arm, https://www.arm.com/company/success-library/arm-designs.

[52]   "NXP Accelerates Software Creation on S32K Automotive Microcontrollers," Arm Case Study, https://armkeil.blob.core.windows.net/developer/Files/pdf/case-study/arm-nxp-case-study.pdf

a.   "***Intel-based*** system" is defined as "A computer that ***uses a CPU from Intel***, such as a Core, Xeon, or Pentium chip. Also known as an 'x86-based system.' The x86 designation comes from the first PC, which used the Intel 8086 chip."[53] (Emphasis added)

b.   "***PowerPC based***" is defined as "A computer that ***uses PowerPC chips***."[54] (Emphasis added) Similarly, "***PowerPC-based*** Mac" is defined as "An earlier Mac computer that ***used a PowerPC CPU chip***."[55] (Emphasis added)

c.   "***RISC-based*** system" is defined as "A computer system that ***uses a RISC CPU*** such as a SPARC, PowerPC or MIPS chip."[56] (Emphasis added)

d.   "***CMOS based***" is defined as "An integrated circuit ***fabricated using CMOS technology***."[57] (Emphasis added)

e.   "***Windows based***" is defined as "(Windows-based; upper case "W") Hardware and software that ***runs a version of Microsoft Windows***."[58] (Emphasis added)

### V.A.2. The Term "Arm-Compliant" Is Likely to Indicate Compliance of Nuvia products with Arm Brand Standards and Specifications to Qualcomm's Customers and Industry Participants

18.   As I noted in my Opening Report, Qualcomm's non-ALA-licensed use of the Arm Trademarks includes the use of the term ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[59] The term ▮▮▮▮▮▮▮ generally means "in agreement with a set of rules,"[60] or "conforming to requirements."[61] Further, given the sophisticated customers with a likely knowledge of Arm,

---

[53]   "Intel-based system," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/intel-based-system; Jim Turley, "Introduction to Intel Architecture," https://www.intel.com/content/dam/www/public/us/en/documents/white-papers/ia-introduction-basics-paper.pdf

[54]   "PowerPC based," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/powerpc-based.

[55]   "PowerPC-based Mac," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/powerpc-based-mac.

[56]   "RISC-based system," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/risc-based-system.

[57]   "CMOS based," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/cmos-based. "CMOS" is an acronym for Complementary Metal-Oxide-Semiconductor, a type of technology used in the manufacturing of processors, and other chips and digital devices. *See, e.g.,* "What is CMOS," Lenovo, https://www.lenovo.com/us/en/glossary/cmos/.

[58]   "Windows based," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/windows-based.

[59]   Dhar Opening Report, ¶ 77.

[60]   "Compliant," Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/compliant?q=compliant.

[61]   "Compliant," Meriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/compliant.

*HIGHLY CONFIDENTIAL*

customers can be expected to perceive the meaning of compliant with Arm as a product that has been verified and validatedby Arm.[62]

19. Consistent with this general meaning, the PCMag Encyclopedia defines "compliance" as "conforming to a specification, standard or law that has been clearly defined."[63] In this particular case, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[64]

20. In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮

21. ARM's Senior Vice President Paul Williamson echoed this ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ even more clearly in his testimony:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [66]

---

[62] Eoin McCann, *System Validation at Arm* (April 2016), https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/system-validation-at-arm-enabling-our-partners-to-build-better-systems.

[63] "Compliance," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/compliance

[64] Arm engages in two primary types of licenses: a technology license agreement ("TLA") and architectural license agreement ("ALA") license. As described by Mr. Will Abbey, Arm's VP of commercial operations for physical IP, a TLA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ By contrast, an ALA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " Deposition of Will Abbey (Arm), October 27, 2023, 75:13-78:9. *See also,* Complaint, *Arm Ltd. v. Qualcomm Inc.,* C.A. No. 1:99-MC-0999, August 31, 2022, ¶¶ 17-19

[65] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[66] Deposition of Paul Williamson (Arm), November 9, 2023, 209:18-21.

*HIGHLY CONFIDENTIAL*

22. ███████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

23. Under these licenses, ████████████████████████████████
████████████████████████████████████████.[68] ██
██████████████████████████████████████████████████
████████████████████████████████████████████████



24. In addition to validation with Arm, manufacturers of Arm-compliant products are subject to specific branding guidelines. The guidelines expressly use the term "Arm Complaint Product" and govern the packaging, promotion, and technical documentation for the product.[70] Likewise, the Trademark Use Guidelines provide a list of "Don'ts" to third parties, which include: "Do not use inaccurate or misleading nouns after Arm's trademarks. Arm's trademarks are used for specific products and services."[71]



[68] "System Architecture Compliance Suites (ACS)," *Arm Developer*, https://developer.arm.com/Architectures/Architectural%20Compliance%20Suite#Technical-Information.

[69] ████████████████████████████████████████████████

[70] "Arm Branding Guidelines," Arm, https://www.arm.com/company/policies/trademarks/guidelines-brand. ██

[71] Arm Trademark Use Guidelines, https://www.arm.com/company/policies/trademarks/guidelines-trademarks.

*HIGHLY CONFIDENTIAL*

25.  In sum, the term "Arm-compliant" is likely to communicate to industry participants—including both Arm's and Qualcomm's customers[72]—that a product conforms to Arm specifications and has been validated by Arm. This meaning for the term "Arm compliant" is corroborated by statements and testimony from both Qualcomm and Arm staff, Arm licensing agreements, and Arm's specific technical validation processes. Moreover, it is not possible for an unlicensed entity to be Arm-compliant because it would not have gone through the specific Arm validation and compliance process afforded only to licensees. Professor Steckel fails to consider any of this support in his own analysis of this issue, and his assertions to the contrary are unsupported.

### V.B. Contrary to the Assertions of Professor Steckel, Qualcomm's Communication About and Description of the Snapdragon X Elite Processor as "Arm," "Arm-Based," and/or "Arm-Compliant" Is Likely to Confuse Customers

26.  As I explain in my Opening Report and above,  Qualcomm's use of the terms "Arm-based" and "Arm-compliant" is likely to mislead other relevant industry participants into believing that there is a false connection with Arm's brand, and/or a product is licensed, verified, or validated by Arm. Even so, after acquiring Nuvia in 2021, Qualcomm's top management officers described Nuvia's *non-ALA-licensed* upcoming product (Snapdragon X Elite) as "Arm," "Arm-based," and "Arm-Compliant" in numerous public statements.[73]

27.  For example, Qualcomm executives and employees continued to make similar statements about the Nuvia Products, up to, during, and after the announcement of the ▉▉▉▉▉▉▉▉. These

---

[72]  Some of ARM's customers are also Qualcomm's sophisticated customers. For example, both Arm and Qualcomm count Microsoft as a customer. *See* Arm Holdings plc, Amendment No. 2 to Form F-1, September 5, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm, ("Arm Total Access customers include Amazon AWS, Infineon Technologies AG, Marvell Technology, Inc., Microsoft, NXP Semiconductors N.V., Realtek Semiconductor Corp, STMicroelectronics N.V. and others."); *see also,* "Qualcomm and Microsoft Align Efforts to Scale On-Device AI at Build," *Qualcomm*, May 23, 2023, https://www.qualcomm.com/news/releases/2023/05/qualcomm-and-microsoft-align-efforts-to-scale-on-device-ai-at-bu.

[73]  A number of these public statements are strategic pre-announcement communications. Academic studies show that firms use such strategic "preannouncement" communications to inform investors, B2B partners, and other market participants about what to expect in their upcoming product pipelines. *See, e.g.*, Kim Schatzel and Roger Calantone, "Creating Market Anticipation: An Exploratory Examination of the Effect of Preannouncement Behavior on a New Product's Launch," *Journal of the Academy of Marketing Science* 34(3) (2006): 357-366, at 357 (Finding that preannouncement communication "emphasizes the use of preannouncements as business-to-business marketing communications aimed at influencing current and prospective supply chain partners in the firm's favor."), and Chien-Wei Chen and Veronica Wong, "Design and Delivery of New Product Preannouncement Messages," *Journal of Marketing Theory and Practice* 20(2) (2012): 203-221, at 203 ("The preannouncements can facilitate or accelerate the initial rate of customer adoption through evoking curiosity and interest.").

*HIGHLY CONFIDENTIAL*

Qualcomm top management included: Qualcomm President and CEO, Mr. Cristiano Amon; CFO, Mr. Akash Palkhiwala; VP of Product Marketing, Mr. Michael Roberts; Director of Product Management, CPU Technology, Manju Varma; and Senior VP and General Manager, Compute and Gaming, Keder Kondap.

28. The following excerpts illustrate that these remarks often described the Nuvia Products and ████████████████████████████████████████████

   a. April 2021, Mr. Amon: "The NUVIA asset give[s] us a lot of flexibility. You should think about it as having a scalable leading CPU asset to get together with the other Qualcomm assets. [. . .] And **some of the transition across the board to ARM architecture really create a big expansion opportunity for Qualcomm**, and **we're very focused to make that happen with a leading position leveraging the NUVIA CPU**." [74] (Emphasis added).

   b. May 2021, Mr. Amon: "**With the NUVIA acquisition, we believe we can build the leading ARM CPU**. The ecosystem is already moving to ARM. We feel pretty good about our partnership with Microsoft, and we see that as definitely a growth opportunity in the horizon for Qualcomm." [75] (Emphasis added).

   c. August 2021, Mr. Palkhiwala: "As you're well aware, Joe, we just -- *we bought this company called NUVIA, which does very high-performance, low-power, ARM-based CPU cores*. And we're very excited about bringing that technology over to the PC industry and becoming the alternative for the PC ecosystem to compete with the Apple M1 processor." [76]

   d. November 2021, Mr. Amon: "We are pleased with the strong market validation of *ARM-based personal computing* in the industry transition to a new SoC architecture. We're more confident than ever in the connected computing opportunity, *our upcoming solutions powered by our NUVIA CPUs* and our collaboration with Microsoft." [77] (Emphasis added).

---

[74]   Qualcomm Inc. Q2 2021 Earnings Call, April 28, 2021, transcript published by S&P Global Market Intelligence, pp. 12-13.

[75]   Qualcomm Inc. presentation at J.P. Morgan's 49th Annual Global Technology Conference, May 26, 2021, transcript published by S&P Global Market Intelligence, pp. 8-9.

[76]   Qualcomm Inc. presentation at Nasdaq Virtual Investor Conference in Asia, August 10, 2021, transcript published by S&P Global Market Intelligence, p. 11.

[77]   Qualcomm Inc. Q4 2021 Earnings Call, November 3, 2021, transcript published by S&P Global Market Intelligence, p. 4.

*HIGHLY CONFIDENTIAL*

e.  February 2022, Mr. Amon: "[O]ur early investments, collaboration with Microsoft and the ***recent acquisition of NUVIA uniquely positions us to drive the PC industry transition to ARM-based computing*** for next-generation connected laptops."[78] (Emphasis added).

f.  April 2022, Mr. Amon: "We're encouraged by the broad interest in our upcoming products, utilizing our industry-leading ***CPUs designed by our NUVIA team***. ***We continue to drive the inevitable transition to ARM-based computing*** while redefining the future of mobile productivity." [79] (Emphasis added).

g.  May 2022, Mr. Palkhiwala: "We wanted to develop ***our own custom ARM CPU***, so we acquired this company called NUVIA. And they're extremely well -- doing extremely well. They're fit right into our road map." [80] (Emphasis added).

h.  June 2022, Mr. Amon: "[***Nuvia] was the team that design[ed], I think that breakthrough ARM processor and performance***. And we're going to take it to first PC, then auto and then mobile." [81] (Emphasis added).

i.  May 2023, Mr. Palkhiwala: "[Analyst Question]: And it sounds like from the way you've been talking about it, you're exactly sort of trying to hit this [PC] market, sort of this target opportunity with this NUVIA chip. Is that fair to say? [Mr. Palkhiwala]: That's right. So ***it is a chip that has a custom arm CPU designed by the NUVIA team.***" [82] (Emphasis added).

j.  August 2023, Mr. Palkhiwala: ("[Analyst question]: So talk a little bit about NUVIA and how it fits into this whole? [Mr. Palkhiwala] ***We've used that team and our architecture license with ARM to develop highly power-efficient cores*** for EDGE device [. . .] And we're

---

[78]   Qualcomm Inc. Q1 2022 Earnings Call, February 2, 2022, transcript published by S&P Global Market Intelligence, p. 4.

[79]   Qualcomm Inc. Q2 2022 Earnings Call, April 27, 2022, transcript published by S&P Global Market Intelligence, p. 5.

[80]   Qualcomm Inc. presentation at J.P. Morgan's 50th Annual Global Technology Conference, May 23, 2022, transcript published by S&P Global Market Intelligence, p. 8.

[81]   Qualcomm Inc. presentation at Bernstein 38th Annual Strategic Decisions Conference, June 1, 2022, transcript published by S&P Global Market Intelligence, p. 17.

[82]   Qualcomm Inc. presentation at 51st Annual J.P. Morgan Global Technology, Media and Communications Conference, May 22, 2023, transcript published by S&P Global Market Intelligence, p. 10.

very confident that ***we'll have CPU cores that are aligned with ARM architecture***, but really have a performance advantage versus our competition." [83] (Emphasis added).

k.  October 25, 2023, Mrs. Varma: ███████████████████████████████████████ ███████████████████████████████████." [84] (Emphasis added).

l.  October 25, 2023, Mr. Kondap: ████████████████████████████████████████ ████████████████████████████[85].

m.  October 25, 2023, CEO of Qualcomm Partner HONOR, George Zhao, at the Snapdragon Compute Spotlight event: Announcing HONOR will "join the ████████████████ ██████████████████████████[86] (Emphasis added).

n.  

o.  November 2023, Mr. Palkhiwala: "**[T]he chip that we announced about a month ago** [the Snapdragon X Elite announced in October] is really a very modern architecture, bringing the strength of our phone platform to PCs.████████████████████████████ ██████████████████ ██ (Emphasis added).

[83]  Qualcomm Inc. presentation at Deutsche Bank 2023 Technology Conference, August 31, 2023, transcript published by S&P Global Market Intelligence, p. 8.

[84]  Manju Varma, "Snapdragon Compute Spotlight: Day 2 Livestream," at 36:40, YouTube, uploaded by Snapdragon October 25, 2023, https://www.youtube.com/live/dJcSaEbzQN0?si=bdIjMBVJvvabq4x5&t=2246.

[85]  Kedar Kondap, "At the intersection of intelligence and imagination: Rethink what's possible with Snapdragon X Elite," Qualcomm, October 25, 2023, https://www.qualcomm.com/news/onq/2023/10/rethink-whats-possible-with-new-snapdragon-x-elite-platform.

[86]  George Zhao, "Snapdragon Compute Spotlight: Day 2 Livestream," at 28:42, YouTube, uploaded by Snapdragon October 25, 2023, https://www.youtube.com/live/dJcSaEbzQN0?si=2r7Kb9iyuZz3KqOH.

[87]  ██████████████████████████████████████████

[88]  Qualcomm Inc. presentation at 2023 UBS Global Technology Conference, November 28, 2023, transcript published by S&P Global Market Intelligence, p. 7.

### V.C. Media Coverage of Qualcomm's Unlicensed Use of the Arm Brand and Trademarks Linked to Its Nuvia Products Both Demonstrates and Amplifies the Likelihood of Confusion

29. As I explained in my Opening Report, numerous third-party sources are using Arm's Trademarks to describe the Nuvia Products, and this use of the Arm Trademarks demonstrates that ". . . participants throughout the relevant industry are associating the Nuvia Products with Arm sponsorship and falsely assuming a licensing relationship exists between Arm and Qualcomm regarding the Nuvia Products."[89] Moreover, this use of the Arm Trademarks also amplifies "the confusion created by Qualcomm's own use by suggesting Arm sponsorship and endorsement of the Nuvia Products to an even broader audience."[90]

30. While Section V.A above adds to my Opening Report's examples of Qualcomm's misleading statements regarding the Snapdragon X Elite, this section adds to my Opening Report's examples of well-known trade publications that reflect Qualcomm's misstatements and identifies similar statements in analyst reports. The examples contained in these sources provide further support for my finding that Qualcomm's misstatements are likely to confuse customers by falsely suggesting connection to the Arm brand.[91] In contrast, Professor Steckel provides no support for his assertion that customers are unlikely to be confused by Qualcomm's misleading statements.[92]

---

[89]    Dhar Opening Report, ¶120.

[90]    Dhar Opening Report, ¶ 120. Section V. above provides additional examples of Qualcomm's misleading statements about the Snapdragon X Elite product.

[91]    I believe that the third-party press provides a good indication of how a sophisticated purchaser would interpret Qualcomm's misleading use of the terms "Arm-based" and "Arm-compliant" in its press releases. It was not feasible to survey B2B customers to assess their actual confusion because the product had not yet launched as of the filing date of my Opening Report, and no PCs powered by Snapdragon X Elite are expected to be released until mid-2024. "Qualcomm Unleashes Snapdragon X Elite: The AI Super-Charged Platform to Revolutionize the PC," Qualcomm, October 24, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-unleashes-snapdragon-x-elite--the-ai-super-charged-plat. ("PCs powered by Snapdragon X Elite are expected from leading OEMs starting mid-2024").

   I note that Professor Steckel also has not conducted any customer surveys to indicate that his interpretations of these terms are correct and that mine are not.

[92]    Steckel Rebuttal Report, ¶ 63. In addition to providing support for my finding that Qualcomm's misstatements are likely to confuse customers, these additional examples of media confusion provide further support for my finding that the confusion likely created by Qualcomm's own misuse of Arm's Trademarks is amplified by erroneous media coverage.

**V.C.1. The Third-Party Press Provides Numerous Examples Presenting the Snapdragon X Elite Processor as "Arm," "Arm-Based," and/or "Arm-Compliant."**

31. To identify additional examples of how the third-party press has referred to the Snapdragon X Elite, I used Dow Jones' Factiva database.[93] I searched the database for "All Sources," between October 24, 2023, and March 18, 2024, and reviewed the following:

   a. all articles that include the term "Snapdragon X Elite" and either the term "Arm" or "Arm-based" either in the headline or the article body;

   b. all articles that include the term "Snapdragon X Elite" in the headline, and either the term "Arm" or "Arm-based" in the headline or article body.

32. My analysis of this database indicates the following: [94]

   a. Out of 501 articles in the Factiva database that include the term "Snapdragon X Elite" 50% also include the term "Arm" (251), and 26% also include the term "Arm-based" (132).[95]

   b. Out of 95 articles in the Factiva database that include the term "Snapdragon X Elite" *in the article headline*, 58% also include the term "Arm" (55) *in the article body*, and 37% also include the term "Arm-based" (35) *in the article body*.[96]

33. As discussed in aggregate above, articles and publications in the media reporting on Qualcomm's Nuvia Products and Snapdragon X Elite have presented the product as Arm-based and/or Arm-compliant. These results highlight the significant connection of Qualcomm's Snapdragon X

---

[93] Factiva is a business intelligence database that includes content from 33,000 sources, including newspapers, magazines, journals, websites, blogs, and market research publications. *See* "What is Factiva?" *Dow Jones Factiva*, https://www.dowjones.com/professional/glossary/factiva/.

[94] Factiva, Dow Jones & Company, https://factiva.com.

[95] For example, Matthew S. Smith, "Grown-up Arm Chips Look to Dethrone x86 in Laptops," *IEEE Spectrum*, November 9, 2023, via Factiva on March 18, 2024 ("Qualcomm announced the Snapdragon X Elite, a system-on-a-chip (SoC) with a custom Arm architecture designed specifically for laptop PCs."), and Subhrojit Mallick, "Apple Launches New M3 Chips for Mac Laptops, Desktops. What Does This Mean for Users in India?" *The Economic Times,* October 31, 2023, via Factiva on March 18, 2024 ("Qualcomm unveiled the Snapdragon X Elite, an ARM-based chip designed for Windows laptops").

[96] For example, "Qualcomm's Snapdragon X Elite Chips Promise Major PC Performance," *PCWorld*, October 24, 2023, via Factiva on March 18, 2024 ("[A]fter buying chip designer Nuvia in 2021, Qualcomm is trying again, hoping that its superpowered Arm chips can once again make Windows on Arm PCs a competitor to conventional X86 PCs when they launch in mid-2024."), and Harry McCracken, "Qualcomm's Snapdragon X Elite Chip is a Big Bet on the PC's Future," *Fast Company,* October 24, 2023, via Factiva, March 18, 2024 ("Qualcomm—like Apple, Nvidia, Samsung, and others—licenses some of its core technology from Arm, then designs chips on top of it.").

*HIGHLY CONFIDENTIAL*

Elite processor with the Arm Trademarks and brand broadly exhibited by third-party media and press.

34. This is specifically demonstrated by the following examples:

a. *Qualcomm's Nuvia ARM chips to challenge Apple M-series won't arrive until late 2023*, Windows Central, April 29, 2022: "Qualcomm's Nuvia ARM CPUs will not ship in devices until late 2023."[97]

b. *Qualcomm Promises to Outplay Apple's M2 With Its Upcoming Arm Chips*, Tom's Hardware, June 9, 2022: "Qualcomm's goal is nothing short of claiming performance leadership in the personal computing CPU space with its Nuvia-powered Arm chips."[98]

c. *Apple Thunders Ahead With 90% Arm Notebook Market Share,* WCCFtech, June 18, 2022: "Despite its low share, Qualcomm continues to invest in notebook PC processors with its Nuvia CPU cores. We believe that Arm-based notebook PC processor offers an attractive opportunity to Qualcomm."[99]

d. *Qualcomm: Next Generation Nuvia-Based Snapdragon Allegedly Has Design Wins,* Tom's Hardware, November 4, 2022: "Furthermore, this shows their assurance of performance and competitive advantages that such computers may provide, which is a good sign both for Qualcomm and other designers of Arm-powered SoCs."[100]

e. *Qualcomm's Computer CPU Could Hit the Markets as Early As 2024: Report*, Digit, November 8, 2022: [101] "Qualcomm desktop CPU will use Nuvia's Phoenix core design, developed by engineers who have worked with Apple in developing its ARM-based chipset.

---

[97]   Sean Endicott, "Qualcomm's Nuvia ARM chips to challenge Apple M-series won't arrive until late 2023," *Windows Central*, April 29, 2022, https://www.windowscentral.com/qualcomms-nuvia-arm-chips-wont-arrive-until-late-2023.

[98]   Francisco Pires, "Qualcomm Promises to Outplay Apple's M2 With Its Upcoming Arm Chips," *Tom's Hardware*, June 9, 2022, https://www.tomshardware.com/news/qualcomm-promises-to-outplay-apples-m2-with-its-upcoming-arm-chips.

[99]   Ramish Zafar, "Apple Thunders Ahead With 90% Arm Notebook Market Share," *WCCFtech*, June 18, 2022, https://wccftech.com/apple-thunders-ahead-with-90-arm-notebook-market-share/.

[100]   Anton Shilov, "Qualcomm: Next Generation Nuvia-Based Snapdragon Allegedly Has Design Wins," *Tom's Hardware*, November 4, 2022, https://www.tomshardware.com/news/qualcomm-nuvia-based-snapdragon-due-in-2024-increases-design-wins.

[101]   Shikhar Mehrotra, "Qualcomm's computer CPU could hit the markets as early as 2024: Report," *Digit*, November 8, 2022, https://www.digit.in/news/general/qualcomm-computer-cpu-could-hit-the-markets-as-early-as-2024-report-65953.html.

[. . .] The Qualcomm 12-core chipset is expected to offer high performance. If that happens, it would be the first-time users can use ARM-based Windows computers based on Qualcomm's chipset."

f.   *Qualcomm's ARM-based 12-core Desktop CPU to be Unveiled in 2024: Report*, Business Standard, November 9, 2022: "The Phoenix core architecture from Nuvia, created by former Apple employees who worked on the company's existing ARM-based Apple CPUs, is reportedly what Qualcomm would adopt. [. . .] Either way, the report suggests that the performance is 'extremely promising' so might finally be a proper ARM-based Windows experience in the next couple of years, as per GSM Arena."[102]

g.   *Qualcomm names new CPUs Oryon, plans launch in 2023,* Telecompaper World, November 17, 2022: "The new name is expected to lead a further push into the Arm-based computing market, following the takeover of Nuvia in 2021."[103]

h.   *Qualcomm goes beyond the smartphone, shows off new hardware*, Techspot, November 18, 2022: "Qualcomm also announced the name—though no technical details—of its next-generation Arm-based CPU that they're going to call Oryon and hope to ship in 2023."[104]

i.   *Qualcomm testing its answer to Apple's M-series chips*, Times of India, December 30, 2022: "Qualcomm has been desperate to bring an ARM-based chip for Windows PCs to compete with Apple's M-series chips. Earlier this year, the chipmaker announced a new brand, 'Oryon,' a lineup of new CPUs meant for more powerful devices, made by Nuvia, a team of ex-Apple chip designers Qualcomm acquired last year, who happened to work on the M-series chip."[105]

---

[102] "Qualcomm's ARM-based 12-core desktop CPU to be unveiled in 2024: Report," *Business Standard*, November 9, 2022, https://www.business-standard.com/article/technology/qualcomm-s-arm-based-12-core-desktop-cpu-to-be-unveiled-in-2024-report-122110900025_1.html.

[103] "Qualcomm names new CPUs Oryon, Plans Launch in 2023," *Telecompaper World*, November 17, 2022, https://www.telecompaper.com/news/qualcomm-names-new-cpus-oryon-plans-launch-in-2023--1444584.

[104] Bob O'Donnell, "Qualcomm goes beyond the smartphone, shows off new hardware," *Techspot*, November 18, 2022, https://www.techspot.com/news/96696-qualcomm-goes-beyond-smartphone-shows-off-new-hardware.html.

[105] "Qualcomm testing its answer to Apple's M-series chips," *Times of India*, December 30, 2022, https://timesofindia.indiatimes.com/gadgets-news/qualcomm-testing-its-answer-to-apples-m-series-chips/articleshow/96621492.cms.

*HIGHLY CONFIDENTIAL*

j.  *Qualcomm developing its own ARM-based chips to rival Apple's M-series processors: Report,* Financial Express Online, December 31, 2022: "An ARM-based chip for Windows PCs has been aimed by Qualcomm to compete with Apple's M-series chips. The chipmaker announced a new brand earlier this year called 'Oryon'."[106]

k.  *Qualcomm's next round of PC chips will fight Apple under the name Snapdragon X*, The Verge, October 10, 2023: "Qualcomm says it has a new name for the next generation of its ARM PC platform: Snapdragon X. The platform is based on the Oryon CPU tech from its 2021 acquisition of Nuvia"[107]

l.  *Qualcomm to Take on Apple Silicon Chips with Snapdragon X Series for PCs*, Mac Rumors, October 10, 2023: "Snapdragon X chips will use the Qualcomm Oryon CPU, which is built on the chip technology that it got when it purchased Nuvia. Founded by ex-Apple chip designers, Nuvia designed custom Arm-based chips that are expected to bring Apple silicon-like performance to PCs with improved power and efficiency."[108]

m.  *Qualcomm Snapdragon X: Is 2024 finally the year for Arm-powered PCs?,* Laptop Magazine, October 12, 2023: "Ahead of Qualcomm's annual Snapdragon Summit, the company just announced details about its new Arm processors for PCs titled Snapdragon X. According to Qualcomm (via Ars Technica), Snapdragon X will include a new CPU architecture called Oryon, GPU cores, and an NPU that takes advantage of generative AI."[109]

n.  *Meet Snapdragon X Elite: Qualcomm Touts Big AI, Compute Gains on Arm Laptop CPUs,* PC World, October 24, 2023: "The broader 'Snapdragon X' is the follow-on to the company's Snapdragon 8cx, an Arm-based CPU line. . . Oryon (pronounced like 'Orion,' the

---

[106]  Ishita Banerjee, "Qualcomm developing its own ARM-based chips to rival Apple's M-series processors: Report," *Financial Express Online*, December 31, 2022, https://www.financialexpress.com/life/technology-qualcomm-developing-its-own-arm-based-chips-to-rival-apples-m-series-processors-report-2932738/.

[107]  Wes Davis, "Qualcomm's next round of PC chips will fight Apple under the name Snapdragon X," *The Verge*, October 10, 2023, https://www.theverge.com/2023/10/10/23911431/qualcomm-snapdragon-x-platform-oryon-cpu-windows-pc-apple-silicon.

[108]  Juli Clover, "Qualcomm to Take on Apple Silicon Chips With Snapdragon X Series for PCs," *Mac Rumors*, October 10, 2023, https://www.macrumors.com/2023/10/10/qualcomm-snapdragon-x/.

[109]  Sarah Chaney, "Qualcomm Snapdragon X: Is 2024 finally the year for Arm-powered PCs?" *Laptop Magazine*, October 12, 2023, https://www.laptopmag.com/laptops/qualcomm-snapdragon-x-is-2024-finally-the-year-for-arm-powered-pcs.

star system) in its initial offering is a 12-core Arm CPU core, custom-designed by Qualcomm."[110]

o.  *Qualcomm's Snapdragon X Elite Chips Promise Major PC Performance*, PC World, October 24, 2023: "But after buying chip designer Nuvia in 2021, Qualcomm is trying again, hoping that its superpowered Arm chips can once again make Windows on Arm PCs a competitor to conventional X86 PCs when they launch in mid-2024."[111]

p.  *New Qualcomm Snapdragon X Elite Has a Real Shot at The Laptop x86 Market*, Forbes, October 24, 2023: "And laptops are just the beginning of the road for the new Oryon CPU, which will become the primary Qualcomm Arm CPU for all devices".[112]

q.  *The Snapdragon X Elite is Qualcomm's most powerful chip to date*, Engadget, October 24, 2023: "The Arm-based Snapdragon X Elite is the successor to last year's Snapdragon 8cx Gen 3 line of laptop chips, which recently got a name change to reflect the huge leap in performance for this upcoming generation. Powered by 12 Oryon cores…."[113]

r.  *Intel's Turnaround Was Just Dealt a Devastating Blow*, The Motley Fool, October 26, 2023: "Qualcomm just released its new Arm PC chip Tuesday [. . .] Qualcomm looks to give everyone a run for their money, based on the specs for its new Snapdragon X Elite processor for Windows laptops, which it unveiled on Tuesday. These new chips should be available in Windows laptops sometime in 2024. The new system-on-chip processor contains Qualcomm's Oryon central processing unit, an Adreno graphics processor, a Hexagon neural (AI) processor, RAM memory, and other circuitry that makes PCs run."[114]

---

[110]  John Burek, "Meet Snapdragon X Elite: Qualcomm Touts Big AI, Compute Gains on Arm Laptop CPUs," *PC World*, October 24, 2023, https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-unveiled.

[111]  Mark Hachman, "Qualcomm's Snapdragon X Elite chips promise major PC performance," *PC World*, October 24, 2023, https://www.pcworld.com/article/2112907/qualcomm-snapdragon-x-elite-chips-promise-major-pc-performance.html.

[112]  Karl Freund, "New Qualcomm Snapdragon X Elite Has A Real Shot At The Laptop x86 Market," *Forbes*, October 24, 2023, https://www.forbes.com/sites/karlfreund/2023/10/24/new-qualcomm-snapdragon-x-elite-has-a-real-shot-at-the-laptop-x86-market/?sh=10430351526f.

[113]  Sam Rutherford, "The Snapdragon X Elite is Qualcomm's most powerful chip to date," *Engadget*, October 24, 2023, https://www.engadget.com/the-snapdragon-x-elite-is-qualcomms-most-powerful-chip-to-date-190004830.html.

[114]  Billy Duberstein, "Intel's Turnaround Was Just Dealt a Devastating Blow," *The Motley Fool*, October 26, 2023, https://www.fool.com/investing/2023/10/26/intels-turnaround-was-just-dealt-a-devastating-blo/.

s.   *Qualcomm Snapdragon X Elite Performance Preview: A First Look at What's to Come*, AnandTech, October 30, 2023: "Backed by Qualcomm's custom Arm CPU core, Oryon, the company is aiming to make the Snapdragon X Elite a watershed moment for the Snapdragon brand, both carving out a piece of the lucrative Windows laptop market. . . ."[115]

t.   *First Snapdragon X Elite benchmarks: Impressive gains over M2 Max, Ryzen 9 7940HS, Intel 13th gen-H, and 14th gen desktop CPUs*, NotebookCheck, October 30, 2023: "The X Elite uses ARM's 8.7 instruction set and its Adreno GPU offers full DirectX and OpenGL support, according to Qualcomm. [. . .] Overall, we see that the Snapdragon X Elite has excellent potential—one that the Windows on ARM platform has been sorely longing for all these years."[116]

u.   *Qualcomm Snapdragon X Elite Unveiled: ARM-based SoC for Windows-powered AI PCs*, Counterpoint Research, November 2, 2023: "Based on its brand-new ARM CPU core 'Oryon', developed from its Nuvia acquisition, Qualcomm's Snapdragon X Elite SoC is built on TSMC's 4nm process node. The CPU uses ARM's 8.7 instruction set and features 12 high-performance 'Oryon' cores clocked at 3.8GHz."[117] (Emphasis in original).

v.   *Chip wars are coming to PCs*, Financial Times, November 3, 2023: "Last week, mobile chipmaker Qualcomm unveiled an Arm-based PC chip of its own. It is the first chip based on designs from Nuvia, a start-up founded by some of Apple's top chip engineers that Qualcomm acquired two years ago, and a sign that a real technology race is breaking out in PC chips."[118]

w.   *Results are in: Qualcomm's Snapdragon X Elite goes toe-to-toe with Apple's new M3 Pro processor*, Windows Central, November 7, 2023: "Using Geekbench 6, which is a

---

[115]   Ryan Smith, "Qualcomm Snapdragon X Elite Performance Preview: A First Look at What's to Come," *AnandTech*, October 30, 2023, https://www.anandtech.com/show/21112/qualcomm-snapdragon-x-elite-performance-preview-a-first-look-at-whats-to-come.

[116]   Vaidyanathan Subramaniam and Alexander Fagot, "First Snapdragon X Elite benchmarks: Impressive gains over M2 Max, Ryzen 9 7940HS, Intel 13th gen-H, and 14th gen desktop CPUs," *NotebookCheck*, October 30, 2023, https://www.notebookcheck.net/First-Snapdragon-X-Elite-Benchmarks-Impressive-gains-over-M2-Max-Ryzen-9-7940HS-Intel-13th-gen-H-and-14th-gen-desktop-CPUs.763149.0.html.

[117]   "Qualcomm Snapdragon X Elite Unveiled: ARM-based SoC for Windows-powered AI PCs," *Counterpoint Research*, November 2, 2023, https://www.counterpointresearch.com/insights/qualcomm-snapdragon-x-elite-arm-based-soc-windows-ai-pc/.

[118]   Richard Waters, "Chip wars are coming to PCs," *Financial Times*, November 3, 2023, https://www.ft.com/content/c9731eb8-7213-4f51-bfa3-1c15b4581fc0.

*HIGHLY CONFIDENTIAL*

platform-neutral benchmarking app that can handle both x86 processors like Intel and AMD and ARM-based ones like Apple's M-series and Qualcomm Snapdragon, is one of the go-to benchmarks for laptops, desktop PCs, tablets, and even smartphones. [. . .] Pulling results from Geekbench leaderboards, we can understand how Apple's finalized M3 chips compare to Qualcomm's, which are still being optimized [. . .] You must give Qualcomm some credit here. The company is coming out with its first-gen Oryon processor, and not only does it do well against the M2 series, but it also competes very well against the new M3 and M3 Pro."[119]

x. *Grown-up Arm Chips Look to Dethrone x86 in Laptops: Qualcomm's Snapdragon X and Apple M3 show Arm architecture gaining ground,* IEEE Spectrum, November 11, 2023: "At the company's October 2023 Snapdragon Summit, Qualcomm announced the Snapdragon X Elite, a system-on-a-chip (SoC) with a custom Arm architecture"[120]

y. *Qualcomm Will Try to Have Its Apple Silicon Moment in PCs with "Snapdragon X"*, Ars Technica, November 11, 2023: "We should learn more about Qualcomm's high-end Arm chip later this month [. . .] The company hasn't shared many specifics yet, but yesterday we finally got a name: 'Snapdragon X,' which is coming in 2024, and it may finally do for Arm-powered Windows PCs what Apple Silicon chips did for Macs a few years ago".[121]

z. *Qualcomm claims Snapdragon X Elite Arm SoC is faster than Apple's M3*, Techspot, December 18, 2023: "Qualcomm recently announced the Snapdragon X Elite system-on-chip (SoC) device as a new laptop-class Arm processor".[122]

aa. *2024 could be the year the PC finally dumps x86 for Arm, all thanks to Windows 12 and Qualcomm's new chip*, PC Gamer, December 24, 2023: "We've already reported on

---

[119]   Daniel Rubino, "Results are in: Qualcomm's Snapdragon X Elite goes toe-to-toe with Apple's new M3 Pro processor," *Windows Central*, November 7, 2023, https://www.windowscentral.com/hardware/laptops/results-are-in-qualcomms-snapdragon-x-elite-goes-toe-to-toe-with-apples-new-m3-pro-processor.

[120]   Matthew S. Smith, "Grown-up Arm Chips Look to Dethrone x86 in Laptops: Qualcomm's Snapdragon X and Apple M3 show Arm architecture gaining ground," *IEEE Spectrum*, November 09, 2023, https://spectrum.ieee.org/qualcomm-snapdragon.

[121]   Andrew Cunningham, "Qualcomm will try to have its Apple Silicon moment in PCs with 'Snapdragon X'", *Ars Technica*, October 11, 2023, https://arstechnica.com/gadgets/2023/10/qualcomm-will-try-to-have-its-apple-silicon-moment-in-pcs-with-snapdragon-x/.

[122]   Alfonso Maruccia, "Qualcomm claims Snapdragon X Elite Arm SoC is faster than Apple's M3," *Techspot*, December 18, 2023, https://www.techspot.com/news/101246-qualcomm-claims-snapdragon-x-elite-arm-laptop-soc.html.

*HIGHLY CONFIDENTIAL*

Qualcomm's new 12-core Arm uberchip, the Snapdragon X Elite, and its claims of x86-beating performance and efficiency. But it takes two to tango when it comes a major transition like moving from x86 CPUs to Arm chips."[123]

bb.  *Early Snapdragon X Elite benchmark shows Arm CPU is faster than AMD's top-end mobile APU,* Tom's Hardware, February 25, 2024: "The Snapdragon X Elite is highly anticipated as it should be Qualcomm's fastest Arm chip ever, featuring 12 Oryon cores developed by Nuvia, which Qualcomm acquired in January 2021."[124]

cc.  *Qualcomm Snapdragon X Elite "X1E80100" CPU Gets Geekbenched*, TechPowerup, February 26, 2024: "Last October, Qualcomm introduced Snapdragon X Elite as its most powerful computing processor for PC, but the ARM-based mobile solution is still months away from launch. [. . .] Geekbench Browser's "CPU Information" section identifies the alleged high-end Snapdragon X Elite processor as an "ARMv8 (64-bit) Family 8 Model 1 Revision 201" part. Average clock speeds were listed as 4.01 GHz (base frequency). Cluster 1 seems to contain eight Nuvia-designed Oryon processor cores, while Cluster 2 receives the remaining four units."[125]

dd.  *Snapdragon X Elite flexes AI muscles and destroys Intel Core Ultra 7 CPU in image creation head-to-head*, TechRadar, February 27, 2024: "The Snapdragon X Elite is an ARM-based chip as well, and having such silicon powering your laptop, as opposed to an x86 Intel CPU, does have some clear downsides. [. . .] And if the leaks, and indeed Qualcomm's own pre-release benchmark claims, are correct, this is a CPU that could be a genuine rival to Apple's (also ARM-based) M3 silicon for raw performance."[126]

---

[123]  Jeremy Laird, "2024 could be the year the PC finally dumps x86 for Arm, all thanks to Windows 12 and Qualcomm's new chip," *PC Gamer*, December 24, 2023, https://www.pcgamer.com/2024-could-be-the-year-the-pc-finally-dumps-x86-for-arm-all-thanks-to-windows-12-and-qualcomms-new-chip/.

[124]  Matthew Connatser, "Early Snapdragon X Elite benchmark shows Arm CPU is faster than AMD's top-end mobile APU," *Tom's Hardware*, February 25, 2024, https://www.tomshardware.com/pc-components/cpus/early-snapdragon-x-elite-benchmark-shows-arm-cpu-is-faster-than-amds-top-end-mobile-apu.

[125]  "Qualcomm Snapdragon X Elite "X1E80100" CPU Gets Geekbenched," *TechPowerup*, February 26, 2024, https://www.techpowerup.com/319630/qualcomm-snapdragon-x-elite-x1e80100-cpu-gets-geekbenched.

[126]  Darren Allan, "Snapdragon X Elite flexes AI muscles and destroys Intel Core Ultra 7 CPU in image creation head-to-head," *TechRadar*, February 27, 2024, https://www.techradar.com/computing/cpu/snapdragon-x-elite-flexes-ai-muscles-and-destroys-intel-core-ultra-7-cpu-in-image-creation-head-to-head.

### V.C.2. Financial Analyst Reports Also Describe the Snapdragon X Elite Processor as "Arm," "Arm-Based," and/or "Arm-Compliant."

35. Financial analyst reporting on the development and launch of Qualcomm's Snapdragon X Elite product have also presented such products as "Arm-based" and/or "Arm-compliant" in their communications. In some cases, the analyst reporting was based on meetings with Qualcomm executives and/or investor relations where the Qualcomm representatives evidently continued their use of the Arm Trademarks.

a. In February 2023, J.P. Morgan Chase analysts met with Qualcomm investor relations and subsequently issued a report amplifying Qualcomm's pre-announcement "Arm-based" communications about the Nuvia Products, seeing a perceived upside for Qualcomm in the Arm-based PC market:

    i. "ARM-based chipset, Oryon, to start adding meaningful revenues in CY24: **Qualcomm's ARM-based chipset, Oryon,** is expected to compete head-on with Apple's M series processors, through which Apple has already proved market readiness for ARM-based processors and has successfully driven market share gains."[127] (Emphasis added).

b. In May 2023, J.P. Morgan analysts met with Akash Palkhiwala, Qualcomm Chief Financial Officer. Palkhiwala continued Qualcomm's pre-announcement use of the Arm Trademarks in connection to the upcoming Nuvia Products, leading J.P. Morgan to amplify this use in their subsequent report:

    i. "**Qualcomm highlighted that its custom ARM CPU, designed by the Nuvia team**, is expected to launch in 2024 concurrent with the typical pace of PC product launches."[128] (Emphasis added).

c. Following Qualcomm's October 2023 Snapdragon X Elite announcement, numerous financial analysts again echoed Qualcomm's "Arm-based" communications from the announcement and thereafter. For example:

---

[127] Samik Chatterjee et al., "Qualcomm: F1Q23 Earnings Follow-Up Meeting Takeaways," J.P. Morgan North American Equities Research, February 09, 2023.

[128] Samik Chatterjee and Joseph Cardoso, "Qualcomm: J.P. Morgan TMC Conference Takeaways – Alert," J.P. Morgan North American Equities Research, May 22, 2023.

*HIGHLY CONFIDENTIAL*

i.  Rosenblatt Securities, October 25, 2023: "**The Snapdragon X Elite is a 4nm SoC with 12 Qualcomm Oryon (custom Arm-based) CPU cores**, upgraded Adreno GPU, Hexagon NPU (AI processor) [. . .] **The Oryon custom Arm-based CPU** was developed by the Nuvia engineering team Qualcomm acquired Nuvia in 2021. [. . .] Starting with Microsoft designing Windows 11 to run natively on Arm-based processors, we see an opening for Arm-based CPUs to accelerate PC market share gains. In our view, Qualcomm's high volume, highly integrated, highly connected Snapdragon SoC platform as making breakthroughs in the mobile PC market."[129] (Emphasis added).

ii.  Wolfe Research, October 25, 2023: "**QCOM announced a new Arm-based CPU product using Nuvia's Oryon cores, called the Snapdragon X Elite** SoC. [. . .] We expect CY24 to represent a period of exclusivity for QCOM in the Arm PC market".[130] (Emphasis added).

iii.  HSBC, November 2, 2023: "We also believe Qualcomm has a strong product portfolio in edge AI with its next generation smartphone SoC platform, Snapdragon 8, and **the ARM-based PC CPU, Snapdragon X Elite**, could be also led to further upside relative to market expectations in FY24e."[131] (Emphasis added).

iv.  Wells Fargo Equity Research, November 20, 2023: "As demonstrated by Qualcomm's recent launch of its **Oryon Arm cores** and SnapDragon X Elite processors, to use one example, semiconductor companies are clearly making a push to differentiate smartphone, tablets and PC processors. . ."[132]

v.  J.P. Morgan, November 8, 2023: "The increasing discussion around on-device AI has led investors to focus on the **steppingstones required to eventually enable the ARM opportunity in PCs** outside of Apple as well as eventually Qualcomm cementing a position in the market. The management team highlighted the following milestones for

---

[129]   Kevin Cassidy, "Snapdragon X Elite Delivers Gen AI to PCs," Rosenblatt Securities, October 25, 2023.

[130]   Chris Caso, Liz Pate, and Nicholas Welsch-Lehmann, "Takeaways from QCOM Snapdragon Summit," Wolfe Research, October 25, 2023.

[131]   Frank Lee and Pulkit Aggarwal, "Buy: Improving smartphone outlook in-line with our view; room for more upside," HSBC Global Research, November 2, 2023.

[132]   Gary Mobley and Travis Poulin, "ARM: From a Tiny Acorn to Tall Oak; Initiating Coverage," Wells Fargo Equity Research, November 20, 2023.

investors to look to: 1) **the already announced Snapdragon X Elite** launch. . .".[133] (Emphasis added).

vi. Rosenblatt Securities, January 24, 2024 "**The X Elite, which includes the Arm-based Orion [sic] CPU**, will have a presence in enterprise notebook PCs. . .The long-awaited Snapdragon X Elite featuring the Oryon CPU and upgrade Hexagon NPU is expected to be found in PCs in mid-2024.We remain positive on the IoT segment to drive diversification."[134] (Emphasis added).

vii. HSBC, February 1, 2024: "We believe an important potential catalyst for Qualcomm for further re-rating will be its upcoming **Arm-based AI CPU, Snapdragon X Elite**, to be used in AI PCs."[135] (Emphasis added).

### V.D. Professor Steckel's Assertions Do Not Refute My Findings Regarding Likelihood of Confusion

#### V.D.1. Professor Steckel Fails to Address Qualcomm's Stand-Alone Use of the Term "Arm" and Baselessly Asserts that the Terms "Arm-Based" and "Arm-Compliant" Refer Only to the Technical Attributes of a Chip

36. I have already noted that Professor Steckel never addresses Qualcomm's stand-alone use of the term "Arm" to describe its Nuvia Products.[136] In addition, he asserts without any basis that the terms "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[137]

37. Professor Steckel's flawed assertions are contradicted by the numerous examples discussed at length above. As I explain in my Opening Report and in Section V above, Qualcomm's use of these terms is likely to mislead other relevant industry participants into believing that there is a

---

[133] Samik Chatterjee, Joseph Cardoso, and Priyanka Thapa, "Qualcomm Key Takeaways from CEO and CFO Meeting," J.P. Morgan, November 8, 2023.

[134] Kevin Cassidy, "Earnings Preview: First Inning of Smartphone Upgrade Cycle," Rosenblatt Securities, January 24, 2024.

[135] Frank Lee and Pulkit Aggarwal, "Buy: 1Q24 Beat; soft 2Q24 outlook from seasonality," HSBC Global Research, February 1, 2024.

[136] Although Professor Steckel asserts that in my Opening Report, I identified only two examples of Qualcomm using the stand-alone "Arm" modifier, Section V.B. above highlights several other instances in which the stand-alone "Arm" modifier is used by Qualcomm in connection with the Snapdragon X Elite.

[137] Steckel Rebuttal Report, ¶ 66. *See also*, Steckel Rebuttal Report, ¶ 85.

connection to Arm's brand. Thus, neither Professor Steckel's failure to recognize Qualcomm's unlicensed use of the stand-alone "Arm" modifier, nor his unsupported attempt to redefine the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ change my opinion on this matter.

### V.D.2. Professor Steckel Provides No Support for His Claim that Qualcomm's Use of "Arm-based" and Other Phrases Constitutes Permissible "Referential Use."

38. Although Professor Steckel claims that Qualcomm's use of the terms "Arm-based" and other similar phrases is permissible "referential use," it is my understanding that his purported support for these claims is based on a misreading of Arm's Trademark Use guidelines. In particular, Professor Steckel mischaracterizes that "Arm's own publicly available Trademark Use guidelines. . . explicitly instructs third parties to describe their products as 'Arm-based' in order to accurately describe the relationship between the third-party technology and Arm's technologies."[138] In fact, it is my understanding that the Trademark Guidelines do not "instruct" third parties to describe their products as "Arm-based," as Professor Steckel suggests. Moreover, Qualcomm's use does not fall within the Guidelines, and Professor Steckel provides no relevant support for his assertions that the terms "Arm-based" and "Arm-compliant" mean anything other to industry participants than what I explained in Section V.A[139]

39. Instead, it is my understanding that the Trademark Guidelines state that "You may refer to Arm-based products by using the word '-based' between the relevant Arm trademark and the relevant third-party product. In this situation, you may use any appropriate noun after the word

---

[138]   Steckel Rebuttal Report, ¶ 84.

[139]   For example, Professor Steckel appears to misinterpret the testimony of Mr. Simon Segars and Arm's own 2023 F-1 filing to incorrectly speculate that "software designers refer to their technology written to interoperate on Arm technologies as 'Arm-based.'" (*See* Steckel Report, ¶85 and fn. 132) A review of these sources suggests that Mr. Segars' statement only qualifies his understanding of an "Arm-based server chip" to represent "a silicon chip for use in servers that would execute the Arm. . .[a]rchitecture [that] does go beyond the instruction set architecture." (Deposition of Simon Segars, November 16, 2023, 39:25-40:6.) In addition, Professor Steckel also appears to misinterpret a passage from Arm's own 2023 F-1 that says nothing about how software developers refer to their technology written to interoperate on Arm, and simply highlights the global popularity and pervasiveness of the Arm CPU and the Arm ISA. (*See* ARM-01259705 at -9825.) Similarly, Professor Steckel misquotes Mr. Armstrong's testimony in which Mr. Armstrong neither mentions anything about "software designers that describe their software as 'Arm-based,'" nor does it have any relevance for what the terms "Arm-based" and "Arm-compliant" mean to industry participants. (*See* Steckel Report, ¶ 85 and fn. 136).

'-based' if it is **accurate, fair, and not misleading and it complies with these guidelines**." (Emphasis added.)[140]

40. Thus, contrary to Professor Steckel's assertions, it is my understanding that Qualcomm's use of "Arm-based" in connection with Nuvia Products is not "accurate, fair, and not misleading." As described in my Opening Report, Qualcomm's use of "Arm-based" and "Arm-compliant," among other phrases, likely creates confusion for customers by falsely signaling that these unlicensed products have a connection to Arm's brand and/or have been licensed, verified and validated by the Arm brand, particularly since Qualcomm is an Arm partner with respect to other products.

41. Contrary to Professor Steckel's assertions, numerous examples show that Qualcomm's unauthorized use of the Arm Trademarks to describe the ███████████████ mirrors its authorized use of the Arm Trademarks to describe other, ██████████████ ████ █████████████████████████████ ██████████ █

   a. ██████████████████████████ ███████████████████████████ ████████████████ █



---

[140] *See* QCARM_7517739 – 744 at 741 ("Arm Trademark Use Guidelines") (emphasis added). Moreover, it is my understanding that this is the case, whether the license is ALA or TLA—i.e., neither type of license provides a general right to use the ARM Marks. Thus, the ALA licenses to implement Arm designs in a custom ████ ████████████—have clauses requiring the licensee to follow Arm's explicit "Trademark Guidelines," specifying how the Arm mark can be used in promotion and technical documentation. Accordingly—and contrary to Professor Steckel's contention—██████████████████████████████

[141] ████████████████████████████████████████████████

[142] "Snapdragon Fact Sheet," *Qualcomm*, accessed March 22, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon_Fact_SheetJune.pdf,

Continued next page.

b. 

42. Professor Steckel also asserts, incorrectly and without adequate support, that "Qualcomm. . . can. . . refer to Arm's products and services in describing their own products and services without (falsely) signifying affiliation or approval between them."[145] Professor Steckel does not contend with the likelihood of confusion, nor does he explain why Qualcomm's mention of Arm, Arm-based, or Arm-compliant in connection with unlicensed products (that Arm has filed a lawsuit to enjoin Qualcomm's use and sale of such products) fails to signify affiliation with the Arm brand. Again, Professor Steckel fails to engage with what I understand to be the Trademark Guidelines' limitation to use that is "accurate, fair, and not misleading." In sum, it is my understanding that Qualcomm's use of "Arm-based" and other phrases is not permissible "referential use," but is infringing use that is likely to confuse customers and cause harm to Arm.

---

and "Enabling the rise of the smartphone: Chronicling the developmental history at Qualcomm," *Qualcomm Technologies, Inc*, December 10, 2020, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/presentation_-_enabling_the_rise_of_the_smartphone_-_web.pdf81.pdf.

[143]   "Qualcomm Snapdragon 600 Processor APQ8064 Data Sheet," *Qualcomm Technologies, Inc*, February 2016, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/snapdragon_600_apq_8064_data_sheet.pdf, and "Qualcomm Snapdragon 600E Embedded Platform," *Qualcomm Technologies, Inc*, accessed March 22, 2024, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/snapdragon-600e-product-brief_87-pc346-1-c_0.pdf.

[144]   "Qualcomm Begins Commercial Sampling of World's First 10nm Server Processor and Reshapes the Future of Datacenter Computing," *Qualcomm*, December 6, 2016, https://www.qualcomm.com/news/releases/2016/12/qualcomm-begins-commercial-sampling-worlds-first-10nm-server-processor-and and "Meet Qualcomm Centriq 2400, the world's first 10-nanometer server processor," *Qualcomm*, December 6, 2016, https://www.qualcomm.com/news/onq/2016/12/meet-qualcomm-centriq-2400-worlds-first-10-nanometer-server-processor, and Barry Wolford, Thomas Speier, and Dileep Bhandarkar, "Qualcomm Centriq 2400 Processor," *Qualcomm*, August 22, 2017, p. 14, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm_centriq_2400_hotchips_final_0.pdf.

[145]   Steckel Report, ¶ 84.

*HIGHLY CONFIDENTIAL*

### V.D.3. Professor Steckel Misinterprets My Prior Use Examples and Wrongly Asserts that My Likelihood of Confusion Analysis Is Based on Historical Information

43. According to the Steckel Rebuttal Report, my conclusion that Qualcomm's use of the Arm Trademarks is likely to create confusion "is partly based on the examples of Qualcomm's prior use of the Arm Trademarks in connection with [non-ALA-licensed] CPU cores, rather than Qualcomm's [ALA-licensed] custom cores."[146] Contrary to Professor Steckel's assertions, however, the likelihood of confusion analysis in my Opening Report is *not* based on Qualcomm's prior use of the Arm Trademarks. Instead, it is based directly on Qualcomm's actual communications describing the Nuvia Products using the Arm brand, including Qualcomm's various public statements, and third-party media mentions.[147]

44. Moreover, as I explain below, another reason that Qualcomm's misstatements about the Snapdragon X Elite are likely to confuse customers is that Qualcomm uses the same Arm Trademarks in describing both (i) *unlicensed* Nuvia Products and (ii) *Arm-licensed* products that are like *unlicensed* Nuvia Products.

### V.D.3.a. Professor Steckel Incorrectly Claims that my Examples of Qualcomm's Use of the Arm Trademarks Are Misplaced

45. Professor Steckel incorrectly asserts that Qualcomm's use of the Arm Trademarks to describe the ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ As I explain below, Professor Steckel is incorrect for three reasons. *First*, the terms "Arm-based" and

---

[146]   Steckel Report, ¶ 64.

[147]   *See, e.g.*, Dhar Opening Report, ¶ 14 ("Qualcomm's prior history and usage of Arm's Trademarks [. . .] demonstrate a high likelihood that Qualcomm will continue to use Arm's Trademarks in connection with its future products, particularly Nuvia Products."). *See also*, Dhar Opening Report, ¶ 15 ("I also understand from the materials I reviewed that Qualcomm has used Arm's Trademarks in connection with its future Nuvia Products [. . .] Qualcomm's use of Arm's Trademarks is likely to cause customer confusion. Thus, Qualcomm's unauthorized use of the Arm Mark for Nuvia Products is likely to mislead customers and other relevant industry participants into believing that there is some connection as to source, affiliation, sponsorship, or approval between Arm and Qualcomm.").

"Arm-compliant" communicate a connection to the Arm brand regardless of the product type.[148] **Second**, Qualcomm uses these terms correctly to describe both its TLA-licensed and ALA-licensed products in a similar manner.[149] **Third**, 

### V.D.4. Contrary to the Assertions of Professor Steckel, Qualcomm's Communication and Description of the Snapdragon X Elite Processor as "Arm," "Arm-Based," and/or "Arm-Compliant" Is Likely to Confuse Customers Regardless of Their Sophistication or Efforts to Exercise a Higher Degree of Care

46. I agree with Professor Steckel that many B2B customers exercise a higher degree of care (time and effort) when making a purchasing decision.[151] However, I disagree that exercising greater care would make clear that there is no connection between the Nuvia Products and Arm. **First**, as discussed at length above, Qualcomm frequently (and inaccurately) refers to the Nuvia Products as being Arm, Arm-based, and/or Arm-compliant. Because customers are likely to view Qualcomm as a reputable company, they will have little reason to question its claims.[152] **Second**,

---

[148]   As explained in my Opening report and in Section V.A above, the terms

[149]   Contrary to Professor Steckel's assertion—and as I show in numerous examples—Qualcomm uses these terms correctly to describe both its TLA-licensed and its ALA-licensed products. Such demonstrated and authorized use of the terms "Arm-based" and "Arm-compliant" by Qualcomm is consistent with the meaning communicated to industry participants by these terms as explained in my Opening Report and in Section V.

[150]   Professor Steckel asserts that the "Dhar Report inappropriately assumes that past usage indicates future usage, particularly under different circumstances," in part because it cites to "Qualcomm's prior use of the Arm Trademarks in connection with Arm-built CPU cores, rather than Qualcomm's custom-designed cores" (Steckel Report, ¶¶ 64-65.)

[151]   In fact, in my Opening Report, I explained that buyers in the B2B market are more sophisticated than general consumers, noting that "the degree of expertise among buyers and the often complex buying process at many firms means that many B2B brands emphasize the performance benefits and tangible points of differentiation of the product, the reduction of risk associated with choosing the brand, relative to many B2C brands. . . ." (Dhar Opening Report, ¶ 96.)

[152]   *See, e.g.*, Philip Kotler and Kevin Lane Keller, *Marketing Management*, 15th ed., (Pearson, 2016), p. 209 ("Trust is a firm's willingness to rely on a business partner. It depends on several interpersonal and interorganizational factors, such as the firm's perceived competence, integrity, honesty, and benevolence. Personal interactions with

Continued next page.

 This creates a further reason to believe that customers are likely to falsely believe that there is connection to the Arm brand and/or the Nuvia Products are ███████████████████████████ ***Third,*** the third-party press also frequently refers to the Nuvia Products as being Arm, Arm-based, and/or Arm compliant. As explained above, this press coverage demonstrates that sophisticated market participants are likely to be confused by Qualcomm's unlicensed use of these terms. Moreover, the third party press' misuse of these terms broadens the encounter of Qualcomm's infringing actions even when Qualcomm itself may discontinue such usage. Thus, it is my opinion that customers are likely to be confused by Qualcomm's misstatements.

### V.D.5. Contrary to the Assertions of Professor Steckel, It Is Not Necessary to Demonstrate Actual Confusion

47. Professor Steckel appears to suggest that my conclusion is not sufficiently substantiated because I did not show evidence of actual confusion. However, it is my understanding that there was no requirement to show actual confusion because (i) the Nuvia Products have not yet been launched and (ii) there is a wealth of available materials that point to the likelihood of confusion in various ways. Moreover, I believe that even an analysis of customers after the launch of the Snapdragon X Elite may not be particularly informative. This is because a customer purchasing a Qualcomm product will not be alerted to the lack of actual connection between Qualcomm's product and Arm's brand through their purchase experience. In fact, nothing about the customer's purchase experience would signal to them that they are not in fact purchasing an Arm-licensed product.

48. Moreover, the analysis contained in my Opening Report demonstrating a likelihood of confusion was (i) well-substantiated; (ii) based on standard, commonly accepted methodology; (iii) and is consistent with other peer-reviewed work. In conducting this analysis, I reviewed extensive

---

employees of the firm, opinions about the company as a whole, and perceptions of trust will evolve with experience."); Michael Pirson, Kirsten Martin, and Bidhan Parmar, "Public Trust in Business and Its Determinants," *Business & Society* 58(1) (2019): 132-166; Arjun Chaudhuri and Morris B Holbrook, "The Chain of Effects from Brand Trust and Brand Affect to Brand Performance: The Role of Brand Loyalty," *Journal of Marketing* 65(2) (2001): 81–93; Sandra J. Suchar and Shalene Gupta, "The Trust Crisis," *Harvard Business Review*, July 16, 2019, https://hbr.org/2019/07/the-trust-crisis?ab=seriesnav-bigidea.

*HIGHLY CONFIDENTIAL*

materials related to this matter and formulated opinions based on those materials, in accordance with accepted academic principles regarding the concept of a brand, including strong and distinctive brand identity, and the role of brand image for B2B relationships. I also analyzed extensive materials regarding Qualcomm's past and current usage of the Arm Trademarks and third-party mentions of the Arm Trademarks related to Qualcomm's Nuvia Products. Based on those materials, I applied commonly-accepted criteria for evaluating brand strength and impact on a brand to address "[w]hether Qualcomm's unlicensed use of the Arm Trademarks in connection with 'Nuvia Products'. . .would likely result in confusion. . .[and] is likely to cause harm by impacting the brand or result in loss of sales by Arm."[153] Based on my extensive research and analysis, and drawing from my expertise, I reached the conclusion that Qualcomm's use of the Arm Trademarks is likely to result in customer confusion, and—as discussed in Section VI—harm to Arm, including its brand.

49.   The analysis contained in my Opening Report demonstrating a likelihood of confusion also draws on my extensive experience and qualifications. I am qualified to opine on the impact of Qualcomm's use of the Arm Trademarks and the impact of such use on Arm's brand from the perspective of a skilled branding expert and educator. As described in my Opening Report, I have experience and specialized knowledge in the field of branding and marketing. I teach several courses at Yale University's School of Management on consumer behavior and marketing. I hold a Ph.D. and Master of Science in Business Administration from the University of California at Berkeley. Moreover, I have published more than 90 papers in journals, proceedings, as book chapters, and in leading marketing, psychology, and management journals on consumer psychology, research, marketing research and science, and other related topics.

50.   Professor Steckel's contention that "the unique context of B2B transactions" undermines my assessment of "the likely confusion caused by Qualcomm's use of the term 'Arm-based' or 'Arm-compliant'" is likewise baseless.[154] As noted above, Professor Steckel repeatedly states that a false designation—stating "Arm" or "Arm-based"—would be unlikely to cause sophisticated consumers to believe that there is a connection between the Nuvia Products and the Arm brand, and/or that they are licensed, verified, or validated by Arm. These assertions are not

---

153   Dhar Opening Report, ¶ 9.
154   Steckel Rebuttal Report, ¶ 70.

*HIGHLY CONFIDENTIAL*

supported, particularly in this matter where Qualcomm is using the exact mark "Arm," as well as the modifiers "Arm-based" and "Arm-compliant." Thus, as I opined in my Opening Report, "Qualcomm's unauthorized use of the Arm Mark for Nuvia Products is likely to mislead customers and other relevant industry participants into believing that there is some connection as to source, affiliation, sponsorship, or approval between Arm and Qualcomm."[155]

51.   Further, my Opening Report expressly contemplated the differences between B2B and B2C markets when arriving at the conclusion that Qualcomm's unauthorized use of the Arm Trademarks is likely to cause confusion and harm. I articulated that buyers in the B2B market are more sophisticated than general consumers, noting that "the degree of expertise among buyers and the often complex buying process at many firms means that many B2B brands emphasize the performance benefits and tangible points of differentiation of the product, and the reduction of risk associated with choosing the brand, relative to many B2C brands."[156] As I stated in my Opening Report, Arm is an important element of the Nuvia Products, and the sophistication of customers in the B2B market will not eliminate the effect of a false designation. Moreover, to the extent that customers think that the Nuvia Products have a connection to the Arm brand and/or are licensed, verified, or validated by Arm, it is likely that sales will be diverted from other products that are, in fact, properly developed under an Arm license. For these reasons, Qualcomm's unauthorized use of the Arm Trademarks is likely to cause confusion in the B2B market.

52.   It is also important to recognize that Professor Steckel did not conduct a survey to support his own opinion that there is *not* likely to be confusion. He merely asserts that my opinions "that consumers are being confused, or are highly likely to be confused, are unsupported by any evidence, empirical or otherwise, and cannot be relied upon."[157] These assertions with regard to likelihood of confusion are baseless, and Professor Steckel notably did not conduct a consumer survey despite contending that my conclusions are unsupported without one.

---

[155]   Dhar Opening Report, ¶ 15.
[156]   Dhar Opening Report, ¶ 96.
[157]   Steckel Rebuttal Report, ¶ 91.

*HIGHLY CONFIDENTIAL*

**VI. Qualcomm's Unlicensed Use of the Arm Trademarks Is Likely to Result in Harm, and Professor Steckel Fails to Provide any Evidence to the Contrary**

**VI.A. I Used Well-Established Principles to Determine that Qualcomm's Unlicensed Use of the Arm Trademarks is Likely to Result in Harm**

53.    I have already demonstrated that Qualcomm's unlicensed use of the Arm Trademarks is likely to confuse customers. As explained in my Opening Report, "[t]he use of the familiar and trusted Arm brand will enable Qualcomm to communicate that the Nuvia Products are licensed and have been verified and validated by Arm, thereby facilitating acceptance and adoption of such products, and enabling Qualcomm to access the broad marketplace associated with the Arm ecosystem. Thus, by using the Arm Trademarks without Arm's permission, Qualcomm will draw on the equity of the Arm Mark to increase the likelihood of acceptance of its products."[158]

54.    Moreover, I rely upon my credentials and experience as a marketing expert, along with established principles in the field of academic marketing, to determine that Qualcomm's unlicensed use of the Arm Trademarks is likely to result in harm. As I explain in my Opening Report, Qualcomm's unlicensed use of the Arm Trademarks will cause harm to Arm through two separate channels.[159]

   a.    ***First,*** Qualcomm's unlicensed use of the Arm Trademarks will cause Arm to lose control of its brand and goodwill. Qualcomm's unlicensed use of the Arm Trademarks to describe the Nuvia Products links the Arm brand to both Qualcomm and the Nuvia Products, which is not under Arm's control. Through this linkage, any negative attributions and inferences associated with Qualcomm and/or the Nuvia Products can spillover to Arm. In fact, academic literature establishes that, in instances where two companies partner on a co-branding or

---

[158]    Dhar Opening Report, ¶ 126.

[159]    Dhar Opening Report, ¶¶ 127-132. I also state in my Opening Report that ███████████ ████████████████████████████████████████████████████████ ██████ (Dhar Opening Report, ¶ 133). Supporting this finding, I explain in my Opening Report and in Section IV above that Arm's processors and business model offer unique customer benefits, which is further indicated by Arm's sales success and renown. *See, e.g.*, Dhar Opening Report, Sections VI.A, VI.C.1, and VIII.B.

composite branding strategy, negative experiences with the co-branded product or one of the partner brands can result in negative spillovers to the other partner brand.[160]

b. ***Second,*** Qualcomm's unlicensed use of the Arm Trademarks will likely influence purchase of Qualcomm's Nuvia Products (because of their purported connection to the Arm brand, including a license, verification, or validation from Arm) rather than products from legitimate Arm licensees. This can be expected to harm Arm by placing downward pressure on its licensing revenues. The academic literature explains how this diversion of sales could occur. Consumer purchase decisions are influenced by points-of-difference ("PODs") and points-of-parity ("POPs"). PODs are "attributes or benefits that consumers strongly associate with a brand, positively evaluate, and believe they could not find to the same extent with a competitive brand."[161] In contrast, POPs are "attribute or benefit associations that are not necessarily unique to the brand but may in fact be shared with other brands."[162] In the current matter, legitimate Arm licensees are not able to benefit from the Arm Trademarks as a POD when Qualcomm falsely uses the Arm brand to describe the Nuvia Products. Instead, the Arm Trademarks become a POP between legitimate Arm licensees and Qualcomm. By losing a key POD, legitimate Arm licensees are likely to lose sales to Qualcomm.

### VI.B. Professor Steckel Provides No Evidence that Contradicts My Finding of Harm

55. Although Professor Steckel asserts that my conclusions about harm to Arm's brand and goodwill are unsupported, he provides no evidence that contradicts my finding of harm and makes a number of incorrect and/or irrelevant claims.[163] As an initial matter, he asserts that I have not put forward any empirical evidence to suggest that Qualcomm's unlicensed use of the Arm Trademarks would have an effect on Arm's brand and goodwill.[164] However, he fails to recognize that I cannot provide evidence of actual harm to Arm's brand and goodwill—nor am I

---

[160] *See, e.g.*, Bernard L. Simonin and Julie A. Ruth, "Is a Company Known by the Company It Keeps? Assessing the Spillover Effects of Brand Alliances on Consumer Brand Attitudes," *Journal of Marketing Research* 35(1) (1998): pp. 30-42; Aron M. Levin, J. Charlene Davis, and Irwin Levin, "Theoretical and Empirical Linkages Between Consumers' Responses to Different Branding Strategies," *Advances in Consumer Research* 23 (1996): pp. 296-300.

[161] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 15th ed., (Pearson, 2016), p. 300.

[162] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 15th ed., (Pearson, 2016), p. 302.

[163] *See generally*, Steckel Rebuttal Report, Section VI.A.

[164] Steckel Reply Report, ¶ 95.

required to do so—because the launch of the Nuvia Products has not yet occurred.[165] Moreover, I have provided ample evidence indicating that the third-party press has been confused by Qualcomm's repeated and false assertions that the Snapdragon X Elite is "Arm-based" and/or "Arm-compliant."[166]

56. In his attempt to refute my conclusions about harm to Arm's brand and goodwill, Professor Steckel also raises the following two irrelevant points.

    a. ***First,*** Professor Steckel asserts that there is a perception within the industry that Qualcomm's custom cores have performed better than Arm-built cores and are likely to be perceived as higher quality.[167] However, he fails to recognize that this statement is irrelevant to the fact that Qualcomm's infringement will cause Arm to lose control of its brand and goodwill. Moreover, even if I were to accept for the sake of argument that Qualcomm's custom cores are currently perceived as better than Arm-built cores, this does not prevent future harm to Arm's brand because of Qualcomm's infringing actions. As explained above, negative spillovers can occur when a company loses control of its brand.

    b. ***Second,*** Professor Steckel asserts that I have failed to explain whether and how the sophisticated purchasers of the Nuvia Products would connect any negative features of these products with Arm.[168] However, as discussed above, academic literature establishes that, in instances where two companies partner on a co-branding or composite branding strategy, negative experiences with the co-branded product or one of the partner brands can result in negative spillovers to the other partner brand.

---

[165] *See, e.g.*, Steckel Reply Report, ¶ 96 ("Critically, the Dhar Report ignores evidence in the record contrary to his conclusion, including deposition testimony from Arm's own witnesses stating that they were unaware of any actual harm to Arm, including from loss of goodwill or purported consumer confusion in connection with Arm Trademarks."), ¶ 98 ("The Dhar Report further states 'Qualcomm's unauthorized use of Arm's Trademarks means that how customers view the Arm Mark is now connected to the quality and outcomes associated with the Nuvia products,' and that any potential negative customer experience with the Nuvia Products could 'place Arm's valuable brand asset at risk.' This assertion is also speculative, forward-looking, and unsupported.") However, no evidence of (i) actual harm or (ii) negative experience with the Nuvia Products is necessary now since the launch of the Nuvia Products has not yet occurred.

[166] Section V.B. provides examples of Qualcomm's misstatements and Section V.C. shows that the third-party press and analyst reports reiterate Qualcomm's misstatements and thereby magnify their impact.

[167] Steckel Reply Report, ¶ 99.

[168] Steckel Reply Report, ¶¶ 98, 100.

57. Finally, Professor Steckel seeks to refute my conclusions about Arm's loss of licensing revenue—through diverted sales from authorized users of the Arm Trademarks, but his criticisms are unfounded. ***First***, Professor Steckel fails to recognize that Qualcomm's unlicensed use of the terms "Arm," "Arm-based," and "Arm-compliant" is likely to confuse customers. Moreover, as I explained, Qualcomm's unlicensed use of the terms "Arm," "Arm-based," and "Arm-compliant" is likely to confuse customers ***regardless of their sophistication or efforts to exercise a higher degree of care***.[169] ***Second***, Professor Steckel fails to recognize that I cannot provide evidence that sales are being diverted from authorized users of the Arm Trademarks since the launch of the Nuvia Products has not yet occurred. Finally, I have explained in my Opening Report and in Section IV above that customers who might have sought out an Arm product because of the value that Arm provides may be diverted to Qualcomm's Nuvia Products.[170]

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on   March 25, 2024   in   New Haven, CT   .

_____
Ravi Dhar
March 25, 2024

---

[169]   Steckel Reply Report, ¶ 102.
[170]   Dhar Opening Report, Sections VI.A, VI.C.1, and VIII.B.

# APPENDIX A

HIGHLY CONFIDENTIAL

# APPENDIX A: LIST OF MATERIALS RELIED UPON

## PLEADINGS

1. Complaint, Arm Ltd. v. Qualcomm Inc., C.A. No. 1:22-1146, August 31, 2022, and Exhibits thereto.

2. Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Counterclaim, Arm Ltd. v. Qualcomm Inc., C.A. No. 1:22-1146, September 30, 2022.

3. Defendants' Answer and Amended Counterclaims, Arm Ltd. v. Qualcomm Inc., C.A. No. 1:22-1146, October 26, 2022.

4. Plaintiff's Answer to Amended Counterclaims, Arm Ltd. v. Qualcomm Inc., C.A. No. 1:22-1146, November 15, 2022.

5. USPTO Trademark Registration No. 5,692,669 and filed documents.

6. USPTO Trademark Registration No. 5,692,670 and filed documents.

## FILINGS IN OTHER PROCEEDINGS

7. Complaint, *In the Matter of Nvidia Corporation, Softbank Group Corporation, and Arm, Ltd.*, Docket No. 9404, Federal Trade Commission, December 2, 2021.

## EXPERT REPORTS

8. Expert Report of Ravi Dhar, *Arm Ltd. v. Qualcomm Inc, Qualcomm Technologies, Inc., and NUVIA Inc.* (C.A. No. 22-1146-MN), December 20, 2023.

9. Expert Rebuttal Report of Joel Steckel, *Arm Ltd. v. Qualcomm Inc, Qualcomm Technologies, Inc., and NUVIA Inc.* (C.A. No. 22-1146-MN), February 27, 2024.

## DEPOSITION TRANSCRIPTS

10. 30(b)(6) Deposition of Jonathan Armstrong (Arm), December 8, 2023.

11. Deposition of Cristiano Amon (Qualcomm), November 15, 2023.

12. Deposition of Michael Roberts (Qualcomm), November 28, 2023.

13. Deposition of Nitin Sharma (Nuvia and Qualcomm), October 27, 2023.

14. Deposition of Paul Williamson (Arm), November 9, 2023.

15. Deposition of Simon Segars (Arm), November 16, 2023.

16. Deposition of Will Abbey (Arm), October 27, 2023.

## ACADEMIC MATERIALS

17. Arjun Chaudhuri and Morris B Holbrook, "The Chain of Effects from Brand Trust and Brand Affect to Brand Performance: The Role of Brand Loyalty," *Journal of Marketing* 65(2) (2001): 81–93.

HIGHLY CONFIDENTIAL

18. Aron M. Levin, J. Charlene Davis, and Irwin Levin, "Theoretical and Empirical Linkages Between Consumers' Responses to Different Branding Strategies," *Advances in Consumer Research* 23 (1996): 296-300.

19. Bernard L. Simonin and Julie A. Ruth, "Is a Company Known by the Company It Keeps? Assessing the Spillover Effects of Brand Alliances on Consumer Brand Attitudes," *Journal of Marketing Research* 35(1) (1998): 30-42.

20. Chien-Wei Chen and Veronica Wong, "Design and Delivery of New Product Preannouncement Messages,' *Journal of Marketing Theory and Practice* 20(2) (2012): 203-221.

21. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed., (Danvers: Thomson Reuters, June 2017).

22. Kevin Lane Keller and Donald R. Lehmann, "Brands and Branding: Research Findings and Future Priorities," *Marketing Science* 25(6) (2006): 740-759.

23. Kevin Lane Keller and Donald R. Lehmann, "How Do Brands Create Value," *Marketing Management* (May/June 2003):  26-31.

24. Kim Schatzel and Roger Calantone, "Creating Market Anticipation: An Exploratory Examination of the Effect of Preannouncement Behavior on a New Product's Launch," *Journal of the Academy of Marketing Science* 34(3) (2006): 357-366.

25. Michael Pirson, Kirsten Martin, and Bidhan Parmar, "Public Trust in Business and Its Determinants," *Business & Society* 58(1) (2019): 132-166.

26. Philip Kotler and Kevin Lane Keller, *Marketing Management*, 15th ed., (Pearson, 2016).

27. Vanitha Swaminathan, Sayan Gupta, Kevin Lane Keller, and Donald Lehmann, "Brand Actions and Financial Consequences: A Review of Key Findings and Directions for Future Research," *Journal of the Academy of Marketing Science* 50 (2022): 639-664.

## SEC FORM F-1 REGISTRATION STATEMENTS

28. Arm Holdings plc, Amendment No. 2 to Form F-1, September 5, 2023, https://www.sec.gov/Archives/edgar/data/1973239/000119312523228059/d393891df1a.htm.

## EARNINGS CALL AND CORPORATE PRESENTATIONS

29. Qualcomm Inc. presentation at 2023 UBS Global Technology Conference, November 28, 2023, transcript published by S&P Global Market Intelligence, p. 7.

30. Qualcomm Inc. presentation at 51st Annual J.P. Morgan Global Technology, Media and Communications Conference, May 22, 2023, transcript published by S&P Global Market Intelligence.

31. Qualcomm Inc. presentation at Bernstein 38th Annual Strategic Decisions Conference, June 1, 2022, transcript published by S&P Global Market Intelligence.

32. Qualcomm Inc. presentation at Deutsche Bank 2023 Technology Conference, August 31, 2023, transcript published by S&P Global Market Intelligence.

HIGHLY CONFIDENTIAL

33. Qualcomm Inc. presentation at J.P. Morgan's 50th Annual Global Technology Conference, May 23, 2022, transcript published by S&P Global Market Intelligence.

34. Qualcomm Inc. presentation at J.P. Morgan's 49th Annual Global Technology Conference, May 26, 2021, transcript published by S&P Global Market Intelligence.

35. Qualcomm Inc. presentation at Nasdaq Virtual Investor Conference in Asia, August 10, 2021, transcript published by S&P Global Market Intelligence.

36. Qualcomm Inc. Q2 2021 Earnings Call, April 28, 2021, transcript published by S&P Global Market Intelligence.

37. Qualcomm Inc. Q4 2021 Earnings Call, November 3, 2021, transcript published by S&P Global Market Intelligence.

38. Qualcomm Inc. Q1 2022 Earnings Call, February 2, 2022, transcript published by S&P Global Market Intelligence.

39. Qualcomm Inc. Q2 2022 Earnings Call, April 27, 2022, transcript published by S&P Global Market Intelligence.

## ANALYST REPORTS

40. Chris Caso, Liz Pate, and Nicholas Welsch-Lehmann, "Takeaways from QCOM Snapdragon Summit," Wolfe Research, October 25, 2023.

41. Frank Lee and Pulkit Aggarwal, "Buy: "1Q24 Beat; soft 2Q24 outlook from seasonality," HSBC Global Research, February 1, 2024.

42. Frank Lee and Pulkit Aggarwal, "Buy: Improving smartphone outlook in-line with our view; room for more upside," HSBC Global Research, November 2, 2023.

43. Gary Mobley and Travis Poulin, "ARM: From a Tiny Acorn to Tall Oak; Initiating Coverage," Wells Fargo Equity Research, November 20, 2023.

44. Kevin Cassidy, "Earnings Preview: First Inning of Smartphone Upgrade Cycle," Rosenblatt Securities, January 24, 2024.

45. Kevin Cassidy, "Snapdragon X Elite Delivers Gen AI to PCs," Rosenblatt Securities, October 25, 2023.

46. Samik Chatterjee and Joseph Cardoso, "Qualcomm: J.P. Morgan TMC Conference Takeaways – Alert," J.P. Morgan North American Equities Research, May 22, 2023.

47. Samik Chatterjee et al., "Qualcomm: F1Q23 Earnings Follow-Up Meeting Takeaways," J.P. Morgan North American Equities Research, February 09, 2023.

48. Samik Chatterjee, Joseph Cardoso, and Priyanka Thapa, "Qualcomm Key Takeaways from CEO and CFO Meeting," J.P. Morgan, November 8, 2023.

## ADDITIONAL PUBLIC LITERATURE AND WEBPAGES

49. "Arm Branding Guidelines," Arm, https://www.arm.com/company/policies/trademarks/guidelines-brand.

50. "Arm Designs," Arm, https://www.arm.com/company/success-library/arm-designs.

51. "Arm Holdings plc (ARM)," Yahoo Finance, https://finance.yahoo.com/quote/ARM/.

52. "ARM Holdings Plc Reports Results for The Fourth Quarter and Full Year 2015," Arm, February 10, 2016, https://newsroom.arm.com/news/arm-holdings-plc-reports-results-for-the-fourth-quarter-and-full-year-2015.

53. "Arm Partners are Shipping More Than 900 Arm-based Chips Per Second Based on Latest Results," Arm Newsroom, May 20, 2021, https://newsroom.arm.com/news/arm-partners-are-shipping-more-than-900-arm-based-chips-per-second-based-on-latest-results.

54. "Arm Trademark Use Guidelines," Arm, https://www.arm.com/company/policies/trademarks/guidelines-trademarks.

55. "CMOS based," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/cmos-based.

56. "Compliance," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/compliance.

57. "Compliant," *Meriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/compliant.

58. "Compliant," *Oxford Learner's Dictionaries*, https://www.oxfordlearnersdictionaries.com/us/definition/english/compliant?q=compliant.

59. "CPU Architecture," Arm, https://www.arm.com/architecture/cpu.

60. "Enabling the Rise of the Smartphone: Chronicling the Developmental History at Qualcomm," Qualcomm, December 10, 2020, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/presentation_-_enabling_the_rise_of_the_smartphone_-_web.pdf81.pdf.

61. "How Can I Tell Whether I Have an 'Intel' or an 'Apple Silicon' based Mac?" *Focusrite*, https://focusritepro.zendesk.com/hc/en-gb/articles/360017409720-How-can-I-tell-whether-I-have-an-Intel-or-an-Apple-Silicon-based-Mac.

62. "Intel-based System," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/intel-based-system.

63. "Meet Qualcomm Centriq 2400, the World's First 10-Nanometer Server Processor," Qualcomm, December 6, 2016, https://www.qualcomm.com/news/onq/2016/12/meet-qualcomm-centriq-2400-worlds-first-10-nanometer-server-pr.

64. "NXP Accelerates Software Creation on S32K Automotive Microcontrollers," Arm Case Study, https://armkeil.blob.core.windows.net/developer/Files/pdf/case-study/arm-nxp-case-study.pdf.

65. "PowerPC based," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/powerpc-based.

66. "PowerPC-based Mac," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/powerpc-based-mac.

67. "Premium Arm-based Chromebooks Delivering World-class Performance," Arm Newsroom, January 17, 2023, https://newsroom.arm.com/premium-arm-based-chromebooks.

68. "Qualcomm and Microsoft Align Efforts to Scale On-Device AI at Build," Qualcomm, May 23, 2023, https://www.qualcomm.com/news/releases/2023/05/qualcomm-and-microsoft-align-efforts-to-scale-on-device-ai-at-bu.

69. "Qualcomm Begins Commercial Sampling of World's First 10nm Server Processor and Reshapes the Future of Datacenter Computing," Qualcomm, December 6, 2016, https://www.qualcomm.com/news/releases/2016/12/qualcomm-begins-commercial-sampling-worlds-first-10nm-server-processor-and.

HIGHLY CONFIDENTIAL

70. "Qualcomm Names New CPUs Oryon, Plans Launch in 2023," *Telecompaper World*, November 17, 2022, https://www.telecompaper.com/news/qualcomm-names-new-cpus-oryon-plans-launch-in-2023--1444584.

71. "Qualcomm Snapdragon 600 Processor APQ8064 Data Sheet," Qualcomm Technologies, Inc, February 2016, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/snapdragon_600_apq_8064_data_sheet.pdf.

72. "Qualcomm Snapdragon 600E Embedded Platform," Qualcomm Technologies, Inc, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/snapdragon-600e-product-brief_87-pc346-1-c_0.pdf.

73. "Qualcomm Snapdragon X Elite "X1E80100" CPU Gets Geekbenched," *TechPowerup*, February 26, 2024, https://www.techpowerup.com/319630/qualcomm-snapdragon-x-elite-x1e80100-cpu-gets-geekbenched.

74. "Qualcomm Snapdragon X Elite Unveiled: ARM-based SoC for Windows-powered AI PCs," *Counterpoint Research*, November 2, 2023, https://www.counterpointresearch.com/insights/qualcomm-snapdragon-x-elite-arm-based-soc-windows-ai-pc/.

75. "Qualcomm Testing its Answer to Apple's M-series Chips," *Times of India*, December 30, 2022, https://timesofindia.indiatimes.com/gadgets-news/qualcomm-testing-its-answer-to-apples-m-series-chips/articleshow/96621492.cms.

76. "Qualcomm Unleashes Snapdragon X Elite: The AI Super-Charged Platform to Revolutionize the PC," Qualcomm, October 24, 2023, https://www.qualcomm.com/news/releases/2023/10/qualcomm-unleashes-snapdragon-x-elite--the-ai-super-charged-plat.

77. "Qualcomm's Snapdragon X Elite Chips Promise Major PC Performance," *PCWorld*, October 24, 2023.

78. "Qualcomm's ARM-based 12-core Desktop CPU to be Unveiled in 2024: Report," *Business Standard*, November 9, 2022, https://www.business-standard.com/article/technology/qualcomm-s-arm-based-12-core-desktop-cpu-to-be-unveiled-in-2024-report-122110900025_1.html.

79. "Record Shipments of Arm-based Chips in Previous Quarter," Arm Newsroom, February 25, 2020, https://newsroom.arm.com/news/record-shipments-of-arm-based-chips-in-previous-quarter.

80. "RISC-based system," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/risc-based-system.

81. "Snapdragon Fact Sheet," Qualcomm, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon_Fact_SheetJune.pdf

82. "System Architecture Compliance Suites (ACS)," Arm Developer, https://developer.arm.com/Architectures/Architectural%20Compliance%20Suite#Technical-Information.

83. "The Arm Ecosystem Ships a Record 6.7 Billion Arm-based Chips in a Single Quarter," Arm Newsroom, February 11, 2021, https://newsroom.arm.com/news/the-arm-ecosystem-ships-a-record-6-7-billion-arm-based-chips-in-a-single-quarter.

84. "What is CMOS," Lenovo, https://www.lenovo.com/us/en/glossary/cmos/.

85. "What is Factiva?" Dow Jones Factiva, https://www.dowjones.com/professional/glossary/factiva/.

86. "Why Everyone Wants Arm," *The Economist*, June 22, 2022, https://www.economist.com/business/2022/06/22/why-everyone-wants-arm.

87. "Windows Based," *PC Magazine*, https://www.pcmag.com/encyclopedia/term/windows-based.

HIGHLY CONFIDENTIAL

88. Alfonso Maruccia, "Qualcomm Claims Snapdragon X Elite Arm SoC is Faster than Apple's M3," *Techspot*, December 18, 2023, https://www.techspot.com/news/101246-qualcomm-claims-snapdragon-x-elite-arm-laptop-soc.html.

89. Andrew Cunningham, "Qualcomm Will Try to Have its Apple Silicon Moment in PCs with 'Snapdragon X'", *Ars Technica*, October 11, 2023, https://arstechnica.com/gadgets/2023/10/qualcomm-will-try-to-have-its-apple-silicon-moment-in-pcs-with-snapdragon-x/.

90. Anna Gross and Tim Bradshaw, "Qualcomm Wants to Buy a Stake in Arm Alongside Its Rivals," *The Financial Times*, May 30, 2022, https://www.ft.com/content/eab1d19d-ab4c-45b7-88b4-f1f5e115d16e.

91. Anton Shilov, "Qualcomm: Next Generation Nuvia-Based Snapdragon Allegedly Has Design Wins," *Tom's Hardware*, November 4, 2022, https://www.tomshardware.com/news/qualcomm-nuvia-based-snapdragon-due-in-2024-increases-design-wins.

92. Barry Wolford, Thomas Speier, and Dileep Bhandarkar, "Qualcomm Centriq 2400 Processor," Qualcomm, August 22, 2017, https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm_centriq_2400_hotchips_final_0.pdf .

93. Billy Duberstein, "Intel's Turnaround Was Just Dealt a Devastating Blow," *The Motley Fool*, October 26, 2023, https://www.fool.com/investing/2023/10/26/intels-turnaround-was-just-dealt-a-devastating-blo/.

94. Bob O'Donnell, "Qualcomm Goes Beyond the Smartphone, Shows Off New Hardware," *Techspot*, November 18, 2022, https://www.techspot.com/news/96696-qualcomm-goes-beyond-smartphone-shows-off-new-hardware.html.

95. Daniel Rubino, "Results Are In: Qualcomm's Snapdragon X Elite Goes Toe-to-Toe with Apple's New M3 Pro Processor," *Windows Central*, November 7, 2023, https://www.windowscentral.com/hardware/laptops/results-are-in-qualcomms-snapdragon-x-elite-goes-toe-to-toe-with-apples-new-m3-pro-processor.

96. Darren Allan, "Snapdragon X Elite Flexes AI Muscles and Destroys Intel Core Ultra 7 CPU in Image Creation Head-to-Head," *TechRadar*, February 27, 2024, https://www.techradar.com/computing/cpu/snapdragon-x-elite-flexes-ai-muscles-and-destroys-intel-core-ultra-7-cpu-in-image-creation-head-to-head.

97. Dominic Rushe, "UK Chip Designer Arm Soars on Nasdaq Debut to Notch $65bn Valuation," *The Guardian*, September 14, 2023, https://www.theguardian.com/business/2023/sep/14/arm-ipo-share-sale-nasdaq-stock-market.

98. Eoin McCann, "System Validation at Arm," Arm, April 2016, https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/system-validation-at-arm-enabling-our-partners-to-build-better-systems

99. Francisco Pires, "Qualcomm Promises to Outplay Apple's M2 With Its Upcoming Arm Chips," *Tom's Hardware*, June 9, 2022, https://www.tomshardware.com/news/qualcomm-promises-to-outplay-apples-m2-with-its-upcoming-arm-chips.

100. George Zhao, "Snapdragon Compute Spotlight: Day 2 Livestream," at 28:42, YouTube, uploaded by Snapdragon October 25, 2023, https://www.youtube.com/live/dJcSaEbzQN0?si=2r7Kb9iyuZz3KqOH.

101. Harry McCracken, "Qualcomm's Snapdragon X Elite Chip is a Big Bet on the PC's Future," *Fast Company*, October 24, 2023.

HIGHLY CONFIDENTIAL

102. Ishita Banerjee, "Qualcomm Developing Its Own ARM-based Chips to Rival Apple's M-series Processors: Report," *Financial Express Online*, December 31, 2022, https://www.financialexpress.com/life/technology-qualcomm-developing-its-own-arm-based-chips-to-rival-apples-m-series-processors-report-2932738/.

103. Jeremy Laird, "2024 Could Be the Year the PC Finally Dumps x86 for Arm, All thanks to Windows 12 and Qualcomm's New Chip," *PC Gamer*, December 24, 2023, https://www.pcgamer.com/2024-could-be-the-year-the-pc-finally-dumps-x86-for-arm-all-thanks-to-windows-12-and-qualcomms-new-chip/.

104. Jim Turley, "Introduction to Intel Architecture," Intel, https://www.intel.com/content/dam/www/public/us/en/documents/white-papers/ia-introduction-basics-paper.pdf

105. John Burek, "Meet Snapdragon X Elite: Qualcomm Touts Big AI, Compute Gains on Arm Laptop CPUs," *PC World*, October 24, 2023, https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-unveiled.

106. Juli Clover, "Qualcomm to Take on Apple Silicon Chips with Snapdragon X Series for PCs," *Mac Rumors*, October 10, 2023, https://www.macrumors.com/2023/10/10/qualcomm-snapdragon-x/.

107. Karl Freund, "New Qualcomm Snapdragon X Elite Has a Real Shot At The Laptop x86 Market," *Forbes*, October 24, 2023, https://www.forbes.com/sites/karlfreund/2023/10/24/new-qualcomm-snapdragon-x-elite-has-a-real-shot-at-the-laptop-x86-market/?sh=10430351526f.

108. Kedar Kondap, "At the Intersection of Intelligence and Imagination: Rethink What's Possible with Snapdragon X Elite," Qualcomm, October 25, 2023, https://www.qualcomm.com/news/onq/2023/10/rethink-whats-possible-with-new-snapdragon-x-elite-platform.

109. Manju Varma, "Snapdragon Compute Spotlight: Day 2 Livestream," at 36:40, YouTube, uploaded by Snapdragon October 25, 2023, https://www.youtube.com/live/dJcSaEbzQN0?si=bdIjMBVJvvabq4x5&t=2246.

110. Mark Hachman, "Qualcomm's Snapdragon X Elite Chips Promise Major PC Performance," *PC World*, October 24, 2023, https://www.pcworld.com/article/2112907/qualcomm-snapdragon-x-elite-chips-promise-major-pc-performance.html.

111. Matthew Connatser, "Early Snapdragon X Elite Benchmark Shows Arm CPU is Faster Than AMD's Top-End Mobile APU," *Tom's Hardware*, February 25, 2024, https://www.tomshardware.com/pc-components/cpus/early-snapdragon-x-elite-benchmark-shows-arm-cpu-is-faster-than-amds-top-end-mobile-apu.

112. Matthew S. Smith, "Grown-Up Arm Chips Look to Dethrone x86 in Laptops: Qualcomm's Snapdragon X and Apple M3 Show Arm Architecture Gaining Ground," *IEEE Spectrum,* November 09, 2023, https://spectrum.ieee.org/qualcomm-snapdragon.

113. M.S. Hrishikesh, Madhusudhan Rajagopalan, Sujatha Sriram, and Rashmin Mantri, "System Validation at Arm; Enabling our Partners to Build Better Systems," April 2016, https://developer.arm.com/-/media/Arm%20Developer%20Community/PDF/System%20IP/System_Validation_at_ARM_Enabling_our_partners_to_build_better_systems.pdf.

114. Nick Turner, "Nvidia Tried and Failed to Buy Arm for $40 Billion in 2020, But It Just Reported a Stake Worth $147.3 Million," *Fortune*, February 14, 2024, https://fortune.com/2024/02/14/nvidia-reports-stake-in-arm-ai-semiconductor-chips/.

115. Ramish Zafar, "Apple Thunders Ahead With 90% Arm Notebook Market Share," *WCCFtech*, June 18, 2022, https://wccftech.com/apple-thunders-ahead-with-90-arm-notebook-market-share/.

HIGHLY CONFIDENTIAL

116. Richard Waters, "Chip Wars Are Coming to PCs," *Financial Times*, November 3, 2023, https://www.ft.com/content/c9731eb8-7213-4f51-bfa3-1c15b4581fc0.

117. Ryan Browne, "What Arm's Expected Debut Means for the IPO Market and SoftBank," *CNBC*, August 21, 2023, https://www.cnbc.com/2023/08/21/arm-ipo-what-it-means-for-ipo-market-softbank.html.

118. Ryan Smith, "Qualcomm Snapdragon X Elite Performance Preview: A First Look at What's to Come," *AnandTech*, October 30, 2023, https://www.anandtech.com/show/21112/qualcomm-snapdragon-x-elite-performance-preview-a-first-look-at-whats-to-come.

119. Sam Becker, "Arm IPO Update: Filing Reveals SoftBank's Target Valuation as Listing Day Approaches," *Fast Company*, September 5, 2023, https://www.fastcompany.com/90948568/arm-ipo-date-softbank-valuation-listing.

120. Sam Rutherford, "The Snapdragon X Elite is Qualcomm's Most Powerful Chip to Date," *Engadget*, October 24, 2023, https://www.engadget.com/the-snapdragon-x-elite-is-qualcomms-most-powerful-chip-to-date-190004830.html.

121. Sandra J. Suchar and Shalene Gupta, "The Trust Crisis," *Harvard Business Review*, July 16, 2019, https://hbr.org/2019/07/the-trust-crisis?ab=seriesnav-bigidea.

122. Sarah Chaney, "Qualcomm Snapdragon X: Is 2024 finally the year for Arm-powered PCs?" *Laptop Magazine*, October 12, 2023, https://www.laptopmag.com/laptops/qualcomm-snapdragon-x-is-2024-finally-the-year-for-arm-powered-pcs.

123. Sean Endicott, "Qualcomm's Nuvia ARM Chips to Challenge Apple M-Series Won't Arrive Until Late 2023," *Windows Central*, April 29, 2022, https://www.windowscentral.com/qualcomms-nuvia-arm-chips-wont-arrive-until-late-2023.

124. Scott Fulton III, "Arm Processors: Everything You Need to Know Now," March 30, 2021, ZDNet, https://www.zdnet.com/article/arm-processors-everything-you-need-to-know-now/.

125. Shikhar Mehrotra, "Qualcomm's Computer CPU Could Hit the Markets as Early as 2024: Report," *Digit*, November 8, 2022, https://www.digit.in/news/general/qualcomm-computer-cpu-could-hit-the-markets-as-early-as-2024-report-65953.html.

126. Subhrojit Mallick, "Apple Launches New M3 Chips for Mac Laptops, Desktops. What Does This Mean for Users in India?" *The Economic Times*, October 31, 2023.

127. Vaidyanathan Subramaniam and Alexander Fagot, "First Snapdragon X Elite Benchmarks: Impressive Gains Over M2 Max, Ryzen 9 7940HS, Intel 13th Gen-H, and 14th Gen Desktop CPUs," *NotebookCheck*, October 30, 2023, https://www.notebookcheck.net/First-Snapdragon-X-Elite-benchmarks-Impressive-gains-over-M2-Max-Ryzen-9-7940HS-Intel-13th-gen-H-and-14th-gen-desktop-CPUs.763149.0.html.

128. Wes Davis, "Qualcomm's Next Round of PC chips Will Fight Apple Under the Name Snapdragon X," *The Verge*, October 10, 2023, https://www.theverge.com/2023/10/10/23911431/qualcomm-snapdragon-x-platform-oryon-cpu-windows-pc-apple-silicon.

## DATASETS

129. Factiva, Dow Jones & Company, https://factiva.com.

HIGHLY CONFIDENTIAL

## PRODUCED MATERIALS

130. ARM_00051126.
131. ARM_00059183.
132. ARM_01259705.

133. ARM_01259705.
134. QCARM_7517739.

**\*\*Note I also relied upon any other documents cited in either this report and/or my Opening Report, but not mentioned in this list.**