IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | **REDACTED – PUBLIC VERSION** |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | **Original Filing Date: July 10, 2024** |
| | ) | **Redacted Filing Date: July 22, 2024** |
| Defendants. | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
Samantha Mehring
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

July 10, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT .......................................**Error! Bookmark not defined.**

II.     NATURE AND STAGE OF THE PROCEEDING...........**Error! Bookmark not defined.**

III.    SUMMARY OF ARGUMENT ........................................**Error! Bookmark not defined.**

IV.     STATEMENT OF FACTS .............................................**Error! Bookmark not defined.**

V.      LEGAL STANDARD.....................................................**Error! Bookmark not defined.**

VI.     ARGUMENT...................................................................**Error! Bookmark not defined.**

    A.   Arm Cannot Show Any Cognizable Injury Caused by the Alleged Breach ..**Error! Bookmark not defined.**

        1.   Arm Has Not Suffered Any Concrete Injury ........... **Error! Bookmark not defined.**

        2.   Arm's Theories of Future Injury Are Inadequate .... **Error! Bookmark not defined.**

    B.   Qualcomm Is Not a Party to the Nuvia ALA.........**Error! Bookmark not defined.**

    C.   The Qualcomm ALA Authorizes Qualcomm's Post-Acquisition Products ..**Error! Bookmark not defined.**

    D.   The Nuvia ALA Does Not Require Defendants to Cease Using or Destroy Nuvia's Pre-Acquisition Design Work .................**Error! Bookmark not defined.**

        1.   ███████████████████████████ ████████████████████████████ .......................**Error! Bookmark not defined.**

        2.   The Architectural Reference Manual Is Neither ████████████ Nor ████████████████ .......**Error! Bookmark not defined.**

        3.   The Nuvia RTL Code Is Not Subject to the Termination Provision..**Error! Bookmark not defined.**

    E.   Qualcomm Has Made Only Nominative Use of the ARM Marks for Which There Is No Likelihood of Confusion....................**Error! Bookmark not defined.**

        1.   Qualcomm Has Made Only Nominative Use of the ARM Marks..... **Error! Bookmark not defined.**

        2.   Arm Cannot Establish that Qualcomm's Nominative Use of the ARM Marks Is Likely to Cause Confusion .........**Error! Bookmark not defined.**

        3.   Dr. Dhar's Theory of Confusion Do Not Create A Genuine Issue of Fact...........................................................**Error! Bookmark not defined.**

VII.    CONCLUSION................................................................**Error! Bookmark not defined.**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&H Sportswear, Inc.* v. *Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000)..................................................................................22

*Arrowpoint Cap. Corp.* v. *Arrowpoint Asset Mgmt., LLC*,
   793 F.3d 313 (3d Cir. 2015)..............................................................................23, 24

*Behnke* v. *State Farm Gen. Ins. Co.*,
   127 Cal. Rptr. 3d 372 (Ct. App. 2011) ..................................................................6

*Century 21 Real Est. Corp.* v. *LendingTree, Inc.*,
   425 F.3d 211 (3d Cir. 2005)...................................................................22, 23, 25, 26

*Checkpoint Sys., Inc.* v. *Check Point Software Techs., Inc.*,
   269 F.3d 270 (3d Cir. 2001)..................................................................................24

*City of N. Miami Beach Gen. Emps.' Ret. Plan* v. *Dr. Pepper Snapple Grp.*,
   189 A.3d 188, 200 (Del. Ch. 2018)........................................................................11

*Dam Things from Denmark* v. *Russ Berrie & Co.*,
   290 F.3d 548 (3d Cir. 2002)..................................................................................21

*Darbun Enters., Inc.* v. *San Fernando Cmty. Hosp.*,
   191 Cal. Rptr. 3d 340 (Ct. App. 2015) ..................................................................6

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)...............................................................................................9

*Ford Motor Co.* v. *O.E. Wheel Distribs., LLC*,
   868 F. Supp. 2d 1350 (M.D. Fla. 2012)................................................................23

*Green River Bottling Co.* v. *Green River Corp.*,
   997 F.2d 359 (7th Cir. 1993) ................................................................................10

*Halsey* v. *Pfeiffer*,
   750 F.3d 273 (3d Cir. 2014)....................................................................................9

*Interpace Corp.* v. *Lapp, Inc.*,
   721 F.2d 460 (3d Cir. 1983)...............................................................................23, 26

*Jensen* v. *Traders & Gen. Ins. Co.*,
   345 P.2d 1 (Cal. 1959) ..........................................................................................15

*Keurig Inc.* v. *Strum Foods, Inc.*,
 769 F. Supp. 2d 699 (D. Del. 2011) ................................................................................26

*Lewis* v. *Ward*,
 C.A. No. 15255, 2003 WL 22461894 (Del. Ch. Oct. 29, 2003), *aff'd*, 852 A.2d
 896 (Del. 2004) ..............................................................................................................11

*Meso Scale Diagnostics, LLC* v. *Roche Diagnostics GmbH*,
 62 A.3d 62 (Del. Ch. 2013) ...........................................................................................11

*Mission Beverage Co.* v. *Pabst Brewing Co.*,
 223 Cal. Rptr. 3d 547 (Ct. App. 2017) .............................................................................6

*N. Valley Mall, LLC* v. *Longs Drug Stores Cal., LLC*,
 238 Cal. Rptr. 3d 368 (Ct. App. 2018) ...........................................................................11

*Oasis W. Realty, LLC* v. *Goldman*,
 250 P.3d 1115 (Cal. 2011) .................................................................................................6

*Paratore* v. *Perry*,
 48 Cal. Rptr. 682 (Ct. App. 1966) .....................................................................................8

*In re Providian Credit Card Cases*,
 116 Cal. Rptr. 2d 833 (Ct. App. 2002) ...........................................................................21

*Rivera* v. *Redfern*,
 98 F.4th 419 (3d Cir. 2024) ...............................................................................................6

*Rose* v. *Lawton*,
 29 Cal. Rptr. 844 (Ct. App. 1963) .....................................................................................8

*St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*,
 124 Cal. Rptr. 2d 818 (Ct. App. 2002) ..............................................................................6

*Tamarind Lithography Workshop, Inc.* v. *Sanders*,
 193 Cal. Rptr. 409 (Ct. App. 1983) ...................................................................................8

*Tiffany & Co.* v. *Spreckels*,
 262 P. 742 (Cal. 1927) .....................................................................................................10

*Timothy W.* v. *Julie W.*,
 301 Cal. Rptr. 3d 294 (Ct. App. 2022), *review denied* (Cal. Feb. 22, 2023) ...............6

*Tri-Continent Int'l Corp.* v. *Paris Sav. & Loan Ass'n*,
 16 Cal. Rptr. 2d 508 (Ct. App. 1993) ..............................................................................10

*Union Oil Co. of Cal.* v. *Greka Energy Corp.*,
 80 Cal. Rptr. 3d 738 (Ct. App. 2008) ................................................................................8

*Versata Software, Inc.* v. *SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013)..................................................................................10

*W. Standard, LLC* v. *Sourcehov Holdings, Inc.*,
   C.A. No. 2018-280, 2019 WL 3322406 (Del. Ch. July 24, 2019).........................................11

*Wilkison* v. *Wiederkehr*,
   124 Cal. Rptr. 2d 631 (Ct. App. 2002) ...........................................................................8

**Federal Statutes**

15 U.S.C. §§ 1114, 1125......................................................................................................22

17 U.S.C. § 101.....................................................................................................................20

Copyright Act.......................................................................................................................20

**State Statutes**

Delaware Code Title 8, Section 259(a)..............................................................................11

Delaware Code Title 8, Section 262 ..................................................................................11

Cal. Civ. Code § 3426.1(d) ...............................................................................................21

Cal. Civ. Proc. Code § 1858 .............................................................................................15

**Federal Rules**

Fed. R. Civ. P. 56(c)(2)......................................................................................................9

**Other Authorities**

Witkin Cal. Procedure § 780 (6th ed. 2024) ....................................................................6

## I.      PRELIMINARY STATEMENT

For years, Qualcomm—a global leader in the development of microprocessors—licensed off-the-shelf central processing units ("CPUs") from Arm. But after it became evident that Arm's CPUs were no longer competitive and Qualcomm had asked Arm to improve its performance, Qualcomm decided to undertake the massive engineering effort to develop a custom CPU as authorized by its longstanding license with Arm. As part of that initiative, Qualcomm acquired Nuvia, a small start-up with world-renowned engineers, which had begun work to develop a custom Arm-compliant core (a component of a CPU) for use in servers. Qualcomm then engaged in many months of exhaustive and independent design work, all with Arm's knowledge, to create its groundbreaking CPUs made for use in PCs, mobile, and automotive. Around the same time, NVIDIA's attempted acquisition of Arm failed, SoftBank's Chairman took a heavier hand in Arm's management, and Arm's business model underwent a shift to compete directly with Qualcomm's products that were under development. Against that backdrop and after an entire year had elapsed, Arm terminated Nuvia's license—which Qualcomm neither needed nor wanted—and now contends that Qualcomm cannot sell the products it spent hundreds of millions of dollars designing, because those products contain some of Nuvia's nascent design work.

Arm's attempt to exploit the termination provisions of its license with Nuvia to hold up Qualcomm lack merit, as do its trademark claims. Indeed, Qualcomm's own license authorizes its innovative products.

## II.     NATURE AND STAGE OF THE PROCEEDING

Arm asserts claims for breach of the Architecture License Agreement between Arm and Nuvia (the "Nuvia ALA") and federal trademark infringement and false designation of origin against Defendants Qualcomm, Inc.; Qualcomm Technologies, Inc. (together, "Qualcomm"); and Nuvia, Inc. Defendants assert counterclaims for declaratory judgment, breach of the Nuvia ALA,

and breach of the Technology License Agreement between Arm and Nuvia. Fact and expert discovery are closed.

## III.   SUMMARY OF ARGUMENT

1.    Arm's contract claim first fails because Arm cannot demonstrate any cognizable injury caused by the alleged breach. Under California law, Arm must demonstrate that the alleged breach caused injury as an element of a claim for breach of contract. Multiple Arm executives, including Arm's CEO, have testified that they are unaware of any concrete injury suffered by Arm from the alleged breach; their expert on damages has stated that Arm has only made him aware of a potential future harm, and he has not assessed the probability of that harm. Even if there were past injury, Arm also cannot show that money damages would be inadequate to remedy those injuries, as is required to obtain specific performance.

2.    Qualcomm is not a party to the Nuvia ALA and cannot be liable for breach. Only Arm and Nuvia are parties to the Nuvia ALA. Qualcomm was not assigned the Nuvia ALA. And no assignment occurred by operation of law. Qualcomm acquired Nuvia through a reverse-triangular merger under Delaware law. The transaction left Nuvia intact as an independent corporation wholly owned by Qualcomm. In such a merger, the target's assets are not transferred or assigned to the parent, and no provision of the acquisition agreement transferred the Nuvia ALA to Qualcomm.

3.    Defendants are entitled to a declaratory judgment that Qualcomm's Arm-compliant cores are properly licensed under Qualcomm's license agreement with Arm (the "Qualcomm ALA"). The Qualcomm ALA authorizes Qualcomm to use Arm's technology to develop Arm-compliant cores and products incorporating those cores. Qualcomm developed its cores after acquiring Nuvia and engaged in substantial independent design work to develop those cores for four different markets, including all physical development of the cores. Because Qualcomm

worked under its own license to design the cores, the cores are licensed, and nothing in the license prevented Qualcomm from using work started by Nuvia as one component of the cores.

4.     Arm's contract claim fails because, under the Nuvia ALA's plain language, the ████████████████ subject to the termination provision on which Arm relies is limited to the ████████████████████████████████████████. That limitation flows through to the definition of ████████████████████████ which is defined as ████████████████████ ████████████████████████████████ Applying those definitions to the termination provision, Nuvia's work is unusable or subject to destruction only if ████████████ ████████████████████████████████████. Because it is neither, Nuvia has no obligation to stop using or distributing that work, or to destroy it.

5.     Arm's trademark claims fail because Qualcomm's use of the ARM marks constitutes nominative use for which there is no likelihood of confusion. Qualcomm's use of the ARM marks is textbook nominative use, because Qualcomm is only describing an aspect of its own products rather than passing off its products as being produced by ARM. And there is no likelihood of confusion from Qualcomm's nominative use: Arm admits that both parties' customers are sophisticated, and there is no evidence of actual market confusion or of any intent by Qualcomm to confuse customers about its relationship with Arm.

## IV.    STATEMENT OF FACTS

Qualcomm designs and commercializes semiconductor microprocessors used in cellular phones, computers and other devices. D.I. 1 ¶ 25. Arm is in the business of developing and licensing technology for central processing units compatible with Arm's instruction-set architecture, the instructions that allow hardware to interact with Arm-compliant software programs. *Id.* ¶¶ 10–16. Arm grants Architecture License Agreements (ALAs) to design and sell custom Arm-compatible "cores"—the element of a CPU that reads and executes program

instructions. *Id.* ¶¶ 12, 17. Qualcomm is a longtime Arm licensee and currently operates under a 2013 ALA and multiple annexes to that ALA, executed in 2013 and 2020. *Id.* ¶ 26; SOF ¶¶ 14 - 19; Ex. 1; Ex. 2; Ex. 3.

In March 2021, Qualcomm acquired Nuvia, a start-up working on a custom Arm-compliant core code-named ███ and a system-on-a-chip ("SoC") called ███, both designed for use in data centers and servers. D.I. ¶¶ 24, 28; Ex. 4 at ¶ 90. SOF ¶ 12. Nuvia was a party to an ALA with ARM (governed by California law, Ex. 5 at ███), which licensed it to design cores implementing version 8-A of Arm's instruction-set architecture. D.I. 1 at ¶ 21; SOF ¶ 1; Ex. 5; Ex. 7. Through the acquisition, Qualcomm gained access to work Nuvia had started on ███ and the ███ system-on-a-chip, including what is known as RTL code. ████████████ ██████████. RTL, short for register-transfer language, is a representation of "the functionality and behavior of [a microprocessor] in terms of registers, data flow, and control signals." Ex. 10 at ¶¶ 2, 38.

Before the acquisition closed, Qualcomm wrote to ARM identifying the "potential overlap in licensing agreements" and conveying that Qualcomm "intend[ed] to transfer [Nuvia's] work and employees to [Qualcomm] . . . and have the then-former [Nuvia] employees continue their activities under the Qualcomm ALA." Ex. 11. Qualcomm then began intensive work on designing three new version 8-A CPUs ████████████ for the compute (*e.g.*, laptops/PCs), mobile (*e.g.*, cellphones), and automotive (*e.g.*, digital cockpit) markets, respectively, and a fourth series of custom cores compliant with version 9-A of Arm's architecture ███. SOF ¶¶ 21–22. Qualcomm's ALA covers its use of both version 8-A and

4

9-A of the Arm architecture.[1] Ex. 2 & 3.

On February 1, 2022—more than a year after the acquisition and Qualcomm's letter to Arm—Arm wrote to Nuvia terminating the Nuvia ALA, claiming that Nuvia had violated the ALA's non-assignment provision by failing to obtain Arm's consent before the merger. Ex. 12. Arm invoked the Nuvia ALA's termination provision, ██████████ stating that, upon termination, Nuvia was required to ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████ Arm claimed that the Nuvia ALA's termination provision "extended to Qualcomm and its widely publicized use of Nuvia's technology." Ex. 12.

In October 2023, Qualcomm launched its Snapdragon X Elite laptop microprocessor, which incorporates Arm-compliant ████████ cores. SOF ¶ 22.  Those cores have since entered the consumer market. *Id.*

## V.   LEGAL STANDARD

Summary judgment is proper if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law," when viewing the evidence "in the light most favorable to the non-moving party." *Rivera* v. *Redfern*, 98 F.4th 419, 422 (3d Cir. 2024).

---

[1] As background, Qualcomm's design work included RTL development, comprehensive verification of its RTL designs and the ████████████ verification that its designs were architecturally compliant, interfacing the CPUs with the SOCs, and designing and incorporating architecture features. It also included the entirety of the "physical design," which assists with "the fabrication of the actual physical device." Ex. 10 at ¶ 38.

## VI.    ARGUMENT

### A.    Arm Cannot Show Any Cognizable Injury Caused by the Alleged Breach

Arm asserts that Defendants breached the Nuvia ALA's termination provision, ███████, by failing to cease using or distributing, or failing to return or destroy, technology developed by Nuvia. Arm's claim fails because it cannot show any cognizable injury caused by the alleged breach.

Under California law, which governs the Nuvia ALA, a plaintiff asserting breach of contract must prove "a contractual duty, breach of that duty, causation, and damages." *Mission Beverage Co.* v. *Pabst Brewing Co.*, 223 Cal. Rptr. 3d 547, 560 (Ct. App. 2017); *see Oasis W. Realty, LLC* v. *Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). Damages—that is, harm—are thus "an essential element of a breach of contract claim." *Behnke* v. *State Farm Gen. Ins. Co.*, 127 Cal. Rptr. 3d 372, 391 (Ct. App. 2011); *see* Judicial Council of Cal., Civil Jury Instruction 303 (requiring proof that that the plaintiff "was harmed"); *St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*, 124 Cal. Rptr. 2d 818, 834–35 (Ct. App. 2002) (dismissing contract claim where the plaintiff sustained no damage caused by the breach).

That remains true where, as here, the plaintiff is seeking specific performance rather than money damages. Specific performance is an equitable remedy for breach of contract, *Timothy W.* v. *Julie W.*, 301 Cal. Rptr. 3d 294, 306 (Ct. App. 2022), *review denied* (Cal. Feb. 22, 2023), meaning that a plaintiff seeking specific performance must "prov[e] the elements of a standard breach of contract" and satisfy the separate requirements for obtaining specific performance. *Darbun Enters., Inc.* v. *San Fernando Cmty. Hosp.*, 191 Cal. Rptr. 3d 340, 348 (Ct. App. 2015); *accord* Witkin Cal. Procedure § 780 (6th ed. 2024) ("Witkin").

### 1.    Arm Has Not Suffered Any Concrete Injury

The record contains no evidence of concrete harm to Arm caused by the alleged breach.

Arm's witnesses have admitted this. When asked, ███████████████████████████

███████████ Arm's Chief Executive Officer Rene Haas answered ███████████ Ex. 13 at

███████████ He further stated that █████████████████████████████████████████

███████████ *Id.* at ███████████████████.

Arm's Chief Commercial Officer Will Abbey similarly testified that ████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████ Ex. 14 at ███████████. He admitted that ████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Abbey admitted

that █████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Paul Williamson, an Arm senior vice president, testified that ██████████████████████

███████████████████████████████████████████████████████████████████████████

Ex. 15 at ███████████. Nor █████████████████████████████████████████████████████

███████████████████████████████████████████████ Although

Williamson testified that ███████████████████████████████████████████████████████

███████████████████████████████████████████████████. He also

admitted that ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Even Arm's expert on contract remedies, CPA Todd Schoettelkotte, stated that it is

"impossible" to say that Arm has yet incurred any injury from Qualcomm's products and the harms

he discusses "have not yet transpired." Ex. 16 at ¶¶ 14, 39; Ex. 17 at 83:3–87:4, 181:15–182:3. In light of the testimony from Arm's executives and expert, Arm cannot credibly argue that it suffered any concrete injury caused by Defendants' alleged breach.  *See*, *also* Ex. 43 at 60:8 – 61:1.

### 2.     *Arm's Theories of Future Injury Are Inadequate*

Once the elements for a breach of contract have been established, California courts may award the remedy of specific performance where the plaintiff shows, among other things, that a party lacks "an adequate remedy by way of an action in damages for breach of contract." *Wilkison* v. *Wiederkehr*, 124 Cal. Rptr. 2d 631, 640 (Ct. App. 2002). California courts recognize limited situations in which damages are an inadequate remedy for breach of contract. Damages may be inadequate in light of "the unique nature of the property" at issue or "its lack of a determinable market value." Witkin § 800. Damages may also be inadequate where "an accurate assessment of damages would be far too difficult and require much speculation." *Tamarind Lithography Workshop, Inc.* v. *Sanders*, 193 Cal. Rptr. 409, 412 (Ct. App. 1983); *see Union Oil Co. of Cal.* v. *Greka Energy Corp.*, 80 Cal. Rptr. 3d 738, 741–43 (Ct. App. 2008) ("palpable risk" of groundwater contamination, gas leaks, third-party liability, and public-image deterioration subjected Unocal to "substantial and continuing exposure to third party liability"). Where specific performance is unavailable, so too are damages incidental to specific performance. *Paratore* v. *Perry*, 48 Cal. Rptr. 682, 685 (Ct. App. 1966); *Rose* v. *Lawton*, 29 Cal. Rptr. 844, 847 (Ct. App. 1963).

Even if Arm had established the elements for a claim of breach of contract, Arm cannot justify a request for a remedy of specific performance.  To support a claim for specific performance, Arm asserts hypothetical future injuries. None suffices: each is speculative and can be remedied with money damages.

Arm's expert, Todd Schoettelkotte discusses five categories of potential harms Arm "may" or "could" experience in the future: potential harm to (1) Arm's "licensing ecosystem"; (2) Arm's

"first mover advantage" from competition; (3) Arm's expansion into the server market, which was allegedly hampered when Nuvia's acquisition diverted its efforts to develop an Arm-compliant core for servers; (4) Arm's investment in research and development; and (5) Arm's reputation and goodwill. Ex. 18 at ¶¶ 71–136. Schoettelkotte offers the opinion that money damages are not adequate to remedy those "harms" that Arm might suffer in the future if specific performance is not awarded. *Id.* at ¶ 14; Ex. 16 at ¶¶ 14, 39, 50.[2] In offering that opinion, he is not opining as an expert that Defendants harmed Arm or will cause it future harm, he is identifying future harms claimed by Arm and opining on the issue of whether monetary damages can be adequate. Ex. 17 at 38:12–41:18. And he is relying on statements from Arm witnesses expressing concern about how Defendants' alleged breach might affect Arm in the future and then opining on whether an award of damages would remedy such alleged harms. *Id.*

There is no record evidence that any of the potential harms cited by Schoettelkotte are likely to arise. Schoettelkotte made clear that he is not opining on the probability of any future harms occurring. Ex. 17 at 90:12–92:2, 135:3–10, 142:4–14, 144:14–146:12, 176:2–7. No such harms materialized after Qualcomm launched its Arm-compliant microprocessors in October 2023. And the primary "evidence" Schoettelkotte relies on is speculation by Arm witnesses. *E.g.*, Ex. 18 at ¶¶ 72–136 & nn.184–330. That speculation is not enough to survive summary judgment. *See Halsey* v. *Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014).

Arm also has not shown that damages are inadequate to remedy its possible future harms. Schoettelkotte does not opine that a breach of the Nuvia ALA by itself would mean that money damages are inadequate; instead, he states that an alleged breach would have to be combined with

---

[2] Defendants are moving to exclude Schoettelkotte's report under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). If his report is excluded, it should be disregarded for purposes of summary judgment. Fed. R. Civ. P. 56(c)(2).

an order of this Court denying specific performance. Ex. 18 at ¶ 14; Ex. 16 at ¶¶ 14, 39, 50; Ex. 16 at 84:22–85:2. But in opining on the effect of the Court's potential future order, Schoettelkotte admits that he lacks any knowledge of how Arm licensees would react to an award of money damages, as opposed to an order of specific performance, or even if licensees know what relief Arm is seeking in this case. Ex. 17 at 106:17–108:15, 109:21–110:14, 140:13–142:3. And with respect to competitive harm, lost profits or royalties are the very sort of knowable and quantifiable damages typically awarded in intellectual-property disputes—as Schoettelkotte has conceded. *Id.* at 52:24–56:2; *Versata Software, Inc.* v. *SAP Am., Inc.*, 717 F.3d 1255, 1263–64, 1267 (Fed. Cir. 2013); *Green River Bottling Co.* v. *Green River Corp.*, 997 F.2d 359, 363 (7th Cir. 1993). Arm thus cannot show lack of an adequate remedy at law, nor can it show injury.

## B.    Qualcomm Is Not a Party to the Nuvia ALA

A defendant cannot be liable for breaching a contract to which it is not a party. *See, e.g.*, *Tiffany & Co.* v. *Spreckels*, 262 P. 742, 747 (Cal. 1927); *Tri-Continent Int'l Corp.* v. *Paris Sav. & Loan Ass'n*, 16 Cal. Rptr. 2d 508, 511 (Ct. App. 1993). The Nuvia ALA lists only Arm Limited and Nuvia, Inc., as parties; it does not list Qualcomm. *See* Ex. 5 at 1; *see also id.* at ████████ ████████████████████████████.[3] Recognizing that problem, Arm alleges that "Qualcomm is subject to Nuvia's termination requirements as the acquirer of Nuvia." D.I. 1 at ¶ 43. There is no evidence that Nuvia assigned the Nuvia ALA to Qualcomm.

Nor did Qualcomm's acquisition of Nuvia transfer the Nuvia ALA to Qualcomm by operation of law. Qualcomm acquired Nuvia through a reverse triangular merger. Under the merger agreement, governed by Delaware law, a wholly owned subsidiary of Qualcomm merged with and into Nuvia, with Nuvia surviving as a wholly owned subsidiary of Qualcomm and the

---

[3] At the time, Nuvia was independent and unrelated to Qualcomm. *Compare* Ex. 5 at 1 (effective date of Sept. 27, 2019), *with* Ex. 19 (executed Jan. 12, 2021).

former Qualcomm subsidiary dissolving. Ex. 19 at §§ 2.1, 2.3, 2.6(a), (g), 2.7(b)–(c). The effect of the reverse triangular merger was "the same as the purchase" by Qualcomm of Nuvia's "outstanding stock." *W. Standard, LLC* v. *Sourcehov Holdings, Inc.*, C.A. No. 2018-280, 2019 WL 3322406, at *6 (Del. Ch. July 24, 2019) (internal quotation marks and alteration omitted).

Qualcomm's acquisition of Nuvia did not assign the Nuvia ALA to Qualcomm. No provision of the merger agreement states that Qualcomm, as the parent corporation, assumed Nuvia's contracts. Under Title 8, Section 259(a) of the Delaware Code, when a "constituent corporation" merges into a "surviving or resulting corporation," the constituent corporation ceases to exist, and its assets become property of the surviving corporation. "A reverse triangular merger generally is not an assignment by operation of law" of the surviving corporation's assets because those assets stay with the surviving subsidiary and do not transfer to either the parent corporation or its extinguished subsidiary. *Meso Scale Diagnostics, LLC* v. *Roche Diagnostics GmbH*, 62 A.3d 62, 82–83 (Del. Ch. 2013); *see also City of N. Miami Beach Gen. Emps.' Ret. Plan* v. *Dr. Pepper Snapple Grp.*, 189 A.3d 188, 200 (Del. Ch. 2018) (holding that the parent corporation in a reverse triangular merger is not a "constituent corporation" for purposes of Del. Code tit. 8, § 262). Reverse triangular mergers are "the preferred method of acquisition for a wide range of transactions" precisely because "the rights and obligations of the target are not transferred, assumed or affected." *Lewis* v. *Ward*, C.A. No. 15255, 2003 WL 22461894, at *4 n.18 (Del. Ch. Oct. 29, 2003), *aff'd*, 852 A.2d 896 (Del. 2004). The merger of Qualcomm's now-extinguished subsidiary into Nuvia thus did not effectuate an assignment of Nuvia's contracts to Qualcomm. *Cf. N. Valley Mall, LLC* v. *Longs Drug Stores Cal., LLC*, 238 Cal. Rptr. 3d 368, 372–73 (Ct. App. 2018) (holding, under California law, that a reverse triangular merger did not effectuate an assignment of the target corporation's property to the parent corporation).

11

**C.      The Qualcomm ALA Authorizes Qualcomm's Post-Acquisition Products**

Defendants' counterclaim for declaratory judgment seeks, among other things, a ruling that

Qualcomm's cores ███████████████████████████████████████████████ are

licensed under its own ALA. D.I. 300 at ¶ 275(b). Summary judgment for Defendants is warranted

on that issue, because the plain text of the Qualcomm ALA demonstrates that Qualcomm acted

within its license when developing and using its cores.

The Qualcomm ALA licenses Qualcomm (and its subsidiaries) to use Arm's architecture

technology to design custom Arm-compliant cores and manufacture microprocessors

incorporating those cores. Qualcomm is licensed ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. Under the Qualcomm ALA, the term ██████

██████████████ means ████████████████████████████████████████

███████████████████████████████████████.[4] That technology included

███████████████████████████████████████████████████████

██████████████████████████████. The term ████████████████████ means a

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████. The Qualcomm ALA

then provides Qualcomm with a license to ████████████████████████████████

███████████████████████████████████████████████████████

_____

[4] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████████

████████████████

Qualcomm's license authorizes it to use ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Qualcomm started its cores after the acquisition of Nuvia and informed Arm that it was proceeding under the Qualcomm ALA. Ex. 11.

Qualcomm was licensed to engage in the substantial work it did using the technology licensed under its own ALA to develop unique products for different markets. Once at Qualcomm, former Nuvia employees began to develop several new systems-on-a-chip containing various custom cores, each with specific features for those markets. ███████████████████████ ███████████████████. At the time Arm terminated the Nuvia agreements, Qualcomm was well into the process of developing the ███████████ core, intended for the compute market; and the ███████████ core, intended for the mobile market. Ex. 22 at 20–21. In addition to those cores, Qualcomm started the process of planning the development of the ████████████ core, intended for the automotive market; and the ███████ core, a next generation custom core. Ex. 23 at ¶ 17. Qualcomm plotted the timelines of those products to be developed and released over a number of years, with finalization dates plotted until the mid-2020s. Ex. 4 at ¶ 114. All of that work was licensed under the Qualcomm ALA.

The licensed development of those products, all of which commenced following the acquisition, took place under the Qualcomm ALA, resulted from substantial Qualcomm innovation and design work targeting market-specific applications for each microprocessor. ███████████████ █████████████████████████████████████ Designing a CPU requires RTL development

and validation testing by a separate team during the course of design work. Ex. 4 at ¶¶ 40–41. Given the complexity in design work, validation engineers rely on validation test suites, random testing, bespoke software tests, emulation systems, and large server farms to run testing. *Id.* at ¶ 42. Following the validation, the CPU will go through a production process in which the RTL database is processed through a fabrication plant (such as TSMC) into a silicon design where photochemical processing occurs after other rigorous testing of the silicon design. *Id.* at ¶ 43.

The cores resulting from Qualcomm's extensive design work are ███████████████ ███████████████████████. They were ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████. On April 12, 2022, after the Nuvia agreements had been terminated, Arm provided Qualcomm with ████████████████████ ██████ ██████, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████ Ex. 24. Arm stated that the █████████████████████ was ███████████ ████████████████████████████████████████████████████████████ ███████████ *Id.* at 6, 7.

That Qualcomm's cores incorporated some Nuvia RTL code does not render them unlicensed. Under the Qualcomm ALA's plain language, █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

14



. Any argument to the contrary would require

reading language into the contract that is not there—which California law prohibits. *See* Cal. Civ.

Proc. Code § 1858; *Jensen* v. *Traders & Gen. Ins. Co.*, 345 P.2d 1, 3 (Cal. 1959).

**D.** **The Nuvia ALA Does Not Require Defendants to Cease Using or Destroy Nuvia's Pre-Acquisition Design Work**

Arm contends that the termination provision requires Defendants to "cease using and

destroy" all of Qualcomm's ▆▆▆▆ cores. D.I. 1 at ¶ 62. According to Arm, the RTL code

developed by Nuvia for the ▆▆▆▆▆ core before the corporate acquisition (the "Nuvia RTL

code") is either an embodiment or derivative of ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆. Ex. 4 at ¶¶ 131, 166. Arm reaches that

conclusion because Nuvia allegedly relied on ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆. *Id.* at ¶¶ 135–38, 149–

53. Arm then argues that the cores developed by Qualcomm after the acquisition ▆▆▆▆▆

███████████████████████████████████████ contain portions of the Nuvia RTL code, *id.*

at ¶ 166, and therefore Defendants must cease using and destroy those cores as well.

     Arm's argument fails under the plain language of the Nuvia ALA, because the ████████

████████████████████████████████████████████████████████████████

██████████████████████." Arm reaches the contrary conclusion only by relying on an

incorrect interpretation of the ████████████████████████████████████████

██████████████. That is wrong; the plain language of the Nuvia ALA ████████████████

████████████████████████"

        *1.*    █████████████████████████████████████████

████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████"[5]

████████████████████████████████████████████████

██████████████████  ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

_____

[5] ████████████████████████████████████████████████████

████████████████████████████████████████



Arm's Rule 30(b)(6) witness on the definition of ███████████ and chief architect of the Arm instruction-set-architecture, Richard Grisenthwaite, confirmed this; he stated that ██████████████████████████ Ex. 25 at 132:17–133:8.

████████████████████████████████████████████████████████

███████████████████████████████

     Although the issue is one of plain contractual language, undisputed deposition testimony from Arm employees confirms that understanding. Arm's Rule 30(b)(6) witness on the definition of ███████████████ Richard Grisenthwaite, stated at his deposition that ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ ██████████████████████████████████████████████

██████████ ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ No Arm witness testified to the contrary.

     ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ [6]

**2.    *The Architectural Reference Manual Is Neither* ███████████
***Nor*** ████████████████████**

The Arm Architectural Reference Manual (sometimes referred to as the "Arm ARM") is a *publicly available* PDF document that describes the "behavior" a core must "conform to" in order to be "compliant with the Arm architecture," but it does not "describe how to build an implementation of the [core]." Ex. 26 at A1-34.[7] The Manual does not constitute ████

███████████████████████████████████████████████████. ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████   Arm did not need to classify the version

---

[6] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[7]  Arm Developer, *Arm Architecture Reference Manual for A-profile Architecture*, https://developer.arm.com/documentation/ddi0487/latest/

8-A Manual as ███████████████████████ because Nuvia could (and did) download the version 8-A Manual from Arm's public website. ████████████████████████. The items in █████ on the other hand, were not publicly available.

Although not necessary to decide this motion, deposition testimony confirms that the ████████████████████ are not equivalent to the Manual. ARM's Senior Principal Engineer responsible for Arm's Architecture Compliance Support explained that ████████████████ ███████████████ ████████████████████████████ ██████████████████████████████████ *cf.* Ex. 30 at 129:3–130:17 (making a similar distinction in the context of Arm's Technology License Agreements).

As previously stated, an item that is not ███████████████ constitutes ███████ ██████████████████████████████████████████████ ███████████████████████████ ████████████████ ██████████████████████████████████████████ █████████████████████████████████████ That language mirrors the Copyright Act, which defines the term "derivative work" to mean "a work based upon one or more preexisting works, such as a *translation*, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, *abridgment*, condensation, or any *other form in which a work may be recast, transformed, or adapted*," including "a work consisting of editorial revisions, annotations, elaborations, or other *modifications* which, as a whole, represent an original work of authorship." 17 U.S.C. § 101 (emphasis added). As the Third Circuit has explained, "by definition, derivative works are *substantially similar* to the original work, because a work is not derivative unless it has been

20

*substantially* copied from a prior work." *Dam Things from Denmark* v. *Russ Berrie & Co.*, 290

F.3d 548, 565 (3d Cir. 2002) (internal quotation marks and alterations omitted).

Applying those definitions here, the Manual is not a "derivative" of the <span>███</span>

<span>███████</span> because it is not substantially similar to the items listed <span>██████</span> After all, those

items are listed separately from and in addition to the Manual—a preexisting document—in

<span>██████</span>. And there is no evidence that the Manual could possibly derive from the other

<span>█████████████</span>. The Manual is also not a "trade secret," because it is a publicly available

document published on Arm's website. *See* Cal. Civ. Code § 3426.1(d); *In re Providian Credit

Card Cases*, 116 Cal. Rptr. 2d 833, 842 (Ct. App. 2002).

The Manual is thus neither <span>███████████████</span> nor <span>██████████████████████████</span>

under the Nuvia ALA. In turn, the obligations in the Nuvia ALA's termination provision would

not apply to an embodiment or derivative of the Manual.

### 3.    *The Nuvia RTL Code Is Not Subject to the Termination Provision*

Defendants have no obligation under the termination provision to cease using, cease

distributing, or destroy the Nuvia RTL code or Qualcomm's cores, because the Nuvia RTL code

is not an embodiment or derivative of <span>███████████████</span> or an embodiment of <span>██████</span>

<span>█████████████████████████████</span>

*First,* the Nuvia RTL code is not a <span>████████████████████████████████</span>

<span>██████████████████████████████████████████████████</span>

<span>████████████████████████</span>. And in his opening report, Arm's expert Dr. Shuo-

Wei (Mike) Chen identified only a single <span>████████████████████████</span>

<span>█████████████████████████████████████████████████</span>

<span>███████████</span>. Ex. 23 at ¶¶ 48–51. But Chen does not cite any actual code implementing the

feature, which is unsurprising: when Nuvia was acquired by Qualcomm, it had not yet

implemented ████████████████. Ex. 31 at ¶¶ 300–301.

*Second*, the Nuvia RTL code is not an embodiment of the ████████████ or ████ ████████████. The ordinary meaning of the verb "embody" is "to make concrete and perceptible." *Webster's Third New International Dictionary* 608 (2002); *see American Heritage Dictionary* 489 (defining "embody" as "to give a bodily form to; incarnate"). There is no evidence in the record that Nuvia incorporated the ████████████████████████████ ██████████████████████████.

### E.     Qualcomm Has Made Only Nominative Use of the ARM Marks for Which There Is No Likelihood of Confusion

Arm alleges that Qualcomm's use of the ARM trademarks constitutes trademark infringement and false designation of origin. *See* 15 U.S.C. §§ 1114, 1125. Those claims—which are governed by identical standards, *A&H Sportswear, Inc.* v. *Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000)—fail as a matter of law because Qualcomm's use of the ARM marks constitutes nominative use, and there is no likelihood of confusion.

### 1.     *Qualcomm Has Made Only Nominative Use of the ARM Marks*

This is not an ordinary trademark case where the plaintiff alleges the defendant "passed off [the plaintiff's] mark as its own or . . . used a similar name, confusing the public as to precisely whose goods are being sold." *Century 21 Real Est. Corp.* v. *LendingTree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005). Arm contends only that Qualcomm used the word marks to describe its products as "compliant" with, "based" on, or "compatible" with Arm's instruction-set architecture. *See* Ex. 32 at ¶¶ 112–118; Ex. 33 at ¶ 28. Nor does Arm argue that Qualcomm confused the relevant market about the *origin* of Qualcomm's products. Arm instead contends that Qualcomm's cores are not properly licensed, and use of the ARM marks "falsely signifies connection as to [source], affiliation, sponsorship, or approval from Arm and verification and validation by Arm under an

applicable ALA Annex and that the product is covered by a license to Arm Technology." Ex. 32 at ¶ 122.

That is textbook nominative use. Nominative use, also called referential use, is where "[t]he defendant is not purporting to be selling goods or services that the plaintiff has trademarked, but, rather, is using plaintiff's mark in order to refer to defendant's own goods or to the goods of the trademark owner." *Century 21*, 425 F.3d at 217. A classic example is "use of the term 'Volkswagen' by a car mechanic in an ad describing the types of cars he repairs." *Id.* at 214. Another more pertinent example is where a defendant uses the plaintiff's mark "to put potential customers on notice that its parts are compatible with [the plaintiff's] product." *Ford Motor Co.* v. *O.E. Wheel Distribs., LLC*, 868 F. Supp. 2d 1350, 1368 (M.D. Fla. 2012). By describing its products as "Arm-based" or "Arm-compliant," Qualcomm is merely signaling to customers that its products will run software compatible with Arm's instruction-set architecture.

### 2. *Arm Cannot Establish that Qualcomm's Nominative Use of the ARM Marks Is Likely to Cause Confusion*

To determine likelihood of confusion in nominative-use cases, courts apply an abbreviated version of the ten-factor test from *Interpace Corp.* v. *Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983). *Century 21*, 425 F.3d at 224–25. The analysis focuses on the following factors: (3) factors indicating the care and attention expected of customers (including price); (4) the duration the defendant used the mark without actual confusion arising; (5) the defendant's intent in using the mark; and (6) the evidence of actual confusion. *Id.* at 225–26. No factor is "determinative and each must be 'weighed and balanced' based on the particular facts of the case." *Arrowpoint Cap. Corp.* v. *Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 320 (3d Cir. 2015). Factor 6, however, "is of particular significance because it focuses on evidence of actual confusion," which goes directly to "the fundamental question of whether there is a likelihood of confusion." *Id.* Factor 3 is also

particularly probative, because courts generally do not find trademark violations where "the buyer class consists of sophisticated or professional purchasers." *Checkpoint Sys., Inc.* v. *Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001). Here, the applicable factors are decidedly in defendants' favor.

**Factor 3. —** Arm's and Qualcomm's customers are undisputedly sophisticated. Arm's trademark expert, Dr. Ravi Dhar, admits that Arm's "direct customers are chip developers and manufacturers, such as Amazon, Google, Intel, NVIDIA, and Samsung." Ex. 32 at ¶¶ 95, 97. Dhar also admits that Qualcomm operates in a business-to-business market with "sophisticated" customers. Ex. 33 at ¶¶ 12, 18, 25 n.72, 46.

**Factors 4 and 6. —** The record also contains no evidence of actual confusion in the three years that Qualcomm has used the ARM marks in connection with custom cores. Schoettelkotte was asked to opine on any damages from Arm's trademark claims and was told by Arm that Arm was not aware of any trademark infringement by Defendants to date. Ex. 18 at ¶¶ 3, 141; Ex. 17 at 42:4–43:2. Dhar opines that certain of Qualcomm's statements may contribute to a likelihood of confusion about Qualcomm and Arm's relationship, *see* Ex. 33 at ¶¶ 25–28, but he concedes that he did not attempt "[to] show evidence of actual confusion," *id.* ¶ 47, including after Qualcomm's launch of Snapdragon X Elite chips in October 2023. Nor could Arm's Rule 30(b)(6) witness point to any confusion in the market arising from Qualcomm's nominative use of the ARM marks. Ex. 34 at 109:15–20, 110:8–13. Neither Arm nor Dhar surveyed the market to determine whether confusion was present (or was likely to be present). *See* Ex. 35 at 129:13–19, 323:23–324:2. The absence of any actual confusion is powerful evidence that no confusion is likely to occur. *See Arrowpoint Cap.*, 793 F.3d at 320.

**Factor 5.** — In nominative-use cases, the question under Factor 5 is whether the defendant

"used the mark with the intent to confuse the public as to the *relationship* between the defendant and the plaintiff." *Century 21*, 425 F.3d at 227 (internal quotation marks omitted). "Use of the mark alone is not sufficiently probative of such intent." *Id.* Here, there is no record evidence that Qualcomm intended to confuse the public about its relationship with Arm. To the contrary, as Qualcomm's vice president for product marketing explained, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ .

The examples Arm cites only confirm the point. In his opening report, Dhar cites four instances in which Qualcomm used the word "Arm" to refer to their custom core products (or anticipated future products). Ex. 32 at ¶¶ 112, 116. But each instance was a truthful description that the relevant microprocessors were compatible with Arm's instruction set architecture. *See id.* In his reply, Dr. Dhar marshals fifteen other examples of Qualcomm's nominative use of the marks. *See* Ex. 33 at ¶ 28. But ten of those examples are public statements made by Qualcomm, mostly to financial analysts, about Qualcomm's general plans to bring to market a microprocessor compatible with the Arm architecture. *Id.* ¶ 28(a)-(j). The remaining five involve Qualcomm explaining that its microprocessors are "Arm-based," "Arm-compatible," or "Arm-compliant," which shows that Qualcomm was truthfully explaining that its microprocessors are compliant with Arm's instruction-set architecture. *Id.* ¶ 28(k)–(o).

With respect to Nuvia: Dhar relies only on uses of the ARM marks by Qualcomm. Ex. 32 at ¶¶ 107–18; Ex. 33 at ¶¶ 27–28. Arm has not identified any other use of the marks by Nuvia that Arm claims is improper. No reasonably jury could find that either Qualcomm or Nuvia intended to confuse customers.

*Other factors.* — *Lapp* factors 1 and 2 are inapplicable in nominative-use cases. *See Century 21*, 425 F.3d at 224–25. Courts will consider *Lapp* factors 7–10, however, if they are relevant to the particular facts. *See id.* at 225. Here, those factors are either irrelevant or tilt in Qualcomm's favor. Factors 7 and 8 concern whether the goods are marketed through the same channels of trade and media, and the extent to which the target of the parties' sales efforts are the same. *See Lapp*, 721 F.2d at 463. But in nominative-use cases, "the fact that the goods are marketed through the same sales channels is irrelevant," and "the mere fact that the parties target identical customers has no bearing." *Keurig Inc.* v. *Strum Foods, Inc.*, 769 F. Supp. 2d 699, 707–08 (D. Del. 2011) (citation and alternations omitted). Factors 9 and 10 concern customers' perspective on the relationship between the goods in light of their functional similarity and the actual or potential overlap between the market for the parties' goods. *See Lapp*, 721 F.2d at 463. But Arm cites no evidence regarding the relationship of its and Qualcomm's products in the mind of Qualcomm's customers, nor has Arm identified any facts suggesting that customers expect Arm to expand into Qualcomm's market. All told, the undisputed evidence shows that the relevant *Lapp* factors weigh entirely in Defendants' favor.

### 3.     *Dr. Dhar's Theory of Confusion Do Not Create A Genuine Issue of Fact*

Dr. Dhar does not analyze likelihood of confusion using the *Lapp* factors. Instead, he broadly contends that Qualcomm's use of the ARM marks would confuse Qualcomm's customers because they would infer a "connection to the Arm brand" or that Qualcomm's products are "licensed, verified, or validated by Arm." Ex. 33 at ¶ 46; *see* Ex. 32 at ¶ 117. Even if his reports were admissible and his analysis consistent with *Lapp*,[8] his theory would not suffice to create a genuine issue of fact on likelihood of confusion.

---

[8] Defendants have moved to exclude Dhar's report under *Daubert.* Like Schoettelkotte's report, Dhar's report should be disregarded if Defendants' motion is granted.

The undisputed evidence demonstrates that Qualcomm's use of the ARM marks merely conveyed to purchasers that Qualcomm's microprocessors were designed to be compliant with Arm's instruction-set architecture—not that Arm had any particular role in product development or testing.[9] For example, Arm's Rule 30(b)(6) witness testified that ███████████████ ████████████████████████████████████████████████████████████ he further confirmed that ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████ Dhar similarly concluded that the strength of the ARM marks depends on "Arm's CPU architecture," not any licensing or verification by Arm. Ex 32 at ¶ 98. More still, Arm's Trademark Use Guidelines permit certain uses of the ARM marks, including the phrase "Arm-based," while forbidding any uses that would "express[] or impl[y] that Arm has any affiliation, sponsorship, endorsement, certification, or approval of [the relevant] product, service or company." Ex. 37 at -7741. Arm thus does not believe that use of the term "Arm-based" implies any "connection" with Arm beyond the implementation of Arm's architecture. Arm offers no evidence that use of the term "Arm-compatible" is any different.

The evidence Dhar marshals does not move the needle. Dhar suggests that confusion might arise because Arm uses "Arm-based" to describe licensed products. Ex. 33 at ¶ 16. But when Arm wants to make clear it is discussing issues of licensing, it refers to "licenses" or "partners," not merely "Arm-based" cores or products. *See id.* Dhar also suggests that "Arm-compliant" signifies that a product "has been verified and validated by Arm." *Id*. ¶ 18. But the evidence he cites shows only that an "Arm compliant" product is one "based on ARM technology." *Id.* ¶ 21; *see id.* ¶ 22 (a

---

[9] Qualcomm also has its own license to develop architecture-compliant CPUs.  *Supra*, Section VI.2; Ex. 2.

product "incorporating any of the ARM Technology"). Dhar tries to avoid that problem by asserting that "compliance" requires verification through Arm's testing suite. Ex. 32 at ¶ 117; Ex. 33 at ¶ 23. But even assuming *Qualcomm* and *Arm* understood compliance that way, there is no evidence that *Qualcomm's current and potential customers* would understand it that way. Accordingly, even if admissible, Dhar's reports do not create a fact issue on whether Qualcomm's use of the ARM marks would have confused its customers concerning Qualcomm's relationship with Arm.

## VII.    CONCLUSION

The motion for summary judgment should be granted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
Samantha Mehring
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

July 10, 2024

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 10, 2024, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                              *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Joyce Liou, Esquire                                                     *VIA ELECTRONIC MAIL*
Lydia Davenport, Esquire
Daralyn J. Durie, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                                  *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                                          *VIA ELECTRONIC MAIL*
Sarah E. Brickey, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Daniel P. Muino, Esquire                              *VIA ELECTRONIC MAIL*
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                          *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                             *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                         *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL  33131
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*

_____

Jennifer Ying (#5550)