# EXHIBIT 1

# EXHIBIT 2

# EXHIBIT 3

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD., a U.K. corporation,

        Plaintiff,

      v.

QUALCOMM INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation,

        Defendants.

C.A. No. 22-1146 (MN)

**CONTAINS HIGHLY CONFIDENTIAL – SOURCE CODE-ATTORNEYS' EYES ONLY**

## OPENING EXPERT REPORT OF DR. ROBERT P. COLWELL

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................1

II.     EXPERIENCE AND QUALIFICATIONS ............................2

III.    BACKGROUND AND OPINIONS........................................7

    A.    Microprocessor Industry ............................................7

        2.    Microprocessor Architectures. ......................10

        3.    Microprocessor Development. .......................19

        4.    Business Models for Licensing Microprocessor
            Architectures ..................................................22

    B.    Parties ......................................................................25

        1.    Arm ...............................................................25

            (i)    Company Background..............................25

            (ii)   Arm Architecture ...................................26

            (iii)  Arm Processors .....................................30

            (iv)   Arm Has a Large Patent Portfolio
                 Covering Its Architectural Innovations .....32

            (v)    Industry Adoption of Arm
                 Architectures..............................................32

        2.    Qualcomm.....................................................33

        3.    Nuvia .............................................................34

            a.    Company Background .........................34

            b.    Nuvia's ALA and TLA .......................35

                (i)    Background of Nuvia's ALA and TLA........35

                (ii)   Definition of ███████████...............36

                (iii)  ████████████████████............41

                (iv)   ███████████████.....................43

    C.    Factual Background....................................................44

        1.    Nuvia Develops the ████████ Core in Compliance
            with the Arm Architecture................................44

        2.    Qualcomm Purchases Nuvia and Arm Objects..............47

        3.    Qualcomm Incorporates Nuvia Cores Into Its Own
            Products ..................................................53

# TABLE OF CONTENTS
### (continued)

Page

4.   Qualcomm Releases Snapdragon X ...................................60

5.   Abbreviated Timeline of Events .....................................60

IV.   FURTHER OPINIONS ...................................................62

A.   The ████ Cores Were Designed as ████████ and Are ██████████ .......62

1.   Relevant Technical Definitions from Nuvia ALA and Annex ...............................................62

2.   The Nuvia ████ Core and Later Versions of the ████ Core Were Designed to Implement the Elements of the Armv8 Architecture ............................65

a.   Nuvia decided to create a custom core based on the Arm architecture. ...............................65

b.   The ████████████████████ .................................66

(i)   ████████████████ ....................................66

(ii)   ████████████████ ...................................67

(iii)   ████████████ ........................70

c.   Nuvia utilized Arm materials to develop the ████ Core. ...............................................73

(i)   Nuvia used ████████ as defined in the ALA Annex to build the ████ Core. ...............................73

(ii)   Nuvia also used other Arm documents, tools, and knowledge to build the ████ Core. ...............................75

d.   Nuvia and Qualcomm employees testified that the ████ Cores were designed to implement Armv8 Architecture and be Arm-compliant. ...............................77

sf-5616808

**TABLE OF CONTENTS**
(continued)

**Page**

3. The Nuvia ███████ Core Was Validated as an
███████████████████████ ..............................................80

    a. Nuvia and Qualcomm used confidential Arm
tools to verify the Nuvia █████ Core's
compliance with Armv8 Architecture. ..................80

    b. Arm validated the Nuvia ███████ Core as an
█████████████████████. ......................81

B. Nuvia's Design of the █████ Core Is Incorporated into
Several of Qualcomm's SoC Products..........................................83

C. Qualcomm's Purported Swap Out ██████████████
████████ ..................................................................89

1. Qualcomm's Swap Out Was in Response to
Termination of the Nuvia Agreements..............................89

2. The Swap Out ████████████████████ ........90

3. Qualcomm Did Not Discontinue Using the ██████
Cores in █████████████████ Following
the Termination of the Nuvia Licenses...........................92

V. CONCLUSION ........................................................................94

sf-5616808

## I.      INTRODUCTION

1.      My name is Dr. Robert P. Colwell, and I have been retained as an expert witness on behalf of the Plaintiff Arm Ltd. in this matter.  I understand that Arm has sued Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc. in the District of Delaware in the case captioned *Arm Ltd. v. Qualcomm Inc. et al.*, No. 1-22-cv-001146-MN (D. Del.). I am being compensated for my time in connection with this proceeding at $650/hour.  My compensation is not dependent on the substance of my opinions, my testimony, or the outcome of this proceeding.

2.      I have been asked to analyze whether certain Qualcomm CPU cores incorporate technology developed by Nuvia under the Nuvia Architecture License Agreement ("Nuvia ALA"), ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████

3.      As discussed further below, it is my opinion that:

(i)  The ████████ core initially developed by Nuvia (a) was designed to be ████████████████████████████████████████████ ████████ ; (b) implements the Arm instruction set and other components of ████████████████████████████ ; and (c) was validated as an Arm ████████████████████ .

(ii)  Qualcomm incorporated substantial parts of the Nuvia-designed ████████ core into later versions of the ████████ core used in certain Qualcomm

1

System-on-Chip ("SoC") products, including the  core, the

██████████ core, and the ████████████ core.

(iii)  While I understand that Qualcomm claims it swapped out certain Arm

IPs from its products following Arm's termination of the Nuvia licenses, the

documents and testimony provided by Qualcomm indicate that ██████████

████████████████████████████████████████████████████████████

████████████

    4.     I base my opinions on my extensive experience in the industry;

experience with Arm technology; my review of documents produced in this

litigation; my review of deposition transcripts; my review of discovery

responses; a conversation I had with Arm Chief Architect Richard

Grisenthwaite on December 13, 2023; source code produced by Qualcomm;

and other materials.  I also reviewed the Expert Report of Dr. Shuo-Wei

(Mike) Chen submitted in this case.  I include a list of materials considered in

Appendix A to this report.

## II.    EXPERIENCE AND QUALIFICATIONS

    5.     I am a technical expert in the field of computer engineering and

microprocessor design.  I am also an industry expert in those fields.  I attach

a copy of my *curriculum vitae* as Appendix B to this report, which describes

my relevant experience, including academic and employment history,

publications, professional activities, and speaking engagements.

    6.     I received a B.S. degree in Electrical Engineering from the

University of Pittsburgh in 1977.  I received an M.S. degree in Computer

Engineering from Carnegie Mellon University (CMU) in 1978, followed by a Ph.D. in Computer Engineering from CMU in 1985.

7.     From 1977 until 1980 I worked for Bell Laboratories in Holmdel, New Jersey as a hardware design engineer developing 8- and 32-bit microprocessors.  My specific responsibilities included design and support of their in-circuit emulators, and design and timing analysis of interchip signaling protocols.

8.     From 1980 until 1984, while obtaining my Ph.D., I worked part time for Perq Systems in Pittsburgh, Pennsylvania, as a hardware design engineer working on high-resolution graphics display hardware for first generation bit-slice-based workstations.

9.     From 1985 until 1990, I worked at Multiflow Computer in Branford, Connecticut, as a hardware design engineer creating the world's first VLIW (very long instruction word) scientific supercomputer.  Multiflow sold about 125 such systems at an average selling price of $200K.

10.    From 1990 to 2001, I held various positions at Intel Corp. in Hillsboro, Oregon, including Senior CPU Architect and Chief Architect (for Intel's IA-32, also known as x86).  As part of my responsibilities at Intel, I co-invented Intel's P6 microarchitecture, productized as the Pentium Pro, which also formed the core of the Pentium II, the Pentium III, Celeron, Xeon, and Centrino families, as well as the Pentium 4.  P6 microarchitecture features are still very influential today in Intel's top-of-the-line Core i3, i5, i7,

i9, and X-series processors.  In addition, I led Intel's overall x86 Pentium CPU architecture endeavors across multiple chip developments.  I was honored to be named an Intel fellow in 1997 in recognition of my contributions to the P6 microarchitecture development.  Overall, I worked with and spent 11 years leading a large industrial microprocessor design team at Intel, which by the late 1990s included more than 850 engineers.

11.     Along with the x86 chip development work, in my role as Intel's Chief Architect, I also tracked current and emerging competition in the microprocessor product space.  Although Arm Inc. products were not performance-competitive with Intel's chips in the 1990's, I paid attention to Arm because my personal conviction in the late 1990's was that low-power and low-cost processors would increasingly be required in the future mobile computing platforms that I was sure would emerge (which turned out to primarily take the form of smartphones and tablets).  I analyzed the ARM instruction set, core performance, and software tool availability (compilers, debuggers, simulators), as well as projected licensing costs and support models.  The conclusion I reached at the time, and still hold today, is that a capable design team could use the ARM instruction set to design Arm-compliant processors that would challenge the best processors from Intel

sf-5616808

or AMD in every market segment.  My conclusion ended up being correct, as evidenced by Apple's introduction of the M-series processors.[1]

12.     While at Intel, I also paid attention to Qualcomm, because I found it worrisome that we at Intel had a processor product line that had little to offer the coming mobile computing markets.  Intel had no suitable x86 cores to sell to those low-power markets, and no ability to license x86 cores to Qualcomm, even if we had those cores in our product line.  Given Qualcomm's long history in the cell phone industry, which is necessarily a mobile and battery-operated environment, the SoC paradigm looked to be a natural fit to serve as the basis for those mobile products.  SoCs are space-efficient, incorporating most of the necessary system functions on a single chip, and power-efficient because electrical interconnections are short and the SoC designers can optimize the SoCs' functions rather than having to use whatever is available.  SoCs require, among other things, one or more CPUs, each with one or more processor cores.  Licensing cores from a company dedicated to developing those cores is an effective solution compared to creating and permanently maintaining a CPU core development team so that each new generation remains performance competitive.

13.     I became a self-employed industry consultant in 2001, working with computer industry clients such as Safeware, the University of

---

[1] Hassan Mujtaba, *Apple M1 ARM 8 Core CPU Is Faster Than Intel & AMD's Fastest 8 Core Chips in Single-Core Performance Benchmark*, WCCFTECH (March 25, 2021), https://wccftech.com/apple-m1-arm-8-core-cpu-faster-intel-amd-fastest-8-core-chips-single-core-performance/ (last visited December 19, 2023).

sf-5616808

Pittsburgh, Intel, venture capital companies, various expert witness

engagements, and the U.S. Department of Defense (DoD).

14.     In 2011, I joined DoD's Defense Advanced Research Projects

Agency (DARPA) as deputy director of the Microsystems Technology Office

(MTO).  DARPA is the U.S. government's premier defense-related funding

agency, specializing in high-risk and high-reward technologies for the U.S.

military.  A year later I became MTO's director, until my departure in

April 2014.  MTO had an annual budget of approximately $600M, and my job

as office leader was to invest that money in promising new technologies for

the DoD, including new energy-efficient computing systems, modular and

adaptable radars, position/navigation/timing systems for GPS-denied

environments, computer-mediated prosthetics for military (and civilian)

amputees, traumatic brain injury detection devices for soldiers, fused

multiple-band night vision sensors, extremely high-power lasers, and much

more.

15.     I have authored numerous publications including books,

chapters in books, journal papers, and numerous patents (40) associated with

computer hardware and processor design.  My *curriculum vitae* includes a list

of all the publications I have authored in the last 10 years.  Many of these

publications concern the design of microprocessors and computer systems.  I

have also been an editor for Institute of Electrical and Electronics Engineers

(IEEE) publications, as well as a columnist and author.

sf-5616808

16.     I have received multiple awards, including the 2005 Eckert-Mauchly Award for "outstanding achievements in the design and implementation of industry-changing microarchitectures."  The Eckert-Mauchly Award is generally viewed as the highest recognition in the field of computer architecture.  In 2006, I was elected to IEEE Fellow and inducted into the National Academy of Engineering for contributions to turning novel computer architecture concepts into viable, cutting-edge commercial processors.  In 2012, I was inducted into the American Academy of Arts and Sciences (AAAS).  Other inductees in my AAAS "class" that year included Sir Paul McCartney, Hillary Rodham Clinton, and Mel Brooks.  In 2015, I received the Bob Rau Award from the IEEE for "contributions to critical analysis of microarchitecture and the development of the Pentium Pro processor."

## III.    BACKGROUND AND OPINIONS

### A.    Microprocessor Industry

17.     A microprocessor is a computer on an integrated circuit, also known colloquially as a "computer chip."  The "micro" part of the word "microprocessor" refers to the physical size of the processor.  At the time the term microprocessor was coined (1971), computer systems were the size of several full-sized refrigerators, while the microprocessor was the size of a pack of chewing gum.  Regardless of size, all such processors can fetch and execute machine instructions from main memory.  A microprocessor is also known as a "CPU," or Central Processing Unit.  A new term for

7

microprocessors, "core," has come into vogue since the burgeoning number of transistors afforded by Moore's Law enabled the industry to put more than one CPU onto a single integrated circuit. By convention, the product is still called a microprocessor, but there can be multiple cores within that processor, each capable of independently fetching and executing its own instruction stream. These multiple independent cores may share certain facilities such as a common cache, an on-chip network, access to main memory, and an input/output interface.

18.     Other components of a modern computer system, such as those in a smartphone, can also be integrated onto the same silicon as the cores, yielding a product conventionally called a System-on-Chip, or SoC.

19.     Microprocessors and SoCs are now ubiquitous in everyday life and are no longer found just in computer systems, phones, and tablets. Modern automobiles have many different processors, from entertainment systems, security systems, engine controllers, antilock brake controllers, transmission controllers, to the key fob that opens the doors. Likewise, today's homes are rife with computing horsepower: processors run the microwave, washing machine, dryer, furnace, TV, router, cable modem, and even light switches and flashlights.

20.     The International Trade Commission (ITC) estimates the size of the global information technology (IT) sector to be $5T and more than 10% of

the U.S. gross domestic product.[2] Several of the largest companies in the world are heavily IT-centric. By some metrics, Apple is #1 with the largest market cap at $2.65T. Microsoft is #3 with a market cap of $2.1T, Alphabet (Google) at #4 with $1.54T, Amazon at #5 with $1.42T, NVIDIA with $1.06T, Tesla at #6 with $910B. By contrast, Toyota, a more conventional manufacturing company, has a market cap of $236B. The entire U.S. movie industry revenue in 2022 was $41.7B, and the music industry at $19.1B in 2020, while the high-tech video game market was valued at $159.3B in 2020, three times higher than movies and music combined.[3]

21.     It is important to realize that new computer technology does not just afford incremental improvements to existing products or markets, but also enables entirely new markets and products. For instance, the Internet came into existence when computers became fast enough, and inexpensive enough, to handle the data traffic. Smartphones became feasible products when processors became fast enough to execute useful applications at power levels that did not quickly drain the battery.

---

[2] David Coffin et al., *The Roadblocks of the COVID-19 Pandemic in the U.S. Automotive Industry*, U.S. INTERNATIONAL TRADE COMMISSION (USITC) (June 2022), https://www.usitc.gov/publications/332/working_papers/the_roadblocks_of_the_covid-19_pandemic_in_the_automotive_industry_final.pdf (last visited December 19, 2023).
[3] Gavin Divers, *Gaming Industry Dominates as the Highest-Grossing Entertainment Industry*, GAMERHUB (January 24, 2023), https://gamerhub.co.uk/gaming-industry-dominates-as-the-highest-grossing-entertainment-industry/#:~:text=To%20put%20that%20in%20perspective,much%20as%20the%20movie%20industry (last visited December 15, 2023).

9

sf-5616808

## 2.      Microprocessor Architectures.

22.     A computer instruction set architecture (ISA) is the list of instructions that a compatible processor is able to execute, plus other information needed by an assembly language programmer, such as the number and width of the machine's registers, addressing modes, control register descriptions, supported data types (*e.g.*, integers, single and double precision floating point, and strings), as well as the actual bit-for-bit encoding of the instructions.

23.     A computer instruction is an operation that a given processor "knows how to perform," encoded into a pattern of bits that the processor can decode and execute.  A canonical example might be an integer add instruction.  For the Arm ISA, the corresponding "opcode" would be called ADD, and the overall instruction would specify the two source registers whose contents are to be added together, plus a destination register indicating where the sum is to be written.  If the data to be added happened to reside in main memory, two memory loads would have to first be performed to get the data into the registers.  The much more complicated Intel x86 architecture, by contrast, allows the ADD instruction itself to access memory for one of the source values, and the destination can also be memory.

24.     ISAs such as Intel's x86 architecture comprise hundreds (or thousands, depending on how one counts) of instructions, which include simple instructions but also much more complicated operations that require microcode (a kind of computer-within-the-computer code) for their

10

sf-5616808

implementation.  This type of ISA is known as complex instruction set computers (CISC).

25.     Originally, Arm's ISA had only a few dozen instructions and adhered to a design philosophy known as reduced instruction set computers (RISC).  Subsequently, the Arm ISA has added several hundred more instructions with Armv8.  The Arm ISA can directly access 16 registers from user mode, while the x86 architecture has only 4 such registers, with a few others that are dedicated to certain activities, plus some vestigial segment registers.  Arm has two operating modes, user and privileged, while x86 has a more elaborate ring mechanism.

26.     Below is a screenshot of a few exemplary instructions from the Arm A64 Instruction Set (described in the Arm ARM), including the ADD instruction previously discussed.  The ADD instruction, as discussed above, simply adds two data values together and puts the sum into a destination register.  (The "immediate" tag on these particular instructions signifies that one of the data values to be added is not in a register but is contained within the instruction encoding itself, making it "immediately" available to the hardware adder.)  The ADDS instruction does exactly the same operation as ADD, but also sets some one-bit result (also called "status") flags such as Zero, Negative, Carry, and Overflow. The SUB and SUBS instructions are just like ADD/ADDS except that they perform subtraction instead of addition. Compare instructions set the result flags according to whether one data value

sf-5616808

is larger or smaller than the other one, and the result flags are generally used by subsequent conditional branches.

| Table C3-42 Arithmetic instructions with an immediate | | |
|---|---|---|
| **Mnemonic** | **Instruction** | **See** |
| ADD | Add | *ADD (immediate)* on page C6-883 |
| ADDS | Add and set flags | *ADDS (immediate)* on page C6-891 |
| SUB | Subtract | *SUB (immediate)* on page C6-1455 |
| SUBS | Subtract and set flags | *SUBS (immediate)* on page C6-1466 |
| CMP | Compare | *CMP (immediate)* on page C6-982 |
| CMN | Compare negative | *CMN (immediate)* on page C6-976 |

Figure 1:  Arithmetic Instructions from Arm A64 Instruction Set.  (ARM_01324149 at -390.)

27.     The Intel x86 ISA evolved largely as a competition between one generation of CPUs and the next generation – if a new Intel chip was not compellingly faster than the existing one, the new one would not command a profit margin high enough to underwrite the next generation of fab equipment.  While Intel chip designers still had to balance multiple competing factors in creating a new chip, such as performance, power dissipation, product cost, schedule, and risk of design errata, performance generally came first among design goals.  It was my experience that the last 10% of performance gain in a design comes at a disproportionately large cost in power and design effort.  The Arm ISA, by contrast, explicitly aimed to enable compatible implementations that emphasized good performance at

12

outstanding power efficiency, an excellent recipe for the computational elements underlying smartphones and tablets.

28.     Developing a new ISA requires achieving a subtle and extremely complex balance among many competing concerns.  Beyond a minimal set of instructions that any ISA would be expected to have (integer ADD, for example), designers could choose to add more instructions, attempting to provide hardware to support high-level functions in the user code for best performance.  But it can be difficult for a compiler to spot opportunities to use those specialized instructions, and meanwhile, the bit encodings of the instructions will be necessarily larger, thus potentially compromising other aspects of the machine, such as cache performance.  It is also quite easy to (intentionally or otherwise) embed certain aspects of the current microarchitecture into the ISA itself, which then requires all future implementations of that ISA to re-implement them, possibly to their detriment.

29.     But perhaps the biggest challenge facing an ISA designer has to do with his or her motivation for attempting a new ISA design in the first place.  There would have to be some very compelling reason why that designer believes it would be worth the enormous expense and risk of attempting to develop a custom ISA.  That designer must therefore achieve the delicate balance required of any ISA while also maintaining the compelling innovation aspect of the new ISA, along with development of the

sf-5616808

software tools (itself a gargantuan task), documentation, training, and creation and maintenance of validation suites.  Another way to look at this is that, even if an existing ISA is not perfect for a particular implementation and therefore foregoes some potential performance or power savings, it is not a given that a new ISA could do so much better that performance alone could be a sufficient motivation for a new ISA development.  In my career, I have had the opportunity to help develop a new ISA (at Bell Labs and Multiflow Computer), and as Intel's chief x86 architect, I oversaw the addition of hundreds of new instructions to x86 to keep the performance of x86 chips competitive.  Indeed, the x86 ISA was considered doomed in the 1980s by most computer architecture researchers, who believed it was too archaic even then to remain competitive.  Forty years later, with continuous development, it is still one of the most popular and profitable ISA for servers, desktops, and laptops.

30.     Most system architects choose to license existing ISAs for the CPU parts of their new product.  Rather than waste time and incur project risk by developing a new ISA, they can invest their limited time and resources in optimizing other essential aspects of the system: cache design, placement, policies, sizes and speeds; memory size, controller features, and power/performance tradeoffs; system power management and power-efficient operating states; and hardware accelerators for important functions or emerging applications.  When they finish and begin marketing their new

CPU, being able to stamp the Arm-compliant imprimatur can be extremely valuable, because it raises the confidence of a prospective CPU purchaser concerning the maturity of the design, the tools available (and quality thereof), what backup plans might be feasible, and much more.

31.     While SoC technology has been around since the 1970s, continuing advances in chip implementation technology, combined with steadily increasing user expectations, have converged to make SoCs the technology of choice.  An SoC is at the heart of every smartphone, Apple or otherwise.  An SoC, as exemplified below,[4] is a combination of IP blocks for specific functions, comprising such modules as one or more CPU cores, a graphics processor, DRAM interfaces, a power management unit, and various I/O standard interfaces, all on a single chip.

---

[4] *NVIDIA and Qualcomm ARM Up Against Competitors*, BERKELEY DESIGN TECHNOLOGY, INC. (October 18, 2011), https://www.bdti.com/InsideDSP/2011/10/20/NvidiaQualcomm (last visited December 19, 2023).

sf-5616808



Figure 2: SoC showing various IP blocks and two CPU cores.

32. Systems with as many required features as modern SoCs rely heavily on industry standards to help manage that complexity. Today's SoCs have several different radio transmitter/receivers, and each of them corresponds to an industry standard, so that the final SoC will allow the user to successfully contact the cell phone tower, the local WiFi network(s), and a Bluetooth device attempting to pair with it. Similarly, there are industry standards for touchscreens, USB cables, batteries, chargers, and many other aspects of an SoC-based product. From a product designer's point of view, being compatible with communications standards is absolutely required:

buyers of their product will expect their new smartphone to reliably talk to cell phone towers using the appropriate cell phone radio protocols, send and receive data (and device charging current) via a USB cable, connect to nearby printers and headphones via Bluetooth, and so on.

33.    One of the other choices the SoC designer will make concerns the ISA of the general processor (or processors, in the case of multiple cores) on the SoC.  They will choose one of three options: (1) adopt an existing ISA such as Arm's ISA; (2) start with a "blank sheet" and design their own ISA (the "full custom" option); or (3) start with an existing ISA and modify it.  The full custom option (2) is much more expensive than the other two, both in design and software tools support, and is risky.  The first option is the most expedient and has a great deal to recommend it – for a reasonable licensing fee, the designer can license a known-working core (such as an Arm-designed core) that is compatible with the desired ISA, along with the software tool chain required to use it.  There is broad industry acceptance of (1), as numerous companies license cores from Arm, including Nuvia, which had a TLA agreement.  Some customers may want to add some feature or instruction to an existing ISA (option (3)), which retains the advantages of option (1) at a small cost in new software tool development, potentially resulting in a valuable product differentiation opportunity, but at the cost of additional development and permanent maintenance overhead.

17

34.     The CPU is often described as the "brains" of a system.  It executes a program that allows it to control the SoC: it oversees management of the battery subsystem, it runs whatever application(s) the user has indicated, it controls the display and reads the touchscreen inputs, and so on. CPUs work by "fetching" or retrieving an instruction from memory, decoding that instruction, performing the indicated operation, and then deciding what instruction is to be done next (which is usually the next sequential instruction in memory).

35.     The CPU is designed to correctly perform all instructions from an "instruction set" using various machine resources such as registers (fast temporary storage), control/configuration registers, operating system facilities such as translation lookaside buffers, main memory, and input/output (I/O).  CPUs must also strictly follow the ISA's design for how to handle faults (such as divide-by-zero errors) and illegal instructions.

36.     An instruction set is a collection of instructions that the CPU can perform, along with whatever information an assembly language programmer would need.  Aside from the list of valid instructions, an assembly language programmer would need to know how many registers there are and whether any of them have side effects.  They would also have to know how the ISA handles "memory semantics" (special rules one must follow to successfully interact with main memory), supported data types (such as integer, floating point, and strings), and the maximum size of virtual

sf-5616808

and physical addresses.  If a designer is developing a custom CPU core that is compliant with a particular ISA, the CPU design will need to comply with the constraints and requirements of that ISA.

37.    CPUs can only perform instructions from the set of instructions for which they were designed.  An Arm-compliant CPU cannot execute code for an x86, nor can an x86 processor execute Arm code.  Both Arm and x86 have their own lists of instructions, Arm's list being shorter than x86's, each instruction encoded in its own way.  If a processor fetches an instruction, and upon trying to decode that instruction discovers that the fetched bit pattern does not correspond to any of the instructions it understands, then the processor will perform a special maneuver called an "illegal instruction trap" and will terminate the application in which the illegal instruction appeared.  Due to these issues of compatibility, it is imperative for designers to adopt an ISA that is broadly used, like the Arm ISA.

38.    A microprocessor's ISA is often referred to by the shorthand "architecture"; *e.g.*, one might speak of the Intel Architecture or Arm Architecture.  It is important to realize that any given architecture can be implemented in any number of different ways, each of them delivering different combinations of performance, power, cost, and size, while remaining compliant with the ISA.

### 3.    Microprocessor Development.

39.    A CPU architecture can be viewed as an abstract set of rules describing the interface between hardware and software – the interface as

seen by an assembly-language programmer.  A CPU *microarchitecture*, by contrast, is the set of hardware functional blocks and protocols between those blocks that jointly implement the CPU architecture.  A given CPU architecture may be implemented in a microarchitecture that optimizes performance above all else, including at the expense of high power and high product cost which would make it suitable for supercomputers and high-end servers. Conversely, that same CPU architecture can be realized via a different microarchitecture optimized for low power and long battery life, as required by mobile platforms such as tablets, smartphones, and laptops.

40.     A CPU microarchitecture is implemented in a specialized low-level programming language called register transfer language (RTL). Examples of RTL include Verilog and VHDL.  During development of a CPU core, a computer engineer uses a computer workstation to write and edit the RTL, adding new features or fixing errors.  Then her work would be combined with that of her co-designers to constitute the current design.  After innumerable such edit/fix/add/test sessions, the aggregate design will have implemented all necessary functionality to be considered compliant with the intended ISA.  Automated software tools then translate the RTL into circuits and interconnections on the actual silicon substrate.

41.     While the designers are modifying their RTL to complete the design and remove errors, a validation team is testing that RTL against legacy tests, random tests, and test suites.  Design errors caught during RTL

20

development are generally orders of magnitude less expensive to ameliorate than "bugs" that escape into product deployment.  It is easy to overlook the crucial role that validation plays in a processor development.  As one CAD vendor put it: "In the field of electronics . . . verifying a design is universally the most critical aspect of a project.  This applies to microprocessor design as well.  Microprocessor designers generally require more time to verify their design than all other [design] steps combined."[5]

42.     It is not possible to test every bit pattern against every instruction against every possible exception condition – there are far too many combinations to try them all, even on the fastest computers.  Instead, validation engineers use their intuition and experience to wield validation test suites, random testing, bespoke software tests, emulation systems, and large server farms, to help decide when a design has matured to the point where production can be considered.  When the design team has finished RTL coding, and validation and management give the go-ahead, production commences.

43.     Production consists of transferring the RTL database, through a set of electronic design automation tools, to a fabrication plant such as TSMC.  There, the fab engineers will run the incoming RTL design through their own set of rigorous checks, looking for silicon design rule errors that

---

[5] *The Microprocessor Chip: Design Guidelines, Functionality, and Characteristics*, CADENCE PCB SOLUTIONS (2020), https://resources.pcb.cadence.com/blog/2020-the-microprocessor-chip-design-guidelines-functionality-and-characteristics (last visited December 19, 2023).

sf-5616808

would impact yield (such as on-chip wires that are too close together or inadequate power/ground planes).  When the fab engineers are satisfied, the actual photochemical processing of making a silicon chip begins.

44.     Silicon processing is performed on wafers, thin disks that can hold dozens or hundreds of individual chips.  After many steps and having traversed many large photochemical "tools" within the fab, the wafer processing eventually completes.  The fab then performs quick tests on each die on the wafer and marks any die that fails so that further effort will not be wasted on it.  The remaining dice are cut from the wafer and tested further. Those that survive will be packaged for sale to customers.

### 4.    Business Models for Licensing Microprocessor Architectures

45.     As outlined above, SoC designers have several fundamental options to consider, including which ISA their CPUs will be compliant with. There are only a few available ISA choices:  Arm, RISC-V, and potentially (in the future) x86.

46.     Arm is the gold standard for licensing ISAs and ISA-compliant cores.  It has been in the ISA business for 33 years and has successfully developed multiple versions of its ISA (the latest is version 9) and numerous Arm ISA-compliant cores.  Where RISC-V is open-source, meaning all intellectual property within the ISA and tools are publicly available and royalty-free, Arm is closed-source:  buy the license and use the tools, but be subject to Arm's license requirements.  In exchange, the licensee gets

sf-5616808

consultation, documentation, guidance, and a relatively low-risk development path.

47.     There are other advantages to an Arm license.  The first is the intangible benefit of partnering with a company that has helped many others develop a successful product in the high-tech marketplace, and therefore is in a good position to evaluate a licensee's plans for new features and technical risks.  A second is Arm's comprehensive portfolio of available technologies for other aspects of the licensee's product, such as on-chip interconnects that work well with the Arm ISA, and extensive validation suites that not only check architectural compliance but also serve as a thorough check on basic correctness of a new CPU implementation.  Indeed, when Arm judges a new processor to be Arm-compliant, it is not just the processor designer's reputation at stake, it is also Arm's own reputation, which is a valuable endorsement for a chip design company, especially one with no previous track record.

48.     RISC-V is a new ISA contender that is currently emerging with one major selling point – it is free.  As one designer put it, "[i]f you wanted to make a CPU and you're not AMD or Intel, there are two real choices: ARM and RISC-V."[6]

---

[6] Matthew Connatser, *ARM vs. RISC-V: Is one better than the other?* DIGITALTRENDS (May 31, 2022), https://www.digitaltrends.com/computing/arm-vs-risc-v/ (last visited December 15, 2023).

sf-5616808

49.     RISC-V was designed from the start to be "open source" – freely available and usable now and in the future.  Support for the RISC-V open-source ISA may carry challenges.  When a bug is found in a core design or in a critical software tool, who fixes it, and on what schedule?  If a required feature is currently missing from a tool, who will develop that feature and maintain it, and when?  If support is needed by a designer who has questions, who provides reliable answers on an urgent basis?  Are future-looking ISA extensions being actively researched so that the RISC-V ISA will become and remain competitive in the future?  RISC-V advocates argue that ISA customization will be increasingly important in a power-constrained future.  Detractors point out that there is no guarantee that such innovations will be generally available, there being no requirement that RISC-V users share their advances.  Both sides cite "fragmentation" where open-source users all run off in different directions with little central coordination (witness the wild proliferation of various Linuxes).  RISC-V argues that it's a good thing, allowing for innovation, while closed-source fans prefer standardization.  All of this uncertainty adds up to considerable risk to a project development.

50.     Qualcomm's Manu Gulati (co-founder of Nuvia) stated that RISC-V is "in its very early stages" and "is not that mature today."  (Gulati Dep. Tr. 38:20-22, 39:4-7.)  "Risk 5 is today where ARM ecosystem was, like, more than 10 years ago. So it is not ready for someone coming up with . . . a full-blown server product with all the software and the tool chains and OSes

sf-5616808

and everything that we've been talking about for software.  It is not ready for that."  (*Id.* at 38:22-25, 39:1-4.)

51.    Intel has announced that it will begin x86 core licensing soon, but for the past 30 years, it declined to make x86 available and guarded its ISA zealously, so whether reasonably priced x86 cores at competitive performance and availability will appear is currently unknown.

### B.    Parties

#### 1.    Arm

##### (i)    Company Background

52.    Arm was established in 1990 with the goal of developing computer processors that were highly power efficient.  Prospectus[7] at 3.  By the mid-1990s, Arm-based processors had gained traction in mobile phones due particularly to the energy efficiency of the processors.  (*Id.*)

53.    Arm's success with mobile phones has grown substantially over the years.  Arm's technology is now present in 99% of the world's smartphones.  As of the beginning of 2023, Arm estimates that its technology is present in 250 billion processors worldwide and that approximately 70% of the world's population uses Arm-based products.  (*Id.* at 11.)

54.    Arm is a major technology company, with annual revenue of approximately $2.6 billion and almost 6,000 full-time employees.  (*Id.* at 12.)

---

[7] Arm Holdings plc., 95,500,000 American Depositary Shares (Representing 95,500,000 Ordinary Shares) (Form SEC-424B4) (September 13, 2023), https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm (last visited December 15, 2023) (hereafter "Prospectus").

sf-5616808

About 80% of Arm's employees are devoted to research and development (R&D) (*id*.), and the company spends approximately $1.3 billion per year on R&D efforts (*id*. at 110).  Arm has business relationships with some of the world's biggest technology companies, including Apple, Samsung, Amazon, Mercedes Benz, and Siemens AG.  (*Id*. at 14.)  Arm is an owner or co-owner of approximately 6,800 issued patents.  (*Id*. at 20.)

### (ii)    Arm Architecture

55.    Arm's R&D efforts include developing and improving the Arm architecture, which Arm licenses to customers who wish to develop their own Arm-compliant custom cores under an Architecture License Agreement (ALA).  Arm also provides development tools to assist ALA customers with implementing the Arm architecture in custom Arm-compliant cores.[8]

56.    The Arm architecture includes the set of instructions that an Arm-compliant processor must be able to execute.  These Arm instructions form the basis of the ISA.  In addition to the required instructions, the Arm ISA includes other information that is needed to execute the instructions, such as information about registers that store data, encoding of data, and supported data types.  The Arm architecture further includes information about exception detection and handling addressing modes, memory access ordering, special register semantics, operating system support functions, control registers, rules for co-processors, context swap information,

---

[8] ARM, https://www.arm.com/products/development-tools (last visited December 15, 2023).

sf-5616808

interrupts, breakpoints, boot procedures, privileged modes, various abort vectors, security features, fencing and atomic operation support, and memory alignment restrictions.  Arm has offered a number of versions of its ISA over the years, with the latest being version 9.[9]

57.    The Arm architecture is described in documentation provided by Arm, specifically the Arm Architecture Reference Manual, sometimes called the "Arm ARM."  Arm also provides other documentation and technical support to its customers to help them develop processors that embody the Arm architecture and other Arm technology.

58.    Based on my discussions with Arm Chief Architect Richard Grisenthwaite, the Arm ARM is the authoritative document that defines the Arm architecture.  It is thousands of pages long and contains more information and detail than any engineering team could recall with precision. Thus, any engineering team designing a custom Arm-compliant core would need to regularly consult the Arm ARM and implement its contents in the RTL code design for the custom Arm-compliant core.  Mr. Grisenthwaite noted that ███████████████████████████████████████████ ███████████████████████████  The Arm ARM contains a great many technical details concerning the Arm architecture that need to be correctly implemented in a core for it to be Arm-compliant.

---

[9] ARM, *Arm CPU Architecture: A Foundation for Computing Everywhere*, https://www.arm.com/architecture/cpu (last visited December 15, 2023).

sf-5616808

59.    The types of information included in the Arm ARM includes the number, types, and any special aspects of the general register set; an introduction to the architecture and the instruction set; a discussion of the Programmer's Model (general information for an assembly language programmer, such as modes, exceptions, and synchronization primitives); details of the memory hierarchy design, including caches, write buffers, exceptions, and the like; architectural provisions for incorporating co-processors; features and design choices built into the virtual addressing mechanism; extensive discussions about the new floating point vector instructions and their use; and coverage of the built-in Debug Architecture.

60.    While the Arm ARM is a publicly available document, I understand that the technology described in the Arm ARM is protected at least by patents and copyrights, as discussed below.  Even though it is publicly available, the Arm ARM is still the subject of license restrictions with individual customers.  For example, version G.b of the Arm ARM (ARM_01324149) includes the following restrictions:

---

**Proprietary Notice**

This document is protected by copyright and other related rights and the practice or implementation of the information contained in this document may be protected by one or more patents or pending patent applications. No part of this document may be reproduced in any form by any means without the express prior written permission of Arm. **No license, express or implied, by estoppel or otherwise to any intellectual property rights is granted by this document unless specifically stated.**

Your access to the information in this document is conditional upon your acceptance that you will not use or permit others to use the information for the purposes of determining whether implementations infringe any third party patents.

---

(ARM_01324149 at -150.)

**Confidentiality Status**

This document is Non-Confidential. The right to use, copy and disclose this document may be subject to license restrictions in accordance with the terms of the agreement entered into by Arm and the party that Arm delivered this document to.

(ARM_01324149 at -151.)

61.     Arm updates the Arm ARM periodically as it continues to develop and improve upon the Arm architecture.  Arm releases different versions of the Arm ARM to describe updated features.  The second page of the document lists the various versions and identifies the changes from the prior version.

| 03 June 2016 | A.j | Non-Confidential EAC | EAC release |
| 30 September 2016 | A.k | Non-Confidential Armv8.0 EAC | Updated EAC release |
| 31 March 2017 | B.a | Non-Confidential Armv8.1 EAC, v8.2 Beta | Initial release incorporating Armv8.1 and Armv8.2 |
| 26 September 2017 | B.b | Non-Confidential Armv8.2 EAC | Initial Armv8.2 EAC release, incorporating SPE |
| 20 December 2017 | C.a | Non-Confidential Armv8.3 EAC | Initial Armv8.3 EAC release |
| 31 October 2018 | D.a | Non-Confidential Armv8.4 EAC | Initial Armv8.4 EAC release |
| 29 April 2019 | D.b | Non-Confidential Armv8.4 EAC | Updated Armv8.4 EAC release incorporating accessibility changes |
| 05 July 2019 | E.a | Non-Confidential Armv8.5 EAC | Initial Armv8.5 EAC release |
| 20 February 2020 | F.a | Non-Confidential Armv8.6 Beta | Initial Armv8.6 Beta release |
| 31 March 2020 | F.b | Non-Confidential Armv8.5 EAC, v8.6 Beta | Armv8.5 EAC release, initial Armv8.6 Beta release |
| 17 July 2020 | F.c | Non-Confidential Armv8.6 EAC | Initial Armv8.6 EAC release |
| 22 January 2021 | G.a | Non-Confidential Armv8.7 EAC | Initial Armv8.7 EAC release |
| 22 July 2021 | G.b | Non-Confidential Armv8.7 EAC | Updated Armv8.7 EAC release |

(ARM_01324149 at -150.)

62.     An ALA allows a customer to develop its own customized core that is compliant with the Arm architecture.  Prospectus at 96.  According to Mr. Grisenthwaite, ███████████████████████████████████████

████████████    ███████████████████████████████████

sf-5616808



63.     I discussed with Mr. Grisenthwaite the types of support that Arm provides to its customers. He noted that

### (iii)   Arm Processors

64.     Arm also offers its customers a variety of Arm-developed processor products, including its Cortex CPUs, GPUs, Physical IP, System IP, Security IP, and Subsystems IP.[10]  When a core is compatible with Arm, it can interoperate with other Arm-developed products. For example, the Nuvia/Qualcomm NCCs and SoCs included cores that interoperated with

---

[10] ARM, https://www.arm.com/products (last visited December 15, 2023).

sf-5616808

other IP blocks from Arm.  Thus, there is an ecosystem of Arm IP and tools from which those designing their own Arm cores can benefit.  A company can license the Arm processor products and IP blocks under a Technology License Agreement ("TLA").  Prospectus at 96.  Under a TLA, customers are provided with "off-the-shelf" Arm CPUs and IP blocks that are compliant with the Arm architecture.

65.     Arm's Cortex CPUs include the Cortex-A, Cortex-R, and Cortex-M families.  The Cortex-A processors are CPUs for general use with operating systems and third-party applications.[11]  The Cortex-R processors are embedded processors for real-time digital signal processing and control.[12] The Cortex-M processors are microcontrollers.[13]

66.     Arm's processors are used for many different applications in different markets, including consumer technologies (*e.g.*, personal computers, smartphones, tablets),[14] automotive,[15] cloud computing,[16] and Internet of Things (IoT).[17]

---

[11] ARM, https://www.arm.com/product-filter?families=cortex-a&showall=true (last visited December 15, 2023).

[12] ARM, https://www.arm.com/products/silicon-ip-cpu?families=cortex-r (last visited December 15, 2023).

[13] ARM, https://www.arm.com/products/silicon-ip-cpu?families=cortex-m&showall=true (last visited December 15, 2023).

[14] ARM, https://www.arm.com/markets/consumer-technologies (last visited December 15, 2023).

[15] ARM, https://www.arm.com/markets/automotive (last visited December 15, 2023).

[16] ARM, https://www.arm.com/markets/computing-infrastructure (last visited December 15, 2023).

[17] ARM, https://www.arm.com/markets/iot (last visited December 15, 2023).

sf-5616808

              **(iv)    Arm Has a Large Patent Portfolio Covering Its Architectural Innovations**

67.    One of the ways Arm protects its proprietary technology is by seeking patent protection for its innovations.  Prospectus at 148.  As of March 31, 2023, Arm owns or co-owns approximately 6,800 issued patents and has approximately 2,700 pending patent applications worldwide.  (*Id.*) The patents cover aspects of Arm's processor architecture and microarchitecture, including certain specific instructions.  (*Id.*)  By patenting its technology, Arm retains IP rights in the Arm architecture that it licenses to its customers, even while making the Arm ARM available to the public.

68.    I spoke with Mr. Grisenthwaite regarding Arm's patent portfolio.  He confirmed that Arm's patents cover aspects of the Arm architecture, including memory management for 64-bit addresses, memory stack protection, and circuits for efficient conditional execution of certain instructions.[18]

              **(v)    Industry Adoption of Arm Architectures**

69.    Arm-based CPUs are the most popular and pervasive CPUs in history.  Prospectus at 12.  As I mentioned above, ARM-based CPUs are in 99% of the world's smartphones and Arm estimates that 70% of the world's population uses Arm-based products.  Prospectus at 11.  More than

---

[18] By way of example, Mr. Grisenthwaite identified the following U.S. patents that describe features in the Armv8 architecture: Nos. 9,753,724; 9,760,374; and 8,566,563.

260 companies report that they shipped Arm-based chips in the fiscal year ending on March 31, 2023, including the world's largest companies like Amazon, Google, AMD, Intel, MediaTek, NVIDIA, and Samsung. (*Id*.) The Arm architecture and Arm-based CPUs have been adopted throughout the industry.

## 2. Qualcomm

70.     Qualcomm is a technology company whose primary focus is on developing and commercializing technology for mobile devices and other wireless products.[19]  Qualcomm principally derives revenue from sales of its integrated circuit products, including its Snapdragon family of products, and licensing of its intellectual property.  Qualcomm Annual Report at 8.  Around 2017, Qualcomm sought to develop a custom Arm-based CPU for data centers.  Qualcomm called the custom core "Falkor" and the related SoC "Centriq."[20]  This effort was not ongoing at the time of the Nuvia acquisition, since the president of Qualcomm's data center business unit had left and the media reported that Qualcomm planned to offload the division.[21]  ████████

████████████████████████████   ████████

[19] Qualcomm, Annual Report (Form 10-K) (September 26, 2021), https://www.sec.gov/Archives/edgar/data/804328/000172894921000076/qcom-20210926.htm (last visited December 15, 2023) (hereafter Qualcomm Annual Report).

[20] *Introducing the Qualcomm Falkor CPU core: purpose-built for cloud workloads*, QUALCOMM, OnQ Blog (August 19, 2017), https://www.qualcomm.com/news/onq/2017/08/introducing-qualcomm-falkor-cpu-core-purpose-built-cloud-workloads (last visited December 15, 2023).

[21] James Morra, *With Future Uncertain, Qualcomm Loses Data Center President*, ELECTRICDESIGN (May 22, 2018), https://www.electronicdesign.com/markets/automation/article/21806539/with-future-uncertain-qualcomm-loses-data-center-president (last visited December 15, 2023).



QCARM_3520804.)

### 3.   Nuvia

#### a.   Company Background

71.     Nuvia was founded as a start-up in 2019 by ex-Apple engineers

Gerard Williams III, Manu Gulati, and John Bruno.[22]  Mr. Williams was

previously an ARM fellow at Arm for twelve years (███████████████████)

and was also the Chief Architect at Apple for the M1 processor, which was a

custom Arm-compliant CPU for consumer devices like laptops.  (████

████   ████   ████) Nuvia planned to design energy-efficient

---

[22] Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TECHCRUNCH (November 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/ (last visited December 15, 2023).

sf-5616808

CPUs for data center servers based on the Arm architecture.[23]  At the time, designing a processor for data centers would have expanded the market for Arm's technology, since the data center market was historically dominated by x86 architectures.  (███)  Nuvia named its custom Arm-based CPU core "██████" (████████████████)

### b.    Nuvia's ALA and TLA

### (i)    Background of Nuvia's ALA and TLA

72.    On September 26, 2019, Arm and Nuvia entered into both an ALA (ARM_00059183) and a TLA (ARM_00002988).  On September 27, 2019, Arm and Nuvia entered into an Annex 1 for both the ALA (QCARM_0339310) and the TLA (ARM_00051126).  On March 27, 2020, Arm and Nuvia entered into another Annex 1 for both the ALA (ARM_00057230) and the TLA (QCARM_3861394).

73.    As I explained in § III.B.1.ii, above, ALAs generally provide the licensee with the right to develop and produce a custom core that is compliant with the Arm architecture.

74.    I am not an expert on licensing, but I have reviewed the Nuvia ALA agreement (including both Annex 1 documents).  As I understand it, the Arm-Nuvia ALA agreement gave Nuvia the right to design and market a custom Arm-compliant core under that agreement.  The Arm-Nuvia ALA

---

[23] Dean Takahashi, *Nuvia raises $240 million to design Arm-based CPUs for datacenters*, VENTUREBEAT (September 24, 2020), https://venturebeat.com/business/nuvia-raises-240-million-to-design-arm-based-cpus-for-datacenters/ (last visited December 15, 2023).

agreement provided Nuvia with access to a ██████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████

**(ii)    Definition of** ████████████████

75.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████



████████████████

76.    ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████

sf-5616808



(ARM_00057230 at -231.)

77.     According to my understanding from reviewing the documents,

██████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████   ██████████████████████████████

██████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

As Mr. Grisenthwaite explained in his deposition, the ALA ███████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████

78.     ████████████████████████████████

██████████████████████████████████████████

37



79.

(ARM_00057230 at -231.)

80.    The "ARMv8-A Architecture Compliance Kit" (ACK), product code AR115, includes, among other things, a compliance kit, validation suite, and a trace checker module:



(ARM_00057230 at -231-232.)

81.



sf-5616808

███████████████████████. Arm's Richard Grisenthwaite told me ██

███████████████████████████████████████████

██████████████████████

██ ████████████████████████████████████

███████████████████████████████████



(ARM_00057230 at -232.)

83.     Computer security has become an essential element of modern systems, particularly systems through which valuable information flows (such as credit card numbers or bank account data).  These systems, including smartphones, are actively and routinely attacked, so in response, these information flows must be encrypted by the sender and decrypted by the receiver.  Encryption and decryption algorithms are computationally quite intensive, yet must be performed quickly enough that system users do not become impatient. █████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

sf-5616808

**(iii)** ███████████████████████

84.   ███████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████  ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

85.   At every step of CPU development, hundreds of decisions are made that balance the various project goals against the fixed requirements of the ISA.  Nearly every aspect of the RTL implicitly reflects the influences of the ████████████████████████████████████ ████████████████████████████████████████████.  Arm also provides ██████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

86.     My understanding is consistent with that of Mr. Grisenthwaite, who told me that ████████████████████████████████████ ████████████████████████████  ██████  █████████████. Similarly, I consider ████████████████████████████████ ██ ████████████  ████████████████████████  ████████  ███  █████ ████████████████  ██████  ████████████████████████████ ████████████.[24]

87.     Likewise, if a licensee has chosen to implement ████████████ ████████████████████ obviously the instruction decoder design will necessarily reflect that, since it has to detect and decode all CPU instructions.  Beyond that, however, inclusion of ███████████████████ will impact the microarchitecture in several distinct ways that are unique to Arm-compliant CPUs: a ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

---

[24] As I mentioned in § III.B.3.b.iv below, the termination provision of the Nuvia ALA states:

████████████████████████████████████████
█████████████ ██ ███████████████████ █ █

### (iv)   Termination Provision

88.   From my review of the documents, it is my understanding that ██████ of the Nuvia ALA discusses Nuvia's obligations if Arm terminates the ALA.  (ARM_00059183 at -196.)  This section references the █████ ██████ definition, which I previously discussed:



(*Id.*)

89.   From my review, I understand that ██████ requires that upon termination of the ALA by Arm, Nuvia is required to ████████ ███████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ As I explained in § III.B.3.b.iii, above, my understanding as a technical and

industry expert is that ███████████████████ include ███████

███████████████████████████ ███████████████████

███████

### C.   Factual Background

#### 1.   Nuvia Develops the ███████████ in Compliance with the Arm Architecture

90.   Nuvia developed an SoC codenamed "████ that was designed for the data center market.  (QCARM_2402257 at -263.)  ████ included a custom CPU core called "████████ (████████████████████)

███████████████████████████████

███████████████



(QCARM_2402257 at -269.)



(QCARM_2402257 at -270.)

(QCARM_2402257 at -318.)

91.     Nuvia designed the ██████ core in accordance with the

Armv8-A architecture described in the Arm ARM. ████████

███████████████████████████████████████

███████████████████████████████

███████████████████████████ (*See*

QCARM_3087757, QCARM_3087992, QCARM_0325086, QCARM_0490031,

QCARM_3088245, QCARM_3089361, QCARM_3087396, QCARM_3088553,

QCARM_0325371, QCARM_0490329, QCARM_3088937.)

92.     ████████████████████████████

████████████████████████████

███████████████████████████████████

████████████████



(QCARM_3087757 (highlighting added).)

93. 

sf-5616808

94. 

95.

### 2.     Qualcomm Purchases Nuvia and Arm Objects

96.     As I explained in § III.B.1.i, above, Arm established dominance in the mobile processor market in the 1990s and Arm remains recognized as the premier CPU provider for the mobile processor market.[25] Arm technology was in 90% of smartphones as far back as 2010, and its market share of the

---

[25] William Gayde, *How Arm Came to Dominate the Mobile Market*, TECHSPOT (December 24, 2020), https://www.techspot.com/article/1989-arm-inside/ (last visited December 15, 2023).

mobile processor market has only grown since then, with Arm "dominat[ing] the mobile processor market with almost every major release built on top of its architecture." (*Id*.)

97.     Arm licensee Apple launched its M1 SoC on November 10, 2020,[26] designed for personal computers.  The M1 SoC uses a custom Arm processor as opposed to an x86 processor from Intel.[27]  The M1 was an instant hit, as it was touted as being more efficient, operating faster, and having a longer battery life than competing SoCs, all with the use of a custom Arm processor.  (*Id*.)

98.     The release of the M1 SoC catapulted Arm into the PC market, as the M1 SoC was quickly recognized as outperforming other SoCs on the market.[28]  The Apple M1 has since been viewed as a game changer in the CPU processor world and has helped Apple capture over 21% of the global PC

---

[26] APPLE, Press Release: Apple unleashes M1 (November 10, 2020), https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/ (last visited December 15, 2023).
[27] Nermin Hajdarbegović, *Apple M1 Processor Overview and Compatibility*, TOPTAL, https://www.toptal.com/apple/apple-m1-processor-compatibility-overview (last visited December 15, 2023).
[28] Stephen Shankland, *Apple M1 Macs are kick-starting a new Arm-based PC era. Arm's CEO is optimistic*, CNET (January 13, 2021), https://www.cnet.com/tech/computing/apple-m1-macs-are-kick-starting-new-arm-based-pc-era-arm-ceo-is-optimistic/ (last visited December 15, 2023).

48

market.[29]  With the expansion into the PC market, Arm is now recognized as a major player in designing CPU chips used in PCs.[30]

99.     Following the rise of Apple's M1 chip, Qualcomm considered purchasing Nuvia, which was developing its own Arm-based custom CPU core. █████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████



(QCARM_3536689.)

[29] Urvish Mahajan, *Apple M1 — How Apple Silicon Changed the PC Industry*, MEDIUM (September 23, 2023), https://medium.com/@urvishmahajan/apple-m1-how-apple-changed-the-pc-industry-4a7c3c8a3d57#:~:text=The%20M1%20chip%20powered%20MacBook,Window's%20growth%20was%20just%206%25 (last visited December 15, 2023).
[30] Katie Tarasov, *How Arm is gaining chip dominance with its architecture in Apple, Nvidia, AMD, Amazon, Qualcomm and more*, CNBC (November 9, 2023), https://www.cnbc.com/2023/11/09/how-arm-gained-chip-dominance-with-apple-nvidia-amazon-and-qualcomm.html (last visited December 15, 2023).

100. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████



(QCARM_3536628.)

101. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████   ████████

sf-5616808

███████████████████████████████████████████

████████████████  ████████████████████████

102.    On January 13, 2021, Qualcomm announced that Qualcomm

Technologies, Inc. was acquiring Nuvia for $1.4 billion.  (QCARM_2423540.)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████  ███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████

103.    ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

sf-5616808



104.

105.

106.

sf-5616808

███████████████████████████████████████

███████████████████████████ Qualcomm has

represented to the media that "the creation of our custom CPU was started

by Nuvia engineers while employed at Nuvia."[31]

107.   On March 1, 2022, the Nuvia licenses terminated, along with

the corresponding rights to use or sell products based on or incorporating

Nuvia technology developed under those licenses.  (QCARM_0338883.)

108.   ████████████████████████████

███████████████████████████████████████

█████████████████████████████████████



### 3.    Qualcomm Incorporates Nuvia Cores Into Its Own Products

109.   After acquiring Nuvia, Qualcomm incorporated Nuvia's work on

the ██████ core into Qualcomm's own products.  ███████████████

███████████████████████████████████████

███████████████████████████████████████

---

[31] Mark Hachman, *Qualcomm dubs Nuvia CPU 'Oryon,' on track for 2023*, PCWORLD (November 17, 2022), https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html (last visited December 16, 2023).

sf-5616808



I would expect that Qualcomm used Nuvia's pre-acquisition work on the ████ core to further develop the ████ core that was submitted to Arm for verification. Consistent with my expectations, Qualcomm representatives have been quoted in the press as saying that "the creation of our custom CPU was started by Nuvia engineers while employed at Nuvia."[32]  Also, as described below, Dr. Chen's analysis of the RTL code for the ████ cores establishes that a significant portion of the ████ RTL code developed at Nuvia was incorporated into the later versions of the ████ core developed by Qualcomm.

110.  ████████████████████████

████████████████████████████████

████████████████████████████████

---

[32] Mark Hachman, *Qualcomm dubs Nuvia CPU 'Oryon,' on track for 2023*, PCWORLD (November 17, 2022), https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html (last visited December 16, 2023).

sf-5616808



111.

sf-5616808



(QCARM_0181949 at -950.)

112. 

sf-5616808



(QCARM_0182011 at -019.)

113.

sf-5616808



(QCARM_0169739 at -744 (cropped for visibility).)



(QCARM_0169739 at -749.)

114.



(QCARM_0550518 at -521.)

59

### 4.     Qualcomm Releases Snapdragon X

115.   On October 24, 2023, Qualcomm announced its new Snapdragon® X Elite platform of SoCs, with what it called its "custom integrated Qualcomm Oryon CPU."[33]   Qualcomm's attorneys represented that they produced source code corresponding to Oryon: "Oryon is a brand name and does not refer to a specific project or piece of technology.  Qualcomm has produced source code for the custom CPUs that will be sold under the Oryon name."  (10/26/2023 email from J. Braly to J. Li.) Based on these representations and the dates of the produced source code (*see* § IV.B, below), it is my understanding that the October 24, 2023 ████████ ███████ code corresponds to the Qualcomm Oryon CPU announced on the same date, making the Snapdragon® X Elite platform of SoCs and Qualcomm Oryon CPU ███████████████████████████████████████████████ ████████

### 5.     Abbreviated Timeline of Events

116.   Below is an abridged timeline of events for this case.

| Date | Event |
|------|-------|
| Feb. 2019 | Gerard Williams III, John Bruno, and Manu Gulati found Nuvia.[34] |

---

[33] QUALCOMM, Press Note: Qualcomm Unleashes Snapdragon X Elite: The AI Super-Charged Platform to Revolutionize the PC (Oct. 24, 2023), https://www.qualcomm.com/news/releases/2023/10/qualcomm-unleashes-snapdragon-x-elite--the-ai-super-charged-plat (last visited December 16, 2023).

[34] Dean Takahashi, *Nuvia raises $240 million to design Arm-based CPUs for datacenters*, VENTUREBEAT (Sept. 24, 2020), https://venturebeat.com/business/nuvia-raises-240-million-to-design-arm-based-cpus-for-datacenters/ (last visited December 15, 2023).

sf-5616808

| Sep. 27, 2019 | Arm and Nuvia enter into the Architecture License Agreement (ALA) and the      Technology License Agreement (TLA).[35] |
| --- | --- |
| Aug. 11, 2020 | Nuvia announces the ███████ core.[36] |
| Mar. 16, 2021 | Qualcomm completes acquisition of Nuvia.[37] |
| Feb. 1, 2022 | Arm notifies Nuvia that it intends to terminate the ALA and the TLA due to Nuvia's violation of the assignment provisions.  The termination is to be effective as of Mar. 1, 2022.[38] |
| ████ | ████████████████████████ |
| Mar. 1, 2022 | Effective date of termination of Nuvia ALA and TLA.[40] |
| ████ | ████████████████████████ |
| ████ | ████████████████████████ |
| Aug. 31, 2022 | Arm files a complaint against Qualcomm and Nuvia for breach of contract and trademark infringement in the U.S. District Court for the District of Delaware.[43] |

---

[35] (QCARM_0337839; QCARM_0338297.)
[36] Matthew Connaster, *Nuvia Announces CPI Codenamed* ███████ *Promises to Deliver Leading Single Threaded Performance*, ADOREDTV (August 11, 2020), https://adoredtv.com/nuvia-announces-cpu-codenamed-███████-promises-to-deliver-leading-single-threaded-performance/ (last visited December 20, 2023).
[37] (QCARM_2402586.)
[38] (QCARM_0338883.)
[39] (QCARM_0557206.)
[40] (QCARM_0338883.)
[41] (QCARM_3433989.)
[42] (QCARM_0190735.)
[43] (ARM_00045395.)

sf-5616808

## IV.    FURTHER OPINIONS[44]

### A.    The ███████ Cores Were Designed as ███ ███████ and Are ███████ ███████████

#### 1.    Relevant Technical Definitions from Nuvia ALA and Annex.

117.    ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

118.    █████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  ██████████████

119.    ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

---

[44] In addition to my opinions set forth in § IV, I note that I have provided some opinions in the Background (§ III).  I incorporate any opinions from the Background (§ III) into the Opinion (§ IV).

sf-5616808

120. █████████████████████████████
████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
██████████████████████████

121. ██████████████████████████████
██████████████████████████████
███████████████████████████████████
████████████████████████████
████████████████████████████
███████████████████████████
████████████████████████████████
██████████████████████ ██
███████████████████████████████





(*Id.*)

122.

123.

sf-5616808

2. **The Nuvia ███████ Core and Later Versions of the ███████ Core Were Designed to Implement the Elements of the Armv8 Architecture.**

    a. **Nuvia decided to create a custom core based on the Arm architecture.**

124. Since its founding, Nuvia's vision was to create an enterprise-level data server processor using the Armv8 architecture. (QCARM_3314892 at -893, -905.) ███████████████████

███████████████████████

███████████████████████

███████████████████████ ██████

██████████████████

125. ███████████████████

███████████████████████

████████████████████

████████████████████

██████████████████

██████████████████

███████████████████ █

█████████████████

████████████████████

████████████████

███████████████████

sf-5616808

**b.** 

**(i)**

126.

sf-5616808

(ii) 

127.



(*Id.* at -772-773.)

128. ██████████████████████████

████████████████████████████████████

██ ████████████████████████████████

███████████████████████████████

129. ████████████████████████████

██████████████████████████████████

████████████████████████████

|  | Phoenix Cores[46] |
|---|---|
| ████████████ | ████████████ |
| ████████████ | ████████████ |
| | █████[49] |
| ████████████ | |

[45] Requirements listed in Nuvia Annex ████████████████████

[46] ████████████████████████████████

[47] *Id.* at -772.

[48] *Id.* at -972.

[49] *Id.* at -772.

sf-5616808



130. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████ ████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██ █████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[50] *Id.* at -813.

[51] *Id.* at -922.

[52] *Id.* at -773.

[53] "The Armv8 A-profile architecture includes a *Virtual Memory System Architecture* (VMSA)."  Arm Architecture Reference Manual: Armv8, for A-profile architecture, D4.1.1 "Form of the memory system architecture."  (ARM_0132149 at -782.)

[54] (QCARM_3087757 at -922.)

[55] *Id.* at -773.

131.    As the above shows, Nuvia developed the ████ core to ultimately be an ████████████████████ As Mr. Grisenthwaite stated during our conversation, an Arm-compliant core is necessarily ████ ████████████ the Arm architecture.  He maintained that one cannot produce an Arm-compliant core without understanding the Arm architecture, which requires consulting the Arm ARM to get every one of thousands of details right. ████████████████

**(iii)**    ████████████████

132.    ████████████████



sf-5616808

| Source | File Name | Date | Total Pages | "Armv8 ISA support" – Page Numbers |
|---|---|---|---|---|
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |
| ████ | ████████ | ███ | ██ | ██ |

72

sf-5616808

**c.**   **Nuvia utilized Arm materials to develop the** █████ **Core.**

**(i)**   **Nuvia used** █████████ **as defined in the ALA Annex to build the** █████ **Core.**

135.   ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████   I understand that Nuvia downloaded these

documents and tools either online or through ████████████████████

██████████████████████████████████████   and used

them during the development process for the █████ core.   (*See e.g.*,

ARM_00002045 (showing that ██████████████████████

███████████████████████████████████

██████████████████ █████████████████████

████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████

136.   ███████████████████████████████████

████████████████████████████████████████

sf-5616808

█████████████████████ As summarized by Mr. Grisenthwaite during

our conversation, ████████████████████████████████████████████

█████████████████████ ██████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████ █

████████████████████████████████████████████████████

██████████████████████████████████ ████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ██████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████

    137.   ████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████ ██

██████████████████████████████████████ I further discuss

these verification tools and Nuvia's use of them below in § IV.A.3.a.

    138.   ████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

sf-5616808

██████████████████████████████████████

██████████████████████████████████████

███████████████████ Nuvia downloaded elements of the

███████████████████████████

█████████ █████████████████████████

████████████████████████████

████████████████████████████

██████████████████████

████████████████████████

█████████ ████████████████████████

██████████████████████

████████████████████████

██████████████████████████

█████████ ███████████████

        **(ii)**   **Nuvia also used other Arm documents, tools, and knowledge to build the ███████ Core.**

139.  In addition to the ████████████ defined in the ALA Annex, Nuvia also used other Arm materials to develop █████ According to

█████████████████████████

███████████████████████████

███████████████████████████

█████████ Most of these files were downloaded in 2019 and 2020, prior to Qualcomm's acquisition of Nuvia.  (*See id.*)  For example, Mr. Trivedi

sf-5616808

downloaded ███████████████████████████████

███████████████████████████████. (*Id.*; ███████

████████████) ████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████ Nuvia engineers Vinod Chamarty and Geeta Balakrishnan

downloaded hundreds of Arm documents and tools while at Nuvia in 2019

and 2020. (*See* ARM_00002045.)

140.    Aside from distinct Arm materials and tools, Nuvia also

obtained Arm support and knowledge to develop the ██████ core. (*See, e.g.,*

ARM_00040395; ARM_00038935.)  During my conversation with

Mr. Grisenthwaite, he mentioned that █████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████ In 2020 and 2021, Nuvia/Qualcomm and Arm personnel

sf-5616808



**d.**   **Nuvia and Qualcomm employees testified that the ██████ Cores were designed to implement Armv8 Architecture and be Arm-compliant.**

141.

142.

143.

sf-5616808



144.

145.

sf-5616808

146. 

147.

148.

sf-5616808

3. **The Nuvia ███████ Core Was Validated as an ██████████████.**

      a. **Nuvia and Qualcomm used confidential Arm tools to verify the Nuvia ██████ Core's compliance with Armv8 Architecture.**

149. In designing the Nuvia █████ core to be an Arm-compliant core, Nuvia had access to and utilized confidential Arm tools. ██████████ ████████████████████████████████████████ ███████████████████████████████████████████ █████ █████ ██████ ████████████████████ ██████████ █████████

150. The ████████████████████████████, is █████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████ █████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ██████████████████████

151. The ████████████████ is ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

152. ███████████████████████████████

153. ███████████████████████████████

**b.** **Arm validated the Nuvia ███████**
**Core as an Arm** ███████

154. ███████████████████████████████

sf-5616808



155.

sf-5616808



**B.** **Nuvia's Design of the** ███ **Core Is Incorporated into Several of Qualcomm's SoC Products.**

156.    As I explained in §§ III.C.1 and IV.A above, Nuvia worked on designing and developing a custom Arm CPU core called ███ which Nuvia worked to incorporate into an SoC called ███ As I also explained in § III.C.3, after Qualcomm acquired Nuvia, Qualcomm incorporated the Nuvia ███ core into several of its SoCs, including the ████████ ████ SoCs.  This is confirmed by the RTL code analysis described below.

157.    I understand based on information from Qualcomm's attorneys (*see* 9/12/2023 email from J. Braly to F. Patel) and my own review of the RTL code that Qualcomm has produced the following RTL code in this litigation:

- ███ NCC
  - o   March 14, 2021
  - o   February 28, 2022
  - o   April 1, 2022
  - o   October 24, 2022
- ███ NCC
  - o   July 30, 2021
  - o   April 13, 2023
  - o   October 24, 2023
- ███ NCC

sf-5616808

- o January 11, 2022
- o July 28, 2023
- ██████████ NCC
  - o February 21, 2023
  - o July 28, 2023
- ██████ NCC
  - o July 28, 2023

158.   Based on my review, I understand that the RTL code produced for "████ NCC," "██████ NCC," "██████ NCC," and "████████ NCC" includes code for versions of the ████ core incorporated into each of those SoCs.  I understand that the RTL code produced for "██████ NCC" includes code for a CPU core called "██████ that is designed ████████████ ████████████.

159.   I note that the March 14, 2021 ████ NCC code is dated one day before the March 15, 2021 Qualcomm acquisition of Nuvia.  Based on these dates, I understand that the March 14, 2021 ████ NCC code is RTL code that Nuvia prepared and that Qualcomm acquired as part of its purchase of Nuvia.

160.   I understand that Arm asked Dr. Mike Chen to review the RTL source code produced by Qualcomm and prepare an expert report describing his analysis.  Dr. Chen is a professor in the School of Electrical and Computer Engineering at the University of Southern California and has a Ph.D. in Electrical Engineering from the University of California at Berkeley.

sf-5616808

161.   I have reviewed Dr. Chen's expert report.  In addition, on December 15 from approximately 9 a.m. to 4:30 p.m., I reviewed the source code produced by Qualcomm on the source code desktop, together with Dr. Chen.  During that meeting, Dr. Chen showed me the source code produced by Qualcomm, explained the analysis that he performed, and described his findings.

162.   As explained in § II, I am an expert in computer engineering and microprocessor design due to, among other things, my time as Chief Architect of the x86 at Intel.  I have extensive experience writing and interpreting RTL.  Based on my experience, my review of Dr. Chen's report, my discussions with Dr. Chen, and my own review of the RTL source code, I endorse the qualitative and quantitative conclusions from Dr. Chen's expert report, namely that: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

163.   Specifically, I endorse and share Dr. Chen's conclusion that the ███████████████████████████████████████████ As Dr. Chen notes in his report, and consistent with my review of

As Dr. Chen's report shows, ███████████████████

164.    I endorse and share Dr. Chen's conclusions that ████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████ Using file comparison tools, Dr. Chen was able to show the percentage of █████████████████████ lines of code that precisely matched those in the Nuvia ██████ design.  If only a relatively few lines of code were found to have been "reused" from the earlier ██████ RTL, then further investigation would have had to be performed

sf-5616808

before concluding that the later designs were the same core as the earlier ones. ███████████████████████████

████████████████████████████████

165.   Dr. Chen also collected data comparing the Nuvia █████ database to ██████ and ████████ which ████████████████

██████████████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████

██████████████████████████████

████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████

166.   Thus, in view of Dr. Chen's report and my own scrutiny of the RTL code, it is my opinion that the March 14, 2021, Nuvia ██████ code is ████████████████████████████████

██████████████████████████ Nuvia and Qualcomm designs

sf-5616808

after the March 14, 2021, Nuvia ▇▇▇▇ code are also ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇

167.   In view of Dr. Chen's report and my own code review, it is also my opinion that the March 14, 2021, ▇▇▇▇ code is also ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

████████████████████████████████████████████████
████████████████████████

C.    **Qualcomm's Purported Swap Out** ██████████████
█████████████████

1.    **Qualcomm's Swap Out Was in Response to Termination of the Nuvia Agreements**

168.   As discussed in § IV(A), the Nuvia ██████ core was designed to be an ████████████████████████. I understand that, following Arm's termination of the Nuvia ALA and TLA on March 1, 2022, Qualcomm made efforts ██████████████████████████████████████████ ████████████████████ I refer to this exercise as the "Swap Out," consistent with Qualcomm's terminology. (████████████████ ████████) I have reviewed Qualcomm's responses to Arm's Interrogatory No. 5 in which Qualcomm describes the actions it undertook as part of the Swap Out.

169.   I understand that when Arm terminated the Nuvia ALA and TLA, Arm asked Nuvia to ████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ I understand that this language is based on ██████████ of the Nuvia ALA and TLA. (ARM_00059183; ARM_00002988.)  By its request, Arm was asking Nuvia to:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



170.

171.

2.      **The Swap Out**

172.

sf-5616808



173. ████████████████████████████████████

174. ████████████████████████████████████

175. ████████████████████████████████████

176. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████

**3.    Qualcomm Did Not Discontinue Using the Cores in** ██████████ **Following the Termination of the Nuvia Licenses**

177.   Qualcomm states that it performed the Swap Out to "comply with the termination provisions in Nuvia's license agreements" (ECF No. 18 at ¶ 231), but the Swap Out ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

178.   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

sf-5616808

███████████████████████████████

█████████████████████████████████

███████████████████████████████████

███████████████████████████████

█████████████████████████████

179.   As discussed in § IV.A above, the Nuvia ██████ core was

developed as an ███████████████████████████ based on information in

the ARMv8-A Architecture Documentation Set (the Arm ARM) and other

████████████████ materials supplied to Nuvia under the Nuvia ALA.

180.   █████████████████████████████████████

███████████████████████████████████

█████████████████████ Nuvia employees received this information.

For example, a download log shows that ████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████

███████████████████████

| Transaction ID | | | Part ID | | ALA Annex Part | |
|---|---|---|---|---|---|---|
| ███ | | | ███████ | | ███ | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

---

sf-5616808



181. ███████████████████████████████

█████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

███████

182. █████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

## V.    CONCLUSION

183.   My opinions above are based on available information to date.  I

reserve the right to supplement or amend my opinions in this report, and also

94

to rebut opinions by Qualcomm's experts with which I disagree.  I also reserve the right to correct any clerical errors that I discover after service of this report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 20th day of December of 2023 in Portland, Oregon.

By: _____

Dr. Robert P. Colwell

96

# APPENDIX A
## LIST OF MATERIALS CONSIDERED

All documents cited within this report.
Technical Expert Report of Dr. Michael Chen.
Qualcomm Source Code computer.
Correspondence dated 10/26/2023, email from J. Braly to J. Li.
Correspondence dated 9/12/2023, email from J. Braly to F. Patel.

## PLEADINGS

Arm Ltd. v. Qualcomm Inc. et al., No. 1-22-cv-001146 MN (D. Del.):
    ECF No. 1, Complaint, dated August 31, 2022.
    ECF No. 12, SEALED Defendants' Answer and Defenses to Plaintiff's Complaint
    and Jury Demand and Defendants' Counterclaim, dated September 30, 2022.
    ECF No. 18, SEALED Defendants' Answer and Defenses to Plaintiff's Complaint
    and Jury Demand and Defendants' Amended Counterclaim, dated October 26,
    2022.
    ECF No. 23, SEALED Plaintiff Arm Ltd.'s Answer and Affirmative Defenses to
    Defendants Qualcomm Inc., Qualcomm Technologies, Inc., and Nuvia, Inc.'s
    Amended Counterclaim, dated November 15, 2022.

## DISCOVERY

Defendants' Response and Objections to Plaintiff's First Set of Interrogatories
(Nos. 1-13), dated February 27, 2023.

## DEPOSITION TRANSCRIPTS REVIEWED[57]

Gulati Deposition Transcript dated October 12, 2023.
Amon Deposition Transcript dated November 15, 2023.
Trivedi Deposition Transcript dated October 25, 2023.
Williams Deposition Transcript dated November 3, 2023.
Asghar Deposition Transcript dated November 8, 2023.
Grisenthwaite Deposition Transcript dated November 15, 2023.
Bos Deposition Transcript dated November 29, 2023.
Thompson Deposition Transcript dated November 28, 2023.
Sharma Deposition Transcript dated October 27, 2023.
Kanapathipillai Deposition Transcript dated December 1, 2023.

## PRODUCED MATERIALS

| | | |
|---|---|---|
| ARM_01324149 | ARM_00051126 | QCARM_3087757 |
| ARM_00059183 | ARM_00057230 | QCARM_3087992 |
| ARM_00002988 | QCARM_3861394 | QCARM_0325086 |
| QCARM_0339310 | QCARM_2402257 | QCARM_0490031 |

---

[57] I had all deposition transcripts available to me.

| | | |
|---|---|---|
| QCARM_3088245 | QCARM_7403869 | ARM_00002516 |
| QCARM_3089361 | QCARM_3535060 | ARM_00042794 |
| QCARM_3087396 | QCARM_3534786 | ARM_00038568 |
| QCARM_3088553 | QCARM_0338883 | ARM_01309676 |
| QCARM_0325371 | QCARM_0557206 | QCARM_0000864 |
| QCARM_0490329 | QCARM_3433989 | QCARM_2540979 |
| QCARM_3088937 | QCARM_2402586 | QCARM_2414840 |
| QCARM_3536689 | QCARM_0190735 | ARM_00039434 |
| QCARM_3536628 | QCARM_3041647 | ARM_00001456 |
| QCARM_2423540 | ARM_01216002 | ARM_00099622 |
| QCARM_3443782 | ARM_01230173 | QCARM_0337839 |
| QCARM_0027987 | QCARM_0181949 | QCARM_0338297 |
| QCARM_0339647 | QCARM_0182011 | ARM_00045395 |
| QCARM_0339935 | QCARM_0169739 | ARM_00002654 |
| QCARM_0339630 | QCARM_0550518 | QCARM_3520804 |
| QCARM_3451883 | QCARM_3314892 | |
| QCARM_3972047 | QCARM_0002581 | |
| QCARM_3535531 | ARM_00002045 | |
| QCARM_3535726 | ARM_00040395 | |
| QCARM_3535496 | ARM_00038935 | |

## PUBLICLY AVAILABLE SOURCES

US Patent No. 9,753,724

US Patent No. 9,760,374

US Patent No. 8,566,563

Gavin Divers, Gaming Industry Dominates as the Highest-Grossing Entertainment Industry, GAMERHUB (Jan. 24, 2023), https://gamerhub.co.uk/gaming-industry-dominates-as-the-highest-grossing-entertainment-industry/#:~:text=To%20put%20that%20in%20perspective,much%20as%20the%20movie%20industry (last visited December 15, 2023).

Matthew Connatser, ARM vs. RISC-V: Is one better than the other? DIGITALTRENDS (May 31, 2022), https://www.digitaltrends.com/computing/arm-vs-risc-v/ (last visited December 15, 2023).

Arm Holdings plc., 95,500,000 American Depositary Shares (Representing 95,500,000 Ordinary Shares) (Form SEC-424B4) (September 13, 2023), https://www.sec.gov/Archives/edgar/data/1973239/000119312523235320/d550931d424b4.htm (last visited December 15, 2023).

ARM, https://www.arm.com/products/development-tools (last visited December 15, 2023).

ARM, Arm CPU Architecture: A Foundation for Computing Everywhere, https://www.arm.com/architecture/cpu (last visited December 15, 2023).

ARM, https://www.arm.com/products (last visited December 15, 2023).

ARM, https://www.arm.com/product-filter?families=cortex-a&showall=true(last visited December 15, 2023).

2

ARM, https://www.arm.com/products/silicon-ip-cpu?families=cortex-r(last visited December 15, 2023).

ARM, https://www.arm.com/products/silicon-ip-cpu?families=cortex-m&showall=true(last visited December 15, 2023).

ARM, https://www.arm.com/markets/consumer-technologies (last visited December 15, 2023).

ARM, https://www.arm.com/markets/automotive (last visited December 15, 2023).

ARM, https://www.arm.com/markets/computing-infrastructure (last visited December 15, 2023).

ARM, https://www.arm.com/markets/iot (last visited December 15, 2023).

Qualcomm, Annual Report (Form 10-K) (September 26, 2021), https://www.sec.gov/Archives/edgar/data/804328/000172894921000076/qcom-20210926.htm (last visited December 15, 2023).

*Introducing the Qualcomm Falkor CPU core: purpose-built for cloud workloads*, QUALCOMM, OnQ Blog (Aug. 19, 2017), https://www.qualcomm.com/news/onq/2017/08/introducing-qualcomm-falkor-cpu-core-purpose-built-cloud-workloads (last visited December 15, 2023).

James Morra, *With Future Uncertain, Qualcomm Loses Data Center President*, ELECTRICDESIGN (May 22, 2018), https://www.electronicdesign.com/markets/automation/article/21806539/with-future-uncertain-qualcomm-loses-data-center-president (last visited December 15, 2023).

Danny Crichton, *Three of Apple and Google's former star chip designers launch NUVIA with $53M in series A funding*, TECHCRUNCH (Nov. 15, 2019), https://techcrunch.com/2019/11/15/three-of-apple-and-googles-former-star-chip-designers-launch-nuvia-with-53m-in-series-a-funding/ (last visited December 15, 2023).

Dean Takahashi, *Nuvia raises $240 million to design Arm-based CPUs for datacenters*, VENTUREBEAT (Sept. 24, 2020), https://venturebeat.com/business/nuvia-raises-240-million-to-design-arm-based-cpus-for-datacenters/ (last visited December 15, 2023).

William Gayde, *How Arm Came to Dominate the Mobile Market*, TECHSPOT (Dec. 24, 2020), https://www.techspot.com/article/1989-arm-inside/ (last visited December 15, 2023).

APPLE, Press Release: Apple unleashes M1 (Nov. 10, 2020), https://www.apple.com/newsroom/2020/11/apple-unleashes-m1/ (last visited December 15, 2023).

Nermin Hajdarbegović, *Apple M1 Processor Overview and Compatibility*, TOPTAL, https://www.toptal.com/apple/apple-m1-processor-compatibility-overview (last visited December 15, 2023).

Stephen Shankland, *Apple M1 Macs are kick-starting a new Arm-based PC era. Arm's CEO is optimistic*, CNET (Jan. 13, 2021), https://www.cnet.com/tech/computing/apple-m1-macs-are-kick-starting-new-arm-based-pc-era-arm-ceo-is-optimistic/ (last visited December 15, 2023).

Urvish Mahajan, *Apple M1 — How Apple Silicon Changed the PC Industry*, MEDIUM (Sep. 23, 2023), https://medium.com/@urvishmahajan/apple-m1-how-apple-changed-the-pc-industry-

sf-5616808

4a7c3c8a3d57#:~:text=The%20M1%20chip%20powered%20MacBook,Window's%20grow th%20was%20just%206%25 (last visited December 15, 2023).

Katie Tarasov, *How Arm is gaining chip dominance with its architecture in Apple, Nvidia, AMD, Amazon, Qualcomm and more*, CNBC (Nov. 9, 2023), https://www.cnbc.com/2023/11/09/how-arm-gained-chip-dominance-with-apple-nvidia-amazon-and-qualcomm.html (last visited December 15, 2023).

Mark Hachman, Qualcomm dubs Nuvia CPU 'Oryon,' on track for 2023, PCWORLD (Nov. 17, 2022), https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html (last visited December 16, 2023).

QUALCOMM, Press Note: Qualcomm Unleashes Snapdragon X Elite: The AI Super-Charged Platform to Revolutionize the PC (Oct. 24, 2023), https://www.qualcomm.com/news/releases/2023/10/qualcomm-unleashes-snapdragon-x-elite--the-ai-super-charged-plat (last visited December 16, 2023).

Hassan Mujtaba, *Apple M1 ARM 8 Core CPU Is Faster Than Intel & AMD's Fastest 8 Core Chips in Single-Core Performance Benchmark*, WCCFTECH (March 25, 2021), https://wccftech.com/apple-m1-arm-8-core-cpu-faster-intel-amd-fastest-8-core-chips-single-core-performance/ (last visited December 19, 2023).

David Coffin et al., *The Roadblocks of the COVID-19 Pandemic in the U.S. Automotive Industry*, U.S. INTERNATIONAL TRADE COMMISSION (USITC) (June 2022), https://www.usitc.gov/publications/332/working_papers/the_roadblocks_of_the_covid-19_pandemic_in_the_automotive_industry_final.pdf (last visited December 19, 2023).

*NVIDIA and Qualcomm ARM Up Against Competitors*, BERKELEY DESIGN TECHNOLOGY, INC. (October 18, 2011), https://www.bdti.com/InsideDSP/2011/10/20/NvidiaQualcomm (last visited December 19, 2023).

The Microprocessor Chip: Design Guidelines, Functionality, and Characteristics, CADENCE PCB SOLUTIONS (2020), https://resources.pcb.cadence.com/blog/2020-the-microprocessor-chip-design-guidelines-functionality-and-characteristics (last visited December 19, 2023).

Matthew Connaster, *Nuvia Announces CPI Codenamed* ██████ *Promises to Deliver Leading Single Threaded Performance*, ADOREDTV (August 11, 2020), https://adoredtv.com/nuvia-announces-cpu-codenamed-████-promises-to-deliver-leading-single-threaded-performance/ (last visited December 20, 2023).

4

sf-5616808

# Appendix B

# ROBERT P. COLWELL

3594 NW BRONSON CREST LOOP
PORTLAND, OR 97229
503-629-9638
BOB.COLWELL@GMAIL.COM

## PROFESSIONAL EXPERIENCE

- **Director**, Microsystems Technology Office, DARPA Arlington VA   2012-2014

- **Deputy Director**, Microsystems Technology Office, DARPA    2011-2012

    Led office of 17 program managers, budget ~$600M/yr, funding research on computer systems, nanophotonics, bioengineering, radar, comms, lasers, IR imaging, and much more.

- **Consultant**, Portland, OR  2001-2011, 2014 - present

    General computer HW/SW consulting to industry and academia (Safeware, the University of Pittsburgh, Intel, Qualcomm, venture capital companies, many startups, expert witness engagements, Lawrence Berkeley National Lab, US DoD)

- Named an **Intel Fellow** (27 Fellows in Intel's employee population of ~80,000) in 1997; winner of 2005 **Eckert-Mauchly Award**, highest award in field of computer architecture, for "outstanding achievements in the design and implementation of industry-changing microarchitectures, and for significant contributions to the RISC/CISC architecture debate"; elected to **IEEE Fellow** and **the National Academy of Engineering** in 2006 (the highest recognition in field of engineering) for "contributions to turning novel computer architecture concepts into viable, cutting-edge commercial processors." Inducted into the **American Academy of Arts and Sciences**, 2012. Winner of **IEEE Bob Rau Award**, 2015.

- **Chief IA-32 Architect**, Intel Corporation, Hillsboro OR, 1992-2001

    Lead IA32 architect, responsible for all of Intel's x86 Pentium CPU architecture efforts (direct management included 40 – 110 people): Pentium Pro, Pentium II, III, 4; Initiated and led Intel's Pentium 4 CPU development

- **Senior CPU Architect**, Intel Corporation, Hillsboro OR, 1990-1992

    One of three senior architects responsible for conceiving Intel's P6 microarchitecture, the core of the company's Pentium II, Pentium III, Celeron, Xeon, and Centrino families

- **Hardware Architect**, Multiflow Computer, New Haven, CT 1985-1990

    One of seven hardware engineers who created the world's first VLIW (very long instruction word) scientific supercomputer under direction of Josh Fisher

- **Hardware Engineer** (part-time) Perq Systems, Pittsburgh PA, 1980 - 1984

    Hardware design engineer working on graphics display hardware for first generation bit-slice-based engineering workstations

- **Member of Technical Staff**, Bell Telephone Laboratories, Holmdel, NJ, 1977-1980

    Hardware design engineer working on 8 and 32-bit microprocessors

## EDUCATION

- **PhD in Computer Engineering**, Carnegie-Mellon University, 1985

- **MSEE** in Computer Engineering, Carnegie-Mellon University, 1978

- **BSEE** in Electrical Engineering, University of Pittsburgh, 1977

PUBLICATIONS

Wrote foreword to "Weaving High Performance Multi-Core Processor Fabric: Essential Insights to the Intel Quickpath Architecture", Maddox, Singh, Safranek, Intel Press 2009

National Research Council, The Future of Computing Performance: Game Over or Next Level?, Washington, D.C.: The National Academies Press, 2010.

VLIW: The Unlikeliest Architecture, IEEE Solid State Circuits News, 2009

Wrote intro to DE Shaw's article on the Anton molecular folding engine in CACM, July 2008

Contributed parameterized chapter 2 problem sets to Hennessy & Patterson's "Computer Architecture: A Quantitative Approach, 4th Edition" 2006

The Pentium Chronicles, IEEE/Wiley, December 2005

IEEE Computer Magazine, 48 columns for "At Random" column 2002-2005

Wrote foreword to Josh Fisher's book "Embedded Computing: A VLIW Approach to Architecture, Compilers and Tools", Morgan-Kaufman 2005

We May Need A New Box, IEEE Computer March 2004

Superscalar Processor Design, P6 chapter, Shen & Lipasti, McGraw-Hill 2003

Embedded Everywhere, National Academy of Science, October 2001

Intel's College Hiring Methods and Recent Results, Microelectronics Systems Education Conference, Robert Colwell, Gary Brown, Frank See, July 1999

Microprocessor, Wiley & Son Technical Encyclopedia, 1999

Challenges and Trends in Processor Design, roundtable discussion in IEEE Computer, January 1998

A 0.6um BiCMOS Processor with Dynamic Execution, Robert P. Colwell, Randy L. Steck, 1995 IEEE International Solid State Circuits Conference, pp. 176-177 (won best paper award)

Latent Design Faults in the Development of Multiflow's TRACE/200, 22nd Annual International Symposium on Fault-Tolerant Computing, Boston MA, July 1992

Architecture and Implementation of a VLIW Supercomputer, Robert P. Colwell, W. Eric Hall, Chandra S. Joshi, David B. Papworth, Paul K. Rodman, James E. Tornes, Proceedings of Supercomputing '90, New York, November 1990

A VLIW Architecture for a Trace Scheduling Compiler, Robert P. Colwell, Robert P. Nix, John J. O'Donnell, David B. Papworth, Paul K. Rodman, IEEE Trans. on Comp., V. 37, N. 8, Aug.1988

A VLIW Architecture for a Trace Scheduling Compiler, Robert P. Colwell, Robert P. Nix, John J. O'Donnell, David B. Papworth, Paul K. Rodman, Proceedings of the 2nd Int'l Conf. on

Architectural Support for Programming Languages and Operating Systems, Oct. 1987, Palo Alto CA (2021 Winner of Influential Paper Award from ASPLOS Conference)

Fast Object-Oriented Procedure Calls: Lessons from the Intel 432, Edward F. Gehringer, Robert P. Colwell, ISCA 13, June 1986, pp. 92-101

The Performance Effects of Architectural Complexity in the Intel 432, Robert P. Colwell, Edward F. Gehringer, E. Douglas Jensen, ACM Transactions on Computer Systems, Aug. 1988, V. 6, N. 3

A Display Architecture for Driving Two Different Bitmapped Displays from One Frame Buffer, Robert P. Colwell, 1st Int'l Conference on Computer Workstations, San Jose CA, November 1985

Computers, Complexity, and Controversy, R.P. Colwell, C.Y. Hitchcock III, E.D. Jensen, H.M. Brinkley Sprunt, C.P. Kollar, IEEE Computer, September, 1985, pp. 8-19

The Performance Effects of Function Migration and Architectural Complexity in Object-Oriented Systems, Robert P. Colwell, PhD thesis, Carnegie-Mellon University, Pittsburgh, PA, August 1985

Peering Through The RISC/CISC Fog: An Outline Of Research, Computer Architecture News, Vol. 11, No. 1, March 1983 pp. 44-50

A Perspective on the Processor Complexity Controversy, Proceedings of the International Conference on Computer Design, 1983, pp. 613-616

The Origin of Intel's Micro-ops, invited paper, IEEE Micro 2021

## LECTURES AND INVITED TALKS

P6: Myths and Pipelined Realities, MP Forum '95 in Santa Clara

Evolution of Slot 1 and Slot 2, MP Forum '97 in Santa Clara

Micro '30 keynote speaker, 1997, San Jose

HPCA2 keynote speaker, Santa Clara, 1996

Talks on computing futures at CMU and Oregon Graduate Institute, Intel's Design Test and Technology Conference 1997-1998 (best presentation DTTC), invited keynote DTTC '04

LCPC (Languages and Compilers for Parallel Computing) keynote speaker, San Jose 1996

Intel Research Forum invited speaker, Hillsboro '96, Santa Clara '99

Intel Distinguished Lecture Series talks on the Pentium Pro at BYU, MIT, UCB, Stanford, CMU, Illinois, Wisconsin, Univ of Washington, OGI, UCLA

Distinguished Lectures: UC Davis May 2003; Carnegie-Mellon Univ Nov. 2003; USC April 2004

Microprocessor Report dinner speaker on Pentium Pro, March '95

Neural Networks for Computing Conference, Snowbird Utah, April 1994

IEEE Winter VLSI Workshop 1995

DARPA Winter PI conference, Pasadena CA, January 1994

International Applications Conference, San Diego CA, June 1994

Nature's Paradigm and the Challenge of Validation, Intel Validation Summit 1998, invited talk

Validation Lessons from Elsewhere, Intel Validation Summit 1999, invited talk

ISCA keynote, Anchorage Alaska, June 2002

ECE380 Seminar invited talk, Stanford Univ. February 2004

Invited speaker, Technology Management Lecture Series, PSU May 2004

Invited speaker, CSE Division Wide Seminar, University of Michigan, January 2005

Invited keynote speaker, IEEE Int'l Symp. on Async Circuits and Systems, NYC, March 2005

Invited speaker, IEEE Management Series, Portland OR, April 2005

Eckert-Mauchly Award acceptance speech, ISCA, Madison Wisconsin, June 2005

Invited keynote, International Multiconference on Computer Science and Computer Engineering, Las Vegas NV, June 2005

Invited speaker: Google, Sun Labs, Portland State University 2005

Invited speaker: Cadence, Carnegie-Mellon Univ. CS, Univ. of Rochester, Walla Walla College 2006

Invited keynote, PICMET, Portland Oregon, August 2005

Distinguished lecture, Univ. of Utah, March 2006

Invited speaker: Computer Science Symposium, St. Petersburg, Russia 2006

Invited speaker, IEEE-CS 60th anniversary meeting, Santiago Chile, San Diego CA 2006

Invited speaker, National Academies "Distinguished Voices" lecture series, April 2007, Irvine CA

Invited speaker, FCRC "Future Of Computer Architecture 2007", June, San Diego CA

Invited keynote speaker, ASAP 2007 conference, July, Montreal Canada 2007

Invited speaker, UC Irvine, "How To Be a Successful Engineer", Feb. 2008

Invited speaker, US Naval Workshop on Ship Design, Williamsburg, VA May 2008

Invited speaker, DARPA DSRC summer session, Santa Cruz CA July 2008

Distinguished Hopeman Lecture, Grove City College, April 2009

Many invited talks as DARPA MTO spokesperson on the end of Moore's Law 2011-2014

Invited speaker, Microsoft Research 20th Anniversary Symposium, Sept. 2011

Invited speaker, Computer Science and Telecommunications Board (CSTB), Sept. 2011

Invited speaker, Secretary of Defense Corporate Fellows, July 2012, 2013

Invited speaker after-dinner talk, Salishan Conference on High Performance Computing, April 2013

Invited speaker, Industrial Physics Forum, Baltimore MD, March 2013

Invited speaker, Computing Community Consortium (CCC), Pgh PA, March 2013

Invited speaker, National Defense University College, Wash. DC, May 2013

Invited speaker, Design Automation Conference, Austin TX, June 2013

Invited keynote, Hot Chips Conference, Stanford, August 2013

Invited speaker, Gov't Forum on Moore's Law, Wash. DC, November 2013

Invited talks at UT Austin, seminar & computer architecture lecture, November 2013

Invited speaker, Rebooting Computing, Wash. DC, December 2013

Invited speaker, Dartmouth College, January 2014

Invited speaker, MIT Annual Research Conference (MARC), January 2014

Invited speaker, Virginia Tech Univ., February 2014

Invited speaker, Univ. of Rochester, March 2014

Invited speaker, IEEE Technology Time Machine conf, October 2014

Invited speaker, DARPA HAPTIX kickoff meeting, Arlington VA, Nov. 2014

Invited speaker, CSTB Continuing Innovation in IT workshop, Washington DC, Mar. 2015

Invited keynote, Stanford SystemX "Headlights" Workshop, April 2015

Invited keynote, Berkeley Energy Efficient Electronics Systems Symposium, Oct. 2015

Invited speaker, University of Washington, Nov. 2015

Invited speaker, Arizona State University, Feb. 2016

Invited keynote, DoE Extreme Heterogeneity workshop, January 2018

Invited keynote, DARPA NICE workshop, Feb. 2018 (Neuro-Inspired Computing Elements), Oregon

Invited keynote, ModSim workshop, Seattle, August 2018

ECE Commencement speaker, Portland State University, June 2019

Member, National Academy of Engineering review panel for NIST (National Institute of Standards and Technology) Nanotechnology Division, June 2021

Invited keynote, ModSim workshop, Seattle, August 2023

## PANEL SESSIONS

DAC '91 panel session panelist; DAC '92 CAD tools workshop instructor

ICCD '91 moderator/organizer of panel session, San Jose CA

ICCAD-94, panel session panelist, November 1994, San Jose CA

Micro 26 '93, moderator/organizer of panel session, Portland OR

ISCA workshop talk, Santa Margerita Ligure, Italy 1995, panelist Phila. PA 1996

PAID 97 Workshop talk on "accidental performance decisions" with Dave Papworth

FPGA panel session panelist, November 1996, Monterey CA

ASPLOS-VII panel session panelist, October 1998, San Jose CA

IEEE Workshop on Low-Power design panel session, San Diego, CA 1999

Four panel sessions in 2000 at various conferences

Computer Research Assoc. "Grand Challenges" conference, Santa Cruz CA, Dec. 2005

DARPA MTO Exposition, Arlington VA  July 2014

NSF Future Computing evaluation panel April 2018

ModSim 2018 panelist, Seattle WA

## CONFERENCE COMMITTEES

ICCD 1990, 1991, 1992, 1993, 1994, 1995

IEEE Micro 24, 26, 27, 30, 31, 32, general co-chair 37, 39, 40, 41

ISCA 1999, 2000, 2008, 2009, 2010, 2015

Supercomputing 2013, 2014

## TECHNICAL EXPERT LEGAL CASES WORKED

**AVM v. Intel**, Wilmer Hale, Lauren Fletcher, 2015-2017

    Damages expert report, deposed, trial Wilmington DE May 2017

**Futurelink v. Intel**, Kirkland Ellis, Eric Cheng, 2014-2017

Invalidity, non-infringement expert reports, deposed 3 times, case settled 8/17/2023

**Broadcom v. <u>Renesas</u>**, Morrison Foerster, Fahd Patel, Daniel Muino, 2018-2020

Invalidity, non-infringement expert reports, deposed twice, testified at ITC hearing

**Semcon v. <u>Amazon</u>**, Sidley Austin, Tung Nguyen, Cal Butcher, 2019

Invalidity expert report, deposed 8/15/19, case settled

**VLSI Tech. v. <u>Intel</u>**, Wilmer Hale, Christine Duh, George Manley, Jordan Hirsch, 2017-2021

Damages expert report, Rebuttal report, deposed twice

**CCO (Computer Circuit Operations) v Marvell**, Sheppard Mullin, Wendy Cheung, 2020

Declaration filed, case settled August 2020

**ACQIS v. <u>Samsung</u>**, DLA Piper, Gianni Minutoli, 2021

Claim Construction declaration, deposed twice, case settled Dec. 2021

**ACQIS v. <u>Inventec</u>,** BlankRome, Greg Hermann, 2022

Damages & apportionment, case settled May 2022

**Apple Inc. v. Future Link Systems**, Inter Partes Review, EriseIP, Adam Seitz

IPR declaration filed, case settled April 2022

**Apple Inc. v. Future Link Systems**, Fish Richardson, John Brinkmann

Work on claim construction, case settled April 2022

**ACQIS v. <u>Microsoft</u>,** DLA Piper, Gianni Minutoli, 2022

Claim Construction declaration, case settled June 2023

OTHER

Selected as member of ISAT (Information Systems Advanced Technology) panel for DARPA, 2006-2009, co-chaired Machine Learning on Multicore 2009 with Carlos Guestrin and Greg Morrisett

Panelist, Dept of Defense Summer Study on Future Technology, summer 1999, Washington DC

CSTB Panelist, National Academy of Science, Networks of Embedded Processors, 1999-2000, Wash. DC

CSTB Panelist, National Academy of Science, Sustaining Growth in Computing Performance, 2006-2011, Wash. DC

IEEE Computer Magazine editor for High Performance Computing, 1995 to 1999

IEEE Computer Magazine editorial board member, Perspectives editor, 1999-present

Reviewer of dozens of technical books for Morgan Kaufmann, Mindshare, Addison-Wesley

Committee member on NSF funding for computer arch futures, Philadelphia, 1996

Intel Innovator's Day finalist '93, judge '95, judge '97

IEEE Senior Reviewer status in 1994, 1995, 1996 (conference papers, books, magazine articles)

Intel P6 public spokesman at dozens of radio, TV, and magazine interviews

Intel Divisional Award 1993 for DFA performance modeling tool

Intel Achievement Award 1996 for Pentium Pro Microarchitecture

CMU Alumni Merit Award, 1996, for technical leadership on Pentium Pro development

ACM Eckert-Mauchly award committee member, 1998-2001

Univ. of Pgh. Distinguished Alumni Award, 2000, for technical leadership on Intel's microprocessors

Univ. of Pgh. University Achievement Award, 2001, for accomplishments in field of Computing

Carnegie-Mellon Distinguished Alumni Fellows Award 2001

PICMET "Medal of Excellence" 2005

Judge for CSIDC (Computer Society Int'l Design Competition) 2005, 2006

Instructor ECE570, Adv. Computer Arch., Oregon State Univ., winter semesters 2000, 2003

Inventor or co-inventor on 40 patents

# EXHIBIT 5

# EXHIBIT 6

# EXHIBIT 7

# EXHIBIT 8

ZIAD ASGHAR  Conf. AEO - 30b6
ARM, LTD. V. QUALCOMM INC.

November 08, 2023
1—4

---

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4
5   ARM LTD., a U.K. corporation,     )
                                       )
6          Plaintiff,                  ) Case No. 22-1146-MN
                                       )
7              vs.                     )
                                       )
8   QUALCOMM INC., a Delaware          )
    corporation, QUALCOMM TECHNOLOGIES,)
9   INC., a Delaware corporation, and  )
    NUVIA, INC., a Delaware            )
10  corporation,                       )
                                       )
11         Defendants.                 )
    _____)
12
13              C O N F I D E N T I A L
14             ATTORNEYS' EYES ONLY
15
16
17    VIDEOTAPED DEPOSITION OF QUALCOMM 30(b)(6)
18             designee ZIAD ASGHAR
19
20
21        Deposition taken on:
          Wednesday, November 8, 2023, 8:39 a.m.
22
          12531 High Bluff Drive, Suite 100
23        San Diego, California
24
    Reported By:  Kimberly Reichert, CSR 10986
25  Job No. J10465669
```

**Page 2**

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4
5   ARM LTD., a U.K. corporation,     )
                                       )
6          Plaintiff,                  ) Case No. 22-1146-MN
                                       )
7              vs.                     )
                                       )
8   QUALCOMM INC., a Delaware          )
    corporation, QUALCOMM TECHNOLOGIES,)
9   INC., a Delaware corporation, and  )
    NUVIA, INC., a Delaware            )
10  corporation,                       )
                                       )
11         Defendants.                 )
    _____)
12
13
14
15
16
17              C O N F I D E N T I A L
18         ATTORNEYS' EYES ONLY videotaped deposition
19  of QUALCOMM 30(b)(6)designee ZIAD ASGHAR, taken on
20  behalf of the Plaintiff, at 12531 High Bluff Drive,
21  Suite 100, San Diego, California, commencing at
22  8:39 a.m., Wednesday, November 8, 2023, before
23  Kimberly Reichert, Certified Shorthand Reporter
24  No. 10986.
25
```

**Page 3**

```
1   APPEARANCES OF COUNSEL:
2   For the Plaintiff:
3                        MORRISON & FOERSTER LLP
4                        By:  DANIEL P. MUINO, ESQ.
                         2100 L Street, NW
                         Suite 900
5                        Washington, DC  20037
                         dmuino@mofo.com
6
7   For Defendants:
8                        PAUL, WEISS, RIFKIND, WHARTON
                         & GARRISON, LLP
9                        By:  JACOB BRALY, ESQ.
                              CATHERINE NYARADY, ESQ.
10                       1285 Avenue of the Americas
                         New York, New York  10019
11                       jbraly@paulweiss.com
                         cnyarady@paulweiss.com
12
13                       QUALCOMM INCORPORATED
                         QUALCOMM LEGAL COUNSEL
14                       By:  KURT KJELLAND, ESQ.
                         5775 Morehouse Drive
15                       San Diego, California  92121
                         kurtk@qualcomm.com
16
17
18
19  Also Present:  Rene Sanchez, Videographer
20
21
22
23
24
25
```

**Page 4**

```
1                        I N D E X
2   DEPONENT         EXAMINED BY              PAGE
3   ZIAD ASGHAR      MR. MUINO                   9
4
5
6   EXHIBITS FOR IDENTIFICATION               PAGE
7   Plaintiff's
8   Exhibit 1    LinkedIn Profile for          14
                 Ziad Asghar
9
    Exhibit 2    Arm Ltd's First Notice of     29
10               Deposition of Qualcomm
11  Exhibit 3    Arm Ltd's First Notice of     34
                 Deposition of Nuvia, Inc.
12
    Exhibit 4    Amended and Restated Architecture  36
13               License Agreement between Arm
                 Limited and Qualcomm Global Trading
14
    Exhibit 5    E-mail to Andy Oberst         75
15               from Ziad Asghar
                 dated 5/15/2013
16
    Exhibit 6    A document about Arm as a company  76
17               and looking at what their business
                 model looks like
18
    Exhibit 7    E-mail chain                  87
19               top e-mail to Akash Palkhiwala
                 dated 3/10/2019
20
    Exhibit 8    E-mail chain                  95
21               top e-mail to Travis Lanier, et al.
                 dated 9/9/2019
22
    Exhibit 9    Document entitled "ARM        99
23               alternative strategies"
    Exhibit 10   E-mail chain                  105
24               top e-mail to Quinn Li, et al.
                 dated 6/19/2020
25
```

Case 1:22-cv-01146-MN   Document 411-1   Filed 07/22/24   Page 259 of 750 PageID #: 22526

ZIAD ASGHAR  Conf. AEO - 30b6                    November 08, 2023
ARM, LTD. V. QUALCOMM INC.                                    5—8

Page 5

```
 1  EXHIBITS FOR IDENTIFICATION (Cont.)          PAGE
 2  Plaintiff's
 3  Exhibit 11      E-mail chain                   115
                    top e-mail to Cristiano Amon, et al.
 4                  dated 8/27/2020
 5  Exhibit 12      E-mail chain                   126
                    top e-mail to Azzedine Touzni, et al.
 6                  dated 1/13/2021
 7  Exhibit 13      Document entitled "Qualcomm to  140
                    Acquire Nuvia" dated 1/13/2021
 8
    Exhibit 14      E-mail chain                   144
 9                  top e-mail to Michelle Gerevas
                    dated 2/8/2021
10
    Exhibit 15      E-mail to Rajiv Gupta, et al.  146
11                  from Raghu Sankuratri
                    dated 1/20/2021
12
    Exhibit 16      Letter to Paul Williamson      157
13                  from Ziad Asghar
                    dated 1/27/2021
14
    Exhibit 17      E-mail to Ziad Asghar          167
15                  from Paul Williamson
                    dated 5/18/2021
16
    Exhibit 18      E-mail chain                   171
17                  top e-mail to Rajiv Gupta, et al.
                    dated 7/1/2021
18
    Exhibit 19      Letter to Ziad Asghar          171
19                  from Paul Williamson
                    dated 2/2/2021
20
    Exhibit 20      Letter to Paul Williamson      176
21                  from Ziad Asghar
                    dated 2/3/2021
22
    Exhibit 21      Letter to Paul Williamson      179
23                  from Ziad Asghar
                    dated 2/25/2021
24
25
```

Page 6

```
 1  EXHIBITS FOR IDENTIFICATION (Cont.)          PAGE
 2  Plaintiff's
 3  Exhibit 22      Technology License Agreement   184
                    between Arm Limited and Nuvia, Inc.
 4
    Exhibit 23      Letter to Paul Williamson      192
 5                  from Ziad Asghar
                    dated 3/14/2021
 6
    Exhibit 24      E-mail chain                   196
 7                  top e-mail from RK Chunduru
                    dated 7/1/2021
 8
    Exhibit 25      E-mail chain                   202
 9                  top e-mail from Ziad Asghar
                    dated 5/7/2022
10
    Exhibit 26      E-mail to Will Abbey, et al.   205
11                  from Ziad Asghar
                    dated 3/25/2021
12
    Exhibit 27      E-mail chain                   207
13                  top e-mail to Ziad Asghar
                    dated 4/2/2021
14
    Exhibit 28      E-mail to Manu Gulati and      214
15                  Ziad Asghar from Sender Unspecified
16  Exhibit 29      E-mail chain                   216
                    top e-mail to RK Chunduru
17                  dated 4/21/2021
18  Exhibit 30      E-mail chain                   221
                    top e-mail to Cristiano Amon
19                  dated 9/21/2021
20  Exhibit 31      Letter to Gerard Williams III  224
                    from Carolyn Herzog
21                  dated 2/1/2022
22  Exhibit 32      E-mail chain                   227
                    top e-mail to Karl Whealton
23                  dated 3/1/2022
24  Exhibit 33      Global CPU Transition Plan as  243
                    Part of Nuvia
25
```

Page 7

```
 1  EXHIBITS FOR IDENTIFICATION (Cont.)          PAGE
 2  Plaintiff's
 3  Exhibit 34      E-mail chain                   249
                    top e-mail to Asaf Shen, et al.
 4                  dated 3/9/2022
 5  Exhibit 35      E-mail chain                   252
                    top e-mail to Alex Katouzian
 6                  dated 8/15/2022
 7  Exhibit 36      E-mail chain                   254
                    top e-mail to Ziad Asghar and Jim
 8                  Thompson dated 7/22/2022
 9  Exhibit 37      E-mail chain                   259
                    top e-mail to Ziad Asghar
10                  dated 8/23/2022
11  Exhibit 38      E-mail to Ziad Asghar and Tejas 264
                    Krishnamohan from Sender Unspecified
12
    Exhibit 39      E-mail chain                   269
13                  top e-mail to Ziad Asghar, et al.
                    from Savi Soin
14                  dated 11/21/2022
15
16
17  QUESTIONS INSTRUCTED NOT TO ANSWER:
18      PAGE    LINE
19       13      9
20       29      25
21      184      23
22
23
24
25
```

Page 8

```
 1          SAN DIEGO, CALIFORNIA
 2        WEDNESDAY, NOVEMBER 8, 2023; 8:39 A.M.
 3
 4       THE VIDEOGRAPHER:  Good morning.  This is tape
 5   No. 1 to the videotaped deposition of Ziad Asghar
 6   testifying in the matter of Arm Limited, a UK
 7   Corporation versus Qualcomm Inc., et al.  This case
 8   is being heard before the United States District
 9   Court for the District of Delaware.  The case number
10   is 22-1146-MN.  This deposition is being held at
11   12531 High Bluff Drive, Suite 100 in San Diego,
12   California 92130.  Today's date is November 8th,
13   2023, and the time is 8:39 a.m. Pacific Standard
14   Time.
15       My name is Rene Sanchez and I'm the
16   videographer here with our court reporter Kim
17   Reichert.  Would counsel please introduce yourselves
18   and your affiliations and the witness will be sworn.
19       MR. MUINO:  Daniel Muino of Morrison & Foerster
20   for plaintiff Arm Limited.
21       MR. BRALY:  Jacob Braly with Paul, Weiss for
22   defendants and the witness.  With me are Catherine
23   Nyarady, also from Paul, Weiss, and Kurt Kjelland
24   from Qualcomm.
25   ///
```

ZIAD ASGHAR  Conf. AEO - 30b6                    November 08, 2023
ARM, LTD. V. QUALCOMM INC.                                    9–12

Page 9
1              ZIAD ASGHAR,
2      deponent, was sworn and examined
3         and testified as follows:
4
5      THE REPORTER:  Mr. Asghar, will you raise your
6  right hand for me, please.  Do you solemnly state
7  that the evidence you shall give in this matter now
8  pending shall be the truth, the whole truth and
9  nothing but the truth so help you God?
10      THE WITNESS:  I do.
11
12             EXAMINATION
13  BY MR. MUINO:
14      Q    Good morning, Mr. Asghar.
15      A    Good morning.
16      Q    Could you please state your name for the
17  record?
18      A    Ziad Asghar.
19      Q    What is your current address?
20      A    My current home address is 17019 Coyote
21  Bush Drive, San Diego 92127.
22      Q    Are you currently employed by Qualcomm?
23      A    I am.
24      Q    And what is your current position at
25  Qualcomm?

Page 10
1      A    My current position is SVP product
2  management or senior V.P. of product management.
3      Q    Is that for a specific Qualcomm product,
4  like the Snapdragon product?
5      A    So my role is horizontally across the
6  company, which means my team creates all the
7  technology IPs from a product perspective for all
8  the different businesses that Qualcomm operates in
9  for application process and technology.
10      Q    Have you ever had your deposition taken
11  before?
12      A    I have.
13      Q    How many times?
14      A    If I recall, once.
15      Q    When was that?
16      A    I believe it was during COVID times, so
17  I'm not exactly sure, but a couple years plus.
18      Q    2020?
19      A    I don't remember exactly.  I think about
20  '20, '21.
21      Q    Do you recall which case that was?
22      A    This was a case that had to do with one of
23  our -- a case that had to do with Samsung.
24      Q    You were testifying in your capacity as
25  your position at Qualcomm?

Page 11
1      A    Yes.
2      Q    Do you recall the -- in a general sense
3  the nature of the case?
4      A    It's been a little while, but it had to do
5  with process technology.
6      Q    Was Qualcomm the plaintiff or the
7  defendant in the case?
8      A    I think we were neither from what I
9  recall, but it's been a while.
10      Q    Apart from that, have you had your
11  deposition taken on other occasions?
12      A    No.
13      Q    Have you ever testified in court?
14      A    No, I haven't.
15      Q    So you might remember from your last
16  experience, but the basic ground rule here is that
17  you and I should try to avoid speaking over one
18  another so the court reporter can take down
19  everything that we're saying.  So, if you give me a
20  chance to finish my questions, I'll give you a
21  chance to answer fully; is that okay?
22      A    Sounds good.
23      Q    From time to time counsel might object to
24  a question that I ask.  Unless he instructs you not
25  to answer a question, you should go ahead and answer

Page 12
1  to the best of your ability.
2         Do you understand that?
3      A    I understand.
4      Q    I usually take breaks about every hour.
5  If you need a break in between, just let me know.  I
6  understand we will do a short lunch break today and
7  I know there's an hour period where you need to have
8  a meeting, so we will respect that time as well.
9      A    I appreciate it.
10      Q    Is there any reason that you can't give
11  full and complete testimony today?
12      A    Shouldn't be any reason.
13      Q    Did you do anything to prepare for today's
14  deposition?
15      A    I had a discussion with my lawyers.
16      Q    And which lawyers did you have a
17  discussion with?
18      A    All three of them here.
19      Q    How many occasions did you meet with them?
20      A    Just once.
21      Q    When was that?
22      A    Monday.
23      Q    How long did that last?
24      A    A few hours.
25      Q    Did you review any documents to prepare



Page 53

1    A   Version 9.
2    Q   Are there -- is there more than one
3    ███████ core?
4    A   There is.  There are more ███████ cores,
5    yes.
6    Q   Let me get a list of the ███████ cores.
7    What's the first one?
8    A   So we have the first one, which is going
9    to be a ███████ large.  That's going to go into a
10   smartphone SOC.
11   Q   Does that smartphone SOC have a name?
12   A   It's called ███████
13   Q   And you said there are other ███████ cores
14   also?
15   A   Yes, ███████ medium core for mobile.
16   That's going to also go into ███████
17   Q   What is the purpose of offering a large
18   core and a medium core for the ███████ SOC?
19   A   In a smartphone chip you want to have the
20   ability to go to high performance, but you also want
21   to have the ability to be able to operate a very low
22   part consumption.  So when you're using the phone
23   actively, you go to the big core.  When you use it,
24   for example, it's sitting in your pocket it's
25   typically using the smaller core.  You need low

Page 54

1    performance, high performance, low power, high
2    power, and it also allows you to get to a better
3    area.
4    Q   Is there a price difference between those
5    cores?
6    A   Custom cores, I don't believe there is a
7    difference.
8    Q   In terms of the price that Qualcomm is
9    charging to customers?
10   A   Oh, no, no.  This goes into a single SOC,
11   right, so we just offer the SOC, so the big or the
12   large and medium go together in SOC.
13   Q   Have we exhausted the list of ███████
14   cores?
15   A   There are more.
16   Q   What is the next one?
17   A   So the next one would be a ███████ large
18   and medium that goes into a PC product for PC
19   market, and that one is called ███████.
20   Q   ███████ SOC?
21   A   ███████, and that's a PC product.
22   Q   ███████ you said?
23   A   That's right.
24   Q   Any other ███████ cores?
25   A   These are the ones that I have planned at

Page 55

1    this time.  We might do others and might use them in
2    different products still being planned.
3    Q   Okay.  So I planned to do this later in
4    the day, but since we got on this subject I'm going
5    to ask you more details about these cores.  We still
6    have some time before we take a break.  Let's start
7    back with the ███████ core for the ███████ SOC.  Was
8    that the first ███████ core that Qualcomm worked on?
9    A   This was the first custom core that we
10   developed.
11   Q   And when?
12   A   In the ███████ family, just to be clear.
13   All the other parts that I mentioned earlier that
14   were also custom cores in the past.
15   Q   The ███████ core was originally acquired
16   from Nuvia; is that right?
17   A   What we acquired or what Nuvia was working
18   on was a server product.  What we have in ███████ is a
19   PC product.  From my product perspective, servers
20   are very different products than PC, and their
21   requirements are vastly different.  This is a custom
22   core for the PC market.  Very different.
23   Q   The ███████ core that Qualcomm acquired
24   with Nuvia was for the server market?
25   A   It was for the server market.

Page 56

1    Q   And did that pertain to an SOC called
2    ███████?
3    A   That's correct.
4    Q   That's ███████████████
5    A   That's right.
6    Q   You didn't mention that in your list of
7    cores that Qualcomm worked on.  Did Qualcomm
8    continue the development of the ███████ core for the
9    ███████ SOC after the acquisition of Nuvia?
10   A   It was more the SOC work that continued
11   for some time, but that was discontinued.
12   Q   When was that discontinued?
13   A   I want to say around after March or April
14   of '22.  I don't know the exact date, but somewhere
15   thereabouts.
16   Q   In March or April of 2022, Qualcomm
17   discontinued --
18   A   After that time, not in March/April, after
19   March or April of '22.
20   Q   After March or April of 2022, Qualcomm
21   discontinued its work on the ███████ SOC; is that
22   right?
23   A   That's right.
24   Q   The ███████n SOC included a ███████ core; is
25   that right?

Page 57

1    A   For the server market, that's right.
2    Q   Why did Qualcomm discontinue the ▓▓▓▓
3  SOC?
4    A   I believe we had gotten some sort of
5  notice from Arm and we wanted to just make sure we
6  are abiding by all contracts.  I was part of it.
7    Q   So part of the reason for discontinuing
8  the ▓▓▓ SOC was because of the positions that Arm
9  was taking?
10   A   Yes, partly.
11   Q   Were you involved in those conversations
12  with Arm?
13   MR. BRALY:  Objection.
14   THE WITNESS:  Not with Arm, but internally I
15  was in some discussions.
16  BY MR. MUINO:
17   Q   What was your understanding of -- this is
18  the early 2022 time frame, what was your
19  understanding of what Arm was saying to Qualcomm
20  that caused Qualcomm to discontinue the ▓▓▓ SOC?
21   A   From a product perspective, Arm was
22  claiming that there were certain Arm technologies in
23  those products and there was a concern on our side.
24  We wanted to, of course, abide by all the rules and
25  that's why we delayed ▓▓▓▓ to actually make sure

Page 58

1  that we remove any IPs there might be any concern
2  around, and, similarly, ▓▓▓▓ would have to make
3  those changes, and it was canceled.  A lot of work
4  was wasted.
5    Q   Is there any current plan to bring the
6  ▓▓▓ SOC back?
7    A   I'm not aware of any such plan.
8    Q   Does Qualcomm have any plan to use any
9  version of the ▓▓▓▓ core for server SOCs?
10   A   I'm not aware of any such plan.
11   Q   The employees who were working on the
12  ▓▓▓ SOC, were they redeployed to other purposes?
13   A   It's more of an engineering question
14  really.  I would think so.
15   Q   Did Qualcomm have other reasons for
16  discontinuing the ▓▓▓ SOC?
17   A   Not anything that I can recall, but there
18  could have been other reasons.
19   Q   All right.  Let me ask you now about the
20  ▓▓▓▓ core for the ▓▓▓ SOC.  When did Qualcomm
21  begin work on that?
22   A   Pretty much once we started to have our
23  Qualcomm custom CPU team in place, we started to
24  work on the CPU for ▓▓▓▓.
25   Q   So we are oriented in terms of time, the

Page 59

1  acquisition of Nuvia by Qualcomm occurred in March
2  of 2021; is that correct?
3    A   I believe so.
4    Q   And was that the time at which the ▓▓▓▓
5  core for ▓▓▓▓ got started?
6    A   After that, yes.
7    Q   The employees, the engineers who were
8  working on ▓▓▓▓ for ▓▓▓▓a, were they the former
9  Nuvia engineers?
10   A   I'm not aware of the exact personnel, but
11  I'm assuming they were there and, of course,
12  Qualcomm had CPU capable people as well, so the
13  combined team.
14   Q   And the ▓▓▓▓ core for the ▓▓▓▓ SOC was
15  based at the start on the ▓▓▓▓ core that came in
16  from Nuvia; correct?
17   A   It was a new core.  Like I explained, that
18  the server market and PC markets are very different.
19  You have liquid cooling and a very different sort of
20  parameters in the server market compared to what you
21  have in a device like a PC.  So these are different
22  cores.
23   Q   My question really is the ▓▓▓▓ core for
24  ▓▓▓▓, it wasn't developed from scratch, right, it
25  started with the RTL from the ▓▓▓▓ that came in

Page 60

1  with Nuvia?
2    A   I don't believe so, but that should be a
3  question for engineering.
4    Q   You're not sure about that?
5    A   No, I don't think it came from there, but
6  it's a question, for engineering like I mentioned.
7    Q   It isn't your understanding that ▓▓▓▓
8  for ▓▓▓▓ is a completely new core, is it?
9    MR. BRALY:  Objection.
10   THE WITNESS:  It's a core that's a custom core
11  that's developed for a very different market, like I
12  was explaining.  So from a PC perspective the
13  parameters are very different from what a server CPU
14  requires.
15  BY MR. MUINO:
16   Q   I understand.  What I understand is the
17  connection between the ▓▓▓▓ core that Nuvia had
18  begun and started to develop and the ▓▓▓▓ core
19  that was developed for ▓▓▓▓, the ▓▓▓▓
20  core, was derived in some way from the ▓▓▓▓▓▓
21  core; correct?
22   MR. BRALY:  Objection; asked and answered.
23   THE WITNESS:  I'm not aware of that.  That
24  should be an engineering question.
25  ///



Page 61

1  BY MR. MUINO:
2      Q    It wasn't a coincidence they're both
3  called ████; right?
4      MR. BRALY:  Objection.
5      THE WITNESS:  You know, we change the names of
6  products on a daily basis.  Names pretty much mean
7  nothing.  Internal code names change all the time.
8  BY MR. MUINO:
9      Q    The engineering -- so the Nuvia engineers
10 who joined Qualcomm after the acquisition in
11 March 2021, they went to work on ████ for ████;
12 correct?
13     A    Like I said, the combined Qualcomm CPU
14 team which, of course, had a lot of capabilities
15 before, but definitely required this team because
16 they're a very good team and the combined team
17 worked on the custom core.
18     Q    From a technical perspective, do you know
19 what differences there are between the ████ core
20 for ████ and the ████ core for ████?
21     MR. BRALY:  Objection.
22     THE WITNESS:  I don't.
23 BY MR. MUINO:
24     Q    You're not in a position to have looked at
25 the RTL code?

Page 62

1      A    No, I'm not an engineer, as you know.
2      Q    Has Qualcomm finished developing the
3  ████ core for ████?
4      A    Yes.
5      Q    When did that development finish?
6      A    I don't know the exact date, but, as you
7  know, publicly we launched our Snapdragon X Elite
8  product, which is the public name for ████.
9      Q    The Snapdragon X Elite included ████ SOC?
10     A    Like I said, the names mean nothing.
11 Internal name is ████.  Snapdragon X Elite is the
12 public name for ████.
13     Q    I appreciate that clarification.  The
14 Snapdragon X Elite contains the ████ core;
15 correct?
16     A    That's right.
17     Q    Do you know how -- there's multiple
18 ████ cores inside of that product; is that
19 correct?
20     A    There are multiple ████ cores, yes.
21     Q    When was that product launched as it --
22 when did it become available first?
23     A    Availability means a lot of things to
24 people, but we have our summit October 23rd, which
25 is publicly launched in Hawaii.

Page 63

1      Q    That was October 23rd of this year?
2      A    Yes, October 23rd or 24th is when it was
3  launched, yeah.
4      Q    Just so that I make sure I've asked this
5  question, do you know in terms of the internal
6  development of the ████ SOC, do you know
7  approximately when that wrapped up?
8      MR. BRALY:  Objection.
9      THE WITNESS:  I don't honestly remember the
10 exact dates, but for you to be able to launch a
11 product it needs to have a certain degree of
12 readiness.
13 BY MR. MUINO:
14     Q    Obviously by the time the product was
15 launched, October of 2023, ████ SOC was ready; is
16 that correct?
17     A    You have to understand the software in our
18 work continues on much afterwards, so that work, of
19 course, is still going to be going on until you see
20 commercial products come on the shelves.  Hardware
21 is different from software.
22     MR. MUINO:  Why don't we take a break.
23     THE VIDEOGRAPHER:  Off the record at 9:48 a.m.
24         (A recess was taken from 9:48 a.m. to
25 9:58 a.m.)

Page 64

1      THE VIDEOGRAPHER:  On the record at 9:58 a.m.
2      MR. BRALY:  I would just like to designate this
3  transcript as highly confidential, attorneys' eyes
4  only.
5  BY MR. MUINO:
6      Q    Mr. Asghar, I want to go back to the
7  subject of the different ████ cores.  The ████
8  core for the ████ SOC was -- is an Arm-compliant
9  core; correct?
10     A    It is based on Arm ISO, yes.
11     Q    Do you remember which version of the Arm
12 ISO it's based on?
13     A    I believe it' version 8.
14     Q    Let me ask you about the ████ core for
15 the ████ SOC.  You indicated, I think, there were
16 two versions of that ████ core; is that correct?
17     MR. BRALY:  Objection.
18     THE WITNESS:  These are two different cores.  A
19 ████████████.  Very different
20 power, performance area, like I mentioned earlier.
21 BY MR. MUINO:
22     Q    There's a ████████████
23 ████████, both for the ████ SOC?
24     A    That's correct.
25     Q    When did Qualcomm start development of the





Page 65

1  ██████████████ ?
2      A   Not sure of the exact date, but we launch
3  our mobile products every year, and we have
4  basically a cadence based on that.
5      Q   Do you know approximately when that
6  development began?
7      A   So the SOC development cycles are
8  significant.  I don't remember the exact date.
9      Q   The engineers who worked on the ████
10  big core for ████, were they the former Nuvia
11  engineers?
12      A   This was the combined team from the
13  Qualcomm and our acquisition.  This is the Qualcomm
14  custom core team especially.
15      Q   The Nuvia team was part of that team for
16  the ████████████████; correct?
17      MR. BRALY:  Objection.
18      THE WITNESS:  They were integrated into a
19  single team with Qualcomm engineers and the acquired
20  talent as well.
21  BY MR. MUINO:
22      Q   Has Qualcomm finished developing the
23  ████████████████ ?
24      A   I believe so.
25      Q   When did that development finish?

Page 66

1      A   Again, there are hardware aspects and
2  software aspects.  The first tape out, as we call
3  it, already happened.  The commercial tape out is
4  going to be happening by, I believe, January time
5  frame or something.
6      Q   You said the first tape out of the ████
7  ████████████ has already occurred?
8      A   ██████ is the SOC that's going to tape
9  the ████████████ together in a single CPU
10  cluster and that's going to ship out to SOC.  The
11  first tape out is not the commercial version.  The
12  commercial tape out of the silicon will happen in
13  January time frame.
14      Q   When you're referring to the tape out,
15  you're talking about the tape out of the ████ SOC?
16      A   That's right.
17      Q   And the ████ SOC will include a ████
18  ██████████████ore?
19      A   That's right.
20      Q   Is that true for all ████ SOC, they will
21  include both of those?
22      A   ████ is a single SOC that's called
23  ██████, and that would be this case.
24      Q   Do you know offhand how many of the big
25  cores and how many of the medium cores are included

Page 67

1  in the ████ SOC?
2      A   ████ has two big cores for mobile and
3  six medium cores.
4      Q   You said the initial tape out of the
5  initial ████ SOC already occurred.  When did that
6  occur?
7      A   I believe it was July of last year.
8  Sorry, I'm still in '23.  July of this year.
9      Q   July of 2023 is when the initial tape out
10  for the ████ SOC occurred?
11      A   That's right.
12      Q   That SOC includes both the ████████
13  ████████████████ ?
14      A   That's right.
15      Q   You mentioned a commercial tape out as
16  well?
17      A   Yes.
18      Q   When will that occur?
19      A   Like I mentioned, it will be in the
20  January time frame.
21      Q   January of 2024?
22      A   That's right.
23      Q   What's the difference between the initial
24  tape out and commercial tape out?
25      A   Probably an engineering question, but we

Page 68

1  improve quality in various different respects on the
2  SOC.
3      Q   Does Qualcomm have an expected time for
4  commercializing the ████ SOC?
5      A   Yes.
6      Q   What is that timing?
7      A   We most likely will have products towards
8  the end of 2024 based on ████.
9      Q   Does Qualcomm have a product name for the
10  ████ SOC?
11      A   Public name?
12      Q   Public name.
13      A   Not at this time, but you can guess the
14  last one we launched was Snapdragon 8 and 3.  It's
15  probably 10 and 4, but no public name.
16      Q   It will likely be called Snapdragon?
17      A   Snapdragon 4.
18      Q   And the ████ SOC is for the mobile
19  market; is that correct?
20      A   That is right.
21      Q   Let me ask about the ████ core for the
22  ████ SOC.  Is that currently in development?
23      A   Yes, it is being developed.
24      Q   You described that as a ████ mid
25  automotive core.



Page 69

1    A   That's right.
2    Q   Is that the only core being developed for
3  the ███████ SOC?
4    A   From the CPU perspective, that would be
5  the only core that's being developed.
6    Q   When did development of the ███████ core
7  for ███████ start?
8    A   I don't remember the exact date.
9    Q   The team working on the ███████ core for
10  ███████, does it include the former Nuvia
11  engineers?
12    A   I believe it's the Qualcomm custom core
13  team that basically has the team that came from
14  acquisition.
15    Q   Has Qualcomm finished developing the
16  ███████ core for ███████?
17    A   I'm not sure, but it should be getting
18  there fairly close, fairly soon.
19    Q   Has a tape out occurred?
20    A   No.
21    Q   Do you know if a tape out is planned for
22  the ███████ core for ███████?
23    A   Yes.
24    Q   When is that going to occur?
25    A   I believe it's in June of 2024.

Page 70

1    Q   Does Qualcomm have an expected timing for
2  commercializing the ███████ SOC?
3    A   It should be after that date.  Automotive
4  time lines are a little bit longer than smartphones,
5  but it should be after that date.
6    Q   Would that be sometime in 2025?
7    A   We'll, of course, start to provide samples
8  to customers usually before that, but actual
9  commercial products would come out later, so, yeah,
10  we would probably get samples, commercial samples
11  out to customers in '25.
12    Q   Is there a public-facing product name for
13  the ███████ SOC?
14    A   I don't -- I'm not aware of one at this
15  time.
16    Q   At a technical level, are you aware of the
17  differences between the ███████ core for ███████, for
18  ███████ and for ███████?
19    MR. BRALY:  Objection.
20    THE WITNESS:  It's a question best answered by
21  the engineering team.
22  BY MR. MUINO:
23    Q   To your knowledge, are there differences
24  between those cores?
25    A   They're very different markets like I've

Page 71

1  talked about.  A PC goes into a device.  That size
2  of smartphone that's in your hand, it should last a
3  full day.  An auto has a much larger battery, but
4  auto places very specific requirements on the core
5  development.  You have to have certain capabilities
6  for functional safety in automotive that are very
7  restrictive also.  So, all of these markets are very
8  different in terms of what's needed for them.
9    Q   Just to make sure I asked this, are you
10  aware at the technical level of any differences
11  between the ███████ core for the ███████ SOC and the
12  ███████ core for the ███████ SOC?
13    MR. BRALY:  Objection.
14    THE WITNESS:  Again, the question's for
15  engineers, but like I mentioned before, the server
16  market and PC market are vastly different.
17  Requirements are very different between them.
18  BY MR. MUINO:
19    Q   Let me ask you now about the ███████
20  cores.  You described the ███████████████
21  ███████ SOC; correct?
22    A   That's right.
23    Q   Are those cores in development currently?
24    A   That's right.
25    Q   Do you know when development on those

Page 72

1  cores began?
2    A   I don't know the exact date.
3    Q   Do you know approximately?
4    A   You should think of it this way.  Like I
5  said, ███████ a will have products at the end of '24.
6  ███████ we will have products end of '25.  So this
7  is the cadence we have on our smartphone products.
8  We have to get a chip out every year and it needs to
9  be better than the last one.
10    Q   But those two ███████ cores, the large and
11  medium, are in development currently?
12    A   Yes.
13    Q   The team working on the ███████ cores,
14  does it include the former Nuvia engineers?
15    A   It basically is the Qualcomm combined CPU
16  team, which includes some of the acquisition and
17  engineering as well.
18    Q   The ███████ SOC, is that for the mobile
19  market?
20    A   That's right.
21    Q   Has Qualcomm finished development of the
22  ███████?
23    A   Again, it's a nebulous term, but the work
24  is ongoing.  We'll have the chip ready for
25  commercial products end of '25.

Page 73

1    Q   Has there been a tape out for those cores?
2    MR. BRALY:  Objection.
3    THE WITNESS:  Not yet.
4  BY MR. MUINO:
5    Q   Is there a tape out scheduled for the
6  ████████████████████?
7    MR. BRALY:  Objection.
8    THE WITNESS:  Yes.
9  BY MR. MUINO:
10    Q   When is that scheduled for?
11    A   Again, this is forward looking.  Time
12  lines change all the time.  It's scheduled for, I
13  believe, June of 2024.
14    Q   The ████████████████ are
15  compliant with Arm's version 9 architecture; is that
16  correct?
17    A   These are V9 capable cores, yes.
18    Q   The ████████ SOC hasn't been
19  commercialized yet; correct?
20    A   No.
21    Q   Is there a timing for commercializing that
22  SOC?
23    A   Like I mentioned, ████████ will launch Q4 of
24  '24, and the ████████████ will be in the
25  market Q4 of '25.

Page 74

1    Q   Does Qualcomm have a public-facing name
2  for the ████████ SOC?
3    A   Not at this time.
4    Q   Will that likely -- will it likely have a
5  Snapdragon name?
6    A   Yes.
7    Q   Is that true for the ████████ SOC as
8  well?  Will that likely have a Snapdragon name?
9    A   I believe so.
10    Q   Then you also mentioned the ████████
11  ████████████ for the ████ r SOC.  Is that
12  currently in development at Qualcomm?
13    A   Yes.
14    Q   When did development on those cores begin?
15    A   I don't know the exact date.
16    Q   Has the development of those cores
17  finished?
18    A   Not yet.
19    Q   Is there a scheduled time for a tape out
20  of those cores?
21    A   Yes, there is.
22    Q   When is that?
23    A   I believe it's in Q3 of '24.
24    Q   The ████████ SOC is for the PC market; is
25  that correct?

Page 75

1    A   It is for the PC.
2    Q   What is the expected timing for
3  commercializing the ████████ SOC?
4    A   It should basically be somewhere in '25.
5    Q   Is there a public-facing product name for
6  the ████████ SOC?
7    A   Not at this time.
8    Q   Will it likely have a Snapdragon name?
9    A   Yes.
10    Q   The ████████████████████, are
11  those compliant with the Arm version 9 architecture?
12    A   They are V9 cores, that's right.
13    MR. MUINO:  I'd like to mark as the next
14  exhibit, Exhibit 5, which is a document with the
15  Bates label QCARM_275506.  It's an e-mail from
16  Mr. Asghar dated May 15, 2013.
17    (Plaintiff's Exhibit 5 was marked for
18  identification by the deposition officer and is
19  attached hereto.)
20  BY MR. MUINO:
21    Q   Mr. Asghar, I know this e-mail is from
22  quite some time ago, but do you recognize this
23  e-mail?
24    A   It has my name on it, so yes.
25    Q   You recognize this as an e-mail that you

Page 76

1  sent back in May 2013?
2    A   I guess so, yes.
3    Q   At this time in May 2013, I think your
4  role was director of QCT strategy; is that correct?
5    A   Uh-huh, yes.
6    Q   And you say here that you're attaching the
7  Arm analysis.  Do you see that?
8    A   Yes.
9    Q   Do you recall what was the Arm analysis?
10    A   Honestly, I don't remember at this time.
11  We analyze companies all the time, so...
12    Q   We will take a look at it.  Do you see
13  there's an attachment "Arm Strategy 050513"?
14    A   Yes.
15    Q   Let's take a look at that.
16    A   Sure.
17    MR. MUINO:  This will be Asghar Exhibit 6.
18  It's a document that starts with the Bates number
19  QCARM_0275507.
20    (Plaintiff's Exhibit 6 was marked for
21  identification by the deposition officer and is
22  attached hereto.)
23  BY MR. MUINO:
24    Q   Mr. Asghar, I'll represent this was the
25  document that was produced behind the previous one



Page 133

1   this time in January 2021; correct?
2       A   Yes.
3       Q   Those were CPUs that Nuvia had developed
4   prior to its acquisition; right?
5       MR. BRALY:  Objection; calls for speculation.
6       THE WITNESS:  Again, it's very clear to anybody
7   who is in this area that he does not mean exactly
8   the same CPUs, because if you made a smartphone with
9   a server CPU, it would last five minutes and burn a
10  hole in your hand.  I think anybody who is aware
11  knows what he means by this, that we would develop
12  custom cores for these markets.  You cannot take a
13  server CPU into a smartphone.  Your phone would
14  literally last a few minutes.
15  BY MR. MUINO:
16      Q   Let's try to focus, Mr. Asghar, on what
17  I'm asking.  I'm not asking about what Qualcomm did
18  subsequently, I'm asking about what was being
19  acquired through the acquisition of Nuvia.  Nuvia
20  had developed some CPU cores, right; is that
21  correct?
22      A   Yes.
23      Q   And specifically the core that they had
24  developed was called ████; right?
25      A   For servers, yes.

Page 134

1       Q   That was a core for the ████SOC;
2   correct?
3       A   That's right.
4       Q   The ████ SOC was for the server market;
5   is that right?
6       A   That's right.
7       Q   So that ████ core was part of what
8   Qualcomm was acquiring when it acquired Nuvia;
9   right?
10      MR. BRALY:  Objection.
11      THE WITNESS:  We were acquiring the entire
12  Nuvia team.  Yes.
13  BY MR. MUINO:
14      Q   I'm not asking about the team.  Part of
15  what Qualcomm was acquiring when it acquired Nuvia
16  was the Nuvia ████ core; correct?
17      MR. BRALY:  Objection.
18      THE WITNESS:  Yes.  All the assets came along,
19  yes, but this statement is talking about future
20  product plans.  I think that should be quite clear,
21  right?  We expect to integrate such that we are
22  clear on that.
23  BY MR. MUINO:
24      Q   But, again, I just -- I think you answered
25  my question.  Part of what Qualcomm was acquiring

Page 135

1   when it acquired Nuvia was the Nuvia ████ core;
2   correct?
3       MR. BRALY:  Objection; asked and answered.
4       THE WITNESS:  Yes.
5   BY MR. MUINO:
6       Q   What Mr. Amon is saying here is "We expect
7   to integrate the Nuvia CPUs across Qualcomm's
8   portfolio of products"; correct?
9       A   That's what he's saying, but this is not
10  something that you should look at as exactly the
11  same CPU.  Like I'm explaining from a technology
12  perspective, you cannot do that.  So the audience is
13  well aware of the fact that this will be newly
14  defined, newly designed CPUs that would be very
15  different in nature to be able to meet the
16  requirements of these different product lines.
17      Q   That's not what Mr. Amon says in this
18  e-mail; right?
19      MR. BRALY:  Objection; mischaracterizes the
20  document.
21  BY MR. MUINO:
22      Q   Is that right?
23      A   I'm telling you, you can ask anybody --
24  pick out any of the Qualcomm.all and ask them what
25  this means.  They will say it could not be the same

Page 136

1   CPU because the server CPU is vastly different than
2   the CPU that goes into a smartphone.  That's why we
3   were negotiating with them to create a different CPU
4   for us because we knew a server CPU cannot go into a
5   smartphone.  So what he's saying over there is
6   Qualcomm cores, Qualcomm CPUs will be designed to go
7   into these markets.
8       Q   It was Qualcomm's intent to use the
9   ████ core that Nuvia had developed, correct,
10  after the acquisition?
11      MR. BRALY:  Objection.
12      THE WITNESS:  It was Qualcomm's intent to use
13  the Qualcomm custom core team to design different
14  custom cores for these very different markets than
15  what Nuvia was working on.
16  BY MR. MUINO:
17      Q   Was Qualcomm planning to throw away the
18  ████ core that Nuvia had developed?
19      MR. BRALY:  Objection.
20      THE WITNESS:  As we discussed earlier, there
21  was an ████ product which we as a company could
22  choose to continue or not, but it would exist in
23  that SOC.  For these other markets, smartphone, PC,
24  XR, automotive, we would need new cores.
25  ///



Page 169

1  at this time?  Do you know?
2      A   I don't know.  If they were deactivated, I
3  think they probably wouldn't be able to access it, I
4  suppose.
5      Q   And do you know at this point if the
6  former Nuvia employees switched over to using
7  Qualcomm credentials?
8      A   I think once we got the notice, I'm
9  assuming we passed it on to the relevant teams and
10  they, of course, abided by it, but basically saying
11  these are all Qualcomm teams at this point, which is
12  true.
13      Q   If you look at the third line, the
14  sentence starting -- the second half of the third
15  line says:
16  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
24      Do you see that?
25      A   I do.

Page 170

1      Q   Do you recall if that actually occurred,
2  that the Nuvia credentials were deactivated?
3      A   I'm not sure, but I suppose so.
4      Q   At this point in time in May 2021, were
5  Arm and Qualcomm discussing terms by which the Nuvia
6  design and related Arm IP could be transferred to
7  Qualcomm?
8      MR. BRALY:  Objection.
9      THE WITNESS:  We were discussing on basically
10  using Qualcomm ALA to be able to design our cores
11  and how that was the overarching document.
12  BY MR. MUINO:
13      Q   That was an ongoing discussion you were
14  having with Arm?
15      A   With Paul and Will at that time.
16      Q   Will is Will Abbey?
17      A   That's right.
18      Q   Were you the one at Qualcomm leading those
19  discussions?
20      MR. BRALY:  Objection.
21      THE WITNESS:  We were -- RK and I were involved
22  in those discussions, but there were other people
23  working in the background.
24      MR. MUINO:  I'm going to mark as Exhibit 18 a
25  document that has the Bates label 3450805.

Page 171

1          (Plaintiff's Exhibit 18 was marked for
2  identification by the deposition officer and is
3  attached hereto.)
4      MR. MUINO:  I'm sorry, the text is so small.
5  Let's put this one aside.  Let me see if I can get a
6  better copy.
7      THE WITNESS:  Sure.
8      MR. MUINO:  The next one has the same problem.
9  Okay, let's mark as Exhibit 19 a document that has
10  the label QCARM_27987.
11          (Plaintiff's Exhibit 19 was marked
12  for identification by the deposition officer and is
13  attached hereto.)
14  BY MR. MUINO:
15      Q   Mr. Asghar, do you see this is a letter
16  from Paul Williamson to you dated February 2nd,
17  2021?
18      A   Yes.
19      Q   And you recognize this letter?
20      A   Yes, I do.
21      Q   The first sentence says:
22          "Thank you for your letter
23          dated January 27, 2021 regarding the
24          acquisition of Nuvia, Inc. ('NUVIA')
25          by Qualcomm Technologies, Inc.

Page 172

1          ('QTI')."
2          Do you see that?
3      A   Yes.
4      Q   You understood this was Mr. Williamson
5  responding to your earlier letter?
6      A   Yes.
7      Q   The second paragraph says:
8          ▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
22      Do you see that?
23      A   I see that.
24      Q   Now, by this point in time you understood
25  that Qualcomm and Nuvia each had agreements, license



**Page 261**

13    Q   To your knowledge was Cadmus produced by
14    TSMC?
15    A   Yes.
16    Q   Was Microsoft the first Qualcomm customer
17    to use the ▮▮▮ SOC?
18    MR. BRALY:  Objection.
19    THE WITNESS:  As I mentioned earlier, ▮▮▮ is
20    not commercial at this point in time, so there
21    aren't any products that have launched based on
22    ▮▮▮.
23    BY MR. MUINO:
24    Q   Was Broadcom the first customer to tape
25    out the ▮▮▮ SOC?

**Page 262**

1    MR. BRALY:  Objection.

**Page 263**

21    BY MR. MUINO:
22    Q   When you say the "engagement with them."
23    does that involve sending them samples of the ▮▮▮
24    SOC?
25    A   It includes having discussions with them,

**Page 264**

1    sharing information and at some point sending
2    samples to them.
3    Q   Do you know which customers have received
4    samples of the ▮▮▮ SOC?
5    A   I don't.

8    MR. MUINO:  I'm going to mark as Exhibit 38 a
9    document with the number QCARM_340000.
10    (Plaintiff's Exhibit 38 was marked
11    for identification by the deposition officer and is
12    attached hereto.)
13    BY MR. MUINO:
14    Q   Mr. Asghar, you see your name at the top
15    of this document?
16    A   Yes.
17    Q   And this appears as if it might be a
18    Microsoft Teams chat?
19    A   That's right.
20    Q   You see in the chat your name is
21    appearing; correct?
22    A   Yes.
23    Q   And you appear to be conversing with
24    somebody named Tjas?
25    A   Tjas.

ZIAD ASGHAR  Conf. AEO - 30b6
ARM, LTD. V. QUALCOMM INC.

November 08, 2023
273—276

Page 273

```
 1              C E R T I F I C A T E

 2

 3   STATE OF CALIFORNIA   )
                           )  ss.
 4   COUNTY OF ORANGE      )

 5

 6        I, KIMBERLY C. REICHERT, holder of Certificate

 7   Number CSR 10986, issued by the Court Reporters Board of

 8   California, do hereby certify that I was authorized to

 9   and did report said remote teleconference deposition in

10   stenotype; and that the foregoing pages are a true and

11   correct transcription of my shorthand notes of said

12   remote teleconference deposition.

13        I further certify that said remote

14   teleconference deposition was taken at the time and

15   place hereinabove set forth and that the taking of

16   said remote teleconference deposition was commenced

17   and completed as hereinabove set out.

18        I further certify that I am not attorney or

19   counsel of any of the parties, nor am I a relative or

20   employee of any attorney or counsel of any party

21   connected with the action, nor am I financially

22   interested in the action.

23        The foregoing certification of this transcript

24   does not apply to any reproduction of the same by any

25   means unless under the direct control and/or direction
```

Page 274

```
 1   of the certifying reporter.

 2

 3   Dated this date:  November 21, 2023.

 4

 5            Kim Reichert

 6            _____
             KIMBERLY C. REICHERT, CSR No. 10986
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 275

```
 1              DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No. J10465669

 4   Case Caption:  ARM LTD. vs. QUALCOMM INC., ET AL.

 5

 6

 7

 8        DECLARATION UNDER PENALTY OF PERJURY

 9

10        I ZIAD ASGHAR,

11   declare under penalty of perjury that I have read the

12   entire transcript of my Deposition taken in the

13   captioned mater or the same has been read to me, and the

14   same is true and accurate, save and except for changes

15   and/or corrections, if any, as indicated by me on the

16   DEPOSITION ERRATA SHEET hereof, with the understanding

17   that I offer these changes as if still under oath.

18        Signed on the _____ day of

19   _____, 20 ____.

20

21        _____

22        ZIAD ASGHAR

23

24

25
```

Page 276

```
 1              DEPOSITION ERRATA SHEET

 2   Page No. _____ Line No. _____ Change to: _____

 3   _____

 4   Reason for change: _____

 5   Page No. _____ Line No. _____ Change to: _____

 6   _____

 7   Reason for change: _____

 8   Page No. _____ Line No. _____ Change to: _____

 9   _____

10   Reason for change: _____

11   Page No. _____ Line No. _____ Change to: _____

12   _____

13   Reason for change: _____

14   Page No. _____ Line No. _____ Change to: _____

15   _____

16   Reason for change: _____

17   Page No. _____ Line No. _____ Change to: _____

18   _____

19   Reason for change: _____

20   Page No. _____ Line No. _____ Change to: _____

21   _____

22   Reason for change: _____

23

24   SIGNATURE: _____  DATE: _____

25              Witness
```

ZIAD ASGHAR  Conf. AEO - 30b6
ARM, LTD. V. QUALCOMM INC.

November 08, 2023
277

Page 277

```
 1                  DEPOSITION ERRATA SHEET
 2    Page No. _____ Line No. _____ Change to: _____
 3    _____
 4    Reason for change: _____
 5    Page No. _____ Line No. _____ Change to: _____
 6    _____
 7    Reason for change: _____
 8    Page No. _____ Line No. _____ Change to: _____
 9    _____
10    Reason for change: _____
11    Page No. _____ Line No. _____ Change to: _____
12    _____
13    Reason for change: _____
14    Page No. _____ Line No. _____ Change to: _____
15    _____
16    Reason for change: _____
17    Page No. _____ Line No. _____ Change to: _____
18    _____
19    Reason for change: _____
20    Page No. _____ Line No. _____ Change to: _____
21    _____
22    Reason for change: _____
23
24    SIGNATURE: _____ DATE: _____
25                    Witness
```

# EXHIBIT 9

LYNN BOS  Highly Confidential - AEO
ARM, LTD. vs QUALCOMM, INC.

November 29, 2023
1—4

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3   ARM LTD., a U.K.          )
     corporation,             )
 4                            )  Case No.:  C.A. No.
                Plaintiff,    )  22-1146-MN
 5                            )
        vs.                   )
 6                            )
     QUALCOMM, INC., a        )
 7   Delaware corporation, et )
     al.,                     )
 8                            )
                Defendants.   )
 9   _____ )
10
11
12       HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY
13        VIDEOTAPED DEPOSITION OF LYNN BOS
14               755 Page Mill Road
15            Palo Alto, California 94304
16               November 29, 2023
17                  9:02 a.m.
18
19
20
21
22
23
24   REPORTED BY:
25   Tammy Moon, CSR No. 13184, RDR, CRR
```

## Page 2

```
 1   APPEARANCES:
 2   FOR PLAINTIFF ARM LTD., a U.K. corporation:
 3   MORRISON FOERSTER
     BY:  JACK (RUOHAN) LI, ESQ.
 4   2100 L St., NW, Ste 900
     Washington, D.C. 20037
 5   202.887.1562
     Jackli@mofo.com
 6
 7   FOR DEFENDANT QUALCOMM, INC., a Delaware
     corporation:
 8
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 9   BY:  CATHERINE NYARADY, ESQ.
     BY:  JACOB BRALY, ESQ.
10   1285 Avenue of the Americas
     New York, New York 10019
11   212.373.3726
     Cnyarady@paulweiss.com
12
13   FOR DEFENDANT QUALCOMM:
14   QUALCOMM
     BY:  KURT KJELLAND, ESQ.
15   5775 Morehouse Dr.
     San Diego, California 92121-1714
16   858.651.5423
     Kurtk@qualcomm.com
17
18   ALSO PRESENT:  KEVIN MCMAHON, THE VIDEOGRAPHER
19
20
21
22
23
24
25
```

## Page 3

```
 1              INDEX TO EXAMINATION
 2                    LYNN BOS
 3          Wednesday, November 29, 2023
 4       Tammy Moon CSR No. 13184, RPR, CRR
 5             WITNESS:  LYNN BOS
 6
 7   EXAMINATION                          PAGE
 8   MR. LI:                              7, 144
 9   MS. NYARADY:                         142, 149
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX TO EXHIBITS
 2                    LYNN BOS
 3          Wednesday, November 29, 2023
 4       Tammy Moon CSR No. 13184, RPR, CRR
 5   MARKED      DESCRIPTION                    PAGE
 6   Exhibit 1   Arm's First Notice of Deposition  14
 7               of Qualcomm and Qualcomm
 8               Technologies, Inc.
 9   Exhibit 2   Arm Ltd.'s First Notice of        18
10               Deposition of Nuvia, Inc. Pursuant
11               to Federal Rule of Civil Procedure
12               30(b)(6)
13   Exhibit 3   Lynn Bos' LinkedIn page           20
14   Exhibit 4   Bates-stamped page QCARM_0025780  34
15   Exhibit 5   Bates-stamped page QCARM_7422237  59
16   Exhibit 6   Bates-stamped pages               61
17               QCARM_0024011-QCARM_0024016
18   Exhibit 7   Bates-stamped pages               71
19               QCARM_0007285-QCARM_0007286
20   Exhibit 8   Bates-stamped pages               93
21               QCARM_3389968-QCARM_3389970
22   Exhibit 9   Bates-stamped pages               101
23               QCARM_3312272-QCARM_3312274
24
25
```

LYNN BOS  Highly Confidential - AEO
ARM, LTD. vs QUALCOMM, INC.

November 29, 2023
5—8

Page 5

```
1              INDEX TO EXHIBITS
2                  LYNN BOS
3          Wednesday, November 29, 2023
4       Tammy Moon CSR No. 13184, RPR, CRR
5   Exhibit 10    Bates-stamped pages        103
6                 QCARM_3304664-QCARM_3304669
7   Exhibit 11    Bates-stamped pages        104
8                 QCARM_3312122-QCARM_3312123
9   Exhibit 12    Bates-stamped pages        109
10                QCARM_2403551-QCARM_2403553
11  Exhibit 13    Bates-stamped page QCARM_0360587  115
12  Exhibit 14    Email from Madalyn Vaughn to Jack  122
13                Li, and others, dated August 15,
14                2023
15  Exhibit 15    Arm Ltd.'s Set of Interrogatories  123
16                to Defendants Qualcomm Inc.,
17                Qualcomm Technologies, Inc., and
18                Nuvia, Inc. (No.s 1-13)
19  Exhibit 16    Document                   143
20
21
22
23
24
25
```

Page 6

```
1        Wednesday, November 29, 2023, 9:02 a.m.
2        THE VIDEOGRAPHER:  Good morning.  We are on
3   the video record on November 29th, 2023.  The time
4   is 9:02 a.m.  My name is Kevin McMahon.  I am the
5   legal videographer.  And the court reporter today is
6   Tammy Moon.  We are both here representing Esquire
7   Deposition Solutions.
8        This is the beginning of Media Unit 1 for
9   the deposition of Lynn Bos in the matter of Arm,
10  Ltd., v. Qualcomm, Inc., venued in the United States
11  District Court, for the District of Delaware.  The
12  case number is 22-1146-MN.
13       We are located today at Morrison Foerster,
14  755 Page Mill Road, Palo Alto, California 94303.
15       Counsel, will you please identify
16  yourselves for the record.  Let's start with the
17  noticing attorney.
18       MR. LI:  Jack Li on behalf of plaintiff,
19  Arm.
20       MS. NYARADY:  Catherine Nyarady from Paul,
21  Weiss on behalf of the defendants.  And I'm joined
22  by Jake Braly -- also of Paul, Weiss -- and Kurt
23  Kjelland from Qualcomm.
24       THE VIDEOGRAPHER:  The court reporter may
25  now swear in the witness.
```

Page 7

```
1                LYNN BOS,
2   called as a witness, having been duly sworn,
3          testified as follows:
4        THE WITNESS:  Yes.
5        THE VIDEOGRAPHER:  Please proceed.
6        MS. NYARADY:  And I should add I also
7   represent the witness.
8        DIRECT EXAMINATION BY MR. LI
9   MR. LI:
10  Q.   Morning, Ms. Bos.  Could you please state
11  your name for the record, please.
12  A.   My full name?
13  Q.   Yes.
14  A.   Yes.  Lynn Marie Natalie Bos.
15  Q.   Thank you.  And what is your current
16  address?
17  A.   1128 Spinosa Drive, Sunnyvale, California
18  94087.
19  Q.   And are you currently employed by Qualcomm?
20  A.   Correct.
21  Q.   What is your current position?
22  A.   Program manager.
23  Q.   And have you had your deposition taken
24  before?
25  A.   No.  This is my first time.
```

Page 8

```
1   Q.   Okay.  And have you ever testified in court
2   before?
3   A.   No.
4   Q.   Okay.  Since you have never had your
5   deposition taken before, I just want to run through
6   some quick rules.  The big main thing is that the
7   court reporter will need to record what we're
8   saying.
9        To make sure the court reporter can hear us
10  clearly, I will just ask that you wait until I
11  finish my question before you start answering.  And
12  in turn, I will, of course, wait for you to finish
13  answering before I ask my next question.  Is that
14  okay?
15  A.   Okay.
16  Q.   Okay.  And then from time to time, your
17  counsel might object to my questions.  But unless
18  your counsel instructs you not to answer, you will
19  still need to answer the question.  Do you
20  understand?
21  A.   Yes.
22  Q.   Okay.  And I normally take a break about
23  every hour.  But if you need a break in between, as
24  long as we're not in the middle of a question, we
25  can also accommodate that.  You can just let me know
```

Page 49

1     MR. LI:
2     Q.   Welcome back, Ms. Bos.
3          When Nuvia was not yet acquired by
4  Qualcomm -- so before Qualcomm's acquisition, I
5  should say -- did Nuvia use Arm IP in developing its
6  products?
7     A.   We used the IP that were licensed under the
8  TLA agreement.
9     Q.   And did Nuvia use confidential information
10  obtained from Arm to develop its products?
11         MS. NYARADY:  Objection.
12         THE WITNESS:  I -- I'm not an engineer.
13  I -- I don't know how they design nor what they use.
14         MR. LI:
15    Q.   But to your understanding, did Nuvia use
16  information that Arm delivered to Nuvia in
17  developing Nuvia's products?
18         MS. NYARADY:  Objection.  Asked and
19  answered.
20         THE WITNESS:  Yeah.  I'm sorry.  I -- I
21  really don't know.  I'm not even a CPU design
22  engineer, so I don't -- I really don't know how they
23  use it.
24         MR. LI:
25    Q.   You mentioned a Google Drive for Nuvia

Page 50

1  before Nuvia was acquired by Qualcomm, correct?
2     A.   Yes.
3     A.   Yeah.
4     A.   Nuvia Google Drive, yeah.

24    Q.   Okay.  And once you have joined Qualcomm
25  and -- when Nuvia was acquired by Qualcomm, did you

Page 51

1  still have access to ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛?
2     A.   I never had access because I'm a program
3  manager.  I believe the engineers had access still.
4     Q.   And when you say "still," do they -- do the
5  engineers still have access to that file system
6  today?
7     A.   I don't think so.
8     Q.   Do you know when those engineers lost
9  access to that ⬛⬛⬛⬛⬛⬛⬛⬛⬛ for Nuvia?
10         MS. NYARADY:  Objection.  Foundation.
11         MR. LI:
12    Q.   You can answer.
13    A.   No.
14    Q.   Okay.  But you said you believe they did
15  not have access to that ⬛⬛⬛⬛⬛⬛⬛ anymore,
16  correct?
17         MS. NYARADY:  Objection.
18         THE WITNESS:  I -- yeah.  I don't think so,
19  but I'm not 100 percent sure.
20         MR. LI:
21    Q.   When you say you don't think so, what is
22  the basis of that understanding?
23    A.   The reason why I think so is, at a certain
24  point, we started using ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.  So that makes me

Page 52

1  think that we have transitioned.  But when that
2  happens, I don't know for certain.
3     Q.   I see.  Do you have a general idea of when
4  that happened?
5     A.   Anywhere between end of '21 and the end --
6  mid '23.
7     Q.   Okay.  And you mentioned that ⬛⬛⬛⬛⬛⬛

14    Q.   Okay.
15    A.   So if you need to know and need to have
16  access to a particular directory that is protected
17  with that access list, you need to be a member of it
18  in order to see it.
19    Q.   I see.  And you also mentioned that when
20  Qualcomm first acquired Nuvia, Nuvia had still
21  access to a ⬛⬛⬛⬛⬛⬛⬛⬛.  Do you know how --
22  for how long Nuvia had access to that ⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛ before it stopped having access?
24    A.   Like I said, I -- I don't remember.
25    Q.   Do you know if anybody at Qualcomm had

Page 53

1   access to that ███████████?
2        MS. NYARADY:  Objection.
3        THE WITNESS:  I -- I don't know.  Yeah.
4        MR. LI:
5    Q.   So who had access to that ███████████
6   that came with Nuvia to Qualcomm?
7        MS. NYARADY:  Objection.  Asked and
8   answered.
9        THE WITNESS:  Yeah.
10        MR. LI:
11    Q.   Do you know who had access to that ███
12   ███████████?
13        MS. NYARADY:  Same objection.
14        THE WITNESS:  So those access lists were
15   not managed by me.  I don't know who was on those
16   access lists.
17        MR. LI:
18    Q.   Generally speaking, do you have any
19   understanding as to who will be on that access list?
20    A.   The engineers that need to work on the
21   ███████████ would have access.
22    Q.   Which engineers would need to work on that
23   ███████████?
24    A.   The ones that developed RTL code or
25   verified it or the physical design.

Page 54

1    Q.   When you say "the physical design," the RTL
2   codes -- are you referring to any specific products
3   within Qualcomm or just generally all RTL codes or
4   physical designs?
5    A.   I thought you were asking me about who had
6   access to the ███████████.
7    Q.   Yes.
8    A.   Is that correct?
9    Q.   That's correct, yes.
10    A.   Okay.  So I would think that the people
11   that had access were people working on the ████
12   products or the custom CPU.  Yeah.
13    Q.   Okay.  And people who were working on the
14   custom CPU, are those people all ex-Nuvia employees?
15    A.   Mostly.  We did continue to hire people
16   even when we -- I mean, after -- after the
17   acquisition.
18    Q.   Were there any employees that were already
19   at Qualcomm when Nuvia was acquired by Qualcomm who
20   was now working on the custom CPU team?
21    A.   Are you asking if Qualcomm employees that
22   were a Qualcomm employee before the Nuvia
23   acquisition -- if they have joined our team after
24   the acquisition --
25    Q.   Yes.

Page 55

1    A.   -- to work on custom CPU --
2    Q.   Correct.
3    A.   -- or ███?  Yes.
4    Q.   Do you --
5    A.   Some people have transferred.
6    Q.   Do you know how many people were
7   transferred from Qualcomm to the custom CPU team
8   when Nuvia was acquired?
9    A.   No.
10    Q.   Was it five people, more or less?
11        MS. NYARADY:  Objection.
12        THE WITNESS:  I can't say with certainty
13   how many.
14        MR. LI:
15    Q.   Okay.  How many people are on the custom
16   CPU team?  Do you know?
17    A.   Now?
18    Q.   Mm-hmm.
19    A.   Let me -- let me think.  I cannot say with
20   certainty, again, because it changes quickly.  Under
21   the custom CPU team, I would think 400, 500,
22   something like that.  But I cannot say that with
23   certainty.
24    Q.   And the files that were in the ██████
25   █████████, are they on the ███████████

Page 56

1   ██████ now?
2    A.   Any document -- I mean, let me tell you
3   my -- let me explain you my pause.
4    Q.   Please.
5    A.   I would think that most documents have
6   transferred, yeah.  I -- yeah.
7    Q.   Okay.  And who will have access to those
8   files on the ███████████████████ now?
9    A.   The people that are part of the custom CPU
10   and -- yeah, custom CPU team.  Yes.  Yeah.
11    Q.   Would anyone else have access to that file?
12    A.   People that are truly part of our
13   organization.  Or sometimes there are people that
14   have been assigned, like, indefinitely to our team.
15   But sometimes they don't report in to Gerard.  There
16   are just very few individuals, but that has
17   happened.
18    Q.   I see.  And when you say "people who are
19   not part of our organization," by "organization," do
20   you mean the custom CPU team?
21    A.   Yeah.  That didn't report in to Gerard's --
22   yeah.
23    Q.   Got it.  Do you know who those people
24   reported to?
25    A.   No, no.  I actually realize that -- so the

LYNN BOS  Highly Confidential - AEO
ARM, LTD. vs QUALCOMM, INC.

November 29, 2023
153–155

Page 153

```
 1                DEPOSITION ERRATA SHEET
 2
 3
 4    Our Assignment No. J10593039
 5    Case Caption: ARM LTD.
 6    vs. QUALCOMM, INC.
 7
 8        DECLARATION UNDER PENALTY OF PERJURY
 9        I declare under penalty of perjury
10    that I have read the entire transcript of
11    my Deposition taken in the captioned matter
12    or the same has been read to me, and
13    the same is true and accurate, save and
14    except for changes and/or corrections, if
15    any, as indicated by me on the DEPOSITION
16    ERRATA SHEET hereof, with the understanding
17    that I offer these changes as if still under
18    oath.
19        Signed on the _____ day of
20    _____, 20___.
21
22    _____
23            LYNN BOS
24
25
```

Page 155

```
 1                DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25            LYNN BOS
```

Page 154

```
 1                DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25            LYNN BOS
```

# EXHIBIT 10

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARM LTD.,

        Plaintiff,

    v.

QUALCOMM INC., QUALCOMM
TECHNOLOGIES, INC. and NUVIA, INC.,

        Defendants

C.A. No. 22-1146 (MN)

**<u>OPENING EXPERT REPORT OF DR. MURALI ANNAVARAM</u>**

December 20, 2023

HIGHLY CONFIDENTIAL – SOURCE CODE - ATTORNEY'S EYES ONLY

## TABLE OF CONTENTS

II. INTRODUCTION .................................................................................................. 1

    A. Summary of Opinions ................................................................................. 1

    B. Reservations ............................................................................................... 2

III. QUALIFICATIONS AND BACKGROUND ....................................................... 3

IV. BASIS FOR OPINIONS ...................................................................................... 8

V. TECHNOLOGY BACKGROUND ...................................................................... 9

    A. Processor Technology ................................................................................ 9

    B. RTL ........................................................................................................... 10

VI. BACKGROUND FACTS .................................................................................... 12

    A. Nuvia ......................................................................................................... 12

    B. Qualcomm ................................................................................................. 13

    C. ARM Connect ........................................................................................... 14

VII. ANALYSIS ........................................................................................................... 16

    A. The Qualcomm Codebases ....................................................................... 16

    B. IP Swap Out Process ................................................................................ 21

        1. Identification .................................................................................. 21

        2. Scripts for Identification ............................................................... 24

        3. Removal ......................................................................................... 27

            i. Git History Mitigation ..................................................... 29

                (1) Redaction .............................................................. 30

                    i. Predefined Redaction Lists ................................... 31

                    ii. Regular Expressions .............................................. 33

                    iii. Blob (Binary Large Object) Redaction Check ...... 34

                    iv. Commit Message and History Analysis ................ 35

                    v. Metadata Modification Methods ........................... 37

                (2) New Repositories (Orion, Hamoa, and Pakala) ............... 39

                    i. Orion ..................................................................... 39

                    ii. Hamoa and Pakala .................................................. 42

i

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

## II.     INTRODUCTION

1.      My name is Murali Annavaram.  I have been retained as an expert in this action on

behalf of Defendants Qualcomm Inc., Qualcomm Technologies (collectively, "Qualcomm"), and

Nuvia, Inc. ("Nuvia") (together, "Defendants").  I am being compensated for my work on this case

at my standard consulting rate of $600 per hour.  I am also being reimbursed for expenses that I

may incur.  My compensation is not contingent upon the results of my analysis or the substance of

my opinions or testimony.

### A.     Summary of Opinions

2.      For this report, I have been asked to analyze the materials discussed in this report

and offer my expert opinions on the reasonableness of Qualcomm's process to identify and remove

Nuvia-sourced ARM RTL and related test and debug code[1] from certain Qualcomm codebases.

For reasons described further below, I will refer to this process as the "Swap Out."  RTL stands

for register transfer language, a well-known programming abstraction for describing the

functionality of a chip.  By "Nuvia-sourced ARM RTL," I mean ARM RTL downloaded by Nuvia

under Nuvia's license through ARM Connect using Nuvia credentials.

3.      I submit this report to describe my opinions related to the Swap Out.  For

background, I provide a technology overview, including Register-Transfer Level code (RTL) and

how processors and system-on-chips ("SoCs") are developed and represented in RTL.  ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1] The source code discussed in this Report is predominantly RTL (e.g. file extensions, .v, .sv or .svh).  Even though there are instances where the source code is not what would be classified as RTL, I will generally reference the source code in this Report as RTL unless otherwise noted.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

4.      After ARM terminated Nuvia's license, it is my understanding that Qualcomm undertook efforts to identify and remove all Nuvia-sourced ARM RTL from Qualcomm Codebases. My opinion, based on my expertise in processor design, is that Qualcomm designed and implemented a thorough process to identify Nuvia-Sourced ARM RTL in the Qualcomm Codebases based on my review of the materials discussed below,

**B.**      **Reservations**

5.      I expect to be called to provide expert testimony regarding opinions formed resulting from my analysis of the issues considered in this report if asked about those issues by the

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

court or by the private parties' attorneys.  If called to testify, I may use demonstratives to explain the concepts and issues discussed below.  I may also use various documents produced in this case that refer to or relate to the matters discussed in this report to present my opinions.  I may also discuss my own work, teaching, and publications in the field, and knowledge of the state of the art in the relevant time period.  I may rely on handbooks, textbooks, technical literature, my own personal experience in the field, and other relevant materials and/or information to demonstrate the state of the art in the relevant period and the evolution of relevant technologies.

6.      I reserve the right to modify or supplement my opinions, as well as the basis for my opinions, after considering new positions set forth by ARM LTD. ("ARM").  For example, I may update my opinions based on additional opinions that ARM's experts may present and information I may receive in the future or additional work I may perform in connection with these opinions and information.

7.      It is my understanding that discovery is still ongoing.  For example, I understand that the parties are still taking depositions, and completing discovery, which may result in updating written discovery.  I reserve the right to modify or supplement my opinions, as well as the basis for my opinions, based on any documents, testimony, or other evidence that may emerge during the course of this matter.

8.      It is also my understanding that ARM may submit an expert report corresponding to this report.  I reserve the right to rebut any positions taken in that report.

## III.    QUALIFICATIONS AND BACKGROUND

9.      My curriculum vitae ("CV") is attached as Appendix A and provides a summary of my background, education, and professional experience.

10.     I am an expert in the field of SoC, CPU and GPU architecture and microarchitecture, mobile systems, and datacenter computing.  My research focuses on designing

3

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

energy efficient and high performance chip multiprocessors (CMPs), server computer systems, mobile SoCs, microarchitectural innovations and instruction set architecture (ISA) enhancements, RTL based modeling and simulations of SoC, CPU and GPU microarchitectural blocks, verification and testing of hardware designs, software based simulation of SoC and processor components to perform wide range design space tradeoff analysis, compiler schemes for translating high level language applications into efficient instructions mapped to the underlying processor ISA, interconnection network architectures, reliability of computing platforms, and superconducting computer architecture. I have done many of these studies both in industry and academia.

11.    I have been a faculty member at the Ming-Hsieh Department of Electrical and Computer Engineering, with a joint appointment in the Computer Science department at the University of Southern California since 2007. I currently hold the Lloyd Hunt Chair Professorship at USC. In the past I held the position of Dean's Professor until June 2023, and Robert G. and Mary G. Lane Early Career Chair until Aug 2017. I also held the Rukmini Gopalakrishnachar visiting chair at the Indian Institute of Science.

12.    I co-authored Parallel Computer Organization and Design, a widely-used textbook for graduate-level computer architecture courses, which addresses the design of modern high-performance CPUs and prepares students for a career designing the computer systems of the future. I teach several undergraduate and graduate computer architecture courses at USC, including topics such as CPU and GPUs microarchitecture, server and cloud computing, mobile and edge computing systems, systems for machine learning, and memory system design. These classes have included EE109 – Introduction to Embedded Systems, EE557 – Advanced Computer Architecture, EE653 – Advanced Topics in Microarchitecture, and other special topic courses.

4

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

13.     Prior to joining USC, I spent nearly 7 years at Intel as a senior research staff member.  At Intel, I worked on a broad range of topics including processor microarchitecture techniques to improve power-performance tradeoffs, efficient coherence and consistency models for chip multiprocessors (CMPs), 3D stacked memory technologies, energy per instruction (EPI) throttling schemes, database performance optimizations on Intel architectures, and the impact of process variations on CPU's timing analysis.  I spent a year at Nokia as a visiting scientist working on mobile SoCs, including studying the tradeoffs between compute, sensing and communication in SoCs.

14.     I received my Bachelor of Technology degree in Computer Science from the National Institute of Technology in Warangal, India, in 1993, and my Master of Science degree in Computer Science and Engineering from Colorado State University in 1996.  I received my Ph.D. degree in Computer Science and Engineering from The University of Michigan in 2001.

15.     I have published over 100 well-cited research papers with a total citation count exceeding 8600.  My work on CPU design using 3D die stacking, energy efficient computing on CMPs through EPI throttling, and energy efficient sensing and computing in SoCs have each been cited over 300 times.

16.     I have received numerous awards including, for example, the IBM Faculty Partnership award in 2008, the Best Paper Award at the 2009 IEEE International Conference on Distributed Computing in Sensor Systems (DCOSS), and the National Science Foundation CAREER award in 2010.

17.     I was named an IEEE fellow for my contributions to heterogeneous architectures for energy-efficient computing systems.  I am a Distinguished Member of the Association of Computing Machinery (ACM).

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

18.     My research has been published at the major computing conferences in the field of computer architecture, including the International Symposium on Computer Architecture (ISCA), the High-Performance Computer Architecture (HPCA), and the Symposium on Microarchitecture (MICRO).

19.     My research on server energy efficiency has been selected for the IEEE Micro TopPicks award for the most influential computer architecture paper of the year 2013.  I have given keynote presentations at the Swedish Multicore Symposium in 2018 and at the IEEE International On-Line Test Symposium in 2014.  My group's research won Best Paper and Best Student paper finalist nominations at the Supercomputing 2019 conference.  I was the Frontiers in Technology Distinguished Speaker at UC Merced during 2022.

20.     For my research and publications in this field, I was inducted into the ACM Special Interest Group on Microarchitecture Hall of Fame in December 2015.  I am one of only 47 researchers over the past 48 years at that time to receive this honor.  I was also inducted into the IEEE Computer Society Technical Committee on Computer Architecture's High Performance Computer Architecture Hall of Fame.  I am one of only 42 researchers over the past 22 years at that time to receive this honor.  Finally, I was inducted into the ACM International Symposium on Computer Architecture (ISCA) Hall of Fame in June 2017.  I am one of only 81 researchers to have received this honor over the past 44 years at the time of the award.

21.     I served as the General Co-Chair for ISCA 2018 and served as the Technical Program Chair for HPCA 2021.  I am going to serve as a Technical Program Chair of the International Conference on Supercomputing, 2024.  I have also served as a program committee member for several international conferences and symposiums, including ISCA, MICRO, HPCA, SIGMETRICS, DSN, HiPC, and ASPLOS.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

22.     I served as an associate editor for the technical journal of the Association for Computer Machinery Transactions on Design Automation of Electronic Systems (ACM TODAES), and I served as a journal reviewer for the ACM Transactions on Computer Systems (ACM TOCS), ACM Transactions on Embedded Computing Systems (ACM TECS), ACM Computing Surveys, ACM Transactions on Architecture and Code Optimization (ACM TACO), and IEEE Top Picks in Microarchitecture 2010.

23.     I am an inventor or co-inventor of several issued patents.

24.     I have graduated 15 PhD students at USC, and 11 of them were solely advised by me.  Of these, 6 are now in academia (both in the USA and abroad) as professors working on various computer architecture related problems.

25.     My Research Lab at USC is nicknamed SCIP (Super Computing In Pocket).  SCIP research areas include: energy efficiency through heterogeneous computing; reliability of high-performance computing; bandwidth efficient big data computing; runtime systems design to enable dispersed computing; hardware-assisted secure and private machine learning; and building innovative sensor data collection platforms to improve human performance.  SCIP engages with researchers in industry and academia to tackle compelling computer system challenges.

26.     I am also the inaugural director of the USC-Meta Center for Research and Education in AI and Learning (REAL@USC-Meta Center).  REAL@USC advances foundations for cooperative algorithmic optimization, hardware innovations for AI, and AI education accessibility.

27.     My research group has published more than 30 papers on the topic of CPU and GPU microarchitecture alone at top-tier computer architecture conferences in the past 10 years, where the typical acceptance rates are less than 20%.  In particular, my group published 3 papers

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

at the flagship computer architecture conference ISCA during 2016, which is a record for the highest number of published papers by a single research group.

28.     My research group has designed and evaluated the energy efficient techniques for mobile systems, including the KNOWME wireless body area sensor networks, energy efficient management of sensor subsystems on mobile phones, and privacy preserving traffic monitoring from mobile devices.

29.     My group has done extensive experimentation and analysis of our proposed research ideas using a wide range of instruction set architecture enhancements, microarchitecture block designs of CPUs and GPUs, operating system modifications, system-level hardware modifications, and design enhancements.  We routinely work with RTL modules, instruction set architectures (ISAs), test and verification tools, software and RTL simulation infrastructures.

## IV.     BASIS FOR OPINIONS

30.     My qualifications are summarized in Section III of this report.  My full curriculum vitae is attached as Appendix A to this report.

31.     As part of my preparation for writing this report, I reviewed the materials listed in Appendix B to this report.  These materials include, but are not limited to, the following: spreadsheets and scripts responsible for identifying Nuvia-sourced ARM RTL or other related code, scripts for the removal of related information, deposition transcripts, and copies of the documents described in this report.

32.     I also reviewed RTL in Qualcomm Codebases that was produced in this litigation. For that code review, I accessed codebases for multiple snapshots of RTL during my time reviewing code at the Prosearch source code review location in Los Angeles, CA.  I provide further description of this code in my analysis below.

8

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

33.     I further had several discussions with Qualcomm engineers Nick Jones (Director of Engineering, Qualcomm) and Bob Pflederer (Senior Director, Qualcomm) regarding the Swap Out, who were both substantially involved in the process.

## V.     TECHNOLOGY BACKGROUND

34.     In what follows, I will provide an overview of processor technology and RTL representation used in microarchitectures.

### A.   Processor Technology

35.     A System-on-Chip or SoC design places a variety of components such as processors, caches, memories, and input/output devices all on a single piece of silicon.  Such a design offers both reduced latency for executing an application and reduced power consumption than a design in which the various components are placed on separate chips.  One reason for improved SoC power efficiency and performance is that the components on the SoC can communicate with each other using on-chip wires that have lower resistance than off-chip pins.  SoCs also enable integration of heterogenous technologies such as central processing unit (CPU), graphics processing unit (GPU), volatile memory such as DRAM that holds application programs when they are executing, and non-volatile storage such as Flash memory that holds applications and other media files even when the device is turned off.

36.     One of the components typically included on a SoC is one or more Central Processing Unit (CPU) cores.  Each CPU core may include components or blocks such as a data cache, an instruction cache, an Arithmetic Logic Unit (ALU), a Memory Management Unit (MMU), and a Floating Point Unit (FPU).  A CPU may include only a single CPU core (called a single-core CPU or single-core processor) or may include multiple CPU cores (called a chip multiprocessor (CMP) or multi-core processor).

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

37.     A CPU is designed to perform operations on data.  Designers implement these operations in circuitry using a collection of techniques such as microarchitecture design, the placement of gates and routing of wires across the chip, selection of process technology nodes, and selection of the cell implementation libraries. This circuitry is represented in a type of computer language referred to as RTL code, which I will describe further in the next section.

**B.     RTL**

38.     RTL describes the implementation of the CPU's microarchitecture.  RTL design is a digital design methodology that focuses on the transfer of data between registers within a digital system.  It serves as an abstraction level between the high-level behavioral description of a system and its physical implementation in hardware.  At the RTL level, designers describe the functionality and behavior of the system in terms of registers, data flow, and control signals.

39.     A designer may develop an RTL description of a digital circuit manually using a Hardware Description Language (HDL) such as Verilog or automatically from a higher-level language using an RTL synthesis tool.  After the RTL representation is completed, it is then transformed through a series of hardware compilers, place and route tools and cell libraries to create representation that helps with the fabrication of the actual physical device.

40.     The RTL description may be organized into groups of code referred to as "modules," with each module likewise organized into smaller groups of code referred to as "submodules."  Organizing the RTL into modules and submodules improves the efficiency in managing large projects by allowing code to be modularized and re-used in different aspects of the projects.  For example, the RTL modules for complex functions implemented in a CPU can be treated as abstract boxes with input and output pins.  Hence different module developers can easily interface without knowing the details of the module design.

10

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

41.     Verilog has some commonality with other high level programming languages like C or Fortran.  For example, a module is, conceptually, very similar to a subroutine.  However, the behavior of a Verilog program is generally dictated by the way signals are routed across connected modules rather than by the order of code that appears within the Verilog program.

42.     For a simple example of RTL, consider a D (Delay) flip flop that transfers an input value to an output on the falling edge of a clock signal.  This is a common component in digital logic circuits, like CPUs.  The flip flop can be used to temporarily store data during CPU operation. The behavior of such a component could be described with RTL as follows:

```
Module Dff(q, clock, data);
output    q;
reg       q;
input     clock, data;

initial
q=0;

always
@(negedge clock) #1 q=data;
endmodule
```

43.     The "always" statement in that RTL description indicates that when the clock goes from high to low (i.e., on a falling or negative edge) the output register "q" is assigned the input value "data" after a delay of one-time unit.

44.     The use of RTL in the design of a CPU provides numerous advantages including ease of development of the processor using a high-level programming abstraction, much like writing software using C/C++ to accomplish an application task.  The hardware designers do not need to worry too much about how the digital gates, such as AND and NOR gates, are implemented in a particular process technology node.

45.     A second advantage provided by RTL is design validation in which the designers are able to simulate and test their design using commercial tools.  Such testing allows the designers

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

to identify and correct problems much earlier in the design process and with much less cost than would be incurred later during the fabrication process.

46.     A third advantage provided by RTL is modularity.  Designers can create libraries of RTL components that can be easily reused across an entire design.  For example, the flip flop described in the example RTL code above may be a defined module that is re-used throughout CPU and SoC design.  These reusable blocks can be easily integrated into new designs, promoting design reuse, reducing development time, and enabling faster prototyping and system assembly.

## VI.     BACKGROUND FACTS

47.     In this section, I summarize my review of information relevant to my analysis, including a background of the early development work Nuvia did for the ███████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████, and ARM RTL made available through the ██████████████████

### A.     Nuvia

48.     Nuvia was founded in 2019 by Gerard Williams (CEO, who formerly worked at Apple), Manu Gulati (SVP Silicon Engineering, who formerly worked at Google), and John Bruno (SVP Engineering, who formerly worked at Google) with the goal of bringing higher energy efficiency and performance to the server market.  QCARM_0002749 at 59-60; QCARM_2414840. Nuvia focused on the design and development of chips used in data centers, by specializing the chip by prioritizing efficiency for operations common in data centers and less common in desktops, laptops, and mobile devices.  █████████████████████████████████

[2] ████████████████████████████████████████████████████
████████████████████████████████

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY

███████████████████████████████████████████████████████

████████████████████████

    49.    Qualcomm acquired Nuvia on March 15, 2021.[3]

**B.**    **Qualcomm**

    50.    ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

    51.    I have been informed that during the early development of ████ at Nuvia, Nuvia entered into license agreements with ARM that enabled Nuvia to access certain ARM IP, including some RTL modules (ARM RTL).  Nuvia instantiated some ARM RTL in the ████████ by downloading the ARM RTL through ARM Connect (using Nuvia's credentials), which is a website made available to ARM licensees such as Nuvia.  I provide additional information regarding ARM Connect below.

    52.    I have been informed that ARM terminated the license agreement with Nuvia on or around March 2022, about one year after Qualcomm completed its acquisition of Nuvia.  ████

███████████████████████████████████████████████████████

---

[3] https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

███████████████████████████████████████████████████

███████████████████████████████████████████████

53.     I have been informed that Qualcomm had separate license agreements with ARM, which were in effect at the time that Qualcomm completed the acquisition of Nuvia and continues to remain in effect at the time that I provide this Report.  Through those licenses, Qualcomm has a license for and corresponding access to at least the same ARM RTL as downloaded under the Nuvia license.  A licensee like Qualcomm can obtain the ARM RTL through ARM Connect by using its credentials supplied by ARM as part of a license with ARM.  I will refer throughout my report to the ARM RTL that is available on ARM Connect as "Nuvia-sourced ARM RTL" for copies of ARM RTL that Nuvia downloaded from ARM Connect using Nuvia's credentials, and "Qualcomm-sourced ARM RTL" for copies of ARM RTL that Qualcomm downloaded from ARM Connect using Qualcomm's credentials.

54.     As I will describe in more detail below, Qualcomm undertook reasonable efforts to identify Nuvia-sourced ARM RTL and completely remove it from its source code repositories. ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██

**C.     ARM Connect**

55.     ███████████████████████████████████████████

███████████████████████████████████████████████████

14

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

56.     ARM allows its customers to download ARM IP such as RTL, documentation, or release notes through its Product Download Hub, formerly known as Connect.[4]  I will focus on Connect as it was the platform available during the relevant time period discussed in this report, namely 2019 through 2022.[5]

57.     As described in the Connect user guide: ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[4] https://developer.arm.com/documentation/107572/latest/.
[5] According to ARM documentation, Connect was closed around August 2022, and transitioned to the Product Download Hub that appears to contain similar functionality. https://developer.arm.com/documentation/107571/latest/.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

**Connect Product Page for Cortex-M3**

*Id*. at 74.

58. Within the Connect platform, the download process includes three stages ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

**VII. ANALYSIS**

59. █████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

**A. The Qualcomm Codebases**

60. █████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████

16

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

61. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ████████

████████████████████████████████████████████

████████████████████████████████████████

62. ████████████████████████████████████████

████████████████████████████████████████████

████████████

63. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

17

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

64. ████████████████████████████████████████

65. ████████████████████████████████████████

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

66.

67.

68.

69.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

70.

71.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

72. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**B.** ███████████████

73. ███████████████████████████████████████████

███████████████████████████████

**1.** ████████████

74. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



75.

76.

77.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



78.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

79. ███████████████████████████████

80. ███████████████████████████████

2. ████████████

81. ███████████████████████████████

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



82.

83.

84.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

85. ██████████████████████████████████████

86. ██████████████████████████████████████

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

**3.** ███████

87. ████████████████████████████████████

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

88.



89.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



90.

91.

     i.

92.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

93.

(1)

94.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



97.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



104.

iv.

105.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



106.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



v.

107.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY



108.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



114.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



115.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



ii. ▮▮▮▮▮▮

116. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

117. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

118. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



122.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEY'S EYES ONLY**

I certify under penalty of perjury that the foregoing is true and correct.

Date: December 20, 2023

_____
Murali Annavaram, Ph.D.

Los Angeles, California

# EXHIBIT 11



**Qualcomm Technologies, Inc.**

5775 Morehouse Drive, San Diego, CA 92121

www.qualcomm.com

January 27, 2021

Paul Williamson, VP, General Manager Client Line of Business
ARM Limited

**VIA EMAIL**

Dear Paul:

As you may have seen in the press, Qualcomm Incorporated recently announced that its subsidiary, Qualcomm Technologies, Inc. ("QTI"), has entered into a definitive agreement to acquire NUVIA Inc. ("NUVIA").

Following the closing of the acquisition, for ease of operation and structure, QTI intends to transfer NUVIA's work and employees to QTI and other current Qualcomm subsidiaries and have the then former NUVIA employees

I apologize for the short fuse on this request, but given the pace of the acquisition, please let us know by February 3, 2021 if the foregoing poses any concerns for ARM. We look forward to continuing (and with this acquisition, expanding) our mutually beneficial partnership into the future.

Sincerely,

Ziad Asghar
VP, Product Management
Qualcomm Technologies, Inc.

# EXHIBIT 12



Gerard Williams III
CEO and President
NuVia, Inc.
2841 Mission College Blvd., 4th Floor
Santa Clara, CA 94024

1 February 2022

Dear Gerard:

We write pursuant to the Architecture License Agreement (ALA #CM0001215) and the Technology License Agreement (TLA #CM0001229), both dated September 27, 2019, between our companies (collectively, "the Agreements").

Arm intends to terminate both agreements for material breach under ███████ of the Agreements. NuVia violated the assignment provisions, ████████, of the Agreements, by entering into the acquisition of NuVia by Qualcomm without Arm's consent. NuVia also violated the confidentiality provisions under ███████ of the Agreements and made unlicensed use of Arm's confidential information in violation of ██████ of the Agreements.

Following termination, under ██████ of the Agreements, NuVia must:

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

These obligations extend to Qualcomm and its widely publicized use of NuVia's technology developed under NuVia's ALA and TLA. The certification set forth immediately above should thus extend to Qualcomm as well.

This termination will be effective as of March 1, 2022.

Sincerely,

Carolyn Herzog
Executive Vice President and General Counsel
Arm Limited

cc:    Ann Chaplin, General Counsel & Corporate Secretary
       Qualcomm Technologies, Inc.
       5775 Morehouse Drive
       San Diego, CA 92121

CONFIDENTIAL

# EXHIBIT 13

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3                          ---oOo---

4

5      ARM LTD., a UK Corporation, )
                                   )
6                    Plaintiff,    )
                                   )
7      vs.                         )  C.A. No. 22-1146 (MN)
                                   )
8      QUALCOMM INC., a Delaware   )
       corporation; QUALCOMM       )
9      TECHNOLOGIES, INC., a       )
       Delaware Corporation, and   )
10     NUVIA, INC., a Delaware     )
       Corporation,                )
11                                 )
                     Defendants.   )
12     _____)

13

14

15           HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

16             VIDEOTAPED DEPOSITION OF RENE HAAS

17               TUESDAY, DECEMBER 12, 2023

18

19

20

21     STENOGRAPHICALLY REPORTED BY:

22     ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23     CSR LICENSE NO. 9830

24     JOB NO. 6326906

25

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 2

```
1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3                    ---oOo---
4
5    ARM LTD., a UK Corporation, )
                                 )
6          Plaintiff,   )
                        )
7    vs.          ) C.A. No. 22-1146 (MN)
                  )
8    QUALCOMM INC., a Delaware  )
     corporation; QUALCOMM      )
9    TECHNOLOGIES, INC., a      )
     Delaware Corporation, and  )
10   NUVIA, INC., a Delaware    )
     Corporation,              )
11                        )
           Defendants.   )
12   _____)
13
14
15
16        Videotaped deposition of RENE HAAS, taken on
17   behalf of the Defendant, pursuant to Notice, on
18   Tuesday, December 12, 2023, at Morrison & Foerster,
19   LLP, 755 Page Mill Road, Palo Alto, California
20   beginning at 9:25 a.m., and ending at 6:02 p.m.,
21   before me, ANDREA M. IGNACIO, CSR, RPR, CCRR,
22   CRR, CLR ~ License No. 9830.
23
24
25
```

Page 3

```
1    A P P E A R A N C E S :
2
3        FOR THE PLAINTIFF:
4          MORRISON & FOERSTER LLP
5          By:  MICHAEL JACOBS, Esq.
6              ERIK J. OLSON, Esq.
7          755 Page Mill Road
8          Palo Alto, California 94304
9          650.813.5825
10         mjacobs@mofo.com
11
12       FOR THE DEFENDANT:
13         PAUL WEISS
14         By:  KAREN L. DUNN, Esq.
15             MADALYN VAUGHN, Esq. New York
16             ERIN MORGAN, Esq. New York
17         2001 K Street, NW
18         Washington, D.C.  20006-1047
19         kdunn@paulweiss.com
20
21
22       ALSO PRESENT:
23         Doug Stock, Videographer
24         Robert Calico, Arm Ltd.
25                 ---oOo---
```

Page 4

```
1                    I N D E X
2
3    WITNESS:  Rene Haas
4
5    EXAMINATION                    PAGE
6    BY MS. DUNN                    9, 351
7    BY MS. YING                    319
8    BY MR. JACOBS                  348, 354
9
10          E X H I B I T S
11   EXHIBIT                        PAGE
12   Exhibit 142  RH Masa 2.4 20.22.ptx Bates      14
13        ARM_01230402 - '81
14   Exhibit 143  2022-04-28 Rene briefing Bates   47
15        ARM_00098756
16   Exhibit 144  Chat Filters, Bates          59
17        ARM_01241616 - 20
18   Exhibit 145  Chat Filters, Bates          73
19        ARM_00082083 - '89
20   Exhibit 146  Chat Filters, Bates         108
21        ARM_00082120 - '27
22   Exhibit 147  Chat Filters, Bates         124
23        ARM_01239056 - '68
24   Exhibit 148  2-1-22 Letter, Bates ARM_00037427   136
25   //
```

Page 5

```
1                    EXHIBITS
2    EXHIBIT                        PAGE
3    Exhibit 149  Chat Filters, Bates         153
4        ARM_00087926 - '29
5    Exhibit 150  Chat Filters, Bates         175
6        ARM_00087844 - '50
7    Exhibit 151  8-31-22 E-mail Bates         184
8        ARM_00094320 - '63
9    Exhibit 152  8-31-22 E-mail Bates         200
10       ARM_00110511 - '12
11   Exhibit 153  Chat Filters, Bates         225
12       ARM_00087844 - '50
13   Exhibit 154  3-5-23 E-mail Bates         231
14       ARM_01215878 - '79
15   Exhibit 155  Anticipated Acquisition by Nvidia  273
16       Corporation of Arm Limited Initial
17       Submission 12-20-21 Bates
18       ARM_00088656 - '84
19   Exhibit 156  Chat Filters, Bates ARM_01239046  288
20       - '49
21   Exhibit 157  ████████████████████         310
22       10-4-22, Bates ARM_01427450 - '92
23   Exhibit 158  How a Lopsided Apple Deal Got  326
24       Under Arm's Skin
25   //
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 6

PREVIOUSLY MARKED EXHIBITS

| EXHIBIT | PAGE |
|---|---|
| Exhibit 108    2-16-21 Letter, Bates | 91 |
| ARM_01284106 | |

---oOo---

Page 7

1    DEPOSITION PROCEEDINGS
2    DECEMBER 12, 2023        9:25 A.M.
3        ---oOo---
4
5        THE VIDEOGRAPHER:  Good morning.  We are on
6    the record at 9:25 a.m. on December 12, 2023.        0
7        Please note that the microphones are
8    sensitive and may pick up whispering and private
9    conversations.  Please mute your phones at this time.
10    Audio and video recording will continue to take place
11    unless all parties agree to go off the record.
12        This is Media Unit 1 of the video-recorded
13    deposition of Rene Haas.  Taken by counsel for the
14    Defendant, in the matter of Arm Limited versus
15    Qualcomm Inc., et al.  This case is filed in the
16    United States District Court for the District of
17    Delaware.  Case No. 22-1146(MN).
18        The location of today's deposition is
19    755 Page Mill Road, Palo Alto, California.
20        My name is Douglas Stock, representing
21    Veritext.  I am the videographer.
22        And the court reporter today is Andrea
23    Ignacio, also from Veritext.
24        I am not authorized to administer an oath.  I
25    am not related to any party in this action, nor am I

Page 8

1    financially interested in the outcome.
2        If there are any objections to proceeding,
3    please state them at the time of your appearance.
4        Counsel and all present -- and all present
5    will now state their appearance and affiliation for
6    the record, beginning with the noticing attorney.
7        MS. DUNN:  Karen Dunn from Paul Weiss, on
8    behalf of Qualcomm.
9        MS. MORGAN:  Erin Morgan from Paul Weiss, on
10    behalf of Qualcomm.
11        MS. VAUGHN:  Madalyn Vaughn from Paul Weiss,
12    on behalf of Qualcomm.
13        MS. YING:  Jennifer Ying from Morris Nichols
14    Arsht & Tunnell, on behalf of Qualcomm.
15        MR. JACOBS:  Michael Jacobs, Morrison &
16    Foerster, for Arm.
17        MR. OLSON:  Erik Olson, Morrison & Foerster,
18    for Arm.
19        MR. CALICO:  I'm Rob Calico, in-house counsel
20    for Arm.
21        THE VIDEOGRAPHER:  Thank you.
22        And Madam Court Reporter, if you would please
23    swear in the witness.
24        And then, counsel, you may proceed.
25

Page 9

1        RENE HAAS,
2        having been sworn as a witness
3        by the Certified Shorthand Reporter,
4        testified as follows:
5
6        MS. DUNN:  Thank you.
7
8        EXAMINATION
9    BY MS. DUNN:
10    Q  Mr. Haas, when did you start working at Arm?
11    A  October of 2013.
12    Q  Great.
13        And what was your role when you started at
14    Arm?
15    A  I was vice president for strategic alliances.
16    Q  Okay.  Are you trained as an engineer?
17    A  My degree is in engineering.
18    Q  Okay.  Do you consider yourself an engineer
19    today?
20    A  I don't do engineering work today.
21    Q  Okay.  When was the last time you did any?
22    A  I was a field application engineer at NEC
23    Electronics in the early 1990s.  That was probably the
24    last time.
25    Q  Okay.  And then at some point, you were named

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 162

1   with what was called █████
2       Do you recall that?
3   A  Yes.
4   Q  Okay. ████████████████████████
5   ████████████
6   A  I don't know if we ever did.
7   Q  Okay.
8   A  I don't think we did.
9   Q  Okay.  Okay.
10      And then if you could just look at the end
11  where Mr. Williamson is saying:
12  █████████████████████████
13  ████████████
14  ████████████████████████
15  █████████████
16  ██████████████
17  █████████████
18  ████████████████████████
19      Do you see that?
20  A  Yes.
21  Q  Do you know what you're -- what you are
22  talking about when you say ███████████
23  A  ████████████████████████
24  ████████████████████████████

Page 164

1   ████████████████████████████
2   ████████████████████████
3   ███████████████████████
4   ███████████████
5   ████████████████████████████████
6   █████████████████████████████████
7   ████████████████████████
8   ████████
9   █████████████████████
10  ████████████████████████████████
11  ██████████████████████████████
12  █████████████████
13  ████████████████
14      MS. DUNN:  Okay.
15  ██████████████████████████████
16  █████████████████
17  ███████████████████████
18  ████████
19  ████████████████████
20  ██████████████████████████████
21  ██████████████████████████████████

Page 163

1   ███████████████████████████████
2   ████████████.
3   Q  Okay. ████████████████████████
4   ████████████████
5   ██████████████
6   ████████████████████████
7   ████████
8   ████████████
9       So Arm sued Qualcomm on August 31 of 2022.
10  And at that time -- you recall that?
11      You can put that to the side.
12      You recall that Arm sued Qualcomm on
13  August 31, 2022; correct?
14  A  Uh-huh.
15  ██████████████████████████████
16  ████████████████████████████████
17      MR. JACOBS:  Objection; form.
18  ████████████████████████████
19  ███████████████████████████
20  █████████████
21      MS. DUNN:  Yeah.
22  █████████████████████
23  ██████████████████████████████
24  █████████████████████████████████

Page 165

1   ██████████████
2   █████████████████████████████
3   █████████████████████████
4   ███████████████████
5   █████████████████████████
6   ███████████████████
7   ████████████████████████████████████
8   ██████████████████████████████
9   █████████████████████████████
10  ███████████████████
11  ██████████████████████
12  ███████████████████████████████
13  ██████████
14  ██████████████████████████
15  █████████████████████
16  ██████████████████████████
17  ████████████████████
18  █████████████
19  ████████████████████████
20  ████████████████
21  ████████████████████████
22  ██████████████████████
23  ███████████████████████
24  ████████████

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY



Page 166

6   Q   Okay.

9   Q   Okay.

14   Q   Okay.

18   Q   Okay.

21   Q   Okay.

Have -- actually, strike that,

Page 167

1   because there was -- ambiguous.
2

5   Q   Okay.

Page 168

18   MS. DUNN:  Move to strike.  And also, a good
19   amount of your answer was hearsay.
20

Page 169

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 358

1  Arm Ltd. v. Qualcomm Inc., Et Al.
2  Rene Haas (#6326906)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Rene Haas              Date
25

Page 359

1  Arm Ltd. v. Qualcomm Inc., Et Al.
2  Rene Haas (#6326906)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Rene Haas, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Rene Haas              Date
13 *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20____.
16
17
18    _____
19    NOTARY PUBLIC
20
21
22
23
24
25

91 (Pages 358 - 359)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

 4    ARM LTD.,                        )
                                       )
 5          Plaintiff and             )
            Counterclaim Defendant,    )
 6                                     )
            v.                         ) C.A. No. 22-1146
 7                                     ) (MN)
      QUALCOMM INC., QUALCOMM          )
 8    TECHNOLOGIES, INC. and NUVIA,    )
      INC.,                            )
 9                                     )
            Defendants and            )
10          Counterclaim Plaintiffs.   )
      _____ )
11

12

13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14         VIDEO-RECORDED DEPOSITION OF WILL ABBEY

15

16              Friday, October 27, 2023

17                Palo Alto, California

18

19

20

21

22

23    Stenographically Reported By:

24    Hanna Kim, CLR, CSR No. 13083

25    Job No. 6165933
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4   ARM LTD.,              )
                            )
 5       Plaintiff and      )
     Counterclaim Defendant, )
 6                          )
         v.                ) C.A. No. 22-1146
 7                          ) (MN)
     QUALCOMM INC., QUALCOMM         )
 8   TECHNOLOGIES, INC. and NUVIA,    )
     INC.,                   )
 9                          )
         Defendants and      )
10       Counterclaim Plaintiffs.  )
     _____ )
11
12
13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES
14   ONLY, video-recorded deposition OF WILL ABBEY taken
15   on behalf of the Defendants, at 755 Page Mill Road,
16   Palo Alto, California 94304, on Friday, October 27,
17   2023, beginning at 9:06 a.m., PDT, and concluding at
18   5:42 p.m., before Hanna Kim, CLR, Certified
19   Shorthand Reporter, No. 13083.
20
21
22
23
24
25
```

Page 4

```
 1   APPEARANCES OF COUNSEL:  (CONTINUED)
 2
 3   ALSO PRESENT:
 4       PHILLIP PRICE, Counsel for Arm Ltd.
 5       SHAWNA HYNES, Video Operator
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          APPEARANCES OF COUNSEL:
 2
 3   FOR PLAINTIFF ARM LTD.:
 4       MORRISON & FOERSTER LLP
 5       BY:  SCOTT F. LLEWELLYN, ESQ.
 6       4200 Republic Plaza
 7       370 Seventeenth Street
 8       Denver, Colorado 80202-5638
 9       303.592.2204
10       sllewellyn@mofo.com
11
12
13   FOR DEFENDANTS QUALCOMM INC., QUALCOMM
14   TECHNOLOGIES, INC. AND NUVIA, INC.:
15       PAUL, WEISS, RIFKIND, WHARTON & GARRISON
16       LLP
17       BY:  ERIN J. MORGAN, ESQ.
18       BY:  MADALYN VAUGHN, ESQ.
19       2001 K Street, N.W.
20       Washington, D.C. 20006-1047
21       202.223.7300
22       emorgan@paulweiss.com
23       mvaughn@paulweiss.com
24
25
```

Page 5

```
 1              INDEX OF EXAMINATION
 2
 3   WITNESS:  WILL ABBEY
 4   EXAMINATION                          PAGE
 5       BY MS. MORGAN:                     11
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

1    INDEX OF EXHIBITS
2
3    ABBEY DEPOSITION EXHIBITS                    PAGE
4    Exhibit QX19  E-mail from Tim Herbert,        79
5        18/01/2022, and attachment;
6        Bates nos. ARM_00088655
7        through ARM_00088684
8    Exhibit QX20  E-mail set, with top e-mail    136
9        Rene Haas, 28/01/2021;
10       Bates nos. ARM_00081998
11   Exhibit QX21  E-mail set, with top e-mail    146
12       from Tim Herbert, 28/06/2021;
13       Bates nos. ARM_00064035
14       through ARM_00064036
15   Exhibit QX22  E-mail from Will Abbey,        184
16       02/06/2021, and attachment;
17       Bates nos. ARM_00000019
18       through ARM_ 00000021
19   Exhibit QX23  E-mail set, with top e-mail    218
20       from Will Abbey, 01/06/2021;
21       Bates nos. ARM_00110012
22       through ARM_00110016
23
24
25

Page 7

1    INDEX OF EXHIBITS (CONTINUED)
2
3    ABBEY DEPOSITION EXHIBITS                    PAGE
4    Exhibit QX24  E-mail set, redacted, with top  251
5        e-mail from RK Chunduru,
6        8/24/2021; Bates nos.
7        QCARM_3972038 through
8        QCARM_3972039
9    Exhibit QX25  E-mail from Will Abbey,        264
10       31/08/2021, and attachment;
11       Bates nos. ARM_00000016
12       through ARM_00000018
13   Exhibit QX26  E-mail from Will Abbey,        280
14       30/09/2021, and attachment;
15       Bates nos. ARM_00081785
16       through ARM_00081787
17   Exhibit QX27  E-mail set, with top e-mail    291
18       from Will Abbey, 14/07/2021;
19       Bates nos. ARM_00036331
20       through ARM_00036334
21   Exhibit QX28  E-mail from Will Abbey,        315
22       31/08/2022, "Arm News"; Bates
23       nos. ARM_01215564
24
25

Page 8

1    INDEX OF EXHIBITS (CONTINUED)
2
3    ABBEY DEPOSITION EXHIBITS                    PAGE
4    Exhibit QX29  E-mail set, with top e-mail    337
5        from Lynn Couillard,
6        02/09/2022; Bates nos.
7        ARM_00094941 through ARM
8        00094943
9    Exhibit QX30  E-mail Will Abbey,             349
10       02/05/2023, ███████████
11   █     ██████████
12       Bates nos. ARM_01215886
13       --o0o--
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1              Palo Alto, California
2       Friday, October 27, 2023; 9:06 a.m., PDT
3                   --o0o--
4            THE VIDEOGRAPHER:  Good morning.  We are
5    going on the record at 9:06 a.m., on October 27,
6    2023.
7            Please note that the microphones are
8    sensitive and may pick up whispering and private
9    conversations.
10           Please mute your phones at this time.
11           Audio and video recording will continue to
12   take place unless all parties agree to go off the
13   record.
14           This is Media Unit 1 of the video-recorded
15   deposition of Will Abbey, taken by counsel for
16   Defendant, in the matter of Arm, Ltd., versus
17   Qualcomm Inc., et al., filed in the United States
18   District Court, for the District of Delaware, Case
19   Number 22-1146 MN.
20           The location of the deposition is 755 Page
21   Mill Road, Palo Alto, California 94304.
22           My name is Shawna Hynes, representing
23   Veritext Legal Solutions, and I am the videographer.
24           The court reporter is Hanna Kim, from the
25   firm Veritext Legal Solutions.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1     I am not related to any party in this
2  action, nor am I financially interested in the
3  outcome.
4     If there are any objections to proceeding,
5  please state them at the time of your appearance.
6     Counsel and all present will now state
7  their appearances and affiliations for the record,
8  beginning with the noticing attorney.
9     MS. MORGAN:  Good morning.  I'm Erin
10  Morgan from Paul Weiss.  I'm here with my colleague
11  Madalyn Vaughn.  And we represent the Defendants in
12  this case.
13     MR. LLEWELLYN:  Scott Llewellyn, Morrison
14  & Foerster, for Arm.
15     With me is Phillip Price, in-house counsel
16  for Arm.
17     THE VIDEOGRAPHER:  Thank you.
18     Will the court reporter please swear in
19  the witness.
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///

Page 11

1        WILL ABBEY,
2     having been duly administered an oath over
3  videoconference as stipulated by all counsel, was
4     examined and testified as follows:
5
6        EXAMINATION
7  BY MS. MORGAN:
8     Q.  Good morning.
9     A.  Good morning.
10     Q.  Can you state your name for the record?
11     A.  Will Abbey.
12     Q.  Okay.  Mr. Abbey, have you ever been
13  deposed before?
14     A.  No.  This is the first time.
15     Q.  Okay.  So I'm sure your counsel has gone
16  over some of this with you, but I'm just going to
17  explain a couple of ground rules to you and -- and
18  make sure that you understand what we're doing
19  today.
20     Okay?
21     A.  Yes, that's okay.
22     Q.  Okay.  So you understand that you're under
23  oath at this deposition and that you're expected to
24  tell the truth in response to my questions; right?
25     A.  I do.

Page 12

1     Q.  Is there any reason you can't do that
2  today?
3     A.  No reason at all.
4     Q.  Okay.  A funny thing about a deposition is
5  that everything that you say is being written down
6  by the court reporter.
7     What that means is that even though you're
8  on video and even though in a normal conversation if
9  I ask you a question you could nod or say "mm-hmm"
10  or something like that and it would indicate a
11  response, for the court reporter, you have to give
12  an actual verbal response.
13     So you should try to remember to do that.
14  I have the same issue.  I nod when I'm responding.
15  I'll try to remind you.  She'll remind both of us.
16     But can you try to give a verbal response
17  when I ask you a question?
18     A.  I will.
19     Q.  Okay.
20     Also for the court reporter, we have to
21  try not to talk over each other.  It's weird.  It's
22  not like a normal conversation where you can finish
23  someone's sentence, but we have to make an effort
24  for me to ask the question and then for you to
25  answer.  I will try not to cut you off.

Page 13

1     Can you try to do the same?
2     A.  Absolutely.
3     Q.  Again, as your colleagues know or as your
4  counsel knows, I will fail at this.  So, you know,
5  it's not -- it's not the end of the world, but we
6  should just make an effort, and Hanna will keep us
7  in line.
8     If you don't understand a question, you
9  should ask me to clarify.
10     Does that make sense?
11     A.  It does.
12     Q.  Okay.  And from time to time your attorney
13  may object.  It's fine for you to go ahead and
14  answer.  The objection is for the record, unless he
15  tells you specifically not to answer a question,
16  which typically would come up in the context of
17  privileged information, which I'm not going to be
18  seeking today.
19     Do you understand?
20     A.  I do.
21     Q.  Okay.  Do you have any questions before we
22  get started?
23     A.  No questions at all.
24     Q.  Okay.  Oh, I should also say, I'm going to
25  try to take a break about every hour because

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 358

1  what each word meant and what the outcomes were that
2  we were trying to achieve by sending this e-mail at
3  the time it was sent.  But, again, this is some time
4  ago.
5

8        MR. LLEWELLYN:  Objection.  Calls for
9  speculation.
10       THE WITNESS:

12 BY MS. MORGAN:
13

20       MR. LLEWELLYN:  Objection.  Form.
21

Page 359

1  BY MS. MORGAN:
2     Q.
3        MR. LLEWELLYN:  Objection.  Form.
4        THE WITNESS:

7  BY MS. MORGAN:
8     Q.

14       MR. LLEWELLYN:  Objection.  Form.    --
15 BY MS. MORGAN:
16

23       MR. LLEWELLYN:  Objection.  Form.
24

Page 360

1  BY MS. MORGAN:
2

10       MR. LLEWELLYN:  Objection.  Form.
11 BY MS. MORGAN:
12

15       MR. LLEWELLYN:  Objection.  Form.
16                                       .
17 BY MS. MORGAN:

Page 361

1

3        MR. LLEWELLYN:  Objection.  Form.
4  BY MS. MORGAN:
5

91 (Pages 358 - 361)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 362

9      MR. LLEWELLYN:  Objection.  Form.

13  BY MS. MORGAN:

17     MR. LLEWELLYN:  Objection.  Form.
18

Page 364

2      MR. LLEWELLYN:  Objection.  Form.

6  BY MS. MORGAN:

9      MR. LLEWELLYN:  Objection.  Form.
10  Mischaracterizes testimony.
11  BY MS. MORGAN:

20     MR. LLEWELLYN:  Objection.  Calls for
21  speculation.

24  BY MS. MORGAN:

3  BY MS. MORGAN:

17     MR. LLEWELLYN:  Objection.  Form.
18

22  BY MS. MORGAN:

17     MR. LLEWELLYN:  Objection.  Form.
18

20     MR. LLEWELLYN:  Objection.  Form.
21

22  BY MS. MORGAN:

92 (Pages 362 - 365)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 366

2      MR. LLEWELLYN: Objection. Form.
3  BY MS. MORGAN:
4  BY MS. MORGAN:
5

23     MR. LLEWELLYN: Objection. Form.
24

Page 367

1  BY MS. MORGAN:

5      MR. LLEWELLYN: Objection. Form.

8  BY MS. MORGAN:
9

14     MR. LLEWELLYN: Objection. Form.
15

18     MS. MORGAN: Mr. Abbey, I have no further
19  questions for you.
20

22     MR. LLEWELLYN: No questions. We're done.
23     MS. MORGAN: So then we can congratulate
24  you on finishing your deposition and thank you for
25  your time. And we can go off the record.

Page 368

1      THE WITNESS: Thank you so much.
2      THE VIDEOGRAPHER: Do you want to get your
3  orders on the record?
4      MR. LLEWELLYN: No, I --
5      THE VIDEOGRAPHER: This marks the -- one
6  moment.
7      We are off the record at 5:42 p.m., and
8  this concludes today's testimony given by Will
9  Abbey. The total number of media used was seven and
10  will be retained by Veritext Legal Solutions.
11     (Proceedings concluded, 5:42 p.m., PDT, on
12     October 27, 2023.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 369

1      CERTIFICATE OF REPORTER
2      I, Hanna Kim, a Certified Shorthand
3  Reporter, do hereby certify:
4      That prior to being examined, the witness
5  in the foregoing proceedings was by me duly sworn to
6  testify to the truth, the whole truth, and nothing
7  but the truth;
8      That said proceedings were taken before me
9  at the time and place therein set forth and were
10  taken down by me in shorthand and thereafter
11  transcribed into typewriting under my direction and
12  supervision;
13     I further certify that I am neither
14  counsel for, nor related to, any party to said
15  proceedings, not in anywise interested in the
16  outcome thereof.
17     Further, that if the foregoing pertains to
18  the original transcri                    eral
19  case, before comple                      eview
20  of the transcript [x]                     .
21     In witness wh
22  subscribed my nam
23     Dated: 1st day of
24
25  Hanna Kim
    CLR, CSR No. 13083

93 (Pages 366 - 369)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 370

1  SCOTT F. LLEWELLYN, ESQ.
2  sllewellyn@mofo.com
3           November 1, 2023
4  RE:   ARM Ltd. v. Qualcomm Inc., Et Al.
5    10/27/2023, Will Abbey (#6165933)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22           Yours,
23           Veritext Legal Solutions
24
25

Page 372

1       JURAT
2
3       I, WILL ABBEY, do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on Friday,
6  October 27, 2023; that I have made such corrections
7  as appear noted herein in ink, initialed by me; that
8  my testimony as contained herein, as corrected, is
9  true and correct.
10
11     Dated this _____ day of _____, 2023,
12  at _____.
13
14
15
16
17
18       _____
        WILL ABBEY
19
20
21
22
23
24
25

Page 371

1     ERRATA SHEET FOR THE TRANSCRIPT OF:
2  Case Name: ARM, LTD. vs. QUALCOMM, ET AL.
3  Dep. Date: OCTOBER 27, 2023
4  Deponent: WILL ABBEY
5           CORRECTIONS:
6  Pg. Ln.   Now Reads   Should Read   Reason
7  ___ ___   _____   _____   _____
8  ___ ___   _____   _____   _____
9  ___ ___   _____   _____   _____
10  ___ ___   _____   _____   _____
11  ___ ___   _____   _____   _____
12  ___ ___   _____   _____   _____
13  ___ ___   _____   _____   _____
14  ___ ___   _____   _____   _____
15  ___ ___   _____   _____   _____
16  ___ ___   _____   _____   _____
17  ___ ___   _____   _____   _____
18  ___ ___   _____   _____   _____
19       _____
20         Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS____DAY OF_____, 2023.
23  _____
24  (Notary Public) MY COMMISSION
25  EXPIRES:_____

94 (Pages 370 - 372)

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                           Page 1
 1        H I G H L Y   C O N F I D E N T I A L
 2                ATTORNEYS' EYES ONLY
 3         IN THE UNITED STATES DISTRICT COURT
 4             FOR THE DISTRICT OF DELAWARE
 5                         C.A. NO: 22-1146 (MN)
 6    ----------------------------------
 7    ARM LTD., a UK Corporation,
 8
 9           Plaintiff,
10    v.
11    QUALCOMM INC., a Delaware corporation,
12    QUALCOMM TECHNOLOGIES, INC., a
13    Delaware Corporation, and NUVIA, INC., a
14    Delaware Corporation,
15           Defendants.
16    ----------------------------------
17       Deposition of PAUL WILLIAMSON, taken by AILSA
18     WILLIAMS, Certified Court Reporter, held at the
19    offices of Norton Rose Fulbright, London, United
20       Kingdom, on 9 November, 2023 at 9:00 a.m
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

1    A P P E A R A N C E S:
2   Attorneys for the Plaintiff:
3       MORRISON & FOERSTER LLP
4       BY: KYLE W.K. MOONEY
5       Kmooney@mofo.com
6
7   For the Defendants:
8       PAUL, WEISS, RIFKIND, WHARTON & GARRISON
9   LLP
10      BY: MELISSA FELDER ZAPPALA and BRIAN SHIUE
11      Mzappala@paulweiss.com
12      Bshiue@paulweiss.com
13
14  ALSO PRESENT:
15  PHILIP PRICE: (ARM)
16  COURT REPORTER:  AILSA WILLIAMS
17  VIDEOGRAPHER: PHILIP HILL
18
19
20
21
22
23
24
25

Page 3

1
2           I N D E X
3   PAUL WILLIAMSON (Sworn)
4   Examination by MS. ZAPPALA: Pg. 6
5   Examination by MR. MOONEY: Pg. 310
6   Further Examination by MS. ZAPPALA: Pg. 314
7
8           INDEX OF EXHIBITS
9   Previously Marked Exhibits Referenced:
10          Exhibit QX 19, Exhibit QX29
11  QX45 Notice of Deposition . ... ... ... ... ... .8
12  QX46 Email exchange ARM_01238940-44 ... ... ... 13
13  QX47 Teams Chat ARM_00087671-73 ... ... ... ... 14
14  QX48 Teams Chat ARM_01241616-20 ... ... ... ... 31
15  QX49 Technology License Agreement . ... ... ... 47
16  QX50 Annex 1, ARM_00111082-97 . ... ... ... ... 48
17  QX51 Teams Chat, ARM_00087851 . ... ... ... ... 56
18  QX52 Teams Chat, ARM_01242365-66 ... ... ... ... 66
19  QX53 Email exchange, ARM_00063607-10 ... ... ... 71
20  QX54 "ARM - Qualcomm & Nuvia Architecture . ... 78
21  License"
22  QX55 Annex 1, ARM_00002654-67 . ... ... ... ... 88
23  QX56 Teams Chat, ARM_01239039-45 ... ... ... ... 94
24  QX57 Teams Chat, ARM_00082090-93 ... ... ... ...119
25  QX58 Email and attachments, ARM_00032601-02 ...144

Page 4

1   QX59 Email and attachments, ARM_00048483-84 ...147
2   QX60 Email and attachments, ARM_00032623-25 ...158
3   QX61 Email and attachments, ARM_00032605-06 ...168
4   QX62 Email and attachments, ARM_00032598-99 ...184
5   QX63 Email exchange, ARM_00095801-02 .. ... ...190
6   QX64 Teams Chat, ARM_00098825-27 ... ... ... ...193
7   QX65 Email and attachments, ARM_01294035-36 ...198
8   QX66 Teams Chat, ARM_00115764 . ... ... ... ...203
9   QX67 Teams Chat and Slide Deck, ... ... ... ...221
10  ARM_00082120-31
11  QX68 Team Chat, ARM_00081197 . ... ... ... ...229
12  QX69  Complaint ... ... ... ... ... ... ... ...240
13  QX70 Email exchange, ARM_01238950-54 .. ... ...253
14  QX71 ███████████████ .. ... ... ... ...262
15  ARM_01240527-94
16  QX72 Teams Chat, ARM_00087733-35 .. ... ... ...272
17  QX73 Email exchange, ARM_01231257-59 .. ... ...295
18  QX74 ████████████████████
19  ████████  ARM_01291819-62
20
21
22
23
24
25

Page 5

1       THE VIDEOGRAPHER:  Good morning.  We are        09:26
2   going on the record.  The time is 09:24 a.m. local   09:26
3   time in London, UK, on November 9, 2023.             09:26
4       This is the beginning of media number           09:27
5   one, volume one, in the video recorded deposition    09:27
6   of Paul Williamson, taken by counsel for plaintiff   09:27
7   in the matter of ARM Limited versus Qualcomm Inc     09:27
8   et al, filed in the United States District Court     09:27
9   for the District of Delaware, case number/docket     09:27
10  number C.A No: 22-1146 (MN).                          09:27
11      This deposition is being held at Norton          09:27
12  Rose Fulbright at the London office.                 09:27
13      My name is Philip Hill from Veritext             09:27
14  Legal Solutions and I am the videographer.  The      09:27
15  court reporter is Ailsa Williams, also from          09:27
16  Veritext Legal Solutions.                            09:27
17      Please would counsel introduce                   09:27
18  themselves for the record.                           09:27
19      MS. ZAPPALA:  Melissa Zappala, on behalf         09:28
20  of defendant, of Paul Weiss.  With me is my          09:28
21  colleague, Brian Shiue.  One correction to the       09:28
22  record, this deposition is being taken by            09:28
23  defendants and counter claimants.                    09:28
24      MR. MOONEY:  Kyle Mooney, Morrison and           09:28
25  Foerster, counsel for ARM and with me is Philip      09:28

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1 Price Senior Director and Head of Litigation at        09:28
2 ARM.                                                    09:28
3        THE VIDEOGRAPHER:  Would the court              09:28
4 reporter swear in the witness.                          09:28
5        PAUL WILLIAMSON                                  09:28
6        Having been sworn,                               09:28
7        Testified as follows:                           09:28
8     EXAMINATION BY MS. ZAPPALA:                         09:28
9    MS. ZAPPALA:  Good morning.                          09:28
10    A  Good morning.                                    09:28
11    Q  Could you state your name for the                09:28
12 record.                                                09:28
13    A  My name is Paul Williamson.                      09:28
14    Q  I am Melissa Zappala.  I will be                 09:28
15 taking your deposition today.  I just wanted to go     09:28
16 over a couple of ground rules for the deposition.      09:29
17        One thing I wanted to note, I have a            09:29
18 hearing loss.  It affects my speech.  You are          09:29
19 British, you have an accent, so we may have a          09:29
20 sense of dueling accents here.  If you can't           09:29
21 understand anything I say, please ask me to repeat     09:29
22 myself.  Likewise, if I have difficulty I hope you     09:29
23 will indulge me by repeating the answer.               09:29
24    A  Absolutely, and I appreciate you                 09:29
25 sharing that with me.                                  09:29

Page 7

1    Q  So we have a clean record I will be               09:29
2 asking questions, I would appreciate if you would      09:29
3 wait for me to finish my question and likewise         09:29
4 I will wait for you to finish your answer, so that     09:29
5 the court reporter can take down what we are both      09:29
6 saying.  Is that okay?                                 09:29
7    A  I understand, yes.                                09:29
8    Q  And if at any time you a need a                   09:29
9 break, please ask and we can accommodate that.         09:29
10        Also, in terms of the natural pattern of        09:29
11 human speech, people tend to say "uh-huh", nod        09:29
12 their head.  It is important for the deposition        09:30
13 transcript to give audible answers.  I would          09:30
14 appreciate if you keep that in mind.                   09:30
15    A  Understood.                                      09:30
16    Q  Is there any reason you cannot give             09:30
17 truthful testimony today?                              09:30
18    A  None.                                            09:30
19    Q  We are here today taking your                   09:30
20 deposition in your personal capacity as an            09:30
21 individual witness, but you understand that you       09:30
22 have been designated as a corporate representative    09:30
23 on behalf of ARM on a few topics.  Do you have        09:30
24 that understanding?                                    09:30
25    A  I do.                                            09:30

Page 8

1    Q  Let me share with you the deposition             09:30
2 notice.  So this would be marked as Exhibit QX45.      09:30
3        (Exhibit QX45 marked for identification)        09:31
4        I have put in front of you as QX45 our          09:31
5 notice 30(b)(6) deposition notice.  I wanted to        09:31
6 make sure we are on the same page in terms of the      09:31
7 topics that you will be testifying about in your       09:31
8 corporate representative capacity.  I understand       09:31
9 they are topics -- the topics start on page 4.         09:31
10 I understand you to be testifying on topics 1, 20,    09:31
11 21, 23, 25, 27, 28, 30, 31, 33, 34, 35, 36, 37,       09:31
12 40, 41, and 59.  Is that consistent with your         09:32
13 understanding?                                         09:32
14        MR. MOONEY:  Counsel, let me jump in so         09:32
15 the witness doesn't become uncomfortable because      09:32
16 he doesn't remember all the numbers.  Let me          09:32
17 represent that yes, Mr. Williamson is designated      09:32
18 to testify as to topics 1, 20, 21, 23, 25, 27, 28,    09:32
19 30, 31, 33, 34, 35, 36, 37, 40, 41 and 59,            09:32
20 consistent with ARM's objections and the             09:32
21 agreements reached between the parties, as well as    09:32
22 any objections that are made today, but subject to    09:33
23 that the list of numbers I think does match what      09:33
24 you read out.                                          09:33
25        MS. ZAPPALA:  Thank you.  If I had just        09:33

Page 9

1 asked your counsel that would have been easiest.       09:33
2        Okay.  So we are agreed between counsel         09:33
3 we are going to combine your individual testimony      09:33
4 with the corporate representative testimony.  For      09:33
5 the sake of efficiency on the record, if we get to     09:33
6 a set of questions on which you have been              09:33
7 designated that you don't have personal knowledge      09:33
8 of, please let me know so then we can make a          09:33
9 record that you don't have personal knowledge of      09:33
10 the issue but are testifying as a corporate          09:33
11 representative.  Does that make sense?                 09:33
12        MR. MOONEY:  Objection.                         09:33
13    A  Yes.                                             09:33
14        MR. MOONEY:  I'm not even following            09:33
15 this.                                                  09:33
16        MS. ZAPPALA:  We are going to ask              09:33
17 questions because a lot of the topics on which he    09:33
18 has been designated will lead into his personal      09:33
19 knowledge, so we are not going topic by topic, we    09:33
20 are combining the record.                             09:34
21        MR. MOONEY:  That is fine but you are          09:34
22 asking him to tell you if he doesn't have personal    09:34
23 knowledge or if he does for each question?  I am      09:34
24 not following this.                                    09:34
25        MS. ZAPPALA:  No, I am saying if we get        09:34

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 242

1        MR. MOONEY:  Objection, mischaracterizes        17:33
2    the paragraph.                          17:33
3        A  I don't see --

17:34

21       MR. MOONEY:  Objection, beyond the scope        17:34
22   of the 30(b)(6) notice.                   17:34
23

17:34

Page 244

17:36

10       MR. MOONEY:  Objection, vague,        17:36
11   speculation.                          17:36
12

17:37

Page 243

17:34

3

17:36

23       MR. MOONEY:  Objection, form.        17:36
24   Mischaracterizes testimony.              17:36
25

17:36

Page 245

17:39

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 314

1 they sent those messages?                    19:46
2      A  No.                                   19:46
3      Q  Are you aware of anybody else who     19:46
4 sent the messages in these exhibits having spoken  19:46
5 to any lawyer about the content of any of these   19:46
6 messages before they were sent?               19:46
7      A  No.                                   19:46
8      MR. MOONEY:  No further questions.       19:46
9      Further Examination by MS. ZAPPALA:      19:46
10     MS. ZAPPALA:  One redirect.  So counsel  19:47
11 asked you a number of questions about whether you  19:47
12 reviewed the Nuvia ALA before you sent those  19:47
13 messages, correct?                           19:47
14     A  Yes.                                  19:47
15     Q  At the time that you sent those       19:47
16 messages, were the real comments in those messages  19:47
17 your best understanding of the situation at the  19:47
18 time that you sent them?                     19:47
19     MR. MOONEY:  Objection, form, compound.  19:47
20     A  As we discussed earlier, these were   19:47
21 my speculations as to potential impact which would  19:47
22 reflect my limited understanding at the time.  19:47
23     Q  Right, so at the time that you sent   19:47
24 those Teams messages they reflected your limited  19:47
25 understanding at the time of the Nuvia ALA?   19:47

Page 315

1      MR. MOONEY:  Objection, form, vague.     19:48
2      A  I would say more than limited. ███████
███████████████████████████████████ ███████
                                             19:48
5      Q  But you sent messages reflecting      19:48
6 what you understood the rights were under the  19:48
7 Nuvia ALA, right, even though right now you say it  19:48
8 is speculation?                              19:48
9      MR. MOONEY:  Objection, form, vague,     19:48
10 compound.                                    19:48
11     A  I speculated as to the potential      19:48
12 impact, should certain outcomes occur without  19:48
13 understanding or having viewed the Nuvia ALA.  19:48
14     MS. ZAPPALA:  No further questions.      19:48
15     MR. MOONEY:  Nothing further.            19:48
16     THE VIDEOGRAPHER:  Going off the record.  19:48
17 The time is 19:46.  End of media card number  19:48
18 seven.  End of the video deposition of Paul  19:48
19 Williamson.                                  19:49
20     Please can all parties state their       19:49
21 transcripts or video orders for clarity, thank  19:49
22 you.                                         19:49
23     MR. MOONEY:  I would like to order a      19:49
24 transcript.                                  19:49
25     MS. ZAPPALA:  I would like to order a     19:49

Page 316

1 transcript and video.                        19:49
2      MR. MOONEY:  Counsel are both agreed      19:49
3 they would like transcripts and videos of this  19:49
4 deposition.                                  19:49
5      MR. SHIUE:  Quickly if possible.         19:49
6      MS. ZAPPALA:  Okay, thank you.           19:50
7      THE VIDEOGRAPHER:  Thank you.            19:50
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 317

1           CERTIFICATE OF WITNESS
2
3 I, Paul Williamson, am the witness in the
4 foregoing deposition.  I have read the foregoing
5 statement and, having made such changes and
6 corrections as I desired, I certify that the
7 transcript is a true and accurate record of my
8 responses to the questions put to me on Thursday,
9 9 November, 2023.
10
11
12
13
14 _____
15 Paul Williamson
16
17
18
19
20
21
22
23
24
25

80 (Pages 314 - 317)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 318

1      CERTIFICATE OF COURT REPORTER

2

3  I, AILSA WILLIAMS, an Accredited LiveNote

4  Reporter, hereby certify that Paul Williamson was

5  duly sworn, that I took the Stenograph notes of

6  the foregoing deposition and that the transcript

7  thereof is a true and accurate record transcribed

8  to the best of my skill and ability.  I further

9  certify that I am neither counsel for, related to,

10  nor employed by any of the parties to the action

11  in which the deposition was taken, and that I am

12  not a relative or employee of any attorney or

13  counsel employed by the parties hereto, nor

14  financially or otherwise interested in the outcome

15  of the action.

16  Before completion of the deposition, review of the

17  transcript was requested.  Any changes made by the

18  deponent (and provided to the reporter) during the

19  period allowed are appended hereto.

20

21

22  _____

23  AILSA WILLIAMS

24  Dated:   11/14/23

25

Page 319

1              ERRATA SHEET
               VERITEXT/NEW YORK REPORTING, LLC
2
   CASE NAME: ARM Ltd. v. Qualcomm Inc., Et Al.
3  DATE OF DEPOSITION: 11/9/2023
   WITNESSES' NAME: Paul Williamson
4
5  PAGE  LINE (S)    CHANGE        REASON
6  ____|_____|_____|_____
7  ____|_____|_____|_____
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18 ____|_____|_____|_____
19 ____|_____|_____|_____
20 ____|_____|_____|_____
21              _____
                 Paul Williamson
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24  _____
25  (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

81 (Pages 318 - 319)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., a U.K. corporation, | § § § | |
| Plaintiff, | § § | |
| v. | § § | C.A. No. 22-1146 (MN)) |
| QUALCOMM, INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation | § § § § § § § | |
| Defendants. | § | |

REPLY EXPERT REPORT OF W. TODD SCHOETTELKOTTE

RELATING TO REMEDIES FOR DEFENDANTS' BREACH OF CONTRACT

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOLLOWING IS TRUE AND CORRECT.

_____
W. TODD SCHOETTELKOTTE

3-25-24
_____
EXECUTED ON

**Table of Contents**

I.    INTRODUCTION ........................................................................................... 1

II.   CREDENTIALS AND COMPENSATION ........................................................ 2

III.  INFORMATION REVIEWED AND CONSIDERED ........................................ 2

IV.   LEGAL FRAMEWORK FOR DAMAGES ...................................................... 4

V.    SUMMARY OF OPINIONS ........................................................................... 4

VI.   ASSESSMENT OF THE KENNEDY REPORT ................................................ 5

      A.   Summary ........................................................................................... 5

      B.   Arm Public Statements Identified By Dr. Kennedy Do Not Address Prospective
           Harms .......................................................................................... 6

      C.   Testimony Identified By Dr. Kennedy Does Not Address Prospective Harms 12

      D.   Dr. Kennedy's Claim of Purported Benefit of Oryon Launch Is Misguided .... 14

      E.   Dr. Kennedy's Asserted Examples of Quantified Damages Are Not Applicable
           ................................................................................................. 16

           i.    Arm's 2019 Nuvia Total Contract Value ("TCV") Amounts Are Not Applicable
                 ........................................................................................... 16

           ii.   Arm's 2021 Nuvia TCV Amounts Are Not Applicable ........................... 17

           iii.  Arm's Negotiations With Qualcomm Are Not Applicable ...................... 18

      F.   The "Available Methodologies to Quantify Damages" Identified By Dr.
           Kennedy Are Not Supported Or Applicable ........................................... 21

           i.    Dr. Kennedy's "Head Start" Methodology Is Unsupported And Does Not
                 Address Harms At Issue ............................................................... 21

           ii.   Dr. Kennedy's "Design Transfer Fee" Methodology Is Unsupported And Does
                 Not Address Harms At Issue .......................................................... 23

G.      Dr. Kennedy's Various Critiques Of My Initial Report Are Unpersuasive, Unsupported, And Incorrect ........................................................................... 26

i.      Arm's "Systemic and Idiosyncratic Risks" Do Not Discount Harms From Defendants ............................................................................................................... 26

ii.     Dr. Kennedy Incorrectly Interprets RISC-V Threat .................................. 28

iii.    Dr. Kennedy Misunderstands Arm's "First Mover Advantage" ....................... 29

iv.     Dr. Kennedy's Assessment Of Arm's Research and Development Is Unsupported ........................................................................................................ 30

v.      Dr. Kennedy's Assessment Of Harm To Goodwill Is Incorrect .......................... 31

VII.    OTHER ISSUES ...................................................................................................... 33

## I.   INTRODUCTION

1.      Plaintiff Arm Ltd. ("Arm" or "Plaintiff") has accused Defendants Qualcomm Inc., Qualcomm Technologies, Inc. (collectively, "Qualcomm") and Nuvia, Inc. ("Nuvia") (both collectively, "Defendants") of breaching the Nuvia Architecture License Agreement (the "Nuvia ALA").[1]  More specifically, I understand Arm alleges that Nuvia was acquired by Qualcomm without Arm's consent to assignment of the Nuvia ALA, and that Nuvia therefore breached ███████████████████████.[2]  I understand that Arm further alleges ███████████ ████████████████████████████████████████████████████ █ ███ ████████████████████████████████████████████████████ ████████████████████████████████████████████  As a remedy for Defendants' breach of the Nuvia ALA, I understand that Arm seeks specific performance of ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████ █

2.      I have been retained as an expert on behalf of Arm to assess and provide testimony regarding whether damages are adequate to compensate Arm for the harm caused by Defendants' breach of the Nuvia ALA.  On December 20, 2023, I submitted an expert report

---

[1] Complaint, August 31, 2022, pp. 16 – 18.
[2] Complaint, August 31, 2022, pp. 10 – 11; ARM_00111064 – 080 at 078.
[3] ███████████████████████████████████████████████████ ███████████████████
[4] Complaint, August 31, 2022, pp. 13 – 16; ARM_00111064 – 080 at 077.
[5] Complaint, August 31, 2022, pp. 16 – 18; ARM_00111064 – 080 at 077.  I am informed and understand that Arm is not requesting that any silicon (physical computer chips) made before Qualcomm's acquisition be destroyed, to the extent there are any.

containing my opinions ("Initial Report").  On February 27, 2024, Patrick F. Kennedy, Ph.D. issued his expert report ("Kennedy Report") which includes his rebuttal opinions to my Initial Report.  I have been asked to review the Kennedy Report and provide an assessment of Dr. Kennedy's opinions and critiques.  As stated in my Initial Report, I was asked to assume that Defendants are found liable for breach of the Nuvia ALA.  I offer no opinion regarding liability.

3.     My analysis, as set forth in this report, is based on information available to me as of the date of this report.

## II.    CREDENTIALS AND COMPENSATION

4.     I am a Senior Managing Director of J.S. Held LLC ("J.S. Held"), a global consulting firm providing specialized technical, scientific, financial, and advisory services.[6]  I currently serve as the firm's Intellectual Property Practice Lead.  My credentials were detailed in my Initial Report.  Attached as Schedule 1 to this report is a summary of my professional background and testifying experience, including all publications over the last ten years and all expert testimonies over the last four years.

5.     J.S. Held is compensated for my team's involvement in this matter based upon J.S. Held's hourly billing rates.  My time is currently billed at a rate of $695 per hour.  J.S. Held's fee is not contingent upon the outcome of this litigation or the opinions that I express.

## III.   INFORMATION REVIEWED AND CONSIDERED

6.     In connection with the preparation of this report, I have reviewed and considered information from a variety of sources, including documents and data produced by the parties; legal documents (and related exhibits); deposition testimony (and related exhibits); and publicly

---

[6] J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services.  J.S. Held is not a law firm and does not provide legal advice.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

available information, articles, press releases, and Internet websites.  The documents and other information that I have reviewed and considered as of the date of this report include those cited throughout this report (including the footnotes) as well as those listed on Schedule 2 attached to this report.  I have also held discussions with Arm personnel, including Will Abbey (Executive Vice President & Chief Commercial Officer at Arm), Christine Tran (Senior Director of Legal at Arm), and Paul Williamson (Senior Vice President and General Manager of IoT Line of Business at Arm), as well as Arm's technical expert, Robert Colwell, Ph.D.  In addition, I have reviewed and considered the following deposition transcripts (and related exhibits):[7]

### Arm Personnel

- Will Abbey, Executive Vice President & Chief Commercial Officer
- Jonathan Armstrong, Head of Brand and Creative Services
- Lynn Couillard, Vice President of Sales
- Richard Grisenthwaite, Executive Vice President & Chief Architect
- Rene Haas, Chief Executive Officer
- Tim Herbert, Vice President of North American Sales (retired)
- Simon Segars, Former Chief Executive Officer
- Karthik Shivashankar, Senior Director of Wearables and Commercial Licensing
- Christine Tran, Senior Director of Legal
- Ian Thornton, Vice President of Investor Relations
- Paul Williamson, Senior Vice President and General Manager of IoT Line of Business
- Mark Werkheiser, Distinguished Engineer

### Nuvia Personnel

- Lynn Bos, former Technical Program Manager
- Manu Gulati, former Founder & Senior Vice President of Engineering
- Pradeep Kanapathipillai, former CPU Microarchitecture and RTL Lead
- Nitin Sharma, former CPU Verification Engineer
- Jignesh Trivedi, former CPU Verification Engineer
- Gerard Williams, III, former Founder & Chief Executive Officer

---

[7] Since the issuance of my Initial Report, I have received and reviewed the final deposition transcripts of those previously identified as rough transcripts in my Initial Report.

**Qualcomm Personnel**

- Cristiano Amon, President and Chief Executive Officer
- Ziad Asghar, Senior Vice President of Product Management
- Geeta Balakrishnan, Principal Engineer in the CAD Team
- Ramakrishna Chunduru, former Chief Procurement Officer
- Michael Roberts, Vice President of Global Marketing
- Laura Sand, Senior Vice President, Legal Counsel
- Rohit Singh, Director of Program Management
- James Thompson, Chief Technology Officer

7.     In addition to the above, I have also reviewed and considered Dr. Kennedy's report, including the opinions, documents, and other information cited therein.  In forming my opinions in this case, I have relied upon the information and documents identified in my Initial Report and this report, and I have also relied upon my more than 25 years of experience and expertise in analyzing remedies for misuse of intellectual property, analyzing the adequacy of damages to compensate for harms relating to the misuse of intellectual property, and assessing and calculating damages adequate to compensate for such harms.  My analysis in this case is ongoing. Should additional information, such as documents or data provided by the parties, testimony, whether through expert report or deposition, or rulings issued by the Court, come to my attention after the date of this report, I may find it necessary to update or revise my analysis, opinions, and conclusions.  I reserve my right to do so.

## IV.   LEGAL FRAMEWORK FOR DAMAGES

8.     The legal framework for specific performance and damages and my understanding of same are set forth in my Initial Report and are unchanged.

## V.   SUMMARY OF OPINIONS

9.     I have reviewed and considered the Kennedy Report as well as documents and information referenced by Dr. Kennedy.  The Kennedy Report, including the documents and

information referenced by Dr. Kennedy, do not change the opinions expressed in my Initial Report.

## VI.   ASSESSMENT OF THE KENNEDY REPORT

### A.  Summary

10.   The Kennedy Report sets forth numerous assertions in response to my Initial Report. Dr. Kennedy misunderstands or misrepresents the positions and support provided in my Initial Report and fails adequately to support his own opinions.

11.   For example, Dr. Kennedy claims that "contrary to Mr. Schoettelkotte's opinions, assuming a liability finding in favor of Arm, Arm's damages are readily quantifiable with reasonable certainty, and such damages are adequate to compensate for Arm's alleged harm if Arm is successful in proving its claims."[8]  But Dr. Kennedy misrepresents my opinions and fails to support his own opinion, as summarized below.

- Dr. Kennedy fails to recognize that the harms discussed in my Initial Report are prospective and are not harms that have already occurred.  As such, his reliance on an alleged lack of past harm and Arm's current position is irrelevant.  Arm's public statements regarding past events and Arm's current position, Arm personnel testimony regarding past events, Arm's past valuations of its Nuvia relationship, and Arm's past negotiations with Qualcomm do not establish that the prospective harms that I have identified in my Initial Report are unlikely to occur, or that any damages associated with any of those harms can be calculated with reasonable certainty and would be adequate to compensate Arm.

- Dr. Kennedy repeatedly approaches his analysis from the wrong frame of reference.  His opinions are focused on the alleged value of Nuvia using Arm's technology (not the proper analysis), rather than the harms caused by Qualcomm misusing Arm's technology in an unlicensed manner that undermines the Arm licensing ecosystem.

- Dr. Kennedy does not provide any evidence showing that Arm's licensing ecosystem would not be substantially harmed if Defendants are found liable for the breach of the Nuvia ALA but are not ordered to discontinue the use and distribution of ███████████████████

---

[8] Kennedy Report, p. 17.

█████, and any products embodying such technology or information.

- Dr. Kennedy fails to demonstrate that the "available methodologies to quantify damages" that he identifies or any others (alone or in combination) are adequate to calculate damages for any of the harms identified in my Initial Report with reasonable certainty.

- Dr. Kennedy does not identify any specific formula, calculation, or quantitative or qualitative means that (alone or in combination) can be used to calculate the alleged damages associated with any of the harms identified in my Initial Report with reasonable certainty.

- Dr. Kennedy does not calculate, with reasonable certainty or otherwise, alleged damages that (alone or in combination with any other damages) are adequate to compensate Arm for any one or more of the harms identified in my Initial Report, or even identify a specific process and inputs for doing so.

- Dr. Kennedy's position that damages adequate to compensate Arm can be calculated with reasonable certainty is undermined by the fact that he fails to calculate *any* damage amounts for any one or more of the alleged harms (or any portion(s) of those harms) identified in my Initial Report.

- Dr. Kennedy's critiques of my Initial Report are unpersuasive, unsupported, and incorrect. Dr. Kennedy mischaracterizes the opinions in my Initial Report and makes numerous incorrect or unsupported statements as a result.

12. Throughout the remainder of this report, I provide my assessment of the discussion and conclusions set forth in the Kennedy Report. Any lack of specific criticism is not meant to imply and is not agreement with Dr. Kennedy's opinions and conclusions.

**B. Arm Public Statements Identified By Dr. Kennedy Do Not Address Prospective Harms**

13. Dr. Kennedy's first rebuttal section reveals Dr. Kennedy's fundamental misunderstanding of my Initial Report. Specifically, Dr. Kennedy states that "Arm alleges the Defendants' actions have caused it harm, but Arm's public statements do not identify the

purported harms that are the subject of Mr. Schoettelkotte's report."[9]  Further, Dr. Kennedy states that "Mr. Schoettelkotte fails to acknowledge these public statements and nowhere addresses the fact that these statements contradict Mr. Schoettelkotte['s] allegations of harm."[10]  However, as my Initial Report plainly stated:

> [i]n my opinion, if Defendants are found liable for breach of the Nuvia ALA but are not ordered to discontinue the use and distribution of ████ ████████████████████████████, and any products embodying such technology or information (including Nuvia-based Cores), then monetary damages are not adequate to compensate Arm for the harm (including future harm) caused by Defendants' breach of the Nuvia ALA. In my opinion, the monetary damages associated with the harm to Arm (including future harm) caused by Defendants' breach of the Nuvia ALA cannot be determined with reasonable certainty.
>
> I have considered the harms that Defendants' breach of the Nuvia ALA may cause to Arm, based on my discussions with Arm employees and review of the record, and described those harms [in my Initial Report].[11]

14.     Given that Arm's request for specific performance has not been addressed by the Court and denied, the harms discussed in my Initial Report have not yet transpired.  As such, the examples cited by Dr. Kennedy focusing on the existence of past harms are inapplicable and do not refute the prospective harms identified in my Initial Report.

15.     Dr. Kennedy claims that:

> Arm's public statements since the Defendants' alleged breach portray increasing royalty revenue, market share, and strength in Arm's ecosystem.  These public statements of financial health and affirming the strength of Arm's licensing ecosystem—which postdate Defendants' alleged breach of the Arm / Nuvia ALA—contradict the notion that Arm has been damaged to date, and Arm has not made any public disclosure of the type and extent of the harm suggest by Mr. Schoettelkotte.[12]

The Kennedy Report then references various public statements by Arm—none of which relate to

---

[9] Kennedy Report, p. 19.
[10] Kennedy Report, p. 19.
[11] Initial Report, p. 32.
[12] Kennedy Report, p. 19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                          7

the harm that would result from a denial of Arm's request for specific performance.[13]

16.   Dr. Kennedy concludes that:

> [w]hile Mr. Schoettelkotte opines that Arm has and will suffer irreparable harm, Arm's statements to the public and public-facing documents contradict the type and scope of past or prospective future harm claimed by Mr. Schoettelkotte.  In its public statements and filings, Arm repeatedly highlights its strong financial performance, robust licensing position, and its plans for future growth and does not mention any significant weaknesses.[14]

Dr. Kennedy's conclusion simply highlights his misunderstanding of the harms identified in my Initial Report.  Notably, Dr. Kennedy ignores and does not consider Arm's public statements that identified material prospective harms that could result from this dispute.  Specifically, Dr. Kennedy did not include in his list public statements in Arm's Form F-1 filing that "[w]e have experienced, and may in the future experience, significant fluctuations in our period-to-period results of operations.  Our results may fluctuate and be unpredictable because of a variety of factors, including, among others:" "new litigation or developments in current litigation, including, but not limited to, a lawsuit with Qualcomm and Nuvia…."[15]  Further, Arm described the litigation with Qualcomm and indicated that "[o]ur complaint seeks, among other things, specific performance of the Nuvia ALA termination provisions to require Qualcomm and Nuvia to stop using and destroy the relevant Nuvia technology…."[16] Arm also stated that "[w]e can provide no assurances regarding the outcome of the litigation, or how the litigation will affect our relationship with Qualcomm, which is currently a major customer of ours and accounted for 11% of our total revenue for the fiscal year ended March 31, 2023."[17]  Arm also indicated that

---

[13] Kennedy Report, pp. 20 – 24.
[14] Kennedy Report, p. 24.
[15] ARM_01259705 – 0105 at 735 – 736.
[16] ARM_01259705 – 0105 at 754.
[17] ARM_01259705 – 0105 at 754.

"because litigation and the outcome of regulatory proceedings are inherently unpredictable, our business, results of operations, financial condition and prospects could be materially adversely affected by an unfavorable resolution of one or more of these proceedings, claims, demands or investigations."[18]  As such, Dr. Kennedy's claim that "Arm's statements to the public and public-facing documents contradict the type and scope of past or prospective future harm claimed by Mr. Schoettelkotte" is incorrect.[19]   A full consideration of Arm's public statements only emphasizes the gravity of the potential harm to Arm considering its recent statements regarding the "strong financial performance, robust licensing position, and its plans for future growth" as described by Dr. Kennedy.

17.    The public statements identified by Dr. Kennedy relate to past events and do not address the prospective harms raised in my Initial Report.  As such, Dr. Kennedy fails to indicate the relevance of the public statements for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the public statements cited by Dr. Kennedy do not support his assertion that damages (as an alternative to specific performance) can be calculated with reasonable certainty or would be adequate to compensate Arm.

18.    While questioning the veracity of the harms identified in my Initial Report based on Arm's statements in its public filings, Dr. Kennedy also ignores that Qualcomm has also recognized in its public filings many of the same types of prospective threats to its own licensing ecosystem.

19.    For example, Qualcomm has also identified the risk of potential re-negotiations of

---

[18] ARM_01259705 – 0105 at 754.
[19] Kennedy Report, p. 24.

its license agreements as a result of legal proceedings.[20]  Specifically, Qualcomm has stated that it could be "required to reduce the royalty rates in [its] patent license agreements" as well as changes requiring the modification or renegotiation of its "existing license agreements or pursuing other commercial arrangements."[21]  Along with the risk of renegotiation, Qualcomm also identified the potential for transaction costs, stating:

> [t]o the extent we are required to implement any of these licensing and/or business practices, including by modifying or renegotiating our existing license agreements or pursuing other commercial arrangements, *we would incur additional transaction costs, which may be significant,* we could incur delays in recognizing revenues until license negotiations were completed, and our business, revenues, results of operations, cash flows and financial condition could be harmed.[22]

20.    Qualcomm also identifies in its own public filings the importance of its R&D as well as the link to its future success.  For example, Qualcomm states that "[w]hile we continue to invest significant resources toward advancements primarily in support of 5G-based technologies, we also invest in new and expanded product areas, and industries and applications beyond mobile handsets, but utilizing our existing technical and business expertise and through acquisitions or other strategic transactions."[23]  Qualcomm further stated that "[i]n particular, *our future growth* depends in part on new and expanded product areas, and industries and applications beyond mobile handsets…..  Accordingly, *we intend to continue to make substantial investments* in these new and expanded product areas, industries and applications, and in developing related products and technologies."[24]  Qualcomm also highlighted the impact on its future success if its efforts "on new and expanded product areas" are not successful, stating:

---

[20] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, pp. 28 – 29.
[21] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 29.
[22] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 29 (emphasis added).
[23] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 21.
[24] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 21 (emphasis added).

[i]f we are *not successful* in extending our technologies and products into new and expanded areas, and industries and applications beyond mobile handsets, if our new technologies and products are not successful, or if we are not successful in the time frames we anticipate, we may incur significant costs and asset impairments, *our business and revenues may not grow or grow as anticipated, our revenues and margins may be negatively impacted*, our stock price may decline and *our reputation may be harmed.*[25]

21.   In addition, Qualcomm indicated that a reduction in revenue would hinder its resources for research and development:

[t]he loss of any one of our significant customers, a reduction in the purchase of our products by any of these customers or the cancellation of significant purchases by any of these customers,…would reduce our revenues and could harm our ability to achieve or sustain expected results of operations.  A delay of significant purchases, even if only temporary, would reduce our revenues in the period of the delay.  *Any such reduction in revenues would also impact our cash resources available for other purposes, such as research and development.*[26]

22.   In addition, Qualcomm recognized that the misuse of its intellectual property could cause it reputational harm as well.  Specifically, Qualcomm stated:

[t]he misappropriation, theft, misuse, disclosure, loss or destruction of the technology, intellectual property, or the proprietary, confidential or personal information, of us or our employees, customers, licensees, suppliers or third parties, could harm our competitive position, reduce the value of our investment in research and development and other strategic initiatives, cause us to lose business, *damage our reputation*, subject us to legal or regulatory proceedings, cause us to incur other loss or liability and otherwise adversely affect our business.[27]

23.   Qualcomm's identification of many of the types of prospective threats and harms to its licensing ecosystem that were discussed in my Initial Report further supports the opinions set forth in my Initial Report.  This is because Qualcomm has itself acknowledged through public

---

[25] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 21 (emphasis added).

[26] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 19 (emphasis added).

[27] Qualcomm Incorporated Form 10-K for the fiscal year ended September 24, 2023, p. 26 (emphasis added).

statements that the types of harms which Arm identified are of a similar risk to its own business.

24.    Additional public statements and statements from regulators support the importance of Arm's licensing ecosystem and corroborate the harms identified in my Initial Report.  For example, a complaint filed by the FTC in 2021 states that:

> Arm Processor Technology is at the foundation of many innovative products of our modern digital age, including nearly every smartphone on the market, advanced driver assistance features in recent and upcoming cars, web servers that can provide significantly better cost performance over the most comparable non-Arm servers, and many other examples. In these products, Arm Processor Technology is a critical input. The wide deployment of Arm's Processor Technology has fostered a vibrant ecosystem of software and hardware developers, software, and devices.[28]

## C.  Testimony Identified By Dr. Kennedy Does Not Address Prospective Harms

25.    Continuing his apparent misunderstanding of my Initial Report, Dr. Kennedy states that "[n]ot only do Arm's public statements indicate that Arm has not been harmed, Arm's witnesses, including those Mr. Schoettelkotte relies on heavily in his report, testified that no actual harm has been experienced by Arm.  These statements by Arm's own personnel contradict allegations that Arm has been harmed."[29]  Dr. Kennedy goes on to cite and discuss testimony from Arm personnel related to the existence of *past* harm, at the time of their depositions, with Arm's lawsuit pending and the Court yet to rule on specific performance.[30]  Dr. Kennedy ignores the testimony discussed in my Initial Report that relates to the *future* harms that may flow from a denial of Arm's request for specific performance.  Dr. Kennedy's focus on the existence of *past* harm is irrelevant.  As discussed in my Initial Report, the harm to Arm is *prospective*, and evidence of that prospective harm is not contradicted or undermined by Arm witness testimony regarding

---

[28] Complaint, In the Matter of Nvidia Corporation, Softbank Group Corporation, and Arm, Ltd., Docket No. 9404, Federal Trade Commission, December 2, 2021, p. 2 (https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf).
[29] Kennedy Report, p. 24.
[30] Kennedy Report, pp. 24 – 26.

past harm.  Dr. Kennedy also ignores testimony by Arm witnesses, cited below and in my Initial

Report, showing the likelihood of the prospective harms to Arm's licensing ecosystem if specific

performance is not ordered in this case.

26.    For example, as cited in my Initial Report, Mr. Williamson testified concerning



"[31]  Mr. Williamson further testified that

27.    Mr. Abbey also stated that

[34]  Further, Mr. Abbey testified that

Mr. Williamson testified that

[36]   Similarly,

---

[31] Deposition of Paul Williamson, November 9, 2023, pp. 243 – 244.
[32] Deposition of Paul Williamson, November 9, 2023, p. 244.
[33] Deposition of Paul Williamson, November 9, 2023, pp. 244 – 245.
[34] Deposition of Will Abbey, October 27, 2023, p. 361.
[35] Deposition of Will Abbey, October 27, 2023, p. 361.
[36] Deposition of Paul Williamson, November 9, 2023, p. 246.

Mr. Williamson testified that 

28.    In sum, the testimony identified by Dr. Kennedy largely relates to past events and does not address the prospective harms raised in my Initial Report.  Dr. Kennedy fails to indicate the relevance of the testimony for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the testimony cited by Dr. Kennedy does not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

**D.  Dr. Kennedy's Claim of Purported Benefit of ▮▮▮▮ Launch Is Misguided**

29.    Dr. Kennedy claims that "[w]hile Arm alleges that the Defendants' alleged breach has caused harm, Qualcomm's development efforts and business plans related to the development of custom Arm-compliant CPUs in certain markets will actually benefit Arm. Specifically, Qualcomm's development efforts of its Arm-compatible ▮▮▮ CPU cores (▮ ▮▮▮▮▮ will likely lead to increased royalties for Arm.  Mr. Schoettelkotte ignores this in his report."[39]  Dr. Kennedy subsequently identifies discussion of Qualcomm's intention to enter the PC market with the ▮▮▮▮ .  Dr. Kennedy concludes that "any market share that

---

[37] Deposition of Paul Williamson, November 9, 2023, p. 246.
[38] Deposition of Rene Haas, December 12, 2023, pp. 164 – 165.
[39] Kennedy Report, p. 26.

Qualcomm gains in the PC market is market share gained for Arm versus x86 alternatives. Further, Qualcomm's sales of ██████████ will generate royalties for Arm under the Arm / Qualcomm ALA. Therefore, Qualcomm's development of the ██████████ will generate additional royalties for Arm from an increased volume of shipments for the PC market."[40]

30.    As discussed in my Initial Report, I understand that ████████████████████ ████████████[41] Further, I understand that the ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Dr. Kennedy fails to recognize the significance that ████████████████████████ ████████████. As such, the impending launch of the ████████████, should the court not order specific performance, is an event signaling to Arm's licensing ecosystem and the market more broadly that ████████████████████████████████████████[43] leading to the harms that are addressed in my Initial Report.

31.    In sum, the alleged benefit of ██████ sales identified by Dr. Kennedy does not address the prospective harms raised in my Initial Report. Dr. Kennedy fails to indicate the relevance of this alleged benefit for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm for harms beyond

---

[40] Kennedy Report, p. 30.
[41] Correspondence dated 10/26/2023, email from J. Braly to J. Li; Deposition of Mike Roberts, November 28, 2023, pp. 35 – 37.
[42] ARM_01238999 – 9003; *see also* ARM_01215997 – 6001 at 997 ████████████████████████████ ████████████████████████████████████████████
QCARM_2417783 ████████████████████████████████████████
[43] Deposition of Will Abbey, October 27, 2023, p. 361.

any Oryon royalties. That is, even if Arm may receive royalties for ███, those royalties must be offset by the many-faceted and interconnected types of harm to Arm identified in my Initial Report, which Dr. Kennedy has not calculated, let alone shown would be net positive when considering ███ royalties (as his opinions implicitly assume).  As such, the alleged benefit raised by Dr. Kennedy does not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### E.  Dr. Kennedy's Asserted Examples of Quantified Damages Are Not Applicable

32.   Dr. Kennedy states that "Mr. Schoettelkotte contends that damages cannot be quantified, while ignoring the extensive evidence that Arm has expended time and effort quantifying what it sought as adequate compensation."[44]  Dr. Kenndy identifies two instances in which he alleges that Arm has quantified "damages":



33.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[47]  Dr. Kennedy goes on to identify several Arm documents regarding the Arm / Nuvia negotiations and Arm's

---

[44] Kennedy Report, p. 31.
[45] Kennedy Report, p. 31.
[46] Kennedy Report, p. 33.
[47] Kennedy Report, p. 31.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                          16

analysis of the Nuvia relationship in 2019.[48]

34.　████████████ identified by Dr. Kennedy are irrelevant as they do not address the prospective harms raised in my Initial Report from Qualcomm proceeding with unlicensed technology.　Dr. Kennedy fails to indicate the relevance of these amounts for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.　Indeed, ████████████████ ████████████████████████████ As such, ████████ ████████ do not support that damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

　　　　**ii.**　████████████████████

35.　Dr. Kennedy states that he ████████████████████ ████████████████████████████████ ████████████████████████[49]　Dr. Kennedy then discusses several internal Arm documents related to its assessment of the ████████████.[50]　Dr. Kennedy concludes that ████████████████████ ████████████████████████████████ ████████████████████[51]

36.　████████████████ identified by Dr. Kennedy are irrelevant as they do not address the prospective harms raised in my Initial Report from the failure to reach a deal and the

---

[48] Kennedy Report, pp. 31 – 33.
[49] Kennedy Report, p. 33.
[50] Kennedy Report, pp. 33 – 35.
[51] Kennedy Report, p. 35.

impact on Arm from Qualcomm proceeding with unlicensed technology. Dr. Kennedy fails to indicate the relevance of these amounts for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm. Further, while describing the ███████████████ as "inflated," Dr. Kennedy provides no explanation as to why the amounts are allegedly "inflated." As such, ███████████████ do not support that the damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### iii.   Arm's Negotiations With Qualcomm Are Not Applicable

37.   Dr. Kennedy states that "Arm sought payment from Qualcomm in connection with the Nuvia acquisition in the form of ████████████████████████████ ████████████████████████████. Arm and Qualcomm engaged in extensive back and forth negotiations regarding Arm's request for compensation in connection with the acquisition."[52] Dr. Kennedy then discusses documents regarding negotiations between Arm and Qualcomm that included various proposed royalty rates (based on market segments), proposed assignment fees, and proposed transition fees—all of which would have been related to Qualcomm's continued use of Arm's technology in an authorized/licensed manner.[53]

38.   Dr. Kennedy states that "████████████████████ address issues at play in this litigation, and, therefore, demonstrate that Arm has been able to attach a monetary value to the issues in this litigation."[54] Dr. Kennedy further states that:

---

[52] Kennedy Report, p. 35.
[53] Kennedy Report, pp. 35 – 41; ARM_00086285 – 293; QCARM_3537713 – 715; QCARM_3535535 – 536; QCARM_7434227 – 229; ARM_01305785 – 789; ARM_00000017 – 018.
[54] Kennedy Report, p. 41.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    18

[t]he relevant issue here is not whether Arm's ███████████ is correct, but instead that Arm was able to calculate a value that it used in negotiations to seek compensation for Qualcomm's alleged use of the Nuvia-based designs, thus illustrating that the value of the Nuvia agreement could be monetized and calculated.  Yet, Mr. Schoettelkotte ignores this evidence of valuation.[55]

39.   Dr. Kennedy's discussion and conclusion of the amounts from the negotiations demonstrate his misunderstanding of my Initial Report and Arm's claims in this matter.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████ In fact, in an email exchange cited by Dr. Kennedy, █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ █ ████████████████████

███████████████████████████████████████████████████

---

[55] Kennedy Report, p. 42.
[56] QCARM_3537713 – 715 at 713.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████    ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████    ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

40.     As a final matter, I understand there may be a dispute regarding the admissibility of the documents related to these negotiations.  As such, I have included the response above solely to address Dr. Kennedy's discussion of these documents to the extent the Court were to allow any of this information to be considered or addressed by experts in this case.

41.     As discussed above, the negotiation amounts identified by Dr. Kennedy are irrelevant as they do not address the prospective harms raised in my Initial Report.  Dr. Kennedy fails to indicate the relevance of these amounts for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the amounts identified by Dr. Kennedy do not support that damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

**F.    The "Available Methodologies to Quantify Damages" Identified By Dr. Kennedy Are Not Supported Or Applicable**

42.    Dr. Kennedy states that "Mr. Schoettelkotte ignores that, even if Arm had not attached a value to the issues in this litigation [], there are well established methodologies that could be used to calculate damages[]: (1) quantification of the alleged head start damages, and (2) utilization of previous design transfer fees as a proxy for adequate compensation."[57]   As discussed below, Dr. Kennedy fails to demonstrate that either of these "available methodologies" address the harms identified in my Initial Report, that they can be used to determine damages for such harms with reasonable certainty, or that they would be adequate to compensate Arm.

**i.    Dr. Kennedy's "Head Start" Methodology Is Unsupported And Does Not Address Harms At Issue**

43.    Dr. Kennedy states that "Arm alleges that Qualcomm received a head start by using certain Arm intellectual property.  That is, Qualcomm was allegedly able to save development time and will be able to commercialize its custom CPUs for certain market segments earlier than it otherwise would have.  For head start damages in this litigation, this benefit, (i.e., Qualcomm's head start) would be tied to its alleged improper use of certain technology as opposed to other independent development efforts."[58]  Dr. Kennedy also states that "[i]n this matter, the financial consequence of Qualcomm's alleged head start to Arm would be that Qualcomm will shift from ██████████████████████████████████████ earlier than it otherwise would have for certain market segments."[59]

44.    Dr. Kennedy asserts that "[o]nce the head start period is determined, the specific calculation of damages would flow directly from the application of royalty rates to units sold over the appropriate head start period.  Further, because Qualcomm intends to release its custom

---

[57] Kennedy Report, p. 45.
[58] Kennedy Report, p. 45.
[59] Kennedy Report, pp. 47 – 48.

CPU products in various market segments at different times, and because of the dynamics that are unique to each market segment, Qualcomm's alleged head start and Arm's resulting damages, if any, would need to be quantified on a market-by-market basis…."[60] Dr. Kennedy further claims that "these [head start] damages would provide adequate compensation to Arm as it ties the alleged harm (i.e., lost royalties) back to the specific alleged wrongful conduct (i.e., Defendants' breach and alleged improper use of Arm's intellectual property)."[61]

45.    Dr. Kennedy is incorrect.  Dr. Kennedy approaches damages in this matter as if Arm's claim was one for misappropriation of trade secrets.[62]  However, as indicated at the beginning of my Initial Report and this report, I understand this matter relates to the Defendant's alleged breach of the Nuvia ALA and the impact of the court denying Arm's request for specific performance.  As such, Dr. Kennedy is not addressing the relevant harms as identified in my Initial Report.

46.    Critically, Dr. Kennedy has not demonstrated that the "head start" methodology described in his report can be used to calculate damages associated with all the harms to Arm addressed in my Initial Report (let alone with reasonable certainty) or would be adequate to compensate Arm for those harms that are distinct from the benefit to Qualcomm from any head start.

47.    In conjunction with the fact that Dr. Kennedy's "head start" methodology does not properly address the prospective harms identified in my Initial Report, he fails to include a calculation demonstrating the viability of the methodology he purports to be appropriate. Indeed, Dr. Kennedy claims his "head start" methodology "can be calculated with reasonable

---

[60] Kennedy Report, p. 53.
[61] Kennedy Report, pp. 56 – 57.
[62] Indeed, Dr. Kennedy cites to a treatise entitled "*Commentary on Monetary Remedies in Trade Secret Litigation.*"

certainty."[63]  Yet, Dr. Kennedy has not proven that to be the case by employing the methodology he asserts is appropriate.  Indeed, public statements made by Mr. Amon indicate that the benefit to Qualcomm and resultant harm to Arm from a head start due to Nuvia is not easily quantifiable. In April 2021, Mr. Amon stated "The NUVIA asset give[s] us a lot of flexibility.  You should think about it as having a scalable leading CPU asset to together with the other Qualcomm assets."[64] Mr. Amon further stated that "the transition across the board to ARM architecture really create[s] a big expansion opportunity for Qualcomm, and we're very focused to make that happen with a leading position leveraging the NUVIA CPU.  Having said that, I think this asset gives us a lot of flexibility to continue to be expanding to all the different business vectors we're building in the company."[65]

48.    As discussed above, Dr. Kennedy's "head start" methodology is irrelevant as it does not address the prospective harms raised in my Initial Report.  Dr. Kennedy fails to indicate the relevance of this methodology for determining or quantifying the scope of the prospective harms identified in my Initial Report, and whether the damages associated with those harms can be determined with reasonable certainty and would adequately compensate Arm.  As such, the "head start" methodology identified by Dr. Kennedy does not support that damages associated with the harms to Arm if its request for specific performance is denied can be calculated with reasonable certainty or would be adequate to compensate Arm.

### ii. Dr. Kennedy's "Design Transfer Fee" Methodology Is Unsupported And Does Not Address Harms At Issue

49.    Dr. Kennedy states that ████████████████████████████████████████

---

[63] Kennedy Report, p. 56.
[64] https://seekingalpha.com/article/4422252-qualcomm-incorporateds-qcom-ceo-steve-mollenkopf-on-q2-2021-results-earnings-call-transcript.
[65] https://seekingalpha.com/article/4422252-qualcomm-incorporateds-qcom-ceo-steve-mollenkopf-on-q2-2021-results-earnings-call-transcript.



." [66]  Dr. Kennedy further claims that " [67]  In addition, Dr. Kennedy concludes that " [68]

50.    As with his "head start" assessment, Dr. Kennedy has not demonstrated that the "design transfer fee" methodology can adequately compensate Arm for the types of harms enumerated in my Initial Report.  Further, Dr. Kennedy does not demonstrate that the "design transfer free" methodology can compensate for the harms discussed in my Initial Report with reasonable certainty.  Specifically, Dr. Kennedy has not shown how his "design transfer fee" methodology addresses the facts of this case.  As discussed previously in this report and in my Initial Report, a denial of specific performance would signal to Arm's licensing ecosystem and the market more broadly that licensees [69] leading to the harms that are addressed in my Initial Report.  Nothing in the Kennedy Report indicates that Dr. Kennedy's "design transfer fee" methodology would address these harms, in particular because he fails to identify a specific amount or perform an analysis of how said design transfer fee would compensate for the harms identified in my Initial Report.

---

[66] Kennedy Report, p. 57.
[67] Kennedy Report, p. 57.
[68] Kennedy Report, p. 59.
[69] Deposition of Will Abbey, October 27, 2023, p. 361.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                    24

51. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

██  ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[70] Kennedy Report, p. 45.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

### G. Dr. Kennedy's Various Critiques Of My Initial Report Are Unpersuasive, Unsupported, And Incorrect

54.    The remaining portion of the Kennedy Report includes various critiques of sections of my Initial Report.  As an initial matter, I note that throughout his report, Dr. Kennedy mischaracterizes the opinions set forth in my Initial Report (and reiterated above in this report).[71] Below I address certain of Mr. Kennedy's assessments.  As previously stated in this report, any lack of specific criticism is not meant to imply and is not agreement with Dr. Kennedy's opinions and conclusions.

#### i.    Arm's "Systemic and Idiosyncratic Risks" Do Not Discount Harms From Defendants

55.    Dr. Kennedy claims that "Mr. Schoettelkotte conflates Arm's systemic and idiosyncratic risks with risk purportedly associated only with Qualcomm's alleged actions. However, many of Arm's purported harms exist simply due to the nature of Arm's business, and Mr. Schoettelkotte has not differentiated the harms purportedly due to Defendants' alleged wrongful conduct from harms that are due to the nature of Arm's inherent business risks."[72]  Dr. Kennedy makes similar claims throughout his report, such as the examples below.

- "Mr. Schoettelkotte fails to distinguish existing and prospective licensees' possible demand for lower royalties that could occur in the normal course of business, versus the demand for 'more favorable terms' that he identifies as purported harm to Arm."[73]

- "Based on Arm's own submissions to the SEC, CMA, and FTC, it is evident

---

[71] *See, e.g.*, Kennedy Report, pp. 62, 70, 73 – 75, 81 – 82, and 92 – 95.
[72] Kennedy Report, p. 61.
[73] Kennedy Report, p. 64.

that Arm encounters attempts by licensees to renegotiate the terms of the existing license agreements in the normal course of business, and such activity occurs separately from Defendants' alleged actions."[74]

- "Mr. Schoettelkotte's opinions fail to differentiate between activity and business risks that occur in the normal course of Arm's business and what he claims is wrongful conduct by Defendants."[75]

- "This competitive environment is not a purported harm, but rather a general business risk that exists within Arm's business model, including granting rights under ALAs to Qualcomm and to other manufacturers."[76]

- "Thus, the potential impact to Arm's revenues and R&D from a competing custom CPU pre-dates Qualcomm's acquisition of Nuvia and Mr. Schoettelkotte fails to account for the risk Arm faces from ALA agreements in general, unrelated to the claims made against Defendants in this matter."[77]

56.  Dr. Kennedy fails to recognize that while the prospective harms addressed in my Initial Report are not unlike some of the risks identified by Arm in its public statements, the harms discussed in my Initial Report would be tied to a denial of specific performance and are over and above any "systemic and idiosyncratic" risks Arm has otherwise identified in its public statements (if Qualcomm proceeds with unlicensed technology, it will exacerbate those types of harm, along with imposing others).  Further, Dr. Kennedy fails to recognize the impact of the prospective harms identified in my Initial Report because they are related to the actions of one of Arm's largest licensees flouting Arm's license agreement (in the event specific performance is denied).  Notably, Dr. Kennedy's above cited examples do not reflect that Arm has addressed the impacts that may result from this matter in its public filings, as discussed previously in this report and my Initial Report.

---

[74] Kennedy Report, pp. 65 – 66.
[75] Kennedy Report, p. 73.
[76] Kennedy Report, pp. 75 – 76.
[77] Kennedy Report, p. 93.

### ii.    Dr. Kennedy Incorrectly Interprets RISC-V Threat

57.    Regarding RISC-V, Dr. Kennedy states that ███████████████████████

████████████████████████"[78] Dr. Kennedy appears to be making a claim

that is not stated in my Initial Report.  Nowhere in my Initial Report do I state ██████████

███████████████████████.  Further, Dr. Kennedy asserts that there is a

contradiction in my Initial Report.[79]   However, this is yet another misunderstanding (or

mischaracterization) on Dr. Kennedy's part. ████████████████████████████

████████████████████████████████████████

██████████

58.    Dr. Kennedy indicates that "████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████"[80] In support of his statement, Dr. Kennedy identifies ██████████

████████████████████████████████████████

█████████████████████████[81] Based on these documents, Dr. Kennedy concludes

that ████████████████████████████████████

████████████████████████████████████████

█████████████████████[82]  On this conclusion, Dr. Kennedy and I agree.

Yet, the harm discussed in my Initial Report is related to *prospective* harm that would arise if

Arm's request for specific performance is denied.

---

[78] Kennedy Report, p. 79.
[79] Kennedy Report, pp. 79 – 80.
[80] Kennedy Report, p. 80.
[81] Kennedy Report, pp. 80 – 81; ARM_01282466 – 575; ARM_00120530 - 536.
[82] Kennedy Report, pp. 80 -81.

59.   As noted in my Initial Report, "█████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████"[83]  Further, as the documents cited by

Dr. Kennedy illustrate, ████████████████████████████████████████████

However, █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████  For example, t██████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████"[84]  Further, the document indicated that a████████

████████████████████████████[85]  Specifically, the document noted that ███████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████[86]  Notably the document indicated that █████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ █████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████

### iii.   Dr. Kennedy Misunderstands Arm's "First Mover Advantage"

60.   Dr. Kennedy claims:



---

[83] Initial Report, pp. 43 – 44.
[84] ARM_00120530 – 536 at 532.
[85] ARM_00120530 – 536 at 531.
[86] ARM_00120530 – 536 at 531.
[87] ARM_00120530 – 536 at 535.



[88]

Further, Dr. Kennedy states that ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████'"[89]

61.    Dr. Kennedy's misunderstanding is perplexing.  My Initial Report identifies the mobile phone segment numerous times in describing Arm's first mover advantage and how that advantage might translate to other segments, ████████████████████████

████████████████████████████████████████████████████████████

██████████.[90]   Dr. Kennedy even identifies Arm's prevalence of "████████████████████

██████████████████████████"[91]  However, Dr. Kennedy then goes on to discuss his view regarding Arm's loss of its first mover advantage being "inconsistent with history."[92]    But given Dr. Kennedy's misunderstanding of the first mover advantage discussed in my Initial Report, his conclusions do not apply.

### iv.    Dr. Kennedy's Assessment Of Arm's Research and Development Is Unsupported

62.    Dr. Kennedy claims that "████████████████████████████████

████████████████████████[93]  Dr. Kennedy's assertion is particularly surprising given that Arm states in its public filings that it "architect[s], develop[s], and license[s] high-

---

[88] Kennedy Report, p. 81.
[89] Kennedy Report, p. 83.
[90] Initial Report, pp. 45 – 47.
[91] Kennedy Report, p. 83.
[92] Kennedy Report, p. 83.
[93] Kennedy Report, p. 92.

performance, low-cost, and energy-efficient CPU products and related technology" (*i.e.*, does not manufacture a product) and that R&D "is at the heart of [its] business and critical to [its] future success."[94]  Indeed, ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████[95]  Further, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

63.   As such, Dr. Kennedy's claim that Arm's R&D activities are not tied to its revenues is unsupported given the magnitude of Arm's R&D expenses as percentage of revenue and how it compares to other companies in the industry.

### v.   Dr. Kennedy's Assessment Of Harm To Goodwill Is Incorrect

64.   Dr. Kennedy claims that "from a damages perspective, harm to goodwill is a quantitative conclusion based upon the financial impact that an event has on a business's ability to generate future profit."[96],[97] Dr. Kennedy further states that "Arm's public disclosures state that it has identified 'no indication of impairment' to its goodwill over its last three fiscal years."[98] Finally, Dr. Kennedy states that "Mr. Schoettelkotte presents no analytical or quantitative foundation for the claim that Arm's brand and reputation has been damaged or will be imminently damaged as a result of the Defendant's alleged breach, and his claims are

---

[94] ARM_01259705 – 0105 at 712 and 804.
[95] See Schedules 3 and 4.
[96] Kennedy Report, p. 94.
[97] I note that the cited pages to the *Litigation Services Handbook* do not support Dr. Kennedy's statement.
[98] Kennedy Report, p. 94.

contradicted by Arm's public disclosures in its SEC filings."[99]

65.    Due to Dr. Kennedy's misunderstanding of my Initial Report, he has focused on *past* events rather than the *prospective* harm related to Arm's goodwill if Qualcomm were permitted to proceed with unlicensed technology.  As such, Dr. Kennedy's stating that Arm has not identified any "indication of impairment" to its goodwill over the last three years is irrelevant. Rather, contrary to Dr. Kennedy's assertion, Arm's public disclosures *have* identified the potential harm due to the dispute at issue.  Notably, in its Form F-1 filing, Arm stated "[w]e have experienced, and may in the future experience, significant fluctuations in our period-to-period results of operations.  Our results may fluctuate and be unpredictable because of a variety of factors, including, among others:" "new litigation or developments in current litigation, including, but not limited to, a lawsuit with Qualcomm and Nuvia…."[100]  Further, Arm described the litigation with Qualcomm and indicated that "[w]e can provide no assurances regarding the outcome of the litigation, or *how the litigation will affect our relationship with Qualcomm*, which is currently a major customer of ours and accounted for 11% of our total revenue for the fiscal year ended March 31, 2023."[101]  In addition, Arm stated that "our involvement in such litigation *could cause us to incur significant reputational damage in the industry, in our relationship with Qualcomm or in our relationship with other third-party partners*."[102]

66.    Further, despite claiming "harm to goodwill is a quantitative conclusion," Dr. Kennedy identifies no methodology that would measure prospective harm to goodwill.  Neither does Dr. Kennedy explain how the "available methodologies" he asserts earlier in his report would include the prospective harm to Arm's goodwill.

---

[99] Kennedy Report, p. 95.
[100] ARM_01259705 – 0105 at 735 – 736.
[101] ARM_01259705 – 0105 at 754 (emphasis added).
[102] ARM_01259705 – 0105 at 754 (emphasis added).

## VII.   OTHER ISSUES

67.   This report represents my analysis, opinions, and conclusions at this time and is based on information available to me as of the date above.  The citations listed in this report are illustrative, and as part of my analysis, I also considered the additional documents and other information listed on Schedule 2.  If additional information or testimony becomes available to me, I may revise or supplement my analysis, opinions, and conclusions, and I may modify or supplement my report as necessary.  I may testify at trial regarding any related matter raised by the parties after the date of this report if asked to do so by the Court or the parties' attorneys.  I may be asked to develop additional schedules or exhibits for trial purposes related to my analysis, opinions, and conclusions.  I may also be asked to develop and rely on demonstratives at trial or any pre-trial proceeding.  I may also be asked to develop additional schedules or exhibits if asked to do so by the Court or the parties' attorneys, post-trial.  This report is intended solely for use in the above-referenced litigation and is not to be used for any other purpose.



**Schedule 1**

# W. Todd Schoettelkotte, CPA, CVA
*Senior Managing Director*

333 Clay Street, Suite 3960
Houston, Texas 77002
713-335-5455 | tschoettelkotte@jsheld.com

**Certifications**
Certified Public Accountant, Texas
Certified Valuation Analyst

**Professional Affiliations**
State Bar of Texas' Grievance
Committee, Committee Member,
2004 – 2009

Federal Bar Association,
South Texas Chapter, Treasurer,
2007 – 2015

Institution for Law and Technology
Advisory Board Member

**Associations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

Licensing Executives Society

National Association of Certified
Valuators and Analysts

**Education**
Master of Accounting
Rice University, Houston, TX

BS Management
Rice University, Houston, TX

W. Todd Schoettelkotte is a Senior Managing Director of Ocean Tomo, a part of J.S. Held LLC, a global consulting firm providing specialized technical, scientific, financial, and advisory services. Mr. Schoettelkotte has more than 25 years of experience in the evaluation and quantification of economic damages arising from patent, copyright and trademark infringement, and trade secret misappropriation disputes. His clients have included numerous Fortune 500 companies in a wide variety of industries including semiconductor, telecommunication, energy, consumer products, life sciences and computers (hardware, software and the internet). Mr. Schoettelkotte has been recognized by Intellectual Asset Management Magazine as one of the leading patent damages experts in the United States. Mr. Schoettelkotte's background is in accounting, finance and economics, and he has a specific, focused understanding of those issues integral to the valuation and management of intellectual property.

**Intellectual Property Valuation**

Mr. Schoettelkotte has directed numerous valuation projects related to patents, trademarks and trade secrets. A significant portion of his practice is focused on the determination of royalty rates and terms for licensing agreements. Additionally, Mr. Schoettelkotte has conducted numerous studies involving lost profits and unjust enrichment.

In the process of assisting clients in the valuation of intellectual property assets, Mr. Schoettelkotte has participated in the identification and review of business plans, market studies, financial documents and other related information.

**Patent, Copyright and Trademark Infringement**

Mr. Schoettelkotte has performed market analyses/studies wherein the patented, trademarked or copyrighted product is sold, assessed lost profits stemming from alleged infringements, evaluated the contribution of the patented process/method to the end product and established the economic value of the underlying intellectual property.

Mr. Schoettelkotte is skilled in the application of the Georgia-Pacific factors to the determination of reasonable royalty rates. He has determined reasonable royalty rates within infringement suits on many occasions in numerous industries. Over the course of his career, Mr. Schoettelkotte has reviewed hundreds of license agreements, providing a broad frame of reference for reasonable royalty damages analyses. Mr. Schoettelkotte has testified in federal and state court and arbitration proceedings on matters involving intellectual property valuation, lost profits, reasonable royalty and economic damages issues.

**Articles and Presentations**

"Intellectual Property Damages," Chicago-Kent College of Law, October 15, 2019

"Damages in Other Areas of Intellectual Property," The University of Arizona IP Conference, March 5, 2018

**W. Todd Schoettelkotte**

"Impact of Recent Court Cases on 'Real World' Royalty Rates," LES (USA & Canada) Houston Chapter, July 20, 2017

"What is Discoverable and Admissible for Damages, Willfulness and Other Purposes," Intellectual Property Owners Association, March 21, 2011

"Strategies in Intellectual Property," Chicago Kent, College of Law, Spring 2004 – 2010

Damages, Part II: "Litigation Strategies" – 15th Annual Advanced Patent Law Institute - University of Texas School of Law, October 28-29, 2010

"IP Damages and Valuation," Global Intellectual Property Management, Georgetown University Law Center, July 2, 2008

"Keys for Effectively Working with Your Damages Expert Throughout the Litigation Life Cycle," Houston Bar Association, March 22, 2007

"Advanced Evidence and Discovery – Working With Experts From Start To Finish" – Texas Bar Association, April-May 2006

"Trademarks – Financial Disclosure and Corporate Governance" – International Trademark Association, Emerging Issues in Trademark Law Forum, February 2-3, 2006

"Valuation of IP – A Licensing Perspective" – Lighthouse Seminar Group, IP Licensing Nuts & Bolts, March 3, 2005

"Measuring the Value of Damages in Trademark Infringement Claims" – DuPont's 18th Annual CLE Intellectual Property Law Seminar, October 12, 2004

"Measuring the Value of Damages in Patent and Trademark Claims" – Houston CPA Society, September 2004

"Measuring Damages in Trademark Infringement and Related Claims in Light of Recent Court Decisions" – The 19th Annual Intellectual Property Law Conference – American Bar Association, April 1, 2004

"Intellectual Property Damages: Patents & Trademarks" – Houston CPA Society "Litigation and Valuation Services Committee," January 28, 2004

Co-Author: "Accounting for Attorneys" – University of Oregon School of Law, November 12, 2003

"What are the Financial Stakes in Litigation? What are the Costs and the Return on Investment (ROI) That Can Be Expected? The Question of Intangible Returns?" – 2003 Fourth International Conference on Intellectual Property by CNCPI, October 7, 2003, Paris, France

"Current Issues in the Analysis of Reasonable Royalties in Patent Infringement Actions" – 2003 Licensing Executives Society Annual Meeting, September 24, 2003

Co-Author FTI Consulting Training Course: "Calculating Damages in Patent Infringement – A Lost Profits and Reasonable Royalty Case Study," July 17, 2003



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*In the Matter of Certain Semiconductor Devices, and Methods of Manufacturing Same and Products Containing the Same (Respondents);* U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Hearing

*Demaray LLC v. Samsung Electronics Co. Ltd., et al.:* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition, Supplemental Report, Deposition, Second Supplemental Report, Deposition, Trial

*Ningde Amperex Technology Limited v. Zhuhai CosMX Battery Co., Ltd., et al.;* U.S. District Court, Eastern District of Texas (Marshall), Initial Report, Rebuttal Expert Report, Deposition, Trial

*HID Global Corporation v. Vector Flow., et al.;* U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Trial

*Persawvere, Inc. v. Milwaukee Electric Tool, Corporation;* U.S. District Court, District of Delaware (Wilmington), Rebuttal Expert Report, Deposition, Trial

*Beacon Navigation GmbH v. Bayerische Motoren Werke AG; BMW of North America, LLC and BMW Manufacturing Co., LLC;* U.S. District Court, Southern District of Michigan, Expert Report, Deposition

*Plastipak Packaging, Inc. v. Nestlé Waters North America, Inc.;* U.S. District Court, Eastern District of Virginia (Alexandria), Opening Expert Report, Rebuttal Expert Report, Supplemental Expert Report, Supplemental Rebuttal Expert Report, Deposition

*Ollnova Technologies Limited v. ecobee Technologies, ULC d/b/a Ecobee;* U.S. District Court, Eastern District of Texas (Marshall), Rebuttal Expert Report, Deposition, Trial

*EIS, Inc. v. IntiHealth GER GmbH, et al.;* U.S. District Court, District of Delaware, Expert Report, Rebuttal Expert Report, Commercial Success Report, Reply Report, Trial

*BlueRadios, Inc. v. Kopin Corporation, Inc.;* U.S. District Court, District of Colorado (Denver), Rebuttal Expert Report, Deposition, Supplemental Rebuttal Expert Report, Deposition

*Bay Materials, LLC v. 3M Company;* U.S. District Court, District of Delaware (Wilmington), Declaration, Deposition, Commercial Success Report, Deposition

*Continuous Composites, Inc. v. Markforged, Inc.;* U.S. District Court, District of Delaware, Expert Report, Reply Report, Deposition

*Fate Therapeutics, Inc., et al. v. Shoreline Biosciences, Inc., et al.;* U.S. District Court, Southern District of California (San Diego), Rebuttal Expert Report, Deposition

*Delta Air Lines, Inc. v. Marriott International, Inc.;* U.S. District Court, Northern District of Georgia (Atlanta), Rebuttal Expert Report, Supplemental Rebuttal Report, Deposition



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
| --- |

*Textron Innovations Inc. v. <u>SZ DJI Technology Co., Ltd., et al.</u>;* U.S. District Court, Western District of Texas (Waco), Expert Report, Deposition, Supplemental Expert Report, Trial

*VoIP-Pal.com, Inc. v. <u>Verizon Communications Inc., et al</u>.;* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition

*Ragnarok Game, LLC and ESDFOS, LLC v. <u>ZeniMax Media Inc, et al.</u>;* Superior Court of the State of California, County of Los Angeles, Central District, Opening Expert Report, Rebuttal Expert Report, Deposition

*<u>DivX, LLC</u> v. Harman International Industries, Inc.;* New York Supreme Court, New York County, Expert Report, Rebuttal Expert Report, Deposition

*Shimon Maimon v. <u>Lockheed Martin Corporation</u>;* Judicial Arbitration and Mediation Services, Rebuttal Expert Report, Deposition, Arbitration

*WSOU Investments, LLC d/b/a Brazos Licensing and Development v. <u>ZTE Corporation</u>;* U.S. District Court, Western District of Texas (Waco), Rebuttal Expert Report, Deposition

*<u>Wonderland Switzerland AG</u> v. Evenflo Company, Inc.;* U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Supplemental Expert Report, Trial

*<u>NNCrystal US Corporation and The Board of Trustees of The University of Arkansas</u> v. Nanosys, Inc.;* U.S. District Court, District of Delaware, Expert Report, Reply Report, Deposition

*Pavemetrics Systems, Inc. v. <u>Tetra Tech, Inc. and Tetra Tech Tas Inc.</u>;* U.S. District Court, Central District of California (Los Angeles), Expert Report, Deposition, Trial

*<u>Global Tubing, LLC</u> v. Tenaris Coiled Tubes, LLC and Tenaris, S.A.;* U.S. District Court, Southern District of Texas (Houston), Expert Report, Deposition

*The Cookie Department, Inc. v. <u>The Hershey Company, One Brands, LLC</u>;* U.S. District Court, Northern District of California (Oakland), Rebuttal Expert Report, Deposition

*Unirac, Inc. v. <u>EcoFasten Solar, LLC and Esdec, Inc.</u>;* U.S. District Court, District of Delaware, Expert Reports, Deposition

*In the Matter of Certain Integrated Circuits, Chipsets, and Electronic Devices, and Products Containing the Same (<u>Respondents</u>);* U.S. International Trade Commission, Washington, D.C., Rebuttal Expert Report, Deposition



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

| CASE DESCRIPTION / TYPE OF TESTIMONY |
|---|

*In the Matter of Certain High-Density Fiber Optic Equipment and Components Thereof (Complainant)*; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing; Enforcement Proceeding - Expert Report, Supplement to the Expert Report, Deposition, 2nd Supplement to the Expert Report, 3rd Supplement to the Expert Report, Witness Statement, 4th Supplement to the Expert Report, Supplement to Witness Statement, Hearing

*Blue Mountain Holdings, Ltd., et al. v. Bliss Nutraceticals LLC, et al.*; U.S. District Court, Northern District of Georgia (Atlanta), Expert Report, Deposition

*Gibson Brands, Inc. v. Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC*; U.S. District Court, Eastern District of Texas (Sherman), Rebuttal Expert Report, Deposition, Supplemental Rebuttal Expert Report, Trial

*Conformis, Inc. v. Medacta USA, Inc. and Medacta International SA*; U.S. District Court, District of Delaware, Rebuttal Expert Report, Supplemental Rebuttal Expert Report, Deposition

*In the Matter of Certain Silicon Photovoltaic Cells and Modules with Nanostructures, and Products Containing Same (Respondents)*; U.S. International Trade Commission (Washington, D.C.), Expert Report, Deposition, Witness Statement, Hearing

*EcoFactor, Inc. v. Google LLC*; U.S. District Court, Western District of Texas (Waco), Expert Report, Deposition, Supplemental Report, Trial, Declaration

*G.W. Lisk Company, Inc. v. GITS Manufacturing Company*; U.S. District Court, Southern District of Iowa (Central); Expert Report, Reply Report, Deposition

*American Eagle Outfitters, Inc. and Retail Royalty Company v. Walmart, Inc.*; U.S. District Court, Western District of Pennsylvania (Pittsburgh), Expert Report, Rebuttal Report, Deposition

*Simply Wireless, Inc. v. T-Mobile US, Inc., et al.*; U.S. District Court, Eastern District of Virginia (Alexandria), Expert Report, Reply Report, Deposition, Sur-Sur Reply Report

*Gentex Corporation v. Galvion LTD and Galvion Inc.*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition

*Kirsch Research and Development, LLC v. DuPont de Nemours, Inc., FT Synthetics, Inc. and Atlas Roofing Corporation*; U.S. District Court, Eastern District of Texas (Texarkana), Expert Report, Deposition

*Malvern PanAnalytical Inc. v. TA Instruments-Waters LLC and Waters Technologies Corporation*; U.S. District Court, District of Delaware (Wilmington), Expert Report, Rebuttal Report, Reply Report, Deposition

*Finalrod IP, LLC v. Endurance Lift Solutions, Inc.*; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Deposition

*Pierce Manufacturing, Inc. and Oshkosh Corporation v. E-One, Inc. and REV Group, Inc.*; U.S. District Court, Middle District of Florida (Tampa), Declaration, Expert Report, Deposition, Trial



**W. Todd Schoettelkotte**
**Four Year List of Testimony**
**As of March 2024**

---

**CASE DESCRIPTION / TYPE OF TESTIMONY**

---

_Polar Electro Oy_ v. _Suunto Oy, et al._; U.S. District Court, District of Utah (Central), Expert Report, Deposition

_Wonderland Switzerland AG_ v. _Evenflo Company, Inc., et al._; U.S. District Court, District of Delaware (Wilmington), Expert Report, Reply Report, Deposition, Trial

_Lufkin Industries, Inc._ v. _International Business Machines Corporation, et al._; 159th Judicial District Court of Angelina County, Texas, Expert Report #1, Supplemental Report #1, Expert Report #2, Supplemental Report #2, Deposition

_The Hillman Group, Inc._ v. _KeyMe, LLC_; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Deposition #1, Consolidated Report, Deposition #2

_Team Worldwide Corporation_ v. _Academy, LTD d/b/a Academy Sports + Outdoors, et al._; U.S. District Court, Eastern District of Texas (Marshall), Expert Report, Rebuttal Report, Deposition #1, Deposition #2, Supplemental Report

_Nevro Corp._ v. _Boston Scientific Corporation, et al._; U.S. District Court, Northern District of California (San Francisco), Expert Report, Supplemental Report, Deposition, Declaration

_Carnegie Institution of Washington, et al._ v. _Pure Grown Diamonds, Inc., et al.;_ U.S. District Court, Southern District of New York (Foley Square), Expert Report, Supplemental Report, Deposition

_In the Matter of Certain High-Density Fiber Optic Equipment and Components Thereof (Complainant)_; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Witness Statement, Hearing

_Nissei ASB Co. and Nissei ASB Machine, Co., LTD._ v. _R&D Tool & Engineering Co._; U.S. District Court, Western District of Missouri (Western), Expert Report, Reply Report, Deposition

_Jager Pro Incorporated_ v. _Bull Creek Welding and Fabrication, Inc._; U.S. District Court, Eastern District of Arkansas (Central), Expert Report, Deposition

_CFA Institute_ v. _American Society of Pension Professionals & Actuaries, et al._; U.S. District Court, Western District of Virginia (Charlottesville), Expert Report, Deposition

_Legacy Separators, LLC, et al._ v. _Halliburton Energy Services, Inc., et al._; U.S. District Court, Southern District of Texas (Houston), Expert Report, Rebuttal Report, Deposition, Supplemental Report, Second Supplemental Report, Deposition #2, Trial

_Saracen LLC, Saracen Energy Power Advisors LP, Saracen Energy Advisors LP, collectively d/b/a The Saracen Group of Companies_ v. _Sylvain Ross and Marginal Unit, Inc._; U.S. District Court, Southern District of Texas (Houston), Expert Report, Supplemental Report, Second Supplemental Report, Third Supplemental Report, Revised Third Supplemental Report, Trial

_Innovation Sciences, LLC_ v. _HTC Corporation_; U.S. District Court, Eastern District of Texas (Sherman), Expert Report, Deposition

_In the Matter of Certain Digital Video Receivers, Broadband Gateways, and Related Hardware and Software Components (Respondents)_; U.S. International Trade Commission, Washington, D.C., Expert Report, Deposition, Hearing

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**   Schedule 2
**Documents and Other Information Considered**

| ARM_ | | ARM_ | | ARM_ | | ARM_ | | ARM_ | | ARM_ | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Begin | End | Begin | End | Begin | End | Begin | End | Begin | End | Begin | End |
| 00000003 | 00000003 | 00056882 | 00056894 | 00095579 | 00095579 | 01228039 | 01228039 | 01236610 | 01236612 | 01239464 | 01239464 |
| 00000017 | 00000018 | 00056900 | 00056909 | 00095580 | 00095580 | 01228040 | 01228040 | 01236613 | 01236615 | 01239465 | 01239465 |
| 00000019 | 00000021 | 00057479 | 00057481 | 00095789 | 00095790 | 01228041 | 01228041 | 01236616 | 01236617 | 01239466 | 01239466 |
| 00000022 | 00000023 | 00058159 | 00058163 | 00095791 | 00095791 | 01228042 | 01228042 | 01236618 | 01236644 | 01239467 | 01239469 |
| 00000045 | 00000045 | 00060458 | 00060512 | 00096011 | 00096011 | 01228043 | 01228043 | 01236645 | 01236653 | 01239470 | 01239470 |
| 00000244 | 00000381 | 00063607 | 00063610 | 00096692 | 00096715 | 01228044 | 01228044 | 01236654 | 01236666 | 01239471 | 01239471 |
| 00000382 | 00000509 | 00063692 | 00063693 | 00097388 | 00097420 | 01228045 | 01228045 | 01236667 | 01236670 | 01239472 | 01239472 |
| 00000510 | 00000632 | 00067288 | 00067289 | 00097527 | 00097528 | 01228046 | 01228046 | 01236671 | 01236677 | 01239473 | 01239473 |
| 00002198 | 00002202 | 00079507 | 00079514 | 00098968 | 00099018 | 01228047 | 01228047 | 01236678 | 01236682 | 01239474 | 01239474 |
| 00002226 | 00002230 | 00081942 | 00081944 | 00104678 | 00104678 | 01228048 | 01228048 | 01236683 | 01236683 | 01239475 | 01239475 |
| 00024810 | 00024810 | 00081945 | 00081947 | 00109518 | 00109560 | 01228049 | 01228049 | 01236684 | 01236690 | 01239476 | 01239476 |
| 00024815 | 00024815 | 00081962 | 00081963 | 00109734 | 00109750 | 01228050 | 01228050 | 01236691 | 01236697 | 01239477 | 01239477 |
| 00024817 | 00024817 | 00082714 | 00082716 | 00109778 | 00109778 | 01228051 | 01228051 | 01236698 | 01236699 | 01239478 | 01239478 |
| 00024819 | 00024819 | 00082717 | 00082717 | 00109791 | 00109803 | 01228052 | 01228052 | 01236700 | 01236702 | 01239479 | 01239479 |
| 00024820 | 00024820 | 00082925 | 00082937 | 00109806 | 00109819 | 01228053 | 01228053 | 01236703 | 01236707 | 01239483 | 01239483 |
| 00024825 | 00024825 | 00083356 | 00083356 | 00109822 | 00109852 | 01228054 | 01228054 | 01236708 | 01236710 | 01239485 | 01239485 |
| 00024826 | 00024826 | 00085677 | 00085677 | 00109865 | 00109865 | 01228055 | 01228055 | 01236711 | 01236730 | 01239486 | 01239486 |
| 00024837 | 00024837 | 00085679 | 00085679 | 00109982 | 00109985 | 01228056 | 01228056 | 01236731 | 01236733 | 01239488 | 01239488 |
| 00024838 | 00024838 | 00085680 | 00085680 | 00109991 | 00109991 | 01228057 | 01228057 | 01236734 | 01236739 | 01239490 | 01239490 |
| 00024841 | 00024841 | 00085682 | 00085682 | 00110165 | 00110168 | 01228058 | 01228058 | 01236740 | 01236742 | 01239493 | 01239493 |
| 00024844 | 00024844 | 00085687 | 00085687 | 00112064 | 00112067 | 01228059 | 01228059 | 01236743 | 01236744 | 01239495 | 01239495 |
| 00024851 | 00024851 | 00086088 | 00086088 | 00118835 | 00118938 | 01228060 | 01228060 | 01237617 | 01237617 | 01239504 | 01239504 |
| 00032604 | 00032604 | 00086164 | 00086245 | 00120302 | 00120303 | 01228061 | 01228061 | 01238999 | 01239003 | 01239789 | 01240096 |
| 00032650 | 00032654 | 00086247 | 00086251 | 00120530 | 00120536 | 01228062 | 01228062 | 01239440 | 01239440 | 01240202 | 01240203 |
| 00037713 | 00037713 | 00086285 | 00086293 | 01215343 | 01215344 | 01228063 | 01228063 | 01239441 | 01239441 | 01240204 | 01240225 |
| 00037718 | 00037718 | 00086829 | 00086837 | 01215409 | 01215409 | 01228064 | 01228064 | 01239442 | 01239442 | 01240226 | 01240236 |
| 00037729 | 00037729 | 00087367 | 00087371 | 01215423 | 01215423 | 01228065 | 01228065 | 01239443 | 01239443 | 01240237 | 01240280 |
| 00040078 | 00040080 | 00087449 | 00087449 | 01215632 | 01215633 | 01228066 | 01228066 | 01239444 | 01239444 | 01240281 | 01240282 |
| 00040237 | 00040241 | 00087451 | 00087451 | 01215634 | 01215653 | 01228073 | 01228073 | 01239445 | 01239445 | 01240283 | 01240304 |
| 00040283 | 00040285 | 00087699 | 00087702 | 01215997 | 01216001 | 01228074 | 01228074 | 01239446 | 01239446 | 01240305 | 01240307 |
| 00040289 | 00040306 | 00087854 | 00087856 | 01226630 | 01226706 | 01228075 | 01228075 | 01239447 | 01239447 | 01240308 | 01240325 |
| 00044650 | 00044692 | 00087936 | 00087937 | 01228026 | 01228026 | 01232495 | 01232512 | 01239448 | 01239448 | 01240326 | 01240353 |
| 00045250 | 00045253 | 00088045 | 00088303 | 01228027 | 01228027 | 01233718 | 01233718 | 01239449 | 01239449 | 01240354 | 01240381 |
| 00045262 | 00045264 | 00088371 | 00088386 | 01228028 | 01228028 | 01235135 | 01235137 | 01239450 | 01239450 | 01240382 | 01240391 |
| 00045266 | 00045276 | 00088390 | 00088408 | 01228029 | 01228029 | 01235144 | 01235144 | 01239451 | 01239451 | 01240392 | 01240412 |
| 00045334 | 00045335 | 00088655 | 00088655 | 01228030 | 01228030 | 01235148 | 01235148 | 01239452 | 01239452 | 01240413 | 01240437 |
| 00045393 | 00045393 | 00088656 | 00088684 | 01228031 | 01228031 | 01235149 | 01235149 | 01239453 | 01239453 | 01240438 | 01240447 |
| 00051071 | 00051073 | 00088892 | 00088903 | 01228032 | 01228032 | 01236577 | 01236579 | 01239454 | 01239457 | 01240448 | 01240448 |
| 00051088 | 00051088 | 00088906 | 00088918 | 01228033 | 01228033 | 01236580 | 01236580 | 01239458 | 01239458 | 01240449 | 01240469 |
| 00052794 | 00052816 | 00092674 | 00092679 | 01228034 | 01228034 | 01236581 | 01236587 | 01239459 | 01239459 | 01240470 | 01240507 |
| 00056424 | 00056433 | 00092784 | 00092787 | 01228035 | 01228035 | 01236588 | 01236593 | 01239460 | 01239460 | 01240508 | 01240526 |
| 00056439 | 00056441 | 00094543 | 00094545 | 01228036 | 01228036 | 01236594 | 01236595 | 01239461 | 01239461 | 01241187 | 01241187 |
| 00056519 | 00056529 | 00095370 | 00095449 | 01228037 | 01228037 | 01236596 | 01236604 | 01239462 | 01239462 | 01241589 | 01241589 |
| 00056538 | 00056552 | 00095578 | 00095578 | 01228038 | 01228038 | 01236605 | 01236609 | 01239463 | 01239463 | 01241597 | 01241598 |

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
**Documents and Other Information Considered**

Schedule 2

| ARM_ Begin | ARM_ End | ARM_ Begin | ARM_ End | QCARM_ Begin | QCARM_ End | QCARM_ Begin | QCARM_ End | QCARM_ Begin | QCARM_ End |
|---|---|---|---|---|---|---|---|---|---|
| 01241616 | 01241620 | 01271927 | 01271928 | 0550518 | 0550529 | 3438074 | 3438074 | 3536902 | 3536905 |
| 01243410 | 01243629 | 01271929 | 01271953 | 0557206 | 0557207 | 3438075 | 3438113 | 3536921 | 3536933 |
| 01243875 | 01243995 | 01281879 | 01281879 | 0569461 | 0569494 | 3438114 | 3438152 | 3537376 | 3537378 |
| 01245599 | 01245617 | 01282466 | 01282575 | 0584330 | 0584332 | 3438153 | 3438193 | 3537713 | 3537715 |
| 01245618 | 01245618 | 01286878 | 01286998 | 0591730 | 0591732 | 3438194 | 3438234 | 3537773 | 3537776 |
| 01245619 | 01245640 | 01291202 | 01291202 | 0591733 | 0591736 | 3438235 | 3438275 | 3839896 | 3839911 |
| 01245641 | 01245672 | 01292638 | 01292644 | 0591737 | 0591740 | 3452409 | 3452442 | 3920067 | 3920067 |
| 01245673 | 01245703 | 01292866 | 01292866 | 0591741 | 0591745 | 3452662 | 3452664 | 7434227 | 7434227 |
| 01245704 | 01245705 | 01292867 | 01292914 | 0592425 | 0592431 | 3452665 | 3452667 | 7434228 | 7434229 |
| 01245706 | 01245719 | 01294035 | 01294036 | 2414807 | 2414813 | 3452668 | 3452672 | 7505464 | 7505464 |
| 01245720 | 01245726 | 01294037 | 01294038 | 2417783 | 2417783 | 3452720 | 3452723 | | |
| 01245727 | 01245755 | 01296809 | 01296825 | 2423231 | 2423233 | 3452805 | 3452807 | | |
| 01245756 | 01245793 | 01305479 | 01305479 | 2424464 | 2424466 | 3453808 | 3453810 | | |
| 01245794 | 01245813 | 01305515 | 01305515 | 2424496 | 2424498 | 3453866 | 3453868 | | |
| 01245814 | 01245837 | 01305785 | 01305789 | 2424621 | 2424623 | 3453870 | 3453872 | | |
| 01245838 | 01245848 | 01309668 | 01309669 | 2425046 | 2425048 | 3453873 | 3453874 | | |
| 01245849 | 01245890 | 01311070 | 01311084 | 2425297 | 2425299 | 3453875 | 3453877 | | |
| 01245891 | 01245914 | 01425186 | 01425186 | 2426801 | 2426803 | 3453879 | 3453881 | | |
| 01245915 | 01245938 | 01426109 | 01426156 | 2426804 | 2426806 | 3454302 | 3454304 | | |
| 01245939 | 01245940 | 01427450 | 01427492 | 2426807 | 2426814 | 3457104 | 3457104 | | |
| 01245941 | 01245978 | 01427493 | 01427522 | 2426815 | 2426821 | 3460229 | 3460233 | | |
| 01245979 | 01246020 | 01427523 | 01427537 | 2426822 | 2426836 | 3460451 | 3460453 | | |
| 01246021 | 01246042 | | | 2426837 | 2426852 | 3474751 | 3474828 | | |
| 01246043 | 01246066 | | | 2426853 | 2426855 | 3519910 | 3519912 | | |
| 01246067 | 01246085 | | | 2426856 | 2426881 | 3520810 | 3520812 | | |
| 01246086 | 01246111 | | | 2426882 | 2426882 | 3520813 | 3520815 | | |
| 01246112 | 01246134 | | | 2426883 | 2426884 | 3520816 | 3520818 | | |
| 01246135 | 01246157 | | | 2426887 | 2426887 | 3520819 | 3520821 | | |
| 01246158 | 01246194 | | | 2426888 | 2426888 | 3520822 | 3520825 | | |
| 01246195 | 01246197 | | | 2426889 | 2426891 | 3520826 | 3520829 | | |
| 01246198 | 01246224 | | | 2426892 | 2426894 | 3520830 | 3520834 | | |
| 01246225 | 01246227 | | | 2426895 | 2426897 | 3522610 | 3522611 | | |
| 01250306 | 01250306 | | | 2554114 | 2554116 | 3522895 | 3522902 | | |
| 01250307 | 01250307 | | | 3241389 | 3241393 | 3526546 | 3526553 | | |
| 01259704 | 01259704 | | | 3337797 | 3337799 | 3535535 | 3535535 | | |
| 01259705 | 01260105 | | | 3400486 | 3400548 | 3535536 | 3535536 | | |
| 01260121 | 01260391 | | | 3404294 | 3404353 | 3536628 | 3536629 | | |
| 01260418 | 01260686 | | | 3426632 | 3426638 | 3536886 | 3536888 | | |
| 01262030 | 01262366 | | | 3429791 | 3429872 | 3536889 | 3536891 | | |
| 01266931 | 01266990 | | | 3434164 | 3434165 | 3536892 | 3536894 | | |
| 01266995 | 01267070 | | | 3437962 | 3438003 | 3536895 | 3536897 | | |
| 01271909 | 01271926 | | | 3438004 | 3438037 | 3536898 | 3536901 | | |

| MASA_ Begin | MASA_ End |
|---|---|
| 00001719 | 00001724 |

| QCARM_ Begin | QCARM_ End |
|---|---|
| 0002821 | 0002823 |
| 0002825 | 0002827 |
| 0275507 | 0275543 |
| 0275743 | 0275763 |
| 0337839 | 0337855 |
| 0337857 | 0337899 |
| 0338297 | 0338311 |
| 0338573 | 0338576 |
| 0343120 | 0343142 |
| 0343143 | 0343222 |
| 0343533 | 0343587 |
| 0343954 | 0343976 |
| 0363482 | 0363482 |

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
**Documents and Other Information Considered**

Schedule 2

| Legal Documents and Related Exhibits |
| --- |
| 2022-08-31 - Complaint |
| 2022-09-30 - Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Counterclaim |
| 2022-10-26 - Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim |
| 2023-02-27 - Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Interrogatories, Nos. 1-11 |
| 2023-02-27 - Arm Ltd.'s Objections and Responses to Qualcomm's First Set of Requests for Production, Nos. 1-36 |
| 2023-02-27 - Defendants' Responses and Objections to Plaintiff's First Set of Interrogatories, Nos. 1-13 |
| 2023-02-27 - Defendants' Responses and Objections to Plaintiff's First Set of Requests for Production, Nos. 1-51 |
| 2023-04-04 - Arm Ltd.'s First Amended Objections and Responses to Qualcomm's First Set of Requests for Production, Nos. 1-36 |
| 2023-04-26 - Corrected Second Amended Complaint for Willful Patent Infringement |
| 2023-05-04 - Defendants' Responses and Objections to Plaintiff's Second Set of Requests for Production, Nos. 52-58 |
| 2023-05-05 - Arm Ltd.'s First Objection and Responses to Qualcomm's Second Set of Requests for Production, Nos 37-50 |
| 2023-06-23 - Defendants' First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, Nos. 1-4 and 6 |
| 2023-07-14 - Arm Ltd.'s First Objection and Responses to Qualcomm's Third Set of Requests for Production, Nos. 51-54 |
| 2023-08-23 - Defendants' Responses and Objections to Plaintiff's Third Set of Requests for Production, Nos. 59-122 |
| 2023-10-02 - Arm Ltd.'s Objections and Responses to Qualcomm's Second Set of Interrogatories, Nos. 12-19 |
| 2023-10-02 - Plaintiff Arm Ltd.'s Objections and Responses to Defendant Qualcomm's Fourth Set of Requests for Production, Nos. 55-70 |
| 2023-10-20 - Defendants' Responses and Objections to Plaintiff's First Set of Requests for Admission, Nos. 1-30 |
| 2023-10-26 - Defendants' Supplemental and Amended Response and Objections to Plaintiff's First Set of Interrogatories, No. 5 |
| 2023-10-26 - Correspondence Email from J. Braly to J. Li |
| 2023-10-27 - Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories |
| 2023-11-09 - Arm Ltd.'s Objections and Responses to Qualcomm's Third Set of Interrogatories, No. 20 |
| 2023-11-17 - Arm Ltd.'s First Supplemental Objections and Responses to Qualcomm's Second Set of Interrogatories, Nos. 12-19 |
| 2023-11-17 - Arm Ltd.'s Objections and Responses to Qualcomm's Fourth Set of Interrogatories, Nos. 21-25 |
| 2023-11-17 - Arm Ltd.'s Second Supplemental Objections and Responses to Qualcomm's First Set of Interrogatories, Nos. 1-11 |
| 2023-11-17 - Arm Ltd.'s Supplemental Objections and Responses to Qualcomm's Third Set of Interrogatories, No. 20 |
| 2023-11-17 - Defendants' First Supplemental Reponses and Objections to Plaintiff's Second Set of Interrogatories, Nos. 15-16 |
| 2023-11-17 - Defendants' Responses and Objections to Plaintiff's Fourth Set of Requests for Production, No. 123 |
| 2023-11-17 - Plaintiff Arm Ltd.'s Objection and Responses to Defendant Qualcomm's Fifth Set of Requests for Production, Nos. 71-124 |
| 2023-11-17 - Plaintiff Arm Ltd.'s Responses and Objections to Qualcomm's First Requests for Admissions to Plaintiff, Nos. 1-30 |

| Deposition Transcripts and Related Exhibits | | | |
| --- | --- | --- | --- |
| 2023-09-22 - Rohit Singh | 2023-11-02 - Lynn Couillard | 2023-11-28 - Jim Thompson | 2023-12-08 - Jonathan Armstrong |
| 2023-10-12 - Manu Gulati | 2023-11-03 - Gerard Williams | 2023-11-28 - Michael Roberts | 2023-12-12 - Rene Haas |
| 2023-10-20 - Ramakrishna Chunduru | 2023-11-08 - Ziad Asghar | 2023-11-29 - Lynn Bos | 2023-12-14 - Vivek Agrawal |
| 2023-10-25 - Jignesh Trivedi | 2023-11-09 - Paul Williamson | 2023-11-30 - Karthik Shivashankar | 2023-12-14 - Laura Sand |
| 2023-10-25 - Tim Herbert | 2023-11-15 - Christiano Amon | 2023-12-01 - Pradeep Kanapathipillai | 2023-12-19 - Christine Tran |
| 2023-10-27 - Nitin Sharma | 2023-11-15 - Richard Grisenthwaite | 2023-12-07 - Mark Werkheiser | 2023-12-20 - Ian Thornton |
| 2023-10-27 - Will Abbey | 2023-11-16 - Simon Segars | 2023-12-08 - Geeta Balakrishnan | |

| Expert Reports |
| --- |
| 2024-02-27 - Expert Report of Patrick F. Kennedy, PhD. |

| Publicly Available Information/Other |
| --- |
| Ampere's Second Mot. for Protective Order |
| Arm Holdings plc Amendment No. 2 to Form F-1, September 5, 2023 |
| Arm Holdings plc Form 424(b)(4), September 14, 2023 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**

**Documents and Other Information Considered**

Schedule 2

| Publicly Available Information/Other (cont.) |
| --- |

Arm Holdings plc FQ2 2024 Earnings Call Transcripts, November 8, 2023
Arm Holdings plc FQ3 2024 Earnings Call Transcripts, February 7, 2024
Arm Holdings plc FQ3 2024 Results Presentation, February 7, 2024
Arm Holdings plc Q2 FY 2024 Key Financial Data
Arm Holdings plc Q2 FY 2024 Shareholder Letter
Arm Holdings plc Q3 FY 2024 Key Financial Data
Arm Holdings plc Q3 FY 2024 Shareholder Letter
Bhandarkar, Dileep, and Douglas W. Clark. "Performance from architecture: comparing a RISC and a CISC with similar hardware organization." Proceedings of the fourth international conference on Architectural support for programming languages and operating systems. 1991
Hearing Transcript, September 29, 2023
https://9to5mac.com/2019/11/15/three-former-apple-execs-create-new-chip-company-will-compete-with-intel-and-amd/
https://aws.amazon.com/what-is/cpu/
https://community.fs.com/article/what-is-a-server-cpu.html
https://download.intel.com/newsroom/kits/40thanniversary/pdfs/What_is_a_Microprocessor.pdf
https://futurumgroup.com/about-us/who-we-are/
https://futurumgroup.com/insights/qualcomm-snapdragon-x-elite-and-oryon-cpu-aim-to-disrupt-the-pc-market/
https://hbr.org/2022/08/in-uncertain-times-the-best-strategy-is-adaptability
https://investor.qualcomm.com/segments/qct
https://investors.arm.com/static-files/187d293b-42eb-48b0-b82f-e78bce4da9e4
https://medium.com/silicon-reimagined/performance-delivered-a-new-way-8f0f5ed283d5
https://mixed-news.com/en/samsung-xr-devices-will-use-google-and-qualcomm-tech/
https://newsroom.arm.com/news/arm-announces-closing-of-initial-public-offering
https://nvidianews.nvidia.com/news/nvidia-introduces-grace-cpu-superchip
https://pc-tablet.com/qualcomm-throws-down-the-gauntlet-snapdragon-xr2-gen-2-challenges-apples-vision-pro-in-mixed-reality-race/
https://podcasts.apple.com/us/podcast/qualcomm-ceo-on-what-he-really-thinks-of-apple/id1091374076?i=1000565773375)
https://seekingalpha.com/article/4422252-qualcomm-incorporateds-qcom-ceo-steve-mollenkopf-on-q2-2021-results-earnings-call-transcript
https://semiengineering.com/knowledge_centers/integrated-circuit/ic-types/processors/central-processing-unit-cpu/
https://support.microsoft.com/en-us/windows/common-pc-and-device-terms-4542f069-4cf7-431a-bb6b-c6cbdbe3e6e9
https://techcrunch.com/2020/09/24/nuvia-series-b
https://viewpoint.pwc.com/dt/us/en/pwc/pwc_sec_volume/pwc_sec_volume_US/8000_registration_an_US/sec_8110_form_f1_US.html#pwc-topic.dita_fb3ce65d-0b9d-4db7-92ff-4e1fd99ba885
https://web.archive.org/web/20210115193713/https://nuviainc.com/
https://web.archive.org/web/20210316180114/https://nuviainc.com/
https://web.archive.org/web/20210422062904/https://nuviainc.com/nuvia-raises-53-million-to-reimagine-silicon-design-for-the-data-center/
https://www.americanbar.org/groups/tort_trial_insurance_practice/committees/automobile-litigation/safety_regulatory_considerations/
https://www.androidauthority.com/mobile-processors-2022-2741344/
https://www.arm.com/architecture/cpu
https://www.arm.com/glossary/adas
https://www.arm.com/glossary/connected-devices
https://www.arm.com/glossary/cpu
https://www.arm.com/glossary/iot-devices
https://www.arm.com/glossary/isa
https://www.arm.com/glossary/risc
https://www.arm.com/glossary/smart-devices
https://www.arm.com/glossary/soc-development
https://www.arm.com/partners

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**
Schedule 2
**Documents and Other Information Considered**

| Publicly Available Information/Other (cont.) |
| --- |
| https://www.cnbc.com/2022/09/01/why-arms-lawsuit-against-qualcomm-is-a-big-deal.html |
| https://www.cnbc.com/2023/09/14/arm-ipo-what-is-risc-v-and-why-does-arm-call-the-rival-product-a-risk.html |
| https://www.cnbc.com/2023/11/09/how-arm-gained-chip-dominance-with-apple-nvidia-amazon-and-qualcomm.html |
| https://www.cnet.com/tech/computing/qualcomms-pc-chip-could-mean-windows-pcs-as-good-as-apple-macbooks/ |
| https://www.currency.me.uk/convert/gbp/usd |
| https://www.digitaltrends.com/computing/what-is-a-cpu/ |
| https://www.eweek.com/servers/cavium-introduces-thunderx2-arm-server-chip-for-data-center-systems/ |
| https://www.forbes.com/sites/jonmarkman/2023/12/05/qualcomms-x-elite-crushes-apple-arm-holdings-stocks-surge/?sh=5f330d9e7d04 |
| https://www.forbes.com/sites/startswithabang/2018/02/13/chaos-theory-the-butterfly-effect-and-the-computer-glitch-that-started-it-all/?sh=4b460bee69f6 |
| https://www.ftc.gov/system/files/documents/cases/d09404_part_3_complaint_public_version.pdf |
| https://www.gigabyte.com/Article/server-processors-the-core-of-a-server-s-performance |
| https://www.gigabyte.com/Glossary/cisc |
| https://www.globenewswire.com/news-release/2019/11/15/1948072/0/en/NUVIA-Raises-53-Million-to-Reimagine-Silicon-Design-for-the-Data-Center.html |
| https://www.intel.com/content/www/us/en/newsroom/resources/moores-law.html |
| https://www.intel.com/content/www/us/en/products/docs/processors/xeon/server-processor-overview.html |
| https://www.intel.com/content/www/us/en/support/articles/000056236/intel-nuc.html |
| https://www.investopedia.com/articles/markets/012216/worlds-top-10-semiconductor-companies-tsmintc.asp |
| https://www.lenovo.com/us/en/glossary/cpu-core/ |
| https://www.lenovo.com/us/en/glossary/instruction-set-architecture/ |
| https://www.lenovo.com/us/en/glossary/x86/ |
| https://www.linkedin.com/in/ivan-knez/ |
| https://www.linkedin.com/in/peter-greenhalgh-8900789b/ |
| https://www.linkedin.com/in/shultzwang/ |
| https://www.linkedin.com/in/todd-lepinski-ababaa9/ |
| https://www.mckinsey.com/featured-insights/mckinsey-explainers/what-is-the-internet-of-things |
| https://www.pcmag.com/news/qualcomm-snapdragon-x-elite-oryon-chip-tests |
| https://www.pcworld.com/article/1382740/qualcomm-dubs-nuvia-cpu-oryon-on-track-for-2023.html |
| https://www.precedenceresearch.com/microprocessor-market |
| https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/M29QualcommPDFa.pdf |
| https://www.qualcomm.com/news/onq/2013/06/mobile-processors-101-why-smartphones-are-smarter-all-one-processor |
| https://www.qualcomm.com/news/onq/2022/11/qualcomm-oryon-custom-cpu-at-center-of-next-gen-premium-experiences-on-snapdragon-platforms |
| https://www.qualcomm.com/news/releases/2005/11/qualcomm-introduces-worlds-most-advanced-mobile-microprocessor |
| https://www.qualcomm.com/news/releases/2021/01/qualcomm-acquire-nuvia |
| https://www.qualcomm.com/news/releases/2021/03/qualcomm-completes-acquisition-nuvia |
| https://www.qualcomm.com/news/releases/2023/10/qualcomm-unleashes-snapdragon-x-elite--the-ai-super-charged-plat |
| https://www.qualcomm.com/products |
| https://www.qualcomm.com/products/technology/processors |
| https://www.qualcomm.com/research/extended-reality |
| https://www.qualcomm.com/snapdragon/overview |
| https://www.sec.gov/files/reada10k.pdf |
| https://www.techspot.com/article/1856-aiming-for-atoms-chip-manufacturing/ |
| https://www.telink-semi.com/system-on-chip/ |
| https://www.tomshardware.com/news/arm-based-cpus-set-to-double-notebook-pc-market-share-by-2027 |
| https://www.tomshardware.com/pc-components/cpus/arm-pc-market-share-shrinks-mercury-research |
| https://www.tomshardware.com/reviews/glossary/soc-system-on-chip-definition,5890.html |
| https://www.wired.com/story/apples-new-macbook-pro-chips-flex-power-custom-silicon/ |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Arm Ltd. v. Qualcomm, Inc., Qualcomm Technologies, Inc. and Nuvia, Inc.**

Schedule 2

**Documents and Other Information Considered**

| Publicly Available Information/Other (cont.) |
|---|

NuVia, Inc., Private Company Profile, S&P Capital IQ

Nvidia-Arm, A report to the Secretary of State for Digital, Culture, Media & Sport on the anticipated acquisition by NVIDIA Corporation of Arm Limited, July 20, 2021

Performance from Architecture: Comparing a RISC and a CICS with Similar Hardware Organization, Bhandarkar & Clark

Qualcomm Inc. Form 10-K for the fiscal year ended September 24, 2023

Qualcomm Inc. Form 10-K for the fiscal year ended September 26, 2021

Qualcomm Incorporated FQ1 2024 Earnings Call Transcripts, January 31, 2024

Qualcomm Incorporated, Form 10-K for fiscal year ended September 24, 2023

Reference Manual on Scientific Evidence, Federal Judicial Center and National Research Council of the National Academies

S&P Capital IQ, Infineon Technologies AG Transaction Details, Merger/Acquisition: Cypress Semiconductor Corporation

S&P Capital IQ, Nuvia, Inc. Transaction Details, Merger/Acquisition: Qualcomm Technologies, Inc.

S&P Capital IQ, Nuvia, Inc. Transaction Details, Private Placement: Mayfield Fund, LLC

The Sedona Conference, Commentary on Monetary Remedies in Trade Secret Litigation, 24 SEDONA CONF. J. 349 (2023)

Weil, Roman L., et al. Litigation Services Handbook: The Role of the Financial Expert, 6th Edition, Wiley, 2017



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY