**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARM LTD., a U.K. corporation, | |
| Plaintiff, | |
| v. | C.A. No. 22-1146-MN |
| QUALCOMM INC., a Delaware corporation, QUALCOMM TECHNOLOGIES, INC., a Delaware corporation, and NUVIA, INC., a Delaware corporation, | **REDACTED - PUBLIC VERSION** **(Filed August 16, 2024)** |
| Defendants. | |

**DECLARATION OF MICHAEL J. DESTEFANO IN SUPPORT OF ARM LTD.'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Michael J. DeStefano, declare as follows:

1.      I am an attorney with the law firm of Morrison & Foerster LLP ("Morrison & Foerster"), counsel for Plaintiff Arm Ltd. ("Arm") in the above-referenced action.

2.      I submit this declaration in support of Arm's Opposition to Defendants' Motion for Summary Judgment.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of a Qualcomm press release titled, "Snapdragon X Series is the Exclusive Platform to Power the Next Generation of Windows PCs with Copilot+ Today," dated May 20, 2024.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of Defendants' First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 1-4 and 6), dated June 23, 2023.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of Defendants' Supplemental and Amended Response and Objections to Plaintiff's First Set of Interrogatories (No. 5), dated October 26, 2023.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of an Email from Ziad Asghar to Paul Williamson, dated March 31, 2021.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the deposition transcript of Pradeep Kanapathipillai, taken on December 1, 2023.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the Novation Agreement, dated April 17, 2017, produced by Plaintiffs with Bates number ARM_01296540.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of a Consent Letter, dated June 19, 2015, produced by Plaintiffs with Bates number ARM_01296542.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of the deposition transcript of Simon Segars, taken on November 16, 2023.

11.      Attached hereto as **Exhibit 9** is a true and correct copy of the deposition transcript of Christine Cong Tran, taken on December 19, 2023.

12.      Attached hereto as **Exhibit 10** is a true and correct copy of an email from a Sender Unspecified to Manu Gulati and Ziad Asghar, dated January 19, 2022, produced by Defendants with Bates number QCARM_2417783.

13.      Attached hereto as **Exhibit 11** is a true and correct copy of the deposition transcript of Ziad Asghar, taken on November 8, 2023.

14.      Attached hereto as **Exhibit 12** is a true and correct copy of an excerpt from the Arm Architecture Reference Manual, or the "Arm ARM."

15.     Attached hereto as **Exhibit 13** is a true and correct copy of the definition of "embody" from Dictionary.com.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of a letter from Spencer Collins of Arm to Ann Chaplin of Qualcomm Inc., dated April 29, 2022, produced by Defendants with Bates number QCARM_2429057.

17.     Attached hereto as **Exhibit 15** is a true and correct copy of a letter from Spencer Collins of Arm to Ann Chaplin of Qualcomm Inc., dated August 2, 2022, produced by Defendants with Bates number QCARM_01242845.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of August, 2024 at Miami, Florida.

*/s/ Michael J. DeStefano*
Michael J. DeStefano

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 7, 2024, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Madalyn G. Vaughn
Jacob A. Braly
Alexander M. Butwin
Samantha Mehring
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
mvaughn@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com
smehring@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Anna P. Lipin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
alipin@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*

2

# Exhibit 1

 **Qualcomm**

Products ⌄    Developer ⌄    Support ⌄    Company ⌄    🔍        


**Back to All**

🗗 **PRESS NOTE**

# Snapdragon X Series is the Exclusive Platform to Power the Next Generation of Windows PCs with Copilot+ Today

May 20, 2024    SAN DIEGO

f    in    𝕏







**Highlights:**

- Snapdragon X Elite and Snapdragon X Plus are powering the launch of a new category of devices delivering Microsoft Copilot+ PC experiences.

- PCs with Snapdragon X Elite and X Plus deliver, multiple days of battery life, unparalleled performance plus efficiency to accelerate productivity and creativity with unique AI

Feedback

Qualcoɱɱ

- The first wave of over 20 Copilot+ PCs powered by Snapdragon X Elite and Snapdragon X Plus were announced today from leading global OEMs including Acer, ASUS, Dell, HP, Lenovo, Microsoft, and Samsung. Devices are available for pre-order now and can be purchased from major retailers starting June 18.

During the Copilot+ debut, Microsoft and global OEMs announced PCs powered by Snapdragon® X Elite and Snapdragon® X Plus – the only devices that are capable of bringing Copilot+ experiences to life today. The leading AI technology and performance efficiency of these platforms will power this groundbreaking new category, as Copilot+ revolutionizes how users interact with their PCs. Together, Qualcomm Technologies, Inc. and Microsoft are taking intelligent computing to the next level and transforming the PC experience.

Qualcomm Technologies is restoring performance leadership to the Windows PC ecosystem with our leading NPU powered by Snapdragon X Elite which delivers the highest NPU performance per watt for laptops, up to 2.6X vs. M3 and up to 5.4X vs. Core Ultra 7[1]. With the integrated Qualcomm® Hexagon™ NPU architecture, it can deliver up to 24 TOPS/watt peak performance in uses cases like Super Resolution[2] and with our leading Qualcomm Oryon™ CPU, Snapdragon X Elite leads in performance per watt, matching competitor peak PC CPU performance at 60% less power[3].

"It's a new era for the PC and our collaboration with Microsoft combines the power of Snapdragon X Series with the power of Copilot+ to deliver groundbreaking AI capabilities that are redefining the personal computing experience – all with industry-leading performance and

Qualcomm

launched the first Copilot+ PCs exclusively powered by Snapdragon X Series in a variety of form factors and at multiple price points. We're proud to enable this industry shift, which puts Windows PCs at the forefront of technology and allows users to push the boundaries of what's possible across productivity, creativity, and entertainment."

"Copilot+ PCs powered by Qualcomm's Snapdragon X Series deliver performance per watt leadership to the Windows ecosystem while also powering groundbreaking AI experiences and exceptional battery life" said Pavan Davuluri, Corporate Vice President, Windows + Devices for Microsoft. "This is an inflection point for the Windows PC ecosystem, enabled by our deep partnership with Qualcomm. I am thrilled to be able to launch innovative Copilot+ PCs experiences and devices with Snapdragon, including Surface, that have leading performance and energy efficiency."



**Qualcomm**          ⌄          ⌄          ⌄          ⌄

- **Acer** unveils the Swift 14 AI, offering new AI experiences to support everyday computing tasks. Combining the powerful Snapdragon X Series platforms, Copilot+ capabilities in Windows 11, and solutions such as Acer PurifiedView 2.0 and Acer PurifiedVoice 2.0, the Swift 14 AI seamlessly utilizes AI to elevate productivity and creativity. It offers an option with a 2.5K touchscreen display for immersive visuals and stands out with a Copilot+ PC-exclusive design, featuring a unique AI logo on the cover and an Activity Indicator on the touchpad.

- **ASUS** incorporating Snapdragon X Elite and X Plus into the ASUS Vivobook S 15 signifies a paradigm shift in personal computing, delivering unprecedented AI power and efficiency. As a result of integrated 45 NPU TOPS and an unmatched 45W TDP, supported by ASUS IceCool Thermal technology, users will enjoy lightning-fast on-device AI processing, enabling Copilot+ PC next-gen AI-powered features. The ASUS Vivobook S 15 offers more than 18 hours of uninterrupted productivity, despite its 15.6-inch 3K 120 Hz OLED display. All this is combined with a slim form factor and a full set of I/O ports, making it a versatile on-the-go companion. More info about the ASUS Vivobook S 15 is available here.

- **Dell** now offers five new laptops powered by Snapdragon X Elite and Snapdragon X Plus. With a comprehensive portfolio for consumer and commercial, XPS 13, Inspiron 14 Plus, Inspiron 14, Latitude 7455 and Latitude 5455 deliver exceptional speed and AI performance, and groundbreaking battery life to elevate computing and simplify tasks. The new devices also feature

Feedback

Qualcomm

- HP's next gen AI PCs are designed and engineered around the Snapdragon X Elite [processor](#) and its dedicated Neural Processing Unit (NPU), capable of 45 trillion operations per second (TOPS), to run language models and generative AI locally on the device. The HP OmniBook X AI PC and HP EliteBook Ultra AI PC deliver more power in sleek, ultra-thin, and cool form factors that harness the most powerful AI PC technologies with up to 26 hours of battery life, rapid charging, and AI optimization on device for greater productivity. The HP EliteBook Ultra also delivers additional features for commercial customers, including Wolf Pro Security Next Gen Antivirus (NGAV) designed to protect the PC down to the firmware level with hardware security features that shield user credentials and other critical data, Microsoft Secured-Core PC designation (a chip-to-cloud security technology that provides secure identity, secure attestation, and cryptographic services), and a three-year warranty. You can pre-order the Omnibook X [here](#), and find the EliteBook Ultra [here](#).

- **Lenovo** introduced the Lenovo Yoga Slim 7x and Lenovo ThinkPad T14s Gen 6, its first AI PCs powered by Snapdragon X Elite. These laptops offer top PC performance per watt and fast NPU-based AI processing up to 45 trillion operations per second (TOPS). Windows 11 and Copilot+ enhancements enable access to LLM capabilities offline, enhancing creativity, productivity and security. The Yoga Slim 7x and ThinkPad T14s Gen 6 deliver innovative AI PC features, ensuring futuristic and streamlined consumer and business user experiences. Find out more about Lenovo's latest AI PCs [here](#).

Feedback

Qualcoмм  ⌄     ⌄     ⌄     ⌄

bezels, a brilliant touchscreen display, AI-enhanced camera, and a haptic touchpad. It delivers incredible performance, ultra-long battery life and all-new AI experiences powered by Snapdragon X Elite and Snapdragon X Plus processors. Customers get a choice between a 13.8″ and 15″ display and four stunning colors. The all-new Surface Pro is the most flexible 2-in-1 laptop, now reimagined with more speed and battery life for all-new AI experiences, powered by X Elite and X Plus. It introduces a new, optional OLED with HDR display, and ultrawide field of view camera perfect for Windows Studio Effects. The new Surface Pro Flex Keyboard allows you to position your Surface Pro and keyboard where they suit you, designed to be used both attached or detached. Visit here to learn more.

- **Samsung**: Samsung Galaxy Book4 Edge is equipped with cutting-edge hybrid AI integrations, and powered by the fastest, most powerful Snapdragon X Elite for laptops backed by 45 TOPS NPU computing power. This device joins the most hyperconnected Galaxy AI ecosystem. With 14-inch and 16-inch Dynamic AMOLED 2X display size options, Galaxy Book4 Edge unleashes new levels of creativity and productivity, and breaks down communications barriers with intuitive capabilities and simple language prompts. It also brings beloved Galaxy AI features like Circle to Search with Google, Live Translate and Chat Assist to the PC's more expansive display. Experience the next level of personalized, powerful AI computing here.

To learn more about Snapdragon X Series Platforms, visit here. Click here to watch the Microsoft Copilot+ event on-demand.

Feedback

Qualcoʍ

## About Qualcomm

Qualcomm relentlessly innovates to deliver intelligent computing everywhere, helping the world tackle some of its most important challenges. Our proven solutions drive transformation across major industries, and our Snapdragon® branded platforms power extraordinary consumer experiences. Building on our nearly 40-year leadership in setting industry standards and creating era-defining technology breakthroughs, we deliver leading edge AI, high-performance, low-power computing, and unrivaled connectivity. Together with our ecosystem partners, we enable next-generation digital transformation to enrich lives, improve businesses, and advance societies. At Qualcomm, we are engineering human progress.

Qualcomm Incorporated includes our licensing business, QTL, and the vast majority of our patent portfolio. Qualcomm Technologies, Inc., a subsidiary of Qualcomm Incorporated, operates, along with its subsidiaries, substantially all of our engineering and research and development functions, and substantially all of our products and services businesses, including our QCT semiconductor business. Snapdragon and Qualcomm branded products are products of Qualcomm Technologies, Inc. and/or its subsidiaries. Qualcomm patented technologies are licensed by Qualcomm Incorporated.

Qualcomm and Snapdragon products mentioned within this press release are offered by Qualcomm Technologies, Inc. and/or its subsidiaries.
Qualcomm and Snapdragon are registered trademarks of Qualcomm Incorporated.

Feedback

Qualcomm ⌄   ⌄   ⌄   ⌄

under unconstrained PL1/PL2 settings and no thermal limitations. Power and performance comparison reflects results based on measurements and hardware instrumentation of given devices.

[2] Super Resolution network tested in QTI labs.

[3] CPU Performance is based on Geekbench v6.2 Multi-Thread on Windows 11 OS run in March 2024. Snapdragon X Elite was tested using a Qualcomm reference design on Windows 11 OS. The Intel Core Ultra 7 155H (16 core) was tested using an Asus Zenbook 14 OLED (UX3405) laptop, on Windows 11. Maximum performance reflected by Intel Core Ultra 7 155H represents maximum achievable results in given platforms under unconstrained PL1/PL2 settings and no thermal limitations. Power and performance comparison reflects results based on measurements and hardware instrumentation of given devices.

# Contact Information

---

**Clare Conley**
Media Relations

📞 1-858-845-5959

✉ corpcomm@qualcomm.com

**Mauricio Lopez-Hodoyan**
Investor Relations

📞 1-858-658-4813

✉ ir@qualcomm.com

# Related Press Releases

‹ ›

Feedback

 PRESS NOTE     PRESS NOTE     P

Qualcomm ⌄ ⌄ ⌄ ⌄

## to Billions of Smartphone Users Worldwide

Jul 30

Snapdragon

Snapdragon Mobile Platform

## strengthened by Qualcomm Cloud AI 100 Ultra Inference Accelerators

Jul 23

Cloud  AI

## New Glol

Jul 1(

Sna

Sna

Qualcomm

Qualcomm relentlessly innovates to deliver intelligent computing everywhere, helping the world tackle some of its most important challenges. Our leading-edge AI, high performance, low-power computing, and unrivaled connectivity deliver proven solutions that transform major industries. At Qualcomm, we are engineering human progress.

   

### Quick links

Products

Support

Partners

Contact us

### Company info

About us

Careers

Investors

News & media

### Stay connected

Get the latest Qualcomm and industry information delivered to your inbox.

✉ Subscribe

Manage your subscription

Feedback

Qualcomm

## Also of Interest

Qualcomm Unleashes Snapdragon X Elite:...

Linux kernel support Snapdragon X Elite

Qualcomm Accelerates Development for...

Terms of Use    Privacy    Cookie Policy    Accessibility Statement    Cookie Settings        Language: English (US)

© Qualcomm Technologies, Inc. and/or its affiliated companies.

Snapdragon and Qualcomm branded products are products of Qualcomm Technologies, Inc. and/or its subsidiaries. Qualcomm patented technologies are licensed by Qualcomm Incorporated.

Note: Certain services and materials may require you to accept additional terms and conditions before accessing or using those items.

References to "Qualcomm" may mean Qualcomm Incorporated, or subsidiaries or business units within the Qualcomm corporate structure, as applicable.

Qualcomm Incorporated includes our licensing business, QTL, and the vast majority of our patent portfolio. Qualcomm Technologies, Inc., a subsidiary of Qualcomm Incorporated, operates, along with its subsidiaries, substantially all of our engineering, research and development functions, and substantially all of our products and services businesses, including our QCT semiconductor business.

Materials that are as of a specific date, including but not limited to press releases, presentations, blog posts and webcasts, may have been superseded by subsequent events or disclosures.

Nothing in these materials is an offer to sell or license any of the services or materials referenced herein.

Feedback

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARM LTD.,                                     )
                                              )
                    Plaintiff,                )
                                              )
        v.                                    )       C.A. No. 22-1146 (MN)
                                              )
QUALCOMM INC., QUALCOMM                       )       **HIGHLY CONFIDENTIAL – OUTSIDE**
TECHNOLOGIES, INC. and NUVIA, INC.,           )       **COUNSEL EYES ONLY**
                                              )
                    Defendants.               )

**DEFENDANTS' FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-4 AND 6)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, defendants Qualcomm

Inc., Qualcomm Technologies, Inc, and Nuvia, Inc. (collectively "Qualcomm" or "Defendants")

by and through their attorneys, hereby supplement their responses and objections to Plaintiff ARM

LTD.'s ("Plaintiff" or "ARM") Interrogatories to Defendants dated January 13, 2023 as follows:

**GENERAL OBJECTIONS**

1.      Defendants object to each Interrogatory to the extent that it seeks to impose greater

or different obligations on Defendants than those provided for by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of Delaware, any

discovery orders entered into this case, any other applicable Court orders, or agreements reached

by the parties.

2.      Defendants object to each Interrogatory to the extent that it seeks documents, things,

or information protected by the attorney-client privilege, the work-product doctrine, or any other

applicable privilege or immunity.  Nothing contained in these Responses and Objections is

intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or

protection.  Specific Objections on the grounds of privilege are provided for emphasis and clarity

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

only, and the absence of a Specific Objection is neither intended, nor should be interpreted, as evidence that Defendants do not object to an Interrogatory on the basis of an applicable privilege, immunity, or protection.  Any disclosure of any such privileged or protected material in responses to any Interrogatory is inadvertent and not intended to waive those privileges and protections.

3.      Defendants object to the Interrogatories to the extent they seek documents and things that Defendants have a legal or contractual obligation not to disclose.  Defendants will not provide such documents or things without either the consent of the relevant third party or an order compelling the production thereof, or without providing the relevant third party an opportunity to object to the production.

4.      Defendants object to each Interrogatory to the extent that it purports, or may be construed, to call for the production or identification of "any," "all," "each," or "every" document or thing pertaining to a specific subject, on the ground that such language is overbroad and unduly burdensome.  As used herein, the term overbroad includes Interrogatories that, so characterized, seek, at least in part, documents or information irrelevant in scope, subject matter or time period to this lawsuit or to the particular matters at issue in this lawsuit.  To the extent that a search is required, Defendants will perform a reasonable, targeted search designed to reasonably and proportionately identify relevant documents, to the extent any exist.

5.      Defendants object to the Interrogatories to the extent that they call for discovery that is unreasonable or not proportional under the circumstances.

6.      Defendants object to the Interrogatories to the extent that they purport to require Defendants to create, generate, compile, or develop documents not kept, or in a form not kept, in the ordinary course of Defendants' businesses.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

7.      Defendants object to the Interrogatories to the extent that they are not reasonably limited in time.  Defendants will agree to produce documents dating from January 1, 2019 forward, unless otherwise specified.

8.      Defendants object to the Interrogatories and each and every instruction and definition therein to the extent that any Interrogatory: (a) seeks the production of documents or disclosure of information not relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence; (b) is overly broad, unduly burdensome, harassing, oppressive, or duplicative; (c) is vague or ambiguous; (d) calls for the disclosure of information not within Defendants' possession, knowledge, custody, care, or control; (e) calls for the disclosure of information already in Plaintiff's possession, knowledge, custody, care, or control; or (f) calls for the production of documents or disclosure of information readily available to Plaintiff from public or third-party sources.

9.      Defendants' election to respond to an Interrogatory, notwithstanding the objectionable nature of the Interrogatory, is not: (a) an acceptance of, or agreement with, any of the characterizations or purported descriptions of any facts, circumstances, events, or legal conclusions contained in the Interrogatories; (b) a concession or admission that the materials are relevant to this case or would be admissible at trial; (c) a waiver of the General Objections or the objections asserted in response to that specific Interrogatory; (d) an admission that any such documents or things exist; (e) an agreement that requests for similar information or documents will be treated in a similar manner; or (f) an acceptance of, or agreement with, any of the definitions in the Interrogatories, to the extent that the definition or meaning of any defined term is at issue in this case.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

10.     Defendants' investigation of the facts in this proceeding and review of the relevant documents is ongoing.  Accordingly, the objections and responses herein are based on present knowledge, information, and belief.  Defendants reserve the right to modify, supplement, or amend any response and objection, if necessary or appropriate, in any way and at any time.  Defendants further reserve the right to object, at any hearing and any other proceeding in this litigation, to the use or admissibility into evidence of: (a) any documents produced in response to the interrogatories; (b) any of the information contained in any such document; or (c) any other information provided in response to any interrogatory.

11.     In the event that Defendants produce a document that is privileged, protected under Federal Rule of Evidence 502, or otherwise immune from disclosure, it will have been produced through inadvertence and shall not constitute a waiver of any privilege or immunity applicable (a) to that or any other document or (b) to communications concerning the subject matter of that or any other document.

12.     Defendants object to the Interrogatories to the extent that they assume disputed facts or legal conclusions in defining the documents requested.  Defendants hereby deny any such disputed facts or legal conclusions.  Any documents or information produced by Defendants in response to the Interrogatories are without prejudice to this objection.

13.     Defendants' General Objections apply to each and every Interrogatory and are incorporated by reference into each of the responses set forth below, which responses are made without waiver of, and subject to, these General Objections.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.        Defendants object to the "Definitions" to the extent that they attempt to define words beyond or inconsistent with their ordinary meaning.[1]

2.        Defendants object to the definition of "Arm" or "Plaintiff" as vague and ambiguous to the extent the scope of "related corporate entities" is unclear.

3.        Defendants object to the definition of "Qualcomm" as vague, ambiguous, overly broad, and unduly burdensome to the extent it is defined to include not only Qualcomm Incorporated and Qualcomm Technologies, Inc., but also persons or entities that are separate and distinct from Qualcomm Incorporated and Qualcomm Technologies, Inc., and over whom Defendants exercise no control, such as but not limited to affiliates, consultants, independent contractors, experts, investigators, licensees, licensors, attorneys, or collaborators.

4.        Defendants object to the definition of "Nuvia" as vague, ambiguous, overly broad, and unduly burdensome to the extent it is defined to include not only Nuvia, Inc., but also persons or entities that are separate and distinct from Nuvia, Inc., and over whom Defendants exercise no control.

5.        Defendants object to the definitions of "You," "Your," and "Defendants" as vague, ambiguous, overly broad, and unduly burdensome to the extent they seek information relating to persons or entities that are separate and distinct from Qualcomm Incorporated, Qualcomm Technologies, Inc. and Nuvia, Inc. and over whom Defendants exercise no control.  In responding to these Interrogatories, Defendants interpret the terms "You," "Your," and "Defendants" to refer

---

[1]        To the extent not defined here, the definitions used by Defendants in the responses below are consistent with the definitions contained in Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim (D.I. 18) (the "Answer and Amended Counterclaim").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

only to the named parties in this action.  Defendants also object to the definitions of "You," "Your,"
and "Defendants" to the extent they purport to impose obligations on Defendants beyond what is
required by the Rules.  Defendants will interpret the definition of "You," "Your," and "Defendants"
to impose no discovery obligation on any person or entity that is not a party to this litigation.

      6.     Defendants object to the definition of "ALA" as vague, ambiguous, and overbroad
because it is not clear which agreement(s) "an Architecture License Agreement with Arm" refers
to.  Defendants will interpret "ALA" to mean ███████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

      7.     Defendants object to the definition of ████████ as vague, ambiguous,
argumentative, and overly broad.

      8.     Defendants object to the definition of "Nuvia Technology" as vague, ambiguous,
overbroad, and unduly burdensome because the terms "developed," "implemented," "improved,"
"designed," "aspect," "part," "portion," "component," "deliverables," "materials," "technology,"
"support," "processor core," "processor core technology," "custom CPU," "based on ARM
licenses," "under," and "under the Nuvia ALA" are vague, ambiguous and overbroad; because the
inclusion of ████████████ within the definition is inaccurate, vague, or ambiguous; because the
definition includes incorrect characterizations or factual assumptions, including but not limited to
because ███████████████████████ and "custom CPUs" and "processor core technology"
developed prior to March 2022 as Nuvia Technology, and because it characterizes CPUs and
processor core technology as "Nuvia Technology" if "any aspect, part, portion or component of"
was "developed, implemented, improved, or designed based on Arm licenses, deliverables,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

materials, technology, or support provided to Nuvia under the Nuvia ALA" regardless of whether development or work occurred at Qualcomm; and because the definition unduly narrows the scope of what can be considered "Nuvia Technology."

9.      Defendants object to the definition of "Nuvia-based Products" as vague, ambiguous, overbroad, and unduly burdensome because the terms "incorporating," "based on," "embodying," "involving," "part," "portion," "component,"  "Semiconductor chip," "processor core," "custom CPU," "Related product," and ███████████████ are vague, ambiguous, or overbroad; because it includes incorrect characterizations and factual assumptions, including but not limited to because it characterizes "Nuvia-based products" as products "incorporating, based on, embodying, involving, or related to any part, portion, or component of the Nuvia Technology," but the term "Nuvia Technology" is objectionable as set forth above.

10.      Defendants object to the definition of "Arm Trademarks" as overbroad, vague, and ambiguous including but not limited to because, as phrased, ███████████████ ███████████████ Qualcomm understands "Arm Trademarks" to refer to the terms trademarked in U.S. Registration Nos. 5,692,669 and 5,692,670.

11.      Defendants object to the definitions of "Document" and its plural to the extent they purport to impose any obligations beyond what is required by the Federal Rules.  Defendants further object to the definition of "Document" to the extent that it implies that Defendants must collect or produce, e.g., computer programs, testing data, electronic sound records, and other types of files that are typically not required to be collected or produced, as listed in the ESI Protocol Schedule A (D.I. 39).

12.      Defendants object to the definitions of "Communication" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

13.     Defendants object to the definitions of "Thing" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.

14.     Defendants object to the definitions of "Identify," Identifying, or "Identification" to the extent they purport to impose any obligations beyond what is required by the Federal Rules. Defendants also object to the definitions of "Identify," Identifying, or "Identification" to the extent they ask Defendants to provide any information unknown to Defendants or not within their possession, custody, or control, or beyond the scope of this litigation, including but not limited to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants further object to the extent it seeks information other than the production of documents responsive to Plaintiff's First Set of Requests for Production. Defendants will not create documents or provide narrative information to identify particular natural persons, entities, things, documents, or conversations.

15.     Defendants object to Instruction 1 on the grounds that it imposes obligations beyond those provided for by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware.

16.     Defendants object to Instruction No. 4 to the extent that it seeks, in the event that Defendants "object to all or part of any of the interrogatories," that Defendants "(a) Identify the specific portion(s) of the interrogatory which You claim You cannot answer because of the alleged defect in the interrogatory; (b) Identify the specific word(s) or phrase(s) to which Your objection relates; (c) state why the alleged ambiguity, vagueness, or overbreadth, for example, prevents You from answering all or part of the interrogatory; and (d) Identify all of the specific portion(s) of the interrogatory to which You are not responding at all based upon this objection," on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements inconsistent with or more burdensome than those imposed by the local rules and applicable law.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

17.     Defendants object to Instruction 5, to the extent it imposes obligations beyond those required by the Federal Rules of Civil Procedure, and because it is premature and contrary to the provisions in the ESI Protocol or Protective Order (D.I. 38, 39).  To the extent not provided in these documents, Defendants will meet and confer with Plaintiff regarding the nature and scope of privilege logs for the case.

18.     Defendants object to Instruction 7 to the extent it purports to require Defendants to respond to Interrogatories that are not reasonably limited in time, including on subjects other than those for which such discovery is permitted under the Delaware Default Standard for Discovery or as agreed upon in the parties' anticipated agreement regarding electronic discovery.  Defendants will agree to produce documents dating from January 1, 2019 forward, unless otherwise specified.

19.     Subject to and without limiting the foregoing, Defendants specifically object and respond as follows:

## SUPPLEMENTAL RESPONSES

### INTERROGATORY NO. 1:

Describe with specificity the complete legal and factual basis for Your contention that "ARM has waived all claims and causes of action and any recovery or remedy alleged in the complaint." (D.I. 18 ¶ 159.) Your answer should include an Identification of the Persons most knowledgeable about Your answer.

### RESPONSE TO INTERROGATORY NO. 1:

Defendants object to Interrogatory No. 1 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed.  Defendants additionally object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Answer and Amended Counterclaim, is readily within the possession of Plaintiff, or that is more

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

easily available to it.   Defendants further object to the Interrogatory to the extent that the information sought is subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Defendants refer Plaintiff to paragraphs 41, 189-196, 203-206, 208-217, and 240-241 of the Answer and Amended Counterclaim, and incorporate them by reference as if fully set forth herein.

Based on their investigation to date, Defendants identify the following individuals as the persons most likely to be knowledgeable about the facts relating to Defendants' answer:

- Manu Gulati

- Rajiv Gupta

- Jignesh Trivedi

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

Subject to and without waiver of Defendants' General and Specific Objections to Plaintiff's Interrogatories, Defendants supplement their Response to Interrogatory Number 1 as follows:

Defendants' assertion that "ARM has waived all claims and causes of action and any recovery or remedy alleged in the complaint" is based on the following:  ARM was on notice, since before the NUVIA acquisition closed on March 15, 2021 that Qualcomm believed that its design and sale of custom CPUs that included technologies acquired from NUVIA was permissible. ARM waited over eighteen months after learning of Qualcomm's acquisition of NUVIA before filing this action on August 31, 2022.  Despite knowing that Qualcomm was designing custom CPUs that incorporated technology from NUVIA, ARM waited until after the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

conclusion of its merger control proceeding and the announcement that its proposed NVIDIA transaction had been abandoned to terminate the NUVIA ALA.

In addition, throughout this time period, ARM was fully aware that it was interacting with former NUVIA employees who now worked at Qualcomm and that Qualcomm was developing custom CPU technologies and SOC products related to technology initially developed at NUVIA.

Beginning immediately after the acquisition, which closed on March 15, 2021, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████

        █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████.

In or around late 2021, █████████████████████████████████

████████████████████████████████   ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Also in December 2021, ██████████████████████████████████████

████████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Then, in a letter dated February 1, 2022, after ARM had been interfacing with Qualcomm and its development efforts for months, ARM notified Gerard Williams III, the former CEO and President of NUVIA, that it intended to terminate both NUVIA's ALA and TLA for "material breach" and demanded the destruction or return of "any ARM Technology." Even after this letter, ARM continued to provide verification support to Qualcomm in developing custom CPU cores that ARM knew contained technologies that Qualcomm had acquired from NUVIA, and also continued to acknowledge the Defendants' rights under the Qualcomm ALA.

For example, on April 12, 2022—after Qualcomm certified its compliance with ARM's destruction demand—ARM accepted test results verifying that an implementation of the custom core in the Server SoC complied with the requirements necessary to execute ARM's instruction set. ARM explicitly validated this testing under the Qualcomm ALA.

ARM has also continued to license technology to Qualcomm under the Qualcomm TLA that is relevant to technology initially developed at NUVIA, and Qualcomm has continued to pay ARM for those licenses. For example, in July 2021, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ ████████████████████████████

████████████████████████

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

**INTERROGATORY NO. 2:**

Describe with specificity the complete legal and factual basis for Your contention that the Nuvia ALA's termination provisions "apply only to NUVIA, not Qualcomm." (D.I. 18 ¶ 235.) Your answer should include an Identification of the Persons most knowledgeable about Your answer.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendants object to Interrogatory No. 2 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed. Defendants additionally object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Answer and Amended Counterclaim, is readily within the possession of Plaintiff, or that is more easily available to it. Defendants further object to the Interrogatory to the extent that the information sought is subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Defendants refer Plaintiff to the Qualcomm ALA and Nuvia ALA and paragraphs 225 and 235 of the Answer and Amended Counterclaim, and incorporate them by reference as if fully set forth herein, for Defendants' position on the applicability of the Nuvia ALA's termination provisions to Qualcomm.

Based on their investigation to date, Defendants identify the following individual as the person most likely to be knowledgeable about the facts relating to this answer:

- Jonathan Weiser

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

13

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

Subject to and without waiver of Defendants' General and Specific Objections to Plaintiff's Interrogatories, Defendants supplement their Response to Interrogatory Number 2 as follows:

The termination provisions in the NUVIA ALA require only that **NUVIA** ████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ Qualcomm is not a party to the NUVIA ALA. Rather, it has its own ALA.

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**INTERROGATORY NO. 3:**

Describe with specificity the complete legal and factual basis for Your contention that the Qualcomm ALA permits You to use and continue developing the "ARM architecture-compatible" designs created under the Nuvia ALA. (D.I. 18 ¶ 178.) Your answer should include an Identification of the Persons most knowledgeable about Your answer.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendants object to Interrogatory No. 3 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed.  Defendants object to the Interrogatory as vague and ambiguous because it fails to define "use and continue developing" and "designs created under the Nuvia ALA." Defendants also object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Answer and Amended Counterclaim, is readily within the possession of Plaintiff, or that is more easily available to it.  Defendants also object to the Interrogatory to the extent that it inaccurately characterizes the cited paragraph in the Answer and Amended Counterclaim.  Defendants further object to the Interrogatory to the extent that the information sought is subject to the attorney-client privilege, the attorney work-product

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Defendants refer Plaintiff to the Qualcomm ALA and to paragraphs 36, 201-202, and 220-222 of the Answer and Amended Counterclaim, and incorporate them by reference as if fully set forth herein, for Defendants' position.

Based on their investigation to date, Defendants identify the following individuals as the persons most likely to be knowledgeable about the facts relating to this answer:

- Ziad Asghar

- Larissa Cochron

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

Subject to and without waiver of Defendants' General and Specific Objections to Plaintiff's Interrogatories, Defendants supplement their Response to Interrogatory Number 3 as follows:

Qualcomm has its own ALA with ARM, which grants Qualcomm ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████  ████████████████████████████████████

███████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

███████████████████████████████████████████████████████

Moreover, as soon as the acquisition closed, NUVIA became covered under the Qualcomm ALA

because, as a Qualcomm subsidiary, NUVIA was licensed under the Qualcomm ALA to use ████

████████████████████████████

Qualcomm has ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**INTERROGATORY NO. 4:**

Describe with specificity the complete legal and factual basis for Your contention that "Qualcomm's use of any ████████████ utilized in NUVIA's technology was fully licensed under Qualcomm's license agreements as soon as Qualcomm acquired NUVIA" and it was "not necessary" for You to seek "ARM's consent to assign NUVIA's ARM licenses to Qualcomm." (D.I. 18 ¶ 24.)

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants object to Interrogatory No. 4 as premature at this stage of the litigation, given

that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and

(ii) discovery, including, without limitation, document production and depositions, has not been

completed.  Defendants object to the Interrogatory as overly broad and unduly burdensome to the

extent that it calls for the disclosure of information that was articulated in the Answer and

Amended Counterclaim, is readily within the possession of Plaintiff, or that is more easily

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

available to it.  Defendants further object to the Interrogatory to the extent that the information sought is subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine that makes such information non-discoverable.

Subject to and without waiving the foregoing objections, Defendants refer Plaintiff to the Qualcomm ALA and to paragraphs 24-25, 201-203, and 219-223 of the Answer and Amended Counterclaim, and incorporate them by reference as if fully set forth herein, for Defendants' position.

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Subject to and without waiver of Defendants' General and Specific Objections to Plaintiff's Interrogatories, Defendants supplement their Response to Interrogatory Number 4 as follows:

Qualcomm has its own ALA with ARM, which grants Qualcomm █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Accordingly, Qualcomm's ALA granted it █████████████████████████

████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



Additionally,

NUVIA did not need ARM's consent to transfer any licenses to Qualcomm, because Qualcomm already had existing rights to this technology.

In any event, as soon as the acquisition closed, NUVIA was covered under the Qualcomm ALA because, as a Qualcomm subsidiary, NUVIA was licensed under the Qualcomm ALA to use                                . Therefore, both NUVIA and Qualcomm were licensed to use the ARM information in the custom cores and related SoCs under the Qualcomm ALA, and any use of that information by Qualcomm was fully authorized.

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**INTERROGATORY NO.6:**

Describe with specificity the facts supporting Your contention that "ARM . . . through its leadership and through the leadership of its owner, SoftBank, acting on ARM's behalf," has "spread[] misinformation about the nature of Qualcomm's ARM licenses to customers that purchase Qualcomm's ARM-compatible cores and chipsets." (D.I. 18 ¶ 243-44.) Your answer should include an Identification of every communication, correspondence, meeting, or other event that supports Your contention; the Persons affiliated with SoftBank, Arm, or Your customers who were involved in each of these activities; and how You acquired knowledge about each of these activities, including the Persons who acquired that knowledge.

**RESPONSE TO INTERROGATORY NO. 6:**

Defendants object to Interrogatory No. 6 as premature at this stage of the litigation, given that (i) it involves an opinion or contention that relates to fact or the application of law to fact, and (ii) discovery, including, without limitation, document production and depositions, has not been completed. Defendants further object to the Interrogatory as overly broad and unduly burdensome to the extent that it calls for the disclosure of information that was articulated in the Answer and Amended Counterclaim, is readily within the possession of Plaintiff, or that is more easily

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

available to it.  Defendants additionally object to the Interrogatory to the extent it seeks information that is in a third party's possession, including highly commercially sensitive information about third parties that is subject to confidentiality obligations.

Subject to and without waiving the foregoing objections, Defendants respond as follows:

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

                ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

Based on their investigation to date, Defendants identify the following individuals as the persons most likely to be knowledgeable about the facts relating to this answer:

- Masayoshi Son

- ███████████████

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:</u>**

Subject to and without waiver of Defendants' General and Specific Objections to Plaintiff's Interrogatories, Defendants supplement their Response to Interrogatory Number 6 as follows:

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

According to

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

Morris, Nichols, Arsht & Tunnell LLP
*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Andrea L. D'Ambra
Susana Medeiros
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY  10019
(212) 318-3000

Kira Latham
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
(214) 855-8000

June 23, 2023

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, copies of the foregoing were caused to be served

upon the following in the manner indicated:

| | |
|---|---|
| Anne Shea Gaza, Esquire | *VIA ELECTRONIC MAIL* |
| Robert M. Vrana, Esquire | |
| Samantha G. Wilson, Esquire | |
| YOUNG, CONAWAY, STARGATT & TAYLOR LLP | |
| Rodney Square | |
| 1000 North King Street | |
| Wilmington, DE  19801 | |
| *Attorneys for Plaintiff* | |

| | |
|---|---|
| Michael A. Jacobs, Esquire | *VIA ELECTRONIC MAIL* |
| Joyce Liou, Esquire | |
| Diek Van Nort, Esquire | |
| MORRISON & FOERSTER LLP | |
| 425 Market Street | |
| San Francisco, CA  94105 | |
| *Attorneys for Plaintiff* | |

| | |
|---|---|
| Erik J. Olson, Esquire | *VIA ELECTRONIC MAIL* |
| MORRISON & FOERSTER LLP | |
| 755 Page Mill Road | |
| Palo Alto, CA  94304 | |
| *Attorneys for Plaintiff* | |

| | |
|---|---|
| Scott F. Llewellyn, Esquire | *VIA ELECTRONIC MAIL* |
| MORRISON & FOERSTER LLP | |
| 4200 Republic Plaza | |
| 370 Seventeenth Street | |
| Denver, CO  80202-5638 | |
| *Attorneys for Plaintiff* | |

*/s/ Jennifer Ying*

_____

Jennifer Ying (#5550)

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | **HIGHLY CONFIDENTIAL –** |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | **ATTORNEYS' EYES ONLY –** |
| | ) | **SUBJECT TO PROTECTIVE ORDER** |
| Defendants. | ) | |

**DEFENDANTS' SUPPLEMENTAL AND AMENDED RESPONSE AND OBJECTIONS
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NO. 5)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, defendants Qualcomm Inc., Qualcomm Technologies, Inc, and Nuvia, Inc. (collectively "Qualcomm" or "Defendants") by and through their attorneys, hereby respond and object to Plaintiff ARM LTD.'s ("Plaintiff" or "ARM") Interrogatories to Defendants dated January 13, 2023 as follows:

**GENERAL OBJECTIONS**

1.      Defendants object to each Interrogatory to the extent that it seeks to impose greater or different obligations on Defendants than those provided for by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, any discovery orders entered into this case, any other applicable Court orders, or agreements reached by the parties.

2.      Defendants object to each Interrogatory to the extent that it seeks documents, things, or information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.  Nothing contained in these Responses and Objections is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection.  Specific Objections on the grounds of privilege are provided for emphasis and clarity

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –**
**SUBJECT TO PROTECTIVE ORDER**

only, and the absence of a Specific Objection is neither intended, nor should be interpreted, as evidence that Defendants do not object to an Interrogatory on the basis of an applicable privilege, immunity, or protection.  Any disclosure of any such privileged or protected material in responses to any Interrogatory is inadvertent and not intended to waive those privileges and protections.

3.      Defendants object to the Interrogatories to the extent they seek documents and things that Defendants have a legal or contractual obligation not to disclose.  Defendants will not provide such documents or things without either the consent of the relevant third party or an order compelling the production thereof, or without providing the relevant third party an opportunity to object to the production.

4.      Defendants object to each Interrogatory to the extent that it purports, or may be construed, to call for the production or identification of "any," "all," "each," or "every" document or thing pertaining to a specific subject, on the ground that such language is overbroad and unduly burdensome.  As used herein, the term overbroad includes Interrogatories that, so characterized, seek, at least in part, documents or information irrelevant in scope, subject matter or time period to this lawsuit or to the particular matters at issue in this lawsuit.  To the extent that a search is required, Defendants will perform a reasonable, targeted search designed to reasonably and proportionately identify relevant documents, to the extent any exist.

5.      Defendants object to the Interrogatories to the extent that they call for discovery that is unreasonable or not proportional under the circumstances.

6.      Defendants object to the Interrogatories to the extent that they purport to require Defendants to create, generate, compile, or develop documents not kept, or in a form not kept, in the ordinary course of Defendants' businesses.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

7.     Defendants object to the Interrogatories to the extent that they are not reasonably limited in time.  Defendants will agree to produce documents dating from January 1, 2019 forward, unless otherwise specified.

8.     Defendants object to the Interrogatories and each and every instruction and definition therein to the extent that any Interrogatory: (a) seeks the production of documents or disclosure of information not relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence; (b) is overly broad, unduly burdensome, harassing, oppressive, or duplicative; (c) is vague or ambiguous; (d) calls for the disclosure of information not within Defendants' possession, knowledge, custody, care, or control; (e) calls for the disclosure of information already in Plaintiff's possession, knowledge, custody, care, or control; or (f) calls for the production of documents or disclosure of information readily available to Plaintiff from public or third-party sources.

9.     Defendants' election to respond to an Interrogatory, notwithstanding the objectionable nature of the Interrogatory, is not: (a) an acceptance of, or agreement with, any of the characterizations or purported descriptions of any facts, circumstances, events, or legal conclusions contained in the Interrogatories; (b) a concession or admission that the materials are relevant to this case or would be admissible at trial; (c) a waiver of the General Objections or the objections asserted in response to that specific Interrogatory; (d) an admission that any such documents or things exist; (e) an agreement that requests for similar information or documents will be treated in a similar manner; or (f) an acceptance of, or agreement with, any of the definitions in the Interrogatories, to the extent that the definition or meaning of any defined term is at issue in this case.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

10.     Defendants' investigation of the facts in this proceeding and review of the relevant documents is ongoing.  Accordingly, the objections and responses herein are based on present knowledge, information, and belief.  Defendants reserve the right to modify, supplement, or amend any response and objection, if necessary or appropriate, in any way and at any time.  Defendants further reserve the right to object, at any hearing and any other proceeding in this litigation, to the use or admissibility into evidence of: (a) any documents produced in response to the interrogatories; (b) any of the information contained in any such document; or (c) any other information provided in response to any interrogatory.

11.     In the event that Defendants produce a document that is privileged, protected under Federal Rule of Evidence 502, or otherwise immune from disclosure, it will have been produced through inadvertence and shall not constitute a waiver of any privilege or immunity applicable (a) to that or any other document or (b) to communications concerning the subject matter of that or any other document.

12.     Defendants object to the Interrogatories to the extent that they assume disputed facts or legal conclusions in defining the documents requested.  Defendants hereby deny any such disputed facts or legal conclusions.  Any documents or information produced by Defendants in response to the Interrogatories are without prejudice to this objection.

13.     Defendants' General Objections apply to each and every Interrogatory and are incorporated by reference into each of the responses set forth below, which responses are made without waiver of, and subject to, these General Objections.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Defendants object to the "Definitions" to the extent that they attempt to define words beyond or inconsistent with their ordinary meaning.[1]

2.      Defendants object to the definition of "Arm" or "Plaintiff" as vague and ambiguous to the extent the scope of "related corporate entities" is unclear.

3.      Defendants object to the definition of "Qualcomm" as vague, ambiguous, overly broad, and unduly burdensome to the extent it is defined to include not only Qualcomm Incorporated and Qualcomm Technologies, Inc., but also persons or entities that are separate and distinct from Qualcomm Incorporated and Qualcomm Technologies, Inc., and over whom Defendants exercise no control, such as but not limited to affiliates, consultants, independent contractors, experts, investigators, licensees, licensors, attorneys, or collaborators.

4.      Defendants object to the definition of "Nuvia" as vague, ambiguous, overly broad, and unduly burdensome to the extent it is defined to include not only Nuvia, Inc., but also persons or entities that are separate and distinct from Nuvia, Inc., and over whom Defendants exercise no control.

5.      Defendants object to the definitions of "You," "Your," and "Defendants" as vague, ambiguous, overly broad, and unduly burdensome to the extent they seek information relating to persons or entities that are separate and distinct from Qualcomm Incorporated, Qualcomm Technologies, Inc. and Nuvia, Inc. and over whom Defendants exercise no control.  In responding to these Interrogatories, Defendants interpret the terms "You," "Your," and "Defendants" to refer

---

[1]      To the extent not defined here, the definitions used by Defendants in the responses below are consistent with the definitions contained in Defendants' Answer and Defenses to Plaintiff's Complaint and Jury Demand and Defendants' Amended Counterclaim (D.I. 18) (the "Answer and Amended Counterclaim").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

only to the named parties in this action.  Defendants also object to the definitions of "You," "Your,"

and "Defendants" to the extent they purport to impose obligations on Defendants beyond what is

required by the Rules.  Defendants will interpret the definition of "You," "Your," and "Defendants"

to impose no discovery obligation on any person or entity that is not a party to this litigation.

6.    Defendants object to the definition of "ALA" as vague, ambiguous, and overbroad

because it is not clear which agreement(s) "an Architecture License Agreement with Arm" refers

to.  Defendants will interpret "ALA" to mean ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

7.    Defendants object to the definition of ████████ as vague, ambiguous,

argumentative, and overly broad.

8.    Defendants object to the definition of "Nuvia Technology" as vague, ambiguous,

overbroad, and unduly burdensome because the terms "developed," "implemented," "improved,"

"designed," "aspect," "part," "portion," "component," "deliverables," "materials," "technology,"

"support," "processor core," "processor core technology," "custom CPU," "based on ARM

licenses," "under," and "under the Nuvia ALA" are vague, ambiguous and overbroad; because the

inclusion of ████████ within the definition is inaccurate, vague, or ambiguous; because the

definition includes incorrect characterizations or factual assumptions, including but not limited to

because ████████████████ and "custom CPUs" and "processor core technology"

developed prior to March 2022 as Nuvia Technology, and because it characterizes CPUs and

processor core technology as "Nuvia Technology" if "any aspect, part, portion or component of"

was "developed, implemented, improved, or designed based on Arm licenses, deliverables,

6

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

materials, technology, or support provided to Nuvia under the Nuvia ALA"  regardless of whether development or work occurred at Qualcomm; and because the definition unduly narrows the scope of what can be considered "Nuvia Technology."

9.      Defendants object to the definition of "Nuvia-based Products" as vague, ambiguous, overbroad, and unduly burdensome because the terms "incorporating," "based on," "embodying," "involving," "part," "portion," "component,"  "Semiconductor chip," "processor core," "custom CPU," "Related product," and ███████████████ are vague, ambiguous, or overbroad; because it includes incorrect characterizations and factual assumptions, including but not limited to because it characterizes "Nuvia-based products" as products "incorporating, based on, embodying, involving, or related to any part, portion, or component of the Nuvia Technology," but the term "Nuvia Technology" is objectionable as set forth above.

10.     Defendants object to the definition of "Arm Trademarks" as overbroad, vague, and ambiguous including but not limited to because, as phrased, ██████████████████ ██████████████████████ Qualcomm understands "Arm Trademarks" to refer to the terms trademarked in U.S. Registration Nos. 5,692,669 and 5,692,670.

11.     Defendants object to the definitions of "Document" and its plural to the extent they purport to impose any obligations beyond what is required by the Federal Rules.  Defendants further object to the definition of "Document" to the extent that it implies that Defendants must collect or produce, e.g., computer programs, testing data, electronic sound records, and other types of files that are typically not required to be collected or produced, as listed in the ESI Protocol Schedule A (D.I. 39).

12.     Defendants object to the definitions of "Communication" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

13.     Defendants object to the definitions of "Thing" and its plural form to the extent they purport to impose any obligations beyond what is required by the Federal Rules.

14.     Defendants object to the definitions of "Identify," Identifying, or "Identification" to the extent they purport to impose any obligations beyond what is required by the Federal Rules. Defendants also object to the definitions of "Identify," Identifying, or "Identification" to the extent they ask Defendants to provide any information unknown to Defendants or not within their possession, custody, or control, or beyond the scope of this litigation, including but not limited to ██████████████████████████████ Defendants further object to the extent it seeks information other than the production of documents responsive to Plaintiff's First Set of Requests for Production.  Defendants will not create documents or provide narrative information to identify particular natural persons, entities, things, documents, or conversations.

15.     Defendants object to Instruction 1 on the grounds that it imposes obligations beyond those provided for by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware.

16.     Defendants object to Instruction No. 4 to the extent that it seeks, in the event that Defendants "object to all or part of any of the interrogatories," that Defendants "(a) Identify the specific portion(s) of the interrogatory which You claim You cannot answer because of the alleged defect in the interrogatory; (b) Identify the specific word(s) or phrase(s) to which Your objection relates; (c) state why the alleged ambiguity, vagueness, or overbreadth, for example, prevents You from answering all or part of the interrogatory; and (d) Identify all of the specific portion(s) of the interrogatory to which You are not responding at all based upon this objection," on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements inconsistent with or more burdensome than those imposed by the local rules and applicable law.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

17.     Defendants object to Instruction 5, to the extent it imposes obligations beyond those required by the Federal Rules of Civil Procedure, and because it is premature and contrary to the provisions in the ESI Protocol or Protective Order (D.I. 38, 39).   To the extent not provided in these documents, Defendants will meet and confer with Plaintiff regarding the nature and scope of privilege logs for the case.

18.     Defendants object to Instruction 7 to the extent it purports to require Defendants to respond to Interrogatories that are not reasonably limited in time, including on subjects other than those for which such discovery is permitted under the Delaware Default Standard for Discovery or as agreed upon in the parties' anticipated agreement regarding electronic discovery.  Defendants will agree to produce documents dating from January 1, 2019 forward, unless otherwise specified.

19.     Subject to and without limiting the foregoing, Defendants specifically object and respond as follows:

<u>**SPECIFIC RESPONSES AND OBJECTIONS**</u>

<u>**INTERROGATORY NO. 5:**</u>

Describe with specificity the facts supporting your contention that "Qualcomm and NUVIA removed NUVIA-acquired ARM Confidential Information from its designs and redesigned its products to replace it with information acquired under Qualcomm's license—even though it was the exact same information—then quarantined a copy. Qualcomm also removed NUVIA-acquired ARM Confidential Information from its design environment and systems and quarantined it." (D.I. 18 ¶ 231.) Your answer should include an Identification of each Person who took these actions.

<u>**SUPPLEMENTAL AND AMENDED RESPONSE TO INTERROGATORY NO. 5:**</u>

Defendants object to Interrogatory No. 5 as vague and ambiguous to the extent it does not define the "facts" it is seeking in response to the Interrogatory.  Defendants object to the Interrogatory as overly broad and unduly burdensome to the extent it seeks disclosure of information that was articulated in the Answer and Amended Counterclaim and in Qualcomm's April 1, 2022 certification letter, and insofar as it seeks identification of "each Person who took

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –**
**SUBJECT TO PROTECTIVE ORDER**

these actions," regardless of the nature or extent of their involvement and without limitation. Defendants object to the term "each Person who took these actions" as overbroad and burdensome, as over 1500 Persons were involved in the quarantining efforts.

Subject to and without waiving the foregoing objections, Defendants refer Plaintiff to paragraphs 230-233 of the Answer and Amended Counterclaim and incorporate them by reference as if fully set forth herein, and to the April 1, 2022 certification letter referred to in paragraph 233 of the Answer and Amended Counterclaim for Defendants' position.

By way of further response, Defendants state that, ███████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████

████████████████████████████████████████

███████████████████████  ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████

███████████████████████████

Based on their investigation to date, Defendants identify the following individuals as the persons most likely to be knowledgeable about the facts relating to this answer:

- Manu Gulati

- Nitin Sharma

- Rohit Singh

- Matthew Page

- Raghava Denduluri

- Bob Pflederer

- Sarah Bennington

- Nick Jones

Defendants reserve the right to supplement and amend their responses to this Interrogatory.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Brian Shiue
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Madalyn G. Vaughn

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendants*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –**
**SUBJECT TO PROTECTIVE ORDER**

Jacob A. Braly
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Andrea L. D'Ambra
Susana Medeiros
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019
(212) 318-3000

Kira Latham
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
(214) 855-8000

October 26, 2023

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2023, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Michael A. Jacobs, Esquire                                 *VIA ELECTRONIC MAIL*
Joyce Liou, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                     *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                                *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO  80202-5638
*Attorneys for Plaintiff*

Ruohan (Jack) Li, Esquire                                  *VIA ELECTRONIC MAIL*
Daniel P. Muino, Esquire
Fahd Hussein Patel, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY –
SUBJECT TO PROTECTIVE ORDER**

Nicholas Rylan Fung, Esquire                    *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*


                              */s/ Jennifer Ying*
                              _____
                              Jennifer Ying (#5550)

# Exhibit 4



# Exhibit 5

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4   ARM LTD., A U.K. CORPORATION, )
                              )
5          Plaintiff,      )
                              )
6       vs.               ) C.A. NO. 22-1146-MN
                              )
7   QUALCOMM INC., a Delaware    )
    corporation; QUALCOMM        )
8   TECHNOLOGIES, INC., a        )
    Delaware corporation; and    )
9   NUVIA, INC., a Delaware      )
    corporation,             )
10                           )
           Defendants.      )
11   _____ )

12

13

14

15

16      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17          VIDEOTAPED DEPOSITION OF

18          PRADEEP KANAPATHIPILLAI

19           PALO ALTO, CALIFORNIA

20          FRIDAY, DECEMBER 1, 2023

21

22

23

24
    Reported in Stenotype by:
25   Cody R. Knacke, RPR, CSR No. 13691
    Job No.:  J10603607

1          VIDEOTAPED DEPOSITION OF

2    PRADEEP KANAPATHIPILLAI, taken before Cody R.

3    Knacke, RPR, CSR No. 13691, a Certified Shorthand

4    Reporter for the State of California, commencing on

5    Friday, December 1, 2023, at 9:06 a.m., at 755 Page

6    Mill Road, Palo Alto, California.

7

8    APPEARANCES OF COUNSEL:

9      For the Plaintiff:

10         MORRISON & FOERSTER
           BY:  NICHOLAS RYLAN FUNG, ESQ.
11          707 Wilshire Boulevard, Suite 6000
            Los Angeles, California 90017
12          213.892.5348
            nfung@mofo.com
13
       For the Defendants:
14
           PAUL, WEISS, RIFKIND, WHARTON & GARRISON
15          BY:  CATHERINE NYARADY, ESQ.
              JACOB A. BRALY, ESQ.
16          1285 Avenue of the Americas
            New York, New York 10019
17          212.373.3532
            cnyarady@paulweiss.com
18          jbraly@paulweiss.com

19     Also Present:

20         Ruslan Gurzhiy, Videographer
           Kurt Kjelland, Esq., Qualcomm Inc.
21

22

23

24

25

| | |
|---|---|
| 1 | I - N - D - E - X |
| 2 | EXAMINATION BY:                              PAGE |
| 3 | BY MR. FUNG                          6 |
| 4 | BY MS. NYARADY                          78 |
| 5 | |
| 6 | |
| 7 | |
| 8 | E - X - H - I - B - I - T - S |
| 9 | |
| | (Exhibits 2, 3, and 8 retained by counsel.) |
| 10 | |
| 11 | PLAINTIFF'S          DESCRIPTION          PAGE |
| 12 | Exhibit 1     LinkedIn profile of          12 |
| | Pradeep Kanapathipillai |
| 13 | |
| | Exhibit 2     NUVIA ████████ CPU ISA          24 |
| 14 | Reference Manual - Contains |
| | Confidential Source Code |
| 15 | (Retained by Counsel) |
| 16 | Exhibit 3     Slide presentation presented to     26 |
| | Qualcomm - Contains Confidential |
| 17 | Source Code |
| | (Retained by Counsel) |
| 18 | |
| | Exhibit 4     E-mail correspondence dated     33 |
| 19 | 1/14/2020, Bates-labeled |
| | QCARM_2544978 to 2544979 |
| 20 | |
| | Exhibit 5     E-mail correspondence dated     36 |
| 21 | 4/29/2020, Bates-labeled |
| | QCARM_3510613 to 3510614 |
| 22 | |
| | Exhibit 6     E-mail correspondence dated     44 |
| 23 | 6/16/2020, Bates-labeled |
| | QCARM_0002828 to 2829 |
| 24 | |
| 25 | |

| 1 | I - N - D - E - X |
| | (Continued) |

2

3   E - X - H - I - B - I - T - S

4   PLAINTIFF'S           DESCRIPTION                PAGE

5   Exhibit 7     E-mail correspondence dated        49
                    9/12/2023

6
     Exhibit 8     List of projects and folders -    52
7                    Contains Confidential Source
                    Code (Retained by Counsel)

8
     Exhibit 9     E-mail correspondence dated       64
9                    5/20/2021, Bates-labeled
                    QCARM_3753508

10
     Exhibit 10    E-mail correspondence,            69
11                   Bates-labeled QCARM_2553711 to
                    2553712

12

13

14

15          QUESTIONS INSTRUCTED NOT TO ANSWER

16                  None.

17

18

19

20

21          INFORMATION REQUESTED

22                  None.

23

24

25

 1    PALO ALTO, CALIFORNIA; FRIDAY, DECEMBER 1, 2023

 2              9:06 A.M.

 3         THE VIDEOGRAPHER:  Good morning, everyone.

 4    We are on video record on December 1, 2023, and the

 5    time is 9:06 a.m.  My name is Ruslan Gurzhiy.  I'm          09:06

 6    the legal videographer.  And the court reporter

 7    today is Cody Knacke.  We're both here representing

 8    Esquire Deposition Solutions.

 9         This is the beginning of video deposition

10    of Pradeep Kanapathipillai in the matter of ARM Ltd.        09:06

11    versus Qualcomm Incorporated.

12         We're located today in Palo Alto,

13    California.

14         Counsel, would you please introduce

15    yourselves, after which the court reporter may swear        09:06

16    in the witness.

17         Thank you.  You may proceed.

18         MR. FUNG:  Nick Fung from

19    Morrison & Foerster here on behalf of plaintiff,

20    ARM.                                                        09:06

21         MS. NYARADY:  Catherine Nyarady from Paul,

22    Weiss on behalf of the defendants -- representing

23    the defendants and the witness.

24         I'm joined by my colleague Jacob Braly,

25    also from Paul, Weiss, and also Kurt Kjelland from          09:06

1   Qualcomm.

2                    EXAMINATION

3   BY MR. FUNG:

4      Q.   Good morning, sir.

5      A.   Good morning.                                    09:07

6      Q.   Could you please state your name for the

7   record?

8      A.   Pradeep Kanapathipillai.

9          MR. FUNG:  Oh, sorry.  Please swear in the

10  witness.                                                 09:07

11            PRADEEP KANAPATHIPILLAI,

12  called as a witness, having been first duly sworn,

13  testified as follows:

14                    EXAMINATION

15  BY MR. FUNG:

16     Q.   My apologies for that.

17          Are you currently employed by Qualcomm?

18     A.   Yes, I am.

19     Q.   What is your current position?

20     A.   My title is senior director of engineering     09:07

21  in the CPU organization.

22     Q.   Have you had your deposition taken before?

23     A.   No.

24     Q.   Have you ever testified in court?

25     A.   No.                                             09:07

1   Q.   So since this is your first deposition, I'd

2   just like to go over some ground rules.

3        To ensure that the court reporter can

4   record what we're saying, we should try not to talk

5   over each other.                                              09:07

6        Does that sound okay?

7   A.   Yes.

8   Q.   And if you can wait until I finish my

9   question before answering, I will give you an

10  opportunity to answer.                                        09:07

11       Can you comply with that?

12  A.   Yes.

13  Q.   From time to time your counsel may object

14  to some of my questions.  Unless your counsel

15  instructs you not to answer on the basis of           09:08

16  privilege, you are obligated to respond to my

17  question.

18       Do you understand that?

19  A.   Yes.

20  Q.   And you understand that in this court that      09:08

21  between deposition questions, during breaks, you're

22  not allowed to confer with your counsel about the

23  substance of your testimony.

24       Do you understand that?

25  A.   Yes.                                              09:08

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                                        8

1    Q.   Is there any reason you cannot give full

2  and complete testimony today?

3    A.   No.

4    Q.   Did you do anything to prepare for this

5  deposition?                                                                        09:08

6    A.   Yes.

7    Q.   What did you do?

8    A.   There was a few meetings -- there were a

9  few meetings with the counsel.

10   Q.   How many meetings were there?                          09:08

11   A.   Perhaps a day's worth of meetings.

12   Q.   When was that day's worth of meetings?

13   A.   Yesterday.

14   Q.   How many hours did you meet for?

15   A.   Around six to seven hours.  Yeah.                        09:08

16   Q.   Who else was present at those meetings?

17   A.   Just the counsel that was mentioned here.

18   Q.   Did you review documents to prepare for

19  today's deposition?

20       MS. NYARADY:  You can answer that "yes" or        09:09

21  "no."

22       THE WITNESS:  Yes.

23  BY MR. FUNG:

24   Q.   Did any of those documents refresh your

25  recollection?                                                                     09:09

1    A.   Yes.

2    Q.   Which documents?

3    A.   The CPU architecture specs and

4    microarchitecture specs.

5    Q.   CPU architecture specs -- how many CPU                     09:09

6    architecture specs did you review that refreshed

7    your recollection?

8    A.   The CPU ISA document from NUVIA and the CPU

9    microarchitecture specs.

10   Q.   The CPU ISA document from NUVIA, was that           09:09

11   the CPU ISA document for ▮▮▮▮▮▮▮

12        MS. NYARADY:  Objection.

13        THE WITNESS:  Which ▮▮▮▮▮▮

14   BY MR. FUNG:

15   Q.   Was it the CPU ISA document for ▮▮▮▮▮▮▮            09:09

16        MS. NYARADY:  Objection.

17        THE WITNESS:  Which ▮▮▮▮▮ -- which CPU

18   are you referring to?

19   BY MR. FUNG:

20   Q.   Do you know what ▮▮▮▮▮ is?                          09:09

21   A.   ▮▮▮▮▮▮ is the code name that we used for

22   one of our CPUs, yes.

23   Q.   It's the code name for one of your CPUs.

24        So which code name is the CPU ISA

25   architecture that you reviewed?                              09:10



1
2
3
4
5     09:10
6
7
8
9
10    09:10
11
12
13
14
15    09:10

16    Q.   You mentioned a second specification.  Let

17  me just take a quick look.

18       CPU microarchitecture specs.  How many CPU

19  microarchitecture specs did you review?

20    A.   I did not review them in detail, but there    09:11

21  were, I believe -- my recollection is somewhere

22  between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

23    Q.   Which CPUs did these microarchitecture

24  documents correspond to?

25    A.   All of them.    09:11

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
11



14    Q.   Other than the CPU ISA architecture

15    specification and the microarchitecture                    09:12

16    specifications, were there any other documents that

17    refreshed your recollection?

18    A.   No.

19    Q.   Other than the counsel that were identified

20    at this deposition, who else did you speak with          09:12

21    about your deposition?

22    A.   No one else.

23    Q.   Where did you go to college, sir?

24    A.   My last degree was at Stanford University.

25    Q.   Did you get a bachelor's degree?                    09:12

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                         12

1    A.   At Stanford I got my master's.

2    Q.   Did you get a bachelor's degree?

3    A.   Yes.

4    Q.   Where did you get your bachelor's degree?

5    A.   University of Arizona.                                    09:12

6    Q.   When did you get that bachelor's degree?

7    A.   That was conferred in 1998.

8    Q.   You said you got your master's degree at

9    Stanford; is that right?

10   A.   Correct.                                                  09:13

11   Q.   When did you get your master's degree?

12   A.   In the year 2000.

13   Q.   Do you have any other -- any other degrees

14   post college?

15   A.   No.                                                       09:13

16        MR. FUNG:  I would like to mark this

17   exhibit as Exhibit 1.

18        (Exhibit 1 was marked for identification by

19        the Certified Shorthand Reporter, and a

20        copy is attached hereto.)                                 09:13

21   BY MR. FUNG:

22   Q.   And I'll represent to you, sir, that

23   Exhibit 1 is a PDF version of your LinkedIn profile.

24        And my question is, does Exhibit 1

25   accurately represent your LinkedIn profile?                    09:13

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          13

1    A.   Yes.  It does.

2    Q.   Great.

3         I want to talk about your employment at

4    Apple.

5         It says here you worked at Apple from 2008                    09:14

6    to June 2019; is that correct?

7    A.   That is correct.

8    Q.   What were your responsibilities at Apple?

9    A.   Over those 12 years, I did a number of

10   things.  At the time that I left Apple, my                         09:14

11   responsibility was to lead the CPU core architecture

12   and microarchitecture RTL team.

13   Q.   Why did you leave your position at Apple?

14   A.   I wanted to join the start-up, NUVIA.

15   Q.   Did you work with ARM while you were at                       09:14

16   Apple?

17   A.   Yes.

18   Q.   How did you work with ARM at Apple?

19   A.   In a number of capacities.  I used to work

20   with the ARM architects on a technical basis very                  09:14

21   closely for the last 15 years.

22   Q.   When you joined NUVIA, it says here in

23   June 2019, what were your responsibilities when you

24   joined?

25   A.   I was leading the architecture and                            09:15

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          14

1  microarchitecture RTL for the CPU core, the cluster,

2  and the subsystem.

3     Q.   Did your responsibilities change during

4  your time at NUVIA?

5     A.   Not at the time of NUVIA.                           09:15

6

7

8

9

10                                                             09:15

11

12

13

14

15                                                             09:16

16

17     Q.   NUVIA, at some point, was acquired by

18  Qualcomm; is that true?

19     A.   Yes.

20     Q.   When did Qualcomm acquire NUVIA?               09:16

21     A.   March of 2021.

22     Q.   When Qualcomm acquired NUVIA, did your job

23  responsibilities change?

24     A.   Not at the time of acquisition, but since

25  then it has changed.                                     09:16

PRADEEP KANAPATHIPILLAI HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                              15

1    Q.   How has your job responsibilities changed

2    since the acquisition?

3    A.   I now lead the CPU verification team as

4    well as the CPU DFT, design for test, team, as well

5    as some other teams such as program management.          09:16

6    Q.   When Qualcomm acquired NUVIA, did you

7    become a Qualcomm employee?

8    A.   Yes.

9    Q.   Approximately when did you become a

10   Qualcomm employee?                                        09:17

11   A.   March 15, 2021.

12   Q.   Did you own shares or stock in NUVIA at the

13   time of the acquisition?

14   A.   Yes.

15   Q.   How many shares?                                     09:17



                                                               09:17

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
16

1   

2      MS. NYARADY:  Objection.

3

4

5                                                                09:17

6

7   BY MR. FUNG:

8

9

10                                                               09:18

11

12

13

14

15                                                               09:18

16

17

18

19

20                                                               09:18

21

22

23

24

25                                                               09:18

1   start-up to do great work and I was able to do so.

2   And yes, I was pleased with the payoff.

3       Q.   Do you think you should have gotten more?

4       A.   No.

5       Q.   How many employees were at NUVIA -- strike                    09:19

6   that.

7           When you joined NUVIA, how many employees

8   reported to you?

9       A.   When I joined NUVIA, no one reported

10  because at that time the NUVIA as a company was            09:19

11  quite small.  I believe I was the 25th employee at

12  NUVIA, and we were forming the organization at that

13  time.

14      Q.   At the time NUVIA was acquired by Qualcomm,

15  how many individuals reported to you?                      09:19

16      A.   About 25.

17      Q.   How many employees were at NUVIA at the

18  time of the acquisition?

19      A.   250.

20      Q.   Of those 250, how many of those were            09:19

21  engineers at NUVIA?

22      A.   It would be around 220 or so, the remaining

23  30 being sales and management and so on and so

24  forth.

25      Q.   Did your compensation -- did your                09:20

1  compensation change when you became a Qualcomm

2  employee after the acquisition?

3    A.   Yes.

4    Q.   How did your compensation change?

5    A.   All the employees at the time of        09:20

6  acquisition were offered Qualcomm offers, and the

7  numbers definitely were different in terms of how

8  they were structured -- both in dollar amounts, as

9  well as how they were structured.

10    Q.   Did your compensation increase when you   09:20

11  became a Qualcomm employee?

12    A.   I am not recalling the details, but the

13  overall package, I would say, is larger.

14    Q.   Approximately how much larger at the time?

15    A.   It is difficult to compare because prior to   09:21

16  the acquisition, NUVIA was not a public company, and

17  so the stock options were priced at a certain ground

18  price. But there was not a market price for this

19  because it was a start-up.

20  ██████████████████████████████   09:21

21  ██████████████████████████████

22  ██████████████████████████████

23    Q.   How much did your base salary increase

24  after you became a Qualcomm employee?

25  ██████████████████████████████   09:21

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          19



1

2

3   Q.   Do you currently own stock in Qualcomm

4  today?

5   A.   I do.                                                09:21

6   Q.   How many shares?

7   A.   I don't recall the number of shares, but I

8  can quote you in dollar amounts roughly.

9   Q.   What are the dollar amounts?

10                                                             09:22

11

12

13

14   Q.   We talked about          earlier.

15  is a core; is that correct?                               09:22

16      MS. NYARADY:  Objection.

17      THE WITNESS:  There are different CPUs.

18

19

20  BY MR. FUNG:                                               09:22

21

22

23   A.   Can you clarify that question?  What does

24  that mean, what is the CPU?

25                                                             09:23

1        MS. NYARADY:  Objection.

2        THE WITNESS:  CPU is a central processing

3    unit.

4    BY MR. FUNG:

5        Q.   What is different between the                                 09:23

6

7

8

9

10                                                                      09:23

11

12

13

14

15                                                                      09:23

16

17

18

19

20        What is Snapdragon?                                           09:24

21    A.   Snapdragon is the external code name that

22    Qualcomm has been using for their chipsets.

23    Q.   How does Snapdragon relate to

24

25    A.   Snapdragon is the external brand name.        09:24

1   ████████████████ are the internal names of the SoCs.

2   Q.   What is Snapdragon X Elite?

3   A.   Snapdragon X Elite is the latest publicly

4   released, publicly announced SoC that was announced

5   two months ago, about two months ago.                    09:25

6   Q.   Which CPU does Snapdragon X Elite use?

7   A.   It uses the ████████████ CPU.

8   Q.   Is the CPU in Snapdragon X Elite ARM

9   compatible?

10       MS. NYARADY:  Objection.                             09:25

11       THE WITNESS:  Could you rephrase that

12   question?  What does it mean, ARM compatible?

13   BY MR. FUNG:

14   Q.   What does ARM compatible mean?

15   A.   It doesn't have a technical definition.             09:25

16   That's why I'm asking you.

17   Q.   So if I saw marketing materials from

18   Qualcomm that said a CPU core was ARM compatible,

19   would that be an inaccurate statement?

20       MS. NYARADY:  Objection.                             09:26

21       THE WITNESS:  It would be inaccurate.

22   BY MR. FUNG:

23   Q.   Okay.  It would be a false statement?

24       MS. NYARADY:  Objection.  Mischaracterizes

25   testimony.                                               09:26

1        THE WITNESS:  Please clarify.

2   BY MR. FUNG:

3     Q.   So if I were to say the CPU in Snapdragon X

4   Elite used an ARM-compatible CPU core, that would be

5   a false statement?                                            09:26

6        MS. NYARADY:  Objection.

7        THE WITNESS:  It would be an obscure

8   statement.

9   BY MR. FUNG:

10    Q.   What do you mean by "obscure"?                         09:26

11    A.   Because it doesn't define the aspect of the

12  ISA clearly.

13    Q.   Why does it not define the aspect of the

14  ISA clearly?

15    A.   I think you should clarify your question.             09:26

16    Q.   Why does it not define the aspect of the

17  ISA clearly?  That is your testimony.  Can you

18  please explain your testimony?

19    A.   Repeat that question one more time.

20    Q.   Why does "ARM-compatible CPU core" obscure           09:27

21  or not define the aspect of the ISA clearly?

22    A.   So an ISA, which is instruction set

23  architecture, defines the hardware-software contract

24  between the CPU and the software that runs on that

25  CPU.  And an ARM-compatible CPU is not the                   09:27

1   terminology that is used in the industry.

2       There are different ISAs such as ARM ISA,

3   x86 ISA, RISC-V, MIPS, and so forth.

4       The CPU hardware needs to be compliant with

5   the ISA, and that is the terminology that is used in     09:27

6   the industry.

7   Q.   So the proper terminology for the

8   Snapdragon X Elite would be it uses an ARM-compliant

9   core; is that correct?

10      MS. NYARADY:  Objection.  Mischaracterizes     09:27

11   testimony.

12      THE WITNESS:  It uses a CPU that is

13   compliant with ARM ISA.

14   BY MR. FUNG:

15   Q.   "A CPU that is compliant with ARM ISA," is     09:28

16   that different from being an ARM-compliant CPU?

17   A.   It's different from ARM-compatible CPU, but

18   it's the same as ARM-compliant CPU.

19   Q.   Okay.  What market is the Snapdragon X

20   Elite intended for?     09:28

21   A.   It is intended for the premium compute

22   market.

23   Q.   What is the premium compute market?

24   A.   Premium compute would be anywhere from

25   high-end desktops to lower-end desktops to laptops,     09:28

1    high-end to low-end laptops and down to the tablet

2    space.

3        MR. FUNG:  I'd like to mark this next

4    exhibit has Exhibit 2.

5        (Exhibit 2 was marked for identification by                    09:29

6        the Certified Shorthand Reporter, and a

7        copy is attached hereto.)

8    BY MR. FUNG:

9    Q.   And don't worry, I'm not going to ask you

10   about every single page, but if you could just take             09:29

11   a look and let me know if you recognize this

12   document.

13   A.   I do.

14   Q.   What is this document?

15                                                                    09:29

16

17

18

19

20                                                                   09:29

21

22

23

24

25                                                                   09:30

1 ██████████████████████████

2 ██████████████████████████

3 ██████████████████████████

4    A.   This was the first version and also the

5 only version.  Because as a start-up we did not pay     09:30

6 attention to maintaining revisions for this

7 document.

8    Q.   How was this ████████████████ used?

9    A.   ████████████████████████████

10 ████████████████████████████     09:30

11 ████████████████████.

12    Q.   I'd like to direct your attention to

13 page 13 with the Bates number ending in 991.

14       Do you see that table on page 13?

15    A.   I do.     09:31

16    Q.   It says "Revision History," and there's a

17 date on there, October 30th -- or 10/30/19.

18       Do you see that?

19    A.   I see that.

20    Q.   And there's a column with your -- that says     09:31

21 "Name."  It says "Pradeep.K."

22       Do you see that?

23    A.   Yes.

24    Q.   Did you author this document?

25    A.   I did.     09:31

1    Q.   And is the date listed in that column the

2    date that this document was initially released?

3    A.   That was the first release of it.

4    Q.   Did anyone else help you write this

5    document?                                                    09:31

6    A.   No.

7    Q.   You can set this aside.  Thank you.

8         MR. FUNG:  I'd like to mark the next

9    document as Exhibit 3.

10        Exhibit 3 is a document produced by          09:32

11   Qualcomm with Bates ending 688.

12        (Exhibit 3 was marked for identification by

13        the Certified Shorthand Reporter, and a

14        copy is attached hereto.)

15   BY MR. FUNG:                                        09:32

16   Q.   And, sir, if you could please just look at

17   the document and let me know if you recognize it.

18   A.   I recognize this.

19   Q.   What is this document?

20   A.   This appears to be the slide presentation    09:32

21   that I gave to Qualcomm just prior to the

22   acquisition.

23   Q.   And this is an accurate copy of that slide

24   presentation you gave to Qualcomm?

25        MS. NYARADY:  Objection.                      09:32

1      THE WITNESS:  I don't recall all of the

2  content in the presentation that was given at that

3  time.  This was two and a half years ago.  But this

4  appears to be the main presentation.

5  BY MR. FUNG:          09:33

6    Q.  Great.

7      If you could please turn to page 3, Bates

8  ending 690.  The title of this page is ▮▮▮▮

9  ▮▮▮▮▮▮▮▮

10      Do you see that?        09:33

11    A.  Yes.

12    Q.  The NUVIA -- excuse me.

13      The ▮▮▮▮▮▮▮, which CPU is this

14  referring to?

15    A.  This one refers to the ▮▮▮▮▮CPU.    09:33

16  ▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮

18    Q.  I want to direct your attention to this

19  figure that says ▮▮▮▮."

20      Do you see that?        09:34

21    A.  Yes.

22    Q.  What does ▮▮▮" stand for?

23    A.  ▮▮▮▮▮.

24    Q.  What is the difference between an ▮▮▮ and

25  an SoC?          09:34



1    A.   The SoC is the system on a chip, and that's

2    the die that is fabricated and manufactured.  And

3    the ████████████████████████████████

████████████████

5    Q.   Would it be correct to think of it as an                    09:34

6    SoC can have one or many████?

7         MS. NYARADY:  Objection.

8         THE WITNESS:  An SoC can have many

9    instances of a CPU cluster, whichever way the

10   designers choose to organize it; as a cluster or any            09:35

11   other way.

12   BY MR. FUNG:

13   Q.   So when you mention "cluster," the diagram

14   we see here,████████, that's an example of one

15   such cluster?                                                   09:35

16   A.   Correct.

17   Q.   Okay.  This particular ███████████████

███████████████.

19        Do you see that?

20   A.   Yes.                                                       09:35

21   Q.   And there's an arrow that points to a

22   figure in the middle of the page that says "CPU

23   core."

24        Do you see that?

25   A.   Yes.                                                       09:35

1    Q.   So would it be accurate ██████████

██ t██████████████████████

3    A.   From a design boundary and a physical

4    boundary it would be accurate.

5    Q.   Got it.                                                    09:35

6         Within the diagram that says "CPU core,"

7    there are various agents listed: ████████████

8    et cetera -- strike that.

9         Actually, let me clarify first.

10        What is a CPU agent?                                       09:36

11   A.   A CPU agent, that's not a terminology

12   that's used in the industry.

13        Can you clarify?

14   Q.   Let me ask it a different way.

15        What is -- in this figure there is a series        09:36

16   of boxes labeled with various letters, including

17   ██████████████ and so on.

18        What is an ████

19   A.   An ███ -- the acronym ███ stands for

20   ████████████████                                               09:36

21        (Stenographer clarification.)

22   Q.   What is an ██████████████

23   A.   ████████████████

██ ██████████████████████████

██ t██████████████████████                                         09:36

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                            30

1   ███████████████████████████████

    ███████████████████████████████

    █████████████ .

4   Q.   You mentioned that it is a block.

5        Would it be correct to view these acronyms                09:37

6   in this CPU core figure as CPU blocks?

7   A.   Either blocks or units.  Those would be

8   fine.

9   Q.   So they're either blocks or units, but they

10  are not agents?                                                09:37

11  A.   They are not agents.

12  Q.   Does the term "agent" mean anything to you

13  in the context of a CPU core?

14  A.   No.

15  Q.   So from this figure I see that there are               09:37

16  ███████████████████████████ ; is

17  that accurate?

18  A.   That's accurate.

19  Q.   There is a block that lists ███████ ."

20       Do you see that?                                         09:37

21  A.   Yes.

22  Q.   What does ███ stand for?

23  A.   ███ stands for ████████

24  Q.   And what does ███ stand for?

25  A.   ███████████ , is what ███ stands            09:38

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          31

1    for.

2       Q.   The CPU blocks that are listed here, are

3    these implemented using code?

4       A.   They are designed in the RTL using Verilog

5    code.  But there are many representations of the          09:38

6    design.

7       Q.   Got it.

8            There's an image here on the right.

9    Unfortunately it's a little blurry.  But this

10   darkened image on the right, I see there is ██████         09:38

11   listed in a couple -- a few places.

12           What is this image from?

13      A.   ████████████████████████████████

██ ██████████████.

15      Q.   How was this image generated?                      09:39

16      A.   ████████████████████████████████

██ █████████████████████████████████

██ ██████████████████████████

19      Q.   Was this -- just to clarify, did you mean

20   flow plan or floor plan?                                   09:39

21      A.   Floor as in F-L-O-O-R P-L-A-N.  Floor plan.

22      Q.   Oh, okay.

23           The floor plan for the CPU, was that done

24   in Cadence?

25      A.   I don't recall the EDA CAD tools we used          09:39

1   back then.

2       Q.   How many engineers worked on designing and

3   implementing the CPU blocks we see here in this

4   figure, the CPU core?

5       A.   We need clarity in that question.                        09:40

6           For how many blocks?  How many -- please

7   clarify.

8       Q.   Okay.  Let me -- let me re-ask it a

9   different way.

10          How many engineers worked on the ▇ block?          09:40

11      A.   So designing a block such as ▇ requires

12   engineers from different disciplines; architecture,

13   microarchitecture, RTL, design verification, DFT,

14   physical design.

15          If combined in total, it would be on the            09:40

16   order of 15 people.

17      Q.   Got it.

18          How about the ▇ block?  How many

19   engineers?

20      A.   I would say similar; 10 to 15 perhaps,             09:40

21   yeah, in total.

22      Q.   Would that be the same answer for the

23   remaining blocks listed here?

24      A.   Yes, roughly.  But in -- different blocks

25   have different levels of complexities, and so there       09:40

1   might be some variance.

2      Q.   When was this presentation given to

3   Qualcomm?

4      A.   I don't recall the detail -- the dates on

5   the details, but it'll be starting from                        09:41

6   mid-December 2020 through end of Jan 2021.

7      Q.   And that was before the acquisition?

8      A.   That was before the acquisition closed.

9      Q.   Got it.  Okay.  You can set this aside.

10         Thank you.                                               09:41

11         MR. FUNG:  I'd like to mark this next

12   document as Exhibit 4, I believe.  This is an e-mail

13   produced by Qualcomm with Bates ending 978.

14         (Exhibit 4 was marked for identification by

15         the Certified Shorthand Reporter, and a          09:42

16         copy is attached hereto.)

17   BY MR. FUNG:

18      Q.   I'll just give you a moment to look over

19   that document.  And please let me know when you're

20   ready.                                                         09:42

21         MS. NYARADY:  Given the documents that have

22   been marked, I'm going to mark the transcript highly

23   confidential source code, attorneys' eyes only, and,

24   for the record, just state under the protective

25   order I'm going to be removing the source code                09:42

1   exhibits at the end of the deposition.  So you can

2   just put a placeholder in there.

3        THE WITNESS:  Repeat that question, sir.

4   BY MR. FUNG:

5   Q.   Sure.                                                       09:42

6        Do you recognize this e-mail exchange?

7   A.   Yes, I recall.

8   Q.   What is this e-mail about?

9   A.   Give me a minute --

10  Q.   Sure thing.                                                 09:43

11  A.   -- let me study this.

12

13

14

15                                                                  09:44

16

17  Q.   I want to direct your attention to the

18  e-mail at the top of the chain on page 1 ending in

19  Bates 978.  It is an e-mail sent by you to

20  Mohd Imran Beg.                                                 09:45

21      Do you see that?

22  A.   Yes.

23  Q.   And this is an e-mail you wrote in your

24  role as a NUVIA employee; is that right?

25  A.   Yes.                                                        09:45

1    Q.   Who is Imran Beg?  I'm not sure if I'm

2   saying his name correctly.   Who is Imran?

3    A.   Imran is -- was an engineer who was

4   reporting to me in my team.

5    Q.   And who is Vinod Chamarty?                          09:45

6    A.   He was an employee at NUVIA, but he was not

7   working on the CPU, but rather on the SoC.

8    Q.   Got it.

9        At the time of this e-mail, how many

10   individuals reported to you at NUVIA?                    09:45

11    A.   This was early 2020.  I would say five to

12   ten people at that time.

13    Q.   And around -- at the time of this e-mail,

14   how many engineers were employed by NUVIA?

15    A.   I don't recall, but I'm going to guess            09:45

16   about 100.

17    Q.   Got it.

18

19

20                                                            09:46

21

22        Do you see that?

23    A.   Yes.

24    Q.   Why did you tell Imran not to disclose

25   anything about NUVIA plans?                              09:46

1    A.   It is standard practice in the industry

2   when you are working with customers or suppliers to

3   never disclose anything about the company's plans.

4    Q.   And that includes to ARM?

5    A.   That includes to ARM.                                    09:46

6    Q.   Are there any instances where you would

7   want to disclose to your licensor your company's

8   plans?

9    A.   No.

10                                                                 09:46

11

12

13   A.   Yes.

14   Q.   What do you mean by "ARM architectural

15   licensee"?                                                    09:47

16   A.   That NUVIA has -- at that time, I believe,

17   NUVIA had signed the ARM architectural license

18   agreement.

19   Q.   Got it.  You can set this document aside.

20       MR. FUNG:  I would like to mark this next           09:47

21   document as Exhibit 5.

22       (Exhibit 5 was marked for identification by

23       the Certified Shorthand Reporter, and a

24       copy is attached hereto.)

25   ///

1   BY MR. FUNG:

2       Q.   Just please take a look at that and let me

3   know when you are ready.

4       A.   Yes.  I recognize.

5       Q.   What is this e-mail about?                          09:49

6       A.   This was, again, in the early stages of

7   developing the ███████████████ we were discussing

8   the interface between the CPU cluster and the

9   coherence fabric that it will interface to.

10      Q.   Got it.                                              09:49

11           And this e-mail was sent and received in

12   the course of business at NUVIA?

13      A.   That is correct.

14      Q.   When you said ███████████████ is that

15   ████████████████████                                        09:49

16   ████████████████████

17      Q.   Got it.

18           I want to direct your attention to your

19   e-mail in the middle of the page 1 ending in

20   Bates 613, dated April 9, 2020.                             09:49

21           Do you see that?

22           MS. NYARADY:  Objection.  I think you meant

23   April 29th.

24           THE WITNESS:  Repeat that question.

25   ///

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          38

1    BY MR. FUNG:

2        Q.   Sure.

3             I want to direct your attention, with

4    Catherine's correction, to your e-mail on the middle

5    of the page that is dated approximately April 29,                    09:49

6    2020.

7             Do you see that?

8        A.   Yes.

9        Q.   This e-mail is to -- or rather your e-mail

10   is addressed to Shyam, Vikas, and Swapnil.                           09:50

11            Do you see that?

12       A.   Yes.

13       Q.   Who is Shyam?

14       A.   He was an engineer reporting to me.

15       Q.   And what was his role?                                      09:50

16       A.   He was the architect and RTL owner for the

17            ███████████ , which was a unit in the CPU

18   cluster.

19       Q.   And who is Vikas?

20       A.   He was in the same team as the ███                         09:50

21   ████████████

22       Q.   Got it.

23            And who is Swapnil?

24       A.   He was also a NUVIA engineer in the same

25   team.                                                               09:50

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                            39

1    Q.   Around at the time of this e-mail, how many

2    individuals reported to you?

3    A.   So this is end of April 2020.  I'm going to

4    guess -- again, I don't recall -- I'm going to guess

5    it's on the order of 20 people.                        09:51

6

7

8

9        Do you see that?

10   A.   Yes.                                              09:51

11

12

13

14

15                                                          09:51

16

17

18

19

20                                                          09:52

21

22

23

24

25                                                          09:52



 5  09:52

10  09:52

11   Q.   Got it.

12        And I want to direct your attention to the

13  next paragraph where there is -- one, two, three,

14  four, five -- five Confluence links -- five

15  Confluence links, I believe.                        09:52

16        Do you see that?

17   A.   Yes.

18   Q.   And in front of each Confluence link,

19  there's some text in bold that read

20        Do you see that?                               09:53

21   A.   Yes.

22

23

24

25                                                       09:53

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
41



1

2

3

4

5    09:53

6

7    Q.   Got it.

8         In the paragraph preceding these five

9    Confluence links, you have a sentence or paragraph

10   directed to Shyam and Vikas.    09:53

11        Do you see that?

12   A.   Yes.

13

14

15    09:54

16        Do you see that?

17   A.   Yes.

18   Q.   What do you mean by seed the estimates?

19   A.   It means that as part of the CPU design

20   development effort, both the design as well as the    09:54

21   verification of the CPU, we had to organize our

22   efforts into a set of integrations.  Within each

23   integration, there are RTL and design verification,

24   DV, tasks.  Each of those tasks had to be

25   enumerated, itemized, and their efforts estimated so    09:54

1  that we can quantify how long it takes to design a

2  CPU.

3     Q.    What does design verification mean?

4     A.    It means verifying the design for its

5  functional correctness.                                          09:54

6     Q.    And where would that functional correctness

7  be defined?

8         MS. NYARADY:  Objection.

9         THE WITNESS:  The functional correctness is

10  of the design against the architecture, whatever the            09:55

11  architecture may be.

12  BY MR. FUNG:

13     Q.    And how did you go about verifying the

14  design for its functional correctness?

15     A.    So this was a large effort that took about            09:55

16  three years to verify the CPU.  Numerous design

17  verification technologies were built at NUVIA and

18  since then at Qualcomm.

19         We can talk about any one of those pieces

20  if you have specific questions.                                  09:55

21     Q.    Approximately how many pieces are you

22  referring to?

23

24

25                                                                  09:56

1    Q.    Could you give three examples of such

2    pieces at the highest level of classification?



09:56

09:56

09:57

09:57

09:57

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
44

5    Q.   Got it.  Okay.  Thank you.  You can set          09:58

6    that document aside.

7        MR. FUNG:  I'd like to mark this next

8    document as Exhibit 6.

9        With apologies for the size of the font,

10   but this document was produced to us by Qualcomm,      09:58

11   Bates ending 828.

12       (Exhibit 6 was marked for identification by

13       the Certified Shorthand Reporter, and a

14       copy is attached hereto.)

15   BY MR. FUNG:                                           09:58

16   Q.  I'll give you a moment to just review it

17   and let me know when you're ready.

18   A.  Is this the only copy that you have?  I'm

19   having difficulty reading this text, the small font.

20   Q.  I'm having difficulty as, so -- well, let          09:59

21   me just ask you a couple questions.

22       The top half of the page, I see an e-mail

23   from Nitin Sharma to Manu Gulati and yourself with a

24   copy to Conrado Blasco.

25       Who is Manu Gulati?                                10:00

1   A.   Manu was one of the founders of NUVIA.

2   Q.   And who is Conrado Blasco?

3   A.   He's another NUVIA employee.

4   Q.   What was Conrado's role at NUVIA?

5   A.   Conrado was leading the CPU performance                 10:00

6   modeling and performance validation.

7   Q.   Got it.

8        There is a chart in the middle of the page.

9        Do you see this chart or, rather, graph or

10  graphic?                                                     10:00

11  A.   Yes.

12  Q.   Do you recognize this particular graphic?

13  A.   No, I don't.

14  Q.   Okay.  Just a couple questions, then.

15       In the middle of the graphic there is a                 10:00

16  text that says █████████████

17       █████████████████████████

18  A.   Let me try to locate that.

19       Is that in the middle of the diagram?

20  Q.   Middle of the diagram, top line between May              10:01

21  and June 2021.

22  A.   Yes, I see that text.

23  Q.   What does ███████ mean?

24  ████████████████████████████████████

25  █████████████████████████████████████                        10:01

1

2          (Stenographer clarification.)

3    Q.   And what does tapeout mean?

4    A.   Tapeout is the terminology that is used in

5  the industry where the completed physical design is          10:02

6  shipped to the foundry for manufacturing.

7    Q.   What is required in a complete -- let me

8  strike that question.  Strike that.

9          What does a -- what does a completed

10  physical design comprise of?                                 10:02

11   A.   I mean, it's a broad question.  The

12  completed physical design of an entire die for the

13  SoC has many pieces within.

14          If there's any -- if there is a specific

15  area, then I can talk about.                                 10:02

16   Q.   Okay.  Let's try it this way:  In order for

17  you to ship the physical design to the foundry, what

18  do you have to physically give to the foundry?

19   A.   The standard process is that the design

20  house has to deliver a fully verified and a fully           10:03

21  completed physical design database in a format

22  called GDS and ship that electronically to the

23  foundry.

24   Q.   And what does the foundry do with that

25  completed physical design database?                          10:03

1    A.   That physical design database is used by

2    the foundry to construct the masks that are used for

3    the lithography process in the silicon process and

4    technology, which is a very complex process.

5    Q.   What is the output of the tapeout process                10:04

6    by the foundry?

7         MS. NYARADY:  Objection.

8         THE WITNESS:  I think your question is not

9    worded correctly.

10   BY MR. FUNG:                                                  10:04

11   Q.   What does -- how would you word the

12   question, then?

13        MS. NYARADY:  Objection.

14        THE WITNESS:  Could you ask the question

15   one more time?                                                10:04

16   BY MR. FUNG:

17   Q.   What do you get in return from the foundry?

18   A.   Depends on how the business arrangement

19   with the foundry is structured by the design house.

20        The typical process in the industry is that            10:04

21   when the foundry completes the manufacturing of the

22   die, it needs to be packaged and tested.  And

23   sometimes that testing happens on-site in the

24   foundry.  Sometimes the foundry partners with the --

25   what we refer to as OSATs, outsourced semiconductor          10:04

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                              48

1    and test assembly houses.

2         But at the end, the design house receives

3    packaged parts.

4      Q.   You mentioned "design house."  Would NUVIA

5    be considered a design house?                                    10:05

6      A.   Yes.

7      Q.   Oh, okay.

8         You can set this document aside.

9         We've been going for about an hour now, if

10   you want to take a ten-minute break.                             10:05

11     A.   I'm fine.

12        MS. NYARADY:  Are you good for a break?

13   BY MR. FUNG:

14     Q.   Good for a break?

15     A.   No, I can continue.                                       10:05

16        MS. NYARADY:  Do you want to keep going?

17   BY MR. FUNG:

18     Q.   You want to keep going?

19     A.   Yes.

20     Q.   Okay.  Let's keep going.                                  10:05

21        I'd like to mark this next document as

22   Exhibit 17.

23        MS. NYARADY:  I think you mean 7.

24        MR. FUNG:  7.  Sorry about that.

25   ///

1          (Exhibit 7 was marked for identification by

2          the Certified Shorthand Reporter, and a

3          copy is attached hereto.)

4     BY MR. FUNG:

5        Q.   And I'll represent to you this is an e-mail                    10:05

6     exchange between ARM's outside counsel and

7     Qualcomm's outside counsel.

8             And I just want to direct you to the first

9     page.  It is an e-mail from jacob@ -- I believe --

10    paulweiss dated September 12, 2023.  And there is a          10:06

11    list of what he describes as SoCs and cores in the

12    middle of that page?

13            Do you see that?

14       A.   Let me read through this.

15       Q.   Sure thing.                                                    10:06

16       A.   Yeah, I see the first page.

17       Q.   Great.

18            That first page lists several of what we

19    have been calling code names:  ████████████

20    ████████████████████████████████████████                    10:08

21            Do you see that?

22       A.   I see that.

23       Q.   We have been talked about ████████████

24    ████████████████████████

25    ████████████████████████████                                10:08

PRADEEP KANAPATHIPILLAI  HC, AEO                        December 01, 2023
ARM LTD. V. QUALCOMM INC.                                              50



1

2

3

4

5   A.   It use --                                                     10:08

6   Q.   Is there a code name for it?

7        Sorry.  Go ahead.

8   A.   It uses the

9

10                                                                     10:08

11

12

13

14

15                                                                     10:09

16   Q.   Let me just try and clear up the record a

17   little.

18

19

20                                                                     10:10

21

22

23

24

25                                                                     10:10



1

2

3

4

5                                                                                            10:10

6

7

8

9

10                                                                                          10:10

11   Q.   Okay.  Okay.  Has the source code for these

12  projects been produced in this lawsuit?

13   A.   I'm not aware of the full list of source

14  codes that has been provided to you.

15       MS. NYARADY:  Counsel, if it helps, we did          10:11

16  prepare a document for this topic that he can use.

17  He just doesn't have personal knowledge.

18       MR. FUNG:  Okay.

19  BY MR. FUNG:

20   Q.   In that case, can you consult your document        10:11

21  and answer that question?

22       MS. NYARADY:  We have copies if you want to

23  mark it.

24       MR. FUNG:  Yeah.  Let's mark this as

25  Exhibit 8.                                                10:11

1      (Exhibit 8 was marked for identification by

2      the Certified Shorthand Reporter, and a

3      copy is attached hereto.)

4   BY MR. FUNG:

5    Q.   Let's switch.  You can look at the marked                10:11

6   version, and I'll look at the unmarked version.

7    A.   Give me a minute.  Let me...

8    Q.   Sure thing.

9    A.   Yes, I see that.

10    Q.   So in your -- what's been marked as                      10:13

11   Exhibit 8 is a list of projects and folders; is that

12   accurate?

13    A.   The way I would characterize this is it's a

14   list of projects.  And right where it says ████

15   the ███████████, and ███████████                              10:14

16    Q.   And the source code for these projects as

17   described in these folders was produced in this

18   lawsuit?

19    A.   I believe so.  That's my understanding.

20    Q.   That source code was made available for            10:14

21   review on a source code computer; is that right?

22    A.   I believe so.

23    Q.   And the source code that was made available

24   for review on the source code computer is an

25   accurate copy of the source code projects as they        10:14

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                              53

1   exist at Qualcomm in NUVIA?

2      A.   I believe at the time of the snapshot,

3   correct.

4      Q.   And the source code files on the source

5   code computer are organized in the same manner as          10:15

6   they are kept in the ordinary course of business at

7   Qualcomm or NUVIA?

8      A.   Repeat that -- sorry -- question again.

9      Q.   Sure thing.

10         The source code files on the source code            10:15

11   computer that were made available for review in this

12   lawsuit are organized in the same manner as they are

13   kept at Qualcomm and NUVIA?

14  

15                                                              10:15

16

17

18

19

20                                                             10:15

21         I was not involved in the organizing and

22   providing of the snapshot, which is why I'm not

23   clear on the -- on the content of these snapshots.

24      Q.   So what was included in each of these

25   snapshots that were made available for review on the       10:16

PRADEEP KANAPATHIPILLAI  HC, AEO                 December 01, 2023
ARM LTD. V. QUALCOMM INC.                                            54

1    source code computer?

2

3

4

5                                                                                    10:16

6    Q.   How about for the rest of the projects

7    listed here?

8

9

10                                                                                   10:17

11

12    Q.   In this list there are names of folders

13    underneath each project.

14        Do you see that?

15    A.   Yes.                                                                       10:17

16    Q.   Were there any subfolders or files excluded

17    under each of these folders?

18        And by "excluded" I mean not made available

19    for review on that source code computer.

20    A.   No.  I believe the complete repository was                                 10:18

21    provided.  But I'll have to look at the folder

22    before commenting, but that's my understanding so

23    far.

24    Q.   You would have to look at the folder on the

25    source code machine?                                                            10:18

PRADEEP KANAPATHIPILLAI  HC, AEO                       December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          55

1    A.   Yes.



18        But again, this is a high-level

19   organization that I'm describing, not necessarily

20   what we may or may not have followed.  But if I were

21   to look at that snapshot, I can tell you more

22   precisely.

23    Q.   When you say "look at the snapshot," what

24   do you mean by that?

25    A.   At the content that was provided to you.

10:18

10:19

10:19

10:19

10:19



1
2
3
4        Is that how the source code was kept in the

5   ordinary course of business at Qualcomm and NUVIA?        10:20

6   A.   I can't comment without looking at it.

7   Q.   Let me just ask a few more questions.

8        Obviously, I don't have the source code

9   computer here, but let's see if you can answer them.

10                                                           10:21

11

12        Does that mean anything to you?

13  A.   No, it doesn't.

14

15                                                           10:21

16  A.   No, it doesn't.

17

18

19

20                                                           10:21

21

22

23

24

25                                                           10:22

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
57



1
2
3
4
5                                                                           10:22
6
7

8    Q.    You've mentioned the -- you've used the

9    term "snapshot" several times now.  What do you mean

10   by snapshot?                                                            10:22

11    A.    In this context, it would be a snapshot of

12   some content from a repository.

13    Q.    "Repository," do you mean the source code

14   repository?

15    A.    In this context, it would be.                                    10:23

16    Q.    Okay.  How is that source code repository

17   maintained at Qualcomm and how -- strike that.

18        How was that source code repository

19   maintained at NUVIA?

20        MS. NYARADY:  Objection.                                           10:23

21

22

23

24

25                                                                          10:24

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          58

1    BY MR. FUNG:

2

3

4

5        MS. NYARADY:  Objection.                                    10:24

6

7

8

9    BY MR. FUNG:

10                                                                   10:24

11

12

13

14

15        MS. NYARADY:  Objection.                                   10:24

16        THE WITNESS:  It is subjective.  Depends on

17   the designer and the verification engineer.

18   BY MR. FUNG:

19   Q.   Sorry.  Let me just go back a little bit.

20        What was your undergraduate degree in?                     10:25

21   A.   In electrical engineering.

22   Q.   What was your graduate degree in?

23   A.   In electrical engineering.

24   Q.   Have you ever worked as a software

25   engineer?                                                       10:25

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
59

1   A.   No.

2   Q.   You mentioned, or you testified that the

3

4

5   A.   That's correct.                                      10:25

6   Q.   How would an engineer determine what

7   changes were made in each version of the code in

8   that repository?

9

10                                                            10:26

11

12

13

14

15                                                           10:26

16

17

18

19

20                                                           10:26

21

22

23

24      MS. NYARADY:  Objection.

25      THE WITNESS:                                          10:27



PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
60



BY MR. FUNG:

10:27

10:28

10:28

10:28

10:29

1    How about for



10:29

10:29

10:30

18   MS. NYARADY:  Objection.

10:30

10:31

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
62

1 | BY MR. FUNG:



10:31

10:31

10:32

10:32

10:33



1
2

3        (Stenographer clarification.)

4    BY MR. FUNG:

5      Q.   Let's just take an example and let's go          10:33

6    with under ███████████ for example.

7
8
9

10        Do you see that?                                    10:34

11     A.   Yes.

12     Q.   I will represent to you that the folder,

13    the top-level folder above that folder has the

14    folder name redacted.

15        Do you know why that folder name would be           10:34

16    redacted, the top-level folder?

17        MS. NYARADY:  Asked and answered.

18    Objection.

19        THE WITNESS:  No.

20        MR. FUNG:  You can set this document aside.         10:35

21        I would like to mark as Exhibit 9 this

22    following e-mail exchange.  It's produced by

23    Qualcomm with Bates ending in 508.

24    ///

25    ///

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                         64

1         (Exhibit 9 was marked for identification by

2         the Certified Shorthand Reporter, and a

3         copy is attached hereto.)

4    BY MR. FUNG:

5     Q.   I'll just give you a moment to take a look                    10:35

6    at it, and please let me know when you are ready.

7     A.   Yes.

8     Q.   What is this document marked as Exhibit 9?

9     A.   It's an e-mail exchange.

10    Q.   This is an e-mail exchange sent and                          10:38

11   received in the ordinary course of business at

12   Qualcomm?

13    A.   Yes.

14    Q.   I want to direct your attention to the top

15   e-mail which appears to be authored by you; is that                10:38

16   correct?

17    A.   Correct.

18    Q.   And that e-mail from you was sent to

19   someone called Huzefa Sanjeliwala.

20        Do you see that?                                               10:38

21    A.   Correct.

22    Q.   Who is Mr. Sanjeliwala?

23    A.   He was an engineer in the CPU team

24   reporting to me.

25    Q.   Was he a NUVIA employee?                                     10:38

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                              65

1          MS. NYARADY:  Objection.

2          MR. FUNG:  Strike that.

3     BY MR. FUNG:

4      Q.   Was he one of the employees from NUVIA that

5     came on board to Qualcomm after the acquisition?        10:38

6      A.   Yes, he was.

7      Q.   And what was his role?

8      A.   He was working on the -- on the 

9

10                                                             10:39

11

12

13

14          Do you see that?

15     A.   Yes.                                               10:39

16

17

18          MS. NYARADY:  And I will just caution you

19     not to reveal attorney-client communications.  But

20     you can answer to the extent you don't do that.        10:39

21          THE WITNESS:  I'm trying to refresh the

22     context of this e-mail thread.

23

24

25                                                             10:41

1

2   BY MR. FUNG:

3   Q.   Anything else you can tell me about your

4   e-mail to Mr. Sanjeliwala that is not privileged?

5   A.   No.  That is all I can recall.                    10:41



1      MS. NYARADY:  Objection.

2      THE WITNESS:  Post-acquisition, NUVIA was

3   no longer a separate company.

4   BY MR. FUNG:

5    Q.   Do you know, post-acquisition, whether                    10:44

6   NUVIA was a separate entity?

7    A.   I think I already answered that.

8    Q.   You said "separate company."

9      Do you mean -- do you mean to say that

10  company and entity are the same thing, in your                 10:44

11  answer?

12   A.   No, it's not.  Entity could mean a variety

13  of things.

14   Q.   Okay.  So do you know -- do you know if --

15  post-acquisition whether NUVIA was a separate                  10:44

16  entity?

17   A.   For a fact, post-acquisition, a company

18  that has been acquired by the larger company -- the

19  smaller company does not exist anymore.  So it's

20  part of the larger company.                                    10:44

21   Q.   Did any employees who were NUVIA employees

22  before the acquisition remain NUVIA employees after

23  the acquisition?

24   A.   No.

25   Q.   You can set that document aside.                         10:45

1       MS. NYARADY:  Could we take a quick break?

2       MR. FUNG:  Yeah, sure.

3       Do you want to take a five, ten-minute

4  break?

5       MS. NYARADY:  Is that okay with you?                 10:45

6       THE WITNESS:  Yeah, absolutely.

7       MR. FUNG:  Let's take a break.

8       THE VIDEOGRAPHER:  Off the record at

9  10:45 a.m.

10       (Recess.)                                          11:00

11       THE VIDEOGRAPHER:  Back on the record.

12  It's 11:00 a.m.

13  BY MR. FUNG:

14   Q.   Welcome back, sir.

15       MS. NYARADY:  And before you start, during      11:00

16  the break after consulting with you, we did educate

17  the witness on -- I think there were three questions

18  relating to the code that had been provided in this

19  case that he was not able to answer.

20       So he's going to answer those questions          11:01

21  now.

22

23

24

25                                                          11:01



PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                              69

1

2

3

4

5                                                                      11:01

6

7

8

9

10   BY MR. FUNG:                                                      11:01

11     Q.   Okay.  Great.  Thank you for that.

12          And I have to ask.  Other than those three

13   questions, did you discuss the substance of your

14   testimony with your counsel?

15     A.   No.                                                        11:01

16          MR. FUNG:  Okay.  Great.

17          Why don't mark this next document as

18   Exhibit 10, I believe.

19          This is a -- I believe it is a chat, but it

20   was produced by Qualcomm with Bates ending 711.       11:02

21          (Exhibit 10 was marked for identification

22          by the Certified Shorthand Reporter, and a

23          copy is attached hereto.)

24   BY MR. FUNG:

25     Q.   If you could just please take a look at       11:02

PRADEEP KANAPATHIPILLAI  HC, AEO                    December 01, 2023
ARM LTD. V. QUALCOMM INC.                                          70

1   this and let me know when you are ready.

2      A.   Yes.

3      Q.   Do you recognize this document marked as

4   Exhibit 10?

5      A.   Yes.                                                       11:06

6      Q.   What is this document?

7      A.   This looks to be a chat exchange between

8   myself and another engineer called Raghu Sankuratri.

9      Q.   What was Mr. Sankuratri's role?

10     A.   He was, at that time, I believe, a senior      11:06

11  director or vice president of the CPU operations.

12     Q.   Did you report to him?

13     A.   No, I did not.

14     Q.   Did he report to you?

15     A.   No, he did not.                                            11:06

16     Q.   He was in a different department or a

17  different group.  Would that be accurate?

18     A.   That's correct.

19     Q.   The first text from Mr. Sankuratri at the

20  very top of the page ending in -- Bates ending 711    11:07

21  

22

23

24        Do you see that?

25     A.   Yeah.                                                      11:07

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
71



1

2

3

4    A.    Correct.

5                                                                11:07

6

7

8

9

10                                                               11:07

11

12

13

14

15                                                               11:08

16

17

18

19

20        Do you see that?                                       11:08

21    A.    Yes.

22    Q.    What does          mean?

23                                                               11:08

24

25                                                               11:08

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
72



1

2

3

4     Do you see that?

5     A.   Yes.                                                11:09

6

7

8

9     A.   Yes.

10                                                             11:09

11

12

13

14

15                                                             11:09

16

17

18

19

20                                                             11:09

21

22

23

24

25                                                             11:10

PRADEEP KANAPATHIPILLAI  HC, AEO
ARM LTD. V. QUALCOMM INC.

December 01, 2023
73

1    Do you see that?

2    A.   Yes.

3    Q.   And I'll just read the full sentence.

4    

5                                                                11:10

6

7

8    Do you see that?

9    A.   Yes.

10   Q.   What did you mean by                                    11:10

11

12

13

14

15                                                               11:11

16

17

18

19

20                                                               11:11

21

22

23   Q.   Okay.  I want to direct your attention to

24   the second page of this document, Bates ending 712.

25       And towards the bottom of the page -- I            11:11



1   guess the third text exchange up from the bottom of

2   the page there is a text from you that starts with:

3

4

5       Do you see that?                                           11:12

6

7

8

9

10                                                                 11:12

11      Do you see that?

12   A.   Yes.

13   Q.   What did you mean by

14

15                                                                 11:12

16

17

18

19

20                                                                 11:12

21

22

23

24

25                                                                 11:13

1      MS. NYARADY:  Objection.

2      THE WITNESS:  There were about █████

3  architectures and features that had to be developed

4  and designed and created from the ground up in the

5  █████████                     11:13

6  BY MR. FUNG:

7    Q.   Were there other features in the ████████

8  that were not developed and designed and created

9  from the ground up?

10      MS. NYARADY:  Objection.          11:14

11      THE WITNESS:  Yes, there were other

12  features.

13  BY MR. FUNG:

14    Q.   Do you have any documentation showing those

15  features?                     11:14

16    A.   Some of the design material that we have

17  provided to you would show that information as to

18  how much work was done at Qualcomm post-acquisition

19  on both -- on the ████████████ as well as the

20  █████████████████████ that was designed at    11:14

21  Qualcomm.

22    Q.   By "design material," do you mean the

23  source code?

24    A.   Not just the source code, but also the Jira

25  tickets, bug information, and so on and so forth.   11:15

PRADEEP KANAPATHIPILLAI  HC, AEO                          December 01, 2023
ARM LTD. V. QUALCOMM INC.                                                    76

1    Q.   I just wanted to go back to a piece of your

2  testimony from earlier.

3        You mentioned that currently the value of

4  your -- I believe it was vested shares of Qualcomm

5  was approximately ▮▮▮▮▮ is that right?                        11:15

6    A.   The unvested.

7    Q.   Unvested.  Okay.

8        Do you currently have vested shares of

9  Qualcomm stock?

10   A.   I believe I do.                                        11:15

11   Q.   How many vested shares of Qualcomm stock do

12  you currently own?

13   A.   I don't recall the exact numbers, but

14  s▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮f ▮▮▮▮▮▮

15   Q.   So would it be -- so would it be accurate      11:16

16  to say that the approximate value of your unvested

17  and vested Qualcomm shares today is approximately

18  ▮▮▮▮▮

19   A.   Pretax.

20   Q.   Pretax.  Got it.                                       11:16

21       MR. FUNG:  Counsel, I have no further

22  questions for today, but as we stated in our

23  correspondence, we have concerns with the amount of

24  time we were given, in terms of notice that this

25  witness would be a 30(b)(6) designee for source code     11:16

1  topics.  We also have concerns that he was not

2  provided with a source code computer nor were we

3  given adequate time to request one.  The parties

4  also have a pending dispute before the Court on the

5  logs and source code change logs for any versions of                    11:17

6  source code produced.  So we will have to keep this

7  deposition open.

8       With that I pass the witness.

9       MS. NYARADY:  We obviously disagree in

10 terms of holding the deposition open.  And just to                       11:17

11 be clear on the topics for source code, we're

12 talking about Qualcomm Topic 44 and NUVIA Topic 40,

13 which are limited to identifying -- as we read the

14 topic, limited to identifying the code that was

15 produced in the litigation, which he's done.                             11:17

16       There were other topics that actually had

17 to do with the code at a more granular level that

18 were assigned to a different witness who was already

19 deposed.  That deposition was not left open.  And

20 ARM's failure to ask that witness questions is ARM's                     11:17

21 own doing.  So we disagree with that.

22       Why don't we take a quick break and then

23 I'll let you know if I have any questions.

24       MR. FUNG:  Sounds great.

25       MS. NYARADY:  Thanks.                                              11:18

PRADEEP KANAPATHIPILLAI HC, AEO                December 01, 2023
ARM LTD. V. QUALCOMM INC.                                        78

1          THE VIDEOGRAPHER:  Off the record at

2    11:18 a.m.

3          (Recess.)

4          THE VIDEOGRAPHER:  Back on the record at

5    11:30 a.m.                                                                    11:30

6                      EXAMINATION

7    BY MS. NYARADY:

8      Q.   If you could pull out Exhibit 2, please.  I

9    want to go back to that quickly.

10          You testified this is -- the title of this            11:31

11   document is ██████████████████████

12   right?

13     A.   Yes.

14     Q.   And do you recall counsel pointed you

15   earlier to page 13?                                                 11:31

16     A.   Yes.

17     Q.   And there was a notation there "Revision

18   0.1," and then it had a date of October 30, 2019.

19          Do you remember that?

20     A.   Yes.                                                             11:31

21     Q.   Has this document been updated since that

22   date of October 30, 2019?

23     A.   Yes.

24     Q.   Is this a document that you continuously

25   update?                                                                  11:31

1    A.   Yes.

2    Q.   And can you tell -- can you tell the date

3  of this document?

4    A.   I couldn't tell because it has no date

5  stamp here.  But it definitely is something                    11:31

6  post-acquisition.

7    Q.   Okay.  And so on page 13, though, there

8  just was no update in terms of, you know, other

9  revisions or dating the updates; is that fair?

10   A.   That is correct.                                         11:32

11       MS. NYARADY:  No further questions.

12       MR. FUNG:  I have no further questions.

13       THE VIDEOGRAPHER:  Conclusion, Counsel?

14  Conclusion?

15       MR. FUNG:  Concluded, yes.                                11:32

16       THE VIDEOGRAPHER:  This concludes today's

17  deposition.  We are off the record at 11:32 a.m.

18  Thank you.

19       (Deposition concluded at 11:32 a.m.)

20

21

22

23

24

25

DECLARATION UNDER PENALTY OF PERJURY


        I hereby declare under penalty of perjury
that the foregoing is my deposition under oath; that
I have read same; and that I have made the
corrections, additions, or changes to my answers
that I deem necessary.


        In witness thereof, I hereby subscribe my
name this        day of          , 2023.






                    _____
                    PRADEEP KANAPATHIPILLAI

1    COUNTY OF LOS ANGELES, )
                          )
2    STATE OF CALIFORNIA,   )

3

4           I, Cody R. Knacke, Registered Professional

5    Reporter, Certified Shorthand Reporter in and for

6    the State of California, License No. 13691, hereby

7    certify that the deponent was by me first duly sworn

8    and the foregoing testimony was reported by me and

9    was thereafter transcribed with computer-aided

10   transcription; that the foregoing is a full,

11   complete, and true record of said proceedings.

12           I further certify that I am not of counsel

13   or attorney for either or any of the parties in the

14   foregoing proceedings and caption named or in any

15   way interested in the outcome of the cause in said

16   caption.

17           The dismantling, unsealing, or unbinding of

18   the original transcript will render the reporter's

19   certificate null and void.

20           In witness whereof, I have hereunto set my

21   hand this day:  December 4, 2023.

22

23

24           _____

25           CODY R. KNACKE, RPR, CSR No. 13691

# Exhibit 6

# Exhibit 7

Reproduced in England and Wales Registered Number 00000000 VAT number 00 000 0000 00. Registered office address

ARM_01296542



CONFIDENTIAL

ARM_01296543

# Exhibit 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3                    ---oOo---

4

5    ARM LTD., a UK Corporation, )
                                 )
6              Plaintiff,        )
                                 )
7    vs.                         )  C.A. No. 22-1146 (MN)
                                 )
8    QUALCOMM INC., a Delaware   )
     corporation; QUALCOMM       )
9    TECHNOLOGIES, INC., a       )
     Delaware Corporation, and   )
10   NUVIA, INC., a Delaware     )
     Corporation,                )
11                               )
               Defendants.       )
12   _____)

13

14

15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16         VIDEOTAPED DEPOSITION OF SIMON SEGARS

17            THURSDAY, NOVEMBER 16, 2023

18

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

24   CSR LICENSE NO. 9830

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3                     ---oOo---

4

5    ARM LTD., a UK Corporation, )
                                 )
6                   Plaintiff,   )
                                 )
7    vs.                         )  C.A. No. 22-1146 (MN)
                                 )
8    QUALCOMM INC., a Delaware   )
     corporation; QUALCOMM       )
9    TECHNOLOGIES, INC., a       )
     Delaware Corporation, and   )
10   NUVIA, INC., a Delaware     )
     Corporation,                )
11                               )
                    Defendants.  )
12   _____)

13

14

15

16           Videotaped deposition of SIMON SEGARS,

17       taken on behalf of the Defendant, pursuant to

18       Notice, on Thursday, November 16, 2023, at

19       Morrison & Foerster, LLP, 755 Page Mill Road,

20       Palo Alto, California beginning at 9:07 a.m., and

21       ending at 4:05 p.m., before me, ANDREA M. IGNACIO,

22       CSR, RPR, CCRR, CRR, CLR ~ License No. 9830.

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 3

```
 1    A P P E A R A N C E S:

 2

 3       FOR THE PLAINTIFF:

 4            MORRISON & FOERSTER LLP

 5            By:  SCOTT LLEWELLYN, Esq.

 6            4200 Republic Plaza

 7            300 17th Street

 8            Denver, Colorado 80202

 9            303.592.2204

10            sllewellyn@mofo.com

11

12       FOR THE DEFENDANT:

13            PAUL WEISS

14            By:  KAREN L. DUNN, Esq.

15                 MADALYN VAUGHN, Esq. New York

16                 ERIN MORGAN, Esq. New York

17            2001 K Street, NW

18            Washington, D.C.  20006-1047

19            kdunn@paulweiss.com

20

21

22       ALSO PRESENT:

23            Cameron Tuttle, Videographer

24

25                      ---oOo---
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                              Page 4

 1                      I N D E X

 2

 3   WITNESS:  SIMON SEGARS

 4

 5   EXAMINATION                                PAGE

 6   BY MS. DUNN                                  9

 7

 8                    E X H I B I T S

 9   EXHIBIT                                     PAGE

10   Exhibit QX100  9-3-13 Email ███████████      36

11                  ███████████████

12                  Bates ARM_00085058 - '59

13   Exhibit QX101  1-15-21 Email ██████████      54

14                  ███████████████████████

15                  ████████████████

16                  ARM_01242767

17   Exhibit QX102  6-9-21 Email ████████████     67

18                  ████████████████████

19                  ███████████████, Bates

20                  ARM_01245004 - '72

21   Exhibit QX103  1-17-21 Email Re:            77

22                  Congratulations Bates ARM_00062124

23   Exhibit QX104  1-17-21 Email Re:            84

24                  Congratulations Bates

25                  ARM_00071014
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 5

1               E X H I B I T S

2    EXHIBIT                                               PAGE

3    Exhibit QX105  1-18-21 Email Re: Nuvia Bates      85

4                   ARM_00081879

5    Exhibit QX106  1-27-21 Letter To Paul Williamson   88

6                   From Ziad Asghar,

7                   Bates ARM_00063625

8    Exhibit QX107  2-2-21 Letter To Ziad Asghar From   90

9                   Paul Williamson, Bates ARM_01284109

10   Exhibit QX108  2-16-21 Letter To Ziad Asghar From  97

11                  Paul Williamson, Bates ARM_01284106

12   Exhibit QX109  10-3-21 E-mail FW: Sync, Bates     138

13                  ARM_00081371

14   Exhibit QX110  3-16-21 Email Re: QC/NUVIA Bates   140

15                  ARM_00081374 - '75

16   Exhibit QX111  2-5-21 Email Re: Contact Names     148

17                  Bates ARM_00081353 - '56

18   Exhibit QX112  7-26-21 Letter To Rhys Bowen From  182

19                  Simon Segars, Bates ARM_00097016

20                  - '18

21   Exhibit QX113  Anticipated Acquisition by NVIDIA  188

22                  Corporation of Arm Limited Bates

23                  ARM_00088656 - '84

24   Exhibit QX114  The Future of Arm Bates            207

25                  ARM_01230489 - '502

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1              PREVIOUSLY MARKED EXHIBITS

2    EXHIBIT                                           PAGE

3    Exhibit QX49  9-27-19 Technology Agreement      105

4                  Bates ARM_00111064 - '80

5    Exhibit QX27  7-14-21 Email Re: Follow up        160

6                  Bates ARM_00036331 - '34

7                       ---oOo---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 7

DEPOSITION PROCEEDINGS

NOVEMBER 16, 2023                                    9:07 A.M.

---oOo---

1

2

3

4

5        THE VIDEOGRAPHER:  Good morning.  We are

6   going on the record.  The time is 9:07 a.m. on            0

7   November 16th, 2023.

8        Please note that the microphones are

9   sensitive and may pick up whispering and private

10  conversations.

11       Please mute your phones at this time.

12       Audio and video recording will continue to

13  take place unless all parties agree to go off the

14  record.

15       This is Media Unit 1 of the video-recorded

16  deposition of Simon Segars.

17       In the matter of Arm LTD versus Qualcomm Inc.

18  Filed in the United States District Court for the

19  District of Delaware.  Case No. 22-1146 MN.

20       The location of the deposition is

21  755 Page Mill Road, Palo Alto, California 94304.

22       My name is Cameron Tuttle, representing

23  Veritext, and I am the videographer.

24       The court reporter is Andrea Ignacio, also

25  from Veritext.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 8

1           I am not authorized to administer an oath.  I

2      am not related to any party in this action, nor am I

3      financially interested in the outcome.

4           If there are any objections to the

5      proceeding, please state them at the time of your

6      appearance.

7           Counsel and all present will now state their

8      appearances and affiliations for the record, beginning

9      with the noticing attorney.

10          MS. DUNN:  Karen Dunn from Paul Weiss, on

11     behalf of Qualcomm.

12          MS. MORGAN:  Erin Morgan from Paul Weiss,

13     also on behalf of Qualcomm.

14          MS. VAUGHN:  Madalyn Vaughn on behalf of Paul

15     Weiss, for Qualcomm.

16          MR. LLEWELLYN:  Scott Llewellyn, Morrison &

17     Foerster, for Arm.

18          With me is Toni Qiu, in-house counsel for

19     Arm.

20          THE VIDEOGRAPHER:  Will the court reporter

21     please swear in the witness.

22     ///

23     ///

24     ///

25     ///

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                            Page 9

 1                      SIMON SEGARS,

 2             having been sworn as a witness

 3          by the Certified Shorthand Reporter,

 4                   testified as follows:

 5

 6                        EXAMINATION

 7    BY MS. DUNN:

 8        Q    Thank you.

 9             Mr. Segars, first, let me make sure I'm

10    saying your last name correctly.

11        A    Segars.

12        Q    Segars.

13        A    Yeah.

14        Q    Okay.  Mr. Segars, have you been deposed

15    before?

16        A    Yes, I have.

17        Q    Okay.  How many times?

18        A    I don't remember.

19        Q    Okay.  More than five?

20        A    Don't remember the exact number.

21        Q    Okay.  When did you start working at Arm?

22        A    In 1991.

23        Q    And what was your role when you started

24    working at Arm?

25        A    I was a design engineer.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

```
 1       Q    Okay.  And I've heard that you said you were
 2   Arm's 16th employee; is that right?
 3       A    That is correct, yeah.
 4       Q    Okay.  And then you worked your way up to be
 5   CEO; is that right?
 6       A    Yes, I did.
 7       Q    And you became CEO in July 2013 and served in
 8   that role until February 7th, 2022; right?
 9       A    I believe that's correct, yes.
10       Q    And in your role as CEO, did you work with
11   Qualcomm?
12            MR. LLEWELLYN:  Objection; vague.
13            THE WITNESS:  What do you mean by --
14            MS. DUNN:  Counsel, the rules say you can
15   make form objections.  So that means you can say
16   "objection; form."
17       Q    You can answer.
18       A    What do you mean by "work with"?
19       Q    Did you have any interaction with anybody at
20   Qualcomm during your time at C -- as CEO?
21       A    Yes, I did.
22       Q    Okay.  And why don't you describe that.
23       A    Well, in that eightish-year period, we would
24   have meetings with Qualcomm.  I would periodically
25   attend in just the normal nature of our business.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 11

 1      Q    Okay.  And did you interact with any
 2    executives who worked at Qualcomm?
 3      A    Exactly what do you mean by "executive"?
 4      Q    You can use whatever definition you would
 5    normally use for executive.
 6      A    Okay.  Yes, I did.
 7      Q    Okay.  And who did you interact with?
 8      A    In that period, I can remember interacting
 9    with Steve Mollenkopf, who was the former CEO;
10    Cristiano Amon.  I can remember meeting their CFO at
11    one point.
12      Q    Okay.  Is Qualcomm one of Arm's key
13    customers?
14           MR. LLEWELLYN:  Objection; vague.
15           MS. DUNN:  I -- counsel, it's outside the
16    rules.
17           MR. LLEWELLYN:  The rules say there are no
18    speaking objections.
19           MS. DUNN:  Right.  You're supposed to say
20    "form," as you know.
21      Q    You can answer.
22           MR. LLEWELLYN:  I don't think that's
23    consistent with the prior depositions.
24           MS. DUNN:  It doesn't matter.  It's
25    consistent with the rules.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 12

```
 1            MR. LLEWELLYN:  Show me the rule.
 2            MS. DUNN:  All right.  We'll get that for
 3    you.  It's surprising you would need that at this
 4    time.
 5            MR. LLEWELLYN:  The rule says no speaking
 6    objections.
 7            MS. DUNN:  Q.  You can answer.
 8      A    I'm sorry.  Could you repeat the question.
 9      Q    Was Qualcomm one of Arm's key customers?
10      A    Before I left -- I can only speak to the time
11    before I left -- Qualcomm was a significant customer
12    of Arm.
13      Q    Okay.  Was Qualcomm Arm's largest customer in
14    any market?
15      A    I can't remember.
16      Q    During the time that you were there, did
17    Qualcomm generate a significant portion of Arm's
18    revenue?
19      A    Qualcomm was a -- well, Arm -- Arm's revenues
20    are comprised of multiple different lines.  ████
      ██  ████████████████████████████████████████████████
      ██  ███████████████████████████████
23      Q    Okay.  So you would say, ████████████████████
      ██  █████████████████████████████████████████
      ██  ████████████████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                            Page 13

 1        A    Yes.

 2        Q    And how about in any other market?

 3        A    I can't remember how Arm's revenues broke

 4    down.

 5        Q    Okay.  You understand that we're here today

 6    because Arm has sued Qualcomm over its acquisition of

 7    a company called NuVia; correct?

 8        A    Yes.

 9        Q    Okay.  And you were a supporter of that

10    acquisition; correct?

11        A    What do you mean by "supporter"?

12        Q    Just use whatever definition of supporter you

13    would use.

14        A    Well, no, then.

15        Q    Okay.  You thought the acquisition of NuVia

16    by Qualcomm was a great outcome for the NuVia team;

17    correct?

18        A    Yes.

19        Q    All right.

20             And then from February 2022 to May 2022, you

21    served as an advisor to Arm; is that correct?

22        A    Sorry.  February 2022 'til May '22, did you

23    say?

24        Q    Correct.

25        A    Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

                                                    Page 14

1        Q    And as an advisor to Arm, what did you do?

2        A    I was available to Rene, or the rest of the

3    management teams for questions.  I believe I did a

4    couple of media interviews in that time.

5             But other than that, I had no involvement in

6    the company.

7        Q    Okay.  And when you say "Rene," you're

8    talking about Rene Haas, the CEO who took over for

9    you; correct?

10       A    Yes.

11       Q    And when you say you were available to Rene

12   and others, how many times during the period that you

13   were an advisor to Arm did you get a phone call asking

14   for your advice?

15            MR. LLEWELLYN:  Objection; form.

16            THE WITNESS:  I don't remember.

17            MS. DUNN:  Okay.

18       Q    Would you say ten times?

19       A    I -- I really don't remember how often.

20       Q    More than ten?

21       A    I really don't remember how often.

22       Q    Okay.  Did he ever call you?

23       A    I don't remember.

24       Q    Okay.  He might have -- not have ever called?

25       A    He may have called me.  He may not have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 15

```
 1   called me.  I can't remember.
 2        Q    Can't remember.  Okay.
 3             Now, you have -- before you resigned in
 4   February of 2022, you had worked for Arm for 31 years;
 5   is that correct?
 6        A    I think I joined the company in March or
 7   April '91.  So technically, it wasn't 31 years at that
 8   point, but close to.
 9        Q    Okay.  And why did you leave Arm?
10        A    I left Arm because it was a good time to
11   transition leadership.  I'd felt I'd worked pretty
12   hard for the company over the years, and I wanted to
13   do something else.
14        Q    Okay.  And was it solely your decision to
15   leave?
16        A    Yes, it was.
17        Q    Okay.  And you said you thought it was a good
18   time.  Why was this time, February 7, 2022, in
19   particular, a good time for you to leave?
20        A    At that time or prior to that time, ███████
     ███████████████████████████████████████████████████
     ████████████████  ███████████████████████████
     ███████████████████████████████████████████
     ██████████████████████████  it was a good time
25   for -- to make a transition to new leadership.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 16

1      Q    Okay.  And you made statements that --

2   that -- strike that.

3           You've made statements suggesting that █████

    ███████████████████████████   You recall that; right?

5           MR. LLEWELLYN:  Objection; form.

6           THE WITNESS:  During the NVIDIA transaction,

7   ████████████████████████████████████████████████████████

    ████████████████████████████████████████████████████████

    ██████████████████████████

10          MS. DUNN:  Okay.

11     Q    And why did you think that ████████████

    ███████████████████████████████████████

13     A    At the time, █████████████████████████████

    ████████████████████████████████████████████████████████

    ████████████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ███████████████████████████████████████████████

    █████████████

19     Q    All right.  Okay.

20          And you said it was solely your decision to

21   leave.  When did you decide that you were going to

22   leave your job?

23     A    In December of 2021, ████████████████████████

    ████████████████████████████████████████████

    ██████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 17

1      Q    Okay.  And why, when you decided to leave,

2    did you ███████████████████████████

3          ████████████████████████████████████████████

       ██    ██████

5      A    Yeah.

6      Q    -- the name he sometimes go -- goes by.

7      A    Yeah.

8      Q    Okay.  So why, when you decided to leave your

9    job as CEO of Arm, did you ████████████████

10     A    ███████████████████████████████████████

11     Q    Okay.  And what was his reaction when you

12   told him that you planned to step down as CEO?

13     A    He was surprised.  Yeah, I'll stop there.

14     Q    Okay.  And are you saying that you decided to

15   leave your job as CEO prior to understanding that the

16   NVIDIA acquisition was not going to go through?

17     A    At the time that I ██████████████████████

     ███████████████████████████████████████████████

     ███████████████████████    ███████████████████████████

     ████████████████████████████████████████████████

     █████████████████████████████████████

22     Q    Okay.  And when you say that "at the time" --

23   and we're talking December of 2022 -- █████████████████

     ████████████████████████████████████████████████████

     ███████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                              Page 18

 1          MR. LLEWELLYN:  Objection; form.  2021.

 2          MS. DUNN:  Thank you.

 3      Q   At the time when -- strike that.

 4          When you say that "at the time" -- and we're

 5  talking about December of 2021 -- ████████████████

    █████████████████████████████████████████████████

    ███████████████████████████████

 8      A   At that point, █████████████████████████████

    █████████████████████████████████████████████████

    ██████████████████  ████████████████████████████████

    ██████████████████████████████████████████████

    ███████████████████████████████

13      Q   So ████████████████████████████████████████

    ███████████████████████████████████████████████

    ██████████████████  ; is that accurate?

16      A   I believe that is the sequence of events,

17  yes.

18      Q   Okay.  And do you remember -- you said

19  December of 2021.  Do you remember when in December

20  that you ████████████████████████████████████

21      A   I don't remember the exact day.

22      Q   Okay.  And you said that he was surprised.

23  Do you remember anything that he said to you when ███

    ██████████████████████████████████████████████████

25          MR. LLEWELLYN:  Objection; form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 19

1        THE WITNESS:  Actually, ███████████████

2    ████

3        MS. DUNN:  Q.  How did that make you feel?

4    A   Well, I was surprised that he said that.

5    Q   ████████████████████████████████████

6    A   No, I didn't.

7    Q   Okay.  During your time as CEO, ████████████

8    ██████████████████████

9    A   I don't remember how many times ████████████

10   ████

11   Q   Just an estimate is fine.

12       How frequently?

13   A   ████████████████████████████████████

14   ██████████████   ████████████████████████████████

15   ████████████████████████████████████   ████████████

16   ██████████████████████████████   ████████████████

17   ████████████████████████████████   So yeah.

18   Q   And how often was that, approximately?

19       MR. LLEWELLYN:  Objection; form.

20       THE WITNESS:  Do you mean how -- how many

21   times ██████████████████████████

22       MS. DUNN:  Q.  Like, how many times a month?

23   How many times a year?

24   A   Did I meet him?

25   Q   Yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 20

1    A   I -- I'd be guessing.

2    Q   I'm just asking for an estimate.

3    A   It -- it's a guess, but █████████████

█    █████████████████████

5    Q   And when you █████████████████████

█    ████████████████████████████████

7    A   Not that I recall.

8    Q   Okay.  And do you remember anything else

9    about this conversation?

10   A   ████████████████████████

11       █ ████████████████████████████████

█        ████████████████████████

█        █ ██████████████████████

█        ████████████

█        █ ████████████████████████

█        ██████████████████

█        █ ██████████████████████

█        ████████████████████████████

█        ████████████████████████████████

█        ████████████████████████

█        █ ███ ████████████████████

█        ████████████████████████████████

█        ████████████

█        █ ████████████

25   Q   Okay.  Do you know █████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                                    Page 21

 1     ████████████████████████████████████████

 2          A    I don't know exactly when.

 3          Q    Okay.  And when did you inform Mr. Haas that

 4     you would be stepping down as CEO?

 5          A    I don't remember.

 6          Q    Okay.  ████████████████████████████████████

 7          A    Yes, I think it was after.

 8          Q    Okay.

 9          A    I don't think I had spoken to anyone in Arm

10     about ████████████████████████████████████

11          Q    Okay.  And do you recall your phone call or

12     meeting with Mr. Haas when you told him that you would

13     step down as CEO?

14          A    No, I don't.

15               Just to correct what you said, before I

16     actually stepped down, Rene knew that I was going to

17     step down.  So my first conversation with Rene would

18     have been about stepping down in the future and, you

19     know...

20          Q    Okay.  And -- but do you recall when that

21     conversation was?

22          A    No, I don't recall.

23          Q    Okay.  And was the conversation when -- that

24     you had with Rene when he knew you were going to step

25     down, did Rene understand he was taking over in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 22

1     course of that conversation?

2              MR. LLEWELLYN:  Objection; form.

3              THE WITNESS:  I think when I spoke to Rene,

4     it was a -- well, Rene knew I was going to step down

5     before I did, and ███████████████████████████████

      ███████████████████████████████████████████████████

      ██████

8              MS. DUNN:  Okay.

9              THE WITNESS:  So my conversation with Rene

10    would have been about me stepping down ████████████

      █████████████████████████████████████████████████

12             MS. DUNN:  Okay.

13        Q    And do you remember what you said to Rene

14    during this conversation?

15        A    No, I don't.

16        Q    Okay.  Do you remember what he said to you?

17        A    No, I don't.

18        Q    Okay.  So the only thing you recall is you

19    had a conversation with Rene about your stepping down

20    ██████████████████████████████████████

21        A    I believe that is what we talked about.

22        Q    Okay.  And you don't remember when that

23    conversation was?

24        A    No.

25        Q    Okay.  Do you have a separation agreement

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 23

```
 1    with Arm?
 2        A    Yes, I do.
 3        Q    Okay.  And when did you sign that separation
 4    agreement with Arm?
 5        ███    ████████████████████████████████████████
 6        Q    Okay.  And what are the material terms of
 7    your separation agreement with Arm?
 8        A    It's been a long time since I read it.  I
 9    don't remember precisely.
10        Q    When was the last time you read it?
11        A    I don't remember.
12        Q    Okay.  You didn't read it in preparation for
13    this deposition?
14        A    No.
15        Q    Okay.  And sitting here right now, you don't
16    remember anything that's in it, any of the terms?
17        A    The terms include ████████████████████
     ████    ██████████████████████  ████████████████████████  ████
     ████    ████████████████████████████  ██████████████
20        Q    Okay.  Does -- does your separation
21    agreement -- strike that.
22             Your separation agreement with Arm is still
23    in force today; correct?
24             MR. LLEWELLYN:  Objection; form.
25             THE WITNESS:    ████████████████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 24

1 ███████████████████████████████████ ████

█ █████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████

5        MS. DUNN:  Okay.

6    Q    And when you say that ████████████████████

█    ███████████████████████████ -- I'm sorry.

8        When you -- strike that.

9        When you say that █████████████████████

█ ████████████████████████████████████████

█ ██████████████

12   █  █████████████████████████████████

█ ███████████████████████ ███████████████

█ ████████████████████████████████████ █

█ █████████████████████████████████████████

█ ██████████████████████████████

█ ██████████████████████████

█ ██████████████████████████████

█ █████████████████████████████████

█ ██████████████████

21   Q    Okay.  ██████████████████████████

█ █████████████████████████████████████████

█  █  █████████████████████████

24        MR. LLEWELLYN:  Objection; form.

25        THE WITNESS:  ███████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

1            MS. DUNN:  Right.

2       Q    And -- and -- and when you say that ████

███ ████████████████████████████████████████████████████

███ ██████████████████████████████████████████████

5            Do you recall that?

6       A    Yes.

7       Q    Okay.  ███████████████████████████████

██ ██████████

9       A    I'd have to reread the agreement to be able

10   to comment on that.

11      Q    Okay.  I'd like to ask you more questions

12   about the agreement so I'm hoping your counsel can

13   produce that at a break so you'll be able to read it.

14            You mentioned that █████████████████████████

██ ████████████████████   ████████████████████████████████

██ ██████████████████████████████

17      A    Yes.

18   ██ █ ██████████████████████████

██ █ ██████████████████████████████████

██ █ █████████  ████████████████████████████

██ ████████████████████████████████████

██ ██████████████

██ █ █████████████████████████████████

██ █ █████████   ████████████████████████

██ ████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1   ███████████████████████████████████████

2   █████████████████

3       A   I don't remember.

4       Q   So there might have been.  You just can't

5   recall?

6       A   Yeah, I can't recall.

7       Q   Okay.  ████████████████████████

8   ████████████████████████████████████████

9   ████████████████████████████████████████

10  ██████████████

11      A   I'd have to reread it.  I can't remember.

12      Q   Okay.  ████████████████████████

13      A   It might do.  It might not.

14      Q   Okay.  So you're sitting here at a

15  deposition, and ██████████████████████████

16  ████████████████████████████████████████

17  █████████████████

18          Do I have that right?

19      A   Yes.

20      Q   Okay.  Okay.

21          Hopefully, we'll come back to that since I'm

22  sure your separation agreement is an accessible

23  document to you and your counsel.

24          Do you -- do you recall whether, then, the

25  separation agreement requires ████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 27

1       █████████████

2           A    I don't recall.

3           Q    Okay.  If there is a trial in this case, do

4       you plan to come if called as a witness?

5                MR. LLEWELLYN:  Objection; form.

6                THE WITNESS:  I think if I was called as a

7       witness to a trial, I would take legal advice before

8       deciding what to do.

9                MS. DUNN:  Okay.

10          Q    And that legal advice, would you seek that

11      from Arm's counsel?

12               MR. LLEWELLYN:  Objection; form.

13               THE WITNESS:  I don't know.

14               MS. DUNN:  Okay.

15          Q    But you don't have personal counsel in this

16      case; right?

17          A    Correct.

18          Q    Okay.  Arm's counsel is representing you?

19          A    Yes.

20          Q    Okay.  And are you being paid by Arm for your

21      time in this deposition?

22          A    No, I'm not.

23          Q    Okay.  And where do you work today?

24          A    I have a number of roles that you would

25      consider part-time.  I'm on some boards.  I do some

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 28

```
 1    advisory work, some consulting.
 2        Q    Okay.  And all of the work that you just
 3    mentioned, how much does -- how much income does that
 4    result in for you?
 5        A    █████████████████████████████████████████
 6        Q    Okay.  And what did you do to prepare for
 7    today's deposition?
 8        A    I met with the legal team.
 9        Q    Okay.  And when you say "the legal team," who
10    do you mean?
11        A    I met with Mr. Llewellyn, Ms. Qiu.  I
12    previously had a phone call with some of -- other
13    lawyers from Arm's team.
14        Q    And how long did you meet, in total, to
15    prepare for your deposition with Arm's counsel?
16        A    Approximately five hours.
17        Q    And in those five hours, or in preparation
18    for this deposition, did you review any documents?
19        A    I was shown some documents.
20        Q    Okay.  What documents do you remember?
21        A    Some e-mails.
22        Q    What e-mails do you remember?
23        A    It was an e-mail between me and Richard
24    Grisenthwaite.  That's the only one I remember.
25        Q    Okay.  So you prepped for five hours.  You
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 29

```
1    were shown documents, and you remember one e-mail; is
2    that right?
3         A    We looked at my LinkedIn profile briefly.
4         Q    Okay.  So apart from that one e-mail and your
5    LinkedIn profile, do you remember other -- any other
6    documents that you reviewed?
7         A    I was shown a -- what I believe was a
8    discussion between me and my then chief of staff,
9    which I think was a Teams discussion.
10        Q    And who was your chief of staff?
11        A    Well, I don't have one now, but my chief of
12   staff at the time --
13        Q    Right.
14        A    -- was a gentleman named Saumil Shah.
15             MS. DUNN:  Okay.  And I assume that document
16   has been produced to us, but if not, we'll ask for it.
17        Q    Any other documents that you remember
18   reviewing in advance of this deposition?
19        A    No.
20        Q    Okay.  Did you review any contracts in
21   advance of the deposition?
22        A    No.
23        Q    Okay.  All right.
24             Let's talk a little bit about Arm's business
25   model.  The majority of Arm's licensees are TLA
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1   licensees who use Arm's off-the-shelf technology in

2   their chip designs; correct?

3   

8        Q    Okay.  We've been using the terms "TLA" and

9   "ALA" in this case.  So I just want to make sure that

10  if I use those terms, you know what I'm talking about.

11       A    Okay.

12       Q    Okay.  Do you -- do you know what I'm talking

13  about when I --

14       A    Say --

15       Q    -- say TLA?

16       A    TLA --

17            STENOGRAPHIC REPORTER:  One at a time,

18  please.

19            MS. DUNN:  Q.  Go ahead.

20

22       Q    Yes.

23

25       Q    Great.  That is -- that is my understanding

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 31

1   as well.

2   ██████████████████████████████████

    ████████████████████████

    █   ████████████████████████████████

5       Q    Okay.   And why would a company want to design

6   their own Arm-compatible CPU rather than use Arm's

7   off-the-shelf technology?

8           MR. LLEWELLYN:   Objection; form.

9           THE WITNESS:   Well, you're -- you're asking

10  me to speculate on behalf of what somebody else would

11  do, but --

12          MS. DUNN:   Q.   I'm asking for your opinion.

13  You were the CEO.   You were -- worked there for

14  30 years.

15          Why do you think a company would want to

16  design their own Arm-compatible CPU rather than use

17  one off the shelf?

18      A   ████████████████████████████████

    ██████████████████████████████████████

    ████████████████████████████████

    ████████████████████████████████████

    ████████████████████████   ████████████

    ██████████████████   ████████████████████

    ██████████████████████

25      Q    And what's the benefit to the customer of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 32

1    having a CPU that's Arm-compatible?

2         MR. LLEWELLYN:   Objection; form.

3         THE WITNESS:

13        MS. DUNN:   Q.   And what is the benefit to Arm

14   of customers making their own Arm-compatible CPUs?

15        A

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 33

1      Q    Do you agree that if an LA -- strike that.

2           Do you agree that if an ALA licensee decided

3      to develop their own custom CPU executing Arm's

4      architecture, ████████████████████████████████

       ███████████████████████████████████

       ██  ████████████████████  █████████████

       ████████████████████████████████████████████

       ████████████████████████████

9      Q    Okay.  So after you left Arm in September of

10     2023, the company put out a Form F-1 registration

11     statement.  I'm just going to read to you part of it

12     and see if you agree with it; okay?

13          It says -- it says some -- talking about

14     Arm's customers, it says:

15          (As read):

16          "Our customers may decide to license our ISA

17     and develop their own processors based on our ISA

18     rather than utilize our predeveloped products through

19     an implementation license, resulting in less fees paid

20     to us.  Customers may choose to develop their own

21     processors if they believe they can do so more

22     effectively than us or if supply and capacity

23     constraints within the semiconductor industry further

24     incentivize vertical integration in an effort to

25     secure additional control over their supply chains.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

1    Some of these customers may have greater name

2    recognition and substantially greater financial,

3    management, marketing, service support, technical

4    distribution, and other resources than we do."

5            And then it says:

6            (As read):

7            "If our customers, and particularly one or

8    more key customers for whom we generate a significant

9    portion of our total revenue, elect to develop their

10   own processors based on our ISA, the market for a

11   developed processor portfolio would decline, which

12   could have a material adverse effect on our business,

13   results of our operations, financial condition, and

14   prospects."

15           Do you agree with that?

16      A    Could you read that last sentence again.

17      Q    Yeah, this is a statement from Arm's F-1, and

18   it says:

19           (As read):

20           "If our customers, and particularly one or

21   more key customers from whom we generate a significant

22   portion of our total revenues, elect to develop their

23   own processors based on our ISA, the market for our

24   developed processor portfolio would decline, which

25   could have a material adverse effect on our business,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 35

```
 1    results of our operations, financial condition, and
 2    prospects."
 3        A    I think that is a reasonable risk to point
 4    out in a document like that.
 5        Q    Yeah.
 6             And there is no reason to think that in a
 7    document like that, which is an official filing --
 8        A    Yeah.
 9        Q    -- that Arm would have said something that
10    was untrue; right?
11        A    Absolutely.
12        Q    Okay.  And you testified earlier that
13    ███████████████████████████████████████████████████
14        A    Yes.
15        Q    Right.
16             And so when Arm's regulatory filings say that
17    "if our customers, and particularly one or more key
18    customers from whom we generate a significant portion
19    of total revenues," ███████████████████████████████
20    correct?
21        A    Read the description again.  Sorry.
22        Q    It says "one or more key customers from whom
23    we generate a significant portion of our total
24    revenues."
25        A    I think it goes on to talk about vertical
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 36

1    integration.

2         Q    That was a different sentence.

3         A    All right.

4         Q    But you don't disagree that ███████████

5    ██ ██████████████████ ; right?

6         A    Yes.

7         Q    And you don't disagree, as I think you agreed

8    earlier, that ████████████████████████████████

9    ██ ████████████████████████████████ ; correct?

10        A    Correct.

11             MS. DUNN:  Okay.  I'd like to show you what

12   we'll mark as Exhibit 100.

13             Oh.  Sorry.

14             MS. MORGAN:  That's a lot of copies.

15             MS. DUNN:  Sorry.

16             MS. MORGAN:  Give that one to the court

17   reporter.

18             MS. DUNN:  Here you go.  Thank you.

19             (Document marked Exhibit 100

20              for identification.)

21             MS. DUNN:  All right.

22             May I have one, too?

23        Q    Just take a second to look at that.  This is

24   an e-mail chain between you and Richard Grisenthwaite

25   dated March 2019.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                              Page 37
 1        A    (Reading document.)
 2        Q    Do you recognize this?
 3        A    Yeah, this appears to be an e-mail that --
 4        Q    Yeah.
 5        A    -- exchanged between Richard and I.
 6        Q    Yes.
 7             And you said earlier you had reviewed a
 8    document that was an e-mail between yourself and
 9    Richard Grisenthwaite.  Is this the e-mail that you
10    reviewed?
11        A    This is the -- I believe this is the e-mail
12    that I was shown yesterday.
13        Q    Okay.  All right.
14             And who is Richard Grisenthwaite?
15        A    Well, Richard is an Arm employee.  Well, he
16    was.  I assume he still is.  And he was our chief
17    architect and worked closely with most, if not all, of
18    our architecture licensees.
19        Q    And as chief architect, what did
20    Mr. Grisenthwaite's job entail?
21        A    He led the engineering teams looking at the
22    future uses of Arm technology and how the architecture
23    may evolve to enable efficient processing of potential
24    feature workloads.
25        Q    Okay.  And was he a relatively senior
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1    executive at the company?

2        A    Richard had been with the company for a long

3    time and is a very senior person, yes.

4        Q    Okay.  All right.

5             So the subject line of this e-mail is

6    "yes" -- I'll spare you the need to read that

7    yourself -- ███████████████████████████████

8             Do you see that?

9        A    I do, yes.

10       Q    All right.

11            And if you direct your attention to the

12   bottom of page 1, you write:

13            █████████████████████████████████████

     ██   ████████████

     ██      █████████████████████████████████████

     ██   ████████████

17       A    Correct.

18       Q    █████████████████████████████████████

     ██   ████████████

20       A    Yes.

21       Q    ███████████████████████████████████████

     ██   ██████████████████

23            MR. LLEWELLYN:  Objection; form.

24            THE WITNESS:  What do you mean by "opinion"

25   of him?

Page 39

1          MS. DUNN:   Q.   What did you think of him?

2     A   ██████████████████████████

      ██   ██   ████    ████████████████████

      ██   ██████████████████████

      ██        ███████████████████████

      ██   ██   █████████████████████████████

      ██   ██████████████████████

8     Q   All right.

9          Anything else?  Do you have any other

10   opinions of ████████████████

11    A   No.

12    Q   Okay.  All right.

13         In the next sentence, you say:

14         ████████████████████████████████████████

      ██   █████████████████████████████████

16         Let's start with:  What is a server?

17    A   The way server is being used in this e-mail,

18   that refers to a computer that would typically sit in

19   a data center.

20    Q   Okay.  So a server is different from, for

21   example, a laptop or a mobile phone; right?

22    A   Yeah, servers typically don't have keyboards

23   and screens.  They are sometimes referred to as

24   headless, and they just run compute workloads.

25    Q   Okay.  And when you say ████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 40



1

4      A    Yes.

7      Q    Okay.  And you wrote:

8

23     Q    Right.

24     A    --                          so --

25     Q    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 41

1    A    -- yes.

2    Q    And is ████████████████████████████████

█    ███████████████████████████████████

4         MR. LLEWELLYN:  Objection; form.

5         THE WITNESS:  Well, I think it's a -- ████████

█    ███████████████████████████ ████████

█    ██████████████████████████

8         MS. DUNN:  Yeah.

9    Q    But when Mr. Grisenthwaite says, ██████████

█    ██████████████████████████████████████

█    ██████████████████████████████████████

█    ██████████████████████

█    █ ████████████████████████████████████

█    █████

15   Q    Okay.  You say here that ████████████████

█    ████████████████ ██████████████

█    █ ███████████████████████████ ████████

█    ████████████████████████████████████████

█    ████████████████████

█    █ ████████████████████████████████████

█    ██████

█    █ ███████████████████████████

█    ██████████████████████████████████████

█    ███████████████████████████

25   Q    Great.  All right.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42



1        If you look at the second page of this
2    exhibit, you'll see that ███████████████████████
     ██████████████████████████████████████
     ██████████████████████████████████████
     ████████████████████████████

6        And then you say:
7            ███████████████████████████████
     ██████████████████████████████████████
     █████████████████████████████

10       Do you see that?
11   A    Yes.
12   Q    ██████████████████████████████████
     ████████████████████████████████; correct?
14   A    I think that is what I was referring to, yes.
15   Q    Okay.  And ████████████████████████████
     ████████████████████    █████████████████████████
     ██████████████████████████████████████████████
     ██████  right?
19   A    Yes.
20   Q    Okay.  And you say:
21           ████████████████████████████████████
     █████████████████████
23       Why do you say that's obvious?
24   A    ███████████████████████████████████████
     ████████████████████    █████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 43

1

10      Q    Okay.   And when you said that

, can you explain what work you were talking

14   about.

15      A    So when

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 44



```
 1  ████████████████████████████████████

    ██████████████████████

    █████████████████████████████████

    ███████████████████████████████

    █████████████████████████████████████

    █████████████████████████████████

    ██████

    ██████████████████████████████

    █████████████████████████████████████

    ████████████████████████████

11      Q   Okay.  And you say that ███████████████

        █████████  When do they do that?

13      A   Typically, █████████████████████████

    ██████████████████████  ████████████████████

    ██████████████████████████████████████

    █████████████████████████████████

    █████████████████  ███████████████████████

    ██████████████████████████████████

    █████████████

20      Q   Okay.  And it's true, though, that ████████

    ████████████████████████████████████

    ████████████████████████████████████ ;

23  right?

24          MR. LLEWELLYN:  Objection; form.

25          THE WITNESS:  I think that depends.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 45

1          MS. DUNN:  Okay.

2     Q    What does it depend on?

3     A    It would depend on ███████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████ .

6     Q    Okay.  So you're saying that ████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████

10    A    I think that can happen.

11    Q    Okay.  How often did it happen when you were

12   CEO?

13    A    I -- I don't know.

14    Q    Can you think of any examples?

15    A    Well, the first companies who sought to

16   ████████████████████████████████████████████

      ████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████

          ████████████████████████████████████

      █████████████████████████████████

      █████████████████████████████████████████

      █████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

 1      Q    Right.

 2           But you just described a circumstance where

 3      ██████████████████████████████████████████████████

        ██████████████████████████

 5           Is there any circumstance where Arm ███

        ████████████████████████████████████████████████

        ███████████████████████████████████████████

        ████████████████████████████████████████████?

 9           MR. LLEWELLYN:  Objection; form.

10           THE WITNESS:  Well, I think that would depend

11      on the financial arrangement in the contract.

12           MS. DUNN:  Okay.

13      Q    And can you think of any examples of that

14      circumstance where ████████████████████████████████

        ██████████████████████████████████████████████

        ██████████████████████████████████████?

17      A    No, I can't.

18      Q    Okay.  And generally, ████████████████████████

        ███████████████████████████████████████████████

        ████████

21           MR. LLEWELLYN:  Objection; form.

22           THE WITNESS:  Again, that would depend on

23      specific arrangements, complex -- that the contracts

24      are complex.

25           MS. DUNN:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 47

1    Q    And let's talk a little bit about investment.

2    When you're operating under a TLA, ███████████████

███████████████████████████████  ████████████

███████████████████████████████████

███████████████████████████████████████████████

███████████████

7    A    I think it's more complex than that.

8    Q    Okay.  Why?

9    A    █████████████████████████████████████

███████████████████████████████████  ████

███████████████████████████████████

███████████████  ████████████████████████████

████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

19   Q    Right.  So let's break this down.

20        First of all, ███████████████████████████

████████████████████████████████████

22        MR. LLEWELLYN:  Objection; form.

23        THE WITNESS:  The architecture is defined in

24   the Architecture Reference Manual.  That is a book.

25        MS. DUNN:  Right.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 48

1      Q    And that book is available across customers;
2    right?
3           The architecture is not designed for a
4    particular customer; correct?
5      A    The architecture defines at a very, very low
6    level what each instruction does, the effect that
7    instruction has on the machine state, the flags, its
8    registers.  It defines how the memory system works.
9    It defines how interrupts work.
10          It's a very low-level description of how a
11   microprocessor will function in terms of its
12   instructions, memory, what happens after an
13   instruction has happened.
14     Q    Right.
15          But my question was:  And that book is
16   available across customers, not designed for a
17   particular customer; correct?
18     A    It's not designed for a particular customer.
19   It's not designed for a particular market.  It is --
20   you can take that and build a very high-performance
21   CPU for one market, a very small, energy-efficient
22   processor for another market.
23     Q    Right.
24     A    So it spans all markets, all customers.
25     Q    Okay.  So let's put that to the side since

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 49

1   that's available across customers.

2           My question is whether ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

8           MR. LLEWELLYN:  Objection; form.

9           THE WITNESS: ████████████████████████

███████████████████████████████████████  ████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████

14                  ██████████████████████████████████████

███████████████████████████  ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████  ████████████

███████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████████████

25          MS. DUNN:  So I -- while I appreciate that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1    answer, it did not answer my question.

2        Q   My question is:  When you're a customer

3    making a custom core, you're investing the lion's

4    share of the money.  And when ████████████████

█    █████████████████████████████████████████████████

█    ████████████████████████████████████████████?

7        A   So I think what I described in my answer was,

8    start with architecture.  Start with the Architecture

9    Reference Manual, ████████████████████████  ██████████

█    █████████████████████████████████████████████████

█    ████████████████████████████.

12       Q   I -- I'm asking you to make a comparison.

13       A   Of effort?

14       Q   Of in- -- of investment of money.

15       A   Right.

16       Q   Right --

17       A   So if you take --

18       Q   So if -- if you're a --

19       A   Sorry.

20       Q   -- customer, and ██████████████████████████

█    █████████████████████████████████████████████████

█    ████████████████████████████.

23       A   Correct.

24       Q   And if you make your own custom core, ████████

█    █████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 51

1   right?

2          MR. LLEWELLYN:  Objection; form.

3          THE WITNESS:  So as you just described that,

4   yes. █████████████████████████████████████████

██  ███████████████████████████.

6          MS. DUNN:  Okay.

7          THE WITNESS:  My...

8          MS. DUNN:  Q.  So in this e-mail where you

9   and Mr. Grisenthwaite are talking about ███████████

██  ███████████████████████████████; correct?

11     A   I don't know when ███████████████████

██  ███████████████████████████████████████████

██  ███████████

14     Q   Okay.  But it's a start-up; right?

15     A   It was a start-up then, yes.

16     Q   Right.

17         So my question is:  Even for a start-up, Arm

18  prefers that ████████████████████████████████

██  ██████████████████████████████████████  ███████

██  ███████

21          MR. LLEWELLYN:  Objection; form.

22          THE WITNESS:  So generally, █████████████

██  █████████████████████████████████████████

██  ████████████████████  ███████████████████  ███████

██  █████████████████  █████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52



15        MS. DUNN:  Right.

16     Q   So

21     Q   Okay.  And success for Arm or success for the

22  customer?

23     A   Well, both, which is a very important thing

24  for Arm's business model.

25     Q   Okay.  And apart from what's in this e-mail,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

1    do you recall anything else that you and Mr. Williams

2    discussed during your meeting?

3              MR. LLEWELLYN:  Objection; form.

4              THE WITNESS:  Not that I remember.

5              MS. DUNN:  Okay.

6        Q    Earlier, you said that as part of your

7    separation agreement with Arm, ███████████████████

█    ████████████████████████████

9              Do you recall that?

10       A    Yes.

11       Q    Okay.  ████████████████████

█    ████████████████████████████████████

█    ██████████████████

█    ████████████████████████████████

█    █  ██████████████████████████████████

█    ████████████████████████████████

17       Q    Okay.

18       A    I don't remember the exact date.

19       Q    Okay.  ████████████████████████

█    ████████████████████

21       A    No.

22       Q    Okay.

23              MR. LLEWELLYN:  I'm going to ask the court

24    reporter to mark the transcript "AEO" for now.  We may

25    need to un-AEO and just make some portion

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                          Page 54

 1   confidential.  But for now, given this document and

 2   some of the testimony --

 3           MS. DUNN:  Okay.  I think -- why don't we

 4   take a break.

 5           MR. LLEWELLYN:  Yeah, it's been an hour.

 6           MS. DUNN:  Yeah, great.  Thanks so much.

 7           THE VIDEOGRAPHER:  We are going off the

 8   record.  The time is 10:14 a.m.

 9           (Recess taken.)

10           THE VIDEOGRAPHER:  We are back on the record.

11   The time is 10:33 a.m.

12           MS. DUNN:  All right.

13           Mr. Segars, we're going to show you what

14   we'll mark as Exhibit 101.

15           (Document marked Exhibit 101

16            for identification.)

17           MS. DUNN:  Okay.  All right.

18      Q   Before I ask you questions about that, let

19   me -- just for background, Qualcomm announced in

20   January 2021 that it had reached a deal to acquire

21   NuVia, Mr. Williams' start-up; correct?

22      A   I don't remember when that was announced.

23      Q   Okay.  But you do recall that Qualcomm

24   announced it was going to acquire NuVia; right?

25      A   Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 55

```
1        Q    All right.

2             And do you learn -- do you recall how you

3     first learned that Qualcomm was going to acquire

4     NuVia?

5        A    No, I don't.

6        Q    ███████████████████████████████████████

██    ████████████████████████████████

8             MR. LLEWELLYN:  Objection; form.

9             THE WITNESS:  ████████████████████████████

██    ███████████████████    ██████████████████████    ████████████████████

██    ██████████████████████

12            MS. DUNN:  All right.

13       Q    ████████████████████████████████████████

██    ███████████████████████████████████

██    ██    ██████████    ████████████████████████████████

██    ██████████████████████

██    ██    ████████████████████████████████████

██    ██████████████████████████████████████████████

██    ████████

██    ██    ████████    ████████████████████████████

██    ████████████████████████████████████

██    ████████████████████████    ██████████████████████

██    ██████████████████████████████

24       Q    Okay.  And your testimony is that ████████

██    ████████████████████████████████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 56

1    ████████████████████

2    A    ████████████████████████████████████

3    ████████

4    Q    Okay.  And in your 30 years at Arm, how many

5    times can you think of that ████████████████████████

6    ████████████████████████████████████████

7    A    Did you say how many times?

8    Q    (Counsel nods head.)

9    A    I -- I don't remember how many times that

10   happened.

11   Q    Can you think of any time?

12   A    Yes, I can think of examples.

13   Q    Okay.  What examples can you think of?

14   A    ████████████████████████████████████

███████████████  ████████████████████████  ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

19   Q    Okay.  And apart from that example, can you

20   think of any other example where ████████████████

████████████████████████████████████████

████████████

23   A    I can't think of another specific example.

24        MS. DUNN:  Okay.  And if we haven't already

25   asked for production of the agreement that the witness

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

1    referred to, we are requesting it now.  All right.

2        Q    Sir, if you'll look at the document that's in

3    front of you.  This is an e-mail chain ███████████████

     ████████████████████████████████████████████████████████

     ████████

6             Do you see that?

7        A    Yes.

8        Q    Okay.  And again, ████████████████████████████

     ████████████████████████

10       █    ████████████████████████████████████

     █    ████████████████████████████████████████████████

     ████████████████████████████████████████████████████████

     ████████████████

14       A    That is correct.

15       Q    ████████████    ████████████████████████████████

     ████████████████████████████████

17       A    That is correct, yes.

18       Q    Okay.  ████████████████████████████████████████

     ████████████████████████████████████████████████

20            MR. LLEWELLYN:  Objection; form.

21            THE WITNESS:  ████████████████████████████████

     ████████████████████████████████████████████

23            MS. DUNN:  Okay.

24       Q    And the subject of the e-mail is:

25            ████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 58

1    ████████████████

2         Do you see that?

3    A   Yes, I do.

4    Q   All right.

5         If you look at the middle of page 1, this is

6    an e-mail from ██████████

7    ████████████████████████████

8    A   I believe he was.  I don't know the details

9    of his investment.

10   Q   Okay.  Well, he's writing ████████████, and

11   he says -- you're CC'ed.  It says:

12   ████████████████████████████████

      ██████████████

14        Do you see that?

15   A   I do.

16   Q   Okay.  And he goes on to say that -- strike

17   that.

18       In this e-mail, ████████████████████████

    ████████████████████████

    ████████████████████████████████

    ██████████████████████████████████

    ██████████████████████

23       MR. LLEWELLYN:  Objection; form.

24       THE WITNESS:  I don't know.

25       MS. DUNN:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 59

1      Q    Well, at this time, had you discussed

2    ████████████████████████████████████████

3      A    I don't know.

4      Q    You might have, and you don't remember?

5      A    I might have, and I don't remember.

6      Q    Okay.  And to your knowledge at this time,

7    had anyone else discussed ██████████████████████

8    █████████████████████████

9           MR. LLEWELLYN:  Objection; form.

10          THE WITNESS:  I don't know.

11          MS. DUNN:  Okay.

12     Q    And --

13          MR. LLEWELLYN:  ████████████████████████

14          MS. DUNN:  Thank you.

15     Q    And what is your recollection of what ██████

16    ████████████████████████████  -- strike that.

17          What is your recollection of what ████████

18    ███████████████████████████████████████████

19     A    I have no recollection of what ████████████

20    ████████

21     Q    Okay.  And did you talk to him about it,

22    either at this time or any time?

23     A    Not that I recall.

24     Q    Okay.  In your job as CEO, would you have

25    ███████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 60

1   ████████

2          MR. LLEWELLYN:  Objection; form.

3          THE WITNESS:  I may have done.  I don't

4   recall a ████████████████████████████████████

5          MS. DUNN:  Okay.

6      Q   But you may have?

7      A   I may have.

8      Q   And -- but you can't say for sure?

9      A   That's right.  I can't say for sure.

10     Q   And you can't say for sure what ████████

██   ██████████████████; right?

12     A   That is also right.

13     Q   Okay.  And you can't say for sure what ██

██   ████████████████████████████████████████████

██   ████████████████  right?

16         MR. LLEWELLYN:  Objection; form.

17         THE WITNESS:  I -- I cannot say for sure what

18   ████████████████████████████████████████████████

██   ████████████████████████

20         MS. DUNN:  Okay.

21     Q   Do you remember a general conversation?

22     A   No.

23     Q   Okay.  Do you remember ████████████████████

██   ██████████████████████████████████

25         MR. LLEWELLYN:  Objection; form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 61

1        THE WITNESS:  I can remember █████████

█    █████████████████████████

3        MS. DUNN:  Okay.

4    Q   ███████████████████████████████

█    ██████████████████████████████████

█    █████████

7    A   Yeah, I don't remember us having

8    ███████████████████████████████████

9    It's a long time ago now.

10   Q   Okay.  So is it your testimony that ████

█    ██████████████████████████████████

█    █████████

13       MR. LLEWELLYN:  Objection; mischaracterizes

14   testimony.

15       THE WITNESS:  No.  ███████████████

█    ██████████████   I just don't remember specifics as I

17   sit here now.

18       MS. DUNN:  Okay.

19   Q   ███████████████████████████████

█    ███████████

█    ██   █   ███████████████████

█    ██   █   █████

█    ██   █   █████████████████████

█    ██   █   ████   ██████████████████

█    █████████████████████