IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARM LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1146 (MN) |
| | ) | |
| QUALCOMM INC., QUALCOMM | ) | |
| TECHNOLOGIES, INC. and NUVIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT NUVIA, INC.'S
<u>RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW</u>**

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
William T. Marks
Anna P. Lipin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000


January 17, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com


*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDING ........................................................... 1

II.    SUMMARY OF ARGUMENT ................................................................................... 1

III.   statement of facts ........................................................................................... 3

IV.   LEGAL STANDARD ............................................................................................ 3

V.     ARGUMENT ....................................................................................................... 4

      A.     Arm Presented No Evidence That Nuvia's Alleged Breach
           Caused Any Harm. ................................................................................ 4

           1.    *Unlicensed Products.* ............................................................. 5

           2.    *Royalties.* ................................................................................ 6

      B.     Nuvia Did Not Breach Section 15.1(a) of the Nuvia ALA. ................... 7

           1.    *Nuvia's RTL Was "Nuvia Technology" Not Subject to Section 15.1(a).* ..... 8

           2.    *The Nuvia RTL Was Not a Derivative of Any ARM Technology.* ............. 10

                a.     The Nuvia ALA Architecture Specifications Listed in Annex 1
                     Encompass Only Confidential Architecture Extensions. .............. 10

                b.     Arm's Derivative Claims Fail Due to Overbreadth. ..................... 13

           3.    The Nuvia RTL Is Not a Derivative of the Arm Architecture Reference
                Manual. ................................................................................... 17

           4.    Only Architecture Compliant Cores that Were "Recast, Transformed or
                Adapted" from ARM Technology Are Derivatives Subject to Section
                15.1(a). ................................................................................... 18

VI.   CONCLUSION .................................................................................................. 19

i

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Aguilera* v. *Pirelli Armstrong Tire Corp.*,
    223 F.3d 1010 (9th Cir. 2000) ................................................................................4

*Ballard* v. *MacCallum*,
    101 P.2d 692 (Cal. 1940) .....................................................................................9

*Behnke* v. *State Farm Gen. Ins. Co.*,
    127 Cal. Rptr. 3d 372 (Ct. App. 2011) ................................................................4

*Blattman* v. *Siebel*,
    Civ. No. 15-530, 2020 WL 475413 (D. Del. Jan. 29, 2020)................................6

*Dam Things from Denmark* v. *Russ Berrie & Co.*,
    290 F.3d 548 (3d Cir. 2002)...............................................................................15

*Oracle Int'l Corp.* v. *Rimini St., Inc.*,
    123 F.4th 986 (9th Cir. 2024) ............................................................................15

*Rodriquez* v. *Se. Pa. Transp. Auth.*,
    119 F.4th 296 (3d Cir. 2024) ...............................................................................3

*St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*,
    124 Cal. Rptr. 2d 818 (Ct. App. 2002) ...............................................................4

*Tanksley* v. *Daniels*,
    902 F.3d 165 (3d Cir. 2018)...............................................................................17

*Ticor Title Ins. Co.* v. *Rancho Santa Fe Ass'n*,
    177 Cal. App. 3d 726 (1986) .............................................................................13

*Unicom Sys., Inc.* v. *Farmers Grp., Inc.*,
    Civ. No. 04-4604, 2007 WL 9705875 (C.D. Cal. June 12, 2007) ........................10

*Universal Athletic Sales Co.* v. *Salkeld*,
    511 F.2d 904 (3d Cir. 1975)...............................................................................15

*Wilkison* v. *Wiederkehr*,
    124 Cal. Rptr. 2d 631 (Ct. App. 2002) ...............................................................6

*Windsor Secs., Inc.* v. *Hartford Life Ins. Co.*,
    986 F.2d 655 (3d Cir. 1993)................................................................................6

*Wolf* v. *Walt Disney Pictures & Television*,
    76 Cal. Rptr. 3d 585 (Ct. App. 2008) ..................................................................9

**Statutes**

17 U.S.C. § 101 ("Copyright Act")...............................................................14, 15, 16, 18

Cal. Civ. Code § 1442..............................................................................................9

Cal. Civ. Code § 1636, 1638...................................................................................16

Cal. Civ. Code § 1638.............................................................................................16

**Rules**

Fed. R. Civ. P. 50(b) ................................................................................................4

## I.      NATURE AND STAGE OF THE PROCEEDING

The Court held a combined jury and bench trial from December 13 to 20, 2024.  The jury returned a verdict in favor of defendants on two of three questions on the verdict form.  D.I. 572.  The jury found that defendants Qualcomm Inc. and Qualcomm Technologies, Inc. (together, "Qualcomm") did not breach Section 15.1(a) of the Architecture License Agreement between plaintiff Arm Ltd. and defendant Nuvia, Inc. (the "Nuvia ALA").  The jury further found that Qualcomm's central processing units that include designs acquired in its acquisition of Nuvia are licensed under the Architecture License Agreement between Arm and Qualcomm (the "Qualcomm ALA").  *Id.*  The jury failed to reach a unanimous verdict on the question whether Nuvia breached Section 15.1(a) of the Nuvia ALA.  *Id.*  The Court accepted the partial verdict on the two questions resolved by the jury and discharged the jury.  Trial Tr. (Tr.) 1016:17–1017:2, 1020:16–1021:2.

## II.     SUMMARY OF ARGUMENT

In an effort to obstruct Qualcomm's development of innovative, high-performance CPUs, Arm brought this action alleging breach of the Nuvia ALA and demanding that Qualcomm destroy all of its products that incorporated designs it obtained after acquiring Nuvia.  That effort failed.  The jury unanimously concluded that Qualcomm did not breach Section 15.1(a) of the Nuvia ALA and that Qualcomm's products based on Nuvia designs are licensed under Qualcomm's own ALA.

The jury did not reach a verdict on Arm's claim against Nuvia for breach of Section 15.1(a) of the Nuvia ALA.  Judgment as a matter of law is now warranted on that claim for two reasons.

1.      Arm presented no evidence that Nuvia's alleged breach caused Arm to suffer any cognizable harm.  To prevail on its contract claims, Arm needed to prove that the defendants' actions caused it to suffer harm.  But to avoid acknowledging that it had an adequate remedy at law—which would have foreclosed its demand for specific performance—Arm forswore past damages.  Instead, Arm argued that it was harmed by having "unlicensed" products "in the market"

or because it supposedly could have obtained greater royalties. Both of those theories are insufficient as a matter of law.

With respect to unlicensed products: Arm did not present any non-speculative evidence that anyone in the market perceived Qualcomm's products to be unlicensed, much less that they did so because of Nuvia's alleged breach. The only evidence presented at trial showed record growth for Arm's licensing business after Qualcomm's acquisition of Nuvia. And Arm's speculation about such harm made no sense. The evidence did not show that the market perceived Qualcomm to be offering "unlicensed products" in the face of Qualcomm's consistent position that its products were licensed. The products at issue here were also being sold by Qualcomm, which acquired an in-development design from Nuvia almost a year before Arm asked Nuvia to destroy it, and there was no evidence at trial that the market would consider a breach of the Nuvia ALA by Nuvia as meaning that Qualcomm's products were not licensed.

Arm's theory concerning royalties fares no better. The Court properly precluded Arm from asserting that theory, because Arm intentionally avoided pursuing it during pretrial proceedings in order to ensure the continued viability of its request for specific performance. In any event, Arm did not present any evidence about the royalties it supposedly could have received in the absence of a breach by Nuvia or that such royalties would have differed from what Qualcomm is already paying to Arm.

2.    Nuvia is also entitled to judgment as a matter of law because the evidence at trial showed that no reasonable jury could conclude that Nuvia breached Section 15.1(a) of the Nuvia ALA. Arm did not prove that Nuvia's design work (namely, its RTL) contained "ARM Technology" or "derivatives" subject to destruction under Section 15.1(a). As even Arm's own expert agreed, Nuvia's RTL was "Nuvia Technology" and thus *Nuvia*'s "Confidential

2

Information" under the Nuvia ALA.  It was thus not ARM Technology or a derivative subject to Section 15.1(a).  And even if Nuvia Technology were subject to Section 15.1(a), the Nuvia RTL did not contain any ARM Technology at the time of termination of the Nuvia ALA.

Arm's primary theory at trial was that the publicly available Arm Architecture Reference Manual (the "Arm ARM") constituted ARM Technology and that the entire Nuvia RTL codebase was a derivative of that document.  But under the plain language of the contract, "ARM Technology" does not include the Arm ARM.  The only item of actual ARM Technology that Arm's experts identified at trial—confidential architecture extensions—was never implemented in the RTL.

In any event, even if the Arm ARM did constitute ARM Technology under the Nuvia ALA, the only portions present in Nuvia's RTL—opcodes and register definitions—were wholly regenerated by Qualcomm under the Qualcomm ALA.  Accordingly, at the time of termination, Nuvia's designs contained no ARM Technology delivered under the Nuvia ALA.  Arm was thus left to fall back on sweeping theories that any product that relied on the Arm ARM in development or was designed to be compliant with the Arm architecture is a "derivative" subject to Section 15.1(a).  That position is based not on the language of the Nuvia ALA but instead on an improper interpretation of the contract of breathtaking scope by Arm's technical expert.

## III.    STATEMENT OF FACTS

The relevant facts are set forth in the Argument section, as appropriate.

## IV.    LEGAL STANDARD

Judgment as a matter of law is appropriate where, when viewing the evidence "in the light most favorable to the non-moving party," the record lacks the "minimum quantum of evidence from which a jury might reasonably afford relief"—including when a plaintiff presents "no evidence" supporting one of the "elements required" to prove its claim.  *Rodriquez* v. *Se. Pa.*

*Transp. Auth.*, 119 F.4th 296, 298–99 (3d Cir. 2024); *see* Fed. R. Civ. P. 50(b).

## V.    ARGUMENT

### A.    Arm Presented No Evidence That Nuvia's Alleged Breach Caused Any Harm.

As required under California law and reflected in an uncontested jury instruction, Arm was required to prove that Nuvia's alleged breach of Section 15.1(a) of the Nuvia ALA caused it harm. D.I. 568 at 6; Tr. 885:8–25; *e.g.*, *Behnke* v. *State Farm Gen. Ins. Co.*, 127 Cal. Rptr. 3d 372, 391 (Ct. App. 2011); *St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*, 124 Cal. Rptr. 2d 818, 834 (Ct. App. 2002).  Arm was required to identify "appreciable and actual damage" from the breach; claims of "speculative harm" are insufficient.  *Aguilera* v. *Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) (citation omitted).

At trial, Arm did not show that Nuvia's alleged failure to stop using and destroy microarchitecture RTL it developed caused any tangible harm to Arm, whether in the form of lost customers or business opportunities.  None of Arm's three testifying executives identified a single lost customer, a single lost business opportunity, or even a single customer complaint arising from Nuvia's alleged breach of the Nuvia ALA.  To the contrary, Arm's CEO confirmed that, as of December 2023—nearly two years after Arm terminated the Nuvia ALA, and after Qualcomm had already begun marketing the products at issue—Arm had not suffered any concrete harm.  Tr. 278:16–19, 279:10–280:7 (Haas).  The unrebutted trial evidence showed that Arm posted record licensing and royalty revenues after terminating the Nuvia ALA.  Tr. 281:7–288:23 (Haas); DTX-496, DTX-791, DTX-1495.  Arm even proclaimed that it has sold more than 300 billion Arm-compliant chips, many billions of which are Qualcomm Snapdragon chips.  Tr. 198:18–199:21 (Abbey).

In the face of that evidence, Arm attempted to prove causation of harm in two ways.  Tr. 100:19–101:7.  *First*, Arm attempted to show that it was harmed because "unlicensed technology based on a Nuvia design is now in the market."  Tr. 278:25–279:1 (Haas); *see* Tr. 100:21–25; Tr. 279:2–9, 280:23–281:1 (Haas); Tr. 850:25–851:1.  *Second*, Arm attempted to show that it received lower royalty payments than it otherwise would have but for the breach.  Tr. 850:21–851:1.  Both of those positions fail as a matter of law.

### 1.    *Unlicensed Products.*

Arm's attempt to demonstrate causation and harm by the presence of "unlicensed" products in the market fails for multiple independent reasons.  To begin with, Arm offered no evidence that any of its customers considered Qualcomm products to be unlicensed.  Instead, the evidence showed that Qualcomm consistently maintained that the products at issue were fully covered by Qualcomm's own licenses.  *E.g.*, D.I. 300 ¶¶ 145, 220.

Qualcomm, not Nuvia, was also the entity selling the products at issue here.  There was no evidence at trial that the market would consider a breach by *Nuvia* of Section 15.1(a) of the Nuvia ALA to mean that Qualcomm's products were not licensed.  Arm presented no evidence from its customers or anyone else that they somehow believed that Qualcomm's products were "unlicensed" because of a breach of the Nuvia ALA.[1]

To the extent Arm is asserting that the mere presence of unlicensed products in the market causes harm, Arm is incorrect.  The only basis Arm has for saying that the products are unlicensed is that defendants allegedly did not comply with their contracts.  But breach and harm are distinct elements of a cause of action for breach of contract, and allowing Arm to show harm merely by pointing to a supposed breach would render the harm element meaningless.  Absent any proof of

---

[1] The jury also found Qualcomm's products to be licensed.  D.I. 572.

actual harm, a jury could have found that Qualcomm's products harmed Arm only through speculation, which cannot sustain a claim.  *See Windsor Secs., Inc.* v. *Hartford Life Ins. Co.*, 986 F.2d 655, 668–69 (3d Cir. 1993); *Blattman* v. *Siebel*, Civ. No. 15-530, 2020 WL 475413, at *19 (D. Del. Jan. 29, 2020).

### 2.    *Royalties.*

Arm's theory that Nuvia's alleged breach of Section 15.1(a) affected the royalties Qualcomm paid Arm is similarly insufficient as a matter of law.

*First*, the Court properly precluded Arm from relying on that theory.  If Arm wanted to obtain a higher royalty rate, it could have sued for money damages.  Instead, Arm disclaimed any damages, declined to produce any damages calculation in discovery, and refused to produce unredacted third-party ALA agreements showing royalty rates paid by those parties.  Mar. 7, 2024 Hr'g Tr. 34:24–36:21, 60:8–61:1; Nov. 20, 2024 Pretrial Conf. Tr. 38:8–9; Tr. 98:16–99:1, 101:2–3.  That was a strategic decision by Arm:  the availability of damages is fatal to the specific-performance remedy Arm sought.  *See Wilkison* v. *Wiederkehr*, 124 Cal. Rptr. 2d 631, 640 (Ct. App. 2002).  This Court precluded Arm from arguing that it satisfied the harm element based on differences in royalty rates under the Qualcomm and Nuvia ALAs "unless and until they show [the Court] that that was something that was raised in discovery."  Tr. 102:1–7.  Arm did not do so; it cannot now argue a theory of harm it deliberately disavowed.

*Second*, the "lost royalties" argument was not substantiated by evidence.  At trial, Arm did not present any evidence of actual lost royalties.  Arm presumes that, if Nuvia had destroyed its RTL after termination of the Nuvia ALA, Qualcomm would have agreed to pay Arm higher rates under the Nuvia ALA.  But Arm presented no evidence supporting that premise.  The evidence

and testimony at trial provided no basis to find that Nuvia's destruction or retention of any RTL in its possession had any bearing on the royalty rates Qualcomm paid Arm.

**B.      Nuvia Did Not Breach Section 15.1(a) of the Nuvia ALA.**

Section 15.1(a) of the Nuvia ALA states that, upon termination of the agreement by Arm under Section 14.2, Nuvia must (1) "immediately discontinue any use and distribution of all ARM Technology, ARM Confidential Information and any products embodying such technology or information" and (2) at Arm's request, "either destroy or return to ARM any ARM Confidential Information, including any copies thereof in its possession and any ARM Technology or derivatives (including any translation, modification, compilation, abridgement or other form in which the ARM Technology has been recast, transformed or adapted) thereof in its possession." JTX-1 § 15.1(a).  Arm's theory of breach at trial was that Nuvia violated Section 15.1(a) by failing to stop using and destroy its in-development RTL.  Tr. 893:24–897:17 (plaintiff's closing).  Any obligations Nuvia had under Section 15.1 did not exist until March 1, 2022, the date of termination, and approximately one year after Qualcomm acquired Nuvia, hired former Nuvia employees, and began progressing Nuvia-based designs under its own ALA.  Tr. 423:19–21, 456:14–457:7 (Williams); Tr. 577:16–23 (Weiser); DTX-1196.

Nuvia's RTL constituted "Nuvia Technology"—not ARM Technology or ARM Confidential Information—under the Nuvia ALA.  It was thus not subject to Section 15.1(a).  In addition, at the time of termination of the Nuvia ALA, there was no ARM Technology delivered under the Nuvia ALA in Qualcomm products.  Arm presented no evidence disputing that the Qualcomm products at issue at trial were conceived of and began at Qualcomm, not Nuvia, nor did it challenge the evidence showing that Qualcomm regenerated the only reflection of the Arm ARM purportedly identified in Nuvia's functional code at trial.  The record evidence thus points

to only one reasonable conclusion: that Nuvia's RTL was not subject to the obligations of Section 15.1(a).

### 1.    Nuvia's RTL Was "Nuvia Technology" Not Subject to Section 15.1(a).

The Nuvia ALA draws a clear distinction between technology developed by Nuvia and technology developed by Arm. The agreement defines "Nuvia Technology" as "the technology developed by LICENSEE" (i.e., Nuvia), and it defines "ARM Technology" to include specific, identified deliverables Arm was required to supply to Nuvia. JTX-1 § 1.27; JTX-5 § 2, cl. A.10. The agreement then distinguishes between "Nuvia Technology" and "ARM Technology" with respect to the definition of "Confidential Information." JTX-1 § 1.8. In particular, that definition treats each party's respective Technology and "derivatives" of that Technology as the party's respective Confidential Information. *Id.* The Nuvia ALA's termination provisions in Section 15.1 then reflect those distinctions by imposing reciprocal obligations on each party to "immediately discontinue any use" of the other's Technology and "either [to] destroy or return" the other party's Confidential Information, including "derivatives" of the party's Technology. *Id.* § 15.1(a) & (b).

Nuvia's RTL was Nuvia Technology, not ARM Technology, because it was "technology developed by" Nuvia. JTX-1 § 1.27. Witnesses from both parties, including Arm's expert, agreed. Tr. 186:6 (Abbey); Tr. 307:24–308:3 (Haas); Tr. 412:15–16, 444:15–24 (Williams); Tr. 542:13–19, 543:14–21 (Chen); Tr. 664:13–20 (Annavaram); Tr. 768:2–5 (Amon). And because the Nuvia RTL constitutes Nuvia Technology, it also constitutes Nuvia Confidential Information, including for purposes of Section 15.1. JTX-1 §§ 1.8(ii), 15.1. The RTL is thus not ARM Technology or ARM Confidential Information, and Section 15.1(a) does not apply to it. The RTL is subject to Section 15.1(b), which imposes obligations on Arm, not Nuvia. *Id.* § 15.1(b).

The testimony at trial supports Nuvia's interpretation. Gerard Williams testified that, despite Arm's initial position that the Nuvia ALA was a one-way license, Nuvia bargained for the

distinction between Nuvia Technology and ARM Technology with the "intent to protect all of the technology that Nuvia created," including Nuvia microprocessors and other intellectual property, to ensure "that there would be no debate about whose [technology] it was." Tr. 432:12–437:3; DTX-1095 at 1 (noting that protections for Nuvia Technology were intended to apply to Section 15); *id.* at 5, 7 (comment bubbles from Arm). Will Abbey's testimony was consistent with Mr. Williams's: Mr. Abbey testified that "Nuvia Technology" was included in the contract so that Nuvia's intellectual property would not "end up into Arm's standard products and be distributed as part of [Arm's] standard TLA products." Tr. 164:13–25. Because "there is no material conflict in the extrinsic evidence," the Court may interpret the contract as a matter of law, *Wolf* v. *Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 602–04 (Ct. App. 2008), and recognize that the Nuvia RTL is Nuvia Technology.[2]

California's policy against forfeitures further confirms the conclusion that Nuvia's RTL was not subject to destruction under Section 15.1(a). Under California law, a "condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created." Cal. Civ. Code § 1442; *Ballard* v. *MacCallum*, 101 P.2d 692, 695 (Cal. 1940). Arm interprets Section 15.1(a) to require forfeiture of the Nuvia RTL, technology Nuvia created, owned, and over which Nuvia has express contractual rights. Arm had nothing to do with creating or developing it. Tr. 444:19–24, 454:5–8 (Williams); Tr. 542:16–19 (Chen); Tr. 597:13–598:5 (Grisenthwaite). To the extent any ambiguity is present, Section 15.1(a) must be construed to avoid any such forfeiture.

---

[2] The Nuvia RTL was also never located at (or even accessible to) Arm and could thus not have been "returned" there. Arm's Chief Architect, Richard Grisenthwaite, testified that it would have been "extraordinarily unusual" for a licensee to send its RTL to Arm because licensees "regard that RTL as embodying their proprietary know how, secret sauce." Tr. 597:13–598:2. Mr. Grisenthwaite could not recall a single instance of a licensee ever providing its RTL to Arm, *id.*, and Mr. Williams confirmed that Nuvia shared no code with Arm, Tr. 453:20–454:4.

*See Unicom Sys., Inc.* v. *Farmers Grp., Inc.*, Civ. No. 04-4604, 2007 WL 9705875, at *13 (C.D. Cal. June 12, 2007) (interpreting termination provision of software license to avoid forfeiture of licensee's rights).

### 2. The Nuvia RTL Was Not a Derivative of Any ARM Technology.

Aside from constituting "Nuvia Technology" not subject to Section 15.1(a) in the first instance, the plain language of the Nuvia ALA demonstrates that the Nuvia RTL was not a derivative of "ARM Technology." Arm's position at trial, and the testimony of its expert Dr. Colwell, was that Nuvia Technology (as well as the microarchitecture in 250 billion CPUs worldwide, including in 99% of smartphones) was all derivative of the publicly available Arm ARM. Tr. 510:22–511:21. That argument lacks merit for numerous reasons.

#### a. The Nuvia ALA Architecture Specifications Listed in Annex 1 Encompass Only Confidential Architecture Extensions.

The Nuvia ALA does not permit Arm to claim rights against the Nuvia RTL based on the publicly available Arm ARM. "ARM Technology" is defined in Annex 1 as "any or all, as the context admits, of the technology identified in Section 1 of this Annex 1, and any Updates thereto delivered by ARM to LICENSEE provided that such technology is Included Technology." JTX-5 § 2, cl. A.10. As defendants explained on summary judgment (D.I. 391 at 16–19), the term "ARM Technology" is limited to the five deliverables listed in Part A of Section 1 of Annex 1 of the Nuvia ALA. The items listed in Parts B–D of Section 1 of Annex 1—the Architecture Compliance Kit, the ETM Trace Checker, and the Crypto Extension, JTX-5 § 1, pt. A—do not constitute "ARM Technology," D.I. 391 at 17–19, and in any event were not used by Nuvia, Tr. 452:9–16 (Williams).

At trial, Arm did not attempt to prove that the Nuvia RTL was a derivative of the items listed in Parts B, C, and D of Section 1. Instead, Arm focused entirely on one item listed in Part

A:  the "ARMv8-A Architecture – Specifications," also referred to by the witnesses at trial as "extensions."   Tr. 501:1–502:6 (Colwell); Tr. 546:6–16 (Chen); PTX-165 (the 2020 Specifications).  And those Specifications, as defined in the contract, constitute ARM Technology under the Nuvia ALA but do not include the Arm ARM.[3]

The contract provides facial support for that conclusion.  The Arm ARM is a public document available for download from Arm's website.  *E.g.*, Tr. 123:15–16 (Arm opening); Tr. 370:22–371:4 (Williams); Tr. 597:4–9 (Grisenthwaite); PTX-651 at 1.  Yet Annex 1 lists the "ARMv8-A Architecture – Specifications" as being "Confidential except disclosure permitted to 'Designers' in accordance with Clause 3 of the ALA."  JTX-5 § 1.  The Specifications are thus distinct from the Arm ARM in that the former are confidential and the latter is not.  The "ArmV8-Architecture Reference Manual" is also a defined term in Annex 1 and is defined not as the Arm ARM but instead as "the documentation identified in Section 1 Subsection 1 Part A of this Annex 1."  JTX-5 § 2, cl. A.8.  Part A does not list the ArmV8-Architecture Reference Manual.  *Id.*

The trial record further demonstrates that the Specifications listed in Part A of Annex 1 refer to unreleased confidential extensions to the Arm Architecture, not the publicly available Arm ARM.  Vivek Agrawal, a senior principal engineer at Arm, testified that the "Specifications" refer to confidential "engineering specifications," which may eventually be incorporated into the Arm ARM, a "more formal document."  Tr. 627:10–628:4.  Mr. Williams had the same understanding: he testified that the Specifications were materials that "became incorporated in the public Arm ARM before the Qualcomm acquisition."  Tr. 452:17–21.  Notably, in an email exchange, Mr. Grisenthwaite explained to Mr. Williams that a potential non-disclosure agreement should not be

---

[3] As discussed below, the Specifications also include register definitions associated with each new feature, which, to the extent they were added to the Nuvia RTL, were regenerated at Qualcomm before termination of the Nuvia ALA.  Tr. 547:1–13 (Chen); Tr. 665:4–666:4 (Annavaram).

"holding you up" because Nuvia could download from the internet the Arm ARM, which at the time included extensions through "8.4." Tr. 599:16–600:6; DTX-76 at 1, 3. Accordingly, both testimony and the language of Annex 1 demonstrate that the Arm ARM does not constitute ARM Technology.

At trial, the only example of a confidential extension discussed—the 2020 Architecture Extensions (PTX-165)—confirms the difference between those extensions and the Arm ARM. Dr. Colwell, Arm's technical expert, testified that the extensions contained "something new [Arm] want[ed] to add in the future" and would "merge . . . into the Arm ARM" if testing was satisfactory, Tr. 488:18–489:1, and the cover of the document refers to the extensions as "Architecture Specifications," PTX-165 at 1. Both of Arm's expert witnesses agreed that the 2020 Extensions—a 36-page document—were different from the 9,000-page Arm ARM. Tr. 501:17–502:8 (Colwell); Tr. 546:17–25 (Chen). Defendants' expert, Dr. Annavaram, had the same understanding of the 2020 Extensions document. Tr. 649:3–650:5, 674:14–24, 707:6–12.

Treating the Arm ARM as part of the "Specifications," and thus as "ARM Technology" under the Nuvia ALA, would also lead to a bizarre result. If the publicly available Arm ARM constituted ARM Technology, then the definition of "Confidential Information" would include facially non-confidential information, and Section 15.1 would require the destruction of derivatives of such non-confidential ARM Technology on the basis that it is ARM Confidential Information. JTX-1 § 1.8(i). It would be strange for a contract to define—and call for the destruction of—publicly available information and its derivatives as Confidential Information, particularly where the definition of Confidential Information refers to trade secrets; "information designed in writing by either party, by appropriate legend, as confidential"; and certain information that is "first disclosed orally" and "is identified as confidential at the time of disclosure." *Id.* § 1.8.

The Nuvia ALA's confidentiality provisions also exempt from all confidentiality obligations information that is in the public domain, or that the party already knows or received, provided that such information is not subject to other confidentiality obligations. *Id.* § 3.9(i)–(iii). It would thus make little sense to treat the Arm ARM as Confidential Information, and courts should "avoid an interpretation" of a contract "which would result in absurdity." *Ticor Title Ins. Co.* v. *Rancho Santa Fe Ass'n*, 177 Cal. App. 3d 726, 730 (1986).

Given that the Arm ARM is not ARM Technology, Arm is left with only a single example of confidential technology allegedly included in the Nuvia RTL. But no evidence showed that the Nuvia Technology was a derivative of that technology. The only confidential extensions that Arm admitted into evidence were the 2020 Architecture Extensions. PTX-165; Tr. 488:16–489:21, 502:12–17 (Colwell, discussing PDX-3.14–3.15). And the record lacks evidence that the Nuvia RTL was a derivative of those extensions. Under the appropriate definition of derivative discussed below, as well as under the broadest definition of derivative, Arm offered no evidence concerning the contents of the Specifications or how any were incorporated into or related to Nuvia Technology. Because the record lacks evidence that the Nuvia RTL implemented any of the confidential extensions, no jury could reasonably find that the RTL constituted a derivative of ARM Technology that would be subject to Section 15.1(a).

### b. *Arm's Derivative Claims Fail Due to Overbreadth.*

Arm's position at trial with respect to what constitutes a derivative not only ignored the contract's pertinent limitation of ARM Technology to the Specifications, but also made claims of astounding breadth, claiming a right of control over most CPUs worldwide. Dr. Colwell testified that any device that is Arm-compliant should be considered a derivative of the Arm ARM. Tr. 506:20–507:2, 511:15–21. As Dr. Colwell explained, some of the largest companies in the world, including Qualcomm, Amazon, Google, NVIDIA, Samsung, and Apple, ship chips with Arm-

based CPUs.  Tr. 509:19–510:3.  In total, there are over 250 billion Arm-based CPUs, used by 70% of the world's population, including in 99% of the world's smartphones.  Tr. 510:22–511:17 (Colwell); Tr. 930:14–931:1 (defendants' closing).  According to Arm, the designs for every one of those CPUs—including designs built from scratch by leading technology companies—are derivatives of the Arm ARM and subject to destruction if Arm terminates the relevant license.  Tr. 509:23–510:21, 512:15–24 (Colwell).  Dr. Colwell's definition of derivative even included designs for CPUs intended to be Arm-compliant that were not finished.  Tr. 509:2–5.  Those designs were "the blood, sweat and tears" of the designers, Tr. 444:19–24 (Williams), involving an extraordinary investment of time, money, and effort, yet Arm claims rights in them all.

 Dr. Colwell based his definition of derivative on his reading of the contract.  He said the term "derivative," as a technical matter, "rang a bell," Tr. 482:14–19, and he testified that it "makes perfect sense" to him that a CPU was a derivative of the Arm ARM because it was designed by an engineer who read the Arm ARM.  Tr. 482:9–483:6; Tr. 911:19–912:16 (Arm closing presentation of PDX-6.91–6.92, containing that testimony).

Setting aside what Dr. Colwell said in his idiosyncratic reading of the contract, when setting forth examples of what constitutes a derivative of ARM Technology, the Nuvia ALA refers to any "translation," "modification," "abridgement," or "other form in which the ARM Technology has been recast, transformed or adapted."  JTX-1 § 1.8.  That language mirrors the Copyright Act, which defines the term "derivative work" to mean "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be *recast, transformed, or adapted*," including "a work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original

work of authorship." 17 U.S.C. § 101 (emphasis added). As the Third Circuit has explained, "by definition, derivative works are substantially similar to the original work, because a work is not derivative unless it has been substantially copied from a prior work." *Dam Things from Denmark* v. *Russ Berrie & Co.*, 290 F.3d 548, 565 (3d Cir. 2002) (internal quotation marks and alterations omitted). Showing that a defendant may have had access to or "referenced" the material alleged to be derivative, without a "quantum of substantial similarity" between the original and the "copied" work, is insufficient as a matter of law. *Universal Athletic Sales Co.* v. *Salkeld*, 511 F.2d 904, 907 (3d Cir. 1975). So too is showing the "mere interoperability" of new technology with a preexisting one. *Oracle Int'l Corp.* v. *Rimini St., Inc.*, 123 F.4th 986, 996 (9th Cir. 2024).

There is no record evidence that the functional code of Qualcomm products at the time of the termination of the Nuvia ALA was substantially similar to the Arm ARM or the 2020 Extensions. Neither Dr. Colwell nor Dr. Chen gave opinions for Arm on whether the code at the time of termination was substantially similar to ARM Technology. Tr. 520:18–24 (Dr. Colwell offered no opinion on what constituted ARM Technology versus Nuvia Technology); Tr. 542:13–19 (Dr. Chen testifying "I consider that all Nuvia Technology"). It was also undisputed that the Arm ARM does not provide the information necessary to build a CPU. DTX-486 at 12; Tr. 443:12–444:3 (Williams).

With respect to the extensions, Dr. Colwell identified language in the RTL purportedly copied from the 2020 Architecture Extensions, but that language appeared in a comment, not functional RTL. Tr. 488:16–489:21, 502:12–17 (discussing PDX-3.14–3.15). As Dr. Annavaram explained, comments merely reflect that the Nuvia engineers may have been considering implementing a feature, and there was no evidence that the feature discussed by Dr. Colwell was ever implemented in Nuvia RTL. Tr. 675:3–676:7. A "comment is just a comment, it's not code."

Tr. 693:18, 693:23–694:17 (Annavaram). At best, Arm offered evidence that Nuvia engineers *referred to* the 2020 Architecture Extension, but the record does not show substantial similarity between the functional RTL and the extensions.

The absence of evidence to support Arm's claim was illustrated in closing argument when Arm argued that Nuvia's in-development Phoenix core was a derivative of the Arm ARM based on the testimony of Dr. Colwell. Tr. 913:6–914:3 (discussing PDX-6.95). In the cited testimony, Dr. Colwell restated his conclusion that a CPU "aiming at Arm compatibility" was an Arm derivative. Tr. 491:9–22. He added, as emphasized by Arm counsel in closing, that "We looked at the code, there is references to Arm all over it." *Id.* Dr. Colwell identified no Arm code or technology, only the "references" to Arm which he said were "congruent with the design is intended to be Arm compliant." *Id.* Nuvia Technology "referencing" Arm was not evidence of substantial similarity to any ARM Technology and was only evidence that the Nuvia RTL was intended to be Arm-compliant. And the "We" to whom Dr. Colwell referred was Dr. Chen, but Dr. Chen then provided no opinions that there was any ARM Technology in Nuvia or Qualcomm products. Tr. 542:13–19 (Chen).The definition of derivative applied by Arm and its expert at trial cannot, as a matter of law, sustain a verdict against Nuvia. Contracts are not defined by what "rings a bell" when a technical expert reads a contract; the contract language governs. Cal. Civ. Code §§ 1636, 1638. And as explained, that language demonstrates that the parties adopted the concept of a derivative from the Copyright Act. Arm's interpretation is not only inconsistent with the contract but also makes no sense: it would mean that a licensee creating Arm-compliant products was agreeing that all of its unique and specialized RTL development would be subject to destruction, based on the use of the legal word "derivative," simply because it referenced a non-confidential document available on the internet.

16

### 3. *The Nuvia RTL Is Not a Derivative of the Arm Architecture Reference Manual.*

Even if the Arm ARM did constitute ARM Technology, Mr. Williams explained that the only ARM Technology in the Nuvia Technology transferred to Qualcomm prior to termination of the Nuvia ALA were what are called opcodes (operation codes) and register definitions. Tr. 445:8–446:25. Consistent with that testimony, Arm's experts identified only two purported features from the Arm ARM incorporated into the Nuvia RTL: the opcodes and register definitions. Specifically, Dr. Colwell identified opcodes for the BTI and DGH instructions in Nuvia's RTL. Tr. 486:17–488:2 (discussing PDX-3.12–3.13); Tr. 666:18–667:9 (Annavaram, discussing same). And Dr. Chen identified "A64 instructions from the Arm ARM"—i.e., Arm opcodes—and "register definitions." Tr. 545:24–546:12. Arm's expert and Qualcomm's expert also agreed that the 2020 Specifications relate to register definitions. Tr. 546:20–547:13 (Chen); Tr. 665:6–666:4 (Annavaram). No Arm witness disputed that the only aspects of the Arm ARM present in the Nuvia RTL were opcodes and register definitions.

The presence of the Arm opcodes and register definitions in the Nuvia RTL does not make the RTL a derivative of the Arm ARM. The opcodes and register definitions comprised 1% or less of the RTL for Nuvia's pre-acquisition, in-development CPU design. Tr. 445:3–446:25 (Williams). Further, the Arm ARM "defines the behavior of an abstract machine," DTX-1587 at 33; the opcodes and register definitions merely provide an interface for software to use that abstract machine, Tr. 446:8–21 (Williams); Tr. 666:11–667:1 (Annavaram). As a result, the opcodes and register definitions were not a "material part" of the Arm ARM. *See Tanksley* v. *Daniels*, 902 F.3d 165, 172–73 (3d Cir. 2018) (unauthorized copying under the Copyright Act requires actual copying and material appropriation).

In addition, following Qualcomm's acquisition of Nuvia and during the year prior to termination of the Nuvia ALA, those opcodes and register definition files were deleted and replaced with new opcode and register definition files generated by Qualcomm engineers under Qualcomm's own ALA, a fact that no Arm witness disputed.  Tr. 445:19–446:1, 446:22–448:4 (Williams); Tr. 667:10–668:15, 669:21–674:13 (Annavaram, discussing DDX-3.12–3.17); DTX-401; DTX-401A.  Because all of the Arm opcodes and register definitions at issue at trial were regenerated at Qualcomm prior to termination of the Nuvia ALA, the Nuvia RTL did not incorporate any derivatives of the Arm ARM for purposes of *the Nuvia ALA*.  Any connection between the RTL files containing Arm opcodes and register definitions and the Nuvia ALA was thus eliminated.

### 4.    *Only Architecture Compliant Cores that Were "Recast, Transformed or Adapted" from ARM Technology Are Derivatives Subject to Section 15.1(a).*

At trial, Arm argued that the Nuvia ALA's inclusion of the term "Architecture Compliant Core" as an example of a derivative of ARM Technology must mean that all microarchitecture implementing the Arm architecture must also be derivative of ARM Technology.  That argument lacks merit.

The term "Architecture Compliant Core" is defined in Annex 1 of the Nuvia ALA, and it does not include an in-development microarchitecture.  JTX-1 § 1.1.  Annex 1 lists 11 requirements that a microarchitecture must satisfy for it to constitute an "Architecture Compliant Core."  JTX-5 § 2, cl. A.5.  The undisputed evidence at trial showed that Nuvia's in-development RTL did not meet those 11 requirements.  Tr. 716:18–21 (Annavaram).  Nuvia thus did not have an Architecture Compliant Core for purposes of the Nuvia ALA.

Arm took the position at trial that, because "[t]here is microarchitecture in an architecture compliant core," the in-development Nuvia RTL must also constitute a derivative, regardless of

whether Nuvia had achieved an Architecture Compliant Core.  Tr. 467:17–469:5 (Williams); *see* Tr. 710:18–712:2, 713:23–716:13 (Annavaram).  But that is not what the contract says.  Only Architecture Compliant Cores that were "recast, transformed or adapted" from ARM Technology are derivative of ARM Technology.  JTX-1 § 1.8(i).  By contrast, "Nuvia Architecture Compliant Cores" that were "recast, transformed or adapted" from Nuvia Technology are derivative of Nuvia Technology.  *Id.* § 1.8(ii).

As Mr. Williams explained, the distinction between Arm Architecture Compliant Cores and Nuvia Architecture Compliant Cores existed because Nuvia discussed with Arm the possibility of modifying an off-the-shelf Arm Architecture Compliant Core rather than building a design from scratch.  Tr. 433:11–434:3.  Had Nuvia modified an Arm off-the-shelf core, it may have "recast, transformed or adapted" ARM Technology (in the form of the off-the-shelf core).  Tr. 726:9–727:8 (Annavaram).  But Nuvia built a custom core of its own rather than building from an Arm off-the-shelf core.  Tr. 368:6–22, 390:8–19, 434:4–8 (Williams).  Nuvia thus intended to build a *Nuvia* Architecture Compliant Core, which is protected as Nuvia's own Confidential Information.  JTX-1 § 1.8(ii).

## VI.    CONCLUSION

Judgment as a matter of law should be granted to Nuvia on Count I of the Complaint (D.I. 1 ¶¶ 58–69) and on Count I(a) of the Answer and Second Amended Counterclaims (D.I. 300 ¶ 275(a)).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Anna P. Lipin
William T. Marks
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
(202) 223-7300

Catherine Nyarady
Erin J. Morgan
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Travis Murray (#6882)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
tmurray@morrisnichols.com

*Attorneys for Defendants*

January 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 17, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                    *VIA ELECTRONIC MAIL*
Robert M. Vrana, Esquire
Samantha G. Wilson, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Plaintiff*

Joyce Liou, Esquire                                        *VIA ELECTRONIC MAIL*
Daralyn J. Durie, Esquire
Shaelyn Dawson, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
*Attorneys for Plaintiff*

Erik J. Olson, Esquire                                     *VIA ELECTRONIC MAIL*
Meet Yatin Mehta, Esquire
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Plaintiff*

Scott F. Llewellyn, Esquire                               *VIA ELECTRONIC MAIL*
Sarah E. Brickey, Esquire
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
*Attorneys for Plaintiff*

Daniel P. Muino, Esquire                                    *VIA ELECTRONIC MAIL*
Reebehl G. El-Hage, Esquire
David Nathaniel Tan, Esquire
Sydney K. Cooper, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Plaintiff*

Nicholas Rylan Fung, Esquire                                *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Laura Gilbert Remus, Esquire
Zach B. Quinlan, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Plaintiff*

Kyle W.K. Mooney, Esquire                                   *VIA ELECTRONIC MAIL*
Kyle D. Friedland, Esquire
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019
*Attorneys for Plaintiff*

Michael J. DeStefano, Esquire                               *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
600 Brickell Avenue, Suite 1560
Miami, FL  33131
*Attorneys for Plaintiff*


                                            */s/ Jennifer Ying*
                                            _____
                                            Jennifer Ying (#5550)

22