# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARM LTD.,

               Plaintiff,

      v.

QUALCOMM INC., QUALCOMM
TECHNOLOGIES, INC., and NUVIA, INC.,

             Defendants.

C.A. No. 22-1146-MN

**REDACTED - PUBLIC VERSION**
**(Filed February 21, 2025)**

## PLAINTIFF ARM LTD.'S BRIEF IN OPPOSITION TO DEFENDANT NUVIA, INC.'S <u>RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW</u>

Dated: February 14, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
AGAZA@YCST.COM
RVRANA@YCST.COM
SWILSON@YCST.COM

*Attorneys for Plaintiff Arm Ltd.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 2

STATEMENT OF FACTS ....................................................................................................... 2

LEGAL STANDARDS ............................................................................................................ 5

ARGUMENT ............................................................................................................................ 5

I.      ARM PRESENTED SUFFICIENT EVIDENCE OF HARM. ...................................... 5

    A.      Arm Does Not Need to Show Appreciable and Actual Damages. ....................... 5

    B.      There is Sufficient Evidence of Actual Damages. ................................................ 8

II.     ARM PRESENTED SUFFICIENT EVIDENCE NUVIA BREACHED...................... 10

    A.      Nuvia's Code is a Derivative of ARM Technology............................................. 10

    B.      Nuvia's Excuses for Ignoring Its Contractual Obligations Fall Flat.................. 14

        1.      *Nuvia and Arm Technology Are Not Mutually Exclusive.* ....................... 14

        2.      *It Is Irrelevant That the Arm ARM Is Public*............................................. 15

        3.      *Nuvia's Overbreadth Argument is Baseless.* ............................................ 17

        4.      *Nuvia's Focus on Opcodes and Register Definitions Is Wrong.* ............. 18

        5.      *Partially Complete ACCs Are Derivatives of Arm Technology.*.............. 20

CONCLUSION........................................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguilera v. Pirelli Armstrong Tire Corp.*,
    223 F.3d 1010 (9th Cir. 2000) ...................................................................................................7

*Bauer Bros. v. Nike, Inc.*,
    159 F. Supp. 3d 1202 (S.D. Cal. 2016)......................................................................................8

*Darbun Enterprises, Inc. v. San Fernando Cmty. Hosp.*,
    239 Cal. App. 4th 399 (2015) ....................................................................................................6

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
    No. 1-04-CV-031829, 2012 WL 12987159 (Cal. Super. Jan. 09, 2012) .............................9 n.2

*Elation Sys., Inc. v. Fenn Bridge LLC*,
    71 Cal. App. 5th 958 (2021) ...............................................................................................1, 6, 7

*Fed. Deposit Ins. Corp. v. Cap. Funding Corp.*,
    No. SA CV 14-00967-AB (ANx), 2015 WL 13916255 (N.D. Cal. Aug. 28,
    2015) .........................................................................................................................................10

*Fisher v. Hampton*,
    44 Cal. App. 3d 741 (1975) .......................................................................................................8

*Jamieson v. City Council of the City of Carpinteria*,
    204 Cal. App. 4th 755 (2012) ..................................................................................................11

*Kids' Universe v. In2Labs*,
    95 Cal. App. 4th 870 (2002) ......................................................................................................8

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
    107 Cal. App. 4th 516 (2003) ..................................................................................................12

*Lundy v. Facebook Inc.*,
    No. 18-cv-06793, 2021 WL 4503071 (N.D. Cal. Sept. 30, 2021)..............................................6

*Mancini v. Northampton*,
    836 F.3d 308 (3d Cir. 2016).......................................................................................................5

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
    No. 09-80-LPS, 2015 WL 2379485 (D. Del. May 18, 2015) ...................................................10

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) .....................................................................................7

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC,*
 3 Cal. 5th 744 (2017) ..................................................................................11

*Raiser v. Ventura Coll. of L.,*
 488 F. App'x 219 (9th Cir. 2012) .................................................................6

*Rodriguez v. American Technologies, Inc.,*
 136 Cal. App. 4th 1110 (2006) ...............................................................16, 17

*Sun Microsystems, Inc. v. Microsoft Corp.,*
 87 F. Supp. 2d 992 (N.D. Cal. 2000) ......................................................9 n.2

*Sweet v. Johnson,*
 169 Cal. App. 2d 630 (1959) ....................................................................6, 7

*T.N. Incorporation, Ltd. v. Fidelity Nat'l Info. Servs., Inc.,*
 No. 18-5552, 2022 WL 910092 (E.D. Pa. Mar. 29, 2022) ...........................17

*Tucker v. PNC Bank, N.A.,*
 No. B323708, 2024 WL 4703474 (Cal. Ct. App. Nov. 7, 2024) .....................8

*Unicom Sys., Inc. v. Farmers Grp., Inc.,*
 No. 04-4604, 2007 WL 9705875 (C.D. Cal. June 12, 2007) ...................15 n.4

*WDT-Winchester v. Nilsson,*
 27 Cal. App. 4th 516 (1994) .......................................................................11

*Estate of Wemyss,*
 49 Cal. App. 3d 53 (1975) ...........................................................................17

**Statutes**

Cal. Civ. Code § 1442.............................................................................15 n.4

Cal. Civ. Code § 3360...............................................................................6, 7

**Other Authorities**

Webster's Dictionary (Merriam-Webster.com) ............................................13

Williston on Contracts § 38:13 (4th ed.)................................................15 n.4

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nuvia's motion for judgment as a matter of law misstates California law and rests on an erroneous interpretation of the Nuvia ALA. Once Arm terminated that contract, Nuvia had to "immediately discontinue any use and distribution of all ARM Technology" and "any products embodying such technology" and "either destroy or return" any "ARM Technology or derivatives" in its possession. (JTX-0001 § 15.1(a).) Nuvia does not dispute that it set out to design an Arm-compliant CPU core based on Arm's v8-A architecture, part of the "Arm Technology" delivered under the ALA. Nuvia therefore should have returned or destroyed the pre-acquisition code for its CPU design when Arm terminated the Nuvia ALA, rather than continuing to use that code in Qualcomm products. Nuvia makes the remarkable argument that the only derivatives of Arm Technology in its pre-acquisition code were a few opcodes and register definitions it could easily swap out. If Arm's industry-leading architecture added so little, it is hard to understand why Nuvia paid millions for a license. And it is equally hard to understand why Nuvia ever had a license to Arm's architecture under its narrow reading of the contract. The truth is Nuvia's CPU design and RTL code are derivatives of Arm's architecture and Arm Technology through and through.

Contrary to Nuvia's arguments, Arm presented sufficient evidence of harm. Nuvia erroneously asserts that Arm failed to provide evidence of appreciable and actual damages, and therefore cannot prevail on a breach of contract claim. But the law is well-settled in California that a plaintiff need not show appreciable and actual damages to prevail on a breach of contract claim. Nuvia's contrary arguments were squarely rejected in *Elation Systems, Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 964-67 (2021), a decision Nuvia never mentions. Moreover, Arm showed actual harm via evidence that Nuvia's breach caused Arm to receive lower royalty payments.

Arm also presented sufficient evidence that Nuvia breached § 15.1. The code Qualcomm acquired from Nuvia constituted the bulk of the code for what ultimately became an Architecture

Compliant Core ("ACC"). That falls squarely within the bounds of the "ARM Technology or derivatives" that Nuvia must return or destroy upon termination. (JTX-0001 § 15.1(a).) The Nuvia ALA is explicit that "ARM Technology and derivatives … includ[es] Architecture Compliant Cores." (JTX-0001 § 1.8.) Nuvia has no answer grounded in the language of the contract for why its obligation to return or destroy an ACC would not extend to a partially completed ACC. Rather than meaningfully engage with the contract language, Nuvia offers a grab-bag set of reasons for rewriting the terms of the contract. The Court should enforce the Nuvia ALA as-written, not a version of the agreement Nuvia now wishes it had negotiated.

## NATURE AND STAGE OF PROCEEDINGS

On December 16, 2024, the Court commenced a four-day jury trial, asking the jury to decide, among other things, whether Nuvia breached its contract with Arm ("Question 1"). (D.I. 569.) On December 20, the jury deadlocked on the issue, (Trial Tr. ("Tr.") 1000:3-1004:10), and the Court declared a mistrial (*id.* at 1017:5-1021:3). On January 17, 2025, Nuvia moved for judgment as a matter of law on that issue. (D.I. 597.) That same day, Arm moved for JMOL and a new trial as to Question 1, as well as the other questions presented to the jury. (D.I. 595.)

## STATEMENT OF FACTS

Arm developed an industry-leading instruction set architecture ("ISA") to facilitate energy-efficient, yet fast, processors. (Tr. 260:7-261:24, 267:19-268:8, 442:16-443:3, 512:6-14.) Stated simply, ISAs are a list of instructions that a CPU and software must both know how to perform. (Tr. 478:10-22.) These instructions enable essential compatibility between electronic devices and software, allowing software (*i.e.*, Microsoft Word) to "speak" the same language as a CPU for any Arm-based device (*e.g.*, smartphone, computer, tablet). (Tr. 260:7-261:24, 681:9-22, 684:20-685:8, 691:7-13.) Arm codifies its instructions in its "architecture reference manual," or "ARM," which engineers use to design CPUs. (Tr. 479:16-25.)

Arm monetizes its instruction set architecture through licenses. (Tr. 266:3-23.) These licenses—and the intellectual property they monetize—are central to Arm's business. (Tr. 263:22-264:13, 277:9-25.) One type of license Arm offers—and the one at issue here—is called an "Architecture License Agreement," or "ALA," in which Arm licenses its intellectual property (*i.e.*, its instruction set architecture) so that the licensee can write RTL (a software language used in designing CPUs) for Arm-compliant CPUs or cores. (Tr. 266:6-9.)

Nuvia was founded in February 2019 by engineers seeking to build Arm-compliant server CPUs. (Tr. 161:19-162:5, 421:2-11, 381:12-382:4, 388:20-22; PTX-103 at 2.) Nuvia told investors that it intended to build an "ARM v8" processor (PTX-0103 at 2), describing the license internally as a "critical" piece of its business plan. (PTX-0105 at 3.) After months of negotiation, (Tr. 384:3-5), Arm and Nuvia signed an ALA agreement for Nuvia to design its own Arm-compliant cores. (JTX-0001; JTX-0002; JTX-0005.) In the end, Nuvia paid $22 million of its start-up funds to acquire a license so that it could generate RTL to build and sell an ACC. (Tr. 440:7-10.) Contrary to Nuvia's efforts to treat the Nuvia ALA as an afterthought or a narrow license grant to 30 or so pages of supplemental material, this evidence shows that the Nuvia ALA was the foundation for Nuvia's efforts to develop an Arm-compliant CPU.

During negotiations, Arm and Nuvia agreed that the ALA would be "NULL" if Nuvia were acquired. (PTX-0122.) The Nuvia ALA imposed certain obligations on Nuvia if Arm terminated. Under Section 15.1(a), Nuvia had to stop using "ARM Technology," "ARM Confidential Information," and "any products embodying such technology or information." (JTX-0001 § 15.1(a).) Section 15.1(a) also required Nuvia to "destroy or return" any "ARM Technology," "ARM Confidential Information," or "derivatives" of Arm Technology. (*Id.*)

After reaching agreement on an ALA, Nuvia began work on an Arm-compliant CPU. Between 2019 and 2021, Nuvia developed RTL code for a processor called "Phoenix." (Tr. 390:8-24.) Nuvia intended to develop an ACC—which is expressly identified as a derivative of Arm Technology—under the Nuvia ALA. (Tr. 390:8-17 ("After Nuvia signed this Architecture License Agreement with Arm, Nuvia worked on building some RTL code that was known as Phoenix, right? A. Yes, the code name of the processor was Phoenix, and it was RTL that was written for it, yes. Q. And you said the plan was for that to be an architecture compliant core, that meant that it would be able to handle all of the ARMv8 Arm instructions, right? A. It was meant to be an architecture compliant core, but it was not yet an architecture compliant core.")

Nuvia's relationship with Arm soured in 2021, when Nuvia was acquired by Qualcomm. (PTX-0212 at 1-2; PTX-0234 at 2; Tr. 172:8-173:7, 216:14-23.) Pursuant to § 16.3 of the Nuvia ALA, Nuvia (through Qualcomm) asked for Arm's consent to assign the Nuvia ALA and code to Qualcomm. (Tr. 177:17-21; PTX-0253 at 1-2; PTX-0268.) Even though Arm did not consent (PTX-0240; PTX-0247; PTX-0260 at 2; Tr. 180:20-181:7, 226:21-24), Qualcomm and Nuvia transferred Nuvia's pre-acquisition code to Qualcomm, in breach of the Nuvia ALA. (Tr. 409:16-21, 410:2-21, 412:9-20, 552:9-20, 809:1-12, 810:1-21.)

After good-faith attempts at resolution of the parties' dispute, Arm terminated the Nuvia ALA, effective March 1, 2022. (JTX-0008.) Arm's termination required Nuvia to cease using and destroy ARM Technology, ARM Confidential Information, and derivatives of and products embodying ARM Technology. (JTX-0001 § 15.1.) Nuvia and Qualcomm, however, did not stop use of or destroy Nuvia's pre-acquisition code. (Tr. 409:16-21, 824:21-24; PTX-0650 at 1.) Instead, Qualcomm incorporated pre-acquisition Nuvia code into products it continues to sell today. (Tr. 409:16-21, 412:9-20, 552:9-20, 824:21-24.)

## LEGAL STANDARDS

JMOL is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Mancini v. Northampton*, 836 F.3d 308, 314 (3d Cir. 2016). The Court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." *Id.*

## ARGUMENT

### I.    ARM PRESENTED SUFFICIENT EVIDENCE OF HARM.

Nuvia contends Arm cannot establish breach, given the need to show "appreciable and actual damage" from the breach. (D.I. 598 ("Br.") at 4.) But Nuvia's argument misinterprets California law: well-settled precedent makes clear that Arm does not need to show actual damage from Nuvia's breach to prevail on a breach of contract claim; the breach itself is harm enough. Further, Arm presented sufficient evidence establishing that Nuvia's breach of the Nuvia ALA harmed Arm by resulting in lower royalty payments from Qualcomm for products based on pre-acquisition Nuvia code.

#### A.    Arm Does Not Need to Show Appreciable and Actual Damages.

Nuvia's argument that Arm needs to show appreciable and actual damages stumbles out of the gate. As an initial matter, Nuvia forgets that Arm sought specific performance, not monetary damages. (*See* D.I. 1 at 18; Tr. 101:2-7 ("[W]e're not seeking damages from the jury as a remedy, we're going to ask Your Honor for specific performance.").) When a plaintiff seeks specific performance, as here, it generally must show (among other things) that there is no "remedy at law"—i.e., there are *no* adequate and quantifiable appreciable or actual damages. *See Darbun Enters., Inc. v. San Fernando Cmty. Hosp.*, 239 Cal. App. 4th 399, 409 n.5 (2015) (listing elements of breach of contract claim seeking specific performance). Nuvia's argument flips this element on

its head, and tries to put Arm in a catch-22 by asserting that Arm is "required to identify 'appreciable and actual damage[s]'" for purposes of breach, but having done so, "the availability of damages is fatal to the specific-performance remedy Arm sought." (Br. at 4, 6.) This is contrary to governing California law.

Whether seeking monetary damages or specific performance, California law is clear that Arm need not show actual damages for purposes of establishing breach. The "inability to show actual damages does not preclude recovery for breach of contract." *Raiser v. Ventura Coll. of L.*, 488 F. App'x 219, 222 (9th Cir. 2012); *Lundy v. Facebook Inc.*, No. 18-cv-06793, 2021 WL 4503071, at *2 (N.D. Cal. Sept. 30, 2021) ("[A]n inability to show actual damages does not preclude recovery for breach of contract under California law."). Instead, a plaintiff may prevail on a breach of contract claim even where there is "no appreciable determinant to the party affected," because a "violation of a contractual right" supports a finding of breach and would justify at least nominal damages. *Elation Sys., Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 965 (2021); Cal. Civ. Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages"). This has been the law in California for more than sixty years. *See, e.g.*, *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (1959) ("A plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him."). While Arm presented evidence of much more than nominal damages, these principles suffice to reject Nuvia's argument.

Nuvia ignores this well-settled law, instead relying exclusively on the Ninth Circuit's decision in *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010 (9th Cir. 2000). (Br. at 4.) But California state and federal courts have repudiated *Aguilera* as out-of-step with California law. *See, e.g.*, *Elation*, 71 Cal. App. 5th at 964-67; *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F.

Supp. 3d 1218, 1258-59 (N.D. Cal. 2022). In *Elation*, the California Court of Appeal specifically rejected Nuvia's argument that a plaintiff must show "appreciable and actual damage" from the breach. 71 Cal. App. 5th at 964-67. Like Nuvia here, the defendant in *Elation* grounded its argument for an appreciable-harm requirement in the Ninth Circuit's *Aguilera* decision. *Id.* at 966-67. *Elation* rejected *Aguilera*'s reasoning, because it failed to follow "section 3360 and *Sweet*" and did not "consider[] the availability of nominal damages in the absence of actual damages." *Id.* at 967. And, in case there were any doubt about *Elation*'s reach, a federal court in *Meta Platforms* made clear that it was *Elation*, and not *Aguilera*, which controlled, stating that there is "no convincing evidence that the California Supreme Court would decide this issue differently from the *Elation Systems* court's conclusion." *See Meta Platforms*, 605 F. Supp. 3d at 1259.

That conclusion forecloses Nuvia's argument. As *Elation* held, even "[w]hen a breach of duty has caused no appreciable detriment to the party affected," the party can still win its breach claim "because failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages." *Elation*, 71 Cal. App. 5th at 965-66. Arm presented sufficient evidence that Nuvia breached the Nuvia ALA for the reasons explained in § II, *infra*. Arm therefore has presented sufficient evidence of harm, based on the breach alone. *Sweet*, 169 Cal. App. 2d at 632; *Elation*, 71 Cal. App. 5th at 965-66 (noting party with no actual damages may still seek specific performance); (*see also* D.I. 1 at 26 (seeking "damages incidental to specific performance"); Tr. 91:11-16 (explaining that Arm disclosed its theory that Nuvia "breached the deal so [Arm] ha[s] been harmed."); Tr. 850:21-23).

Nuvia also asserts that this legal proposition was "reflected in an uncontested jury instruction." (Br. at 4.) Not so. The jury instruction simply states that Arm must prove "Arm suffered harm"—not appreciable or actual damages. (*See* Tr. 885:20-23; *see also* D.I. 568 at 6.)

Nuvia mentions two other cases in passing, but both are inapposite. *Behnke v. State Farm Gen. Ins. Co*. turned on a failure to prove a breach that might support even nominal damages. 196 Cal. App. 4th 1443, 1468 (2011); *Tucker v. PNC Bank, N.A*., No. B323708, 2024 WL 4703474, at *5 (Cal. Ct. App. Nov. 7, 2024) (explaining that nominal damages could not be awarded where plaintiff "did not prove a breach") (unpublished). And *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co*. focuses on causation, in terms of whether there are "damages *resulting from the breach*." 101 Cal. App. 4th 1038, 1060 (2002) (emphasis in original).

### B.    There is Sufficient Evidence of Actual Damages.

Even if Arm had to show appreciable and actual damages, the evidence at trial established that Nuvia's breach caused Arm damages. A plaintiff can show actual damages by showing lost profits, *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 883 (2002), including lost royalty payments resulting from a breach, *Fisher v. Hampton*, 44 Cal. App. 3d 741, 747 (1975); *Bauer Bros., LLC v. Nike, Inc*., 159 F. Supp. 3d 1202, 1213 (S.D. Cal. 2016).

Here, evidence in the record shows that Nuvia's breach caused Arm to lose royalty payments. Arm wanted Qualcomm to pay the Nuvia rates for pre-acquisition Nuvia code used in Qualcomm products. (Tr. 228:8-18, 229:15-24, 247:11-248:4; PTX-0260.) Qualcomm, however, refused to pay those rates. (Tr. 223:20-21.) Arm therefore gave Qualcomm an option: pay the higher Nuvia rates, or Arm would exercise its rights under the contract and require Qualcomm to destroy the Nuvia code and start over. (Tr. 228:8-18, 229:15-24, 247:11-248:4; PTX-0260.)

In either scenario, if Nuvia had not breached its termination obligations, Arm would have received higher royalty rates. In the first scenario, Qualcomm would have paid the Nuvia ALA rates, which were "multiple times higher," (PTX-0277; Tr. 228:19-229:5, 735:10-12), than Qualcomm's rates. (*Compare* JTX-0005 at 10-11 (Nuvia royalties), *with* JTX-0011 at 20 (Qualcomm royalties).) In the second scenario, Qualcomm would have used CPUs licensed under

its TLA agreement with Arm, for which Qualcomm paid higher royalty rates than those in its ALA. (Tr. 229:8-14; PTX-0350 at 5 (Qualcomm projecting that it could save as much as "~$1.4B annually" in licensing costs if its ALA rates were applied rather than TLA rates).) By instead paying the Qualcomm ALA rates, Arm could lose $50 million or more in royalty payments per year. (Tr. 293:1-19; DTX-144.) This more than supports a jury verdict on harm.

Nuvia asserts that the Court precluded Arm from relying on this theory. Not so. At trial, the Court asked Arm whether it "disclose[d] that [it was] going to argue [harm from different royalty rates] during discovery." (Tr. 96:2-4, 102:1-7.) The answer is "yes." While Arm seeks specific performance (D.I. 1 at 18; Tr. 101:2-7), Arm made clear in discovery that *some* of its harm is quantifiable.[1] In Arm's response to an interrogatory asking why adequate damages were not ascertainable, Arm noted that "prospective monetary damages" were difficult to calculate. (D.I. 535, Ex. B at 61-62 (Arm Resp. to Interrog. No. 8).) But Arm also stated that "Defendants' anticipated underpayment of royalties owed to Arm" had harmed it and were calculable, even if additional harms—including the harm to Arm's business model—could not be remedied by money alone. (*Id.* at 62); *see also* Tr. 277:18-25 (Arm's CEO Rene Haas testifying that Arm needed to enforce its rights against Qualcomm's unlicensed use "as Arm is an IP company . . . and contracts are the only tool that we have to protect our inventions.").) Accordingly, Arm disclosed that the

---

[1] As Arm has consistently maintained, monetary compensation for lost royalties would not be adequate to compensate for the full harm that Defendants' breach imposes on Arm's licensing ecosystem. *See, e.g.*, *DVD Copy Control Ass'n v. Kaleidescape, Inc.*, No. 1-04-CV-031829, 2012 WL 12987159, at *26-27 (Cal. Super. Jan. 9, 2012) (finding irreparable harm where "an unaddressed breach of the License Agreement would likely beget follow-on breaches" that would "compromis[e] DVDCCA's authority to enforce the rules going forward"); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992, 997 (N.D. Cal. 2000) (finding irreparable harm where defendant's "unauthorized distribution of incompatible implementations" of plaintiff's technology threatened to "undermine" plaintiff's compatibility goals and harm relationships with licensees).

lost royalty rates had harmed it, and Nuvia was on notice that Arm would present evidence on differing royalty rates. (Tr. 91:17-92:15.) Nuvia cannot now ask the Court to ignore evidence presented to the jury. *Masimo Corp. v. Philips Elec. N. Am. Corp.*, C.A. No. 09-80-LPS, 2015 WL 2379485, at *20 (D. Del. May 18, 2015) ("[C]hallenges to . . . evidence are improper on a JMOL motion."). This is particularly true when Nuvia itself raised and emphasized the difference in royalty rates in its examinations. (*See, e.g.*, Tr. 293:1-19.)

Qualcomm's suggestion in a footnote that the jury's finding on Qualcomm's license defense and counterclaim somehow precludes breach is also wrong. First, that question is subject to Arm's Rule 50(b) motion and motion for a new trial; Nuvia's argument is thus contingent on the outcome of those motions. Moreover, even if Qualcomm were licensed, Nuvia has independent obligations under the termination provisions that trump any general license. *See Fed. Deposit Ins. Corp. v. Cap. Funding Corp.*, No. SA CV 14-00967-AB (ANx), 2015 WL 13916255, at *6 n.4 (N.D. Cal. Aug. 28, 2015) ("Distinct contracts impose distinct legal obligations, and, upon their breach, give rise to distinct claims for relief."). Nuvia cites no authority that supports its assumption that a license provided to one party might override more specific and independent contractual obligations for another.

## II.    ARM PRESENTED SUFFICIENT EVIDENCE NUVIA BREACHED.

Arm presented more than sufficient evidence that Nuvia breached § 15.1. As Arm explained in its pending post-trial motion, the evidence and the language of the contract in fact require judgment as a matter of law in Arm's favor on this issue. (D.I. 596 at 9-10.)

### A.    Nuvia's Code is a Derivative of ARM Technology.

The pre-acquisition Nuvia code is a "derivative" of "ARM Technology," as defined by the Nuvia ALA, and therefore is directly subject to Nuvia's obligations under § 15.1. In interpreting a contract, the Court begins with the words themselves. *Jamieson v. City Council of the City of*

*Carpinteria*, 204 Cal. App. 4th 755, 761 (2012). Where the language is "clear" and "explicit," this language "controls [the Court's] interpretation." *WDT-Winchester v. Nilsson*, 27 Cal. App. 4th 516, 528 (1994). The Court's goal is to understand the intention of the parties and interpret the contract with "reference to the circumstances under which it was made and the matter to which it relates." *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 752 (2017).

Upon termination by Arm, Section 15.1 generally requires Nuvia to stop using and destroy technology developed under the Nuvia ALA. Specifically, Section 15.1 requires Nuvia to "immediately discontinue" any "use and distribution" of (1) "ARM Technology," (2) "ARM Confidential Information," or (3) "any products embodying such technology or information." (JTX-0001 § 15.1(a).) Section 15.1 also requires Nuvia to "destroy or return to ARM" any "ARM Confidential Information" and "any ARM Technology or derivatives," including "any translation, modification, compilation, abridgment or other form in which the ARM Technology has been recast, transformed, or adapted." (JTX-0001 § 15.1.) The ALA expressly identifies an ACC as a non-limiting example of a "derivative" of "Arm Technology." (JTX-0001 § 1.8.)

Arm presented ample evidence from which a jury could conclude that "ARM Technology" includes the Arm architecture as codified in the Arm ARM. "ARM Technology"—which is directly subject to discontinuance and destruction under § 15.1, regardless of whether it is "Arm Confidential Information"—is defined as "the technology identified in *each* Annex 1 and any Updates thereto delivered by ARM to LICENSEE." (*Id.* § 1.5.) The September 2019 Annex 1 and March 2020 Annex 1 each contain a list of Arm Technology delivered to Nuvia, including the ARMv8-A Architecture itself (delivered under the September Annex 1) and the Arm ARM (delivered under the March Annex 1). (JTX-0002 at 2-3; JTX-0005 at 2-3.) Annex 1 identifies Part AR100-DA-70000 as part of the Arm Technology delivered under the ALA (JTX-0002 at 2;

JTX-0005 at 2) which both Mr. Williams and Mr. Abbey testified included the Arm ARM (Tr. 414:5-11; Tr. 169:3-22). Annex 1 also defines "Armv8-A Architecture Reference Manual" (which witnesses testified referred to the Arm ARM, *see* Tr. 370:7-15) as the documentation in Section 1 of Annex 1. (*See* JTX-0005 § A6.) And the contract defines "Documentation" to include the Arm ARM (JTX-0005 at § A.15), lists "Documentation" as one of the deliverables (*id.* at 2), and makes clear the Arm ARM is "Included Technology" based on its role in defining the Arm v8-A profile (*id.* at §§ A.18, A.9).

Taking a step back, that the Arm architecture and ARM is "ARM Technology" is inescapable. Nuvia wanted, and negotiated for, a license to make and sell products compliant with the Arm architecture's instruction set. (Tr. 381:9-182:25; 388:16-18; 422:15-24.) Nuvia, of course, could have chosen to follow another instruction set, (Tr. 685:13-22), but didn't. The Nuvia ALA gives Nuvia a license to use "ARM Technology." (JTX-0001 § 2.1.) If the Arm ARM and Arm's instruction set are not "ARM Technology" in the contract, then Nuvia never got a license to use the Arm architecture or ARM, and it would not be clear why Nuvia was paying millions of dollars to Arm for an "architecture" license. *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 526 (2003) ("[C]ourts must give a 'reasonable and commonsense interpretation' of a contract consistent with the parties' apparent intent.").

Arm also presented sufficient evidence for a jury to conclude that the Nuvia code is a "derivative" of "ARM Technology" like the v8-A architecture and the Arm ARM. (*See* Tr. 482:14–19.) The examples of derivatives in the ALA confirm the term is broad. The Nuvia ALA provides that "derivatives" of Arm Technology include "any translation, modification, compilation, abridgement or other form in which the ARM Technology has been recast, transformed or adapted." (JTX-0001 § 1.8.) This is consistent with the ordinary and popular

definition of "derivative": something "made up of or marked by derived elements." (*Derivative,* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/derivative (last visited Feb. 14, 2025).) Nuvia's pre-acquisition RTL code—which was developed based on the Arm architecture as specified by the Arm ARM—is a "translation" or other "form" (*i.e.*, implementation) of Arm's instruction set that has been "recast" or "adapted" into something else (a core design). (JTX-0001 § 1.8.) There is no dispute that Nuvia's code implemented Arm's instructions: Nuvia obtained an ALA license so it could design an Arm-compliant core, (PTX-0103 at 2), and it developed its pre-acquisition code to be compliant with Arm's architecture, consulting the Arm ARM in doing so (Tr. 390:8-17; 490:8-491:22; 558:7-12; 559:12-14 ("Q. As part of your job at Nuvia in 2020, you would have consulted that Arm version eight architecture specification? A. Yes."); 689:16-692:17; 694:18-695:9; 696:4 698:1; 357:20-25; DTX-358.)

Further, the ALA makes clear that an ACC—the very thing Nuvia was developing under its ALA, as made clear in Annex 1—is a derivative of the Arm Technology. (JTX-0001 § 1.8 (listing ACC as a derivative); JTX-0005 § A.5 (defining "Architecture Compliant Core" as "a microprocessor core *developed by LICENSEE [Nuvia]* under the licenses granted in this Annex 1").) Nuvia's code is a partially complete ACC, and thus a derivative. (Tr. 390:8-24.)

For the same reasons, the Qualcomm products incorporating pre-acquisition Nuvia code are "product[s] embodying" the "ARM Technology," subject to the termination obligations of § 15.1. (JTX-0001 § 15.1.)[2] As witnesses explained, Arm's instruction set in the Arm ARM is "the description of the behavior of an abstract machine," but the *implementation* of those instructions

---

[2] Nuvia's RTL code fits this description: it "embodied," i.e., "made concrete," Arm's instruction set. (*Embody*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/embody (last visited Feb. 14, 2025).)

is "an embodiment of that abstract machine." (Tr. 598:16-599:2; *see also* Tr. 491:20-22 ("[D]esigns that are intending to be Arm compliant, must embody parts of the Arm ARM").) Because the Nuvia code implementing Arm's architecture "embod[ies] parts of the Arm ARM," (Tr. 491:9-22), products incorporating that code also embody Arm Technology for purposes of Section 15.1.

Both Mr. Williams and a former Nuvia engineer, Jignesh Trivedi, admitted that, prior to Nuvia's acquisition by Qualcomm, Nuvia was developing code for an ACC, specifically for the Armv8-A Architecture. (Tr. 390:8-17, 558:7-12.) Because Nuvia's pre-acquisition code was designed to comply with the Armv8-A Architecture, that code is derivative of the Armv8-A Architecture. With the benefit of his extensive experience with CPU architectures, Dr. Colwell agreed that the Nuvia's code was a derivative of Arm Technology. (Tr. 490:8-491:22.)

Dr. Colwell and Dr. Chen also testified that the pre-acquisition code was reused after termination. (Tr. 490:8-491:22, 536:12-538:5.) Mr. Williams and Qualcomm's witnesses admitted the same thing. (Tr. 409:16-21, 410:2-21, 412:9-20, 426:5-11, 552:9-20, 705:12-20, 809:1-12.) Arm thus presented more than enough evidence to survive JMOL on the issue of breach.

**B.    Nuvia's Excuses for Ignoring Its Contractual Obligations Fall Flat.**

1.    *Nuvia and Arm Technology Are Not Mutually Exclusive.*

Nuvia contends that the pre-acquisition Nuvia RTL is "Nuvia Technology," and therefore cannot also be a derivative of "ARM Technology." But this argument rests on an illusory distinction. Nothing in the contract requires code to be *either* "ARM Technology" or "Nuvia Technology." Instead, the contract permits technology to be both, listing an "Architecture Compliant Core" both as ARM Technology and Nuvia Technology. (*See* JTX-0001 § 1.8.) Further, the ALA expressly identifies an ACC as a derivative of Arm Technology, even though the entire purpose of the ALA was to have Nuvia write the code for an ACC, reinforcing that

14

Nuvia Technology is not an exclusive subset distinct from derivatives of Arm Technology. (JTX-0001 § 1.8; JTX-0005 § A.5 (defining "Architecture Compliant Core" as "a microprocessor core *developed by LICENSEE [Nuvia]* under the licenses granted in this Annex 1").)

The testimony at trial makes clear that the purpose of the "Nuvia Technology" definition was the opposite of what Nuvia asserts. Contrary to Nuvia's argument, the "Nuvia Technology" definition was not included as a *shield* to protect Nuvia's code from destruction under § 15.1(a).[3] Instead, the "Nuvia Technology" definition was included as a *sword* to prevent use of Nuvia's work in Arm products. Under the Nuvia ALA, Nuvia could not assert so-called "Essential Claims" in Nuvia's patents against Arm if Arm developed a CPU implementing those claims. (JTX-0001 §§ 1.11, 2.18.) Nuvia therefore sought a definition of "Nuvia Technology" and corresponding destruction requirements in § 15.1(b) "to protect [Nuvia's IP] that is not essential claims" and keep its designs out of Arm TLA products. (Tr. 164:13-25; 389:23-390:6 (provision included "to protect Nuvia technology"; DTX-1095); *see also* Tr. 435:10-24; 465:7-16; DTX-1113.)

> 2.    *It Is Irrelevant That the Arm ARM Is Public.*

Nuvia claims that "ARM Technology" only includes confidential information, (Br. at 10-13), and thus the Arm ARM, as a public document, is not "Arm Technology." (*Id.*) Nuvia swats away the presence of "ARMv8-A Architecture – Specifications" in the list of ALA deliverables—which witnesses testified referred to the Arm ARM—as instead referring to additional confidential "extensions" (*i.e.*, edits) Arm made to the Arm ARM. (*Id.*)

Nuvia ignores contract language that directly refutes its argument. For example, Nuvia's

---

[3] California's policy against forfeitures applies only where there is an ambiguity, and Nuvia fails to identify one. *See Unicom Sys., Inc. v. Farmers Grp., Inc.*, No. 04-4604-GHK, 2007 WL 9705875, at *13 (C.D. Cal. June 12, 2007) (applying Cal. Civ. Code § 1442 "to the extent that the terms [in the license] are ambiguous"); *cf* Williston on Contracts § 38:13 (4th ed.) (no preference for interpretation reducing risk of forfeiture where risk assumed.)

contention that "Armv8-A Architecture Reference Manual" is not present in Section 1, Annex 1 is beside the point. The "Armv8-A Architecture Reference Manual" (i.e., the Arm ARM) is defined as everything in Section 1, Annex 1, and therefore is "ARM Technology." (*See* JTX-0005 § A.8 (Arm ARM is "the documentation identified in Section 1 Subsection 1 Part A of this Annex 1").) Furthermore, as discussed above (*see supra* § II(A)), "Documentation," is defined to include the Arm ARM, and "Documentation," is in turn expressly listed as a deliverable.

Nuvia's argument relies on defining "ARMv8-A Architecture – Specifications" to mean "extensions." (Br. at 11-12.) Never mind that "extensions" is used elsewhere in the ALA separate from specifications. (*See* JTX-0005 §§ A.3, A.4, A.18.) And never mind that witnesses testified that "ARMv8-A Architecture – Specifications" refers to the Arm ARM. (Tr. 370:9-17 (explaining that "Armv8-A Architecture Reference Manual" refers to the Arm ARM).) All Nuvia can muster in support is off-hand testimony by witnesses not directly addressed to this issue. (*See* Br. at 11.) When the witnesses Nuvia relies on *did* address the issue, they clarified that the Arm ARM was included as "ARM Technology." (*E.g.*, Tr. 371:5-9 (testimony of Mr. Williams) ("Q. But in the Architecture License Agreement that you signed with Arm, you got a license to use that documentation, the ArmV8-A Architecture Reference Manual, to make architecture compliant cores, right? A. That's what this terminology says, right.").)

Without a textual hook or trial testimony, Nuvia is left arguing that rejecting its interpretation will lead to the "bizarre result" of Nuvia having to destroy a public document. (Br. at 12.) That argument is a non sequitur. The real dispute is not over the destruction of a reference manual, but rather Nuvia's continued use of code designed based on Arm's architecture and reference manual after Nuvia lost its license. This highlights why the real "bizarre result" would be *accepting* Nuvia's interpretation. If "ARM Technology" does *not* include the Arm ARM and

Arm's architecture, then Nuvia never received a license to design and sell Arm-compliant custom cores. (*See* JTX-0001 § 2.1; JTX-0005 § B.1.) That interpretation would be at odds with the overwhelming evidence in the record and intention of the parties. (*See supra* § II(A).) Even if there were tension arising from the plain language of the ALA defining the term Arm Confidential Information to include otherwise public Arm Technology, it would not be enough reason for the Court to rewrite the express terms of the contract. *Rodriguez v. American Technologies, Inc*., 136 Cal.App.4th 1110, 1122 (2006) ("While we may question the wisdom of the parties' choice, . . . the parties were free to choose their [contractual agreement].").

### 3. *Nuvia's Overbreadth Argument is Baseless.*

Unhappy with the contract language, Nuvia protests that the contract language would lead to "astounding overbreadth," giving Arm the right to "control . . . most CPUs worldwide." (Br. at 13.) Not so. Under Arm's ALA with Nuvia, Arm can seek destruction of Nuvia's code only if Nuvia materially breaches the contract and Arm terminates. A comparison with the Qualcomm ALA is dispositive on this point: the Qualcomm ALA grants Qualcomm the "███████████████████ ████████████████████████████████████████████████████████ ████████████████" even after termination, so long as "████████████████████████████ ██████████████████████████████████████████." (JTX-0010 ████.) The Nuvia ALA, in contrast, does not provide post-termination rights to continue using designs developed under the now-terminated ALA. It is not the Court's job to rewrite contracts to give Nuvia post-termination rights it never sought or obtained. *Rodriguez*, 136 Cal.App.4th at 1122.

Nuvia next completely abandons the contract language and moves the goal posts: it ports over a "substantial similarity" test from the Copyright Act and claims that the Nuvia RTL is not "substantially similar" to the Arm ARM. (Br. at 13-16.) Nuvia's retreat to the Copyright Act should be rejected: the terms of the contract are clear, and "there is no reason to look at the text of a

statute" where the agreement "contains no suggestion that its interpretation should be informed by the Copyright Act." *T.N. Incorporation, Ltd. v. Fidelity Nat'l Info. Servs., Inc.*, C.A. No. 18-5552, 2022 WL 910092, at \*9 n.6 (E.D. Pa. Mar. 29, 2022); *see Estate of Wemyss*, 49 Cal.App.3d 53, 59 (1975) ("[C]ourts are not empowered under the guise of construction or explanation to depart from the plain meaning of the writing and insert a term or limitation not found therein."). Further, importing tests from the Copyright Act would contradict the express terms of the contract, because the Nuvia ALA expressly identifies an ACC as an example of a "derivative." (JTX-0001 § 1.8.) Nuvia argues that the Nuvia code is not "substantially similar" to the Arm ARM, (Br. 1at 5), meaning that an ACC would flunk Nuvia's test for a derivative of Arm Technology, despite the ALA expressly identifying an ACC as a derivative of Arm Technology. (*See* JTX-0001 § 1.8.)

### 4.    *Nuvia's Focus on Opcodes and Register Definitions Is Wrong.*

Nuvia contends that the Nuvia code is not a derivative of the Arm ARM because "the only aspects of the Arm ARM present in the Nuvia RTL were opcodes and register definitions." (Br. at 17.) Nuvia asserts that, because these aspects were "1% or less" of the Nuvia RTL and otherwise regenerated by Qualcomm, derivatives of the Arm ARM are not a "material part" of the Arm-compliant Nuvia code. (*Id.*) Nuvia's argument is not just wrong, but requires the Court to accept Nuvia's (not Arm's) side of a disputed evidentiary issue.

Nuvia's argument wrongly assumes that the opcodes and register definitions are the only features in the Nuvia code that are derivatives. As explained by Dr. Colwell, however, the Nuvia code was designed to reflect numerous components of the Arm architecture, including the Arm server base architecture, Arm exception levels, and Arm architecture extensions. (Tr. 483:14–485:22; *see also* Tr. 558:20-22, 559:19-23.) Further, Dr. Colwell reviewed the Nuvia code beyond just the opcodes and register definitions (Tr. 486:14-16) and found references to Arm features "all over it." (Tr. 491:9-22.) Qualcomm's expert, Dr. Annavaram, admitted that the Nuvia RTL

contains references to other Arm features. (Tr. 689:16-699:12.) Additionally, Dr. Annavaram admitted that the pre-acquisition Nuvia RTL implemented "maybe . . . a third" or "half" of the thousands of instructions specified in the Arm ARM. (Tr. 686:15-687:4, 679:14-23.) Accordingly, regardless of whether Qualcomm may have updated certain opcodes or register definitions, other aspects of the pre-acquisition Nuvia code were derivative of Arm Technology. And Arm presented evidence at trial that portions of Nuvia's pre-acquisition code remained present in Qualcomm's products both after Qualcomm acquired Nuvia and after termination. (Tr. 536:12-537:13.)

The bigger problem with this argument is that Nuvia has essentially thrown in the towel when it comes to interpreting the contract language. Nuvia's opcode argument does not discuss the concept of "derivative," or try to interpret it in the context of the contract or according to its ordinary meaning. Nor does Nuvia explain why it again refers to the Copyright Act, this time to analyze whether the opcodes' presence makes the code a "derivative." (*See* Br. at 17 (citing Copyright Act case and suggesting the Nuvia code is not "derivative" because opcodes and register definitions are not a "material part" of the Arm ARM).) Nuvia ultimately has no answer for why it would pay millions for an ALA that permits it to design an ACC using the Arm architecture as specified in the Arm ARM if all this involved was copying a few register definitions and opcodes. Nuvia did not license Arm's opcodes; it licensed Arm's architecture as specified in the Arm ARM.

In sum, Arm presented ample evidence at trial that pre-acquisition Nuvia code is derivative of Arm Technology and remains incorporated in Qualcomm products, thereby breaching Section 15.1. (Tr. 536:12-537:13 (Dr. Chen testifying that Qualcomm's Hamoa, Pakala, Nordschleife, and Pegasus cores shared 40-70%, 30-55%, 30-55%, and 20-45% identical lines of code with the Nuvia pre-acquisition code, respectively)).)

5.      *Partially Complete ACCs Are Derivatives of Arm Technology.*

Nuvia separately asserts that a partially completed ACC (like the pre-acquisition Nuvia code) is not a derivative of "ARM Technology," even if a completed ACC indisputably is. (Br. at 18.) But the express identification of an "Architecture Compliant Core" as a non-limiting example of a "derivative" of "Arm Technology" is a strong confirmation that the Nuvia code (a partially complete ACC) is too. (*See supra* II(A).) Qualcomm's own Vice President identified Nuvia's Phoenix core as an ACC. (Tr. 357:20-25.)

Further, there was sufficient evidence that Nuvia's pre-acquisition code, even if not yet a completed ACC, is a "derivative" of the ARMv8-A Architecture and the Arm ARM (both of which are "Arm Technology" delivered under the Nuvia ALA). For example, Dr. Colwell testified that, given his extensive experience with CPU architectures, Nuvia's code was a derivative of Arm Technology. (Tr. 490:8-491:22.)

Nuvia nonetheless argues that, because it "intended to build a *Nuvia* Architecture Compliant Core," the Nuvia code cannot be an ACC. (Br. at 18-19.) But that is flatly inconsistent with the definition of ACC in Annex 1 (a core developed by Nuvia under the ALA), and the Nuvia ALA does not define "Nuvia Architecture Compliant Core" to be exclusive of an ACC. (*See* JTX-0001 § 1.8(ii).) The testimony Nuvia points to is about the "Nuvia Technology" term and a *TLA* contract. (Tr. 432:11-434:8.) Whatever its purpose, Nuvia does not explain how that term could negate its obligations under § 15.1(a) with respect to derivatives of Arm Technology.

## CONCLUSION

The Court should deny Nuvia's motion and grant Arm's parallel Rule 50(b) motion.

Dated: February 14, 2025

OF COUNSEL:

Gregg F. LoCascio, P.C.
Jason M. Wilcox, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
glocascio@kirkland.com
jason.wilcox@kirkland.com

Jay Emerick
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Daralyn J. Durie
Shaelyn Dawson
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000
ddurie@mofo.com
sdawson@mofo.com

Erik J. Olson
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
(650) 813-5600
ejolson@mofo.com

Scott F. Llewellyn
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202
(303) 592-2204
sllewellyn@mofo.com

Nicholas Rylan Fung
MORRISON & FOERSTER LLP

YOUNG CONAWAY STARGATT &
TAYLOR, LLP


*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com


*Attorneys for Plaintiff Arm Ltd.*

21

707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5348
nfung@mofo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 14, 2025, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Isaac B. Zaur
Nora Niedzielski-Eichner
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001
izaur@cgr-law.com
nniedzie@cgr-law.com

Catherine Nyarady
Anna R. Gressel
Jacob A. Braly
Alexander M. Butwin
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
cnyarady@paulweiss.com
agressel@paulweiss.com
jbraly@paulweiss.com
abutwin@paulweiss.com

Karen L. Dunn
William A. Isaacson
Melissa F. Zappala
Erin J. Morgan
Anna P. Lipin
William T. Marks
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
kdunn@paulweiss.com
wisaacson@paulweiss.com
mzappala@paulweiss.com
ejmorgan@paulweiss.com
alipin@paulweiss.com
wmarks@paulweiss.com

Andrea L. D'Ambra
Susana Medeiros
Kira Latham
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
andrea.dambra@nortonrosefulbright.com
susana.medeiros@nortonrosefulbright.com
kira.latham@nortonrosefulbright.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Arm Ltd.*